UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC.,<br>TELEXFREE FINANCIAL, INC.,<br><br>    Debtors | Chapter 11<br>Case No. 14-40987-MSH<br>Case No. 14-40988-MSH<br>Case No. 14-40989-MSH<br><br>Jointly Administered |
| STEPHEN B. DARR, Chapter 11 Trustee,<br><br>    Plaintiff,<br><br>vs.<br><br>BENJAMIN ARGUETA, ALEXANDRO ROCHA, JOSE NETO, JULIO C. PAZ, EUZEBIO SUDRE NETO, HUGO ALVARADO, ANA R. RAMOS, LINDA SUZANNE HACKETT, RUDDY ABREAU, MARCO ALMEIDA, RODRIGO MONTEMOR, LAUREANO ARELLANO, AARON ATAIDE, ROSANE CRUZ, OMAR QUINONEZ, CARLOS C. DEJESUS, BILKISH SUNESARA, ANDRES BOLIVAR ESTEVEZ, JOSE LOPEZ, ANA ROSA LOPEZ, FRANTZ BALAN, MARCELO DASILVA, GLADYS ALVARADO, AND A DEFENDANT CLASS OF NET WINNERS,<br><br>    Defendants | Adv. Proc. No. |

**AFFIDAVIT OF STEPHEN B. DARR IN SUPPORT
OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

    I, Stephen B. Darr, hereby submit the following affidavit in support of the *Plaintiff's Motion for Class Certification*.

1

## Introduction

1. I am the duly appointed Chapter 11 trustee (the "Trustee") in these cases, having been appointed by order of the Court dated June 6, 2014.

2. I am a Managing Director with the Business Advisory Practice of Huron Consulting Services, LLC. I have more than 35 years of experience providing accounting, auditing and financial consulting services to business organizations many of which are experiencing significant financial and operating difficulties. I am a Certified Public Accountant in Massachusetts and New Hampshire, a Certified Insolvency and Restructuring Advisor and hold certifications in Distressed Business Valuation and other professional qualifications.

3. The statements provided herein are based upon information and knowledge I have derived through my involvement in these Chapter 11 cases, as further set forth herein.

4. During the course of my investigative duties in these cases, my colleagues and I have examined the Debtors' books and records that were seized from the Debtors by federal authorities, electronic copies of which were provided to me, as well as documents produced by third parties in response to numerous motions for Federal Rule of Bankruptcy Procedure 2004 examinations. I and my professionals have conducted interviews of the Debtors' former employees and consultants, as well as professionals retained by the Debtors during the Chapter 11 cases. I have also reviewed the docket in these cases.

## I. BACKGROUND AND PROCEDURAL POSTURE

5. On April 13, 2014 (the "Petition Date"), each of TelexFree, Inc., TelexFree, LLC, and TelexFree Financial, Inc. (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") with the United States Bankruptcy Court for the District of Nevada ("the Nevada Bankruptcy Court").

6. The Debtors initially operated as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7. On the Petition Date, the Debtors filed a motion for joint administration of the cases, with TelexFree, LLC designated as the lead case. By order dated April 24, 2014, the order for joint administration was approved.

8. On or about April 22, 2014, the Office of the United States Trustee filed a motion for the appointment of a Chapter 11 Trustee based upon allegations of illegal activity.

9. On April 23, 2014, the SEC filed a motion to transfer venue of the cases to the United States Bankruptcy Court for the District of Massachusetts (the "Court"). By order dated May 6, 2014, the motion to change venue was approved. The cases were transferred to the Court on May 9, 2014.

10. On May 30, 2014, this Court allowed the United States Trustee's motion to appoint a Chapter 11 trustee, and I was appointed on June 6, 2014.

11. On October 7, 2015, the Trustee filed a *Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief* (the "Ponzi Motion"). By order dated November 24, 2015, as amended by order dated December 21, 2015, the Court found that the Debtors engaged in a Ponzi scheme and that such finding was the law of the case.

### A. Mechanics of Scheme and Methods of Compensation

12. The Debtors purported to be in the business of selling a voice over internet service, or "VoIP" that cost $49.90 per month to conduct international phone calls. The sale of VoIP on a monthly basis is hereinafter referred to as a "VoIP Package". Customers who purchased the VoIP Package registered their phone numbers with the Debtors and received software that

3

enabled their computers to place phone calls through the Debtors' computer servers in Marlborough, Massachusetts to approximately 40 countries.

