UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>          Debtors. | Chapter 11 Cases<br><br>14-40987-MSH<br>14-40988-MSH<br>14-40989-MSH<br><br>Jointly Administered |
| STEPHEN B. DARR AS HE IS TRUSTEE OF<br>THE CHAPTER 11 ESTATES OF<br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>          Plaintiff,<br>v.<br><br>CARLOS WANZELER, ET AL,<br>          Defendant(s). | Adversary Proceeding<br>No.16-4032 |
| STEPHEN B. DARR AS HE IS TRUSTEE OF<br>THE CHAPTER 11 ESTATES OF<br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>          Plaintiff,<br>v.<br><br>BENJAMIN ARGUETA, ET AL<br>          Defendant(s). | Adversary Proceeding<br>No.16-4006 |

**MOTION BY TRUSTEE TO APPROVE STIPULATION OF SETTLEMENT BETWEEN
CHAPTER 11 TRUSTEE AND SANDERLEY RODRIGUES**

Stephen Darr, the duly appointed Chapter 11 Trustee (the "Trustee") of TelexFree, LLC,

TelexFree, Inc. and TelexFree Financial, Inc. ("TelexFree" or the "Debtors"), respectfully

requests that the Court approve the stipulation ("Stipulation") attached hereto by and between the Trustee and Sanderley Rodrigues de Vasconcelos ("Rodrigues"), pursuant to Federal Rule of Bankruptcy Procedure 9019. The Stipulation is anticipated to result in a recovery by the bankruptcy estates of cash and other property with an estimated value of approximately $1,700,000 in settlement of claims against Rodrigues, a high-level participant in the TelexFree scheme. In support of this motion, the Trustee states as follows:

### BACKGROUND

1. On April 13, 2014 (the "Petition Date"), the Debtors filed voluntary Chapter 11 petitions with the United States Bankruptcy Court for the District of Nevada.

2. By order dated May 6, 2014, the Nevada Bankruptcy Court approved a motion to change venue filed by the Securities and Exchange Commission (the "SEC"). The cases were transferred to this Court on May 9, 2014.

3. On May 30, 2014, the Court approved the motion of the Office of the United States Trustee to appoint a Chapter 11 trustee, and the Trustee was appointed on June 6, 2014.

4. The Debtors ostensibly operated a "multi-level marketing" company with its headquarters in Marlborough, Massachusetts. It represented itself as being in the business of selling telephone service plans that use "voice over internet protocol" ("VoIP") technology. The sale of VoIP, however, constituted only a minor portion of their business; the Debtors' actual business was the recruitment of participants ("Participants"). The Debtors operated a massive Ponzi and pyramid scheme which involved more than a million Participants from multiple countries.

5. On November 25, 2015, the Court, on motion by the Trustee and after notice, entered an Order, as amended on December 21, 2015, finding that the Debtors were engaged in a

Ponzi scheme and that this ruling was the law of the case in each of the jointly administered cases.

6. On January 26, 2016, the Court entered an order approving a process for the determination of Participant claims based upon their involvement in the TelexFree scheme. The order approved the use of the "Net Equity" formula in determining a Participant's claim against the estates. Specifically, in determining whether a Participant was a Net Winner or Net Loser, the Court would consider amounts invested by a Participant, including amounts invested pursuant to Triangular Transactions,[1] less amounts received by the Participant from involvement in the scheme, including amounts received through Triangular Transactions.

### I. Rodrigues' Involvement in TelexFree

7. Rodrigues previously lived in Revere, Massachusetts and now lives in Davenport, Florida. He was one of the most successful promoters of TelexFree, especially among the Brazilian community in Massachusetts and elsewhere. Rodrigues appeared in promotional videos that have been posted on the internet and publicly claimed to be the first United States based promoter to become a millionaire.

8. According to the Debtors' records of Participant activity that was reconstructed by the Trustee, Rodrigues was a Net Winner in the aggregate amount of $501,841 on account of both direct transactions with TelexFree and Triangular Transactions. Rodrigues was also issued $1,757,797 in "manual credits", which were credits issued by TelexFree to certain insiders and their associates so that they could benefit from the subsequent sale or redemption of those credits.

