## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF MASSACHUSETTS - BOSTON

====================================

| | | |
|---|---|---|
| IN THE MATTER OF: | . | Case #14-40987 |
| | . | |
| TELEXFREE, LLC | . | Boston, Massachusetts |
| | . | **September 24, 2020** |
| Debtor. | . | 10:00 A.M. |

====================================

| | | |
|---|---|---|
| DARR, | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | AP #16-04006 |
| | . | |
| ARGUETA, | . | |
| | . | |
| Defendant. | . | |

====================================

| | | |
|---|---|---|
| DARR, | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | AP #16-04007 |
| | . | |
| ALECCI, | . | |
| | . | |
| Defendant. | . | |

====================================

### TRANSCRIPT OF VIDEO HEARING RE:
### STATUS CONFERENCE (C. BENNETT FOR PLAINTIFF)
### BEFORE THE HONORABLE MELVIN S. HOFFMAN,  J.U.S.B.C

Electronic Sound Recording Operator:   Yvonne Woodbury

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

### CASCADE HILLS TRANSCRIPTION, INC.
**5001 Woodland Hills Drive, Eagle, Nebraska 68347**
**(503) 871-5566 ~ Email:  hagerruthann@aol.com**

**APPEARANCES:**

For the Trustee:                          CHARLES R. BENNETT, JR., ESQ.
                                          ANDREW LIZOTTE, ESQ.
                                          Murphy & King, P.C.
                                          One Beacon Street
                                          Boston, Massachusetts  02108

For the Defendants:                       ILYAS J. RONA, ESQ.
                                          MICHAEL DURAN, ESQ.
                                          Milligan Rona Duran & King, LLC
                                          50 Congress Street
                                          Suite #600
                                          Boston, Massachusetts  02109

Electronic Sound Recording Operator:   Yvonne Woodbury

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

**CASCADE HILLS TRANSCRIPTION, INC.**
**5001 Woodland Hills Drive, Eagle, Nebraska 68347**
**(503) 871-5566 ~ Email:  hagerruthann@aol.com**

1  (10:00 a.m.)

2          THE CLERK:  Calling adversary proceedings 16-04006,

3  *Darr v. Argueta*, and 16-4007, *Darr v. Alecci*.

4          Could you please identify yourself for the record

5  starting with Mr. Bennett?

6          MR. BENNETT:  Good morning, Your Honor.  Charles

7  Bennett on behalf of Mr. Darr.  He is the Trustee.

8          THE CLERK:  And Mr. Lizotte?

9          MR. LIZOTTE:  Andrew Lizotte for the Trustee, Your

10  Honor.

11          THE CLERK:  And Mr. Rona?

12          MR. RONA:  Good morning, Your Honor.  Ilyas Rona on

13  behalf of both sets of class defendants.

14          THE CLERK:  And lastly, Mr. Duran.

15          MR. DURAN:  Good morning, Your Honor.  Michael Duran

16  on behalf of the class defendants.

17          THE COURT:  Good morning, everyone.

18          MR. DURAN:  Good morning, Your Honor.

19          THE COURT:  Mr. Bennett, I know that this is a status

20  conference and maybe a little less formal than our regular

21  hearings, but --

22          MR. BENNETT:  I --

23          THE COURT:  -- in the future, please wear a jacket.

24          MR. BENNETT:  Well, I had my suit jacket hanging up.

25  I was just walking down the hallway finishing another hearing

1  and when I got here, I realized I didn't have my suit jacket

2  on.  I can go back and get it, Your Honor.  I am --

3              THE COURT:  It's not necessary.

4              MR. BENNETT:  I apologize, but --

5              THE COURT:  All right.

6              MR. BENNETT:  -- had a hearing -- it was not working

7  very well electronically.

8              THE COURT:  All right.  So we are here for a status

9  conference that I guess deals with the status of the expert

10 testimony in these two class action lawsuits.  Does anybody

11 want to start off by telling me where things stand?

