## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>     Reorganized Debtors. | Chapter 11 Cases<br><br>14-40987-MSH<br>14-40988-MSH<br>14-40989-MSH<br><br>Substantively Consolidated |
| STEPHEN B. DARR, TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>     Plaintiff,<br>v.<br>FRANZ BALAN, A REPRESENTATIVE OF A<br>CLASS OF DEFENDANT NET WINNERS<br>     Defendants. | Adversary Proceeding<br>No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>     Plaintiffs,<br>v.<br>MARCO PUZZARINI AND SANDRO PAULO<br>FREITAS, REPRESENTATIVES OF A CLASS<br>OF DEFENDANT NET WINNERS<br>     Defendants. | Adversary Proceeding<br>No. 16-4007 |

### TRUSTEE'S MEMORANDUM IN SUPPORT OF THE ADMISSIBILITY OF TIMOTHY MARTIN'S EXPERT OPINION

Stephen B. Darr as he is the Liquidating Trustee (the "Trustee") of the Reorganized

Debtors TelexFree, LLC, TelexFree, Inc. and TelexFree Financial, Inc. (collectively

"TelexFree") submits this Memorandum in support of the admissibility of the expert opinion

("Expert Opinion") of Timothy Martin of the Huron Consulting Group LLC ("Huron") setting

1

forth the methodology developed by Huron under the supervision of Mr. Martin to link multiple

Participant User Accounts to determine those Participants who are Net Winners and the amount

of their Net Winnings.  The Trustee will offer the expert testimony of Mr. Martin as set forth in

the Expert Report as part of his *prima facie* case establishing that the amount of the Net

Winnings received by a Participant constitutes a fraudulent conveyance recoverable by the

Trustee, pursuant to § 548 of the Bankruptcy Code.[1]

The Trustee submits that by reason of Mr. Martin's education, training, experience and

expertise and that of the various individuals at Huron who assisted Mr. Martin in developing the

methodology, Mr. Martin is qualified to render an expert opinion.  Mr. Martin's qualifications,

coupled with the extraordinary efforts by Huron under the supervision of Mr. Martin to

reconstruct the records of TelexFree and the lengthy procedures used consistent with the

recognized deterministic methodology, constitute a reliable methodology for linking User

Accounts under Rule 702 of the Rules of Federal Evidence for admissibility of the Expert

Opinion.  The Trustee further submits that the arguments raised by the Class Action

Representatives concerning the reliability of the factual underpinnings and criticism of the

Expert Opinion go to the weight to be given the Expert Opinion and not its admissibility.

The Trustee is offering the Expert Opinion to establish his *prima facie* case as to the

Defendant Classes.  Each individual Participant Defendant will have an opportunity to offer

evidence to dispute the amount of the Net Winnings attributable to him/her.

---

[1] On November 25, 2015, the Court entered an Order determining that TelexFree engaged in a Ponzi scheme, which Order was further entered as law of the case.  [Docket No. 654]   As a result, TelexFree is presumed to be insolvent and Net Winnings, to be fraudulent transfers.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011).

### Factual Statement

On April 13, 2014, TelexFree commenced the Chapter 11 proceedings in the United States Bankruptcy Court for the District of Nevada.  Subsequently, the cases were transferred to the United States Bankruptcy for the District of Massachusetts, and on June 6, 2014, the Trustee was appointed.  Substantially contemporaneously with TelexFree's commencement of their chapter 11 cases, the Securities and Exchange Commission commenced a civil enforcement action against TelexFree, and the United States Attorney commenced a criminal investigation into the activities of TelexFree.  In its criminal investigation, the United States, through the Department of Homeland Security, executed a search of the premises of TelexFree seizing, among other items, computers and servers.  Thus, when the Trustee was appointed, he did not have access to any of the electronic records of TelexFree.  Homeland Security provided to the Trustee a forensic copy of the files located on the seized servers and computers so that the Trustee would have access to TelexFree's electronic records.

