## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF: | : | Case No. 14-40987 |
| | | 14-40988, 14-40989 |
| TELEXFREE, LLC, TELEXFREE | : | (Jointly Administered) |
| INC., and TELEXFREE | | |
| FINANCIAL, INC., | : | Boston, Massachusetts |
| | | **November 23, 2020** |
| Debtors, | : | 10:01:23 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| STEPHEN B. DARR, | : | AP 16-04006 |
| Plaintiff, | : | |
| v. | : | |
| BENJAMIN ARGUETA, ET AL., | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| STEPHEN B. DARR, | : | AP 16-04007 |
| Plaintiff, | : | |
| v. | : | |
| PAOLA ZOLLO ALECCI, ET AL., | : | |
| Defendants. | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

### VOLUME 1
### TRANSCRIPT OF VIDEO EVIDENTIARY HEARINGS: DETERMINING
### THE ADMISSIBILITY AND PRESUMPTIVE EFFECT OF THE
### AGGREGATION METHODOLOGY IN DETERMINING NET WINNERS
### BEFORE THE HONORABLE MELVIN S. HOFFMAN, J.U.S.B.C.

**APPEARANCES (via video and telephone):**

<u>For Plaintiff, Stephen Darr,</u>   Murphy & King, P.C.
<u>Chapter 11 Trustee:</u>            BY:  ANDREW G. LIZOTTE, ESQ.
                                       CHARLES BENNETT, JR., ESQ.
                                  One Beacon Street, 21st Floor
                                  Boston, MA  02108

1 | **APPEARANCES (via video and telephone continued):**

2

3 | For Class Defendants:              Milligan Rona Duran & King LLC
                                       BY:  ILYAS J. RONA, ESQ.
                                            MICHAEL J. DURAN, ESQ.
4                                      50 Congress Street, Suite 600
                                       Boston, MA  02109

5

6 | For Certain Claimants:             JORDAN L. SHAPIRO, ESQ.
                                       P. O. Box 392
                                       Malden, MA  02148

7

8
                                       STEPHEN DARR
9                                      Chapter 11 Trustee
                                       265 Franklin Street
10                                     Boston, MA  02210

11                                     JEAN-LOUIS SORONDO
                                       Huron Consulting Group

12

13

14 | Audio Operator:                   YVONNE WOODBURY, ECRO

15

16 | Transcript prepared by:           JANICE RUSSELL TRANSCRIPTS
                                       1418 Red Fox Circle
17                                     Severance, CO  80550
                                       (757) 422-9089
18                                     trussell31@tdsmail.com

19
     Proceedings recorded by electronic sound recording; transcript
20   produced by transcription service.

21

22

23

24

25

     **#14-40987/AP 16-04006/AP 16-04007**                    **11-23-2020**

3

INDEX

OPENING STATEMENTS:

    On behalf of the Plaintiff, by Mr. Bennett       7

    On behalf of the Defendants, by Mr. Rona       12

| | Direct | Cross |
|---|---|---|
| WITNESSES FOR THE PLAINTIFF: | | |
| Timothy J. Martin | 20 | 127 |

| EXHIBITS: | Marked | Received |
|---|---|---|
| Plaintiff's 1  Martin report | 125 | 126 |
| Plaintiff's 2  Martin reply report | 126 | 127 |
| Defendants' 19 Balan affidavit | 149 | |

**4**

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Before we start today's

3    evidentiary hearing, I just wanted to make a short

4    announcement, that the Court reminds all of you who are

5    participating in or observing today's remote hearing, that the

6    recording or rebroadcasting of court proceedings is strictly

7    prohibited.  Violators may be subject to severe sanctions.

8    Official transcripts of all court proceedings are available for

9    purchase upon request to the Clerk of the Court.

10             Thank you.

11             The evidentiary hearing will begin shortly.

12        (Pause)

13             THE COURT:  Good morning, everyone.

14             Regina, do you want to call the case, please?

15             THE COURTROOM DEPUTY:  Calling Adversary Proceedings

16   16-4006, Darr versus Argueta, and 16-4007, Darr versus Alecci.

17             Could the parties please identify themselves for the

18   record, starting with counsel to the plaintiffs?

19             THE COURT:  Mr. Bennett, you may be on mute.

20             MR. RONA:  Charlie, you're on mute.

21             MR. BENNETT:  They took that off.  There we go.  Try

22   it again.

23             Good morning, your Honor.  It's Charles Bennett on

24   behalf of Mr. Darr as he is the trustee of the TelexFree

25   estates.  With me in the conference room is Mr. Lizotte.  We're

1    going to need, if we can, to correct the name on the screen

2    from Kate Cruickshank to Andrew Lizotte at some point in time.

3    Also present in the court, in the conference room is Mr. Darr,

4    the trustee.

5          And listening, but will not be participating as a

6    witness is Jean-Louis Sorondo.  He's an employee of Huron and

7    he worked with Mr. Martin in connection with the expert report.

8          THE COURT:  Thank you.

9          THE COURTROOM DEPUTY:  And for the defendants?

10          MR. RONA:  Good morning, your Honor.  Ilyas Rona on

11    behalf of both sets of class defendants.  I'm joined by my

12    colleague, Mike Duran, as well as the expert for the

13    defendants. Mr. Joshua Dennis, who's at the offices of

14    StoneTurn.

15          THE COURT:  All right.  Can everybody hear me okay?

16          MR. BENNETT:  Fine, yes.  Thank you.

17          MR. RONA:  Yes.

18          THE COURT:  Good.

19          In terms of housekeeping, I guess what we should do is

20    if you are not actively speaking, you should probably stay on

21    mute.  And if you would like to speak, then unmute yourself or

22    if you are objecting to a question of a witness and you want to

23    stop the, the answer, wave your hand or something and we'll

24    hold off.  We'll try to make this work as smoothly as we can.

25          My understanding is that we are going to be hearing

1   from two witnesses for this hearing, Mr. Martin and, and

2   Mr. Dennis.  Anybody else besides those two, Counsel?

3       MR. BENNETT:  Not from the plaintiff's standpoint,

4   your Honor.

5       MR. RONA:  And not from the defendants' standpoint.

6       THE COURT:  All right.

7       I have all of the exhibits that were provided, or

8   material.  They haven't been admitted into evidence.  It's

9   certainly a lot of stuff and any other -- any -- any other

10  preliminaries that we have to address before we plow into this?

11      MR. BENNETT:  Don't believe so from the plaintiff's

12  standpoint.  I don't know if the Court wants a brief opening

13  statement.  If so, I'm prepared to give one.  If not, I will

14  just begin immediately with Mr. Martin.

15      THE COURT:  I, I, I was going to suggest opening,

16  brief opening statements.  Before we do that, anything else

17  besides that that we have to talk about or does anybody want to

18  point anything out to me that I should know?

19      MR. RONA:  Your Honor, just in terms of timing, I -- I

20  -- Mr. Dennis is here and he's ready to go, but I wasn't sure

21  if your Honor by scheduling this for two days contemplated one

22  witness per day.  Obviously, if we move fast, we could see what

23  we could accomplish today, but I also don't, didn't want to be

24  over ambitious and was wondering what your Honor was, had

25  allocated for time today.

1          THE COURT:  I -- I -- I don't remember anymore how we

2     came up with the two days, but that, maybe that was just to be

3     extra, extra careful.

4          What we'll -- we'll -- we'll -- we'll go until 5:00

5     today and we'll see how far we get.  If we can finish both,

6     wonderful.  If not, we have tomorrow to, to continue, so.

7          But we're going to start with Mr. Martin, I assume.

8          Right, Mr. Bennett?

9          MR. BENNETT:  Yes, your Honor.

10          THE COURT:  All right.

11          So let -- let -- I, I'll let you sort of set the stage

12     and tell me what you want to tell me to, to, to kick us off and

13     then I'll hear from Mr. Rona and then we can begin.

14          So go ahead, Mr. Bennett.

15          MR. BENNETT:  Thank you, your Honor.

16          Your Honor, the way we are bringing this pursuant to

17     your orders and the way the parties sought to structure this

18     matter was to address what I believe is probably the, one of

19     the key issues in the case, which is the admissibility of the,

20     of Mr. Martin's report and, more importantly, the admissibility

21     of the aggregation methodology that was employed on behalf of

22     the trustee to calculate the net winners and the amount of the

23     net winnings.  I view this, your Honor, somewhat in the context

24     of a Daubert-type hearing, which is to deal with the

25     preliminary matter of admissibility and it is not a final

1  conclusion with respect to the result of a contested or final

2  trial.

3       In connection with, with a _Daubert_ hearing I would

4  submit that the bar for which we need to get over in order to

5  admit Mr. Martin's report is one of, one of reasonable

6  reliability based upon the methodologies employed and whether

7  that, the report would assist the finder of fact ultimately in

8  drawing the, making the, the findings and conclusions necessary

9  for the entry of a judgment.  As I understand the standard from

10 _Daubert_, the Court is not determining at this stage the merits

11 of, of the results found pursuant to the aggregation theory,

12 only whether or not the aggregation theory can be used in order

13 to satisfy the trustee's _prima facie_ case.

14       I would contemplate if the Court accepts the

15 aggregation theory and the results of that theory in linking

16 the various user accounts as admissible and as of the, as

17 constituting the _prima facie_ case for, for the trustee, then

18 each one of the individual net winners would have an

19 opportunity, to the extent that they wish to offer

20 counterevidence to, to either contest any particular account

21 which was linked to their name or with respect to the ultimate

22 amount of the net winnings that we seek to have awarded as

23 judgment against each one of the net winners.

24       I believe that if, if the report is found to be

25 admissible and constitute the _prima facie_ case, then the

1   procedure which I would then be suggesting to the Court would

2   be somewhat similar to that which was followed by the Court in

3   connection with resolving claims and that would be a procedure

4   where the net winners would be provided in substance with an

5   accounting as to the claims made against each of them.  It

6   would schedule their user accounts and the amount of damages

7   sought and then each one of the net winners, to the extent they

8   want to contest it, would file whatever evidence they have to

9   contradict the, or contest the trustee's *prima facie* case.  If

10  the parties then can't reach a resolution, obviously it would

11  then come to the Court for final resolution similar to what was

12  done in connection with the ePOC.

13         With respect to the report itself, your Honor, there

14  are two aspects of the report and I believe that we're going to

15  be primarily focusing on the first aspect.  The two aspects of

16  the report is, one, how are the various user accounts linked.

17  And as the Court's aware from the, its participation in this

18  case over the number of years, there was over 17 million

19  separate and individual user accounts.  Each time a participant

20  opened a, bought a membership, it would, he or she or it would

21  open a new user account and then transact business within that

22  account.  In this case, out of the 17 million user accounts we

23  believe approximately 3 million -- there -- there were

24  approximately 3 million actual individual users and of the 3

25  million, we believe probably 1 million was attributable to

1   Ympactus, the Brazilian Ponzi scheme, and the other 2 million

2   to the TelexFree scheme.

3           So the first, first point of business for the, for the

4   trustee was to develop a system for, to sort the various user

5   accounts and to link those accounts and Mr. Martin will testify

6   to the procedures they followed in order to develop that

7   linking system.

8           The second part of the report deals with the amount of

9   damages when you, once you have linked all the user accounts

10  together.  That is, principally, a mathematical calculation.  I

11  don't believe that in and of itself it requires expert

12  testimony.  If the Court finds the linkage methodology to be

13  appropriate and admissible, then the mathematics flow from

14  that.  As we go through the testimony both with respect to

15  Mr. Martin and I expect with the cross-examination of

16  Mr. Dennis, I would anticipate that some of the issues that are

17  going to be addressed really go to the issue of the amount of

18  the damages and, therefore, may not be particularly relevant to

19  the topics before us.

20          With respect to the report itself, Mr. Martin will

21  testify that the methodology he employed was a methodology

22  based upon what was called the deterministic procedures, though

23  he did not necessarily adopt all aspects of the determ,

24  deterministic methodology.  And what that methodology is and

25  what Mr. Martin will testify to, it's to develop various

1    linking keys to identify the various linkage and, therefore,

2    to, how to identify the various user accounts and how each

3    individual user account should be linked with another.

4           The system that Mr. Martin will testify to has been,

5    was set forth in our pre-hearing memorandum.  I think the best

6    way, the best analogy to look at is that of a snowball.

7    That's --  I have to credit Mr. Lizotte with that particular

8    analogy.  And in substance, as the Court will, would see from

9    the memo we submitted and from Mr. Martin's testimony is the

10   computer would run a series of 13 different independent

11   analysis through all 17 million of the user accounts comparing

12   certain specified identifiers, then linking those identifiers.

13          So in Step 1, you would identify certain accounts that

14   dealt with names and e-mails.  Step 2, you may identify names,

15   e-mail, and cellphones and then you would, once you had the

16   Step 2, which was independent from Step 1, you'd compare Step 1

17   and 2 together and if there was overlap, they would be added

18   together and that would then begin to build the snowball.  And

19   Mr. Martin will go in more detail from that.

20          That, your Honor, is in substance what we will be

21   offering for our testimony today.

22          THE COURT:  Thank you.

23          And, and by the way, the exhibits that, or the, the

24   items that are included in the one volume of proposed exhibit

25   book that you submitted, you're -- you'll -- you will be able

1   to, to the extent you want the, the witness to talk about them

2   or me to see them, you'll be able to put them on Share Screen

3   so that we can all see them?

4          MR. BENNETT:  Yes, we will, your Honor.

5          THE COURT:  Okay.

6          MR. BENNETT:  That was our intention.

7          THE COURT:  Thank you.

8          Mr. Rona, do you want to make, make an opening,

9   please?

10         MR. RONA:  Yes.  Thank you, your Honor.

11         I think Huron was given a challenge in this case,

12  given the size of the Ponzi scheme, the number of participants,

13  and the estimates for the amount of money that people may have

14  lost and certainly, I think, Huron did and Mr. Martin took an

15  admirable approach in order to solve this problem.

16  Unfortunately, the methodology employed here was not reliable

17  and while it's certainly possible that Mr. Martin has reached

18  the right result for a lot of particularly smaller users,

19  especially net, smaller participants, especially net losers,

20  he, he reached the results in the wrong way and we don't know

21  how far off his estimates are, but we do know that as, if you

22  look at large net losers or net winners, that the estimates

23  appear to be way off.  The problem lies in the fact that the

24  data, the underlying data has flaws.  And so the, if you put

25  flawed data into a computer, you can't expect anything but

1  flawed results to come out.

2       Now there are ways to try to fix data and improve it

3  using statistical methods, but those were not employed here.

4  What was done, instead, was there were various assumptions used

5  and some of assumptions may be correct, but other assumptions

6  were incorrect or inconsistent.  Further, there was a cherry-

7  picking of what identifiers to look at, what identifiers to not

8  look at, and most importantly, what identifiers get elevat4ed.

9       Here, Mr. Martin chose to elevate the name that was

10  typed into a TelexFree computer portal under the assumption

11  that the name was accurate, consistent, and, and applicable to

12  the person who typed it.  That is not true.  What we know is

13  that people used different names, people had errors, people

14  from different parts of the world have different naming

15  conventions that allow for shorter names or longer names,

16  depending on, on, on who, essentially, who's asking.  And so

17  the name field skews the results because it assumes that those

18  names are accurate.  In fact, methodologically, Mr. Martin

19  selected the deterministic method for record linkage which

20  assumes that you have good quality data.  It -- it -- it --

21  it's -- it's the bread and butter of the financial industry

22  when you have a Social Security number or some other ident,

23  like a health care identifier number that we know when you have

24  that number that that refers to one unique individual and there

25  are the correct number of digits.

1          TelexFree did not require that if you entered a Social

2     Security number -- and people did enter Social Security

3     numbers.   Those were available to Mr. Martin, but he ignored

4     those -- but there was no requirement that it had the right

5     number of digits.   Phone numbers didn't necessarily have the

6     right digits.   E-mails were not validated and names were not

7     validated.

8          So there was nothing intrinsic to TelexFree that,

9     that, that tried to give us any assurances that this data was,

10    was usable for this purpose.

11         What then ensued was a series of, of steps that

12    Mr. Bennett mentioned, the 13 steps, but Mr. Martin is the one

13    who chose those 13 steps, meaning he could have picked 11

14    steps, he could have picked 12 steps, he could have kept going.

15    There was nothing particularly scientific that guided when he

16    was going to stop.   What he will testify to is that he used

17    visual inspection and it's true that when you look at data in

18    rows and columns you can see that things tend to match in the

19    area that you're looking.

20         So he looked at the aggregations that he had created

21    and was satisfied with them, but what he didn't see is that

22    there were other aggregations that were attributed to other

23    participants that, if you actually know a little more, are the

24    same person.   And there -- so there are countless examples of,

25    of, of participants who were essentially, their aggregations

1    were separated.  They were split between two different bodies

2    of aggregations based on the criteria that Mr. Martin used.

3         Now the, the driver for this was, I think, an attempt

4    to address the community outcry that had occurred when

5    TelexFree went bankrupt and Mr. Martin admits that he spoke to

6    people who had lost money and they were the, the primary source

7    of feedback for Mr. Martin as he developed this model, but that

8    may have skewed his analysis in favor of net losers and, and,

9    and away from net winners and particularly large net winners.

10        Turning to the, to the credits -- so there, there are

11   issues with the aggregation and those are independent of the

12   calculations.  We disagree with the statement Mr. Bennett made

13   that once you're satisfied with the aggregation, the math

14   flows.  We don't think the math flows.  There were a number of

15   columns of data suggesting movement of credits in TelexFree and

16   for reasons that the, the trustee can explain counsel advised

17   Mr. Martin to ignore two of those columns, which are credit

18   transfers in and credit transfers out.  The result of that

19   exclusion is that, essentially, there's an assumption that

20   when, when two participants transfer credits between each

21   other, that that, those credits are worth zero.  However, if,

22   if the same participants, one decides to pay the invoice for

23   the other, there's an assumption that, that the exact amount of

24   that invoice was collected in cash.

25        Now the trustee is aware that people did, in fact, buy

1    and sell credits and that would have, that means that there was

2    a movement of cash, but there was no effort to estimate or even

3    include those cash movements in, in, in this analysis.  Further

4    -- so that's an inconsistent set of assumptions.

5            Further, there is no empirical data to support the

6    assumption that credits were worth a dollar.  And so the

7    underlying assumption that every time an invoice was paid, that

8    that exact amount -- and the, one of the most common invoice

9    amounts was $49.90 -- there's an assumption that every time one

10   of those invoices was paid that, that the, the payor collected

11   from, from the beneficiary account exactly $49.90 and there's

12   no evidence that that happened, how often it happened, to what

13   extent.  There's evidence that sometimes those credits were

14   worth more than a dollar and there's evidence that credits were

15   worth sometimes less than a dollar.  But we don't know.

16           So the assumption that credits are worth either a

17   dollar or zero, neither is supportable.

18           At bottom, what happens here is that we're essentially

19   use, doing something we've never done before.  We're taking the

20   Ponzi scheme data, the, the evidence of the Ponzi scheme, and

21   attempting to translate those into actual financial

22   transactions.  And to my knowledge, that's never been done.

23   And so while we -- what -- what we see in the TelexFree data is

24   movements of credits.  We do not see movements of dollars

25   except in very limited circumstances that Mr. Martin

1    identifies, but he chose to broaden his analysis to also

2    include other forms of credit transactions and we're attempting

3    to add dollar values to those when those are -- that -- that

4    is, itself, the artifice of, of the Ponzi scheme.

5          Turning to the endgame here, I, our concern is that if

6    this evidence is, is found to be admissible despite its

7    methodological flaws and its unreliability, it essentially ends

8    the case in favor of the trustee.  While it's true that there's

9    a procedure that we could employ, what we've seen in the claims

10   allowance process and, and what I know from talking to people

11   is there are no records that anyone will be able to marshal to

12   refute or rebut the allegations.  It's been six years since

13   TelexFree closed its doors.  These are mostly cash

14   transactions, many of them on the, on the street, and there are

15   no records for that.

16         So it will be, it will be almost impossible and what

17   will, to refute that.  And so what will happen is the burden is

18   essentially being flipped on a defendant who will not be able

19   to meet that burden.  And so the, the defendants' position is

20   the trustee should be, should be required to meet his burden,

21   but only with admissible, reliable evidence.

22         THE COURT:  Thank you.

23         Mr. Bennett, do you want to call your witness, please?

24         MR. BENNETT:  Thank you, your Honor.

25         Mr. Martin.

1    MR. MARTIN:  Coming.

2    MR. BENNETT:  Do we need a process for swearing

3  Mr. Martin in?

4    THE COURT:  Yes.  I'll, I'll deal with that in a

5  second.

6    Mr. Martin, would you raise your right hand, please?

7    TIMOTHY J. MARTIN, PLAINTIFF'S WITNESS, SWORN

8    THE COURT:  Thank you.

9    Let me ask you a few preliminary questions before we

10  start your testimony.  Can you please tell us where you are

11  currently located?

12    THE WITNESS:  At Waltham, Massachusetts at my house.

13    THE COURT:  And -- sorry?

14    THE WITNESS:  At my house at Waltham, Massachusetts.

15    THE COURT:  And describe the room that you're in

16  currently.

17    THE WITNESS:  It's, it's my office/guest room/where

18  the kids do their homework.  It has a TV on the wall to my

19  right, a couch to my left, and I have a larger monitor here and

20  a printer over here.

21    THE COURT:  All right.  Now are all of those other

22  devices turned off?

23    THE WITNESS:  The monitor is on, but there is -- it's

24  just on because when the exhibits are presented on the screen,

25  I can move them over there and they'll be larger.

1          THE COURT:  Okay.  And, and you understand that while

2    you are under oath testifying, either in direct examination or

3    cross-examination, you are not to communicate with anyone other

4    than attorneys who are examining you and the, and, and me.  No

5    outside communications whatsoever, you understand that?

6          THE WITNESS:  Yes, your Honor.

7          THE COURT:  Okay.  And is your cellphone turned on to

8    vibrate or something so it won't go off --

9          THE WITNESS:  It is.

10         THE COURT:  -- during all this?

11         THE WITNESS:  It is.

12         THE COURT:  And you're not going to look at it.

13   You're not going to get any texts or any e-mails?

14         THE WITNESS:  I'll put it farther over here so that it

15   is outside of, of view.

16         THE COURT:  All right.  And there's nobody else, your

17   kids are not in there with you?  There's no one else --

18         THE WITNESS:  They aren't.

19         THE COURT:  -- in the room?

20         THE WITNESS:  They are not.  And I'm hoping that it'll

21   stay that way and there will not be any knocks on the door.

22         THE COURT:  And if that, that changes, you'll --

23   you'll -- you'll -- we'll call a timeout and you'll let us

24   know, all right?

25         THE WITNESS:  Thank you.

#14-40987/AP 16-04006/AP 16-04007                    11-23-2020

 1          THE COURT:  All right.  Thank you.

 2          Mr. Bennett, your witness.

 3          MR. BENNETT:  Thank you, your Honor.

 4                      DIRECT EXAMINATION

 5   BY MR. BENNETT:

 6   Q   Mr. Martin, please state your full name, spell your last

 7   name.

 8   A   Timothy John Martin, M-A-R-T-I-N.

 9   Q   And I understand, Mr. Martin, you are testifying from your

10   home that you -- your home is in Waltham, Massachusetts?

11   A   That's correct.

12   Q   Mr. Martin, would you tell us what your educational

13   background is, please, beginning after high school?

14   A   Sure.

15       I have a Bachelor of Arts in Business, Business

16   Administration in Accounting from the University of

17   Massachusetts at Amherst.

18   Q   And since graduating from the University of Massachusetts

19   at Amherst, have you taken any graduate school courses?

20   A   I have not taking, I have not taken graduate school

21   courses.

22   Q   Since graduating from the University of Massachusetts at

23   Amherst, have you earned any certificates or, or any

24   certificates?

25   A   Yes.  I'm a certified fraud exhibitor [sic], certified

1  turnaround professional, and certified insolvency and

2  restructuring advisor.

3  Q   Would you take a moment, please, and go through each one of

4  those?  Explain what they are and what you had to do in order

5  to earn them.

6  A   Sure.  I'll just go in order that, in the order that, which

7  I received them.

8      Certified insolvency and restructuring advisor is a

9  certificate through the Association of Certified Restructuring

10 Advisors, AIRA.  That, that certification, if I, well, I know

11 it was three separate tests over about a, a year period and I

12 believe there was a minimum amount of restructuring and

13 insolvency experience.  I don't remember the number of years,

14 but it was at least a thousand hours and I believe it was, it

15 was at least three years' experience in that, but I don't, I

16 don't recall.

17 Q   And, sir, how long have you held that certificate?

18 A   I've, I believe I obtained that in 2002 or 2003.

19 Q   What was the next certificate you listed?  And again,

20 background on it, please.

21 A   The next one was certified turnaround professional.  That

22 is a certificate from the Turnaround Management Association,

23 the TMA.  I received that -- I -- I was, did not have to take

24 the test for that.  Usually, that is a, I believe, a four-part

25 test.  I received industry veteran status to obtain that

```
 1   certification based on submitting testimonials from various

 2   clients over the years as well as, as well as hours, hours

 3   requirements and other items.  They -- they -- they -- I

 4   received the, the certification based on industry veteran

 5   status, meaning I had, had enough experience that they

 6   recognized it and awarded me the certificate.

 7   Q    And the third certificate that you have earned?

 8   A    Certified fraud examiner.  That is a, that was through

 9   four, four tests.  I believe I, I believe I obtained that

10   distinction in 2016, I believe.  That was four tests and a

11   minimum amount of service.  I, I believe I -- that -- that --

12   it's a certification, pretty common, not as much common in the

13   restructuring community.  It's more in the investigative

14   community, internal, internal audit communities, banking

15   community.  And like I said, I think I've had that about five,

16   four or five years.

17   Q    Do you --

18   A    And I should mention that --

19   Q    -- hold any other certificates or licenses?

20   A    No.

21   Q    Would you tell us briefly what your employment history is,

22   beginning after you graduated from UMass at Amherst?

23   A    Sure.

24        I just wanted to -- one thing I was about to say there,

25   with respect to each of those three certificates, there is a
```

1   minimum amount of annual education that's necessary in order to

2   maintain the certificates and whether, I believe AIRA may be,

3   certified fraud exhibitor may be ten years.  AIRA may be 15

4   hours a year, but there's a minimum amount of courses I have to

5   take each year in order to maintain those certifications.

6   Q    And have you done so?

7   A    I have.

8   Q    Is there anything else you'd like to add with respect to

9   your education or qualifications and certificates?

10  A    Education, no, nothing else to add there.

11  Q    Would you tell us --

12  A    And, Mr., Mr. Bennett, I will say that in 2000 -- just to

13  be complete -- 2019, I believe at the end of the year, I did

14  not have, I was a couple credits short on the certified fraud

15  examiner and I, that I finished those up in February.  So I

16  went inactive for two months, just -- you have to do a test to

17  do it and I told them I was a couple credits short and made

18  those up in February.

19  Q    Thank you, Mr. Martin, for your honesty.

20       With respect to your employment history, would you tell us

21  what your employment history was, beginning after you graduated

22  from college?

23  A    Yes.

24       While, while I was at, at the University of Massachusetts,

25  I received an offer to work at Arthur Andersen outside, out of

1   college.  I joined Arthur Andersen in the Boston office in, I

2   believe, the fall of '97.  I was an auditor at Arthur Andersen.

3   I continued as an auditor at Arthur, at Arthur Andersen for

4   about three years, 2-1/2 years, and in the fall of 1999, I

5   transferred from Arthur Andersen's audit practice in Boston to

6   their restructuring practice in Miami.  I worked in, in that

7   practice for, until about 2002, focusing primarily on bankrupt

8   companies, insolvent companies, and the related investigations

9   as to the cause of the, of the bankruptcies.

10  Q   And in 2002 did you join a different company?

11  A   I did.  In 2002, at the end of 2002, Arthur Andersen

12  famously ceased to exist and my practice in Miami, we, was sold

13  to KPMG.

14      So every one in my Miami practice joined the restructuring

15  practice of KPMG.  I was, was there for a couple years and then

16  I transferred back up to Boston into KPMG's restructuring

17  practice in Boston, I want to say in late 2003.

18      And the following year, I believe, Mesirow Financial --

19  sorry -- KPMG sold its restructuring practice to a firm called

20  Mesirow Financial in Chicago.  So I -- nothing changed except

21  the name on the door.  My, my, my desk didn't change, but we,

22  our practice became Mesirow.

23  Q   Did you -- for how long did you continue to work for

24  Mesirow?

25  A   I was with Mesirow in the same capacity, which was a

1  combination of restructuring and litigation forensics, from

2  either 2003 or 2004, whenever that transaction was, until 2015

3  when I left Mesirow to join Huron Consulting Group.

4  Q    And you're currently employed at Huron?

5  A    I am currently employed with Huron.

6  Q    And what is your status and title or position at Huron?

7  A    I am the Managing Director of, within Huron Business

8  Advisory.

9  Q    Would you back up and with respect to your employment

10  history, could you tell us whether you were involved in any

11  matters while employed either at KPMG or Mesirow relating to

12  Ponzi schemes exclusive of the TelexFree matter?

13  A    Yes.  I've had several engagements involving Ponzi schemes

14  over the years.  I -- the largest -- the one that I spent the

15  most of my time on, starting back in 2008, was the, the Petters

16  Ponzi scheme, the Ponzi scheme orchestrated by Thomas Petters

17  out of Minneapolis.  I was retained by the trustee to the

18  Lancelot family of hedge funds that lost about a billion eight

19  in the Petters Ponzi scheme.  It was the largest victim of that

20  Ponzi scheme.  And I have, I have been financial advisor to the

21  trustee on that case since 2008 and continuing to today.  That

22  case is ongoing.

23      I also worked for, on a, I want to say two, may have been

24  three different Madoff-related cases where we were retained by

25  feeder funds into the Madoff Ponzi scheme to investigate the

1    circumstances regarding the, the investment and one of the

2    cases related to a potential accounting malpractice case

3    against the auditors to the feeder fund.

4        I did some work for the invest, the receiver for the

5    investors -- investors -- the group of investors in the

6    Stanford Ponzi scheme.  That was the Allen Stanford Ponzi,

7    which was the sale of certificates, certificates of deposits.

8    I think that was back around 2009-2010.

9        And also the Rothstein Ponzi out of Miami.  We were

10   financial advisors to the trustee in that case, former Judge

11   Olson.  That was a Ponzi scheme that involved the sale of

12   confidential employ, employment settlements, sexual harassment,

13   accidents, etc., and the idea was they, they were selling the,

14   selling an interest in those settlements.

15   Q   In addition to having engaged in those, engaged in

16   providing services to functionaries with respect to those

17   different Ponzi schemes, could you also generally tell me what

18   your background has been with respect to restructuring in

19   bankruptcy?

20   A   Sure.

21       As I mentioned, I started in the restructuring bankruptcy

22   world back in 1999 in the Miami office of Arthur Andersen.

23   That office, the, the partner in charge of that office was, was

24   a panel trustee in the Southern District of Miami, Southern

25   District of Florida-Miami.  So worked on a lot of chapter 7

1  liquidations that, and additional workouts there as well as

2  large national cases, including Integrated Health Services --

3  sorry -- I drew a blank on the company.  It was the second

4  largest leasing company after General Motors.  It was based in

5  Miami -- after General Electric.  It was based in Miami.

6       So several large cases, a lot, a lot of workouts, but it

7  was also chapter 7 in all cases.

8       When I left after Arthur Andersen going to KPMG, it was

9  more large, large national cases.  For example, the, the Kmart

10 case.  That was a couple, couple years on that case.  I -- I

11 was -- did -- worked on the restructuring of that case as well

12 as the litigation associated with an investigation into the

13 activities of the board and management leading up to the

14 bankruptcy.  It was known as the Kmart Store Chip

15 Investigation.

16      Also at KPMG, in addition to the -- well, KPMG/Mesirow --

17 as, as I mentioned, from KPMG to Mesirow it was really just a

18 name change.  All the, the engagements we were on we just

19 continued to work on.  So there's some overlap there.  All the,

20 all the large bankruptcies there -- drawing a blank -- the

21 large -- Centennial was a large fraud.  That was, it was a

22 commodities trading investigation and bankruptcy.

23      But pretty much throughout the KPMG into Mesirow time it

24 was, I would say, a mix of 60-70 percent large bankruptcies, 30

25 percent smaller cases.  And my work also was sort of also in

1   that 70-30 range, which was about 30 percent of real, 30

2   percent bankruptcy and more about 70 percent of my time on the

3   investigations and litigation support-related to insolvencies.

4       So over the course of my career it's sort of a switch from

5   being mostly restructuring to a smaller subset of litigation

6   forensics to a balancing and then over the last four or five

7   years a heavier concentration in litigation and forensics.

8   Q   Thank you, Mr. Martin.

9       Mr. Martin, at some time did you become familiar or become

10  engaged to work on the TelexFree bankruptcy proceeding?

11  A   Yes, back in June of 2014.

12  Q   And would you tell us briefly just the circumstances of how

13  you became engaged to work on that, on the TelexFree

14  proceedings?

