**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN THE MATTER OF: | : | Case No. 14-40987 |
| | | 14-40988, 14-40989 |
| TELEXFREE, LLC, TELEXFREE | : | (Jointly Administered) |
| INC., and TELEXFREE | | |
| FINANCIAL, INC., | : | Boston, Massachusetts |
| | | **November 24, 2020** |
| Debtors, | : | 10:00:34 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| STEPHEN B. DARR, | : | AP 16-04006 |
| Plaintiff, | : | |
| v. | : | |
| BENJAMIN ARGUETA, ET AL., | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| STEPHEN B. DARR, | : | AP 16-04007 |
| Plaintiff, | : | |
| v. | : | |
| PAOLA ZOLLO ALECCI, ET AL., | : | |
| Defendants. | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : :

**VOLUME 2**
**TRANSCRIPT OF VIDEO EVIDENTIARY HEARINGS: DETERMINING**
**THE ADMISSIBILITY AND PRESUMPTIVE EFFECT OF THE**
**AGGREGATION METHODOLOGY IN DETERMINING NET WINNERS**
**BEFORE THE HONORABLE MELVIN S. HOFFMAN, J.U.S.B.C.**

**APPEARANCES (via video and telephone):**

For Plaintiff, Stephen Darr,    Murphy & King, P.C.
Chapter 11 Trustee:             BY:  CHARLES BENNETT, JR. ESQ.
                                     ANDREW G. LIZOTTE, ESQ.
                                One Beacon Street, 21st Floor
                                Boston, MA  02108

1    **APPEARANCES (via video and telephone continued):**

2

3    For Class Defendants:        Milligan Rona Duran & King LLC
                                  BY:  ILYAS J. RONA, ESQ.
                                       MICHAEL J. DURAN, ESQ.

4                                 50 Congress Street, Suite 600
                                  Boston, MA  02109

5    For Certain Claimants:       JORDAN L. SHAPIRO, ESQ.

6                                 P. O. Box 392
                                  Malden, MA  02148

7

8                                 STEPHEN DARR
                                  Chapter 11 Trustee

9                                 265 Franklin Street
                                  Boston, MA  02210

10
                                  JEAN-LOUIS SORONDO

11                                Huron Consulting Group

12

13   Audio Operator:              YVONNE WOODBURY, ECRO

14

15   Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
                                  1418 Red Fox Circle

16                                Severance, CO  80550
                                  (757) 422-9089

17                                trussell31@tdsmail.com

18
     Proceedings recorded by electronic sound recording; transcript
19   produced by transcription service.

20

21

22

23

24

25

     #14-40987/AP 16-04006/AP 16-04007                      11-24-2020

1                                    INDEX

2
                                  Direct    Cross    Redirect
3   WITNESSES FOR THE
      DEFENDANTS:
4   Joshua Dennis              234      345      407

5


6
    EXHIBITS:                                  Marked      Received
7

8       Defendants' 1  Dennis report          242         246

9       Defendants' 19 Balan affidavit        148         425

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE COURTROOM DEPUTY:  The Court reminds all of you

3   who are participating in or observing today's remote hearing,

4   that the recording or rebroadcasting of court proceedings is

5   strictly prohibited.  Violators may be subject to severe

6   sanctions.  Official transcripts of all court proceedings are

7   available for purchase upon request to the Clerk of the Court.

8          The evidentiary hearing will begin shortly.

9      (Pause)

10         THE COURT:  Good morning, everyone.

11         Regina, are we, are we ready to start?

12         MR. BENNETT:  Before we start, I wonder if we could

13  just adjust the name.  It's not Kate.  It should be Andrew.

14         THE COURTROOM DEPUTY:  Will do.

15         We are, your Honor.

16         THE COURT:  All right.

17         MR. BENNETT:  And you have to adjust my name?

18         THE COURTROOM DEPUTY:  Correct.

19         MR. BENNETT:  Thank you.

20         THE COURT:  Then you can call the case, please,

21  Regina.

22         THE COURTROOM DEPUTY:  Calling Adversary Proceedings

23  16-4006, Darr versus Argueta, and 16-4007, Darr versus Alecci.

24         Could the parties please identify themselves for the

25  record (audio drops).

```
1          THE COURT:  Oops.

2          MR. BENNETT:  Charles --

3          THE COURT:  Hold on a second.

4          Regina, you still there?

5          THE COURTROOM DEPUTY:  I am.

6          THE COURT:  Okay.

7          Go ahead, Mr. Bennett.  Lead us off, please, with --

8          MR. BENNETT:  Thank you.

9          Charles Bennett on behalf of the plaintiff, Stephen

10    Darr, as he, as he is trustee of the bankruptcy proceedings of

11    TelexFree.  With me is Andrew Lizotte.  Also listening in from,

12    I believe, still at home is Tim Martin and I believe Mr. Darr

13    and Mr. Sorondo may listen in subsequently.

14          THE COURTROOM DEPUTY:  And for the defendants?

15          MR. RONA:  Good morning, your Honor.  Ilyas Rona on

16    behalf of both defendant classes.  I'm joined by my colleague,

17    Michael Duran, and I see, or I thought I saw Mr. Josh Dennis.

18          THE COURT:  Yes.

19          MR. RONA:  I don't see his name now, but I did see his

20    name before.

21          And I neglected to mention yesterday, your Honor, that

22    I think by audio international, one of the international class

23    representatives, Sandro Paulo Freitas, was listening in, along

24    with his personal counsel, Sara Teixeira.  And, and I think

25    they're on as well, listening, again, today as well.
```

1          THE COURT:  Thank you.

2          MR. DENNIS:  And, Mr. Rona, I'm sorry.  I am here.

3   This is, this is Josh Dennis.  I tested my video, but appears

4   to not be working currently.  If it'll be okay with the Court,

5   do you mind if I just log off Zoom and log back in again?

6          THE COURT:  Please.

7          MR. DENNIS:  Thank you.  My apologies.

8      (Pause)

9          THE COURT:  All right.  I think we see Mr. Dennis.

10         This -- here we are on Day 2 of the <u>Daubert</u> hearings

11  in connection with the, the TelexFree adversary proceedings.  I

12  think where we left off, we completed the examination of

13  Mr. Martin.

14         And, Mr. Rona, do you want to call Mr. Dennis as a

15  rebuttal witness?

16         MR. RONA:  Well, I would like to call Mr. Dennis as a

17  witness, if, if, if that's what your Honor is referring to.

18  Yes, I would like to call Mr. Dennis this morning.

19         THE COURT:  All right.  Then let's do that.

20         Mr. Dennis, take yourself off mute.  Raise your right

21  hand.  Do you -- I don't see your hand.  Mr. Dennis, can you

22  hear me?  There we go.  You're on, you're on mute, again.

23         MR. DENNIS:  Yes, thank you.  My apologies.

24         THE COURT:  Okay.  Raise your right hand, please.

25              JOSHUA DENNIS, DEFENDANTS' WITNESS, SWORN

1           THE COURT:  Thank you.

2           Just a few preliminary questions, please.  Describe

3    where you're, where you're currently sitting.

4           THE WITNESS:  In our offices of, StoneTurn's offices

5    at 75 State Street in Boston.

6           THE COURT:  And are you alone in the room?

7           THE WITNESS:  I am.

8           THE COURT:  And are all electronic devices other than

9    the computer you are looking at that happen to be in the room

10   with you turned off or put away so that you don't see any of

11   those?

12          THE WITNESS:  That's correct, other than the monitor I

13   have to my left to put the exhibits on so I can see them in

14   full size.

15          THE COURT:  Okay.  And you understand you aren't to

16   communicate electronically or any, any other manner with anyone

17   while you are testifying as a witness except for the attorneys

18   who are questioning you and, and me?

19          THE WITNESS:  I do.

20          THE COURT:  Okay.

21          Then I will turn the floor over to you, Mr. Rona.

22          MR. RONA:  Thank you, your Honor.

23                          DIRECT EXAMINATION

24   BY MR. RONA:

25   Q   Good morning.

1      Could you please state your name for the record?

2   A   Joshua Dennis.  It's D-E-N-N-I-S.

3   Q   And where are you employed, Mr. Dennis?

4   A   I'm employed at StoneTurn Group.

5   Q   Okay.  Could you sketch out your educational background

6   briefly for me, starting at, after high school?

7   A   Sure.

8      I attended Skidmore College.  That is in Saratoga Springs,

9   New York.  So Upstate New York.  I received my bachelor's

10  degree in management and business and a minor in computer

11  science with a focus on a mixture of math and accounting as

12  well.

13  Q   Okay.  And what -- did you pursue any education after

14  Skidmore?

15  A   I, I didn't pursue a, a master's degree.  I, I took other

16  continuing education.

17  Q   Okay.  What did you take continuing education courses in?

18  A   Primarily, computer science, intellectual property, and,

19  and other valuation-related topics.

20  Q   Okay.  And within the area of computer science were there

21  specific subjects that you pursued continuing education?

22  A   Yes.  Primarily, sequel programming, which is a programming

23  language that you use to query and manipulate large datasets

24  like we have here.

25  Q   Okay.  Have you received any certifications?

DENNIS - DIRECT                                                      236

1   A    I have, yes.

2   Q    Okay.  And, and what certifications have you received?

3   A    I'm a certified valuation analyst.  That's a designation

4   from NACVA, the National Association of Certified Valuation

5   Analysts, and I received my intellectual property law

6   certificate from Suffolk College -- Suffolk University.  Excuse

7   me.

8   Q    Okay.  And going back, I think you said the first one was

9   certified valuation analyst.  What subjects or topics were you

10  certified in with respect to that certification?  Or let me

11  withdraw that question.

12       What -- in order to receive that certification, what topics

13  did you have to study?

14  A    Sure.

15       So that particular certification related primarily to

16  business valuation or interest in business and that included

17  about a week-long process of classes followed by a test.  It

18  was multiple choice.  We also had to submit a full written

19  valuation report and then there were also requirements as to

20  the number of valuation and then related hours that I had to

21  attest to.

22  Q    Okay.  And what -- what -- were there specific issues that

23  you studied in order to get that certification within the

24  umbrella of business valuation, meaning were there sub, were

25  there topics within that?

1   A    Certainly.  I mean, there's, there's a lot, obviously, goes

2   into business valuation, but, you know, fundamentally, it was

3   looking at cashflows and future cashflows, assessing those,

4   determining the present value of those cashflows as, as a way

5   to go about determining the value of an investment or business.

6   Q    And then at some point did you become employed?

7   A    I did.  I did --

8   Q    Okay.

9   A    -- become employed, thankfully.

10  Q    And when -- can you just lay out your employment history,

11  please?

12  A    Sure.

13       So I graduated from Skidmore College in 2004.  At that time

14  I, I answered a job posting for a company that didn't have a

15  website and I didn't know much about, StoneTurn.  At the time

16  it was about, about a month old, had seven people, and I

17  thought it would either be a fun story to tell if it went under

18  or, or, lo and behold, you know, 16 years later it's been grown

19  into a very profitable and, and great company to work for.

20  Over my career there, you know, I've, I've changed roles and

21  got to work on a lot of different types of projects.

22       But StoneTurn Group broadly, and what I've done is a

23  mixture of forensic accounting, dispute and economic damages

24  work, worked in areas of compliance and regulatory matters, but

25  throughout that it's always been very quantitatively driven.

1   So quantitative analysis has been a thread throughout all of

2   that.

3       Maybe six or seven years ago now there was a clear need for

4   StoneTurn to have a dedicated data analytics group, a group

5   that has had two primary purposes.  One is to help support the,

6   the other areas of expertise.  So, for example, in our forensic

7   accounting group the nature of the information we were

8   receiving, you know, was no longer, you know, green-bar paper.

9   It wasn't even, you know, PDFs.  It was large datasets,

10  extracts from ERP systems like SAP and Oracle and Great Plains

11  and we needed to have a group whose job it was to take all that

12  complex information and distill it down to something that was,

13  was usable, that was factual, and that was informative that our

14  other subject matter experts could then put to use in, in their

15  cases.

16  Q   Okay.  And have you been involved at StoneTurn in various

17  types of litigation?

18  A   I have.

19  Q   Okay.  What types of litigation, without getting into

20  specifics, but just what are the, the types of, of cases that

21  you've been involved in?

22  A   Sure.

23      So broadly, the work I've done would, I think, would fall

24  under economic damages.  So it's quantification of economic

25  loss and that can fall into a lot of different categories.

1    So we've done a fair amount of work in intellectual

2  property space related to patent infringement, theft of trade

3  secrets, trademarks, a lot of breach-of-contract work, things

4  of that nature, as well as working on behalf of and against the

5  Government related to things like False Claims Act, anti-

6  kickback statute, and another things in the health care space.

7  Q    Okay.  And so do you only -- are StoneTurn's engagements

8  only on either the plaintiff's side or the defendant's side?

9  A    No.

10  Q    Okay.  Have, have you worked on, on both sides in your

11  career?

12  A    I have.

13  Q    Okay.  And I think you said compliance matters.  What --

14  can you give some examples of compliance matters that you've

15  worked on?  I apologize.  I'm getting --

16  A    And I apologize as well.  I may have to shift slightly like

17  a sundial as, as we go through the day here.

18    Yes, of course.  So from a compliance perspective, you

19  know, StoneTurn has been part of some very large monitorships,

20  which means that our firm is charged with going in and helping

21  attest to the fact that a company has sufficient controls in

22  place to help prevent Natech fraud.

23    So as part of that, you know, we'll help assess with the

24  data aspects looking at things like transaction monitoring and

25  other data-driven compliance programs.

1   Q   Okay.  And so is that -- who are the -- are these internal

2   matters that you're referring to, the compliance matters?

3   A   Internal in what sense?

4   Q   Meaning is the company retaining StoneTurn in those

5   matters?

6   A   It's a little more complex than that.  I think,

7   technically, we were retained by, by the Government.  So, for

8   example, the DOJ, I think, is who we largely answer to in those

9   instances, whether it's, you know, Deutsche Bank or, or

10  Volkswagen relative to the emission scandal.

11  Q   Okay.  And we'll get more into some of the, the topics

12  there.

13      But have you also prepared publications?

14  A   I have.

15  Q   Okay.  Let's talk about the, your retention in this case.

16      So when were you retained?

17  A   I was retained, I believe it was, January of 2017.

18  Q   Okay.  And what was your understanding of the, the, the

19  assignment for the retention?

20  A   So we were retained by, by your firm, Mr. Rona, Milligan

21  Rona Duran & King, as class counsel for the net winners in this

22  case, to help assess a methodology used by the trustee in, in

23  calculating and aggregating net equity for participants in

24  TelexFree.

25  Q   Okay.  And did you bill for this work?

1   A    I did.

2   Q    Okay.  What, what was your billing rate?

3   A    $450 per hour.

4   Q    Okay.  And has -- has Stone -- did StoneTurn -- what was

5   StoneTurn's billing arrangement in this case or fee

6   arrangement?

7   A    So we had initially, or had a budget in this matter of, I

8   believe it was, 147,500 related to both the domestic and

9   international class on a combined basis to do the kind of

10  preliminary analysis work.

11  Q    Okay.  And at -- at -- when you said "preliminary

12  analysis," at -- at -- at that time what -- was there a

13  contemplation of a formal expert report?

14  A    No, there wasn't.

15  Q    Okay.  And has StoneTurn stayed within that budget?

16  A    We have certainly billed within that budget.  We, we have

17  curred, incurred fees in excess of that.

18  Q    Okay.

19       Let's turn to -- what information did you review in

20  connection with this engagement?

21  A    Sure.

22       So there are a host of things.  We certainly reviewed the,

23  the SIG data.  We reviewed what we were provided by, by Huron,

24  which was a combination of data tables that were, essentially,

25  calculations and results of the, Huron's and Mr. Martin's

1   aggregation process and calculation of net equity.  There,

2   there are four tables as part of that we received.  I reviewed

3   Mr. Martin's expert report in this matter, various academic

4   papers that he cited to and, and attached to that expert

5   report.  There were also legal filings and legal pleadings and

6   then I'm sure there's a few additional things I had cited to in

7   my report and my docs considered.

8   Q   Okay.  Are the doc, documents that you considered listed in

9   your report?

10  A   They are and in the footnotes as well.

11  Q   Okay.  If I may, I'll show you.

12      And first of all, is this -- what is this document that's

13  been identified as Defendants' Exhibit 1?

14  A   That would be the expert report I submitted on July 31st of

15  this year.

16  Q   Okay.  And if I were to go to Page --

17  A   That would be Exhibit 2.

18  Q   Okay.  So --

19  A   There we are.

20  Q   Okay.  So is this -- did you prepare this, what's Exhibit 2

21  to your report?  And just for clarity of the record let's just

22  call it the documents considered list?

23  A   I did prepare that, yes.

24  Q   Okay.  And does, does this list the information that you

25  reviewed?

DENNIS - DIRECT                                                          **243**

1   A    It does.

2   Q    Okay.  And I, I think you, you mentioned, you mentioned the

3   SIG database.  Is that the entire SIG database that Mr. Martin

4   described the reconstruction or reassembly efforts of

5   yesterday?

6   A    Yes.  So we certainly had received the entirety of, of the

7   SIG database and we loaded it.  Ultimately, you know, my

8   primary focus here was on what, what's listed here as the Huron

9   data tables which are, again, you know, Mr. Martin's, the

10  results of Mr. Martin's and the trustee's aggregation process

11  and net equity calculation split amongst, you know, four

12  separate tables.

13  Q    Okay.  And in -- in -- on this list is, are the data tables

14  referred to under the heading Huron Documents?

15  A    They are.

16  Q    Okay.  And there's an item -- what's the item above that?

17  A    That would be the ePOC Data Tables, electronic proofs of

18  claim that we discussed yesterday, or Mr. Martin had discussed.

19  Q    Okay.  So you had the opportunity to refer, to review that

20  as well?

21  A    I did, yes.

22  Q    Okay.  And looking above, you said Legal Filings, do you

23  see that?

24  A    I do.

25  Q    Okay.  Did you also review certain affidavits?

1    A    Yes, I did.

2    Q    Okay.  And which affidavits did you review?

3    A    So those would be the, the ones listed at the, the bottom

4    of the Legal Filings section.  So that would be the affidavit

5    of Lisette Balan, the affidavit of Frantz Balan, and the

6    affidavit of Sandro Paulo Freitas.

7    Q    Okay.  And then you mentioned literature.  Is that what's,

8    what's referred to in, in the Other category?

9    A    Largely.  Certainly the first, maybe, five or six of those.

10   Q    Okay.  So in brief, in brief terms, could you just lay out,

11   without getting into the substance of it, but just what, what

12   types of analyses you performed?

13   A    Sure, of course.

14         So the first thing we wanted to do is make sure that we

15   understood the data and the data received was complete and

16   accurate.  So, you know, once we had it loaded in our system

17   we, we queried it to try to make sure that we could get back to

18   the same kind of summary-level statistics that we understood

19   Huron had arrived at.

20         Once we did that, we sought to understand a little bit more

21   that, about the data.  It took kind of two approaches.  First,

22   kind of a top down, high-level approach, meaning we wanted to

23   understand in, in big picture, you know, what did it look like.

24   We did that through a process of stratification, meaning we

25   wanted to see and look at net winners and net losers by, by

1  tier and by type of transaction to understand kind of the four

2  corners of, of, and the relative sizes of each of those

3  populations.

4      We also did more of a detailed bottom-up approach where we

5  looked at various case studies 'cause we had focused on larger

6  net winners and net losers to really dig into the detail and

7  understand the nature of how they were transacting and how they

8  were aggregating.

9      And then I think another point we noted on the ePOC data is

10  we wanted to dig into that information and understand how the

11  claims process and the, the result of what people are claiming

12  may inform either aggregation or net equity.

13  Q   Okay.  And based on your, on, on those analyses did, did

14  you eventually form opinions as to the reliability of

15  Mr. Martin's conclusions?

16  A   I did.

17  Q   Okay.  And before we get to what those opinions are, are,

18  did you prepare a report contain, containing or describing your

19  opinions?

20  A   I did, yes.

21  Q   Okay.

22  A   That was Exhibit 1 that you referenced earlier.

23  Q   Okay.

24          MR. RONA:  And, your Honor, I just, before -- I don't

25  want to forget.  So I don't know if it makes sense for me to

1  move to admit Exhibit 1 at this point.

2           THE COURT:  What do you say, Mr. Bennett?

3           MR. BENNETT:  I have no objections to Mr. Dennis'

4  qualification and to his expert report being marked as an

5  exhibit.  Presumably, it merely will be a summary of what we

6  will hear in his testimony, your Honor.  So there's no

7  objection.

8           THE COURT:  All right.

9           So we'll, we'll admit Mr. Dennis' expert report as

10 Defendants' Exhibit 1.

11          MR. RONA:  Okay.

12     (Defendant's Exhibit 1 admitted in evidence)

13 BY MR. RONA:

14 Q   And let's, let's talk about the, your report, Mr. Dennis.

15     First, could you describe the, the, the process by which

16 you prepared the report?

17 A   Sure.

18     So we started preparing the report, gosh, I would say,

19 maybe two months prior to its submission.  Obviously, we did a

20 lot of work before that and I'm talking in terms of actually

21 putting, you know, pen to paper.  But what we endeavored to do

22 was, was, you know, take all the information we learned, put

23 together specific analyses, examples, prepare more formal

24 reports, and really make sure that that report, you know,

25 captures, as, as I sat there at the time, you know, the

1  totality of, of my opinions, at least in summary.

2  Q   Okay.  And did you have a report from Mr. Martin to, to

3  review as part of the preparation of your report?

4  A   I did.

5  Q   Okay.  And do you recall when you received that report?

6  A   I want to say it may have been February of, of this year,

7  although I think his expert report may have been dated in, in

8  2018, if I recall correctly.

9  Q   Okay.  And do you know how many reports you've, of

10  Mr. Martin's, that you've been provided with?

11  A   Two.

12  Q   Okay.  So the one you just described, was that the first,

13  the earlier of the two?

14  A   It was.

15  Q   Okay.  And, and I don't know if I asked you this, but,

16  maybe, let me pull up Exhibit 1.  Well, we can move on.

17      Who helped you, if anybody, in the preparation of your

18  report?

19  A   So they're, primarily, two of my colleagues, the first

20  being Patrick Ryan.  Patrick Ryan is a fellow member of the

21  data analytics group.  He is a, has his master's in data

22  science from UC-Berkeley and he helped me, primarily, load the

23  SIG and the other data tables into our sequel system as, as

24  well as review and QC some of the calculations and, and various

25  queries I'd written for purposes of my report.

1   Q    Okay.

2   A    The, the other person is Gladys Leung, L-E-U-N-G.  She

3   helped me prepare the exhibits in terms of formatting to get

4   them and pulling together various of the examples.

5   Q    Okay.  And did you review the work that was performed by

6   Mr. Ryan and, and Ms. Leung?

7   A    Yes.  I, I reviewed their work and, and they reviewed mine.

8   Q    Okay.  Have you performed any work subsequent to your

9   report?

10  A    I have.

11  Q    Okay.  What -- what -- what subsequent work have you

12  performed?

13  A    Well, I certainly reviewed the reply report that Mr. Martin

14  had submitted subsequently.  I read, at least in part, his

15  deposition transcript.  That was last week, I believe.  In

16  addition, I certainly reviewed, I think it was, a couple

17  additional legal filings.  And based on Mr. Martin's report,

18  you know, his reply report, I went back and reviewed some of my

19  calculations relative to the, the 95 percent figure in terms of

20  claims that were accepted in the electronic proofs of claim

21  data.

22  Q    Okay.  And I didn't ask you this, but prior to receiving

23  new information did your report contain a summary of all your

24  opinions?

25  A    It did.

1   Q   Okay.  And did any new informa -- did you receive any new

2   information that, that in any way caused you to change or, or

3   modify any of those opinions?

4   A   No.

5   Q   Okay.  So let's turn to what your opinions are.

6        Without, without getting too in depth, could you at least

7   first outline what your opinions are?  And --

8   A   Sure.  And I think it's kind of important to take this in,

9   in pieces.

10       So the way I broke it up in my report and the way I'll

11  discuss it here is, is first discussing some of the issues I

12  found in terms of reliability on the aggregation process and

13  then, separately, we can begin to talk about some of the issues

14  related to the net equity calculation.

15  Q   Okay.

16  A   So I'll, I'll go -- sorry, Mr. Rona.  Mind if I go one by

17  one?  You can just -- I'll pause --

18  Q   Well, I was just going to ask you.  So let's focus then, I

19  guess, first, let's talk about the -- well, why -- let me ask

20  before you, we proceed.

21       Why did you break them down into aggregation process and

22  net equity calculations?

23  A   I think that -- the reason I did that is 'cause they're a

24  little bit separate concepts.  One doesn't necessarily impact

25  the other, although certainly, you know, depending on what you

**250**

1   do on the other, on the aggregation side, that would,

2   obviously, impact your net equity.  But I think they're

3   separate conceptual issues.

4   Q   Okay.  And are your opinions in both categories related to

5   the reliability of Mr. Martin's conclusions?

6   A   I think it's a fair characterization.

7   Q   Okay.  So let's, let's first talk about the, the

8   aggregation process issues.

9       Have you formed opinions as to the reliability of

10  Mr. Martin's aggregation process?

11  A   I have.

12  Q   Okay.  And what are those opinions?

13  A   Sure.

14      So I think there's kind of five key points I want to

15  address here.  Can I take them one by one?

16  Q   Yeah.  Let's -- let's start -- why don't you go one, take

17  them one by one and I may ask a question or two as to each.

18  A   Of course.

19      So the first is related to the choice of the approach for

20  aggregation.  Mr. Martin described yesterday, you know, two

21  different approaches, deterministic approach and probabilistic

22  approach.  And what he described yesterday, which is consistent

23  with what he said in his report, is that his choice of the

24  deterministic approach was primarily based on its, its

25  transparency and ease of explanation, not necessarily its

1  accuracy or reliability.  For accuracy and reliability, the

2  primary driving factor, the literature recites to, explicitly

3  states that in areas where data quality is poor and unique

4  identifiers are not available, the probabilistic method

5  consistently outperforms the deterministic method.

6  Q   And, and based on your review, did you make findings as to

7  the quality of the data or the availability of unique

8  identifiers in this case?

9  A   Yes.  And we, we touched on it yesterday and we'll

10  certainly see some examples today -- and I don't think that

11  Mr. Martin necessarily disagrees with me -- that the, the data

12  quality was poor and unique identifiers did not exist.

13  Q   Okay.  And we'll get to, obviously, these in more detail,

14  but just to sort of outline your, your views.

15     So you -- what was -- what's the second reason for, as to

16  the aggregation process?

17  A   Sure.

18     The, the second reason is, really, the application of the

19  deterministic record-linkage process.  The process that

20  Mr. Martin undertook was a very manual, iterative, and,

21  ultimately, subjective process that, that there's very little

22  documentation of and it was guided in, in large part or, by

23  participants, the vast majority of whom were net losers which

24  introduces what's known as "selection bias," which means you,

25  you're creating a process and algorithm that is geared towards

DENNIS - DIRECT                                                           **252**

1   and may work much better for, for some portion of the

2   population than it does for others.  And what we'll see today

3   is that there's, actually, a really big difference in terms of

4   net winners and net losers in terms of their structure and

5   complexity.

6   Q    Okay.

7        And let's turn to, what's the third reason relative to the

8   aggregation process?

9   A    So the third reason has to do with the, the assumption and

10  requirement within the aggregation process that participants

11  consistently used across all of their user accounts, which

12  could number in the thousands, the, the same or highly similar

13  name.  And that's an assumption that's inconsistent with the

14  case facts in this matter.

15       What we see is that TelexFree had no validation process as

16  part of the registration of the user accounts, which means that

17  a participant could and, and did enter any information they

18  wanted in that field.  It could be punctuation and numbers,

19  letters, arbitrary names, fictitious names.  There, there was

20  simply no validation or requirement and, frankly, little

21  incentive to enter a name consistently.

22  Q    Okay.  And do you know how many possible fields of data

23  entry there were for each user account, roughly speaking?

24  A    In totality?  I -- I -- I, I believe Mr. Martin said

25  yesterday there was, it was 40, but I, I can think of at least

DENNIS - DIRECT                                                           **253**

1   12 to 15 off the top of my head.

2   Q    Okay.  And do you know how many Mr. Martin used for his

3   deterministic record linkage?

4   A    I believe he said seven yesterday, but I'd have to go

5   count.

6   Q    Okay.  So --

7   A    I think it depends on how you count.  I know he split some,

8   things like name into part name.  So I think it depends on, on

9   how you count it.

10  Q    Okay.

11       And turning to the, the fourth issue as to the aggregation

12  process?

13  A    So my fourth issue goes to the concept of reliability,

14  generally.  You know, I think it's important to consider

15  reliability not just in the context of does my aggregation

16  algorithm work most of the time or even the vast majority of

17  time, but, when it doesn't work, how impactful is it.  And what

18  we see here is that a single missed aggregation, a single

19  under, under aggregation has a dramatic, can have a dramatic

20  effect on somebody's net equity, including turn, turning a net

21  winner into a net loser or vice versa.

