UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC.,<br>TELEXFREE FINANCIAL, INC.,<br><br>        Debtors. | Chapter 11 Cases<br>14-40987-MSH<br>14-40988-MSH<br>14-40989-MSH<br><br>Jointly Administered |
| STEPHEN DARR, CHAPTER 11<br>TRUSTEE OF THE ESTATES OF EACH<br>OF THE DEBTORS,<br><br>        Plaintiff,<br><br>      v.<br><br>BENJAMIN ARGUETA, *et al.,* and a<br>CLASS OF DOMESTIC NET WINNERS,<br><br>        Defendants. | Adv. Proceeding No.: 16-04006 |
| STEPHEN DARR, CHAPTER 11<br>TRUSTEE OF THE ESTATES OF EACH<br>OF THE DEBTORS,<br><br>        Plaintiff,<br><br>      v.<br><br>PAOLA ZOLLO ALECCI, *et al.,* and a<br>CLASS OF INTERNATIONAL NET<br>WINNERS,<br><br>        Defendants. | Adv. Proceeding No.: 16-04007 |

**DOMESTIC & INTERNATIONAL CLASS REPRESENTATIVES'
MOTION TO EXCLUDE TESTIMONY OF
TIMOTHY MARTIN AS INADMISSIBLE UNDER *DAUBERT***

Domestic Class Representative Frantz Balan and International Class Representatives Marco Puzzarini and Sandro Paulo Freitas (the "Class Defendants") hereby move to exclude the expert testimony of Timothy Martin of Huron Consulting Group LLC (the "Martin Opinions") as inadmissible under Rules 702 and 703 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In support thereof, the Class Defendants state as follows:

## PROCEDURAL BACKGROUND

On February 3, 2020, the Trustee provided to the Class Defendants the initial Expert Report of Timothy Martin of Huron Consulting Group LLC ("Martin Report").[1] On July 31, 2020, the Class Defendant's expert Joshua Dennis of StoneTurn Group provided his Rebuttal Expert Report ("Dennis Report").[2] On September 23, 2020, the Trustee provided Mr. Martin's Reply Expert Report ("Martin Reply Report").[3] This Court held a two-day *Daubert* hearing on the Martin Opinions on November 23 and 24, 2020.

## SUMMARY OF MARTIN OPINIONS

The Martin Report summarizes the services that Huron Consulting Services LLC ("Huron") performed in an effort to "identify the net amount of money that each person (a 'Participant') received or expended with TelexFree, LLC, TelexFree, Inc. or TelexFree Financial, Inc. (collectively 'TelexFree') directly or with other persons in connection with the purchase of membership plans or voice over internet protocol packages ('VoIP')." Martin Report, at 3. In certain instances, the net amount of funds received by a Participant exceeded the amounts expended (a 'Net Winner'); conversely, in other

---

[1] Admitted as Plaintiff's Exhibit 1.
[2] Admitted as Defendants' Exhibit 1.
[3] Admitted as Plaintiff's Exhibit 2.

instances the net amount of funds expended by a Participant exceeded the amounts received (a 'Net Loser'). *Id* at 3.

Huron developed a computer based algorithm ("Algorithm") "to identify owners of TelexFree accounts ('User Accounts')" and to "aggregate multiple User Accounts by Participants." *Id.* Such an Algorithm was necessary because the recordkeeping system for Participants' transactions was complex and contained data regarding millions of individual accounts. *Id.* The Algorithm relies on information—such as name, email address, street address, and cell phone number—that Participants input when registering User Accounts. *Id.* The Algorithm also relies on other information that was stored in the TelexFree's Management Information System ("SIG"). *Id.*

Using their Aggregation method, Huron claims that the named Defendants in the domestic class action (Adv. Pro. No. 16-4006) had aggregate net winnings of $109,896,632, and the named Defendants in the foreign class action (Adv. Pro. No. 16-4007) had aggregate net winnings of $100,598,249. *Id.* at 4.

The Trustee also developed an electronic Proof of Claim process ("ePOC") portal to enable Net Losers to electronically file a claim. In order to file a claim, ePOC required a Participant to provide at least 4 Common Identifiers associated with any of their User Accounts. *Id.* at 3. ePOC would then show the Participant the User Account(s)—and only the user accounts—that the aggregation process associated with that Participant. *Id.* The Participant could then dispute the User Account(s), provide information regarding additional accounts, or dispute any transactions occurring in any account associated with that Participant identified by the algorithm. *Id.* at 3-4.

3

Mr. Martin claims that the Aggregation Process was validated by the results of the ePOC process. *Id.* at 4. Mr. Martin makes this claim because, according to him, "[t]here were approximately 130,700 timely filed claims, of which approximately 118,000 provided at least four Common Identifiers," and because more than 95% of those who provided the minimum Common Identifiers, "accepted the User Accounts identified by the Aggregation Algorithm." *Id.*

<u>**SUMMARY OF DENNIS REPORT**</u>

Defendants' expert Joshua Dennis of StoneTurn Group makes the following critiques of the Martin Opinions:

**1. TelexFree's Lack of Controls Over User-entered Names Makes an Aggregation Process Based on Names Unreliable**

There is no meaningful evidence that TelexFree had internal controls in place during the registration of a User Account that would have prevented a Participant from entering different variations of their name or a name other than their own, such as a spouse's name, a family member name, a business name, a colleague/employer name, or some fictitious, erroneous, or arbitrary combination of numbers, letters, or punctuation. Dennis Report, ¶ 56. As a result, utilizing an Aggregation Process—that as a "starting point" requires Participants to have accurately entered the same or similar names in every instance across all their User Accounts (which could number in the thousands)—is unreliable and inconsistent with the facts of the case. *Id.* ¶ 59.

2.  **Testing of the Largest Aggregations Shows an Under-Aggregation and Corresponding Misstatement of Liability**

Manual review of the top Net Loser and Net Winner Account Aggregations suggests numerous instances of potential under aggregation. This is highly problematic because a single missed link has the ability to (and often did) dramatically impact the Net Equity associated with Participants. *Id.*, ¶¶ 73-80.

Given the structure of TelexFree, there is a low likelihood that a Participant would incur significant net losses on the scale reflected by the top Net Losers (i.e., Participants who repeatedly buy into TelexFree either directly or through Triangular Transactions yet receive minimal or no gains). *Id.* ¶ 74. Mr. Dennis hypothesized that one alternative rationale for the existence of some of these large Net Losers is the Trustee's failure to appropriately consolidate certain Net Loser Account Aggregations with corresponding Net Winners. *Id.* To test his hypothesis, Mr. Dennis manually reviewed the Potential Identifiers for each of the top Net Losers with losses over $200,000, which totaled 31 Account Aggregations, and subsequently attempted to find matching Potential Identifiers among Net Winners. *Id.* Of the 31 aggregations reviewed, Mr. Dennis found one or more Potential Identifiers that matched a Net Winner aggregation for 30 of them. *Id.* This evidence includes instances where the same or similar values for Potential Identifiers, such as address, phone number, login, or email, appeared across both a Net Loser and Net Winner Account Aggregations. *Id.* ¶ 74

Mr. Dennis identified approximately $11 million in Net Loser aggregations that could potentially reduce the $25 million allegedly owed by the matched Net Winners, resulting in a reduction of approximately 45%. *Id.* ¶ 77. One of the factors likely driving

what appears to be under-aggregation in certain instances is the disconnect between (a) the Aggregation Algorithm's requirement that the names be the same or similar across every Participant User Account and (b) the reality that Participants could create User Accounts using a variety of names, such as business name, personal name, or even fictional names. *Id*. ¶ 78. This reliance on consistent naming fails to appropriately account for instances where other Potential Identifiers provide strong indicia that the User Accounts belong to a single Participant. *Id.*

### 3.  Mr. Martin's Application of Deterministic Record Linkage Rather than Probabilistic Record Linkage Does Not Provide Reliable Results

Mr. Martin provides no support for why deterministic record linkage, a supposedly "generally accepted" methodology for linking patient/medical information for research studies, is appropriate for aggregating the Potential Identifiers of User Accounts in an alleged Ponzi/pyramid scheme, especially given the differences in both the data quality and relative impact of missing or false links. *Id.* ¶¶ 48-53.

