UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>Reorganized Debtors. | Chapter 11 Cases<br><br>14-40987-FJB<br>14-40988-FJB<br>14-40989-FJB<br><br>Substantively Consolidated |
| STEPHEN B. DARR, TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>    Plaintiff,<br>v.<br>FRANZ BALAN, A REPRESENTATIVE OF A<br>CLASS OF DEFENDANT NET WINNERS,<br>    Defendants. | Adversary Proceeding<br>No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>    Plaintiff,<br>v.<br>MARCO PUZZARINI AND SANDRO PAULO<br>FREITAS, REPRESENTATIVES OF A CLASS<br>OF DEFENDANT NET WINNERS,<br>    Defendants. | Adversary Proceeding<br>No. 16-4007 |

**MOTION BY LIQUIDATING TRUSTEE TO SCHEDULE CASE MANAGEMENT
CONFERENCE RESPECTING SUPPLEMENTATION OF EXPERT REPORTS**

To the Honorable Frank J. Bailey, United States Bankruptcy Judge:

Stephen B. Darr, formerly the Chapter 11 Trustee and now the Liquidating Trustee (the "Trustee") of the Reorganized Debtors TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. (collectively, the "Debtors" or "TelexFree"), respectfully requests that the Court schedule a Case Management Conference ("Conference") for the purpose of entering a

Scheduling Order to, *inter alia*, set dates for the supplementation of expert reports to address the issues raised by the Court (Hoffman, J.) in the Memorandum of Decision ("Decision") on Class Defendants' Motion to Exclude Expert Witness Testimony of Timothy Martin ("Exclusion Motion"). A copy of the Proposed Scheduling Order is attached as Exhibit A.

By way of background, when the TelexFree Ponzi and pyramid scheme collapsed, the Trustee was appointed and charged with identifying Net Winners and Net Losers among the more than one million participants in the scheme ("Participants"). Each time that a Participant purchased a membership plan in TelexFree, the Participant established a User Account by inputting personal information into the TelexFree database, and many Participants had dozens, or hundreds, of User Accounts. In order to establish each Participant's Net Winner or Net Loser position, the Trustee needed to aggregate all of a Participant's User Accounts. The Trustee's task was difficult because Participants sometimes entered information that was inconsistent (such as using different variations of a name), incomplete (such as submitting a portion of an email address) or inaccurate (such as inserting "Mickey Mouse" or "…" for a name field). The Trustee's task was further complicated by the fact that the TelexFree database permitted this information to be input without correction and did not provide an independent means of aggregating User Accounts.

The Trustee retained Huron Consulting Group ("Huron"), which, under the supervision of Timothy Martin and after extensive analysis and testing, developed a thirteen-step process to identify and aggregate each Participant's User Accounts based on the information input by the Participants. As part of the Claims determination process approved by the Court to determine the amount of Claims by Net Losers, the aggregation results generated by the Huron methodology for each Participant were presented in an electronic portal. Participants were able to review their individualized results, and could adopt them as the amount of their filed Claims or propose

2

adjustments with supporting documentation, which were then either accepted by the Trustee or were addressed in a contested hearing. Of the approximately 132,000 Claims that were filed through the portal, more than ninety six percent (96%) of Participants accepted the User Account aggregation provided by the Huron methodology, and adopted the aggregation results in their certified Claims. The Trustee has since disbursed approximately $97,000,000 to Net Loser Participants under this process.

Although the Huron methodology was accepted by the Court for the purpose of establishing the identity of Net Losers and the amount of Net Loser Claims, in the Decision, the Court deemed the Huron methodology inadmissible for the purpose of determining *prima facie* liability against the Net Winner Defendants in the two class actions commenced by the Trustee to recover fictitious profits retained by Net Winners for the benefit of Net Losers.

