# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | Chapter 11 Cases |
| TELEXFREE, LLC, | 14–40987–FJB |
| TELEXFREE, INC. and | 14–40988–FJB |
| TELEXFREE FINANCIAL, INC., | 14–40989–FJB |
| Reorganized Debtors. | Jointly Administered |
| STEPHEN B. DARR, TRUSTEE OF THE ESTATES OF TELEXFREE, LLC, TELEXFREE, INC. and TELEXFREE FINANCIAL, INC., | |
| Plaintiff, | Adversary Proceeding |
| v. | No. 16-4006–FJB |
| FRANTZ BALAN, A REPRESENTATIVE OF A CLASS OF DEFENDANT NET WINNERS, | |
| Defendants. | |
| STEPHEN B. DARR AS TRUSTEE OF THE ESTATES OF TELEXFREE, LLC, TELEXFREE, INC. and TELEXFREE FINANCIAL, INC., | |
| Plaintiffs, | Adversary Proceeding |
| v. | No. 16-4007–FJB |
| MARCO PUZZARINI AND SANDRO PAULO FREITAS, REPRESENTATIVES OF A CLASS OF DEFENDANT NET WINNERS, | |
| Defendants. | |

## DOMESTIC & INTERNATIONAL CLASS REPRESENTATIVES' OPPOSITION TO THE TRUSTEES' REQUEST TO APPOINT NEW EXPERT WITNESS

To the Honorable Frank J.Bailey, United States Bankruptcy Judge:

Frantz Balan, Marco Puzzarini, and Sandro Paulo Freitas, as representatives of the Domestic and Foreign Classes of Net Winners, hereby respectfully oppose the Trustee's request for leave to designate a replacement expert. (Adv. Pr. No. 16–4006–FJB (the "Domestic Case"), (ECF No. 389) & Adv. Pr. No. 16–4007–FJB (the "International Case"), (ECF No. 540)) ("The Motion"). As grounds for this opposition, the class members state as follows:

## INTRODUCTION

The Trustee's request to replace his expert must be denied because the Trustee has known about the class members' critique of the Trustee's methodology and results since September 15, 2017, when the class members presented their analysis to the Trustee and his expert, Mr. Martin. The Trustee had another opportunity to cure the deficiencies after receiving the class members' rebuttal report of July 31, 2020, which again identified the problems. As Judge Hoffman ruled on June 22, 2021, Mr. Martin failed to cure these deficiencies either in his reply report or byway of his testimony at the two-day *Daubert* hearing. Because of the Trustee's lack of diligence in waiting almost four years to attempt remedying issues with his analysis, he cannot show "good cause" to justify the supplementation of his expert report. Nor can the Trustee rebut the extreme prejudice to the class members if the Trustee is permitted to designate a new expert, who would attempt to identify the class members and calculate their liability, almost 6 years after initiating these cases.

## A.  Procedural History Regarding Class Actions and Expert Analysis

Five years, nine months, and seventeen days ago, (on January 15, 2016) the Trustee

filed the initial complaint (ECF No. 1)[1] in the Domestic Case and filed a Motion for Class

Certification (ECF No. 2). The Trustee requested that this Court certify a class of "Net

Winners" who were defined as:

> a Participant who received more from the Debtors and from
> other persons in connection with the purchase of Plans or
> VoIP packages than such Participant paid to the Debtors or
> to other persons in connection with the purchase of Plans or
> VoIP packages, *as determined based upon an aggregation of
> activity in all the User Accounts of a Participant* (the "Related
> User Accounts")

Trustee's Motion for Class Certification in the Domestic Case, at 2 (ECF No. 2)

(emphasis added); *see also* Complaint, ¶ 33 (ECF No. 1); Amended Complaint, ¶ 33 (ECF

No. 113). In his Motion the Trustee further requested that the Court determine:

> That the Court determine that the common claims, issues,
> defenses of the Class include by [sic] is not limited to: (i)
> what transfers should be included in the determination of a
> Net Winner; (ii) whether Net Winners should be determined
> by an aggregation of Related User Accounts...;

Trustee's Motion for Class Certification in the Domestic Case, at 2-3 (ECF No. 2).

The Trustee further requested that "[t]he Court find that the defenses of the Named

Defendants as the Punitive Class Representatives, are typical of the defenses of the

Class." Trustee's Motion for Class Certification in the Domestic Case, at 3 (ECF No. 2).

According to the Trustee, these "common issues" were "capable of classwide

resolution" and in fact "require classwide resolution to avoid a multiplicity of suits that

---

[1] For simplicity, unless otherwise stated, the class members will only refer to the
ECF docket numbers for the Domestic Case.

run the risk of inconsistent adjudications." Affidavit of Stephen B. Darr in Support of

Plaintiff's Motion for Class Certification, at 9, ¶ 34, (ECF 2-1).

### *MRDK's Appointment as Class Counsel*

On September 26, 2016, Defendant Frantz Balan filed a Motion to Designate Class

Representative, Appoint Milligan Rona Duran & King LLC ("MRDK") as Class Counsel,

and Create Defense Fund. In its motion, the class members laid out the anticipated

scope of MRDK's retention, including: "Discovery," "Data Review," "Retention of a

common issue expert," and ***Determination of the procedures to be used to make***

***binding findings as to individual liability and damages.*** " Motion to Designate Class

Representative, at 10 (ECF No. 188.) (emphasis added).

On October 6, 2016, this Court certified the defendant Net Winner class in the

Domestic Case, appointed Franz Balan as Domestic Class representative, appointed

MRDK as class counsel, and created the domestic defense fund in the amount of

$225,000 and a $87,500 fund for expert fees. Order on Class Certification, at 13-14 (ECF

No. 194). The Court made a similar order in the International Case, except that the

amount of the international defense fund was $165,000 and a $60,000 fund for expert

fees. Order on Class Certification, at 12, (International Case, ECF No. 479).

The Court further held that:

> There are questions of law and fact common to all class
> members including but not limited to that the common
> claims, issues, defenses of the Class include but are not
> limited to: … (ii) whether Net Winners should be
> determined by an aggregation of Related User Accounts; (iii)
> whether the initial methodology for determining Related
> User Accounts is reasonable; (iv) whether the information
> maintained on the Debtors' SIG records with respect to each

> Participant transactions with the Debtor and other
> Participants is reasonably reliable...

Order on Class Certification, at 11 (ECF No. 194).

*Discovery*

On or about December 6, 2016, the Trustee provided the class members with a large spreadsheet purporting to identify domestic net winners and the user accounts that Huron's aggregation methodology assigned to each (the "<u>Trustee's Net Winner Determinations</u>"). The Trustee's Net Winner Determinations also included a calculation of claimed net winnings based on those aggregations. After a brief review of the Trustee's Net Winner Determinations, the class members requested access to the Trustee's supporting data, aggregation methods and a copy of the SIG database, in order to begin testing the Trustee's methods and results.

On January 6, 2017, the Trustee sent the class members their 13-step aggregation method that was used to generate the Trustee's Net Winner Determinations. On that date the Trustee also initiated delivery of Texlexfree's SIG Database to the class members' Expert Stoneturn.

Over the next 10 months, the class members, with Stoneturn's help, engaged in substantial testing of the Trustee's methodologies and results. But first, the massive SIG Database needed to be loaded onto Stoneturn's server. Specifically, from December 16, 2016 to April 24, 2017 Stoneturn spent 86.4 hours for the acquisition, formatting, preparation, loading and sampling of the SIG database, as well as the Trustee's summary tables thereof. First Interim Application for Compensation and Reimbursement of Expenses of Stoneturn Group, LLP as Expert Consultants for Both

Domestic and International Defendant Classes, ¶¶ 2, 7(b)-(c), Exhibits D & E, (Main

Case, ECF 937). For this work, the class members incurred $28,420.00 in fees from

Stoneturn. *Id.* Next from April 25, 2017 to September 15, 2017, Stoneturn spent 213.9

hours related to subsequent testing and analysis of the Trustee's calculations and

assumptions with respect to the determination of net equity. For this work the class

members incurred $77,587.50 in fees. *Id.*

While Stoneturn and the class members conducted their analysis, MRDK and

counsel for the Trustee began setting the parameters for expert discovery and reports,

and agreed to proceed with these cases in two phases.  On January 11, 2017, the Court

issued a Pre-Trial Order in the Domestic Case that: (a) required that discovery be

completed by April 11, 2017 "unless the Court, upon appropriate motion, alters the time

and manner of discovery"; and (b) required that expert disclosures required under Fed.

R. Bankr. P. 7026 (a)(2) be made by no later than May 29, 2017. Pre-Trial Order, ¶¶ 6-7

(ECF No. 229), January 11, 2017.

On March 3, 2017, The Trustee and class members submitted a Rule 26(f)

Certification and Discovery Plan in the Domestic Case. In that filing, the parties jointly

stated that:

> The parties are in general agreement that resolution of this proceeding
> should occur in two stages. The first stage will address the Trustee's ability
> to establish his prima facie case for avoidance and recovery against the
> Defendant class of alleged net winners. The second stage would entail the
> computation of damages against individual Defendants."

