# Exhibit D.

Attorney Work Product
Privileged & Confidential, DRAFT

## NET EQUITY CALCULATIONS PERFORMED BY HURON CONSULTING GROUP ON BEHALF OF THE TRUSTEE

*September 15, 2017*

## Summary of Preliminary Findings and Discussion Points:

1. Account Aggregation Methodology and Results

    a.  *Huron Approach:*

        i.  13-step process that utilized combinations of name, login, email, phone, address, and secondary password information (or portions thereof) to group sub-accounts under a single master account.  The master account reflects the account with the lowest rep_id. (**Telexfree Net Equity Calculation and Aggregation.pdf, pgs. 3-6**)

    b.  *Purpose of Testing:*

        i.  Determine whether the account aggregation methodology utilized by Huron is sufficiently accurate, and to what extent such an approach may cause over/under aggregation resulting in faulty net equity amounts attributed to alleged net winner participants.

        ii. If the account aggregation methodology is found to be deficient, suggest possible updates and changes to the methodology to correct such issues, to the extent any potential solutions are identified and available.

    c.  *Testing Process:*

        i.  **Manual Analysis of Largest Net Losers and Net Winners (Top Winner-Loser Acct Aggregation.xls)**

            1.  Extract detailed participant and sub-account information for Top 100 Net Winners and Top 100 Net Losers in TelexFree on a global basis.

1

Attorney Work Product
Privileged & Confidential, DRAFT

    a.   Given the low likelihood that a participant would incur significant net losses (i.e., repeatedly buy in TelexFree either directly or through triangular transactions, yet receive minimal or no gains), manually review largest of the Top 100 Losers, and attempt to identify potential aggregation to top net winners.

    b.   Create examples, including sub-account user information, demonstrating top losers should actually be aggregated to net winners.

   **ii.**  **Manual Review of Select Case Study Participants (Case Study Net Equity and Transfer Detail.xls)**

    1.  Compile extracts from Huron's claim_statement, telexfree_accounts, rep_id_summary, and telexfree_transaction tables for selected participants, including: (**Tabs 13A-13D**)

       a.   Paola Zollo Alecci (#190916) - $2,530,424 Net Winner

       b.   Linda S. Hackett (#707775) - $1,216,914 Net Winner

       c.   Alexandro Rocha (#1944460) - $3,051,871 Net Winner

       d.   Sonya Crosby (#562833) - $541,450 Net Winner

       e.   Randy Crosby (#585819) - $487,621 Net Winner

       f.   Julio Silva (#1619724) - $1,597,488 Net Winner

       g.   Fabio Faria  (#2281408) - $964,345 Net Winner

       h.   Frantz Balan  (#7692912) - $518,540 Net Winner

       i.   Lusette Balan (#10391181) - $721,287 Net Winner

       j.   Jozelia Sangali (#10925941) - $1,825.40 Ne Winner

       k.   Rita Dos Santos (#229287) - ($7,090) Net Loser

       l.   DL1 Inc. (#11849449) - ($622,342) Net Loser

Attorney Work Product
Privileged & Confidential, DRAFT

2. Create dynamic summary worksheets to assist in the review of case study participants, including net equity calculations, triangular transactions, transfer of credit, and purchased credits. This analysis also consider the portion of such triangular transactions and credit transfers that were internal vs. external to each Case study participant. (**Tabs 1-7**)

iii. **Programmatic Review of Select Case Study Participants (Case Study Net Equity and Transfer Detail.xls)**

1. Identify all sub-accounts that conduct either a triangle transaction or transfer of credit with a case study participant ("counter sub-account"). Also, identify the parent C13 rep_id associated with each counter sub account ("counter participant").

2. Extract detail for all counter participants and underlying counter sub-accounts, including identify information (e.g., login, email, address, etc.) and net equity amounts. (**Tab 14**)

3. Attempt to create a consistent programmatic methodology to identify potential counter participants that appear to require aggregation with a case study participant. Methodology focused on the matching of normalized criteria, including login, name email and address.

4. Review results of programmatic matching process to determine effectiveness, as well as any over/under aggregation. (**Tabs 8-10**)

d. *Findings*

i. **Manual Analysis of Largest Net Losers and Net Winners (Top Winner-Loser Acct Aggregation.xls)**

1. The top 100 net losers in TelexFree Global comprise a loss of approximately $22 million.

   a. Losers of $25,000 or more accounted for $275 million in loss, or 8% of the total global TelexFree loss.

Attorney Work Product
Privileged & Confidential, DRAFT

2. Of the top 10 largest net losers, 7 were successfully aggregated to net winners, 2 were outside the U.S. (thus not reviewed), and 1 could not be aggregated to a net winner.

