UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC.,<br>TELEXFREE FINANCIAL, INC.,<br><br>         Reorganized Debtors. | Chapter 11 Cases<br>14–40987–EDK<br>14–40988–EDK<br>14–40989–EDK<br><br>Jointly Administered |
| STEPHEN DARR, CHAPTER 11<br>TRUSTEE OF THE ESTATES OF EACH<br>OF THE DEBTORS,<br><br>         Plaintiff,<br><br>    v.<br><br>BENJAMIN ARGUETA, *et al.,* and a<br>CLASS OF DOMESTIC NET WINNERS,<br><br>         Defendants. | Adv. Pro. No.: 16–04006–EDK |
| STEPHEN DARR, CHAPTER 11<br>TRUSTEE OF THE ESTATES OF EACH<br>OF THE DEBTORS,<br><br>         Plaintiff,<br><br>    v.<br><br>PAOLA ZOLLO ALECCI, *et al.,* and a<br>CLASS OF INTERNATIONAL NET<br>WINNERS,<br><br>         Defendants. | Adv. Pro. No.: 16–04007–EDK<br><br>**\*\*EVIDENTIARY HEARING<br>REQUESTED\*\*** |

**DOMESTIC & INTERNATIONAL CLASS REPRESENTATIVES'
MOTION TO EXCLUDE TESTIMONY OF
DR. CAMERON E. FREER AS INADMISSIBLE UNDER *DAUBERT***

Domestic Class Representative Frantz Balan and International Class

Representatives Marco Puzzarini and Sandro Paulo Freitas (the "<u>Class Defendants</u>")

hereby move to exclude the expert testimony of Cameron Freer, PhD (the "<u>Freer</u>

<u>Opinions</u>"), as inadmissible under Rule 702 and the principles set forth in *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Class Defendants further

request an evidentiary hearing on this motion. In support thereof, the Class Defendants

state as follows:[1]

## **PROCEDURAL BACKGROUND**

On February 3, 2020, the Trustee provided to the Class Defendants the initial Report

of Timothy Martin of Huron Consulting Group LLC ("<u>Martin Report</u>")wherein Mr.

Martin sought to provide an expert opinion to determine the identities and gains of the

net winners in these adversary proceedings. On July 31, 2020, the Class Defendant's

expert Joshua Dennis of StoneTurn Group provided his Rebuttal Expert Report ("<u>First</u>

<u>Dennis Report</u>"). On September 23, 2020, the Trustee provided Mr. Martin's Reply

Expert Report ("<u>Martin Reply Report</u>"). This Court held a two-day *Daubert* hearing on

the Martin Opinions on November 23 and 24, 2020. On February 2, 2021, Class

Defendants filed a Motion to Exclude the Testimony of Timothy Martin as Inadmissible

Under Daubert. (Domestic Case, ECF No. 528, International Case, ECF 377).

On June 22, 2021, this Court issued an order and accompanying memorandum

granting the Class Defendants Motion to Exclude the Testimony of Timothy Martin as

Inadmissible, in both cases.(Domestic Case, ECF Nos. 385 & 386, International Case,

ECF Nos. 536 & 537). Judge Hoffman concluded that:

---

[1] Unless stated otherwise, all exhibit references below are to the Affidavit of Ilyas J. Rona.

> The trustee has not shown by a preponderance of the evidence the reliability of his expert's opinion as to the selection and application of his method for aggregating user accounts to determine in these adversary proceedings the identities and gains of the net winners in the TelexFree scheme.

(Domestic Case ECF No. 536, at 39) (the "<u>Daubert Ruling</u>").

Mr. Martin's entire opinion, including his net equity calculations were excluded.

Judge Hoffman made this abundantly clear in his final footnote:

> The defendants also raise arguments beyond simply addressing the reliability of Mr. Martin's selection and application of an aggregation methodology, including arguments that relate to Mr. Martin's assumptions and decisions *after* the aggregation process was complete, ***when he set out to calculate the gains and losses (net equity) of each alleged participant***. Having determined that the reliability of Mr. Martin's aggregation methodology has not been established and ***thus his expert opinion cannot be admitted***, it is unnecessary to address the defendants' additional arguments, which they may choose to raise in the future, if appropriate.

(Daubert Ruling, at 40, n.32) (emphasis added).

As a result of Mr. Martin's exclusion, in or around September 2021, the Trustee retained Dr. Freer of Borelian Corporation as a replacement testifying expert. Class Defendants now challenge the sufficiency and reliability of Dr. Freer's opinions.

<u>SUMMARY OF FREER OPINIONS</u>

The Freer Aggregation Process utilizes information supplied by Participants when registering User Accounts, such as name, email address, street address, cell phone number, and other information ("Potential Identifiers"), which was stored in the representante table (i.e., Account Table).[2] Specifically, Dr. Freer developed a 10-step Aggregation Process, which attempts to confirm which User Accounts belong to the

---

[2] (Ex. A, Freer Report, at 5, 23-37 and 44-45.)

same Participant primarily through the application of a probabilistic record linkage

approach known as the Fellegi-Sunter model with Expectation Maximization.[3]

Dr. Freer describes the Fellegi-Sunter model as a way to track agreement on

multiple fields simultaneously and turn that information into an overall match

probability for each pair of records under consideration. The output of the

Fellegi-Sunter model is the agreement score for each pair of records under

consideration, typically formulated as a "match probability."[4]

<u>Step 1: Selection and Transformation of Fields</u>

The first step in the Freer Aggregation Process was the selection and transformation

of relevant fields from the list of Potential Identifiers. Specifically, he selects 11 of the 44

data fields in the Account Table ("Aggregation Fields"):[5]

- Rep_nome – Full Name
- Rep_email – Email
- Rep_cel – Mobile Phone
- Rep_fone – Telephone
- Rep_end – Address
- Rep_numero – Address Number
- Rep_cep – Address Postal Code
- Rep_login – Username
- Rep_pwd_secondary – User Created Secondary Password
- Rep_cpf – Social Security or Other Personal Identifier (Other Countries)
- Rep_datanasc – Birthday

Other Potential Identifiers available in the Account Table that were not utilized in the

Freer Aggregation Process, include, but are not limited to: first name

(rep_primeiro_nome); last name (rep_sobrenome); gender (rep_Sexo); company

---

[3] (Ex. A, Freer Report, at 5, 13, and 62.)

[4] (Ex. A, Freer Report, at 13-15.)

[5] (Ex. A, Freer Report, at 5 and 40; and 10ksample.xlsx.)

(rep_comp);[6] address neighborhood (rep_barrio); city (rep_cidade); address state (rep_uf); and country code (rep_pais). Additionally, with respect to the rep_login field, Dr. Freer makes a further transformation and truncates it to just the first four characters.[7]

## Step 2: Cleansing of Fields

The second step of the Freer Aggregation Process was to clean-up and format certain fields. Depending on the specific field, this typically included converting letters to lower case and eliminating certain spaces.[8] Other cleansing steps were performed on specific fields. For example, the rep_nome field ("Name Field") was replaced with an empty string where it had a length of one, where it was comprised of entirely non-alphanumeric characters, or where it had a length of three and the first and third characters were standard Latin alphabet while the second character was a space .[9] For phone numbers, any non-digit characters were removed and only the last 7 digits were used.[10]

## Step 3: Deterministic Linkage

The third step in the Freer Aggregation Process was the application of an initial deterministic record linkage, whereby it combined any User Accounts that were in exact agreement on cleansed non-null versions of eight of the fields: rep_nome; rep_email;

---

[6] Consistent with Dr. Freer's observation, this field actually appears to contain various components of the address. (Ex. A, Freer Report, at 35.)

[7] (Ex. A, Freer Report at 44-45.)

[8] (Ex. A, Freer Report at 45-46.)

[9] (Ex. A, Freer Report at 46.)

[10] (Ex. A, Freer Report at 46.)

rep_cel; rep_fone; rep_end; rep_numero; rep_cep; and rep_login. This deterministic step resulted in 4,367,728 account groupings.[11]

<div align="center">Step 4: Blocking</div>

Dr. Freer states that when the dataset is large, it may be computationally unreasonable to run the Fellegi-Sunter algorithm on the set of all pairs directly. For example, in the TelexFree dataset after the application of Step 3, there were approximately 4 million account groupings, resulting in approximately 10 trillion pairs of account groupings to consider. As such, Dr. Freer's fourth step utilized a technique known as "blocking" to reduce the number of pairs under consideration to a much smaller number. Dr. Freer notes that the restriction to a smaller subset of pairs is justified only if every pair that is excluded from the blocking set would have been very unlikely to match, had it been considered. Dr. Freer further states that, importantly, the presence of a pair of records in the blocking set does not signal that the pair is necessarily likely to be a match; rather, it simply means that the pair meets the minimum requirement to be further considered.[12] For purposes of consideration for potential linkage, Dr. Freer required that User Accounts have "substantial agreement on name." And any account grouping pairs that did not meet this threshold, as determined by Dr. Freer, were deemed to not be part of the blocking set and were thus assigned a match probability of 0.[13]

---

[11] (Ex. A, Freer Report at 49.)

[12] (Ex. A, Freer Report at 17-18 and 50.)

[13] (Ex. A, Freer Report at 25 and 51.)

Specifically, Dr. Freer concludes that there is "substantial agreement" with a name if it meets the following criteria:[14]

$$WRatio(\text{accountGrouping1.}clean\_rep\_name,$$
$$\text{accountGrouping2.}clean\_rep\_name) >= 85.5$$

AND

$$(ratio(\text{accountGrouping1.}clean\_rep\_name,$$
$$\text{accountGrouping2.}clean\_rep\_name) >= 70$$

OR

$$ratio(firstLast(\text{accountGrouping1.}clean\_rep\_name),$$
$$firstLast(\text{accountGrouping2.}clean\_rep\_name)) >= 80)$$

As part of this step, Dr. Freer also manually aggregates 62,725 User Accounts with a rep_name of "John Williams" that also shared other commonalities, such as email domain ("mailinator.com") and street name ("Warry Lane").[15] After the exclusion of John Williams pairs, the output was a blocking set consisting of 117,563,883 pairs of account groupings.[16]

<u>Step 5: Calculation of Gammas</u>

The fifth step of the Freer Aggregation Process was to consider every pair of account groupings in the blocking set and assign each pair a comparison vector containing the gamma values for the cleaned fields. The gamma values, which depending on the field ranged from 0-1, 0-2, 0-3 or 0-5, were typically determined by

---

[14] (Ex. A, Freer Report at 53-54.)

[15] (Ex. A, Freer Report at 55.)

[16] (Ex. A, Freer Report at 55.)

applying cutoffs to the results of the string nearness measures (i.e., fuzzy matching)

applied.[17] As an example, the criteria for the email address gamma is shown below:[18]

*gamma_clean_rep_email*:
- 3 **if** *email_ratio* == 100
- 2 **if** (*email_ratio* >= 92)
- 1 **if** (*email_beforeAt_ratio* >= 90)
- 0 otherwise

where

- *beforeAt* returns the portion of the string before the first @ character

- *email_ratio = ratio*(accountGrouping1.*clean_rep_email*,

  accountGrouping2.*clean_rep_email*)

- *email_beforeAt_ratio = ratio*(*beforeAt*(accountGrouping1.*clean_rep_email*),

  *beforeAt*(accountGrouping2.*clean_rep_email*))

### Step 6: Calculation of Match Probabilities

The sixth step of the Freer Aggregation Process was to utilize the Splink Python

Library to automatically convert the comparison vectors for each pair of account

groupings to match probabilities.[19] The output was an assignment of the match

probability to each of the 117,563,883 pairs of account groupings in the blocking set.

### Steps 7-8: Fixed Threshold and Dynamic Clustering

The seventh and eighth steps of the Freer Aggregation Process involved

aggregating pairs of the account groups into clusters. This was done by first creating

149 fixed threshold values, with the fixed thresholds occurring at given percentiles from

0.006 to 100. For any given fixed threshold value, Dr. Freer created a cluster such that

each account grouping was placed into one cluster of the clustering by taking the

---

[17] (Ex. A, Freer Report at 56 to 60 (user birthday and secondary password were compared directly with no fuzzy matching resulting in a binary match (1) or non-match (0).)

[18] (Ex. A, Freer Report at 57.)

