# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC.,<br>TELEXFREE FINANCIAL, INC.,<br><br>          Reorganized Debtors. | Chapter 11 Cases<br>14–40987–EDK<br>14–40988–EDK<br>14–40989–EDK<br><br>Jointly Administered |
| STEPHEN DARR, CHAPTER 11 TRUSTEE OF THE ESTATES OF EACH OF THE DEBTORS,<br><br>          Plaintiff,<br><br>     v.<br><br>BENJAMIN ARGUETA, *et al.,* and a CLASS OF DOMESTIC NET WINNERS,<br><br>          Defendants. | Adv. Pro. No.: 16–04006–EDK |
| STEPHEN DARR, CHAPTER 11 TRUSTEE OF THE ESTATES OF EACH OF THE DEBTORS,<br><br>          Plaintiff,<br><br>     v.<br><br>PAOLA ZOLLO ALECCI, *et al.,* and a CLASS OF INTERNATIONAL NET WINNERS,<br><br>          Defendants. | Adv. Pro. No.: 16–04007–EDK<br><br>**\*\*HEARING REQUESTED\*\*** |

## DOMESTIC & INTERNATIONAL CLASS REPRESENTATIVES' MOTION FOR SUMMARY JUDGMENT

Domestic Class Representative Frantz Balan and International Class Representatives Marco Puzzarini and Sandro Paulo Freitas (the "Class Defendants") hereby move for summary judgment pursuant to Fed. R. Civ. P. 56(a), made applicable by Bankr. R. 7056, and D. Mass. L.R. 56.1, made applicable by M.L.B.R. 7056-1, on all accounts, including the Trustee's claims for declaratory judgment, fraudulent transfer, preference, and claim disallowance. The Class Defendants further request an evidentiary hearing on this motion. In support thereof, the Class Defendants attach the Affidavit of Ilyas J. Rona and state as follows:[1]

## INTRODUCTION

Summary Judgment is appropriate because the Trustee has failed to designate an expert to identify net winners or calculate "net equity," and therefore he will not be able to prove his claims against any given participant. Furthermore, due to the extreme data quality issues with the SIG data (related to unreliability of unverified user-entered information in an uncontrolled environment), no expert could make such a determination with sufficient reliability to hold a defendant liable in these adversary proceedings. Finally, if Dr. Freer is disqualified for the reasons stated in the Domestic & International Class Representatives' Motion to Exclude Testimony of Cameron Freer as Inadmissible under *Daubert,* the Trustee will have no expert to aggregate participant user accounts. Accordingly, there is no genuine issue for trial, and summary judgment in favor of the Class Defendants is appropriate.

---

[1] Unless stated otherwise, all exhibit references below are to the Affidavit of Ilyas J. Rona.

## STATEMENT OF MATERIAL FACTS PURSUANT TO L.R. 56.1

On January 15, 2016, the Trustee filed the initial complaint (ECF No. 1)[2] in the

Domestic Case and filed a Motion for Class Certification (ECF No. 2). In his Motion, the

Trustee requested that the Court determine:

> That the Court determine that the common claims, issues,
> defenses of the Class include by [sic] is not limited to: (i)
> what transfers should be included in the determination of a
> Net Winner; (ii) whether Net Winners should be determined
> by an aggregation of Related User Accounts...;

(Trustee's Motion for Class Certification in the Domestic Case, at 2-3, ECF No. 2).

The Trustee further requested that "[t]he Court find that the defenses of the Named

Defendants as the Punitive Class Representatives, are typical of the defenses of the

Class." (Trustee's Motion for Class Certification in the Domestic Case, at 3, ECF No. 2.)

According to the Trustee, these "common issues" were "capable of classwide

resolution" and in fact "require classwide resolution to avoid a multiplicity of suits that

run the risk of inconsistent adjudications." (Affidavit of Stephen B. Darr in Support of

Plaintiff's Motion for Class Certification, at 9, ¶ 34, ECF 2-1.) The Trustee's claims

include counts for declaratory judgment, fraudulent transfer, preference, and claim

disallowance. (Amended Complaint, ¶¶ 57 - 83, ECF No. 113).

On January 26, 2016, in the consolidated Main Case, this Court ordered as follows:

> (i) In determining the amount of claims of Participants, any claim or
> portion of claim based upon accumulated credits in a Participants' User
> Accounts as of the Petition Date shall be disallowed;
>
> (ii) The claims amounts of Participants shall be determined on a Net
> Equity basis, which shall be defined as follows: the amount invested by

---

[2] For simplicity, unless otherwise stated, the class members will only refer to the ECF
docket numbers for the Domestic Case.

the Participant into the Debtors' scheme, including amounts paid
pursuant to Triangular Transactions, less amounts received by the
Participant from the Debtors' scheme, including amounts received
pursuant to Triangular Transactions.

(iii) In determining the amount of a claim of a Participant who has more
than one User Account, the activity in all of the Participants' User
Accounts shall be aggregated and netted against one another;

(Ponzi Scheme Order dated January 26, 2016, Main Case, ECF No. 0687, at 2-3

(emphasis added).)

On October 6, 2016, this Court certified the defendant Net Winner class in the

Domestic Case and appointed Franz Balan as Domestic Class representative, and

appointed MRDK as class counsel. (Order on Class Certification, at 13-14, ECF No. 194.)

The Court made a similar order in the International Case. (Order on Class Certification,

at 12, International Case, ECF No. 479.)

The Court further held that:

There are questions of law and fact common to all class members
including but not limited to that the common claims, issues, defenses of
the Class include but are not limited to: … (ii) whether Net Winners
should be determined by an aggregation of Related User Accounts; (iii)
whether the initial methodology for determining Related User Accounts is
reasonable; (iv) whether the information maintained on the Debtors' SIG
records with respect to each Participant transactions with the Debtor and
other Participants is reasonably reliable...

(Order on Class Certification, at 11, ECF No. 194.)

Almost all TelexFree's revenue came from membership subscriptions that enabled

participants to earn "credits" by selling VoIP subscriptions, by posting internet

advertisements, and also by recruiting new participants who bought memberships.

(ECF No. 536, at 3 [hereinafter "_Daubert_ Ruling"].)

