## AFFIDAVIT OF JOHN S. SOARES IN SUPPORT OF SEARCH WARRANTS

I, Special Agent John S. Soares, being duly sworn, state:

### Introduction

1.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I am a Special Agent with the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI").  I have served in this capacity since May 2009.  My current responsibilities include conducting federal criminal investigations, including investigations of financial fraud schemes, money laundering, and violations of the Bank Secrecy Act, and participating in operations to protect the United States from exploitation of legitimate trade, travel, and financial systems.  I have received specialized training in investigating financial crimes, money laundering, and asset forfeiture.  During my employment with HSI, I have been involved in the investigation of financial crimes, fraud schemes, money laundering, and in identifying and seizing criminally derived proceeds and property.

3.      As an agent assigned to this matter, I have personally participated in many aspects of the investigation described below.  I am also familiar with the facts and circumstances of the investigation through discussions with other HSI personnel and others, and from my review of business records, reports and other materials relating to the investigation.

4.      I submit this affidavit for the limited purpose of supporting an application for a warrant, in part under 18 U.S.C. § 2703(a), and Rule 41 of the Federal Rules of Criminal Procedure, to search and seize records and data from the following locations:

a.      An electronic storage facility maintained by Xand Corporation, also

known as Access Northeast, located at 34 Saint Martin Drive, Marlborough,

Massachusetts;

b.      An electronic storage facility, maintained by Exigo Office, Inc., located at

8130 John W. Carpenter Freeway, Dallas, Texas;

c.      The business headquarters of TelexFree, Inc., located at 225 Cedar Hill

Street, Suite 118, Marlborough, Massachusetts.

5.      The facts in this affidavit are drawn from my review of documents and data

obtained during the investigation, my training and experience, and information obtained from

other agents. This affidavit is only intended to show that there is sufficient probable cause for the

requested warrants.  It does not contain all facts relevant to this matter.

### Descriptions of the Properties to be Searched

6.      **Xand Corporation**:  Based on open source information and information provided

by James Merrill, the President of TelexFree, during sworn testimony before the Massachusetts

Securities Division on March 25, 2014,[1] Xand Corporation, a/k/a Access Northeast, is a business

that hosts data for other companies.  According to Xand's website, its Massachusetts "data

center," located at 34 Saint Martin Drive, Marlborough, Massachusetts, is one of six it maintains

nationwide.  According to Merrill's testimony, TelexFree maintains servers at Xand's

Marlborough data center; TelexFree itself owns the servers, but they are held by Xand in its

facility, where Xand can provide a secure environment and service the machines as needed.

---

[1] In March 2014, Carlos Wanzeler and James Merrill, who ran TelexFree, were deposed by the
Massachusetts Securities Division as part of that agency's separate investigation of TelexFree.  The
Securities Division ("MSD") disclosed some of its investigative materials to federal authorities after the
U.S. Attorney's Office for the District of Massachusetts made a formal request for access on March 31,
2014.

Case 16-04006  Doc 455-1  Filed 09/11/23  Entered 09/11/23 15:29:26  Desc Exhibit
Case 1:14-cr-10363-RGS  Document 24-2  Filed 09/01/23  Page 3 of 45
Affidavit of John S. Soares in Support of Search Warrants    Page 3 of 45
Page 3 of 45

According to Merrill, TelexFree, at least as of the date of his testimony, had begun the process of "migrating" data from Xand to Exigo, a company based in Texas.

7.      **Exigo Office, Inc**.:  Based on open source information and Merrill's testimony to the MSD, Exigo is a company based in Dallas, Texas, at 8130 John W. Carpenter Freeway, that markets specifically to "multi-level marketing" businesses. "Multi-level marketing" is a term for businesses that market their products through a hierarchy of people who sign up to make money pursuing that activity, and who recruit others to do so.  Certain businesses that purport to be legitimate multi-level marketing ("MLM") enterprises are in fact illegal pyramid schemes.  On its web site, Exigo touts its MLM "business platform."  In his MSD testimony, Merrill referred to Exigo as a "more friendly environment," confirmed that TelexFree has a contract with Exigo and, as above, said that TelexFree had begun "migrating" its data to Exigo.  Based on Exigo's web site, it has only one location.

8.      **TelexFree Headquarters**:  According to TelexFree's public filings and Merrill's testimony, TelexFree's business headquarters are located at 225 Cedar Hill Street, Suite 118, Marlborough, Massachusetts.  As more fully described in Attachment A, based on surveillance by federal agents, 225 Cedar Hill Street is a multi-unit, multi-story brick façade commercial property located on the east side of Cedar Hill Street in Marlborough, Massachusetts.  The number "225" is plainly visible in grey lettering and "REGUS Fully Furnished Offices" is plainly visible in blue lettering on the façade of the building.  The TelexFree offices are located on the first floor within the building; "TELEXFREE INC. Employee Entrance" in white and blue lettering, as well as the company logo, is plainly visible on the glass door to the office.  According to Merrill's sworn testimony, TelexFree's business is run out of Suite 118 of the building, although the business "used to be upstairs in the Regus Suite, Suite 200."  Merrill

explained that the initial space became too small for the company's operations, and that the new

area "downstairs" at Suite 118 had about 4,500 square feet.  Merrill described the new space as

having about 12 "individual spaces" and five "executive offices," a conference room and a

training area.  The headquarters appears to employ about 30 people.[2]

9.    With regard to the search warrants to be executed at Xand and Exigo above, I am

informed that warrants issued under 18 U.S.C. § 2703 do not require an officer to be present for

service or execution of the search warrant.  *See* 18 U.S.C. § 2703(g).[3]  If the Court issues the

warrants,

a.    As to Xand, because it appears that TelexFree itself owns the servers

maintained at Xand's Marlborough location and that, therefore, those servers are

discrete storage devices containing only TelexFree data, the government intends

to have agents serve the warrant on Xand personnel and, at that time, take

physical possession of TelexFree's servers.[4]

b.    As to Exigo Office, Inc., to minimize the level of government intrusion,

the United States does not intend to execute that warrant by entering Exigo's

Dallas office location, but by serving a copy of the warrant on Exigo and awaiting

production of the requested data.

---

[2]  "[W]e were able to re-engineer some [of the 12] cubicles to fit 30 people in the same area that there is 12."

[3]  Section 2703(g) says that "[n]otwithstanding § 3105 of this title, *the presence of an officer shall not be required for service or execution of a search warrant* issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service."  (Emphasis added.)

[4]  The government seeks authorization for the search warrant on Xand pursuant to both Federal Rule of Criminal Procedure Rule 41 and 18 U.S.C. § 2703.

10.     The rest of this affidavit is organized as follows:  The first section below explains TelexFree's operations and why TelexFree is operating a pyramid scheme in violation of 18 U.S.C. §§ 1343 & 1349.  The second section further discusses the nexus between the properties to be searched and TelexFree's illegal activities.

**Allegations Pertaining to Probable Cause to
Believe that TelexFree is a Pyramid Scheme**

I.      <u>Overview</u>

11.     TelexFree, Inc., and TelexFree LLC (collectively, "TelexFree") ostensibly provide "voice-over-internet-protocol" ("VOIP") telephone services, for which customers can sign up via a web site maintained by TelexFree.  Based on our investigation, however, TelexFree is actually a pyramid scheme.

12.     Based on my training and experience, and generally speaking, a pyramid scheme involves a seemingly legitimate business that purports to sell a product but actually derives its revenue not from selling the product to third parties but from recruiting new participants to pay into the system.  The hallmark of these schemes is a promise of substantial returns in a short period of time for doing little beyond paying into the organization and convincing others to do the same.

13.     People operating pyramid schemes usually go to great lengths to layer the program with jargon, procedural complexities, a formalized hierarchy of participation, and other trappings that create the appearance of a legitimate company pursuing a (legal) multi-level marketing program.  But, as in "Ponzi"-type schemes, the organizers simply take in money from newly-invested participants and use those funds to pay the returns promised to earlier participants.

14.     Again like Ponzi schemes, pyramid schemes are ultimately unsustainable because the returns promised to an ever-growing number of participants must be paid using funds deposited by a necessarily finite pool of new participants.  At some point the scheme must become too big, that is, it must run out of new participants depositing sufficient cash to cover commitments to earlier participants and, because the underlying product is not in fact profitable, most of the scheme's participants lose their money.

15.     In this case, between about January 2012 and March 2014, TelexFree purported to aggressively market its VOIP service by recruiting thousands of "promoters" to post ads for the product on the internet.  Each promoter was required to "buy in" to TelexFree at a certain price, after which they were compensated by TelexFree, under a convoluted compensation structure, on a weekly basis so long as they post ads for TelexFree's VOIP service on the internet.  What TelexFree failed to disclose, however, was that it was not concerned with advertising the VOIP service; the ad-posting requirements were a meaningless exercise, in which promoters cut and paste ads into various classified ad sites provided by TelexFree and already saturated with ads posted by earlier participants.

