UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>      Reorganized Debtors. | Chapter 11 Cases<br><br>14-40987-EDK<br>14-40988-EDK<br>14-40989-EDK<br><br>Substantively Consolidated |
| STEPHEN B. DARR, TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>      Plaintiff,<br>v.<br>FRANZ BALAN, A REPRESENTATIVE OF A<br>CLASS OF DEFENDANT NET WINNERS,<br>      Defendants. | Adversary Proceeding<br>No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>      Plaintiff,<br>v.<br>MARCO PUZZARINI AND SANDRO PAULO<br>FREITAS, REPRESENTATIVES OF A CLASS<br>OF DEFENDANT NET WINNERS,<br>      Defendants. | Adversary Proceeding<br>No. 16-4007 |

TRUSTEE, STEPHEN B. DARR'S MOTION TO PARTIALLY STRIKE PORTIONS OF THE
<u>AFFIDAVIT OF FRANTZ BALAN UNDER FEDERAL RULE OF EVIDENCE 602 AND 702</u>

      Now comes Stephen B. Darr, as he is Trustee of the Estates of Telex Free, LLC, Telex Free, Inc., and Telex Financial, Inc., and moves to strike portions of the Affidavit of Frantz Balan ("Balan Affidavit") as failing to meet the admissibility requirements of Federal Rule of Evidence ("FRE") 602 (Need for Personal Knowledge) and 702 (Testimony by Expert Witness).

Balan's testimony purporting to testify about what Telex Participants did or didn't do generally is inadmissible speculation under FRE 602, and his opinions about what a trained data scientist can or cannot determine from the Telex database violates FRE 702 because he is a lay witness. Finally multiple portions of the Balan Affidavit raise net equity arguments outside of the Court's January 26, 2016 Supplemental Order Respecting Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief (Docket No. 687) (the Net Equity Order"), and are therefore irrelevant.

Class Defendants' expert, Joshua W. Dennis ("Dennis"), cites and relies on inadmissible testimony in the Balan Affidavit to support the behavior of Telex Participants generally, as evidenced in the below excerpts from the Dennis Report.

> 180. In direct contradiction to this assumption, I understand that Frantz Balan, a supposed Net Winner, affirmed the following:
>
>> It is a mistake to assume that 100% of the face amount of invoices were collected 100% of the time. In practice, promotors like me rarely received the full amount in cash. I would estimate for me and the promotors I worked with or spoke to that at best this happened only 10% of the time.
>>
>> Most often, promotors were only able to ask for steeply discounted payments, as low as $250 for an AdCentral Family membership. Most commonly, the amount requested ranged from 50% to 75% of the invoiced amount. (citing Balan Aff., p. 5)
>
> 181. Additionally, I understand that Participants were often part of larger teams working alongside or employing other Participants. In these instances, I understand each team, and each pair of Participants within a team, had their own compensation arrangements and there was no universal payment practice. (citing Balan Aff. P. 2)

182. As one approach to teaming, I understand that it was the role of the lower-level recruiting Participants of the team to identify and signup new members; however, the responsibility of satisfying the resulting invoices with Credits general fell to the higher-level team leads in the Telex Free pyramid scheme. The recruiting Participants would also collect the cash from the new recruits ... and then distribute a percentage of the cash collected to the lead Participant and keep the remainder of the fee. In this way, Participants were actually sharing compensation in a manner not reflected in the SIG data. (citing Balan Aff., p. 6).

Dennis's use of the Balan Affidavit to extrapolate behaviors across the entire Participant class is improper. *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st. Cir. 1996) ("expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion"... Thus, 'an expert should not be permitted to give an opinion that is based on conjecture or speculation from an evidentiary foundation.") (internal citations omitted). Any admitted portions of the Balan Affidavit should not include: 1.) testimony based on speculation about Participant behavior other than his own team; 2.) testimony purporting to opine on what qualifies experts can reliably determine from the Telex database; and 3.) attempts to insert a new definition of how net equity is to be calculated in this case.

An annotated copy of the Balan Affidavit is attached as Exhibit 1. The highlighted portion of Balan's testimony should not be allowed into evidence on the grounds specified.