13. The Debtors ostensibly used a multi-level marketing plan, or "MLMP", to sell the VoIP Packages.

14. Until they purported to change their MLMP in March 2014, the Debtors provided Participants with two options to become members and to thereby open User Accounts:

    a. "AdCentral Plan": $339 for a one-year contract ($50 membership fee plus $289 contract fee). This contract entitled the User Account holder with the right to sell ten VoIP Packages, as to which a Participant could receive a commission if the packages were sold, although there was no sale requirement. Participants were required to place one internet ad per day and, for each week in which the Participant placed the required ads, he/she was entitled to one additional VoIP Package, which could be sold or exchanged for $20 in credits with the Debtors. Thus, Participants who posted the required ads were eligible to receive $20 per week for 52 weeks, for a total return of $1,040 (a return of 207% on the investment of $339).

    b. "AdCentral Family Plan": $1,425 for a one-year contract ($50 membership fee plus $1,375 contract fee). This contract entitled the User Account holder with the right to sell fifty VoIP Packages, as to which a Participant could receive a commission if the packages were sold, although there was no sale requirement. Participants were required to place five internet ads per day and, for each week in which the Participant placed the required ads, he/she was entitled to five additional VoIP Packages, which could be sold or exchanged for $100 in credits with the Debtors. Thus, the Participants who posted the required ads were eligible to receive $100 per week for 52 weeks, for a total return of $5,200 (a return of 265% on the investment of $1,425).

15. In addition to credits for posting these advertisements, the Debtors issued credits to Participants for the sale of membership plans and the establishment of new User Accounts as follows:

    a. $20 in credits for each new Ad Central Plan and $100 in credits for each new AdCentral Family Plan in a Participant's network.

4

  b. $20 in credits for each User Account in one's "network," up to a maximum of $440, as long as there were two subsidiary User Accounts.

  c. 2% of all payments to each User Account within one's network, down to six "levels" of the network, provided that each User Account had a registered VoIP customer.

  d. 2% of the Debtors' net monthly billing, up to a maximum of $39,600 in credits, for an AdCentral Family Plan that had ten new AdCentral Family Plans in its network, so long as each plan had five registered VoIP customers.

16. The Debtors also issued credits to Participants for the sale of VoIP Packages as follows:

  a. 90% (or $44.90 in credits) for the initial sale of a VoIP Package at $49.90.

  b. 10% (or $4.99 in credits) per month for the renewal of a VOIP Package by a User Account holder directly in one's network[1] and 2% (or $0.99 in credits) per month for the renewal of a VOIP Package by a User Account holder indirectly in one's network, down to six levels of the network.

  c. 2% from all VoIP Package sales in one's network, down to six levels of the network.

17. The credits issued to Participants for placing advertisements and selling membership plans and VoIP Packages could be redeemed for cash, transferred to another User Account, or applied in satisfaction of an invoice for another User Account.

18. Invoices for the purchase of a membership plan could be satisfied in one of two ways. Participants could pay the invoice in cash directly to the Debtors or Participants could pay a recruiting Participant for the purchase of a membership plan through the recruiting Participant's redemption of credits in an existing User Account.

19. In the case of a Participant satisfying his/her own invoice directly by payment in cash to the Debtors, the process worked, generally, as follows:

---

[1] In practice, the Debtors appear to have provided Participants with credits equal to ninety percent (90%) of the renewal fees.

5

(i) The Participant established an online account;

(ii) The Debtors' database recorded the data entered by the new Participant and the identity of the recruiting Participant, and assigned an identification number to the new User Account;

(iii) The Debtors recorded the purchase, issued a numbered invoice, and marked the invoice as 'pending';

(iv) A Participant could pay the invoice by cash, check, cashier's check, wire transfer, or through a third-party online payment processing account. When the invoice was paid, the Debtors would update the invoice;

(v) The new Participant could then start building a pyramid underneath the newly created User Account by recruiting other members (or by purchasing new User Accounts themselves) and generating bonuses and commissions.

20. Alternatively, as described below, a Participant could satisfy his/her own invoice directly by payment in cash to another Participant, who would satisfy the invoice by a redemption of accumulated credits. Thus, the new Participant's membership fee was paid directly to the recruiting Participant, rather than to the Debtors.

21. There are 10,987,617 User Accounts associated with the Debtors' MLMP, involving up to 1,900,000 Participants. Many Participants maintained multiple User Accounts, and some had hundreds, or even thousands, of User Accounts.

22. As noted above, a Participant could monetize accumulated credits by recruiting a new Participant to join the Debtors' scheme and using his/her accumulated credits to satisfy the invoice for the new Participant's membership plan in exchange for payment of the membership fee from the new Participant (a "Triangular Transaction"). In a Triangular Transaction, the Debtors issued the membership invoice to the recruited Participant, the recruited Participant paid the membership invoice that was due to the Debtors instead to the recruiting Participant, and the Debtors redeemed the credits of the recruiting Participant in satisfaction of the invoice.

23. In a Triangular Transaction, the process generally worked in the same manner outlined above except that:

(i) A Participant created his/her online account, or used their existing account information, to establish a new User Account;
(ii) The Debtors' database recorded the details entered by the new Participant and assigned an identification number to the new User Account;
(iii) The Debtors recorded the purchase, issued an invoice to the new User Account, and marked the invoice as 'pending';
(iv) The new Participant forwarded the invoice to the recruiting Participant, who satisfied the invoice with accumulated credits in the existing User Account;
(v) The new Participant paid the invoice amount to the recruiting Participant (in those cases where there were two separate Participants involved).