---

[1] "Triangular Transactions" refer generally to transactions where a Participant purchased a TelexFree membership plan or phone package from the Debtors and paid the associated fee to the recruiting Participant, rather than directly to the Debtors, and the recruiting Participant satisfied the new recruit's invoice through the application of accumulated credits "earned" from involvement in the TelexFree program.

3

### II. Trustee Litigation

9. Rodrigues is the subject of two separate actions brought by the Trustee (the "Adversary Proceedings").

10. Rodrigues is an unnamed defendant in the domestic class action suit, adversary proceeding number 16-4006, in which the Trustee seeks the recovery of fraudulent and preferential transfers from all Net Winners located in the United States (the "Domestic Class Action"). The defendant class has been certified and class counsel has been retained in the Domestic Class Action.

11. Rodrigues is one of many named defendants in adversary proceeding number 16-4032 (the "4032 Action"), which seeks recovery from Rodrigues on account of the manual credits issued to him. This action had been stayed because of the pendency of the criminal proceedings against the Debtors' principals.

### III. SEC Litigation

12. On April 15, 2014, the SEC commenced an action in the United States District Court for the District of Massachusetts against the Debtors and several high-level promoters, including Rodrigues, styled as case no. 1:14-cv-11858-DJC (the "SEC Action"). The SEC Action seeks a determination that the defendants violated Section 10(b) of the Exchange Act, Rule 10(b)-5 thereunder, Section 17(a) of the Securities Act, and Section 5(a) and 5(c) of the Securities Act.

13. On April 16, 2014, the District Court entered a Temporary Restraining Order, Order Freezing Assets and for Other Equitable Relief ("TRO"). The TRO ordered the defendants to hold and retain all funds and other assets in their direct or indirect control. The TRO also restrained the defendants from taking any action to dissipate such funds and other assets.

14. On May 8, 2014, the District Court entered a Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief as to Rodrigues ("Injunction") that extended the TRO on substantially the same terms.

15. Rodrigues violated the TRO and Injunction on numerous occasions by transferring cash, automobiles, and real estate to himself or to one of many affiliated entities (the "Related Parties") as further set forth below.

16. On and after the entry of the injunctive relief, Rodrigues made the following cash transfers in violation of the asset freeze:

(i) Between April 21 and April 25, 2014, Rodrigues withdrew $21,600 from his BMO Harris bank account for Related Parties;

(ii) On May 1, 2014, Rodrigues withdrew $211,473 from a JP Morgan account for a Related Party;

(iii) Between May 2014 and February 2015, Rodrigues withdrew at least $176,000 from a PayPal account;

(iv) Between June 2014 and April 2015, Rodrigues opened five (5) new accounts for himself and Related Parties, deposited more than $502,000 into the accounts, and then withdrew more than $295,000.

17. On and after the entry of the injunctive relief, Rodrigues made the following automobile transfers in violation of the asset freeze:

(i) On April 25, 2014, Rodrigues caused a Related Party to transfer a 2007 Lamborghini sports car to Daniel Filho, an acquaintance of Rodrigues. Nearly one year later, Filho paid $150,000 to the Related Party;

(ii) On April 29, 2014, Rodrigues caused a Related Party to sell a 2007 Mercedes Benz to a car dealer in Pompano Beach, Florida for $22,000 and to retain the proceeds of the sale;

(iii) On May 8, 2014, Rodrigues caused a Related Party to transfer a 2005 Ferrari to a car dealer in Orlando, Florida who sold the vehicle to a third party. The third party paid $79,700 to a Related Party;

(iv) On June 6, 2014, Rodrigues bought a 2013 BMW automobile for his wife for a cost of $59,621 and used his credit card to finance $41,000 of the purchase price.

18. On and after the entry of the injunctive relief, Rodrigues made the following transfers of real estate in violation of the asset freeze:

(i) On May 5, 2014, Rodrigues caused a Related Party to transfer to Five Star Investments & Properties, LLC ("Five Star"), for little or no consideration, his family's house at 124 Woodmoore Ct., Davenport, Florida (the "Residence").[2] Rodrigues purchased the Residence in 2013 for $425,000.

(ii) On May 6, 2014, Rodrigues caused a Related Party to transfer to Five Star, for little or no consideration, a condominium located at 5,600 North Flagler Drive, #307, West Palm Beach, Florida (the "Condominium"),[3] and three single family houses in West Palm Beach, Florida, located at 1) 1014 17th Street,[4] 2) 1103 18th Street, Apt. 1,[5] and 3) 711 Division Avenue.[6] Rodrigues paid the aggregate amount of $268,400 to acquire the properties in 2013 and 2014.