12             MR. BENNETT:  Your Honor, if I could, I would begin.

13 Your Honor, the plaintiff, Mr. Darr, has prepared his expert

14 reports, sent it to the defendants.  The defendants have

15 submitted their rebuttal report and we have submitted on behalf

16 of Mr. Darr a response to that rebuttal report.  So all the

17 expert reports have been completed.

18             There has been no depositions yet of the experts.  I

19 believe Mr. Rona is looking to take Mr. Martin's deposition and

20 we'll work out -- we're trying to schedule a date for that.  I

21 have not made a decision yet as to whether I'm going to depose

22 the stone-turn individual, Mr. Dennis, who's the -- on behalf

23 of the class action defendants.

24             What we -- I believe at this point we would like to

25 at least see what the scheduling would be.  It would be -- I

1  believe it's going to be depending on the Court's own staff up

2  to your scheduling, but it appears now it's going to be an

3  evidentiary hearing.  I do not anticipate any more than the two

4  experts as the witnesses and the issue will be, as we tried to

5  frame in our joint status report, a determination whether or

6  not the Trustee's methodology in determining the net winners

7  has sufficient reliability and credibility so that the Court

8  could accept that as meeting the Trustee's *prima facie* case.

9        That would then reserve to each individual defendants

10  an opportunity to offer substantive evidence to point out

11  whether the Trustee's accounting as to that individual

12  defendant is in error.  I believe that's where we are.

13  Mr. Rona could correct me to the extent I made a misstatement.

14        MR. RONA:  No, I think that was a good summary, Your

15  Honor.

16        THE COURT:  So am I to understand -- I look at --

17  according to the status of the motion for a status conference,

18  the class action defendants have concerns about the methodology

19  of the Trustee's expert.  It's the -- am I right in assuming

20  then that the Trustee does not have similar concerns about the

21  defendant's expert?

22        MR. BENNETT:  The defendant's expert, he's not really

23  offered an alternative calculation on methodology.  The -- at

24  least as I read the expert report.  What I understand the

25  defendant's expert report to do is basically challenge the

1 underlying reasonableness and assumptions of the Trustee's

2 report and for, I guess, anal -- it would be analogous a

3 hearing on whether or not as to the admissibility of the

4 Trustee's report. So it's not necessarily to conflicting

5 determinations. It is the Trustee's report and the criticism

6 of the Trustee's report.

7 　　THE COURT: So in other words, Mr. Rona, I'll turn to

8 you. So your strategy is simply to re -- to undermine or to

9 disqualify the Trustee's expert essentially and because the

10 Trustee has the burden of proof you're just going to stop there

11 and not -- not give me a contrary expert report that allows me

12 to make determinations? Is that how you're going to defend

13 this?

14 　　MR. RONA: Well, yes. But if I could just back up

15 and explain first how we got here and then also the issues with

16 anyone making -- offering expert opinions or determinations in

17 this matter.

18 　　Originally when we were engaged, Your Honor may

19 remember, we put together a limited budget for expert work and

20 I don't believe anybody contemplated that that would be a

21 reinvention of the wheel that Huron spent a significant sum of

22 money to do at the outset. So we didn't have the budget to

23 duplicate their work. Our budget was focused on determining

24 whether Huron's analysis was sufficiently reliable or not.

25 　　And I don't want to get too deep into the preview of

1 the defendant's positions, but essentially our position is that

2 no expert could put together based on fragmented and unverified

3 data a full picture of what happened in Telexfree.  When I say

4 "in Telexfree," of course not in Telexfree.  These were on

5 street corners, in rented offices, in people's houses akin to

6 Tupperware parties all around the world.  They were informal

7 transactions partially recorded or sometimes not recorded at

8 all in data.