Based upon his investigation including interviews with interested parties, information provided by governmental authorities, and documents produced pursuant to Rule 2004 examinations, the Trustee obtain an understanding of the mechanics of the TelexFree scheme.

The Debtors purported to be in the business of providing a voice over internet protocol ("VOIP") service. The primary business of the Debtors, however, was the recruitment of new persons ("Participants") to generate revenues for the Debtors, its principals, and existing Participants.   Each time that a Participant purchased a VOIP plan or a membership plan, the Participant opened a new account ("User Accounts").  Participants were asked to input various categories of personal information when opening a User Account, including name, email address, physical address, cell and home phone, passwords, and similar information.

3

User Accounts could be opened through Direct Transactions or Triangular Transactions. In the case of a Direct Transaction, the Participant paid their invoice for the VOIP or membership plan directly to TelexFree.  In the case of a Triangular Transaction, the Participant paid the amount of their invoice to the Participant who recruited them.  The recruiting Participant would then use accumulated credits, as further described below, in satisfaction of the invoice and would retain the fee paid by the new Participant.

Once a User Account was opened, Participants could receive credits based upon bonuses or commissions "earned" during their involvement in the scheme, including through the recruitment of other Participants.  These credits could be redeemed for cash, transferred to another Participant, or applied in satisfaction of an invoice as in the case of Triangular Transactions.

## I.    RECONSTRUCTION OF TELEXFREE'S RECORDS

Upon obtaining access to the electronically stored records, the Trustee's first goal was to obtain an understanding with respect to the TelexFree record-keeping systems and the nature and amount of the information contained therein.  The focus of the Trustee's investigation was the mechanics of the TelexFree management information system, commonly referred to as SIG, which was the program used by TelexFree to track Participant activity once a User Account was opened, including the accumulation and use of credits, payment made by the Participant and amounts disbursed to Participants.  The Trustee also considered the Quickbooks accounting system for funds received and disbursed.[2]

---

[2] The Trustee retained the services of Mesirow to assist him.  The Trustee and several of the key people working on the TelexFree matter subsequently left Mesirow and joined Huron.  Hereinafter, no distinction will be made for the work performed by those individuals while employed at Mesirow and the continuation of the work at Huron.

Gaining an understanding of SIG was an enormous task.  SIG contained more than a hundred tables containing billions of records.  By running queries through SIG, Huron determined that there were four data tables in the SIG system that contained the principle information associated with the transactions related to TelexFree and Participants.[3]  These tables were identified as follows:

1.    Account Table, which contains records for each User Account registered with TelexFree;

2.    Invoice Table, which contains a unique record for each Participant invoice generated by TelexFree for the purchase of a VOIP or membership plan.  The invoices contain details including the type of plan purchased, the invoice amount, and how the invoice was satisfied, e.g., cash transfer to TelexFree or a credit transaction as part of a Triangular Transaction;

3.    Transfer Table, which contains information about each transfer of credits within the TelexFree system, including requests by Participants to redeem credits for cash; and

4.    Bonus Table, which contains information about each accretion of TelexFree credits into a Participant's User Account.

The Account Table contained 17,016,780 User Accounts.  With respect to each User Account, the Account Table contained 44 fields of data for each Participant.  Further, each time a Participant bought a membership plan, a new User Account would be opened for that Participant. Thus, Participants usually had multiple User Accounts.  Further complicating matters, the Account Tables included User Accounts not only for Participants in TelexFree but also for

---

[3] Huron employees including while at Mesirow spent hundreds of hours investigating SIG in order to develop an understanding of SIG and the information contained in SIG.

Participants in Ympactus, which was a similar Ponzi scheme operated from Brazil by an affiliate of TelexFree.[4]

## II.    STEPS TO DISTINGUISH THE TELEXFREE PARTICIPANTS FROM THE YMPACTUS PARTICIPANTS

The Invoice Tables within the SIG system distinguish between invoices paid in U.S. dollars and invoices converted to U.S. dollars from Brazilian Reais.  Huron determined that the Reais/dollar distinction was a reliable method to segregate transactions for Ympactus Participants from those of TelexFree Participants.  Huron reviewed the Invoice Tables, which contained, among other fields, a "currency field" and an "exchange rate field."  The currency field denoted the currency used to pay for the memberships, and the exchange rate field denoted the exchange rate if the currency was not in U.S. dollars.