15  A   Sure.

16      I had actually been following the TelexFree story pretty

17  closely when I was at, at Mesirow and when we saw, we were

18  looking at different avenues, actually, to try to, try to get

19  in, into that case.  I believe Alvarez & Marsal was the

20  debtor's advisors and Steve Darr, the trustee, had been, had

21  been asked to interview for the trustee position there and

22  myself and a colleague of mine at Mesirow, Jim Feltman, worked

23  with the trust, Steve Darr, who would be the future trustee, to

24  put together a, materials to present to the, to the U. S.

25  Trustee's Office in, in, in Boston in connection with the

1    appointment of a trustee and it was contemplated that if

2    Mr. Darr was to be retained as trustee, then the, the Mesirow

3    team, which I was a part of, would be the financial advisors to

4    the trustee.

5    Q    And do I understand Mr. Darr did become the trustee of the

6    TelexFree cases and Mesirow was retained as the trustee's

7    advisor?

8    A    That's correct.

9    Q    Okay.  And in connection with the retention of Mesirow as

10   the trustee's advisor did you assist in putting together a team

11   at Mesirow to work on the TelexFree case?

12   A    I did, yes.  The team consist --

13   Q    Briefly --

14   A    I'm sorry. It'd be --

15   Q    That's all right.

16       Can you briefly describe what -- I'm sorry.  I don't mean

17   to talk over you.

18       Just briefly describe what you did, how you assembled the

19   team, who was on the team, and what their particular areas of

20   expertise was.

21   A    Sure.

22       As I mentioned, there were a few of us that were involved

23   in the presentation for the retention of a trustee.  The, the

24   other gentleman in that was a gentleman named James Feltman,

25   Jim.  So Jim, Jim was part of the team when Mesirow, when

1    Mesirow was retained, myself, and then the -- the rest -- and a

2    gentleman named David McCormack who at the time, I believe, was

3    a manager.  And then quickly, as we obtained more information

4    about the engagement, we brought on more team members and, and

5    that included Jean Sorondo, Jean-Louis Sorondo, and Kevin

6    Faulkner.  Kevin, Kevin is a, a computer specialist and Jean

7    is, is a database e-discovery specialist.

8         (Pause)

9    BY MR. BENNETT:

10   Q    And do I understand at some later date the trustee moved

11   his employment to Huron and you subsequently followed the

12   trustee to Huron?

13   A    Yes.  It wasn't as continuous as that.  The -- I believe

14   the trustee left Mesirow in, I want to say, February of 2015,

15   may have been January of 2015, and I left Mesirow in, I think,

16   August 31st of 2015.

17   Q    And when you left Mesirow to go to, you went to Huron to

18   work with the trustee, again?

19   A    That's correct.

20   Q    And did Huron then become the financial consultant to the

21   trustee?

22   A    Yes.  After, after I joined Huron, filed retention papers

23   to become successor financial advisor and accountant to the

24   trustee for Mes --

25   Q    And did --

1   A    -- for Huron to become successor.

2   Q    And did anyone else other than yourself who had been on the

3   Mesirow team move to Huron?

4   A    Yes.  After I joined, I want to say by the end of that year

5   both Jean Sorondo and David McCormack joined.  There was a gap,

6   again, there.

7   Q    And did Mr. McCormack and Mr. Sorondo continue with their

8   general duties with respect to the, assisting in you, in, in

9   financial investigation in the TelexFree matter?

10  A    They did, in addition to bringing on, using additional

11  resources at Huron.

12  Q    Did anyone else, in addition to those two, those two

13  individuals join your team at Huron?

14  A    No.  Maybe -- let me make sure I understand the question.

15       Nobody else from Mesirow joined the Huron team on

16  TelexFree, but there were additional people at Huron that --

17  that we -- different resources we used at Huron on the team.

18  For example, we had, had, Huron had a division called Huron

19  Legal, which was a, which were all computer specialists, e-

20  discovery specialists.  Huron spun off that group, I want to

21  say, the beginning of, might have been early '16 or early -- I

22  don't recall, but we -- we -- members of that team assisted us

23  in the transition from Mesirow into Huron, getting the system

24  set up, and in analytics.

25  Q    Okay.  When the -- going -- do you recall approximately

1   when the trustee was appointed?

2   A    Yeah.  Well, roughly, it was early June 2014, may have been

3   June 5th, is what's in my head.  Early June 2015.

4   Q    Would you describe for us the --

5   A    2014.  Sorry.  2014.

6   Q    -- the circumstances once, the circumstances that you found

7   or that Mesirow found with respect to the state of the

8   TelexFree business when you, when the trustee was appointed and

9   you became financial advisors?

10  A    Sure.

11       Yeah, I -- yes, Mr. Bennett.  I remember them pretty well

12  because I think we were appointed, it may have been a Wednesday

13  or a Thursday -- it was towards the end of the week -- I

14  remember we were ready to get going.  We had the team organized

15  to work the weekend and plow through everything we had and what

16  we had was very little information to actually get going with

17  at that immediate time.  Before Huron had, before Mesirow had

18  been retained and before the trustee had been appointed the

19  Department of Homeland Security with the U. S. Attorney's

20  Office had raided the facilities at TelexFree's Marlborough

21  offices.  They had removed all the, all the records, both paper

22  and computer, the entire computer systems as well as any

23  computer systems that were offsite.  They, those had all been,

24  that they knew about that were offsite, had all been

25  confiscated.  There was a lack of information available to us

1    at that immediate time.

2    Q   At some point in time after the, after the initial

3    appointment of the trustee, were you able to gain access to the

4    computer information?

5    A   We did.  And it was a -- before we, we gained access to the

6    computer, we -- we --

7    Q   Just -- don't jump ahead too far.

8        Just were you able to gain access?

9    A   We did.  We gained --we, we gained possession of records

10   in, from the computer system in August of 2014.

11   Q   Okay.  Between June and the appointment of a trustee in

12   August, what, if any, investigations did then Mesirow conduct

13   to begin to gather information concerning TelexFree and its

14   Ponzi scheme?

15   A   Prior to the retention of the trustee, the, TelexFree had,

16   had retained its own advisors.  They had Alvarez & Marsal, I

17   believe, in there as financial advisors.  They had Greenberg

18   Traurig and a, I believe a couple of other law firms in there

19   as legal advisors.  They had a, a CFO that they had retained on

20   a contract basis and, and other professionals.

21       To -- quickly after the trustee was appointed we had

22   meetings with the counsel, with counsel like Greenberg Traurig,

23   meetings with the Alvarez & Marsal team and others, and the CFO

24   to obtain an understanding of what, how the business worked,

25   what information existed, what reports they could provide us,

1   and the trustee issued somewhere around 20, 25, might have been

2   26 2004 subpoenas to those prior professionals and others and I

3   believe we obtained somewhere around 150,000 documents from

4   those professionals as well as a lot of electronic reports that

5   Alvarez & Marsal was able to provide us with.  Because before,

6   before Alvarez was replaced they had been in there for several

7   months and had an understanding of a lot of the data and was

8   able, able to provide us with that information.

9   Q   Were you able to speak to anybody from Alvarez & Marsal to

10  assist you in gathering some basic information concerning the

11  operation of  TelexFree?

12  A   Yeah, yes.  We had several meetings with the Alvarez

13  professionals.

14  Q   Now at some time did you, in August, were you able to

15  obtain access to the information that Homeland Security or the

16  U. S. Government had seized from TelexFree?

17  A   Yes.  In August of 2014 we obtained, we obtained copies of,

18  of information from Homeland Security.  At that time Homeland

19  Security had not yet been able to put the pieces together and

20  under, and rebuild the TelexFree server.  As, as I think

21  Mr. Darr has said in court many times, it's -- when the -- when

22  Homeland Security removed the service to the walls they didn't

23  put together, they didn't create a diagram of how to put them

24  back together again.  And I'm not for sure it's that simple,

25  but my, my point is a lot of work was necessary to reassemble

1 | the components of the computer into a working system.

2 | Q   Okay.

3 |        MR. BENNETT:   If we could just put up, it would be

4 | Plaintiff's ID No. 5, please.

5 |        A little technical difficulty here, Mr. Lizotte.

6 |        One moment, your Honor.   Mr. Lizotte may have a minor

7 | technical difficulty.

8 |        THE COURT:   Sure.

9 |    (Pause)

10 |        MR. BENNETT:   Do you need assistance?

11 |        I wonder -- we, we have a minor technical glitch here.

12 | Could we, could we have a two-minute recess?   I'll bring in one

13 | of our IT people to get it working, your Honor.

14 |        THE COURT:   Okay.   Two-minute recess, everyone.

15 |        MR. BENNETT:   Thank you, your Honor.

16 |    (Recess from 10:50:17 a.m., until 10:53:49 a.m.)

17 |                          AFTER RECESS

18 |        THE WITNESS:   Charlie, I, I found that with these

19 | exhibits you sometimes want to shrink the percentage down to

20 | make the whole thing fit on the screen a little bit from your

21 | 168 percent.

22 |        THE COURT:   Okay.   Everybody ready to go back on the

23 | record?

24 |        MR. BENNETT:   Yes, we are, your Honor.

25 |        THE COURT:   Okay.

1          MR. BENNETT:  I believe so.

2          THE COURT:  Go ahead, Mr. Bennett.

3          MR. BENNETT:  Thank you.

4    BY MR. BENNETT:

5    Q    Mr. Martin, I believe you were telling us that in August

6    you were able to gain some access to the computer records that

7    were seized by the United States Government.

8          Could you give us some sense of the volume of what you --

9    of the -- of the materials that you had obtained from the U. S.

10   Government?  And does Slide No. 5 help refresh your

11   recollection as to the volume of information being obtained?

12   A    Sure, yeah.  Yes, it does.

13         Homeland Security provided us, us with a tremendous amount

14   of information in terms, in terms of copies of computers.  The

15   -- there were about, about 30 different servers, 20 computers,

16   as well as, I believe, there were copies of laptops and several

17   other sources of information.  It was, it was a tremendous

18   amount of information.  It would be millions and millions and

19   millions of pages if, if it was to be printed, which, of

20   course, nobody would.

21         I want to note here, as I, as I had mentioned, that

22   Homeland Security provided this information to us, but they

23   didn't yet know how to use it.  They, they had the servers and

24   they were asking for our help to put the computer system back

25   together again and, and make it work.  And our -- Hur -- at the

1   time Mesirow's professionals spent a significant amount of time

2   over at Homeland Security's offices in Boston helping them

3   figure out how to put the computer back together again and make

4   it work, but you, you can't really do that in a, in a vacuum.

5       So we, we had the benefit of having received the

6   information that Mr. Darr had subpoenaed from the 2004 records

7   to understand what reports look like.  We had the benefit of

8   former employees of, of TelexFree to come to our office and

9   work with us on the computers to show us what information they

10  would look for, how they used it, and identify where it would

11  be held, where it would be held within the system as we pulled

12  all this information together.

13      So it's, it's important to note that just having 30 servers

14  and 20 computers isn't very useful, in and of itself.  It's

15  having access to information and to, to learn how to pull it

16  back, pull it together into, from data engine information.

17  That, that took -- I think I mentioned we got, received access

18  to this information in August.  I think it was around October

19  that we had put it to the point, together to the point where we

20  understood what the information was there.  We were able to

21  confirm with former employees and others that it looked right.

22  Q    Did you review --

23  A    And it was from there just for data integrity.  We didn't

24  continue to work on -- we never worked on the servers, the

25  original servers.  There were images that were provided, images

1   of these servers that were provided to us from Homeland

2   Security and then we built a system from there and then used

3   the data in that system to create large databases that we could

4   run our own reports of without, without using the servers, the

5   images themselves in order to maintain the integrity of those.

6       So what we would do is we would pull the data together,

7   build databases, and run reports, go back to the original

8   system, run the same report, do analytics to make sure that the

9   reports matched, and keep doing that until we were confident

10  that the information that we had extracted from the system was,

11  was complete and accurate.

12  Q   And do I understand this process of gathering the

13  information, gathering knowledge of the operations, and then

14  gathering the data so that it could be usable was done over a

15  period of three to four months?

16          THE COURT:  He's on mute.

17  BY MR. BENNETT:

18  Q   You're on the mute, Tim, for some reason.

19  A   Yeah.  It --

20  Q   You're on mute, again.

21          THE COURT:  You're on mute again.

22  BY MR. BENNETT:

23  Q   Tim, you're on mute again.  Tim?

24          MR. LIZOTTE:  He knows.

25          MR. BENNETT:  Oh.

1           THE WITNESS:  So I keep getting a message, Charlie,

2     that says the host is muting me.

3           MR. BENNETT:  All right.

4           THE COURT:  Go ahead, Mr. Martin.

5           MR. BENNETT:  Okay.

6     BY MR. BENNETT:

7     Q   I, I think the question was, though, this gathering of the

8     information and gathering and under, gathering the information,

9     making the system operative, and gathering an understanding of

10    how the system operated was something that Mesirow worked on

11    for a period of three or four months?

12    A   Yeah.  Two or -- several months to put the system back

13    together again and pull the data and extract it.  It would -- I

14    would say it was more than a few months in terms of fully under

15    -- to -- understanding the data.  That was a more ongoing

16    process.

17        But in terms of putting the system together and ensuring

18    that we had a, a complete, complete databases of the

19    information that was determined to be relevant to the accounts

20    based on discussions with the former employees and former

21    advisors, that, that was a few months.

22    Q   Okay.  And with respect to the sheer volume of information

23    that was recorded on the TelexFree systems, could you give the

24    Court some sense of the volume, please?

25          MR. BENNETT:  And if you want, if you could go to

1  Slide, or Plaintiff's ID for identification 6.

2  A    Sure.  In --

3  Q    Hold on one second.

4         MR. BENNETT:  Let's just put 6 up.  You want to shrink

5  it and then go to the page?

6         THE WITNESS:  As I, as I was about to say,

7  Mr. Bennett, yeah.  And the, the exhibit helps, but some of

8  these numbers are sort of burned into your brain over the, over

9  the years.  And that -- that was -- there were about

10  approximately a billion, 1.3 billion unique transactions within

11  SIG between the, between the relevant periods and it was 2 --

12  you can, you can see the, the years and the transactions on the

13  schedule, but it just grew exponentially from 2012 to 2013.

14  And, you know, 2014 is a smaller number, but recall that the

15  business was shut down in April.  So that's only four months'

16  worth of activity.

17  Q    Okay.  When you say there was 1.3 billion in unique

18  transactions, what, what are we discussing in those unique

19  transactions?

20  A    That -- a transaction could, would be any, any, anything

21  that involved an increase or decrease of, of funds.  Credits is

22  what they were called.  So a transaction could be the purchase

23  of a user plan, purchase of a phone plan, or the, the

24  generation of a bonus earned from the sale of, of a, of a plan

25  or the, or even a bonus derived from a downline participant's

1   sale of, of a plan.

2   Q    Okay.  About this time, say after you, Mesirow has been

3   hired for about six months or so, were you able to gain some

4   understanding as to the basic overall, basic operation of the

5   Ponzi scheme?

6   A    Yes.  Yes.  Well, first I, I should mention that, a couple

7   things.

8        One, early on in the case we had access to Homeland

9   Security investigations and there was -- Homeland Security had

10  been undercover within, within TelexFree for a significant

11  amount of time and one of, one of their agents joined TelexFree

12  through, through triangular transactions and was able to

13  explain to us how, how the process worked, how, the process of

14  opening an account through, through a triangular transaction,

15  the placing of the ads, the, the monitoring of how, the

16  generation of additional credits, the monetizing.  That was

17  explained to us through Homeland Security in one of our many

18  meetings.  We also had access to several -- well, I shouldn't

19  say -- a couple employees of TelexFree as well as the CFO.

20       But the most -- there was an employee, I believe her name

21  was Andreia Moreira, who had been with TelexFree for most of

22  the period and she worked closely with us, came to our office

23  several times.  I recall her coming with us to Homeland

24  Security's offices at least once, working with the system.  And

25  we would have her sit down and walk us through the creation of

1   a user account, where is that information stored, how can we

2   follow, follow the process, and learning through that process.

3   She's opening an account.  Where did she open the account?

4   Where does that exist?  Where is that information stored?  She

5   purchases a, a user account.  Where is that registered?  How

6   can we follow who paid for that user account?

7       So it was really with -- that was one of the real sources

8   of information, is having access to a couple people at

9   TelexFree.  In addition to Andreia, I believe there was a woman

10  named Danni Gois (phonetic) and then Joe Craft was the CFO, but

11  I won't -- he was, he was helpful, but not as helpful as the,

12  the line employees were.

13  Q   Okay.  And having this, gaining this information and this

14  general knowledge with respect to the operations, were you able

15  to identify any particular accounts -- well, strike that.

16  Before we get there.

17      On this particular document that's been marked as, for

18  identification it references a S-I-G, SIG.  What is, what --

19  what is that referring to, please?

20  A   That's the company's, the computer system that TelexFree

21  operated.  If I recall correctly -- and I'm not going to try

22  the Portuguese words, but SIG is a Portuguese acronym that

23  translates into management information system.  But that was

24  TelexFree's management information system.

25  Q   Okay.  And do I understand that the TelexFree system, much

1    of it was in Portuguese?

2    A    That's correct.  Much of it was.  Much of it was in

3    Portuguese.  Sometimes it'd be something that would all of a

4    sudden show up as Spanish or it might be some English, but it

5    was predominately Portuguese.

6    Q    And did Mesirow and then Huron have individuals that could

7    help you understand Portuguese?

8    A    We, we did, yes.  We, we obviously took advantage of Google

9    Translate where necessary, but we had, we had employees that

10   could read Portuguese.

11   Q    And that allowed you to then translate and determine what

12   the English equivalent was of the various documents and

13   accounts that were established at TelexFree?

14   A    That's correct.  Again, we also had access to employees

15   that could help with that, TelexFree employees that could help

16   with those questions, also.

17            MR. BENNETT:  Could you go to Slide 7?

18   BY MR. BENNETT:

19   Q    I'm going to refer you to what we have marked for

20   plaintiff's identification as Exhibit No. 7.  Now, Mr. Martin,

21   this particular document we just have up on the screen is

22   captioned Overview of the Database Structure.

23       Do I understand that as a result of the various work done

24   by Mesirow you were able to identify what you considered to be

25   the important or relevant tables maintained within the SIG

1  system?

2  A    That's correct.  As I mentioned, we walked through with

3  employees of TelexFree and we, several of the participants of

4  TelexFree how they opened up their accounts, what information

5  they relied upon.  There was a, there was a system that the

6  employee, that the participants used called Back Office -- I'm,

7  I'm sorry.  Let me strike, strike that.  Back Office was -- I

8  think it was Back Office.  But anyways, it all used SIG.

9      So we asked what information they used, what information

10  they relied upon.  They showed us different reports that they

11  had and we'd go back and determine where did that information

12  exist within SIG.  And these are the four tables that we

13  identified as having the information that was relevant to

14  creating an accounting of the, the activity in the user

15  accounts.

16  Q    Okay.

17      Now you indicated that you, you found that these were four

18  relevant tables.  Do you know how many tables in total were,

19  were maintained within the SIG system?

20  A    I recall it was close to or maybe slightly more than a

21  hundred different tables were in, were in that system.

22  Q    And if you had that many tables, why were your, why did you

23  focus on these four particular tables?

24  A    Well, a couple things.  First of all, a lot of the tables

25  were completely irrelevant.  The, the SIG system was designed

1   by a couple of the TelexFree executives and it -- and it was --

2   it pulled from a system that they used to run a prior business.

3       So there were, there were tables on there from prior

4   businesses that had no relation to, to TelexFree.  There was

5   also information within there that was related more towards

6   phone, phone calls made, the number of phone calls made with

7   the phone plans, those type of information that wasn't

8   necessary with respect to an accounting of the, of the user

9   accounts.  These four tables we determined were the, were the

10  most useful because they contained information about the actual

11  participant themselves, the information that those participants

12  entered into TelexFree.com when they open an account.  It

13  include the, any invoices that were purchased.  So purchase of

14  a phone plan, the purchase of a, of a family plan, any, any

15  purchases were through that table.  That's the Fatura Table

16  that you see, the second one, or invoice table translate.

17  Q   Okay.  We'll go back in a second and go over each one of

18  the tables.

19      But I noticed in this slide there's a reference not only to

20  TelexFree, but to an entity known as Ympactus.  Could you tell

21  us, please, what Ympactus was or what, what the nature of its

22  business was?

23  A   Sure.  I, I see you're, you're referencing that in the, the

24  first one, in the account table.

25      Ympactus was a, essentially, a mirror image scheme to

1   TelexFree.  It started, it was started in Brazil prior to

2   TelexFree's real emergence in the United States and it was, it

3   was very much a -- the -- a similar scheme to, to TelexFree.

4   And it was use, it used the same SIG system.  It was

5   intertwined.

6   Q    And am I correct, sir, that the, there was information

7   contained within each one of the relevant tables that related

8   to participants who were only participants in the Ympactus

9   Ponzi scheme and not the TelexFree Ponzi scheme?

10  A    To make sure I understand the question.  Within -- within

11  these -- are you asking regarding the four tables here or

12  within the hundred other tables?

13  Q    Well, primarily within the four tables here.

14  A    Within the four tables there were, there was information in

15  there that related to user accounts that were, that were

16  Ympactus only, yes.  But there was -- none of these four tables

17  were, were in and of themselves Ympactus only, but they did

18  include records that related only to Ympactus.

19  Q    Okay.  You used the word "user accounts."  Would you just

20  briefly describe or identify what you mean by a "user account,"

21  please?

22  A    Sure.

23       When a, a participant -- and I'll just, when I refer to a

24  participant I'm referring to any, any person who had a

25  TelexFree account.  So when a participant opened an account

1  with, with TelexFree, they would create a user account that had

2  its own, essentially, a log-in name to it.  Hypothetically, if

3  I opened my first one, I might call it Tim1 and that, that is

4  independent and that, that relates strictly to, to that user

5  account.  It has an ID number associated with it within, within

6  TelexFree and every transaction associated with that user

7  account is maintained within TelexFree, also.

8  Q   Okay.  And now if, going back to the issue with respect to

9  Ympactus, information relating to Ympactus which was within the

10  SIG system.  Did you have to take some steps in order to

11  separate the participants that were Ympactus participants from

12  the TelexFree participants?

13  A   We did.  That, that was necessary in order to do an

14  accounting for the purposes of the, of TelexFree, which was

15  what the trustee was appointed in connection with, not, not

16  Ympactus.

17      So we -- it was necessary to determine a methodology for

18  removing the Ympactus-related user accounts and transactions

19  from those of TelexFree.

20  Q   And was one of the reasons for that was that any

21  participant who was a creditor in the Ympactus case was not to

22  share in the distribution in the TelexFree case?

23  A   That is correct.  That -- the Ympactus case was admin --

24  the liquidation of the Ympactus case and the, and their

25  creditors was done with a separate proceeding in Brazil.  And

1  we -- that --

2  Q   And did --

3  A    -- moved here.

4  Q   Did you take some steps to, to develop a procedure in order

5  to separate out the TelexFree participants from the Ympactus

6  participants?

7  A   We did.  What we cared -- obviously, what we cared most

8  about were, were transactions that involved, actually had any

9  activity.  And as I mentioned, the activity was, was reflected

10 in -- when I say "activity" I mean, made a purchase of a user

11 account or a phone plan or some TelexFree product.  Those are

12 reflected in the invoice table.  And, you know, within the

13 invoice table there was a designation as to country and there

14 was a designation, I believe it was -- it was, essentially,

15 binary "D" or "R," which we determined to be dollar or, or

16 Reais.  And based on our analysis we determined that the Reais

17 designations were, were a designation for the Ympactus user

18 accounts.  As -- when you -- based on the timing of the

19 TelexFree lifespan when you cut out the Reais accounts they

20 essentially stopped at the same time that Ympactus stopped and

21 there was very little overlap.

22 Q   And using that methodology were you then able to separate

23 out the TelexFree participants from the Ympactus participants

24 or, more appropriately, the TelexFree user accounts from the

25 Ympactus user accounts?

1  A    Yes, we were.

2  Q    Could you just back up just very briefly and tell us what

3  each one of, what was contained within each one of these

4  account tables that are listed on this Slide No. 7 for

5  identification?

6  A    Sure.

7       The first one here is the representante, or account table.

8  And I, I'm just going to call them the English language tables

9  going forward.  So this is the account table, which is the

10  information associated with the, each of the user accounts.  So

11  when you open your user account you would enter your name and

12  other identifying information.  That would all be in the

13  account table.as well as a system-generated identifying number.

14      So it's based on how -- your first user account would have

15  the lowest number and they'd get larger as you joined based on

16  cumulative user accounts.

17      The, the invoice table had a unique record for each invoice

18  that was generated by TelexFree.  I'm, I'm just going to talk

19  about TelexFree, not Ympactus right now, but it would be both.

20  But we stripped out Ympactus.  So a unique record for each

21  invoice and that detailed the, what, what was purchased, when

22  it was purchased, and how, and how it was satisfied.  And we --

23  we -- I'll stop there.

24      The transfer table was information about each transfer of

25  credits within the system.  A transfer could be between user

1   accounts or it could be a request to redeem credits through

2   withdrawal or other ways.

3       And the bonus table was -- within TelexFree you could earn

4   credits through, not just, not just through purchases, but you

5   could earn credits through, as commissions essentially, and

6   those accretions of credits were recorded in the bonus table.

7   Q   Okay.  And having, having gathered all this information,

8   Mr. Martin, with respect to what was in the system and the

9   various accounts, what was the purpose, what was the task, the,

10  the basic task that Mesirow and then Huron was charged with by

11  the trustee?

12  A   I mentioned the account table contains a, a record for each

13  user account, but what it doesn't, what doesn't exist there or

14  anywhere within this information we're talking about is

15  something that binds the accounts to an individual.  So a

16  participant that has more than one user account, there's no,

17  there's no way for the system to know that those two user

18  accounts belong to that same person.  There's no, no unique

19  ident, no identifier associated with every account by an

20  individual.

21      So to go -- to go, make sure I fully follow your question,

22  Mr. Bennett, the, the assignment was to determine the net

23  winnings or net losings associated with any participant within

24  TelexFree, but in order to do that the secondary assignment was

25  to, to determine a methodology for aggregating or bringing

1    together the user accounts associated with an individual.

2    Q   And why was it important to, for the trustee to be able to

3    identify the net winners and the net losers in the TelexFree

4    matter?

5    A   Because in order -- in order for -- in order to have a

6    claims process you have to have an understanding as to how much

7    each participant lost and for your Chapter V actions, recovery

8    actions, you need to have an understanding of what -- what the

9    -- what participants made, how much -- winnings we'll call

10   it -- through their dealings with TelexFree.

11   Q   Do I understand that it was only the net losers who were

12   going to be entitled to share in any of the distributions in

13   the TelexFree case?

14   A   That's my understanding, yes, only the net losers.

15   Q   So the need to separate the net winners from the net losers

16   was consistent with trying to determine who would be the

17   parties entitled to share in the distributions?

18   A   Yes.

19   Q   In determining who was a net winner and a net loser, was

20   there a particular basis that was to be used?

21   A   Yes.  There -- there was a -- Mesirow, then, then Huron was

22   provided with a calculation that a, to be used, but that was --

23   and that, that calculation, I believe, was memorialized in a,

24   in a, in a court order.

25   Q   And do you under -- did you understand that that was

1  characterized or identified as what was known as the, as net

2  equity?

3  A   That -- yes, I do.  That's my understanding and that was

4  referred to as the net equity formula.

5  Q   Okay.

6            MR. BENNETT:  If you would put Slide 11 up for

7  identification, please?

8  BY MR. BENNETT:

9  Q   Now, Mr. Martin, what I put up on the screen is for ID No.

10 11.  And, sir, is that the definition that you were using on

11 the, to determine the net equity?

12 A   Let me -- yes, that's the definition, but I, I would just

13 clarify the, the definition existed, but I, we were provided

14 with, through, through counsel and the trustee, with their

15 inter -- how they -- how they deter, believed this -- the

16 answer is yes.  This -- this was -- this was the definition.

17 Q   Okay.  And then were you provided some advice or instructed

18 to make certain assumptions with respect to how this definition

19 should be applied?

20 A   Yes, we were.

21 Q   Okay.  And do you recall what you were, assumptions you

22 were made or advice you were provided with the application?  In

23 other words, what was to be included or, more importantly, what

24 was to be excluded?

25 A   There were various types of, of transactions that were

1 identified within TelexFree through the system and through

2 discussions through Homeland Security, through participants,

3 etc., and there were -- certain of those, if I was to

4 characterize those transactions, there were direct

5 transactions, meaning payments made directly to TelexFree or,

6 or payments received directly from TelexFree.  Those were to be

7 included in the calculation.  And then there were the

8 triangular transactions, which are explicitly stated in the

9 order, also, and those were included in the calculation.

10 Q    And what was a triangular transaction?

11 A    A triangular transaction is when credits are, credits are

12 used to satisfy the invoice, the purchase of an invoice.

13 Q    Okay.  Now did you also include within the calculation of

14 net equity any credits that were bought by a participant from

15 TelexFree itself?

16 A    Yes.  If the credits were -- I, I would put that in that

17 first category, money provided directly to TelexFree.

18      So, yes.  If a, if a participant provided funds to

19 TelexFree in exchange for credits, those would be included.

20 Q    Okay.  And did you, did you identify as you were going

21 through the doc, the system whether there were any other types

22 of exchange of credits?

23 A    Yes.  There -- there were -- there were exchanges of

24 credits where a participant would purchase credits from another

25 participant, is that what -- yes, that, that existed.

1   Q    Those would be intra, inter, inter-participant transfers?

2   A    Yes.

3   Q    Okay.  And did you exclude those from your calculation of

4   the net winnings and net losings?

5   A    Correct.  Those are not included in the net equity

6   calculation that we used.

7   Q    And why did you exclude those?

8   A    As mentioned, we -- I -- that was -- that exclusion was at

9   the advice of counsel.  It was instructions.  It would be more

10  clear to say not at the advice, at the instruction.

11  Q    Okay.

12          MR. BENNETT:  Would you go to Table 8 for me?

13          MR. LIZOTTE:  Exhibit 8?

14          MR. BENNETT:  Exhibit 8.

15  BY MR. BENNETT:

16  Q    Now, Mr. Martin, I wonder if you could give the Court some

17  sense of the sheer enormity of the information that you were

18  dealing with in going through the, the Telex accounts?

19  A    Sure.

20      As mentioned earlier, there are approximately 17 million

21  user accounts within the TelexFree database, which is why you

22  see that there was approximately 17 million logins.  Each

23  login, each user account should have a login.  Then within each

24  of those it'd be the information that was provided by the

25  participant with respect to each of the logins.  Some of the

1  information on this list here was actually formulaic.  For

2  example, first name and last name wasn't -- it -- that was

3  derived by the system pulling from the, the name -- for -- so

4  the first name and last name were pulled from the full name

5  formulaically and different combinations over time.  But if

6  you're looking at this, you could see that you have 17 million

7  logins, 3.1 million names; tax ID numbers, about 5 million.

8      So there was a tremendous amount of information within the,

9  within the account table.

10  Q   And the difference between what you said was the total of

11  the 17 million and then unique, the amount of certain unique

12  information, what do you mean by that?  What was the difference

13  between the total and the unique, such as for the name?

14  A   If you were to think of it in terms of groups, so you have

15  17 million logins.  Within that, within that 17 million,

16  there's 3, there was 3.2 million different names used.

17      So just -- if -- I'm hearing thunder in the background.  If

18  I had, my name was in there 3 times, Tim Martin, then 3, 3 of

19  that 17 million would be one unique name as opposed to looking

20  at tax ID number.  There were five million different, different

21  tax ID numbers used within the system.

22  Q   With respect to the e-mails again, you have a total of 17

23  million, yet you have unique of 2., a little over 2.1 million.

24  Again, what are we, what are we looking at in that combination?

25  A   Well, of -- of the -- you -- of the 17 million e-mails in

1    there, if you were to do a subtotal and group them, there'd be

2    about 2, 2 million, 2.1 million different e-mails used among

3    those 17 million user accounts.

4    Q    And, sir, do I understand as, trying to do the process of

5    aggregating the, or linking the various user accounts to the

6    names, your task was to try to identify a system from which you

7    could look at 17 million separate user accounts and link them

8    to approximately 3.1 individual names?

9    A    Yes.  What we were trying to do was determine a reasonably

10   reliable way to take the 17 million user accounts and aggregate

11   them in a way that was representative of a participant, always

12   with the assumption that there was no way with 17 million user

13   accounts that you're going to be 100 percent accurate.

14        So there's always the assumption that a participant would

15   have the ability to provide either evidence or explanation as

16   to why some of the user accounts that were aggregated shouldn't

17   have been or why other ones should have been included.

18        But to answer your question, yes, the task was to determine

19   a reasonably reliable methodology for aggregating these down to

20   the name or participant level.

21   Q    Okay.  And I think you told us the reason for that was so,

22   ultimately, you could do a calculation for the net winners and

23   the net losers?