22  Q    Okay.

23       And then the, the fifth reason?

24  A    So the fifth reason relates to the reliance on the

25  electronic proofs of claim data.  Mr. Martin stated in his

DENNIS - DIRECT                                                    **254**

1   report that the best indication, the best indication that the

2   aggregation methodology was reliable was the proofs of claim

3   data and the fact that 95 percent of the claims submitted were

4   accepted.  However, I think it's important to understand what

5   that metric means.  He's looking at claims and what we see in

6   the data is that a single person, single user, single creditor,

7   could and did submit multiple claims and within a claim a

8   person could and did submit multiple pieces of account

9   information and what that allowed them to do is for one person

10  to go in and actually claim multiple different, supposedly

11  separate aggregations.  In effect, what these people are saying

12  is, "Even though the aggregation algorithm said that these two

13  people are separate, that's incorrect and these are both mine."

14  They are -- they are -- they're making that correction and

15  despite that fact, the 95 percent suggests that, that

16  Mr. Martin calculates, says, "Well, they accepted the claim.

17  So I think that's a win in my book," and I'm suggesting that

18  that is actually an indication it's not working correctly.

19  Q    And did you also review, or to what extent did you also

20  review whether and to what extent ePOC is a representative

21  sample of TelexFree participants at large?

22  A    I did.  And what we see is that the total number of

23  aggregations claimed in ePOC is, is less than 6 percent of the

24  total aggregations for TelexFree and that is, that's a small

25  population and I have not seen any indication that Mr. Martin

1   has done any type of statistical analysis or otherwise to, to

2   suggest whether or not that is representative.

3   Q   Okay.  And is that it for the main sort of reasons for --

4   for -- as to your opinions about Mr. Martin's aggregation

5   process?

6   A   It is.

7   Q   Okay.

8       Turning to the net equity side, how, what are the, the, the

9   main opinions that, that, that you have as to Mr. Martin's net

10  equity calculations?

11  A   Sure.

12      So, so here, I've got two primary reasons that I think are

13  important.  So the first really comes down to the inconsistent

14  treatment of credit transfers.  So I'll, I'll use an example.

15      So if, if you, Mr. Rona, transferred 10,000 credits to

16  TelexFree to satisfy invoices on my behalf, I, and then I

17  turned and paid you some sum of money as a result of that,

18  under the current net equity calculation it would assume that

19  you, your net equity would increase by $10,000 and my net

20  equity would decrease by $10,000.  That's considered a

21  triangular transaction and included as part of net equity.

22  However, there's something else that occurred and that we can

23  see.

24      There are situations where, instead, what we see happening

25  is that you would transfer me 10,000 credits, I would give you

1  that same sum of money, and then I would simply use those

2  credits to, to create my own accounts.  And again, the end

3  result of that from the economic perspective is exactly the

4  same.  I've still given you and you still have received the

5  same sum of money.  We still created the same user accounts,

6  but on one hand we're including that in net equity.  On the

7  other hand, we're not.  And I think the other thing --

8  Q    And --

9  A    I'm sorry.  Go ahead, Mr. Rona.

10  Q    Well, were you able to -- does the -- do the Huron data

11  tables permit credit transfers to be taken into account?

12  A    They do.

13  Q    And what happens if credit transfers are taken into

14  account?

15  A    It really depends on, on the individual account, but it can

16  have a dramatic impact.

17  Q    Okay.  And we'll get to that in more detail.

18       But is -- are there other, other issues that you have with

19  the net equity calculations?

20  A    There are.

21  Q    Okay.  And what are they?

22  A    I apologize.  Give me one minute to take a quick sip of

23  water.

24       So my second issue has to do with the assumption that for

25  every credit that moved in the SIG system, certainly related to

DENNIS - DIRECT                                                          257

1   triangular transactions, that one real dollar, U.S. dollar,

2   exchanged hands in the real world.  I don't think that's an

3   assumption that can be made here.  What we see is, is two

4   things.

5       We see Mr. Martin suggesting and stating that at times

6   credits could exchange hands for more than a dollar.  We see

7   Mr. Balan in his affidavit explaining a situation were in his

8   experience he often received much less and paid much less than

9   a dollar.  What TelexFree has created and what we see happening

10  is, is a marketplace for credits.  They've created a system

11  where credits could be freely traded and as such, are subject

12  to the same laws of supply and demand.

13      So, and as Mr. Martin noted, when people really wanted

14  credits, there's a run on credits, right, so credits were

15  scarce.  They naturally traded for higher than a dollar.  And

16  conversely, in Mr. Balan's example, when he had a significant

17  amount of credits he was willing to trade them for less than a

18  dollar or buy them for less than a dollar.

19      So the assumption that credits always changed hands for a

20  dollar is inconsistent with what we see actually happening in

21  the real world.

22      And then you have considerations, as Mr. Balan describes,

23  where people may be working in teams.  They've got issues with

24  collection, they have complex business arrangements, that all

25  lead to the conclusion that to suggest that credits are a

1   dollar is an oversimplification and not a reality.

2   Q   Okay.  And we'll, we'll, obviously, I think, get to that in

3   more detail.

4       But let's -- so is it correct, then, that there are,

5   essentially, seven main categories of opinion that you've

6   offered, five in the area of aggregation and two in the area of

7   net equity calculations?

8   A   That's fair.

9   Q   Okay.  So I guess there's no time like the present to dive

10  in.  So let's start with your first aggregation issue and I

11  believe you -- you -- this is the issue about deterministic

12  versus probabilistic record linkage, is that right?

13  A   It is.

14  Q   Okay.  So let's start with, first, what, could you describe

15  what a deterministic record linkage is?

16  A   Sure.

17      And consistent with Mr. Martin's description yesterday -- I

18  don't disagree with that -- it, it's using a predetermined set

19  of characteristics that either, you know, match or don't match

20  as a way to suggest whether two records are, are, in fact, the

21  same.  I'm happy to provide an example if that'll be helpful.

22  Q   Sure.  Give me some examples.

23  A   Sure.

24      So just to pick a recent example from earlier this year.

25  We are working on a case that required us to link two sets of,

 1  of trading data.  One ended up being a subset of the other and

 2  neither set had a single unique identifier, didn't have a trade

 3  ID I could, I could easily match primary key across both of

 4  those datasets.

 5      So what we did is used deterministic record linkage to

 6  create that primary key and what we had to do was use a

 7  combination of things.  We looked at, first, what was the

 8  security that was traded.  Of course, that's not unique in and

 9  of itself.  So we had to add things in.  What was the date it

10  was traded?  Was it a purchase or sale?  What was the price it

11  was traded?  What was the quantity?  What was the time?  And

12  once we combined all those unique things together, that defined

13  and created a unique identifier and that allowed us to connect

14  those two datasets and say that this transaction in A is the

15  same as that transaction in B.

16  Q   And in that example --

17  A   That --

18  Q   I'm sorry.

19  A   I'm sorry.  Go ahead.

20  Q   That example that you gave, what was the quality of the

21  data that you used?

22  A   It, it was very high in that both datasets came directly

23  out of financial systems.  So we had a high degree of certainty

24  that when it said a particular trade time, that that was, in

25  fact, the accurate trade time or if that was the security that

DENNIS - DIRECT                                                      260

1    was said that was bought or sold, that we knew it was the

2    security that was bought or sold.

3    Q    And when you say came out of financial systems, what do you

4    mean?

5    A    In that particular instance, one was a company's actual

6    financial system that, that records the purchase and sales.

7    The other was a, was, actually, a FINRA dataset, which is the

8    submission of, of financial records to, to FINRA.

9    Q    Okay.  Meaning were these system-generated transaction

10   datasets?

11   A    They were.

12   Q    Okay.  Not -- were they user-entered datasets?

13   A    No.

14   Q    Okay.

15        What is -- could you describe a, what a probabilistic

16   record linkage is?

17   A    Sure.

18        So, so a probabilistic record linkage uses math and

19   statistics to compare instances where there aren't high quality

20   unique identifiers and does that by creating weights that

21   suggest whether a single variable is, is, is indicative or not

22   indicative in the population of a match.

23        So what it allows you to do is precisely what we have here

24   where there is, are small, there can be small details in the

25   data like misspellings and other things like that.  It can

1  account for those kind of discrepancies and also account for

2  issues when there, some combination of things isn't inherently

3  distinct, which is where deterministic is, is most helpful.

4  Q   And, and when you refer to non, well, slight differences,

5  is, is that what is sometimes referred to as "fuzzy" matching?

6  A   It can be.  So, for example, if I'm trying to, if in one

7  hand I have the name StoneTurn and in another instance I have

8  this, the name StoneBurn -- so there's a one-letter difference

9  -- you can use algorithms like Levenshtein distance or it's

10 called edit distance to look at the number of insertions,

11 deletions, or substitutions you need to make to get from Name A

12 to Name B.  And what it does is create a score from 0 to 1 to

13 suggest how close those two strings are.

14     So you can, what you can see is it's not a binary yes/no as

15 it would be in the form of a deterministic approach, but put

16 things on a spectrum that you can then look at.

17 Q   And what level -- you said there's a score from 0 to 1.

18 What level of subjectivity is that score, meaning is someone

19 looking at something and assigning it or is that determined

20 some other way?

21 A   No, no.  That, that's a score that is calculated.

22 Q   Okay.  And, and how is it calculated, meaning what

23 principles are used to make that calculation?

24 A   So in, in that case you're using, actually, statistical --

25 well, as I noted, you're using the number, it's actually a

 1  count of the number of insertions, deletions, and substitutions

 2  you used.  So that's an algorithm.  That creates that score of

 3  how many you need to do.

 4  Q   Okay.  And so I think you, you, you gave an example of a

 5  deterministic record linkage.  Can you give an example of a

 6  situation where someone has used a probabilistic linkage?

 7  A   Sure.

 8      And I'll describe a situation that's actually in, in that

 9  same case, just a different aspect, where we absolutely used

10  elements of a probabilistic.

11      So later on in that case what we had was the need, or the

12  client had the need to, to notify a lot of the people that,

13  that were involved and within their database they had a set of

14  addresses, but they had between 10 and 50 addresses for each

15  person and some of the addresses they had for a person were,

16  were different and some were very similar and contained errors

17  'cause they were user entered.  Sometimes there would be slight

18  differences in the attention of who it was to, could be the

19  spelling of a, the party name.  It could be small differences

20  in the address or zip code.

21      And so what we did is used a much more probabilistic

22  approach to try to solve and collapse that down to unique

23  addresses.  And the way we did that was by taking the address

24  and parsing it into chunks.  So we, we parsed out the numerical

25  values and the street.  We looked at the street name.  We

DENNIS - DIRECT                                                    **263**

1  looked at the zip code and the state and through that we

2  essentially looked at the, the proximity or how close those

3  are, again using things like edit distance to suggest are these

4  not exact, how close are they and then weighted each one of

5  those different variables based on, on their ability to, to

6  appropriately assess whether something was a match or not a

7  match.

8  Q   Okay.  And what did the, what did that process enable, you

9  know, what, what was the reason that it was done in, in that

10 case and what did that enable you to do?

11 A   So what that enabled them to do was really limit the, the

12 notifications and prevent, you know, someone from receiving ten

13 different notifications 'cause they had small misspellings in

14 their address.  Again, the purpose here was to send out, you

15 know, these notifications to, to people on, on a unique basis

16 where possible.

17 Q   Okay.  And was -- was there -- were there certain

18 calculations in this example that fell below a threshold and,

19 therefore, weren't used?

20 A   I -- I -- certainly, to the extent that there was a low

21 ability to match two different addresses, they would be kept

22 distinct.

23 Q   Okay.  And by the way, is, it is possible to, to do a

24 deterministic record linkage and also a probabilistic linkage

25 on the same datasets, meaning --

1    A    Yes.  Well, I guess there's two things.  Could you do --

2    you could -- could you have tried it both ways?  Absolutely.

3    And again, these, these are not binary either/or necessarily.

4    You could certainly use aspects of both.  But, but yes, it's

5    certainly possible to use deterministic on a single dataset.

6    And, and to be clear, it is definitely possible to use

7    probabilistic on a single dataset as well.

8    Q    Okay.  And -- so you've explained them.  Are there -- could

9    you describe  the, the advantages and disadvantages of the, of

10   the two methods?

11   A    Sure.

12       And we've touched on some of these, already.  You know, the

13   advantages of a, a deterministic approach is that it is very

14   straightforward, you know.  It, it is, in many ways, easier to

15   explain and it can be very efficient and effective when unique

16   identifiers are available, meaning I've got high-quality data

17   and all I need to do is combine the right combination of things

18   and that creates a unique descriptive identifier.  That is

19   definitely an advantage of the deterministic model.  The

20   downside is it's also very binary, right?  Things need to be

21   identical and whether that's a name or a part of a name, they

22   still need to be identical.  Yes or no.

23       Conversely, on the probabilistic side, it allows for more

24   flexibility and that's what it states in the literature that

25   Mr. Martin cites, that when data quality is poor, it allows you

1   to have those slight nuances.  It has a scale or range.  It's

2   not a 0-1.  It could be 98 percent or 50 percent, right?  And

3   that allows to account, it accounts for the fact that there are

4   imperfections in the data.

5   Q   Okay.  And, and you said the, "the literature that

6   Mr. Martin cites."  Did you review his citations?

7   A   I did.  Well, I, I think there is one -- there may be six

8   or seven -- I think there's one that he wasn't able to find and

9   wasn't available publicly online.

10  Q   Okay.  But for the one -- and -- and -- but you're -- when

11  you refer to the ones he cites, were you able to review those

12  citations?

13  A   I was.

14  Q   Okay.  And if I could just -- you -- and, and did -- do you

15  recall whether you commented on this, on the cites, the

16  literature in your report?

17  A   I did.

18  Q   Okay.  I'm just going to go back to your report.

19      In Paragraph 52, there's a reference to the Statistical

20  Data Warehouse Design Manual, do you see that?

21  A   I, I do.  And, and to clarify, that actually came from a --

22  that -- that's an incorrect footnote.  That's a typo on my

23  part.  That came from the, the Health, the Health Resources

24  web, citation.

25  Q   Okay.  But that's from Mr. Martin?

DENNIS - DIRECT                                                    266

1  A    It is, yes.

2  Q    Okay.  And you have a -- is this the quote that, from that,

3  that citation?

4  A    It is.

5  Q    Okay.  And is this referring to -- is this the basis for

6  the statement that, "When the data is poor quality

7  probabilistic methods consistently outperform deterministic

8  methods"?

9  A    It -- that is.  That's one of them, although that concept

10 appeared in multiple of the different pieces of literature that

11 Mr. Martin cited.

12 Q    Okay.  And I just want to point your attention to the, I

13 guess, the rest of that sentence.  It says "merit extra time

14 and resources required to implement them."  What is that

15 referring to?

16 A    So as part of doing our probabilistic linkage it, it can,

17 it can be, depending on how you do it and what you plan to do,

18 you know, in the alternative, it can be more time intensive and

19 resource intensive.  It is, certainly takes more math to, to

20 build out that kind of approach because you're trying to

21 account for the fact that you do have poor quality data.

22 Q    Okay.  So that might be a factor why, or let me ask it this

23 way.

24     Could that be a factor in why one method might be employed

25 over another?

DENNIS - DIRECT                                                    267

1  A   It could be, but I think it depends on the situation.  I

2  think the, the intent of one generally tries to do a

3  deterministic record linkage is because you have high-quality

4  data and, thus, you, you wouldn't need to move to a more

5  probabilistic approach.  Now that doesn't mean you can't spend

6  thousands of hours on, on trying to do a very complex

7  deterministic record linkage.  So it really just depends on, on

8  what you do.

9  Q   Okay.  And so I think we've, we've covered those two, those

10 two methods.

11    Did you review Mr. Martin's deterministic approach in this

12 case?

13 A   I did.

14 Q   Okay.  And what are your findings as to his, his approach?

15 A   So I think what struck me -- and I think some of this is,

16 is also a function of, you know, hearing testimony yesterday --

17 was the, the amount of, of trial and error, iterative, manual

18 processes that were guided so directly by, by the net loser

19 population and, really importantly, for which we don't have any

20 documentation or support, right?  We don't, we don't know

21 sitting here today how many people he talked to, who he talked

22 to, whether they were large net losers or small net losers.  We

23 don't know how that caused a change in, in the aggregation

24 process, whether that verified something or, or negated a step.

25 All we know is he, he talked to people and as a result, it

1  somehow either confirmed or didn't confirm his analysis.  And

2  what we heard is that, you know, he would, he would run a

3  iteration by looking at the data, then he would look at it

4  again and, and say, at some sample population, we don't know

5  what or how many, and say, "Yeah, this either looks right or it

6  doesn't look right," you know.  "We need to go back to the

7  drawing board," or, "This is probably okay."

8      And he went through that process 13 times and then --

9  Q   And --

10 A   -- at the end of, at the end of that process he said, "I'm

11 going to stop here not because it's perfect, but because it's

12 law of diminishing returns."  Said, "I'm stopping here 'cause

13 it's diminishing returns," not to say that a 14th step couldn't

14 have gotten, gotten it better.  And I think for those reasons I

15 find it subjective, right?  To state that, sitting here today,

16 if you had to start from scratch, he would actually get to

17 those same 13 steps in the same way exactly again, I think

18 would be a challenge.

19 Q   And does it -- to what extent does that process, your

20 understanding of his process raise potential concerns about

21 bias?

22 A   So what we heard is that, you know, the vast majority of

23 people he spoke to were net losers.  Again, we don't know how

24 big or small, but, you know, on average, certainly net losers

25 are much smaller than net winners.  And what that means is when

1    he was looking to confirm or deny his aggregation is working

2    he, he doesn't have the benefit of, of an entire class of

3    people who are structuring their accounts very differently in

4    terms of size and complexity than that of net losers.

5    Q   Okay.  And I think you had, you had mentioned that you did

6    some form of stratification --

7    A   I did.

8    Q   -- analysis?  Okay.

9        Let's go to Exhibit 7.

10          MR. RONA:  And this is Defendants' Designation 7.

11   BY MR. RONA:

12   Q   And this is also, I believe, attached to the report as

13   Exhibit 5.

14       But do you recognize this exhibit, Mr. Dennis?

15   A   I do.

16   Q   Okay.  And is this -- does this, shows some form of

17   stratification, or is this part of your stratification

18   analysis?

19   A   It is.

20   Q   Okay.  Could you first just describe what this is showing

21   and, and then comment on, on why this is helpful in, in your

22   analysis?

23   A   Sure, of course.

24       The way this particular exhibit is structured is it's three

25   sections.  The top section encompasses all participants and

1  user accounts and some numbers there that, that you'll see

2  familiar.  So, for example, the first column, well, the first

3  column numbers, anyway, where it says User Accounts, you can

4  see that the total at the bottom there for all is about 11

5  million user accounts.  To the right of that, you'll see some

6  familiar numbers like the participant account aggregation is

7  approximately 2.2 million account aggregations.

8       So this is looking at everybody in TelexFree and what we've

9  done here is stratify it.  What I mean by "stratify it" is I've

10 broken it up in, into tiers in terms of the, the size of, in

11 this case, the, the net winnings and net losings, net losses.

12 So, for example, Tier A says 0 to 100.  That encompasses the

13 number of participants in count, in accounts that either won or

14 lost in a net basis between 0 and 100.  And that's what we

15 wanted to do to be able to see kind of the break-out across

16 those sizes.

17 Q   Okay.

18 A   And I think --

19 Q   So the -- sorry.

20 A   Sorry.  Please go ahead.

21 Q   Well, so you're, you're describing now the top third of

22 this exhibit?

23 A   I am, sure.

24 Q   Okay.  And that, that's all participants, is that correct?

25 A   It is.

1    Q    Okay.

2         And then did you also stratify -- what does the middle tier

3    show?

4    A    Sure.

5         So I, I've stratified -- I've taken that all and broke it

6    into the two different chunks, right, the top being net losers

7    and then the very bottom being net winners.  So maybe starting

8    with, as you have it there highlighted, the net loser section,

9    the middle there, first.

10        So here what we're seeing is of the 10.9, almost 11 million

11   user accounts and 2.1 million participant aggregations, the net

12   losers in this middle section, there are approximately 2

13   million net losers which are comprised of about 9.2 million

14   user accounts, and then, again, we can see the, just looking at

15   net losses, the number of user accounts, aggregations, and net

16   equity that falls into, again, each of those tiers.

17   Q    Okay.  And does this show you the average accounts per

18   aggregation?

19   A    Yes, it does.

20        So in, in the second kind of numerical column there it says

21   Average User Accounts Per Aggregation.  What that shows is that

22   the average user -- I'm sorry -- the average account

23   aggregation is, is comprised of five user accounts for a net

24   loser.

25   Q    Okay.  And if I could just direct your attention to Row C,

1  does Row C, is that the, the range of, of users, the tier of

2  users that fall within a loss of between 1 and $5,000?

3  A   It, it does, does, indeed.  So --

4  Q   Okay.

5  A   -- Tier C reflects that there, it's actually the biggest

6  category of loss in, in terms of net equity and user accounts.

7  You can see -- and -- and that -- that there's approximately

8  $850 million of, of loss which, which accounts for, you know,

9  about 47 percent.  So nearly half of the total net losses.  And

10  there's about 440,000 participant aggregations that fall into

11  that and about 3 million user accounts.  And that makes some

12  level of sense because we know that the AdCentral Family plan

13  was, was $1425.

14     So what we're seeing here are these people who lost, you

15  know, one or two or a small number of AdCentral Family plans,

16  most likely.

17  Q   And the, what is the average number of user accounts for

18  this third tier?

19  A   Seven.

20  Q   Okay.  And -- okay.  Let's, let's, let's move on.

21     Can we go to the -- what does the bottom third of this, of

22  this exhibit show?

23  A   Sure.

24     So the bottom third, we're now down to our remaining

25  population, which was, was net winners.  So again, of the total

1   11 million users and 2.1 million participants, here we have 1.8

2   million users that are aggregated into 95,000 net winner

3   participants with total alleged net winnings of approximately

4   1.6 billion.

5   Q   Okay.  And what is the average number of user accounts for

6   the, the net winners in aggregate?

7   A   Nineteen.

8   Q   Okay.

9   A   And I guess one other thing that's important to show,

10  again, is, is why stratification is interesting here is what we

11  can see is really starting at Tier F downward, right, that the

12  -- the -- Tier F -- so people who made, who won $25,000 or more

13  -- account for about 80 percent of the total net equity and

14  that population actually averaged 50 or more user accounts per,

15  per aggregation based on the current aggregation assumptions.

16  Q   Okay.  And so -- and, and what is the significance, in your

17  mind, if any, of a difference in average number of accounts

18  between two different populations?

19  A   Sure.

20      So what I explained was that it's a difference in terms of

21  the net winners and net losers, on average, in terms of size

22  and complexity.  What I mean by that is when you have a

23  situation where the net winners have substantially more, on

24  average, user accounts than net loser, that gives a lot more

25  opportunity for someone to use a different name.  Every time

DENNIS - DIRECT                                                      **274**

1   they sign up for another user account, that's another chance

2   that someone's going to decide, for whatever reason, to

3   potentially put something different in that, in that field and

4   if they did put something different in that name field, then it

5   wouldn't aggregate correctly.

6   Q   Okay.  And in -- in -- to -- are you -- to -- what is your,

7   what is your assessment of the extent to which Mr. Martin took

8   that concern into, into account?

9   A   I'm not aware they took that concern into account at all.

10  Q   Okay.

11      Let's go -- so turning to now -- I think this was the third

12  issue that you raised with aggregation -- does, does this

13  concern data quality specifically?

14  A   It does.

15  Q   Okay.  And let's turn to Exhibit, Defendants' Designation

16  Exhibit 2.

17      And is this a -- do you recognize this exhibit?

18  A   I do.

19  Q   Okay.  What is this?

20  A   So this is a table I've included as part of my expert

21  report.

22  Q   Okay.  And what does it show?

23  A   So what I have here is really for exemplary purposes.  What

24  I went and did is I, I went and queried the data for unique

25  full names that were less than four characters.  My

1    understanding of, of Mr. Martin's approach is that if a name

2    had less than four characters, it wasn't even considered for

3    aggregation.  And I looked at some of those names and then I, I

4    kind of collapsed or, or aggregated those just for exemplary

5    purposes here.

6        So, for example, that first full name 1 1, so that may have

7    been someone who put just 1 1 as their full name.  That

8    occurred 40,687 times in the database based on Mr. Martin's ag,

9    or I should just -- it occurred in the database.  It's not, not

10   aggregated and if you add up all those net losses for those

11   user accounts, it's about $2 million.  And again, those are all

12   left as, as standalone, singular aggregations under the current

13   methodology.

14   Q   Okay.  And to what extent would you say it's reasonable to

15   assume that in the example of 1 1 that those were either all

16   entered by the same person or all entered by different people?

17   What would be the reasonable assumptions there?

18   A   The, the answer is is we don't know, right?  That could be

19   someone who just decided -- it could be me, Josh Dennis,

20   decided one time just to put 1 1, right?  The fact of the

21   matter is that what this goes to show is that, whether it's

22   putting 1 or "A" or periods for, for my name, that the data

23   wasn't validated.  And what this shows is that there is, you

24   know, across this entire aggregation, you know, millions of

25   dollars of, of unaggregated losses that, that weren't

1   considered because they had a, a different name.

2   Q    And is this exhibit that we're looking at marked for

3   identification as Defendants' 2, is this the extent of the

4   database entries that, that had non, sort of junk-appearing

5   names?

6   A    No, not at all.  This is a small, small subset.

7   Q    Okay.  Are, are these examples that you selected?

8   A    They are.

9   Q    Okay.

10      Let's go Exhibit 16.

11          MR. RONA:  Again, this is Defendants' -- actually, I

12  think that's -- I'm just -- if I could just hold on one -- oh.

13  Let's go to Defendants' 17.  I apologize for that.

14  BY MR. RONA:

15  Q    And do you recognize --

16          MR. RONA:  And I don't know if everyone can see this

17  whole thing.  I might need to resize it so people can see.

18  Okay.

19  BY MR. RONA:

20  Q    Do you recognize what, what this exhibit is?

21  A    I do.

22  Q    Okay.  And could you just walk us through what this shows?

23  A    Sure.

24      So this is an example I'd compiled, you know.  As, as part

25  of, you know, reviewing and looking at the data, I at times

DENNIS - DIRECT                                                        277

1   would just type in, you know, name, you know, what would come

2   out.  And, you know, as a common, you know, hypothetical, you

3   know, some quasi-junk name, you know -- Mickey Mouse came to

4   mind -- and so I typed it in and I think it actually is quite

5   illustrative.  And to be clear, what we're looking at here is

6   not a hypothetical example I made up.  This is something that

7   does exist and came directly out of the database in TelexFree.

8   Q   And what --

9   A   And so what would hap--

10       I'm sorry.  Go ahead.

11  Q   I'm sorry.  If I could -- could we just, before we proceed

12  into it, you, I've put a box around the name Mickey Mouse.

13  That's the name that was entered in the name field?

14  A   That's correct.  The participant typed in the name Mickey

15  Mouse as part of registering a user account.

16  Q   And what was Mickey Mouse's net equity according to

17  Mr. Martin's calculations?

18  A   $59,976.

19  Q   Oops.  Okay.  And that's -- that's shown on this -- this --

20  on this chart as both the -- what - -the white line -- is the

21  white line the --  well, what, what is the difference between

22  the white lines and the blue lines?

23  A   Sure.

24       So what this is showing is that -- I'm trying not to dig

25  too deep into here -- but what I tried to designate is the

DENNIS - DIRECT                                                      **278**

1   white lines represent individual user accounts and the blue

2   lines are the kind of subtotals for how the current aggregation

3   is currently treating them.  So each --

4   Q    Okay.

5   A    -- blue line is separating separate aggregations under the

6   current methodology.

7   Q    Okay.  And so this aggregation for Mickey Mouse had one

8   account with net equity of 59,000?

9   A    It did.

10  Q    Okay.  And what was the e-mail address on that account?

11  A    Billybob.arbone@gmail.com.  Arbone, Arbone, one or the

12  other.

13  Q    Okay.  And what was the rep login?

14  A    The login was smashing000.

15  Q    Okay.  So now walk us through -- 'cause there's -- there's

16  -- Mickey Mouse is only one, you know, the top row.

17       Could you walk us through what the rest of this exhibit

18  shows?

19  A    Sure, of course.

20       So after, you know, identifying this one account I, I went

21  and, went to look at what other accounts and, and aggregations

22  exist within the data that used that same e-mail address.  So

23  everything that falls below are all the other user accounts in

24  current aggregations that, at a minimum, share that same e-mail

25  address of billybob.arbone@gmail.com

1  Q   Okay.  And meaning if I -- I'm going to scroll down.

2  There's, I think, three --

3  A   Thirty-three.

4  Q   -- or quite a few pages, 33 aggregations in total, is that

5  correct?

6  A   That, that's accurate.  There are 33 aggregations that,

7  that share that, that billybob.arbone.gmail account.

8  Q   Okay.  And did you make any other observations besides the

9  e-mail address of any similarities between, in these accounts?