The source literature cited in the Martin Report suggests probabilistic record linkage may be a more appropriate methodology when direct identifiers do not exist and/or the data is of poor quality—both of which are conditions that Mr. Martin admits are present here. *Id.*

### 4.  ePOC Data Does Not Validate the Aggregation Process

Mr. Martin's conclusion that the ePOC data provides "the strongest evidence that the Trustee's Aggregation Process yielded reliable results" is unfounded. Martin Report ¶68, Dennis Report ¶¶ 65-66. The Martin Report fails to account for instances where

6

ePOC users claimed supposedly separate Participant aggregations through the submission of multiple claims or multiple account information sets. Dennis Report ¶ 67. Further, Mr. Martin provides no analysis to suggest that a relatively small percentage of users (*i.e.*, less than 5%) are sufficiently representative of the entirety of TelexFree Participants, including the Net Winner Class. *Id.* ¶ 68. This is especially true given that the majority of user claims in ePOC are for relatively small-dollar Net Losers, which can differ greatly in structure and complexity from that of larger Net Winners. *Id.* ¶ 70, Exhibit 5 to the Dennis Report.

### 5. The Exclusion of Credit Transfers Between Participants from Net Equity Calculations is Inconsistent with Treatment of Triangular Transactions

Mr. Martin's report lacks an adequate explanation for why imputed values of cash for triangular transactions are included within the determination of Net Equity while cash transferred for credits are excluded, even though both appear to be substantively similar from a real-world (*i.e.*, cash based) perspective. Dennis Report, ¶ 85.

To the extent any uncertainty exists regarding if, or how much, cash was exchanged as part of Credit Transfers, then such uncertainty necessarily extends to Triangular Transfers, given that the SIG database does not provide evidence of cash payments for either transaction type. *Id.* This internal inconsistency within the Net Equity Calculation between the treatment of Credit Transfers and Triangular Transactions results in a concluded Net Equity value that is unreliable. *Id.*

### 6. The Amount of Cash Invested/Received by Participants Can Differ from Amount of Credits Recorded in SIG

A foundational assumption of the Net Equity Calculation is that the Credit values recorded within SIG for Triangular Transactions (and/or Credit Transfers) are "typically" reflective of the amount of cash that was exchanged between Participants. Dennis Report, ¶ 92. However, the facts in this case suggest that in practice Participants transacted at amounts that could vary greatly, and sometimes at significant discounts, from the amount of Credits shown in SIG due to factors such as specific business arrangements, competition between Participants, or collection issues from new recruits. *Id.* ¶ 95. Certain Participants also worked as part of larger teams with profit-sharing arrangements and exchanged cash in foreign currencies. *Id.* ¶¶ 96-97, 104-105. None of this real-world activity is reflected in the SIG data on which Mr. Martin and the Trustee relies, and as a result the Net Equity Calculation can differ greatly from the net amount actually invested and received by Participants. *Id.* ¶ 98.

### LEGAL STANDARDS APPLICABLE TO *DAUBERT* ANALYSIS

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). "These two requirements—a reliable foundation and an adequate fit—are separate and distinct." *Samaan*, 670 F.3d at 31. The gatekeeping function applies to all expert testimony, not just scientific testimony. *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 147–48 (1999). Federal Rules of Evidence 702[4] and 703 apply to this analysis.

## A. Expert Opinions Must Be Reliable and Have Reliable Foundation

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a Daubert inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). In *Daubert*, the Supreme Court enumerated a non-exhaustive list of factors that a court may consider in undertaking its reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community. 509 U.S. at 593-94.

The question of reliability is specific, not general; the trial court must decide whether a particular expert has sufficient specialized knowledge to assist the jurors "in

---

[4] Rule 702 states:

> a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

9

deciding the particular issues in the case." *Kumho Tire Co.*, 526 U.S. at 156–57. Mere

say-so of reliability by the expert is not sufficient, as a trial judge is not required to

admit opinion evidence that is connected to existing data "only by the ipse dixit of the

expert." *Id.* As the First Circuit has held:

> The reliable foundation requirement necessitates an inquiry into the
> methodology and the basis for an expert's opinion. To perform the
> required analysis, the district court must consider a number of factors,
> including but not limited to "the verifiability of the expert's theory or
> technique, the error rate inherent therein, whether the theory or technique
> has been published and/or subjected to peer review, and its level of
> acceptance within the scientific community."

*Samaan*, 670 F.3d at 32, quoting *Ruiz–Troche*, 161 F.3d at 81.

In performing its *Daubert* gatekeeping function, a district court need not assess

whether the facts are accurate. Rather, "the focus is on 'whether the witness obtained

the amount of data that the methodology itself demands.'" *In re Blair*, 588 B.R. 605,

615–16 (Bankr. D. Colo. 2018), quoting *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223

(D. Colo. 2008); *see also* Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6268 (2d ed.)

In cases where courts have excluded testimony because the expert relied on too

little data, it was clear that the lack of data undermined or distorted the methodology

itself. *See In re Blair*, 588 B.R. at 617–18 (excluding expert testimony as unreliable where

expert used an altered methodology because, as he acknowledged, he did not have

sufficient data to use the established methodology); *see also Stollings v. Ryobi

Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (giving example that, "if an expert

seeks to testify about an average gross sales price but is going to base the testimony on

sales to only a single customer, a court would appropriately exclude the testimony

because a single observation does not provide a sufficient basis for calculating an average"). Nevertheless, a district court should also consider "whether the expert ignored a significant portion of seemingly important data." *Official Comm. of Unsecured Creditors v. CalPERS Corp. Partners, LLC*, No. 1:18-CV-68-NT, 2020 WL 4041483, at *5 (D. Me. July 17, 2020), citing Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6268 (2d ed.) ("If an expert 'cherry picks' favorable data in this manner but ignores a significant quantity of other important facts, the trial court would be justified in concluding that the expert's testimony is not based on sufficient facts or data."); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (affirming the exclusion of a lost-profits expert where the expert's opinion was based on internal financial projections of "a nascent company, the assumptions underlying which were relatively unknown" to the expert).

The proponent of expert evidence must also prove, by a preponderance, that the evidence is reliable. *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015). The reliability inquiry extends "to all aspects of an expert's testimony," including "the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). Expert evidence that is not "reliable at each and every step" is not admissible. *Id.*; *Jacked Up, L.L.C.*, 807 F. App'x at 348.

## B.  Expert Opinions Must Be Relevant to the Task at Hand and Have "Adequate Fit"

The second main *Daubert* requirement "has attracted less attention. This requirement seeks to ensure that there is an adequate fit between the expert's methods

11

and his conclusions." *Samaan*, 670 F.3d at 32; *see also Daubert*, 509 U.S. at 591. "This

prong of the *Daubert* inquiry addresses the problem that arises when an expert's

methods, though impeccable, yield results that bear a dubious relationship to the

questions on which he proposes to opine." *See Daubert*. 509 U.S. at 591–92; *Samaan*, 670

F.3d 31–32. "Seen in this light, the scope of a *Daubert* hearing is not limited to an

appraisal of an expert's credentials and techniques but also entails an examination of his

conclusions to determine whether they flow rationally from the methodology

employed. If perscrutation reveals that there is simply too great an analytical gap

between the data and the opinion proffered, the expert's testimony should be

excluded." *Samaan*, 670 F.3d at 33–35 (affirming the exclusion of the plaintiff's expert

witness because the methods the expert employed and the data that he presented were

simply too distant from the conclusion that he drew, thus negating an adequate fit

under *Daubert*.); *see also Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d

1227, 1232–33 (11th Cir. 2009) (expert's method was inadequate and speculative because

it merely estimated hospital overcharges that could have caused injury, rather than

demonstrating the requisite amount of unlawful charges which caused actual injury).