The Trustee has now retained the Borelian Corporation ("Borelian"), a data analytics firm with a specific expertise in examining large data sets, to produce a supplemental expert report to address the issues raised by the Court in the Decision. Defendants will suffer no prejudice from the entry of the Proposed Scheduling Order, which provides Defendants with ample opportunity to submit a rebuttal report within ninety (90) days after receiving the Borelian report and conduct additional expert discovery, including deposing a Borelian representative. Moreover, if the Court ultimately admits Borelian's methodology, the Trustee expects to develop another electronic portal through which the individual Defendants will be able to review the aggregation results and propose adjustments with supporting documentation, similar to the previous Claims determination process.

Accordingly, given the importance of establishing a fair and accurate methodology to aggregate User Accounts to determine Net Winner liability on a judicially efficient basis, and

that Defendants will suffer no prejudice, the Trustee respectfully requests that this Motion be allowed.

## BACKGROUND

1. TelexFree was a massive Ponzi and pyramid scheme that ensnared more than a million individuals from multiple countries. While TelexFree was ostensibly in the business of selling voice over internet protocol service, its real business was the sale of membership plans, where membership fees from new members ("Participants") were used to pay the "profits" of existing Participants.

2. Each time that a Participant purchased a membership plan, the Participant opened a "User Account," which asked the Participant to input personal information into the TelexFree database, including, inter alia, name, address, home phone, cell phone, and passwords.

3. Once a User Account was registered, Participants could "earn" credits for advertising TelexFree online and by recruiting other Participants. Those credits could be redeemed for cash, transferred to another Participant, or applied in satisfaction of an invoice for a membership fee.

4. A Participant could purchase a membership plan, and thereby open a User Account, either directly through TelexFree or through a so-called "Triangular Transaction." In a Triangular Transaction, the Participant would pay their membership fee to the recruiting Participant, and the recruiting Participant would retain the membership fee and pay the newly recruited Participant's membership fee to TelexFree through the use of his/her accumulated and unused credits.

5. As of the Petition Date (defined below), there were approximately 11,000,000 TelexFree User Accounts.

6.    When the TelexFree scheme collapsed, some Participants received more money than they had paid into the scheme (Net Winners), whereas the majority of Participants had contributed more into the scheme than they were paid out (Net Losers).

7.    On April 13, 2014 ("Petition Date"), the Debtors commenced Chapter 11 proceedings in the United States Bankruptcy Court for the District of Nevada. The cases were thereafter transferred to this Court.

8.    Shortly after the Petition Date, governmental agencies seized the TelexFree electronic records. After his appointment on June 6, 2014, the Trustee worked with various governmental agencies and departments for months to obtain a forensic copy of the seized TelexFree electronic records, reactivate the computer system, and reconfigure the database and servers to collect pertinent information from the billions of transaction on the TelexFree database.

9.    As earlier referenced, the Trustee soon discovered that the database was difficult to organize because Participants sometimes entered information that was inconsistent, incomplete, or inaccurate

10.    Many Participants had multiple User Accounts, and the program used by TelexFree to track Participant activity did not link Participant's multiple User Accounts.

11.    These issues made it immensely difficult for the Trustee to identify and distinguish Net Losers from Net Winners.

12.    The Trustee retained Huron, under the supervision of Timothy Martin. Huron spent thousands of hours of analysis and testing, at the end of which it created a thirteen-step process to aggregate User Accounts by Participant based on the personal identifying information provided by Participants when setting up their User Accounts ("Huron methodology").

13. The Huron methodology was modeled on a deterministic approach[1] that was modified to fit the unique circumstances of the TelexFree case.

14. By Order dated November 25, 2015, as amended on December 21, 2015, the Court found as the law of the case that the Debtors had engaged in a Ponzi and pyramid scheme, and, as such, the Ponzi presumption was applicable – TelexFree was presumed to be insolvent and that any net winnings of Net Winners were presumptively fraudulent transfers.

15. On January 15, 2016, the Trustee commenced two defendant class actions to recover from Net Winners their fictitious profits from the Ponzi scheme as actual fraudulent transfers: one against approximately 15,000 individuals residing in the United States, and one against approximately 77,000 individuals residing outside the United States (collectively, "Class Actions").[2] A central issue in the Class Actions was the method of determining a Participant's Net Winner or Net Loser position.