Rule 26(f) Certification and Discovery Plan, at 1-2 (ECF No. 250), March 3, 2017. In the

Rule 26(f) Certification, "The parties jointly stated that the Trustee's expert report would

be due on or before July 30, 2017." *Id.*, at 2.[2]

On June 28, 2017, the parties submitted a joint motion to enlarge time for parties to

provide expert reports in the domestic case. (ECF No. 275). In the joint motion, the

parties requested a two-month extension for expert reports, stating: "Due to the volume

and complexity of the SIG data, it has taken longer than anticipated for the class and

counsel to obtain the necessary data for a thorough review by StoneTurn Group." The

parties jointly requested that the Trustee's expert report be due on or before September

29, 2017. *Id.* The Court allowed this motion. (ECF No. 276).

On August 29, 2017, class counsel wrote to Trustee's counsel to discuss exchange of

expert reports. In the email, class counsel stated:

> Charles and Andrew,
>
> StoneTurn is pretty close to being ready to disclose its
> findings but we were wondering if we could get a little more
> time (2-3 weeks).
>
> The extra time might also allow us to discuss procedural
> questions that have arisen on our side about the format or
> manner in which the disclosures should take place. The
> order refers to a "report," but a formal Rule 26 report will
> take considerable more time and add additional cost, which I
> am hoping to avoid.

---

[2] The Court ruled that because the parties were amending the discovery schedule
set forth in the Pre-Trial Order, a motion was necessary. Endorsed Order (ECF No. 251),
March 6, 2017. The following day, the parties submitted a joint motion to amend the
Pre-Trial Order. Joint Motion to Amend Pretrial Order in Conformance with Rule 26(f)
Certification and Discovery Plan (ECF No. 253), March 7, 2017. The Court allowed the
joint motion on March 8, 2017. (ECF No. 254).

Could we have a call tomorrow or Thursday to discuss timing and format of our expert disclosures? Recognizing that what is good for the goose is good for the gander, whatever seems appropriate would obviously apply to Huron as well.

One suggestion is for the reports to be more informal, perhaps in a powerpoint similar to the one Huron prepared in the Merrill case. Another idea is for StoneTurn to present its findings to Huron in person before formal disclosure, to give both sides the opportunity to give constructive feedback before formal reports are exchanged. Huron could do the same afterwards.

I welcome any thoughts you may have in this regard. Let me know when you are available to talk.

Exhibit A, Email dated August 29, 2017.

Counsel for both sides spoke the following day and memorialized their discussion in an August 31, 2017 email. In that follow-up email, class counsel stated:

Charles and Andrew,

I appreciate you both speaking with us yesterday. We discussed deferring the issue of formal Rule 26 expert reports in favor of a more informal, in-person presentation to see if we can determine the areas where StoneTurn and Huron agree and whether additional analysis will be needed. Based on the outcome, we will then discuss exact timing and scope of the Rule 26 reports. Ultimately, I believe we will need to put something in front of the judge, but for now it will be sufficient if you could confirm that your understanding of the above is in accord, or feel free to make any necessary corrections of qualifications.

In any event, and per our conversation, I spoke to StoneTurn and they could make a presentation on September 12 or 13. They think 2 hours should be sufficient but depending on how the meeting goes, maybe we want to block out 3 hours so that there is time for Q&A. We have the fee hearing on the 13th, so perhaps the 12th is better but the afternoon of the 13th would certainly be an option.

Please confirm your understanding that this is how we are
proceeding and then let me know about the 12th or the
afternoon of the 13th.

Exhibit B, Email dated August 31, 2017. Trustee's counsel responded that "this protocol

is fine for now."The parties then agreed to a joint presentation by the experts on

September 15, 2017. Exhibit C, Email string dated September 5, 2017.

The joint presentation took place on September 15, 2017.[3] During that meeting,

Stoneturn presented its critique of Huron's analysis. Stoneturn's critique was

memorialized in a document called " Summary of Net Equity Testing_9-15-17.docx."

Exhibit D.  The presentation also included two detailed and voluminous excel files

entitled: (i) Case Study Net Equity and Transfer Detail_9-15-17.xlsx; and (ii) Top

Winner-Loser Acct Aggregation_9-15-17.xlsx.

At the Trustee's request, all three of these files were later provided to the Trustee

and Huron on October 20, 2017.[4] See the emails identified as Exhibits E, F, & G.

Stoneturn's critique identified a number of problems with the quality of the

underlying SIG data, Huron's aggregation process, chosen methodology, and with

---

[3] This is also corroborated by class counsel's contemporaneous time records, which indicate
that the purpose of the meeting on September 15, 2017, was "to discuss problems with Trustee's
expert analysis." Exhibit L to Second Interim Application for Fees, at 7 (Main Case 14-40987,
ECF No. 995-12) April 27, 2018.

[4] On September 29, 2017, counsel for the Trustee requested an electronic copy of Stoneturn's
findings. Exhibit E, Email dated September 29, 2017. On October 5 2017, class counsel
responded to the Trustee's September 29, 2017 request and agreed to share the written materials.
Exhibit F, Email dated October 5 2017.  On October 20, 2017, class counsel sent the Stoneturn
analysis to the Trustee, including the following files: (i) Case Study Net Equity and Transfer
Detail_9-15-17.xlsx; (ii) Top Winner-Loser Acct Aggregation_9-15-17.xlsx; and (iii) Summary of
Net Equity Testing_9-15-17.docx. Exhibit G, Email dated October 20, 2017.

Huron's results - the Trustee's Net Winner Determinations. The purpose of Stoneturn's

testing was to:

i. Determine whether the account aggregation
methodology utilized by Huron is sufficiently
accurate, and to what extent such an approach may
cause over/under aggregation resulting in faulty net
equity amounts attributed to alleged net winner
participants.

ii. If the account aggregation methodology is found to be
deficient, suggest possible updates and changes to the
methodology to correct such issues, to the extent any
potential solutions are identified and available.

Exhibit D, at 1.

Stoneturn also reported its findings of the methodological problems with Huron's

analysis, which include the following:

- Of the top 10 largest net losers, 7 were successfully
aggregated to net winners, 2 were outside the U.S.
(thus not reviewed), and 1 could not be aggregated to
a net winner.

- Each of the 13 steps in the Huron aggregation
methodology required the sub-account name to match
(in whole and in part), which prevented what appears
to be necessary and appropriate aggregations.

- Matches between top net losers and net winners were
based on a clear and identifiable relationship between
personal information, such as Login, Email, and
Address within the sub-accounts of each participant.

- Based just on this preliminary manual review of a
subset of participants, and without further analysis of
all net losers or [even] top 100 net losers, net winnings
appear to be overstated by at least $4.3 million, and
likely much more.

Id. at 4.

Stoneturn also found flaws in the 13-step aggregation method Huron used,

including:

- Review of the counter-party login for triangular/transfer transaction demonstrated potential issues in the 13 step aggregation process.

- Inconsistent aggregation results between highly similar logins with differing numerical suffix. See e.g., Tab 5, Frantz Balan, Internal and External Transactions, Rows 331-376 ("frantzXXX"), 673-680 ("lsemexantXXX"), 934-938 ("mytelexfreeXXX"), 1298-1434 ("yourwayXXXX"); tab 7, Fabio Faria, Internal and External Transactions,rows 178-184 ("equipefloridaXXX") and 388-398 ("telexfloridaXXX").

- Un-aggregated counter parties logins appear to be highly similar to case study participant name. See e.g., Tab 5, Frantz Balan, Internal and External Transactions, rows 82-90 ("balanXX" and "balanfranXXX").

*Id.* at 4-5.

Stoneturn further conducted a Programmatic Review of Select Case Study

Participants where Stoneturn "attempted to create a programmatic means of

aggregating case study to participants just to those external participants and

sub-accounts with whom the case study participant transacted." *Id.* at 5. In other words,

Stoneturn attempted to improve Huron's aggregation process. Based on this exercise,

Stoneturn made additional findings that: "*Creation of an aggregation methodology was

highly iterative,* and required the application of consistent bright-line tests based level of

sensitivity," a methodology such as the Trustee's "requiring some or all of the name to

match *creates a very high likelihood of under aggregation, resulting in inaccurate net equity for*

*a given participant,"*[5]and that *"Application of a consistent methodology is likely not able to accurately and fully aggregate sub-accounts within the SIG database due to the data limitations and lack of validations of requisite identifying criteria." Id.* at 6. (emphasis added) In its discussion points, Stoneturn also identified a red flag that laid bare a critical problem with Mr. Martin's sub-account name matching model: the "[p]otential for a participant to use a non-identifying name, *such as punctuation." Id.* at 7. (emphasis added)

On October 3, 2017, the parties jointly submitted a Rule 26(f) Certification and Discovery Plan in the International Case. In that report, the parties jointly stated:

**3. Experts.**

a. <u>Reports</u>. The parties have informally exchanged reports in the Domestic Case. The parties are currently meeting and conferring with respect to framing the issues that need to be presented to the Court in the Domestic Case that require expert testimony. The parties believe that it [*sic*] not necessary at this time to set a deadline for filing expert reports and it would be more efficient to await a determination in the Domestic Case.

b. <u>Depositions of Experts</u>. After exchanging expert reports, the parties will confer as to the need for depositions of experts and a schedule for the completion of same.