3. Each of the 13 steps in the Huron aggregation methodology required the sub-account name to match (in whole and in part), which prevented what appears to be necessary and appropriate aggregations.

   a. Matches between top net losers and net winners were based on a clear and identifiable relationship between personal information, such as Login, Email, and Address within the sub-accounts of each participant.

4. Based just on this preliminary manual review of a subset of participants, and without further analysis of all net losers or event top 100 net losers, net winnings appear to be overstated by at least $4.3 million, and likely much more.

ii. **Manual Review of Select Case Study Participants (Case Study Net Equity and Transfer Detail.xls, Tabs 1-7)**

   1. Participant sub-accounts are frequently established through internal triangular transactions, or involved in the transfer of credit

      a. Proportion of internal vs. external triangular transactions differed by participant, but net out in the determination of Net Equity

      b. Internal transfers do not exactly net out, as TelexFree appears to have charged a $3 fee per transfer.

   2. Participants often utilized a consistent login naming convention with sub-accounts differing by an incremental number as the suffix.

   3. Review of the counter-party login for triangular/transfer transaction demonstrated potential issues in the 13 step aggregation process.

Attorney Work Product
Privileged & Confidential, DRAFT

    a. Inconsistent aggregation results between highly similar logins with differing numerical suffix.

        i. See e.g., **Tab 5**, Frantz Balan, Internal and External Transactions, Rows 331-376 ("frantzXXX"), 673-680 ("lsemexantXXX"), 934-938 ("mytelexfreeXXX"), 1298-1434 ("yourwayXXXX").

        ii. See e.g., **Tab 5**, Alexandro Rocha, Internal and External Transactions, Rows 576-1584 ("bbcbostonXXX").

        iii. See e.g., **Tab 7**, Fabio Faria, Internal and External Transactions, rows 178-184 ("equipefloridaXXX") and 388-398 ("telexfloridaXXX").

    b. Un-aggregated counter parties logins appear to be highly similar to case study participant name.

        i. See e.g., **Tab 5**, Frantz Balan, Internal and External Transactions, rows 82-90 ("balanXX" and "balanfranXXX").

    c. Similar transaction pattern with same counterparties by un-aggregated participants may suggests ownership/control by same participant.

        i. See e.g., **Tab 3,** Frantz Balan & Lusette Balan, rows 435-443 ("posyXXX"), 625-637 ("mebelleXXX")

iii. **Programmatic Review of Select Case Study Participants (Case Study Net Equity and Transfer Detail.xls, Tabs 8-11, 14)**

    1. StoneTurn analysis attempted to create a programmatic means of aggregating case study to participants just to those external participants and sub-accounts with whom the case study participant transacted. (**Tab 8**)

Attorney Work Product
Privileged & Confidential, DRAFT

a. Creation of an aggregation methodology was highly iterative, and required the application of consistent bright-line tests based level of sensitivity, such as: (**Tab 14**)

    i. How many and which criteria needed to match

    ii. How to properly create a normalized or shortened version of each criteria.

    iii. How many or what proportion of sub accounts needed to match in order to aggregate the parent participant.

b. Results of StoneTurn analysis demonstrate that a methodology requiring some or all of the name to match creates a very high likelihood of under aggregation, resulting in inaccurate net equity for a given participant. (**Tabs 10**)

    i. Over $100,000 of additional losses were aggregated to Alexandro Rocha based primarily on use of same/similar address, email and logins, but differing name.

c. Application of a consistent methodology is likely not able to accurately and fully aggregate sub-accounts within the SIG database due to the data limitations and lack of validations of requisite identifying criteria.

    i. Both StoneTurn and Huron aggregation methodology still failed to aggregate sub-accounts and participants that appear to be highly related, and which were only identified through manual review.  (**Tab 11**)

        1. Cross matching by email or login may match to a case study participant name.

        2. Variances in spelling and typos

Attorney Work Product
Privileged & Confidential, DRAFT

### e. Discussion Points

i. Likelihood of participants to generate large net losses.

    1. Low receipt-to-payment ratio

    2. Impact of earliest transaction date

ii. Rigor of TelexFree name validation process, if any, for creation of sub-account names.

iii. Potential for a single participant to utilize multiple sub-account names.

    1. Potential for a single participant to also use one or more login naming conventions, email addresses, street addresses, phone numbers, etc.

iv. Potential for a participant to use a non-identifying name, such as punctuation.

v. Potential for a participant to work alongside or employee other participants with same/different contact information and with same/different sub-account name.

    1. Potential for a participant to create sub-accounts for family members, or created controlled sub-accounts using family member names.

vi. Potential for a participant to create sub-accounts using both personal name and business name.

## 2. Value of Credits in Triangular Transactions and Credit Transfers

### a. Huron Approach:

i. For purposes of triangular transactions, credits are considered to have value in that the payment of credits by Participant A to TelexFree on behalf of new Participant B is assumed to result in full cash compensation by Participant B to Participant A.