[19] (Ex. A, Freer Report at 62.)

transitive closure of the set of all account grouping pairs whose match probability was at least the given threshold. Higher fixed thresholds that required more closely related pairs would yield a larger number of clusters with smaller average cluster size, while smaller fixed thresholds that did not require the same closeness would yield fewer clusters with a larger average cluster size.[20]

However, due to the heterogeneity of the TelexFree dataset (i.e., some Participants entered information very consistently across may accounts, while other participants entered information that differed more widely), Dr. Freer ultimately elected to forgo a fixed threshold approach in favor of a dynamic clustering process.[21]

Dr. Freer states that the dynamic clustering process seeks to select a different fixed threshold for each account grouping in such a way that (a) the choices are compatible across the entire dataset, and (b) the measures of "overclustering" and "underclustering" are balanced with each other.[22] Dr. Freer describes "overclustering" as:[23]

> Namely, define the overclustering measure of a given account grouping (with respect to a proposed clustering) to be the fraction of account groupings within its cluster with which it has a match probability above 0.5. In other words, it is the number of account groupings in its cluster with which it has a match probability over 0.5, divided by the total number of account groupings in its cluster. The average overclustering measure of a cluster (e.g., the fixed-threshold cluster of an account grouping for some particular fixed threshold) is then defined to be the average of the overclustering measures of each account grouping in the cluster. Finally, the overclustering measure of an entire proposed clustering (e.g., a candidate clustering for the dynamic clustering process)

---

[20] (Ex. A, Freer Report at 62-63.)

[21] (Ex. A, Freer Report at 64-65.)

[22] (Ex. A, Freer Report at 69.)

[23] (Ex. A, Freer Report at 67-68.)

is defined to be the average overclustering measure of each account grouping's cluster, averaged across all account groupings. In this way, if the overclustering measure of a given clustering is close to 1, this indicates that the clusters do not contain many pairs of account groupings having low match probability, while if the overclustering measure is close to 0, this indicates that the clusters contain many pairs of account groupings having low match probability.

Similarly, Dr. Freer describes "underclustering" as:[24]

Namely, define the underclustering measure of a given account grouping (with respect to a given clustering) to be the fraction of all account groupings with which it has a match probability above 0.5 that are already within its cluster. In other words, it is the number of account groupings in its cluster with which it has a match probability over 0.5, divided by the total number of account groupings in the dataset with which it has a match probability over 0.5. The underclustering measure of an entire proposed clustering (e.g., a candidate clustering for the dynamic clustering process) is then defined to be this quantity averaged across all account groupings. In this way, if the underclustering measure of a given clustering is close to 1, this indicates that its set of clusters already contains most of the pairs of account groupings having high match probability, while if the underclustering measure is close to 0, this indicates that there are many pairs of account groupings having high match probability which failed to both be included in any cluster.

This balance between overclustering and underclustering was done by choosing, for each account grouping, the fixed-threshold clustering with the smallest threshold that is still consistent with the resulting cluster having average overclustering measure above a determined dynamic clustering parameter. In this case, Dr. Freer determined the dynamic clustering parameter to be 0.60.[25] This step resulted in dynamic clustering of 4,367,728 account groupings.[26]

---

[24] (Ex. A, Freer Report at 68.)

[25] (Ex. A, Freer Report at 71.)

[26] (Ex. A, Freer Report at 72.)

Step 9: Convert Clusters of Account Groupings into Clusters of User Accounts

The ninth step was to determine the final clusters by ungrouping the account groupings created in the various steps and converting each back into User Accounts. This step resulted in 1,566,383 clusters of User Accounts ("Account Aggregations" or "Clusters"), with a mean size of 7.01 User Accounts per cluster.[27]

Step 10: Tabulate Total Net Equity for Each Cluster

The tenth and final step was to sum the Net Equity amount associated with each User Account as determined by Mr. Martin across all the User Accounts in a given cluster. In total, Dr. Freer aggregated 10,987,617 TelexFree User Accounts to 1,566,383 Clusters. Of those 1,566,383 Clusters, 1,484,702 Clusters are alleged to be Net Losers and 81,681 are alleged to be Net Winners. The Net Winners are claimed to have a total net gain of $1,555,981,482, with an average net gain of $19,049 per Net Winner, while the Net Losers are claimed to have a total net loss of $1,782,171,730, with an average net loss of $1,200 per Net Loser.[28]

Dr. Freer does not make his own Net Equity calculations apart from importing the calculations made by Martin in Step 10.

---

[27] (Ex. A, Freer Report at 72.)

[28] (Ex. A, Freer Report at 72-73.)



## SUMMARY OF SECOND DENNIS REPORT

Defendants' expert Joshua Dennis of StoneTurn Group makes the following

critiques of Dr. Freer's Opinions:

### A.  Dr. Freer's Aggregation Process Is Unreliable

After a detailed review of Dr. Freer's aggregation process, Joshua Dennis found the

following significant flaws:

### a. Dr. Freer's Foundational Assumptions Regarding the Special Role of the Name Field is Unsupported and Counter to Case Facts

The Second Dennis Report notes that a key assumption of Dr. Freer: of the 44 fields in the account table, the name field ("rep_nome") plays a "special role." (Ex. B, 2d Dennis Report, ¶ 73.) Dr. Freer bases this assumption on his "understanding… that, in the course of User Account creation, it was common practice for recruits to use their own name while using the contact information (email address, phone number, street address, and other fields) of their recruiters, or for family members to share the same contact information, or for a business and an individual to share the same contact information." (*Id.*) Dennis observes that this "understanding" is of paramount importance and is foundational to the entirety of the Freer aggregation process. (Ex. B, 2d Dennis Report, ¶ 74.)

Despite the critical importance placed on the name field, Dennis finds that Dr. Freer fails to provide a source for this "understanding" that people use their own names. This lacks meaningful support anywhere in the Freer Report. (Ex. B, 2d Dennis Report, ¶ 75.) According to Dennis, the only support that Dr. Freer was able to provide for his "understanding" was in his deposition, where Dr. Freer referenced "court documents, including primarily, I believe the court's memorandum from June 2021 and possibly from the Martin report or Dennis rebuttal or Martin reply." (*Id.*)

According to Dennis, the assumption about the elevated importance of the name is unsupported and is as flawed as the Martin assumption that "it is reasonable to assume that a Participant would include an accurate name when registering a User Account." (Ex. B, 2d Dennis Report, ¶ 76.) Like Martin, Dr. Freer provides no explanation for why

participants might use variations in contact information but consistently and accurately use their one name. Ultimately, Judge Hoffman's found Martin's reliance on the name field as the most important variable unreliable because "[Martin] has offered only unsupported assumptions and untestable bases for why he selected the name field, despite its acknowledged flaws, above all other fields to be the primary focus in his aggregation process….He has not shown that his assumptions about the name field data's accuracy are reasonable and not speculative." (Ex. B, 2d Dennis Report, ¶ 79.) It is therefore "unclear" to Dennis why Dr. Freer references the *Daubert* Decision as "somehow" supporting his understanding (Ex. B, 2d Dennis Report, ¶ 80.) It is also unclear why he cited the First Dennis Report, as it indicated that participants "could create User Accounts using a variety of names, such as business name, personal name, or even fictional names." (Ex. B, 2d Dennis Report, ¶ 81.) Dr. Freer's citation to the Martin report or the Martin Reply is also unavailing because those reports were found to lack support for the assumption that names were consistently and accurately entered.

Dennis finds that like Martin, Dr. Freer fails to provide "real-world explanation as to why Participants, when creating User Accounts, supposedly always entered the same or substantially similar names in the Name Field, but frequently elected to utilize inconsistent or inaccurate information when entering every other field…" (Ex. B, 2d Dennis Report, ¶ 87.) Worse, Dennis finds that Dr. Freer ignores real-world data that directly contradicts his findings. For example, Dr. Freer continues to aggregate accounts *to* class representative Frantz Balan that use a different email address —vjmanigat@gmail.com— that Mr. Balan has stated under oath does not belong to him.

14

(Ex. B, 2d Dennis Report, ¶ 86.) In sum, Dennis finds Dr. Freer's assumption regarding

the reliability and consistency of the Name Field lacking meaningful support, thus

rendering all of Dr. Freer's opinions unreliable.

### b. Dr. Freer Failed to Appropriately Consider the Quality of the Data Utilized in His Aggregation Process

Dennis found that Dr. Freer also failed to consider or address the data quality

problems that were insurmountable to Martin. Dr. Freer recognizes that "it is crucial to

assess the quality of the data in each field" and "select fields to be used for linkage

based on data quality." (Ex. B, 2d Dennis Report, ¶ 89.) To assess data quality, Dr. Freer

understands that a data quality assessment is needed to identify fields that are of

sufficiently high quality for reliably assessing pairwise matches. Dr. Freer only identifies

**four** dimensions to assess data quality: (1) completeness (how often the field values are

present vs. missing), (2) consistency (how consistent the values used for matching are),

(3) accessibility (inclusion of different kinds of nonoverlapping fields such as name,

address, phone, email, etc.), and (4) believability (how credible or plausible the actual

values are). (Ex. B, 2d Dennis Report, ¶ 90.) Dr. Freer cites to Section 3.1 of *Data

Matching, Data-Centric Systems and Applications*," a book by by Peter Christen, as support

for those **four** dimensions. Yet Section 3.1 of this book lists *six* dimensions, including

two additional dimensions of (5) timeliness (how old are the data available and were

they recorded at the same time) and (6) accuracy (how accurate are the attribute values).

Dr. Freer left these two dimensions out. (Ex. B, 2d Dennis Report, ¶ 91.) Dennis finds

these two dimensions to be relevant and their omission to be significant. Timeliness is

noted as a "crucial" factor to Christen because personal information can change over

time. (Ex. B, 2d Dennis Report, ¶ 92.) With respect to accuracy, Christen states that it,

along with consistency, *are arguably the most important data quality dimensions* for

data matching and deduplication. (Ex. B, 2d Dennis Report, ¶ 93.)

Assessing the accuracy dimension requires consideration of how data has been

entered or recorded, whether data entry checks have been performed, and whether data

has been verified for correctness using *external reference data* (such as references of

known and valid addresses). (Ex. B, 2d Dennis Report, ¶¶ 91, 94.) Dennis finds that

Dr. Freer did none of those things, as the Telexfree data entry was unregulated,

unchecked, and unverified. (Ex. B, 2d Dennis Report, ¶¶ 95-97.) Indeed, Dr. Freer

admits that he "didn't make as, formal, a separate assessment" of accuracy. Rather he

states that, "completeness, consistency, and believability have to do with accuracy and

those I assessed in detail." (Ex. B, 2d Dennis Report, ¶ 99.) Dennis finds that using these

other three dimensions of data quality as a proxy for accuracy is unfounded. Dr. Freer's

position is further undermined by his subsequent admission that "it's certainly possible

to have complete data that is not accurate, or consistent data that is not accurate, or

believable data that is not accurate." (Ex. B, 2d Dennis Report, ¶ 99 (quoting Freer

Depo., at 128).)

Dennis also finds little support for Dr. Freer's findings that data in the name field is

"generally rather believable." (Ex. B, 2d Dennis Report, ¶ 107.)[29] "Mickey Mouse" aside,

Dennis calculates that by Dr. Freer's own admission, there are over 500,000 User

Accounts that do not appear to contain a name in the Name Field. (Ex. B, 2d Dennis

---

[29] Examples of less-than-believable names include: Tom Cruise, Lady Gaga, Leonardo Dicaprio,
Shakira, and Bill Gates. (Affidavit of Ilyas J. Rona, ¶¶ 25-26.)

Report, ¶ 105.) Of those, there are over 125,000 TelexFree User Accounts that consist entirely of numerical values, punctuation, or spaces, such as "........." or "398985 9849348." (Ex. B, 2d Dennis Report, ¶ 102.) Additionally, there are approximately 2,400 unique names associated with more than 200,000 separate User Accounts where the name entered by the user is less than 4 characters, including the following:

| Full_Name | # of User Accounts | Aggregate Net Loss |
|---|---|---|
| 1 1 | 40,687 | ($2,063,193) |
| . . | 36,498 | ($1,986,986) |
| a a | 30,363 | ($1,551,269) |
| . | 8,329 | ($535,314) |
| q q | 5,339 | ($278,741) |
| W W | 3,191 | ($161,427) |
| c c | 3,009 | ($151,197) |
| m m | 2,077 | ($108,882) |
| x x | 2,166 | ($108,732) |
| d d | 2,021 | ($102,095) |
| l l | 1,966 | ($98,403) |
| Jo | 1,849 | ($92,354) |
| A B | 1,770 | ($89,421) |
| 0 0 | 1,667 | ($84,082) |
| k k | 1,512 | ($76,497) |
| s s | 1,455 | ($72,954) |
| j | 1,328 | ($68,650) |
| j j | 1,298 | ($65,619) |
| p p | 1,242 | ($62,076) |
| f f | 1,171 | ($59,481) |
| , , | 1002 | ($59,243) |
| 1 | 830 | ($44,638) |

(Ex. B, 2d Dennis Report, ¶ 101.)