Credits were redeemable for cash, used to offset membership fees, and often transferred between participants. *Id.*

It was common for individual participants in TelexFree to have many user accounts. *Id.* TelexFree's record database did not directly link user accounts that belonged to the same participant. *Id.* Determining the extent to which a given individual participant had paid in or received funds from the TelexFree scheme required aggregating that participant's user accounts. *Id.* Then, the transaction data associated with those user accounts could be combined to determine whether the participant had gained or lost in the end, that is, whether the participant was a "net winner" or a "net loser." *Id.*

The Trustee initially retained a team of professionals from Huron Consulting Group, LLC, led by Timothy Martin, to develop a methodology for determining net winners and net losers. *Id.* The Trustee used that methodology to assist him in the claims resolution process in the main chapter 11 cases by identifying net losers, who qualified as creditors of TelexFree. *Id.* On February 3, 2020, the Trustee provided to the Class Defendants the initial Report of Timothy Martin of Huron Consulting Group LLC ("<u>Martin Report</u>") wherein Mr. Martin sought to provide an expert opinion and expert testimony in these cases in order to:

> identify the net amount of money that each person (a "Participant") received or expended with TelexFree, LLC, TelexFree, Inc. or TelexFree Financial, Inc. (collectively "TelexFree" or the "Company") directly or with other persons in connection with the purchase of membership plans or voice over internet protocol packages ("VoIP").

(Martin Report, at 3.)

On July 31, 2020, the Class Defendant's expert Joshua Dennis of StoneTurn Group
provided his Rebuttal Expert Report ("First Dennis Report"). On September 23, 2020,
the Trustee provided Mr. Martin's Reply Expert Report ("Martin Reply Report"). This
Court held a two-day *Daubert* hearing on the Martin Opinions on November 23 and 24,
2020. On February 2, 2021, Class Defendants filed a Motion to Exclude the Testimony of
Timothy Martin as Inadmissible Under *Daubert.* (ECF No. 528; International Case,
ECF No. 377.)

On June 22, 2021, this Court issued an order and accompanying memorandum
granting the Class Defendants Motion to Exclude the Testimony of Timothy Martin as
Inadmissible, in both cases. (ECF Nos. 385 & 386; International Case, ECF Nos. 536 &
537.) Judge Hoffman concluded that:

> The trustee has not shown by a preponderance of the evidence the
> reliability of his expert's opinion as to the selection and application of his
> method for aggregating user accounts to determine in these adversary
> proceedings the identities and gains of the net winners in the TelexFree
> scheme.

(ECF No. 536 [hereinafter "*Daubert* Ruling"].)

One of the quality issues with TelexFree's data was that individual participants
were able to create user accounts under multiple names. *Daubert* Ruling, at 12 ("James
Smith might have accounts in the names of "J. Smith," "Jim Smith," "Smith, J.," or even
a nickname, "Smitty," or a pseudonym, "Superman." The possibilities were practically
endless."); (*Daubert* Ruling, at 17.)

There were not any restrictions on which characters a participant could enter in the
name field or any process by which the information entered would have been validated

as the actual name of the user account holder. *Id. See also* TelexFree Analysis of Damages at 24, *United States v. Merrill*, No. 14-cr-40028-TSH-1 (D. Mass. Mar. 16, 2017), ECF No. 332-1 (noting that TelexFree "did not validate data").

Tens of thousands of name field entries contained blatantly false names such as "a a" and ". ." *Daubert* Ruling, at 17. Mr. Dennis also found an account under the name of "Mickey Mouse," which led to his discovery of multiple accounts under other apparently false names, including "Walt Disney" and "Team Legendary." (*Daubert* Ruling, at 17.)

In the Daubert ruling, Judge Hoffman stated in his final footnote:

> The defendants also raise arguments beyond simply addressing the reliability of Mr. Martin's selection and application of an aggregation methodology, including arguments that relate to Mr. Martin's assumptions and decisions *after* the aggregation process was complete, ***when he set out to calculate the gains and losses (net equity) of each alleged participant***. Having determined that the reliability of Mr. Martin's aggregation methodology has not been established and ***thus his expert opinion cannot be admitted***, it is unnecessary to address the defendants' additional arguments, which they may choose to raise in the future, if appropriate.

(*Daubert* Ruling, at 40, n.32 (emphasis added).)

On September 7, 2021, the Trustee filed his Motion by Liquidating Trustee to Schedule Case Management Conference Respecting Supplementation of Expert Reports. (ECF No. 389.) In that Motion, the Trustee stated as follows:

> Although the Huron methodology was accepted by the Court for the purpose of establishing the identity of Net Losers and the amount of Net Loser Claims, in the Decision, the Court deemed the Huron methodology inadmissible for the purpose of determining *prima facie* liability against the Net Winner Defendants in the two class actions commenced by the Trustee to recover fictitious profits retained by Net Winners for the benefit of Net Losers.

The Trustee has now retained the Borelian Corporation ("Borelian"), a data
analytics firm with a specific expertise in examining large data sets, to produce a
supplemental expert report to address the issues raised by the Court in the
Decision.

…

[G]iven the importance of establishing a fair and accurate methodology to
aggregate User Accounts to determine Net Winner liability on a judicially
efficient basis, and that Defendants will suffer no prejudice, the Trustee
respectfully requests that this Motion be allowed.

(*Id.* at 3-4.) The Trustee further stated in that motion its hope to use Borelian to establish
its *prima facie* case as follows:

if the Court ultimately admits Borelian's methodology as admissible expert
testimony for the purpose of establishing the Trustee's *prima facie* case, the
individual Defendants will still have an opportunity to review the aggregation
results and propose any adjustments with supporting documentation similar to
the Claim Determination Process.

(*Id.* at 18.)

The Trustee's Motion was allowed by this Court on December 1, 2021, conditioned

on the following:

(a) the parties negotiating, and filing a joint motion to approve, an amended fee
arrangement for the Defendants and (b) the parties filing either an agreed
proposed scheduling order or separate competing proposed scheduling orders.
On or before January 4, 2022, the parties shall file a joint motion to approve an
amended fee arrangement. And on or before February 4, 2021, the parties shall
file either an agreed proposed scheduling order or separate competing proposed
scheduling orders.

(ECF No. 407 at 3.)