16.     Meanwhile, as TelexFree's bank records and "back office" business data attest, it derived a miniscule amount of revenue from sales of VOIP service – less than 1% of TelexFree's hundreds of millions of dollars in revenue over the last two years.  The overwhelming majority of its revenue – the other roughly 99% – came from new people buying into the scheme.  In fact, TelexFree was only able to pay the returns it had promised to its existing promoters by bringing in money from newly-recruited promoters.

17.     On or about March 8, 2014, TelexFree announced changes to its compensation system that appear to have been prompted by an investigation by the Massachusetts Securities

Case 16-04006  Doc 455-1  Filed 09/11/23  Entered 09/11/23 15:29:26  Desc Exhibit
Case 1:15-cr-10338-FDS  Document 821-1  Filed 08/04/16  Entered 09/04/16 Page 7 of 45
Page 8 of 45
Affidavit of John S. Soares in Support of Search Warrants    Page 7 of 45

Division.  Based on a review of video clips on YouTube, Steven Labriola, who is a TelexFree senior executive, openly admitted to TelexFree promoters that the changes were necessary "to come into compliance."  Soon after the changes were announced, promoters began protesting at TelexFree's Marlborough Massachusetts headquarters at 225 Cedar Hill Street, because the new system required them to actually sell TelexFree's VOIP product and, as one promoter told a news reporter, "It's almost impossible to sell."

18.     On April 14, 2014, the TelexFree scheme collapsed:  TelexFree and its related entities filed for voluntary Chapter 11 bankruptcy protection in the District of Nevada (No. 14-12524-ABL).  In a declaration filed in the bankruptcy proceeding on behalf of the company, the company said, among other things, that it changed its compensation plan in March 2014 "[b]ecause questions were raised" about the prior plan.  TelexFree also admitted that it was entering bankruptcy because, after changing the compensation plan, "These discretionary payments [that is, payouts to current investors] quickly became a substantial drain on the Company's liquidity."  That is, once new investor dollars stopped coming in, TelexFree was unable to pay its current investors, a hallmark of collapsing Ponzi or pyramid schemes.

19.     The day of the bankruptcy filing, TelexFree's web site, which all TelexFree promoters use to manage their accounts and transfer funds paid to them by TelexFree, became inoperative, with a screen posting by the company notifying its investors that the situation was temporary and that TelexFree looked forward to reorganizing and continuing to do business.

Case 16-04006  Doc 455-1  Filed 09/11/23  Entered 09/11/23 15:29:26  Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants  Page 8 of 45
Case 1:14-cr-10015  Document 2-1  Filed 02/04/14  Page 71 of 557  Exhibit
Page 8 of 45

## II.    **The Brazilian Investigation of TelexFree**[5]

20.    In June 2013, open-source query about TelexFree revealed that it was under investigation by law enforcement authorities in Brazil, where TelexFree was originally based. Documents provided by Brazilian law enforcement authorities showed that they had concluded that TelexFree was a pyramid scheme, operating with the same modus operandi later used in the United States (that is, that the company ostensibly provided VOIP services, but in fact derived revenue principally from new promoter buy-in fees).  The Brazilians also determined that Carlos Wanzeler, James Merrill, and Carlos Costa were connected to the Brazilian entity.  For example, in 2010, Wanzeler registered a company in Brazil named "Ympactus," which began doing business as TelexFree in 2012.

21.    The Brazilian investigation resulted in the Brazilian government suing TelexFree in June 2013, including seeking an injunction prohibiting TelexFree from recruiting new promoters and from taking in funds or paying money to existing TelexFree promoters. As of the date of this affidavit, the Brazilian injunction is still in effect.  Also, according to sworn testimony provided by Carlos Wanzeler to the MSD, the Brazilian government has also frozen about $350,000,000 in funds that apparently belongs to TelexFree.

22.    Records from the Brazilian Ministry of the Treasury showed that, since TelexFree began recruiting promoters in Brazil in 2012, TelexFree bank accounts in Brazil had received about $446,000,000 in U.S. dollars. The records also noted that on February 19, 2013, TelexFree's Brazilian bank balances totaled over $200,000,000.  The Brazilian Ministry of Treasury materials also showed that transfers were made from TelexFree bank accounts to

---

[5] At this point, TelexFree has been investigated and prohibited from operating in several countries, including Rwanda, the Dominican Republic, and the British Crown Dependencies of Jersey and Guernsey.

Brazilian bank accounts belonging to Wanzeler, and from there to U.S. accounts in Wanzeler's name. Wanzeler's transfers to U.S. accounts totaled about $3,500,000.

23.     As discussed further below, a review of filings by U.S. banks for TelexFree's banking activity in 2012 – 2013 showed a pattern similar to the activity uncovered in Brazil: significant sums deposited to TelexFree accounts, generally in small amounts, which were rapidly disbursed, again in small amounts.  Meanwhile, little of the money appeared to be derived from selling a product to third parties.

### III.    TelexFree's Corporate Structure in the United States and Its Relationship with Other Entities

24.     According to incorporation paperwork on file with the State of Massachusetts and other states, Carlos Wanzeler and James Merrill own and operate a U.S. company called TelexFree, Incorporated, and related entities.

25.     Through a query on the Commonwealth of Massachusetts, Secretary of State's website I learned that TelexFree was originally known as "Common Cents Communications." Common Cents Communications was incorporated in Massachusetts in December 2002 and listed Carlos Wanzeler as President and James Merrill as Treasurer.  In February 2012, Common Cents Communications filed an article of amendment with the Massachusetts Secretary of State, changing the name of the corporation to "TelexFree, Inc."  The article of amendment was filed by Carlos Wanzeler in his capacity as President.  In October 2012, TelexFree, Inc., filed an annual report with the Massachusetts Secretary of State, in which Wanzeler and Merrill were listed as the sole officers and directors of the company. The incorporation documents for TelexFree list a corporate address of 225 Cedar Hill Street, Suite 200, Marlborough, Massachusetts.

Case 1:14-cr-00064 Document 22 Filed 07/02/14 Page 73 of 157

26.     In July 2012, another entity named "TelexFree" was registered as a limited

liability company ("LLC") in the State of Nevada. The company listed Carlos Wanzeler, James

Merrill, and another man as officers of the LLC.  In April 2013, TelexFree LLC filed an

application for registration as a foreign limited liability company with the Massachusetts

Secretary of State.  With that application, James Merrill filed a letter of consent for TelexFree

LLC to use the name "TelexFree" in Massachusetts, and signed it in his capacity as President of

TelexFree, Inc. (it is not clear when Merrill replaced Wanzeler as President, if that in fact

occurred).

27.     In testimony before the MSD in March 2014, both men confirmed their leadership

positions at TelexFree and that each of them owns 50% of the company.

28.     It appears that TelexFree is also intertwined with other entities, as summarized

below.  The government seeks authorization to review materials pertain to these additional

entities, because they may in fact contain evidence related to the activities of TelexFree,

Wanzeler, Merrill, and/or other co-conspirators.

29.     On October 10, 2007, Brazilian Help, Inc., was registered as a corporation in

Massachusetts.  Wanzeler is listed as the president, treasurer, secretary, and director of that

entity, and its principal office is 225 Cedar Hill Street, Suite 200, Marlborough, MA 01742 – the

same as that listed for TelexFree.

30.     On March 26, 2014, in sworn testimony before the MSD, Wanzeler described the

relationship among several entities, including Brazilian Help, TelexFree, Inc., and TelexFree

LLC, and others called Diskavontade, Ympactus, and TelexFree Financial.  Wanzeler testified

that in or about 2002 he formed Brazilian Help, Inc., which does business under the name

Diskavontade.  Wanzeler is the president and owner of Diskavontade, and both Wanzeler and

Case 16-04006  Doc 455-1  Filed 09/11/23  Entered 09/11/23 15:09:26  Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants   Page 11 of 45
Case 1:15-cr-40085-TSH Document 25  Entered 09/02/15  Page 74 of 157
Page 11 of 45

Merrill receive profits from Brazilian Help, Inc./Diskavontade.  According to Wanzeler,
Brazilian Help, Inc./Diskavontade provided VOIP service and used a compensation structure that
encouraged company promoters to recruit both customers and new promoters.  Wanzeler then
described the relationship between TelexFree and Diskavontade as "the same company for me."
In an additional entanglement, on or about December 2007, Brazilian Help, Inc., entered a
contract with iBasis, a carrier of international voice traffic, for VOIP services.  At some point
between 2007 and August 2013, the contract was modified to substitute TelexFree for Brazilian
Help.