Respectfully submitted,

STEPHEN B. DARR, LIQUIDATING TRUSTEE,
By his counsel:

Dated: September 11, 2023

*/s/ Daniel J. Lyne*
Daniel J Lyne (BBO #309290)
Alexandra Papas (BBO #707581)
MURPHY & KING,
Professional Corporation
28 State Street, 31st Floor
Boston, MA 02109
Telephone: (617) 423-0400
Dlyne@murphyking.com

# EXHIBIT

# A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>　　　　Debtors. | Chapter 11 Cases<br><br>14-40987-MSH<br>14-40988-MSH<br>14-40989-MSH<br><br>Jointly Administered |
| STEPHEN B. DARR, TRUSTEE OF THE ESTATES OF TELEXFREE, LLC, TELEXFREE, INC. and TELEXFREE FINANCIAL, INC.,<br><br>　　　　Plaintiff,<br>v.<br><br>FRANTZ BALAN, A REPRESENTATIVE OF A CLASS OF DEFENDANT NET WINNERS,<br><br>　　　　Defendants. | Adversary Proceeding<br>No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE OF THE ESTATES OF TELEXFREE, LLC, TELEXFREE, INC. and TELEXFREE FINANCIAL, INC.,<br><br>　　　　Plaintiffs,<br>v.<br><br>MARCO PUZZARINI AND SANDRO PAULO FREITAS, REPRESENTATIVES OF A CLASS OF DEFENDANT NET WINNERS,<br><br>　　　　Defendants. | Adversary Proceeding<br>No. 16-4007 |

### AFFIDAVIT OF FRANTZ BALAN

I, Frantz Balan, hereby state and declare as follows:

1. The following is true and accurate to the best of my personal knowledge, recollection, and belief. If called upon, I am competent to testify about the subjects discussed below.

## Background

2. I am a resident of the Commonwealth of Massachusetts and reside at 564 Lowell Street in Peabody, Massachusetts.

3. I have lived at this address for 10 years.

4. I am married to Lusette Balan, my wife of 14 years.

5. I was involved in TelexFree for a roughly nine- or ten-month period in 2013 and 2014. For this reason, I have familiarity with TelexFree and its systems.

6. For some period of time, TelexFree was a full-time job. I typically worked 10-12 hour days, 6-7 days a week. For purposes of calculating net equity, the Trustee does not consider the amount of time that participants worked or their entitlement to compensation earned as a result. The Trustee also does not consider that for many people who got involved in TelexFree, this was the sole or primary source of income.

7. I rented an office for me and my team to use. For purposes of calculating net equity, the Trustee does not consider the amounts that participants paid in rent.

8. My team members and I hired someone to perform secretarial functions. This included posting ads, which despite what the Trustee states, was a time-consuming activity. For purposes of calculating net equity, the Trustee does not consider the amounts that participants paid to hire staff and support them.



Fed. R. Evid. 701;
Irrelevant under Net Equity Order

2

9. Working as a promoter for TelexFree, I never earned the sums alleged by the Trustee or anything close to those amounts.

10. If I were required to pay TelexFree any amounts that I received as compensation in exchange for my work for TelexFree, it would present a significant financial hardship for me and my family.

*Aggregation Problems*

11. I understand that the Trustee has "aggregated" accounts by grouping them by alleged owner.

12. The outcome of this aggregation method is not fully accurate or reliable.   ← Fed. R. Evid. 702

13. There are accounts that were set up by me or team members working with me, or that were in my name, that were not aggregated to me. For example, the account under the name "frantzy Balan Balan" (Account no. 12693693) refers to me, uses my email address, and shows my home address. This account was not aggregated to me.

14. There are numerous other accounts that were set up by me or team members working with me that were not in my name but that use my personal email address and are aggregated to someone else. For example, the Trustee has aggregated several accounts to my wife, Lusette. This is incorrect because my wife Lusette had no personal involvement with TelexFree.

15. Similarly, there are accounts that I did not set up or in any way operate that are aggregated to me, even though they use a different email, street address, or username. Some of those accounts use email addresses that do not belong to me, such as vjmanigat@gmail.com.

3

16. [Based on my understanding of the Trustee's aggregation model, I believe the Trustee does not understand] that many participants worked in teams, which had shared goals of member recruitment in order to earn money. [The Trustee assumes everyone worked alone.] If you tried to work alone, it would have taken you years to earn the credits necessary to recruit new members and increase credit-earning potential. — Fed. R. Evid. 702 / Fed. R. Evid. 702

17. [It is not possible to determine how much money a participant made or lost simply by allocating the accounts based on the aggregations. As discussed below, each team and each pair of participants within a team had their own compensation arrangements that varied by team and participant. There was no universal payment practice.] — Fed. R. Evid. 701 / Fed. R. Evid. 602

18. I have no records that accurately indicate which accounts were set up or operated by me and which accounts were not. I would have to go account by account and review all associated transactions to confirm. [However, simply going by the information entered in the TelexFree system is unreliable and would cause mistakes.] — Fed. R. Evid. 702

19. There are a number of reasons why the information used to make the aggregations is unreliable.

20. First, within my team, everyone's basic personal information like name, address, and phone number was known, so anyone could put an account in someone else's name.