24. In fact, it was a regular practice of the Debtors' scheme for membership fees to be paid by the use of accumulated credits rather than by cash.

25. While invoices associated with the sale of membership plans or VoIP Packages had a face value of $3,073,471,326, only $359,792,242, or approximately twelve percent (11.7%) of that amount, was paid in cash to the Debtors. The balance of these invoices, totaling $2,713,679,084, was satisfied by the use of Participants' credits.

**B.     SIG/Back Office**

26. The Debtors maintained two computer applications for accessing and processing information from the Debtors' database relating to User Account activity, referred to as "SIG" and the "Back Office".[2]

27. SIG stands for Sistemas de Informacoes Gerenciais, which is Portuguese and translates roughly to "Information Management System." SIG tracked the activity for Participants by User Account, and the User Accounts are the only records available to confirm Participant activity.

---

[2] The Back Office was the program used by Participants to obtain information on their User Account activity.

7

28.     Each time that a Participant purchased a membership plan or VoIP Package, an account was established with SIG (the "User Account"). After a User Account was established, SIG tracked the activity of the Participant in that User Account, including the accumulation of credits for bonuses and commissions 'earned', the use or transfer of credits between User Accounts, and payments made to or from the Participant directly with the Debtors.

29.     At the time a User Account was created, Participants were asked to input into the Debtors' database their name, email address, passcode, and other identifiying information (the "Common Identifiers"). SIG did not contain a mechanism to automatically link or aggregate all User Accounts of a Participant. Through the use of algorithms linking Common Identifiers, however, the Trustee is able to determine a Participant's User Accounts ("Related User Accounts").

30.     Although, as in most Ponzi schemes, the vast number of Participants lost money, approximately 15,000 Participants are believed to be Net Winners, defined as any Participant who received more from their involvement in the scheme, either directly from the Debtors or through Triangular Transactions, than such Participant paid out during the scheme, either directly to the Debtors or through Triangular Transactions.[3] Within the class of Net Winners are Participants who also received preferential transfers, that is, they received more than they paid out during the ninety days prior to the bankruptcy filings as a result of their involvement in the scheme. The list of Net Winners was prepared by the Trustee using algorithms to link the Common Identifiers for individual Participants.

## II.    CLASS CERTIFICATION IS APPROPRIATE

---

[3] Additionally, there are approximately 78,000 persons who are net winners and reside outside of the United States who will be subject to a separate action.

8

31. There are approximately 15,000 Net Winners dispersed throughout the United States. There are too many Net Winners, as a practical matter, to join all Defendants in a single action, and a separate suit against each Defendant is also not practical.

32. There are questions of fact that are common to each of the Defendant class members.

33. Issues common to each member of the Net Winner Class include, among other things: (i) what transfers should be included in the determination of a Net Winner; (ii) whether Net Winners should be determined by an aggregation of Related User Accounts; (iii) whether the Net Winner Payments are avoidable as fraudulent transfers because the Debtors had the actual intent to hinder, delay, or defraud creditors; (iv) whether the Net Winner Payments are avoidable as fraudulent transfers because the transfers were made for less than fair consideration while the Debtors were insolvent, undercapitalized, or unable to pay debts as they became due; (v) whether the Net Preference Payments may be recovered as preferential transfers; (vi) whether the Court's finding that the Debtors engaged in a Ponzi and pyramid scheme may be applied, along with any applicable presumptions, in determining the Trustee's claims.

34. There are some individual issues of fact in the cases, namely the date and amount of each avoidable payment. But the common issues are "capable of classwide resolution," and in fact they *require* classwide resolution to avoid a multiplicity of suits that run the risk of inconsistent adjudications.

35. Each of the Net Winners is identically situated. Because the Debtors have been found to have operated a Ponzi scheme, all of the causes of action asserted, avoidance of fraudulent transfers and avoidance of preferential transfers, turn on the activity of the Debtors, not of the Net Winners. Even without the Ponzi finding and presumptions that follow from such

finding, the issues—aside from the dates and amounts of particular transactions—are readily susceptible of class treatment.

36. As set forth above, the only issue that is unique to each class member pertains to the amount of each member's Net Winnings and the date of the transactions in question. The Complaint proposes a procedure, to take place after the Court has ruled on the class issues, that will address the computation of liability for each class member.

37. The Trustee has selected a group of potential class representatives, each of whom is a significant Net Winner and should therefore have the resources to conduct a proper defense and adequately represent the interests of the Defendant class. There has not been any collusion between any putative class representative and the Trustee.

I attest that, to the best of my knowledge, the foregoing is true and accurate.

Dated: January __, 2016

                                                      Stephen B. Darr
                                                      Chapter 11 Trustee

701092