19. Rodrigues later reacquired ownership of the Residence and the Condominium, through Five Star.[7]

20. Rodrigues was also found to have failed on numerous occasions to comply with Court orders to provide the SEC with an accounting of his assets. On July 30, 2015, Rodrigues finally provided an accounting but it was materially incomplete and misleading. Rodrigues failed to identify all of the entities that he controlled, failed to identify all bank accounts over which he had

---

[2] The Residence has a 2016 tax assessment value of $438,088. Upon information and belief, it is unencumbered.
[3] The Condominium has a 2016 tax assessment value of $161,000 and may be subject to condominium association liens totaling approximately $13,000.
[4] This property has a 2016 tax assessment value of $40,526. Upon information and belief, it is unencumbered.
[5] This property has a 2016 tax assessment value of $59,059. Upon information and belief, it is unencumbered.
[6] This property has a 2016 tax assessment value of $37,369. Upon information and belief, the property is subject to municipal liens in an undetermined amount.
[7] Five Star was the subject of a convoluted series of transactions involving Rodrigues, Filho, and Joel Nunez, an acquaintance of Rodrigues and Filho. Filho transferred ownership of Five Star (which at the time owned the five aforementioned real properties) to Nunez in satisfaction of debt owed by Filho to Nunez. (Rodrigues may have had an interest in Five Star as well). Nunez then transferred the three West Palm Beach single family homes to J&K Capital Group, an affiliate of Nunez. Nunez later transferred ownership of Five Star (which then owned only the Residence and the Condominium) to Rodrigues. Filho allegedly paid Nunez $200,000 to facilitate the transfer of Five Star to Rodrigues.

6

direct or indirect control, failed to identify all real estate over which he had direct or indirect control, made misrepresentations respecting the transfer of interests in automobiles, and failed to accurately disclose monies received in connection with his participation in the TelexFree scheme.

21. On May 7, 2015, the United States Attorney's Office in Boston filed a criminal complaint against Rodrigues for visa fraud. The injunctions were modified to permit Rodrigues to obtain funds to post bond and Rodrigues was then released on bail, subject to his continuing obligation to comply with the asset freeze.

22. On August 12, 2015, the SEC filed a motion in District Court to hold Rodrigues in civil contempt for his failure to abide by the terms of the asset freeze and his obligation to provide an accounting of his assets.

23. Initial hearings on the SEC's contempt motion were held on September 30, 2015 and October 16, 2015, while Rodrigues was under house arrest in Florida. On November 30, 2015, the SEC filed a Status Report, noting that while accounting-related issues had largely been resolved, Rodrigues had failed to address concerns respecting the return of assets previously transferred.

24. On December 18, 2015, the District Court allowed the SEC's motion to hold Rodrigues in contempt for dissipation of assets and failure to provide a full accounting. Rodrigues was directed to, on or before January 15, 2016, restore all funds and other assets transferred or disposed of in violation of the asset freeze. Specifically, Rodrigues was ordered to restore funds totaling $334,973 taken through the removal of cash from accounts or the sale of automobiles.[8] Rodrigues was further ordered, with respect to the three West Palm Beach single family homes, to either obtain a reconveyance, to remit funds equal to the market value of the properties, or to propose a plan to cure the contempt associated with the transfers.

---

[8] This amount is comprised of $211,473 withdrawn from a JP Morgan account, $21,600 withdrawn from BMO Harris accounts for SMA Logistics and ZVX Investments, $22,000 received from the sale of a 2007 Mercedes, and $79,700 received from the sale of the Ferrari F340.

7

25. Rodrigues did not comply with the order of December 18, 2015. Rodrigues moved for a stay of the contempt proceedings, which was denied on January 15, 2016. Rodrigues was arrested on January 20, 2016. On February 15, 2016, Rodrigues moved for release from custody and for approval of a payment plan with the SEC, which was subsequently amended. On or about March 21, 2016, after approximately two months of incarceration, Rodrigues' motion was approved. The payment plan provided for, among other things, Rodrigues to pay the SEC $300 per week from his new employment, for Rodrigues to pay the SEC one-half of any income from a book he wrote and a business development course he was creating, and for Rodrigues to retain a contingency lawyer to pursue various causes of action and to turn over any recoveries to the SEC.