9      And so the question is, can any person look at that

10 data and replicate what happened on the ground.  And our

11 position is we don't have to answer that question, but we

12 certainly looked at what the Trustee did and said that that

13 effort while certainly commendable fell short of the Daubert

14 standards.  And I would say that after reviewing our expert's

15 report I think it's a fair conclusion that it might have been

16 impossible for anybody to use this data to make -- to determine

17 cash transactions that are not actually cash there in the data.

18      THE COURT:  Well, is the test -- is the test

19 impossibility or is it -- is it this is the best -- this is the

20 best we have to work with, there is no other alternative, we've

21 got to come up with some methodology to be able to complete

22 this bankruptcy case to show us a better method --

23      MR. RONA:  Well --

24      THE COURT:  -- and you're telling me that there isn't

25 any method.

1          MR. RONA:  Well, no.  There were different -- there

2   were choices available and our expert lays it out that -- and

3   it's in the status report that one -- there's two main areas of

4   disagreement.  One of them is in the Trustee's selection -- or

5   Huron's selection of a deterministic versus problemistic

6   methodology for linking accounts together.  And I understand

7   that there's some nuance there from the Trustee's standpoint

8   that they're not -- they say that they're not really -- they

9   didn't really use a deterministic model.  But certainly there

10  was an alternative approach that our expert suggests was the

11  only one that was feasible in this case and that was not used.

12          Similarly, there were assumptions that had to be made

13  about transfers and the Trustee selected one set of assumptions

14  for tri -- for what I'll call triangular transfers, which Your

15  Honor I'm sure now is very familiar with, the idea that when a

16  new person enters the system that they theoretically hand

17  cashed to a promoter that promoter then uses his or her credits

18  to pay the invoice and, therefore, in the amount of the cash

19  received such that when you see the invoice being paid one

20  could posit that there was an equal equivalent amount of cash

21  that changed hands.  That's the triangular transfer assumption

22  and we're not disagreeing that on occasion that happened.

23  We're saying you can't know that it always happened in that

24  way.

25          However, when one participant sends credits over to

1  another participant, the Trustee assumes that no money changed

2  hands and that would lead to the irrational situa -- an absurd

3  situation where credits are in one set of transactions worth

4  100 cents on the dollar, but in another set of transactions

5  they're worth nothing and essentially are given away for free.

6  Well, if you could monetize your credits one way, why would you

7  ever do it the other way?  And the data shows that there were,

8  in fact, significant credit transfers.  And there's even been

9  some suggestion in some of the pleadings that have made it to

10  Your Honor's desk that people who lost money, lost money vis

11  credit transactions as opposed to triangular transactions.

12          So there were alternatives that were available, but

13  to redo that work would have been well outside of I think what

14  the class defendants are in a position to do and not what was

15  originally contemplated, which was really more kicking the

16  tires, so to speak, of Huron's work.

17          THE COURT:  So this deterministic versus problemistic

18  sounds very metaphysical to me, but as I read it I -- what --

19  in my simple mind I was thinking about fights between real

20  estate appraisers where one person values the property based on

21  the income approach and the other one values the property based

22  on the replacement cost approach.  I mean, both are reliable

23  methods.  You just happened to disagree about which one is the

24  one that should be chosen.  That's what I was thinking we were

25  dealing with here.

 1          And so even if you don't have the resources for your

 2    expert to prepare a dueling report, if I -- if we go down this

 3    road and I conclude that problemistic was a better approach

 4    then determinilistic and that there has to be cash credit given

 5    for all of the transfers between participants and it isn't

 6    correct to use the -- the user names, giving that greater

 7    weight, all the things you're complaining about, doesn't that

 8    just tell the Trustee he can go back and do the report over

 9    again using these different standards?  Can he do that or is he

10    out of luck?

11          MR. RONA:  Well, I think that's a decision that Your

12    Honor may have to make.  We would argue that they've had plenty

13    of time and fair warning of our -- of many of our criticisms

14    because we had a meeting awhile back where there was a sort of

15    discussion between the principals, the experts about the

16    assumptions and the disagreements over those assumptions.