For 99.7% of the transactions, the currency field was noted with a "D" [denoting U.S. Dollar] and the exchange rate was populated with a zero.  Conversely, for 99.8% of the transactions where the currency field was populated with an "R" [denoting Brazilian Reais], the exchange rate was populated with a range of values from 1.98% to 2.37%, which exchange rates for the relevant period equated with the exchange rates between the Reais and the U.S. Dollar. Huron concluded that the User Accounts associated with the Ympactus Participants could be separated from TelexFree Participants' User Accounts based upon the currency paid.

Huron verified the separation of the Ympactus User Accounts from the TelexFree User Accounts by comparing the payment of invoices in Reais as opposed to payment in Dollars. Substantially all of the invoices paid in Reais were paid between February 2012 and August 2013.  During that time period, substantially all of the activity was in Ympactus, and very little

---

[4] Ympactus was a similar Ponzi scheme run by Messrs. Wanzeler and Costa in Brazil.  When the Brazilian Government shut down Ympactus in June 2013, Messrs. Wanzeler and Costa, along with Merrill, continued the Ponzi scheme through TelexFree.

activity was in TelexFree.  In June of 2013, Ympactus was shut down by the Brazilian

authorities, and invoices paid with Reais halted.  Simultaneously, there was a substantial increase

in invoices paid in U.S. dollars.  The increase in the payments in dollars coincided with the

increase in the activity in the TelexFree business.  (See chart annexed as Exhibit ____.)

Therefore, Huron was able to distinguish between the TelexFree Participants and the

Ympactus Participants by using the currency field and eliminate the Ympactus User Accounts

from its analysis.  Even with the elimination of approximately 4,000,000 User Accounts

associated with Ympactus, there were approximately 11,000,000 User Accounts identified in

SIG associated with TelexFree.

## III.    DEVELOPMENT OF AGGREGATION METHODOLOGY

Participants frequently purchased multiple User Accounts but SIG did not provide a

method to link a Participant's User Accounts. [5]  In order to properly ascertain whether a

Participant is a Net Winner or Net Loser and the amount of any Net Winnings or Net Losses, it

was necessary to develop a methodology to link the various User Accounts attributable to each

Participant.  The process of developing this methodology occurred over many months and with

the testing of multiple different methodologies to determine the best methodology in order to

accomplish the linkage of these multiple accounts.  The amount of the data and the number of

variables were substantial, and it was a daunting task presented to Huron to develop this

methodology.[6]  For example, there were approximately 15,000,000 TelexFree combined User

Accounts existing in SIG, each with one or more paid invoices.  Of these 15,000,000 User

Accounts, there appeared to be approximately 3,300,000 Participants whose accounts aggregated

---

[5] The number of User Accounts per Participant could range from one to thousands.

[6] Huron spent over a thousand hours developing its methodology.

to this number.  Even after Huron was able to exclude from the aggregation process those

Participants who purchased only a single VoIP package, there remained 2,100,000 User

Accounts which needed to be aggregated, and from this 2,100,000, Huron needed to segregate

the Net Losers from the Net Winners.

## IV.    EFFORTS TO DEVELOP A SINGLE COMMON IDENTIFIER

Initially, Huron attempted to identify a single common identifier which could be utilized

to link the User Accounts.  Huron considered various Account Table fields as the common

identifier.  For example, Huron at one point believed that using the e-mail addresses as a

common identifier could be an appropriate methodology to link the User Accounts.  However,

after running numerous tests on this method, it proved to be inefficient because recruiting

Participants often used their email addresses to open User Accounts for Participants they

recruited.  Accordingly, an email address alone was not sufficient because it would attribute

numerous User Accounts to a recruiting Participant, as opposed to the recruited Participant.

Thus, e-mail address was rejected as a single common identifier.