24   A    That's correct.

25        (Pause)

1   BY MR. BENNETT:

2   Q    Now, sir --

3           MR. BENNETT:  You can take that down.

4   BY MR. BENNETT:

5   Q    Now, Mr. Martin, could you begin for us the process that

6   Mesirow and then Huron went through in order to develop a

7   system in order to link all these various user accounts so that

8   you could do that task of determining net winners and net

9   losers?  Could you tell us the, the, sort of the preliminary

10  step?  Did you try to identify some general methodology?

11  A    Yes.  We -- starting with the, the 17 million user

12  accounts, we had a lot of discussions with participants as, in

13  terms of what they would be, what, first of all, would they be

14  able to remember all the user accounts, if that was the step.

15  If the claims process said here's, here's a table.  Enter all

16  your user accounts.  Could you do that?  Because that would be

17  the easiest thing to do and, and then you wouldn't, at least on

18  the claim side, and the answer was, no, we wouldn't be able to

19  provide that.  You have to be able, you have to be able to help

20  us determine our user accounts.  Okay.  The next question was,

21  how can we help you?  How would, how would it be helpful to

22  help you identify your user accounts?  And we had various

23  discussions as to what information would be the most useful.

24  And we -- we -- for example, we, our initial thoughts centered

25  around the e-mail address, thinking that --

1   Q    Before, before we go there, and backing up a second.

2        Just in approaching the problem of the aggregation, were

3   there certain accepted methodologies for record linking that

4   you looked at?

5   A    There, there were and I think, just to take a step, the

6   first thing that we had to do is recognize there was a need to

7   link.  That was, that was the first thing we did, was recognize

8   that there was a need to link the records together.

9        And this is a little different than most record-linkage

10  situations; whereas, typically, with, with record linkage you'd

11  be linking from one database to another and determining how you

12  pull information from here to here.  As you know, as we just

13  discussed, we had one straight database, the account table, the

14  17 million users.  We were, we weren't comparing it to another

15  table.  We had the 17 million user accounts.

16       So we looked at different methodologies to, to link records

17  together and we determined, ended on something that was

18  referred to as close to, "deterministic," but there are two

19  really generally accepted or more, more generally accepted

20  methodologies of record linkage and that's deterministic and

21  probabilistic.

22  Q    Okay.

23           MR. BENNETT:  Let's just put up ID No. 12, please.

24  BY MR. BENNETT:

25  Q    Now, sir, Mr. Martin, you, again, you make reference to two

1  recognized record-linkage methodologies.  Are these the two

2  that you looked at, deterministic and probabilistic?

3  A    Yes, they are.

4  Q    And would you tell us what the difference was between the

5  two?

6  A    Sure.

7       Deterministic record linkage is linking records together

8  based on predetermined criteria.  So if you, if you determine

9  the criteria and there's a match, then -- then it's a  -- then

10 it's a match.  If, if, for example, you're, you're determining

11 -- if the phone numbers match, you know, then you, then you

12 have a match.

13      And probabilistic is based upon, you use weighted

14 calculated probabilities in determining if there's a match.

15 And what I mean by that is, you have three records.  You have

16 to determine the probability of a match that should be matched

17 and the probability of a match that shouldn't match and do,

18 create weighted, weighted probabilities that you run through

19 and it may not be the same every time and it's -- but it's --

20 it's more, there are more assumptions built into that.

21 Q    Okay.  And which of -- as far as looking for a basic model

22 to use in coming up with the aggregation to be used with

23 respect to the TelexFree matter, which of these two recognized

24 systems did you decide to base your aggregation upon?

25 A    Our -- the aggregation was primarily based upon determ,

MARTIN - DIRECT                                                      60

1    deterministic, which is, again, set criteria to do, to identify

2    matches, but it did use a concept in the probabilistic, which

3    is using partial data keys.

4        So we did, we did borrow from probabilistic for that, for

5    the partial keys, which we'll, I'm sure we'll, you'll ask me

6    about at some point.  But deterministic is the methodology that

7    was -- deterministic is the process that was selected.

8    Q    Now -- and the reason for not using, for not rejecting the

9    deterministic and just using the probabilistic was what?

10   A    I'm -- could you please ask that question again?

11   Q    Yes.  The reason for not rejecting the deterministic and

12   just using probabilistic was what?

13   A    For -- the reason for not rejecting deterministic in favor

14   of probabilistic --

15   Q    Yes.

16   A    -- was, a couple reasons.  One, as I had mentioned earlier,

17   our objective here was to create a reasonable, a reasonable

18   methodology for aggregating the user accounts that we expected

19   we would have to walk through and explain to participants and

20   allow them the ability to challenge the inclusion of a user

21   account within the aggregation and to introduce additional user

22   accounts.

23       Deterministic is, as I mentioned, it's -- it's -- your,

24   your account is either in or out based on the deterministic and

25   you can say to some, to a participant, "This is why we included

1  this user account in your aggregation," whereas, probabilistic,

2  every time you run the aggregation a user account may, because

3  of the way the prob, the probabilities work and the weightings,

4  if you change the weight, the user account may show up this, in

5  this aggregation the first time but if you change a weighting

6  by a percentage, it will not show up in the aggregation the

7  second time.  And that's less concrete and it's less, in, in

8  our opinion, it's not as transparent in trying to explain to a

9  participant why it is that this, a certain user account is

10 included within their aggregation.

11 Q   And would it be also fair to say that the probabilistic

12 method requires more subjectivity as far as normally

13 identifying or determining the identifiers, but then

14 determining what appropriate weight should be placed upon each

15 identifier?

16 A   That's what I was just trying to direct you to say, yes.

17 That, that's exactly right.  That -- there is, there's more

18 subjectivity with respect to the probabilistic and then you

19 have to create weights.  And also, I mentioned a few minutes

20 ago that we didn't have two separate databases.  We, we had

21 one.

22     So a lot of probabilistic is looking at -- you -- you have

23 -- you -- what you do is you go back to two different databases

24 and you say, for example, Timothy Martin and I'll just sort,

25 I'll say Tina Martin, and you look at -- you look at the --

1  what are the odds of the, of a correct match on Timothy Martin

2  and the, and the odds of a incorrect mark on Tina Martin and

3  you go back and you calculate those probabilities.  But because

4  we don't have two sets to compare against, we don't know what

5  the actual, we don't have an answer key on the other side that

6  we can go back to.  Determining those weightings would have

7  been much more subjective.

8  Q    Okay.  Now you understood from going through the TelexFree

9  systems that not all the information was necessarily accurate,

10  is that correct?

11  A    That is correct.

12  Q    And how did you account for that in using the -- in -- even

13  with that knowledge, why did you, why did you still proceed

14  with the deterministic record-linkage methodology?  Was there

15  any other reasons other than what you have already given us?

16  A    Well, the, the fact that the, some of the information was

17  inaccurate didn't play a tremendous amount in, into that

18  decision, but we --we -- what we had to do was make what I'll

19  refer to as normal, normalizing the data within the, the SIG

20  system to assist in the implementation of the deterministic

21  methodology.

22  Q    And when you say "normalize the data," what are you

23  referring to?  What did you do?

24  A    So with any, with any approach you -- you want -- you want

25  to come up with a, come up with a theory on what you're going

1   to do, you want to do it, then you want to test it and test it

2   and test it.  So when we first looked at -- for example, I

3   mentioned at one point we looked at matching by e-mail

4   addresses.  Well, you would run that, then you would go back

5   and look at similar e-mail addresses and see why they didn't

6   match and what you'd find is sometimes there, there was an

7   extra space within the, within the system, blank space.  So

8   normalizing it would be removing that space.

9        With respect to names, for example, Timothy J. Martin, J

10  with a period.  You would find in some cases there would be a

11  middle name used with a period, some cases there wouldn't.  So

12  in normalizing the data, we removed the spaces between the

13  names and we removed any non-alphanumeric characters.  We'd

14  remove, we'd remove the period and normalize it so Timothy J.

15  Martin with spaces and Timothy J. Martin with no spaces would,

16  would become a match because we've normalized that data.

17       Same -- a better example would probably be phone numbers.

18  Some people'll have the habit of putting the dash after the,

19  after the area code.  Some people don't.  They write, just

20  write out the number.  Removing the dashes and normalizing the

21  phone number into just numerical characters allowed for a,

22  allowed for matching, whereas non-normalized data would not.

23  Q   Now having to determ --

24       MR. BENNETT:  You can take that slide down.  Thank

25  you.

1   BY MR. BENNETT:

2   Q    Having determined that you were going to try to do this

3   aggregation based upon at least a deterministic platform, what

4   was the first step that you now took in starting the

5   aggregation process?

6   A    The first step was determining what, what would be the

7   first -- the deterministic process runs multiple different

8   aggregations individually, which are then compared to each

9   other.  And to use the analogy you had used earlier,

10  Mr. Bennett, you're starting with a snowball and you go into

11  the, the next aggregation.  You pick up user accounts and you

12  pick up user accounts and it gets bigger and bigger.  But you

13  need to determine where to start, what, what record would be

14  the best to start from.  And when you -- through that process

15  we determined that the best starting place, I believe, we used

16  was a combination of both the person's name and the e-mail

17  address.

18       So to get there, that's not as simple as it sounds, as

19  making the assumption name, e-mail address.  We worked through

20  many different variations and it was determined that no single,

21  no single identifier to run an aggregation provided a

22  meaningful grouping.  So that's why we combined two different

23  identifiers to create a single identifier --

24  Q    Let's --

25  A    -- the name, plus the e-mail together.

1   Q    Let's back up for a second.

2        Did you first, when you were, when Mesirow and then Huron

3   was trying to develop the aggregation system, did you first try

4   to identify a, to see whether or not there could be a single

5   identifier which would be able, which would allow you to link

6   the accounts?

7   A    We did.  We, we spent significant amount of time trying to

8   determine if a single identifier could be used.

9   Q    And why don't you walk us through what was done at that

10  time?  What did you -- what various single identifiers did you

11  use and, or did you identify and then why were they rejected?

12  A    Sure.

13       Mr. Rona earlier mentioned the, the Social Security number

14  as an, as an easy place to start.  Well, we tried that and

15  there were various reasons why that, that didn't work,

16  incomplete data, bad data.  So that, that's why.  That would

17  have been a logical one, is isolating an individual person by

18  Social Security number, but that, that didn't work.

19       We tried e-mail address and we were hoping that that would

20  be a, where to aggregate the user accounts together, assuming

21  that each individual uses their own e-mail address and they

22  would have put that with their account.  So you group by, sort

23  by the e-mail address and you would have a good representation

24  of the accounts under each participant.  That, that's where we

25  started with.

1    Q   Why did you not use -- what was wrong with using the e-

2    mails?

3    A   Couple things.  We, we did significant amount of analysis

4    on the e-mail method.  I believe we met with, with the trustee

5    and his counsel many, many times on, as we tried to work

6    through the use of the e-mail address to bring the accounts

7    together, and what we found were there were a lot of instances

8    where a promoter may open accounts for other individuals and,

9    and would continue to use their e-mail address, but they would

10   enter the correct names of each of the promoter [sic].  So the

11   names would be different, but they would continue to use their

12   own e-mail address because they were handling all the different

13   correspondence.

14       So you weren't getting a representation of the different

15   participants.  What you're really getting a grouping of, is a

16   grouping of the participants associated with a single promoter.

17       There was, there was also a lot of bad e-mail addresses, e-

18   mail addresses that didn't have extensions, no, no "at"

19   symbols, and things like that.

20   Q   So you rejected that as a single identifier?

21   A   We did.

22   Q   Did you also look to see whether or not using the name

23   alone would, as a single identifier, be appropriate to link the

24   accounts?

25   A   We did.  We, we did look at that and we determined that

1  that was not, that was not possible.  Similar to the idea of

2  using the Social Security number, that, that would be great if

3  we could just sort by name, but one issue is that there are

4  many -- when you have as many participants in TelexFree as

5  there were, there is, there's overlap in names.  You know, my

6  name being Tim Martin, I'm used to that.  There's -- there's --

7  it's not exactly an original name.  There, there was a

8  significant amount of overlap in names.

9      So that, that was not determined to be a, a useful starting

10 point.

11 Q   And did you try any other -- before you got to the, trying

12 to develop combinations of identifiers, did you try any other

13 single identifiers?

14 A   Well, we pretty much tried them all because it's computer

15 generated.  So we -- we didn't -- we didn't discount any, any

16 method.  So we tried Social Security number.  We tried e-mail

17 address.  We tried name, looked at phone number as, as an

18 option.  There was a home phone number and a cell number, a lot

19 of overlap in that, in that, that grouping.

20     So eventually, it was determined that a -- you couldn't

21 simply aggregate by one, by one identifier.  It was, it was not

22 going to produce meaningful results.

23 Q   And did you eventually determine that you were going to

24 need to use a combination of identifiers?

25 A   We, we determined we're going to need a combination of

1   identifiers and multiple aggregations.

2             MR. BENNETT:  Your Honor, wonder if we could take a,

3   just a brief recess?

4             THE COURT:  Yes.  We're getting close to the lunch

5   hour.  It may be a little too early to have an actual lunch

6   break, but that's going to be coming up soon.  Do you want to

7   push through until noontime and then break for lunch, or, or do

8   you need to break right now, Mr. Bennett?

9             MR. BENNETT:  When are we going to -- it all depends

10  when we're breaking for lunch now.

11            THE COURT:  Well --

12            MR. BENNETT:  I'm just trying to think a, a logical

13  point to stop before.  That's all.

14            THE COURT:  Oh.  Then I would say we could --

15  noontime.  If 15 more minutes would make sense for you, or

16  whenever the next logical time would be around noontime, I

17  think we should do that.  Unless there's a, a need to break for

18  any other reason, like a bathroom visit, we, we should hold off

19  and go through, all right?

20            MR. BENNETT:  That's fine, your Honor.  That's, that's

21  fine, your Honor.

22  BY MR. BENNETT:

23  Q   Are you all right, Mr. Martin?  Let me just --

24  A   I am, yes.

25  Q   Now when you talk about name or e-mail, were these what --

1    were these -- where did you obtain this information from?  Was

2    there, was there specific documents that you looked at that

3    contained this type of information?

4    A    This was all in that account table we discussed earlier.

5    Q    Okay.  Now in addition to name and e-mail, about how many

6    different fields were in these account tables?

7    A    The account table, on recollection, I want to say there

8    were 40, 40 sounds right, fields within that account table.

9    Q    And did -- at some point in time did you decide as to what

10   the appropriate number, what the appropriate number of

11   identifiers -- strike that.

12       At some point in time did you select a number of

13   identifiers that you believed were appropriate for the process?

14   A    We did.

15       I want to take a step back, just so you know.  I was

16   guessing on that 40 number.  I think, I think that's right from

17   my memory, but it was a guess off my memory as to how many

18   fields there were in that account table.

19       We did.  We selected, I believe, seven identifiers that

20   were more consistently used and, then there was an additional

21   identifier that wasn't user generated.  There was the rep ID,

22   which is just simply that number I mentioned earlier based on

23   the order in which the account was generated.

24       But seven participant-entered fields I believe we used.

25   Q    And what were those seven participant-entered fields?

1   A    You're making me go from memory here, Mr. Bennett.

2   Q    If you look at --

3   A    No.  I think we, I think it was name, login, home cell,

4   home phone, cellphone, address, and there was a, a hash

5   associated with the password.

6   Q    Okay.

7        If we put up Exhibit 15, or Document 15, ID Document 15,

8   that might help you.

9        If I, if you look at the document we have marked as 15 for

10  identification, does this identify the various identifiers that

11  were going to be used in the linking combination process?

12  A    Yes.  And -- yes, but the bridge between what I was just

13  talking about and this.  What I, what I understood you to be

14  asking is from the account table what, what participant-

15  generated fields we were using and those are the seven that I

16  have just referenced.

17  Q    Right.

18  A    These are linking --

19  Q    I was just asking if this help -- you got all seven out of

20  here, Mr. Martin.

21       Do you want to take a look at this and see if it helps?

22  A    The answer is, the answer is yes, and then some.  And that,

23  the reason I say that is you'll see that, for example, in Row

24  10 the -- Row 9 you see a part-name key and Row 10, a part-name

25  key 2.

1    So these are keys that were generated from those

2    information.  So there's, there's more than seven of these.

3    Q   All right.  But just initially, Mr. Martin, I believe your

4    testimony was that you selected seven identifiers and you've

5    identified those as the name, e-mail, cellphone, home phone,

6    home, home address, also?

7    A   Yeah.  And the hash key was the other one.

8    Q   And the hash key.

9        And those were the seven identifiers and then you had to

10   develop a process of how you were going to use those in a

11   systematic linking process?

12   A   That, that is correct.

13   Q   Okay.  Now why did you select those seven as opposed to the

14   other, maybe, 23 or so other potential fields for which you

15   could have selected as identifiers?

16   A   Combination of reasons.  One is we wanted to, we wanted to

17   use fields that were required as opposed to optional.  Optional

18   fields are not very helpful in, in the aggregation process as

19   they'll be blank in, in many of the, many of the records.  How

20   distinct a, a field was, is important.  For example, name is

21   pretty distinct.  There's going to be, there's going to be

22   duplicates of name.  As I mentioned, you know, Tim Martin's

23   pretty common, but there's going to be less duplicates in name

24   than there's going to be in country.  There's going to be --

25   many more users are going to have the same country than are

1   going to have the same name.  So country was not determine,

2   determined to be a useful field for aggregation purposes.

3       So along that line what we had to do for each, each of the

4   fields is determine how many unique, unique examples of that

5   exist, cardinality associated with it, and make that

6   determination.  And that's how we determined this.

7   Q   And once you had selected these seven and just rejected the

8   other potential fields of identifiers, did you then have to

9   take some steps in order to come up with a process by which you

10  would use these identifiers in order to link the accounts?

11  A   We did, yes.

12  Q   Okay.  And would you tell us, first of all, generally, what

13  was the process, what was the process or procedure you were

14  looking at?

15  A   Sure.

16      And let me just -- I'm going to try to be methodical in

17  this answer, that you see 13 different aggregation procedures

18  here on the screen.  There was never any predetermined number

19  of procedures that there were going to be.  It wasn't going --

20  it'd be wonderful if you could aggregate sufficiently with one,

21  with one or two, but 13 wasn't a number that was predetermined.

22  It was determined through iteration and analysis.

23      So the first step was to determine what, what information

24  to start the aggregation process and --

25  Q   Before you get there, though, you, you referenced that

1  those 13 steps were, were determined through iteration and

2  analysis.  What did you do?  What was, what was encompassed in

3  that?

4  A   Well, after each step, you had, it was necessary to go

5  through and, and analyze the number of user accounts that sub,

6  that became aggregated with the previous user accounts as a

7  result of that step as well as aggregate the user accounts that

8  did not become aggregated with other user accounts as a result

9  of that step and determine what were the, what the reasons were

10  and determine if, if any modifications were necessary to the,

11  to the linking keys that were being used and then determine

12  additional linking keys that would help pick up additional user

13  accounts.  And that -- that's not -- that wasn't a eyeball

14  test.  It -- there was some eyeball test, to be clear, but it,

15  but it's also analytical.

16      We -- each grouping has a, what was referred to as parakey,

17  which is that, the lowest numbered rep ID that we had mentioned

18  earlier, that system-made rep ID, and we can see after each

19  step which, which groupings based on rep IDs no longer existed,

20  meaning they got pulled into another aggregation, and we could

21  go through and do analytical steps to determine why they got

22  pulled in and then, then do a review of, of the fields that

23  they got aggregated with to determine if they actually should

24  be together or not.

25      So it was a -- after each step, there was a analysis

MARTIN - DIRECT                                                                    74

1   determining what, what got aggregated, why did it get

2   aggregated, should it have been aggregated, and then for the,

3   for the items that didn't get aggregated, the next step is why

4   didn't they and should they be and how, how could they be.

5   Q    Okay.  Let's just get a sense of the amount of time that

6   was spent in getting to the point we're at now, the amount of

7   time that Mesirow and then Huron spent in just trying to

8   determine the methodology; in other words, the, using

9   identifiers.

10       How much time was just spent on sort of the basics?

11  A    It would, it would be thousands of hours, total.

12  Q    And when you got to the identifiers and you tried to test

13  out the single, whether a single identifier was going to work,

14  how many hours are we talking about that Mesirow and Huron

15  spent in reviewing the various single identifiers and

16  determining that they were not, ultimately did not give the

17  sufficient information?

18  A    I would -- over the course of the time that this process

19  was being done, there were people who, that was most of, most

20  of their worktime and, and TelexFree was essentially, for some

21  people, their, their primary, if not only, engagement.  That

22  was, again, thousands of hours.

23  Q    And just between there and when you finally get down to a

24  selection of the seven keys, just to select those seven, how

25  many hours, roughly, were spent on just going through the

1  process in order to determine those seven keys would appear to

2  be appropriate?

3  A   First, it, it makes as log, as logical.  The -- some, some

4  of the keys didn't require a lot of effort to determine if we

5  were going to use name or e-mail, but once you get into partial

6  keys like part-name key and part-in key, and end key, again

7  that, that's hundreds if, hundreds of hours of, of just, of

8  analysis.

9  Q   Certainly this was not a project that was done in a week or

10 two?

11 A   Absolutely not.  This, this process went into 2016.

12 Q   You spent over -- would it be fair to say that in just

13 trying to develop this -- once you're recognizing issue of the

14 need to link the accounts, would it be fair to say that Mesirow

15 and then Huron spent, primarily, a, a good part of a year plus

16 in trying to develop the system?

17 A   Yeah.  That -- that -- that is correct.

18 Q   Okay.  And just looking at this system here that you, you

19 came up with, the 13 steps, you said that the, you described

20 for us the, the process to, to test each step.

21      How many hours are we talking about just to develop this,

22 these 13 steps?

23 A   There -- to develop the 13 steps -- well, developing the 13

24 steps was a significant amount of work because that,

25 essentially, is what results in the, a complete algorithm and,

1   and once you got to the last few steps, those were extremely

2   time intensive and analysis driven.

3        So again, it's -- it's -- again, it's within that over-a-

4   year period, a significant amount of time.

5   Q   And, and how did you go about determining the order by

6   which this aggregation process was going to be followed?  In

7   other words, starting with name, e-mail, and going name, cell,

8   then name, phone, and all the way down the 13 steps.  How did

9   you decide those 13 steps in that particular order?

10  A   There was a lot of work that went into determining the, the

11  first step.  The -- we -- we -- we knew from various analyses

12  that over a period of time that we were going to start with

13  something to do with the, the name key and from there, it was

14  experimenting whether it was the name and the cell, name and

15  the phone, run it in different iterations, and just

16  continuously analyze the data.

17       But to do -- your -- I think -- if I remember your

18  question, it was how much time went into determining which keys

19  to start with?

20  Q   No.  Which -- how you went through determine the --

21  the -- all 13 steps, just generally, to get down to 13 steps,

22  how many hours are we talking about?

23  A   Oh, again, it was close to a year.  It was -- and close to

24  a year with several people.  So thousands of hours.

25  BY THE COURT:

1    Q    The question was what, how you determined the order.   I

2    think that was -- I, I'd be interested in understanding that.

3             MR. BENNETT:   Yeah.

4    BY THE COURT:

5    Q    How did you decide to start with one?

6    A    Thank you, Judge.   I thought -- I thought -- I thought that

7    was the question there.

8         Yeah.   How did we start, decide to start with the name key

9    and the e-mail key and then progress from there.   As I

10   mentioned earlier, e-mail key was one of the, the fields that

11   we had done a tremendous amount of analysis on.   Originally, we

12   were looking at aggregating by e-mail and was that possible and

13   it was determined that we couldn't use that because oftentimes

14   we found that the promoter would use their same e-mail address,

15   but they would change the name.   So the name and the name field

16   would be different, but they were the same e-mail address.   So

17   we experimented with the idea of let's use the e-mail address,

18   but then combined with the name.

19        So if, hypothetically, I, Tim Martin, opened up accounts

20   for ten different people and I used my e-mail address for each

21   of them, but I put their correct name with their user accounts,

22   the combination of their name with their user account would,

23   would bring their user accounts together.   And it wasn't as

24   simple as just choosing that one.   We -- we -- we tried the,

25   probably the No. 2, 3, and 4 as initial keys in deter, looked,

1   looked at the results and based on the analysis we found that

2   we got the best combination of initial aggregations at the

3   first step by using the combination of name key and e-mail key.

4       But I would say that was a combination of a lot of analysis

5   and our understanding from talking to participants as to how

6   accounts were opened and how they tended to use their names

7   with the promoter's e-mail address.

8   BY MR. BENNETT:

9   Q    And why were you -- the references in Step 6 through 13

10  with respect to part name, part phone, etc., what, what are you

11  referring to there?

12  A    Well, the, the name key, we, we always believed that the,

13  the name was a, a good starting place after -- I shouldn't say

14  always -- after a significant amount of analysis we determined

15  that the name was a good place to start, but we understood

16  there were variations in names.  Not to, you know, continuously

17  use, use myself as an example here, but somebody would enter

18  Timothy Martin on one user account, but another account they

19  might use T. Martin or Tim Martin.

20      So what we tried to do was determine how, how could we pick

21  that up, those, and we ran various analyses of picking up

22  certain letters within a name, certain combinations, and what

23  the part-name key does, I believe, is the first three letters

24  of the, the name key.  So again, the -- my -- this wasn't based

25  on my name.  I'm just using an example.  It would have picked

1    up Tim and then it would have combined that.

2        So you, you take two different user accounts, one that says

3    Timothy Martin, one that says Tim Martin.  From both of those,

4    you're pulling the first three letters, Tim, which is the part-

5    name key, and if it also has the same e-mail address and the

6    same phone number, well, then, it was, it was determined that's

7    a pretty good indication that it's the same person.

8        And then part-name key 2, I believe, took the first letter

9    of the name.  So "T," and then the last three of the entire

10   name.  So T-I-N in Martin.  So it'd be T-T-I-N.  Actually, I

11   think it was the last four, R-T-I-N.  So T-R-T-I-N, and it

12   pulled that, pulled those together and again, in combination

13   with other linking keys as a way to bring in names.  And we

14   found that that was a, a useful indi, useful combination of

15   information to bring in user accounts.

16   Q   Just so we have some scale here, each time that you did one

17   of these steps or tested part name, part phone, login, the

18   computer would run it through all 17 million user accounts?

19   A   That, that's correct.  And -- that's correct.  And it was a

20   significant amount of computer power that -- it wasn't as

21   simple as, "Run this now and I want to take a look at it in ten

22   minutes."  It was, "Run it now and, hopefully, by 5:00 tonight

23   there'll be something I can look at to take home."  It was --

24   the -- it was a lot of computer processing power to run these

25   each time.

1  Q   All right.

2  BY THE COURT:

3  Q   Let me ask one more question, Mr. Martin.  I didn't quite

4  understand your answer to the question of why Social Security

5  numbers were disregarded.  I see that they're not part of this

6  at all.

7     What was the reason you didn't use those?

8  A   A lot of incomplete information in the field.  Not -- not -

9  - I believe, if I remember correctly, not all of them, many of

10  them were not filled in and a lot of it was more garbage

11  information, like a high percentage of dash, dash, dash or dot,

12  dot, dot, or, if, if my recollection is correct.

13     And I'm also not certain right now -- I just don't

14  recall -- if that was a required field and when fields were not

15  required, you tended to have less quality information.

16  BY MR. BENNETT:

17  Q   And by the way, the 17 million user accounts, those would

18  have been including United States domestic accounts, plus all

19  the foreign accounts?

20  A   That's correct.

21  Q   And was there any indication whether foreign accounts would

22  have had something similar to a Social Security number or was

23  any way of telling whether or not whatever they used in France

24  or England would equate to a Social Security number in the

25  United States?

MARTIN - DIRECT                                                    81

1 | A    There was a tax ID number, if I remember correctly.

2 | Q    And why was that not used?

3 | A    Same, same exact reason.  That -- if, if we could have done

4 | this by, by tax ID and Social Security number, that would have

5 | been exactly where we'd go and, unfortunately, based on the

6 | quality of the data that was ruled out.

7 | Q    Would it be fair to say, though, that you did try to see

8 | what the result was using both Social Security and/or tax ID

9 | numbers?

10 | A    Oh, absolutely, yes.

11 | Q    There was no particular field that you simply rejected

12 | without first running through the iterative process in the

13 | analysis, is that correct?

14 | A    Yes.  I just don't -- I don't want to -- I don't want it to

15 | sound that we took all, if I remember correct, 40 and ran them

16 | and each of the 13 steps included them, but we reviewed each of

17 | them and considered them and some of them were just determined

18 | based on the quality of the data outright, that they, after

19 | reviewing it, they would not work in any of the steps.

20 |     So we didn't, we didn't try it again in the next step if it

21 | was determined that it was just not, not quality data and

22 | relatively qual, relatively quality data.

23 |         MR. BENNETT:  Your Honor, this might be a good time

24 | be, to stop because the next is going to be, probably, a long

25 | recitation on how this process, going through a whole set of

1 | examples of how this process works.

2 |          THE COURT:  Yes.  I, I think that is -- this is a good

3 | time.

4 |          So we'll break for lunch and reconvene at 1:00.  Does

5 | that work for everyone?

6 |          MR. BENNETT:  It's fine with the plaintiff, your

7 | Honor.

8 |          THE COURT:  Mr. Rona, you okay with an hour?

9 |          MR. RONA:  Yes, your Honor.

10 |          THE COURT:  Okay, good.

11 |          Court will be in recess until 1:00.

12 |          MR. BENNETT:  Thank you, your Honor.

13 |          THE COURT:  Turn your --

14 |          MR. RONA:  Thank you, your Honor.

15 |          THE COURT:  Turn yourself on mute and shut your video

16 | so we don't see anything you don't want us to see.

17 |          MR. RONA:  Thank you, your Honor.

18 |     (Lunch recess from 12:04:13 p.m., until 1:01:46 p.m.

19 |                          AFTER RECESS

20 |          THE COURT:  Are we recording, Regina?

21 |          THE COURTROOM DEPUTY:  We are, your Honor.

22 |          THE COURT:  All right.

23 |          So we're back on the record in TelexFree 101.

24 |          And I had one more question, if I could just steal the

25 | floor for another minute, Mr. Bennett, about --

1       MR. BENNETT:  Certainly, your Honor.

2       THE COURT:  -- about this Slide No. 15 with the 13

3  aggregate steps that we were talking about before the break.

4       MR. BENNETT:  Yes.

5  BY THE COURT:

6  Q   Mr. Martin, does the order of the aggregation process

7  matter?  In other words, would there have been a different

8  result if you had done the, made the snowball in a different

9  order?

10 A   Sorry.  Yes, your Honor.  The order does matter.

11      I was, I was explaining to Mr. Bennett earlier in the

12 previous example, yes, the order matters and there's a reason

13 for the order.

14 Q   Okay.

15      THE COURT:  Back to you, Mr. Bennett.

16      MR. BENNETT:  Thank you.

17 BY MR. BENNETT:

18 Q   Mr. Martin, if we can, maybe, just, before we just

19 immediately follow up on the, the Court's question, we talked

20 about fields and we've talked about keys.

21      Could you just tell us what the difference is between the

22 two, if any?

23 A   Sure.  Sure.

24      The way, the way I think about it, at least, is a field is

25 a, a field is a, record within, within a, a database.  So when

1   I say "fields," what I'm referring to is, specifically as

2   relates to the aggregation.  The account table, which we

3   discussed earlier, where a participant would enter their name,

4   their phone, the phone number, the cellphone, the address, I

5   considered those to be fields.  Those are fields within, within

6   the database.

7        The keys are the normalized versions of those fields and in

8   some cases, truncated versions.  For example, I mentioned

9   earlier the part-name key, which is a, a portion of the name.

10  That's, that's a key, but that's -- that is not -- that is not

11  a mirror image of something a participant entered.  It's

12  modified from a field to a key.

13  Q   Okay.  And the Judge asked you whether or not it made a

14  difference, the, the order by which you did your steps made a

15  difference.  You said it did.

16       Could you explain to us why?

17  A   Sure.

18       And -- well, and I'm certain we'll go, go into this in some

19  more detail throughout my testimony, but there's 13 separate

20  independent steps where each of the steps is looking at all the

21  15 million user accounts ran in each one.  Subsequent to the

22  first step, the second step is then, the results of the second

23  one are combined with the first if there's overlapping

24  information.

25       So not to steal Mr. Lizotte's example from earlier, but I

1   will.  If you had the snowball that existed after Step 1, it

2   then goes through Step 2 and picks user accounts that, that get

3   pulled into it and makes that snowball bigger as it, as it

4   goes.  So, and it continues through all 13.  If you change the

5   order of the steps, many of the same user accounts wouldn't

6   become aggregated, but I -- but there would -- I'm -- as I'm

7   thinking it through, I think there would, there may be some

8   small variations.  But the idea is that we, there's a reason

9   why each step is where it is.

10  Q   Maybe if we go through the steps, it'll become a little

11  clearer, then we can go back to this point.