10 A   I did.

11 Q   Okay.  What are the other similarities?

12 A   So you see a number of different similarities and it may

13 differ across and between various of these, these, you know,

14 separate aggregations.  But we see that, we see a street

15 address of 123 Main Street.  We see commonalities in, in the

16 zip code.  We see commonalities in, in login naming

17 conventions.  We see smashing0123456 and so on.  And we also

18 see, you know, commonalities almost in, in, in theme.  We see

19 Mickey Mouse, Walt Disney, you know, Team Legendary, maybe

20 different themes, but -- I think there's a Barack Obama down,

21 down at the bottom, Ghostbusters.

22     So there, there's a substantial amount of commonality

23 across all these supposedly different 33 aggregations.

24 Q   Okay.  And so there are -- do you --- by the way, I don't

25 know if you say it -- but, but this shows 33 different

DENNIS - DIRECT                                                        **280**

1   aggregations and at least 33 different user accounts, is that

2   right?

3   A   More than 33 user accounts.  I'm not, I don't have a

4   specific count on here, but 33 aggregations.

5   Q   But, but suffice it to say, there's more than five user

6   accounts here?

7   A   There are, there are more than five user accounts here,

8   yes.

9   Q   Okay.

10      So to what extent did, based on your review, did TelexFree

11  require users to enter their full legal name?

12  A   Yeah.  I'm not aware of any requirement and the data

13  suggests that they, they clearly didn't.

14  Q   And to what extent did TelexFree require names to be

15  entered consistently, to your understanding?

16  A   I'm not, I'm not aware of any such requirement.

17  Q   Based on your review, do you have any knowledge one way or

18  the other about whether TelexFree either monitored or, or

19  somehow enforced the use of, of appropriate names?

20  A   I, I think I do have.  I mean, based on what the data shows

21  if, if I'm able to enter Mickey Mouse or smashing001 in the

22  data, you know, I think that's stands for the proposition that

23  they didn't require it.

24  Q   Okay.  Now based on your review what is your assessment of

25  the, of the priority given to names in Mr. Martin's aggregation

1  analysis?

2  A    I think it's problematic.  Again, in order for, very

3  simply, in order for the aggregation to work correctly, you,

4  you need to have consistent naming, right?  And what we see is

5  and is clear indicia that people were, were, were not using

6  consistent naming for any reason they wanted.  They had no,

7  they had no real incentive or requirement to.  When you do

8  that, there's -- there's a -- when you do consider that factor,

9  it can greatly impact net equity.

10 Q    Okay.  Let's, let's move on to --

11           THE COURT:  Hold on, Mr. Rona.

12           THE WITNESS:  Sorry, Mr. Rona.  Just one more point

13 on, on that chart.

14 BY MR. RONA:

15 Q    Sorry.  Do you want me to pull it back up?

16 A    I, I do, please.

17 Q    Okay.  My apologies.

18 A    So just a point on net equity, Mickey Mouse is currently a

19 net winner of $60,000.  He's a net winner, probably in the net

20 winner class.  When you look at the totality of the information

21 and based on this one could, I think, reasonably assume that

22 this was likely all done by the same person.

23      We scroll to the bottom.  Were, were these to have been

24 aggregated on a combined basis, Mickey Mouse is, is no longer a

25 $60,000 net winner, but, actually, a net loser of $44,000.

DENNIS - DIRECT                                                **282**

1    Again, that goes to why I say it could have significant impact

2    on whether someone's a net winner or a net loser.

3    Q    Okay.

4              THE COURT:  Whoa, whoa.  Put it back up, please,

5    Mr. Rona.

6              MR. RONA:  I apologize, your Honor.  I, I feel this

7    pressure to, to move with alacrity.  But I will put it back up.

8              THE COURT:  That's a good idea, but let's -- I, I just

9    want to -- a quick question.

10   BY THE COURT:

11   Q    On -- on -- on the question of how many user accounts this

12   represents, Mr. Dennis, doesn't Column 2 list them?  Aren't

13   each one of those a different user account?  If we counted

14   those up, we would know?

15   A    Absolutely, your Honor.  You're entirely correct.  I simply

16   hadn't done that, that calculus, but given two minutes I could

17   certainly grab a pencil and do so.

18   Q    Okay.  Just wanted to make sure I understood the chart.

19        Thank you.

20   A    Yes, of course.  And, and to be clear, that, that column

21   there says User Account, that's the rep ID that Mr. Martin was

22   referring to yesterday.  That is unique to every user account

23   and then the first column there says Participant ID in C13, as

24   it is in the dataset I have, that's the unique identifier

25   relative to each aggregation.  That is, generally, the, the

1  first or earliest user account.

2  BY MR. RONA:

3  Q   Okay.  And just, just so that the, the record is clear,

4  these groupings by aggregation, these are the, the resulting

5  aggregations by Mr. Martin?

6  A   They are.

7  Q   Each subgroup is -- is -- you have -- you didn't construct

8  these yourself.  You just put them together in, in one slide,

9  correct?

10 A   That's correct.

11 Q   Okay.

12      MR. RONA:  And I will now ask if it's okay for me to

13 take down Exhibit 17?

14      THE COURT:  Okay with me.

15      MR. RONA:  Okay.

16      THE WITNESS:  It is.  Thank you.  Thank you, Mr. Rona.

17 BY MR. RONA:

18 Q   So let's move to -- I think that addresses the, the third

19 issue.

20     What was -- and if you could just remind me, what was your

21 fourth issue?

22 A   So the fourth issue really goes to the concept of, of

23 the -- and we touched on this briefly -- the impact of, of

24 particularly under aggregation in this case.

25 Q   Okay.  What is under aggregation?

DENNIS - DIRECT                                                      284

1   A    So under aggregation is, is when two groups of accounts or

2   singular user accounts are kept separate when, in fact, they

3   should be merged or combined into one.  The opposite of that

4   would be over aggregation, right, which where the issue there

5   would be two things that should have been separate were, in

6   fact, combined.

7   Q    Okay.  And did the Mickey Mouse prior exhibit, would that

8   be, if, if you assume that those accounts were all generated by

9   the same person, would -- would it -- would that be an example,

10  in your mind, of under aggregation?

11  A    It would.

12  Q    Okay.  And what, what problems, if any, do, does under

13  aggregation cause in terms of the reliability of Mr. Martin's

14  analysis?

15  A    Well, as we'll see, the under aggregation can have a

16  dramatic impact.  We aren't just necessarily talking about, you

17  know, one account missing here and there, but because of how

18  the aggregation algorithm is built what you're doing is

19  creating very large buckets of, of net winners and net losers

20  such that if those are to be connected, it can create a very

21  dramatic swing in someone's net equity.

22  Q    Okay.

23          MR. RONA:  And I'm going to turn to Defendants'

24  Exhibit 9, or Identification Exhibit 9.  And again, I'm going

25  to resize this.  So I don't know if, if people can see the

1   entirety of it.

2   BY MR. RONA:

3   Q    And is this an exhibit that you prepared?

4   A    It is.

5   Q    Okay.  This was attached to your report as Exhibit 7.

6   A    It was, indeed.

7   Q    Okay.  And what -- what is -- before I zoom in -- I know

8   it's going to be heard to read, maybe -- but what is, what is

9   Identification Exhibit 9 showing?

10  A    This is Exhibit 7 to my, my expert report.  If you don't

11  mind, Mr. Rona, I'm just going to use my, my hard copy here and

12  a, and a ruler.

13  Q    Okay.  Or, or I could blow up individual rows.

14  A    Oh, that's -- we can, we can do both.  I just want to make

15  sure I can follow along.

16  Q    You want me to -- do you want to start with a row, for

17  example, the top one, and you walk us through what this shows?

18  A    Yeah.  That, that'll be helpful.  Let's start in the kind

19  of upper left of this chart and we'll do, do our best to walk

20  along from there.

21  Q    Okay.  Let's do Row 1 just for clarity.

22  A    Sure.  And --

23  Q    So what --

24  A    And maybe if I could, may I just take a quick step back

25  and, and talk about conceptually what this represents?

1       So what this is is this is a listing -- and it goes on, I

2    think, for two pages -- of the top 100 largest net losers in

3    TelexFree.  By "net losers" I mean, in terms of the currently,

4    you know, alleged net equity under the current aggregation,

5    right?  So each row represents a unique aggregation and

6    combination of, of user accounts.

7       So now circling back to your question, Mr. Rona, the first

8    one here, No. 1, we can see is, you know, unique Rep I, well,

9    Rep ID 13043527.  The name on that is Du Painting.  We can see

10   an exemplary login and e-mail address and we can see that

11   within this aggregation there is currently 1,232 user accounts

12   with, with calculated alleged net equity of, or net losses of

13   approximately $1 million.

14   Q   Okay.  And, and just to be clear, these are all -- this is

15   the largest net losers according to the Martin aggregation?

16   A   They are.

17   Q   And I'm just going to mark -- there's a DL1, Inc., do you

18   see, do you remember discussion yesterday about DL1, Inc.?

19   A   I do.  And I believe Du Painting was referenced yesterday

20   as well.

21   Q   Okay.  So 1 and, and 5 on this list were discussed

22   yesterday, to your knowledge?

23   A   That's my recollection.

24   Q   Okay.  So -- so what -- how does this help on, on the issue

25   of understanding the significance of under aggregation?

1   A    So one of the things I, I sought to understand is -- it

2   surprised me conceptually at first pass that there would be

3   such a magnitude of large net loser, particularly in a Ponzi

4   scheme, you know.  The proposition that someone would, would

5   come in and, and pay, you know, a million dollars in, into a

6   scheme and not, continue to pay money into a scheme, and not

7   recoup any real benefit was surprising to me.

8        So what I wanted to do is understand a little bit more

9   about these accounts and consider the, the potential that some

10  of these supposedly large net loser aggregations are, in fact,

11  part of, and part and parcel, to someone's activities and a

12  participant who, who is a net winner and potentially, a large

13  net winner.

14  Q    Okay.  And why did you want to do that?

15  A    Again here, the purpose was to test the, the aggregation

16  methodology and when we see things that, that don't appear, at

17  least on their face, to be logical, we, we try to test those

18  things and look for alternative theories and explanations.

19  Q    Okay.  And did you do this same analysis as to top net

20  winners?

21  A    Yes, I did.

22  Q    Okay.  Would it be appropriate now to look at that, that

23  exhibit as well?

24  A    That's right.  And ultimately, we, we can dive into some of

25  the detail here, but I think that's, that's a good place to go

1   next.

2   Q   Okay.

3          MR. RONA:  Let's go to Defendants' Designation 10.

4   Okay.  And I'll resize this again.

5   BY MR. RONA:

6   Q   Okay.  And this is also one of the exhibits to your report,

7   No. 8?

8   A   It is.

9   Q   Okay.  So let's, I'll do the same thing.  I'll -- we'll, we

10  can talk about the top row, but I'll just zoom in.

11      And just -- what is -- what -- what is -- what is this

12  exhibit showing?

13  A   So this is, really, the, the mirror image of what we just

14  looked at.  So instead of top net losers, here we're looking at

15  the top 100 net winners based on the, the, the current

16  aggregation and net equity calculations.

17      So to, to take the, the first row by way of example, that

18  first row Rep ID 132785, Maria Neves, she had 431 user accounts

19  and total aggregate alleged net winnings of approximately 4.1

20  million.

21  Q   Okay.  And, and are the, the largest net, alleged net

22  winners north of a million dollars?

23  A   You have to scroll to the second page.  Maybe you can, I

24  could tell you very quickly.  The answer is for top 100,

25  almost, it looks like.  I -- actually, I can look at my hard

1   copy.

2        So of the top 100, the smallest is 932,000.

3   Q   Okay.  And is there anything else that you wanted to talk,

4   mention on this exhibit before we can go to an example?

5   A   Sure.  And we'll, we'll come back to this.

6        Just to finish the overall explanation, you know.  If you'd

7   shift to the, the right, Mr. Rona, slightly.

8        What we, what we've done is for each of the, the, the total

9   net equity we've broken it out by type of transaction,

10  including credit transfers.  And we'll come back to this.  I

11  just wanted to give the picture of what this is in full.

12  Q   Okay.  So there are, looks like eight numbered columns, is

13  that correct?

14  A   There are.

15  Q   Okay.  And so for each, for each aggregation it is, is it

16  possible to compute the sum of some or all of those columns in

17  order to make the calculations?

18  A   Precisely.

19       So we can see that, for example, in the first row, you

20  know, of her 4 million, 4.1 million in, in net winnings, you

21  know, the vast majority in that instance was through triangular

22  receipts.

23  Q   Okay.  And that's Column 4?

24  A   It is, yes.  And that's the only thing I wanted to point

25  out here before we moved on.

1   Q   Okay.  Okay.

2       So let's go to an example.

3           MR. RONA:  And I'll proceed with Exhibit 11.  Okay.

4   BY MR. RONA:

5   Q   And this is going be, may be hard to read, but I, I'll try

6   my best to zoom in as appropriate as you direct me.

7       But what does Exhibit 11 on the defendants' designations

8   show?

9   A   Sure.

10      So this is Exhibit 9.1 to my expert report.  And, and I had

11  a series of these, these exhibits that look similar.  And what

12  this was was the results of the process I just described where

13  for the, the top, each of the top net losers over $200,000,

14  which was, for which there's 31 of them, I went and tried to

15  look for other aggregations and user accounts within TelexFree

16  that, that shared commonalities across the various identifiers,

17  again to test the assumption that despite having a different

18  name, that what we were seeing in these large net losers are,

19  are, in fact, the same participant just they may have, for

20  whatever reason, used a different name --

21  Q   Okay.

22  A   -- not being consistent.

23  Q   And -- and the -- so can you describe -- it looks like

24  there's two sets of, of, of data.  Can -- one with an orange

25  header and one with a green.

1    Could you tell us what these two sets are?

2  A    So -- of course.

3      So the top section -- just pause right, right there,

4  Mr. Rona.  Thank you.  The top section is, is for the, the net

5  loser aggregation.  So this is, we'll just walk through this

6  for Du Painting.  This is our, our largest net loser

7  aggregation.  You can see in that top, very, kind of top orange

8  box it shows a parent ID of 13043527.  So again, that's the

9  unique ID associated with the aggregation.  That shows them to

10  be, this aggregation to be a net loser of, of $1 million.  And

11  there's that same 1,232 user accounts and below it I show --

12  it's, obviously, not all 1200 of those -- but just a sample.

13      So we can get a feel for the types of different e-mail

14  addresses, logins, street numbers, and, and other

15  characteristics like phone number that they were using.

16  Q    Okay.  And, and incidentally, it says Du Painting in, in,

17  in the, the name field, but there's also d/b/a.

18      What's d/b/a, to your understanding?

19  A    Doing business as.

20  Q    Okay.  And, and based on your experience does, does doing

21  business as sometimes suggest that there's not an actual

22  corporate entity?

23  A    It, it could.  It would just depend.

24  Q    Okay.  And then if we could look -- before we make

25  comparisons, could we now go down to the -- what does the, the

1    bottom set show?

2    A    So the bottom set, again almost like we did with in

3    totality, it's just kind of, a little bit of a mirror image

4    here in that this is the net winner.  So when we went and

5    looked in the, in the data, again for similar characteristics,

6    what we found was Parent ID 4032900.  This parent, this

7    aggregation was a net winner of $1.5 million.  It contained 80

8    user accounts of which, a sample which is shown below in green.

9    Q    Okay.  And so looking at these two sets, so this, this net

10   loser aggregation and net winner aggregation, what

11   commonalities -- and maybe I'll -- let's see if I can do it so

12   you can see.

13   A    That's perfect right, right there.

14   Q    Oh, okay.

15   A    That'd be great.  Thank you.

16   Q    What commonalities did you see?

17   A    So certainly, there was, there's a strong commonality on e-

18   mail address.  We can see that, even within Du Painting, the e-

19   mail address was, was DavidTeixeira@hotmail.com, which is, in

20   fact, the name in the, in the lower net winner aggregation.  We

21   can see commonalities in the login.  So we can see that there's

22   Vision USA 38911 and so forth in the top.

23       If you wouldn't mind scrolling down just ever so slightly,

24   Mr. Rona.

25   Q    Okay.  I will -- the -- my annotations will drift.

1  A    Sorry.  That's good right there.

2  Q    That got it?

3  A    That's -- that's close.  I think -- perfect.

4       You can see Vision USA 2 down on, on the net winner side.

5  You can see commonalities in the street name, Vernal Street.

6  We can see the, the address number of 33.  We can see the City

7  of, of Everett.  We can see commonalities in zip code, although

8  Everett probably gets it partway there.  And then, also,

9  commonalities -- if you wouldn't mind going to the right a

10 little bit.  Thank you.  That's, that's wonderful -- on, on the

11 phone number as well, the 781 number.

12 Q    Okay.  Now is -- is -- is -- is the common -- are the

13 commonalities uniform in this, meaning are, are they identical

14 in all instances for both accounts or both aggregations?

15 A    There are certainly commonalities in all, but, obviously,

16 you can see there's, there's, within each aggregation, there,

17 there's variance in, in the street name, city, phone number.

18 Q    Okay.  And you, do you see variance with respect to e-mail

19 addresses?

20 A    I do.  And again, this is not a complete population, but I

21 believe there's variances in, in the e-mail for David Teixeira

22 as well.

23 Q    Okay.  And so what -- from, from Exhibit 11, what's -- what

24 -- what -- what is your assessment of what Exhibit 11 shows as

25 an example of?

1   A   I think what this shows is it brings into, to question the,

2   the almost sole reliance or the reliance that a name be

3   consistent, if not accurate.  You know, the fact of the matter

4   is that the chance of, of two people completely independent of

5   each other, you know, typing in these two separate aggregations

6   is, is, is clearly not the case, you know, and whether or

7   not -- what we heard yesterday that "there's probably a

8   reason" -- I think Mr., that's the words Mr. Martin used -

9   "there's probably a reason that these were entered as different

10  names."  That's not, "I'm certain there's a reason," or "I'm,"

11  you know, "reasonably, reasonably certain," or, "reasonably

12  reliable that there's a reason," that "There's probably a

13  reason."  And the fact of the matter is we're talking

14  thousands, thousands of, of user accounts here.

15      If you wouldn't mind going back to that, Mr. Rona.

16  Q   Okay.

17  A   Sorry.

18  Q   That's all right.  I, I have a quick hook.

19  A   You do.

20      I think there's one other important point to make here.

21  Q   Sure.  Go ahead.

22  A   Oh, just on, on that exhibit, if you wouldn't mind.

23  Q   Oh.  Is it -- did I not -- I'm sorry.  I thought I Shared

24  it.  I apologize.

25  A   Sure.

1    So if we go down to the, the net winner portion -- and

2    scroll particularly to the right.  There, there we go.  That's

3    wonderful.  Thank you -- you can see that while he's a net

4    winner of 1.5 million, all of those net winnings are

5    consolidated, really, into a single account, single account,

6    right?  So what we have on one hand is, is net losers who

7    typically are comprised, you know, certainly large net losers

8    like, like Du Painting, of kind of singular individual plans.

9    On the net winner side, you tend to have your winnings very

10   compressed into one user account.

11   So it's not the case that someone's necessarily trying to

12   hide losses in one and, and gains in another, you know.  What

13   we see -- and we see this across a lot of, particularly large

14   net losers -- is that compression into one, winnings into one,

15   one account, if you will.  Again, net equity is something we're

16   constructing here and not something that they necessarily

17   envisioned as they were doing this.

18   So as you have these kind of accounts it created over time

19   with a different name, you could end up with these kind of

20   inequities where you end up with aggregations that are, you

21   know, a composite of large individual singular accounts that

22   may be in one name and then it just depends on where they

23   happened, what account they happened to be using to, to

24   primarily work through in terms of credit transfers and

25   triangular transactions to create that kind of singular account

1  with, with most of the net winnings.

2  Q   Okay.  And to what extent are your concerns about the

3  problem of under aggregation limited to the Du Painting example

4  where there's a, a person, apparently a person and, and a

5  corporate name?

6  A   That is just one example or flavor of where we see

7  differences in, in name.

8  Q   Okay.  Let me -- let's --

9  A   But commonalities across other, other aspects.

10 Q   Okay.  So on -- on -- we'll do one more exhibit on this

11 topic.

12           MR. RONA:  Let's go to Defendants' Designation Exhibit

13 14.

14 BY MR. RONA:

15 Q   And this is, this is also an exhibit that you attached to

16 your report?

17 A   I did.

18 Q   Okay.  And what does this show?

19 A   So this is of the exact same structure of, of the prior

20 exhibit.  So our top half is our, our net loser.  In this

21 instance, we have a Parent ID 10811451.  They are a net loser

22 of approximately $241,000 and comprised under the current

23 aggregation of 1,027 user accounts, a sample of which is shown

24 in that kind of darker orange box below.

25 Q   Okay.  And I'm, I'm, I'm a little behind here, but that's

1  the, the negative set of accounts and this is, what I'm marking

2  is a positive set of accounts?

3  A   That, that's right.  So the lower section here was a

4  separate aggregation under the current methodology.  This is

5  Parent ID 10838191.  They are a alleged net winner of $295,498

6  and contain just three accounts.

7      So that's not a, not a sample.  That's all three accounts

8  comprising that aggregation.

9  Q   Okay.  And what are the commonalities that you observed

10 between these two different aggregations?

11 A   We see a high degree of commonality, you know, across the

12 board here, you know.  We can see that the, the login name both

13 is Sosa and numerical.  We can see a lot of overlap in the, in

14 the e-mail address.  We can see overlap in the, in the, the

15 exact same street names, city, state, zip code, and even phone

16 number.  And what we also see a commonality in is, is, frankly,

17 the name.

18 Q   And what is the name of the top set of accounts?

19 A   Oscar Sosa.

20 Q   Okay.  And what is the name on the bottom set of accounts?

21 A   Oscar Enrique Sosa Esculpi.  There should be -- I think a

22 cutoff slightly -- there should be an "I" at the end of that.

23 Q   Okay.  And, I mean, does, does anybody have any way of

24 knowing whether that's the same or, or a different person?

25 A   I mean, certainly I don't have personal knowledge of, of,

1    you know, Mr. Sosa, but, or whatever his last name is, but it's

2    certainly common, you know, in Spanish and Latin American names

3    for, for people to have two different surnames they may use.

4    Q    Okay.  And, and it's also possible to have two different or

5    user first, either to have two first names or to have a first

6    and a middle name that is used prominently?

7    A    As someone who has, in fact, two first names -- it's Joshua

8    Dennis -- I, I get confused with that a lot.  But, but yes,

9    people can use different names.

10   Q    Okay.  All right.

11            MR. RONA:  Since we -- we're not -- I don't know if

12   your Honor wants to -- we didn't really do a break, but I can

13   keep going until noon if, if your Honor prefers.

14            THE COURT:  Anybody need a break?

15       (No response)

16            THE COURT:  Okay.  Let's, let's push on to lunch

17   break.  It doesn't have to be exactly at 12:00, but whenever we

18   come to a -- a --

19            MR. RONA:  Okay.

20            THE COURT:  -- stopping place, we can break for lunch.

21            But I have a question of, of the witness for these

22   last couple of exhibits

23   BY THE COURT:

24   Q    How -- in order for you to come up with the, with this

25   analysis on these two exhibits, did you use some sort of a

1   algorithmic formula of your own?  How did you do this?

2   A   So in these examples I was looking at just, again, the top

3   31 that went over $200,000 and starting on the net loser side

4   and what we did is simply query the data, not in an algorithm

5   format, but simply searching for, primarily, e-mail addresses

6   as a strong starting point and then looking at what other

7   commonalities existed.

8   Q   Thank you.

9   BY MR. RONA:

10  Q   So I think we can turn, then, to the, the final issue that

11  you had raised with the aggregation analysis and that concerned

12  ePOC, is that correct?

13  A   Yes.

14  Q   Okay.  Why, why did you look at ePOC in this case?

15  A   So one of the things, well, a number of reasons, you know.

16  One primary reason was that, you know, Mr. Martin, in his, in

17  support of the aggregation methodology said it was the best

18  indicator that his aggregation was working correctly.  And so,

19  naturally, that was something I wanted to review and

20  understand.

21  Q   Okay.  And after your review, do you, did you share

22  Mr. Martin's assessment?

23  A   I did not.

24  Q   Okay.  Why not?

25  A   So the statistic that Mr. Martin uses is number of accepted

1    claims -- and I touched a little bit on this kind of at the

2    beginning here -- but keep in mind here of how the process

3    worked and what a claim represents.  A given user could go in

4    and create more than one claim and even within each claim the

5    user, as Mr. Martin described yesterday, had the ability to

6    submit sets of identifying information of which four need to

7    match.  They had the ability and did often submit more than one

8    sets of information and what that allowed them to do was go in

9    and claim more than one supposedly unique aggregation.

10       So again, they could go in and say, "That aggregation's

11   mine and that aggregation's mine," right?  And what, what

12   they're doing when they're saying that is they're saying that,

13   "The aggregation isn't working correctly for me.  It is under

14   aggregating, for whatever reason, and those are both mine."

15   And Mr. Martin would look at that claim and say, "Well, they

16   accepted it.  So that's -- that goes -- that verifies that,

17   that my aggregation is working correctly."

18       I think it shows the opposite.  It's showing that there's

19   under aggravation and his methodology and approach isn't

20   working.

21   Q    And do you know how often that happened where there was

22   acceptance, but claiming of additional aggregations in the

23   process?

24   A    Yes.  That, that was something I looked at in a few

25   different ways in my report.

1   Q   Okay.  And what -- what -- can you estimate the percentage

2   of time that that happened?

3   A   So we see across the board in terms of just the aggregation

4   issue closer to 10 to 15 percent of the time and then if you

5   layer in other issues like people contesting the equity amount

6   or, or adjusting things, the number can grow to, to as high as

7   25 percent.

8       But I think what's important is not just across the board,

9   but to look at, you know, what we see for, for large net

10  winners or net winners and particularly large net winners.  And

11  what we see for large net winners is, is a much higher

12  percentage of, of a failure rate.  We can see, you know, close

13  to 45 percent of large net winners over $25,000 -- again, I'm

14  defining a net winner there as a specific creditor -- either

15  saying, "I've got more than one that's mine," or disputing the,

16  the net equity amount that, that's, that's been calculated.

17  Q   Okay.

18      And I'd like to go to -- well, let's go to Exhibit 16.

19  Okay.

20      This is another one of the exhibits or, that you've

21  prepared in this case?

22  A   It is.

23  Q   Okay.  And what does this show?  I don't know if I should

24  zoom -- should I zoom in and then --

25  A   You, you, you can pause there and then we'll, we'll, we'll

1  drill down a little bit.

2       So what I've prepared -- and there's a few of them on, on

3  one page here -- are examples of just what we've talked about a

4  moment ago, which is examples where we have a single ePOC user,

5  single creditor, who's going in and submitting multiple

6  different account aggregations and, and as a result, are

7  claiming more than one supposedly separate aggregation.

8       So I can break that down.  And maybe if you wouldn't mind,

9  Mr. Rona, looking at that top left, just the green section to

10 start.

11 Q   Okay.

12 A   Thank you.  That, that's perfect right there.

13      So what we have is there was a user created as part of ePOC

14 with the name Luz Arboleda that was registered with an e-mail

15 address aris17@gmail.com (phonetic) and she filed Claim No. 466

16 -- I'm sorry -- 46884 on September 26, 2016.  And as part of

17 doing that she entered 528 different sets of account

18 information.

19 Q   Okay.  And what, what does that mean "she entered 528

20 different sets of user account information"?

21 A   So as I understand the claims process to work, when you

22 went in and you -- your -- the process by which one would go in

23 and, and try to, I'll call it, match into claims or capture

24 claims, is that they could type in account information, like,

25 as Mr. Martin described yesterday, maybe a log-in name, phone

1  number, street address, e-mail address, and then what -- and

2  you could do that more than once -- and then you'd kind of hit

3  Go and then out the other side would come the various

4  aggregations that -- that would -- that -- where you hit on at

5  least, at least four of the pieces of information that you

6  entered.

7  Q    So -- and -- and I'm -- this is, I think, beyond, maybe, my

8  ability to comprehend, but, but do you know -- does that mean

9  that there were 528 different, let's call them pieces of data

10 that had been entered by, by the claimant in order to claim the

11 accounts that are listed?

12 A    I don't know that she -- I don't think she would have to

13 enter all 528 of those.  And again, that's more than 528 pieces

14 of information.  That's 528 sets of at least four information

15 each.

16 Q    Okay.  And -- and -- and --

17 A    Presumably.  I guess they could have entered less, but

18 yeah.

19 Q    Okay.  But you only needed to enter four to claim an

20 account, is that correct?

21 A    Four needed -- my understanding is that four need to match.

22 Q    Okay.  And so -- okay.  So does this show the, the matches

23 or the attempts?

24 A    The attempts.

25 Q    Okay.  So if you look at the row below that says Adriana

1   Sena (phonetic) or Adriana Mendez Sena phonetic), there, the

2   count says 4.  And what, what does that suggest?

3   A    That this individual entered four different sets of account

4   information.

5   Q    Okay.

6        And so you want to -- can we now go to the right?

7   A    Yes, please.

8   Q    And what, what does -- just again focusing on the top use,

9   claimant.  And I don't know.  I can't really shrink -- oh,

10  there we go.