## ARGUMENT

The Martin Opinions must be excluded under *Daubert* because they are based on

unreliable and incomplete data, employ inconsistent and faulty assumptions, and use a

methodology that is subjective, unreliable, and results-oriented. These opinions are

inadmissible under Rules 702 and 703 and the principles set forth in *Daubert*, and

accordingly the Trustee cannot use these opinions to meet his burden of proof to

identify the nearly 95,052 alleged Net Winners and quantify their share of the alleged

$1.5 billion liability with the required level of exactitude. Ex. 5 to Dennis Report.

### A. The Trustee's Aggregation Method Must Be Precluded Under *Daubert*

Central to the Martin Opinions is the methodology by which user accounts were

aggregated to each claimed Defendant. This aggregation methodology was severely

flawed for several reasons. Most notably, all the TelexFree account data was entered by

TelexFree participants, without any meaningful controls. Huron used *this* unverified

data as a starting point for its aggregations, forever dooming the analysis from the start.

Making matters worse, Huron then chose to use deterministic record linkage, a

methodology designed for high quality data where matches are known to exist. Huron

applied this incorrect methodology in a biased and subjective manner, using

trial-and-error and visual inspection, and favoring transparency to lay creditors over

statistical accuracy. This resulted in aggregation determinations that this Court simply

cannot rely upon to identify liable parties and assign amounts of their liability.

### 1. Because Name Data Used by Huron Was Entered by Participants, without Controls, it was Insufficient, and Huron's Methodology and Opinion Based on that Name Data is Unreliable

Mr. Martin methodologies are underpinned by insufficient data. *See Polaino v. Bayer*

*Corp.*, 122 F. Supp. 2d 63, 70 (D. Mass. 2000) (excluding an expert in part because of the

"fundamental error" of failing to determine the "actual concentrations (if any) of acetic

acid and glutaraldehyde"). Instead, he relied entirely on user entered data that was

inaccurate and in many cases fictitious or unintelligible. If the underlying data is

unreliable, any expert opinion that relies on it must be excluded. *See Carrozza v. CVS*

*Pharmacy, Inc.*, 391 F. Supp. 3d 136, 145 (D. Mass. 2019) (excluding an expert opinion not based on adequate data that amounted to mere "assumptions, speculation[,] and guesswork"). A court should exclude expert testimony where the expert lacks facts and data necessary to support his chosen methodology. *In re Blair*, 588 B.R. at 619 (excluding expert's testimony regarding the Debtor's insolvency, where there were insufficient facts to support the expert's "fair market value balance sheet methodology").

Here, the name data within the SIG system that formed the basis for Huron's aggregation methodology is incredibly flawed and insufficient. As Mr. Dennis points out there were no internal controls that took place during the registration of a User Account that would have validated or confirmed a name, or prevented a Participant from entering a fictitious, erroneous or arbitrary combination of numbers, letters, or punctuation in place of a name. Dennis Report, ¶ 56. Hundreds of thousands of accounts have names consisting of short arbitrary letters, numbers, or merely punctuation. *Id.* Mr. Martin gives examples of  names like "........", which was used for seven different User Accounts. *Id.* ¶ 58. There were also names that included Chinese characters. *Id.* ¶ 57. There was even a "Mickey Mouse." Hearing Tr. 277:11-18. Data of this type is not a  reliable "starting point" for the Aggregation methodology. *Id.* ¶ 59.

 Mr. Martin admits that numerous factors impact the reliability of the user data; for example: different people go by different names; there are different naming conventions around the world; some people have multiple last names; different users could enter data for a single person; and people could misspell their own name. Hearing Tr. 146:4-148:7. Mr. Martin did not know whether there was any requirement at TelexFree

14

for a person to use their real name. Hearing Tr. 148:22-149:12. Mr. Martin did not rule

out that TelexFree data entry was subject to autocomplete, meaning previously entered

data could be re-entered inadvertently when not appropriate, causing errors in the data.

Hearing Tr. 148:14-21. Simply put, Mr. Martin agrees with StoneTurn that there were

inaccuracies in the data, including the use of fictitious names and changes in the names

used. Hearing Tr. 118:4-14.

Mr. Martin attempts to buttress his decision to use the name field by providing

three inadequate justifications:

> since Participants could redeem credits for cash directly from TelexFree, it
> is reasonable to assume that the Participants would associate their name
> with the User Account...

> Over the approximately two-year operations of TelexFree, a Participant's
> name is more likely to remain constant when compared against other
> potential identifiers, such as phone numbers, email addresses, and
> physical addresses...

> Additionally, a Participant's name will remain distinct even when other
> similar information is shared, as would be expected among family
> members or roommates.

Martin Reply Report, ¶¶ 15-16.

This rationale is wholly speculative, and not based on any review or analysis of

actual common practices at TelexFree. Direct redemptions from TelexFree only

accounted for about 5% of the total combined Direct Receipts, Triangular Receipts, and

chargebacks in TelexFree, and only 2% of participants actually had direct receipts.

Dennis Report, ¶ 55. As such, suggesting that Participants entered consistent names

across all their User Accounts just so they could receive Direct Receipts is untenable. *Id.*

Further, Martin's explanations miss the mark because a fundamental part of TelexFree's entire scheme consisted of individual users *posing* as multiple users. This unregulated practice necessitated aggregation in the first place. Why would Participants always use the same or a similar name when they were posing as someone else? If a *single* Participant was rapidly registering new user accounts, why would they change their primary phone number, email address, and physical addresses rather than simply changing the name on the user account? Wouldn't those items typically remain constant? Martin provides no meaningful reason for elevating the name fields over the other intrinsically flawed data fields.

> **2.  Martin Employed a Methodology that, While Reliable for Robust Data Where Proper Matches Are Assured, Is Unreliable in this Case Where Matches Cannot Be Assured**

Mr. Martin compounds the unreliability of his analysis by applying a "deterministic" record linkage, which he describes as "generat[ing] links based on the number of individual identifiers that match among the available data sets…[t]wo records are considered a match under a deterministic record linkage procedure if all, or a predetermined number of identifiers are identical. Martin Report, ¶¶ 14-15. Mr. Martin claims that deterministic record linkages are "a generally accepted practice," but the literature he cites only recommend this method "[i]n information-rich scenarios where direct identifiers are available and of good quality" and that "[i]n these scenarios, deterministic methods are easy to implement, easy to interpret, and effective." Martin Report, ¶ 14.

The opposite is true in this case. The data is not of good quality and the direct identifiers are neither consistent nor accurate. In these circumstances, the literature Mr. Martin cites, notably the Statistical Data Warehouse Design Manual, indicates that probabilistic approaches consistently outperform deterministic linkages. Dennis Report, ¶ 72. A Deterministic model assumes a match, which is often the case in financial or healthcare records where there is data (like a social security number) that can assure a match. Probabilistic methods, on the other hand, calculate "weighted probabilities" in determining the strength of a match. Hearing Tr. 59:13-18.

Mr. Martin admits that one of the reasons probabilistic methods are used is "when data is not good quality" and "no one identifier is known to be superior to any other." Hearing Tr. 128:17-21. This was precisely the case here. Indeed, the poor quality of data forced Mr. Martin to reject the use of any single identifier. Hearing Tr. 57:24-25, 65:13-18, 66:1-21.

Given that he had no stable identifiers to work with, Mr. Martin gave no adequate explanation for why he eschewed a probabilistic approach, other than to say that a deterministic model made it easier to "walk through and explain to participants and allow them the ability to challenge the inclusion of a user account within the aggregation and to introduce additional user accounts." Hearing Tr. 60:11-22. Indeed, the selection of a deterministic model was heavily driven by public relations: "Transparency was always a, a strong consideration..." Hearing Tr. 143:3. Mr. Martin thought a deterministic model would be easier to explain to lay people. Hearing Tr. 145:5-7. He also wanted a model where any participant "could look at the user accounts

and just by looking at it, get a sense of why it is that they were included in there."
Hearing Tr., 145:9-10.