---

[1] Deterministic record linkage joins user accounts when certain combinations of personal identifiers have identical values after a predefined transformation (such as removing spaces, concatenating fields, etc.). Probabilistic record linkage allows for a greater degree of discrepancy between the values of these personal identifiers by utilizing methods such as fuzzy matching and statistical techniques to determine the probability of a match. Hybrid record linkage combines these two approaches, often using an initial deterministic step followed by probabilistic steps that aim to match additional records.

[2] Various Participants commenced multiple other actions against TelexFree, which were consolidated into multi-district litigation in the United States District Court for the District of Massachusetts [C.A. No. 4:14-md-02566-TSH] ("MDL"). A Plaintiff's Interim Executive Committee ("PIEC") was appointed as the Plaintiffs' representatives in the MDL. The PIEC brought claims to recover on the same Triangular Transactions that were part of the Trustee's Class Actions, thereby creating competing claims and impeding the progress in the Trustee's Class Actions. The Trustee commenced an adversary proceeding against the PIEC in 2015 to enjoin their pursuit of the Triangular Transactions [A.P. No. 15-4055]. On cross-motions for summary judgment, the Court entered proposed findings of fact and rulings of law in favor of the Trustee, holding that the TelexFree Estates had a property interest in the funds paid through Triangular Transactions. The proposed findings and rulings were adopted by the District Court, and that decision was affirmed on appeal by the First Circuit Court of Appeals on October 29, 2019.

16. Class certification and appointment of Class representatives were difficult and time-consuming for a variety of reasons, including the unique nature of the defendant class action, the reluctance of a Defendant or group of Defendants to bear the expense of defending the entire class, the geographical dispersion of the Defendants, and their individual level of business sophistication. After much effort by the Trustee and his agreement to provide a fund for the payment of Defendants' professionals, the Court ultimately certified the Defendant classes, and appointed class representatives along with class counsel.

17. The Trustee relied on the Huron methodology to identify the individual Net Winner Defendants by their respective aggregated User Accounts, with the understanding that the Net Winner Defendants would ultimately have the opportunity to dispute the aggregation results.

18. By Order dated January 26, 2016, the Court approved the Net Equity formula[3] submitted by the Trustee for determining the allowed claims of Net Loser Participants, which provided among other things that a Participant's User Accounts should be aggregated and netted.

19. Also on January 26, 2016, the Court allowed the Trustee's Motion by Chapter 11 Trustee for Entry of Order Fixing Bar Date for Filing Proofs of Claim, Approving Form and Manner of Providing Notice, Directing that Claims Be Filed Electronically, and Approving Content of Electronic Proofs of Claim.

20. Applying the Net Equity formula and the aggregation methodology established by Huron, the Trustee, with the assistance of his advisors, developed an interactive, electronic

---

[3] The Net Equity formula compared amounts contributed by a Participant to the scheme with amounts that a Participant invested into the scheme to establish a Net Winner or Net Loser position.

7

claims portal (the "Portal") for Participants to file their electronic proofs of claim that would supersede the various types of claims that had been earlier submitted in multiple locations.

21. As part of the process for determining the amount of claims ("Claims Determination Process"), a Participant would log in to the Portal using the same personally identifiable information used to create their User Accounts, which would enable the Participant to view the aggregated User Accounts ascribed to him/her by the Huron methodology. The Participant could then accept or modify the aggregation results and submit supporting documentation for any changes before having the Portal compile updated results to generate a proposed claim amount. The Participant then electronically signed the claim, certified its accuracy, and submitted the claim.

22. Of the approximately 132,000 claims that were filed through the Portal, more than ninety six percent (96%) of Participants accepted the User Account aggregation provided by the Huron methodology, and adopted the aggregation results in their certified claims.

23. Substantially all of the remaining filed claims, where the Participants did not accept the aggregation results, were addressed through a dispute resolution process established by Order dated December 26, 2017. Through this process, the Trustee first sought to resolve disputed claims through an out of Court process. If the claim remained in dispute, the Order established a mechanism for filing omnibus objections to claims with the Court, and the Court would resolve the objection using the Huron methodology as *prima facie* evidence of the claim amount.