**4. Dispositive Motions and Pre-Trial Procedure.**The parties submit that it would be more efficient to defer the setting of any deadlines for dispositive motions until after the parties have obtained rulings in the Domestic Case regarding the Trustee's methodology in determining "Net Winner" has been addressed.

(ECF No. 490).

---

[5] For example, "Over $100,000 of additional losses were aggregated to Alexandro Rocha based primarily on use of same/similar address, email and logins, but differing name."

Over the next two years, MRDK continued its work with Stoneturn to refine its analysis, advocated for the class members in the Telexfree claims allowance process to the extent it had an effect on alleged net winners, filed an answer in the International Case, and spent a significant amount of time attempting to negotiate a framework for class-wide settlement. *See* MRDK's Second Interim Fee Application, pg. 3 (ECF 995) & MRDK's Third Interim Fee Application, at 2 (ECF 3458). Throughout this time, the class members relied on the Trustee's disclosures of its aggregation process, which as shown by Stoneturn's critique dated September 15, 2017 was fundamentally flawed and incorrect. For this reason, the class members believed that both the International Case and the Domestic Case were ripe for a negotiated settlement with the Trustee.

On February 3, 2020, the Trustee provided to the class members with the Expert Report of Timothy Martin of Huron Consulting Group LLC, dated April 13, 2018,[6] ("Martin Report"). The Martin Report was based on the exact same aggregation methods, without any alteration, that the Trustee first presented to the class members back in December of 2016. The Trustee's Expert Report failed to remedy any of the issues identified by Stoneturn in its September 15, 2017 critique and supported the Trustees Net Winner Determinations, unmodified from its original version. Further, the aggregate computations appeared to be identical to or nearly identical to the calculations Huron presented in the criminal prosecution of James Merrill in March 2017. *See* Exhibit H, Huron Presentation.

---

[6] The Trustee's nearly two-year delay in producing the Martin Report to class members has never been explained.

*The Parties Jointly Request Determination of Admissibility of the Martin Report*

On March 17, 2020, the parties jointly requested a scheduling order for this case

stating as follows:

> [the parties] jointly request this Scheduling Order to address
> the Trustee's proposed expert testimony by Timothy J.
> Martin, Managing Director, Huron Consulting Group, LLC
> (the "Trustee's Expert") on the issue of the aggregation
> methodology utilized by the Trustee in determining Net
> Winners... Each Participant had numerous unlinked User
> Accounts reflecting transactions with Telexfree. In order to
> determine whether a Participant was a Net Winner and, if
> so, what that Participant's Net Winnings were, it is necessary
> to aggregate all of the User Accounts attributable to that
> Participant. Because the Telexfree information system did
> not link a Participant's User Accounts, the Trustee was
> required to develop a methodology to aggregate (link)
> Participants' User Accounts. ***Therefore, a determination
> regarding whether the methodology employed by the Trustee
> to determine a Participant's Net Winnings is admissible and
> should be adopted by the Court as the methodology to be
> utilized in determining the amount of Net Winnings
> attributable to each individual Participant is essential to
> the resolution of the Class Action***.

Joint Motion filed by Plaintiff Stephen B. Darr For Scheduling Order Determining the

Admissibility and Presumptive Effect of the Trustee's Aggregation Methodology in

Determining Net Winners, at 1-2, *Domestic Case*, ECF No. 338 & *International Case*,

ECF No. 494. (emphasis added). The joint motion acknowledged that class members

were challenging the "reliability and admissibility" of Huron's analysis, including the

the following:" Whether Martin's testimony is based upon sufficient facts or data";

"Whether Martin's testimony is the product of reliable principles and methods"; and

"Whether Martin has reliably applied the principles and methodology to the facts of the

case."*Id.* at 5-6

On July 13, 2020, the Trustee and the class members again agreed to a slight

modification of the Scheduling Order, " to address the Trustee's proposed expert

testimony by Mr. Martin, "on the issue of the aggregation methodology utilized by the

Trustee in determining Net Winners."ECF 353 16-04006 & ECF 508 16-04007. As grounds

for this joint motion, the Parties state as follows:

> 1. Due to data production delays, the Parties hereby request
> a slight modification of that Scheduling Order so that the
> deadline for Class Action Defendants to provide the Trustee
> with their expert report, which was set to July 15, 2020, be
> enlarged by fifteen (15) days to July 31, 2020.
>
> 2. The deadline for the Trustee's rebuttal report, if any, will
> remain twenty (20) days from receipt of the Class Action
> Defendants' report.
>
> 3. Expert depositions, if any, shall be concluded by
> September 15, 2020.
>
> 4. The deadline to file a status report shall remain as
> September 4, 2020.
>
> 5. ***The parties have now exchanged all agreed-upon data and
> thus they do not anticipate seeking any further
> modifications of the above schedule.***

*Id.* (emphasis added)

On July 31, 2020, the Class Defendant's expert Joshua Dennis of StoneTurn Group

provided his Rebuttal Expert Report ("Dennis Report").

On September 4, 2020, the Trustee agreed to a joint status report regarding experts

("Joint Status Report Regarding Experts") which stated:

> While the Parties have not completed their assessment of
> their respective expert reports and whether additional
> discovery may be necessary, based on the Expert Reports,
> the Parties have identified the main points of dispute

> between the two experts which need to be addressed in
> connection with determining whether the Trustee's
> methodology is sufficiently reliable to set forth the Trustee's
> prima facie case.

Joint Status Report Regarding Experts, ¶ 4 (Case 16-04006), ECF No. 355, Sept. 4, 2020.

This report enumerated the areas of dispute, including:

> The Class Action Representatives dispute the methodology
> by which the Huron linked records of different accounts to a
> single user. Huron and StoneTurn both recognize that the
> need to link records with or without unique identifiers is not
> unusual, and there are commonly accepted methodologies
> for joining records, including data files, books, Web sites and
> databases. The Trustee contends that the methodology
> employed in the Huron Report, while not wholeheartedly
> adopting the "Deterministic" methodology, adopted certain
> principles associated with that methodology. StoneTurn
> contends that the "Probabilistic" approach, rather than a
> so-called modified "Deterministic" approach, would have
> been more appropriate under the facts presented, and
> StoneTurn asserts that the approach used by Huron is not
> recommended in such circumstances and undermines the
> reliability of Huron's record linkages.

*Id.*, ¶ 5(i). The Joint Status Report Regarding Experts further noted that the "second area

of dispute concerns the use of common identifiers":

> Both Experts agree that the use of common identifiers is
> appropriate to analyze and link diverse accounts. The Huron
> Report identifies a series of common identifiers to be used in
> the aggregation process, beginning with the name entered
> into the SIG System. The StoneTurn Report challenges
> Huron's decision to accord greater weight to the names that
> users entered into the SIG system, given that there were no
> internal controls to verify the accuracy of the information
> entered. The Huron Report submits it is reasonable to
> assume that a Participant would include an accurate name
> when registering a User Account because that would be the
> name in which the Participant would be receiving credits
> and transfers. Accordingly, the name would be the most
> likely common identifier. The StoneTurn Report challenges

> the assumption by pointing to entries in the SIG System
> where the information entered in the name category appears
> to be a combination of numbers, letters, or punctuation
> marks, with no actual name included. The StoneTurn Report
> also points out that users could and did in fact enter names
> of businesses, other people or entities, fictitious names, or
> arbitrary. StoneTurn asserts the use of unverified or
> unrelated names, along with the use of unusable sets of
> non-name characters, calls into question the reliability of an
> aggregation model that assumes names were always valid.

*Id.*, ¶ 5(i). The Joint Status Report Regarding Experts then laid out a plan to resolve the

above disputes:

> The Parties submit that in order to resolve the differences
> between the Huron Report and the StoneTurn Rebuttal, the
> Court will need to conduct an evidentiary hearing, at which
> each expert would be examined by the opposing Party,
> similar to a 'Daubert' hearing.

*Id.*, ¶ 6. The Trustee joined the class members in requesting that "the Court schedule a

management conference to address the most efficient manner to proceed." Id., ¶ 7.

On September 23, 2020, the Trustee provided Mr. Martin's Reply Expert Report

("Martin Reply Report"). The next day, a case management conference was held by

video. Proceeding Memorandum and Order, (Case 16-04006), ECF No. 358, Sept. 24,

2020. During that conference, the Trustee made no mention of obtaining further expert

testimony. After a brief discussion on the record, the parties agreed to a two-day

evidentiary Daubert hearing. *Id.*

On November 18, 2020, the Trustee filed a "pre-hearing memorandum" on the

admissibility of the Martin Report. (ECF No. 365). That memorandum made no

reference to the need for further expert testimony.

This Court held a two-day *Daubert* hearing on the Martin Opinions on November 23 and 24, 2020. At no point during either day of the hearing did the Trustee indicate that further expert testimony was necessary or contemplated.