7

Attorney Work Product
Privileged & Confidential, DRAFT

    ii.   For purposes of credit transfers, credits are considered to have <u>no</u> value in that the transfer of credits by Participant A to Participant B is assumed to <u>not</u> have resulted in any cash compensation, in whole or in part.

## b. *Purpose:*

    i.   Analyze credit transfer data to understand the frequency and volume of such transactions, as well as any discernable patterns that may provide an indication as to the value or use by participants in credit transfers

## c. *Testing Process:*

    i.   Extract detailed participant and sub-account information for Top 100 Net Winners and Top 100 Net Losers in TelexFree on a global basis, including total amount of credit transfers in and out. (**Top Winner-Loser Acct Aggregation.xls**)

        1.   Review magnitude of such transfers and impact on net equity.

    ii.   Compile credit transfer transaction detail for case study participants, including counter rep_id and parent id. (**Case Study Net Equity and Transfer Detail.xls**)

        1.   Determine the portion of such transfers which are internal and which are external to the case study participant.

        2.   Review magnitude of such transfers and impact on net equity.

## d. *Findings:*

    i.   **Credit Transfers by Top 100 Net Losers and Winner (Top Winner-Loser Acct Aggregation.xls)**

        1.   While amount of credit transfers in/out varied considerably by participant, in the aggregate losses for top 100 net losers decreased by approximately 62% from $22.1 million to $8.6 million. (**Tab 100 Net Losers (Tlx)**)

Attorney Work Product
Privileged & Confidential, DRAFT

       a.   Net losers transferred on average $179,000 of credits in and $315,000 of credits out, for an average of $136,000 of net credits in (increase to net equity)

2. While amount of credit transfers in/out varied considerably by participant, in the aggregate, winnings for top net winners would decrease by approximately 28% from $147.5 million to 106.0 million. (**Tab 100 Net Winners (Tlx)**)

       a.   Rep ID 10926373, Nathana Santos Reis, was a significant outlier with over $20 million in credits transferred in and out.

       b.   Excluding Rep ID 10926373, the remaining net winners transferred on average $2.3 million of credits in and $1.6 million of credits out, for an average of $0.7 million of net credits in (reduction to net equity)

ii. **Credit Transfers by Case Study Participants (Case Study Net Equity and Transfer Detail.xls, Tabs 1, 6-7)**

1. All 12 of the case study participants transferred credits both in and out, with frequency and amounts varying greatly.

       a.   While the inclusion of credit transfers would impact some participants positively and other negatively with respect to net equity, in the aggregate net credit transfer would decrease case study participant net equity by $3.8 million.

       b.   The inclusion of credit transfers can have a drastic impact on participant net equity, impacting all but one case study participant by +/- 25% or more.

2. Especially with larger net winners, a considerable portion of the credit transfers (both in terms of number of transactions and amount transferred) occurred between internal sub-accounts aggregated to the same participant.

Attorney Work Product
Privileged & Confidential, DRAFT

      a.   Internal credit transfers have no impact on net equity, other than the $3 per transactions that appears to have been charged by TelexFree.

### e. Discussion Points:

    i.   Why transferred credits would be assumed to have no value if they could be readily monetized through triangular transactions to generate cash.

    ii.   Purpose of transferring large sums of credits, both internally and externally, if not to generate return.

        1.   Rationale for purchasing credits from TelexFree vs. purchasing from another TelexFree participant at full or partial value.

    iii.   Any specific evidence by the trustee that external credit transferred were made between differing participants without the exchange of cash, in whole or in part.

## 3. Trending of Participant Net Equity Over Time

### a. Huron Approach:

    i.   n/a

### b. Purpose:

    i.   Demonstrate that primary difference between net winners and net losers in the aggregate is potentially less intent to defraud, but rather duration of time during which the scheme was available to participants

### c. Testing Process:

    i.   Create a table for U.S. only Telexfree/Ympactus combined with one record for aggregated participant.  Include information pertaining to net equity (both in total and by transaction type), transfers, number of sub-accounts, earliest and

Attorney Work Product
Privileged & Confidential, DRAFT

latest transaction date, and other identifying information (**US-Participants_Telex Ympactus Split (U.S. Primary Acct).xls**)

  ii.  Create graphic visualization detailing impact of variables such as account duration and earliest transaction date on an individuals' net equity.

### d. *Findings:*

  i.  In the aggregate, U.S. individuals that were involved in TelexFree would be net winners if they participated in the scheme for at least six (6) months.

  ii.  Participants that joined TelexFree after September 2013 were generally net losers, while participants that joined TelexFree prior were generally net winners.

  iii.  Determination of country geography appears inconsistent, and precise methodology has not been explained by Huron. As such, total U.S.-only net equity amounts differ from Huron results.