Dr. Freer only sampled 300 accounts (a list of which is not disclosed) and concluded that 98% of accounts "look like a name." (Ex. B, 2d Dennis Report, ¶ 104.) It is unclear what standards Dr. Freer uses to make this determination other than subjectivity, as he concedes that "Mickey Mouse" would not have looked like a name to him but "Barack Obama" would have, despite the probability that both names are inaccurate. (*Id.*)

Dennis notes that Dr. Freer's assessment of consistency also lacked proper support.
Dr. Freer contends that "while it may turn out that a name is made up (such as 'Mickey
Mouse'), this itself is not a critical issue for data aggregation." (Ex. A, Freer Report,
¶ 92.). The relevant issue for aggregation is whether the values in the field support the
matches, ***not whether or not the values in the field reflect the true name***." (Ex. B,
2d Dennis Report, ¶ 108) (emphasis added). Dr. Freer next states: "Even when a
Participant uses a pseudonym that is totally unrelated to their real name, it is possible to
successfully aggregate their User Accounts if (a) they use the pseudonym consistently,
and (b) not too many other Participants use that same pseudonym without including
different information in other fields." (*Id.*) Dr. Freer notes no support for this assertion,
which is expressed as a conditional statement, not a fact. (*Id.*) If stated in the converse,
Dennis finds that "if Participants did not enter names consistently or did not provide
sufficient differentiation in other Aggregation Fields, which the case facts suggest was
likely for certain Participants (especially large Net Winners), then it would not be
possible for Dr. Freer to successfully aggregate their User Accounts." (Ex. B, 2d Dennis
Report, ¶ 110.)

Dr. Freer recognizes the challenge of heterogeneity in the TelexFree dataset, but he
made no effort to bring in external, real-world data, so called "ground-truth data,"
which Christen notes is the gold standard. (Ex. B, 2d Dennis Report, ¶ 110-11.) In the
absence of substantive verification or internal controls, the Christen book notes that "the
*garbage-in garbage-out* principle holds. If the quality of the input data is low, then the

output generated is normally not [of] high quality or accuracy either." (Ex. B, 2d Dennis Report, ¶ 112.)

Dr. Freer's reliance on consistent naming fails to appropriately account for instances where other Potential Identifiers provide strong *indicia* that the User Accounts belong to a single Participant. *Id.*

### c.  Dr. Freer's Results are Internally Inconsistent

Dennis observes several inconsistencies in Dr. Freer's expert opinions. Because of the "special role" of the name, it is "important that no pairs of account groupings that substantially disagree on the name end up matched together." As an example, Dr. Freer states that "Alice Adams" and "Bob Baker" should not be aggregated. But Dennis found numerous instances where names with substantial disagreement were aggregated. For example, Cluster 23118541 shows dissimilar and obviously fake names of "A," "B," "C," *etc.* in the "rep_nome" field being aggregated together:

| cluster_id | rep_nome | rep_email | rep_numero | rep_end | rep_cidade | rep_pais | rep_fone | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|---|---|
| ⊟ 23118541 | ⊟ A | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (1,047.90) | 21 |
| | ⊟ B | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (12,125.70) | 243 |
| | ⊟ C | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (13,572.80) | 272 |
| | ⊟ D | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (7,634.70) | 153 |
| | ⊟ F | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (5,189.60) | 104 |
| | ⊟ H | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (948.10) | 19 |
| | ⊟ J | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (54,590.60) | 1,094 |
| | ⊟ K | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (1,097.80) | 22 |
| | ⊟ L | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (12,075.80) | 242 |
| | ⊟ M | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (11,676.60) | 234 |
| | ⊟ N | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (10,429.10) | 209 |
| | ⊟ P | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (6,586.80) | 132 |
| | ⊟ R | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (3,293.40) | 66 |
| | ⊟ S | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (7,684.60) | 154 |
| | ⊟ T | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (8,932.10) | 179 |
| | ⊟ V | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (6,736.50) | 135 |
| | ⊟ Z | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (748.50) | 15 |
| | ⊟ (blank) | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (12,075.80) | 242 |
| **Grand Total** | | | | | | | | $ (176,446.40) | 3,536 |

The aggregation of 3,536 accounts into a single cluster irrespective of the name undermines the assertion that the name is the "only true identifier." Dennis provides another example of how Dr. Freer's analysis differs from the results that Dr. Freer predicts. In this example, it is difficult to discern any rhyme or reason why some accounts are aggregated together but others are not:

| cluster_id | rep_nome | rep_email | rep_end | rep_cep | rep_fone | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|
| ⊟10758965 | ⊟Team Legendary | ⊟billybob.arbonne@gmail.com | ⊟1 | ⊟1 | ? | $ (1,425.00) | 1 |
| | | | ⊟? | ⊟? | 3477667668 | $ (1,425.00) | 1 |
| | | | | | ? | $ (2,101.50) | 2 |
| | | | ⊟123 main st | ⊟77007 | 3477667668 | $ (19,900.10) | 14 |
| | | | ⊟123 main st. | ⊟77007 | 3477667668 | $ (21,125.50) | 15 |
| | | ⊟tommylin19@yahoo.com | ⊟? | ⊟? | ? | $ (14,832.40) | 13 |
| | | | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 10heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 11heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 12heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 13heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (2,850.00) | 2 |
| | ⊟Team Legendary 15heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 16heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 17heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 18heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟10778683 | ⊟Team Legendary | ⊟billybob.arbonne@gmail.com | ⊟? | ⊟? | ? | $ (1,025.80) | 1 |
| ⊟10787619 | ⊟Team Legendary | ⊟peterkwongusa@yahoo.com | ⊟1 | ⊟1 | 1 | $ (1,425.00) | 1 |
| | | | ⊟? | ⊟? | ? | $ (4,203.00) | 4 |
| | ⊟Team Legendary | ⊟billybob.arbonne@gmail.com | ⊟1 | ⊟1 | ? | $ 7,174.90 | 1 |
| ⊟11089827 | ⊟chin hao chang | ⊟billybob.arbonne@gmail.com | ⊟9080 telstar ave #302 | ⊟91731 | 3477667668 | $ 18,824.40 | 1 |
| ⊟12982273 | ⊟X Legend X | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77017 | 3477667668 | $ (1,425.00) | 1 |
| ⊟13328313 | ⊟27legendary WC | ⊟billybob.arbonne@gmail.com | ⊟1337 legend ave | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟14207003 | ⊟Majestic Tia | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77077 | 3477667668 | $ (1,425.00) | 1 |
| ⊟14394871 | ⊟Walt Disney | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟551166 | 11111111111 | $ (14,250.00) | 10 |
| | | | ⊟123 main st. | ⊟77007 | | $ 1,474.90 | 1 |
| ⊟15341909 | ⊟Agent hydralisk | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (11,350.10) | 8 |
| | ⊟Agent Hydralisk2 | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Agent Hydralisk3 | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟15744519 | ⊟Wi-Fi Cindy | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟22032025 | ⊟King Blizzard | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟0 | 3477667668 | $ (339.60) | 1 |
| ⊟23079231 | ⊟Barack Obama | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟0 | 1111111111 | $ (339.60) | 1 |
| ⊟23088735 | ⊟why why not | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟0 | 1111111111 | $ (339.60) | 1 |
| ⊟23092685 | ⊟glee 810 | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟0 | 1111111111 | $ (339.60) | 1 |
| ⊟23104679 | ⊟dark shadow | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟0 | 1111111111 | $ (339.60) | 1 |
| **Grand Total** | | | | | | $ (90,087.20) | 94 |

Dennis observes a critical contradiction: if it is appropriate to cluster multiple user accounts with "A," "B," or "C" as the name based on the assumption that a single participant was willing and able to create these accounts and chose to rotate the names despite some consistency across contact information, why is it any less likely that a single participant created multiple user accounts that rotated names like "Barack

Obama," "Walt Disney," or "Team Legendary" as the name given some consistent

contact information? (Ex. B, 2d Dennis Report, ¶ 118.) Extending Dr. Freer's logic one

step further, "if a Participant is willing and able to use a range of fictitious names only

limited by their creativity, why is it any less likely that a Participant (or someone on the

Participant's behalf) either intentionally or unintentionally entered other inaccurate or

inconsistent names across their various User Accounts, such as the name of friends,

relatives, or businesses? Dennis opines that this internal inconsistency provides

additional evidence of the flawed nature of Dr. Freer's aggregation process. (Ex. B,

2d Dennis Report, ¶ 119.)

### d. The Results of the Freer Aggregation Process are Inconsistent with his Stated Methodology and Requirements

Dennis observes additional inconsistencies between Dr. Freer's stated goals and his

outputs. According to Dr. Freer:

> Because of the special role that the name field plays in the TelexFree dataset..., ***it is important that no pairs of account groupings that substantially disagree on the name end up matched together***. I use blocking as a mechanism to accomplish this goal, by ensuring that the blocking set contains only pairs of account groupings with substantial agreement on name. In this way, only such pairs (i.e. those with substantial agreement on name) are even considered for potential linkage.

(Ex. B, 2d Dennis Report, ¶ 120) (emphasis added). Dennis notes that the blocking

mechanism does not appear to have worked, and that when measured against the

stated intent, Dr. Freer's results are "inaccurate and inconsistent with his desired

outcome." (Ex. B, 2d Dennis Report, ¶ 121.) This inconsistency is shown in Cluster

119427:

| cluster_id | rep_nome | rep_email | rep_end | rep_cidade | rep_pai | rep_fone | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|---|
| 119427 | Alex de carvalho Lopes | carvalopes@gmail.com | Rua Prof° Renato Ribeir | Vitória | UY | 5527300262158 | (1,375.10) | 1 |
| | Alex Lopes | carvalopes@gmail.com | R Prof Renato Ribeiro d | Vitoria | UY | 5527939785z189 | (1,474.90) | 2 |
| | Edjane Carreiro | nay_justin@hotmail.com | SW 10Ch Place | derfildbeach | US | 15613057841 | (49.90) | 1 |
| | | may_justin@hotmail.com | Sw 10Th place | Deerfield Beach | US | 5613057841 | (289.10) | 1 |
| | Eliaavne Carreiro | elianevit40@gmail.com | Maplewood Av | Everett | US | 17818445344 | (49.90) | 1 |
| | Eliane B Carreiro | elianevit40@gmail.com | elianevit31@hotmail.co | Boston | US | 17818445344 | (975.00) | 1 |
| | | | Maplewood av | Boston | US | 17818445344 | 515.40 | 1 |
| | | | | Everett | US | 16175071974 | (2,990.00) | 2 |
| | | | maplewood ave | Boston | US | 17818445344 | 710.00 | 1 |
| | | | Rua Sao Jorge | Itaciba | US | 2732868987 | (906.50) | 1 |
| | Eliane B. Carreiro | elianevit40@gmail.com | Maplewood av | Boston | US | 17818445344 | (149.70) | 1 |
| | | elianevit31@hotmail.com | 43 maplewood ave | Boston | US | 17818445344 | 16,875.74 | 1 |
| | | | | | US | 7818445344 | (199.60) | 1 |
| | | | 43 maplewood ave, | Everett | US | 17818445344 | 210,371.50 | 1 |
| | | | Maplewood av | Boston | US | 17818445344 | (1,351.00) | 2 |
| | | | maplewood ave | Boston | US | 17818445344 | (1,975.00) | 4 |
| | Eliane Carreiro | elianevit40@gmail.com | maplewood av | Everett | US | 17818445344 | (49.90) | 1 |
| | | | 43 maplewood | Boston | US | 17818445344 | 11,257.16 | 1 |
| | | | 43 maplewood ave | | US | 7818445344 | (49.90) | 1 |
| | | | | | | 16173083340 | (49.90) | 1 |
| | | | Maplewood Av | Boston | US | 16175071973 | (49.90) | 1 |
| | | | Maplewood av | 2149 | US | 17818445344 | (249.50) | 1 |
| | | | | Everett | US | 17818445344 | (6,745.90) | 8 |
| | | | | | | 2732868987 | (149.70) | 2 |
| | | | | | | 16173083340 | (249.50) | 1 |
| | | | | | | 7817384710 | (1,445.10) | 1 |
| | | | | | | 16175071974 | (28,045.90) | 53 |
| | | | | | | 18578883783 | (99.80) | 1 |
| | | | maplewood ave | Boston | US | 17818445344 | (49.90) | 1 |
| | | | Rua Sao Jorge | cariacica | BS | (27) 3286-8987 | (49.90) | 1 |
| | | | | | US | (27) 3286-8987 | (49.90) | 1 |
| | | | | Itaciba | US | (27) 3286-8987 | 38,350.90 | 2 |
| | | elianevit31@hotmail.com | 43 maplewood ave | Everett | US | 17818445344 | (199.60) | 1 |
| | | | 43 maplewood av | Everett | US | 2792290673 | (49.90) | 1 |
| | | | 43 maplewood ave | Everett | US | 16178422930 | (49.90) | 1 |
| | | | | | US | 18573184245 | (49.90) | 1 |
| | | | Maplewood av | 2149 | US | 17818445344 | (149.70) | 2 |
| | | | | Everett | US | 17818445344 | (848.30) | 11 |
| | | elianevit40@gmail.com | Maplewood av | Everett | US | 7818445344 | (49.90) | 1 |
| | | Cleidesantos2273@hotma | Maplewood av | Everett | US | 16175071974 | (99.80) | 1 |
| | | may_justin@hotmail.com | 4373 w 10th place | Deerfield Beach | US | 5613057841 | (49.90) | 1 |
| | | felishapaz@gmail.com | Maplewood av | Everett | US | 16175071974 | (149.70) | 1 |
| | jaqueline lopes | josehelber@gmail.com | .............. | .............. | US | 18578882783 | (49.90) | 1 |
| | Jaqueline Lopes Carreir | josehilber@gmail.com | 121 main st | Everett | US | 8578882783 | (5,700.00) | 4 |
| | Jean Carreiro | jelite2014@gmail.com | maplewood ave | Everett | US | 8572461459 | (49.90) | 1 |
| | | | Maplewood ave. | Everett | US | 8572461459 | (49.90) | 1 |
| | | | Mapplewood Ave | Everett | US | 8572461459 | (49.90) | 1 |
| | Jean de Paula Carreiro | carreirojean@hotmail.com | 43 maplewood ave | Boston | US | 18572461459 | (49.90) | 1 |
| | Jean P Carreiro | elianevit40@gmail.com | maplewood ave | Boston | US | 18572461459 | (3,925.00) | 7 |
| | | | Maplewood Ave | Boston | US | 18572461459 | (1,375.00) | 1 |
| | Jean P. Carreiro | elianevit40@gmail.com | 43 maplewood ave | Boston | US | 18572461459 | 1,375.00 | 1 |
| | | | Maplewood av | Boston | US | 18572461459 | 112,639.20 | 1 |
| | nael lopes | saminha_nunes@yahoo.c | | Everett | US | | (49.90) | 1 |
| **Grand Total** | | | | | | | **$ 327,228.50** | **140** |