On January 4, 2022, the Parties agreed to the scope of Phase I of these adversary

proceedings as follows:

19.     Phase I will be comprised of discovery, pleadings, dispositive
motions, and hearings on the admissibility of the expert opinion of
Borelian Corporation ("Borelian") and will include, ***among other things***,
the following:
(i) the integrity and reliability of the SIG data used by Borelian;

> (ii) *the reasonableness of the assumptions made by Borelian in computing the amount of the Net Winnings, including but not limited to the inclusion or exclusion of transfers of credits between Participants in the computation of Net Winnings and the assumptions made with respect to the treatment of Triangular Transactions in the computation of Net Winnings*.

20.    The Court's findings and conclusions as to Phase I will inform the necessity for Phase II.

(Main Case, ECF No. 3707, ¶¶ 19, 20 (emphasis added).)

The Trustee retained Dr. Freer of Borelian Corporation as a replacement expert in these adversary proceedings. As part of his work for the Trustee, on November 3, 2021 Dr. Freer asked the Trustee for further guidance on whether he would be asked to render his opinions about net equity, stating:

> I think you've said this before, but *we wanted to confirm that the Net Equity calculation by Huron is not under review here*. It is our understanding that the Court has approved the Net Equity formula, and that Huron has implemented this formula to create the net_equity field for each account in the database. *We are hoping that we can continue to use this field without further investigation*, even as we examine which accounts should be aggregated.

(Ex. I, BC002506) (emphasis added). The Trustee's counsel responded Dr. Freer's question as follows:

> Your assumption is correct. The principal inquiry here is reaching a resolution on the user accounts to be aggregated. As the defendants have pointed out, they may raise issue with respect to the calculation of the net equity, but that is an issue for another day (and is in any event presently outside of your scope).

(*Id.*, at BC002505).

Dr. Freer readily admits that he did not perform his own net equity calculations; rather they were supplied by Huron and brought into the tables he generated in the

10th and final step. (Ex. B, 2d Dennis Report, ¶¶ 35, 62; Ex. D, Freer Depo., at 42:15-16.)

The net-equity calculations that Dr. Freer relied on were taken "from something that

Huron Consulting Group calculated." (Ex. D, Freer Depo., at 42:3-17.) Put simply,

Huron supplied the net equity calculations for each account. (Ex. D, Freer Depo., at

45:6-15.) Dr. Freer has confirmed that he did not form any opinions "in detail" regarding

whether Martin's calculations were correct or appropriate because he "didn't

investigate enough to tell." (Ex. B, 2d Dennis Report, ¶ 35.)

Throughout his deposition, Dr. Freer made it clear that he was merely clustering

accounts to each other: "I'm not clustering them to persons." (Ex. D, Freer Depo., at

86:1-87-5 ("Once again, I'm not clustering them to persons…but the clustering is not to

persons, it is to clusters.").)

On April 14, 2023, the Class Defendants provided the Trustee with the

Supplemental Rebuttal Expert Report of Joshua W. Dennis (the "2d Dennis Report").

The 2d Dennis Report disclosed Mr. Dennis' opinions. With respect to net equity, Mr.

Dennis states:

> Absent from Dr. Freer's assignment is any discussion related to an
> independent calculation or conclusion as to Net Equity. Instead, it appears
> Dr. Freer was only tasked with aggregating User Accounts ("Freer
> Aggregation Process"), and *was instructed by counsel for the Trustee to
> adopt Mr. Martin's concluded Net Equity amounts associated with each
> User Account*. Given that the Court appears to have excluded Mr. Martin's
> opinion in its entirety, it is unclear if, or to what extent, Dr. Freer is able to
> rely on Mr. Martin's work product, opinions or conclusions, in whole or in
> part, in forming his own opinions…I am not aware of any experts retained
> by the Trustee at this time other than Mr. Martin who have independently
> performed a Net Equity calculation as part of this Adversary Proceeding.
> In any event, Dr. Freer did not perform his own net equity calculations as
> he admitted they were supplied by Huron. Dr. Freer also confirmed that
> he did not form any opinions "in detail" regarding whether Martin's

calculations were correct or appropriate because he "didn't investigate enough to tell."

(Ex. B, 2d Dennis Report, ¶ 35.)

On May 22, 2023, the Trustee provided Class Defendants with the Reply Report of

Dr. Cameron E. Freer. In his Reply Report, Dr. Freer stated as follows:

> **The Freer aggregation methodology is agnostic to the choice of net equity formula**
>
> The Court has previously approved the formula for Net Equity per User Account. I have no reason to believe that Mr. Martin incorrectly implemented that formula.

(Ex. C, Freer Reply, at 43.)

There is no timely disclosed expert in these cases who can opine on the Trustee's net

equity calculation for each user account. (Ex. B, 2d Dennis Report, ¶ 35.)

## ARGUMENT

There is no genuine dispute that the data that the Trustee's expert relies upon is

unreliable and incomplete. Given the extremely poor quality of the SIG data, which is

unverified, incorrect, or incomplete, it is insufficient for exclusive reliance. There is also

no genuine issue that the Trustee has failed to designate an expert to identify net

winners or calculate "net equity." Instead, the Trustee is attempting to use a new expert

as a conduit to revive the opinions of the earlier expert who has been disqualified. As

set forth below, this is not permitted. Additionally, for the reasons stated in the

Domestic & International Class Representatives' Motion to Exclude Testimony of

Cameron Freer as Inadmissible under *Daubert*, Dr. Freer's opinions are inadmissible

under Rule 702 and the principles set forth in *Daubert*, and without admissible expert

testimony, the Trustee will be unable to meet his burden of proof to identify the roughy

95,000 alleged Net Winners and quantify their share of the alleged $1.5 billion liability

with the required level of exactitude. Summary judgment is therefore appropriate.

## A. Legal Standard

A "court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The role of summary judgment is "to pierce the

pleadings and to assess the proof in order to see whether there is a genuine need for

trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). Summary judgment

should be granted "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a), made applicable to this proceeding by Fed. R. Civ. P. 7056; *see also Desmond v.

Varrasso (In re Varrasso)*, 37 F.3d 760, 762-63 (1st Cir. 1994).

Where, as here, the moving party would not bear the burden of proof at trial, the

movant's initial burden is simply to demonstrate or point out a lack of evidence to

support at least one essential element of the opposing party's case. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-323 (1986).

Where a plaintiff needs an expert to establish elements of his cause of action, the

plaintiff cannot rely on excluded expert testimony to "withstand the summary

judgment sickle." *Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 18

(1st Cir. 2022), *citing Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (explaining

that inadmissible expert evidence can't be used to defeat summary judgment). *See also*

*Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 476 (1st Cir. 2016) ("Once the district court excluded Dr. Butler's testimony, it then correctly granted Rust–Oleum's motion for summary judgment.").