31.     During his testimony, Wanzeler also discussed "Ympactus," which he described
as the Brazilian incarnation of TelexFree; both companies shared the web site
www.telexfree.com.  Wanzeler described Ympactus as using the TelexFree brand name in
Brazil.

32.     When asked to describe the TelexFree corporate structure, Wanzeler stated,
"Yeah, we have a TelexFree LLC in Nevada and we have a TelexFree Inc. and we have a
TelexFree International we never use 'cuz everything comes to LLC and the Inc. and we have
Ympactus in Brazil, that's construction."  Wanzeler went on to state the he has an ownership
interest in each entity and that the only other individuals with an ownership interest in them are
Merrill and another man.

33.     The relationships among TelexFree, LLC; TelexFree, Inc.; and TelexFree
Financial are equally interwoven.  Wanzeler testified that TelexFree Financial was created to pay
the employees of TelexFree LLC and TelexFree, Inc., because they "have so many problems
with the bank."  Wanzeler testified, "We open company called TelexFree Financial just to pay
our bills."  Wanzeler went on to say that, "TelexFree Financial was opened not too long ago,

Case 16-04006 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:29:25 Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants Page 12 of 45
Case 1:14-cr-40028-TSH Document 2-5 Filed 07/02/15 Page 25 of 57
Page 12 of 45

okay, TelexFree Financial is open because the problem we have in the banks and if all our bank

shut down by TelexFree we need some bank; you know, we try get some place we can pay our

employees, pay our debt, you know, and that's what TelexFree – TelexFree Financial will just let

you guys know that it's another TelexFree company."

**IV.** **TelexFree's U.S.-Based Business Operations**

34.     TelexFree maintains a website, www.telexfree.com. An internet registry search

showed that the name was registered by Diskavontade, a company operated by Wanzeler.  Again

based on open-source domain name registries, in 2008 Wanzeler registered the domain name

www.diskavontade.com and, based on his testimony before the MSD, he is the president and

owner of that entity.

35.     As further discussed below, TelexFree's VOIP product, usually called

99TelexFree, could be bought directly through the TelexFree site or the websites TelexFree

provides to its promoters.  A few factors, however, distinguish TelexFree and its product from

the operations of a legitimate company:

> a.      The product, however, appears poorly designed for actually securing and
>
> keeping customers.
>
> b.      The way TelexFree compensated those who signed up to "promote" the
>
> VOIP product had little or nothing to do with actually *selling* the VOIP product,
>
> and the compensation system was not based on a sustainable business model.
>
> c.      An analysis of the bank and credit card processing accounts behind
>
> TelexFree's publicly-stated income and revenue figures shows that TelexFree was
>
> deriving less than 1% of its revenue from its VOIP products, about 99% from
>
> investments by new promoters, and that it could not meet its massive payment

Case 16-04006 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:29:26 Desc Exhibit
Case 1:14-cr-40028 Doc 6-2 Filed 04/04/14 Entered 04/04/14 Page 76 of 57 Exhibit
Affidavit of John S. Soares in Support of Search Warrants    Page 13 of 45
Page 13 of 45

obligations to existing promoters without equally large infusions of cash from

new promoters.

d.        TelexFree's public statements, including statements and instructions to its

promoters, consistently omitted the fact that TelexFree's survival, and so

promoters' profits, depended on a constant influx of new promoters, and not on

selling the VOIP product.

36.    These facets of TelexFree's operations, which were typical of pyramid schemes,

are discussed below.

A.    **The Product TelexFree Purports to Sell**

37.    The 99TelexFree product allows the user to make Internet-based long distance

calls to foreign countries.  It is downloaded by the purchaser and installed on a computer (or,

more recently, on a smartphone), after which the purchaser registers his phone number with

TelexFree. The purchaser can then call a local access number from the registered phone number.

When the TelexFree system recognizes a call by a registered phone number, the purchaser is

alerted by a new dial tone and can then complete an international call.

38.    The process for buying TelexFree's VOIP service is exceptionally cumbersome,

and not indicative of a genuinely competitive product, that is, of a product that a genuine retail

customer would prefer over readily available competing services.  On April 9, 2014, an HSI

agent acting in an undercover capacity ("UC2"),[6] bought a TelexFree VOIP package from

www.telexfree.com.  The initial steps in the process took over two hours.

39.    UC2 was first required to provide his/her name, date of birth, Social Security

number, cellular telephone number, email address, and mailing/billing address, and to create a

---

[6]  The activities of the initial undercover agent working on this investigation are discussed below.

log-in name and password.  He/She then entered a telephone "number of origin," so TelexFree

could determine which local access numbers the new customer should use.

40.     The TelexFree site then created an invoice for $49.90 for the VOIP purchase.

But to pay that invoice, the site required UC2 to create an "eWallet," and to follow the same

process summarized above – entering extensive personal information and generating a log-in

name and password.  The site then required UC2 to validate his/her credit card by scanning and

uploading to the TelexFree site a copy of his/her driver's license and credit card, and to complete

a credit card authorization form and a "pre-authorization validation" in which TelexFree tested

the credit card by making "a small random temporary charge on your credit card account."  A

disclaimer during the validation process warned that UC2 should "please allow 1 to 2 business

days to process your document."[7]

41.     Beyond credit card sales, it appears that a customer could buy the VOIP service

by paying the $49.90 monthly fee to a promoter, after which TelexFree subtracts that amount

from what TelexFree owes the promoter in "buy back" fees or commissions (discussed below).

It is unlikely, however, that significant retail sales of 99TelexFree to genuine third party

customers are accomplished in this manner.  First, the site itself allows for the use of a credit

card for payment, an especially likely option in scenarios, like this one, where automatic monthly

payments are needed.  Second, paying via a promoter – instead of simply paying the site itself –

implies a level of familiarity and trust between the promoter and the new customer, that is, that

the promoter knows the customer, who apparently is willing to give the promoter $49.90 a

month.  Anyone paying for the VOIP product in that manner – even assuming they actually use

---

[7]  Signing up for competing sites providing similar services, like Skype, takes a matter of
minutes.

Case 16-04006  Doc 45-1  Filed 09/11/23  Entered 09/11/23 15:29:26  Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants    Page 15 of 45
Case 1:14-cr-40028  Document 25  Filed 09/11/23  Page 15 of 45

the product instead of simply buying it to satisfy TelexFree eligibility requirements – is most likely a newly-recruited promoter.

### B.    The Compensation Structure – Making Money Without Selling Anything

42.    The TelexFree site, www.telexfree.com, explains how TelexFree compensates participants.  TelexFree instructional videos, available on YouTube and perhaps other sources, also describe the numerous ways TelexFree pays its promoters.  From approximately March 2012 to September 2012, the TelexFree site contained a "promoters" link that told potential promoters that they could, "Earn money doing announcements on Internet!"   That is, the site told potential investors that, after an initial investment in the company, they could make money for a year without selling any of TelexFree's VOIP services, but simply by posting ads for the product.  For example, in the summer of 2012 the website said, in part, the following:

> Be our promoter
> Earn money doing announcements on Internet!
> Through a ADCENTRAL, that you geot [sic] for the amount of US$299 (annually).
>
> The promoter will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday.  All in a way fast, easy, and standardized in your virtual office (BO) Telexfree.
>
> This will be for the 52 weeks of the year, of your contract, then see the simulation:
>
> 52 weeks x $20 (Putting the 7 announcements) = $ 1,040 in the year

43.    The TelexFree site also contained a link, next to a photograph of James Merrill, that read, "See our opportunity presented by our President James Merrill."  This link connected to a downloadable PowerPoint presentation.  The presentation encouraged people to sign up as promoters and "*Earn money the smart way! Without having to invite anyone, without selling*

Case 1:15-cv-04054   Document 1   Filed 09/02/15   Page 79 of 217

*anything in the comfort of your own home.*"  (Emphasis added.)  It went on to explain that by placing one advertisement for TelexFree a day a promoter could earn $20 per week, $80 per month, $1,040 per year, and $741 in net profit per year.  The presentation encouraged potential promoters to join under an "AdCentral Family Plan" (explained further below).  This plan required an initial $1,375 payment, after which the promoter must publish five advertisements per day, every day.  A promoter who published five ads each day would receive $100 per week, $400 per month, $5,200 per year, and a net profit of $3,825.

44.     During his sworn testimony before the MSD, Merrill confirmed that, beyond the PowerPoint presentation being available on TelexFree's site, promoters used the presentation themselves to show others how to make money with TelexFree.