21. Second, shared computers allowed users to "autocomplete" fields, so even if someone used the computer in our office to set up TelexFree accounts, they could use the autocomplete to enter my information without me necessarily knowing about it or

4

using the account. Similarly, if you were rushed, you could make typographical errors that were not blocked by the system.

22. Third, there were financial incentives for people to set up accounts that appeared to be someone different, even if you were using the account. This included the basic rule that you could not "recruit yourself," meaning that your downlines needed to be different people.

### Net Equity Problems

23. I understand the Trustee is using a "net equity" formula to determine liability.

24. The Trustee's "net equity" calculations are not accurate or reliable. — Fed. R. Evid. 702

25. First, the Trustee assumes that for each new membership, the promoter received cash from the recruit in the <u>exact</u> amount of the invoice, *e.g.* $1,425 for an "AdCentral Family" program membership, <u>100% of the time</u>. Both underlined assumptions are false. — Fed. R. Evid. 602

26. It is a mistake to assume that 100% of the face amount of invoices were collected 100% of the time. In practice, promoters like me rarely received the full amount in cash. I would estimate for me and the promoters I worked with or spoke to that at best this happened only 10% of the time. — Fed. R. Evid. 602

27. Most often, promoters were only able to ask for steeply discounted payments, as low as $250 for an AdCentral Family membership. Most commonly, the amount requested ranged from 50% to 75% of the invoiced amount. The Trustee fails to consider that there was competition for new recruits, and promoters would therefore seek to — Fed. R. Evid. 602

5

collect lower membership fees. It is a mistake not to take into account competition and the effect that had on the price of a new membership. ← Fed. R. Evid. 602

28. Further, the assumption that transactions between participants were strictly triangular is incorrect. Much of the time, a person being recruited ("A") by a promoter ("B") was actually being recruited on behalf of or in concert with the promoter's promoter ("C"). Because C likely had more credits than B, C would most often pay the invoice. B would then be responsible for collecting cash, and B would keep some amount of that payment, very often 10%. It is a mistake to believe that 100% of these membership transactions were triangular. It is also a mistake to assume that no compensation among promoters was shared. ← Fed. R. Evid. 602

29. Finally, the amounts collected were not 100% of the amounts requested. It was common to have collection problems or have newly recruited people to ask for more time to pay or offer an arrangement where money would be paid based on future income. It is a mistake to assume that even the discounted amounts were collected 100% of the time. The Trustee overstates any net equity I may have had by wrongly assuming that I collected 100% of all people I recruited. I could not estimate the amount of money that I never collected, but it was significant. ← Fed. R. Evid. 602

30. Another problem is that the Trustee assumes that credit transfers between participants were free. This is not true. Credits were bought and sold on a discounted basis an overwhelming majority of the time, often as low as 50% of 70% of face value. While there could be valid reasons to give a team member credits for free, to help grow your business, it makes no sense to work long hours to earn credits to simply give them ← Fed. R. Evid. 602

6

away for free. Also, if you could get credits for fee, there would be no reason for people like me to buy credits directly from TelexFree. The typical discount when I bought credits was about 10%, meaning that roughly 90% of the face value was paid. The exact discount varied from transaction to transcaction based on many factors. TelexFree closed operations before I could sell or use all of the credits I purchased. This means the Trustee's calculation overstates any net equity I may have had, as it does not reflect the amounts I paid to buy credits. — Fed. R. Evid. 602

31. The Trustee is also undercounting direct credit purchases. According to the Trustee, I purchased a significant amount of credits using primarily one bank during a one-month time period. This is incorrect. In reality, I purchases credits from TelexFree throughout the entire time period I was involved. This was done using more than one bank, as well as postal money orders. However, for my credit purchases, only transactions from one 30-day period using one bank are reflected. This means that the Trustee's net equity calculation for me is even more overstated.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 30, 2020.

Frantz Balan

7