26. The SEC asserts claims against Rodrigues in the amount of $1,518,563, with prejudgment interest thereon in the amount of $163,245, and a civil penalty in the amount of $150,000, for a total of $1,831,808 (the "SEC Obligation").

27. The SEC has frozen six cash and securities accounts in which Rodrigues has an interest and which are believed to have an estimated value of approximately $1,100,000. The SEC has also frozen the Residence and the Condominium. Rodrigues failed to obtain reconveyance of the three West Palm Beach homes and failed to account for and restore the dissipation of $334,973 as ordered by the District Court. Rodrigues and his spouse remain in possession of the 2013 BMW.

28. The Trustee, the SEC, and Rodrigues have entered into negotiations to resolve the SEC Obligation and the Trustee's claims against Rodrigues in the Adversary Proceedings. As a result of these negotiations, the SEC has accepted Rodrigues' proposal of settlement. Upon Bankruptcy Court approval of the Stipulation, the SEC will present a proposed judgment ("Judgment") to the District Court for entry, which will provide for the transfer of money and property to the Trustee, as set forth in the Stipulation, and which will generally enjoin Rodrigues

from violating various securities laws. The negotiations also resulted in a settlement of the Trustee's claim against Rodrigues. The Stipulation between the Trustee and Rodrigues provides essentially as follows:[9]

### Settlement

A. Rodrigues, on behalf of himself and Camilla B. Quinamo, WWW Global Business, Inc., World Global Business, Inc. Atlantic Star USA, Inc., and SCZV, LLC, hereby releases any interest in the following financial accounts:

| # | Name(s) on Account | Bank | Account No. |
|---|---|---|---|
| 1 | Sanderley Vasconcelos & Camilla B Quinamo | Wells Fargo Advisors | xxxx0153 |
| 2 | www Global Business Inc. | BMO Harris | xxxxxx2209 |
| 3 | World Global Business Inc. | SunTrust | xxxxxxxxx9119 |
| 4 | Atlantic Star USA Inc. | Regions | xxxxx1634 |
| 5 | SCZV LLC | BMO Harris | xxxxxx1644 |
| 6 | Sanderley Rodrigues de Vasconcelos | CenterState Bank | xxxx3721 |

B. Rodrigues shall direct his counsel to turn over to the Trustee: (i) all funds held in the Chase account ending in 6715; and (ii) the sum of $200,000, currently held by Rodrigues' counsel in their trust account, previously withdrawn from the Wells Fargo Advisors account ending in 0153 under the *Order to Provide Accountings and Carve Out to Sanderley Rodrigues de Vasconcelos* in the SEC Action.

C. Within ten (10) days of the entry of the Judgment in the SEC Action, Rodrigues, on behalf of himself and Five Star, shall execute and deliver deeds to the Trustee of the Residence and the Condominium.

---

[9] To the extent of any inconsistencies between the Stipulation and this motion, the terms of the Stipulation shall govern.

D.  Rodrigues releases and waives any right, claim, interest, or exemption he may have in the Residence. Rodrigues shall vacate the Residence by the earlier of June 2, 2017 or ninety (90) days following Court approval of the Stipulation ("Vacancy Date"), leaving the Residence undamaged and free of personal effects, and shall cause any other party to similarly vacate the Residence. On and after the Vacancy Date, the Trustee may take any and all actions required to market and sell the Residence for the benefit of the TelexFree estates. In the event that Rodrigues or another may fail to timely vacate the Residence, the Trustee may take all steps reasonably required to remove the occupants. Rodrigues shall be liable to the Trustee for the costs and expenses associated therewith, including attorneys' fees.

E.  Upon full compliance by Rodrigues with the terms of the Judgment and the terms of the Stipulation, the Trustee shall release Rodrigues, his heirs and attorneys of any and all claims that the Trustee may have against Rodrigues. Rodrigues releases and waives any and all claims he may have against the Trustee or the TelexFree estates.

F.  The Trustee shall not assess any costs or expenses against the assets recovered pursuant to this settlement, other than the Trustee's commission, and the fees and expenses associated with the liquidation and distribution of the assets and proceeds thereof recovered in the settlement, including reasonable attorneys' fees.