17          But the issue with deterministic, Your Honor, is not

18    that there are different valid methods, for example, appraising

19    real estate.  The issue with the deterministic model is that it

20    assumes that the data is all true and valid.  And so, for

21    example, credit card transactions are very susceptible to a

22    deterministic model because there's actually a built-in

23    mechanism to know that a credit card number is a real credit

24    card number, there's that security code.  And so you can look

25    at a sea of transactions and know that that data is all good

1  data.  Now we would have to match up which of those credit card

2  transactions are mine, which are Mr. Bennett's.  That would be

3  where you would use a deterministic model.

4        Here the data is not validated and there are clear

5  examples indicating that there are problems with any assumption

6  assuming that the data was because people could type in

7  anything.  And even with auto complete now you have a situation

8  where you might have different users sharing a computer

9  clicking through a bunch of screens and populating and

10 essentially commingling their data into the database.

11       And so you don't know that any of that data is true

12 and, therefore, is you would have -- our position is you would

13 have to use a problemistic model.

14       Now, if Your Honor says, well, Huron could redo its

15 analysis we'd probably object, but if -- Your Honor might have

16 that discretion I don't know how long it would take for them to

17 do that work.  And so that -- I have concerns about the status

18 of this case which has been pending for some time.

19       MR. BENNETT:  If I may, Your Honor.

20       THE COURT:  Sure.

21       MR. BENNETT:  Thank you.  Your Honor, the -- while

22 there are two various -- two recognized methodologies,

23 deterministic and problemistic, the Trustee when faced with the

24 issues in this case, which I think are (indiscernible), we're

25 faced with the overwhelming amount of data and with respect to

1  the question of reliability with certain of the aspects and

2  also faced with the task of the need to come up with an

3  algorithm and a methodology in order to determine net winners

4  and net losers, both for the claims process and for this

5  litigation to recover against the net winners.

6          Applied various theories and went through various --

7  as the testimony would show, went through various different

8  scenarios, different testing used both very much of the

9  deterministic, but not necessarily completely rely upon that,

10 so basically fashion a methodology which when taken in totality

11 addresses all the issues and lends a level of reliability and

12 credibility such that we would meet, I believe, the Daubert

13 test and establish the Trustee's case with the *prima facie* and

14 I say *prima facie* nature of the Trustee's case.

15         The issue with respect to the credits that was raised

16 by Mr. Rona, these are credits that would have been

17 transactions that occurred outside of Telex itself.  These were

18 not transactions in which Telex would have been a party to, so

19 this would have been two participants dealing with credits.

20         I believe as a matter of law and as a matter of

21 the -- this matter of this case those credits were not

22 considered in determination of the claims either in the claim

23 process or as we did in the net winners or net losers since

24 Telexfree itself was not a participant to it and would have

25 neither received nor given anything in connection with those

1  transactions.  So to the extent that's an issue, that's an

2  issue -- that's a legal issue that the Court can address.

3          THE COURT:  While you're on that point, Mr. Bennett,

4  what about what -- the defendants telling me that there is

5  supposed to be a three percent commission or user -- no, the

6  three percent fee that Telexfree charged the participants for

7  those participant-to-participant transfers?  Is that not the

8  Trustee's understanding?

9          MR. BENNETT:  Whether there was -- there was a number

10 of different contracts and agreements, Your Honor, but as far

11 as the Trustee's position on this our information doesn't --

12 doesn't provide us -- or forget (phonetic) -- we don't have

13 sufficient information to show whether that -- that fee was

14 ever charged or any regular basis being charged or that we

15 would have had any particular systematic knowledge of those

16 transactions because they were pretty much independent

17 transactions.  We would have had some knowledge with respect to

18 somebody asking for credit to be drawn or transferred --

19          THE COURT:  Right.

20          MR. BENNETT:  -- but not necessarily in all cases.

21 They may have just been directly -- one party can be directing

22 the use towards another.