Huron then considered using the name ascribed to the User Account as a single common

identifier to link User Accounts.  However, this methodology also proved inadequate.

Participants would open User Accounts with variations of their names.  For example, James

Sample, Jim Sample, J. Sample, Sample Jim.  Also, Participants did not always populate the

name field when opening a User Account.  Instead of a name, Participants might insert into the

Account Table a series of letters, initials or fictitious names.  Accordingly, Huron determined

that using the name field alone was not an adequate means to link User Accounts.

## V.      AGGREGATION OF ACCOUNTS THROUGH USE OF MULTI-IDENTIFIERS

Having determined that no single common identifier could be used to link the User

Accounts, Huron identified eight different fields to be used in combination to link the User

Accounts.  Those fields are as follows:

1.   Name associated with each User Account in SIG;

2.   Email address associated with each User Account in SIG;

3.   Home phone number entered into SIG;

4.   Cellphone number entered into SIG;

5.   Physical address such as a street address entered into SIG;

6.   Login which was a unique one-word name created by Participant in the SIG system;

7.   Password which the Participant created to access User Account details; and

8.   Rep ID, or User Account identifier, which was a unique identifier generated by SIG
     for each User Account.

Using these eight data fields as identifiers, Huron developed a multi-step aggregation

process which combined the different data fields, and combinations of portions of the data fields,

to identify all the User Accounts associated with a Participant.  The aggregation consisted of

thirteen (13) independent steps that combined User Accounts through differing combinations of

Participant data entered when opening the User Accounts, as set forth on Slides 1, 2, and 3 to

Exhibit "A".  Each of the 13 steps aggregates User Accounts based on the respective step criteria

and the results of each step are compared to the previously aggregated User Accounts for

common identifiers.  The amount of aggregated User Accounts may increase after each step but

does not decrease.  An illustration of the aggregation process is set forth in Slides 4 through 11

of Exhibit "A" to this memorandum.

**Step 1: Name and Email Address**

Step 1 in the aggregation process used the name entered by the Participant as this was considered to be the most reliable data point.   To reduce the aggregation of potentially unrelated User Accounts, spaces, numbers, and special characters were removed from the name column (for example, John B. Doe would be adjusted to "johnbdoe"), and a minimum number of characters (four) was required to be considered for aggregation.

It is reasonable to assume that Participants would want to include a valid email address in order to receive information about their User Account.  Therefore, the first grouping was that of name and email address.  To reduce the grouping of potentially unrelated accounts, email addresses without "@" and other necessary criteria were not considered because all valid email address require a certain format.

Slide 4 of Exhibit "A' demonstrates that four User Accounts, 1, 2, 7, and 8 contain the name James Sample and the email address jsample@gmail.com, so these four User Accounts have been aggregated.[7]

**Step 2: Name and Mobile Phone**

Step 2 combines cellular phone number with the Participant name.  In the event the name and cellular phone number match those contained in two previously aggregated User Accounts (in this example, User Accounts 1, 2, 7, and 8), then those User Accounts will be added to the aggregation.  Slide 5 of Exhibit "A" demonstrates that User Accounts 6, 12, and 15 contain the same name and cellular phone number of previously aggregated User Accounts 1, 2, 7, and 8 and therefore are now included in the aggregation.

---

[7] There may have been other groups of User Accounts that could be separately aggregated, for example, User Accounts 3 and 9.  For purposes of this example, the Trustee is selecting a particular aggregation and following only that aggregation through the 13 step process for illustrative purposes.

**Step 3: Name and Home Phone**

Step 3 involves comparison of the name and home telephone number. In the event the name and home phone number match those contained in two previously aggregated User Accounts, then those User Accounts will be added to the aggregation.  Slide 6 of Exhibit "A" demonstrates that User Accounts 5, 11, and 14 contain the same name and home phone number of previously aggregated User Accounts 1, 2, 6, 7, 8, 12, and 15, and therefore are now included in the aggregation.