12  A   Okay.

13  Q   If you could, Mr. Martin, we're going to turn to the, the

14  process itself; in other words, how did you actually aggregate

15  a, a user account or how'd you go through the 17 million to get

16  to a, an aggregated account.

17        MR. BENNETT:  So if we could put up, first, Slide 16

18  for identification.  Okay.

19  BY MR. BENNETT:

20  Q   Now, Mr. Martin, this is, would be what -- what -- Step 1

21  on this slide would equate to the first step that appears on,

22  that did appear on Slide 15, the name key and the e-mail key.

23      So could you walk us through, please, the process that was

24  followed with respect to this first Step 1 to begin to link

25  user accounts?

1   A    Sure.  Let me do that, Mr. Bennett, but just for, for

2   conversation sake and to make this easier, I think I'm, for

3   nomenclature we, we just discussed that these, the name key and

4   the e-mails key are keys.  I'm going to refer to what's in the

5   shaded blue under Step 1, name key, e-mail key, together.  I'm,

6   I'm going to refer to that as, as an identifier.

7        So whatever is in that section, I'll refer to as an

8   identifier so we're not using the word "key" multiple times

9   here.

10       So just to go and explain that a little bit more, in Step 1

11  the first process is a combination of the name key and e-mail

12  key.  So if, if you're looking in Row 1, this is, this is

13  supposed to represent 15 different user accounts that will

14  eventually be aggregated together and showing you how it is

15  they became aggregated together.

16       So on Row 1, you could see it says James Sample,

17  JSample@gmail.com.  That's a combination of a name and e-mail

18  pulled together with no spaces.  And what you can see is that

19  that exact same information, James Sample, JSample@gmail.com,

20  it's the same in Number, User Account 1, User Account 2, User

21  Account 7, and User Account 8.  They all have the exact same

22  identifier, the identifier being the combination of name key

23  and e-mail key.

24       I'll stop there to see if there's any questions before I

25  continue.

1   Q    Okay.  Let me be clear -- but let's be clear.  You don't

2   enter in the name James Sample, right?  You're not, you don't

3   presuppose any particular combination.  You, you have the

4   computer go through or the, the computer go through the, the,

5   the process and as it goes through 17 million user accounts, it

6   begins to pick out or associate the -- the -- the various user

7   accounts based upon the identifiers.  So --

8   A    That's correct.

9   Q    -- in this particular situation, the, the computer ran

10  through 17 million and in running through 17 million different

11  user accounts looking at name key and e-mail key, or those

12  identifiers, it turned up what, sir?

13  A    So in this, in this example, it -- it -- it ran through,

14  just to be clear, it runs through 15 million user accounts

15  because it only includes e-mail accounts that have invoices in

16  the 15 million user accounts and looks for any groupings, exact

17  groupings.

18       So No. 1, 2, 7, and 8 are an exact grouping and that one is

19  shown because that's the example we're going to walk through

20  here, but you'll see, just so that the judge, so your Honor

21  isn't confused, you'll see that there are other groupings.  No.

22  3 and No. 9, for example, are another, are another grouping

23  that are exactly the same and there -- it -- I don't have my

24  report in front of me, but I, if I recall correctly, in the

25  first step when the 17 million user accounts were looked at it

1  generated a little more than 3 million different groupings.

2      So the idea is this is just representing one of the

3  groupings that were, identical groupings that came from the

4  first step.

5      I'll -- again, I'll stop to see if there's any questions on

6  that before --

7  Q   Okay.  So at the end of the first step we now have four

8  user accounts that were identified to JamesSample@gmail.com,

9  correct?

10 A   That is correct.  And because there's more than two,

11 more -- sorry -- more than one, so because there's at least two

12 in that grouping, those user accounts that are exactly the same

13 are now an aggregation.  They can, they can be added to other

14 aggre, other user accounts as we progress through the process,

15 but they will never be split.  These, these four will remain

16 together throughout the whole process.  In addition to that --

17 Q   So  --

18 A   Go ahead.

19 Q   This is your -- okay.

20     So this is the -- the red checkmarks are the four that have

21 -- are -- that have been -- that have the same identifiers and

22 becomes your first snowball, is that correct?

23 A   That is correct.

24 Q   Okay.

25 A   And I just want to point out just so it's not confusing to

```
 1   those looking at this.  You see on No. 5 and No. 11 they say

 2   "excluded."  And the reason something would be excluded and not

 3   have a, an identifier is it had to have invalid information.

 4        So in, in this case, invalid information.  For example, it

 5   would be an e-mail that has no "at" symbol in it or no

 6   extension, no dot, anything.  That's not -- it's, it's

 7   recognized as not being a real e-mail.  So because there is no

 8   real e-mail, it can't have, it can't have a Step 1 key.  That,

 9   that's why No. 5 and 11, for example, would not -- would be --

10   say excluded there.  And you'll see as we go along it does not

11   mean it'll stay excluded, but for that step it can't work.

12   Q   All right.  And that's because the computer is only looking

13   for the name and the e-mail match, right?

14   A   That's correct.

15             MR. BENNETT:  So then we go to Step 2, which is the

16   next slide, Slide 17.

17   BY MR. BENNETT:

18   Q   So now if we look at Slide 17, the -- the -- the keys that

19   become the identifier for Step 2 is the name and the cell.  Is

20   that cellphone?

21   A   That's correct.  It's a combination of the name and the

22   cellphone.

23   Q   So let's -- let's -- now tell us what the process was in

24   Step 2.

25   A   Sure.
```

1    So again, the steps are independent.  So Step 2 was run on

2    all 15 million user accounts that had an invoice independent of

3    the first step.  It's run completely on its own and when it's

4    run, it, it'll create as many different clusters of, within

5    that 15 million as there are duplicate entries.  And as you can

6    see shaded in green here, there are five user accounts, Nos. 2,

7    6, 8, 12, and 15, that are identical in their second

8    identifier, the name key and the cell key.  And, and this is

9    important.  Because two of that five, Nos. 2 and 8, were

10   included in an existing aggregation all five of these, 2, 6, 8,

11   12, and 15, are now part of that existing aggregation.

12       So as Mr. Lizotte called the snowball, the snowball started

13   with No. 1, 2, 7, and 8.  It now, after Step 2, would consist

14   of No. 1, 2, 6, 7, 8, 12, and 15.

15   Q   Okay.  So let's just be clear, again.  When the, when you

16   take Step 2, the first thing that's being done is the computer

17   is running through all, I guess at this point, 15 million user

18   accounts and looking for a match between the name and the

19   cellphone, correct?

20   A   That's correct.

21   Q   Okay.  And that generated, then, these 13 different, 13

22   different accounts, correct?

23   A   Fifteen.

24   Q   Fifteen, sorry.  Look at my -- 15 different accounts.

25       And then when -- after having generated the 15 different

1   accounts, what's the next -- go again, tell us again what the,

2   the green-shaded accounts were.

3   A   Those are the ones that are identical.  Green, for the

4   purpose of this illustration, green means that the information

5   within those accounts for the name key-cell key are exactly the

6   same.

7   Q   Okay.  So in Step 2, the computer found that there were

8   five user accounts that matched based on the name and the cell

9   key, right?

10  A   No. 2, 6, 8, 12, and 15.

11  Q   Okay.

12      Now next step, then.  How do -- how does the -- how does

13  the computer move -- what's the next step in the aggregation

14  process having identified those five accounts through the

15  identifier?

16  A   The next step is the computer is looking to see if any of

17  the, the clusters identified in Step 2, in this case the one

18  we're talking about, 2, 6, 8, 12, 15, can be joined with

19  clusters that existed on the previous steps.  And the way it

20  does that ---

21  Q   Okay.  First, you said "can be joined."  What do you mean?

22  A   By "joined" I mean, the user accounts -- the -- the

23  accounts being added to the aggregations that existed in the

24  prior steps.  So increasing the number of user accounts in an

25  aggregation.

1  Q   Why -- let's take like Step 8, all right, User Account 8.

2  A   Uh-huh (indicating an affirmative response.)

3  Q   Why is those two being joined?

4  A   If I -- let me make sure, make sure I understand the

5  question.  Are you asking why it is that User Account 8 is

6  being joined to the aggregation?

7  Q   Why -- why is -- yes.  Why is the user account under the

8  Step 2 shaded in green and then why is it going into, to be

9  joined with 8?

10 A   I'm going to answer that in two parts to make, to make this

11 very clear.  User Account 8 was joined into the aggregation in

12 Step 1 because it had the exact same name key-e-mail key as

13 Nos. 1, 2, and 7.

14     So in Step 1 -- you see -- if a red check, checkmark is in

15 Step 1, that means it was joined in Step 1.

16 Q   Right.

17 A   So Nos. 1, 2, 7, and 8 joined the aggregation in, became an

18 aggregation on their own in Step 1 because they're exactly the

19 same.

20     Then in Step 2 there was a cluster created of five user

21 accounts, had the exact same information, No. 2, 6, 8, 12, and

22 15.  Now the question is do they have any overlap with the,

23 with an aggregation that existed after Step 1 and the answer is

24 yes.  They had -- the overlap exists in that User Account 2,

25 which is part of those five that are the same after Step 2, was

1  already in the aggregation after Step 1 as was User Account 8.

2       So because of that, the other three, Nos. 6, 12, and 15,

3  joined the aggregation.

4  Q   So in -- once you matched two in the second step with those

5  that were in the first step, all of the ones that matched in 2

6  then get added to the matches in 1?

7  A   That's exactly right.  So when you create a, a group of

8  identical identifiers at any step, as long as two of them

9  within that grouping existed in the, in the same aggregation in

10 a prior step they all get pulled in together.

11      So I'm just going to say that one more time to make that

12 clear here.  In Step 2, the, the counts that matched were Nos.

13 2, 6, 8, 12, and 15 in that they had the exact same name key-

14 cell key.  The next step was to see if they overlapped any

15 prior aggregation and the answer is that two of the five, of

16 those five user accounts, overlapped that prior aggregation,

17 Nos. 2 and 8, as evidenced by the checkmark in Step 1.  Now all

18 of those are an aggregation together, 1, 2, 6, 7, 8, 12, and

19 15.

20 Q   And when the computer was doing this sort under the two,

21 under Step 2, it was the computer that was matching User

22 Account 2 under Step 1 with User Account 2 under Step 2?

23 A   Yes.  It's the computer that's recognizing that, that

24 overlap.

25 Q   Okay.  So now within the aggregation we have how many user

1   accounts do we now have aggregated having used Steps 1 and 2?

2   A    Seven.  You have User Accounts 1, 2, 7, and 8 -- they were

3   aggregated in the first step -- and 6, 12, and -- I'm sorry --

4   and -- 1, 2, 7, 8, and 6, 12, and 15 in the second step.  So

5   that's for a total of seven, four and three.

6   Q    Okay.

7   BY THE COURT:

8   Q    So the obvious question I have is why two?  What, what made

9   you settle on two being the minimum overlap?

10  A    The, the reason was that when we were doing one --

11  obviously, we looked at one for overlap, which isn't a lot of

12  overlap.  We, we found after several runs that sometimes it

13  would, it would bring in more coincidence than it would, than

14  something that looked like it actually belonged.

15       So, for example, you have the name key and the e-mail key,

16  the name and the cell, and there'd be a match and then, then

17  one member would match and then the other six just didn't look

18  like they had any real relationship, might be a promoter and a,

19  and a subscriber.  But when we went to two, combined with the

20  next, with the following steps, it seemed to actually have a

21  correlation.

22  Q    Okay.

23  BY MR. BENNETT:

24  Q    Was there any, was there any analysis done as to whether or

25  not you should use three overlaps in each one of the steps in

1   order to have -- use three in order -- identify three overlaps

2   in order to bring them into the aggregation?  In other words,

3   was there any reason that you, to stop at two and not, not look

4   at more than two?

5   A   Oh, no, I, I follow your question completely.  And, and the

6   answer is, is absolutely.  There, there was a significant

7   amount of analysis after each step to assess whether or not the

8   aggregation looked, appeared to be working.  And remember what,

9   what we're doing here -- I, I say remember, but I don't think

10  we, we got to this point so far in this testimony -- that we,

11  we had participants and, that had provided us with lists of

12  their, of their aggre, well, their user accounts and that was

13  one of the things that we were sort of basing it.  If we ran it

14  this way, does this at all come, come close to their, their

15  user accounts based on many reviews and then running sort of a

16  set of tests after each one?

17      So absolutely.  We looked at -- did this over aggregate

18  versus under aggregate?  If it looked like it was an under

19  aggregation, should we have looked at, possibly three?  Yes, we

20  looked at that in each step.

21          MR. BENNETT:  And if we go to Plaintiff's

22  Identification No. 18 and this would be, the next step in line

23  would be Step 3.

24  BY MR. BENNETT:

25  Q   And again, tell us what's going on with respect to this

1    step, please.

2    A    Sure.

3        Similar to as I described before, each step is its own

4    independent comparison of the 15 million user accounts.  So

5    just, just starting with what's going on in Step 3 and to move

6    back, in Step 3 it, the computer is looking for combinations of

7    name key and phone key, which is typically the home phone as

8    opposed to the cell.  There were eight user accounts.  Eight

9    out of the fifteen user accounts had an exact match here.  Nos.

10   1, 5, 6, 7, 11, 12, 14, and 15 had the exact same combination

11   of name key and phone key.

12       So now the question is of that group of eight do at least

13   two, are at least two of those user accounts user accounts that

14   were in a single prior aggregation and the answer is yes.  You

15   can see that No. 1 was, joined the aggregation at Step 1;  No.

16   6 joined at Step 2; No., No. 7 joined at Step 1; and No. 12

17   joined at Step 2, as did 15.  So multiple -- most, most of

18   those user accounts had already been in prior aggregation, in

19   that prior aggregation.

20       So because of, because five of the eight -- well, because

21   only -- you only needed two, but five of those eight were in

22   previous aggregations.  So the other three come in, No. 5, 11,

23   and 14.

24       Let me just stop there to make sure that wasn't too fast

25   and that was followed.

1   Q   Okay.  Now the fact that there is 15 user accounts listed

2   in Steps 1, 2, and 3, that's just by way of example, correct?

3   It -- when the computer did it, it could list user accounts

4   anywhere between 1 and any particular number, correct?  Could

5   have been a hundred user accounts?

6   A   Absolutely.  It could -- absolutely.  As, as I mentioned at

7   Step 1, the purpose of this illustration is to demonstrate 15

8   user accounts that eventually become aggregated together and to

9   show why it is they became aggregated together.

10      But yes, each -- there would be millions of clusters in, in

11  each of these.

12          MR. BENNETT:  Now if you put up the next slide for

13  identification, which will be 19, please.

14  BY MR. BENNETT:

15  Q   Mr. Martin, I understand from the description this would be

16  Steps 4 and 5.  Could you tell us what this slide's

17  representing and how it fits into the aggregation process?

18  A   Sure.

19      Step 4 and 5 -- well, Step 4 is name key combined with the

20  part-phone key, which I believe was the, the first -- so

21  part -- part -- part-phone key is the last five digits of the

22  phone number.  I'm just try -- I don't have in front of me the

23  key, so I'm trying to remember what, what part-phone key.

24  Q   Do you want to go back and look at --

25  A   It's okay, but the point is it, it combines those two

1    pieces together, the name key and the part-phone key.  And the

2    third one, actually, has three -- Step 5 actually has three

3    steps.  It's -- now it's doing the name key, the login key, and

4    the end key and I'll get to what end key is in a second.

5        But, but the, the point here is that none of the user

6    accounts, no two user accounts matched in either of these

7    steps.  So because no two user accounts matched, you didn't

8    even get to the point of comparing to see if there was a

9    linkage to prior aggregations.  Nothing else joins in either of

10   these two steps.

11   Q   So again, the process, Mr. Martin, was that the computer

12   ran through, again, 15 million different user accounts looking

13   at these, in Step 4, looking at those identifiers, which was

14   the combination of name key-part-phone key, and in Step 5,

15   looking at the ident -- the com -- the combination of name key,

16   login key, and end key as a group of identifiers, ran through

17   all 15 million, and didn't find any matches, correct?  Is that

18   what that shows us?

19   A   That's correct.  And, and I'm just going to point out

20   something else here that is, is important.

21       If you look at Nos. 5 and No. 11, I pointed out earlier

22   when we were on Step 1 that neither of those had a, information

23   that could be used in the first key, the name key-e-mail key.

24   They're excluded because they had bad e-mails.  But if you

25   notice now, by the time we got past Step 3, because of the

1   different variations of information we used both of those user

2   accounts were able to get, be included in the aggregation.

3   They both came in at Step 3.

4       So the aggregation was able to look, use accounts that had

5   poor information; in this case e-mail addresses that didn't

6   have, that were not complete, but it didn't disregard the

7   account.  It, it looked for other information and, eventually,

8   it was able to bring that user account into the aggregation.

9   Q   And that was the purpose of running each one as independent

10  steps?

11  A   That's, that's right.  And it's the point of that and the

12  point of different combinations.

13  Q   Yeah.

14          MR. BENNETT:  Now if we go over to Slide for

15  identification No. 20.  This is Step 6.

16  BY MR. BENNETT:

17  Q   What are we looking at in this and what are, what was being

18  done at this step?

19  A   All right.

20      Step 6 is another three, three-peat key, was the part-name

21  key, e-mail key, and the part-phone key.

22      Now if I remember correctly, now that I look at it, I

23  believe what part-phone key is is it took the last five digits

24  of the cellphone number and the last five digits of the home

25  phone and combined them.  So essentially, it took off

1  extensions like area codes and country codes and normalized the

2  data to something that became more useful.  But that's what

3  part-phone key was.

4      So in this, in this example, using those three pieces of

5  information in combination there were six user accounts that

6  contained that, the exact combinations of that information,

7  Nos. 1, 2, 4, 7, 8, and 10.  Of those groups, or just using

8  that group of six, there was enough overlap to link it with the

9  prior aggregation as User Accounts 1 and 2 and 7 and 8 were in

10 the prior aggregation, as you can see by the checkmarks, and

11 those all, all joined in Step 1, 1, 2, 7, and 8.  So all of

12 those become part of the aggregation.

13 Q   So the only two new user accounts that were added to the

14 aggregation in Step 6 was 4 and 10?

15 A   Actually, no.  I'm sorry.  The way this screen is showing,

16 I can't see Row 15 on my computer.  There we go.  There we --

17 thank you.

18     All right.  And then you'll see the, shaded in a different

19 color on the bottom are User Accounts 13, 14, and 15.

20 Q   Okay.  Before we get there, let's just stop for a second

21 and make sure we got -- the dark green ones were aggregated

22 under this, were, were combined using these identifiers in Step

23 6, correct?

24 A   They had the exact same combination of the identifier in

25 Step, Step 6, part-name key, e-mail key --

1  Q    So they were, they were clustered together as one group?

2  A    That's correct.

3  Q    And then you compared that cluster of those six with the

4  prior aggre, the prior user accounts that had been grouped

5  together or linked and out of that you added two more into the

6  aggregation process, right?

7  A    That's correct.  No. 4 and No. 10 joined the prior

8  aggregation.

9       So the snowball's getting bigger by two more user accounts,

10 yes.

11 Q    And that's because you had, already had matches, you

12 already had four matches with earlier aggregations, correct?

13 A    That's correct.  Only two were necessary, but there were

14 four.

15 Q    Okay.

16      Now when we get down, farther down in Step 6, we have a

17 lighter shade of green for User Accounts 13, 14, and 15.

18      Could you explain that to us, please?

19 A    Sure.

20      Just like the other six were identical matches of, of those

21 three pieces of information, these three are identical matches

22 of a different set of that same information.

23      So 13, 14, and 15 all have the same part-name key, e-mail

24 key, and part-phone key.  So they are their own little cluster

25 and -- but -- so they're their own little cluster.  So you know

MARTIN - DIRECT                                                    102

1    they stay together.  They aggregate together.

2        Now the second question is is there overlap between that

3    cluster and a prior aggregation?  And you can see that Nos. 14

4    and 15 were in a prior aggregation and they were in that same

5    prior aggregation as the ones above.  So those, those three are

6    part of that prior aggregation now because you added 13 at this

7    step level.  To say, to say it more clear, those three are a

8    match, two are already in the aggregation, 14 and 15, and now

9    13 joins that prior aggregation.

10   Q    Okay.  But those three were not an identical, were not a

11   match as to the prior 12 within Step 6, correct?

12   A    That is correct.  If you look at 1, 2, 4, 6, 7, and 8,

13   you'll notice that all of those have a "at" gmail.com as, as an

14   e-mail address, but if you look at the bottom three, it's hard

15   to see the checkmark on No. 13, but you can see 14.  They, they

16   have Hotmail.com e-mail addresses.  So they have a different e-

17   mail address.

18       So what's being, what's happening here is if a participant

19   happened to, to use two different e-mail addresses or multiple

20   e-mail addresses in their time with TelexFree, that doesn't

21   mean that they're going to end up in multiple aggregations.

22   Even though you, they use multiple e-mail addresses, the, the

23   aggregation has different ways of trying to bring those all

24   back to the same person.

25   Q    Right.  And, in fact, if we go over to very, the Step 1 and

1   go to 13, 14, and 15 in Step 1, we can see that in those steps

2   they all turned up a Hotmail as the e-mail address, correct?

3   A   Yeah, that's, that's correct.

4   Q   Okay.  All right.

5       So now we have added, we, we have added the additional --

6   A   We've added three additional user accounts out of the 15.

7   So after this step only User Account 3 and 9 are not part of

8   the aggregation.

9   Q   Okay.

10          MR. BENNETT:  Now if we go to Slide 21, which is Steps

11  7, 8, and 9.

12  BY MR. BENNETT:

13  Q   What are we getting in those three steps?

14  A   This is showing that in Step 7, 8, and 9 through the

15  various combinations of identifiers in each one neither of

16  those -- there were no matches on those.  Neither of those two

17  user accounts are brought, are brought in.

18      So those -- 3 and 9 remain unaggregated at this point.

19  Q   Okay.

20          MR. BENNETT:  And then if we go to the next slide,

21  which is 10.

22  BY MR. BENNETT:

23  Q   What do we have on 10?

24  A   In Step 10, the identifier is the part-name key 2.  I

25  believe part-name key 2 was the, the first letter of the name

1   and the last four of the last name -- so in my case T-R-T-I-

2   N -- e-mail address, and the part-phone key and what it found

3   was that four user accounts shared the exact same

4   information's, information, No. 3, 6, 9, and 12.  Of those,

5   Nos. 6 and 12 were already in the pre-existing aggregation.

6   And because that's at least two, that means that No. 3 and No.

7   9 also joined that aggregation.  At the end of Step 10, all 15

8   of the user accounts are aggregated.

9   Q   Okay.  At that point the, the process stopped, the computer

10  would stop aggregating then or --

11  A   The computer would continue to, to, to search for

12  additional user accounts, but because this illustration was 15

13  user accounts that were eventually aggregated together and why

14  they're aggregated together, they were, they come together by

15  the end of Step 10.  But if this was -- the system -- remember,

16  Step 11, 12, and 13 were run independently and they, they go

17  regardless and it's always look, looking for additional

18  matches.

19  Q   Okay.  So even though this illustration stops at Step 10,

20  in fact, you would have run all, the computer would have run

21  all 15 steps, all 13 --

22  A   That's correct.

23  Q   -- correct?

24  A   That -- all 13 steps, that's correct.

25  Q   Okay.

1          MR. BENNETT:  If we go to Slide for identification 23.

2    BY MR. BENNETT:

3    Q   So what do we have here now, Mr. Martin?

4    A   This is just showing that -- that at -- at -- after Step

5    10, all 15 were aggregated.  So nothing, no other user accounts

6    joined the aggregation.

7    Q   Well, in fact, it shows that you went through all the

8    steps, right?

9    A   Yeah.  It shows -- every step is there independently

10   aggregated and you, you can see where Step, where User Account

11   1 would have been in Step 11.  We didn't highlight where there

12   are matches on these, on these because at this point they were

13   all aggregated together.

14   Q   Okay.  So out of all these various combinations of

15   identifiers, each one separately, ultimately, the computer

16   would have come up with 15 matches?

17   A   That's correct.  All 15 of these user accounts would have

18   been aggregated together as one match.

19   Q   Okay.

20   A   And importantly, we'd be able to show a participant,

21   where -- where each -- why it is we chose each of the user

22   account and where it was brought in and, and, and they would

23   understand what, what data we used for it and allow them the

24   ability to review it and, and contest anything that they

25   believe is not right.

1  Q   Okay.  So then if --

2          MR. BENNETT:  Could we go to Slide 14 for

3  identification?

4  BY MR. BENNETT:

5  Q   Now Slide 14, am I correct, Slide 14 shows the results of

6  the process and it would be something that could be shown to a

7  participant to identify to the participant the accounts that

8  were being linked?

9  A   That's correct.  This -- this -- this would be the 15 user

10 accounts that were aggregated together.  I would -- this is

11 normalized information here, meaning that, you know, for

12 example, the name on No. 1, the spaces are removed from James

13 Sample and the spaces are removed in the address.  If I, if I

14 was showing this to a participant, I would show the full

15 information, you know, and wouldn't, wouldn't normalize it.

16 For example, I'd, you know, 100 Main Street would have a space

17 between 100 and if there were apartments or anything like that.

18     But this, what this represents is the 15 user accounts that

19 were aggregated together.

20 Q   Right.  And this aggre -- this Slide 15 also shows the, the

21 fields that ultimately were normalized and became the keys?

22 A   That's correct.  These --

23 Q   These fields --

24 A   These were the normalized fields that were used to create

25 the keys.

1   Q   And these, these fields were taken from the SIG system from

2   one of the more lengthy account statements?

3   A   That's correct.  These were taken from, from the SIG

4   system, each from a dif, each from a different record.

5   Q   But at the end of the day, Mr. Martin, the, using these

6   various keys to create these various identifiers and then to

7   run them through the, have the computer run them through to do

8   the matches, that was the methodology that you developed for

9   your aggregation, is that correct?

10  A   Mr. Bennett, can you ask that question one more time?

11  Q   Sure.

12      If we -- what we did -- what you did was you took the

13  various fields, created the various keys, used the various,

14  combined the various keys to form these different identifiers.

15  You then took, you took 13 steps applying the different

16  identifiers and ultimately, when the computer matched up user

17  accounts using those different identifiers, that was your

18  aggregation process?

19  A   That's, that's correct.  The, the aggregation process was

20  starting with the information with, that existed within SIG,

21  normalizing it for any extraneous spaces or, or characters,

22  using, turning that information into keys, using the keys to

23  run, to create combinations for the 13 different aggregation

24  procedures that are run independently, and then joined.  That,

25  that is the process.

1    Q   Now having gone through this process, what steps were you

2    taking in order to assess the reasonableness of your, of this

3    process?

4    A   Within -- within each step -- after each step, we, we're

5    able to run a report that will give us the number of

6    aggregations and the -- each aggregation has a identifier.  We

7    call it the parent key and the parent key associated with each,

8    each of the aggregations.  And then when we, when we run it,

9    when we run the next aggregation we, there are certain user

10   accounts that looking, when you go through analytically and

11   look for matches, you would expect would join and you, you

12   compare.  These are user accounts that we would have expected

13   to belong to this person and would expect the system to

14   recognize and you'd review it and make determinations as to why

15   didn't it join, what modifications were necessary.

16       And you'd also look at user accounts that did join that,

17   when you go back, don't look like they, there should be any

18   connection.  Just to say an example, if it's James Martin and

19   Joanna Martin, okay, yes, they have the same first letter

20   initial, same last name, but should they really be the same

21   person based on the information?  And you make, make

22   modifications at each step after performing that analysis.

23   Q   And this analysis of these, these assessments that you were

24   doing after each step, were these done again?  How were they

25   done?  Were they done manually?  Were they just asking -- were

1   you just asking the computer to do something?  What were you

2   doing?

3   A    There's -- we're talking about millions of aggregations

4   based on 15 million user accounts.  It, it's not something that

5   could be done manually.  It was analytical to identify

6   variances and, and exceptions than when -- than when that --

7   when you identify.

8        So I'm just going to give an example.  If you started in a

9   aggregation that had 9 million aggregations after Step 1 and

10  you, and after Step 2 it brought in 300,000 in, into that

11  group.  Now you'd want to analyze that 300,000 and determine

12  should, what got added and why did it get added and you run

13  analytical procedures on those.  And then from there, you know

14  -- when I say analytical procedures, it's algorithms -- so did

15  these three match the state and match this.  If yes, return

16  this, if no, return this, and gives you the ability to then go

17  back and do, at that point start doing more of a manual review

18  to, to review each one where you could say this doesn't look

19  like it should belong, this, this doesn't seem right, and

20  refine the analysis.

21  Q    Okay.  And as you went through that process were you making

22  modifications before you came up with the final aggregation

23  methodology?

24  A    Oh, yes, absolutely.  We, we mentioned earlier the process

25  was developed over a year's time and there was a significant

MARTIN - DIRECT                                                      110

1   amount of modifications in consultation with, with counsel and

2   the trustee, reviewing the data, reviewing it, reviewing it

3   with participants, reviewing outputs with others as determined

4   does this, does this look like something that would be a

5   reasonable aggregation of user accounts, understanding that

6   perfection wasn't something that really could be achieved with

7   15 million user accounts with the quality of the data.  What we

8   were looking for is a reasonable aggregation that not only

9   produces a, an aggregation of the information, but also a

10  output that can be reviewed by a third party that they can look

11  at to determine if it looks right to them, meaning the

12  participant, a creditor, a net winner, the individual.

13  Q    Now I understand this aggregation process was clearly

14  meant, intended to be used as part of the class action

15  litigation to recover against net winners.

16       What was the principal reason for the development and use

17  of this aggregation system?

18  A    The principal reason for the aggregation was to determine

19  who -- who were the -- who lost money and who made money in,

20  through TelexFree and the reason we need to determine that

21  right, right from the beginning was the trustee necessarily

22  needed to create a, a claims process in this case.  And --

23  Q    All right.

24  A    And we spent significant amount of time with creditors

25  asking them what would be necessary for them to file claims.  I

1   think you -- I think you're aware, made aware that there was a

2   claims process that started before the trustee became involved,

3   a typical bankruptcy form process when the case was in Nevada,

4   and what you were getting were claims with just a number, just

5   a, just a dollar amount with no way for the trustee to

6   understand what that means and how do you translate that number

7   back to user accounts.

8        And just, same way the other way.  There's no way for us to

9   provide information to creditors without us understanding what

10  the user accounts were.

11       So that, that's the reason it was necessary from the start.

12  Q    Okay.  And do I understand that, ultimately, there was

13  what, what became commonly referred to as the "ePOC"?

14  A    The ePOC was the end product of the development of the, the

15  algo, the algorithm and the claim calculation.

16  Q    And how did the aggre, the aggregation methodology that we

17  just talked about, how did that work within the ePOC system?

18  A    The results of the aggre -- the, the ePOC system did not,

19  did not independently run the algo, the algorithm.  The

20  algorithm was run and the results were put into a database that

21  the e-P-O-C, the ePOC, was populated with.

22       So when a participant was  to log into the ePOC, they

23  would, they could provide pieces of information that would then

24  search their algorithm -- sorry.  I should try that again --

25  search their aggregation and if you had four matches, it would

1  pull the infor, the information and provide them with the whole

2  aggregation.

3      So just looking at what's on the screen as the illustrative

4  example, if that was a creditor and they were able to provide

5  their login, their, their name, their phone number, and an

6  address, e-mail address, then all, all 15 of these user

7  accounts would populate for them if they could provide that

8  information, the matches within this grouping here.

9  Q   And once that information was then populated and shown to

10 the participant, what, what, if anything, could the participant

11 do?

12 A   Once it -- first, first thing they had to do, they were

13 asked, asked to do was to either agree or disagree that that

14 user account population is correct and if it wasn't correct,

15 they had the ability to add user accounts to it or the, or to

16 remove user accounts from it.

17     So if this, in this example of 15, if No., if this person

18 determined that No. 9 was not them, then they could remove No.

19 9 from the list and they would be asked to upload any

20 information they could to support that, but they could just,

21 they could remove that and that would be removed from their

22 claim calculation.

23 Q   And approximately how many claims were filed in this case?

24 A   I recall approximately 130,000, 131,000.

25 Q   It hasn't been introduced yet, but I think it might be

1   helpful if you would look to --

2          MR. BENNETT:  If we could put up Page 8 of the reply

3   report that Mr. Martin prepared, and particularly Paragraph 18.

4   BY MR. BENNETT:

5   Q   Mr. Martin, would you take a look at Paragraph 18?  This

6   was in your reply report.

7       And could you explain the information that's in here and

8   how this relates to trying to assess the reasonableness of the

9   aggregation methodology?

10  A   Sure.

11      So I, I guess I was pretty close, 130,700 filed, filed

12  claims.  And so, so for each of those claims, when they, when

13  they were filed, the participant was asked to provide four

14  identifiers as I walked through, a login, an e-mail address, a

15  phone number, any of those, and if they could provide four

16  that, that were from that aggregation, then the system provided

17  them with the aggregation.