11  A    Yeah.  You can --

12  Q    I don't --

13  A    I don't know whether you can see all of it.  Maybe you can

14  just even focus in a little bit.  Yeah, that's perfect.  Thank

15  you.

16  Q    Okay.  So what does this right side show?

17  A    So as a result of her entering those 528 unique sets of

18  account information -- well, I don't know they're unique -- 528

19  sets of account information, she was able to match, match into

20  and, and claim 5 different unique account aggregations under

21  the current methodology.  Each of those aggregations you can

22  see there, that's the unique parent ID, again associated with

23  that aggregation.  To the right of that, it shows the number of

24  logins or, or users that are associated with that aggregation

25  and then it, then it shows information related to the, that

1    aggregation in terms of, you know, full name, e-mail, and

2    address.  And again, those are more exemplary.  That's

3    typically tied to the first earliest user account in each

4    aggregation.

5    Q   Okay.  And I'm sorry.  I, I, I was just looking at

6    something else.  Okay.

7        And so what -- and what is the -- what are the -- what are

8    the relative net equities of these different aggregations?

9    A   Sure.

10       So you can see that the, the top aggregation she matched

11   into was, was a net winner of $263,000 and then following below

12   are, for each of the other ones, are approximately a $1400 net

13   winner, a $339 net loser aggregation, a approximately $9,000

14   net loser, and an approximately $81,000 net loser.

15   Q   Okay.  And to your knowledge, if somebody had logged into

16   ePOC and, let's say, matched into and only claimed the, let's

17   say, the last row that says under name Luz Mery, I'll, I'll

18   just say it's Reese (phonetic), what, would they, would they

19   have been able to assert a claim in this case?

20   A   I, I, I don't know for certain how the, how the trustee

21   would have treated that.

22   Q   Okay.  Well --

23   A   But that would have been, that would have been their only

24   amount they had claimed, yes.

25   Q   And what would have been that amount?

1   A    The, the $81,000 loss indicated there.

2   Q    Okay.  And -- okay.

3   A    I guess -- and the other thing to note there before you

4   move on, Mr. Rona, if you would, if you scroll a little bit to

5   the, the left again so you can see maybe a little bit of the

6   green and, and the blue.  Right.

7        So you can see there there's, you know, certainly

8   commonalities amongst the name for at least some of the

9   accounts, like Luz Mery Arboleda and Luz Mery Reese.  It's in

10  the name Luz.

11  Q    Okay.  But the -- but would you agree that the registration

12  e-mail is different than the account e-mails on the claimed

13  accounts?

14  A    For that one, it is.  For, for others, they're the same.

15  Q    Okay.  And would it have been possible to do a

16  probabilistic analysis comparing the ePOC data to Mr. Martin's

17  aggregations?

18  A    I -- you know, I really haven't thought that through.  That

19  would certainly be interesting to think about how one would

20  dovetail, you know, the, the results of the ePOC data as

21  providing indicia of, of how, you know, what are true and, and

22  false matches to help inform a probabilistic approach.  That

23  would be an interesting question.  That would be one that I

24  think we'd like to explore.

25  Q    Okay.  And you -- do you, do you recall yesterday that

1  there was some testimony about whether you needed two datasets

2  to do a probabilistic analysis?

3  A    I do.

4  Q    Okay.  Have you ever seen, by the way, such an analysis

5  done by Mr. Martin?

6  A    A probabilistic approach?

7  Q    Comparing ePOC data to his overall aggregation.

8  A    Not other than to suggest that 95 percent of the claims

9  were accepted.

10  Q    Okay.  But I, I meant a probabilistic data-linkage

11  approach.

12  A    No.  No.

13  Q    Okay.

14      Let's go -- I think we have time to do one more.  Can I

15  leave this exhibit, Mr. Mar -- Dennis -- sorry -- or do you

16  want to make other observations?

17  A    My only other observation -- and I agree.  I don't need to

18  go through all these examples 'cause I think they tell the same

19  story -- is that, to be clear, this is not, you know, the sum

20  total of, of the only time this has occurred.  This is an

21  example of when it occurred.

22  Q    Okay.  And I think you testified that there were maybe 10

23  to 15 percent of the time this happened?

24  A    Across the entire population and a higher percentage

25  relative, particularly, to large net winners.

1    Q    Okay.

2         Let's go to -- and I think we'll, hopefully, make this the

3    last one we do before we break.

4         But what -- what does -- what does Exhibit 3 of defendants'

5    identification show?

6    A    Sure.

7         This -- so I think there's a few things going on here.  So

8    I'll try to pick it apart piece by piece.

9         Let's first start with the bars.  And there's two-colored

10   bars, yellow and blue.  And categorically, the significance of

11   the color on this chart is that yellow refers to net losers and

12   blue refers to net winners.  So what we're doing is graphically

13   showing the various tiers that we've talked about before.

14        So look, turning to just the yellow bars to start, the size

15   of the yellow bar reflects the total of the equity for either

16   the net loser or the net winner population.  So what we can --

17   what this tells us and why this is informative is that, for

18   example, the fact that there is a really tall bar in, in Tier C

19   for net losers.  What that tells us is, roughly, 47 percent of,

20   of the net losses come from people who lost between 1,000 and

21   $5,000.

22        By comparison, I'm going to shift to the blue now, this --

23   again, this is all a net winner -- the tallest blue bar is off

24   to the right.  So we can see that, roughly, the, the, the

25   biggest tier, single tier in terms of net winners are people

1   who won between, in terms of total dollars, people who won

2   between 250 and a million dollars account for, that's, roughly,

3   27 or so percent of the total net winnings.

4       Why it's important is to see and contrast the differences

5   here.  On one hand, we have a large population of smaller net

6   losers accounting for a lot of the net losses.  On the other

7   hand, we have net winners where, disproportionately, most of

8   your, your net winnings are coming from smaller numbers of very

9   high, large-dollar net winners.

10       So I, I'll pause there and then we can move on to the

11   lines.

12  Q   Okay.  And -- and -- and the -- does this -- who came up

13  with these tiers, by the way?

14  A   So the exact range of the tiers are my own.  But to be

15  clear, when I'm talking about net equity and, really, the

16  aggregations, those are a function of, of what has been done by

17  Mr. Martin.

18  Q   Okay.  And -- and does the -- does this show for the blue

19  bars the net, alleged net winners that, with maybe, maybe one

20  exception -- it's not clear -- ascending combined equity as you

21  go up at least through Column I?

22  A   That, that's exactly right.  And that, that kind of stands

23  what we said before, which is that you end up with, you know,

24  smaller numbers of, of, of much larger individual net winners

25  under the current aggregation.

1   Q   Okay.

2       All right.  Let's turn to now -- what -- what -- so you've

3   done the bars.

4       What do the lines show?

5   A   So what I've tried to do here is overlay what we see in the

6   ePOC, in the claims data, to show graphically, you know, what

7   portion of each of those tiers are claimed.

8       So just to, to simplify a little bit, you know, looking at

9   any given bar, right, let's start with the blue bar and we'll

10  start with Tier I, the portion above the bar represents the,

11  the kind of equity that was not claimed as part of the ePOC

12  process and kind of below the, the line, if you will,

13  represents the portion of the claim that, that, that was

14  included not necessarily agreed with or that they didn't

15  aggregate it with other people, but at least that that

16  particular aggregation, you know, was claimed as part of the

17  ePOC process.

18  Q   And -- and --

19  A   So what we wanted to do here is see, basically, you know,

20  get a visual perspective of, you know, how representative or

21  not representative, you know, the claims data may be.

22  Q   Okay.  And I -- you said that the -- the -- the area above

23  the line represents unclaimed equity.  Is that -- is the box

24  that I drew depicting what you were describing?

25  A   For that tier for net winners, yes.

1   Q    Okay.  All right.

2        And, and then -- on the -- the -- and did you do the same

3   sort of review on the net loser side?

4   A    I did.  And we can look at, maybe, Tier C as an example.

5        So --

6   Q    And what, what does my box show on Tier C?

7   A    That represents the, the portion of that tier which was

8   unclaimed.  So that means with -- with an e -- well, not with

9   an ePOC -- within Mr. Martin's aggregation there's a large

10  portion of, of aggregations between 1,000 and $5,000 that

11  nobody claimed as part of the claims process.

12  Q    Okay.  And so what -- what -- what does this show, or is,

13  is -- what -- how -- to what extent is this helpful in

14  explaining your assessments of the applicability of ePOC in --

15  in -- in the analysis in this case?

16  A    So I think -- there's a couple of things that, that I, I

17  think are interesting.  One is, you know, that, that's a lot of

18  unclaimed small aggregations.  Now what we saw earlier was

19  there's a lot of aggregations that have made -- that -- that --

20  or a lot of individual user accounts that weren't aggregated of

21  that size because they happened to have less than four

22  characters or any number of reasons.

23       So I guess the question is all of that money that no one

24  sought to claim, you know, does that represent someone's lack

25  of desire and ability to claim that or is that representative

1   of the fact that it should have been aggregated with other net

2   winners.

3   Q   Okay.  What, what other significance do, do you draw from

4   this, this exhibit?

5   A   I think, again, just from a, a representative perspective,

6   you know, those lines, particularly on the net winner side, you

7   know, particularly on some of those larger net winners are not

8   very high.  We see, as we explained earlier, that not, there

9   weren't a ton of net winners claimed, certainly not in terms of

10  total dollars, and those that were, they either, you know, at

11  least north of 45, north of 40 percent disputed it either to

12  the extent they, they thought that net equity wasn't right or

13  they are self-aggregating into, into other groups.

14  Q   Okay.  And did, to your knowledge, did Mr. Martin offer any

15  statistics on the, whether the blue line could be extrapolated

16  to the, the entire population of, of net winners?

17  A   No.  What I think we heard yesterday -- there, there's

18  certainly nothing to that extent in his, his report -- was that

19  it was an -- exact phraseology -- but it's a decent size or a

20  good size in terms of the 130,000 total and, and that it was,

21  you know, what he had to work with.

22  Q   Okay.

23  A   But it wasn't any statistical analysis.

24  Q   Okay.  And did Mr. -- to your knowledge, did Mr. Martin

25  attempt to make a correlation between the, the claim, the

DENNIS - DIRECT                                                      **313**

1    claims submitted by net losers within his aggregation versus

2    any claims submitted or claim, or any accounts claimed by net

3    winners according to his aggregation?

4    A    I'm sorry.  Can you ask that one more time?

5    Q    I apologize.  That was unwieldy.

6         To your knowledge, did Mr. Martin attempt to make any

7    correlations between the, the ePOC claims relating to accounts

8    he assessed to be net loser accounts versus accounts that he

9    assessed to be net winner accounts?

10   A    No.  I mean, there's certainly no correlation he, he made

11   at all in terms of, in terms of that.  So no.

12   Q    Okay.  And incidentally, relative to your concern about

13   under aggregation what does my, the box that I've drawn on, on

14   the third yellow bar, what, what significance does that box

15   have?

16   A    Well, I think that goes to what I was saying a few moments

17   ago, that, again, to the extent those are unclaimed, unclaimed

18   aggregations in user accounts, that would provide the

19   opportunity or the potential for those to be simply under

20   aggregated.

21   Q    Okay.

22            MR. RONA:  Your Honor, I, I note that it is 12:03 and

23   I didn't want to turn to a new section.  So I thought this is a

24   good, a good time to break.

25            THE COURT:  Okay, great.

1        We'll all be back here at 1:00.

2        MR. RONA:  Okay.

3        THE COURT:  All right?

4        MR. RONA:  Thank you, your Honor.

5        THE COURT:  All right.  Thank --

6        MR. BENNETT:  Thank you, your Honor.

7        THE COURT:  Yes.

8        THE WITNESS:  Thank you.

9        MR. LIZOTTE:  Thank you, your Honor.

10    (Lunch recess from 12:03:30 p.m., until 1:00:51 p.m.)

11                       AFTER RECESS

12        THE COURT:  Okay.  Everyone back?

13        MR. RONA:  Yes, your Honor.

14        MR. BENNETT:  Yes your Honor.

15        THE COURT:  Back on the record in TelexFree.

16        And I think we're -- you had the floor, Mr. Rona.  Go

17    ahead.

18        MR. RONA:  Thank you, your Honor.

19    BY MR. RONA:

20    Q    Good afternoon, Mr. Dennis.

21        I'm looking for some detail at the five issues that you had

22    raised with respect to Mr. Martin's aggregation.

23        In -- in -- in summary, what is your overall opinion as to

24    the reliability of Mr. Martin's aggregation?

25    A    Well, I think for each of the reasons we went over, you

1  know, individually and certainly in, in combination, there's

2  considerable issues with respect to reliability, you know, both

3  in terms of the, the approach taken, how that approach was

4  performed, certain assumptions regarding the consistency,

5  particularly of name that was used, and, frankly, the impact to

6  individuals and particularly large net winners that can occur

7  when even a single under aggregation occurs and that what we

8  see in the ePOC data is that, in fact, under aggregation did

9  frequently occur.

10 Q   And is -- and so is your opinion that -- do you agree with

11 Mr. Martin that his aggregation methodology is reliable?

12 A   No, I do not.

13 Q   Okay.

14     Let's turn to the -- to the -- I think you had mentioned

15 two issues with respect to the net equity calculations.

16     What is the first issue?

17 A   So the first issue I had mentioned is, is the inconsistent

18 treatment of credit transfers.

19 Q   Okay.  And what do you mean by that?

20 A   So as I talked about a little bit earlier that, you know,

21 there are a couple of ways that credits are transferred as part

22 of various transactions.  One way we described in the context

23 of a triangular transaction where credits are transferred to

24 TelexFree to satisfy the invoice of another participant.

25 Another way that credits can be, be transferred are, are

1   directly between participants and we had talked about how

2   those, in sum and substance, at the end of the day can, can be

3   exactly the same thing, yet, on one hand, triangular

4   transactions are, are included as part of net equity, yet

5   direct transfers of credits between participants is not

6   included.  It's excluded currently from the calculation of net

7   equity.

8   Q    Okay.  And I'm, I'm going to show you what's been marked

9   for identification as Defendants' 8.  And-I, I believe we've

10  seen this before, is that right, Mr. Dennis?

11  A    Yes.  If not, this one, then, it's a parallel version that

12  shared a lot of the same structure.

13  Q    Okay.

14  A    I believe, I believe we did talk through this one, though.

15  Q    Okay.  And so, just again, this -- what does this show?

16  A    So this here was Exhibit 4 to my expert report and it shows

17  for all participants on a combined basis and then separately

18  for net losers and net winners the amount of total equity at

19  each of the tiers.  And again, tier being a, a range of either

20  net winnings or net losses.  And then to the right of that it's

21  showning all, showing all of the component parts that were

22  first included as part of net equity, that is, the transactions

23  labeled 1, 2, 3, 4, 5, and 8, as well as the transactions we

24  see that were excluded from net equity, which are 6, 7, and a

25  portion of 5; 6 and 7 being the, the credit transfers in and

1    credit transfers out.

2    Q   Okay.  And if I, if I zoomed in, the, the bottom tier,

3    that's, pertains to net winners, is that correct?

4    A   It does.

5    Q   Okay.  So if I zoomed in a little bit.

6    A   I'm sorry, Mr. Rona.  Just so I can follow along on a hard

7    copy, which, which exhibit is that in this?

8    Q   It's Exhibit 8 for identification.

9    A   Thank you.

10   Q   And so this shows the, those numbered, those same numbered

11   columns, is that correct?

12   A   That's correct.

13   Q   Okay.  And the credit transfers that you're referring to,

14   which columns are those?

15   A   The credit transfers are Columns 6 and 7 on the right side

16   of the page under Excluded from Net Equity.

17   Q   Okay.  And what findings did you make or observations about

18   the quantity of excluded credit transfers as it pertained to

19   net winners?

20   A   So as a first observation, it's considerable, right?  So we

21   can see across the board there were, down at the bottom of 6,

22   there were for this population of net winners, or for net

23   winners, there's 2.5 billion of credits that were transferred

24   in and 1.8 billion in credits that were transferred out.

25   Q   Okay.  And  I've used my cursor to mark those two figures,

1  is that -- is that -- are those the two figures you were

2  reading from?

3  A    They are.

4  Q    Okay.  And is it possible on a stratified basis to look on

5  the, at each tier of net winners and see what the, what each

6  tier's share of those overall credit transfers is?

7  A    You can, yes.

8  Q    Okay.  And so what -- I apologize if you said it, but,

9  roughly, what's the difference between the two aggregate, the,

10 the two box numbers that -- that I -- the boxes that I've

11 drawn?

12 A    That'll be a, a $600 million net credit transfer in.

13 Q    Okay.  And what's the significance of a credit transfer in

14 in terms of TelexFree?

15 A    So a credit transfer in would be, again, the, the receipt

16 of credits and the way it's directionally shown in the data and

17 shown here is that a credit transfer in, were it to be counted

18 -- and the presumption was that those credits were purchased at

19 least dollar for dollar -- on a net basis would be a reduction,

20 reduction to net equity of 600 million.

21 Q    Okay.  So credit transfers in would be consistent with the

22 purchase of credits by a participant?

23 A    Conceptually, yes.

24 Q    Okay.

25 A    They -- they -- there -- they would be purchasing those

1   credits, but rather from purchasing them from TelexFree, they,

2   they're purchasing them from another participant.

3   Q    Okay.   Maybe a cleaner way to ask it is if a participant

4   purchased credits, would that purchase appear in transfers in?

5   A    To the extent they are purchasing those credits from a

6   nonparticipant, yes.

7   Q    Okay.   And similarly, what, what are credit transfers out?

8   A    They would simply be the, the other side of that

9   transaction.   So as Mr. Martin explained yesterday, for, you

10  know, those two sides, for every credit transfer in, there's a,

11  there's a corresponding credit transfer out with, you know, the

12  distinction really being, I believe, as he said, on the

13  recipient side would be a three-credit reduction.

14  Q    Okay.   But putting aside the, the, the, TelexFree's take of

15  the -- of -- of a portion, a small portion of credit transfers,

16  the -- the -- the aggregate difference between credit outflows

17  or credit inflows compared to credit outflows, is that the 600

18  million that you mentioned?

19  A    That's right.   There are 600 million more in credit

20  transfers in than there are in credit transfers out.

21  Q    Okay.   And so if credits were valued at a dollar, that

22  would represent, roughly, 600 million?

23  A    That's right.   And just to say it again, we're only talking

24  about the net winners in this case.

25  Q    Okay.   And of the tiers that you've shown here, how many of

DENNIS - DIRECT                                                    **320**

1    them have greater quantities of credits transferred in than

2    transferred out?

3    A   It would be all except the first three smallest tiers, A,

4    B, and C.  So it'd be Tiers D on downward.

5    Q   Okay.

6    A   You can see the, the quantities and, and the credit

7    transfers in.  Six are, are greater than the -- the -- the --

8    well, actually, an absolute value greater, right, but more or

9    less than Column 7, the credit transfers out.

10   Q   Okay.  And is that the -- the -- are -- the ones that,

11   where it's greater credits in than out, are those the ones

12   within the box that I've drawn?

13   A   They are.

14   Q   Okay.  And I -- I'm -- I'm forgetting, but do you recall

15   which tier or tiers were the most -- had the most -- the

16   largest share of overall net equity?

17   A   From a net winner perspective?

18   Q   Yes.

19   A   That would be, if we look across to the left -- you may

20   have to help me scroll -- there's a $435 million number.  Yes,

21   there it is.  Thank you.  That would be our, our net winners of

22   between 250,000 and a million.

23   Q   Okay.  And of that group, I'm going to try to see how

24   steady my hand is, but if I go across --

25   A   Yeah.  You go --

1   Q    -- that same row --

2   A    It's the -- start -- exactly.  Right there, the 616

3   million --

4   Q    Okay.

5   A    -- of, of the credit transfers in.

6   Q    And how many -- what is the amount of credit transfers out?

7   A    Approximately 395 million.

8   Q    Okay.

9        Let's go -- let me stop Sharing.

10       Let's go to Exhibit 10 that's been marked for

11  identification by the defendants.  And I, I think we've seen

12  this, already.  So we don't have to reintroduce this.  But

13  what, or resummarize it.

14       But this is -- what does Exhibit 10 briefly show?

15  A    Again, this is a two-page exhibit, but it shows the top 100

16  TelexFree net winners by descending alleged net equity.

17  Q    Okay.  And if I called your attention to the final right-

18  hand two columns, what do those columns show?

19  A    So this is structured not dissimilar to what we had before

20  by tier, but now, again, it's by, you know, top net winner.

21  And what're showing is the -- well, to the left we have total

22  net equity in bold to the left of 1 and then to the, to the

23  right, to the right of 5 we have the impact of total net equity

24  were it just Column 6 and 7, transfers in and transfers out to

25  be included.  And then that final column that you just

1   highlighted on the right reflects a variance or difference or,

2   really, impact of inclusion of, of the net transfers in and

3   out.

4   Q   Okay.  And just to be clear, these are not calculations

5   that -- are these calculations, the final two columns, that

6   Mr. Martin made or are they, they ones that you made?

7   A   No.  They're -- they're certainly -- they're just math.

8   Anyone could make them, but these are calculations I've, I put

9   in here.

10  Q   Okay.  And focusing on the variance column, what does a

11  negative number show?

12  A   That would reflect a, a reduction to net equity were the

13  transfers in and transfers out to be included.

14  Q   Okay.  And so --

15  A   On a dollar-for-dollar basis, a dollar-for-credit basis.

16  Q   Okay.  On -- and on that basis, if I were to just -- and

17  I'm not sure this is exactly top ten, but I'm going to draw a

18  box around this group of people.  This is the top dozen or so.

19  A   Probably a little more than a dozen, but yes.

20  Q   A little more, yeah.

21      And -- and are -- what is the val -- what is -- what is the

22  value of the, the variance -- for the group that I boxed?

23  A   Without doing the math, it looks to be certainly in excess

24  of ten million.

25  Q   Oh.  Yeah, I'm -- I apologize.  Let me ask the question in

1   a better way.

2       Is the -- are the figures for each of the individuals or

3   the aggregations that I've boxed, are they all, are the

4   variances all negative?

5   A   They are.

6   Q   Okay.  And, and that means that there were more credits in

7   than out?

8   A   That's correct.

9   Q   Okay.

10  A   More credits were, were bought than sold from a transfer

11  perspective.

12  Q   Okay.  And, and would you agree that several, many of

13  these, that variance is more than a million dollars if you

14  imputed a value of $1 per credit?

15  A   I would.

16  Q   All right.

17      Let's go to -- well, what -- based on your review of the

18  data if you, if you factored in credit transfers at the same

19  assumption of triangular transfers, the same value assumption,

20  what are the different combinations that could, resulting

21  combinations that could happen to a net winner in terms of

22  remaining a net winner, having their net equity go up or down,

23  or even flipped to a net loser?  Which of those combinations

24  are possible?

25  A   All of them.  You could have net winners become more net

DENNIS - DIRECT                                               **324**

1   winners.  You could have net, net winnings go down for a net

2   winner.  You could have net winners become net losers.  And the

3   converse was true on the net loser side.

4   Q   Okay.  Let's go to -- well, okay.

5       Well, let's now turn to the -- what evidence have you seen

6   or are you aware of that credits were sold for cash on a

7   routine basis?

8   A   That credits were sold for -- are you talking about

9   transfers now or, or some other type of sale?

10  Q   Well, let me ask, let me be more precise.

11      What evidence have you seen that credit transfers took

12  place, as we've just been describing, that also involved the --

13  the -- the transfer of cash in the opposite direction?

14  A   Well, certainly, there's discussions of that in the ePOC

15  data about people explaining that that's what they've done.

16  Q   Okay.  And let's see if we can go to that.

17      Did you, did you include some of those in your report?

18  A   I did.

19      And I think Mr. Martin said as much yesterday in his

20  conversation about transfers.  I don't think he disputed

21  that -- that -- that cash exchanged hands as part of transfers

22  of credits.

23  Q   Okay.  Well, let's look just quickly at what you saw in

24  your, or you noted in your report.  I'm, I'm now looking at

25  Page 31 of Exhibit 1.  There are references to two ePOC claims,

1  is that correct?

2  A    That's right.

3  Q    Okay.  And what does the first reference pertain to?

4  A    So the first reference, you know, people had the ability,

5  at least for certain parts of, of ePOC, to put in commentary

6  notes.  And so what I did was was go through and look for some

7  of those and, and read the explanations.

8      So the first one relates to a ePOC Claim ID 68594.  This is

9  an Ana Patricia Salmeron de Pereira.  Thank you.  And she

10  included a note in ePOC that stated, "Through the account of

11  Patricia Y. Carlos (phonetic) I was buying the credit for other

12  participants with real cash so I could accumulate a large

13  amount of credit in this account to allow me to easily create

14  new accounts for new members as this was the fastest method."

15  And then it continues from there.

16  Q    Okay.  And incidentally, do you know what, do you know what

17  is meant by "the fastest method"?

18  A    Obviously, I have no -- no -- no personal knowledge other

19  than she found it was the quickest way to get credits,

20  presumably.

21  Q    Okay.  But compared to -- are you -- do you know what

22  that's being, in comparison to what other options?

23  A    Sure.

24      So -- and to be clear here, she says, "I was buying the

25  credit for other participants with real cash."  So if you're,

DENNIS - DIRECT                                                    **326**

1    if you're buying credits, you could certainly buy them from,

2    from TelexFree, right?  You could purchase, purchase credits or

3    you could purchase them, as we see, for -- as -- and have them

4    transferred to you and purchase them from another participant.

5        Here, looking at her account, we can see that she had no

6    direct purchases.  She didn't purchase any credits from, from

7    TelexFree.  So she's referring to purchases from, from other

8    participants.  So I think she's suggesting that that was a

9    faster method than trying to buy credits directly from

10   TelexFree.

11   Q   And were you able to confirm whether she, in fact, or that

12   -- I don't want to even say "she" -- whether this ePOC

13   claimant, in fact, purchased credits?

14   A   Yes, I was, or in close proximity in that in her, her note

15   above she says, "Therefore, when TelexFree got shut down all of

16   the accumulated money, $90,000, had been distributed and

17   ultimately given to TelexFree through the accounts and voice

18   over IP plans."  And, you know, when we go and, and we look at

19   the transactions reflected in SIG, what we see is that -- I say

20   Ms. here.  I mean, that's presumptuous, although I say "his"

21   later.  My apologies -- that had $100,000 in, in total credit

22   transfers in and we looked just at the two logins of Patricia

23   Y. Alex and Patricia Y. Carlos, we get to around 83,000 in net

24   credit transfers in.

25       So again, you know, we're not getting exactly to the 90,000

1  mark she mentions, but we're, we're getting, certainly, close.

2  Q   Okay.  And if -- if -- using Mr. Martin's aggregation, if

3  you factored in credit transfers, assuming the dollar-to-credit

4  ratio or rate, what effect did that have on the net winnings of

5  that aggregation?

6  A   So for this aggregation her, her net winnings or alleged

7  net winnings of about 116,000 would be reduced to approximately

8  43,000, which would be a decrease of, roughly, 63 percent.

9  Q   Okay.

10       And then just quickly looking at the next example, what,

11  what does this one pertain to?

12  A   So it's the same concept in that we found this quote

13  through looking at the electronic proofs of claim data.  This

14  is for Claim ID 4282, a Marcelle McFerrin (phonetic).  And what

15  he stated was, "I gave money to a friend of mine, Diego Alonzo

16  Lazama Zagaro (phonetic) on several opportunities, who

17  transferred TelexFree credits to my account in order to

18  purchase new accounts in voice over IP, or VOIP plans."  It

19  goes on to say, "But in the time I participated in TelexFree I

20  paid cash, $30,383.40 US dollars that were transferred to my

21  account from other user accounts."

22  Q   Okay.  And then were you able to confirm what credit

23  transfers pertained to this participant?

24  A   I was.

25  Q   And what, what did you find?

1   A    In that second bullet what I have noted down below at the

2   very bottom of the page -- yes.  Thank you -- the transactions

3   that we see confirm that, again I say Mr. McFerrin, had 30,889

4   of credit transfers in from, from users that were not

5   aggregated to, to Mr. McFerrin.

6        So again, that 30,889 is, is very close to the 30383.40

7   that, that he states he, he paid in cash for and had credits

8   transferred to him.

9   Q    Okay.  And then I'm just going to quickly go to -- I

10  apologize -- the next page.

11       If you -- did you then calculate what that user's,

12  Mr. McFerrin as you call him, what his net equity would be if

13  credit transfers were included using that dollar-per-credit

14  rate?

15  A    Yes, I did.  So Mr. McFerrin's net winnings were $2,736 and

16  inclusive of credit transfers on a net basis he would be a net

17  loser of approximately $21,924, which would be a net change of,

18  roughly, 900 percent.

19  Q    Okay.  And so this, this would be an example of a

20  participant whose net equity, if, if credit transfers were

21  included at the dollar-per-credit rate, would actually flip

22  from a net winner to a net loser?

23  A    It would.

24  Q    Okay.

25       What other evidence -- I'm gonna stop Sharing this

1    document.