The selection of the wrong methodology stems from an apparent conceptual
misunderstanding. Mr. Martin concedes that he proceeded at the outset "with the
assumption that there was no way with 17 million user accounts that you're going to be
100 percent accurate." Hearing Tr. 56:9-13. In such a case, the proper methodology
would be to proceed with weighted probabilities because you cannot assume data
matches. But instead, Mr. Martin selected a method that assumes matches in a binary
fashion: "your account is either in or out based on the deterministic [model]." Hearing
Tr. 60:23-24. "Deterministic record linkage is linking records together based on
predetermined criteria. So if you, if you determine the criteria and there's a match,
then—then it's a—then it's a match. If, if, for example, you're, you're determining—if
the phone numbers match, you know, then you, then you have a match." Hearing Tr.
59:7-12. This makes sense when there is "a single reliable and stable identifier." Hearing
Tr. 128:25-129:3. But it does not make sense where there are no *reliable* identifiers.

But what if the data does not always match? Because the TelexFree data was
discordant and unverified, there were bound to be records that could not be matched
mathematically. Mr. Martin wanted to avoid this result in his discussion with creditors:

> [with the probabilistic method] every time you run the aggregation a user
> account may, because of the way the prob, the probabilities work and the
> weightings, if you change the weight, the user account may show up this,
> in this aggregation the first time but if you change a weighting by a
> percentage, it will not show up in the aggregation the second time. And
> that's less concrete and it's less, in, in our opinion, it's not as transparent
> in trying to explain to a participant why it is that this, a certain user
> account is included within their aggregation.

18

Hearing Tr. 61:1-10. The failure of certain associations to be made is precisely the point. If the data is too weak to support a linkage, a probabilistic method will prevent the linkage. If Mr. Martin had used a probabilistic model, certain accounts would have failed to meet a threshold and would not have been aggregated, not based on subjectivity, but based on objective math.[5] Hearing Tr. 131:3-10.

Tellingly, Mr. Martin admits the lack of "an answer key" in this case. Hearing Tr. 62:3-7. But he erroneously concludes that the lack of an answer key favors the use of a deterministic, not probabilistic method. This is incorrect, as his own citations show. The lack of an answer key is the very reason why Mr. Martin should have performed a probabilistic linkage analysis. Mr. Martin expresses further confusion, believing that the probabilistic method requires two sets of data. Hearing Tr. 130:15-131:2. In reality, all that is required are two different "data items" to assign a weight. Hearing Tr. 131:24-132:4. Had Mr. Martin conducted a probabilistic method, then this Court would be in a position to review the strength of the record linkages. Linkages that were too weak could have been jettisoned. Here, we don't know the strength of the linkages: we are told to simply allow them, even as the Trustee allows creditors to come forward and modify the record linkages on an *ad hoc* basis.

As Joshua Dennis observes, missed links under the deterministic approach skews the results towards under-aggregation. *See* Dennis Report, ¶¶ 72-73, 77-78.

---

[5] Mr. Martin's somewhat dismissive reference to probabilistic record linkage as "fuzzy matching" suggests a lack of understanding of the proper use of probabilistic record linkage. Martin Report, ¶ 45. Probabilistic linkage weeds out those results that fail to meet a mathematical threshold but otherwise identifies matches that may be less than 100% perfect. It is not the approach itself that is fuzzy.

19

Under-aggregation falsely implies that there are more participants than there actually are, and that overall net winnings may be greater than they actually are. *Id.*

In sum, while deterministic methods may be generally accepted, they are not generally accepted in cases where the data is of such poor quality. *Id.* ¶¶ 52, 72. *See Kumho Tire Co.*, 526 U.S. at 156–57 (holding that the question of reliability is specific, not general; the trial court has to decide whether a particular expert has sufficient specialized knowledge to assist the jurors "in deciding the particular issues in the case.").

### 3. The Trustee's Aggregation Is Further Unreliable Because It Relies on Subjective Analysis, Visual Inspection, Bias, and Trial-And-Error

An admissible expert opinion must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. For example a visual inspection, not recognized by other experts, is connected to existing data only by the *ipse dixit* of the expert and must be excluded. *See Kumho Tire Co.*, 526 U.S. at 157.

Here, Mr. Martin employed an admittedly subjective analysis. He selected the variables to use based on trial and error. Hearing Tr. 136:18-137:8. He then used subjective and "visual inspection" to determine whether each iterative round with the new identifier represented a subjective improvement, in a process which Mr. Martin admits involved some form of the "eyeball test." Hearing Tr. 13:15-137:25, 73:4-15, 73:25-74:4 ("[A]fter each step, there was a analysis determining what, what got aggregated, why did it get aggregated, ***should it have been aggregated***, and then for the, for the items that didn't get aggregated, the next step is ***why didn't they and should they be and how, how could they be***.") (emphasis added). This subjective review

process took more than a year. Hearing Tr. 76:3-4. He then subjectively proceeded

through thirteen rounds before subjectively deciding that he had hit diminishing

returns. Hearing Tr. 142:3-7. From his testimony, it is clear that there is no scientific

principle at play here:

> Me with my team and after going through each of the iterations with the
> trustee and counsel. We'd look at this is the results after 'X,' this is the
> results after 'Y,' and we discussed it and 13—I think we, if I remember
> correctly, we, we had 13. We looked—the answer is yes. We made the
> determination at 13...That, that was the correct place to stop."

Hearing Tr. 141;17-24. In the end, the sole criterion was if the aggregation "appeared to

be working." Hearing Tr. 94:3-95:20.

In between those steps, he used subjective and biased conversions with various

third parties, primarily net losers, to determine whether "the output that can be

reviewed by a third party that they can look at to determine if it looks right to them."

Hearing Tr. 109:21-110:12, 122:14-18, 134:25-135:4. The back-and-forth between Mr.

Martin and mostly Net Losers is opaque and cannot be reviewed for bias, as Mr. Martin

could not identify any of the people he spoke with (other than a "Fernando") and has

no comprehensive list of who he spoke to. Hearing Tr.135:25-136:3. Nor could he say

that the sample of people he spoke to was a statistical sample. Hearing Tr. 136:4-136:7.

This was not scientific.

The Trustee likens the process of aggregation to a "snowball." Each round made the

snowball "bigger and bigger," which means that the number of purported participants

reduced. Hearing Tr. 64:9-12. As the snowballs got bigger, there were significant, but

undisclosed, modifications to many individual aggregations. Hearing Tr. 109:21-110:12.

Those changes potentially could have dire consequences for an alleged net winner. But how Mr. Martin arrived at his final list of net winners and the changes that appeared along the way are complete unknowns. This is problematic, especially because Mr. Martin could have kept going with his process. Indeed, he admits that even now he could perform secondary analyses, which could locate additional accounts for aggregations. For instance, in the case of the Zagarella group, he located an additional 1,993 user accounts that were part of his original aggregation. Hearing Tr. 209:9-18.

In the end, Mr. Martin used seven identifiers and thirteen rounds of aggregation that cannot be replicated by another expert. His interim analyses are unavailable for review, and thus it is impossible to determine the evolution of each aggregation. Mr. Martin opines that all of his linkages are strong, but he does not reveal which accounts teetered on their edge or vacillated between different aggregations. This process is too subjective, ad hoc, results-oriented, and unreliable to be admissible under *Daubert*.

### B.  The Trustee's Net Equity Analysis Must Be Precluded Under Daubert

The Martin Opinions as to net equity are unreliable and irrelevant because they deviate from the net equity formula, tabulate the wrong data, use assumptions that are inconsistent, unverifiable, and in most cases false, and rely on the fictitious Ponzi scheme data rather than actual cash transactions.  For these reasons, the net equity calculations are unreliable and lack fit and must be excluded.