24. Pursuant to the Claims Determination Process, the Trustee has made interim distributions of approximately $97,000,000 to Net Loser Participants, all of whose claims were determined using the Huron methodology.

25. In the Class Actions, Mr. Martin prepared on Huron's behalf an expert report explaining the development of the Huron methodology and its underlying assumptions, and illustrating its aggregation process for the User Accounts.

26. Defendants retained the StoneTurn Group ("StoneTurn") as advisor and rebuttal expert.

27. On February 3, 2020, the Trustee provided the Huron expert report to Defendants.

28. In addition to the expert report, Huron provided StoneTurn with all of the data and information concerning the TelexFree electronic record-keeping system. Huron also educated StoneTurn and provided tutorials as to how the TelexFree system was structured, how the claims resolution Portal worked, and how Huron's methodology performed aggregation calculations.

29. On March 17, 2020, the Parties filed a Joint Motion for Scheduling Order Determining the Admissibility and Presumptive Effect of the Trustee's Aggregation Methodology in Determining Net Winners ("Joint Motion for Scheduling Order") [Doc. 338].

30. In the Joint Motion for Scheduling Order, the Parties agreed that all of the User Accounts associated with any individual Participant needed to be aggregated in order to fairly and accurately determine the liability of that Participant as a Net Winner, and that the Court should preliminarily determine whether the Huron algorithm was "admissible and should be adopted by the Court as the methodology to be utilized in determining the amount of Net Winnings attributable to each individual Participant."

31. On March 31, 2020, the Court allowed the Joint Motion for Scheduling Order [Doc. 339], issuing a scheduling order providing for rebuttal reports and expert discovery. No trial date was set.

32. Pursuant to the scheduling order, StoneTurn prepared a rebuttal expert report, Mr. Martin prepared a supplemental report, and the parties conducted expert depositions.

33. On November 18, 2020, the Trustee filed a memorandum requesting that the Court admit Huron's methodology as expert opinion to establish *prima facie* liability against the Defendants in the amounts aggregated by the methodology for each Defendant. Admission of the Huron methodology to establish *prima facie* liability would not have precluded individual Participants from contesting their Net Winner computations as determined by the Trustee.[4]

34. The Court conducted an evidentiary hearing on November 23 and 24, 2020.

35. On February 2, 2021, the Defendants filed the Exclusion Motion.

36. On February 23, 2021, the Trustee filed a memorandum opposing the Exclusion Motion and supporting the admissibility of Mr. Martin's expert opinion. The Trustee argued that Defendants' criticisms of the Huron methodology went to weight rather than admissibility, and that Defendants would still ultimately have an opportunity to challenge the aggregation results if the Court admitted the methodology as part of the Trustee's *prima facie* case.

37. On June 22 2021, the Court entered the Decision granting the Exclusion Motion and articulating certain concerns as to the reliability of Huron's methodology, chief among them, that insufficient scientific or non-subjective justification had been presented to support several assumptions built into the methodology and that probabilistic techniques were not adequately incorporated to account for the poor quality of the input data.

38. Shortly after the Decision issued, the Trustee retained Borelian, a data analytics firm with expertise in examining large data sets.

---

[4] *See* Trustee's Memorandum in Opposition to the Defendants' Motion to Exclude Testimony of Timothy Martin and in Support of the Admissibility of Timothy Martin's Expert Opinion, at pp. 29-30.

10

39. Principal Cameron Freer, a Research Scientist in the Massachusetts Institute of Technology Probabilistic Computing Project, has a Ph.D. in Mathematics from Harvard University, with more than ten years of experience with complex data analysis and aggregation, including the use of SQL queries, Pandas dataframes, and other data extraction and manipulation tools.

40. Principal Mark Meras, who holds a BS/MS in Computer Science from Yale University and an MBA from the Wharton School of the University of Pennsylvania, has been a software developer in the eDiscovery and text search space for almost 20 years, with extensive experience linking large databases of loosely-connected data into a unified datastore.