On February 2, 2021, the class members submitted their *Daubert* motion. ECF No. 377. On February 23, 2021, the Trustee submitted a memorandum in opposition to the Daubert motion. In the opposition, the Trustee made no mention of the need or even the possibility of obtaining a new expert. Instead, the Trustee stated that the "Class Action Representatives' assertion that Huron could have developed an alternative hypothetical model based on a pure probabilistic model is not a basis for finding that Huron's well-founded methodology was in fact unreliable." ECF No. 381.

On June 22, 2021, Judge Hoffman granted the *Daubert* motion. In a 40-page ruling, Judge Hoffman concluded that: "The trustee has not shown by a preponderance of the evidence the reliability of his expert's opinion as to the selection and application of his method for aggregating user accounts to determine in these adversary proceedings the identities and gains of the net winners in the TelexFree scheme." (ECF No. 385) (the "*Daubert* Ruling").

## B.  Legal Standards Applicable to Supplementation of Expert Reports

The starting point for scheduling related motions is Rule 16(b), which requires federal judges to issue a scheduling order "after receiving the parties' report under Rule 26(f)." Fed. R. Civ. P. 16 (b)(1). Once the scheduling order is entered, a schedule "may be modified ***only for good cause*** and with the judge's consent." Fed. R. Civ. P. 16 (b)(4) (emphasis added). The First Circuit has made it clear that the good cause is "more

demanding" than the liberal amendment rules that may be present earlier in the

litigation. *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). The "good cause

"standard focuses on the diligence (or lack thereof) of the moving party more than it

does on any prejudice to the party-opponent." *Id.*

The "good cause" test requires a showing that despite due diligence by the party

seeking the extension, the deadline in the scheduling order could not reasonably be met

*McLaughlin v. McDonald's Corp.*, 203 F.R.D. 45, 50 n.4 (D. Mass. 2001). The scheduling

order will not be amended to permit designation of an expert "on an issue that did not

arise unannounced and unforeseen prior to the deadline." *Id.*, citing *Cabana v. Forcier*,

200 F.R.D. 9, 14 (D. Mass. 2001).

"Recognizing the importance of expert testimony in modern trial practice," Rule 26

provides for "extensive pretrial disclosure of expert testimony." *Lawes v. CSA Architects*

*& Engineers LLP*, 963 F.3d 72, 90 (1st Cir. 2020). Simply disclosing an expert under Rule

26(a)(2)(A) and furnishing the report due under Rule 26(a)(2)(B) do not discharge a

party's obligations. To the contrary, once a party makes any disclosure under Rule 26(a),

Rule 26(e)(1) requires that it "supplement or correct its disclosure or response...in a

timely manner ***if the party learns that in some material respect the disclosure or***

***response is incomplete or incorrect***, and if the additional or corrective information has

not otherwise been made known to the other parties during the discovery process or in

writing." Fed. R. Civ. P. 26(e)(1); se*e also Lawes*, 963 F.3d, at 91. Complete and timely

disclosures and supplementation "ensure an even playing field" and prevent any party

from gaining an "unfair tactical advantage" at trial. *Id.* As the First Circuit has noted,

the expert disclosure requirements "are not merely aspirational, and courts must deal decisively with a party's failure to adhere to them." *Lohnes v. Level 3 Commc'ns, Inc.*, 272 F.3d 49, 59 (1st Cir. 2001).

Rule 37(c)(1) addresses the situation where there are" incomplete or late disclosures," and it authorizes "preclusion" of the "relevant expert information...at a hearing, or at a trial, <u>unless</u> the failure was substantially justified or is harmless." *Lawes*, 963 F.3d, at 91 (emphasis added). The First Circuit has repeatedly stated that the "required sanction in the ordinary case is mandatory preclusion." *See Lohnes,* 272 F.3d, at 59–60, citing *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998). Since an important objective of Rules 16, 26, and 37 is to avoid trial by ambush, federal courts typically set a timetable that "promotes fairness both in the discovery process and at trial." *Thibeault v. Square D Co.*, 960 F.2d 239, 244 (1st Cir. 1992). When a party fails to comply with this timetable, the court has the authority to impose "a condign sanction," including the authority to preclude late-disclosed expert testimony. *Macaulay v. Anas*, 321 F.3d 45, 50 (1st Cir. 2003).

In reviewing preclusion as the appropriate remedy for untimely expert disclosures, courts look to "the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects." *Lawes*, 963 F.3d, at 92, citing *Macaulay*, 321 F.3d, at 51. Although analysis of each factor is relevant, the "focus of a preclusion inquiry is mainly upon surprise and prejudice" to defendants. *Lawes*, 963 F.3d, at 92, citing *Thibeault*, 960 F.2d, at 244 (affirming preclusion of late-disclosed expert, and explaining that expert

disclosure rules were promulgated to facilitate a "fair contest with the basic issues and facts disclosed to the fullest practical extent").

Where a party had "ample time to conduct discovery" and to submit an expert report "within the period allotted by the district court," but nevertheless fails to proffer an expert report unveiling a new theory of liability until after the applicable deadline has expired, preclusion is an appropriate remedy. *See Macaulay*, 321 F.3d, at 51–53 ("Common sense suggests that when a party makes a last-minute change that adds a new theory of liability, the opposing side is likely to suffer undue prejudice."). This is especially true where the "neoteric theory was not based on any newly discovered evidence" and there is no real justification for its tardy emergence. *Id.*, at 52. A significant and unexplained delay in supplementing an expert report is unlikely to be substantially justified and is grounds for preclusion. *See Prouty v. Thippanna*, No. CV 4:17-40126 TSH, 2021 WL 2144853, at *4 (D. Mass. May 26, 2021) ("I find that Plaintiff's failure to supplement Dr. Pacey's March 2019 expert report for more than one year warrants precluding her testifying at trial.")

"Regardless of the context, the longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." *Steir*, 383 F.3d, at 12, *citing Acosta–Mestre v. Hilton Int'l of P.R., Inc.*, 156 F.3d 49, 52–53 (1st Cir. 1998). Motions to amend whose timing prejudices the opposing party by "requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy" are,

in the words of the First Circuit, "[p]articularly disfavored." *Steir*, 383 F.3d, at 12.

Indeed, the First Circuit has observed that preclusion is appropriate for "tardy

supplementation" that would force a litigant "to scrap much of its earlier preparation in

favor of a frantic, last-minute scramble to investigate the emergent witnesses, counter

their testimony, and rebut a new and different case concept." *See Thibeault*, 960 F.2d, at

247.

The circumstances where an unjustified late disclosure could be conceptually viewed as

harmless are, in fact, "limited." *See Gagnon*, 437 F.3d, at 197. According to the advisory

committee's notes to Rule 37's 1993 amendments, the "harmlessness" provision is

intended "to avoid unduly harsh penalties" in situations such as: "late disclosures of a

potential witness known to all parties, a trial witness already listed by the adverse party,

or a witness on behalf of a pro se litigant ignorant of the requirement." *Gagnon*, 437 F.3d

at 197.

Courts have recognized that trying to pass off the replacement expert as merely a

"supplement," stretches the rules beyond recognition. *See e.g. In re Ready-Mixed Concrete

Antitrust Litig.*, 261 F.R.D. 154, 159 (S.D. Ind. 2009) ("although Fed.R.Civ.P. 26(e) requires

a party to 'supplement or correct' disclosure upon information later acquired, that

provision does not give license to sandbag one's opponent with claims and issues which

should have been included in the expert witness' report."); *Hartford Ins. Co. v. Gen. Elec.

Co.*, 526 F. Supp. 2d 250, 253 (D.R.I. 2007) ("the purpose of supplementation is not to

introduce wholly new opinions.")

## **ARGUMENT**

The Trustee's motion to belatedly amend the schedule and allow a second bite at the apple for designated experts runs afoul of Rules 16(b), 26(e), and 37(c)(1) and falls short of meeting the "good cause" standard, which focuses on the diligence of the moving party. The Trustee has not shown any diligence in waiting roughly four years after he was first apprised of the methodological flaws of his experts' analysis. The amendment filed so late in this litigation creates a maifest prejudice. The Trustee's actions forced the class members to expend nearly all of their available resources to contest the only expert report that the Trustee disclosed in a timely manner, and in so doing the class members made numerous strategic and tactical decisions based on the goal of a successful *Daubert* challenge. Not only will the class members need to scrap all of this work, but the Trustee will be able to capitalize on its free preview of the class members' cross-examination and trial strategies.

The Trustee attempts to evade the "good cause" standard by looking for outlier decisions outside of the First Circuit. In so doing, the Trustee attempts to divert the Court's attention from his own lack of diligence. The Trustee makes no claim that he was diligent from the moment he first learned of challenges to his expert methodology. Nor does he claim that he was in any way impeded from retaining Borelian in 2017. Instead, the Trustee only claims that "[s]ince the entry of the Decision, the Trustee has acted diligently and expediently."[7] The Trustee gives no explanation for why he waited

---

[7] Merriam-Webster Online Dictionary defines "expediently"as being done in a manner "suitable for achieving a particular end in a given circumstance" or "characterized by concern with what is opportune," especially when "governed by self-interest." https://www.merriam-webster.com/dictionary/expediently. Cambridge Online Dictionary defines "expediently" as "in a way that is helpful or useful in a

until after the Court ruled in June 2021, when the problems with the Trustee's

methodology were made apparent: (a) at a face-to-face meeting of the experts in

September 2017, (b) in the Stoneturn expert report served in August 2020, (c) at a

deposition of Timothy Martin in mid-November 2020, (d) in a two-day Daubert hearing

in late November 2020, and (e) in the class members' *Daubert* motion filed in February

2021. It has now been more than four months since the *Daubert* ruling, and no expert

report has been prepared.