(Ex. B, 2d Dennis Report, ¶ 123.) Even ignoring typos, middle names, and multiple last names, this cluster appears to show at least six separate participants: (i) Alex Lopes; (ii) Edjane Carreiro; (iii) Eliane Carreiro; (iv) Jacqueline Carreiro; (v) Jean Carreiro; and (vi) Nael Lopes. According to Dennis, this example "demonstrates a ***clear failure*** in the Freer Aggregation Process, as it…stands in direct contradiction to his stated goal 'that no pairs of account groupings that substantially disagree on the name end up matched together.'" (Ex. B, 2d Dennis Report, ¶ 124.)

Dennis's opinion is that the above example typified the problem of "chains" or chaining, where individual pairs may meet matching thresholds for "nearness," but the "ends" of the chain do not:



(Ex. B, 2d Dennis Report, ¶¶ 126-28.)

Dennis finds numerous examples of chaining where the ends appear to be dissimilar:

| cluster_id | Name 1 | Name 2 |
|---|---|---|
| 140155 | Irene Ramos Fernandes Silva | Nidya Leal |
| 140155 | Irene Ramos Fernandes Silva | Ruben Sousa |
| 335971 | Flor M Florido | L & L Home Improvement |
| 100223 | Heloisa Santamaria | Marialva Sousa de Matos |
| 2522900 | Benjamin Argueta | Kenia Venjamin |
| 3194458 | Dorali Escobar | Zuly Caicedo |
| 4047480 | fatima elena bettencourt de andrade | maria beatriz de andrade martins |
| 4253920 | George Saad | El Hachem Georges |
| 3931290 | Giovanni Rigatti | go Brignoni |
| 2825686 | Luis Miguel Joaquim Rodrigues | Sao Rodrigues |
| 11199437 | Regina Celia Cintra Castro | Karina c |
| 9021130 | Juan Pablo | Erick Gutierrez |
| 10729205 | Maria Do Scorro Prazeres Rodrigues | Ricardo Trancoso |
| 5326578 | Patrícia Moutinho | Maria Angela Magalhães Coutinho |
| 12071881 | Jose Demoura | Paulo Roberto Ferreira Moura |
| 471741 | Kelly Silva | Arcelina Benedita Mota |

| cluster_id | Name 1 | Name 2 |
|---|---|---|
| 471741 | arcelina | zeike s |
| 5014900 | Camel R Quispe Calderon | ayme sias calderon |
| 11096037 | Helio Paz | eliton gonçalves paz |
| 10756933 | WenXiong Lee | Sui Ning Lee |
| 10630997 | fadelly robayo | Ricardo Ranulfo Yaranga Valencia |
| 12266593 | w dalman general services | BBC Financial Services LLLC |

(Ex. B, 2d Dennis Report, ¶ 129.)

Dennis notes that chaining is a rare occurrence according to Christen in "real world databases" where the "space" (the distance between possible values) is high and records are more unique. (Ex. B, 2d Dennis Report, ¶¶ 130-31.) In TelexFree's data, however, there is substantial commingling or overlap of data.

Another contradiction observed by Dennis is situations where user accounts with not only different names but also different contact information are aggregated together, such as the accounts of Loredana Zaglia and Loredana Ragolia, where no contact information overlaps. (Ex. B, 2d Dennis Report, ¶ 133.) According to Dr. Freer, such aggregations shouldn't happen because of the requirement that "there are other markers of agrement." (Ex. B, 2d Dennis Report, ¶ 133.) Dennis observes various examples, including Cluster 119427 discussed above, where three accounts for "Alex Lopes" are aggregated to other accounts that have no overlap in any of the data fields. (Ex. B, 2d Dennis Report, ¶ 134.)

### e. The Freer Aggregation Process Results in Inconsistent and Speculative Outcomes

Dennis opines that Dr. Freer's use of "fuzzy matching" to determine string nearness results in inconsistent and speculative results, especially where the recruitment into TelexFree spread through families and ethnic communities, where sharing of last names

or first names may be more common. (Ex. B, 2d Dennis Report, ¶ 136.) Without

attempting to determine if there is a relationship between two users with name

commonality, Dr. Freer relies solely on "string nearness" to calculate "weighted

ratios."(Ex. B, 2d Dennis Report, ¶ 137.) If names are sufficiently different, due to lack of

common letters in the same order, then the names could be "blocked" from ever being

paired together, even if all other information was the same. For example, Dr. Freer treats

user accounts with the name Paulo Marinho and those with the name Rejane Marinho

as separate Clusters, despite there being little or no difference across most other

Aggregation Fields other than first name. Similarly, Dr. Freer clusters Frantz Balan and

Lusette Balan separately, despite evidence from signed affidavits available in this case

that they should not be separately clustered. (Ex. B, 2d Dennis Report, ¶ 138.)

For names that are not as distant, however, like the names in Cluster 119427

discussed above, Dennis finds that Dr. Freer's fuzzy matching allows for improper

pairing to survive blocking and transitive closure. Thus, users with different names like

Jean Carriero and Eliane Carriero that have a WRatio and ratio of 82 are able to survive

blocking and transitive closure. The result is that the "Freer Aggregation Process can

lead to certain User Accounts being aggregated while others are kept apart not based on

having "at least fairly similar names" in any meaningful or real-world sense, but

arbitrarily based on, for example, whether two people's first names happen to share

letters in a similar order. " (Ex. B, 2d Dennis Report, ¶ 140.)

**f.   The Only Example Cluster in the Freer Report Contains Questionable Aggregations**

As the sole "visual representation" of his clustering methodology, Dr. Freer selected Cluster 132785, which purports to include user accounts with the name "Maria Neves" or variations thereof. But Cluster 132785 also includes other participants unrelated to "Maria Neves." This includes "Rita Lares" and "Maria Lares," who have no similarities in identifying information as the other accounts aggregated other than their social security numbers are 999999999. (Ex. B, 2d Dennis Report, ¶ 145.)Dennis finds that Cluster 132785 is a "visual representation" of the flaws in Dr. Freer's methodology.

**g.   Aggregation Errors Can Result in a Significant Overstatement of Participant Net Equity**

Dennis finds that the errors in Dr. Freer's aggregation process can have a significant impact on a participant's net equity. (Ex. B, 2d Dennis Report, ¶ 148.) As noted by the Statistical Data Warehouse Design Manual states:

> Poor quality (eg if variables are missing, indecipherable, inaccurate, incomplete, inconstant, inconsistent) could lead to records not being linked – missed links – or being linked to wrong records – false links. *The impact of these two types of errors may not be equal (eg a missed link may be more harmful than a false link), so this needs to be taken into account when designing a data linkage strategy, especially if the linking has legal or healthcare implications.*

(Ex. B, 2d Dennis Report, ¶ 147 (emphasis added).)

Dennis demonstrates the problem, particularly of missed linkages through examples. For example, Dr. Freer separated Cluster 129528, which contained **5** user accounts with the name "sann" or "sann r" and with an alleged net equity of $862,565. (Ex. B, 2d Dennis Report, ¶ 149.) The largest user account in Cluster 129528 has an email address of sann@vicss.com and an address at 189 Squire Rd #40, Revere, MA. (Ex. B,

2d Dennis Report, ¶ 149.) Cluster 128225, on the other hand, is comprised of **839** user accounts, many of which include names such as "Sanderley Devaconcelos," "Sanderley Vaconcelos," and "Sann Vasconcelos," an email address of sann@vicss.com, and an address at 189 Squire Rd #40, Revere, MA, but supposedly is a net loser of ($363,822). (Ex. B, 2d Dennis Report, ¶ 150.) Even taking the net equity calculations at face value (a mistake which is addressed below), Dennis finds no "logical or factual basis for treating these as separate Participants." (Ex. B, 2d Dennis Report, ¶ 147.) When the net equity calculations for the two clusters are combined, the alleged net winner's net equity declines from from $862,565 to $498,743, a reduction of over 40%. (Ex. B, 2d Dennis Report, ¶ 147.) Dennis lists other examples where reuniting separate clusters that Dr. Freer failed to link causes potential reductions in net equity of 80% (Oscar Enrique Sosa Esculpi), 193% (Davidson R. Teixeira), or even 275% (Dolarex). (Ex. B, 2d Dennis Report, ¶¶ 152-54, 158-59.) In the example of Dolarex, the missing linkages would have been identified if Dr. Freer had looked at the ePOC data for the accounts, which he failed to do. (Ex. B, 2d Dennis Report, 159.)

In all, Dennis finds that for individuals within the population of the top 100 net winners, reductions in net equity as high as 90% are possible if proper linkages to large negative unmatched accounts are achieved. (Ex. B, 2d Dennis Report, ¶¶ 155, 160.) Dennis further finds that given the structure of TelexFree, there is a low probability that individuals incurred the large losses that the Trustee estimates. (Ex. B, 2d Dennis Report, ¶ 156.) According to Dr. Freer, each of the top 100 net losers supposedly lost between $132,000 and $3.1 million on average. (Ex. B, 2d Dennis Report, ¶ 155.) It defies

common sense that any one person could lose so much money in a short period of time, without seeking to recoup any losses or realize any gains.

Dennis finds an alternative explanation: large net losers and large net winners have simply had their accounts divorced from each other, creating large phantom gains and losses. (Ex. B, 2d Dennis Report, ¶ 156.) To test this hypothesis, he manually reviewed the top five largest net losers, looking for common identifiers with large net winners. In all five cases, he found one or more potential identifiers that matched a net winner aggregation. These cases are summarized in Exhibit 6 and Exhibits 9.1 to 9.5 of the Second Dennis Report. (Ex. B, 2d Dennis Report, ¶ 156.) Dennis also found a high degree of activity between these net winners and their unpaired net winning accounts, which "strengthens the potential connections." (Ex. B, 2d Dennis Report, ¶ 157.) The existence of common identifiers and common transactions between net winner clusters and net loser clusters is not a factor that Dr. Freer took into account. (Ex. B, 2d Dennis Report, ¶ 157.)