### B.  Dr. Freer Is Not Permitted to be A Mere Conduit for Martin's Net Equity Opinions

In these reverse class actions, the Trustee needs a qualified expert to identify net winners and calculate net equity. Without an expert qualified pursuant to FRE 702, the Trustee will not be able to meet its burden of proof on the essential elements of its claims against TelexFree participants. As a starting point, the expert must provide ***his or her own*** opinions, not simply parrot the opinions of an absent person. This is especially true where the other person is absent *because of* disqualification under *Daubert*.

It is well-settled that an "expert witness must in the end be giving his own opinion. An expert cannot simply be a conduit for the opinion of an unproduced expert."*In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 20-MD-2924, 2022 WL 17480906, at *39 (S.D. Fla. Dec. 6, 2022), appeal dismissed, No. 23-10090-J, 2023 WL 2849068 (11th Cir. Mar. 22, 2023), *citing Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007); *see also Hi-Tech Pharms.*, 2021 WL 2185699, at *7 (explaining that an expert "may not simply parrot the work actually done by another expert").

Experts are not permitted to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 932 (D. Minn. 2020), *citing In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000); *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 713 (N.D. Ill. 2001), *aff'd and adopted sub nom. Traharne v.*

*Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717 (N.D. Ill. 2001) ("In light of our ruling on

'Defendant's Motion To Bar Testimony Of Greg Kaplan, ' Dr. Morse may not reference

any of Mr. Kaplan's proposed opinions and testimony or Mr. Kaplan's proposed

supplemental restraint device."). Otherwise, parties could freely circumvent *Daubert*

rulings by simply palming off the opinions of disqualified experts as new opinions.

Thus, for example, where the expert opinions of an economist are based on a calculator

developed and run by a former colleague, the former colleague is "really the expert" on

the calculator, and consequently the economist "should not be allowed to act as a

mouthpiece for another expert." *Fowler v. United States*, No. 08-216, 2009 WL 2827958, at

*8-9 (W.D. La. Sept. 1, 2009) ("The methods and calculations used by [the former

colleague] are not accessible to the court for purposes of verification and, thus, [the

former colleague] is not merely a 'gopher' or 'assistant,' but an independent expert.");

*see also Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL

779283, at *4 (S.D. Ala. Mar. 2, 2010) (holding that "bootstrapping "of an undisclosed

expert witness's opinions into the reports and testimony of another expert, who merely

acts as a "conduit," is plainly improper). Here, the Trustee will not be able to identify

net winners or determine net winnings because the Trustee has presented no expert to

calculate each alleged Net Winner's respective net equity for the finder of fact.

### C.  It is Undisputed that Dr. Freer Did Not Select a Methodology for Net Equity or Calculate Net Equity For User Accounts

It is undisputed that Dr. Freer did not develop a method for calculating net equity

because the Trustee specifically instructed Dr. Freer that he did not have to do so.

Instead, Dr. Freer simply used Mr. Martin's concluded Net Equity amounts associated

with each User Account without any investigation or scrutiny.

On November 3, 2021 Dr. Freer asked the Trustee for further guidance on whether

he would be asked to render his opinions about net equity, stating:

> *we wanted to confirm that the Net Equity calculation by Huron is not*
> *under review here*. It is our understanding that the Court has approved the
> Net Equity formula, and that Huron has implemented this formula to
> create the net_equity field for each account in the database. *We are hoping*
> *that we can continue to use this field without further investigation*, even
> as we examine which accounts should be aggregated"

(Ex. I, BC002506) (emphasis added). Counsel for the Trustee responded: "Your

assumption is correct. The principal inquiry here is reaching a resolution on the user

accounts to be aggregated." (*Id.*, at BC002506.) Yet Mr. Martin has been disqualified and

thus his opinions have been disallowed by this Court. They are no longer admissible.

Because Dr. Freer did not compute the Net Equity calculations or independently verify

them himself, the Trustee has disclosed no expert who will present opinions about net

equity. For this reason alone, summary judgment is appropriate.

### D. Dr. Freer Conflates this Court's Approval of the Net Equity Formula (with respect to net loser claims) with the Need For a Methodology to Calculate Defendant Net Winnings in These Adversary Proceedings

Dr. Freer's faulty understanding that the Court had "approved the Net Equity

formula" conflates the overall framework for determining net equity on a

cash-in-cash-out basis (which has been approved in the claims process) with the actual

expert methodology for calculating net equity for each participant. For the purposes of

calculating claims this Court defined net equity as:

the amount invested by the Participant into the Debtors' scheme,
including amounts paid pursuant to Triangular Transactions, less amounts
received by the Participant from the Debtors' scheme, including amounts
received pursuant to Triangular Transactions.

Ponzi Scheme Order dated January 26, 2016, ECF No. 0687. The order did not address
the appropriate methodology for calculating net equity.

Clearly *defining* the bounds of net equity as a matter of law is not the not the same
as *calculating* net equity based on actual facts. In order to calculate net equity, the
Trustee needs *a reliable method* to do so. Such a method would need to determine, for
instance, which transactions are to be included and which transactions are to be
excluded from the calculation, if any. Each transaction would also need to be valued. To
do this, data would have to be reviewed and various assumptions have to be deployed.

While Mr. Martin attempted to develop just such a method, he has been
disqualified and his opinions are no longer admissible. Martin's net equity method was
never approved for use in these adversary proceedings. Nothing in this Court's prior
orders adopts Mr. Martin's method of calculating net equity for the purposes of these
adversary proceedings. Judge Hoffman made this abundantly clear in his final footnote
of the Daubert Opinion:

The defendants also raise arguments beyond simply addressing the
reliability of Mr. Martin's selection and application of an aggregation
methodology, including arguments that relate to ***Mr. Martin's
assumptions and decisions after the aggregation process was complete,
when he set out to calculate the gains and losses (net equity) of each
alleged participant***. Having determined that the reliability of Mr. Martin's
aggregation methodology has not been established and ***thus his expert
opinion cannot be admitted***, it is unnecessary to address the defendants'
additional arguments, which they may choose to raise in the future, if
appropriate.