45.     An analysis of the TelexFree site, made while the original compensation system was operating (about January 2012 to March 2014), showed that when a promoter joined TelexFree he was required to have a user name to access the "back office" area of the site.  This was the area from which TelexFree promoters managed their sales activities. Once a promoter accessed the "back office," he was able to copy advertisements already prepared by TelexFree, after which the promoter pasted those pre-made ads into various other websites that allowed free "classified" advertising.  TelexFree provided the links to those sites; the promoter could post the ads to whichever of these sites he chose.

46.     After posting an ad, the promoter submitted a link to the advertisement's internet protocol ("IP") address to TelexFree, which then verified that the ad was placed.  If a retail customer then decided to make a purchase of the 99TelexFree product from that IP address (that is, linking through that ad), TelexFree would have a record of which promoter posted the ad.

Case 16-04006 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:29:26 Desc Exhibit
Case 1:14-cr-40028-TSH Document 25-1 Filed 07/21/14 Page 17 of 45
Affidavit of John S. Soares in Support of Search Warrants    Page 17 of 45

47.     For purposes of illustration, if someone bought into TelexFree and selected the user name "Bambi," when a retail customer tried to buy the 99TelexFree VOIP product from an ad placed by "Bambi," the purchase would link the retail buyer to www.telexfree.com/Bambi. The promoter would then be notified in the back office that somebody had purchased a VOIP product or signed up as a promoter through his or her website, and the promoter would receive credit for that sale.

48.     I and other agents, on multiple dates, have reviewed the sites to which TelexFree directed its promoters to posted advertisements.[8]  An understanding of this ad-placing activity is important to understanding the fundamentally fraudulent nature of TelexFree as a business. These sites, each of which allowed people to post small ads for free, bear hundreds of ads for TelexFree, all of which are essentially identical.  A "screen shot" of a typical site, retrieved by HSI personnel investigating this matter, appears below:

---

[8]  The sites include www.epage.com, www.zamzata.com, www.snnap.com, www.zikbay.com, www.classifiedgiant.com, www.citynews.com, www.adpost.com, www.freeclassifieds.com, www.wantedwants.com, and www.freeadsplanet.com.  In November 2013, TelexFree began referring its promoters to a site called www.telexpub.com.  A review of publicly-available site registry information shows that whoever registered that site chose to make their participation anonymous by using the service Domains by Proxy which, for a fee, substitutes itself as the named registrant.  As of this date, we have not yet received additional information about the true registrant for the site.



Posting ads to sites like these, which already bear hundreds of nearly identical ads, in reality

could have done nothing to promote TelexFree's VOIP product. Moreover, promoters were

*prohibited* from posting TelexFree ads on any site besides the ones provided by TelexFree.

Finally, according Merrill's sworn testimony before the MSD, no promoter ever even asked the

company for permission to do so. During the investigation, investigating agents have not found

TelexFree advertising in other venues in which competing services, or Internet-businesses

generally, advertise, which further indicates that actual advertising and product sales were not

TelexFree's primary concern.

49.     The sum of these factors is that TelexFree's ad-posting appears to have been

busywork, designed to disguise what TelexFree was really offering its hundreds of thousands of

promoters: a guaranteed return on an initial investment, financed by funds from later investors,

for doing essentially nothing. Cutting and pasting ads from TelexFree's site to one of the above

sites which, even if performed five times a day took about two minutes to accomplish, was
intended to mask this dynamic.

### C.  The Compensation Structure – Individual Earnings

50.    Overall, between in or about January 2012 and early March 2014, TelexFree's
compensation structure appeared needlessly opaque and, like the ad-posting exercises described
above, had no obvious business rationale.  Based on my training and experience, these are typical
aspects of pyramid schemes.

51.    Between about January 2012 and March 2014, a person bought into the company
using cash, credit card, Internet-based payment processor (like PayPal), cashier's check, or
money order, and could make the payment directly to TelexFree, or to a promoter who recruited
the new participant.  As discussed below, there were three buy-in levels available and, after
buying into the company, a new participant could be compensated as an individual, or as part of
a "team," earning additional money by recruiting new promoters.  As to the buy-in levels, the
greater the investment by the promoter, the higher the return.

52.    The information below is based on a review of the TelexFree site, YouTube
postings by TelexFree personnel and various promoters; and conversations between an HSI
undercover agent and a successful TelexFree promoter (discussed further below).

### 1.    *The Initial $50 Buy-In for All Members*

53.    All new promoters were required to first pay a $50 membership fee.  After paying
the fee, TelexFree would set up a new "back office" site for that user.  After paying this fee, the
user then had the option of buying two different "AdCentral" packages, priced at $289 and
$1,375.

## 2. *The $289 Buy-In Level (Ad Central)*

54.     At the $289 buy-in level,[9] however, the promoter was compensated *regardless* of whether there were any retail sales of the VOIP product.  The company called this plan "Ad Central." As with the $50 buy-in, TelexFree provided ads and free websites on which to post the ads.  In the event of a retail sale based on one of those ads, the promoter received a 90% commission, that is, $44.99 out of the $49.99 the retail customer paid for the first month of TelexFree's VOIP service.  As in the $50 buy-in, if that retail customer renewed on a monthly basis, that Ad Central promoter earned an additional 10% commission each time.

55.     In the Ad Central plan, the company provided the promoter a "stock" of ten VOIP products to sell that week, and then each week thereafter for 52 weeks. But there was no physical product – for example, no CD or DVD containing the 99TelexFree product, or a software key for downloading it.  There was only an entry in the TelexFree virtual "back office" listing the stock "available" to the Ad Central promoter.  Moreover, if an Ad Central promoter posted ads for seven consecutive days, the company agreed to "buy back" any unsold stock from the promoter for $20, and to continue to do so every week for a year.  This was even though the promoter paid no money to TelexFree for the stock in the first place.

56.     In short, an investment of $350 (the Ad Central promoter's initial buy-in amount), results in an annual return of $1,040 ($20 x 52)– without selling a single VOIP product – so long as the promoter posted advertisements, among the hundreds of pre-existing advertisements, on a site identified by TelexFree.

---

[9]   The cost of this buy-in level may have changed slightly over time.  For example, according to Merrill's TelexFree PowerPoint presentation discussed above, the cost for this level was at some point $299.

Case 16-04006 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:29:26 Desc Exhibit
Case 1:14-cr-40028-TSH Document 2-1 Filed 03/03/14 Page 21 of 45
Affidavit of John S. Soares in Support of Search Warrants Page 21 of 45
Page 21 of 45

### 3.     *The $1,375 Buy-In Level (Ad Central Family)*

57.     The third buy-in level, which required an investment of $1,375,[10] was called Ad Central Family.  At this level the scheme operated the same way as the $350 Ad Central buy-in, but TelexFree gave the promoter a "stock" of 50 VOIP products (instead of 10), and instead of placing one ad per day the promoter had to place five ads per day.  At the end of the seven day period, the company would then "buy back" the unsold stock from the Ad Central Family promoter for $100, and continue to do so for the remaining 51 weeks.

58.     In short, if someone paid TelexFree $1,425 to become an Ad Central Family promoter, and then cut and pasted five ads per day, for seven days, from TelexFree's site to another site, TelexFree would pay that person an annual return of $5,200, regardless of the fact that the promoter has not sold a single VOIP product.

### D.     <u>The Compensation Structure – "Team" Earnings</u>

59.     The "Ponzi" or "pyramid" aspect of TelexFree was magnified by its offer of "team" earnings.  As is typical of pyramid schemes, the company's language for describing the compensation that could be earned by recruiting new members was confusing and ambiguous, using jargon like "uni-level compensation," "binary earnings," "cycle bonus," and "team builder bonus."  In practice, the plan undergirded a pyramid compensation structure, in which people were incentivized to recruit other people, who then recruit additional people, and so on, while no one level of participants needed to make genuine retail sales to make money.

60.     To qualify for the various team-based income streams TelexFree made available, TelexFree required a promoter to make at least one retail sale of the 99TelexFree VOIP product.  Merrill's TelexFree PowerPoint presentation, noted above, and various YouTube videos by

---

[10]   As above, this amount appears to have changed slightly over time.

Case 16-04006   Doc 455-1   Filed 09/11/23   Entered 09/11/23 15:29:26   Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants   Page 22 of 45
Case 1:15-cr-10338-FDS   Document 82   Filed 09/02/15   Page 22 of 39

TelexFree and TelexFree promoters, advised new promoters to make up a new user name and simply buy the product themselves to get credit for making a retail sale.

### 1. *"Binary" and "Uni-Level" Compensation Pyramids*

61.     The first method of team earnings came from the direct recruitment of new promoters.  For each direct recruit who bought in at the Ad Central level ($350), the recruiting promoter got a $20 "fast start" bonus. For each direct recruit who bought in at the Ad Central family level ($1,425), the bonus was $100.