G.  Nothing herein is intended to grant a release by the Trustee to any party other than Rodrigues, his wife Camilla Barreto Quinamo, his heirs and his attorneys.

H.  The effectiveness of the Stipulation shall be contingent upon and subject to the entry of the Judgment in the SEC Action.

**Basis for Approval of Stipulation**

29. Bankruptcy Rule 9019(a) provides, in relevant part, that "On the motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Settlements and compromises are normal parts of the process of reorganization. While the decision to approve a particular settlement lies within the sound discretion of the Bankruptcy Court, the Court should give some deference to the business judgment of the estate representative. Jeffrey v. Desmond, 70 F.3d 183 (1st Cir. 1995).

30. The Court of Appeals has described the test to be used by Bankruptcy Courts called upon to approve or reject proposed compromises and settlements as follows:

The bankruptcy judge has the authority to approve a compromise of a claim pursuant to Bankruptcy Rule 9019(a). The ultimate issue on appeal is whether the bankruptcy court abused its discretion when it approved the compromise, which is a process requiring the bankruptcy court to "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re GHR Cos., 50 B.R. 925, 931 (Bankr. D. Mass. 1985) (quoting In re Boston & Providence R.R., 673 F.2d 11, 12 (1st Cir. 1982)). The specific factors which a bankruptcy court considers when making this determination include: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. In re Anolik, 107 B.R. 427, 429 (D. Mass. 1989).

Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995).

31. In determining whether the proposed settlement is fair and equitable, two principles should guide the court. First, "[c]ompromises are favored in bankruptcy[.]" 10 Lawrence P. King, *Collier on Bankruptcy*, ¶ 9019.01, at 9019-2 (15th ed. Rev. 1997) (citing *Marandas v. Bishop (In re Sassales)*, 160 B.R. 646, 653 (D. Ore. 1993)). *See also In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) ("The law favors compromise and not litigation[.]"). Second, settlements should be approved if they fall above the lowest point on the

continuum of reasonableness. "[The] responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised . . . but rather to canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2nd Cir. 1983); *In re Planned Protective Services, Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991). Thus, the question is not whether a better settlement might have been achieved, or a better result reached if litigation pursued. Instead, the court should approve settlements that meet a minimal threshold of reasonableness. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994); 10 *Collier on Bankruptcy*, ¶ 9019.02, at 9019-4.

32. The Trustee asserts that the Stipulation is fair and reasonable and should be approved by the Court. The Stipulation, in conjunction with the Judgment in the SEC Action, calls for Rodrigues and the Related Parties to transfer and/or release any interest in substantially all of their known assets, other than the 2013 BMW which, upon information and belief, is subject to a security interest. While Rodrigues has not complied with District Court contempt orders to return approximately $335,000 in cash and the three West Palm Beach properties having an aggregate tax assessed value of approximately $150,000, there is reason to believe that Rodrigues would have turned these assets over to the SEC, if feasible, rather than face two months of incarceration for an order of contempt. There are no other known assets that Rodrigues owns or controls that may be used to satisfy a judgment.

33. The potential recovery for the bankruptcy estates from the cash and securities accounts, the Residence, and the Condominium, may be upwards of $1,700,000 or more. This amount represents substantially all of the SEC Obligation and a principal portion of the gains that Rodrigues is alleged to have received from his net winnings and from monetization of the manual

credits. This result will have been achieved without the necessity of litigation or collection actions. Moreover, the Stipulation does not release any third party transferees who may have received property transfers from Rodrigues.

34. Under the circumstances, the Trustee has concluded that the settlement is favorable to the Estates and should be approved.

Wherefore, the Trustee prays that this Court:

1. Approve the Stipulation for the reasons set forth; and
2. Grant such other relief as is just and proper.

STEPHEN DARR, TRUSTEE OF THE
CHAPTER 11 ESTATES OF EACH OF
THE DEBTORS
By his attorneys,

/s/ Andrew G. Lizotte
Harold B. Murphy (BBO #362610)
Andrew G. Lizotte (BBO #559609)
Murphy & King, Professional Corporation
One Beacon Street
Boston, MA 02108
(617) 423-0400
ALizotte@murphyking.com

April 25, 2017
725786