23          As the Court is well aware, we are dealing with

24 millions of different separate entries by parties where one

25 participant has multiple user accounts.  So I believe that once

1  the Court gets an opportunity to hear all of the Huron

2  testimony as to how the issues it faced and how it addressed

3  those issues and then how it tested the issues, the Court would

4  have a basis upon -- a basis to determine the reasonableness of

5  it.

6          I would point out that, again, I've been stressing

7  this as *prima facie* case.  This is not going to deprive the

8  individual defendants -- class action defendants from raising

9  an individual defense.  They will be able to challenge the

10  findings by Huron by coming up and pointing out that offering

11  evidence that any particular user account was not theirs or

12  there was a particular transactions that was not for cash.

13          But what we have under the Huron analysis is enough

14  to get us so that we can present the accounting to each

15  individual defendant and then they have the ability to

16  challenge the individual accounting if they -- if they have a

17  basis to do so.  Obviously they'd have to offer some type of

18  affirmative evidence beyond merely saying that's incorrect, but

19  this would be the step that would certainly substantially

20  simplify the presentation and get us over, I think, a major

21  issue, which is the methodology report.

22          THE COURT:  So in other words, just -- again, I may

23  be oversimplifying this, but if Defendant A is being sued as a

24  net winner for $1,000 and this net -- this Defendant A says,

25  wait a minute, I paid $2,000 to Defendant B and bought some

1   credits which I never got -- and I never got paid on those

2   credits, so I'm out $1,000, I'm actually a net loser, if you

3   take that into consideration you're saying to me that that

4   defendant gets to bring that up if he can prove it on his

5   individual claim?

6         MR. BENNETT:  Well, first of all, only if the Court

7   determined that that was an appropriate measure of the net

8   winners, net losers because we do have a definition.  It's

9   certainly been used in the proof of claim process.

10         THE COURT:  Um-hum.

11         MR. BENNETT:  Which would have excluded such credits.

12  Whether the Court is going to apply that and whether the Court

13  should apply that same definition to the net winners in this

14  case is an issue that will be addressed -- that we can address

15  with the Court at the appropriate time.

16         If the Court says yes, they can raise that defense

17  then, of course, they could offer their credit purchases and

18  they would get a credit and we would determine on an individual

19  basis whether or not the purchase and sale of credits outside

20  of the Telexfree reduced the amount of their claim.  As we

21  said, we've preserved each individual defendant's right to

22  challenge the accounting provided by the Trustee.

23         MR. RONA:  Then, of course, the other problem with my

24  example is that if B were a net winner on Telexfree's records

25  but actually is now a loser because he sold his credit --

1  sorry, the other way around.  If B were a -- was a net winner,

2  therefore entitled to a dividend but in fact that a side deal

3  with A and sold then some credits and is not really a net loser

4  but came out ahead, that's crazy.  I mean, that throws

5  everything into a cocktail (phonetic) and start going down that

6  road.  I don't know how we deal with that, so --

7        MR. RONA:  Well, Your Honor, can I just address that

8  because I -- we thought about that very same point and the

9  reality is that most net losers are net losers due to time.

10  And what I mean by that is that you came into the game very

11  late and you didn't have time to earn credits, to monetize them

12  to become a net winner.  And therefore, the reality is most net

13  losers have fewer accounts, fewer credits and therefore, fewer

14  credit transfers.

15        So that thought did cross our mind and we did look at

16  that and our expert does comment on the -- that there is --

17  there is some data analysis in his report about the difference

18  between the claims that were handled -- you know, the proofs of

19  claim versus that some of the claims -- lower case "c" --

20  against the defendants about how much their net equity is.

21        But I just wanted to respond to one point, Your

22  Honor, while we're trying to keep this at a very -- at 30,000

23  feet.  The area that I disagree with Mr. Bennett is the idea

24  that if -- if we find this -- well, let's assume Your Honor

25  finds reliability problems with the data.  Our position is that

1  then that data can't be used to meet the Trustee's burden of

2  proof.