**Step 4: Name, Partial Cell Number, and Partial Home Number**
**Step 5: Name, Login, and Physical Address**

Step 4 involves comparison of the name, the final five digits of the cell phone number and the final five digits of the home telephone number.  Step 5 involves the aggregation of the name, first three characters of the Participant's login, and first five characters of their physical address.   In the event that these combinations match those contained in two previously aggregated User Accounts, then those User Accounts will be added to the aggregation.  As set forth in Slide 7 of Exhibit "A", neither of these steps resulted in more User Accounts being added to the aggregation.

**Step 6: Name, Partial Name, Email, and Partial Home Number**

Step 6 involves comparison of a portion of name ("Part Name Key"), the email address, and a combination of the last five digits of the cellular phone and home phone numbers ("Part Phone Key").  In the event that these combinations match those contained in two previously aggregated User Accounts, then those User Accounts will be added to the aggregation.  As set forth in Slide 8 of Exhibit "A", User Accounts 4 and 10 contain the same combinations of this information as previously aggregated User Accounts 1, 2, 5, 6, 7, and 8.  Similarly, User

Account 13 contains the same combination of this information as previously aggregated User Accounts 14, and 15.  As a result of Step 6, User Accounts 4, 10, and 13 are now included in the aggregation.

> **Step 7: Part Name Key, Part Phone Key, Login Key, End Key**
> **Step 8: Part Name Key, Email, Login Key, End Key**
> **Step 9: Part Name Key, Login Key, Hash Key**

Step 7 involves comparison of a combination of the Part Name Key, Part Phone Key, a portion of the login associated with the User Account ("Login Key"), and a portion of the physical address ("End Key").  Step 8 involves comparison of a combination of the Part Name Key, email address, Login Key, and End Key.  Step 9 involves comparison of a combination of Part Name Key, Login key, and an aggregation field derived from the code generated by the encryption of the secondary password associated with the User Account ("Hash Key").   In the event that these combinations match those contained in two previously aggregated User Accounts, then those User Accounts will be added to the aggregation.  As set forth in Slide 9 of Exhibit "A", none of these steps resulted in additional User Accounts being added to the aggregation.

> **Step 10: Name, Partial Name, Email, and Partial Home Number**

Step 10 involves comparison of a combination of a portion of the name ("Part Name Key2"), the email address, and the Part Phone Key.  In the event that these identifiers match those contained in two previously aggregated User Accounts, then those User Accounts will be added to the aggregation.  Slide 10 of Exhibit "A" demonstrates that User Accounts 3 and 9 contain the same identifiers as previously aggregated User Accounts 6 and 12, and therefore are now included in the aggregation.

**Step 11: Part Name Key2, Part Phone Key, Login Key, End Key**
**Step 12: Part Name Key2, Email, Login Key, End Key**
**Step 13: Part Name Key2, Login Key, Hash Key**

Steps 11 through 13 are similar to Steps 7 through 9, except that they use Part Name Key

2 rather than Part Name Key in combining fields of data.  In Slide 11, no additional aggregations

result, and the aggregation process is now complete.

## VI.    VERIFICATION

Having applied the aggregation algorithm to link User Accounts to ascertain the Net

Losers and Net Winners, Huron then verified its results by comparing the results to both manual

aggregations performed by Huron and to listings of User Accounts shared with Huron by

Participants. For example, Huron identified that in certain instances a Participant may have used

a shortened version of their first name.  For example, a Participant with the name "James

Sample" may have used combinations of "James Sample", "James A Sample", "Jim Sample",

"JA Sample" and "J Sample".  To address this issue Huron created "Part Name Key2" which

consists of a combination of the first and last four characters of name field.   This search field

allowed the algorithm to aggregate names that would not have been aggregated by comparing the

full name field.  The Part Name Key2 for each of the examples above would be "jmple" and the

algorithm would aggregate the associated User Accounts if there was sufficient overlap of other

data.  The modifications identified by the manual review were made to the aggregation

algorithm, and then another complete review was conducted to arrive at the final algorithm.