18      So out of the 131,000 claims, approximately 118,000 of the

19  claimants were able to provide that information.  They were

20  able to provide the four identifiers from the aggregation and

21  were presented with the aggregation.  Of that, more than, more

22  than 95 percent of them then accepted that aggregation as, as

23  their own, meaning they did not add user accounts to it or

24  remove user accounts from it.

25  Q   Okay.  And the aggregation, the listing of user accounts

1   that the participant would see when they logged into the ePOC

2   and put in this information, would have been the user accounts

3   that were generated as a result of the aggregation system,

4   correct?

5   A    That's correct.

6   Q    Now do you understand that the defendants in the class

7   action retained an expert, StoneTurn?

8   A    I do, yes.

9   Q    Okay.

10  A    I am.

11  Q    And do you understand that StoneTurn had some comments with

12  respect to the 95 percent calculation?

13  A    I do, yes.

14  Q    And what was your response to that?  And I think we have it

15  up on the screen here.

16  A    Yeah.  There -- it seemed to be a discrepancy between the,

17  how to calculate the amount.  We said more than 95, which we

18  get, we get 96.9 percent which was the percentage -- of the

19  114,000 that were able to match -- 114,000 had matched in.  So

20  114,000 of the 118,000 did not dispute it.  So we got 90,

21  almost 97 percent.

22       StoneTurn did a slightly different calculation, which I

23  believe they ended up with somewhere between 91 and 93 percent

24  using different numerators and denominators.  But either way,

25  it's in excess of 90, depending on which way you look at it.

MARTIN - DIRECT                                                115

1   Q    And do I understand out of the 130 odd thousand claims that

2   were filed, ultimately there were only 3,000 claims that were

3   objected to?

4   A    That, that sounds right.  I don't know the exact amount,

5   but that sounds right.

6   Q    Well, 3,000 claims that were objected to and for which

7   there was hear, they needed some process before the Court,

8   correct?

9   A    Yes.  Because there were, there were omnibus objections for

10  zero dollar claims.  But, yes, I think about 3,000 in terms of

11  claims that made it onto the docket.

12  Q    And those -- the submissions that were made by the trustee

13  in connection with those objections, were they, what were they

14  based upon?

15  A    I'm sorry.  Can you ask that question again, Mr. Bennett?

16  Q    Sure.

17       The -- the -- the objections and the supporting information

18  that was provided in connection with those objections, what was

19  that based upon?  Was it based upon your aggregation

20  methodology?

21  A    Some, some cases partially.  Some cases, there was really

22  no, no information provided, but it was a combination of

23  different factors.  But it -- it usually, usually was not the

24  aggregation.  It was -- it was dif -- I don't know how to

25  answer that.  There were different reasons for the, for the

1    objections.

2    Q   Okay.  Do you recall any of those disputes, whether or not

3    -- strike that.

4    A   There, there were certain objections that claimed that they

5    had user accounts that were not in the aggregation, but

6    oftentimes, those were individuals that did not avail

7    themselves to the ePOC, meaning they didn't provide identifiers

8    to help us identify which aggregation they belong in.  They

9    just simply entered a number.  So there were those type of

10   instances.

11   Q   All right.

12       Now I'm going to go through -- and I understand and you

13   understand that StoneTurn had various criticisms to your

14   report.  I'd like to go through some of those and get your

15   response to them.

16       One of the criticisms that were raised by StoneTurn was

17   that the -- the -- it was no situation where the deterministic

18   methodology was applied to a Ponzi scheme.

19       Sir, do you know if -- do you know whether or not there

20   were any other methodologies applied to Ponzi schemes that

21   would be relevant to this particular Ponzi scheme?

22   A   Well, the net equity calculation is, is common in, in all

23   the Ponzi schemes I worked on where it's a determination of

24   cash in -- cash you invested versus cash you receive back.  So

25   the, the net equity calculation was used in the, as the basis

1   in, in, I think, all of the Ponzi schemes that I've worked on.

2   Q    But none of those Ponzi schemes had the same issues that

3   you're finding in the Telex system, which is the multiple user

4   accounts and the need to link those accounts, correct?

5   A    No, that's, that's not anything that I, that I have had to

6   deal with in that, you know, in, for example, in Madoff.  It

7   was hedge, usually hedge funds investing in, significant amount

8   of money as opposed to small-dollar accounts and there wasn't

9   much in the way of sharing.

10      So, same thing with the Petters fund.  So, no, this was not

11  something that was, we had to deal with in the other cases.

12  Q    But the deterministic -- in your understanding, the

13  deterministic methodology is a generally accepted methodology

14  for linking, for record linkage, correct?

15  A    That's correct.

16  Q    Now do you understand that StoneTurn criti, one of

17  StoneTurn's criticisms of your report deals with the use of the

18  name as the first or primary key?

19  A    Yes.

20  Q    Okay.  And they indicate in their report that part of the

21  reason, the criticism is that there was inaccuracies in the

22  recording of the name.  Some of them were fictitious names,

23  appeared to be fictitious names, some were merely dashes, and

24  some were merely numbers.

25      How did you account for that at all in your, in your

1  methodology?

2  A   Well, well, let me address that in a couple of different

3  points.

4      Yes, we, we agree that the, there were inaccuracies in the

5  data.  Some of it, I'm sure some of it intentional, but if, if

6  we allowed the fictitious names or change in names to be the

7  rule rather than the exception and, and just not aggre,

8  aggregate, then, then it would make sense because there was,

9  there was a significant amount of data that did allow

10  aggregation.

11     So, yes, I do -- I think I -- I think in my rebuttal report

12  I, I do acknowledge that, yes, there were inconsistencies in,

13  in the data, but that did not prevent in the aggregation using

14  the name.  And I don't -- it's my recollection that StoneTurn

15  did not propose an alternate field to, to start with, just that

16  they criticized the use of that field and I'm not, based on our

17  analysis, that was the, the best field to start with because of

18  the, the frequency in which it was completed and the, the

19  consistency with it.

20     I believe, I believe one of the criticisms that StoneTurn

21  had with that point was the -- that -- I'm pretty sure it was

22  this point -- was that some people used corporate names where

23  they would use their own name for certain user accounts and a

24  corporate name for another.  I, I recall the example of

25  somebody Teixeira and Du Painting, I believe was --

1    Q   Why don't we hold on that just a -- so why don't we hold on

2    that for a moment, Mr. Martin.  We'll come back to that point,

3    okay?

4        I just wanted to complete with why you used, why your

5    response to their criticism about using the name was the

6    primary, as the first or primary key.  I think you've answered

7    that.

8        They also criticize, simply saying that the ePOC system,

9    the e -- the ePOC was too small of a sample to verify your

10   aggregation system.  What's your response to that?

11   A   It -- it -- well, I wouldn't call 130,000 small.  It -- it

12   -- but my, my reply to that would be it was a, it's what we had

13   to work with in terms of a, a sample size to test the, the

14   aggregation and 130,000 is, is a signif, decent size.  And I

15   think the ePOC process did demonstrate that it was a reasonably

16   reliable process to aggregate the user accounts and I think it

17   also demonstrated that it allowed for the users, the

18   participants, to review the information and contest it.

19       So to the extent that we start the process, we aggregate

20   the user accounts for them.  They can review it and challenge

21   it.  I, I think it was a -- it demonstrated that it was a

22   reasonable process.

23   Q   Okay.  It was just one of the various, various steps that

24   you took in order to try to assess the reasonableness, correct?

25   A   Yeah.  Yes.  I was specifically addressing the, the idea

1    that the ePOC -- I don't think we say, or at least I don't, I'm

2    not sure we say the e, the ePOC was the only thing we did

3    because that's not true.  There was a significant amount of

4    testing done with respect to the, the, the algorithm, including

5    meeting with participants and a lot of, a significant amount of

6    data analysis.

7    Q   Another criticism of your report and findings is that you,

8    you excluded intra-participant credit transactions and that

9    those transactions -- by that I mean, a transaction -- intra --

10   in -- intra, I-N-T-R-A -- transactions between two

11   participants --

12   A   Yeah.

13   Q   -- and with respect to those, there were situations where a

14   participant would either buy or sell credits from another

15   participant, correct?

16   A   It's correct that that occurred and it's correct that we

17   excluded those.

18   Q   And why did you exclude them?

19   A   As I mentioned earlier, that, that was a direction from

20   counsel.

21   Q   And is there anything in the SIG system which would allow

22   you, if you were required to, to be able to determine those

23   credit transact, transfers between participants?

24   A   Yes, that could be done.

25   Q   And with respect to the aggregation process itself, whether

1   those credit transfers between participants was included or

2   excluded, does that change your aggregation methodology at all?

3   A   It does not, no.  That's a number calculation and doesn't

4   in any way impact the aggregation.

5   Q   It would only change the amount of a net winning or net

6   losing?

7   A   That, that's exactly right, yeah.

8   Q   Am I correct that with respect to those transfers between

9   participants there wasn't a, an admin, there was an

10  administrative fee charged by Telex?

11  A   Yes.  With respect to transfers of credits, there was a fee

12  of, I believe it was, 3 credits, but the, the minimum amount

13  you're, of credits you're able to transfer was 300 credits.

14      So the maximum fee was 1 percent, but it was usually much

15  smaller than that because trans, transfers could be pretty

16  large.  But it was a three credit, it was a three-credit

17  charge, which is a $3 charge per transfer.

18  Q   So if I, if a participant transferred or purchased a

19  million dollars' worth of credits from another participant,

20  the, the fee would still be $3?

21  A   Right.  You would see 3 million credits leave one user

22  account and 999,997 go into the other account.

23  Q   And each credit, I think, just between -- each credit was a

24  dollar?

25  A   Yes.

1   Q    Now you also had in your, in your report the assumption

2   that, with respect to triangular transactions; in other words,

3   where one participant recruited another participant, the

4   recruited participant paid money to the recruiting participant,

5   and the recruiting participant used credits to satisfy the

6   TelexFree invoice.  You assumed that there was cash transferred

7   between the parties, is that correct?

8   A    That, that is the assumption we operate under.  That --

9   Q    And why did you make that assumption?

10  A    Well, we made that assumption because that's what we've

11  been told by, by TelexFree when we dealt with the employees

12  there.  That was their understanding.  That was the

13  understanding in the, in the, in the marketing materials for

14  TelexFree.  It was always a credit is a dollar.  In talking to

15  creditors from the Chelsea Collaborative, the Brazilian Women's

16  Group, and all over Boston and through the credits, through the

17  process, the claims process all over the world we continuously

18  heard that there's, there's a dollar-for-dollar RICO system,

19  the exception being that we did hear that going into 2014 when

20  there was contemplation of a new plan, there was such a, a rush

21  on opening new plans that promoters were able to charge more

22  than a dollar per credit in certain instances.  They were able

23  to -- because promoters wanted -- because participants and

24  individuals wanted credits so bad to open accounts, they were

25  willing to pay more than a dollar per credit.

1  Q   Okay.  And this assumption that in triangular transactions

2  there was a cash exchange, does that assumption in any way

3  impact the aggregation methodology?

4  A   No.  That, that's just a calculation.  It does not impact

5  the methodology in any way, just the amount of winnings and,

6  net winning and net losses.

7  Q   So that in the -- in the -- ultimately, that would be an

8  issue for the calculation of damage where, calculation of

9  damage for a judgment against the net winner and the net winner

10  would be entitled to offer some conflicting evidence on that

11  point?

12  A   That's correct.

13  Q   Now you also started to discuss the situation where, a

14  criticism by StoneTurn where the, where a user or a participant

15  would open a user account in their own name and then open

16  another user account in a corporate name.  And I think we had a

17  couple of examples that were in the report.  One was the

18  Hackett example.  The other was the Teixeira-Dupree example.

19      First of all -- well, why don't you explain what, why it is

20  that those weren't necessarily linked and then what the issue,

21  how that could be corrected.

22  A   They were not aggregated.  I'll just -- I'll just -- I'll

23  just use the first example you gave.  Suzanne Hackett, I

24  believe, was her name and DL1 was the corporation name.  They

25  weren't aggregated because each of the 13 steps has some

1   portion of the name as part of the linking key there and Du

2   Painting and Suzanne Hackett are two very different names.

3       And the idea was that if somebody opens an account under

4   one name and then under a completely different name, there's

5   probably a reason they would want those to be separate, you

6   know, whether there's a, there's a strategic reason why they

7   opened a corporation to move user accounts, which was the case

8   in, with Hackett, I believe, from having spoken to that, to

9   those parties, that -- there's a reason why they opened a

10  corporation and were putting accounts in that corporate name.

11  It, it wasn't our, our role to decide that that corporation

12  should be the same as that person.

13  Q   And do I understand under the aggregation process you would

14  be able to -- let's take the, go back to what StoneTurn used,

15  which was the Dupree --

16  A   Du --

17  Q   -- Dupree Painting, I think it was, and Teixeira.  You

18  would be able to run two separate aggregations, one for Tei,

19  one for Teixeira and one for Dupree?

20  A   Exactly.  Because we've already done the aggregation under,

21  I think it was David Teixeira --  but under Teixeira and we've

22  already done the aggregation under Du Painting.  If, if in the

23  case of, in the class action we got to the point where there

24  was a, settlement discussions with Teixeira and Teixeira was

25  able to provide evidence that Du Painting was also him, it's

 1   adding A to B.  You've already done both aggregations.  You

 2   could add the net winnings of one and the net losses to the

 3   other and come to a net number.  That's -- that's a -- that's a

 4   discussion and settlement item and it's not, not an aggregation

 5   issue.

 6   Q    All right.  So to the extent that that issue came up and it

 7   was a criticism of the aggregation methodology, it could be

 8   easily corrected by, by just running the two aggregations and

 9   looking at the evidence as to whether or not they should

10   properly be linked or not and then doing a mathematical

11   calculation for damages, correct?

12   A    That's correct.  I, I don't necessarily believe that it's,

13   it's a issue with the aggregation that it didn't combine

14   somebody's name with their corporate name.  But to the extent

15   that, that they, they wanted to combine them, there's a reason

16   to, it's not, it's just a mathematical exercise that could be

17   done.  It's a calculation.

18   Q    Okay.

19        Now, Mr. Martin, I understand that you prepared written

20   reports to address the, your opinion with respect to the

21   aggregation methodology?

22   A    I did, yes.

23   Q    Okay.  Could you look at Exhibit Plaintiff's 1 for

24   identification?

25   A    (Witness complies.)

1  Q   And, Mr. Martin, without going through the whole document,

2  is this a, an expert report that you prepared dealing with the

3  aggregation methodology that you've just testified to?

4  A   It is.

5          MR. BENNETT:  Your Honor, I'd move for the admission

6  as Exhibit 1 Mr. Martin's expert report.

7          THE COURT:  Mr. Rona?

8          MR. RONA:  No objection, your Honor.

9          THE COURT:  All right.

10          Then we will take Exhibit 1 as, for identification and

11  make it Plaintiff's Exhibit 1 in connection with this

12  proceeding.

13      (Plaintiff's Exhibit 1 admitted in evidence)

14          MR. BENNETT:  And if you could go to Plaintiff's

15  Exhibit, Plaintiff's Identification 2.

16  BY MR. BENNETT:

17  Q   And, Mr. Martin, looking at the document the face of which

18  is now, was marked as 2 for identification, is this a reply

19  report that you prepared in response to the Tone, in response

20  to the StoneTurn rebuttal report?

21  A   It is.

22          MR. BENNETT:  Your Honor, I'd move that Plaintiff's 2

23  for identification be accepted as Exhibit 2 for the purpose of

24  this hearing.

25          THE COURT:  Mr. Rona?

 1              MR. RONA:  No objection, your Honor.

 2              THE COURT:  All right.

 3              Exhibit 2 is in.

 4       (Plaintiff's Exhibit 2 admitted in evidence)

 5   BY MR. BENNETT:

 6   Q    Thank you, Mr. Martin.

 7              MR. BENNETT:  Your Honor, I have no further questions

 8   of this witness at this time.

 9              THE COURT:  Thank you.

10              Do you need a break or anything to get organized,

11   Mr. Rona, or are you ready to cross-examine?

12              MR. RONA:  Your Honor, I'm ready to proceed.

13              THE COURT:  Mr. Martin, are you okay if we just keep

14   going?

15              THE WITNESS:  I am, your Honor.

16              THE COURT:  All right, Mr. Rona.  Go ahead.

17              MR. RONA:  Thank you, your Honor.

18                           CROSS-EXAMINATION

19   BY MR. RONA:

20   Q    Good afternoon, Mr. Martin.

21   A    Good afternoon.

22   Q    I think you testified that StoneTurn didn't offer an

23   alternative method to deal with the issue of names within your

24   record-linkage method.  Did you testify to that?

25   A    I did.  That was my recollection.

1  Q   Okay.  But, but it's true that StoneTurn did offer an

2  alternative, which is to have used the probabilistic method,

3  isn't that correct?

4  A   First, I see that as two different things, just, just to

5  be, to answer.  I -- I -- what I thought the question was was

6  an alternative to using name as the, as the first point in the

7  deterministic method.  So I don't think they did give an -- I

8  don't recall an alternative to name.  They suggested a few

9  different options, but I don't think, if my recollection is

10  correct, they did not say "X" should be used.

11  Q   Well, isn't one of the points of, or reasons that

12  probabilistic methods are used when you don't -- not only is

13  there quality issues with the data, but you can't be sure which

14  field or identifier is superior to any others?

15  A   Yeah.  Yeah, that's correct.  Again, I thought the question

16  was regarding deterministic, but --

17  Q   But do you agree that one of the, the reasons that

18  probabilistic methods are used is when data is not good quality

19  and, and no one identifier is known to be superior to any

20  other?

21  A   Yes, I agree with that.

22  Q   Okay.  In this case, you chose the deterministic approach,

23  right?

24  A   That's correct.

25  Q   And you, you would agree with me that deterministic linkage

1  generally involve a single reliable and stable identifier to be

2  used?

3  A    Generally, the answer is yes.

4       And to go back to your earlier question, Mr. Rona, I don't

5  think that StoneTurn recommended using probabilistic.

6  Q    Didn't StoneTurn's report say that probabilistic methods

7  consistently outperform deterministic methods --

8  A    They did and then I, I believe what they said was Huron

9  does not give a reason why they didn't use probabilistic, but

10 they stopped short of recommending it, is my recollection.  I

11 may be wrong, but that's my recollection.

12 Q    You would agree with me that, that a high degree of

13 certainty, that the high degree of certainty required for

14 deterministic linkage is achieved when you have good quality

15 unique identifiers like a Social Security number?

16 A    That a high degree of certainty can be achieved if you have

17 that?

18 Q    Yeah.

19 A    Yes.  I, I agree that a high degree of certainty would be

20 achieved if you had Social Security numbers.

21 Q    Okay.  And, and that's the, that's the high degree of

22 certainty that is needed to be able to run a successful

23 determination, deterministic linkage, isn't that correct?

24 A    I believe, generally, what you are looking for is a higher

25 degree.  I don't believe that that is a man, mandatory, that

1   it's necessary to be able to do it.

2   Q   Okay.  And in this case, you didn't consider Social

3   Security numbers, correct?

4   A   No.  I, I testified that we did consider Social Security

5   numbers.

6   Q   But you didn't include them in your, your aggregation

7   analysis?

8   A   That, that's correct.  Not everything that was considered

9   was, made its way into the analysis.  There were certain --

10  we -- just generally, there were a lot of different information

11  that was available in the system and just because it was there

12  did not mean we relied upon it.  There's a significant amount

13  of testing of the information before we determined which fields

14  should be used, should be reliably used in the testing.

15  Q   Would you agree with me that one of the purposes of a

16  probabilistic method is that it would provide you with

17  weighting calculations that would allow you to determine the,

18  the, the strength or lack of strength of any particular

19  linkages, isn't that correct?

20  A   If we -- I would agree with you if we had two sets of data,

21  meaning a Table 1 to a Table 2 and you'd be able to say what

22  are, what are the probabilities of a false match and a positive

23  match, but because we did not have two sets of data, I'm not

24  sure you would be able to generate that, that, that weighting

25  in a, in a proper way in this case.  That's why we used a

1   combination of deterministic with some of the, some of the

2   concepts of probabilistic.

3   Q    And one issue with a probabilistic, application of a

4   probabilistic method is that certain attempts at linkage would

5   fail to meet a threshold, isn't that correct?

6   A    That's one -- are you asking if that's one of the issues?

7   Q    That's -- one, one of the out -- one of the likely outcomes

8   of running a probabilistic method is that certain linkage

9   attempts will fail due to not meeting threshold requirements?

10  A    Yeah, that's correct.

11  Q    Okay.  And, and so that would result in a situation where

12  certain user accounts would not necessarily be able to be used

13  and incorporated into your analysis, isn't that correct?

14  A    That certain user accounts would not be picked up in the

15  algorithm?  I think that's what you're asking.

16  Q    Yes.

17  A    Yeah.  Probabilistic, when you run it multiple times, each

18  time you run it some may be included one time, but might not be

19  included the next.

20  Q    But, but each time, each time it's run, those that fail

21  can't be used, isn't that correct?

22  A    Those that fail can't be used.  Could you ask -- I'm not,

23  I'm not sure what you're asking there.

24  Q    Well, the, the, the outcome of a running a probabilistic

25  method is that you have weights, correct, weight --

1  A    Yes.

2  Q    -- calculations between two different data items to be

3  linked?

4  A    Yes.

5  Q    Okay.  And the outcome is going to tell you the strength or

6  lack of strength of that linkage, correct?

7  A    That's correct.

8  Q    And there's a pre-specified threshold that, below which a

9  linkage will be deemed to be inappropriate, isn't that correct?

10 A    I, I'm trying to remember that, but the thing is we didn't

11 have the two different pieces.  So we weren't able to calculate

12 the threshold, the threshold.  But I'll tell you what.  I don't

13 remember what, I don't remember what the threshold was.

14 Q    Okay.  Well, the -- the -- you didn't want to be in a

15 situation where you were leaving out accounts, isn't that

16 right?

17 A    Well, no.  We are in a situation where we had to leave out

18 accounts because if something didn't get grouped by at least

19 two, we had to leave those out.  So we -- we -- even with

20 deterministic, that didn't alleviate the idea that if somebody

21 put in dot, dot, dot for a name and somebody else put in dot,

22 dot for a name, that you didn't get something left out.  If

23 somebody chose not to provide any meaningful information, then

24 it, it could still be left out and it was left out.

25         MR. RONA:  I, I want to go to Plaintiff's

1    Identification Exhibit 12, if I could.

2             MR. BENNETT:  You have to do it, Andy.  They can't do

3    it.

4             MR. RONA:  Oh.  Yeah, if that's okay, Andy.  If you

5    can do your exhibits.  And if you could go to Page 68 -- oh,

6    wait.  I'm sorry.  I think it's just Exhibit 12.  Yes,

7    that's --

8             MR. LIZOTTE:  There's no Exhibit 12.  It's Slide 12.

9             MR. BENNETT:  There's no Exhibit 12.

10   BY MR. RONA:

11   Q    So if I could draw your attention to the, the, the bullet

12   for probabilistic record linkage, the last sentence says, "The

13   methodology employs a threshold to determine whether a

14   particular record pair is a match."

15        Do you see that?

16   A    Yes.

17   Q    Okay.  So if, if, if, if the methodology finds two records

18   that fall within the threshold, it's not able to match them,

19   isn't that correct?

20   A    It finds two methods, two records that fall within the

21   threshold?

22   Q    Below the threshold.

23   A    Below.  Yes, below the threshold, that's correct.

24   Q    They wouldn't be able to be matched?

25   A    They would not -- right.  They would not match together.

1   Q    Okay.  Your -- one of the advantages of your method is you

2   were able to match accounts?

3   A    We were able to match some of, most of the accounts, yes.

4   Q    And so, therefore, you had a -- a -- you were able to tell

5   creditors, "Here are the accounts that I think belong to you,"

6   without having to worry about explaining to them statistics,

7   isn't that correct?

8   A    I wouldn't say without being able to explain statistics.

9   The point was to be able to, to create a reasonably reliable

10  aggre, aggregation that you could present to them, put it in

11  front of them, and if they point to, at a user account and say,

12  "Why is this user account in here," I could explain to them

13  exactly why it's in there, why it was included, and they, and

14  see the overlap and they would show them why it overlaps other

15  accounts.  So why we believed it was theirs.

16      So I would not say it's so that we don't have to explain

17  statistics, more so so that it's more transparent in why a user

18  account was included.  But maybe that's a little semantics to

19  your point.  Having to get into statistics may be a little bit

20  difficult in some cases with, with the creditor.

21  Q    Incidentally, you interviewed or spoke to people, I think

22  you mentioned Chelsea Collaborative and a, I think it was a

23  Brazilian Women's Group, is that right?

24  A    Those are two of the groups, yes.

25  Q    Okay.  And you don't have notes of your interviews,

MARTIN - CROSS                                                          135

1   correct?

2   A    Not in -- nothing form -- nothing like -- there's no note

3   to file or a, formal notes.  I have, you know, notes that, but

4   nothing, nothing in a formal document.

5   Q    Well, were you not in this case asked to provide StoneTurn

6   with notes of, of interviews with participants?

7   A    I spoke to counsel, explained what I had, and the answer

8   was if it's -- if it's -- if -- what format.  If it's an e-mail

9   that says So and So in discussions mentioned something, then

10  that wasn't a formal, that wasn't a response.  That was my

11  understanding.

12  Q    Okay.

13  A    But I, I did go through your request list with counsel.

14  Q    And do you -- you don't have names of the people that you

15  spoke to at those meetings, correct?

16  A    There were, there were a couple.  I, I mentioned a couple

17  to you in the deposition.  Fernando, I, I can't remember his

18  name.  He was also -- I introduced him to the U. S. Attorney

19  and they used him in the, in the criminal case.  I think I

20  mentioned somebody, Ohms (phonetic).  I, I can't -- I'm drawing

21  a blank right now as I sit here.

22  Q    You don't --

23  A    I don't off the top of my head -- no, I don't, I don't

24  recall all the names.

25  Q    You don't have a, a comprehensive list that would allow

 1  somebody else to see the cross-section of people that you spoke

 2  to, correct?

 3  A   I do not have a comprehensive list.  That is correct.

 4  Q   Okay.  And so you don't know if the, the sample that you'd

 5  spoke to was either large enough or somehow representative

 6  enough to guide this type of process, correct?

 7  A   It was not a statistical sample, no.

 8  Q   You -- your -- I think you've testified that your

 9  aggregation method was iterative, correct, meaning there were

10  multiple rounds?

11  A   Yeah.  The 13 independent processes, yes.

12  Q   And to, to even arrive at that 13 processes there were

13  prior attempts to figure out which factors to select and in

14  what order to run them in, isn't that correct?

15  A   Yeah, and, and how to normalize the data, yes.  There --

16  there -- there was -- there was -- a significant amount of

17  consideration went into each step.

18  Q   Okay.  And you used trial and error, by and large, in order

19  to arrive at the factors to consider and the order to consider

20  them, isn't that correct?

21  A   That -- I would say a good portion of it was trial and

22  error.  There was a lot of analyses where we were looking at

23  cardinality in the, in the numbers and unique, unique

24  representations and the sensitivity in terms of after this

25  step, how many, how many user accounts became aggregated using

1  this process.  Is that, is that an over aggregation or an under

2  aggregation in looking at it?  Now the next step, maybe that

3  one reduced the aggregations by only 2,000.  Now, now going

4  through and analyzing those 2,000, were they representative or

5  not.

6      So it's -- each -- I would say trial and error for a

7  portion of it, but there's a lot of analytical components to

8  it.

9  Q   Okay.  But you don't have records of those analytical

10  components, meaning you can't tell me how many of the 17

11  million accounts you looked at to, at each step to, to, to

12  assess the progress that you'd made?

13  A   I, I don't believe there's anything that says of the 17

14  million we looked at "X" million, no.

15  Q   Okay.  You, by and large, I mean, you say you used

16  analytical methods, but you also used visual inspection to see

17  if things looked right, isn't that correct?

18  A   Yeah, I think you have to.  I think you can -- you can

19  be -- you -- analytical is important.  It's, it's critical, but

20  at some point you actually have to take a look at the

21  information to, to see if there are, are reasons to believe

22  that the procedures aren't working correctly.

23      So, yes, there, there definitely was some, a, a degree of,

24  of manually reviewing for what I guess I would call sanity

25  checks with the information.

1   Q   Okay.  And visual inspections would be good at showing you

2   in a, in a cluster, in an aggregation or proposed aggregation

3   that everything within that seems to belong, isn't that right?

4   A   Seems, yes.  You could get, if you were looking at a single

5   aggregation interview, you could determine if something seems

6   to belong.  You --

7   Q   Okay.  And --

8   A   You're not going to know definitively.  That's the whole

9   idea of why you were looking for something that's reason, a

10  reasonable approach that could be challenged.  Because I'm not,

11  we can't pretend to be all knowing with respect to it.

12  Q   And in the example you've given of James Sample, the, if

13  you were to visually inspect that aggregation, it would look

14  like it was -- it -- it -- there was nothing that didn't

15  belong, isn't that correct?

16  A   There's nothing that look likes it doesn't belong.  I'd

17  have to take a look, look at it again.  The, the point was that

18  they did aggregate.  I wasn't, I wasn't trying to create

19  something that looks perfect for the purpose of a court

20  demonstration.  The point is under the aggregation these would

21  aggregate.  Whether I would like them to or not --

22  Q   All right.  And you --

23  A   -- these would aggregate.

24  Q   My, my point is you'd be able to, if you did a visual

25  inspection, you'd be able to visually inspect that everyone in

MARTIN - CROSS                                                           **139**

1   that proposed aggregation had the name Jim Sample or James

2   Sample, correct?

3   A    Yeah.  And I could tell you why it is that they were

4   aggregated.  I can't tell you for, for definitive purposes that

5   they are the same person, but I could tell you why it is that

6   the algorithm believed they were the same person.

7   Q    Okay.  But visual inspection would not be good at catching,

8   for example, if Mr. Sample also sometimes went by a nickname,

9   let's say, J. J. Samp.  If, if he wrote his name in as J. J.

10  Samp, you wouldn't be able to see that upon visual inspection,

11  correct?

12  A    I could, I would be able to see that -- why that -- so let

13  me just, just follow through your example.  Because nothing --

14  nothing lists -- nothing exists as a single field, right?

15       So if there was J. J. Samp, but also at these -- at the --

16  same e-mail address and a number, that would cause me to look

17  at it.  That would make me look at it and say, "Well, why did

18  J. J. Samp not aggregate with Jim Sample?"  I would know

19  because of the name.  And then you'd do a, then you'd do an

20  analysis to determine, well, should I, should I have included a

21  different way of looking, looking at the name in the, in the

22  aggregate, in the algorithm.  And in that case, it would have

23  been, okay, if I make this -- say I make this rule where I

24  include the first three characters regardless of where they

25  are, JJS, what's, is that going to bring it in?  And then you

1   look at it and you determine, okay, maybe that brought that one

2   in in that case, but it also resulted in a large over algorithm

3   when looking at the 17 million.

4        But that's the type of analysis that was done, is you look,

5   exactly what you just said.  You'd find the, the user accounts

6   that you could, you could tell based on other factors should

7   belong, but don't get pulled in by the algorithm and then do an

8   analysis to determine why they don't get pulled in by the

9   algorithm and should you make a change and is it possible to

10  make a change that won't result in a problem and an over, over

11  aggregation or under aggregation with respect to the larger

12  population.

13       But what you just mentioned, yes, those are certainly

14  things we saw.

15  Q   But you are, you are aware that there are instances in

16  which people are claiming that you missed certain aggregations,

17  meaning you missed accounts to combine together for a single

18  participant?

19  A   Yeah, absolutely.  And that, that was, I think, one of the

20  first things I said, is that we were looking for an aggregation

21  process that would be reasonably accurate based on the

22  information, but fully with the anticipation that the, the

23  participant would have the ability to challenge.  If

24  somebody -- James Sample and decided to go with J. J. Samp, you

25  know, he, he chose to go J. J. Samp.  We didn't, there was no,

1    nothing that made him go, change his name for that purpose.

2        So it's not illogical to assume that he would have to

3    explain and tell us, "Yes, I had, I had this other user

4    account, J. J. Samp."

5    Q   When you ran your, your deterministic model with the 13-

6    step algorithm, you could have stopped at 11 or 12, isn't that

7    correct?

8    A   What do you mean by "could have," meaning what?

9    Q   Meaning you weren't required to go to 13, correct?  That

10   was -- you -- you decided -- you settled on the number of, of

11   13 steps?

12   A   Yes.  The -- we, we settled on, on 13 at, at the -- 13 was

13   the end result.

14   Q   Okay.  And you weren't -- you -- you -- you -- after you

15   ran the 11th step, it was you who decided that, for there to be

16   a 12th step?

17   A   Me -- sorry.  Me with my team and after going through each

18   of the iterations with the trustee and counsel.  We'd look at

19   this is the results after "X," this is the results after "Y,"

20   and we discussed it and 13 -- I think we, if I remember

21   correctly, we, we had 13.  We looked -- the answer is yes.  We

22   made the determination at 13.