2         What other evidence are you aware of of, aside from

3    Mr. Martin's testimony yesterday and what you just reviewed, of

4    credits being sold for cash?

5    A    So I'm trying to think.  Certainly, being sold for cash.  I

6    think those are the primary two other than when they're being

7    sold back into, basically sold back to or, TelexFree.  So being

8    direct, their direct receipts.

9    Q    Okay.  Did you have occasion to review an affidavit

10   prepared by, or signed by Mr. Frantz Balan?

11   A    Yes, I did.

12   Q    Okay.  And did that affidavit discuss purchase and sale of

13   credits?

14   A    Yes, it did.  Thank you.  It discussed a number of things,

15   but yes.

16   Q    Okay.  And I'll -- let's go to that.  And it's a little bit

17   of a strange scan.  So it's a little unwieldy.

18        But does this look like the -- what -- the document you're

19   referring to?

20   A    Yes, it does.

21            THE COURT:  What number is it in the book?

22            MR. RONA:  Oh, I apologize, your Honor.  It's

23   Identification No. 19 for the defendants.

24   BY MR. RONA:

25   Q    And I'm going to direct your attention, Mr. Dennis, to Page

1   7, Paragraph 30.  And I'm going to try to do it so we get the

2   whole paragraph, which continues on the following page.  And I

3   say Page 7.  I, I apologize.  Page 6 and Page 7.

4       Does this, does that Paragraph 30 contain a discussion

5   about the purchase and sale of credits?

6   A   Yes, it does.

7   Q   Okay.  And did Mr. Balan make statements about the, the

8   value of, of, of, or ranges of values of credit transfers?

9   A   Yes, it did.  And that -- it's -- I -- I -- I see this

10  document and I'm thinking now to my second point on net equity

11  about the assumption that, that a dollar and credit are the

12  same.

13      But yes.

14  Q   Okay.  But this does refer to -- does this refer to credits

15  being bought and sold in -- apart -- separate and apart from

16  any triangular transfers?

17  A   It does.

18  Q   Okay.  And I, I may have asked you -- I'm going to take

19  this down.

20      I may have asked you this before, but are there -- based on

21  your review of, of the, of the materials provided to you in

22  this case were their advantages to a participant to engage in a

23  credit purchase or sale over the other available types of, of

24  transactions?

25  A   Yeah, there are.

1      So my understanding is that relative to, for example,

2  wanting to buy your credits out of TelexFree -- so direct

3  receipts -- that there are a number of impediments that one

4  might find.  For example, you need to set up and have an

5  eWallet system in place.  There's also a significant timing

6  lag.  You -- I believe you had to submit your request for a

7  receipt on a Tuesday in order to get it by, by the next Friday.

8      So there was some challenges there compared to, for

9  example, simply finding a, you know, willing buyer and willing

10 seller.

11 Q   And so would, would a credit sale be a faster way to

12 monetize money, potentially, than other types of transactions?

13 A   If -- I would think so.

14 Q   Okay.  And how about if a, if a participant wanted to

15 accumulate credits, what would be the, a large number of

16 credits, what would be the fastest way that you, to your

17 understanding, that a, a participant could accumulate a large

18 number of credits?

19 A   Well, certainly, what we see in the data and I think we

20 went through the volumes is there's a significant amount of

21 credit transfers in.  So people, you know, clearly felt that,

22 that the transfer in or the purchase of, of credits from other,

23 other participants was a very convenient way to do that.

24 Q   Okay.

25     Let's go to Defendants' ID No. 4.

1        And do you recognize -- is this something you prepared?

2   A    It is.

3   Q    Okay.  And what does this show?  This is, again, No. 4 for

4   identification for the defendants.  What does this show?

5   A    So this is an extract of a table I, I had in my expert

6   report.

7   Q    Okay.  And what, what does this table depict?

8   A    Sure.

9        So what I've done here -- and this is just for exemplary

10  purposes but to be clear, these are real aggregations -- is it

11  shows the impact that excluding net equity -- I'm sorry --

12  excluding transfers in and out can have.  So starting with that

13  kind of top section, I've, I have five net loser aggregations

14  and you see the specific parent IDs that are unique to those

15  aggregations in the second column.  And the third column,

16  that's the current net equity as calculated by the trustee and

17  Mr. Martin that excludes transfers in and out.

18       So some of those numbers may look familiar.  Like the top

19  one there, that million dollar we know to be, be Du Painting.

20  We've gone over them earlier.  But there's other examples below

21  as well.

22       To the right, we show the kind of aggregate credit transfer

23  in and credit transfer out associated with that aggregation and

24  then to the farthest right column where it says Net Equity

25  Including, Including Transfers In/Out, we can see what their

1  net equity would be were one to consider credit transfers in

2  and out as part of the net equity calculation.

3      But what I wanted to show here is the impact.  You can see

4  that some net losers become smaller net losers.  You can see

5  that some net losers even can become very large net winners,

6  that, that people can go either direction and, and the relative

7  magnitude of that change can vary.

8  Q   And, and similarly, did you make similar -- did you also

9  review net winners for these types of outcomes?

10  A   I did.  And again, some of the examples here may look

11  familiar as these are larger net winners, but I did.  What I

12  was trying to show here is, is the same concept that large net

13  winners, were credit transfers to be included, their net

14  winnings can shrink, sometimes dramatically.  You could be a

15  four million -- looking at the second net winner example there,

16  Parent ID 2522900, who, excluding credit transfers, is a $4

17  million net winner.  But were one to consider the credits in

18  and out that he transferred and purchased and sold, he would be

19  a, a net winner of just $809,000.

20      But you see other examples down below, like the fourth and

21  fifth example for net winners where we have net winners and

22  large net winners that, again, can become net losers were one

23  to consider credit transfers.

24  Q   Okay.  And, and the fact that these -- the -- that the --

25  the differences are different for each aggregation, what does

1   that suggest in terms of the way individual participants

2   operated?

3   A    It just goes to show the complexity of, and the variance

4   about how people operated.  Some people may have utilized

5   credit transfers more than others.  Some people may have been

6   net importers of, of, of credits for, for purposes of arbitrage

7   and, and, you know, buy low, sell high.  Some people may have

8   been using them for, gain those credits so they could do

9   triangular transfers for others or, or triangular transfers to

10  build their own, their own accounts under them, that, that

11  there's no single, you know, 10 percent increase or decrease

12  one can apply here, that it really does vary by, by

13  participant, by aggregation at least here.

14  Q    Okay.  And I think yesterday -- I'm just paraphrasing --

15  but I, I believe there was some testimony to the effect that

16  why would somebody pay less than a dollar in a triangular

17  transfer or maybe why would someone accept less than a dollar

18  if you could also get a dollar for a credit directly from the

19  company.  Do you remember some testimony to that effect?

20  A    I do.

21  Q    Okay.  Would you have a similar -- what, what would be the

22  applicability of that logic, in your mind, to credit transfers?

23  A    I think it would be, be the same, that -- I mean,

24  Mr. Martin touched on it a little bit yesterday -- that there

25  are times when credits would be transferred or used or -- or --

1  and someone would be willing to pay more than a dollar in cash

2  and there'd be times, as Mr. Balan describes, where they would

3  be willing to accept and pay less than a dollar, depending on

4  the supply and demand and availability of credits in their

5  particular situation.

6  Q   Okay.  And did Mr. Martin, to your knowledge, take into

7  account supply and demand or market factors as, with respect to

8  any credit transactions?

9  A   No.  His assumption was that a credit in, in all instances,

10 at least with respect to triangular transactions he included,

11 were equal to a dollar.

12 Q   Okay.  Well, for  triangular transfers, is that correct?

13 A   That's right.  He didn't consider credit transfers in or

14 out.  So I'm not sure where his opinion lies in terms of --

15 Q   So in, in neither -- I guess my question is, with respect

16 to both triangular transfers and credit transfers, to what

17 extent did Mr. Martin consider market factors?

18 A   I'm not aware that he did.

19 Q   Okay.  Let's turn to -- I think we can move to the next

20 issue.

21     What -- what -- what was your second issue with the net

22 equity calculations?

23 A   The second -- we, we've kind of already broached that

24 subject here, is the assumption that a credit that was

25 transferred as part of a triangular transaction, although the

1   same concept would apply certainly to, you know, direct

2   transfers between participants, was in all instances equaled to

3   a dollar and that when I used my 1425 in credits to satisfy an

4   invoice, part of a triangular transaction, and necessarily in

5   the real world, someone paid and another person received 1,425

6   U. S. dollars.

7   Q    And that was -- that was -- was that based on empirical

8   evidence, a broad review of empirical evidence or was that an

9   assumption that Mr. Martin used, to your understanding?

10  A    Well, it's certainly an assumption he used.  My

11  recollection is he referred that he had discussion with, with

12  some participants who, again, were, primarily, net losers.

13  Again, we don't know how many or what size of their losses they

14  were.  I think, my understanding, that was the primary basis.

15  Q    Okay.  But using -- I think you earlier in the morning

16  testified about a financial case where you reviewed transaction

17  data from, relating to trades.

18      To your knowledge, did Mr. Martin review or include in his

19  report a similar review of financial, you know, system-

20  generated financial data with respect to determining the, the

21  value of credits?

22  A    I, I mean, I'm not sure I understand your question.  I'm

23  sorry.

24  Q    Let me, let me ask it a different way.

25      To your knowledge, did, did, did Mr. Martin conduct a

DENNIS - DIRECT                                                      337

1  review of, of financial transactions in order to help guide him

2  on what the value of credits should be for his assumption?

3  A    I don't recall that he did.

4  Q    Okay.

5       Let's go to Exhibit 5 of defendants' materials.  And this

6  is -- is this a graph that you prepared?

7  A    It is.

8  Q    Okay.  What does this show in Exhibit 5?

9  A    So what this shows is, is looking at triangular receipts

10 specifically.  So that's one of the forms, or one of the parts

11 of the triangular transaction, one of the columns we'd shown

12 earlier.  And what this is showing is triangular receipts

13 specifically for the 49.90 phone plans.  So that was one of

14 the, the types of, of things you could purchase as part of a

15 triangular transaction.  And what this shows is over time the,

16 the total net equity and associated number of transactions --

17 so the blue bars are the net equity value that corresponds to

18 the Y axis on the left as net equity -- and then the orange

19 line which kind of follows that, naturally, is the quantity of

20 those transactions.  You can see the quantity values on the

21 right on that secondary axis, number of transactions.  And it

22 shows it by, by month, kind of over time during the course of

23 TelexFree.

24 Q    Okay.  And what, what specifically did you observe in

25 reviewing this quantity or the volume of receipts from 49.90

1    phone plans over time?

2    A    It changes fairly, fairly dramatically.  As you can see,

3    in, in March of 2014 there is a, a significant, significant

4    spike in, you see all of a sudden, in the triangular receipts

5    related to 49.90 phone plans.

6    Q    Okay.

7    A    And correspondingly, there'd be, on the other side, there'd

8    be triangular payments.

9    Q    Okay.  And so this -- is -- I, I put a box around the -- is

10   that the spike that you're referring to?

11   A    It is.

12   Q    Okay.  And incidentally, are you aware of any reasons that

13   there may have been a spike in phone plan sales in March of

14   2014?

15   A    Yes.  My understanding is that around that time there's a

16   requirement by TelexFree, that TelexFree put in place, I think

17   as part of its attempt to dissuade itself as a, as a Ponzi

18   scheme, that each user account needed to, to sell at least one

19   phone plan.

20   Q    Okay.  And so the assumption would be -- if we use the

21   assumption that triangular transfers were for a dollar, what

22   would, what would that assumption carry through to with respect

23   to a spike in purchase of phone plans in March and April of

24   2014?

25   A    So just following the, the tallest bar there in blue, the

1   March 2014, you can see it, it's, you know, roughly, halfway

2   between 140 and 160 million in, in net equity.  So that means

3   that there's, roughly, 150 million of net equity in just 49.90

4   phone plans that occurred in March.  And then in April -- and

5   again, we know that's not a full month.  I believe it's mid or

6   later half of that month -- you see the net equity

7   corresponding with 49.90 phone plans of approximately 130

8   million.

9       So that's, roughly, you know, I think, in my report I think

10  it comes out to, you know, about 270 million -- and it's

11  rounding there -- 270 million across those two months.

12  Q   Okay.  And what does this graph then, what significance do

13  you attach in terms of, of exploring the, the assumption of a

14  dollar per credit?

15  A   Well, the assumption here because this is a triangular

16  transaction is that every time a 49.90 phone plan was sold,

17  that someone actually collected 49.90 in, in cash.  And when I

18  see a spike like this, given the magnitude in both dollars and

19  volume -- so we have to be clear.  If we look at the, the

20  orange line in those two months, we see about, you know, just

21  shy of 3 million transactions in March and maybe 2-1/2 million

22  there in, you know, in April, you know, we're looking at over 5

23  million transactions in, you know, a little more than a month

24  that needed to be collected individually.  And the question is

25  is it reasonable to collect that amount of money in $49

1   increments in, you know, a 30-day or 45-day period.

2   Q   And -- okay.  So I, I think I can proceed to the next

3   exhibit.  Let's go to Defendants' 9.  I think we've seen this

4   one as well, but this is Defendants' Exhibit 9.

5       And just for the record again, what does this show?

6   A   Again, this is our, our top 100 net losers.

7   Q   Okay.  And I'm just going to call your attention to the,

8   the second -- so we've talked about Du Painting is the top net

9   looter -- excuse me -- loser.  Freudian slip -- loser according

10  to Mr. Martin's aggregation, but I wanted to direct your

11  attention to the second name, which we haven't talked about.

12      What observations did you make about this user aggregation?

13  A   Sure.

14      So No. 2 there, the name Mengwi, Rep ID 21036267, we can

15  see that she had 16,909 accounts that were aggregated to her

16  for total net losses of, of $843,759.  And we could do the math

17  here by dividing those -- and I, I've looked in the data -- but

18  every one of those is a 49.90 phone plan that was purchased by

19  this aggregation, or into this aggregation in March or April

20  2014.

21  Q   Okay.  So let's -- just assuming that every triangular

22  transaction occurred with a dollar-per-credit transaction

23  included, what does this suggest that Mengwi paid out of pocket

24  in, throughout the time of involvement with TelexFree?

25  A   So this, this would support that she paid $843,759 in cash

1   for 16, almost 17,000 phone plans in a one-month period and

2   that, correspondingly, someone collected $843,000 in cash and

3   it increased their net equity.

4   Q    Okay.  And if you look at -- again, we're looking at the

5   second row and we've lost the name.  We can't see it, but just

6   looking at the second row -- what other observations did you

7   make about Mengwi's aggregation as it relates to credit

8   transfers?

9   A    She didn't have any.

10  Q    Okay.  And what, if any, significance did you draw from

11  that?

12  A    Only that she -- I'm not sure what she was trying to do or,

13  I mean, she bought a bunch of phone plans.  I'm not sure that

14  she operated outside of that, I guess is what that tells us.

15  Q    Okay.  And did, did this show, incidentally, any triangular

16  receipts for Mengwi?

17  A    No.

18  Q    Okay.

19       By the way, I, I think I, again, did -- I may have done too

20  quick of a hook -- but did, did Mengwi file a proof of claim,

21  if you're able to tell?

22  A    Certainly no -- none of the claims filed were matched to

23  her aggregation.

24  Q    Okay.  And is that -- is what's claimed in this exhibit

25  that you prepared, does that refer to whether you could pair it

1   to a, a proof of claim that had been filed?

2   A    Yes.

3   Q    Okay.

4        What other, besides the specific value issues, what other

5   issues did you consider in, in your analysis of whether a

6   dollar-per-share assumption for triangular transactions was

7   reasonable?

8   A    So I certainly considered what Mr. Martin said yesterday in

9   trading more for a dollar and Mr. Balan's affidavit that they

10  traded less than a dollar.  And some of the realities that,

11  that surround the marketplace as created and, and the

12  conditions with which these people are operating in terms of

13  the, the  various business deals, working in groups, collection

14  issues that, that would correspond to that.

15  Q    Okay.  And by "collection issues," what are you

16  specifically referring to?

17  A    Well, as we can see, the volume of transactions, of

18  triangular transactions and credit transfers was, was massive

19  and the assumption is in each one of those they, they always

20  collected a hundred cents, a hundred U. S. dollars for each of

21  those credits, or one U. S. dollar for each, each credit.  And

22  what I answer, Mr. Rona -- and it makes logical economic sense

23  -- is that, you know, likely didn't, well, certainly, according

24  to Mr. Balan, didn't hold true.

25  Q    And in your experience as, in doing business valuation are

1    accounts receivable, to what extent do accounts receivable get

2    discounted for collection issues?

3              MR. BENNETT:  Objection.

4              THE COURT:  Basis

5              MR. BENNETT:  Your Honor, this is not a business

6    valuation and it's not an individual business that you'd be

7    assessing a, a business' accounts receivable.  We're talking

8    millions of individuals with separate accounts and, therefore,

9    he's expressing an opinion across the board on millions of

10   different individuals all under different circumstances,

11   different transactions, none of which we know anything about.

12             THE COURT:  I guess it's a relevance issue.  I'll take

13   it for what it's worth.

14             You may answer, Mr. Dennis.

15             THE WITNESS:  I'm sorry, Mr. Rona.  Can you just

16   repeat the question?

17   BY MR. RONA:

18   Q    Okay.  I'm going to do my best to try to remember it.

19        Based on your experience and knowledge of, in the field of

20   business valuation, to what extent are accounts receivable in

21   any way discounted to reflect collection issues?

22   A    There are absolutely -- I mean, it obviously depends on a

23   case-by-case basis -- but there are certainly accounting

24   concepts in doing business valuation.  One would consider that

25   the collectability of A/R and I can tell you certainly from

DENNIS - DIRECT                                                    **344**

1   personal experience of being in this business that not all my

2   A/R is always collected.  Often, it's challenging to do

3   collections, particularly when you're trying to collect in cash

4   and particularly from a large sum of people.

5   Q   Okay.  And so I think we've covered your two net equity

6   issues.

7       So based on those two issues, what is your opinion as to

8   the reliability of Mr. Martin's net equity calculations?

9   A   I don't think it's particularly reliable.  I think that,

10  that credit transfers in and out reflect the true investment

11  and receipt of cash that these people made in, in the system.

12  And also, I think with relative inconsistency we are capturing

13  in the, in the calculation of net equity the amount of

14  triangular receipts that someone would collect without

15  considering the outflow they need to do, in large part, to get

16  those credits in the first place.  That's an inconsistent

17  assumption.  We also see relative to net equity that the

18  dollars that changed hands can and did differ from the amount

19  of credits -- 'cause that's all that's recorded in SIG, for the

20  most part -- the credits that are recorded as part of

21  triangular transfers or internal transfers between

22  participants.

23  Q   Okay.  And based on your analysis of Mr. Martin's

24  aggregation methodology and based on your analysis of

25  Mr. Martin's net equity calculations, what is your overall

1   conclusion or opinions as to the reliability of Mr. Martin's

2   proffered expert reports?

3   A   So, I mean, for each of the reasons individually -- and

4   again, certainly in, in combination -- I don't think it's

5   reliable in terms of the, the net equity for each of the

6   participants.

7   Q   Okay.  Thank you.

8           MR. RONA:  I have nothing further at this time, your

9   Honor.

10          MR. BENNETT:  Should I resume, your Honor, or should I

11  begin?

12          THE COURT:  Yes.  Let's turn the floor over to

13  Mr. Bennett for cross examination.

14          Go ahead.

15          MR. BENNETT:  Just one second.  I prefer to stand, so

16  I'm just going to do a slight rearrangement here.

17                         CROSS-EXAMINATION

18  BY MR. BENNETT:

19  Q   Good afternoon, Mr. Dennis.  How are you?

20  A   Well, thank you.

21  Q   Okay.  Do you need or break or anything?  Are you ready to

22  begin?

23  A   I, I will shortly, but let's commence, if you don't mind,

24  and we can -- maybe in a little bit.

25  Q   Fine.

1    Let's begin with your understanding of what the basic task

2  was that the trustee and, therefore, the basic task that the

3  trustee asked Huron to perform for him.  Would you agree with

4  me that in connection with the TelexFree Ponzi scheme there

5  were certain creditors or certain participants who ended up at

6  the end of the day being net winners?  In other words, they

7  received more from participating in the scheme than they put in

8  and those who ended up as net losers.  Would you agree with me

9  with that?

10 A   That there were net losers and net winners as a result of

11 their participation, yes, I'd agree with that.

12 Q   Okay.  And would you agree with me -- before I ask you

13 that.

14    Do you have any familiarity with Ponzi schemes?

15 A   Outside of the three years on this?

16 Q   Outside of this.

17 A   Only what I've read in the paper and then to the extent

18 that a large portion of my work deals with fraud, generally,

19 all sorts of fraud.  And I think there are areas of fraud that

20 overlap with, with Ponzi schemes.

21 Q   Okay.  And you're aware, sir, that in a Ponzi scheme it's

22 only the net losers who are entitled to get distributions,

23 correct?

24 A   That would be a legal matter.  I'm not sure I have an

25 understanding one way or the other.

1   Q   Well, do you under, do you understand that in the context

2   of this case one of the things that, one of the reasons why

3   they, why Huron was asked to determine who are the net winners

4   and who are the net losers was for the purposes of

5   distribution?

6   A   Yes.   That's my understanding.

7   Q   And do you understand that the whole reason for, for

8   developing the ePOC system was to determine who were the

9   claimants who had an allowed claims and the amount of their net

10  losses for distribution, correct?

11  A   I think Martin, Mr. Martin testified to that yesterday.

12  Q   Okay.   And you understood, sir, that there were certain

13  orders entered by the Court in this case early on, early in the

14  proceedings, with respect to, first, that TelexFree was, in

15  fact, engaged in a Ponzi scheme?

16  A   I believe I read that.   I certainly read at least some of

17  the orders relative to the calculation of net equity.

18  Q   Okay.   And you understood that there were certain orders

19  entered with respect to the presumptions which flowed from

20  finding that TelexFree was entered in, was engaged in a Ponzi

21  scheme?

22  A   I'm not sure I understand.   What, what presumptions?

23  Q   There were certain presumptions that flowed from the fact

24  that, that TelexFree was a, participated in a Ponzi scheme,

25  that a Ponzi --

1    A    I guess I don't know what -- I apologize.  Go ahead.

2    Q    Was engaged in a --

3              MR. RONA:  Your Honor, I'm going to object to, I, I

4    think, just the, the use of the word "presumption" in this

5    context.

6              MR. BENNETT:  Okay.

7              THE COURT:  What's the objection?

8              MR. BENNETT:  I'll rephrase.  I'm sorry, your Honor.

9              MR. RONA:  It's -- I think it's confusing and

10   ambiguous whether he's referring to legal presumptions or

11   whether he's referring to scientific presumptions.

12             THE COURT:  Why don't you clarify, Mr. Bennett.

13             MR. BENNETT:  Okay.

14   BY MR. BENNETT:

15   Q    Sir, are you familiar with the concept that in a Ponzi

16   scheme there is a presumption that the debtor -- in this case

17   TelexFree -- is insolvent and has been insolvent at all times?

18   A    I'm certainly aware TelexFree is, is bankrupt and hence the

19   need for a trustee.  I'm not sure I thought about it from the

20   concept of, of trying to link a, a presumption that they're a

21   Ponzi scheme with that particular notion.

22   Q    Okay.  So you're not familiar with the concept, the legal

23   concept of, that flow from the finding of a, that a debtor was

24   engaged in a Ponzi scheme?

25   A    I'm, I'm not a lawyer and I haven't tried to make any legal

1    presumptions one way or the other.

2    Q   No.  I'm just asking if you're aware of them, not whether

3    you, if anybody instructed you on them.

4    A   No.  I was not instructed as to the presumptions associated

5    with TelexFree being considered a Ponzi scheme.

6    Q   Okay.  And, therefore, you're not aware of the presumption

7    with respect to how accrued and, how accrued credits should be

8    handled in connection with the TelexFree Ponzi scheme?

9           MR. RONA:  I'm going to object to that question.

10   Again, it's unclear to me if this is a, a legal subject or

11   should be handled as referring to an evidentiary approach.

12          MR. BENNETT:  Mr. Rona, I'm -- I don't mean to address

13   you directly.

14          Judge, what I'm referring to here is the legal

15   framework, the presumption that flowed from the findings and

16   whether or not this expert was aware of those findings and

17   whether or not it would have impacted his opinion.  I'm not

18   asking him to render an opinion on it, just whether he was

19   aware of those legal presumptions.

20          THE COURT:  Right.  So sharpen your questions so that

21   it's clear what, more clear that you're asking about these

22   legal presumptions.

23          MR. BENNETT:  Okay.

24   BY MR. BENNETT:

25   Q   Mr. Dennis, were you aware that there was a legal

1  presumption in connection with a Ponzi scheme case,

2  particularly in connection with this Ponzi scheme case, that

3  the accrued credits had no value in the context of determining

4  a claim?

5  A   So what I -- maybe to make sure I'm talking about the same

6  thing and what I quote in my report was a portion of a court

7  order that, that described, you know, what was to be and was

8  not to be included in net equity, the definition of "net

9  equity."  Is that what you're referring to?

10 Q   That's part of it.  Okay.  Let's ask that.

11     Did you accept that definition that the Court entered in

12 your determination of net equity?

13 A   I, I did.  That's the Court's definition and I, I accepted

14 that, those words, certainly.

15 Q   Okay.  Did that definition include whether transfers of

16 credits between participants should be included or not included

17 in the net equity calculation?

18 A   If you could break --

19        MR. RONA:  Objection.  I, I apologize.  But I think

20 that's ambiguous as well.

21        THE COURT:  Overruled.  I don't think it's ambiguous.

22        If you understand the question and can answer it,

23 please do, Mr. Dennis.

24        THE WITNESS:  With respect to the, the definition --

25 and it'd be helpful to have up the specific words so we could

1  be clear here -- it doesn't say the words "transfer in or out."

2  My recollection -- and again, I can, I can read it -- is that

3  it said the receipt, right, by participants and then says

4  including triangular receipts, right?  I don't think it says

5  excluding internal transfers, if that's what you're asking.

6  BY MR. BENNETT:

7  Q   Why don't we -- let's put the definition up.  We have to go

8  Mr. Martin's report.

9        MR. BENNETT:  Actually, it's one of the slides, Andy.

10  Let's go to a slide.  Slide 11.  Okay.

11  BY MR. BENNETT:

12  Q   Okay, Mr. Dennis.  Can you see what we had marked

13  previously, or had identified previously as, as No. 11?  That's

14  the definition of "net equity" that was used.

15  A   Yes.  I think that was one of, if I recall, three bullets

16  or maybe more as part of the definition.

17  Q   Okay.  And did you understand in drawing your opinions that

18  that definition of "net equity" included transfers between

19  participants?

20  A   Again, I, I'm not a lawyer and trying to make legal

21  assumptions, but I, I read the plain language of what it says

22  here and from a financial perspective, I think that a credit

23  transfer would be included in here.

24  Q   So you interpreted the definition, the Court's definition

25  of "net equity" to include transfers of credit?

1   A    From a financial perspective, absolutely.  It says, "The

2   amount invested by a participant into the debtor's scheme,

3   including amounts pursuant to triangular transactions."  I

4   didn't read that to mean only including.  It says -- it doesn't

5   say "including, and not limited to" -- "and to the extent the

6   participant is purchasing credits, TelexFree credits that are

7   recorded in TelexFree system for purposes of the TelexFree

8   scheme," then I think that would fall under investment.

9   Q    Okay.  Did you get any legal advice on that point?

10  A    I'm, I'm simply talking about the word "invested" --

11  Q    No.  Excuse me.

12  A    -- and the plain language from a financial perspective.

13  Q    Mr. Dennis, please.

14  A    I apologize.

15  Q    Listen to my question.

16       Did you receive any legal advice on that point?

17  A    No, I didn't.  Apologies.

18  Q    Were you -- did you seek any legal opinions from Mr. Rona

19  or someone else with respect to what you should include within

20  the definition of "net equity"?

21  A    No.

22  Q    Okay.

23       Now, sir, you understood that the, the, the task before

24  Mr. Martin and Huron was to take 17 million user accounts and

25  find some way to aggregate those to individual participants,

1   correct?

2   A   I think the number is actually slightly less than that.  I

3   think 17 was closer to the totality, including Ympactus.  So, I

4   guess, the portion of TelexFree, I believe, is less, but I

5   understand they needed to aggregate those.

6   Q   Well, sir, when you got the SIG account you understood that

7   there were, in fact, 17 million different user accounts in SIG

8   which included both the TelexFree and the Ympactus

9   participants, correct?

10  A   I thought the number was slightly less, but that sounds

11  close.

12  Q   Okay.  And you understood that one of the first tasks would

13  have been to separate out the Ympactus participants from the

14  TelexFree participants, correct?

15  A   Yes.

16  Q   Okay.  And you heard Mr. -- you looked at Mr. Martin's

17  report and you heard Mr. Martin testify as to the procedures

18  which Huron used in order to segregate the Ympactus

19  participants from the TelexFree participants, correct?