### 1.  Net Equity Formulas Only Count Cash, and Must Therefore Ignore the Fraud of the Ponzi Scheme

The well-settled law on "net equity" requires that all cash transactions, be included in the calculation, while the fictitious and fraudulent accounting of the Ponzi scheme be

disregarded. At the instructions of counsel, Mr. Martin deviates from this beaten path, by intentionally excluding credit sales.

Net equity models expressly require a collapsing of all transactions down to "cash in and cash out," rejecting any other calculations that reflect the fraud or artifice of the Ponzi scheme. In the Madoff cases, the trustee concluded that each customer's "net equity" should be calculated by the "Net Investment Method," which credited "the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011). The Second Circuit affirmed, ruling that Trustee Picard's net equity definition "was more consistent with the statutory definition of 'net equity' than any other method advocated by the parties or perceived by the Court. *Id.* at 235. In that instance, the Court ruled that "[u]se of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations," and further noted that while SIPA speaks to the liquidation value of "securities positions," determining such positions for purposes of the Madoff investments was impossible because Madoff never made any actual investments. *Id.* at 235. Furthermore, "the account statements were wholly the invention of Madoff and do not reflect actual securities positions." *Id.* at 237. Therefore, for purposes of cash payments to customers from the customer funds, the trustee was correct in utilizing the Net Investment Method.

In the TelexFree cases, the definition of net equity is:

> the amount invested by the Participant into the Debtors' scheme, including amounts paid pursuant to Triangular Transactions, less

23

> amounts received by the Participant from the Debtors' scheme, including
> amounts received pursuant to Triangular Transactions.

Ponzi Scheme Order dated January 26, 2016, ECF No. 0687. This is similar to the Madoff

Net Investment Method, other than that it implicitly recognizes that many transactions

were with other participants and did not occur directly to or from TelexFree. Thus, the

proper interpretation of this definition turns on what it means to invest "into" or

receive money "from" the "scheme."

According to this Court's Ponzi Scheme Order, scheme is one of several terms

ascribed the meaning in the Trustee's motion. *Id.* at 2 n.1. In that motion, the Trustee

describes the "Mechanics of Scheme and Methods of Compensation." Ponzi Motion, at

6, ECF No. 623. In that section, the Trustee describes how credits could be monetized:

"The credits issued to Participants for placing advertisements and selling membership

plans and VoIP Packages could be redeemed for cash, transferred to another User

Account, or applied in satisfaction of an invoice for another User Account." *Id.* ¶ 21. It is

thus clear that part of the TelexFree scheme included "exchanges of credits between

User Accounts unassociated with the issuance and satisfaction of Debtor invoices."

Ponzi Motion ¶ 59, ECF No. 623.

Parsing the net equity formula became important when alleged victims of the

scheme attempted to argue in this case that the Estate had no interest in cash

transactions between participants. In rejecting that argument, Court indicated that it

understood the Trustee's request for a net equity formula as follows:

> Mr. Darr requested that the participant's claim be calculated as the ***total
> amount of money paid by a participant to*** either TelexFree ***or another
> participant*** less ***all amounts received by the participant from*** TelexFree ***or***

24

> *another participant*….Using the net Equity formula, the total amount a
> participant paid, whether to TelexFree or to a recruiting participant,
> minus the amount of money that the participant received, whether from
> TelexFree or a recruited participant, results in the amount of the
> participant's claim.

Proposed Findings of Fact and Rulings of Law, *Darr v. Dos Santos* (Adv. Pr. 15-4055), at

10.  There were no limitations on how a participant could pay or receive money from

another participant, and there was certainly no express finding limiting such amounts

to triangular transactions.

The First Circuit affirmed this Court's proposed findings of fact and conclusions of

law, finding that the Trustee's definition of net equity to be broader than PIEC's. PIEC's

definition, which this Court rejected, only included inter-participant transfers; the

Trustee's net equity formula, which the court did approve, "includes payments from

TelexFree *as well as other participants* when calculating who is a Net Winner." *In re

TelexFree, LLC*, 941 F.3d 576, 585 (1st Cir. 2019) (emphasis added).

It would strain credulity for anyone at this late stage of the case to argue that the

Trustee ceded all credit sales to PIEC by way of abandonment, without alerting this

Court, the First Circuit, or PIEC itself that it might have had standing to pursue

potentially hundreds of millions of dollars of transfers. *See In re Ontos, Inc.*, 478 F.3d 427,

431 (1st Cir. 2007) ("creditors only have standing to pursue such claims during

bankruptcy proceedings when a trustee or debtor in possession unjustifiably fails to

pursue the claim."). In reality, the Trustee continues to view credit sales as part of the

scheme, as the Trustee's *Daubert* Brief makes clear: "[t]hese credits could be redeemed

for cash, transferred to another Participant, or applied in satisfaction of an invoice as in

the case of Triangular Transactions." Trustee's Daubert Brief, at 4, ECF No. 517. As the Trustee recognizes: "To the extent recruiting Participants received more from the scheme than they invested, the Bankruptcy Code's avoidance actions provide the method to ensure equality of distribution among Participants." Ponzi Motion, ¶ 93, ECF No., 623.

As is clear from Joshua Dennis's analysis, the method of the Martin Opinions to ignore credit sales results in net equity calculations "arbitrarily and unequally distributed among customers." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 (2d Cir. 2011). Indeed, as is clear from Exhibits 7 and 8 to the Dennis Report, large differentials in the direction that credits were transferred had a significant impact on net equity, particularly for top net losers and winners. In some cases, net equity could grow; in other cases net equity could be slashed to a small fraction of the Trustee's calculation; and in some cases, net winners could become net losers or *vice versa*. Dennis Report, Exs. 7 & 8.

Here, Mr. Martin ignores the sale of credits at the instruction of counsel. Hearing Tr. 54:3-10. This instruction undermines the reliability and relevance of his opinions. *In re Blair*, 588 BR at 616, 622 (excluding expert testimony where expert relied on counsel who "told him that the data was not available and instructed him 'to proceed based on what I had'"). By ignoring one of three channels through which a participant could monetize or acquire more credits, Mr. Martin does not adhere to the definition of net equity in this case. He thus answers the wrong question. Perhaps the decision to ignore credit sales could be explained through empirical analysis that considers whether the

exclusion has no impact on his conclusions. But there are no such assurances. Martin

makes no effort to calculate what the effects of this assumption are or how they impact

identification of liable parties or the amounts of their liability.

For whatever reason, the Martin Opinions lose sight of the Madoff proviso to look

solely at cash and ignore the fictions of the Ponzi scheme. Here, Mr. Martin justifies an

inconsistent set of assumptions that includes credit transactions that were part of

triangular transactions while excluding other transactions, equally triangular in nature,

simply because the latter lacked an invoice and thus has no "revenue and liability

impacts to TelexFree" or its "balance sheet." Hearing Tr. 185:17-190:18. In other words,

Martin does not look to the essence of transactions, but merely takes the books and

records of TelexFree at face value. Amazingly, Martin admits that his net equity

calculations, insofar as they were based primarily on triangular transactions, were

"somewhat tied to the impact on TelexFree *as opposed to the amount changing hands*."

Hearing Tr. 202:7-8. But the TelexFree invoices are themselves evidence of the fraud, no

less fictitious than the monthly account statement that investors received from Madoff.

Under the net equity formula in this case, once a person paid money to receive

TelexFree credits, they became a customer and thus an investor in the scheme.

Similarly, once a participant parted with credits for cash, that participant received

amounts from the scheme. Pursuant to prior Court Orders in this case, credit sales

should have been included. Mr. Martin's failure to adhere to the Net Equity formula

would allow one participant to "elevate her claim over the claims of others," which

"thwarts the policy of ratable distribution at the heart of the bankruptcy system."