41. The CV's for the Principals are attached hereto as Exhibit "B".

42. Borelian has examined the TelexFree dataset, evaluated the Huron methodology, and conceptualized a hybrid methodology that will incorporate initial deterministic elements similar to those used by Huron with later probabilistic components.[5]

43. The deterministic techniques will include clustering based on exact-match aggregation on the most high-quality data fields. The probabilistic techniques will include "fuzzy-matching" (i.e. matching pairs of field values that are almost, but not exactly, the same) based on industry standard processes for evaluating potential matches (such as the Levenshtein ratio) that will capture typos and other data input errors for matching purposes.

---

[5] Such a hybrid approach is an accepted technique in the field of data analytics. *See* Ong. Et al., *A hybrid approach to record linkage using a combination of deterministic and probabilistic methodology.* J. Am. Med. Inform. Assoc. 2020; 27(4):505-513 ("The hybrid method presented here is a viable solution for missing and time-varying data as linkage variables with these characteristics can be implemented in 2 different linkage methods (e.g., deterministic, then probabilistic) as a safeguard against uncertainty. Probabilistic methods compensate for weaknesses of exact match methods by allowing for a degree of discrepancy between linkage variables.").

11

44. The acceptable parameters for approximate matches will be determined by quantitative evidence based on linkage scores and not intuition.

45. The Borelian methodology will further incorporate standard data cleaning (such as removing non-numeric characters from the phone number field data and controlling for improperly formatted email addresses) to ensure that salvageable data fields are not prematurely discarded.

46. Borelian is prepared to produce a supplemental expert report setting forth the Borelian hybrid methodology within 60 days of the Court's Order on this Motion.

47. As set forth in the Proposed Scheduling Order, StoneTurn will have ample opportunity to review the Borelian report and submit a rebuttal report, and a Borelian representative will be available for an expert deposition.

48. As with the Portal that was used in the Claims Determination Process, the Trustee expects to create a Net Winner portal ("Net Winner Portal") that will enable the individual Defendants to review and propose adjustments to the aggregation results generated by the Borelian methodology and request additional information regarding their accounts if needed.

49. Defendants will be provided with a statement indicating the Trustee's computation of their Net Winner position, along with a link to the Net Winner Portal. Toward this purpose, the Trustee will use all available contact information in the TelexFree books and records, as well as public record databases to ensure best efforts in contacting Defendants, and maintain a log of all attempted communications.

50. Upon logging on to the Net Winner Portal, Defendants will be able to review the User Accounts and the amount of Net Winnings attributed to them by the Trustee. Similar to the Claims Determination Process, Defendants will be able to add or dispute User Accounts or transactions within User Accounts. Defendants will also be able to provide additional personal

information that would form the basis of a new aggregation of User Accounts based upon the Borelian methodology. After making any other adjustments and providing attachments, Defendants would then submit their response which could either be accepted by the Trustee, form the basis of a settlement, or be addressed at a hearing on the merits.

51.    No scheduling order currently exists for any further pretrial proceedings and no trial date has been set.

52.    Defendants' class counsel and StoneTurn have heretofore been compensated by the TelexFree Estates.

## ARGUMENT

I.    Standard.

The Court has wide latitude in managing pretrial matters and may exercise its discretion to allow a party to supplement an expert report after the expert's opinion has been excluded in a *Daubert* ruling. *Ford Motor Co. v. Versata Software, Inc.*, No. 15-cv-10628, 2018 U.S. Dist. LEXIS 152388, at *20 (E.D. Mich. Sep. 7, 2018) (citing cases allowing submission of supplemental reports to cure problems identified in the court's order). "[T]otal inflexibility is undesirable," and exclusion of evidence is considered a "drastic sanction." *Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997).

Four factors are determinative on a motion for a new scheduling order:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1254 (10th Cir. 2011).