　　The Trustee's proposal threatens the exact type of unfair tactical advantage that the

disclosure rules were designed to eradicate. *See Thibeault*, 960 F.2d, at 244 (explaining

that expert disclosure rules were promulgated to facilitate a "fair contest with the basic

issues and facts disclosed to the fullest practical extent"). The Trustee agreed with the

class members and the Court (by way of a joint status report) that the only matter to be

resolved was "whether the Trustee's methodology is sufficiently reliable to set forth the

Trustee's prima facie case." Joint Status Report Regarding Experts, ¶ 4 (Case 16-04006),

ECF No. 355, Sept. 4, 2020. At that point, the Trustee recognized that its subjective,

deterministic methodology for linking accounts was under attack, but nevertheless he

defended it, stating: "The Trustee contends that the methodology employed in the

Huron Report, while not wholeheartedly adopting the 'Deterministic' methodology,

adopted certain principles associated with that methodology." *Id.*, ¶ 5(i). The Trustee

also defended its reliance on common identifiers that Judge Hoffman later found

unreliable, stating: "it is reasonable to assume that a Participant would include an

---

particular situation, but sometimes not morally acceptable."
https://dictionary.cambridge.org/us/dictionary/english/expediently. The class
members assume that the Trustee meant to say "expeditiously."

accurate name when registering a User Account because that would be the name in

which the Participant would be receiving credits and transfers. Accordingly, the name

would be the most likely common identifier." *Id.*, ¶ 5(i). In the field of experts, diligence

requires more than simply restating prior positions.

Because class actions require a rigorous analysis of the experts at the earliest

possible stage, it is simply unreasonable to view the vetting process as indefinite or

through sequential *Daubert* hearings. The joint status report indicated that the parties

were ready for a determination by the Court and that "in order to resolve the

differences between the Huron Report and the StoneTurn Rebuttal, the Court will need

to conduct an evidentiary hearing, at which each expert would be examined by the

opposing Party, similar to a 'Daubert' hearing." *Id.*, ¶ 6. The Trustee similarly failed to

raise the possibility of new experts in the case management conference on September

24, 2021 or during either of the two-day Daubert sessions held on November 23-24,

2020.  As the party carrying the burden of proof and seeking class certification, the

Trustee was required to seek timely disclosure of all expert opinions that were

foreseeably necessary, not to wait and see which ones survived and which ones did not.

**A.  The Trustee's Failure to Remedy His Aggregation Methodology Soon After the September 15, 2017 Meeting with Stoneturn Shows A Lack of Diligence**

In the First Circuit, requests to modify a scheduling order to save an untimely

expert disclosure are governed by the "good cause" standard, which necessarily places

a greater focus on the diligence of the moving party. The "good cause "standard focuses

on the diligence (or lack thereof) of the moving party more than it does on any prejudice

to the party-opponent. *Steir*, 383 F.3d, 12. This requires a showing that despite due

diligence by the party seeking the extension, the deadline in the scheduling order could not reasonably be met *McLaughlin v. McDonald's Corp.*, 203 F.R.D. 45, 50 n.4 (D. Mass. 2001). A scheduling order will not be amended to permit designation of an expert "on an issue that did not arise unannounced and unforeseen prior to the deadline." *Id.*, citing *Cabana*, 200 F.R.D., at 14.

Here, the four-year failure to retain the new experts to counter the methodological flaws of Huron's analysis is unexplained. The Trustee ignored very real and very serious flaws that were pointed out to it in September 2017 at a meeting intended to "give both sides the opportunity to give constructive feedback *before formal reports are exchanged*." Exhibit A (emphasis added). It ignored those flaws and finalized the Martin six months later, with no apparent change in methodology. The Trustee continued to ignore the flaws for nearly another two years when it finally served the report, again without any edit or revision, on the class members without any changes or supplementation.

On July 31, 2020, the Trustee received a detailed, point-by-point elucidation from Stoneturn Group of the methodological flaws of the Martin report, including the use of a subjectively guided, deterministic linkage method, rather than an objectively constructed probabilistic method. At that point, there was still nearly two months left for the Trustee to prepare a rebuttal report. The Trustee could have retained Borellian Group at that point, but it chose not to. The Trustee also could have alerted the Court and the class members that it intended to pursue a different theory of liability based on Borelian's "hybrid" analysis rather than the flawed subjective method chosen by Huron.

Instead, the Trustee simply doubled-down and refused to concede any validity to Stoneturn's observations that a probabilistic approach rather than a deterministic approach "would have been more appropriate under the facts presented, and that the approach used by Huron "is not recommended in such circumstances and undermines the reliability of Huron's record linkages." Joint Status Report Regarding Experts, at ¶ 5(i). Instead, the Trustee tried to apply a favorable gloss to the Huron report, arguing that "the methodology employed in the Huron Report, while not wholeheartedly adopting the 'Deterministic' methodology, adopted certain principles associated with that methodology." *Id.*

Perhaps the Trustee did not want to admit any weakness in the run-up to the *Daubert* hearings by admitting that additional expert opinions would be necessary. But the Trustee could have saved the Court and the class members extraordinary time and trouble if it had worried more about the prejudice to the class members and less about optics. The class members spent a significant amount of time and money to prepare for and conduct Huron's deposition, prepare for and conduct a two-day mini-trial on *Daubert* issues, and then prepare and file a nearly 50-page *Daubert* motion.

Motivations aside, the Trustee's silence throughout this entire time reveals an absence of diligence. It also reveals an indifference to the burden and prejudice that could have been avoided with a timely disclosure. The Trustee has not explained why it did not retain Borelian at any point prior to the deadline to furnish its supplemental report in September 2020. In the absence of any diligence or attempt to address the

shortcomings of the Martin report in a timely manner, the motion to amend the

schedule must be denied.

## B. Because the Dennis Report Again Gave the Trustee Adequate Notice of the Problems With the Martin Report (Prior to the Trustee's Reply Report Deadline) The Trustee Fails to Show Good Cause to Supplement the Martin Report

The Trustee cannot show good cause because the Dennis Report again gave the

Trustee adequate notice of all of the problems with the Martin Report later cited by

Judge Hoffman. None of these issues that the Trustee now seeks to remedy were

unannounced or unforeseen prior to the deadline.

### *The Trustee's Expert Failed to Remedy Data Quality Issues With the Name Data within the SIG system*

The Trustee and Mr. Martin had adequate notice of the significant quality issues

with the name data within the SIG system. As Mr. Dennis pointed out in the Dennis

Report, there were no internal controls that took place during the registration of a User

Account that would have validated or confirmed a name, or prevented a Participant

from entering a fictitious, erroneous or arbitrary combination of numbers, letters, or

punctuation in place of a name. Dennis Report, ¶ 56. Hundreds of thousands of

accounts have names consisting of short arbitrary letters, numbers, or merely

punctuation. *Id.* Mr. Dennis also gives examples of names like ".........", which was used

for seven different User Accounts. *Id.* ¶ 58. There were also names that included

Chinese characters. *Id.* ¶ 57. As Mr. Dennis explained in the Dennis Report, "[t]he

examples described above are demonstrative of the poor quality of the name entered by

the Participant on which Mr. Martin relies heavily in his Aggregation Process." *Id.* ¶ 58.

The Trustee was clearly told that utilizing an Aggregation Process—that as a "starting point" requires Participants to have accurately entered the same or similar names in every instance across all their User Accounts (which could number in the thousands)—is unreliable and inconsistent with the facts of the case. *Id.* ¶ 59.

On this issue, Judge Hoffman found that "Mr. Martin has also largely failed to detail the extent to which acknowledged data quality issues were considered, analyzed, and addressed, including issues with name field data." Order at 16. "When asked, Mr. Martin conceded that false names could have been entered and that he had not attempted to determine the extent to which this had occurred." *Id.* at 17. See Martin Tr. 161:20-25.

In fact, Mr. Martin and Huron have known about these data quality issues for some time. *See* <u>Exhibit H</u>, (stating in Huron-produced report that "many Participants included incomplete and/or intentionally incorrect information when registering their User Account (and noting that TelexFree "did not validate data" ).

In certain instances, Mr. Martin attempted to address the data quality issues but failed to do so sufficiently. For instance, Mr. Martin excluded from his aggregation process all user account records that had three characters or fewer in the name field, after all spaces and "extraneous characters" had been removed. *Id.* at 17; Martin Report. ¶ 56, Addendum A 1. Mr. Martin then claimed in his reply report that this decision to remove roughly 200,000 User Accounts from his calculation represent less than 2% of the 11 million User Accounts associated with at least one invoice and they are all the result of the Participant choosing to use a name other than their own." Martin Reply

Rpt. ¶ 17. Yet Judge Hoffman found this explanation lacking in support. ("Mr. Martin's

response does not, however, explain or support that suggestion or his decision to

exclude the records from the aggregation process and does not address the potential

impact of that decision.") *Daubert* Ruling at 18.