Dennis finds that even if the problem of under-aggregation were small, this problem could "dramatically change the result for a single Participant." (Ex. B, 2d Dennis Report, ¶ 162.) Under-aggregation has occurred in this case because Dr. Freer, like Martin before him, fails to take into account a factor driving under-aggregation: "the disconnect between the Freer Aggregation Process's requirement that the names be the same or similar across every Participant User Account and the reality that Participants could create User Accounts using a variety of names, such as business

name, personal name, nicknames, or even fictitious names." (Ex. B, 2d Dennis Report,
¶ 161.)

### h. Dr. Freer has Failed to Deliver the Full Scope of His Engagement

The final, and perhaps most fatal, failing of Dr. Freer's method, according to
Dennis, is that it fails to achieve the scope for which is being offered as an expert. "Dr.
Freer was asked to 'develop an aggregation methodology that creates *one "cluster"* of
User Accounts *for each Participant*.'" (Ex. B, 2d Dennis Report, ¶ 163 (emphasis
added).) But instead, Dr. Freer performs "a purely mathematical exercise" that attempts
to link together user accounts that have similar characteristics, and specifically where
there is substantial agreement on the values in the name field, without regard to
whether the linkages are appropriate or not. (Ex. B, 2d Dennis Report, ¶ 163.) On more
than one occasion, Dr. Freer emphatically stated "*I'm not aggregating accounts to
persons* period. *I'm aggregating accounts to other accounts in clusters.* <u>The assignment
to persons is a different thing that might come later</u>." (Ex. B, 2d Dennis Report, ¶ 165.)
Thus, Dennis finds that, by Dr. Freer's own admission, he does not attempt to provide
any opinions to satisfy the Court's mandate to identify "Participants," the amounts
invested by "Participants" into the scheme less the amounts received by "Participants"
from the scheme, and, if the "Participant" had "more than one User Account," an
aggregation of "all of the Participants' User Accounts."[30] (Ex. B, 2d Dennis Report,
¶¶ 165-66.)

---

[30] *See* Supplemental Order Respecting Motion by Chapter 11 Trustee for Entry of Order Finding
that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief, January 26, 2016
(ECF No. 687) ("Supplemental Order"), at 2-3.

### B. Dr. Freer Relies Entirely on a Previously Disqualified Expert's Calculation of Net Equity, Which Was Unreliable

In addition to the problems with Dr. Freer's aggregation, Mr. Dennis finds three problems related to the Trustee's net equity calculation. First, Dr. Freer expresses no *independent* conclusion or calculations of net equity, instead relying wholesale on the opinions of a disqualified expert (Mr. Martin) who is now absent from the case. Second, Mr. Martin's net equity analysis fails to take into account the *cash* that participants exchanged for credits. Third, Mr. Martin's net equity analysis assumes, without foundation, that the SIG system records the amount of cash that was transferred in triangular transactions, when in fact the SIG system does not record any cash transactions between participants. Each of these flaws renders the net equity tabulations unreliable.

### a. Dr. Freer Performed No Net Equity Calculations or Determinations, But Rather Uncritically Adopted the Flawed Opinions of a Disqualified Expert

First and foremost, Joshua Dennis finds that Dr. Freer offers no independent conclusion or calculations of net equity. Dennis writes:

> Absent from Dr. Freer's assignment is any discussion related to an independent calculation or conclusion as to Net Equity. Instead, it appears Dr. Freer was only tasked with aggregating User Accounts ("Freer Aggregation Process"), and wa*s instructed by counsel for the Trustee to adopt Mr. Martin's concluded Net Equity amounts associated with each User Account.* Given that the Court appears to have excluded Mr. Martin's opinion in its entirety, it is unclear if, or to what extent, Dr. Freer is able to rely on Mr. Martin's work product, opinions or conclusions, in whole or in part, in forming his own opinions. If it is concluded that Mr. Martin's opinions and related work product should, in fact, be excluded in relevant part, then Dr. Freer's conclusions as to Net Winners and Net Losers, which necessarily utilizes Mr. Martin's concluded Net Equity figures, would likewise have *no independent basis*.

(Ex. B, 2d Dennis Report, ¶ 35.) Dennis points to a November 2021 email that Dr. Freer

wrote to the Trustee's counsel wherein he asked:

> I think you've said this before, but we wanted to confirm that the Net
> Equity calculation by Huron is not under review here. It is our
> understanding that the Court has approved the Net Equity formula, and
> that Huron has implemented this formula to create the net_equity field for
> each account in the database. We are hoping that we can continue to use
> this field without further investigation, even as we examine which
> accounts should be aggregated

(Ex. I, at BC002506.)

The Trustee's counsel responded Dr. Freer's question as follows:

> Your assumption is correct. The principal inquiry here is reaching a
> resolution on the user accounts to be aggregated. As the defendants have
> pointed out, they may raise issue with respect to the calculation of the net
> equity, but that is an issue for another day (and is in any event presently
> outside of your scope)."

(*Id.*, at BC002505.)

Dr. Freer readily admits that he did not perform his own net equity calculations,

rather they were supplied by Huron and brought into the tables he generated in the

10th and final step. (Ex. B, 2d Dennis Report, ¶¶ 35, 62.) Dr. Freer has confirmed that he

did not form any opinions "in detail" regarding whether Martin's calculations were

correct or appropriate because he "didn't investigate enough to tell." (Ex. B, 2d Dennis

Report, ¶ 35.) Thus, Dennis is "not aware" of any timely-disclosed expert who can

opine about net equity. (Ex. B, 2d Dennis Report, ¶ 35.)

**b.  The Net Equity Calculation Fails to Account for Participant Investments
and Receipts Related to Transfers of Credit**

Dennis notes that while the Supplemental Order of the Court disallows claims

based on "accumulated Credits," it requires net equity to consider "the amount

invested" by a Participant in TelexFree less "amounts received" by a Participant from the TelexFree scheme. (Ex. B, 2d Dennis Report, ¶ 166.) Amounts invested and received boils down to "actual monetary consideration, such as cash." (Ex. B, 2d Dennis Report, ¶ 166.) Dennis finds that the proffered determination of net equity "does not account for instances where a Participant uses cash to purchase Credits…" (Ex. B, 2d Dennis Report, ¶ 168.) This is different than in so-called triangular transfers, where the Trustee assumes that cash is used to offset for the retirement of credits. In both instances, a Participant is investing "actual cash into the TelexFree scheme," yet the proffered determination of net equity treats these situations "inconsistently by including Triangular Transactions and excluding Credit Transfers." (Ex. B, 2d Dennis Report, ¶ 168.)

Dennis finds that the inconsistent treatment of credit transfers and invoice payments "defies economic logic." (Ex. B, 2d Dennis Report, ¶ 174.) Why would a participant sometimes demand full value for credits and other times give them away for free? (Ex. B, 2d Dennis Report, ¶ 174.) The flawed nature of the Trustee's assumption is evident in the case of Frantz Balan, whose alleged net winnings of $1.5 million were only made possible by purchase of $836,000 in credits. (Ex. B, 2d Dennis Report, ¶ 168; Balan Aff., ¶ 30.) By treating Mr. Balan's triangular transactions at face value, while ignoring Mr. Balan's credit purchases, Martin (the only expert to review Balan's net equity) is "artificially increasing" net equity. (Ex. B, 2d Dennis Report, ¶ 168.)

Dennis finds no discussion in any expert report regarding "why Triangular Transactions are considered within the determination of Net Equity but Credit Transfers are excluded when both appear to be substantively similar from a real-world (*i.e.*, cash

based) perspective." (Ex. B, 2d Dennis Report, ¶ 170.) Indeed, a review of ePOC data

finds numerous references that support the notion that participants paid cash for

credits. (Ex. B, 2d Dennis Report, ¶ 175.) The real-world consequences of this

unexplained decision to exclude all investments is "highly impactful":

| Participant Type | Cluster | Net Equity Excluding Transfers In/Out | 6 - Credit Transfers In | 7 - Credit Transfers Out | Net Equity Including Transfers In/Out |
|---|---|---|---|---|---|
| NetLoser | 13022279 | ($1,018,291) | ($578,327) | $845,237 | ($751,381) |
| NetLoser | 11849449 | ($622,342) | ($1,904,355) | $2,254,352 | ($272,344) |
| NetLoser | 12242105 | ($481,228) | ($621,865) | $1,008,813 | ($94,279) |
| NetLoser | 10525055 | ($240,773) | ($768,138) | $1,548,862 | $539,950 |
| NetLoser | 1020407 | ($210,525) | ($5,147,691) | $6,163,099 | $804,884 |
| NetWinner | 132785 | $4,087,745 | ($7,290,296) | $6,634,688 | $3,432,137 |
| NetWinner | 2522900 | $4,012,999 | ($7,135,275) | $3,926,183 | $803,907 |
| NetWinner | 323967 | $3,147,693 | ($5,155,263) | $3,265,763 | $1,258,193 |
| NetWinner | 1385480 | $1,494,466 | ($3,220,534) | $1,554,200 | ($171,868) |
| NetWinner | 10853999 | $1,308,377 | ($1,581,410) | $176,389 | ($96,644) |

(Ex. B, 2d Dennis Report, ¶ 173.) The above table shows the effect (on net equity) of Mr.

Martin's decision to exclude credit transfers. Dennis calculates that the exclusion of

credit transfers makes net equity calculations unreliable for nearly every alleged

winner--73,000 of the roughly 80,000 alleged net winners. (Ex. B, 2d Dennis Report, ¶¶

7, 176.)

**c. The Amount of Cash Invested/Received by Participants as Part of Triangular Transactions or Credits Transfers Can Differ from Amount of Credits Recorded in SIG**

Dennis finds that to the extent any uncertainty exists regarding if, or how much,

cash was exchanged as part of credit transfers, then such uncertainty necessarily

extends to triangular transactions, given that "the SIG database d*oes not provide*

*evidence of cash payments* for either transaction type." (Ex. B, 2d Dennis Report, ¶ 71.)

33

A foundational assumption for the proffered net equity calculation is that the credit values recorded within SIG are "typically" reflective of the amount of cash that was exchanged between Participants. (Ex. B, 2d Dennis Report, ¶ 177.) "Typically" is the word used by Martin, but he provides no guidance for what that means in the context of this case, either in terms of dollar amount or frequency. (Ex. B, 2d Dennis Report, ¶ 179.) The only source given to support this assumption is "interviews" with participants, but Martin only interviewed a "small percentage" of predominantly (or exclusively) net losers.[31]

This assumption is contradicted by Frantz Balan, who stated:

> It is a mistake to assume that 100% of the face amount of invoices were collected 100% of the time. In practice, promoters like me rarely received the full amount in cash. I would estimate for me and the promoters I worked with or spoke to that at best this happened only 10% of the time.

> Most often, promoters were only able to ask for steeply discounted payments, as low as $250 for an AdCentral Family membership. Most commonly, the amount requested ranged from 50% to 75% of the invoiced amount.

(Ex. B, 2d Dennis Report, ¶ 180.) Dennis finds that the "real-world dynamic" of participants acting in teams or having their own compensation arrangements meant that "Participants were actually sharing compensation in a manner not reflected in the SIG data." (Ex. B, 2d Dennis Report, ¶¶ 181-82.) This makes SIG a potentially "unreliable" source for determining net equity. (Ex. B, 2d Dennis Report, ¶ 183.) Dennis

---

[31] Prior to being *Dauberted*, Martin conceded that he relied upon information gained through conversations with a nonstatistical sample of net losers about their experiences in creating user accounts and participating in the TelexFree scheme, but *he had no formal notes from those conversations and no comprehensive list of those with whom he spoke.*" (*Daubert* Ruling at 37; Martin Tr. 78:4-7, 95:11-16, 134:21-136:7, 142:11-143:13.)

finds that the unreliability of SIG would tend to overstate the net equity of some
promoters while understating the net equity for others. (Ex. B, 2d Dennis Report, ¶ 183.)

Finally, Dennis observes other aspects of Mr. Martin's net equity calculations that
make them unreliable, including the failure to consider the impact of foreign currency
exchange rates and the uncertainty of whether $49.90 phone plan purchases genuinely
took place. (Ex. B, 2d Dennis Report, ¶ 185-92.) Dennis's conclusion is that use of SIG as
a reliable proxy for measuring actual cash is unreliable. (Ex. B, 2d Dennis Report, ¶ 191.)

## LEGAL STANDARDS APPLICABLE TO *DAUBERT* ANALYSIS

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), courts
considering the admissibility of scientific testimony must "act as gatekeepers, ensuring
that an expert's proffered testimony 'both rests on a reliable foundation and is relevant
to the task at hand.'" *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting
*Daubert*, 509 U.S. at 597). "These two requirements—a reliable foundation and an
adequate fit—are separate and distinct." *Samaan*, 670 F.3d at 31. The gatekeeping
function applies to all expert testimony, not just scientific testimony. *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 147–48 (1999). Federal Rule of Evidence 702[32] applies to this

analysis.