*Daubert* Ruling, at 40, n.32 (emphasis added). While Class Defendants challenged the

reliability of Martin's net equity calculations, and have preserved those challenges here,

the Court does not have to reach the issue of those challenges because no

timely-disclosed expert is stepping forward to provide those opinions.

The Trustee's instruction to Dr. Freer to avoid investigating or opining on net equity

is also inconsistent with the agreed-to scope of Phase I of these proceedings. The parties

agreed as follows:

> 19.    Phase I will be comprised of discovery, pleadings, dispositive
> motions, and hearings on the admissibility of the expert opinion of
> Borelian Corporation ("Borelian") and will include, among other things,
> the following:
>> (i) the integrity and reliability of the SIG data used by Borelian;
>> (ii) ***the reasonableness of the assumptions made by Borelian in
>> computing the amount of the Net Winnings,*** including but not
>> limited to the inclusion or exclusion of transfers of credits between
>> Participants in the computation of Net Winnings and the
>> assumptions made with respect to the treatment of Triangular
>> Transactions in the computation of Net Winnings.
>
> 20.    The Court's findings and conclusions as to Phase I will inform the
> necessity for Phase II.

(Main Case, ECF No. 3707, ¶¶ 19, 20) (emphasis added).

There is no question that the Trustee and the Class Defendants agreed that

Dr. Freer's assumptions made when computing the amount of the Net Winnings would

be tested in Phase I. Indeed, one of the stated issues—"the inclusion or exclusion of

transfers of credits between Participants in the computation of Net

Winnings"—specifically relates to the method of calculating net equity, rather than a

method of aggregation. For instance, in Mr. Martin's now excluded opinion, Mr. Martin

ignored credit transfers between Participants in his Net Equity calculation and the Class

Defendants disputed Mr. Martin's basis for doing so. (ECF No 377 at 26.) Later, in their

approved stipulation with the Trustee, the Class Defendants preserved their right to

dispute the treatment of credit transfers (which were often sold for cash) *in the event that*

Dr. Freer chose to exclude such transfers from his net equity calculation. Yet Dr. Freer

doesn't offer any opinion on how credit transfers should be treated, because he offers no

opinion on how to calculate net equity at all. Dr. Freer merely relies on the validity of

Mr. Martin's calculations without conducting any independent analysis. Without an

expert qualified under FRE 702 to calculate net equity, the Trustee simply has no

admissible basis to prove whether a class defendant is a net winner (or net loser) in

these adversary proceedings, and the Trustee is therefore without an admissible basis to

calculate the amount of net winnings.

    Dr. Freer's deposition confirms that with respect to the net equity calculation, he is

a mere conduit for the opinion of Mr. Martin. Dr. Freer admits that he did not calculate

the net equity for each account. (Ex. D, Freer Depo., at 42:15-16.) Those calculations

were taken "from something that Huron Consulting Group calculated." (Ex. D, Freer

Depo., at 42:3-17.) Huron supplied the net equity calculations for each account. (Ex. D,

Freer Depo., at 45:6-15.) Dr. Freer did not check those calculations or attempt to form

opinions as to whether the numbers that Huron provided were correct or appropriate,

at least not "in detail." (Ex. D, Freer Depo., at 48:11-21.) The calculations were already

embedded in the data that was provided to Dr. Freer. (Ex. D, Freer Depo., at 57:4-10.)

    Dr. Freer made no effort to determine the dollar value of any transactions. (Ex. D,

Freer Depo., at 49:15-50:1.) Dr. Freer testified that all he did was read the Martin expert

report and review the materials that were provided to him from Huron and decide to

adopt it because "nothing seemed amiss in what I read. It seemed essentially sensible."

(*Id.*) Dr. Freer is thus unable to offer any opinions as to the net equity calculations,

which **do not** capture **any cash transactions** between participants, and fails to satisfy

the requirement to show that the Defendants received more money than they paid out.

### E. Summary Judgment Is Appropriate Because the Trustee Cannot Objectively Identify Net Winners and Instead Identifies "Clusters" of User Accounts.

In order to proceed to Phase II of these adversary proceedings, the Trustee must

first be able to objectively identify the defendants against whom claims are asserted. In

order to do that, the Trustee must identify each net winner and the amount of net

winners. There are substantial due process concerns if these requirements were relaxed.

*See Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("A defendant has a similar, if

not the same, due process right to challenge the proof used to demonstrate class

membership as it does to challenge the elements of a plaintiff's claim."); *see also Marcus*

*v. BMW of North America, LLC*, 687 F.3d 583, 594 (3d Cir. 2012) ("Forcing BMW and

Bridgestone to accept as true absent persons' declarations that they are members of the

class, without further indicia of reliability, would have serious due process

implications.").

In other words, it is not enough for a class to be *capable* of conceptual definition, the

identity of class members must be *objectively identifiable* without the need for "extensive

and individualized fact-finding." *In re Niaspan Antitrust Litigation*, 67 F.4th 118, 130-31

(3d Cir. 2023) (*citing Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 353 (3d Cir. 2013)). If

individual class members cannot be identified in an economically and administratively

feasible manner, then "significant benefits of a class action are lost." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). Additionally, the mere "say-so" of a party, usually a putative class member but here the Trustee, is not enough. *See id.* at 304. Only objective proof may be used to identify a class member; the Trustee cannot start the process and hope that "self-identification" finishes it. *See Karhu v. Vital Pharmaceuticals, Inc.*, 621 Fed. Appx. 945, 948 (11th Cir. 2015) ("[A] plaintiff cannot satisfy the ascertainability requirement by proposing that class members self-identify (such as through affidavits) without first establishing that self-identification is administratively feasible and not otherwise problematic.").

To the extent data matching techniques are used, they must also be reliable. *In re Niaspan*, 67 F.4th at 123 (holding that end-payor plaintiffs could not objectively determine class membership using Pharmacy Benefit Manager records where such data captured only the identify of the entity directly paying the PBM, and where additional individualized proof would then be required to show whether such payor was or was not an end-payor). And while corporate records may sometimes also be used to identify class members, the records must be reliable and sufficient to identify class members. S*ee Carrera v. Bayer Corp.*, 727 F.3d 300, 308–09 (3d Cir. 2013).