62.     YouTube videos the government has reviewed that explain the TelexFree compensation structure discussed a "binary" system, meaning that each promoter had two streams of recruits below him, a "left side" stream and a "right side" stream. To maximize compensation, the promoter had to ensure that both the left side and right side had *their own* recruits. For example, when a promoter ("Al") recruited a new promoter ("Ben"), Al could place Ben into Al's left or right side stream.  Assume Al placed Ben on Al's left side stream.  If Al recruited another person ("Chuck"), Al would then want to place Chuck in Al's right side stream, which would make Al eligible for a "cycle bonus" payment of $20 if both Ben and Chuck joined as Ad Central promoters, or of $80 if Ben and Chuck joined as Ad Central Family promoters. TelexFree would pay Al up to 22 cycle bonuses for Ad Central recruits each day, so if Al hosted an event and managed to sign up 44 Ad Central promoters, Al would receive a cycle bonus of $440  in addition to an $880 quick start bonus.  If Al recruited only Ad Central Family promoters, the company would pay up to 768 cycle bonuses per day, for a daily maximum cycle bonus of $15,360.

63.     To continue the left/right example, if Ben, who was recruited by Al, himself recruited a new promoter ("Dan"), Dan would appear on Al's left side stream and Ben, in turn,

would be able to choose whether Dan should appear in Ben's left or right side stream. If Chuck
was able to recruit a new member ("Ed"), Ed would appear on Al's right side stream. Al would
earn an additional $20 (or $80 at the Ad Central Family level) cycle bonus for the people
recruited by Ben and Chuck, even though Al did not recruit them himself.

     64.    The YouTube videos explaining the TelexFree compensation structure also
discuss "uni-level" compensation. This form of compensation was tied both to selling the
99TelexFree VOIP product and to the recruits beneath a promoter in the binary plan above. As
discussed above, each individual AdCentral or AdCentral Family promoter posted free ads on the
Internet, supposedly in an effort to bring in retail sales of 99TelexFree. When a promoter failed
to make any retail sales, TelexFree "bought back" the unsold stock for $20 (Ad Central), or $100
(Ad Central Family). In the uni-level compensation scheme, TelexFree paid a promoter an
additional 2% commission on each "buy back" for each recruit beneath him in his binary stream.
For recruits who bought in at the Ad Central level, the promoter earned $.40 each week a recruit
failed to sell any 99TelexFree products, and for recruits who bought in at the Ad Central Family
level, the promoter earns $2.00 each week. The uni-level payment system paid the original
promoter for buy backs going six levels deep.

     65.    According to YouTube videos posted by promoters (and corroborated by a
promoter who discussed compensation with an HSI undercover agent), promoters could benefit
from yet another form of "uni-level" earnings when recruits in their right or left side streams
actually sold the 99TelexFree product. As noted above, 99TelexFree VOIP service was billed
monthly at $49.90, and the Ad Central promoter making the direct sale earned a 90%
commission on that amount in the first month. Each promoter in the binary stream above the
direct seller earned a $.99 commission for each sale by a promoter in his binary stream and for

Case 1:16-cr-10095 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:29:26 Desc Exhibit
Case 1:14-mj-04085-JGD Document 2-1 Filed 04/02/14 Page 97 of 157
Affidavit of John S. Soares in Support of Search Warrants    Page 24 of 45
Page 24 of 45

each monthly renewal.  This form of uni-level compensation paid the original promoter for retail sales five levels deep.

66.    The "binary" and "uni-level" systems created powerful financial incentives for promoters to recruit additional promoters, but essentially no incentive to sell TelexFree's purported VOIP product.  As described above, promoters could make substantial profits without selling a thing, but merely by recruiting others to buy into the system.

### 2.    *"Team Builder" Bonuses*

67.    TelexFree's also provided "team builder bonus" compensation. To qualify for this compensation, a promoter must have made five retail sales of the 99TelexFree VOIP product, must have directly recruited 10 AdCentral Family promoters, and each of those recruits must have themselves also made five retail sales of 99TelexFree. The maximum bonus available as a team builder was $39,600.

68.    It appears that, in certain instances, promoters have simply bought into the TelexFree system as team builders.  That is, they themselves bought 11 AdCentral Family positions (theirs, plus the 10 they are required to "recruit") and the required five VOIP packages. For example, on one check reviewed as part of our analysis of TelexFree's bank accounts, a participant paid in $15,675 and wrote in the memo line, "team builder."

### E.    **Corroborating Information from Undercover Activities**

69.    During the investigation, law enforcement arranged to have him/herself recruited as a TelexFree promoter, to confirm how portions of the TelexFree system operated.

70.    On October 15, 2013, an HSI task force officer working in an undercover capacity ("UC") met with a TelexFree promoter ("Person A").  During the conversation, Person A told the UC that the UC could make $100 a week using an "Ad Central Family Package" to post

online ads for TelexFree, and could earn additional money by recruiting other people to join TelexFree. Person A drew out for the UC a diagram showing how "binary" recruitment would work.

71. The UC met Person A again the next day, and successfully joined TelexFree as a new promoter. The UC bought the Ad Central Plan for $1,425 (a $50 membership fee plus $1,375 for the AdCentral package), using a check made payable to the Person A. Person B, an associate of Person A, helped the UC register and verify the UC's new TelexFree "back office" account. This consisted of entering a name, date of birth, Social Security number, cellular telephone number, email address, and mailing/billing address. In order to access the back office, the UC created a unique log-in name and password.

72. Starting on October 21, 2013, using the UC's access to the TelexFree system, an HSI Intelligence Research Specialist placed online advertisements as a promoter for TelexFree. Following the system discussed above, the Specialist copied advertisements created by TelexFree and made available to her in the back office area of TelexFree's site, and pasted them to another website TelexFree recommended. As required under the Ad Central Family plan, the Specialist did this five times a day. The entire process took about 25 minutes per day.

73. Between October 21, 2013, and the date of this affidavit, the Specialist posted more than 700 advertisements. The ads have resulted in no retail sales of TelexFree's VOIP product. As described above, the sites on which these ads were posted contained page after page after page of hundreds of nearly identical ads placed by various TelexFree promoters for the identical VOIP service.

74. During a conversation with Person A on November 2, 2013, Person A told the UC that the UC did not need to sell TelexFree's VOIP product in order to make money, but just post

Case 16-04006 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:29:26 Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants    Page 26 of 45
Case 1:14-cr-04002 Doc 4082-1 Filed 08/02/16 Entered 08/02/16 15:59:59 desc7 Exhibit
Page 26 of 45

ads.  This is in keeping with Merrill's PowerPoint presentation on TelexFree's site, discussed

above.  Similarly, in a meeting on December 2, 2013, Person A told the UC that, since July 2012,

he had earned $1,600,000 as a TelexFree promoter, without selling a TelexFree product.

75.    On December 6, 2013, the Specialist set up an "electronic wallet" (or "eWallet")

through the TelexFree back office.  On January 14, 2014, an undercover bank account was linked

to the eWallet and, since that date, the account has received payments from TelexFree for the

posting of advertisements.

76.    In light of the above, from a business standpoint the TelexFree business model

was nonsensical unless it was a pyramid scheme.  There is no legitimate business model that can

sustain "giving" inventory to it sellers at no cost; limiting advertising to a handful of classified ad

sites already saturated with company ads; paying promoters a 90% commission on initial retail

sales; "buying back" from promoters the unsold stock that had been provided for free in the first

place; and finding ways to compensate promoters even more for recruiting other promoters.

77.    As discussed further below, this is confirmed by an analysis of TelexFree

revenues; did not make substantial revenue from sales of the VOIP product.  TelexFree was

nonetheless able to meet its massive payment obligations to existing promoters for some time,

and it was only able to do that because it continuously brought in considerable investment dollars

from new promoters.

### F.    TelexFree's Revenue

78.    Among the documents the government has reviewed are profit and loss statements

and balance sheets for both TelexFree, Inc., and TelexFree LLC, which TelexFree had provided

to the MSD.  The government has also reviewed financial information TelexFree submitted to

various state regulatory agencies, including Idaho, Washington, and Tennessee. There are
various inconsistencies among these submissions.

79.     In April 2013, a lawyer for TelexFree, Inc., and TelexFree LLC submitted to
MSD a profit and loss statement for TelexFree, Inc., for the year 2012, followed by another
version in February 2014. The figures on the two statements differ substantially; for example,
the April 2013 statements listed about $1.8 million in total income for TelexFree, Inc., in 2012,
while the February 2014 statement listed $2.8 million.