3        So the issue here what's at stake is whether the

4  defendants have essentially the burden of proof to disprove

5  data that we say has reliability problems or whether it's

6  properly the Trustee's burden, which I -- I don't think there's

7  a dispute the Trustee has the burden, and can meet that burden

8  (indiscernible) to this data.

9        And I would say going back to the first question Your

10 Honor asked, what would happen if we threw the data out.  Well,

11 then Mr. Darr would be in the same position that other trustees

12 are and my firm, for example, represents trustees trying to

13 prove fraudulent transfer claims, you go straight to the bank

14 records.  You go straight to Paypal.  You depose witnesses and

15 ask them, how much cash did you give, how much cash did you

16 get.  And so there are alternative remedies to try to prove --

17 it's up -- it will be certainly ugly and Herculean but that's

18 no different than any other trustee's position.

19        Here -- and I'm not aware of any other case where

20 somebody is trying to use data that doesn't actually reflect

21 cash transactions to prove cash transactions.  So this is the

22 opposite of Bernie Madoff.  And Bernie Madoff, the -- you could

23 take each client's statement -- monthly statement and the

24 beginning of the statement tells you how much cash you put in

25 last month and how much cash you took out and then the rest of

1   the pages have all the projections and stock rates of return.

2       Well, the Trustee ripped up those subsequent pages as

3   garbage and fantasy and only used the cash-in/cash-out.  And

4   that was actually very brilliant and effective and accurate

5   because it showed cash.

6       Here what we're doing is we're taking the -- what we

7   say is akin to the fantasy of the Madoff projections and saying

8   that this is just unregulated user data and then we're going to

9   now into it infer, hypothesize at there are cash transactions

10   that match and I don't believe that's ever been done.  And it's

11   certainly a novel issue and I'm sure Your Honor appreciates

12   having one more novel issue coming down the pike, but this is

13   certainly a novel issue and I think there are significant

14   Daubert concerns.

15       THE COURT:  Well, I think that that's going to be one

16   version of the interpretation of what the Trustee's expert is

17   doing and I'm sure that the Trustee has a different version,

18   but I guess that's what we're going to have to wrestle with at

19   an evidentiary hearing on this.  But I don't see any way

20   around -- I guess you guys were ahead of me on this.  I was

21   hoping we could avoid an evidentiary hearing, but I don't -- as

22   I'm hearing where this is going I don't see how we can.

23       MR. RONA:  Well, Your Honor, I guess the good news if

24   there is good news is that there is -- and I might be wrong and

25   Mr. Bennett will correct me, but if this data is found to be

1  not reliable, then I think that that essentially takes with it

2  the quantum of evidence that the Trustee would intend to offer,

3  at least against all defendants on a class basis.

4        And so this would essentially replace what would have

5  been a summary judgment hearing, I would think.  I'll

6  Mr. Bennett -- maybe I -- I don't mean to speak for him, but

7  that's certainly the way I'm looking at this.

8        THE COURT:  Well, it's possible, yes.

9        MR. BENNETT:  Your Honor, I don't believe this is

10  going to be susceptible to summary judgment exchange of expert

11  reports or evidence.  I do think the Court is going to need to

12  hear from both experts, particularly from the Huron expert and

13  obviously appreciate, and I'm sure the Court already does

14  appreciate, the complexity of the issues that we faced and the

15  methodology that we then tried to address -- tried to use to

16  address that complexity.

17        This is not the Bernie Madoff case unfortunately,

18  which quite frankly was in many aspects much easier, not the

19  least of which is you had a lot of feeder funds and direct

20  targets with multiple millions of dollars.  Here we've got

21  hundreds of thousands of individuals' separate claims that we

22  have tried to analyze all of the data.  I really think the

23  Court is going to need to have it by way of an evidentiary

24  hearing to have a record as to what we did, why we did it,

25  why -- and how we tested it and why we believe that this is the

1 best methodology and has -- has an appropriate level of

2 credibility to meet our *prima facie* obligations.