 The algorithm served as the basis for the Trustee's establishment of an interactive

internet portal ("Portal") for Participants to file electronic proofs of claim ("ePOCs").  The Portal

was designed so that each Participant could enter the personal identifiers that were input when

establishing their User Accounts.   If the personal identifiers entered by the Participant matched a

13

portion of the personal identifiers associated with a User Account, the Portal would then present

Participants with a listing of their aggregated User Accounts based upon the information input.

Participants could accept or reject any of the User Accounts generated, add additional User

Accounts, adjust transactions, or input additional data before submitting their claim.  One of the

changes that a Participant could make through the ePOC system was to add or subtract User

Accounts.  Approximately 132,000 claims were filed through the ePOC system, and of those

claims, more than ninety percent (90%) agreed with the information provided, including the User

Accounts that were ascribed to them based upon the algorithms developed by Huron.

      The aggregation algorithm described above was developed over more than three months,

and thousands of hours were expended on developing, testing, refining, modifying and,

ultimately, reaching the conclusions expressed in the Expert Report.  Given the millions of User

Accounts and the transactions reflected in those accounts and the issues with respect to the

information contained in the accounts, the aggregation algorithm prepared by Huron meets the

threshold requirements under Federal Rules of Evidence, Rule 702 for admissibility.  Admitting

the Trustee's Expert Report and Opinion testimony leaves open for each individual Participant to

dispute the specific finding as to them and for the Court to weigh the findings by Huron as to any

individual Net Winner against specific evidence offered by a Participant.

## VII.    LEGAL STANDARD

      The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  Rule

702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to
the facts of the case.

The trial judge is the gatekeeper whose function is to ensure that an expert witness is

sufficiently qualified by "knowledge, skill, experience, training, or education" and that the

"testimony both rests on a reliable foundation and is relevant to the task at hand" so as to assist

the trier of fact. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993);

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (clarifying that *Daubert*'s gatekeeping

obligation extended to technical and other specialized expert testimony). In evaluating reliability,

a trial court "*may* consider one or more of the more specific factors that *Daubert* mentioned,"

such as testing, peer review, error rates, and acceptability in the relevant scientific community,

but these factors "do not constitute a 'definitive checklist or test.'" *Kumho Tire*, 526 U.S. at 150

(emphasis in original). The appellate courts have stressed that the trial court must have

"considerable leeway" in both "how to determine reliability" and "its ultimate conclusion." *Id.* at

152–53. The test of reliability is "a flexible one" and must be "tied to the facts of a particular

case." *Id*. at 150 (citations and quotations omitted).

While a trial judge may examine the data offered to support an expert's opinions, Rule

702 does not require that the proffering party "carry the burden of proving to the judge that the

expert's assessment of the situation is correct." *Milward v. Acuity Specialty Products Group,*

*Inc.,* 639 F.3d 11, 15 (1st Cir. 2011), *cert. denied*, 132 S. Ct. 1002 (2012) (citation and quotation

omitted). Instead, the proponent of the expert testimony must show only "by a preponderance of

proof" that the expert has used a "sound and methodologically reliable" reasoning process to

reach his or her conclusion, and that the expert, "whether basing testimony on professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152;

*Daubert,* 509 U.S. at 592 & n. 10.

> The First Circuit in addressing the Trial Court's gatekeeper function has cautioned that:

> So long as an expert's scientific testimony rests upon 'good grounds,' based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Milward,* 639 F.3d at 15.

Thus, admissibility of the Expert Opinion does not hinge on the Court finding at this stage that the aggregation algorithm developed by Huron is, in fact, correct. Rather, the inquiry is whether the methodology employed to generate the result has the earmarking of reliability. *Kumbo Tire Co. v. Carmichael,* 526 U.S. at 152 (1999). Once admissible, the basis for the opinion and the methodology will be tested by cross-examination, and the Court will determine the weight to be given to the expert opinion. In this case, the opinion will be subject to a dual test; first, in light of the StoneTurn rebuttal report and, then, each Participant will have the opportunity to offer evidence to challenge the specific facts that he/she is a Net Winner and the amount of the Net Winnings.