23   Q   All right.

24   A   That, that was the correct place to stop.

25   Q   And you -- if you had chosen, you could, there could have

1  been a 14th step, correct?

2  A   You could have, you could have done 14.

3  Q   There was nothing scientific, there was no scientific

4  principle that made, that made you stop when you stopped on, on

5  the 13th step, correct?

6  A   At, at that point it was a combination of judgment and

7  analytical analysis of the results of diminishing returns.

8  Q   Okay.  And that's, that was yours and maybe your group's

9  subjective determination, correct?

10  A   It was our determination.

11  Q   And I think you had said you shared the different

12  iterations and some of your different trial-and-error outputs

13  with some of the creditors that you met with so they could see

14  it and comment on it, is that correct?

15  A   That's correct.  If -- if -- if I -- yes.  The answer is

16  yes, that's correct.

17  Q   Okay.  And -- and you -- and part of that was to be

18  transparent with them, correct?

19  A   Correct, partly correct.  It's, it was to be transparent

20  with them, but also for them to help us and understanding why

21  it is there may be variations in the data.  It -- it didn't,

22  may not seem right that there'd be five different people with

23  the same name in the same house, in the same unit, then you

24  talk to some of the people, "Yes, I -- my, my wife had her own

25  account.  My three kids had their own account."  They all live

1    in the same house.  So, okay.  Now that, that does make sense.

2        So I wouldn't -- it wasn't -- it was to be transparent.

3    Transparency was always a, a strong consideration, but it was

4    also for them to help us in developing the methodology.

5    Q    But there -- no -- there was no similar sharing of, of

6    previous rounds or iterations with any of the net winners in

7    this case, correct?

8    A    I don't know, is the answer.  I, I know that there were

9    sharing, sharing of the aggregation with some of the net

10   winners.  I, I don't believe -- I don't know if there would

11   have been a, I don't know when that was.  I, I, I can think of

12   at least one net winner that was before the aggregation, I

13   think, was finalized.  But the answer is I'm not sure.

14   Q    Okay.  But there -- you, you're aware there are, that

15   you've alleged there are 90,000 net winners in this case,

16   correct?

17   A    Yes.

18   Q    Okay.  And you haven't shared a different, possible

19   aggregations that you've arrived at in the course of, of your

20   methodology with any more than a tiny handful of these net

21   winners, correct?

22   A    That's correct.

23   Q    Okay.  So a net winner has not had the benefit and, and

24   does not have the benefit of seeing any, any of the outputs of

25   your previous attempts so that they could decide, for example,

1   which one is, perhaps, more accurate for them or more favorable

2   for them?

3   A   More accurate or more favorable, no.  But remember, the --

4   the aggre -- the algorithm isn't final.  The aggregation isn't

5   final.  They, they can review it and contest it.

6       So it wouldn't have mattered to your example if there were

7   11 steps or 14.  At the end, it's, they can review it and

8   determine if we missed some or didn't miss some.

9   Q   Would you agree with me that, that an alternative method

10  would, instead of using names and e-mails and, and visual

11  inspection, to run statistical analysis and let the statistical

12  analysis guide the strength of the relationships?

13  A   No.

14  Q   You wouldn't agree with that?

15  A   In this case, no.

16  Q   Didn't you -- have you testified in this case that you

17  chose not to use a statistical approach rather than a visually

18  inspected deterministic approach because you thought it would

19  be more transparent and easier for participants that you had

20  met with to understand?

21  A   Yeah.  I think we discussed that a few minutes ago.  More

22  transparent in that we, they could understand how it was we

23  came up with the user account, which, again, is the, is the,

24  the basis for starting the conversation, that they can add to

25  or challenge, and then explain to them where, where it came

1   from.  So that was, that was one of the considerations, the

2   other being we have, we have one set of information, not two.

3   So you really couldn't create weights for probability purposes.

4   So that, that was another one.

5       And again, I don't, I don't necessarily want to say to make

6   it easier to explain to the participants, but I guess by saying

7   transparent it means easier.  I, I didn't -- I wanted to make

8   sure that anybody, not just a net loser, but a net winner,

9   anybody could look at the user accounts and just by looking at

10  it, get a sense of why it is that they were included in there.

11  Q   Well, let's, let's talk a little bit about your

12  understanding of what this, what this data was.

13      I think you indicated that, that a user didn't necessarily

14  have, even have to enter their own information for, for their

15  account, correct?

16  A   The -- what, what kind of information did you say?

17  Q   Meaning somebody else could enter information for you

18  within TelexFree, isn't that right?

19  A   I -- I -- I believe that there's no pro -- there's no

20  author -- I believe it could be done, yes.

21  Q   I think you earlier testified that, in fact, what you

22  often, what you sometimes saw was information entered for

23  Person A, but there would be Person, Person B's e-mail.  Do you

24  remember testifying to that?

25  A   Yeah, that the promoter's e-mail would be used in the

1   participant's record.  I don't -- I'm not making a

2   determination as to who entered it, but it was the promoter's

3   e-mail address that was maintained as the e-mail address there.

4   Q   Okay.  And that could lightly, likely be explained by the

5   fact that the promoter entered that data, correct?

6   A   It could.

7   Q   And different people go by different names, isn't that

8   correct?

9   A   I'll agree with that.

10  Q   And when you bring in cultural and, and, and, and

11  linguistic factors, there are different naming conventions

12  around the world, correct?

13  A   There are, yes.

14  Q   Okay.  It's very common in, for example, Latin America or

15  in the Portuguese-speaking world for people to have multiple

16  last names?

17  A   Correct.

18  Q   And they don't always use all their last names in all

19  instances, correct?

20  A   That, I can't testify on.  But they, they do have different

21  names, but in terms of is there a convention why they sometimes

22  use a portion of the name versus sometimes use other last

23  names, that I don't know.

24  Q   Okay.  And it's, it's also common to, for people to have

25  first names and middle names, correct?

1   A    That's correct.

2   Q    Okay.  And some people use their first and middle name or

3   even have a hyphen in the names, correct?

4   A    That's correct.

5   Q    Okay.  But it's common for people to sometimes drop the,

6   the name after the hyphen or to drop out their middle name,

7   correct?

8   A    You mean some cases use it and some cases don't?

9   Q    Yes.

10  A    I, I don't know how common that is.  I mean, I think of

11  myself, I, I generally use my -- when I'm filling out a form, I

12  generally use my, Timothy Martin and I don't change it to be a

13  different name.

14  Q    Okay.  But if you were -- I think you referred earlier as,

15  Mr. Sorondo as, as Jean?

16  A    Yes.

17  Q    But his name is, in fact, Jean-Louis?

18  A    Yes.

19  Q    Okay.

20  A    Jean hyphen Louis.

21  Q    Yes.  Jean-Louis, sorry.

22       And so there are -- there's also possibilities of

23  misspellings and, and, and other issues, correct, in just the

24  name field?

25  A    Meaning people misspelling their own name?

1   Q    Names being misspelled.

2   A    I -- yeah, I guess that's possible.

3   Q    I mean, if someone else entered a person's name in, it's

4   possible that that name could be misspelled?

5   A    Okay.  Again, using the, using the, the supposition that

6   somebody else is entering the other person's name and

7   misspelled it, yes.  I'll, I'll agree with you that's possible.

8   Q    Okay.  And are -- do you have any familiarity with the idea

9   that people on occasion, different participants shared

10  computers?

11  A    They shared computers, meaning -- I think if -- if I -- to

12  understand what you're asking, they used a common computer?  I

13  could, I could understand that to happen.

14  Q    And are you familiar with the fact that some, depending on

15  what computer you're using, what web browser, there may be, and

16  what website, there may the possibility of auto completion?

17  A    I, I don't know if that existed within TelexFree, but I'm,

18  I'm familiar with what auto complete is.

19  Q    Okay.  Well, you don't know that auto, that TelexFree used

20  any method to prohibit auto completes in data entry, correct?

21  A    I don't know either way.

22  Q    Okay.  And there -- was there a requirement to use your

23  real name in TelexFree in order to operate or make money?

24  A    No, there was not.

25  Q    Okay.  And, and I guess what I meant by "requirement,"

1 | there was no practical requirement, correct?

2 | A   What do you mean by "practical"?

3 | Q   Meaning you, it wouldn't be an impediment to getting money

4 | if you hadn't used your exact real name, correct?

5 | A   I'm going to say I don't know.  And the reason I say that

6 | is there's a strong correlation between the net -- the --

7 | the -- those that have eWallet accounts.  I think you recall

8 | with an eWallet account you had to provide your driver's

9 | license, passport, that type of information.  In those cases,

10 | there's usually a strong correlation between that, that name

11 | and the name on their, on that user account, but I don't know.

12 | I don't, I do not know the answer.

13 | Q   Okay.

14 |        MR. RONA:  If I could take back the screen from

15 | Mr. Lizotte and I'd like to go to Plaintiff's, I mean -- excuse

16 | me -- Defendants' Exhibit 19.

17 | BY MR. RONA:

18 | Q   Have you, have you reviewed this document before?

19 | A   I believe so.

20 | Q   Okay.

21 | A   I, I believe I have.

22 | Q   Okay.  And do you recognize the name of, of this person?

23 | A   Yeah.  I, I've heard that name before.

24 | Q   Okay.  That's Mr. Balan, the Class Representative for the

25 | Domestic Class, is that correct?

1    A    Are you asking me if that's correct?  I believe so.

2    Q    Yes.  Okay.

3         And if we go to -- this is an affidavit that he submitted

4    in this case, is that right?

5    A    Yes.

6    Q    Okay.  And if we go to Page 4 of his affidavit, he talks

7    about shared computers and auto complete, do you see that?

8    A    I do, yes.

9    Q    Okay.  And, and if I go -- sorry.  I was on Page, Page 4.

10        If I go to Page 3, do you see that Paragraph 13 he says

11   that, "There were accounts set up by me or team members who

12   were working with me that were in my name that were not

13   aggregated to me.  For example, the account under the name

14   Frantz Balan wallet refers to me, uses my e-mail address, and

15   shows my home address, but was not aggregated to me."

16        Do you see that?

17   A    I do.

18   Q    Okay.  And that, that would be an example of a data entry

19   issue thwarting your aggregation method, correct?

20   A    I, I'd have to look at it.  I'm looking at his name and,

21   and that looks -- if he uses -- he says he uses his e-mail

22   address, uses his home address, the, the name key, part-name

23   key and part-name key 2 look like they would both pick up his,

24   his name there.  Because part, part-name key was the, the first

25   four letters and part-name key 2 was the first letter, plus the

1   last four letters of the whole thing.  Both of those look like

2   they would pick it up.

3       So I'd have to, I'd have to look at it, but --

4   Q   But you --

5   A   -- I don't --

6   Q   You --

7   A   He says he --  I don't know if he does or he didn't.  He

8   says he uses it.

9   Q   Okay.  Well, do you have any reason to dispute that this

10  was not aggregated to him?

11          MR. BENNETT:  Objection, your Honor.

12          THE WITNESS:  I --

13          THE COURT:  What's the basis?

14          MR. BENNETT:  I don't --

15          THE COURT:  Hold, hold on, Mr. Martin.

16          MR. BENNETT:  I don't mind using this as a question to

17  Mr. Martin, but I don't believe we should use it as substantive

18  evidence one way or the other, your Honor.  It's an affidavit.

19  It wasn't provided, I don't think, as part of this particular

20  piece of litigation --

21          THE COURT:  All right.

22          MR. BENNETT:  -- I mean, this particular aspect of the

23  litigation.

24          THE COURT:  I, I'll take it for what it's worth.

25  Overruled.

1           THE COURT:  Can you answer the question, Mr. Martin?

2           THE WITNESS:  Yeah.

3           Mr. Rona, I, I would -- your question, I think, do I

4    have any reason to believe it wasn't in the aggregation.  The

5    answer is I have no reason to believe either way without seeing

6    -- I mean, this is Account No. 12,693,603.  I just have no way

7    from memory of knowing if this user account, this, this name

8    was included.  I just have no way of knowing.

9    BY MR. RONA:

10   Q   Okay.  But you did -- but I think you've testified that you

11   didn't do a visual inspection of all 17 million accounts each

12   time you ran your aggregation steps, correct?

13   A   That's correct.  But this would be analytical, not visual,

14   picking up the, the keys.

15          MR. RONA:  If we could go to Exhibit 25.

16          THE WITNESS:  But I should say, Mr., Mr. Rona, I'm not

17   disputing it because either way if he's aware of it and that

18   seems pretty clear of information, then that's exactly what

19   we're looking for, right, with a, a reasonable aggregation that

20   could be challenged by the, by the participant and they could

21   show it.  I mean, that, that's exactly what that is.  He should

22   be able to show that information.  If it really is his home

23   phone number and his address with a, with a name, Frantz Balan,

24   then I would think that he could just present that and I, I

25   have a hard time believing the trustee wouldn't aggregate that

#14-40987/AP 16-04006/AP 16-04007                        11-23-2020

1  with, add it to the algorithm.  I mean, it's a quality-of-data

2  issue.

3  BY MR. RONA:

4  Q   Is it, is it your intent that net winners should be,

5  alleged net winners should be required to load this, either the

6  SIG system or your output tables into a computer system in

7  order to determine if they're missing accounts?

8         MR. BENNETT:  Objection, your Honor.

9         THE COURT:  Basis?

10        MR. BENNETT:  I don't believe that's what the, the

11  witness has testified to or in responsive [sic] to the last

12  question.  The witness' response was that Mr. -- I forget how

13  to pronounce his last name -- would have an opportunity to

14  present evidence at the sort of an assessment of damage point

15  as to whether or not that was an account.  There's no

16  requirement that he would have to go through the whole SIG

17  system.

18        THE COURT:  I -- I think -- I think the question is

19  reasonable.  I'm going to overrule the objection.

20        You can, you can answer, if you can, Mr. Martin.

21        THE WITNESS:  Yeah.  I -- thank you, your Honor.

22        I'm just not sure that that's a, a financial or an

23  aggregation question, more of a legal question as to whether or

24  not that's beyond the, that burden should fall to the, to the

25  defendant.

1      But I don't think in this case that's necessary.

2  He -- sounds like what he's saying is he knows the name, he

3  knows the phone number, he knows the address.  I don't, not

4  sure why he would need the SIG system to, to just tell us that

5  and we, we could find it.  Maybe -- he's, he's saying that this

6  user account is his and it wasn't aggregated, but he knows the

7  name of it, he knows the phone number, he knows the address of

8  it.  He wouldn't need the SIG system for that.  He could --

9  that could be easily done in the, in the process, provide that

10  information.  He knows the, he even knows the user account

11  number.

12  BY MR. RONA:

13  Q   So your -- right.  And, and your belief is that that had

14  nothing to do with the fact that StoneTurn was able to retrieve

15  that record for him?

16        MR. BENNETT:  Objection.

17        THE WITNESS:  I wasn't aware that StoneTurn helped him

18  provide that affidavit.

19        THE COURT:  Hold on.  Hold, hold.

20        Say it a little louder next time so we all hear you.

21        MR. BENNETT:  Sorry.  Objection, your Honor.

22        THE COURT:  What's the basis for the objection?

23        MR. BENNETT:  There's no evidence whether StoneTurn

24  did or didn't do that.  Mr. -- the affirmative statement that

25  that information was provided by StoneTurn, there's no basis

1   for that.

2           THE COURT:  I -- I -- I wondered about that, too,

3   Mr. Rona.  Can you go back --

4           MR. RONA:  I'll, I'll withdraw, I'll withdraw the

5   question, your Honor.

6   BY MR. RONA:

7   Q   You don't know one way or the, the other whether Mr. Balan

8   had help from StoneTurn to retrieve a missing account, is that

9   correct?

10  A   I have no knowledge whatsoever of process by which

11  Mr. Balan prepared the, his affidavit.

12  Q   And, and you're aware, are you not, that in the claims

13  process that many claimants have, have had issues with using

14  that recall or records to be able to locate all their accounts,

15  isn't that, isn't that correct?

16  A   Correct.  That, that was one of the reasons why the ePOC

17  was created.

18  Q   Okay.  But even through ePOC there are instances where

19  individuals can't remember all of their accounts, correct?

20  A   I'll say correct, but they're not required to remember

21  their accounts with ePOC.  They're just required to remember

22  any four pieces of information that relate to their entire

23  group of accounts.

24          MR. RONA:  I'd like to go to Exhibit, Defendants' 25

25  and I'll just go to the, so it's a little easier, the, the

1   third page.

2   BY MR. RONA:

3   Q   Do you recognize this document, Mr. Martin?

4   A   I, I've been this document.

5   Q   And what is it?

6   A   The complaint, the TelexFree complaint against Linda

7   Hackett, is that right?

8   Q   And that's the Linda Hackett that you mentioned earlier?

9   A   That's correct.

10      Okay.  And Linda Hackett was somebody who, according to

11  your calculations and aggregation work, was a net, net winner

12  of more than a million dollars, isn't that correct?

13  A   I don't know the amount, but she was a net winner.

14  Q   Okay.  And - sorry.

15          MR. RONA:  Let's go to Exhibit A.

16  BY MR. RONA:

17  Q   And do you see that on the top -- and I don't know if I

18  should annotate it -- but do you see on the top line it has

19  Linda Suzanne Hackett, net equity, $1,208,132?  Do you see

20  that?

21  A   I do, yes.

22  Q   Okay.  So she was, according to your work, a net winner of

23  more than a million dollars, correct?

24  A   That's correct.

25  Q   Okay.  But in this complaint there's reference to a DL1 set

1  of accounts, is that correct?

2  A    There is, yes.

3  Q    Okay.  And those accounts are a net loser of $622,342,

4  correct?

5  A    That's correct.

6  Q    Okay.  And incidentally, in this case has anyone, does

7  anyone have an allowed claim for $622,000 that you're aware of?

8  A    Not that I'm aware of.

9  Q    Okay.  And if you add those two together, the net liability

10  reduces from 1.2 million to 580,000, correct?

11  A    That's correct.

12  Q    Okay.  And this case involved not only Linda Hackett, but

13  also David Hackett, is that correct?

14  A    Yeah.  I believe her husband, yes.

15  Q    Yes.

16     And David and Linda were the DL of DL1, correct?

17  A    I'd be speculating.

18  Q    Okay.  But would you agree with me that this complaint is

19  seeking damages on a combined basis against the Hacketts and

20  factoring in the negative net equity of -- sorry.  I just -- I

21  lost it -- but the negative net equity of DL1, isn't that

22  right?

23  A    That's what that exhibit is -- is -- I, I don't know what

24  the complaint alleged, but that exhibit is showing the net

25  amount of Linda Hackett and DL1.

1   Q   Okay.  And so this would be an example of where, because

2   the name in an account was different between Linda Hackett and

3   DL1, that, that your aggregation separated them, correct?

4   A   Correct.

5   Q   Okay.  And it, you don't know to what extent, for example,

6   David Hackett, was involved in any of these accounts, isn't

7   that right?

8   A   I -- I -- I don't know.  I do know at one point I think we

9   spoke to them.  But these -- these -- these are two separate

10  groupings, I believe, where Linda had her own accounts and they

11  opened up a corporation.  DL1, I believe, was an actual

12  corporation that they opened up for, for strategic reasons and

13  they opened up accounts under that, under that grouping.

14      So it was a decision at some point that they made to open

15  up accounts under, under a corporate name that was separate

16  and, and the, the algorithm and the aggregation properly

17  grouped the Linda accounts in one section and the DL1s in the

18  other.

19  Q   Even though it may have been the same person?

20          MR. BENNETT:  Objection.

21          THE COURT:  Yes.  What's the basis, Mr. Bennett?

22          MR. BENNETT:  If one is in an individual and one is a

23  corporation, since the corporation in and of itself is a

24  person, they can't be the same person.  It's clearly a

25  corporate identity and an individual identity.

1        THE COURT:  All right.  I'll sustain that.

2   BY MR. RONA:

3   Q   Well, you, I think, earlier testified that there were

4   corporate tax IDs available in the, in the SIG system, correct?

5   A   I don't recall if there were corporate tax IDs.  There's a

6   tax ID number.  I don't recall if, if it was a corporation or

7   if they put a corporate tax ID number.  If it was an

8   individual, they put an individual's ID number.  That, I don't

9   recall.

10  Q   Okay.

11       MR. RONA:  If I -- I'll, I'll stop Sharing and if I

12  could just ask Mr. Lizotte if he could pull up Plaintiff's 8.

13  BY MR. RONA:

14  Q   In the middle that says the company tax ID, is that

15  correct?

16  A   That's correct.

17  Q   Okay.  And, and there are 999 unique company tax IDs?

18  A   Yes.  Out of --

19  Q   And --

20  A   This is telling me, from what I can read here, remembering,

21  remember, this was three years ago, but it looks like

22  approximately 1/17th of the time was this field entered.

23      So 1.5 million out of 17 million times was there an entry

24  recorded in this field and there's 999 different entries.

25  Q   Okay.  So this, this would suggest to you that there were

1    some number of accounts that had some connection to a, a

2    company, isn't that right?

3    A    Yes.   It's possible that it was a company.

4    Q    Okay.   But you didn't include company tax ID in your, in

5    your deterministic record-linkage algorithms, correct?

6    A    That's correct.

7    Q    Okay.

8             MR. RONA:   We, we can stop --

9             THE WITNESS:   Mr. -- again, just before we go, the

10   reason why we didn't is I, I testified that when looking at

11   whether or not to include a field in the algo, in the algorithm

12   one of the questions was how often was it actually employed.

13   Does it have overlap?   And in this case it was used 1.5 out of

14   17 million times.   So it, it just wasn't, it wasn't a regularly

15   used field.

16   BY MR. RONA:

17   Q    But if, if some percentage of people operated in TelexFree

18   through a company, there would be information available, there

19   was information available to you that would help you identify

20   that company, correct?

21   A    Yeah.   Sorry, Mr. Rona.   I'm not understanding what you

22   mean by that.   If the company name was entered in the user

23   account and they were consistent with all their e-mail or their

24   phone number or anything, all of those companies -- that --

25   those accounts for that company would have been aggregated

1    together.

2    Q    Right.

3    A    It would -- even without using the company tax number, they

4    all would have been aggregated together.

5    Q    Okay.  So if -- if -- if -- if a company name was entered

6    like DL1 and there was an e-mail address that was, that

7    belonged to a person, that would aggregate to the company and

8    not necessarily to that person if that person had accounts in

9    his or her own name?

10   A    Right, that's correct.  Because they opened the account in

11   the company name.

12   Q    Okay.  But -- and you didn't conduct any type of

13   investigation to figure out if any of the companies whose names

14   appeared in TelexFree are, in fact, real companies or had

15   employees or anything like that, correct?

16   A    We have, but not, not in a scientific way.  The -- we --

17   actually, I believe DL1 was incorporated, I believe, if I

18   recall correctly.  But we -- it wasn't done in any scientific

19   way.  It was done more as part of understanding the process.

20   Q    Okay.  And, and I think you may have testified to this, but

21   a name could be fictitious, correct?

22   A    It could be, yes.

23   Q    Okay.  Did you do any searches or seek to get a handle on

24   how many names in, in TelexFree were fictitious?

25   A    No, we did not.  Well, the answer is no.  We did not.

1    Q   Okay.  Incidentally, another issue with data entry is the

2    language of the person entering the data.  Earlier, I think

3    you, you said that parts of the SIG system were in Portuguese,

4    isn't that right?

5    A   That's correct.

6    Q   Okay.  Have you ever viewed the Back Office?

7    A   I have, yes.

8    Q   And what language was Back Office in for TelexFree?

9    A   Oh, I don't recall.  It's -- it's -- it's been a long time,

10   but I believe some of it was Portuguese, but I don't recall.

11   Q   Okay.  And -- but it was not -- TelexFree didn't have a

12   website that was translated into, into all the major languages,

13   correct?

14   A   Not to my recollection.  TelexFree.com, I -- I don't -- I,

15   I don't recall there was translation.

16   Q   Okay.  So if Back Office were in English, let's say,

17   someone who didn't speak English might not necessarily

18   recognize what field is soliciting what data, correct?

19   A   It may not.

20   Q   Okay.  And similarly, if it's in Portuguese, then someone

21   like me who doesn't speak Portuguese would be in trouble,

22   correct?

23   A   Correct.  I -- I -- for some reason, I believe Name was

24   actually on the TelexFree.com.  I believe that it said, I

25   thought it said Name in that case, but I'm, I don't recall.

1    Q    Okay.  But if it said Name, there's a large number of

2    people in this world that wouldn't know what that means,

3    correct?

4    A    That's correct.

5    Q    Okay.  And are you also aware that some people don't, who

6    were trying to get involved in TelexFree may not have even

7    owned a computer and were relying on others to help them enter

8    data?  Have you heard that?

9    A    I, I have heard of people going to -- yes, using other

10   people's computers --

11   Q    Okay.

12   A    -- whether or not they owned one or not.  But I have heard

13   of people using other people's computers.

14           MR. RONA:  And I think we can take down the, the

15   current exhibit.

16           THE COURT:  One second, please.  I have a question

17   while that exhibit's on the screen.

18           MR. RONA:  Okay.

19   BY THE COURT:

20   Q    Mr. Martin, so you -- the -- the -- the linking keys that

21   you used in your aggregation process in, Linking Keys No. 1 was

22   name key and e-mail key.

23       Is the name key derived from the, the second, third, and

24   fourth fields that are listed there?

25   A    Your Honor, it's derived from the second field, which is

1    full name.

2    Q    Full name.

3    A    Because the third and fourth field are actually formulaic

4    within TelexFree and they changed over time.  At, at one point

5    first name was just formulaic and it pulled everything until

6    the first space and last name back to the space prior, then at,

7    then they changed it.

8        So the answer is it's all from the full name as the other

9    two were not user generated.

10   Q    Thank you.

11            THE COURT:  Go ahead, Mr. Rona.

12            MR. RONA:  And, and that -- Mr. Lizotte, you can take

13   that down.

14            I wanted to go to Defendants' 24.

15   BY MR. RONA:

16   Q    And, first of all, Mr. Martin, do you recognize this

17   document?

18   A    I do.  This is a presentation prepared in connection with

19   the sentencing of one of the principals of the company.

20   Q    Okay.  And that's James Merrill?

21   A    Yes.

22   Q    Okay.  And this was done sometime in 2017?

23   A    That's correct.

24            MR. RONA:  And I'm, I'd like to go Page 7.  Let's see

25   if I can do this without scrolling.  No.  Okay.  This is six of

1   the - of the -- of the document.

2   BY MR. RONA:

3   Q   Do you see that it says, "On average, victims of TelexFree

4   lost $1,830"?

5   A   Yes.

6   Q   Okay.

7   A   1,813?

8   Q   I'm sorry?

9   A   1,813, correct?

10  Q   I think it says 30, but --

11  A   Oh, I'm sorry.  I was reading, I was reading on the chart

12  below.  I apologize.

13  Q   Yeah.

14      And so that's, that means the average net loser lost less

15  than $2,000?

16  A   That's correct.

17  Q   And the average net loser only had a small number of

18  accounts, correct?

19  A   It's, it's a little skewed by the, by the, the one-off

20  accounts that didn't get, didn't get aggregated that were, some

21  of them were phone numbers.  But it's, it's somewhere close to

22  2,000, yes.

23  Q   Okay.  Meaning if you look at the bottom approximately

24  400,000 victims lost $1,425, which was the cost of a single

25  AdCentral Family package, correct?

1  A    Correct.

2  Q    Okay.  So to buy into TelexFree with a, with a family

3  package would cost you 1,425, is that right?

4  A    That's correct.

5  Q    Okay.  And that would get you a user account, correct?

6  A    That's correct.

7  Q    Okay.  So now you'd have one user account and the average

8  person lost that, somewhere between the amount of one AdCentral

9  Family package and two AdCentral Family packages, correct?

10  A    Yes.

11  Q    Okay.  So what that means to you is that the average net

12  loser had a small number of accounts, isn't that right?

13  A    The average net loser had a smaller number account than the

14  average net winner, I believe.

15  Q    And, and you're, you're aware that many net winners, in

16  fact, have hundreds of accounts, correct?

17  A    Yes.

18  Q    And, and for whatever reason, the operation of TelexFree

19  causes a proliferation of accounts, correct?  If you're -- for

20  a user, a long-term user, there's a proliferation of accounts?

21  A    Meaning if you, to be a long-term winner you tend to open a

22  lot of accounts?

23  Q    That's one way to look at it.  Is that, would you agree

24  with that?

25  A    Yeah.  It's -- net winners tend, tended to open a large

MARTIN - CROSS                                                            **167**

1    amount of accounts.

2    Q    Okay.  So the people that you were meeting with to review

3    your aggregation work were, by and large, people who only had a

4    small number of accounts?

5    A    I would say smaller.  I -- very -- I don't recall meeting,

6    meeting with anybody that, for example, had less than five or

7    ten accounts because those are not the people that would show

8    up at the, at the meetings.  But I don't, I don't recall

9    meeting with anybody -- well, that's not true.  I, I've met

10   with people that had more than a thousand accounts, but on, on

11   average, it was not, it was not averaging thousands of

12   accounts.

13   Q    Okay.  But some net winners have hundreds or thousands of

14   accounts, correct?

15   A    That's correct.

16   Q    And the, the people who attended these meetings were, one

17   of, one of their goals was to help you in the claims process,

18   correct?

19   A    It was to help, help themselves get to a claim in the

20   process.

21   Q    Yeah.  Help themselves because they felt victimized,

22   correct?

23   A    Yes.

24   Q    They, they had lost money and they were, they were looking

25   to get that money back, correct?

1   A    That's correct.

2   Q    Okay.  And so, so those people -- well, we'll get to my

3   next question later.

4        But I think you had mentioned that there was somebody who

5   attended the meeting that was, in fact, one of the meetings,

6   that was, in fact, a net winner and then they stopped attending

7   when they, when they realized that they might be a net winner.

8   Do you recall saying something to that effect?

9   A    To that effect.  I recall saying that there was somebody

10  that was at the meetings, was a net winner.  People pointed out

11  that she was a net winner and people asked her, "Why are you

12  attending these meetings if you're a net winner?"  I -- I -- I

13  don't necessarily recall her stopping, stopping attending

14  meetings, but --

15  Q    Okay.  But you did not attempt a -- in -- to, to seek

16  feedback from a, a, a coalition of net winners in order to help

17  you in your aggregation methodology, correct?

18  A    That's correct.  We met with net winners where we had the

19  opportunity where people presented us with net winners and gave

20  us their account activity and we were able to compare it

21  against it, but we didn't have the opportunity to meet with a

22  consortium of net winners --

23  Q    Okay.

24  A    -- which I'm sure we would have gladly done if we had that

25  opportunity.

1    Q   Okay.  But you did tailor, I think you said, each iteration

2    of your aggregation, you did seek to tailor it to the people

3    you were speaking with so that it, it matched what they were

4    telling you, correct?

5    A   Yeah, but not just them.  Any of the user account, any of

6    the data we had.  So I think I mentioned to you -- well, it

7    would have been in the deposition -- a net winner that had

8    thousands and thousands of accounts under a bunch of different

9    names and we learned, you know, this is, "I used this name here

10   and this name here."  Well, we would start looking into that

11   and trying to understand what that means for the population.

12       So it wasn't that we were looking for a specific net loser,

13   net, and trying to match that.  It was looking at different

14   variations in account setup and trying to understand that

15   process.

16   Q   Okay.  But the people you met with, for example, none of

17   them used corporate names, correct?

18   A   Well, for example, we did meet with Linda Hackett and David

19   Hackett and they did use a corporate name.  There was another

20   gentleman I think I mentioned to you, Esam.  I believe he had a

21   corporate name.  I -- there was -- no.  There, there's one that

22   we're dealing with right now through the court process that had

23   multiple corporate names.

24       So no, I wouldn't say it was that, that odd or uncommon for

25   somebody to open a corporate name.  It was -- I could think of

1    -- I could probably go through my e-mails and find, you know, a

2    couple, at least a couple of dozen that I'm aware of.

3    Q   And, and these are people that were at the Chelsea

4    Collaborative or the Brazilian Women's Group?

5    A   Yeah.  People -- when people started to get involved in

6    TelexFree there was, to an extent, some people they were going

7    to make a lot of money and some people opened up lots, a lot of

8    accounts and they opened some of them in corporate names.

9    Q   Did any of the people that you were meeting with, the, the

10   creditors, tell you that they used pseudonyms?

11   A   I, I don't know if any of them said that they used

12   pseudonyms.  I think some of that can -- when looking at user

13   accounts sometimes you can just figure that out.  I don't

14   remember anybody making a point of telling us that.

15   Q   But you, you would agree with me that the claimants that

16   you, or, or creditors that you spoke with had a, had some sort

17   of financial interest in, in the outcome of your aggregation,

18   correct?

19   A   Yes.

20   Q   Okay.  If we turn to ePOC, for a second, I think you had

21   said that prior to ePOC people had submitted form proofs of

22   claim.  You remember testifying to that?

23   A   Yeah.  Yes.

24   Q   Did you ever go back and try to correlate those form proofs

25   of claim with either your aggregation or any of your analysis?