20  A   That's correct.

21  Q   Okay.  And if I'm correct in my review of your report, you

22  do not comment at all on the procedures that Huron used to

23  separate the TelexFree participants from the Ympactus

24  participants, is that correct?

25  A   It is.

DENNIS - CROSS                                                    354

1   Q    So you're not disputing that procedural methodology

2   employed by TelexFree?

3   A    No, I'm not.

4   Q    And you understand that the process, the aggregation

5   process that was ultimately developed by, by Huron was the same

6   aggregate, was the same aggregation process used both in the

7   determination of claims and in the determination of net

8   winners?

9   A    Yes.  I believe they only had, had one aggregation process.

10  Q    Okay.  And you understand that that aggregation process

11  was, has already been tested through the courts in connection

12  with various claims objections?

13        MR. RONA:  Objection as to "tested," but --

14        THE COURT:  Why don't you rephrase the question,

15  please, Mr. Bennett.

16  BY MR. BENNETT:

17  Q    You understand, Mr. Dennis, that there has been various

18  objections to claims made by the trustee in this proceeding?

19  A    Yes.  That's my understanding.

20  Q    And you understand that the trustee in making those

21  objections premised those objections upon the aggregation

22  process that, or methodology, that was developed by Huron?

23  A    I, I'm trying to think back.  Could you ask that question

24  one more time?

25  Q    Yes.

1    You understand that the claims objections that were made by

2  the trustee were based upon the aggregation methodology

3  developed by Mr. Martin and Huron?

4  A   I, I guess I don't know all the basis on which the trustee

5  may have objected.

6  Q   Okay.  You didn't look at any of the objections and look at

7  any of the issues that were raised and any of the evidence that

8  was submitted in connection with those claims objections?

9  A   I'm trying to recall.  Just to be clear, I may have looked

10  at some of Mr. Martin's affidavits that were submitted.  For

11  example, yesterday, the, the Zagarella, would that qualify what

12  you're talking about?

13  Q   That was one of the ones that was submitted, yes.

14  A   I, I may have reviewed that and, and maybe one or two

15  others.

16  Q   Okay.  And in reviewing those you noted that Mr. Martin in

17  his affidavit was premising those affidavits upon his

18  aggregation methodology?

19  A   I did.

20        MR. RONA:  I, I apologize.  I'm going to object, I

21  think, in light of the reference to yesterday's testimony on

22  what it means to "premise."  Because I believe Mr. Martin

23  testified to doing a secondary analysis.  And so now I'm

24  confused whether we're referring to the original aggregation or

25  the original, plus the secondary analysis.

1    MR. BENNETT:  I'm referring to just the aggregation

2    process itself, whether he did it in the initial aggregation to

3    determine an objection to the claim or whether he did a

4    secondary analysis.

5    THE COURT:  You can answer if you understand,

6    Mr. Dennis.

7    THE WITNESS:  I'm not -- you -- I'm not sure I do,

8    Mr. Bennett.  I apologize.

9    BY MR. BENNETT:

10   Q   Do you know what the basis was for which Mr. -- in the

11   Zagarella objection, do you know what the basis was -- strike

12   that.

13   A   I, I don't recall.

14   Q   In the Zagarella objection, do you know what the --

15   A   I don't recall.  Oop, sorry.  Please go ahead.

16   Q   -- what the basis was for the objection?

17   A   I don't recall.

18   Q   Sir, do I understand that you were provided, or you or

19   StoneTurn, was provided with the SIG system?

20   A   Yes, we were.

21   Q   Okay.  So you had access to the same information that Huron

22   had?

23   A   I'm sorry.

24   MR. RONA:  Objection.

25   THE WITNESS:  Go ahead, Mr. Rona.

1  BY MR. BENNETT:

2  Q   You can answer it.

3      Your -- you had access to the same information that Huron

4  had?

5  A   No.

6          MR. RONA:  Objection.

7          THE WITNESS:  That's true.

8          MR. RONA:  I apol -- I'm sorry.  Objection to "same

9  information."

10          THE COURT:  Overruled.

11          Can you answer that, Mr. Dennis?

12          THE WITNESS:  Are you, are you talking about within

13  SIG or categorically across the board?  I guess --

14  BY MR. BENNETT:

15  Q   Within SIG.

16  A   Yes.

17  Q   Okay.  You had the same -- you had complete and total

18  access to the SIG system, correct?

19  A   Yes, I believe so.

20  Q   In fact, you had -- Huron gave tutorials to StoneTurn as to

21  how the SIG system operated and different aspects of the SIG

22  system, correct?

23  A   Yes.  We, we had sat down and had a meeting and discussed

24  it.

25  Q   You had a couple of meetings, right?

1   A    Yeah, we did.  I'm trying to remember the contents of

2   those.

3   Q    Okay.  And you also had access to the complete ePOC, to the

4   ePOC system, correct?

5   A    We certainly had -- again, when you say "complete," there

6   are certainly, I think, aspects of the ePOC that we may not

7   have had.  We, we had certain data tables.

8   Q    Well, you were satisfied that you had sufficient

9   information from the ePOC in order to prepare your report and

10  draw the conclusions that you drew from the ePOC system, is

11  that correct?

12  A    Yes, I think so.

13  Q    And you don't dispute that Huron needed to develop a

14  methodology in order to link the various user accounts?

15  A    No, I don't dispute that.  I think one would need to

16  aggregate those.

17  Q    Okay.  Because if you don't aggregate the user accounts,

18  you can't determine the net winners and the net losers,

19  correct?

20  A    Without defining a single user as a single participant.

21  Q    And certainly, from what you know, that wouldn't be the

22  correct methodology in order to determine net winners and net

23  losers, would it?

24  A    I wouldn't think so.

25  Q    So it's clear, then -- and you agree with Mr. Martin --

1  that one of the first tasks was to develop this methodology to

2  link accounts?

3  A    I do agree with that.

4  Q    And you, do you agree with Mr. Martin that there were at

5  least two types of methodologies that could be employed, the

6  deterministic and the probabilistic?

7  A    Those are certainly two methods, yes.

8  Q    Okay.  And the deterministic methodology is a recognized

9  methodology for linking accounts, correct -- I'm sorry -- for

10  linking data?

11  A    It is, it is recognized, yes.

12  Q    Okay.  And I believe in your report you criticized

13  Mr. Martin's use for the deterministic method because you

14  didn't find any cases in which it was used in a Ponzi scheme,

15  is that correct?

16  A    I don't think those were my words, no.

17  Q    Did you find any situations where the deterministic

18  methodology was used in a Ponzi scheme to determine net

19  winners?

20  A    Have I personally?

21  Q    Yes.

22  A    No.

23  Q    Have you found any situations where the probabilistic

24  methodology was used to determine net winners and net losers in

25  a Ponzi scheme?

1    A    Not to my knowledge, no.

2    Q    Have you found in your research any Ponzi schemes which

3    were substantially similar to what we see in the TelexFree

4    situation?

5    A    I don't know that I researched or tried to research

6    comparable Ponzi schemes.

7    Q    Okay.  Would you agree with -- do you know whether or not,

8    then, whether the Ponzi scheme in TelexFree was fairly, a

9    fairly unique system in connection with Ponzi schemes,

10   generally?

11            MR. RONA:  Objection.

12            THE COURT:  Basis?  He can answer it if he knows,

13   Mr. Rona.

14            MR. RONA:  Fair enough, your Honor.

15            THE COURT:  I'm going to overrule that.

16            Do you know?

17            THE WITNESS:  I'm certainly not aware of any Ponzi

18   schemes that have these specific facts and data, no.

19   BY MR. BENNETT:

20   Q    You noticed in Mr. Martin's report that when he went

21   through the various tables in the SIG system that he located

22   four tables that he indicated were the principal tables to be

23   used in his, he used in the process of determining the net

24   winners and the net losers and those tables were the account

25   table, the invoice table, the transfer table, and the bonus

1  table, is that correct?

2  A    That's my recollection what's in -- in -- his --what was in

3  his report, yes.

4  Q    And am I correct your report doesn't comment on

5  Mr. Martin's selection of those four tables out of the SIG

6  system as being the most relevant and significant tables to use

7  in developing the process?

8  A    No.  My report did not comment on that.

9  Q    Okay.  Do you agree with Mr. Martin that those were the

10  four most significant tables?

11  A    That's actually not something that we looked to assess one

12  way or the other.

13  Q    Okay.  And I assume you didn't -- you didn't -- you don't

14  disagree with Mr. Martin that there were, as to the types of

15  transactions that were, the, the types of transactions that

16  occurred within the TelexFree system, correct?  In other words,

17  the direct transfers between a participant and TelexFree and

18  the triangular transactions between a participant and

19  TelexFree, is that correct?

20  A    That I don't -- I'm sorry.  Can you ask that one more time?

21  Q    Do you agree with Mr. Martin's definition -- strike that.

22      Do you agree with Mr. Martin's findings that the principal,

23  that the transactions that occurred between a participant and

24  TelexFree were direct transactions where somebody either

25  bought, where somebody bought a plan or bought or redeemed

1  credits or triangular transactions where someone, someone was

2  recruited by a recruiting promoter and then the, TelexFree

3  would invoice that particular recruited person?  Do you agree

4  with those as the principal transactions?

5          MR. RONA:  Objection --

6          THE WITNESS:  Yes.

7          MR. RONA:  -- as to the word "principal," your Honor.

8          THE COURT:  Overruled.

9          THE WITNESS:  So I think there were eight different

10  categories of, of transactions, as least as, as Mr. Martin

11  defined them.  You know, the substance of our analysis is we

12  were looking at the, the four -- and this is different four

13  tables, I should be clear -- that Mr. Martin provided were,

14  which were the output of his analysis.

15          So those were categories, those eight categories were

16  in those tables that we, that we utilized.  I'm not sure we --

17  we -- we did not try to assess whether there was a ninth type

18  of transaction within SIG.

19  BY MR. BENNETT:

20  Q   And with respect to the transactions you, as we go through

21  them, you'd agree with me that the direct transactions; in

22  other words, the buying and the selling of -- of -- the buying

23  of a plan from TelexFree or the buying or redeeming of a credit

24  from TelexFree, that was, that was an exchange of, of

25  consideration or value between an individual participant and

1   TelexFree itself, correct?

2   A   What were, what were the two types of transactions you

3   mentioned?

4   Q   They either bought a membership from TelexFree or they

5   bought or redeemed credits from TelexFree.

6   A   So we're talking about instances here where the, the

7   participant paid actual cash to TelexFree directly?

8   Q   Yes.

9   A   And in those -- and I'm sorry.  And your question is did

10  they, did they give actual cash?

11  Q   No.  My question is that was a transaction that just

12  involved Telex, actually involved the participant and TelexFree

13  and actually impacted the financial statement of TelexFree,

14  correct?

15  A   I guess I hadn't thought about what transactions impacted

16  the financial, financial statements of TelexFree.

17  Q   Okay.  But clearly, direct transactions would have directly

18  impacted the financial statement of TelexFree, correct?

19  A   Again, when you say "direct transactions," you're talking

20  about when the participant either gave cash to TelexFree or

21  received cash?

22  Q   That's how we're defining it, yes, sir.

23  A   Then, then, yes, I would -- 'cause it would change their,

24  their cash balance of TelexFree if they either gave cash into

25  TelexFree directly or received cash from TelexFree.

1  Q   Okay.  In a triangular transaction, would you agree with me

2  that it also had a direct effect upon the TelexFree financial

3  condition in the sense that it issued a invoice and it, relief

4  of a credit liability

5           MR. RONA:  Objection, your Honor.

6           THE COURT:  What's the objection?

7           MR. RONA:  The objection is I think this is veering

8  into a topic that I thought Mr. Bennett wanted to avoid, but it

9  sounds like an accounting question as to TelexFree.

10          THE COURT:  Overruled.

11          Could you answer the question, Mr. Dennis?

12          THE WITNESS:  Can you ask it one more time?  I want to

13 make sure I'm clear.

14 BY MR. BENNETT:

15 Q   Let's do it this way.  You, you listened to Mr. Martin

16 yesterday, correct?

17 A   I did, yes.

18 Q   You heard Mr. Martin describe that a, a triangular

19 transaction had a financial impact on the balance sheet of

20 TelexFree, correct?

21 A   I recall he said that, yes.

22 Q   Okay.  And do you agree with him on that?

23 A   I don't know that I -- part of what I was asked to do was

24 not consider to what extent TelexFree's balance sheet may or

25 may not have been impacted, but to look at the methodology that

1    was used to calculate net equity for participants.

2    Q    However, when we get to inter-participant transactions --

3    in other words, transfers by, credits by and between

4    participants -- that had no effect upon the TelexFree balance

5    sheet.  That was purely a transaction between the two

6    participants and the only, only involvement that TelexFree

7    would have had at all on that would have been recorded the

8    transaction on its books?

9            MR. RONA:  Objection, your Honor.

10           THE COURT:  Basis?

11           MR. RONA:  Misstates prior testimony as to no impact

12   on the company's balance sheet.

13           THE COURT:  Well, it -- I -- this is Mr. Bennett's

14   question as to what he understood the testimony to have been.

15   If Mr. Dennis is capable of answering, he should answer.

16           MR. RONA:  Okay.

17           THE COURT : So go ahead, Mr. Dennis.

18           THE WITNESS:  I guess -- so I guess to the extent that

19   TelexFree on its balance sheet had separate amounts of credits

20   for each of the individual participants and those credit

21   balances were shifting, then I think it would change the, their

22   individual balances in the system.

23   BY MR. BENNETT:

24   Q    But not change the, not change the overall financial impact

25   on TelexFree?  If you took $1 from A and gave it to B, that

1   doesn't change.  You still got the $1 of liability out there,

2   correct?

3   A   I guess -- I don't know.  I haven't seen any of TelexFree's

4   -- I'm not aware of any TelexFree financial statements relative

5   to balance sheets or otherwise that have been produced in this

6   matter, nor how, how individual transactions would flow to

7   those.

8   Q   Okay.  So you're telling us that you have no knowledge as

9   to how these transfers between participants was treated by

10  TelexFree?

11  A   On its financial statements?

12  Q   Yeah.

13  A   I, I've seen no debit and credit entries that -- that --

14  that would roll up into a balance sheet, income statement, or

15  any other form of consolidated financial statement.

16  Q   Your answer to that question is you don't know how, if at

17  all, these credit transfers were reflected on TelexFree's

18  financial statements?

19  A   I'm not aware of any data that's been produced that would

20  show that.

21  Q   Now, sir, would you tell me where in your report you

22  prepared a probabilistic methodology to measure the net winners

23  and losers?

24  A   I didn't prepare a probabilistic methodology.

25  Q   Nowhere in your report did you ever attempt to prepare a

1  | probabilistic methodology to apply to the TelexFree case?

2  | A    No, I didn't.

3  | Q    And I take it from that, then, we can't -- we -- you -- you

4  | made, drew no conclusion, then, as to whether, if a

5  | probabilistic report [sic] had been used, how much it may have

6  | varied from Mr. Martin's findings using the deterministic, the

7  | basic deterministic approach that he used?

8  | A    I'm sorry.  What -- you're saying I -- I -- can I compare

9  | the probabilistic method linkage that I didn't do to

10 | Mr. Martin's?

11 | Q    What I'm saying is, you can't compare the two results

12 | 'cause you didn't do one of them?

13 | A    That, that's right.  My assignment --

14 | Q    That's true?

15 | A    -- was not to re-create a new methodology and a new

16 | approach from scratch.

17 | Q    Right.  You didn't --

18 | A    Just identify issues in the existing methodology.

19 | Q    So you can't tell us whether, in fact, if Mr. Martin used a

20 | probabilistic methodology, it would have any material impact

21 | upon his findings of the various linking of user accounts?

22 | A    I don't know that that's true.  I think I very much

23 | identified specific case examples that would fit the conditions

24 | of a probabilistic record linkage and would be helped under

25 | that, that approach.

1  Q   I understand that, sir, but you, would you also agree with

2  me that since you didn't do it, didn't do a probabilistic --

3  strike that.

4      Since you did not apply a probabilistic method to try and

5  link these user accounts, you don't know whether in the end of

6  the day the results you would have got from filing or from

7  following a probabilistic method would have been any,

8  materially different from what Mr. Martin found from using the

9  deterministic?

10 A   Certainly absent redoing the process from scratch under a

11 completely different methodology to identify every single

12 difference, then, no, I wouldn't know where the differences

13 would lie or not other than the case examples I provided.

14 Q   But you didn't you apply any specific case examples in your

15 report as, as applying a probabilistic method to even any one

16 set of user accounts?

17 A   I think there are examples that I did show that very much

18 would have been picked up under a probabilistic method.

19 Q   No.  I, I understand you say they may have been picked up

20 under a probabilistic method.  What I'm asking you is did you

21 actually attempt, even in a minor, even with respect to one set

22 of user accounts, to apply the probabilistic methodology to see

23 what the result would be and to be able to compare that to what

24 Mr. Martin found?

25 A   No.  That was not part of my assignment.

1  Q   Now in connection with developing or employing a

2  probabilistic method, do you also have to determine keys for,

3  various keys in order to link those keys into identifiers?

4  A   How are you using the term "key" here?

5  Q   Name, e-mail, street address, any identifier.

6  A   Yeah, certainly.  You'd look to use identifiers, that's

7  correct.

8  Q   Okay.  So you would look to use keys much like Mr. Martin

9  used, looked to use keys in the deterministic method, correct?

10  A   I wouldn't say "much like."  You would certainly use the

11  same, talk about the same dataset.

12  Q   Okay.  And you would try to then develop how, combinations

13  of those keys, correct?

14  A   What do you mean by "combinations"?

15  Q   Name, e-mail, something else in order to make it into an

16  identifier.

17  A   No.  That, that's now how the probabilistic method works.

18  Q   Okay.  Then what -- then what -- how does it work with

19  respect to once you find the keys or the identifiers?

20  A   So it's not that you're finding them.  It's that what

21  you're doing is you're looking through at each of the

22  identifiers and you're making connections and using the math

23  and statistics to help define the weights of how well they can

24  identify a true or false match.

25  Q   Okay.  And Mr. Martin discussed that as, as having,

1    basically, a, two sets of, of data that you're now comparing.

2    I think he said a M axis and a L axis or an X axis or Y axis.

3    Is that correct?

4    A   I, I don't believe that's what he said.

5    Q   Okay.  Am I correct then?  But not -- applying the

6    probabilistic method, you apply one set of data against another

7    set of data and see how they link together?

8    A   You can, or you can take, you can take A and compare it to

9    B or you can take A and compare it to A.

10   Q   Okay.

11   A   They don't have to be different datasets.

12   Q   So what identifiers would -- did you -- what identifiers

13   did you identify in connection with the TelexFree matter?

14   A   I, I'm sorry.  What --

15          MR. RONA:  Objection.  That's confusing.

16          THE COURT:  Overruled.

17   BY MR. BENNETT:

18   Q   Okay.  In -- in -- if you were going to apply the

19   probabilistic method, what identifiers would you have used in,

20   in connection with TelexFree?

21   A   I certainly would have reviewed all of them as part of the

22   development of a probabilistic record linkage.

23   Q   All seven that Mr. Martin identified?

24   A   Yes, and -- and -- well, I don't recall if those are

25   individual or the, the pieces of them, but those and, and the

1   other data that exist within the system.

2   Q   Did you look at what was in those other -- in connect --

3   did you look at that other data?

4   A   I certainly reviewed the fields at least on a sample basis.

5   Q   Did you determine how many of those fields were, in fact,

6   related to other businesses?

7   A   I, I'm sorry.  What do you mean by "other businesses"?

8   Q   Well, did you understand that the principals of TelexFree

9   before they organized TelexFree have run other businesses, in

10  addition to Ympactus, but other businesses, other telephone

11  business?

12  A   I believe Mr. Martin testified to that yesterday.

13  Q   And do you believe that that -- did you understand from

14  Mr. Martin that that information from that other business

15  populated some of those other fields?

16  A   Well, let's be clear what, what I looked at.  What I'm --

17  when I say what I looked at, I didn't really go back into SIG.

18  The -- my primary analysis was on the four data tables that

19  Mr. Martin created, was, that was the output of his methodology

20  and aggregation.  And so when I'm saying I'm looking at

21  identifiers, those are identifiers that associated with, with

22  user accounts with TelexFree and, and Ympactus.

23      So I guess I'm, I'm not clear when you say "other

24  identifiers" what you mean there.

25  Q   Which identifiers -- again, tell me which ones they were.

1  A    So I have them certainly listed in, in my report, both the

2  ones that Mr. Martin considers and doesn't consider.

3  Q    Okay.  And with the ones he doesn't consider, would you

4  look -- did you look at what they were?  What information was

5  contained under each one of those identifiers?

6  A    Yes.  So for each of the, the user accounts -- and again,

7  this is under Mr. Martin's and Huron's tables they provided --

8  there was a, a table -- and it's named specifically in my, my

9  report --- that was entitled TelexFree Accounts and within

10 TelexFree Accounts there was a, there's a record for each

11 individual user.  And within that user record there was a

12 number of different fields and identifiers, including things

13 like name, e-mail, phone number, address, I think there was a

14 tax ID, a neighborhood.  And again, I have a number of them

15 listed in my report.

16 Q    Okay.  So let's look at your report.

17      MR. BENNETT:  If you could, can you find his report?

18      MR. LIZOTTE:  Okay.

19      MR. BENNETT:  Would you go to Page 11, if you could,

20 Paragraph 34?

21 BY MR. BENNETT:

22 Q    Okay, Mr. Dennis.  Do you see Paragraph 34 of your report?

23 A    Yes.  Thank you.  That's just what I was referring to.

24 Q    Okay.  And you list at the beginning of it the identifiers

25 that Mr. Martin uses, correct?

1    A    I do, in, in the table above, I believe.

2    Q    Okay.  And then you just list a series of other potential

3    identifiers, right?

4    A    I do.

5    Q    Okay.  And your only comment is that, "The Martin report

6    neither discusses why these additional potential identifiers

7    were not utilized as part of the aggregation algorithm, nor the

8    extent to which their inclusion may have impacted the overall

9    aggregation process."  Did I read that correctly?

10   A    I think it says "results of the aggregation process," but

11   yes.

12   Q    So what did you do to see whether or not any of these

13   additional identifiers would have impacted the aggregation

14   process?

15   A    Other than review them as part of the case examples, I

16   didn't attempt to redo any type of, of aggregation process in

17   whole.

18   Q    Okay.  So you didn't make any determination whether or not

19   if Mr. Martin had continued to go on and add, say, Social

20   Security number or birth date, how that may or may not have

21   affected his aggregation process, is that correct?

22   A    That's accurate.  I didn't attempt to redo it.

23   Q    So you criticized Mr. Martin for not using those, but you

24   don't give us any guidance as to whether or not, had he used

25   them, there'd be any impact, is that correct?

DENNIS - CROSS                                                    **374**

1    A    I'm not saying I couldn't necessarily -- I think the words

2    I say are not that he, I criticized him for not using it, but

3    there's no explanation in his report about why he didn't use it

4    or to what extent had he used it it would have changed.

5    Q    Okay.  What I'm asking you, though, is you didn't do

6    anything to see whether or not they would, in fact, have an

7    impact?

8    A    I did not try to add a 14th step or change any of the steps

9    to see how they'd be different.

10   Q    You're not giving any opinion as to whether anything would

11   have changed in Mr. Martin's report had he added a 14th step or

12   added another identifier?

13   A    If it would have changed or how it would have changed?

14   Q    If it would have changed.

15   A    I would guarantee that if you change one of his steps, that

16   his output would be different.

17   Q    Okay.  Well, where in your report do you say that, sir?

18   A    Mr. Martin testified that, to that yesterday.

19   Q    No.  Sir, where in your report do you say that?

20   A    That if his steps were different, they'd come out with a

21   different result?

22   Q    Yeah.

23   A    I guess I don't say that as explicitly as such.

24   Q    Yeah.  And where do you say what the impact would be if

25   there was a change?

1    A    As I said, I haven't attempted to recalculate it.

2    Q    So you criticize, but you don't offer anything of substance

3    or beyond that, is that correct?

4    A    No, that's not correct.

5         (Pause)

6              MR. BENNETT:   Okay.   Would you go to Page 15, please?

7    BY MR. BENNETT:

8    Q    Now, Mr. Dennis, I'm showing you Page 15 in your report and

9    there is, under Paragraph 45, there is five bullet points which

10   your criticism, summarize your criticism of Mr. Martin's

11   aggregation process, is that correct?

12   A    That's accurate.

13   Q    Okay.   And the first one states that Mr. Martin didn't

14   provide any research or studies to demonstrate that the

15   deterministic methodology was appropriate for Ponzi schemes, is

16   that correct?

17   A    I -- you're, you're paraphrasing there slightly.

18   Q    What's that?

19   A    So I think what I said was that if I --

20   Q    Okay.

21   A    I'm sorry.   Go ahead.

22   Q    Did I paraphrase correctly?

23   A    What I -- I'm sorry.   I lost -- what was your specific

24   wording?

25   Q    Your specific criticism was Mr. Martin didn't provide any

1   research to show that the deterministic methodology would be

2   appropriate to be used in Ponzi schemes?

3           MR. RONA:  Objection.

4           THE WITNESS:  If -- I think what I -- I'm sorry.  Go

5   ahead, of course.

6           THE WITNESS:  Why, Mr., Mr. Rona?

7           MR. RONA:  Well, I, I mean, I think he could read from

8   the document, your Honor, and ask if, if those were the words

9   written.  I don't believe you can paraphrase in a way that may

10  or may not change the meaning and ask if I'm paraphrasing

11  accurately.  So I think that --

12          THE COURT:  Well, and he asked -- I'm not sure what,

13  what, what value it is to tell me what, whether the

14  paraphrasing is correct.  The words are on the page here,

15  Mr. Bennett.  Why don't you just read the, the language and,

16  and then ask Mr. Dennis -- Davis -- Mr. Dennis a question.

17          MR. BENNETT:  Okay.

18  BY MR. BENNETT:

19  Q   The words of the bullet point is, "Mr. Martin provides no

20  analysis supporting why deterministic record linkage, a

21  supposedly 'generally accepted methodology for linking

22  disparate patient medical information as part of research

23  studies' is appropriate for aggregating the potential

24  identifiers of user accounts in the alleged Ponzi pyramid

25  scheme."

1      Did I read that correctly so far?

2   A    You did.

3   Q    Okay.  I asked you early on whether or not deterministic

4   methodology was, was an accepted methodology.  You said it was.

5      Is there any reason why in your report you have to put that

6   in quotes?

7   A    Yes.

8   Q    Do you dispute that it's a generally accepted methodology

9   for linking information?

10  A    I think it depends on the context, which is what the

11  studies say, that something isn't generally accepted across the

12  board in all instances, but it's case and fact specific.

13  Q    Did you find any research that said deterministic

14  methodologies were not appropriate in Ponzi scheme cases?

15  A    They discuss in the context the nature of the data, not the

16  source of the data.

17  Q    No, sir.  Again, let's listen to the question.

18      Did you find any research that said that, specifically said

19  that deterministic methodology was not appropriate in a Ponzi

20  scheme case?

21  A    I didn't find any articles that talked about record linkage

22  in the context of Ponzi schemes.

23  Q    Okay.  So you're criticizing Mr. Martin for not finding any

24  research or studies, but you yourself will agree you didn't

25  find anything, either?

1  A    No, that's not what I'm criticizing Mr. Martin for.

2  Q    Okay.

3       Now you, you understand that when Huron and Mr. Martin were

4  charged with this task of coming up with an aggregation

5  methodology they had to use the information that was available

6  to them, correct?

7  A    I understand that they had information available to them,

8  yes.

9  Q    They didn't have any other outside, other than what was in

10 the SIG system, they didn't have any other outside sources of

11 information which would assist them in the linking process?

12 A    I don't agree with that.

13 Q    Okay.  What other outside sources did they have?

14 A    My understanding is that they had the availability to talk

15 to individuals.

16 Q    Okay.  And was that an appropriate process to go through in

17 trying to develop an aggregation theory?

18 A    To speak with people?

19 Q    Yeah.

20 A    It could be helpful to understand the information available

21 to you, sure.

22 Q    And you understood that if they talked to participants --

23 A    Yes.

24 Q    -- that would be helpful, right, to understand how the

25 system worked and how people dealt in the system?

1   A    Certainly.

2   Q    Okay.  And that they talked to employees of TelexFree to

3   see how the, how it worked, how the information was recorded,

4   correct?

5   A    Yes.  Are you referring as part of taking the various

6   tables and putting it back together, if you will?  Yes,

7   certainly.

8   Q    They also had the opportunity to talk to Homeland Security

9   and get the benefit of the investigation that Homeland Security

10  did into the Ponzi scheme, correct?

11  A    Are you saying that that's, that's information that they

12  considered?  Is that your question?

13  Q    Yes.

14  A    I understand they talked with Homeland Security, yes.

15  Q    You didn't talk to Homeland Security, did you?

16  A    I did not talk with Homeland Security.

17  Q    And how many participants did you talk to?

18  A    Directly?  I didn't talk to any participants directly.

19  Q    Okay.  How many summaries of interviews did you look at

20  from participants?

21  A    I understand there are none available and Mr. Martin didn't

22  keep those records.