27

Proposed Findings of Fact and Rulings of Law, *Darr v. Dos Santos* (Adv. Pr. 15-4055), at

23. As is discussed below, this makes Mr. Martin's opinions unreliable and irrelevant.

### 2. By Ignoring Significant Cash Transactions, Martin's Assumptions are Inconsistent, and His Opinions Are Unreliable

Regardless of the reason, Mr. Martin's deviation from the net equity methodology

for calculating net equity makes his opinions inadmissible. "Alteration of an established

methodology is a step that renders the analysis unreliable and renders the expert's

testimony inadmissible." *In re Blair*, 588 B.R. 605, 617 (Bankr. D. Colo. 2018) (internal

quotations and brackets omitted). As he knew from his own experience, Mr. Martin was

required to collapse all transactions within the scheme down to cash in and cash out.

Hearing Tr. 116:22-24 ("net equity calculation is, is common in, in all the Ponzi schemes

I worked on where it's a determination of cash in — cash you invested versus cash you

receive back."). He failed to do so.

Here, Mr. Martin admits that credits were sold for cash. Hearing Tr. 176:22-25. And

he further admits that they were sometimes sold for a dollar and sometimes more than

a dollar. Hearing Tr. 177:13-16. Mr. Martin provides no data-driven explanation,

however, for why credit sales could be ignored or why such exclusion had no effect on

his overall opinions. The reason was purely legal, an instruction from Trustee's counsel

that Mr. Martin did not seek to overrule. Hearing Tr. 54:3-10, 179:5-7. This was the case,

even though Martin believed that the credit transfer table was one of the four SIG data

tables that he found "relevant" and "most useful." Hearing Tr. 43:19-45:16.

Interestingly, the instruction to ignore credit sales was not disclosed in Mr. Martin's

original report, which instead made the erroneous claim that "TelexFree was not a party

to these transactions and the transfer of credits did not impact the net winnings or net losses of a participant for purposes of computing Net Equity." Martin Report, at 12 n.6. Mr. Martin was forced to retreat from this claim given his own acknowledgment that TelexFree was a party to these transactions and that he was aware that credits were sold for money. Hearing Tr. 176:22-177:5.

This introduces a fatal inconsistency in Mr. Martin's expert testimony. The entire identification of net winners and the computation of their liability is based on the assumption that "each credit was a dollar." Hearing Tr. 121:23-25. Putting aside the unreliability of that assumption (discussed below), the exclusion of credit sales means that in the Martin Opinions credits are sometimes worth 100 cents and sometimes worth zero. This inconsistency unbalances the entire analysis. Why would anyone pay $1,425 for the right to earn credits if they could receive them for free? And why would anyone give away credits for free if they could monetize them dollar for dollar?

Inconsistent and incompatible assumptions doom an expert opinion. *See Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773, 785–86 (E.D. La. 2015). For example, where an expert assumes in his report that for two months a year, it was too cold to leave the garage doors open, while also assuming that a person's hands and forearms were covered in perspiration those same days, the inconsistency is problematic because it increases his cumulative exposure estimate in one part of his report, while simultaneously failing to account for factors that would have decreased those estimates significantly. *Id.* Such an inconsistency contributes to the overall unreliability of an expert analysis. *Id. See also SMS Systems Maintenance Services, Inc., v. Digital Equipment Corp.*, 188 F.3d 11, 25 (1st

29

Cir. 1999) ("Expert opinions . . . are no better than the data and methodology that

undergird them."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d

430, 478 (S.D.N.Y. 2018) ("Inconsistencies of this magnitude indicate a lack of

reliability…we conclude that the internally inconsistent nature of Dr. Seyhun's models

seriously undermine their reliability.").

The Affidavit of Frantz Balan makes clear that there was in fact a market for credits,

which were undeniably a part of the scheme as triangular transactions. Defendants'

Exhibit 19, ¶ 30. This is confirmed by Exhibit 10 to the Dennis Report, which shows that

Mr. Balan bought or otherwise transferred in $625,513.96 worth of credits (assuming

Mr. Martin's dollar per credit assumption is accurate), while selling or transferring out

$323,569.03. If Martin applied a consistent assumption of dollar parity to Mr. Balan's

credit transfers, the $302,000 imbalance in credit transfers would reduce Mr. Balan's

alleged $518,000 net equity by more than 50%. The Martin Opinions are thus based on

inconsistent assumptions and lawyer-driven instructions which cannot be squared with

the net equity formula to be used in this case. The practical consequences of ignoring

credit sales is that Mr. Martin's net equity calculations may be incorrect and would

change if credit sales were included. Hearing Tr. 177:1-8. On occasion, a net winner

could even become a net loser, and *vice versa. Id.*

### 3. Martin's Net Equity Analysis Is Unreliable and Lacks "Fit" Because it Fails to Consider the Actual Cash Amounts Exchanged for Membership Plans or Discounts Given, and Huron Failed to Obtain this Data

An opinion cannot be based on objectively unreliable data or projections. *Jacked Up,*

*L.L.C.*, 807 F. App'x at 348–49. Although the basis of an expert's opinion usually goes to

the weight and not the admissibility of expert testimony, in some cases "the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion." *Viterbo*, 826 F.2d at 422; *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012). An expert opinion is unreliable when the expert "made no attempt to reconcile his view with a number of real world events" and "fail[s] to acknowledge and account for these events." *In re Iridium Operating LLC*, 373 B.R. 283, 350 (Bankr. S.D.N.Y. 2007) ("'[F]ailure to look' at facts, 'even for a reality check' means that an expert lacks sufficient facts and renders his opinion unreliable."). For this reason, an expert cannot rely on "factually inaccurate data and unsupported assumptions" as those generally lack "the sound scientific basis and intellectual rigor required by *Daubert*." *In re Denture Cream Prod. Liab. Litig.*, No. 09-2051-MD, 2015 WL 392021, at *35 (S.D. Fla. Jan. 28, 2015), *aff'd sub nom. Jones v. SmithKline Beecham*, 652 F. App'x 848 (11th Cir. 2016). An expert is also not permitted to rely on too little data, even in cases where he does not have sufficient data to use the established methodology. *In re Blair*, 588 B.R. at 617–18; *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

Here, Mr. Martin fails to take into any consideration the ***actual*** amounts of cash received by participants on account of triangular transactions. Indeed, his net equity calculations don't factor in any amounts of actual cash that one participant received from or paid to another. Hearing Tr. 195:12-13. Although he had access to some financial records, Martin made no effort to quantify cash or statistically correlate cash with the value of credits. Hearing Tr. 199:23-201:2. Mr. Martin could have bridged this

gap by seeking more records, empirically determining the actual going rate for the sale

of membership plans, or by using statistics to estimate conversion rates based on

economic, geographic, and collection-based factors. No such efforts were made, and the

Trustee never obtained more than a smattering of financial records.

In his rebuttal report, Mr. Dennis points out the clear indications showing that

membership plans did not trade on a dollar for dollar basis, even though the recruiting

participant *paid* the invoice with 1,425 in credits. Dennis Report, ¶¶ 92-94. Mr. Martin

himself recognizes this issue, when he states in his report:

> To redeem credits for a recruited Participant a new User Account was opened for
> the recruited Participant and the recruiting Participant satisfied the resulting
> membership fee with credits held by the recruiting Participant (a "Triangular
> Transaction").
>
> Based upon interviews with Participants and others, the recruited Participant
> **typically** paid the membership fee in cash to the recruiting Participant who, in
> turn, satisfied the recruited Participant's membership fee with their own credits.

Martin Report, ¶¶ 16-17 (emphasis added). Mr. Dennis explains why this is
problematic:

> This description is exemplary of why the Net Equity Calculation is not reliable.
> Mr. Martin and the Trustee are assuming that the amount of Credits transferred
> as part of a Triangular Transaction is equivalent to the amount of cash invested
> or received by Participants. However, the assumption that cash was exchanged is
> based on interviews with what could only be a very small percentage of the total
> 2.1 million TelexFree Participants, many of whom are outside of the U.S., and
> even then, cash exchanges only "typically" occurred.
>
> Mr. Martin does not provide any specific guidance regarding what "typically"
> means in this context. For example, was cash exchanged between Participants as
> part of Triangular Transactions 90% of the time, or less than 75%? In those
> instances where cash was exchanged, was it always the exact amount of, and
> equivalent to, the amount of Credits recorded within SIG, the data source which
> forms the basis for the Trustee's determination of Net Equity? Given the massive
> size and volume of Triangular Transactions that occurred on a global scale (i.e.,
> more than $2.7 billion dollars and 13.3 million transactions for Triangular

Receipts alone), much of which I understand was transacted in physical cash, the
assumption that Credits recorded in SIG are necessarily equivalent to
investments or receipts by Participants is unsupported.