Case 16-04006    Doc 389    Filed 09/07/21    Entered 09/07/21 15:10:07    Desc Main
Document      Page 14 of 19

II.     Under the first factor, there is no prejudice or surprise against Defendants.

Defendants will not suffer any prejudice from the allowance of this Motion because there are "no scheduling order or deadlines to disrupt." *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1254-55 (10th Cir. 2011) ("the single most important fact about the posture of [the] motion for a new scheduling order is that, at the time it was made, there was no longer any impending trial date or pretrial schedule remaining."). There is currently no trial date, and there are no other pretrial deadlines scheduled that would need to be adjusted. This is not a situation where the moving party suddenly discloses an expert on the eve of trial thereby denying the non-moving party an opportunity to adequately prepare. *Contrast MacAulay v. Anas*, 321 F.3d 45, 51 (1st Cir. 2003) (affirming preclusion of late disclosed expert proffering new theory of liability when trial was imminent due to prejudice that would necessarily be imposed upon defendant).

Soon after their initial engagement, Defendants' expert StoneTurn was given full access to TelexFree's data and was provided information by the Trustee about how to interpret such data that took Huron years to glean. Thus, StoneTurn is already familiar with the same underlying data that the Borelian supplemental report will examine. Further, under the Proposed Scheduling Order, StoneTurn will have ample time and opportunity to address any specific issues with the Borelian supplemental report. The Proposed Scheduling Order provides StoneTurn with an opportunity to submit a rebuttal report within ninety (90) days after receiving the Borelian report. *See* Ex. A. It allows Defendants to request and obtain any additional data and paper discovery as necessary. *Id.* Additionally, Defendants will have an opportunity conduct a deposition of a Borelian representative. *Id.*

The Trustee also expects to create the Net Winner Portal, similar to that used in the Claims Determination Process for determining the amount of claims for Net Losers, which will give the individual Defendants the additional opportunity to review the aggregation results

14

derived from the Borelian methodology and propose any adjustments with supporting documentation. Under these circumstances, Defendants would not suffer any prejudice from allowance of this Motion.

### III. Under the second factor, any prejudice is easily cured.

As in *Rimbert*, the Court may cure any potential prejudice by providing "ample opportunity for [Defendants] to test the opinions of the new expert witness, review the witness's reports, depose the new witness, and adequately defend against that expert at trial." 647 F.3d at 1254-55. The Proposed Scheduling Order provides Defendants with exactly such ample opportunity and would cure any potential prejudice that may arise. Specifically, the Proposed Scheduling Order provides the Defendants with sixty (60) days after submission of the Trustee's supplemental report in which to conduct data or paper discovery and ninety (90) days from submission of the Trustee's supplemental report in which to submit a Defendant rebuttal report. The Trustee would be entitled to submit a rebuttal report within twenty (20) days of receiving the Defendants' rebuttal report and both parties would then have twenty (20) days after delivery of the Trustee's rebuttal report (or a statement by the Trustee of no intent to submit a rebuttal report) in which to conduct expert depositions.

To the extent that the Court considers any additional expense for expert discovery, Defendants' costs have heretofore been borne by the TelexFree Estates. In any event, extra expense alone is not the type of prejudice that rises to the level of warranting exclusion of new expert testimony. *Id.* at 1255.

### IV. Under the third factor, issuing a new scheduling order would not disrupt the orderly and efficient trial of the case.

Because there is currently no trial date or any other pretrial deadlines that need to be changed, and Defendants will have ample opportunity to address any issues with Borelian's

15

supplemental report, the relief requested would not negatively impact trial. *Contrast LaPlace-Bayard v. Batlle*, 295 F.3d 157, 162 (1st Cir. 2002) (upholding exclusion where plaintiffs disclosed new expert witness "barely a week before trial"). Borelian's supplemental report is being submitted to ultimately facilitate a much more orderly and efficient trial by establishing a methodology for aggregating User Accounts across all Net Winners.

V. <u>Under the fourth factor, there is no indicia of bad faith</u>.

As to the last factor, the Trustee has not missed any prior deadlines or violated any court orders. The Trustee has also consistently engaged in good faith communication with Defendants' class counsel throughout the expert disclosure and discovery process.