Certainly, if Mr. Martin attempted to address an issue in his Reply Report, it could

not have been an issue that was "unannounced and unforeseen prior to the deadline".

*Cabana*, 200 F.R.D., at 14. Failing to convince a judge that your analysis is reliable is not a

good enough reason to get a "do over' on expert reports.

### The Trustee's Expert Failed to Adequately Support His Decision to Use Name Field as a Reliable Starting Point for Aggregation

One of the core criticisms of the Martin Report, was the decision to use the name

field as a starting point for the aggregation method. To support his selection of the name

field as his starting point in his aggregation methodology, Mr. Martin stated that:

"Because Participants could receive Direct Receipts from TelexFree, it is reasonable to

assume that a Participant would include an accurate name when registering a User

Account." Martin Rpt. ¶ 55. The Dennis Report points out that Mr. Martin failed to

explain how this assumption was reasonable. Dennis Rpt. ¶ 54 ("Mr. Martin does not

expand on this point to explain why a name must be accurate or specific to the

individual in order for the Participant to receive a Direct Receipt, nor does he appear to

consider situations where a single Participant may have created multiple User Accounts

using a range of different names still directly associated with the Participant, such

his/her own name, spouse's name, family member's name, or business name.").

Mr. Dennis also showed that TelexFree transaction data did not support Mr.
Martin's key assumption that participants only used accurate names. Direct receipts
only accounted for about 5% of total Telexfree receipts, and only about 2% of Telexfree
participants had direct receipts. Dennis Rpt. ¶ 55. The assumption that Participants
"necessarily entered consistent and accurate names across all their User Accounts just
so they receive Direct Receipts (to the extent that was even a requirement) is
unfounded." *Id.*

On this point, the Court held that "***Mr. Martin did not address these criticisms in***
***his reply report***. In his testimony, Mr. Martin conceded that he did not know whether a
participant would have been impeded in receiving funds directly from TelexFree if the
participant had failed to provide the participant's actual name."*Id.* at 14-15. Martin Tr.
149:5-12 (emphasis added).

With his reply report, the Trustee had one final opportunity to timely cure the
defects in his aggregation process, the Martin Report, and theTrustee's ultimate Net
Winner Determinations. The Martin Reply Report did none of these things.

### *The Trustee's Expert Failed to Consider What an Acceptable Error Rate*
### *Was for the Application of the Trustee's Net Winner Determinations in These*
### *Proceedings, Which Seek to Assign Legal Liability*

As Mr. Dennis explained, the Martin Report failed to justify, either through his
sources or otherwise, that Martin's chosen linkage method was appropriate for the task
at hand: determining prima facie liability in a ponzi/pyramid scheme. Dennis Rept.
¶ 49 -50. ( "Absent from Mr. Martin's report is any discussion regarding if, or to what
extent, a methodology that may be generally accepted for linking disparate patient files

or medical information for research studies is appropriate for the purposes of

aggregating the Potential Identifiers of User Accounts in a an alleged Ponzi/pyramid

scheme."

Even more, Martin appears to recognize that choosing the appropriate linkage

methodology *relative to the required application* is important:

> Because different industries require different degrees of
> accuracy and because the complexity and diversity of data
> sources vary by company, businesses need to decide which
> data matching strategy best suits their needs prior to
> implementation. Each method has its strengths and
> weaknesses, so businesses should not be concerned about
> which is better in an absolute sense, but rather what the
> practical application will be and their tolerance for errors.

Martin Report at 14 and Exhibit B; Dennis Rpt. ¶ 50.

Yet after all of this, the Martin Report doesn't justify his decision to use

deterministic methods in any meaningful way. Tellingly, Mr. Martin seemed to think

that the Trustee's Net Winner Determinations would not be "final" and would instead

serve to "start[] the conversation" with participants who could then "provide either

evidence or explanation as to why some of the user accounts that were aggregated

shouldn't have been or why other ones should have been included." *Daubert* Ruling at

28-29, quoting Martin Tr. 56:9-17, 144:4-8, 144:22-145:1; *see also* Martin Tr. 140:20-23

(stating he was "looking for an aggregation process that would be reasonably accurate

based on the information, but fully with the anticipation that the . . . participant would

have the ability to challenge [it]"), 223:5-7 ("What we were trying to do was develop a

reasonably accurate aggregation methodology that somebody could review and then

challenge."). Order at pg. 29.

Mr. Martin's failure to grasp the obvious implications of the Trustee's Net Winner Determinations in these class actions is not due to any surprise. The Trustee knows or should know the implications of bringing adversary proceedings against the class members, namely that if successful they would result in default judgments of tens of thousands of alleged net winners, eventual collection actions, and personal bankruptcies.  Certainly, the Trustee was aware that he would use Net Winner Determinations to establish the *prima facie* liability of the class members (the consequences of which are dire). Nevertheless, Judge Hoffman found that Mr. Martin "chose a method that he believed would be "reasonably accurate" merely to get the conversation started. *Daubert* Ruling at 37-38. He further held that Mr. Martin failed to show "that in choosing his iterative deterministic method he properly considered, for the purposes of these adversary proceedings, how the results would be used and what level of error would be acceptable."*Id.* at 37-38.  The need not just to know the error but also exclude parties where there is no liability is a staple of class certification proceedings.  S*ee In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018)

In the Motion, the Trustee now doubles down on the concept of "starting a conversation," and continues to downplay the consequences to the class members of admitting an expert report that establishes the Trustee's *prima facie* case and shifts the burden to them. In their Motion, the Trustee explains that "if the Court ultimately admits Borelian's methodology, the Trustee expects to develop another electronic portal through which the individual class members will be able to review the aggregation results and propose adjustments with supporting documentation, similar to the

previous Claims determination process." Trustee's Motion at 3.  This is old wine in a

shinier bottle. Judge Hoffman already ruled *against* the tactic of using an expert to "start

a conversation" and shifting the burden to the class members to escape liability. This

Court does not need to entertain a redux of this approach.

### C. Even if the Trustee Had Conducted a Replacement Analysis (Which He Still Has Not Done!), Preclusion Would Be the Appropriate Remedy Given the Failure to Supplement in Timely Manner

Rule 26(e)(1) requires each and every litigant, including the Trustee, to "supplement

or correct its disclosure or response...in a timely manner *if the party learns that in some*

*material respect the disclosure or response is incomplete or incorrect*, and if the

additional or corrective information has not otherwise been made known to the other

parties during the discovery process or in writing." *Lawes*, 963 F.3d, at 91. The "required

sanction in the ordinary case is mandatory preclusion." *See Lohnes*, 272 F.3d, at 59–60,

citing *Klonoski*, 156 F.3d, at 269.

Here, the Trustee is not able to show that the failure was "substantially justified" or

"harmless." *See Lawes*, 963 F.3d, at 91. In reviewing whether preclusion is the

appropriate remedy, courts in the First Circuit look to "the history of the litigation, the

proponent's need for the challenged evidence, the justification (if any) for the late

disclosure, and the opponent's ability to overcome its adverse effects." *Lawes*, 963 F.3d,

at 92, citing *Macaulay*, 321 F.3d, at 51. Courts should also assess "what the late disclosure

portends for the court's docket." *Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 197–98

(1st Cir. 2006). Although analysis of each factor is relevant, the "focus of a preclusion

inquiry is mainly upon surprise and prejudice" to defendants. *Lawes*, 963 F.3d, at 92.

In looking at the history of the litigation and the justification for the late disclosure, as detailed in the previous section, the Trustee had ample opportunity to retain different experts to employ a different methodology for more than four years. The Trustee also had ample time to conduct discovery. There were also numerous extensions of the expert deadline. Under the Court's original Pre-Trial Order, expert reports were due May 29, 2017. The parties then submitted a Rule 26(f) conference report which moved the deadline to July 30, 2017. Over the next three years, the parties jointly obtained several extensions. The Trustee did not serve his final rebuttal report until September 23, 2020. Under the schedule agreed upon by the parties, that marked the end of expert disclosures in the case. The parties then turned to expert discovery and the two-day *Daubert* hearing. Even by September 4, 2020, the Trustee could have raised in a joint status report that, by way of belts and suspenders, it was retaining Borelian. Instead, the Trustee took the opposite position, that no supplementation was needed. Now, "after the applicable deadline has expired," the Trustee preclusion is an appropriate remedy. *See Macaulay*, 321 F.3d, at 51–53.