---

[32] Effective December 1, 2023, Rule 702 will read as follows (with amendments in bold):

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if **the proponent demonstrates to the court that it is more likely than not that**:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert's **opinion reflects a reliable application of** the principles and methods to the facts of the case.

Amendment to Fed. R. Evid. 702 (emphasis added). The Advisory Committee on Evidence Rules has recently amended Rule 702 to clarify it in two important ways: first, the proponent of the expert testimony now bears the burden of demonstrating "to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in [Rule 702]"; and second, the court is empowered to determine whether the expert's ultimate opinion is "within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Comm. on Rules of Prac. of Proc., June 7, 2022 Agenda Book 892–94. As the Committee Note explain, that the amendments were necessary because, when applying Daubert, "many courts have held that the critical question of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility" and thus questions for a jury. *Id.* at 892.

Although the proposed amendments do not technically not take effect until December 1, 2023, the Committee Notes are persuasive authority for their present implementation because they are "simply intended to clarify" how Rule 702 should have been applied all along. June 7, 2022 Agenda Book 895. Indeed, the Fourth Circuit recently relied on the proposed amendments, noting that the proposed amendments "confirm[]" that the "importance of [the] gatekeeping function cannot be overstated." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021). Other courts have agreed with the present applicability of the amendment. *See White v. City of Greensboro*, 586 F. Supp.3d 466, 477 (M.D.N.C. 2022); *Howard v. City of Durham*, 2021 WL 5086379, at *15 (M.D.N.C. Nov. 2, 2021); *Bishop v. Triumph Motorcycles (America) Ltd.*, 2021 WL 4316810, at *7 n.8 (N.D.W. Va. Sept. 22, 2021); *Anderson v. United States*, 2023 Bankr. Lexis 153 (Bankr. W.D. Tenn. Jan. 19, 2023).

**A.  Expert Opinions Must Be Reliable and Have Reliable Foundation**

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a Daubert inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). In *Daubert*, the Supreme Court enumerated a non-exhaustive list of factors that a court may consider in undertaking its reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community. 509 U.S. at 593-94.

The question of reliability is specific, not general; the trial court must decide whether a particular expert has sufficient specialized knowledge to assist the jurors "in deciding the particular issues in the case." *Kumho Tire Co.*, 526 U.S. at 156–57. Mere say-so of reliability by the expert is not sufficient, as a trial judge is not required to admit opinion evidence that is connected to existing data "only by the *ipse dixit* of the expert." *Id.* As the First Circuit has held:

> The reliable foundation requirement necessitates an inquiry into the methodology and the basis for an expert's opinion. To perform the required analysis, the district court must consider a number of factors, including but not limited to "the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community."

*Samaan*, 670 F.3d at 32, quoting *Ruiz–Troche*, 161 F.3d at 81.

In performing its *Daubert* gatekeeping function, a district court need not assess

whether the facts are accurate. Rather, "the focus is on 'whether the witness obtained

the amount of data that the methodology itself demands.'" *In re Blair*, 588 B.R. 605,

615–16 (Bankr. D. Colo. 2018), quoting *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223

(D. Colo. 2008); *see also* Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6268 (Ex. B, 2d ed.)

In cases where courts have excluded testimony because the expert relied on too

little data, it was clear that the lack of data undermined or distorted the methodology

itself. *See In re Blair*, 588 B.R. at 617–18 (excluding expert testimony as unreliable where

expert used an altered methodology because, as he acknowledged, he did not have

sufficient data to use the established methodology); *see also Stollings v. Ryobi Technologies,*

*Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (giving example that, "if an expert seeks to testify

about an average gross sales price but is going to base the testimony on sales to only a

single customer, a court would appropriately exclude the testimony because a single

observation does not provide a sufficient basis for calculating an average").

Nevertheless, a district court should also consider "whether the expert ignored a

significant portion of seemingly important data." *Official Comm. of Unsecured Creditors v.*

*CalPERS Corp. Partners, LLC*, No. 1:18-CV-68-NT, 2020 WL 4041483, at *5 (D. Me. July 17,

2020), citing Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6268 (Ex. B, 2d ed.) ("If an

expert 'cherry picks' favorable data in this manner but ignores a significant quantity of

other important facts, the trial court would be justified in concluding that the expert's

testimony is not based on sufficient facts or data."); *see also ZF Meritor, LLC v. Eaton*

*Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (affirming the exclusion of a lost-profits expert

where the expert's opinion was based on internal financial projections of "a nascent

company, the assumptions underlying which were relatively unknown" to the expert).

The proponent of expert evidence must also prove, by a preponderance, that the

evidence is reliable. *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir.

2020); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015). The

reliability inquiry extends "to all aspects of an expert's testimony," including "the

methodology, the facts underlying the expert's opinion, the link between the facts and

the conclusion, et alia." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir.

2007). Expert evidence that is not "reliable at each and every step" is not admissible. *Id.*;

*Jacked Up, L.L.C.*, 807 F. App'x at 348.

## B. Expert Opinions Must Be Relevant to the Task at Hand and Have "Adequate Fit"

The second main *Daubert* requirement "has attracted less attention. This

requirement seeks to ensure that there is an adequate fit between the expert's methods

and his conclusions." *Samaan*, 670 F.3d at 32; *see also Daubert*, 509 U.S. at 591. "This

prong of the *Daubert* inquiry addresses the problem that arises when an expert's

methods, though impeccable, yield results that bear a dubious relationship to the

questions on which he proposes to opine." *See Daubert*. 509 U.S. at 591–92; *Samaan*,

670 F.3d 31–32. "Seen in this light, the scope of a *Daubert* hearing is not limited to an

appraisal of an expert's credentials and techniques but also entails an examination of his

conclusions to determine whether they flow rationally from the methodology

employed. If perscrutation reveals that there is simply too great an analytical gap

between the data and the opinion proffered, the expert's testimony should be

excluded." *Samaan*, 670 F.3d at 33–35 (affirming the exclusion of the plaintiff's expert witness because the methods the expert employed and the data that he presented were simply too distant from the conclusion that he drew, thus negating an adequate fit under *Daubert*.); *see also Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232–33 (11th Cir. 2009) (expert's method was inadequate and speculative because it merely estimated hospital overcharges that could have caused injury, rather than demonstrating the requisite amount of unlawful charges which caused actual injury). "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

"Fit" is lacking when "a large analytical leap must be made between the facts and the opinion." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 20-MD-2924, 2022 WL 17480906, at *11–12 (S.D. Fla. Dec. 6, 2022), appeal dismissed, No. 23-10090-J, 2023 WL 2849068 (11th Cir. Mar. 22, 2023), citing *McDowell*, 392 F.3d at 1298-99 (citing Joiner, 522 U.S. at 146, 118 S.Ct. 512). An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions." *Zantac,*, 2022 WL 17480906, *citing McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004); *cf Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

## ARGUMENT

The Freer Opinions must be excluded under *Daubert* because they are based on unreliable, false, or incomplete data, fail to properly apply a valid methodology to the facts of the case, rely on the opinions of an excluded expert, and do not address the necessary matters that would assist the trier of fact. These opinions are inadmissible

under Rule 702 and the principles set forth in *Daubert*, and accordingly the Trustee
cannot use these opinions to meet his burden of proof to identify the roughly 95,000
alleged Net Winners and quantify their share of the alleged $1.5 billion liability with the
required level of exactitude.

### A.  Dr. Freer's Aggregation Method Must Be Precluded Under *Daubert*

Dr. Freer Opinions as to aggregation are fatally flawed because they stop short of
identifying actual participants and suggest that precise identification will happen at
some later point in the litigation. Because Dr. Freer does not attempt to achieve the
purpose for which he was retained, his opinions are irrelevant, insufficient, and lack the
necessary "fit."

But even if one were to look past Dr. Freer's strategy of not identifying net winners
and saving that to another day, his methodology is still badly flawed. First, Dr. Freer
places excessive reliance on the name fields generally being accurate. But there is simply
no support for that speculative assumption, and indeed there is rampant evidence to the
contrary. Second, Dr. Freer relies exclusively on inaccurate and inconsistent data entered
by TelexFree participants in the absence of any meaningful systems of controls,
validation, or verification. Like Martin, Dr. Freer relies exclusively on this unverified
data as the basis for his aggregations, without seeking to compare it against external,
real-world data. Because Dr. Freer does not measure the data against so-called
"ground-truth data," his analysis is speculative and unreliable. While Dr. Freer
attempted to use a more sophisticated record linkage approach than Martin, his

probabilistic methodology still requires reasonable data quality standards to be
properly performed.

### 1. Dr. Freer Does Not Attempt to Identify Net Winners

The most critical flaw in Dr. Freer's opinions is that he does attempt to identify
actual participants, which is necessary for the Trustee to establish liability against a
single person. Throughout his deposition, he made it clear that he was merely clustering
accounts to each other: "I'm not clustering them to persons." (Ex. D, Freer Depo., at
86:1-87-5 ("Once again, I'm not clustering them to persons…but the clustering is not to
persons, it is to clusters.").)

Dr. Freer's testimony exposes the speculative and unreliable nature of his opinions,
when he admits that: "I did not say I can identify definitively a person." (Ex. D, Freer
Depo., at 88:4-11.) In *lieu* of identifying a person definitively, Dr. Freer suggests that his
opinions could be used to identify participants "indirectly" by a "huge amount of
contact information." (Ex. D, Freer Depo., at 87:22-88:3.) Dr. Freer discloses no method,
however, for how identity of people can be inferred in an objective and reliable way
using data that is now a decade old. (Ex. D, Freer Depo., at 88:16-24.) Despite being
offered numerous chances to swerve his testimony, Dr. Freer held firm, emphatically
stating that "I'm not aggregating accounts to persons, period. I'm aggregating accounts
to other accounts in clusters. ***The assignment to persons is a different thing that might
come later.***" (Ex. D, Freer Depo., at 137:6-10 (emphasis added).) How, when, and by
whom will Dr. Freer's opinions be assigned to actual people? This is never explained.

Seven years and two experts into this litigation, and the Trustee is still no closer to identifying actual net winners.

Thus, for Cluster 132785, which is attached to Dr. Freer's expert report, Dr. Freer can only identify the participant "indirectly" by a "huge amount of contact information." (Ex. D, Freer Depo., at 87:22-88:3.) But how does he propose to resolve whether the alleged net winner is Maria Neves, Rita Lares, Maria Lares, or some combination of these three names? Dr. Freer's only explanation for the appearance of different names in his clustering for Cluster 132785 is: "It's always possible that any of these could refer to different persons or the same persons. All of these things are possible."(Ex. D, Freer Depo., at 93:12-16.)

Dr. Freer has no opinions on determining the correct participant for the cluster, just as he has no opinion whether the user accounts clustered to "Barack Obama" have any relationship with the real-life former president. (Ex. D, Freer Depo., at 64:14-23.) Dr. Freer expressed no skepticism about Barack Obama's participation, testifying "obviously, it seems it is possible." (*Id.*) But he conceded that it "also may not be the case." (*Id.*) Dr. Freer admitted: "I don't know for sure of any particular one. Some are more likely than others to not be an actual person." (Ex. D, Freer Depo., at 64:23-65:3.)

Dr. Freer believes that the identification of net winners is "implicit" from the data and "there's sometimes information that [] would enable you to identify such a person." (Ex. D, Freer Depo., at 65:24-66:18.) Yet Dr. Freer was supposed to make these identifications. It appears that the shortcoming of his opinions was on Dr. Freer's mind when he emailed Trustee's counsel about this problem: "What was the methodology

from going from a Huron-generated cluster to the name of the defendant (i.e., how would you pick who to sue given a cluster, when the cluster involves multiple names)?" (Ex. D, Freer Depo., at 230:2-23.) Trustee's counsel responded that "Huron never really had to migrate from a cluster containing multiple names to a single names because the cluster always had just one name." (Ex. D, Freer Depo., at 233:5-21.) Based on these exchanges, it appears that Dr. Freer considered that his expertise was required simply to link clean sets of records together, not identify people out of a sea of discordant and contradictory records.