Here, the Trustee lacks reliable evidence to identify net winners, both with respect to expert opinions and underlying data. As to expert testimony, Dr. Freer fails to identify the defendants that would be forced to defend this case. Dr. Freer admitted many times that he "was not ... tasked with" identifying actual people. (Ex. D, Freer Depo., at 230:2-23.) On this point he was crystal clear:

> No, once again, I'm not aggregating accounts to persons, period. I'm aggregating accounts to other accounts in clusters. The assignment to persons is a different thing that might come later.

(Ex. D, Freer Depo., at 137:6-10.) Dr. Freer was not able to say whether he was "identifying who the actual person was" beyond their contact information. (Ex. D, Freer Depo., 62:15-63:3.) But he was able to testify that he "did no additional analysis" to understand in a real-world sense the true identities of actual participants of TelexFree. (Ex. D, Freer Depo., 63:4-11.) He did not do "separate investigatory work" to corroborate his analysis with real-world data. (Ex. D, Freer Depo., 63:4-11.) So for example, Dr. Freer offered no opinion of whether the user accounts clustered to "Barack Obama" had any relationship with the real-life former president. (Ex. D, Freer Depo., at 64:14-23.) Dr. Freer expressed no skepticism about "Barack Obama's" participation, testifying "obviously, it seems it is possible." (*Id.*) Dr. Freer conceded that it "also may not be the case." (*Id.*) Dr. Freer admitted: "I don't know for sure of any particular one. Some are more likely than others to not be an actual person." (Ex. D, Freer Depo., at 64:23-65:3.)

Dr. Freer recognized that there was "an additional step" that he did not take. Dr. Freer testified that the identification of net winners is "implicit" from the data and "there's sometimes information that [] would enable you to identify such a person." (Ex. D, Freer Depo., at 65:24-66:18.) For example, even if the name field doesn't contain a natural person's name, Dr. Freer believes that you could "infer an address." (*Id.*) In the case of Mickey Mouse, Dr. Freer believes he is identifying the participant "to the extent

my aggregation provides that information," but only to that extent. (Ex. D, Freer Depo.,

at 67:16-68:2.):

> If the address and phone number and e-mail address canonically identifies
> a single person, then I suppose my analysis has produced that, and hence,
> my opinion. I didn't do any additional work beyond what's implicit in
> that.

(*Id.*)

Recognizing that he has pulled up short of the finish line, Dr. Freer then proposes

exactly the sort of subjective identification or self-identification[3] that is considered

unacceptable when plaintiffs seek to form a class themselves: "In the best case scenario,

the true identity of the Participant can, at a later time, be ascertained from the other

indicia." (Ex. A, Freer Report, at 92.) "I don't know the details of how the case is going

to progress after this, but I assume in some form, one or more than them would be

contacted with the list of accounts assigned to that cluster." (Ex. D, Freer Depo., at

79:21-80:1.)

Similarly, there are no records in this case that can objectively identify each

individual Participant to determine whether they are a class member in an

administratively feasible manner. Telexfree's SIG data is unverified and unreliable and

cannot be used as the sole means of identifying class members. The SIG data contains

User Accounts with wholly fictitious names. Certainly, "Mickey Mouse" cannot be held

liable on the mere "say-so" of the Trustee. But, User Accounts with human-sounding

names likewise must be properly objectively proven to belong to a specific individual

defendant. This requires more than the Trustee's word that he can assign liability by

---

[3] *See Karhu v. Vital Pharmaceuticals, Inc.*, 621 Fed. Appx. 945, 948 (11th Cir. 2015).

filtering out accounts with obviously fictitious names and then assigning liability to actual human beings whose names happen to match the name on a given Telexfree User Account.

On this point of shaky or incomplete methodologies, the Third Circuit's decision in *In re Niaspan* is instructive. There, plaintiffs argued that they could use "automated data matching to identify class members by identifying administrator transactions and then identifying the administrator's end-payor client." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 137 (3d Cir. 2023). The District Court reviewed the proposed methodology and disagreed, finding that the methodology had errors and was "*ad hoc.*" *Id.* The court found that the metric used simply assumed what it had to prove—that the data allowed for class members to be reliably identified. *Id.* at 135. Based on the insufficiency of the data matching technique to identify class members, the District Court found that "identifying class members will require 'individualized fact-finding.'" *Id.*

Moreover, individual Participants likely do not have comprehensive receipts or records to prove just how much money they put into or received from the Telexfree system. Many transactions were done using cash, and Participants usually did not keep detailed records. With a lack of comprehensive records that can be used to objectively identify defendants, there remains a need for extensive individualized proof and mini-trials, which again is not administratively feasible. *See Perez v. Metabolife Intern., Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) (noting that unlike many mass torts or toxic exposure cases, "where passenger lists, employment records, or public records can be used to confirm class membership, it is unlikely that many of these putative class

members will be able to produce objectively verifiable proof that they ingested the

relevant amounts of Metabolife 356 for the relevant period of time"). Because the

Trustee cannot objectively identify Net Winners, summary judgment is appropriate.

**F. Given The Poor Data Quality of the SIG Database No Expert's Methodology, (including Dr. Freer's and Martin's) Can be Reliably Applied to Assess Liability**

In order to find 95,000 participants liable for $1.5 billion, the Trustee needs an

expert whose opinion reflects a reliable application of the principles and methods to the

facts of the case. Thus, the focus is not solely on the *methodology* used by Dr. Freer, but it

also requires that the methodology used be reliably applied *to the facts of this case*. Given

the overwhelming problems and shortcomings of the SIG database, Dr. Freer's

methodology, which makes no attempt to validate the potentially fictitious data, and

which **does not record <u>any</u> inter-participant cash transactions**, cannot be reliably

applied in this case. Perhaps in cases where commercial-grade data that has been

cleaned and validated is available for purchase, Dr. Freer's methodology may well be

reasonable. But where the data is simply not useful by itself, any analysis that limits

itself to the data is also not useful.

Because Dr. Freer relies solely on SIG, and SIG is incomplete, inaccurate,

unintelligible, or all of the above, Dr. Freer is attempting to rely on insufficient data. *See*

*Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 70 (D. Mass. 2000) (excluding an expert in part

because of the "fundamental error" of failing to determine the "actual concentrations (if

any) of acetic acid and glutaraldehyde"). If the underlying data is unreliable, any expert

opinion that relies on it must be excluded. *See Carrozza v. CVS Pharmacy, Inc.*, 391 F.