80.     The government has also reviewed the 2013 profit and loss statements and
balance sheets for TelexFree Inc. and TelexFree LLC, as submitted to MSD in February 2014.
The Profit and Loss statements for TelexFree for the period January through December 2013 (as
submitted to the MSD) report in part the following:

| Description | TelexFree LLC | TelexFree Inc. | Combined |
|---|---|---|---|
| Income – Paid through Bank | $119,468,920.12 | $56,195,790.54 | $175,664,710.66 |
| Income – Paid through System | $572,240,960.21 | $268,930,757.53 | $841,171,717.74 |
| Total Income | $691,709,880.33 | $325,126,548.07 | $1,016,836,428.40 |
| Total Cost of Goods Sold | $2,263,476.65 | $397,736.51 | $2,661,213.16 |
| Agent Commissions – Paid through Bank | $50,670,290.64 | $20,666,027.60 | $71,336,318.24 |
| Agent Commissions – Paid through System | $571,917,743.23 | $268,930,757.53 | $840,848,500.76 |
| Total Agent Commissions | $622,588,033.87 | $289,596,785.13 | $912,184,819.00 |

81.     The Profit and Loss statement for TelexFree LLC reflects additional income of
$174,183,644.66 from Ympactus, TelexFree's operation in Brazil, which is not reflected here.

### 1.     *Incoming Funds to TelexFree Bank Accounts*

82.     TelexFree takes in funds from two sources: fees people pay to become TelexFree
promoters and sales of the company's 99TelexFree VOIP service, which has been sold for

Case 1:14-cr-10363-DPW Document 25 Filed 07/02/14 Page 31 of 57
Page 28 of 39

$49.90 per month since at least 2012.  In the financial statements TelexFree has submitted to the
MSD and other regulatory authorities, it reports income as either "paid through banks" or "paid
through system."  In our investigation, we reviewed bank account, credit card merchant, and
other third-party records in an effort to determine the volume of sales of the VOIP product.

83.     The investigation to date has identified and obtained records of 14 bank accounts
opened and operated in the United States in the name of TelexFree Inc. or TelexFree LLC since
February 2012 (not all operating at the same time).  Wanzeler and Merrill are the authorized
signatories on each of these accounts.  In my review of the TelexFree bank accounts we have
identified, a general pattern emerged.  The vast majority of the thousands of deposits to these
accounts appear to be buy-ins fees for TelexFree promoters.  But of the thousands of cash, check,
wire transfer, or money order deposits into the TelexFree accounts – totaling tens of millions of
dollars in 2013 – only 19 appear to be for the purchase of TelexFree's VOIP service.  For
example:

       a.     A review of Bank of America account XXXXXXXX7408 opened in the
name of TelexFree, Inc., in February 2012 revealed that between June 2012 and
May 2013, the accounts received 1,133 deposits, totaling $12,203,496.48.
Included in that sum were 534 cash deposits totaling $924,231.40.  Between
September 2012 and May 2013 there were 813 deposits in the exact amount of an
Ad Central Family buy-in ($1,425 or $1,375 (the earlier requirement)) totaling
$1,142,625. During that same period there were nine deposits in the amount of
$49.90 – the VOIP purchase price (totaling $449.10).

       b.     Similarly, in September 2012 accounts were opened at TD Bank in the
name of TelexFree Inc. and TelexFree LLC.  In account #XXXXXX8409, in the

Case 16-04006 Doc 455-1 Filed 09/14/23 Entered 09/14/23 15:09:26 Desc Exhibit
Case 1:14-cv-01840-DJC Document 25-1 Filed 07/21/16 Page 22 of 57
Affidavit of John S. Soares in Support of Search Warrants   Page 29 of 45
Page 29 of 45

name of TelexFree LLC, between October 9, 2013, and January 17, 2014, there
were 478 incoming wires ranging from $309 to $142,500, totaling $2,638,712.  In
the same period, there were 957 currency deposits ranging from $50 to $20,000,
totaling $21,277,040.72.  Of the deposits, there were 2,474 in the amount of
$1,425, totaling $3,525,450.  Deposits were made in multiple states along the
eastern coast of the United States.  During that same period there was one deposit
for $49.90.

c.      As to account #XXXXXX2808 at TD Bank, in the name of TelexFree
LLC, between September 2012 and July 2013, there were 1,550 deposits by cash,
check, money order or wire transfer in the exact amount of $1,425 (again, the Ad
Central buy in price).  During that same period there was one deposit for $49.90
(VOIP purchase price).

d.      As to account #XXXXXXX334 at TD Bank, in the name of TelexFree
LLC, between June and October 2013 there were 1800 deposits in the amount of
$1,425. There was one deposit of $49.90.

2.      ***Incoming Funds Paid Through Credit Card Processing Services***

84.     TelexFree also employs credit card processors to process payments to TelexFree's
website, creating another potential avenue for customers to pay for VOIP service (as mentioned
above, the site allows customers to use a credit card to pay for 99TelexFree).  A review of the
EFT deposits and payouts from the TelexFree accounts indicates credit card processors have
made large deposits to TelexFree accounts, as has PayPal.  Based on an analysis of the accounts,
ProPay Inc., a credit card processor, processed credit card transactions for TelexFree from
September 2012 to June 2013.  Global Payroll Gateway Inc. (operating as Phoenix Payments),

another such processor, processed credit card transactions for TelexFree from June 2013 to September 2013, and I-Payout has recorded and tracked credit card payments processed through three other credit card processers since October 2013.

85.    A review of the credit card processor records further confirms that while TelexFree in fact sold some 99TelexFree VOIP packages, the overwhelming percentage of incoming revenue was from new people investing in TelexFree to become promoters.  For example,

> a.    I reviewed business records from ProPay, Inc.  In 2013, ProPay processed 32,471 credit card sales (net of refunds and chargebacks) for TelexFree, totaling $29,150,021.19.  ProPay also processed 6,098 credit card sale transactions (net of refunds and chargebacks) in the amount of $49.90 – the price of TelexFree's VOIP product.  These sales totaled only $304,283.74.

> b.    I also reviewed business records received from Global Payroll Gateway ("GPG").  Between June 2013 and September 2013, GPG/Phoenix Payments processed total sales of $37,419,522.69 for TelexFree.  Based on the records and additional information provided by GPG, GPG processed 49,656 credit card transactions for TelexFree between June 12, 2013, and September 4, 2013.  Of those transactions, 7,362 (approximately 15%) were for less than $50 and, assuming every one of these transactions were to buy the VOIP product (which is unlikely), the sales revenue attributable to VOIP sales in this period was $367,363.80, or about 1% of total sales processed by GPG, a ratio similar to ProPay above.[11]

---

[11] There were also 31,129 credit card transactions in excess of $1,000.

Case 16-04006 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:09:26 Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants Page 31 of 45
Case 1:15-cr-10338-FDS Document 1-1 Filed 07/21/15 Page 31 of 39

c.      I also reviewed records provided by i-Payout, a payment processing

company that disbursed funds for TelexFree and provided record-keeping services

for certain credit card payments made by promoters for buy-ins, and by

purchasers of the VOIP product.  The records show that in 2013 i-Payout recorded

52,562 payments to TelexFree totaling $66,036,927.99.  Of these, there were

2,153 invoices for $49.90 (the monthly VOIP cost), totaling $107,434.70, or less

than .2%

86.      In total, in our review of TelexFree's bank account and credit card merchant

account activity for the period January through December 2013, we identified approximately

15,630 payments to TelexFree, totaling $779,930.54, for monthly purchases of the 99TelexFree

VOIP product.  Based on TelexFree's reported sales of $1.016 billion, known sales of the

99TelexFree VOIP product represented less than 0.1% percent of TelexFree's total revenues.

### 3.    *Outgoing Funds from TelexFree Accounts*

87.      Just as sales of the VOIP product represented a fraction of TelexFree's revenue,

the rest coming from new investors, the overwhelming majority of disbursements by TelexFree

were to pay monies owed to existing promoters.

88.      First, a review of funds disbursed from TelexFree's bank accounts showed that

some funds have been paid to vendors that appear to support the necessary infrastructure for the

99TelexFree VOIP system.  For example, payments, totally about $4,000,000, were identified

going to iBasis, IDT Telecom, Liga Telecom, Exigo Office, Access Northeast (Xand), and

Amazon Web Services.  We also isolated other payments to law firms and consulting firms

specializing in the "multi-level marketing" industry.

89.     In the financial statements furnished by TelexFree to the MSD, the company
reported Cost of Goods Sold for TelexFree, Inc., and TelexFree LLC as $2,263,476.65 and $397,
$736.51, respectively, totaling $2,661,213.16.  These costs of goods sold are described in the
financial statements as Direct Inbound Dial & Access Numbers, Telecomm & Database Network
Expense, and Termination.