3         I would envision the way the evidentiary hearing

4 would go is that the parties would submit their expert reports

5 so that the court could certainly have the opportunity to read

6 and analyze those reports ahead of time and would then call the

7 witnesses.  I think in this case we would actually request that

8 we be allowed to call Mr. Martin on direct so that he can give

9 the background in much more of a context in which his report --

10 in which his report would fit as opposed to just offering the

11 report and then having a cross-examination.

12         I think the complexities here just are going to

13 require a lot more explanation than what we typically see,

14 certainly in an appraisal situation.

15         THE COURT:  Yeah.  You would disagree with that,

16 Mr. Rona?

17         MR. RONA:  The last point about the directing -- each

18 side directing their own, I think that makes sense and I would

19 say that being mindful of the Court's time our intent to depose

20 Mr. Martin is so that Your Honor is not a participant in

21 essentially a fishing expedition.  So I -- that -- our goal of

22 our deposition would be to make our time most efficient on

23 cross.

24         THE COURT:  So the plan would be to depose Mr. Martin

25 and then go to an evidentiary hearing on the expert reports and

1 my making a ruling under 702 as to the Huron report. So have

2 you scheduled a deposition yet?

3          MR. RONA: No. We're -- I think we're trying to.

4 Mr. Bennett and I are trying to work that out. We just

5 received the final report yesterday from Mr. Martin and so I

6 wasn't sure, you know, how much lead time I would need. And

7 now that I've seen it, I think -- I assume we'll be able to

8 agree on a date, but we're looking at I think sometime later in

9 October and I don't know how that meshes with Your Honor's

10 schedule.

11          But I wanted to just go back to one point. I don't

12 know if I mis -- misheard or didn't hear something that was

13 said, but I would think -- and unless Your Honor doesn't want

14 it that there would be pleadings that would precede the

15 evidentiary hearing or does Your Honor want the hearing and

16 then maybe pleadings submitted afterwards? I could see both

17 logic and both approaches.

18          THE COURT: What kind -- apart from the reports, what

19 kind of pleadings?

20          MR. RONA: Well, I would think something akin to a

21 Daubert motion on our side that would -- that set forth all the

22 criticisms and --

23          THE COURT: You mean, there's more -- there's more

24 than -- than what's in here?

25          MR. RONA: No. It would be a distillation, but it

1    would -- the Mr. Dennis's report does not contain any cites to

2    cases that I remember and so I think Your Honor would want to

3    see some refreshment of the rules and the state of the law as

4    of 2020 and then some stitching together of the criticisms to

5    the -- the prongs of a Daubert analysis and that could be done

6    after the evidentiary hearing.  It could be done before.  I

7    believe I've seen it done more before, but again, this is

8    really what Your Honor prefers.

9          THE COURT:  Something like that I would say after

10   would be fine.  The before stuff would be any sort of summary

11   of, in layman's terms, of the expert reports that would help me

12   understand them.  I would certainly be -- that would be useful.

13   The legal stuff can come after.

14         I'm worried about the technical, so I -- I'd be happy

15   to receive with the reports any elaboration, explanation, plain

16   language discussions about the important aspects of the

17   reports, of course.  So we'll -- we can talk about, you know,

18   the time frames.  I mean, so you would be talking -- I think

19   we're talking about a couple of days, it sounds to me, what you

20   think in terms of how long this evidentiary hearing will run.

21         MR. BENNETT:  I would think two days, Your Honor.

22   Each expert will probably take much of a day.  I do think this

23   is probably one of the -- certainly a matter that would lend

24   itself to a Zoom hearing if the Court is still under those

25   restraints depending on the timing.  Given that we have a

1  limited number of witnesses and frankly, probably a limited

2  number of exhibits most of this is going to be explanation from

3  the experts.