## ARGUMENT

### STONETURN'S OBJECTIONS GO TO THE WEIGHT OF THE OPINION, NOT THE ADMISSIBILITY.

The Class Action Representatives will submit the expert testimony of Joshua Dennis as set forth in the expert report of StoneTurn (the "StoneTurn Report") in rebuttal to the Trustee's Expert Report. The StoneTurn Report does not offer an alternative methodology with respect to the linking of the various User Accounts to determine who are the Net Winners, nor does it offer an alternative method for determining the amount of Net Winnings each Net Winner received. The StoneTurn Report criticizes the basis of Huron's report and challenges the sufficiency and

reliability of the information that forms the basis for the Expert Report, but offers no alternative
methodology.  Apparently, StoneTurn is asserting the position that no methodology is possible
and that there is no means of aggregating User Accounts or determining Net Winners and Net
Losers.

StoneTurn's objections to the Expert Report are in two categories.  In the first, StoneTurn
criticizes the reliability of the Expert Report by noting that (1) the deterministic record linkage
methodology has never been applied to a Ponzi scheme, (2) TelexFree's internal controls were
insufficient to prevent Participants from entering inconsistent or unreliable information, (3) the
ePOC data was too small a sample to verify the results, and (4) a review of certain accounts
suggests instances of under-aggregation.

All of StoneTurn's criticisms go to the weight the Court should give to the expert opinion
in arriving at its final judgment, not to the admissibility of the expert opinion. *See Zagklara v.
Sprague Energy Corp.*, No. 2:10-CV-445-GZS, 2013 WL 160271, at *2 (D. Me. Jan. 15, 2013);
*Zurich Ins. Co. v. Sunday River Skiway Corp.*, No. CIV. 08-325-P-H, 2010 WL 1511495, at *14
(D. Me. Apr. 15, 2010); *Forbis v. City of Portland*, No. 02-135-P-H, 2003 WL 21250675, at *4
(D. Me. May 29, 2003) ("Challenges to the methodology used by an expert witness are usually
adequately addressed by cross-examination." (*citing United States v. Diaz,* 300 F.3d 66, 76–77
(1st Cir. 2002)).

As noted, Rule 702 also "does not require that a party who proffers expert testimony to
carry the burden of proving to the judge that the expert's assessment of the situation is correct."
*Milward*, 639 F.3d at 15 (citation omitted). "The soundness of the factual underpinnings of the
expert's analysis and the correctness of the expert's conclusions based on that analysis are
factual matters to be determined by the trier of fact. When the factual underpinning of an

expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." *Id*. at 22 (citations omitted).

As noted, the Expert Report does not rely exclusively upon the deterministic methodology, but utilizes that methodology as a template to develop a more refined methodology so as to match the facts and circumstances presented in the TelexFree case.  It is clear that the TelexFree Ponzi scheme is unique, both in the sense of the amount of the data which needed to be reviewed and collated and in the nature of the scheme itself.  Recognizing this uniqueness, the Expert Report ultimately develops its own methodology for linking User Accounts, borrowing from the recognized deterministic methodology.

StoneTurn's next criticism with respect to the aggregation methodology concerns the use of the name as a key linking data point.  As noted, the name was selected because it is reasonable to assume that Participants who would be receiving either credits or distributions would provide at least in one instance an accurate identification so that they could receive the benefits of their membership.  Additionally, the name was only one of the multiple identifiers utilized, and as detailed above, the Expert Report used a sophisticated 13-step procedure to equate various identifiers to ultimately link the accounts.  Again, StoneTurn's criticism goes to the weight, not to the admissibility.

StoneTurn criticizes the use of the ePOC data as providing a verification of the Trustee's methodology.  A review of the 132,000 claims which were processed through the Portal encompassing approximately 1,900,000 User Accounts, disclosed more than 90% of the Participants substantially agreed with the findings by Huron with respect to User Accounts being attributed to those Participants.  While the number of Participants who filed claims through the Portal were relatively small in comparison to the overall universe of potential claimants, the fact

that the vast majority of the claimants who filed claims through the Portal agreed with the

Trustee's aggregation of User Accounts is certainly indicia of the reliability of the system and a

factor which the Court can consider in considering the admissibility of the Expert Opinion.