1   A   I believe we did.  I -- I -- I'm -- I, I believe we did.

2   I think there was something that was included in some status

3   report at some point.  But I, I believe we did look at that.

4   Q   Okay.  But did you attempt to use that, those forms to

5   guide your aggregation process?

6   A   No, because they did, they did not provide any information

7   other than a number.

8   Q   Okay.  Meaning a dollar amount?

9   A   A dollar amount, exactly.

10  Q   And you would agree with me that the people who are

11  submitting claims, whether in ePOC or on paper, they have a, a

12  financial incentive to agree with -- with the -- with your

13  aggregation if it shows them to be a net loser?

14  A   I -- yeah, I would think that any, any participant we deal

15  with in the, in the process has a reason to agree with our

16  aggregation if it benefits them, if that's what you're

17  asking --

18  Q   Okay.

19  A   -- whether they be, whether they be a net winner or a net

20  loser.

21  Q   Well, if it -- if -- if it -- if it shows -- if, if your

22  aggregation shows someone to be a net loser, they have, they

23  have an incentive to agree with that determination, correct?

24  A   Possibly, but if they believe that they lost more, then I

25  would think they'd want to be, they'd want to have, have their

1   full amount of claim involved.  I mean, they, they have an

2   incentive -- if you're just asking about just financial

3   incentive, then they have incentive to lie and create more

4   or -- but, but the, the incentive was to -- I guess I don't, I

5   don't know the answer to your question.  If -- if -- are you

6   asking, for example, if you give a net winner the aggregation

7   and it doesn't show them to be a net winner by as much they

8   have an incentive to say that they agree with that?

9   Q   Well, I'm asking you about claimants.  I'm asking you if

10  they -- if they're -- someone who submits a claim in ePOC that

11  shows that, that, that they, they put in the four factors and,

12  and pull up your aggregation and that shows, that aggregation

13  shows them to be a net loser, they have a financial incentive

14  to agree with you, correct?

15  A   First of all, yeah.  I want, I want to say I apologize.  I

16  misunderstood the question before.  That's why I went in that

17  whole circle.

18      So, yeah.  You're asking if would an, somebody goes into

19  the POC, enters their information, they're presented with a, a

20  aggregation that shows that they lost more money than they did,

21  that they have an incentive to say yes?

22  Q   Yeah, a financial incentive to say yes.

23  A   Yes, and that's one of the, that's one of the reasons we

24  built into the, the ePOC many different, multiple different

25  steps throughout the process where they had to agree that they

1   have reviewed the transactions, that they actually did receive

2   the money that it says that they received, that they actually

3   paid the money that it says that they paid, and then,

4   obviously, file it under penalty of perjury.

5   Q   Okay.  But you didn't require them, for example, to furnish

6   you with records to corroborate any cash transfer, correct?

7   A   If it agreed with our records, we did not.

8   Q   Okay.  And a claimant could bring in other aggregations

9   into, besides yours and have an allowed claim, correct?

10  A   Correct.

11  Q   And you would consider that a validation of your

12  aggregation method, correct?

13  A   If they brought in additional claims?  If they brought in

14  additional user accounts?

15  Q   Yes.

16  A   The pulling in of the aggregation, I, I would consider to

17  be a validation and if they're able to provide the information

18  and, and pull the, pull the information despite there having

19  been, obviously -- if there's multiple aggregations, that means

20  there's variations of the names, right -- there had to have

21  been -- or variations of the different pieces.  But if they

22  agree to it and test, and say under penalty of perjury that

23  it's correct that they, and they agree to all the transactions

24  in it, then, yes, I would consider it to be corroboration.

25  Q   Okay.  And a common reason for claims not being allowed is

1  that a person claims that they're a net loser but your analysis

2  suggests that they're a net winner, correct?

3  A   If, if our analysis shows they're a net winner, but they

4  believe they're a net loser?  Yes, that would -- we would

5  object.  If, if our analysis says they're a net, a net winner

6  and they say they're a net loser, we'd object.

7  Q   I mean, are -- would you agree with me that there was a

8  large number of people who entered claims within ePOC that once

9  they claimed the accounts it showed them to be, according to

10 your math, a net winner?

11 A   Yes, there were -- there were.  I don't know the amount and

12 how to quantify that as large versus 130,000.  But, yes, there

13 was thousands.

14 Q   And would you agree with me that, that one of the common

15 issues that claimants have had if they try to challenge your

16 aggregation or calculations is the lack of, of available

17 records?

18 A   We, we have had instances where people have had a lack of

19 records.  I wouldn't say that that is a large percentage, but

20 there have been instances where people have had, had difficulty

21 obtaining records.  Oftentimes, what we're finding when that's

22 the case is there was actually a, a transfer, a purchase of

23 credits and not really a, a triangular transaction.

24 Q   And purchase of -- we'll get to that -- but purchase of

25 credits is excluded from your calculations, correct?

1  A    That's exactly right.  So they -- they're -- they're

2  looking to include it, but it's not included.

3  Q    So even if somebody actually lost money in TelexFree, they

4  might not get an allowed claim if their losses are due to the,

5  the purchase of credits, correct?

6  A    Well, that goes to an interpretation --

7            MR. BENNETT:  Objection.

8            THE WITNESS:  -- what you --

9            THE COURT:  Hold on, Mr. Martin.

10           MR. BENNETT:  Objection.

11           THE COURT:  What's the objection?

12           MR. BENNETT:  You're asking, I think, here at this

13 point for a legal conclusion.  Mr. Martin's already said he's

14 worked on the assumption as to what the definition was of "net

15 loser" and the, Mr. Rona is now trying to add into that

16 definition the transfers between participants and any other

17 costs that were excluded from the "definition" of loss.

18           THE COURT:  I'll -- overruled.  I'll take the, the

19 question.

20           Can you answer that, Mr. Martin?

21           THE WITNESS:  Sure.  The answer is no, because under

22 the interpretation of the, of the, the transactions that person

23 may have lost money, but not lost money in TelexFree, but,

24 rather, lost money in, in transactions between themselves and

25 another third party.

1   BY MR. RONA:

2   Q    Who was involved in TelexFree?

3   A    They -- yes, they probably -- yes.

4   Q    Okay.  And we'll get to that more, but I want to -- well,

5   maybe we can turn to that now.

6        Your, your instruction to ignore, to ignore credit

7   transfers was true regardless of how many credits were

8   transferred between participants, correct?

9   A    Yeah.  It, it was not a quantitative test.  It was a, it

10  was the definition test.

11  Q    Okay.  And you ignored credit transfers regardless of

12  whether there were large directions in which the net credit

13  transfers occurred for a single aggregation, meaning if, if one

14  person had many more credits in than credits out, you still

15  ignored it, correct?

16  A    I, I mean, you could say "ignored it," but I, I didn't look

17  at it because credit transfer wasn't part of the analysis.

18  Q    Okay.

19  A    So I didn't look at that particular situation and ignore

20  it.  I didn't look at it because it wasn't part of the

21  analysis.

22  Q    And you're not contending that credits were never sold for

23  cash, correct?

24  A    No.  I believe I, I say in my report that we believe they

25  were sold for cash.

1    Q    Okay.  And you don't know if certain people's net equity

2    would change if you included cash transfers in or out for

3    credits, correct?

4    A    I assume in some cases it would increase and in some cases

5    it would decrease.

6    Q    And in some cases a net winner could become a net loser and

7    vice versa, correct?

8    A    I -- that -- I have to believe that's possible.

9    Q    Okay.  And you don't know which participants were, in fact,

10   selling credits for money, isn't that right?

11   A    It, it would exist within SIG, but it was not part of the

12   analysis.  So I just didn't, I don't have an analysis of that.

13   Q    Okay.  And you don't know how much credits were sold for,

14   correct?

15   A    Based on what I've heard, sometimes a dollar, sometimes

16   more than a dollar.

17   Q    Okay.  But -- and have you heard sometimes less than a

18   dollar?

19   A    From you, but I've not heard that from a creditor.

20   Q    Okay.  Did you make -- well, let me -- let -- let me ask

21   the question this way.

22       You did not attempt to make, conduct any sort of market

23   analysis as to the price of credits, correct?

24   A    That's correct.

25       And I just want to correct something.  I said I've heard it

1    from you, but I believe I also, it was in one of the affidavits

2    that were included with the StoneTurn report, if I remember

3    correctly.

4    Q   And you recall in your deposition testifying to the

5    existence of some people who operated as credit brokers?

6    A   There are, there were people -- I don't know if we had --

7    I guess -- I don't know if I've -- maybe I've used that term,

8    "credit broker."  I don't recall.  But there were people who

9    definitely purchased credits and sold credits.

10   Q   Okay.  And they didn't do that for free, correct?

11   A   They -- no, they, they sold the credits, meaning monetary,

12   for a monetary amount, is my understanding.

13   Q   And did you review ePOC data to see whether there was

14   evidence of, of credit sales in the comments that were

15   submitted by, by users?

16   A   Not for that purpose, no.  I do not -- I don't recall doing

17   an analysis of, to look for comments related to credit

18   transfers.

19   Q   Okay.  So if -- if -- if, let's say -- well, let me ask you

20   this.

21       Did you ever provide counsel with any data to, in order to

22   revisit the instruction not to include credit transfers in your

23   calculations?

24   A   I don't believe so.

25   Q   Okay.  You rested on that instruction, correct?

MARTIN - CROSS                                                          179

1    A    What do you mean I "rested on the instruction," meaning

2    the, the trustee provided a calculation and, and I used the

3    calculation?  Yeah, I, I used the calculation that was, that

4    was agreed upon and, and provided.

5    Q    Let me, let me ask you more colloquially.  You didn't try

6    to talk counsel out of that instruction, correct?

7    A    I did not.

8    Q    Okay.

9         So would you agree with me that the result of excluding

10   credit transfers between two participants is that it, is that

11   the value of those transfers is essentially zero?

12   A    Value of the transfers, meaning that the, the out versus,

13   the out and the in net out to zero?

14   Q    Meaning that in your net equity calculations the -- the --

15   by virtue of excluding credit transfers you're -- you're --

16   you've essentially valued credit transfers at zero, correct?

17              MR. BENNETT:  Objection.

18              THE WITNESS:  Not at all.

19              THE COURT:  Sustained.

20              THE WITNESS:  Just like we --

21              THE COURT:  Hold on, Mr. Martin.

22              Next question, Mr. Rona.

23   BY MR. RONA:

24   Q    The -- the -- well, you would agree with me that, that

25   credits that were -- that a, that a participant had an option,

1    an -- let me start again.

2        You'd agree with me that a participant who had credits had

3    three ways to monetize those credits, correct?

4    A   I, I don't recall enumerating them.  What are the three

5    you're referring to?

6    Q   Well, one way is you could actually withdraw your credits

7    from TelexFree for cash?

8    A   Yep.  Yes.

9    Q   And you see that in the SIG data, correct?

10   A   That's correct.

11   Q   Okay.  And you've calculated that, correct?

12   A   That -- that -- yes.

13   Q   Okay.

14       Another way would be to triangular transfer, correct?

15   A   Yes.

16   Q   And you see that in SIG by virtue of an invoice, correct?

17   A   A combination.  It's a, information that's in the, the

18   transfer table and in the invoice table.

19   Q   Okay.  The transfer table shows credits going down,

20   correct?

21   A   It does, yes.

22   Q   I'm sorry.

23   A   Well, it shows a transfer between one party, one user

24   account to another user account.

25   Q   Well, in a triangular transfer the credits are being

1   retired, correct?

2   A    That's correct.  There's a -- if I recall correctly,

3   there's a notation in the, in the table that, as to the user

4   account that's satisfying an invoice to another user account

5   and then that information is then taken from the invoice,

6   invoice table to determine the amount that was transacted.  But

7   it's a combination of those two tables.

8   Q    Okay.  But -- so my point is that in, in a triangular

9   transfer you, SIG shows you (a) the amount of the invoice and

10  (b) a reduction in the participant's credit balance, correct?

11  A    Yes.

12  Q    And there's nowhere in SIG that shows cash changing hands

13  between participants, correct?

14  A    No.  It shows the amount of the credit transfer used to

15  purchase the invoice.

16  Q    And, and it shows the amount of the invoice, correct?

17  A    Correct.

18  Q    Okay.  So you see two parts of the triangle, but you don't

19  see the third part, correct?

20        THE COURT:  Well, don't use "triangle."  That's just

21  going to get everything confused.

22        MR. RONA:  Okay.

23  BY MR. RONA:

24  Q    You -- you see -- in, in a triangular transfer you don't

25  see the cash prong, correct?

1  A    You don't see the transaction between the two individuals.

2  You only see the transaction that Telex, between TelexFree.  So

3  you don't --

4  Q    Okay.

5  A    You don't see the individual transaction between one party

6  and another party, but you do see the opening of an invoice at

7  TelexFree and, and the use of credits to pay that invoice.

8  Q    Okay.

9       Similarly, in, when there's a credit transfer you see the

10  credit transfers on both sides -- for -- between participants.

11  You see both sides of that transfer, correct, in SIG?

12  A    You mean credits leaving one account and going into

13  another?

14  Q    Yes.

15  A    Yes.

16  Q    Okay.  And I think you testified that there's a three-

17  credit fee that TelexFree takes out of the, the recipient

18  before those credits land in their account, correct?

19  A    Yeah.  I'm trying to recall where, where it comes out, but

20  I believe it's from the recipient, that's correct.

21  Q    And again, if there's money that changes hands, you don't

22  see that in SIG, correct?

23  A    You do not.

24  Q    Okay.  So at no point when two participants exchange money

25  do you ever see that in the SIG database, correct?

1  A    Two participants changing money, no.

2  Q    Okay.

3  A    You do not, but none of that, none of that plays into the,

4  the, the aggregation, though.

5  Q    And your assumption that, of, of how much cash was received

6  in triangular transactions is -- is -- is predicated on the

7  assumption that the exact amount of the invoice was paid in

8  cash from one participant to the other, correct?

9  A    That's, that's the assumption, similar to what, what

10 StoneTurn said where it defies economic reality that somebody

11 would give away something for less than they could get directly

12 from TelexFree.

13 Q    Okay.

14 A    So if they could redeem the credits directly from TelexFree

15 for 1425, then it doesn't make as much sense that they're

16 willing to take less from somebody else.

17 Q    Okay.  Wouldn't that logic, then, also suggest that you

18 wouldn't give away your credits for free in a, in a credit

19 transfer between two participants?

20 A    I'm, I'm having a hard time figuring where you're coming

21 with that.  That -- who -- I'm not suggesting that they did.

22 I'm not saying that transfers were not for money.  I'm saying

23 transfers were not part of the net equity calculation.  They

24 were -- they were -- and had no impact on the aggregation.  I'm

25 not, I'm not saying -- I think you're saying -- but I'm not

MARTIN - CROSS                                                          **184**

1    saying that transfers were not for money.

2    Q    But do you agree that that's an incon -- it's -- those are

3    inconsistent assumptions that on one hand you could monetize

4    credits for a hundred percent in a triangular transfer and yet

5    we, we would not include a credit transfer between participants

6    where money, the same amount of money may have changed hands?

7              MR. BENNETT:  Objection, your Honor.  I object on the

8    basis that's a legal --

9              THE COURT:  Well --

10             MR. BENNETT:  -- that's a legal question, not a

11   factual question.

12             THE COURT:  Let me see if I can short circuit this,

13   Gentlemen.

14             I -- I -- what I understand is, what went on here was

15   that there -- that there were -- that there were transactions

16   between participants for buying and selling credits for amounts

17   of money that -- that -- TelexFree does not, did not have a

18   record and in, in, in formulating the process for aggregating

19   the, the user accounts and the claims the trustee did not

20   consider those transactions one way or the other.  I get that

21   and Mr. Martin has told us that that was on instructions of the

22   trustee.

23             And I don't know where you're going with this,

24   Mr. Rona.  I -- I -- am I missing something?  Is that not what

25   the testimony of this expert is showing?

1        MR. RONA:  No.  Where, where I'm going, your Honor, is

2   the, the, the assumptions as to the value of a transfer,

3   that -- so that --

4        THE COURT:  There were no assumptions.  The trustee

5   doesn't care about the value of those transfers one way or the

6   other.  Yes, when there were triangular transactions there was

7   an assumption that dollar for dollar was, was paid for those

8   memberships.  That's the other assumption.  It is what it is.

9        MR. RONA:  Well, what I'm getting at is the -- is the

10  -- is the -- the -- the next assumption that if you, why if you

11  would do a transaction one way that could have the exact same

12  outcome, that you wouldn't, as another way, you wouldn't

13  analyze both transactions the same way.

14       THE COURT:  Is the, is the question, basically, why

15  didn't the trustee include the inter-participant transactions

16  in this analysis?  Is that --

17       MR. RONA:  My question is isn't that, isn't that an

18  inconsistent set of assumptions.

19       THE COURT:  You -- do you understand the question,

20  Mr. Martin?

21       THE WITNESS:  I do, your Honor, but it, it has no

22  impact on the aggregation at all.  That, that's a calculation

23  question that flows to the, the net equity calculation and the

24  components that the trustee chooses to include it in.  But no

25  matter, if you include zero cents on the dollar, five cents a

1    dollar, or, or hundred cents a dollar, the, it has no impact

2    whatsoever on the aggregation.  The --

3    BY MR. RONA:

4    Q   Well, I'm, I'm not asking about the aggregation,

5    Mr. Martin.  What I'm asking you is on, on equity, net equity

6    calculations -- and I think you've testified that if you, if,

7    if you gave credits a $1 value, it's possible that taking those

8    into account some net winners would have become net losers,

9    isn't that correct?

10   A   The -- if you -- if the, the aggregation stays the same,

11   which it would, if you were to change the calculation to make

12   one something worth, one something worth more, something worth

13   less, then you could change the calculation output.

14   Q   And, and a net winner could become a net loser in some

15   instances, correct?

16   A   As I said, it's, that is possible.

17   Q   Okay.  So I'm not talking about aggregation now.  I'm

18   talking about whether someone is a net winner or not and how we

19   know.

20   A   But that's --

21   Q   And how do we, and how do we know that someone is a net

22   winner or net loser if there are some series of transactions

23   that we're assigning the value of a dollar per transaction or

24   per, per credit and there's another series of transactions that

25   we're excluding altogether.  Doesn't that produce an

1    inconsistent result?

2              MR. BENNETT:  Objection.

3              THE COURT:  Overruled.

4              What's the answer, Mr. Martin?

5              THE WITNESS:  I don't believe it creates an

6    inconsistent result.  I believe -- and again, this is not part

7    of my expert report.  I, my report was the aggregation.  But

8    if, if the question is including the triangular transactions

9    versus including the, the transfers, is that inconsistent, and

10   I say no.  And the reason I say that is because the triangular

11   transactions have an impact on TelexFree.  When a, when a

12   participant opens an account with TelexFree, that is, creates a

13   liability on TelexFree's part for 1425, right?  It's 1425

14   credits that goes to the liabilities on the balance sheet.

15   That's an obligation by TelexFree and the 1425 is revenue that,

16   that, that came in.  Even though it's, it's revenue in the form

17   of credits, it's 1425.

18             Between two parties, if there's -- I'm just going to

19   use the same dollar amount, 1425 -- if one party transfers 1400

20   credits and they have 1400 credits in their, in their account,

21   right now TelexFree's balance sheet reflects a liability of

22   1425.  After that transfer, TelexFree's balance sheet reflects

23   a liability of 1422, but it's three credits less.

24             So when you get, the bigger you get, the more

25   inconsequential it is.  But, but it has no impact on

1   TelexFree's financials.  The, the liability to TelexFree stays

2   the same and there is no revenue to TelexFree.  It's a

3   transaction that does not impact the financials of TelexFree.

4   It's between those two parties.

5   BY MR. RONA:

6   Q   Well, the -- the -- TelexFree in the triangular transaction

7   is not, is not collecting the cash, correct?

8   A   But it is -- it is -- it is receiving a liability of 14,

9   1425 because 1425 -- an account is being opened for 1425 and --

10  I'm sorry.  Let me start again.

11      1425 credits are being used.  So those 1425 reflect a

12  reduction in liability in terms of revenue of 1425 from the

13  purchase of the account.  So it impacts both the, the revenue

14  and the liability on, on TelexFree.

15      So it, it certainly impacts, it's on TelexFree's financials

16  as a financial transaction.

17  Q   Well --

18  A   But a transfer of credits has no impact on TelexFree.

19  Q   I thought we -- let me, let me try this again.

20      I, I thought we agreed that if you have two participants --

21  let's call them A and B -- and B has 1425 credits in his

22  account and A wants to open an account.  B can recruit A, pay

23  A's invoice with his credits, and then collect -- and your,

24  your assumption is then immediately collect 1425 in cash, isn't

25  that correct?

1  A    That's correct.

2  Q    Okay.  So at the moment that, that that transaction happens

3  there's actually an invoice that is generated that's

4  immediately, essentially, retired at the same time that 1425 in

5  credits are retired, correct?

6  A    The invoice is not retired.  It's -- it's -- the invoice is

7  paid, is that what you mean?  It's satisfied?

8  Q    Yes.

9  A    So the 1425 invoice is, is created.  It's satisfied.

10 Revenue is generated, 1425 in revenue to TelexFree because

11 it's, it's an invoice transaction and now TelexFree will, will

12 continue to generate liabilities in the forms of credits earned

13 on that user account that was just opened.

14     So they've generated 1425 in revenue.  Right away, one of

15 the, Party A it is that's opening the, opening the invoice,

16 they're going to get a hundred credits as a bonus right away.

17 So now you've added a hundred, a hundred-dollar liability to

18 TelexFree right there and you're going to continue to build

19 liabilities.

20     A, an invoice transaction has revenue and liability impacts

21 to TelexFree, whereas a transfer has neither.

22 Q    But isn't -- you have, you have Ponzi scheme experience,

23 correct?

24 A    I do.

25 Q    Okay.  Isn't the essence of a net equity formula that

1   you're collapsing the, the, the, any phantom revenue in the

2   Ponzi scheme and only looking at cash in and cash out on the

3   participant, isn't that correct?

4   A   Cash in and cash out to the Ponzi scheme.  So, for example,

5   if you were in the Rothstein Ponzi that I gave the example of

6   where somebody buys an interest in a, in an employee, an

7   employee settlement and sells that to somebody else at a gain

8   or a loss, that's not going to impact that victim's net equity

9   with respect to the Ponzi.  Because that transaction didn't

10  impact the net -- the -- it didn't -- the money didn't go to

11  Rothstein or out of Rothstein.

12      In the example you keep giving -- and again, it was not

13  part of my calculation and I did not spend a, a lot of time on

14  it -- the money isn't going, is not funds that were deposited

15  into TelexFree or funds that came out of  TelexFree.  It's into

16  participant.  The only reason triangular is being considered is

17  because there's a generation of an invoice, which does involve

18  TelexFree.

19  Q   Okay.  And at no point have you gone back and, and

20  attempted to recalculate your net equity calculations if, if

21  you were able to ascertain the value of cash that was exchanged

22  for credit transfers?

23  A   I have not, but it's not a -- because the, the aggregation

24  is done and that's -- that's a -- that's a simple command.

25  Because the aggregation is what takes time.  Pulling in data

1  with respect to the different types of transactions, that would

2  not be a difficult thing to do.

3  Q   And again, you have --

4  A   That's the difference I was making earlier between the

5  aggregation, which is the work that -- that I -- in my report,

6  and the calculation.  That's now formulaic from that point.

7  Q   Okay.  And -- but you -- you don't -- you haven't done it

8  so you don't know what the overall effect on all net, alleged

9  net winners would be if you took into account credit transfers,

10 correct?

11 A   I do not.

12 Q   Okay.  So you wouldn't know -- you wouldn't have any basis

13 to, to contest me if I said the aggregate liability would be

14 reduced by 600 million.  You wouldn't have a basis to challenge

15 that statement?

16 A   I would not have a basis either way.

17        MR. RONA:  I don't know if it's okay -- your Honor,

18 this might be a good point to take a break.

19        THE COURT:  Sure.  It is 3:40.  Shall we say we'll get

20 back together in 15 minutes at 3:55?

21        MR. BENNETT:  Fine with the plaintiff, your Honor.

22        THE COURT:  Okay.

23        All right.  Recess till 3:55.

24    (Recess from 3:40:41 p.m., until 3:55:42 p.m.)

25                        AFTER RECESS

 1              THE COURT:  All right.  Are we ready to continue,

 2   Mr. Rona?

 3              MR. RONA:  We are, if the witness is ready.

 4              THE WITNESS:  I am.

 5   BY MR. RONA:

 6   Q   Mr. Martin, I wanted to just quickly jump back -- my

 7   apologies -- to aggregation for just a moment and I'm

 8   prepared -- I can, actually, I think, Share Screen with, with

 9   Plaintiff's, I believe it's 15.  So I'm just going to go ahead

10   and do that in the interest of time.  And we've, we've had this

11   up before.

12       So, Mr. Martin, you don't need to explain it.

13       But this is the aggregation steps that you performed?

14   A   That's correct.

15   Q   Okay.  And I don't know if you can see my cursor, but you

16   would agree with me that name or part name is in each one of

17   these?

18   A   That's correct.

19   Q   Okay.  So if, the name or part name don't match, then the

20   accounts won't aggregate, correct?

21   A   Well, the part-name key 2, yes.  So one of the three name

22   pieces have to be, have to catch for them to match.

23   Q   Okay.  If all or some portion of a name doesn't match,

24   then, then the accounts won't aggregate?

25   A   That's correct.

1  Q   Okay.  And that would be true even if the e-mail addresses

2  are the same?

3  A   That's correct.

4  Q   Okay.  And that would be true even if the street addresses

5  are the same?

6  A   That's correct.  The name -- some portion of the name has

7  to be similar for them to match.

8  Q   Okay.  And I could go down the list, but that would be the

9  true, that would be true even if cellphones were the same, home

10 phones were the same, passwords were the same, correct?

11 A   That's correct.

12 Q   They wouldn't, they wouldn't aggregate.  Okay.

13        MR. RONA:  I think I can take it back, that down.

14 BY MR. RONA:

15 Q   Turning back to, to, to equity, there was no way within

16 TelexFree for a user to enter the amount of cash received,

17 correct, in a triangular transfer?

18 A   Meaning in a transaction that didn't involve TelexFree, to

19 enter it into TelexFree?  No, there was -- there was --

20 Q   Oh, that -- well, well, I think you've testified that

21 triangular transactions did involve TelexFree.  So I'm talking

22 about triangular transactions.

23 A   Okay.  I, I apol -- sorry.  I didn't follow what you were

24 asking there.

25 Q   Okay.  Triangular --

1    A    But the answer is no.

2    Q    The answer is no.

3         So in a triangular transaction there's no place for any

4    user to enter the amount of cash collected, correct?

5    A    I'm not aware of any place where you would enter that

6    information.

7    Q    Okay.  The only amount -- and I'm not going to call it

8    dollar amount -- the only amount that appears is the amount of

9    the invoice, correct?

10   A    The invoice is in there, that's correct.

11   Q    Okay.  And that's, that's the amount that you are using to

12   calculate net equity, correct?

13   A    That's correct.

14   Q    So if somebody paid a different amount in a triangular

15   trans, transaction, you wouldn't have any ability to take that

16   into account, correct?

17   A    No, certainly we would.  If they, if they presented us with

18   information that says they paid a different amount, then we

19   could just -- it's simple math at that point to make a -- make

20   a -- to make a adjustment to the calculation.

21   Q    Okay.

22   A    So if somebody reviewed our, our aggregation and says that

23   "In, in this transaction it says I paid 1425.  Due to whatever

24   circumstances, I only paid a thousand and this person will

25   agree that I only paid him a thousand," we could make that, we

1  could make that adjustment, certainly.

2  Q   Okay.  But if you have somebody who is on balance close to

3  be, you know, close to zero and if, if it turns out that they

4  could be flipped from either being a net winner to a net loser

5  or vice versa by the amount that they paid in triangular

6  transactions or that they received in triangular transactions,

7  you wouldn't have any way of knowing that in your calculations,

8  correct?

9  A   In the calculation of net equity, that wouldn't be factored

10 in.

11 Q   I'm sorry.  Hold --

12       MR. RONA:  Your Honor, if I could have just a ten-

13 second pause.  My family is invading us.

14       THE COURT:  Sure.

15    (Pause)

16       MR. RONA:  Sorry.  Sorry about that, your Honor.

17 BY MR. RONA:

18 Q   So you're -- you -- Mr. Martin, on a couple of occasions

19 you said that if somebody wants to show information to contest

20 your net equity calculations, you'd be happy to review it.  But

21 should somebody be a defendant in this case, in your opinion,

22 if it's uncertain what their net equity is?

23 A   "If it's uncertain," meaning -- I don't, I don't know what

24 you mean by "if it's uncertain," meaning we don't know within a

25 dollar or you mean we don't know exact?  No, I mean, I, that's

1   not -- I've seen litigation in other cases where you don't know

2   the exact amount of, of loss, but you're, but you're assert,

3   asserting an amount.

4       But here, we've been very clear that we -- we are -- we are

5   proposing an amount that is owed based upon, and a, a

6   methodology, but are, are willing in every instance to have a

7   discussion and if they can provide evidence otherwise, then I

8   think -- I think -- in my opinion, that -- that -- that is not

9   a bad thing.

10  Q   Okay.  So you're -- in, in your view, this --

11  A   Again, that's not an opinion I'm making in my report.

12  That's just opinion, if you're asking me.

13  Q   Okay.

14  A   I think -- I don't see a problem there.

15  Q   But you based your opinions on the triangular transactions

16  being valued uniformly at the amounts of the invoices, correct?

17  A   Yes, the 1425.  And that's, that's pretty consistent, well,

18  it's very consistent with TelexFree's advertising, their

19  presentations, what the Homeland Security, when they entered

20  via triangular transactions they paid the exact amount of the

21  credits and the advertisements when Mr. Merrill says it's

22  $1425, and all, all the YouTube videos where the promoters are

23  talking about it's $1425 for this, $339 for this, and

24  triangular.

25      So we -- our assumption was that, just like Mr. Dennis

1  said, it wouldn't make economic sense that people would charge

2  a different amount than they could get otherwise.  So we made

3  that assumption, but we fully understand that there could be --

4  I'm sure the trustee fully understands -- there may be

5  circumstances where it may be different and evidence could be

6  presented.

7  Q   Okay.  You didn't attempt to determine any specific markets

8  for the value of TelexFree credits, correct?

9  A   You mean physical markets, places?  What do you mean by

10  "markets"?

11  Q   Well, let me, let me withdraw that and ask in a different

12  way.

13     You didn't attempt to use empirical data to calculate what

14  the, what the effective rate was for credits, correct?

15  A   We did not.  And again, to be -- we're talking about the

16  net winners.  Just with, with the net losers, in any case, to

17  the extent it's determined that a credit is really worth 96

18  cents or 102 cents, that's just a, that's just a change in the

19  calculation and it could be done instantly.  Doesn't change,

20  doesn't change the actual aggregation of user accounts.

21  Q   Well, you did not consider negotiating ability in your

22  form, formulation of opinions, correct?

23  A   We did not.

24  Q   Okay.  Would you agree with me that some people are better

25  negotiators than others?

1   A    I believe so.

2   Q    Okay.  So it's possible that there might be somebody who

3   actually has a spread in the credits that they buy versus the

4   credits that they sell, correct?

5   A    That's possible.

6   Q    And it's possible that somebody might have a spread when

7   they're on the, the, the, on the promoter's side of a

8   triangular transfer versus when they are on the recipient's

9   side of a triangular transfer, correct?

10  A    It's, it's possible they could have a spread on either

11  side.

12  Q    Okay.  And that would, that wouldn't be able to be plugged

13  into your system 'cause that would vary by, person to person,

14  correct?

15  A    So you're not talking about a single person, what their

16  spread is.  You're talking about if, if each individual has

17  their own spread, then that would be -- that would -- that

18  would come down to when an individual presents their argument,

19  what, how much they say they were able to negotiate for credits

20  and that would be on an individual basis.

21  Q    Okay.  And in, in, in expressing that you have -- have you

22  considered what records would be available six years after

23  TelexFree filed for bankruptcy that would shed any light on

24  what was the effective rate for triangular transfers?

25          MR. BENNETT:  Objection, your Honor.

1        THE COURT:  The basis?

2        MR. BENNETT:  Your Honor, I think the, the question of

3    the witness, the, the testimony of the witness was is he

4    wouldn't be able to testify with respect to specific individual

5    transactions.  The question that was just asked now was what

6    records deal with an effective rate, which I believe is

7    different than the assumed cash transfer rate.

8        THE COURT:  I'll overrule it.

9        If you can answer the question, Mr. Martin, go ahead.

10       THE WITNESS:  I can't.  I don't, I don't know what

11   information somebody may have.  What we've seen is people have

12   bank, bank withdrawal amounts where the, where the amount that

13   withdrew from the bank ties to the amount of the 6, 7, 9, 11

14   user accounts that they've opened.  We've seen -- we've --

15   we've seen insurance statements where some, somebody had flood

16   insurance and they, they, they have the amount of money they

17   received and they're able to demonstrate that's exactly what

18   they used into TelexFree, other items like that.