23  Q    Well, how about your, yourself?  Did you have anybody go

24  out and get interviews and provide you with summaries of

25  interviews?

1   A    No, I didn't.

2   Q    And I take it you didn't, obviously didn't have access to

3   any employees of TelexFree?

4   A    No, I did not.

5        (Pause)

6   BY MR. BENNETT:

7   Q    And with respect to the use of the ePOC system and the

8   information that was gathered from the ePOC system, other than

9   the ePOC system was there any other information available from,

10  from, from participants where they had an opportunity to, to

11  state the amount of their claims?

12  A    I'm trying to think about that.  That may have appeared in

13  some of what you referenced earlier, like the, the Zagarella

14  affidavit and things like that.

15  Q    No.  I said outside of the ePOC system, sir.  That was in

16  the ePOC system.  That was a claim objection.  I'm talking

17  about outside of the ePOC system.

18  A    Oh, I'm sorry.  When you said ePOC system, I was thinking

19  you were specifically referring to the electronic proofs of

20  claim data itself.  So were you referring out of the claims

21  process, generally, or from that, just that database?

22  Q    From the database and from the claims process, generally,

23  the whole proof of claim process.

24  A    I can't think of anything else as I sit here.

25  Q    Okay.  So when you -- if you're trying to go and look at,

1    sort of verify or assess the reasonableness of your

2    methodology, particularly in this case, other than looking at

3    what happened in the ePOC system, did you have any other

4    methodology of actually seeing what people were saying and

5    commenting on your, on Mr., Mr. Martin's aggregation theory?

6    A    No.  I think I relied on ePOC.  As Mr. Martin said, that

7    was the best indication that his aggregation process was

8    working correctly.

9    Q    Okay.

10        (Pause)

11            MR. BENNETT:  I don't think I have all of the, your

12   exhibits, Mr. Rona, at least we don't have them on our system.

13   So could you put up Exhibit 2 for me?

14            MR. RONA:  It would be my pleasure, but I would need

15   the screen to be --

16            MR. BENNETT:  Sure, I'm sorry.

17            MR. RONA:  -- muted.

18            THE WITNESS:  That's also in the body of my expert

19   report, if that's easier, Mr. Bennett, whatever you prefer.

20            MR. BENNETT:  No.  That's the --

21            THE WITNESS:  It's on Page 19.

22            MR. BENNETT:  It, it doesn't match up because you used

23   different exhibit numbers.

24            THE WITNESS:  Apologies.

25            MR. RONA:  And just to be clear, Mr. Bennett, you said

1  Exhibit 20?

2          MR. BENNETT:  No, Exhibit 2.

3          MR. RONA:  Oh, I'm sorry.

4  BY MR. BENNETT:

5  Q   Now I believe that you told us that this was your, one of

6  the charts that you prepared dealing with inconsistencies in

7  the name?

8  A   It's certainly one of the charts I prepared to show the

9  range of people's names that they entered.

10 Q   Okay.  And one of the items that you were looking at was

11 entries for 1.1.  Is that -- did that tie to one user account,

12 or how many different user accounts?

13 A   I think it's actually 1 space 1.  And, and that occurred

14 40,687 times.  Again, those weren't aggregated.  Those are

15 currently, those are separate participants under the current

16 methodology.

17 Q   You don't know whether they're separate participants or one

18 participant, do you?

19 A   I -- well, when, when you say "participant," are you using

20 the current aggregation methodology?

21 Q   Any methodology.  Do you know whether that, that 1 space 1

22 was, the 40,000 user accounts was attributable to one person,

23 one participant, or was that numerous participants' user

24 accounts?

25 A   Under the current methodology, it's 40,687 separate,

1  separate participants, separate aggregations.

2  Q    Right.  But do you know whether, I mean, do you have any

3  basis to say whether it's more than one user account?

4  A    It is.  It's 40,687 user accounts.

5  Q    Okay.  So under -- you're accepting Mr. Martin's statement

6  that that would be 40,000 different accounts?

7  A    I'm not accepting it one way or the other.  I didn't

8  attempt to aggregate that.

9  Q    And what -- that would represent about what, 1 or 2 percent

10 of the total amount of user accounts?

11 A    Just that --

12 Q    The 17 million user accounts?

13 A    I haven't -- I haven't calculated -- I'd have to do that

14 math.  Are we asking what percent of -- what is 40,687 divided

15 by, by what, by 2 million?

16 Q    No.  I'm asking you, is there were 17 million individual

17 user accounts recorded.

18 A    In TelexFree and Ympactus combined?

19 Q    Combined.  And you've identified 40 with the one space.

20 That represent about 1 or 2 percent of the total?

21 A    To be clear, I didn't analyze anything to do with Ympactus.

22 I carved that out separately.  I was simply looking at the

23 approximately ten million user accounts in TelexFree.

24 Q    Okay.  If I added up all of these users' accounts that you

25 list here, right, do they represent more than 1 percent of the

1  total 17 million user accounts that had to be linked?

2  A   I would have to do that, do that math.  But again,

3  that's -- that's -- this is -- that's an apples-and-oranges

4  comparison.

5  Q   I'm just asking you.  Do they represent, in total, do they

6  represent more than 1 percent of the total user accounts that

7  were being linked by Mr. Martin?

8  A   So if I add up this list, this non-exclusive list of

9  exemplary names and I divided that by the total users across

10 TelexFree and Ympactus, what's the percentage?

11 Q   Yeah.

12 A   I'd have to do that math.

13 Q   Can you -- would you accept if I told you it was

14 approximately 1 percent?

15 A   If that's the way the math works out, then that's the way

16 the math works out.

17 Q   Okay.  And those full-name items, these are what you put

18 down as evidence of the inconsistency in the use of the names,

19 right?

20 A   This is a non-exclusive list of certain instances where the

21 name appears to be less that four characters and, therefore,

22 wasn't aggregated.

23 Q   But you didn't do a calculation to tell us what overall

24 percentage of the names fell within the less than four, less

25 than four characters category?

1  A    I don't know that I did that calculation.

2  Q    So it could be less than, overall, could be less than 4

3  percent, less than 5 percent, could be an insignificant number?

4  A    I guess it depends how you define "insignificant."

5  Q    Not when you're dealing with 17 million different user

6  accounts and you're dealing with a variation of only 4, 4 or 5

7  percent at most, that would be insignificant?

8  A    Again, I wasn't dealing with 17 million user accounts.  I

9  was dealing with ten million user accounts.

10  Q    And you also agree with me that these were all just $49

11  accounts?

12  A    I don't know that I've done that calculation.  Are you

13  asking if I divide the aggregate loss by the user accounts in

14  all the non-exhaustive list I have here, if it comes out to

15  exactly 49.50?

16  Q    Yeah.  Well, divide -- what's -- what's 40,000 into 2

17  million?

18  A    I'm -- would you like me to do that math?

19  Q    Do it in your head or do the math, sure.  It'll take you

20  two seconds.

21  A    Sure.  I have a calculator.  So you're asking 2,063,193

22  divided by 40,687.  It's about -- I might have missed a zero in

23  there 'cause that's coming out not quite right.  Is the answer

24  49, $49?  Is that what you're telling me the answer?  I can do

25  that, again.  2063193 divided by 40687.  Yeah, it's around $50,

1   give or take, at least for the first example.

2   Q    Okay.

3        The next one down, the 36, the 1986 divided by the 36?

4   A    For the people who entered period period after their name?

5   Q    Yeah.

6   A    1,986,986 divided by 36498 comes out to about 54.44.

7   Q    Okay.  And you understand that those purchases were

8   purchases of the telephone plans?  The VOIP plans themselves,

9   not the memberships.

10  A    I guess I don't know individually.  Well, actually, there's

11  an aggregate net loss?  I suppose I don't know and it's only

12  assuming that they're all equal.  To the extent that there are

13  some net winners and net losers as part of those full names --

14  Q    Oh, excuse me.  I don't mean to interrupt.

15       I'm asking you did you understand that the, the $49

16  payments were, were payments to buy the, an actual phone plan

17  as opposed to buy the membership plan into TelexFree?  Did you

18  know that?

19  A    Oh, yes.

20  Q    You knew that, okay.

21  A    Yes.

22  Q    Do you also know that Mr. Martin excluded the phone plans

23  as part of the calculations?

24  A    All 49.90?  I'm not sure that is true.  Yeah, I don't

25  recall him testifying to that yesterday.

1   Q   Do you know that for a fact, one way or the other?  Do you

2   know how he treated the $49 phone plans?  The actual -- where

3   you actually bought a plan and got something for it.

4   A   I think I'd have to go back and look.  I'm, I certainly

5   reconciled there's net equity in the summaries he provided.

6   Q   Okay.  Do you know --

7   A   Most of the phone plans.

8   Q   I'm asking you today as you testify and when you prepared

9   your report, did you know that Mr. Martin eliminated the phone

10  plans?

11  A   I don't recall that either way.

12  Q   Okay.

13  A   It certainly wasn't stated in his expert report.

14  Q   I'm not asking that.  I'm asking you whether or not.

15         MR. BENNETT:  Could you put up Exhibit 17 for me,

16  please?  His 17.  Mr. Rona, if you could, could you go to your

17  17?

18         MR. RONA:  Sure.

19  BY MR. BENNETT:

20  Q   Mr. Dennis, do you see what you, what you had testified

21  earlier to as Exhibit 17?

22  A   I do.

23  Q   Okay.  And again, refresh my recollection as to what this

24  exhibit was to demonstrate.

25  A   This demonstrates the, the variance that, that people can

1   put in the name column.

2   Q    Okay.  And did you link all of these together using e-

3   mails?

4   A    That's how I initially identified this grouping.

5   Q    Okay.  And what you found was that there were a number of

6   different names, but same or very similar e-mails?

7   A    Amongst other criteria.

8   Q    Okay.  Now did you recall Mr. Martin's testimony from

9   yesterday with respect to why he did not use the e-mail as a

10  unique identifier, a single unique identifier?

11  A    I believe so.

12  Q    Okay.  And that testimony was is because promoters very

13  often would enter, or promoters or recruiting participants

14  would very often use  -- strike that.  Let me start, again.

15     The reason was that recruiting participants would very

16  often fill in the data for the participants that they

17  recruited, correct?

18  A    I believe that's what he testified to as one reason that

19  names could differ and e-mails could be the same.

20  Q    And that, that they also, those recruiting participants

21  when they were filling out the information for the recruited

22  participant, the recruiting participant would use his or her

23  own e-mail, is that correct?

24  A    That's what Mr. Martin testified to.

25  Q    Do you have reason to dispute either one of those points?

1   A    I, I've seen no independent notes or knowledge or facts

2   either way.

3   Q    I'm asking you.  Do you have any, do you have any basis,

4   independent basis to dispute that point?

5   A    That a -- that -- let me make sure I have this right --

6   that a recruiter -- the, the fact set is a recruiter may have

7   put in their own e-mail when, and been part of the process of,

8   of actually registering and putting all the information for a,

9   a recruited participant?

10  Q    That a recruiting participant would enter the information

11  for the recruited participant and in doing so would put in the

12  recruiting participant's e-mail.

13  A    Mr. Martin testified to that, yes.

14  Q    Do you have any independent basis to contest that

15  testimony?

16  A    I, I have no facts to that one way or the other.

17  Q    And if you look at your Exhibit 17, you'll see that (audio

18  cuts out)?

19  A    They all used different names.

20  Q    And that would be consistent with, at least to some

21  respect, consistent with Mr. Martin's testimony that recruiting

22  participants would be putting in their e-mail for the recruited

23  participant, correct?

24  A    So what, whether Mickey Mouse as the recruiter recruited

25  Team Legendary?

1   Q    No.   I'm just asking whether the recruiting participant,

2   regardless of who, the name they put in, would be putting in

3   their e-mail as opposed to the recruited participant's e-mail?

4   A    I, I guess.   We have, we have no knowledge either way.

5   Q    But Exhibit 17 is consistent with what Mr. Martin said?

6   A    There's certainly the same e-mail across all of these

7   accounts --

8   Q    Okay.

9   A    -- with different names for any reason.

10  Q    And you understand --

11  A    No.

12  Q    -- that Mr. Martin also said that the reason that they

13  didn't use just the e-mail as a single identifier was if they

14  did so, they would tend to over aggregate into a recruiting

15  participant and they were trying to avoid that, is that

16  correct?

17  A    Whether or not the rationale -- are you asking -- I'm

18  sorry.   Are you asking me the rationale for why they didn't

19  consider this one person?

20  Q    Generally, why they didn't consider -- one of the reasons

21  why they didn't consider e-mails as a single identifier was

22  because recruiting participants would use their e-mails for the

23  recruited participants and if they used the e-mail as a single

24  identifier, it would result in an over aggregation for the

25  recruiting participant?

1   A    I guess we'd have to look across the spectrum of, of all

2   participants that had different names and the, and the same e-

3   mail, right?  The presumption here is whether or not this is

4   one person that chose to type in different names or one

5   recruiter that was signing up multiple different people.  We

6   have no basis to know and I don't think Mr. Martin knows either

7   way.

8   Q    No.  I'm asking, sir, is that consistent with at least

9   what, what Mr. Martin assumed to be the case?

10  A    I would think if this is the recruiter signing up other

11  people, that they would be using names that weren't Mickey

12  Mouse and Team Legendary.  So I don't know --

13  Q    Why would --

14  A    -- that's consistent.

15  Q    Why would you assume that?

16  A    I thought the assumption here was this is a recruiter.

17  Q    That's right.  Why would you assume that they would be

18  putting in, they, they wouldn't be using those names?

19  A    You know what?  That's -- that's -- you're entirely right.

20  That's fair.  I guess I've got no knowledge either way.  You're

21  absolutely right.  I shouldn't assume that and, and don't.

22  Q    Okay.  And you also, I believe, testified, I think -- and I

23  think Mr. Martin test, Mr. Martin was cross-examined -- and I

24  think you test, you testified that, that there was question of

25  whether or not there were teams that were, that were purchasing

1   interests in TelexFree, is that correct?

2   A   That was one of the things noted in the, in the Balan

3   affidavit, yes.

4   Q   Okay.  So you don't know whether or not under these names

5   listing, these could be the names that the team leader was

6   ascribing to the various members of the team, right?

7   A   That, that's correct.  This could all be one person heading

8   up the team, that's right.

9   Q   And under Mr. Martin's methodology of aggregation, instead

10  of including all of those people under one person's name by

11  using the names plus e-mails plus other identifiers, he was

12  able to link all the accounts for Mickey Mouse and all the

13  accounts for the different item, different names that you have,

14  you have listed here in Exhibit 17, correct?

15  A   I'm, I'm sorry.  I didn't follow that question.

16  Q   Under Mr. Martin's aggregation theory or methodology, all

17  of the Mickey Mouse -- all the names Mickey Mouse with the e-

18  mail that's listed on Exhibit 17 would have been linked

19  together?

20  A   That, that's correct.  The name had to be the exact same.

21  Q   Okay.  Well, it didn't, because he also had other

22  variations in the name, but at least in this case they would

23  have been linked together, right?

24  A   Yes.  That's my understanding.

25  Q   Okay.  And that if, if a net winner, you know, just use an

1    example here.  Let's assume that Mr. Martin found that there

2    was a John E. Jones, who is a net winner for a million dollars.

3    If John E. Jones could prove that he also used the name Mickey

4    Mouse, we would have the appropriate link, appropriate

5    aggregated accounts to do a necessary setoff, is that correct?

6    A    I guess I'm not clear on your hypothetical.

7    Q    Okay.  What I'm saying, sir, is that once, once

8    Mr. Martin's aggregation aggregated all the Mickey Mouse user

9    accounts together, if some other net winner came in and tried

10   to, and said, "Not only did I use the name John E. Jones, but I

11   used the name Mickey Mouse," we could then go to the same

12   aggregation process and see all the Mickey Mouse user accounts

13   aggregated together, correct?

14   A    So your hypothetical is that if someone came in and said,

15   "The aggregation process didn't work correctly for me," and

16   they went and pointed out what other accounts were theirs, then

17   you could combine those?

18   Q    Yes.

19   A    Yes.

20   Q    Right.  If they pointed out a Mickey Mouse, Mr. Martin's

21   aggregation theory would give us the, the total universe of the

22   user accounts and then we could just do the mathematical

23   calculation, right?

24   A    To the extent that they didn't put MM or any other

25   combination of the name Mickey Mouse.

1   Q    Uh-huh (indicating an affirmative response.)

2   A    They -- to the extent they put that or something very

3   similar.

4   Q    Okay.  Well, and also, under Mr. Martin's aggregation

5   theory he used various portions of the name to pick something

6   up.  So I believe one of the keys was, would have been the

7   first letter and then the last four letters of the name?

8   A    I believe that was one of them, yes.

9   Q    Okay.  So even misspellings or slight variations on Mickey

10  Mouse would have been picked up?

11  A    No, not necessarily.

12  Q    And, sir, you have -- you also have -- I -- you, you also

13  have access to the SIG system.  So if any of your, any of the

14  net winners, the, the defendants in this lawsuit, said, "You

15  need to link my name, John E. Jones, to, to the user account

16  for Mickey Mouse," you could do that, correct?

17  A    Again, we, I wouldn't even turn to the SIG system.  I would

18  use the, the data tables that, that Mr. Martin, the result of

19  his aggregation.  The SIG database itself doesn't include the

20  aggregation.

21  Q    Okay.  So you would, in fact, rely upon Mr. Martin to

22  aggregate up the various user accounts to do, do a proper

23  calculation for the net winners?

24  A    No.  It depends, it depends on what they, what they're

25  asking.

1   Q   Again, if I'm -- what -- let's not go back and forth here.

2       What I'm saying is if Mr. Martin, if the trustee said,

3   "John E. Jones, you're a, you're a $500,000 net winner," and

4   John E. Jones, one of the clients that you're expressing an

5   expert opinion for, says, "Wait a minute.  You left out my

6   accounts under Mickey Mouse," you could go to, to Mr. Martin's

7   aggregation tables, look at Mickey Mouse, compare that to John

8   E. Jones, and do a calculation to rebut the trustee's position,

9   correct?

10  A   To the extent that a net winner gave us all the specific

11  information as to the name and other identifiers, then we could

12  certainly identify those user accounts in the data tables.

13  Q   Well, it's just simple enough.  If, if he gives you the

14  name Mickey Mouse, you can find out what Mr. Martin has

15  aggregated under Mickey Mouse?

16  A   Assuming the name was spelled consistently as Mickey Mouse,

17  yes.  And assuming that Mickey Mouse also always used the same

18  e-mail address, I should say, at a minimum.

19  Q   Okay.  What I'm saying is is that you have access, you have

20  an ability to link additional accounts for your clients, if

21  necessary --

22  A   Yes.

23  Q   -- using Mr. Martin's aggregation theory?

24  A   Or not using his aggregation theory.  I could do it either

25  way.  We have all the, as I understand, all the user account

1   data in here.

2   Q   Right.

3        MR. BENNETT:  Would you put up Exhibit 9 for me?

4        THE COURT:  Before you do that, I have a, one more

5   question on this exhibit, Mr. Dennis, just to make sure that I

6   understand correctly.

7   BY THE COURT:

8   Q   The -- do you see the blank spaces between the sections

9   that are a lighter color than the, than the, the e-mail color,

10  the yellow?  Do those -- are those divided into the,

11  Mr. Martin's aggregations?  Is that what the divisions

12  represent?

13  A   You're precisely right, your Honor.  So each blue row is

14  actually a subtotal.  You can see the subtotal of net equity

15  off to the right.  And so, obviously, there's only one user

16  account in that particular aggregation by Mr. Martin, then

17  there'll be the same as the number above it.  But if you go to

18  7, for example, that would be the subtotal for his unique

19  Aggregation 10575901.  And that's -- that's -- Mr. Martin's

20  aggregation combines five user accounts that would, in

21  aggregate, is a net loser of $5700.

22      So there's 33 separate user accounts listed in this

23  exhibit.

24  Q   Thank you.

25  A   Excuse me.  Thirty-three separate participants in this

1    exhibit.

2    Q    Okay.

3            THE COURT:  Go ahead, Mr. Bennett.

4            MR. BENNETT:  I'm sorry.  I missed that last point,

5    again.

6    BY MR. BENNETT:

7    Q    Could you just restate what you just said here about the 33

8    separate participants, Mr. Dennis?

9    A    Right, I should be more specific.  These are 30 separate,

10   33 separate aggregations, not participants, just to be clear on

11   the language.

12      Thank you.

13           MR. RONA:  Charles, did you want me to go to another

14   exhibit?

15           MR. BENNETT:  Yes.  Could you try Exhibit 9 for me,

16   please?  I must have the wrong number.  I'm sorry.  You can

17   take that one back down.  Let me see if I can match these up.

18   Exhibit 11, I believe.

19   BY Mr. BENNETT:

20   Q    And where did the information come from, Mr. Dennis, in

21   order to prepare Exhibit 11?

22   A    These are from the Huron data tables we received.

23   Q    Okay.  And are these based upon the aggregations that

24   Mr. Martin did?

25   A    So each of the individual sections -- so the orange section

1  and then separately the green section -- are both independent

2  separate aggregations.

3  Q   Done by whom?

4  A   That Mr. Martin calculates as part of the aggregation

5  process.

6  Q   Okay.  That's what I wanted.

7       So these -- your testimony that you gave with respect to

8  Exhibit 11, that's, that's testimony based upon utilizing

9  Mr. Martin's aggregation methodology, correct?

10 A   Right.  So what I'm suggesting here is there are two

11 separate aggregations.

12 Q   I just asked you if that --

13 A   Oh.

14 Q   -- was correct or not.  You, your counsel can add something

15 if he wishes.

16      And you didn't run any separate analysis using the

17 probabilistic method to come up with the different tables here,

18 correct?

19 A   No.  As I noted, this is -- this is based -- this is me

20 comparing the methodology that Mr. Martin utilized.

21 Q   Okay.  And if we go, actually, just quickly back, if I

22 looked at Exhibit 9 and Exhibit 10, which also contain similar

23 types of charting.

24      MR. BENNETT:  Could you just put those up very

25 quickly, Mr. Rona?

1          MR. RONA:  You want both?

2          MR. BENNETT:  Start with 9 and then 10, just -- I only

3    have one question on each.

4    BY MR. BENNETT:

5    Q   Mr. Dennis, this chart that's, I believe, Exhibit No. 9,

6    this is also based upon Mr., using Mr. Martin's aggregation

7    theory, correct?

8    A   Yes.  'Cause that's what I was trying to assess,

9    absolutely.

10   Q   Okay.  And looking at Exhibit 10, that exhibit, also, is

11   based upon Mr. Martin's aggregation theory, correct?

12   A   That's right.  I was assessing the top net winners under

13   Mr. Martin's aggregation theory.  That's exactly right.

14   Q   And you're accepting Mr. Martin's aggregation theory,

15   you're accepting the various amounts that that theory

16   generated, right, and then just comparing them?

17         MR. RONA:  Objection.

18         THE WITNESS:  No.  I think --

19         THE COURT:  What's the objection?

20         MR. RONA:  I think he's using the word "accepted" in a

21   way that's ambiguous.

22         THE COURT:  Do you understand the question,

23   Mr. Dennis?

24         THE WITNESS:  Not -- you better go ahead and ask again

25   to make sure I do.

1  BY MR. BENNETT:

2  Q    In preparing Exhibits 9, 10, and 11, the last three

3  exhibits we looked at, you accepted Mr. Martin's methodology in

4  order to prepare the exhibits?

5  A    Well, again, the word "accept," I think, is, is where I'm

6  unclear on.  I don't agree with it.  I was certainly utilizing

7  it for comparative purposes to show I didn't agree with it.

8  Q    You didn't do any other method -- you're -- we've said it

9  and we're repeating ourselves -- but you didn't do any other,

10  any other types of methodology to prepare any of these charts?

11  A    Again, as I've, as I've said, you know, I was not asked and

12  I did not attempt to do a complete recalculation from scratch.

13  Q    And the, the linkage was all based upon Mr. Martin and all

14  that you've done is done mathematical calculations based upon

15  his aggregation, correct?

16  A    I, I don't think it's a fair characterization of the

17  entirety of my analysis and opinions.

18  Q    Well, what part of it is not a mathematical calculation,

19  Mr. Dennis, that's shown on this exhibit?  I think this is

20  Exhibit 10.

21  A    What part of, of what, the preparation of this exhibit?  I

22  guess I'm not clear on what -- what you -- what math you're

23  referring to.

24  Q    What part of the information reflected on Exhibit 10 is not

25  a mathematical calculation starting from Mr. Martin's

1   aggregation?

2   A    No.   This, this is entirely a summary of Mr. Martin's

3   aggregation with the exception, I guess, of the column that

4   says Was Claimed, which reflects whether or not that particular

5   aggregation was claimed as, as part of ePOC.

6   Q    Sir, if we should reject Mr. Martin's methodology, what, do

7   we have any basis, then, to proceed forward in determining who

8   the net winners and the net losers are?

9   A    I, I don't know.   I guess that'd be a question for the

10  Court.

11  Q    There's nothing that you can provide us that would help us

12  to continue on in finding net winners or net losers?

13  A    If that was something the Court ask that I do and pursue a

14  full-from-scratch recalculation of the aggregation process,

15  that's certainly something I would consider.

16  Q    Uh-huh (indicating an affirmative response.)

17       Let's look to your analysis on the credits.

18       (Pause)

19  BY MR. BENNETT:

20  Q    In, in determining -- if you could go back, I guess, to, is

21  it Exhibit 8 that has the credit analysis on it?

22            MR. BENNETT:   Mr. Rona, could you put Exhibit 8 up?   I

23  believe that's the appropriate exhibit.

24            MR. RONA:   Okay.

25  BY MR. BENNETT:

1  Q   What was the source of the information for this exhibit,

2  Mr. Dennis?

3  A   These would be the four data tables that I was provided by

4  Mr. Martin and Huron.

5  Q   When you say the "four data tables," what are you referring

6  to here?

7  A   Those are the tables that I, I referenced in my report

8  that, that outline, summarize Mr. Martin's aggregation and net

9  equity calculation.

10  Q   Okay.  And which four of the columns represent those, come

11  from those four tables?

12  A   I'm sorry.  Could you ask that one more time?

13  Q   Let me try it this way.

14      Looking at the top, the, the, the top chart, I, I see three

15  charts on, on Exhibit 8, right?

16  A   Yes.

17  Q   Okay.  What's -- what is the top chart?  What is that to

18  represent?

19  A   So that's a summary of, of all of the participants and,

20  really, the equity associated to those participants under

21  Mr. Martin's assumption of aggregation -- well, yes -- and

22  assumption of net equity, as provided in the, in the tables

23  that he presented to me.

24  Q   Okay.

25      And then the next chart down, the one that's in the middle,

1   is what, sir?

2   A   It would be the portion of the table above but specific to

3   those participants under Mr. Martin's aggregation assumption

4   are net losers.

5   Q   Okay.  And where did you get the information for the

6   credits transfers in and out?

7   A   Those are from the, the data tables I was provided by

8   Mr. Martin.

9   Q   Okay.  So that, those calculations had already been done by

10  Mr. Martin?

11  A   I'm not sure if they are calculations done by Mr. Martin.

12  They were certainly put into those buckets of credit transfer

13  in and credit transfers out.  It was, it was my calculation to

14  put them into various tiers.

15  Q   And would you agree with me, sir, that it will be

16  ultimately up to the Court to determine whether or not the

17  credit transfers between participants should be included or not

18  included in the net equity?

19  A   I would very much think so.

20  Q   You're not -- you're certainly not expressing a legal

21  opinion to the Court, are you, as to whether they should be

22  included?

23  A   No, sir.

24  Q   And the dollar values that you're ascribing to the credit

25  transfers, that's based on a dollar-for-dollar?  Each credit

1    represents a dollar?

2    A    I think I'm not -- I'm not ascribing any value.  I think I

3    testified that in, there's strong indicia that credits weren't

4    necessarily transferred for a dollar.

5    Q    Well, sir, you -- when you, when we look at the numbers,

6    are you ascribing any value to those numbers or is it just

7    these are the amount of credits transferred by and between the,

8    the, the participants?

9    A    This is simply a summary of the amount of credits

10   transferred, yes.

11   Q    So you're making -- is it fair to say, then, you're making

12   no assumptions with respect to the amount, amount to be

13   ascribed to each credit transfer, dollar amount?

14   A    I -- this is simply a summary of the data.  I'm not sure

15   it's, it's anything other, not intended to be anything other

16   than that.

17   Q    Okay.  In any of your -- anywhere in your report are you

18   making any assumptions with respect to the dollar amount that

19   should be ascribed to a credit transfer?

20   A    No.  I think my testimony is it can vary.

21   Q    And do you have any methodology for which we can employ to

22   determine on an individual basis how much should be

23   attributable to that individual's credit transfers?

24   A    When you say "credit transfers," are we talking about

25   triangular transactions or --

DENNIS - CROSS                                                           **405**

1    Q    No.  The credit trans --

2    A    -- between participants?

3    Q    I'm sorry.  Credit transfer.

4    A    Because I think that would be the same -- I'm sorry.  Go

5    ahead.