Dennis Report, ¶¶ 93-94.

Further, in his testimony to the Court, Mr. Martin admitted that he was aware of

instances where membership plans traded at a price different than face value. Hearing

Tr. 122:19-25. This is a huge problem for Mr. Martin, because it shows that he is aware

that his assumptions are incorrect, and there is potentially other data that his

methodology fails to account for. Indeed, there was no way for a participant in a

triangular transaction to enter the amount of cash actually received in the SIG system.

Hearing Tr. 193:15-194:6. Martin also did not consider any real-world factors, such as

collection problems, alternate payment arrangements between participants,

profit-sharing arrangements, or multiple ownership of accounts, which render the

projections on triangular receipts unreliable. Hearing Tr. 202:7-8.

Accordingly, Martin's reliance on the amount of cash projected by Ponzi Scheme's

computer interface fares no better than the projections of "aggressive, gangbusters

scenarios" that contained some amount of "boastfulness and puffery." *Jacked Up, L.L.C.*,

807 F. App'x at 347. Martin admits that he relies solely on the aggregate amounts of

invoices used to calculate net equity. Hearing Tr. 194:7-13. And he found it reasonable

to project net equity as the cumulative sum of the invoiced amounts simply based on

what he was told by TelexFree and its employees, as well as what was contained in the

fraudulent marketing materials for TelexFree. Hearing Tr. 122:1-14. Once again, the

Martin Opinions are taken in by the deceptive fictions of TelexFree.

33

Martin attempts to sidestep the lack of financial transaction data by simply making a blanket assumption that all included (but not the excluded) credit transactions were uniformly worth $1 per credit. Hearing Tr. 201:22-202:8. Even if this Court were to find the Trustee's aggregation method reliable, the identification of net winners still depends on correlating credit transfers with cash transactions, something Mr. Martin does not attempt. "If perscrutation reveals that there is simply too great an analytical gap between the data and the opinion proffered, the expert's testimony should be excluded." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) (internal citations omitted). Stated a different way, Mr. Martin's methods have yielded a result that "bear a dubious relationship to the questions on which he proposes to opine." *Daubert*, 509 U.S. at 591–92. *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31–32 (1st Cir. 2012). In short, Mr. Martin was tasked with counting cash. He did not count it.

### C.  Martin Never Tested His Methods, Calculated Probabilities, or Sampled His Calculations By Cross Referencing With Actual Transactional Data

For Martin's opinions to be admitted, he has to satisfy the *Daubert* factors for reliability. *See Daubert*, 509 U.S. at 593-94. He fails to satisfy these factors. The Martin Opinions: (1) have not been tested; (2) have not been subjected to peer review and publication; (3) disclose no known rate of error; (4) apply or acknowledge no standards controlling the methods by which accounts were aggregated and net equity was calculated; and (5) subjectively utilized the deterministic record linkage system which, given the poor quality of data, is not generally accepted.

The Trustee presents the Martin Opinions as gospel, establishing liability of each of the 90,000 individual defendants down to the last penny. This implies that the Trustee is

100% certain that 100% of his aggregations yield net equity calculations that are 100% correct. But that is not what Mr. Martin achieved or claims to have achieved. To the contrary, he has made numerous adjustments (both before preparing his report and after) and believes that further adjustments will be necessary and appropriate in the future. Repeatedly, Mr. Martin testifies that his opinions are merely a conversation starter:

> Q ...Mr. Martin, on a couple of occasions you said that if somebody wants to show information to contest your net equity calculations, you'd be happy to review it. But should somebody be a defendant in this case, in your opinion, if it's uncertain what their net equity is?
>
> A "If it's uncertain," meaning—I don't, I don't know what you mean by "if it's uncertain," meaning we don't know within a dollar or you mean we don't know exact? No, I mean, I, that's not—I've seen litigation in other cases where you don't know the exact amount of, of loss, but you're, but you're assert, asserting an amount. ***But here, we've been very clear that we—we are—we are proposing an amount that is owed based upon, and a, a methodology, but are, are willing in every instance to have a discussion and if they can provide evidence otherwise, then I think—I think—in my opinion, that—that—that is not a bad thing.***

Hearing Tr. 195:18-196:9 (emphasis added).

Mr. Martin views his opinions on the Defendants' liability as a "proposal" that is modifiable. *Daubert* demands more. Martin presents no confidence intervals, and instead presents his guesses as to liability as precise facts. Hearing Tr. 221:23-222:3. He calculates no probabilities and provides no thresholds below which opinions are deemed too shaky or speculative. *See Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 600 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003) (expert did not "methodologically evaluate statistical significance or confidence intervals ascribed to those studies in deciding how much weight to accord each.").

Further, the data is predominantly user-entered, with no verification, validation, or corroboration at any stage. It should be noted that a probabilistic approach could have provided the Trustee with weighted probabilities as to each user account aggregation. This would have allowed the expert to say that it is more likely than not that a particular defendant, or even a group of defendants, met the requisite thresholds to ascribe liability within known error rates. Mr. Martin opted not to use such a method.

Recognizing the lack of scientific rigor, Martin offers up the ePOC data as some evidence that his methods have been tested. Huron built the ePOC system in this case to allow *net losers* to electronically file proofs of claim as part of the daunting challenge of claims administration. In order to file a claim, ePOC required a Participant to provide at least four common identifiers associated with any of their user accounts. Martin Report, at 3. Once provided, the ePOC interface would then show the Participant the User Account(s)—and only the user accounts—that the aggregation process associated with that Participant. *Id.* The Participant could then dispute the User Account(s), provide information regarding additional accounts, or dispute any transactions occurring in any account associated with that Participant identified by the algorithm. *Id.* at 3-4.

In an effort to validate the aggregation process itself, Martin claims: "Of the Participants who provided the minimum required Common Identifiers, more than 95% accepted the User Accounts identified by the Aggregation Algorithm." Martin Report, at 4. There are several flaws with this attempt to use ePOC to validate his overall methods.

First, it ignores the fact that the overall number of claimants who used the ePOC system was very small. Only 130,000 people attempted to submit a claim, of which fewer than 100,000 were accepted. But Huron estimates that there were 1.8 million net losers ("victims") of the scheme. Martin makes no claim that the ePOC data is a statistically significant or representative sample.

Second, the statement does not consider to what extent users disagreed with his aggregation methodology. A given user had the ability, and frequently did, submit more than one claim. Dennis Report, ¶ 65. Indeed, 15% of the claimants with accepted claims were functionally aggregating multiple supposedly separate participants. *Id.* ¶ 66. Furthermore, each claim could consist of, and each claimant could claim, more than one Account Information Sets that matched (or did not match) to a given User Account or Account Aggregation. *Id.* In both instances, the user is actually suggesting the Trustee has incorrectly aggregated his/her accounts through missed links, despite the individual claim(s) being agreed/accepted and the Account Information Set(s) matched. *Id.* ¶ 65. Further, the user could also dispute transactions and in some cases entered information about an account that didn't aggregate. *Id.* ¶ 66. Due to these frequent user modifications, Mr. Dennis calculated that 25% of the time, users did not blindly agree with ePOC's presentation of accounts. *Id.*  Mr. Martin fails to consider this large percentage of users who entered Account Information Set(s) that didn't match Potential Identifiers (and for which that was a claim amount), didn't accept or agree to a claim, manually added User Accounts, or made some other adjustments to Net Equity. *Id.* ¶ 66.