In the Joint Motion for Scheduling Order, the parties agreed that the Participants' User Accounts should be aggregated in order to determine liability for Net Winners. Because the Huron methodology had already been used in the Claims Determination Process to determine the amount of Claims for Net Losers, the Trustee had a reasonable basis to believe that the same methodology would be found admissible in the Net Winner litigation. As such, the Trustee did not see the utility of expending estate resources to retain an additional expert. Accordingly, the parties agreed pursuant to the Joint Motion for Scheduling Order for the Court to preliminarily determine whether the Huron methodology for aggregating User Accounts was admissible to presumptively satisfy the Trustee's *prima facie* case against each Defendant. Since the entry of the Decision, the Trustee has acted diligently and expeditiously, contacting several potential experts and ultimately engaging Borelian within days after issuance of the Decision.
The Trustee submits this Motion so that Borelian may address in its supplemental expert report the concerns expressed by StoneTurn and the Court regarding the Huron methodology.

Considering the unique circumstances of this case, the complex challenges presented by the state of the TelexFree User Account data, and the procedural hurdles in the Class Actions, a

sanction amounting to preclusion of expert testimony would not be justified. *See Esposito v. Home Depot U.S.A.*, 590 F.3d 72 (1st Cir. 2009) (reversing exclusion of late-disclosed expert after considering history of the litigation, where moving party "missed only one court-scheduled deadline," and had not committed the types of "serial violations" warranting such an extreme sanction).

VI. <u>There is no reasonably efficient and cost-effective alternative</u>.

The parties agree that aggregation of User Accounts is essential to determining the position of Net Winners. There is no judicially efficient alternative to admitting an aggregation methodology in the form of an expert opinion to determine *prima facie* liability against Net Winners on a class basis. If no such expert testimony is allowed, the Trustee's only option would be to pursue his *prima facie* case on an individual basis through fact discovery, including conducting depositions, as to each individual Defendant in both Class Actions. While such an exercise is conceivable, it would be unnecessarily cumbersome and impose a heavy burden in the form of time and resources upon all parties and the Court, effectively defeating the purposes of class certification. Proceeding on such a basis would also severely deplete the Estates' resources and decrease the ultimate distribution to Net Losers.

Defendant Net Winners should not be allowed to retain fictitious profits derived from the TelexFree Ponzi/pyramid scheme due to inaccuracies in the TelexFree data caused by Defendants' own inputs. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, C.A. No. 14-md-02503, 2017 U.S. Dist. LEXIS 170676, at *41 (D. Mass. Oct. 16, 2017) ("although Plaintiffs bear the burden to establish predominance, uncertainties regarding damages should be resolved against the wrongdoer, and not those who have allegedly been injured"); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury

17

which it has itself inflicted."); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.").

As set forth in the Proposed Scheduling Order, allowing this Motion would still provide ample opportunity for Defendants and the Court to examine the credentials of Borelian and test the reliability of its methodology. Moreover, if the Court ultimately admits Borelian's methodology as admissible expert testimony for the purpose of establishing the Trustee's *prima facie* case, the individual Defendants will still have an opportunity to review the aggregation results and propose any adjustments with supporting documentation similar to the Claim Determination Process.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court approve the Motion and schedule a Case Management Conference to address the entry of the Proposed Scheduling Order and grant such other relief as is just and proper.

## CERTIFICATE OF CONFERENCE IN GOOD FAITH PURSUANT TO RULE 9013-1(b)

The undersigned counsel certifies that he made a reasonable and good faith effort to reach agreement with Defendants' class counsel on the matter that is subject to this motion, including the request for a Scheduling Order and a proposed collaborative approach through which both parties' experts would co-develop a fair and accurate methodology for aggregating User Accounts for each Participant. As of the time of this filing, the Trustee has not yet received a response.

STEPHEN B. DARR,
LIQUIDATING TRUSTEE,
By his attorneys,

*/s/ Andrew G. Lizotte*
Harold B. Murphy (BBO #362610)
Charles R. Bennett, Jr. (BBO #037380)
Andrew G. Lizotte (BBO #559609)
Murphy & King, Professional Corporation
One Beacon Street
Boston, MA 02108
Telephone: (617) 423-0400
Facsimile: (617) 423-0498
Email: ALizotte@murphyking.com

Dated: September 7, 2021
801168