As the First Circuit has stated: "Common sense suggests that when a party makes a last-minute change that adds a new theory of liability, the opposing side is likely to suffer undue prejudice." *Macaulay*, 321 F.3d, at 52. Here, the prejudice is extreme. The class members have spent all of their defense funds on refuting the Huron report. To respond to a new report now would require great expense, especially if a new expert had to be engaged. The class members have revealed their trial and cross-examination strategies through the two-day *Daubert* hearing. To give the Trustee a "do-over" so that

it can benefit from what it learned defending an expert that it knew had problems is immeasurable prejudicial. The class members also agreed to informal discovery to counter the Huron report. A new report may require class members to seek to reopen discovery to avoid further prejudice. The expenses would likely be crippling.

### D. The Prejudice to Class Members Would Be Extreme and Incurable

The Trustee claims that "Defendants will suffer no prejudice from the entry of the Proposed Scheduling Order, which provides Defendants with ample opportunity to submit a rebuttal report within ninety (90) days after receiving the Borelian report and conduct additional expert discovery, including deposing a Borelian representative." Motion, at 3. In the context of these unprecedented reverse class actions and history of the litigation, this claim is—to put it mildly—absurd.

The Trustee's assignment of liability in these cases has caused significant hardship on the class members for many years. This includes reputational damage, stress on personal and professional relationships. Exhibit I, Affidavit of Sandro Freitas, ¶ 13. The passage of this time has caused the memory of the class members and other participants with whom the class members transacted to fade. Exhibit I, ¶ 14. Nor do the class members have the same access to transaction information that they possessed when they assisted MRDK and Stoneturn with their critique of the Trustee's aggregation process back in 2017. Exhibit I, ¶ 15.

Specifically, participants have lost access to many of the email accounts used and those email accounts have already been deactivated and the information that might have been stored in these email accounts is no longer accessible. Exhibit I, ¶ 16. In some

cases information may be recoverable, but the cost of such recovery is unclear. Exhibit I, ¶ 16. Banks with transaction information have since collapsed or merged, presumably making record retrieval of the pre-2014 transactions even more difficult. Exhibit I, ¶ 22. In certain instances, participants who transacted with (formerly) alleged net winners have passed away. Exhibit I, ¶ 17. ("If I am called upon to provide additional information in order to prepare a new expert rebuttal, I will no longer be able to count on the testimony of some people with whom I transacted with. Unfortunately, some have died. These participants include: Agostinho Mendes Neves (d. October 2017); Judite Figueira de Sousa (d. November 2020); Ermelinda Vitoria Freitas (d. October 2021). If called upon to defend new claims against me, I will obviously also not be able to call upon these participants in my defense.")

The class members relied on the Trustee's methods of proof when making decisions to preserve data. Exhibit I, ¶ 18. "I tried to keep all information that I thought was relevant at the time of the change, I did not conceive of the fact that the Trustee would try to abandon the assumptions contained in the Martin Report and replace them with brand new assumptions in a new report.") Accordingly, the class members may have irretrievably lost information that, if there is a new expert report, would be essential to their defense. *Id.* Certainly, the names of people they interacted with, both people who recruited them and who they recruited into Telexfree, will be forgotten. The contact information for these people, whether possessed by the Trustee or class members, is likely inaccurate by now.

The class members have spent an inordinate amount of their own time and their own legal fees to critique the Trustee's Net Winner Determinations. For instance, Sandro Freitas's attorneys spent more than 90 hours working with MRDK regarding the Trustee's aggregation methodology. For this work, Mr. Freitas incurred approximately €16,000.00 in personal legal fees and costs associated with this topic. Exhibit I, ¶ 26. The same holds true for many other class members who have hired personal counsel and diligently monitored and participated in these proceedings.

Separate and apart from the class members' individual attorney fees, costs, and time contributions, MRDK, as class counsel, has far exceeded and completely exhausted its entire fee and expert budget. The decision to make these expenditures was based on a strategy to debunk the Trustee's Net Winner Determinations, which amounted to the entire basis for liability against the class members. The strategy was successful, and the expenditures were well worth it. But it will be for naught and those funds essentially wasted if the Trustee gets a "do-over."

Alarmingly, the Trustee now proposes to give the class members a paltry 90 days to accomplish what, by earlier agreements, took nearly four years.  While the bankruptcy estate has paid for the class counsel's fees and costs for this matter, the fact that class members will incur additional legal fees, having already spent all of the half-a-million dollars they previously secured, is itself evidence of the incurable prejudice. The prejudice of being given *less* time to counter an expert analysis that the Trustee promises to be *more robust* is striking and invites the sort of gamesmanship that is disfavored.

The Trustee minimizes the burden by claiming that "StoneTurn is already familiar with the same underlying data" that Borelian will review. This is untrue, as there are hundreds of tables that Stoneturn did not review--Stoneturn only reviewed the data necessary to counter the Huron analysis. Without knowing Borelian's methodology or conclusions, Stoneturn does not know what data is being used, how it relates to other data, or whether any of the assumptions employed are reasonable. Stoneturn confined its review to examine the Huron method. All that work will likely go down the drain.

The inescapable fact is that the Trustee agreed to the scheduling orders in this case, and allowed the class members to set their sights on an unwavering set of opinions represented to be a stationary target. The class members relied on the Trustee's representations of the substance opinions when they expended time and resources on their expert, when they focused their strategy and efforts on this agreed-to first part of the proceeding, and most importantly when they agreed to years-long extensions to the expert discovery process. The class members will never get those years back or recover the money spent. They cannot now be expected to adequately amass hitherto-unknown facts that may be relevant to rebutting a new expert report that has still not been unveiled. Because the Trustee has not even presented his new expert report, the full additional prejudicial effect of having to critique that report is essentially unknown at this time. The Trustee's failure to disclose the new report to the class members, even by this late date, is itself prejudicial. Exhibit L, ¶ 20.

Further, it is highly prejudicial to allow the Trustee to newly identify new net winners almost or change the theory of account aggregations 6 years into these cases.

The Trustee's Net Winner Determination and the Martin Report were the Trustee's sole basis for actually identifying any class members. Judge Hoffman held that the Trustee "has not shown by a preponderance of the evidence the reliability of his expert's opinion as to the selection and application of his **method for aggregating user accounts to determine** in these adversary proceedings **the identities** and gains of the net winners in the TelexFree scheme."Along with the disqualification of Mr. Martin goes his identification of the alleged net winners. *Id.* In other words, the Trustee has still not established that he can reliably identify net winners or calculate damages.

It is not accurate to say that "the sole remaining issue in the adversary proceeding is the calculation of damages as to the Ponzi scheme's net winners." Trustee's Motion, ECF No. 397, at 2. This is "whistling past the graveyard." Without knowing the identity of any alleged net winner, the Trustee will not be able to prove his *prima facie* case on a class-wide basis. According to the Trustee, this case must start at the beginning. This is the height of prejudice to class members, who have been defending this case for more than five years and now must guess whether they are indeed a net winner and they must wait several months before finding out whether their alleged net equity has increased, decreased, or stayed the same.

Under the agreed-upon schedule, the Trustee's rebuttal report was the final opportunity to remedy any doubts to their aggregation methods. The Trustee had ample opportunity to retain new experts. The Trustee cannot bemoan the consequences of its own neglect of the scheduling orders.

### E. Considering the Problems With the SIG Data, Any Efforts by the Trustee to Cure the Analytical Deficiencies Will Be Futile

In the *Daubert* Ruling, Judge Hoffman concluded that, among other serious flaws, Huron's analysis "has not shown the requisite reliability of his selection and use of the name field, which formed the basis of his opinion." This was because of the underlying data's "quality issues," which unaddressed "undermine [Martin's] position that such data is sufficient to support his opinion." *Daubert* Ruling, at 22.

These data quality problems doom any analysis, regardless of whether a probabilistic or "hybrid" data linkage strategy is used. For example, even if the Trustee's new expert could demonstrate to a 90% level of confidence that accounts under the name "Mickey Mouse" actually relate to accounts under the name "Walt Disney," such a finding would be meaningless because the data is still insufficient for the purpose being used. The new and improved statistical analysis would still be bedeviled by the old problem of "junk in—junk out." Not even a better mind grinder can prevent spoiled meat from becoming a spoiled hamburger. For this reason, the Trustee's efforts will simply be futile, and at best further waste time and judicial resources on another *Daubert* challenge.

In his findings pertaining to the underlying data, which begin on page 11 of the Order, Judge Hoffman found serious problems with the use of underlying that were unrelated to the selection of linkage methodology. These problems included the Trustee's own recognition that the user-entered data was "often incomplete, inaccurate, or clearly incorrect." Order at 16 ("Participants often provided inaccurate, inconsistent, or incomplete information when opening accounts...many Participants included

incomplete and/or intentionally incorrect information when registering their User Accounts"). Judge Hoffman noted examples of the anomalies in the data, such as "phone numbers comprised entirely of letters, email addresses missing the '@' symbol and instances where only a period or an ellipsis was entered instead of other requested information." *Daubert* Ruling at 16-17. Judge Hoffman noted that it was undisputed that "there do not appear to have been any restrictions on which characters a participant could enter in the name field or any process by which the information entered would have been validated as the actual name of the user account holder," and that TelexFree "did not validate data." *Id.* at 17. Class members' expert Joshua Dennis found "tens of thousands of name field entries that contained blatantly false names" such as "a a," ". .," "Mickey Mouse," "Walt Disney," and "Team Legendary." *Id.*

The findings led Judge Hoffman to conclude that the Trustee had failed to demonstrate the "requisite reliability" for the "selection and use of the name field." There is no evidence that indicates that any of the other data fields, used alone or together, had better quality or will offer superior reliability. While the Trustee placed significant reliance on the name field, ultimately the Trustee will still have to rely on some combination of unverified, user-entered data which cannot be defended.