### 2.   Dr. Freer's Assumption about the "Special Role" of the Name Field is Unsupported and Similar to Martin's Flawed Assumptions about the Reliability of the Name Field

The Freer Aggregation Process is predicated on Dr. Freer's "understanding" that "it was common practice for recruits to use their own name while using the contact information...of their recruiters, or for family members to share the same contact information, or for a business and individual to share the same contact information." (Ex. A, Freer Report, ¶ 5.) As such he required "that any two User Accounts under consideration for possible linkage have at least fairly similar name." (*Id.*, ¶ 91.) There are two problems with this assumption. First, it is unsupported by either empirical or anecdotal evidence. Second, it runs counter to the evidence in this case that participants freely and often used other names. For example, Rosmery Torrico used "Juan Daza" or "Ross Ross." (Ex. 19, Torrico Depo., at 17:8-9, 36:2-11; Ex M.; Ex. N.) Someone other than Lusette Balan used her name. (Ex. F, Affidavit of Lusette Balan, ¶¶ 6-7.) Dr. Freer ignores this problem and fails to take any measures to try to measure the reliability of

the name—he simply assumes it. (Ex. D, Freer. Depo., at 105:2-106:18.) Indeed, Dr. Freer

recognized that there were "several specific scenarios" where a user entered data that

pertained to somebody else. (Ex. D, Freer Depo., at 133:5-12.)

The Court in this matter has already excluded an expert for making this same

assumption about the reliability of names without adequate support. Specifically, the

Court (Hoffman, J.) stated "I conclude that Mr. Martin has not shown that the name

field data is sufficient to support his opinion that user accounts should be aggregated

primarily by using that data for the purposes of determining who the net winners are

and the extent of their liability...[h]e has not shown that his assumptions about the name

field data's accuracy are reasonable and not speculative." (*Daubert* Ruling at 22.)

Dr. Freer does not appear to have addressed Judge Hoffman's ruling, and this failure

dooms his analysis.

In the case of Mickey Mouse, Dr. Freer believes he is identifying the participant "to

the extent my aggregation provides that information," but only to that extent:

> If the address and phone number and e-mail address canonically identifies
> a single person, then I suppose my analysis has produced that, and hence,
> my opinion. I didn't do any additional work beyond what's implicit in
> that.

(Ex. D, Freer Depo., at 67:16-68:2.) In other words, Dr. Freer believes he did identify the

person who is "Mickey Mouse." He just can't say who that is. He is similarly

circumspect about the person who is "Barack Obama."

Dr. Freer's failure to grasp the extent of the problem in the name field is evidenced

by the minimal analysis he performed. Dr. Freer only reviewed the name field to ensure

that virtually all fields were not blank, and that most had five or more characters in

them that are typically found in names. (Ex. D, Freer Depo., at 109-4-110:12.) Dr. Freer

took a random sample of 300 of the name fields—a list he apparently never

retained—and reviewed the list to see if the names "look like a name." (Ex. B, 2d Dennis

Report, ¶ 104; Freer Depo., at 109-4-110:12.) This falls far short of ensuring that names

are valid or reliable.

Dr. Freer also fails to heed the recommendations of Peter Christen that he purports

to follow. Christen (one of the leading scholars in the field of data matching) gives a

stark warning that in the absence of substantive verification or internal controls, "*the

garbage-in garbage-out* principle holds. If the quality of the input data is low, then the

output generated is normally not [of] high quality or accuracy either." (Ex. B, 2d Dennis

Report, ¶ 112.) Because Dr. Freer made no effort to bring in external, real-world data, so

called "ground-truth data," his analysis is speculative and unreliable. Incredibly, Dr.

Freer omits "accuracy" as one of the dimensions cited by Peter Christen to assess data

quality. (Ex. D, Freer Depo., at 101:15-102:5.) It is in fact the very first dimension cited by

Christen and "arguably the most important," but Dr. Freer believes data accuracy is

"less useful" than other factors. (Ex. D, Freer Depo., at 102:6-12.) He only considered

data accuracy "insofar as accuracy is spoken to by those other characteristics also,"

those other factors being "accessibility, completeness, consistency, and believability."

(Ex. D, Freer Depo., at 105:15-106:18.) There is no support for assessing data accuracy

indirectly using other dimensions, rather than assessing it directly as Christen requires.

Indeed, Dr. Freer concedes that it is possible to have complete data that is not accurate,

consistent data that is not accurate, and believable data that is not accurate. (Ex. D, Freer

Depo., at 127:12-128:13.)

Dr. Freer also misapplies "believability" in the context of this case. As it is no secret

that there are believability problems with the data, Dr. Freer should have assessed the

extent to which name entries are believable. To do that, he could have looked at

real-world data, such as bank data and eWallet ownership data, as such data could have

identified the real economic actors. (Ex. D, Freer Depo., at 120:21-121:2.) Dr. Freer also

could have looked at ePOC data, which as in the case of Rosmery Torrico identified her

name correctly; Dr. Freer did not look at ePOC and was not even familiar with the data

it contains. (Ex. D, Freer Depo., at 205:5-20.) Dr. Freer made no effort, on a sampling

basis or an aggregate basis, to "correlate" or "cross-reference" the name field with any

external databases that have people's names. (Ex. D, Freer Depo., at 70:18-24.) Instead,

Dr. Freer simply concluded, in the face of evidence to the contrary, that the data entries

"seem plausible." (Ex. D, Freer Depo., at 107:3-19.) But seeming plausible and being

believable are two different animals in a case like TelexFree. As one example, Dr. Freer

found the 62,000 accounts that he manually clustered as "John Williams" to contain

believable data, even though the email and street address were different for every single

account.[33]

In the end, Dr. Freer has elevated consistency and superficial plausibility over

accuracy, when it is just as likely if not more likely that participants entered fake names

---

[33] Dr. Freer made no effort to verify if the street ("Warry Lane") for John Williams even existed.
(Ex. D, Freer Depo., at 212:12-15.) No such street appears in Google Maps. Dr. Freer also seemed
unconcerned that one person could have spent $3.1 million in a two-week period purchasing
62,000 phone plans (a rate of about three-plans-a-minute).

consistently rather than enter accurate names inconsistently. Dr. Freer's only solution is

a non-solution: "In the best case scenario, the true identity of the Participant can, at a

later time, be ascertained from the other indicia." (Ex. A, Freer Report, ¶ 92.) This is

eerily similar to Martin's "conversation starter" approach, which Judge Hoffman

expressly rejected. (*Daubert* Ruling, at 33-34.)

### 3.  Dr. Freer's Opinions Are Not a Reliable Application of Probabilistic Record Linkage Given the Obvious Data Quality Issues

To be both relevant and reliable pursuant to Daubert and 702, expert testimony

must be based on a reliable methodology, and that methodology must be properly and

reliably applied to the specific facts in issue. *See Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63,

66 (D. Mass. 2000). Proffered expert testimony is only admissible where it is supported

by appropriate validation—there must be "'good grounds,' based on what is known."

*Id., citing Daubert*, 509 U.S. at 596. While the contours of a given expert's testimony may

vary, "[l]east troubling to the judge is an opinion based on the interpretation of data that

are not in dispute." *Polaino*, 122 F. Supp. 2d at 66. But, where an expert opinion is

"derived from data that are disputed . . . the judge is obligated to scrutinize not only the

expert's methodology but also her ultimate conclusions." *Id.* at 67. Where the trial judge

finds the data does not provide adequate support to mark the expert's testimony as

reliable, the expert's opinion is inadmissible. *Id.* Additionally, inconsistent and

incompatible assumptions are inadequate. *See Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773,

785–86 (E.D. La. 2015). Where an expert has "made no attempt to reconcile his view

with a number of real world events" and "fail[s] to acknowledge and account for these

events," his opinion is unreliable and not based on sufficient facts and data. *In re*

*Iridium*, 373 B.R. 283, 350 (S.D.N.Y. 2007). An expert's opinion is unreliable where he has

failed to look at facts, "even for a reality check." *Id.; see also In re Denture Cream*, 2015 WL

392021, at *24 (S.D. Fla. 2015) (finding that where expert had no corroboration from his

own review of plaintiffs' medical records and simply assumed plaintiffs' treating

physicians had conducted a thorough epidemiological assessment, the extent of this

reliance was "a complete delegation of [the expert's] responsibilities as an

epidemiologist to assess the subjects' exposure to the dental cream, adjust for

confounders, and account for bias"); *see also SMS Systems Maintenance Services, Inc. v.*

*Digital Equipment Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) (finding expert's opinion regarding

decline in customer satisfaction was unreliable where it was based only on internal

company documents and expert failed to conduct survey of actual customers and

expert failed to discuss whether the data in internal documents was sufficiently

representative to permit him to draw any relevant conclusions).

As indicated above, Dr. Freer did not do "separate investigatory work" to

corroborate his analysis with real-world data. (Ex. D, Freer Depo., 63:4-11.) In addition

to the name field, Dr. Freer performed no validation beyond reviewing "court

documents" and determining that the contact information "appeared to be generally

quite reasonable" to work with. (Ex. D, Freer Depo., at 63:18-64:6.) Yet Dr. Freer was

aware that the data entered was not always reasonable. (*Id.*) While Dr. Freer believes the

name information could be accurate, but contact information be reversed between

participants, he made no determinations about the likelihood of the inverse being true,

*i.e.* that names could be reversed but the contact information could stay the same. (Ex. D, Freer Depo., at 132:2-133:4.)

The problem for Dr. Freer is whether his method could be *reliably applied* to a noisy set of data with no external validation *in this case*. Unlike purchased data that is commercially analyzed, which is canonical and semi-canonical data, TelexFree did not have any such data except for "rep ID," which appears once and only once for each user account but is not used by any other data sources outside of TelexFree's internal data. (Ex. D, Freer Depo., at 69:16-70:9.) Dr. Freer did not attempt to "correlate" or "cross-reference" email addresses with any external databases of email addresses. (Ex. D, Freer Depo., at 71:1-72:20.) Dr. Freer only checked to make sure that email addresses were properly formatted. (Ex. D, Freer Depo., at 72:5-14.)[34] Dr. Freer also did not attempt to "correlate" or "cross-reference" street addresses with any external databases of street addresses, such as the United States Postal Service's database of mailing addresses. (Ex. D, Freer Depo., at 72:21-73:14.)

The inescapable fact is that TelexFree had no internal controls in place to validate, verify, or authenticate data entries. Worse, Dr. Freer is aware that it was "common practice" for recruits to "the contact information (email address, phone number, street address, and other fields)" of other people. (Ex. B, 2d Dennis Report, ¶ 73.) But Dr. Freer provides no empirical or statistical basis for why the reverse would not also be true, that users entered their own contact information but used the names of others. For that

---

[34] Dr. Freer concedes that a non-existent email address such as "ilyas@murphyking.com" would pass the formatting test but would not be rejected as invalid. (Ex. D, Freer Depo., at 72:5-14.)

matter, any combination of accurate and inaccurate information could be entered, limited only by "creativity." (Ex. B, 2d Dennis Report, ¶ 119.)

The Trustee has already admitted that "the Debtors' system is permeated with unreliable data because of limited efforts at data validation of information provided by Participants in establishing User Accounts. (Motion By Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief, Case 14-40987, ECF No. 623, ¶ 36.) Dr. Freer's failure to assess data quality directly undermines the reliability of his opinions. As Christen notes, "If the quality of the input data is low, then the output generated is normally not [of] high quality or accuracy either." (Ex. B, 2d Dennis Report, ¶ 112.) Indeed, it is understood in the field of data science, *e.g.* Winkler (2002) and Enamorado (2018), that "in many common situations," probabilistic record linkage "struggles to accurately match records e.g., when the overlap between datasets is small, when only a few common potential identifiers exist, when the amount of noise in the data is large…." (Ex. J., at 1-2.) While there may be techniques to address the shortcomings of probabilistic record linkage when data are noisy, either at the front end or the back end, Dr. Freer did not entertain the need for such methods or their application in this case.

Precisely because of these data problems, the error rate for Dr. Freer's aggregation is effectively known. While it is true that Dr. Freer attempted to calculate an error rate (which he self-reports as low), Dr. Freer's error rate has no real-world footing, and thus appears to be purely hypothetical. If all of Dr. Freer's assumptions were correct, his estimated error rate would probably be correct. But because Dr. Freer ignores real-world

data, he is thus unable to discern problems of under- and over-aggregation. Thus he combines Alex Lopes, Edjane Carreiro, Eliane Carreiro, Jacqueline Carreiro, and Jean Carreiro into a single cluster, without determining whether the latent error rate for this cluster is 1%, 10%, or 100%. Dennis gives numerous examples of such mismatched pairings. Dr. Freer also fails to aggregate accounts that, at least superficially, belong together. If all of Dr. Freer's aggregations have to be visually inspected for accuracy and reliability and subjected to a later process for "assignment to a person," it is hard to understand how he has assisted the trier of fact.