Supp. 3d 136, 145 (D. Mass. 2019) (excluding an expert opinion not based on adequate

data that amounted to mere "assumptions, speculation[,] and guesswork"); *In re Blair*,

588 B.R. at 619 (excluding expert's testimony regarding the Debtor's insolvency, where

there were insufficient facts to support the expert's "fair market value balance sheet

methodology"); *see also In re Paoli R.R. yard PCB Litigation*, 35 F.3d 717, 748 (3d. Cir. 1994)

("If the underlying data are so lacking in probative force and reliability that no expert

could base an opinion on them, an opinion which rests entirely upon them must be

excluded.") (citations omitted).

1. **Because name data was entered by unknown participants, without controls or verification, it is unreliable and any opinions that do not attempt to validate name data with external sources is unreliable**

Here, the most obvious shortcoming of the SIG data is the fact that users were free

to enter anything into the name field, including non-names, nicknames, fictitious

names, names of other people and companies, or unlimited permutations of their own

name or another person that they were working with. *See Daubert* Ruling, at 12. This is

the central problem upon which Martin ran aground. Throughout the decision to

disqualify Martin's opinions, Judge Hoffman outlined the known problems with the

name field data:

> Complicating the ability to aggregate user accounts was the fact that
> individual participants appear to have created user accounts under
> multiple names. James Smith might have accounts in the names of "J.
> Smith," "Jim Smith," "Smith, J.," or even a nickname, "Smitty," or a
> pseudonym, "Superman." ***The possibilities were practically endless***.

*Daubert* Ruling, at 12 (emphasis added). Unlike computer-based systems that are routinely used by legitimate business, TelexFree had no system to police, monitor, or validate the data entered, as Judge Hoffman observed:

> there do not appear to have been any restrictions on which characters a participant could enter in the name field or any process by which the information entered would have been validated as the actual name of the user account holder. *See also* TelexFree Analysis of Damages at 24, *United States v. Merrill*, No. 14-cr-40028-TSH-1 (D. Mass. Mar. 16, 2017), ECF No. 332-1 (noting that TelexFree "did not validate data"). Providing a noncomprehensive list of examples of this issue, Mr. Dennis identified tens of thousands of name field entries that contained blatantly false names such as "a a" and ". ." Dennis Rpt. ¶ 56; *see also* Dennis Tr. 274:12-276:8. Mr. Dennis also discussed finding an account under the name of "Mickey Mouse," which led to his discovery of multiple accounts under other apparently false names, including "Walt Disney" and "Team Legendary." Dennis Tr. 277:2- 282:2. When asked, Mr. Martin conceded that false names could have been entered and that he had not attempted to determine the extent to which this had occurred. See Martin Tr. 161:20-25.

(*Daubert* Ruling, at 17.)

Like Martin, Dr. Freer has made no effort to determine the extent of fake names, or to validate names with other pools of real-world data. Dr. Freer's experience, particularly with Remine, is to take high-quality data, such as property ownership data and financial institution data, and meld them together. While this *in-and-of-itself* is a challenging task for which expertise is required, it is a far cry from making any sense of data that was entered with zero controls and on its face has no presumption of reliability. An expert, in order for his opinion to be reliable and thus admissible, must perform some sort of independent verification on the data upon which his opinions rely. *See Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Penn. 2015) ("Blind adherence to data of unknown origin does not suffice in federal court.").

**2. Any assumption that some SIG data is universally correct and deserves elevated reliance while other data is fickle and can be ignored is unreliable**

Another problem is the fact that Dr. Freer admits that users could "swap" or reverse their data entries with other users for reasons that would not be apparent in the data. Dr. Freer admits that "it was common practice for recruits to use their own name while using the contact information (email address, phone number, street address, and other fields) of their recruiters, or for family members to share the same contact information, or for a business and an individual to share the same contact information." But Dr. Freer made no effort to determine the extent of this practice, or to identify when it happened and when it did not, or when the reverse happened (*i.e.* the names were reversed but the contact information stayed constant). Dr. Freer also has no empirical support for why it is reasonable to assume that on occasion users swapped email addresses, but they never swapped names. Dennis finds evidence that users routinely swapped names, but kept their contact info constant, just as users also used one or more names but swapped contact info. The presumptive reliance that one field is stable but the others are not is simply unsupported and not reliable.

**3. SIG data recorded no cash transactions between participants, and thus it cannot be used to calculate cash in and cash out**

Third, even if the Trustee's replacement expert managed to reliably aggregate unreliable data, the Trustee would still fall well short of the finish line. That is because Borelian Corp. is not being offered to address the speculative and unreliable financial shortcomings of the Trustee's analysis, namely that for 90% of the transaction, the SIG data does not record or reflect actual cash. The class members need not gild the lily:

simply put, even a reliable aggregation of user accounts still leaves open the question of whether individual users were a net winner or a net loser, and by how much. To answer that question, the Trustee will still attempt to use the SIG data to make financial calculations. But the SIG data by and large does not track dollars. Rather, the SIG system tracks the generation, transfer, and retirement of Telexfree's internal credits — credits which are the very fiction that lay at the heart of Telexfree's Ponzi scheme. The use of these credits as evidence of cash thus violates the time-honored principle that a Ponzi scheme's phantom profits are ignored, and only actual cash-in cash-out transactions are calculated. The Trustee still seeks to use the phantom credits to approximate cash. Judge Hoffman did not need to decide this issue. But the Trustee's and Dr. Freer's failure to address this issue alone necessitates summary judgment.

> **4. The Trustee has never attempted to fix the analytical deficiencies of the SIG data, and any effort to do so would be futile**

It is appropriate to remind ourselves of how we got here. In his *Daubert* Ruling, Judge Hoffman concluded that, among other serious flaws, Huron's analysis "has not shown the requisite reliability of his selection and use of the name field, which formed the basis of his opinion." This was because of the underlying data's "quality issues," which unaddressed "undermine [Martin's] position that such data is sufficient to support his opinion." (*Daubert* Ruling, at 22.)

These data quality problems doom any analysis, regardless of whether a probabilistic data linkage strategy was used or not. The use of unverified data alone presents reliability problems that are insurmountable under *Daubert*. S*ee e.g., United States v. Blechman*, 657 F.3d 1052, 1066 (10th Cir. 2011) (where AOL did not make a

meaningful attempt to verify the identity of the person who submitted the information, did not verify who input "subscriber information" and it could have been "anybody in the world who could access a computer," such information is not inherently reliable for purposes of the business exception to the hearsay rule); *United States v. Browne*, 834 F.3d 403, 410-11 (3d Cir. 2016) (where Facebook did not verify the identity of the account user, the records did not suffice to show the author of such communications, and the contents of the user-generated communications were not inherently reliable data). In our case, the user-entered data in SIG is not inherently reliable or accurate, and thus the data alone cannot be used to confirm the identity of a given Participant.