90.     The elephant in the room, however, is the amount paid to TelexFree's promoters.
In this same period that we see $779,930.54 coming in from sales of the 99TelexFree VOIP
product, TelexFree's financial statements reflect commissions paid to agents, either directly or
indirectly ("through the system"), of over $912.1 million.  As TelexFree has only two sources of
revenue – payments to become promoters and monthly access fees for the 99TelexFree product,
it is clear that the source of the company's substantial revenues and the commissions paid to
TelexFree's promoters come not from sales of the VOIP product, but from the payments or buy-
ins from people seeking to become promoters.[12]

91.     Lastly, TelexFree, Inc., reported commissions payable of $7,642,550.42 on its
balance sheet as of December 31, 2013, and TelexFree LLC reported no ($0) commissions
payable at the same date.  At the same time, the company has reported over a billion dollars in
sales.  Further, assuming for the sake of argument that even half of TelexFree's revenue came
from the sale of the TelexFree VOIP product, this would leave some $500,000,000 in promoter

---

[12]  For example, Citizens Bank account XXXXXX8206 was opened in Massachusetts on
February 5, 2013, in the name of Telexfree LLC, listing James Merrill and Carlos Wanzeler as the
authorized signers.  A review of wire transfer data from that account showed that between February 21,
2013, and August 6, 2013, 7,340 wire transfers were made.  Of those, 38 wire transfers, totaling
$808,301.34, were made to entities such as iBasis, telecom companies, and electronic storage providers.
The remaining 7,302 wire transfers, totaling $11,272,627.04, were made to individual persons, in
amounts ranging from $270.00 to $116,650.  Moreover, 1,023 of the wires to individuals were in the
exact amount of $272.00, which, as explained in the "back office" portion of Telexfree's site, appears to
be the minimum transfer amount TelexFree will send to promoters ($300, less transfer fees).

Case 16-04006 Doc 455-1 Filed 09/11/23 Entered 09/11/23 15:39:36 Desc Exhibit
Case 1:14-cr-40028 Document 2-1 Filed 04/07/14 Page 33 of 45
Affidavit of John S. Soares in Support of Search Warrants    Page 33 of 45
Page 93 of 357

buy-ins during the period January through December 2013.  If all of these promoter buy-ins were

all at the AdCentral Family level (and the promoters sold no product but placed advertisements

as required by TelexFree), this $500,000,000 would translate into 350,877 promoters, each

expecting the receipt of $100 per week for 52 weeks – a payment stream aggregating $1.824

billion.  After crediting the full $912 million in commissions reported as paid in 2013 by

TelexFree (although some of these payments doubtless relate to contracts begun in 2012), there

would still remain additional commissions owed or coming due of *$912 million*.[13]

## V.    **Examples of TelexFree's Public Statements**

92.    On March 9, 2014 members of HSI, some in an undercover capacity, attended the

TelexFree "New Compensation Plan" Conference at the Marriott Copley Place Hotel, 110

Huntington Avenue, Boston, Massachusetts.  TelexFree periodically hosted conferences (as did

successful promoters) to generate excitement for TelexFree.  These events had a vaguely

evangelical quality; senior TelexFree personnel tried to whip up the crowd of supporters with

general exclamations about TelexFree's products and the chance to make money.

93.    Merrill and Wanzeler spoke at the Boston conference, along with other TelexFree

personnel and successful promoters.  Several people, including a TelexFree marketing executive

and the head of "IT," enthusiastically touted the quality of TelexFree's VOIP product, its

---

[13]    Overall, TelexFree's accounts received thousands of deposits directly to its bank accounts and also through credit card processors who, after receiving payments from card users, transferred those payments in batches to TelexFree accounts.  These automated clearing house ("ACH") credit transactions were transmitted via wire communications in interstate commerce.  For example, on July 5, 2013, Global Payroll Gateway (also known as Phoenix Payments), recorded 176 sales transactions for TelexFree totaling $214,700.80.  On July 8, 2013, the proceeds from these sales transactions were credited to a Telexfree Citizens Bank account, no. XXXXXX9078, through an ACH credit transaction originating at Phoenix Payments in Tempe, Arizona, and terminating in the bank account of Telexfree at Citizens Bank in Massachusetts.  There are many similar wirings.  Similarly, in 2012 and 2013 there were thousands of payments by bank-to-bank or wire transfer out of TelexFree's accounts in Massachusetts to TelexFree promoters.  Citizens Bank's servers for processing banking transactions are in Rhode Island.

planned expansion, and the opportunity to "market" it.  During Merrill's remarks, he first

complimented the other TelexFree senior personnel at the conference, including Wanzeler, and

talked excitedly about TelexFree's product and the profits to be made, saying, *e.g.*, "We can help

people communicate with their friends and family overseas, for less"; "You are going to create

communities of app users, each agent in here"; "You're gonna get paid"; "We are here to help

you make money."

94.     Later, Wanzeler took the stage, and made comments similar to Merrill's,

extensively praising TelexFree's VOIP product: "TelexFree was built to change people's lives,

save money for people [to] call [from] anywhere in the world to anywhere in the world"; "For

over 20 years, I work in telecommunication. I was agent like you guys for big company in

California. I learned the industry. I learned the product.  We put our own infrastructure, okay?

We changed what we done in the past 20 years and built something nobody else have.  I can sit

here today, please, if I'm lying here you can tell me, what company can give the opportunity for

the people to call cell phone, landline, over 40 countries."[14]

95.     Wanzeler continued, "We have a product and service no one else have; none of

them.  What company here in the U.S. can give you guys the opportunity have mobile, call from

mobile phone to over 40 countries unlimited? ATT do that?  Sprint?  T-Mobile? Anyone do that?

40 countries?  Cell and landline?  Anybody?  Yes?  No?  TelexFree only."  Wanzeler also said,

in the preceding month, "Over 600,000 customers paid $49.90 to TelexFree99."

96.     Similarly, during the conference TelexFree's chief executive officer told the

crowd, "We are here to build a long term sustainable business"; "We need your commitment to

protect this opportunity for you and your families"; and "A long term sustainable business that

---

[14]    Based on an open source internet search, Skype, for one.

Case 16-04006   Doc 455-1   Filed 09/11/23   Entered 09/11/23 15:29:26   Desc Exhibit
Case 1:14-cv-04001   Doc 4822-1   Filed 09/11/28   Entered 07/02/18 15:39:28   Page 98 of 57
Affidavit of John S. Soares in Support of Search Warrants    Page 35 of 45
Page 35 of 45

can help your friends and family for years and years to come." Another TelexFree employee
told the audience, "We just heard an incredible number: 580,000 retail customers [for
TelexFree's VOIP product] in February."

97.     During this and other conferences, Merrill, Wanzeler and the other speakers
generated an excited, cheerleading atmosphere, apparently intended to give the appearance that
TelexFree's VOIP product was groundbreaking and selling well. For example, in a statement
recorded for public consumption on October 8, 2013, Merrill spoke about how "excited" he was
about "new products about to launch." Similarly, at a TelexFree conference appearance on
March 5, 2014, Merrill asked the crowd of TelexFree promoters to do "the wave," and then
urged them to "get the product out there." He asked the audience to "touch people's lives" with
"a billion cell phones," and told them TelexFree was trying to "put its best product together."

98.     In light of TelexFree's actual financial picture, however, the repeated public
statements by TelexFree personnel about TelexFree's VOIP products amounted to misdirection:
Neither Merrill, Wanzeler, nor any other TelexFree executive mentioned that the company
generated a miniscule amount of revenue from selling the VOIP product (about 1% or less), and
instead was founded on, and depended on, generating revenue from new promoters that could be
used to cover TelexFree's payment obligations to existing promoters. According to TelexFree's
finances, the company was not profiting from TelexFree's legion of promoters selling more
VOIP products, but instead depended on a continuous flow of new promoters, a distinction
absent from TelexFree's public statements.

99.     Moreover, based on extensive review of TelexFree's banking activity, credit card
activity, and portions of its back office data, Wanzeler's statement to the crowd that TelexFree
had brought in "over 600,000 customers paying $49.90" in or about February 2014 was false. In

their testimony to the MSD, both Wanzeler and Merrill re-affirmed that 580,000 people bought

VOIP packages in February 2014.  For his part, Wanzeler "guaranteed" that most of those people

were "outside" retail customers, not promoters buying packages themselves, and he insisted that

each of the 580,000 or so users paid $49.90 that month for the service.