4       THE COURT:  Okay.  So if you do your deposition in

5  October we could do something in November if that's enough --

6  if that gives you enough time to put your stuff together is

7  that a realistic time frame, sometime in the second half of the

8  month of November?

9       MR. BENNETT:  That's fine with the Trustee, Your

10 Honor.

11      THE COURT:  What do you say, Mr. Rona?

12      MR. RONA:  I think that's fine for the defendants.

13 If we're only submitting a -- the short summary before then I

14 think that's -- that's feasible.

15      THE COURT:  Yeah.  Right now I -- the week of

16 Thanksgiving, the 23rd, looks like it's wide open so I have

17 time on Monday and Tuesday, 23rd, 24th, if people are okay with

18 the holiday coming up, but -- and I suspect -- I -- you know,

19 we would assume it's going to be by Zoom.  I don't know when

20 we're going to be dipping our toes in the water about coming

21 back into the courtroom, to be honest with you, because so much

22 depends on this anticipated spike that everybody is talking

23 about.  If we -- if that happens, and obviously we're not going

24 anywhere, but if things were to stay more or less where they

25 are now, by this point -- by the end of November, it would be

1  possible that we could be back in court, especially on

2  something like this which is going to involve, what, two

3  witnesses and three, four lawyers, something like that.  We

4  could accommodate that.

5          So I think let's focus -- let's assume we're going to

6  do it by Zoom, but entertain the possibility that we could do

7  it face to face.  Are these experts both local?

8          MR. BENNETT:  Yes, Your Honor.

9          THE COURT:  Does anybody want to tell me right now

10  that they have -- they've decided that they're not going to

11  enter a federal courthouse in calendar year 2020?  Is anybody

12  concerned about this?

13          MR. RONA:  The Murphy -- I know the Murphy & King

14  attorneys have no qualms about entering any buildings, but --

15  and I would say the same for my firm.

16          THE COURT:  All right.

17          MR. BENNETT:  We're fine.  I -- the -- I think

18  Mr. Martin is on the phone and I believe Mr. Darr is on the

19  video.  They can certainly speak for themselves.

20          Mr. Darr, do you have any qualms about entering the

21  court if it's open?

22          MR. DARR:  No, I'm fine with going in.

23          MR. BENNETT:  Mr. Martin, are you on the phone?  If

24  you unmute yourself if you could answer.

25          (No response.)

 1              Apparently he's still on mute, Your Honor.

 2              Mr. Darr, is that schedule all right, the

 3  November 23rd and 24th for you?  You have to unmute.

 4              MR. DARR:  As far as I know it's fine.

 5              MR. RONA:  And, Your Honor, I didn't respond to those

 6  days, but they're fine for our firm.

 7              THE COURT:  All right.  So let's shoot for that and

 8  I'll look forward to getting updates from you in terms of where

 9  things stand and we'll go from there.  I don't know if there's

10  anything else -- is there anything else we need to talk about

11  at this point?

12              MR. BENNETT:  I don't believe so.

13              THE COURT:  All right.  Well, thank you all and look

14  forward to hearing from you in November.

15              ATTORNEYS:  Thank you, Your Honor.

16              THE COURT:  You're welcome.

17              THE CLERK:  Court is in recess.

18  (End at 10:37 a.m.)

19                      * * * * * * *

20

21

22

23

24

25

1          I certify that the foregoing is a true and accurate

2   transcript from the digitally sound-recorded record of the

3   proceedings.

                                                    10/21/2020
_____

**RUTH ANN HAGER**
**Certified Transcriber**
    **Federal C.E.R.T. **D-641**
**CASCADE HILLS TRANSCRIPTION, INC.**
5001 Woodland Hills Drive
Eagle, NE  68347
(503) 871-5566
Email:  hagerruthann@aol.com