Finally, StoneTurn criticized the aggregation method on the basis that when StoneTurn

performed a manual review of the Net Losers and Net Winners' accounts, it found instances of

potential underaggregation.  This criticism, like its others, goes to the weight to be given to the

Expert Opinion, not to its admissibility.  The Expert Report does not purport to state that the

aggregation method is infallible, only that it represents a reasonably methodology for linking

accounts to determine the Net Winners and Net Losers.  Each Net Winner will be provided with

an account statement and an opportunity to contest his/her individual accounting; and in its role

of fact finder, the Court can consider the Expert Opinion, weigh the evidence submitted by the

Net Winners, and ultimately make the factual determination as to the liability, if any, of each

individual Net Winner.  The process for ultimately resolving the amount of each Net Winner's

liability will be substantially similar to the process employed to resolve claim objections, which

process is proven to be fair and efficient.

StoneTurn's objection challenges certain fundamental assumptions made by Mr. Martin

in forming the Expert Opinion.  These core assumptions are:  (1) credit transactions solely

between Participants are not included in the determination of the net equity calculation;[8] and (2)

Triangular Transactions are presumed to involve payment of cash by the new Participant to the

recruiting Participant.

With respect to StoneTurn's criticism that the credit transactions solely among

participants should be included in the calculation of the net equity, that criticism raises a legal

---

[8] Credit transactions where a Participant purchases credits from TelexFree are accounted for in SIG and included in the net equity calculation.

issue, as opposed to admissibility of the Expert Opinion.   The interparticipant credit transactions were excluded from the calculation because they were, in fact, interparticipant transactions, which did not directly involve TelexFree.  While TelexFree does have information with respect to the credit transfers which occurred, they were outside of the TelexFree Ponzi scheme itself. Credits have not been considered in the calculation of any claim outside the definitions of Direct and Triangular Transactions.  Whether credit transfers should be included in the calculation of Net Winnings is in the first instance a legal determination to be made unrelated to the admissibility of the Expert Opinion.  Further, how credits are accounted for goes to the amount of the Net Winnings – therefore, the damage claim – and not to the admissibility of the Expert Opinion itself.  If necessary, an additional calculation can be done to the extent that an individual Net Winner raises an issue of credits and the Court determines as a matter of law that credits should be considered in the calculation of Net Winnings.

The second challenge relates to the assumption made in the Expert Opinion that the Triangular Transactions involved the payment of cash by the new Participant to the recruiting Participant.  The Trustee's expert assumed that the Triangular Transactions were based on cash paid to the recruiting Participant because the recruiting Participant redeemed credits in connection with a Triangular Transaction and it is unreasonable to assume that a recruiting Participant who could redeem credits for cash would redeem them for no payment in connection with a Triangular Transaction.  Further, the Trustee, through meetings with victims groups, provided to the expert information from numerous Participants, all of whom stated that the Triangular Transactions involved the payment of cash to the recruiting Participant.

## CONCLUSION

In conclusion, under the circumstances of the case, the Expert Report is admissible, and

the criticisms and challenges to the Expert Report go to the ultimate weight it should be given

when determining each individual Participant's liability.

> STEVEN B. DARR,
> LIQUIDATING TRUSTEE,
>
> By his counsel,
>
>
>  /s/ Andrew G. Lizotte
> Harold B. Murphy (BBO #362610)
> Charles R. Bennett, Jr. (BBO #037380)
> Andrew G. Lizotte (BBO #559609)
> MURPHY & KING,
> Professional Corporation
> One Beacon Street
> Boston, MA  02108
> Tel: (617) 423-0400
> Fax: (717) 423-0498
> hmurphy@murphyking.com
> cbennett@murphyking.com
> alizotte@murphyking.com

Dated: November 18, 2020
788468