19       So I don't know what they're going to have, but they

20   may have some record.  I have, I have records going back six

21   years.  I don't know the answer.

22   BY MR. RONA:

23   Q   Well, have, have, have you seen any cash receipts in, in,

24   triangular transferred cash receipts in this case?

25   A   Cash receipts.  I, I don't know the answer.  I'm, I'm

1   thinking about that.  I, I've seen checks people have written

2   to others for triangular transactions.  So it's, so, therefore,

3   it's a payment and a receipt.  So yes, there have been, there

4   have been checks.

5   Q   And have -- at any time have you attempted to make any type

6   of statistical correlation between the amounts that you are

7   predicting changed hands in a triangular transfer and the

8   amounts that maybe would be available to, to see in bank

9   transfers or check transfers?

10  A   I, I've pretty much only seen hundred cents on the dollar

11  or, or slightly more and -- but the slight -- so slightly more

12  were rare.

13      So it's not -- I, I don't have a sample where I'm seeing

14  significant amount less than a hundred that would have me do

15  some sort of analysis.  A hundred cents on the dollar is pretty

16  much what everybody's saying they paid.  And what, that's

17  important.  They're saying that's what they paid.  They're not

18  saying that's what they received.  Most of the people we're

19  dealing with with triangular transactions, if we show them the

20  transaction, they're acknowledging that they received that

21  amount.

22  Q   So my question, though, was did you attempt to do any type

23  of statistical correlation between bank transfers or check

24  transfers and the amounts that you're predicting changed hands

25  in a triangular transfer?

1   A    No.  Not, not having access to people's bank accounts and

2   bank records, no, I can't do that.

3   Q    And, and the, the checks that you've seen, those are

4   primarily from people who are coming to you as a victim in the

5   hopes that they can receive compensation, correct?

6   A    Or net winners trying to reduce the amount of their net

7   winnings.

8   Q    Okay.  So you have net winners that came to you with checks

9   to, to prove that their liability should be reduced?

10  A    I -- if I recall correctly, Linda Hackett had checks as

11  support.

12  Q    And was that, was all that information made available to

13  StoneTurn, to your knowledge?

14  A    I don't know.  It was never in -- it was never in -- I

15  don't know if it was ever in my possession, but I don't know

16  the answer.  It was to counsel.

17  Q    Are you aware of any changes in the value of credits over

18  time in, relative to the life of TelexFree?

19  A    Only what I mentioned that towards the end people were --

20  I've heard anecdotal stories from promoters of them having to

21  pay a premium towards the end.

22  Q    Did you take that into account in your calculations?

23  A    We did not.  We -- we -- it's -- it's that credit per

24  dollar in the, in the calculations.

25       And note that the credit per dollar is equal to the amount

1  of the, of the revenue that, on the TelexFree side, right?  No

2  -- so no matter what it was, if the triangular transaction was

3  1425 and somebody paid 1400 for it or 14, 1475 for it, 1425 was

4  the amount of revenue that was booked on the TelexFree side and

5  was the amount of the decrease in liability on the TelexFree

6  side from the, from the, from the use of the credits.

7      So It's somewhat tied to the impact on TelexFree as opposed

8  to the amount that was changing hands, too.

9  Q   Did you consider any collection problems that participants

10  had in triangular transfers?

11  A   I did not, no.

12  Q   Did you consider alternate payment arrangements that

13  existed between participants?

14  A   Did not.

15  Q   Okay.  Did you consider any profit or fee-sharing

16  arrangements that may have been in place between participants?

17  A   No.  I -- I don't -- I, I don't recall that.

18  Q   Okay.  You -- are you aware that -- that -- well, have you

19  assumed in this case that each account has one owner?

20  A   Meaning that an account does not have multiple owners?

21  Q   Correct.

22  A   Yes.  For -- for -- it's not necessarily an assumption

23  that's built into it, the idea being one person registered the

24  account under their name.  Whether or not they had some,

25  whether or not they had some sort of side agreement where

1    they're sharing that, that's, that's, again, it's similar to

2    the transfer of credits.  That's not a TelexFree transaction.

3    That's between them.

4    Q    But you'd agree with me that your deterministic method,

5    it's an either/or situation.  If there are two accounts, either

6    they belong together or they don't belong together, correct?

7    A    Yeah.  They -- they -- meaning -- I don't know what the

8    third alternative you have there is, but yes.  Either they,

9    either somebody has an interest in that account or they don't

10   have an interest in that account.

11   Q    Okay.  And when you run your aggregation you are assuming

12   that if one person owns an account, then it doesn't, can't be

13   owned by another person, correct?

14   A    We're, we're not considering whether somebody might have a

15   side deal with somebody else.

16   Q    Okay.  And are you familiar with situations where people

17   come forward and say that, that there was commingling of

18   accounts or shared ownership?

19   A    I, I don't recall that, but that's -- just similar, similar

20   to other Ponzi schemes, you know, just, just give, you know,

21   Madoff as an example.  You -- you -- or even Petters what I

22   worked on.  You have fund of funds that are investing in, in

23   the Ponzi and you, and what, whoever's name is on the, the

24   fund, that, that's who you're writing the check to.  Whether,

25   however they're going to deal with their own arrangements that

1   they've pooled together funds to make that investment, that

2   wasn't part of the, how the Ponzi -- the Ponzi schemes go two

3   steps in terms of making disbursements, trying to understand

4   who made the investment in the Ponzi and then how many people

5   invested into that pooling arrangement to get there.

6       So we didn't, we didn't really consider pooling, well, we

7   didn't at all consider pooling arrangements.

8   Q   Okay.

9           MR. RONA:  I'd like to show you Defendants' Exhibit

10  35.

11  BY MR. RONA:

12  Q   And ask if you've seen this document?

13  A   I have.

14  Q   Okay.  And this was just shy of two months ago, correct?

15  A   I'll take your word on that, but it was -- it was -- it was

16  this year.

17  Q   Okay.  Well, this is an affidavit of --

18  A   10/27.  So yeah, it was this month.

19  Q   Okay.

20  A   A month ago.

21  Q   This -- I'm sorry.  Not two -- yeah, less than even a month

22  ago.

23  A   A month.

24  Q   This is the affidavit of Brandon Zagarella, correct?

25  A   Yes.

1   Q   Okay.  And do you recall reading this affidavit?

2   A   I do.  If I remember correctly, there were two different

3   versions filed, one where it was the same -- the three of them

4   filed one and then they separately filed individuals.

5       Yeah, I, I recall this.

6   Q   And one issue was that there was a Joseph Zagarella, Sr.

7   and a Joseph Zagarella, Jr.?

8   A   Yes.

9   Q   Okay.  And that, that would be a situation that would -- if

10  you ran a deterministic linkage system, an account can either

11  only belong to Sr. or to Jr., right, but not both?

12  A   That's correct.

13  Q   Okay.  But if, if you had run a probabilistic method,

14  however, you could determine a way that might tell you whether

15  it means more to one than the other, correct?

16  A   I'm not sure in terms of how, how you could do that with,

17  again, with the, the one set of records versus the two set of

18  records.  And Telex -- and within TelexFree the, you know,

19  their books and records reflect a liability to a single

20  individual, not to two individuals.

21      So I don't know how I could make the case that Brandon

22  Zagarella opened an account, but the obligation really belongs

23  to Joseph Zagarella.

24  Q   Okay.  And do you see -- did you review Paragraph 16 of, of

25  this affidavit where Mr. Zagarella says that Telex, he had his

1   own accounts, but TelexFree commingled them with accounts that

2   belonged to his brother and father?

3           MR. BENNETT:  Objection, your Honor.  This, this is

4   hearsay.  I'm not sure what the purpose of asking the witness

5   the question.  If it's being offered for some basis other than

6   the truth of the contents, I'm not sure what it's being offered

7   for.

8           THE COURT:  What do you say, Mr. Rona?

9           MR. RONA:  I'm offering it for whether Mr. Martin was

10  aware or ever considered commingled or overlapping ownership.

11  And I'll just say that, that experts are certainly permitted to

12  rely on hearsay.

13          But I'm not offering it for the truth of the matter.

14  I'm offering it for whether this affidavit or the concept

15  expressed in this affidavit was considered by Mr. Martin.

16          THE COURT:  Right.

17  BY THE COURT:

18  Q   And the question being, Mr. Martin, were you aware that

19  TelexFree commingled accounts?

20          THE COURT:  Right?  Isn't that really the question

21  you're asking, Mr. Rona?

22          MR. RONA:  Yes.

23          THE WITNESS:  I'm aware that Mr. Zagarella asserted

24  that that happened.  There's no evidence within TelexFree that

25  that actually happened, but I'm aware that Mr. Zagarella made

1   that assertion.

2           Mr. Zagarella is one of those examples I had given

3   earlier that when filing a claim he didn't provide any

4   information in his claim system, just an amount.  So we've had

5   to sort of pull the teeth for him to help him figure out the

6   user accounts, so.

7           And the answer is I'm aware that he made that

8   assertion, but there's no evidence that it actually occurred.

9   BY MR. RONA:

10  Q   Okay.  And as a result of your review or your awareness of

11  Mr. Zagarella, you've actually performed an additional

12  analysis, correct?

13  A   Yes.

14  Q   And I'd like to show you what's been designated Defendants'

15  36.

16      Do you recognize this document?

17  A   I do.

18  Q   Okay.  This is an affidavit that you submitted in, in,

19  relative to the, the Zagarella family claims?

20  A   Mr. Rona, could you refresh my memory?  Is this the most

21  recent one or did I file one after this, do, do you recall?

22  Q   Well, does the date -- if I call your attention to October

23  8th --

24  A   Yeah.  That's why I'm asking.  In my mind, I seem to

25  remember something more recent, but maybe not.

1   Q    Okay.  But you -- this is an affidavit that you submitted,

2   is that correct?

3   A    That is correct.

4   Q    Okay.  And if I drew your attention to Paragraph 7, this

5   affidavit describes a secondary investigation that you did?

6   A    Yes.

7   Q    Okay.  And secondary investigation is not something that

8   you've been testifying thus far today about, correct?  At no

9   point have you been discussing the work that you did for any

10  secondary investigation.  You were discussing your, your

11  primary review, correct?

12  A    No.  I, I think this is consistent with what we, what we've

13  been saying where we did the aggregation and pulled together

14  user, pulled together groups of user accounts, then in

15  discussions with the party the party provided additional

16  information, and using that additional information we looked,

17  we looked for more user accounts that may belong to the, to

18  that person and at that point tried to then determine what,

19  what the right answer is.

20       So I think this is consistent.  The first -- the first --

21  there's no -- the first wasn't an investigation.  It's a

22  calculation and it, it created the, the aggregations.  Here, we

23  learned through some information that was provided by

24  Mr. Zagarella that there were accounts opened under different

25  names and different information.  And using that information we

1  identified a large group of other accounts.  They were all,

2  mostly, 14.95 net, net loser accounts.

3      So they were purchases of phone plans and they were under

4  different names that weren't picked up and in this case it

5  greatly reduces the net winnings of Mr. Zagarella and we

6  wouldn't have, we wouldn't have known that, you know, again

7  without the, the, the assistance of Mr. Zagarella's bringing

8  that information to us.

9  Q   Okay.  I just want it to be clear that a secondary

10 investigation is something that you performed after the

11 Zagarellas made themselves known to you, correct?

12 A   After the, after they first made themselves known and then

13 provided, then they provided additional information, yes.

14 Q   Okay.  And with that additional information you were able

15 to identify 1,993 additional user accounts determined to belong

16 to the Zagarella group using your aggregation methodology,

17 correct?

18 A   That's correct.

19 Q   Okay.  And --

20 A   I, I say that's correct.  I don't recall in this affidavit

21 if we said we looked for anything else, but I believe that was

22 correct using the, using the aggregation.

23 Q   Okay.  That's what this affidavit says, correct?

24 A   Okay.  Yes, yep.  You're right.  Sorry.

25 Q   And, and this was an affidavit that was submitted by you in

1  October of --

2  A     Yeah.  I just hadn't read that sentence, again.  Sorry.

3  Q     All right.

4        And then further in this affidavit you describe that in

5  addition to those 1,993 additional user accounts you identified

6  1,610 accounts that were not claimed by the Zagarella group,

7  but were part of additional account aggregations linked through

8  contact information associated with claimed accounts, do you

9  see that?

10 A     Yes.  And I, I, I think we corrected this in, in the last

11 hearing and I believe the 1610 is part of the 1900 --

12 Q     Okay.

13 A     -- 1993.

14 Q     But either way, there were almost 2,000 accounts that the

15 Zagarella group may have had a claim on or any one of the

16 family members may have had a claim on that were not part of

17 your original aggregation, correct?

18 A     That's correct.  We had no reason to believe that Joseph

19 Zagarella and Jeanette Toscano were the same person, as an

20 example, as you can see in the example there.  We had, we

21 had -- it just -- there was no logical reason to believe that

22 Jeanette Toscano and Brandon Zagarella are the same person, but

23 by them providing additional information, we were able to run

24 the -- now we can use Jeanette, right, we can use Jeanette

25 Toscano and run that through the system with the names and

1   identify this other information.

2       But there's no logical reason with --

3   Q   Well, if --

4   A   -- the computer to do that.

5   Q   If, if a probabilistic method had been used, would it have

6   been possible for that method to identify some strength of

7   relationship between somebody even if their name is arbitrarily

8   different, such as Jeanette Toscano?

9   A   I'm not sure in this case because I'm not sure how, without

10  having the two sets of data, you would have been able to do

11  your M probability and the U probability where you would

12  determine the correct, the chances of the system correctly

13  identifying that Brandon Zagarella and Jeanette Toscano are the

14  same person and the choices, the chances of it incorrectly not

15  making that assumption.  Because you don't know in advance,

16  whereas opposed to, in the example you had given earlier with

17  the health care situation, where you have one set of records

18  that you know to be right and another one that you know to have

19  false, you can, you can make some comparisons and, and create

20  the weights by doing the calculations on the probabilities.

21      I'm not sure you would have been able to determine the

22  probability of -- unless you knew in advance that Brandon and

23  Jeanette were the same person, that Brandon Zagarella and

24  Jeanette Toscano were the same person, I don't think you could

25  have created a weight that would have told you how much -- what

1   -- what weighting to give the fact that Jeanette Toscano and

2   Brandon Zagarella are the same person.

3   Q   Okay.  And -- but I think you -- you may have just

4   mentioned it, but I just want to be clear that, that as you, if

5   you do secondary analyses for, with respect to an aggregation,

6   an original aggregation, it's possible for the -- the -- the --

7   the -- a negative net equity to flip to positive and vice

8   versa, correct?

9   A   I said -- yes I, I believe I said the potential exists with

10  the math.  But, yeah.

11  Q   Okay.

12      (Pause)

13  BY MR. RONA:

14  Q   Incidentally, I, I think I -- we -- we -- you've said this,

15  but for the same reason that you, you have not factored in

16  credit transfers, you haven't factored in any out-of-pocket

17  costs that people incurred in connection with TelexFree?

18  A   I believe that was directly in the, in the order that was

19  referenced earlier, that those were not included.

20  Q   Okay.  And did you for that same reason also not factor in

21  any taxes that may have been paid by participants?

22  A   I -- I did -- they were not included.  They -- I -- they

23  were not -- sorry.  I'm stuttering there.  Sorry.

24      They were not part of the order, but I also did not include

25  them because they were not part of the calculation that I was

1   instructed to use.

2   Q    Okay.  Are you aware that participants received 1099s from

3   TelexFree?

4   A    I am, yes.

5   Q    Okay.  Did you do any investigation to see whether and to

6   what extent anyone paid taxes in connection with TelexFree?

7   A    Whether and to what extent anybody did?  I, I think we

8   heard from some, some people that did.  Those, those 1099s were

9   prepared by Pricewaterhouse based on the cumulative credit

10   balance in those, in those accounts and I, if I recall

11   correctly, there was -- I don't know if there was any

12   aggregation of them.  I don't believe there were.

13   Q    Right.  But the actual people received 1099s, correct?

14   A    Actual people did, yes.

15   Q    Okay.  And, and, and actual people may have paid taxes

16   based on the phantom income that they supposedly received from

17   TelexFree reflected in their credit balances, correct?

18   A    Yes, they may have.

19   Q    Okay.

20   A    And they --

21   Q    But that's not something you took into account, correct?

22   A    No.  And I also didn't look to see if they did pay taxes,

23   if they filed for refunds based on the Ponzi presumption.  No,

24   I didn't do that.

25   Q    Okay.  And I didn't -- I didn't -- I apologize.  Let me

1    withdraw that.

2        So going back to -- I, I had asked you earlier about zero-

3    sum game.  You'd agree with me that net equity is a zero-sum

4    game in TelexFree?

5    A   Meaning you either have a net gain or a net -- well, I

6    guess not -- you either have a net gain or net loss or net

7    zero.

8    Q   Well, let's, let's simplify TelexFree to two participants.

9    Let's say there were, hypothetically, two participants in

10   TelexFree.  Would you agree with me that if one is a net

11   winner, the other one becomes a net loser, correct?

12   A   No, I don't agree with that.

13   Q   Why not?

14   A   So somebody's a net winner and they sell some, they sell

15   somebody a user account and that user account cost them money.

16   So now they're a loser by, net loser by whatever amount they

17   paid, but now they, now they generate credits and those credits

18   now allow them to do triangular transactions and make sales.

19       So they can, they can move themselves from net loser to net

20   winner pretty quickly.

21   Q   Okay.  But --

22   A   Are you saying at the exact same time, two user accounts at

23   the exact same time?

24   Q   Well, no.  Let me, let me try -- my -- tweak my

25   hypothetical a little bit differently, then.

1    Would you agree with me that, that every dollar of net

2  equity has to be offset by a dollar of, of positive net equity,

3  correct?

4  A    Dollar of net equity has to be offset by a dollar of, of

5  net equity.  So let's just give an example.  You, you purchase,

6  you purchase credits directly from TelexFree.  That's a

7  increase in your net -- it, it makes -- it brings down your net

8  equity, but it doesn't bring up anybody else's net equity.

9  Q    Well, what I, what I'm getting at, Mr. Martin, is that in

10  TelexFree there are net winners and net losers, correct?

11  A    There are, yes.

12  Q    Okay.  And if you have an aggregation that was a net loser

13  and you go and you combine it with a net winner that would, you

14  would, essentially, add those two values together and, and

15  reduce the value of net winnings in the result of the

16  aggregation, correct?

17  A    You, you add two numbers together.

18  Q    Yes.  So meaning that's zero sum, correct?

19  A    Yeah, that's different than -- yeah.  I, I guess if you're

20  adding -- if you take a positive and you add a, add a negative

21  to it, there's going to be a, there's going to be a reduction,

22  yes.

23  Q    Okay.

24  A    I agree with that.

25  Q    And have you considered the fact that there may be net

1  winners who would not be able to do a secondary review like the

2  Zagarella family if, for example, other people have claimed

3  some of the negative net equity accounts that a net winner will

4  claim belongs in their aggregation?

5  A   So two people claim -- two people can claim the same user

6  account.  That, that's happened before and then we object, we

7  object to both cases.  So one, one person is able to provide

8  some, some evidence that it was theirs.  Is, is that what

9  you're asking, if two people can claim the same user account?

10 Q   Well, what I'm saying is that I think you've shown in, in,

11 in the case of DL1 and Suzanne Hackett that you took a negative

12 net equity of DL1 and combined it with Suzanne Hackett's

13 positive net equity to reduce her net equity, correct?

14 A   No.  I would disagree with that.  I would say the trustee

15 took the, the aggregation of Linda Hackett and combined it with

16 the aggregation of DL1 to reach an amount.  I would not say

17 that the, my algorithm did that.  It kept them separate.

18 Q   Oh, I -- right.  I apologize.  Let me clarify.

19     I think you've offered through this -- at this -- at the

20 end of this process that people can come forward and, and

21 present records and then your aggregation can be modified.

22 That's what I meant to say.

23     Is DL1 and Suzanne Hackett an example of a post-hoc

24 modification of your aggregation?

25 A   That's a settlement that the trustee reached.  I don't

1    believe that the trustee has made some sort of universal

2    statement that corporations equal the person and there's no

3    distinction between an individual and a corporation they may

4    open.  But that's outside of my report, outside of what I'm,

5    I've been asked to do.

6    Q    Right.  Mr. Martin, that wasn't my question.  My question

7    is you'd agree with me that -- that at -- at -- subsequent to

8    your aggregation analysis somebody filed a complaint on behalf

9    of the trustee that combined Suzanne Hackett and DL1's net

10   equities?

11   A    I agree that that happened, yes.

12   Q    Okay.

13   A    And that -- that -- by, by doing so, that reduced Suzanne

14   Hackett's net liability to the estate in the eyes of the

15   trustee, correct?

16   A    I guess in my, I see things a little bit more distinct.  I

17   think it's a multi-prong process.  Somebody make, files a

18   complaint, then the trustee reaches an agreement and then you

19   have a reduction.  I don't think just by filing a, filing a

20   complaint that brings the, the different aggregations together

21   you automatically get it.  I imagine the trustee has some say

22   in, in, as does the judge, in whether or not that's actually

23   the case.

24   Q    Okay.  But, but would you agree with me that if you're

25   going to allow net winners to convince you in a secondary

1    analysis that there are unclaimed accounts that belong in their

2    aggregation, those accounts shouldn't be available to be

3    claimed by a net loser, correct?

4    A    The --

5              MR. BENNETT:  Objection, your Honor.

6              THE COURT:  Sorry?

7              MR. BENNETT:  I, I'm not sure exactly what he, what

8    the purpose of this -- where -- let me start again.  Sorry.

9    It's a little late.

10             I don't understand the premise of the question here

11   and what the basis is.  Is he asking about the first user

12   accounts, same user?  I mean, it, it seems like a very unclear

13   -- it's a very unclear question as to what the premise of the

14   question is.

15             THE COURT:  Do you understand --

16             MR. BENNETT:  If he's asking does the, a negative

17   reduce the positive, the answer to that has been yes

18   repeatedly.

19             THE COURT:  Do you understand the question,

20   Mr. Martin?

21             THE WITNESS:  I, I do not. I think, it sounds like it

22   had something, in relation to do with the net winner portal

23   that Mr. Rona had us create a while back, but I'm not sure

24   where -- I don't understand the question.

25             THE COURT:  Mr. Rona, try again.

1          MR. RONA:  Yeah.  I -- and I apologize if my, if my

2    question was not clear.  And sorry.  Let me just silence -- my

3    phone is beeping at me.

4    BY MR. RONA:

5    Q   I think you've described a process that you envision where

6    net or alleged net winners can come forward and show, give you

7    evidence of other accounts that, that properly belong in their

8    aggregation that you would consider in order to revise their

9    aggregation.  Do you recall testifying to that effect?

10   A   Yeah.  Not necessarily to me, but they would present that

11   to the, to the trustee, that they would provide information.

12       And if I remember correctly, a couple of years ago you

13   asked us to create a net winner portal that allowed net winners

14   to go in and identify user accounts that they believed were

15   theirs, or that we weren't, that we were trying to make sure

16   couldn't be -- I, I forget, forget how -- how -- how it worked,

17   but you essentially had us create a portal for net winners to

18   identify user accounts that may be theirs and we sort of walled

19   those off.  I just don't recall exactly how we did it for you.

20   Q   Well -- right.  I'm not asking about that.  I'm asking

21   about this process that you've, I think, mentioned more than

22   once by which, in your view, you or the trustee would be happy

23   to revisit someone's aggregation if they came forward with

24   evidence of missing accounts.

25   A   Yes.  The trustee would consider the evidence if somebody

1  | presented information regarding missing accounts.

2  | Q   Okay.  And if you, if you combine a missing account in the

3  | way that was done in the exhibit to the Hackett complaint, that

4  | negative account no longer is available for someone to claim as

5  | a net loser, correct?

6  | A   I don't know the answer to that, how the trustee is

7  | treating a dispute between a claim that's already been

8  | adjudicated and somebody who's claiming that that claim belongs

9  | to them.  That's --

10 | Q   Okay.

11 | A   -- outside of what I'm testifying about.

12 | Q   But you would agree with me that it's very important to get

13 | right the aggregation because it determ, it could determine by

14 | itself whether someone is a net loser or a net winner, correct?

15 | A   Yes.  And I think the example you're giving is showing the

16 | aggregation was correct, in the example you're giving.  But if

17 | somebody's saying that their, in the example you're giving,

18 | somebody's saying the accounts that belong to them they would

19 | like the trustee to combine with accounts that belong to a

20 | corporation and the trustee would say, says, "Yes."  And you'll

21 | say, "Well, what if that, what if that corporation's account

22 | has already been claimed by somebody else?"

23 | Q   And if, if there are issues with the aggregation method,

24 | that could potentially affect everybody across both classes,

25 | correct?

1  A    It could, it could have some impact on a different class.

2  I, I'd have to see the example.  But yes, it could.

3  Q    Okay.  And net -- similarly, net equity calculations, if

4  those are, if, if there's an error in those, those could affect

5  everybody across both defendant classes, correct?

6  A    What do you mean by "an error in the net equity

7  calculation," meaning that the calculation as prescribed wasn't

8  followed?

9  Q    If -- if -- if for whatever reason your calculations

10 produce an incorrect result, would you agree with me that that

11 incorrect result would be applied across members of both

12 defendant classes?

13 A    Yeah.  If -- yeah.  I think what you're asking is if you

14 took a calculation and you change a number, would it, would it

15 impact the, the sum.  Yes.

16 Q    Okay.  And you did not express your equity cal, your net

17 equity calculations in terms of ranges or apply any confidence

18 intervals, correct?

19 A    No.  The -- the -- okay.  Because it's a dollar for dollar

20 on the credits, the, it's a, it's a mathematical calculation.

21 The aggregation is the aggregation.  The calculation is just

22 numbers and, and addition and subtraction.

23 Q    Okay.  My question is you didn't apply confidence intervals

24 or assign an error rate to any of your net equity calculations,

25 correct?

1   A    No, we did not.  And in our mind, if 1425 and 1425 add up

2   to what they add up to, then -- then they -- they are -- they

3   either do or they don't add up to that number.

4   Q    Okay.  And so you don't, you don't know, if there's an

5   error rate in your net equity calculations, you, you wouldn't

6   know what that is, correct?

7   A    No.  I don't -- I don't -- I don't believe that it lends

8   itself to that.

9   Q    Okay.  And similarly, you don't know, you didn't assign any

10  sort of confidence interval or weight to your aggregations,

11  correct?

12  A    Weight to -- well, the order itself essentially is a

13  weight, isn't it?  When you, when you're doing 13 steps and one

14  has to be before the other it essentially is a weight.

15  Q    Okay.  Well, that wasn't what I meant, but taking your

16  answer you'd agree with me that you weighted name

17  disproportionately, correct?

18  A    Yeah.  I believe -- yes.  We started -- we -- as I made

19  clear right before, we considered name, name to be the most

20  important variable.  So that, that was the first variable.

21  Q    Okay.  And if a -- if for -- if name didn't mean as much to

22  particular, a particular user, that could skew the results of

23  an aggregation, correct?

24  A    It could, yes.

25  Q    Okay.  And, and you don't have any -- you didn't compute

1  any potential error rate in your aggregation method, correct?

2  A   No.  Again, we don't -- we didn't have an answer key.  So

3  we weren't comparing what we were run, what we were running

4  against the, the answer key to determine how, how accurate is

5  this compared to what, what is there.  What we were trying to

6  do was develop a reasonably accurate aggregation methodology

7  that somebody could review and then challenge.  But without

8  having an answer key we couldn't say this, this aggregation

9  here with a hundred user accounts only captured a hundred of

10  what should have been 103 and ran formulas on that because we

11  didn't have the answer key.

12          MR. RONA:  Your Honor, if I could just have a, a, a

13  one-minute recess, I think I'm done.  And also given the late

14  hour, I don't want to, I don't know if I want to launch into

15  Mr. Dennis.

16          But if I could just have one minute to review my

17  notes, I believe I'm done.

18          THE COURT:  All right.

19          MR. RONA:  And Mr. Bennett might want some time for

20  redirect.

21          THE COURT:  We'll be in recess for, till 4:45.

22          MR. RONA:  Okay.  Thank you.

23      (Recess from 4:39:36 p.m., until 4:44:33 p.m.)

24                          AFTER RECESS

25          THE COURT:  Mr. Rona, are you finished?

1          MR. RONA:  Yes, your Honor.  I have no further

2    questions for the witness.

3          MR. BENNETT:  Your Honor, I have no questions at this

4    time for the witness.  I would reserve the right if I could

5    call him back after Mr. Dennis testifies should I need to

6    respond to something specifically Mr. Dennis says.

7          But I have no redirect at this point.

8          THE COURT:  Any objection to that, Mr. Rona?

9          MR. RONA:  I -- I -- I do, but, in that I think the --

10   that -- I doubt that Mr. Dennis is going to say anything that

11   is, that comes as a surprise to Mr. Martin.

12         So I think -- I, I wouldn't view this as, as proper

13   rebuttal.  I think Mr. Martin was given a chance to critique,

14   the critique of him by Mr. Bennett.

15         MR. BENNETT:  I just want to reserve, your Honor.

16   Obviously, everybody has their rights to object to it.

17         THE COURT:  I guess we'll have to wait and see what

18   happens.  And so I'm not ruling on your reservation, but we are

19   now complete at this point with Mr. Martin.

20         We'll start tomorrow morning at 10:00 with Mr. Dennis,

21   correct?

22         MR. BENNETT:  Yes, fine.

23         Before we leave, Mr. Rona made reference -- I know

24   that, that he has submitted a number of exhibits, none of which

25   -- they, they're not agreed exhibits.  We, we never did

1   actually do agreed exhibits other than Mr. Dennis' report.

2   That's going to be an agreed exhibit.  Mr. Rona then made

3   reference to, I think, three or four different documents during

4   the course of the examination.  I don't know whether he was

5   offering those as exhibits or merely using those as a basis for

6   cross-examination.  He may not necessarily have to clear that

7   point today, but maybe tomorrow morning I should, I'd like to

8   know whether he's -- what he's -- whether he's offered any of

9   those documents as actual exhibits.

10          THE COURT:  Well, I, I have not heard any request to

11  admit any of those documents.  I, I noticed that a number of

12  them are matters of pleadings in, in this court and the

13  district court.

14          So I don't think it's -- they're -- it's necessary to

15  admit those.  I can take judicial notice of any of those,

16  anyway.  But --

17          MR. BENNETT:  Yes, your Honor.  I have no objection.

18  I mean, that -- obviously, you can take judicial notice of any

19  of the pleadings that were filed in this case from the district

20  court.  I believe there's some other documents.  That's the

21  only question.  I wasn't sure what he was offering today as

22  documents.

23          MR. RONA:  Well, I was going to ask, your Honor, for

24  some guidance there.  I wasn't planning on admitting exhibits

25  other than through the examination of, of, of Mr. Dennis, but

1  I, I would say that I'm happy to, maybe with, not withdraw, but

2  provide your Honor with a list of the documents that I think

3  your Honor could take judicial notice of and, and save some

4  clutter.

5       But there are some documents that I may want to,

6  nevertheless, admit.  I don't know if Mr. Bennett has other

7  objections and I'm, I'm happy to review any objections.  But my

8  plan was to admit a number of them, aside from the report of

9  Mr. Dennis.  Although what, what I've done, your Honor, is many

10  of the exhibits are actually exhibits from the Dennis report

11  that I separated out because I thought that would be

12  beneficial, just in the same way that I think the trustee has

13  done.  And so there's some overlap between Exhibit 1 of the

14  defendants and some of the subsequent exhibits.  But I thought

15  that that's clearer for the record.

16       THE COURT:  We'll -- we'll -- we'll sort this out

17  tomorrow as we go through Mr. Dennis' testimony.  Right now --

18       MR. RONA:  Okay.

19       THE COURT:  -- as things stand, none of the exhibits

20  that Mr. Rona has discussed with Mr. Martin is admitted into

21  evidence.

22       MR. BENNETT:  Thank you, your Honor.

23       MR. RONA:  Thank you, your Honor.

24       THE COURT:  All right.  So we'll see you all tomorrow

25  morning.  Thank you very much.  Have a good evening.

1          MR. BENNETT:  At 10:00, your Honor?

2          THE COURT:  10:00.

3          MR. BENNETT:  Thank you.

4          MR. RONA:  Thank you, your Honor.

5          THE COURTROOM DEPUTY:  Court, court is in recess.

6      (Court recessed for the day at 4:48:44 p.m., to reconvene

7  at 10:00 a.m. on November 24, 2020)

8

9

10

11

12

13                          CERTIFICATE

14          I, court approved transcriber, certify that the

15  foregoing is a correct transcript from the official electronic

16  sound recording of the proceedings in the above-entitled

17  matter.

18  /s/ *Janice Russell*                    January 4, 2021

19  Janice Russell, Transcriber                    Date

20

21

22

23

24

25