6    Q    I don't mean to interrupt.

7         The credit transfers that you're reflecting on this

8    Exhibit, I guess it's Exhibit 8.  I lost track of the exhibit.

9    A    So I guess it would be the same commentary for both credit

10   transfers and triangular transactions, that I'm not ascribing

11   any value, that they would -- and that could differ.

12        But your -- I'm sorry.  Your question was do I have a

13   methodology to, to assess for credit transfers in or triangular

14   transactions, what that right value is?

15   Q    Yes.

16   A    I think that's something you'd have to investigate.

17   Q    So you have no opinion to that today?

18   A    I, I have no opinion.  I have not attempted to, to

19   calculate what I think that would be.

20        (Pause)

21           MR. RONA:  Your Honor and Mr. Bennett, I don't mean to

22   interrupt, but I think we've been at it for over two hours.

23   And I, I don't know.  I'm not speaking for myself or anyone

24   else, but I think maybe a break might be in order.

25           THE COURT:  Sure.  Let's take it.  It's, what, 3:20.

1   So let's take a ten-minute break, back at 3:30.

2          MR. BENNETT:  Thank you.

3          MR. RONA:  Thank you, your Honor.

4          THE WITNESS:  Thank you, your Honor.

5      (Recess from 3:19:16 p.m., until 3:33:18 p.m.)

6                        AFTER RECESS

7          THE COURT:  Ready to go back on the record?

8          MR. BENNETT:  We are, your Honor.

9          And having had an opportunity to review my notes and

10  speak to my co-counsel, Mr. Lizotte, I have no further

11  questions of this witness.

12         THE COURT:  Oh.  Thank you, Mr. Bennett.

13         I'll turn the floor back over to you, Mr. Rona, for

14  any redirect.

15         MR. RONA:  Yes, your Honor.  I will, I will do my best

16  to, to keep this brief.

17         If I could just pull up for a moment -- this is --

18  this was marked as Plaintiff's 11.  I just wanted to clarify a

19  couple of things.

20         MR. BENNETT:  Okay.  And watch myself  Okay.

21         MR. RONA:  Mr. Bennett, are you ready?

22         MR. BENNETT:  Yeah, I'm fine.  I just had to move the

23  camera around.  That's all.

24         MR. RONA:  Okay.

25                     REDIRECT EXAMINATION

1   BY MR. RONA:

2   Q   So, Mr. Dennis, you've seen this slide before, correct?

3   A   I have.

4   Q   Okay.  I mean, when I say "before," before today you had --

5   you had seen the  -- well, let me re-ask the question.

6       You've seen the definition of "net equity" that is

7   presented on this slide before today, correct?

8   A   It's quoted in my report, yes.

9   Q   Okay.  And what, what was your interpretation of the word

10  "amount"?

11          MR. BENNETT:  Objection.

12          THE WITNESS:  I, I think -- sorry.

13          THE COURT:  What's the objection, Mr. Bennett?

14          MR. BENNETT:  I'm not sure -- if he's not going to

15  render a legal opinion here what -- his interpretation of the

16  word "amount" is relevant.

17          THE COURT:  Well, maybe the question is what's your

18  understanding of the word "amount."

19          Is that what you mean, Mr. Rona?

20          MR. RONA:  Sure.

21  BY MR. RONA:

22  Q   What's your understanding of the word "amount"?

23  A   So I think it, it's hard to look at one word.  I think it's

24  important to look at the context in which it's provided.  And

25  the sentence reads,  "The amount invested by a participant into

1    the debtor's scheme."  And so in that context, and generally,

2    from my experience, I think this is in line with general

3    economic damages theory and in, in, you know, the but for

4    world.

5        So as I read this, my financial perspective is what we're

6    trying to get it.  In sum and substance, is the amount of cash

7    that a participant invested into the scheme less the amount of,

8    of cash that a participant received out of the scheme.

9    Q   Okay.  And that would be consistent with the first

10   appearance of the word "amounts" after the word "claims," is

11   that right?

12           MR. BENNETT:  Objection, your Honor.

13           THE COURT:  And the objection basis is?

14           MR. BENNETT:  Same basis.  We've got the witness

15   interpreting a judicial order here.

16           MR. RONA:  Okay.  I'm sorry.  I, I will withdraw and

17   ask.

18   BY MR. RONA:

19   Q   The, the understanding that "amounts" means cash would be

20   consistent with the, the first appearance of the word "amounts"

21   in this slide after the word "claims" in the first line, is

22   that right?

23           MR. BENNETT:  Objection.  Still, your Honor, I don't

24   think that the witness should be giving an interpretation of

25   the, of the order and how the order should be read or how the

 1  words should be read together.  The witness has given, already

 2  testified that his understanding of the order was it included

 3  credit transfers.  I'll accept that as his understanding of the

 4  order.  The rest of this is up for counsel to argue applying

 5  whatever law we want to apply to the Court.  I don't think he

 6  should --

 7          THE COURT:  -- I -- I -

 8          MR. BENNETT:  -- be giving an interpretation.

 9          THE COURT:  I'll overrule that.  I'll take, I'll take

10  your understanding of the words of the order.

11          You, you may ask the question, Mr. Rona.

12  BY MR. RONA:

13  Q   Do you need the question again, Mr. Dennis?

14  A   You're asking about the word "amounts" after the word

15  "claims" and my understanding of that?

16  Q   Yes.

17  A   So my understanding of, of the, the claims process and the,

18  really, the purpose of net equity is for the amount of cash

19  they'd be receiving as, as a result of the claims.

20  Q   Okay.  So is it fair to say that in all instances your

21  understanding is the word "amounts" refers to amounts of cash?

22  A   That would be my understanding and what would be consistent

23  with general economic damages.

24  Q   Okay.  And so when Mr. Bennett was asking you about

25  inclusion of credit transfers in, as part of your analysis,

DENNIS - REDIRECT                                                    **410**

1   were you referring to the amounts of credits transferred or

2   were you referring to the amounts of cash exchanged in, in

3   exchange for those credits?

4   A    It would be the latter.  Again, when I think about "the

5   amount invested by a participant into the debtor's scheme," my

6   understanding is that would be the amount of cash that came out

7   of their pocket that would go into the scheme either because

8   they purchased credits or for any other, any of the other

9   reasons.  And then the converse would be true in terms of the

10  amount, less the amount received.

11  Q    Okay.

12       I think you were asked, also, by Mr. Bennett about whether

13  credit transfers affected TelexFree's balance sheet.  Do you

14  recall that line of questioning?

15  A    I do.

16  Q    Okay.  Are you aware of -- well, I think you -- you have

17  testified, have you not, that there was, in fact, a, a credit

18  reduction in the form of a fee assessed by TelexFree for credit

19  transfers, is that right?

20  A    That is right.

21  Q    And it was -- I believe the amount is 3 percent?

22  A    I believe it's actually $3 or three --

23  Q    Oh.

24  A    -- I should say three credits.

25  Q    Three credits -- I apologize -- not 3 percent.  I stand

1    corrected.

2        And I believe yesterday you heard Mr. Martin say that, that

3    he considered that to be insignificant, the three, the three-

4    credit fee, do you recall that?

5    A    It was something along those lines, yes.

6    Q    Okay.  Do you know what the aggregate amount of fees

7    assessed was within TelexFree?  Is that something you recall

8    computing?

9    A    I do.  I think it was in the neighborhood, it was something

10   north of, of 20 million.  I'm trying to recall if that was a

11   figure in my report.

12   Q    Okay.  And would -- would -- would you be able to say, as

13   you sit here today, whether 20 million is, a figure of 20

14   million would be insignificant to the balance sheet of

15   TelexFree?

16   A    Again, I don't know that $3 is significant, insignificant

17   or, or 20 million.  I think it depends on what you're comparing

18   it to.  It's certainly a big number, but I, I haven't seen

19   TelexFree's balance sheet, either.

20   Q    Okay.

21       I think you were asked at length by Mr. Bennett of, of all

22   the different types of analyses that you could have performed,

23   but did not perform.  And so let, let me ask you this question.

24       Would you have agreed to the representation that you

25   provided in this case to do a probabilistic analysis or, I will

1   say, a comprehensive probabilistic analysis of all available

2   user account data for the budget that was offered by the

3   trustee?

4           MR. BENNETT:  Objection, your Honor.

5           THE COURT:  What's the basis?

6           MR. BENNETT:  Your Honor, the, the budget has nothing

7   to do with what the expert would or would have not done to

8   perform his duties.  I don't think that -- that was a -- should

9   be a guiding principle to say, "I'm excused from doing

10  something because the trustee wouldn't put more into a budget."

11          THE COURT:  Well, that, that's neither here nor there.

12  I'll take the question.

13          You may answer, Mr. Dennis.

14          THE WITNESS:  You, you're saying for the budget of,

15  the 147,000 that, that was my budget?

16  BY MR. RONA:

17  Q   Yes.

18  A   That, I think it would have taken substantially more than

19  that, certainly in addition to putting together, you know, the

20  work I did do in terms of, relative to assessing the

21  methodology and the aggregation and the net equity and the

22  reliability of it, let alone put together, you know, the expert

23  report and, and testifying, certainly exceeded that budget as

24  it was.

25  Q   Okay.  And are, are you -- do you have any awareness of the

1   amounts that Huron has submitted in fee applications in this

2   case?

3   A    I've --

4              MR. BENNETT:  Objection, your Honor.

5              THE COURT:  Does -- does it --

6              MR. RONA:  Your -- your -- your Honor, I'll move on.

7   I'll move on.

8   BY MR. RONA:

9   Q    I believe you were asked if, about whether you interviewed

10  anybody as part of this case?

11  A    Yes, I recall that.

12  Q    Did you ask -- do you recall asking Mr. Martin for his

13  notes of interviews?

14  A    I do.

15  Q    Did you recall receiving any notes?

16  A    I, I did not receive any notes, no.

17  Q    Okay.

18       I'm going to go into Exhibit 9 of the defendants'

19  identification and I think you were asked about whether phone

20  plans were -- phone plan pur -- phone plan purchases were

21  excluded by Mr. Martin, do you recall that?

22  A    I do.

23  Q    Okay.  Do you find -- would you find the exclusion of phone

24  plans surprising, given your observations about the second

25  aggregation under the name Mengwi?

1   A    I am, I am genuinely slightly confused about what you mean

2   by "excluded" here.  You know, there, the data we were provided

3   inclusive of the summaries of that data that we attempted to

4   reconcile to, there is a column in that data entitled Net

5   Equity and, and in that column inclusive of, you know, phone

6   plans and triangular transactions for, you know, 49.90, is

7   included in that net equity column that I, I reconciled.

8        So I guess the question is when they say "excluded," I'm

9   not totally clear on, on what it was excluded from or for what

10  purpose.

11  Q    Okay.  And on the subject of somebody named Mengwi, I, I

12  know that one of the techniques Mr. Martin used was to take the

13  first letter in the name field and the last four letters to

14  make a, a part-name key.  Do you recall hearing testimony to

15  that effect?

16  A    That was one of his part-name criteria as part of his

17  deterministic record linkage, yes.

18  Q    Okay.  And do you have any awareness either in, in an

19  expert capacity or just as, as a layperson that there are, of

20  any practices in Asia of using your last name first and your

21  first name last?

22            MR. BENNETT:  Objection, your Honor.

23            THE COURT:  I'll take it.  Overruled.

24            Go ahead, Mr. Dennis.

25            THE WITNESS:  I -- I -- I don't.  I don't have any

1  knowledge of, of the naming conventions in that, on that fact.

2  BY MR. RONA:

3  Q   Okay.  But would you agree with me that if someone used

4  their last name first and their first name last, that that

5  would have a different ability to get picked up by Mr. Martin's

6  part-name key involving the first letter and the last four

7  letters than somebody who uses a tradi, more traditional --

8  well, not -- I don't mean more traditional -- uses a more

9  familiar to, to the Western world of first name first, last

10  name last?

11          MR. BENNETT:  Objection to the, to the foundation of

12  the question because the, the testimony was the part-name key

13  was based upon the way the name was recorded in the record.

14          So if they used their first name last and the last

15  name first, the part-name key doesn't change.

16          THE WITNESS:  Hmm.

17          THE COURT:  Well, that's okay.  You can still answer

18  the question, Mr. Dennis, if you understand it.

19          THE WITNESS:  I, I think I do.  And I -- again, it

20  goes back to how Mr. Martin did it.  We can certainly look.

21  But I thought he took the name as a whole and took the, the

22  pieces of it.  If there's  different thing -- and again, he

23  said the first name and the last name is programmatic in that

24  the name was what was entered.

25          So if people switched the order in which they entered

1    their first name and last name, I would think that would impact

2    the ability for that to get picked up as part of the

3    aggregation process.

4            MR. BENNETT:  Move to --

5            THE WITNESS:  I certainly don't see any instances

6    where I see in the same -- I've never seen an instance where an

7    aggregation has a name that is both, for example, Mengwi and,

8    and Wimeng in the same aggregation.

9            MR. BENNETT:  I'd move to strike, your Honor.  There's

10   no foundation for his testimony.

11           THE COURT:  Overruled.  I'll take it for what it's

12   worth.

13           MR. RONA:  I'm -- I'm -- I'm moving along.

14   BY MR. RONA:

15   Q    The -- I think there was a suggestion by Mr. Bennett that,

16   that, that we could continue to use Mr. Martin's aggregation

17   analysis if a participant comes forward with new information.

18   One could go to Mr. Martin's aggregation, retrieve more claims,

19   and then add those in in, in another round of, of aggregation.

20   Do you recall being asked about that?

21   A    I do.

22   Q    Okay.  And it's certainly possible that that could happen,

23   is that right?  That would be a -- that -- that could be --

24   that would be feasible, is that right?

25   A    Well, certainly, the, the, the tables reflect the user

1   accounts.  And so to the extent that someone identified user

2   accounts, those user accounts could certainly be located in the

3   data and the numbers could be added together.

4   Q   And do, do you recall some testimony by Mr. Martin

5   yesterday that, in fact, that's what the Zagarella group did.

6   They came back to the trustee with additional information, do

7   you recall that?

8   A   I do.

9   Q   And then Mr. Martin testified that he ran a secondary

10  analysis and found 1,900 additional aggregations on top of the

11  ones that the Zagarella family had brought forward, do you

12  recall that?

13  A   That's my recollection.

14  Q   And, and to your knowledge, could that process continue *ad*

15  *infinitum*?

16  A   I'm sorry.  Do you -- can you be a little more specific?

17  Q   Meaning could the iterative, further iterative process of

18  somebody coming forward with information and then the trustee

19  providing counterinformation, could that process continue

20  through further iterations?

21  A   To the extent the individuals had more information about

22  accounts that was theirs and, and the trustee had the ability

23  to query the data, then I don't see why you couldn't go back

24  and forth.

25  Q   Okay.

1    You were asked about whether there was any other pool of

2  information that could be -- I'm paraphrasing -- that could be

3  used as maybe a benchmark to compare against the ePOC data, do

4  you recall that by Mr. Bennett?

5  A    I do.  I do, yes.

6  Q    Okay.  Do you remember testimony yesterday from Mr. Martin

7  that there were, in fact, paper claims filed, proofs of claim

8  filed when, early on in the case before ePOC was created,

9  including when the case was out in, pending in Nevada?  Do you

10  remember that?

11  A    I do recall that, yes.

12  Q    Okay.  So doesn't that suggest that there, there may have

13  been some additional claim information that could have been

14  used to compare to ePOC?

15         MR. BENNETT:  Objection.  Excuse me.  Objection, your

16  Honor.  It's purely speculative.  He has no basis.  I don't

17  believe he's ever testified to seeing those claims, what's in

18  those claims, what relevance at all those claims would have to

19  the process, or how it could be used in the process.  I think

20  Mr. Martin's testimony was they were paper claims with nothing

21  more than numbers.

22         THE COURT:  Yeah.  It's also leading.  I'll, I'll,

23  I'll sustain the objection, so.

24         MR. RONA:  Well, your Honor, before I -- because it

25  will affect my next question -- but, but I believe I can elicit

1   testimony on things an expert hears in court.  I believe that's

2   one of the permissible sources of information.

3          THE COURT:  So let's try rephrasing the question, I

4   guess, then.

5          MR. RONA:  Okay.  I, I will try to ask a proper

6   question, your Honor.

7   BY MR. RONA:

8   Q   Mr. Dennis, if you were aware of there being paper claims

9   that had been submitted by creditors, would -- would that --

10  would you consider that to be a potential source of comparison

11  to ePOC?

12  A   Yes.  I think that was something -- I'd certainly want to

13  consider all the facts.

14  Q   And do --

15  A   If that was available to me, it's something I'd certainly

16  look at.

17  Q   Okay.  And to your knowledge, did Mr. Martin provide you

18  with any analysis comparing ePOC data to any previously

19  submitted paper claims?

20  A   That's not something I've seen.

21  Q   Okay.

22      You were -- hopefully, this is my final question -- but you

23  were asked about the slide that you prepared -- and I -- if

24  you, everybody bears with me, I'm, let me just pull it up.

25      This is Defendants' 11.  This is the Du Painting and David

1   Teixeira comparison.  Do you recall this exhibit?

2   A    I do.

3   Q    Okay.  And I think Mr. Bennett was asking you if these

4   could be combined and netted out, is that right?  Do you recall

5   being asked that?

6   A    I believe so, yes.

7   Q    Okay.  Are you -- were you -- are you offering as an

8   opinion or a finding that these two aggregations are the only

9   two aggregations that pertain to either David, Davidson

10  Teixeira or Du Painting?

11  A    No.  This is simply an illustrative purpose of two

12  aggregations, one very large and one very small, that share a

13  high degree of similarity and were not aggregated.

14  Q    Okay.  These were Mr. Martin's aggregations, is, is that

15  right?

16  A    They were.

17  Q    Okay.  Are you offering any opinions or findings as to

18  whether there were other aggregations that might be relevant to

19  the participants involved with these two aggregations, aside

20  from these two aggregations, meaning are there, potentially,

21  other aggregations?

22  A    There very well could be.  Again, I didn't attempt to

23  re-create this in whole, you know, in whole to suggest that

24  there's this or more than this.  Yeah.  This is just an

25  illustrative example.

1  Q   Okay.

2          MR. BENNETT:  Move to strike, your Honor.  It's purely

3  speculative.  He has no basis.

4          THE COURT:  I'll take it for what it's worth.

5  Overruled.

6          MR. RONA:  That's, that's all I have, your Honor.

7          THE COURT:  Thank you.

8          Mr. Bennett, anything else on your end?

9          MR. BENNETT:  No, your Honor.

10         THE COURT:  All right.  I don't have any questions.

11         So, Mr. Dennis, you are free to step down.

12         Is there any other evidence that anybody wants to

13  present before we conclude this portion of the process?

14         MR. RONA:  Not as, in the form of witnesses, but I

15  have shown some, both witnesses, I believe, or at least I think

16  I've shown Exhibit, Defendants' Exhibit 19, the affidavit of

17  Frantz Balan.  While in pleading form, that has not been filed

18  in court and so that's not a document that your Honor would

19  otherwise be able to take judicial notice of.

20         THE COURT:  Hmm.

21         MR. RONA:  And I would -- and it -- but it was a

22  document reviewed by Mr. Dennis.  And so regardless of

23  whether -- and I've conferred with Mr. Bennett and I understand

24  his position to be it's hearsay -- but regardless of whether

25  it's hearsay, it's, it's information that an expect can

1   properly consider and I think that it would assist the Court in

2   its gatekeeping function to be able to review what Mr. Dennis

3   reviewed.

4           And so plaintiff -- excuse me -- defendants move to

5   admit what's been marked for identification as 19.

6           THE COURT:  So I would, I would be taking it not for,

7   whether or not it's true, but simply as a basis for

8   understanding how Mr. Dennis reached his conclusions?

9           MR. RONA:  That -- that -- that's correct, your Honor.

10          THE COURT:  You have a problem with that, Mr. Bennett?

11          MR. BENNETT:  I do, your Honor.  Because it's, first

12  of all, if we're going to do that, then we, we could end up

13  moving into evidence all of the documents that Mr. - I, I would

14  then go back and offer all the documents Mr. Martin may have

15  relied upon, including the SIG system, and, as documents he

16  relied upon in reaching his conclusion.  I don't think that

17  assists the Court.

18          Mr. Dennis has already testified to the, that he saw

19  the affidavit.  He's testified to what information he took from

20  the information and what conclusions he draw, he drew from it.

21  In and of itself, that's, that's the basis of, you know, that's

22  part of going into his expert testimony.  Taking the affidavit

23  in now puts in other, into evidence or before the Court other

24  factors which have not been testified to.

25          THE COURT:  Are we talking about it being admitted

1  into evidence for all purposes in this adversary proceeding, is

2  that the problem?

3         MR. BENNETT:  I assume -- no.  It's only -- it was --

4  I assume it was only offered for this particular hearing, your

5  Honor, not for the adversary proceeding.

6         THE COURT:  Because I'm not even sure what the, what

7  the implications of it being admitted into evidence in, in the

8  context of this.  It's in -- it's -- I've, I've looked at it.

9  It's been discussed in testimony as have all the other, many of

10 the other documents submitted for identification as sort of, as

11 chalks.

12        What's the difference if it's admitted into evidence

13 or not as, any more than the other exhibits, Mr. Rona?  If, if

14 it's all part of the material that I'm going to look at for

15 purposes of evaluating Mr. Martin's qualification and -- and --

16 as an expert?

17        MR. RONA:  Well, my -- I'm, I'm going to do my best to

18 answer your Honor's question because I think, I don't want to

19 overcomplicate things.  But, but my understanding is we're

20 talking about admitting exhibits for purposes of a Daubert

21 hearing.

22        THE COURT:  Uh-huh (indicating an affirmative

23 response.)

24        MR. RONA:  And so it's not being admitted as a, in a

25 plenary fashion.  It's being admitted for purposes of this

1    threshold inquiry.

2           My further understanding is that while there may be

3    chalks that your Honor has seen, those don't become part of the

4    record.  And so -- and -- and -- and -- and to the extent that

5    in a Daubert proceeding there are reliance materials that are

6    referred to, I, I would suggest that those can, can and should

7    be, if warranted, part of the record and your Honor can take

8    judicial notice of, of pleadings which wouldn't be necessary

9    if, if, if everything was a chalk.  Expert reports just as a

10   general matter are not admissible.

11          So I don't think your Honor's ruling as to

12   admissibility, these aren't going to be exhibits at any trial.

13   This is just for purposes of having a record of, of what was

14   admitted in connection with this hearing, which is two

15   witnesses' testimony, three expert reports, and I'm offering a

16   solitary affidavit.

17          THE COURT:  What would, what would prevent you from,

18   from filing this affidavit in the adversary proceeding and

19   putting it on the docket?

20          MR. BENNETT:  It still wouldn't be evidence, your

21   Honor.  May, may I suggest this 'cause I --

22          THE COURT:  Right, it wouldn't be evidence, but it

23   would be -- now, now it's a pleading.

24          MR. BENNETT:  Well, I know, and I suppose, if I

25   could -- I don't, I don't want to get facetious.  Let me, let

1   me try to reach a, sort of a compromised position here.

2          This is a _Daubert_ hearing.  The -- we have made

3   reference to various chalks and Mr. Rona has drawn the Court's

4   attention to various documents.  I have no objection to the

5   Court looking to and relying upon any document that the parties

6   have made specific reference to and for which a witness has

7   testified to.  Therefore, yes, you can read the, the, the

8   affidavit.  I don't think we need to conclude whether it's

9   admitted or not admitted for evidence.  It can be part of, it

10  can be part of the records, your Honor.  I don't think we need

11  to go through that whole scenario.

12         THE COURT:  All right.  I'm, I'm admitting Mr. Balan's

13  affidavit as part of the record in this _Daubert_ proceeding and

14  I will look at it.

15      (Defendants' Exhibit 19 admitted in evidence)

16         MR. BENNETT:  And do we agree, your Honor, that, that

17  the Court -- I should -- I guess --

18         Mr. Rona, do you object if, if we agree that the --

19  agree -- do you object to having the Court review the various

20  chalks or any document that was referred to?  In other words,

21  do --

22         MR. RONA:  I have no objection and, in fact, I welcome

23  it in this case.  I think it's helpful for your Honor's

24  gatekeeping function.

25         THE COURT:  I think --

1          MR. BENNETT:  But only to those referred to.  'Cause

2   there were some other exhibits and documents there that you,

3   never were referred to and no witness testified to.

4          MR. RONA:  Right.  They were not published, but they

5   were presented to your Honor and I think your Honor, while not

6   obligated to read everything, is welcome to.

7          THE COURT:  Thank you.  And I typically rely, mostly,

8   on what, what people bring to my attention during the, the live

9   portion of these hearings.  So I'm -- I'll -- I'll focus,

10  primarily, on that, on that stuff.

11         MR. BENNETT:  All right.  I wanted to --

12         THE COURT:  All right.  So -- do -- am I right, we, we

13  are concluding the evidentiary portion of the proceeding with

14  regard to Mr. Martin?

15         MR. BENNETT:  Yes, your Honor.

16         MR. RONA:  Yes, your Honor.

17         THE COURT:  Okay, good.

18         So what's next?

19         MR. BENNETT:  We --

20         THE COURT:  I -- I -- I have to tell you just -- I, I

21  assume you guys know this -- that your discussions before we

22  went back on the record at the end of the break were not

23  confidential.  If you had wanted to be in a break-out room and

24  talk about timing and, and all that privately, you could have,

25  but everybody who was signed into Zoom could hear the

1  discussion, including me.

2        MR. BENNETT:  That was fine, your Honor.  It wasn't

3  meant to be confidential.  It was sort of --

4        MR. RONA:  No.

5        MR. BENNETT:  -- to expedite the process.  There was

6  nothing in there that we were --

7        THE COURT:  All right.  So --

8        MR. BENNETT:  I don't think we said anything

9  insulting.

10        THE COURT:  So, so if I understand the, the

11  discussion, we have the, we have the trustee's reply to

12  Mr. Dennis' rebuttal report and now we're going to give the

13  defendants two weeks from when the transcript is completed to

14  submit its surreply to the trustee and then, two weeks after

15  that, for the trustee to reply?

16        MR. RONA:  No.  I think -- let me clarify, your Honor.

17  I, I think there was -- what we were talk -- Mr. Bennett and I

18  were talking about the, the, the pleadings.  Mr. Bennett --

19        THE COURT:  Oh.

20        MR. RONA:  -- and his office filed a pleading late

21  last week, I believe, a memorandum of law --

22        THE COURT:  Okay.

23        MR. RONA:  -- on the principles, I think, that are at

24  play here.

25        THE COURT:  Yes.

#14-40987/AP 16-04006/AP 16-04007                    11-24-2020

1    MR. RONA:  And, and I think it's -- we were planning

2  on filing a, a, a response brief to that.  So that's the, the

3  briefing schedule that we were discussing.  But I think it

4  would be appropriate for your Honor to maybe let the parties

5  know what you envisioned for a Daubert hearing.  Because,

6  normally, the, the moving party files the motion, the opposing

7  party files an opposition, the moving party gets a reply, and

8  then, if large corporations are involved, they ask for

9  surreplies.  And Mr. Bennett has filed first, which I think

10  was, was smart, but now the question is does he get the reply

11  or do the defendants get the reply and what does your Honor

12  want or not want in, in the briefing schedule.

13    THE COURT:  Well, I thought the two of you had come up

14  with a -- with a -- an agreed --

15    MR. RONA:  We -- yeah, we have.  It would be we get

16  two weeks, defendants get two weeks from when the transcript

17  becomes available --

18    THE COURT:  Yep.

19    MR. RONA:  -- to submit a brief, hopefully within page

20  limits, and then the, the trustee would have, I believe, be two

21  weeks --

22    Mr. Bennett, is that right?

23    -- from when we file our brief to file your reply?

24    MR. BENNETT:  That's correct.  It would be a response

25  to yours and to highlight what we thought was the testimony.

1   It was to give --

2           MR. RONA:  Right, and that -- we agree with that.

3           THE COURT:  And, and so do I.  So that's fine.

4           MR. BENNETT:  Okay.

5           THE COURT:  And at that point I'll, I'll take it under

6   advisement and make my, my ruling and let you know as soon as I

7   get the rest of the material in, all right?

8           MR. BENNETT:  Thank you, your Honor.

9           THE COURT:  Thank you all.  Been very enlightening and

10  interesting.  I've heard more about methodologies than I ever

11  would have imagined I could have.  I hope I can retain all of

12  this while I wait for your briefs.

13          MR. BENNETT:  Thank you, your Honor.

14          THE COURT:  Have a good holiday.

15          MR. RONA:  Thank you, your Honor.  You as well.

16          THE COURT:  Thank you.

17          THE COURTROOM DEPUTY:  Court is in recess.

18          MR. LIZOTTE:  Thank you, your Honor.

19      (Proceedings concluded at 4:04:10 p.m.)

20

21

22

23

24

25

1                        <u>CERTIFICATE</u>

2              I, court approved transcriber, certify that the

3      foregoing is a correct transcript from the official electronic

4      sound recording of the proceedings in the above-entitled

5      matter.

6      /s/ *Janice Russell*                    January 4, 2021

7      Janice Russell, Transcriber                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25