37

Third, Martin also fails to consider whether the experiences of net losers can in any way be extrapolated to a population of net winners. The report of Joshua Dennis shows convincingly that it cannot:



Dennis Report, ¶ 68. Most notably, the average net winner had 14 more accounts (n=19) than the average net loser (n=5), a difference of 280%. Dennis Report, Ex. 5. The ePOC system thus generated no data that could be reliably extrapolated to the 90,000 alleged winners.

In reality, Mr. Martin's opinions are a pastiche of linkage methods intertwined with a year's worth of subjective determinations and calculations based entirely on untested and inconsistent assumptions. Martin admits that he didn't calculate an applicable error rate. Hearing Tr. 221:23-222:8. Without testing Mr. Martin's error rates, either on a stand-alone basis or in comparison with all prior iterations, this Court has no basis to conclude as to the reliability of Mr. Martin's methods to identify liable parties. This is

significant when you consider that 15% of successful claimants claimed multiple aggregations in their proofs of claim.

The Trustee cannot be certain which alleged net winner is falsely included, and which actual net winners are falsely excluded. Indeed, courts exclude DNA evidence if it cannot reliably determine the false positives and false negatives, notwithstanding its reputation as establishing a unique "fingerprint" that correctly identifies the one and only person who left a DNA sample. *See United States v. Gissantaner*, 417 F. Supp. 3d 857, 886 (W.D. Mich. 2019) (excluding expert testimony that combined various methodologies with subjective analysis because "the sum of the parts simply does not add up to a reliable whole."). No court would permit expert testimony concerning DNA evidence if the expert admitted that he ran a sequence of iterative analyses, where each time the guilt or innocence of a party seesawed, until the expert was subjectively satisfied with the result. Worse, an expert cannot run multiple scenarios, but then present his conclusions as if this was the only possible outcome, while discarding the other possible outcomes.

While ePOC was a laudable achievement of the Trustee that allowed participants to submit claims, ePOC does not show a validation of Huron's aggregation for purposes of these adversary proceedings. If anything, the ePOC data shows why the aggregation is not good enough for assessing liability.

### D. Huron's Incorrect Calculations are Insufficient to Shift the Trustee's Burden and Compel the Defendants to Disprove Huron

In this case, the burden of proof is on the Trustee to prove his fraudulent transfer claims. *See Burdick v. Lee*, 256 B.R. 837, 839 (D. Mass. 2001); *see also In re Blast Fitness Grp.,*

*LLC*, 602 B.R. 208, 222 (Bankr. D. Mass. 2019). To meet his burden, the Trustee relies

exclusively on Mr. Martin's opinions to identify the recipients of fraudulent transfers on

a net equity basis and at the same time to quantify the alleged amount of fraudulent

transfers. As the proponent of expert evidence, the Trustee must also prove, by a

preponderance, that the expert evidence is reliable. *Jacked Up, L.L.C.*, 807 F. App'x at

348; *MM Steel, L.P.*, 806 F.3d at 850. The Trustee must satisfy both burdens.

For purposes of assessing these burdens, the reliability inquiry extends "to all

aspects of an expert's testimony," including "the methodology, the facts underlying the

expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d

at 355.  Expert evidence that is not "reliable at each and every step" is not admissible.

*Id.*; *see also Jacked Up, L.L.C.*, 807 F. App'x at 348.

Here, the Trustee is trying to repackage Huron's methodology that was originally

created to address the need to create a novel claims procedure to serve as the basis of an

expert opinion that purports to establish the identity and exact liability of each

defendant. While this approach made sense for creditors, who carry the ultimate

burden of proof, *see In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub*

*nom. Peter J. Solomon Co., L.P. v. Oneida Ltd.*, No. 09 CIV. 2229 (DC), 2010 WL 234827

(S.D.N.Y. Jan. 22, 2010), this approach does not make sense when the burden of proof

lies firmly with the Trustee.

Martin did not change his methods to account for the differing goals or burdens in

these two different proceedings. And this failure to recalibrate is evident from his

testimony, where his expressed view that **defendants** are required to come forward and

contradict his testimony saturated his opinions.

The problem of the Trustee's approach is seen in the Affidavit of Frantz Balan.

There, Frantz Balan points out that the name of one of the accounts that should have

been but was not aggregated to him was "frantzy Balan Balan." Defendants' Exhibit 19,

¶ 13. Mr. Martin's response to whether he agreed that this was a missed aggregation

was telling:

> I'm not disputing it because either way if he's aware of it and that seems pretty
> clear of information, then that's exactly what we're looking for, right, with a, a
> reasonable aggregation that could be challenged by the, by the participant and
> **they could show it.** I mean, that, that's exactly what that is. **He should be able to
> show that information**. If it really is his home phone number and his address
> with a, with a name, Frantz Balan, then **I would think that he could just present
> that** and I, I have a hard time believing the trustee wouldn't aggregate that with,
> add it to the algorithm. I mean, it's a quality-of-data issue.

Hearing Tr. 152:1-153:2. *See also* Hearing Tr. 194:14-20 ("if they presented us with

information that says they paid a different amount, then we could just—it's simple

math at that point to make a—make a—to make a adjustment to the calculation."),

195:18-196:9.

Mr. Martin believes it is the burden of class members to find additional accounts,

not his burden to present reliable evidence that he has found all of the accounts. While

Mr. Balan as class representative may have had access to the entire data set and was

able to search for other accounts, other members of the class will not be so fortunate,

especially as many participants have struggled to remember or retrieve their user data.

Hearing Tr. 155:12-17. While shifting the burden in this manner is part and parcel of the

claims administration process, *see In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–174

(3d Cir. 1992), it is not an appropriate method for a plaintiff to carry his double burden described above, and the Trustee cites no law suggesting that the Trustee can palm his burden of proof on defendants simply because his data is less than ideal.

Simply put, the Martin Opinions cannot establish that it is more likely than not that any particular individual owes any money, much less the exact amount of liability. These opinions are not reliable for this purpose, and there is not an adequate fit between the methodology employed and the assigned task, which is to establish with necessary probability the identity of net winners and the amount of their net equity. Many net winners will almost certainly default. Most will have few if any dispositive records. If the Court adopts the Martin Opinions, many individual class defendants will face financial ruin. The consequences of allowing the Trustee to proceed with subjective and irrelevant opinions based on unreliable data will be devastating to the 90,000 alleged net winners, and legally unjustifiable.

## <u>CONCLUSION</u>

For the reasons set forth above, the Class Defendant hereby respectfully move to exclude the expert testimony of Timothy J. Martin.

Respectfully submitted,


FRANTZ BALAN,
FOR HIMSELF AND AS CLASS
REPRESENTATIVE ON BEHALF OF
ALL DOMESTIC NET WINNERS,

*-and-*

MARCO PUZZARINI AND
SANDRO PAULO FREITAS,
FOR THEMSELVES AND AS CLASS
REPRESENTATIVES ON BEHALF OF
ALL INTERNATIONAL NET
WINNERS,

By their counsel,

Dated: February 2, 2021            /s/ Ilyas J. Rona
                                   Ilyas J. Rona, Esq. (BBO# 642964)
                                   Michael J. Duran, Esq. (BBO #569234)
                                   MILLIGAN RONA DURAN & KING LLC
                                   50 Congress Street, Suite 600
                                   Boston, Massachusetts 02109
                                   (617) 395-9570
                                   ijr@mrkdlaw.com
                                   mjd@mrdklaw.com

## CERTIFICATE OF SERVICE

I, Ilyas J. Rona, hereby certify that I have caused a copy of the Domestic &

International Class Representatives' Motion To Exclude Testimony of Timothy Martin

as Inadmissible Under *Daubert* to be served on counsel for the Trustee, counsel for the

Intervenors, and all registered electronic filers appearing in this case using the Court's

CM/ECF system.

Dated: February 2, 2021            /s/ Ilyas J. Rona
                                   Ilyas J. Rona, Esq.