As the class members have already demonstrated, the use of discordant and unverified data results in either under-aggregation, over-aggregation, or both. Mr. Dennis' manual review of the top Net Loser and Net Winner Account Aggregations suggests numerous instances of potential under-aggregation. This is highly problematic

because a single missed link has the ability to (and often did) dramatically impact the Net Equity associated with Participants. Dennis Report, ¶¶ 73-80.

Further, even if the Trustee's replacement expert managed to reliably aggregate unreliable data, the Trustee would still fall well short of the finish line. That is because Borelian Corp. is not being offered to address the speculative and unreliable financial shortcomings of the Trustee's analysis, namely that for 90% of the transaction, the SIG data does not record or reflect actual cash. The class members need not gild the lily: simply put, even a reliable aggregation of user accounts still leaves open the question of whether individual users were a net winner or a net loser, and by how much. To answer that question, the Trustee will still attempt to use the SIG data to make financial calculations. But the SIG data by and large does not track dollars. Rather, the SIG system tracks the generation, transfer, and retirement of Telexfree's internal credits — credits which are the very fiction that lay at the heart of Telexfree's Ponzi scheme. The use of these credits as evidence of cash thus violates the time-honored principle that a Ponzi scheme's phantom profits are ignored, and only actual cash-in cash-out transactions are calculated. The Trustee still seeks to use the phantom credits to approximate cash. Judge Hoffman did not need to decide this issue. But this issue alone would necessitate a second round of *Daubert* hearings, and further drain judicial resources from the Bankruptcy estate.

Worse, it is unclear whether the replacement expert will actually do something different than what the Trustee attempted with Huron. When challenged about using a deterministic method previously, the Trustee backtracked and tried to argue that the

"Huron Report, while not wholeheartedly adopting the "Deterministic" methodology,

adopted certain principles associated with that methodology." Now, the Trustee claims

its new expert has "conceptualized a hybrid methodology that will incorporate initial

deterministic elements similar to those used by Huron with later probabilistic

components." This sounds like more of the same, and without remedying the

weaknesses in the underlying data, it is unclear that Borelian will actually produce a

useful aggregation beyond what they have thus far only "conceptualized."[8]  Six years

into this litigation, the Trustee still has not come up with a way to turn unreliable data

into admissible opinions.

**F.   In class actions, timely Daubert hearings are crucial to advancing the litigation.**

The U.S. Supreme Court has conclusively determined that in class actions, "a

rigorous analysis" of the merits of the underlying claim, including expert opinions,

must be done "at the class-certification stage" in order to satisfy the prerequisites of

Rule 23(b)(3). *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). The Supreme Court's

decision in *Comcast* ended the sometimes artificial distinction between class certification

determinations and merits determinations. There, the Supreme Court ruled that "a

model purporting to serve as evidence of damages in this class action must measure

---

[8] To the extent that Borelian plans *post-hoc* rationalization of Martin's opinion, it should be noted Mr. Martin conceded that he does not have records documenting his efforts to develop his deterministic linkages. *Daubert* Ruling at 37; Martin Tr. 137:9-14. "In developing his method, Mr. Martin also relied upon information gained through conversations with a nonstatistical sample of net losers about their experiences in creating user accounts and participating in the TelexFree scheme, but *he had no formal notes from those conversations and no comprehensive list of those with whom he spoke*." *Daubert* Ruling at 37; Martin Tr. 78:4-7, 95:11-16, 134:21-136:7, 142:11-143:13. If Borelian attempts to duplicate the Martin outcomes, its results will be similarly flawed.

only those damages attributable to that theory" and if "the model does not even attempt

to do that, it cannot possibly establish that damages are susceptible of measurement

across the entire class for purposes of Rule 23(b)(3)." *Id.* Thus, under Rule 23, courts

"must conduct a 'rigorous analysis' " that the prerequisites of Rule 23 have been

satisfied. *Id.*, citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). When an

expert's report or testimony "is critical to class certification," a district court "must

perform a full *Daubert* analysis before certifying the class if the situation warrants." *Am.*

*Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010).

　　The reasoning is straightforward: inadmissible evidence cannot be used "to prove

injury to each class member at or after trial." *In re Asacol Antitrust Litig.*, 907 F.3d, 53. In

the First Circuit, Rule 23 requires district courts to consider "the probable course of the

litigation" so as to "formulate some prediction as to how specific issues will play out in

order to determine whether common or individual issues predominate." *Bais Yaakov of*

*Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021). In sum, before there ever is a

trial, a certified class that relies on expert testimony to prevail must demonstrate that

the expert opinions are reliable.

　　Consistent with the procedures of Rule 23, the parties in this case agreed to class

certification on the admissibility of the Martin report and prepared a joint Rule 26(f)

conference report that divided the case into "two stages," with first stage to address

"the Trustee's ability to establish his prima facie case for avoidance and recovery against

the Defendant class of alleged net winners." Rule 26(f) Certification and Discovery Plan,

at 1-2 (ECF No. 250), March 3, 2017. Accordingly, no trial date was scheduled in this

case as it was unknown whether the Trustee would be entitled to trial, and certainly the identity of the proper class members needed to be established. This is the norm in class actions, as empirical data shows that in certain jurisdictions the majority of class actions do not receive a trial date.[9] For purposes of Rule 23, the closest thing to a Net Winner trial was the two-day evidentiary hearing on the reliability of the Trustee's expert analysis under *Daubert*. The Court's *Daubert* ruling was a determination of the class-wide issues needed to be resolved in "first stage," not to re-start that first stage from scratch.

The Trustee elevates the lack of a trial date to be the sole criterion this Court should consider in its motion. But in so doing, the Trustee neglects to mention that it agreed to resolve this case in stages and that a ruling on the reliability of the Huron analysis was itself the goal of the first stage. A swift determination of class actions does not hinge on trial dates; it hinges the ability to complete each stage of the litigation, including class certification. The Trustee's untimely proposal to inject a new expert and a new methodology into this case stalls the litigation and causes prejudice or unfair surprise. If allowed, it threatens to "degenerate" this litigation, which has thus far served as a commendable model of how complex cases should be resolved, into "a game of cat and mouse." *See Thibeault*, 960 F.2d, at 244.

Further, the rule the Trustee advocates, that in the absence of a trial date experts can be continuously supplemented, offends the sensible procedures courts use to resolve

---

[9] *See* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules, Federal Judicial Center (1996), at 60, available at https://www.uscourts.gov/sites/default/files/rule23_1.pdf.

class actions and would force courts either to allow class actions to tread water indefinitely or, equally bad, wreak havoc on the dockets by imposing artificial dates. If the Trustee is correct, scheduling orders in class actions will never have any teeth. The Court should reject the Trustee's proposal.

At bottom, the Trustee treats the identification of class members as simply an administrative check-box for the litigation, rather than its affirmative burden under Rule 23. The Trustee chose to bring this as a class action. If the class action fails, in large part because the underlying Ponzi-scheme data is unreliable, the Trustee may be able to pursue some parties to the extent it has non-expert evidence of fraudulent transfers. If there is a singularly important criterion, it is "the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Allowing a second bite at the *Daubert* apple in a six-year old case where the Trustee was alerted to the flaws of its expert methodology as far back as 2017, thwarts this mandate.

## CONCLUSION

Given the "history of the litigation," it is appropriate for this Court to draw "a line in the sand." *See Macaulay*, 321 F.3d, at 49. The Trustee had ample opportunity to supplement his expert report within the agreed-upon scheduling orders and prior to Judge Hoffman's exhaustive *Daubert* Ruling.

FRANTZ BALAN,
AS CLASS REPRESENTATIVE FOR THE
DOMESTIC CLASS ACTION,

MARCO PUZZARINI AND SANDRO
PAULO FREITAS, AS CLASS
REPRESENTATIVES FOR THE
INTERNATIONAL CLASS ACTION,

By their counsel,

Dated: November 1, 2021

/s/ Ilyas J. Rona
Ilyas J. Rona (BBO #642964)
Michael J. Duran (BBO # 569234)
MILLIGAN RONA DURAN & KING LLC
50 Congress Street, Suite 600
Boston, MA 02109
Tel: (617) 395-9570
Fax: (855) 395-5525
ijr@mrdklaw.com
mjd@mrdklaw.com

## CERTIFICATE OF SERVICE

I, Ilyas J. Rona, hereby certify that I have caused a copy of the class members'

**Domestic & International Class Representatives' Opposition to the Trustees' Request**

**to Appoint New Expert Witness** to be served on counsel for the Trustee and all

registered electronic filers appearing in this case using the Court's CM/ECF system.

Dated: November 1, 2021

/s/ Ilyas J. Rona
Ilyas J. Rona, Esq.