**4. Failing to Grasp That His Aggregation Would Directly Be Used for the Purposes of Assessing Liability, Dr. Freer Failed to Select a Methodology that Would Help the Trier of Fact Accurately Identify One and Only One Person**

To be admitted, an expert's opinion must help the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. Dr. Freer's opinions do not meet this criteria. In this case, the Trustee needs to establish his *prima facie* case and determine the identity of the net winners and the amounts of their winnings. (*Daubert* Ruling, at 40, n.32; Motion by Liquidating Trustee to Schedule Case Management Conference Respecting Supplementation of Expert Reports, ECF No. 389, at 3-4, 18; Stipulation By Plaintiff Stephen B. Darr and Defendant Class Representatives Respecting Amended Fee Arrangement For Defendants ECF No. 3707, ¶¶ 19, 20 ("... if the Court ultimately admits Borelian's methodology as admissible expert testimony for the purpose of establishing the Trustee's prima facie case"). Dr. Freer did not do this. Instead, Dr. Freer performed a purely mathematical exercise that attempts to link together User Accounts that have similar characteristics, and specifically where there is

substantial agreement on the values in the Name Field. However, such an approach fails to appropriately consider instances where the resulting Clusters may actually relate to more than one Participant, or where a Participant may relate to more than one Cluster. For example, in his deposition, Dr. Freer explicitly states, "[w]hen the name differs substantially, whether it's the same person or not that entered the accounts, that entered that information, when the name differs substantially, my understanding is those are to be considered as separate clusters." As such, to the extent that the ultimate purpose of Dr. Freer's analysis is a quantification of the supposed net funds received by each TelexFree Participant that comprises the Net Winner Class, Dr. Freer's methodology fails to accomplish this goal. This was also confirmed by Dr. Freer in his deposition where he acknowledged "I'm not aggregating accounts to persons period. I'm aggregating accounts to other accounts in clusters. *The assignment to persons is a different thing that might come later*."

Dr. Freer's methodology only sought to match names and other information using math. This does not go far enough. Dr. Freer's task was not just to group similar names together, but rather to identify participants and aggregate their user accounts. This failure to identify actual people likely stems from Dr. Freer's misunderstanding regarding how the results of the analysis would be used and his unfamiliarity with the Trustee's burden of proof. The Trustee intends to use these results for the purposes of determining *prima facie* liability. *See* Motion by Liquidating Trustee to Schedule Case Management Conference Respecting Supplementation of Expert Reports, at 3-4 ("given the importance of establishing a fair and accurate methodology to aggregate User

Accounts to determine Net Winner liability on a judicially efficient basis, and that Defendants will suffer no prejudice, the Trustee respectfully requests that this Motion be allowed."). Without expert testimony identifying net winners and their net winnings at this stage of the litigation, the Trustee's claims cannot survive a dispositive motion.

Dr. Freer's approach was simply to balance "over-clustering" with "under-clustering." (Ex. D, Freer Depo., at 74:21-75:22.) Dr. Freer appears to generically understand that there may be practical consequences to under-clustering, which may not be "ideal." (Ex. D, Freer Depo., at 75:23-76:14.) Superficially, Dr. Freer understands that under- or over-clustering can have an impact on net equity. (Ex. D, Freer Depo., at 76:15-23.) But in the case of where two different participants were clustered together, Dr. Freer does not understand "any details of what's going to happen after this in terms of figuring out which information from a given cluster to use to contact them…" (Ex. D, Freer Depo., at 80:2-14.) In cases of under-clustering, where a participant's positive accounts might be separated from his or her negative accounts, Dr. Freer assumes that both "net winners… and net losers are contacted some way, that would happen respectively with the contact information in the two clusters." (Ex. D, Freer Depo., at 80:16-81:5.) Dr. Freer was not aware of any mechanism of how under-clustered accounts would be reunited together apart from his analysis. (Ex. D, Freer Depo., at 81:10-21.) It was incumbent upon Dr. Freer to develop a reliable methodology to identify *participants* and their *net winnings*. Dr. Freer does neither.

### 5.   Dr. Freer's Opinions Lack "Fit" and Thus Cannot Be Used

In addition to reliability, Rule 702 further requires that the evidence or testimony

"assist the trier of fact to understand the evidence or to determine a fact in issue." This

condition goes primarily to relevance: "Expert testimony which does not relate to any

issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. 579, at 591.

Thus, even where the methodology used is reliable, it must be excluded if it does not

assist the trier of fact. By avoiding the central issue in this litigation, Dr. Freer makes his

opinions irrelevant and unhelpful. Thus, Dr. Freer's opinions must also be excluded for

lack of "fit."

### B.  The Trustee's Net Equity Analysis Must Be Precluded Under Daubert

The net equity options of Martin, which Dr. Freer impermissibly parrots, are

unreliable and irrelevant because they deviate from the net equity formula, tabulate the

wrong data, use assumptions that are inconsistent, unverifiable, and in most cases false,

and rely on the fictitious Ponzi scheme data rather than actual cash transactions. For

these reasons, the net equity calculations are unreliable and lack fit and must be

excluded.

### 1.   Dr. Freer Cannot Rely on a Disqualified Expert for any Net Equity Opinions

"[T]he expert witness must in the end be giving his own opinion. An expert cannot

simply be a conduit for the opinion of an unproduced expert." *In re Zantac (Ranitidine)*

*Prod. Liab. Litig.*, No. 20-MD-2924, 2022 WL 17480906, at *39 (S.D. Fla. Dec. 6, 2022),

appeal dismissed, No. 23-10090-J, 2023 WL 2849068 (11th Cir. Mar. 22, 2023), *citing*

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007); *see also Hi-Tech*

*Pharms.*, 2021 WL 2185699, at *7 (explaining that an expert "may not simply parrot the work actually done by another expert").

Experts are not permitted to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 932 (D. Minn. 2020), *citing In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000); *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 713 (N.D. Ill. 2001), *aff'd and adopted sub nom. Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717 (N.D. Ill. 2001) ("In light of our ruling on 'Defendant's Motion To Bar Testimony Of Greg Kaplan,' Dr. Morse may not reference any of Mr. Kaplan's proposed opinions and testimony or Mr. Kaplan's proposed supplemental restraint device."). Otherwise, parties could freely circumvent *Daubert* rulings by simply palming off the opinions of disqualified experts as new opinions. Thus, for example, where the expert opinions of an economist are based on a calculator developed and run by a former colleague, the former colleague is "really the expert" on the calculator, and consequently the economist "should not be allowed to act as a mouthpiece for another expert." *Fowler v. United States*, No. 08-216, 2009 WL 2827958, at *8-9 (W.D. La. Sept. 1, 2009) ("The methods and calculations used by [the former colleague] are not accessible to the court for purposes of verification and, thus, [the former colleague] is not merely a 'gopher' or 'assistant,' but an independent expert."); *see also Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL 779283, at *4 (S.D. Ala. Mar. 2, 2010) (holding that "bootstrapping "of an undisclosed

expert witness's opinions into the reports and testimony of another expert, who merely acts as a "conduit," is plainly improper).

Here, Dr. Freer did not calculate the net equity for each account. (Ex. D, Freer Depo., at 42:15-16.) Those calculations were taken "from something that Huron Consulting Group calculated." (Ex. D, Freer Depo., at 42:3-17.) Huron supplied the net equity calculations for each account. (Ex. D, Freer Depo., at 45:6-15.) Dr. Freer did not check those calculations or attempt to form opinions as to whether the numbers that Huron provided were correct or appropriate, at least not "in detail." (Ex. D, Freer Depo., at 48:11-21.) The calculations were already embedded in the data that was provided to Dr. Freer. (Ex. D, Freer Depo., at 57:4-10.)

Because Dr. Freer cannot be used as a mouthpiece for the opinions of an excluded expert, the Trustee has no expert to offer an opinion on net equity. For this reason alone, disqualification of net equity calculations is mandated.

> **2. Dr. Freer Does Not Even Attempt to Address the Central Weakness of Relying on SIG to Calculate Net Equity, When SIG Did Not Record Cash Transactions between Participants**

The well-settled law on "net equity" requires that all cash transactions be included in the calculation, while the fictitious and fraudulent accounting of the Ponzi scheme be disregarded. Net equity models expressly require a collapsing of all transactions down to "cash in and cash out," rejecting any other calculations that reflect the fraud or artifice of the Ponzi scheme.

Here, the net equity calculations prepared by Martin, which Dr. Freer *drags-and-drops* into his analysis, are 100% based on the SIG system. But SIG did not

record any cash transactions between participants. Instead, Martin employed a counterfactual assumption that the retirement of credits perfectly correlated to dollars on a 1:1 basis.

This assumption fails to hold up to even modest scrutiny. In his affidavit, Frantz Balan, details the collection problems and the fact that competition between promoters for new recruits drove the cash price for a new recruit down. Thus, even if cash were consistently collected across all allegedly triangular transactions (which it wasn't), the cash collected would be less than the Truste estimates using retired credits. It is simply not credible that 100% of transactions were for 100 cents on the dollar. The Trustee should have determined a means to follow the flow of dollars, or at least correlate the SIG transactions with cash. Indeed, this would have been difficult. To quantify tens or even hundreds of thousands of cash transactions around the world over a two year period would have been a daunting task. But *Daubert* does not relax the rules in difficult situations, especially where the financial consequences to each of the 95,000 class members are potentially dire.

At bottom, neither Dr. Freer nor Martin has made any effort to determine the dollar value of any transactions. (Ex. D, Freer Depo., at 49:15-50:1.) Because the net equity calculations are speculative and indeed false, they must be excluded. And because net equity calculations are needed to identify net winners, all opinions about the identity of net winners must also be excluded.

### 3. Net Equity Formulas Only Count Cash, and Must Therefore Ignore the Fraud of the Ponzi Scheme

In TelexFree's scheme, credits were routinely bought and sold out of necessity, at varying degrees of discounts. The Affidavit of Franz Balan confirms this.Balan Aff., ¶ 30. Thus, while it is false to assume that credits sold at 100 cents on the dollar, by ignoring credit sales, the Trustee makes the equally false assumption that credits were transferred for free. This also defies the legal requirement in Ponzi scheme cases to simply count cash. *See e.g. In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011). This case uses essentially the same definition of net equity as used in the *Madoff* cases, and it is clear that the focus is purely on "money." (Proposed Findings of Fact and Rulings of Law, *Darr v. Dos Santos* (Adv. Pr. 15-4055), at 10 ("Mr. Darr requested that the participant's claim be calculated as the ***total amount of <u>money</u> paid by a participant to*** either TelexFree or another participant … minus the ***amount of <u>money</u> that the participant received***, whether from TelexFree or a recruited participant…").)

Here, the leftover net equity calculations created by Martin exclude the sale of credits, done at the instruction of counsel. (*Daubert* Hearing Tr. 54:3-10.) This instruction undermines the reliability and relevance of the net equity calculations. *In re Blair*, 588 B.R. at 616, 622 (excluding expert testimony where expert relied on counsel who "told him that the data was not available and instructed him 'to proceed based on what I had'"). By ignoring one of three channels through which a participant could monetize or acquire more credits, the Trustee does not adhere to the definition of net equity in this case. He thus answers the wrong question, subjecting participants to dramatic swings in net equity that strain contemporary notions of fairness and justice.

## CONCLUSION

For the reasons set forth above, the Class Defendant hereby respectfully move to exclude the expert testimony of Cameron Freer.


## EVIDENTIARY HEARING REQUESTED

Class Plaintiffs respectfully request an evidentiary hearing, specifically a "*Daubert* hearing,*"* at a time convenient to the Court.

<div style="margin-left:40%">

Respectfully submitted,

FRANTZ BALAN,
FOR HIMSELF AND AS CLASS
REPRESENTATIVE ON BEHALF OF
ALL DOMESTIC NET WINNERS,

*-and-*

MARCO PUZZARINI AND
SANDRO PAULO FREITAS,
FOR THEMSELVES AND AS CLASS
REPRESENTATIVES ON BEHALF OF
ALL INTERNATIONAL NET
WINNERS,

By their counsel,

</div>

Dated: July 21, 2023

/s/ Ilyas J. Rona
Ilyas J. Rona, Esq. (BBO# 642964)
Michael J. Duran, Esq. (BBO #569234)
MILLIGAN RONA DURAN & KING LLC
28 State Street, Suite 802
Boston, Massachusetts 02109
(617) 395-9570
ijr@mrkdlaw.com
mjd@mrdklaw.com

## **CERTIFICATE OF SERVICE**

I, Ilyas J. Rona, hereby certify that I have caused a copy of the Domestic &

International Class Representatives' Motion To Exclude Testimony of Dr. Cameron E.

Freer as Inadmissible Under *Daubert* to be served on counsel for the Trustee and all

registered electronic filers appearing in this case using the Court's CM/ECF system.

Dated: July 21, 2023                          /s/ Ilyas J. Rona
                                              Ilyas J. Rona, Esq.