Dr. Freer's "new and improved" probabilistic analysis is still bedeviled by the age-old problem of "junk in—junk out." Not even a better meat grinder can prevent spoiled meat from becoming a spoiled hamburger. For this reason, the Trustee's insistence to exclusively rely on the SIG data, to the exclusion of any bank data, or financial analysis, has proven futile.

In his findings pertaining to the underlying data, which begin on page 11 of the *Daubert* Ruling, Judge Hoffman found serious problems with the use of underlying data that were unrelated to the selection of linkage methodology. These problems included the Trustee's own recognition that the user-entered data was "often incomplete, inaccurate, or clearly incorrect." *Daubert* Ruling, at 16 ("Participants often provided inaccurate, inconsistent, or incomplete information when opening accounts...many Participants included incomplete and/or intentionally incorrect information when registering their User Accounts"). Judge Hoffman noted examples of the anomalies in

the data, such as "phone numbers comprised entirely of letters, email addresses missing the '@' symbol and instances where only a period or an ellipsis was entered instead of other requested information." *Daubert* Ruling, at 16-17. Judge Hoffman noted that it was undisputed that "there do not appear to have been any restrictions on which characters a participant could enter in the name field or any process by which the information entered would have been validated as the actual name of the user account holder," and that TelexFree "did not validate data." *Id.* at 17. Class members' expert Joshua Dennis found "tens of thousands of name field entries that contained blatantly false names" such as "a a," ". .," "Mickey Mouse," "Walt Disney," and "Team Legendary." *Id.*

The findings led Judge Hoffman to conclude that the Trustee had failed to demonstrate the "requisite reliability" for the "selection and use of the name field." There is no evidence that indicates that any of the other data fields, used alone or together, had better quality or will offer superior reliability. While the Trustee placed significant reliance on the name field, ultimately the Trustee will still have to rely on some combination of unverified, user-entered data which cannot be defended.

As the class members have already demonstrated, the use of discordant and unverified data results in either under-aggregation, over-aggregation, or both. Mr. Dennis' manual review of the top Net Loser and Net Winner Account Aggregations suggests numerous instances of potential under-aggregation. This is highly problematic because a single missed link has the ability to (and often did) dramatically impact the Net Equity associated with Participants. (Ex. B, 2d Dennis Report, ¶¶ 70, 162-80.)

At the end of the day, Dr. Freer's analysis represents no tangible improvement over

Mr. Martin's, especially since Dr. Freer relies on Mr. Martin for determining net equity.

For all of Borelian's much-ballyhooed bells and whistles, the mere act of linking

ambiguous data without external verification is just more of the same. Judge Hoffman's

*Daubert* Ruling was (or should have been) a call to action to address the weaknesses in

the underlying data. This call went unanswered. Seven years into this litigation, the

Trustee still has not come up with a way to turn unreliable data into admissible

opinions. Summary judgment is appropriate.

## G. Without an Expert that Satisfies Daubert, the Trustee Is Unable to Stave Off Summary Judgment

Rule 56 "mandates" the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23,

106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). In such a situation, there can be "no

genuine issue as to any material fact," since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts

immaterial. *Id.*

Where claims must be supported by expert testimony, exclusion of the only expert

testimony warrants summary judgment. *See Rouviere v. DePuy Orthopaedics, Inc.*,

560 F. Supp. 3d 774, 795 (S.D.N.Y. 2021), reconsideration denied, No. 18-CV-4814 (LJL),

2021 WL 5854283 (S.D.N.Y. Dec. 9, 2021) (granting summary judgment against plaintiff

on a defective-design theory, where such theories generally require expert testimony but

plaintiff's expert had been precluded and plaintiff had no other evidence of defective design); *see also Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) ("Having determined that the district court acted within its discretion in excluding [an expert's] testimony, the plaintiff has no evidence in the record to support his theory that the motor had a design defect which caused the accident or increased its severity. As a result, summary judgment was properly granted.").

Here, the burden of proof is on the Trustee to prove his fraudulent transfer claims. *See Burdick v. Lee*, 256 B.R. 837, 839 (D. Mass. 2001); *see also In re Blast Fitness Grp., LLC*, 602 B.R. 208, 222 (Bankr. D. Mass. 2019). The Trustee is required to have expert testimony to identify alleged net winners and to quantify their alleged net winnings in this case. Because the sole evidence to satisfy both requirements was the opinions of Dr. Freer, the exclusion of Dr. Freer's opinions mandates that summary judgment be granted in favor of Class Defendants.

## <u>CONCLUSION</u>

For the reasons set forth above, the Class Defendant hereby respectfully move to exclude the expert testimony of Cameron E. Freer.

## <u>HEARING REQUESTED</u>

Class Plaintiffs respectfully request a hearing at a time convenient to the Court.

Respectfully submitted,

FRANTZ BALAN,
FOR HIMSELF AND AS CLASS
REPRESENTATIVE ON BEHALF OF
ALL DOMESTIC NET WINNERS,

-and-

MARCO PUZZARINI AND
SANDRO PAULO FREITAS,
FOR THEMSELVES AND AS CLASS
REPRESENTATIVES ON BEHALF OF
ALL INTERNATIONAL NET
WINNERS,

By their counsel,

Dated: July 21, 2023

/s/ Ilyas J. Rona
Ilyas J. Rona, Esq. (BBO# 642964)
Michael J. Duran, Esq. (BBO #569234)
MILLIGAN RONA DURAN & KING LLC
28 State Street, Suite 802
Boston, Massachusetts 02109
(617) 395-9570
ijr@mrkdlaw.com
mjd@mrdklaw.com

## CERTIFICATE OF SERVICE

I, Ilyas J. Rona, hereby certify that I have caused a copy of the foregoing Domestic &

International Class Representatives' Motion For Summary Judgment be served on

counsel for the Trustee and all registered electronic filers appearing in this case using

the Court's CM/ECF system.

Dated: July 21, 2023

/s/ Ilyas J. Rona
Ilyas J. Rona, Esq.