100.    But 580,000 customers paying $49.90 would have generated $28,942,000 in

revenue from VOIP sales, and thousands of $49.90 entries in TelexFree's bank and credit card

processing records.  But that revenue appears nowhere in TelexFree's financial activity in that

time frame.  In the alternative, despite Wanzeler's representations to the MSD, the figure was

derived from TelexFree promoters *themselves* "buying" the VOIP product on the TelexFree

system to stay eligible for TelexFree commissions, that is, from promoters using their own "back

office" credits with TelexFree (the money TelexFree owes them under the compensation system

discussed above) to buy, in a virtual sense, the VOIP product.  Thus, there would have been no

genuine retail sales to third party customers, but only virtual purchases by people who have

already invested in the TelexFree system.[15]

### Further Allegations Concerning the Nexus Between TelexFree's
### Illegal Activities and the Properties to be Searched

101.    As described above, TelexFree is a fundamentally fraudulent business.  Although

it maintains an actual VOIP service, only about 1% or less of the company's revenues come from

that service and, at no time in its U.S. existence, could TelexFree's revenue from that service

cover the massive payment obligations TelexFree had to its promoters.  Meanwhile, about 99%

of TelexFree's revenues came from investment dollars deposited by newly-recruited promoters,

---

[15] This strategy of calculating sales, revenue or other seeming legitimate figures from virtual
electronic transactions is common to modern pyramid schemes.

and it is those funds – amounting to hundreds of millions of dollars – that were used to pay existing promoters.

102.     Moreover, as discussed above, TelexFree's compensation system was maintained through its web site portal, and each promoter was given a "back office" location tied to the TelexFree site, through which the promoter could maintain his account, review records of what amounts TelexFree owed him, and seek transfers of funds, among other things.  In short, much of TelexFree's system of managing and compensating promoters was electronically-based and, according to Merrill's sworn testimony, that promoter-related data was maintained on servers at Xand and Exigo.

103.     Consequently, most or all of TelexFree's business records are evidence of an ongoing pyramid scheme, and so subject to seizure.  This would include, for example, all accounting and financial records; all promoter-related records; all web site-related records (*e.g.*, instructions to promoters, advertising, etc.); and all records related to VOIP design and implementation.

## I.     The Marlborough Office Location

104.     Based on public filings, sworn testimony by Merrill and Wanzeler, and other information, TelexFree's operations in the United States are based at 225 Cedar Hill Street, Suite 118, Marlborough, Massachusetts (the "Marlborough Office Location").  As noted above, TelexFree's registered corporate address is that address, although it states Suite 200.  As Merrill explained in sworn testimony, however, the company moved from Suite 200 downstairs to Suite 118 because it needed more space.

105.     As Merrill made clear during his testimony, TelexFree actually conducts business from this address.  Moreover, on March 24, 2014, in a sworn filing with the Tennessee

Case 14-04494-CProof-1 Doc 082-1 Filed 09/04/16 Entered 09/04/16 15:06:04 Desc Exhibit
B Support of Search    Page 38 of 45

Regulatory Authority, Merrill indicated, on behalf of TelexFree, that TelexFree has 15

employees at the Marlborough Office Location and keeps business records there.

## II.      The Xand and Exigo Data Storage Locations

106.     As Merrill said during his testimony, TelexFree's maintains the servers

supporting its business operations at Xand Corporation's data center in Marlborough,

Massachusetts.  Merrill noted that the company was in the process of transferring that data to

Exigo, a Dallas company that appears to provide similar services, but targeted to the MLM

market.

107.     A review of TelexFree bank records confirms substantial payments to Xand and

Exigo.  For example, in 2013, TelexFree paid Xand about $77,781 by check and wire.  In a

similar time frame, but beginning later in 2013, TelexFree paid Exigo about $139,734 by wire

transfer.

Case 16-04006   Doc 455-1   Filed 09/11/23   Entered 09/11/23 15:09:26   Desc Exhibit
Affidavit of John S. Soares in Support of Search Warrants   Page 39 of 45

Case 1:14-mj-xxxxx-DHH   Document 1   Filed 04/16/25   Entered 09/01/16 15:00:02   Desc Exhibit
Page 39 of 45

### Conclusion

108.    Based on the information described above, I have probable cause to believe that records and data from the three locations to be searched (as described in Attachment A), contain evidence, fruits, and instrumentalities of the crime of wire fraud, and aiding and abetting and conspiring to commit that offense (as described in Attachment B).

109.    With regard to electronic data, relevant procedures for copying and reviewing the relevant records are also set out in Attachment B.

Respectfully submitted,

JOHN S. SOARES
Special Agent
Homeland Security Investigations

Sworn and subscribed to before me this 15th day of April 2014, at Boston, Massachusetts.

HON. DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

## ATTACHMENT A

The premises to be searched are located at 225 Cedar Hill Street, Suite 118, Marlborough, MA 01752.  Below are photographs of the premises to be searched:



Case 1:14-cv-04080-DCB   Document 5   Filed 03/04/16   Page 41 of 45



Case 1:14-cr-40028    Doc 2-1    Filed 09/04/15    Entered 09/04/15 08:04:05    Desc Exhibit
Page 42 of 45

The following is a photograph of James Merrill in front of the office building located at 225 Cedar Hill Street.  This photograph is from www.telexfree.com as it existed in or about Spring of 2013.



# ATTACHMENT B

## ITEMS TO BE SEIZED

I.    All records, in whatever form, including but not limited to electronic data, database entries, emails, hardcopy documents, and tangible objects, that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1343 and 1349, including, without limitation:

A.    Records and tangible objects pertaining to the following people, entities, and websites:

1.    Brazilian Help, Inc.
2.    Diskavontage
3.    Ympactus
4.    TelexFree  LLC
5.    TelexFree, Inc.
6.    TelexFree Financial
7.    www.telexfree.com
8.    Carlos Wanzeler
9.    James Merrill

B.    Records and tangible objects pertaining to the following topics:

1.    All VoIP customers and promoters including but not limited to:

a.    All data concerning the names, addresses, email addresses, contact information and any other identifying information for all VoIP customers and promoters since January 1, 2012;

b.    Records detailing the methods and amounts of all financial transactions involving  all promoters and VoIP customers (both active and inactive) including bank, credit card, virtual credits, or any other type of payment credit or transfer, including transactions within the TelexFree back office;

c.    Records detailing the amount of credit card chargebacks from VoIP customers and promoters;

Case 1:14-cr-40028-IT   Document 6   Filed 09/04/16   Page 44 of 45   Desc Exhibit
B Supp of Search   Page 44 of 45

C.  Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other assets by Diskavontade, Brazilian Help, Inc., Ympactus, TelexFree LLC, TelexFree Inc., and TelexFree Financial or any one of the names listed I.A above, including, without limitation:

 1.  Bank, credit union, investment, money transfer, and other financial accounts
 2.  Credit and debit card accounts
 3.  Tax statements and returns
 4.  Business or personal expenses
 5.  Income, whether from wages or investments
 6.  Loans

D.  Records pertaining to the business practices of Diskavontade, Brazilian Help, Inc., Ympactus, TelexFree LLC, TelexFree Inc., and TelexFree Financial, including but not limited to any records relating to the compensation structure for promoters or other investors from the time of the respective companies' inception to the present;

E.  Records pertaining to the total number of VoIP users for TelexFree's VoIP products, including but not limited to the number of unique VoIP users and the minutes used by each VoIP user;

F.  Reports, data, contracts, agreements, design plans, proposals, and other documentation evidencing affiliation or business relationships with telecommunications companies;

G.  Reports, data, contracts, agreements, emails, statements to or from financial institutions or other documentation concerning financial dealings with financial institutions;

H.  Records, documents, written agreements, emails or notes concerning oral agreements and discussions, emails and letters from Diskavontade, Brazilian Help, Inc., Ympactus, TelexFree LLC, TelexFree Inc., and TelexFree Financial concerning or evidencing:

 1.  Ownership interests in and division of profits;
 2.  The sale and marketing of the VoIP product;
 3.  Promoter compensation;
 4.  The financial condition of the company;
 5.  The compensation plans for VoIP promoters;

I.  Records, documents, written agreements, emails, notes, and letters, concerning or evidencing ownership interests in and division of profits from companies and stores described herein.

5

    J.       For any computer hardware, computer software, computer-related documentation, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

        1.      evidence of who used, owned, or controlled the computer equipment;

        2.      evidence of the attachment of other computer hardware or storage media;

        3.      evidence of counter-forensic programs and associated data that are designed to eliminate data;

        4.      evidence of the times the computer equipment was used;

        5.      passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

        6.      records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media; and

    K.      Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II.     All computer hardware, computer software, computer-related documentation, and storage media ("computer equipment"). Off-site searching of the computer equipment shall be limited to searching for the items described in Section I above.

If, after inspecting the computer equipment, the government determines that the computer equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the computer equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If the computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.