# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>Reorganized Debtors. | Chapter 11 Cases<br><br>14-40987-EDK<br>14-40988-EDK<br>14-40989-EDK<br><br>Substantively Consolidated |
| STEPHEN B. DARR, TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>　　　　　Plaintiff,<br>v.<br>FRANZ BALAN, A REPRESENTATIVE OF A<br>CLASS OF DEFENDANT NET WINNERS,<br>　　　　　Defendants. | Adversary Proceeding<br>No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>　　　　　Plaintiff,<br>v.<br>MARCO PUZZARINI AND SANDRO PAULO<br>FREITAS, REPRESENTATIVES OF A CLASS<br>OF DEFENDANT NET WINNERS,<br>　　　　　Defendants. | Adversary Proceeding<br>No. 16-4007 |

## OPPOSITION BY TRUSTEE TO DOMESTIC & INTERNATIONAL CLASS REPRESENTATIVES' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION BY TRUSTEE FOR SUMMARY JUDGMENT

Stephen B. Darr, the Liquidating Trustee ("Trustee") under the confirmed plan of

reorganization of TelexFree LLC, TelexFree Inc., and TelexFree Financial Inc. (collectively,

"TelexFree" or the "Debtor"), respectfully submits this opposition to the Motion by the Domestic

1

and International Class Representatives (the "Class Representatives") for Summary Judgment

and Cross-Motion by the Trustee for Summary Judgment.

There are no genuine issues of material fact in dispute, and the Trustee is entitled to

judgment as a matter of law pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7056,

incorporating Rule 56 of the Federal Rules of Civil Procedure.

## INTRODUCTION

These adversary proceedings were commenced by the Trustee as defendant class actions,

which is atypical in the field of class action litigation.  The Trustee commenced Adv. Proc. No.

16-4006 against a defendant class of Net Winners located within the United States and

commenced Adv. Proc. No. 4007 against a defendant class of Net Winners located outside of the

United States.  Each action seeks to recover from Net Winners those amounts received by such

Net Winner in excess of amounts paid.  The purpose of the defendant class action litigation is to

resolve questions of law and fact that are common to the defendant classes, while preserving

each individual defendant's unique defenses relating to the amount of their liability.

Pursuant to the *Scheduling Order Respecting Supplementation of Expert Reports and

Related Matters* [A.P. No. 16-4006, Doc 421, "Scheduling Order"] as amended, the litigation

was divided into two phases for administrative convenience.  Phase I pertains principally to: (i)

the admissibility of the expert opinion of Dr. Cameron E. Freer ("Freer") of Borelian

Corporation ("Borelian") in connection with the aggregation of Participant accounts to establish

the Net Winnings of each Participant, including (ii) the integrity and reliability of the TelexFree

[SIG] database used by Freer; and (iii) the reasonableness of assumptions made by Freer in

computing the amount of Net Winnings of each Participant which, in turn, includes a

determination of whether: (x) the Trustee properly excluded payments made in transactions

solely between Participants and not involving TelexFree for the transfer of credits in computing

Net Winnings; and (y) the Trustee is entitled to a presumption that cash was paid by recruited

Participants in connection with Triangular Transactions in an amount equal to the cost of the

membership plan and the credits redeemed by the recruiting Participant.

Simultaneously herewith, the Trustee has filed an Opposition to the *Domestic &*

*International Class Representatives' Motion to Exclude Testimony of Dr. Cameron E. Freer as*

*Inadmissible under Daubert* (the "Daubert Motion").  In the Opposition to the Daubert Motion,

the Trustee requests a determination that: (i) the data in the TelexFree [SIG] database is

sufficiently reliable to perform the aggregation of Participant accounts; and (ii) Freer made

appropriate usage of the data fields in the TelexFree database, including the use of the name

field, in establishing the aggregations.

Presuming that the Court finds in the Trustee's favor as to matters (i) and (ii) in the

Opposition to the Daubert Motion, pursuant to this cross-motion the Trustee seeks the following

further determinations:

(i)     That the Trustee's usage of the initial, or first, account in each Participant

        aggregation was an appropriate methodology to establish the identity of the

        Participant whose accounts were aggregated;

(ii)    That monies paid in connection with the transfer of credits between Participants

        are to be excluded in computing Net Winnings;

(iii)   That in computing the Net Winnings in a Triangular Transaction, it is reasonable

        to presume that a recruited Participant paid cash to a recruiting Participant to

        obtain a membership plan from TelexFree.

If the Court grants summary judgment with respect to Phase I, the Trustee would request that the Court establish a schedule to resolve the issues identified in the Scheduling Order as Phase II, many of which are issues of law that may be suitable for adjudication on summary judgment.  Phase II also contemplates the establishment of a procedure to determine the damages assessed against each defendant.  In this regard, the Trustee seeks at this stage only a finding that the Net Winnings for each Participant as set forth in the Trustee's aggregation of User Accounts presumptively establishes the damages for each defendant.  After the class action phases of the litigation are concluded, individual defendants will have the opportunity to contest the amount of the damages asserted and to rebut the presumptions established by the Court.

## I.  BACKGROUND

TelexFree purported to be a multi-level marketing company selling voice over internet protocol ("VOIP") subscriptions, which could be used to make international telephone calls over the internet.  *See Memorandum of Decision on Class Defendants' Motion to Exclude Expert Witness Testimony of Timothy Martin* ("Decision", Adv. Proc. No. 16-4006, docket no. 385, at p.3).  On October 7, 2015, the Trustee filed a *Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief* (the "Ponzi Motion")[docket entry 623].  On November 22, 2015, the Court, on motion by the Trustee and after notice and hearing, entered an Order, as amended on December 21, 2015, approving the Ponzi Motion and finding that:

> Each of the Debtors in these jointly administered cases operated a Ponzi and pyramid scheme.  This ruling is the law of the case in each of these jointly administered cases. [Docket entries no. 654, 668].

The Ponzi Motion also sought a determination that, in accordance with longstanding practice in Ponzi scheme cases, claims be calculated and allowed based upon a Net Equity determination, that is, the difference between amounts that a participant ("Participant") paid into the scheme and amounts that the Participant received. On January 26, 2016, the Bankruptcy Court entered a supplemental order respecting the Ponzi Motion [docket entry no. 687]. The supplemental order provided that:

> The claims amounts of Participants shall be determined on a Net Equity basis, which shall be defined as follows: the amount invested by the Participant into the Debtors' scheme, including amounts paid pursuant to Triangular Transactions, less amounts received by the Participants from the Debtors' scheme, including amounts received pursuant to Triangular Transactions…
>
> In determining the amount of a claim of a Participant who has more than one User Account, the activity in all of the Participants' User Accounts shall be aggregated and netted against one another…
>
> ("Net Equity").

TelexFree derived most of its revenue not from the sale of VOIP plans but from membership fees paid when a Participant purchased a membership plan. Decision, at p. 3. Members, or Participants, 'earned' credits by selling VOIP plans, publishing internet advertisements, and recruiting other Participants into the plan. *Id.* Credits could be redeemed for cash, used to purchase additional memberships for that Participant or another Participant, or transferred to other Participants. *Id.* In essence, the credits served as a currency and, for much of the term of the TelexFree Ponzi scheme, TelexFree recorded credits as denominated in United States currency, with one credit being equal to $1. *See Affidavit of Jean Louis Sorondo,* "Sorondo Affidavit", at ¶9, filed separately.

Each time that a Participant purchased a VOIP plan or a membership plan, the Participant created an account ("User Account"). It was common for an individual Participant to

have numerous User Accounts.  The TelexFree database did not have a mechanism to link User Accounts attributable to a single Participant.  Therefore, the Trustee had to establish a process for aggregating User Accounts for each Participant.  The transactional data for the aggregated User Accounts could then be used to compute the Net Winnings or Net Losses for a Participant. *Decision, at p.3.*

On November 23, 2020 and November 24, 2020, the Court held an evidentiary hearing on Timothy Martin's expert opinion respecting the methodology for aggregating the User Accounts of Net Winners.  By decision dated June 22, 2021, the Court determined that the Trustee had not shown by a preponderance of the evidence the reliability of the expert opinion as to the selection and application of the method for aggregating User Accounts to determine the identity and Net Winnings of the Net Winners. *Decision*, at p. 39.

The Trustee thereafter retained Freer of the firm Borelian, an esteemed "big data" consulting firm, to provide expert testimony on the appropriate method of aggregating the User Accounts of Participants.

### A. Types of Participant Transactions.

In order to administer the case, the Trustee needed to compute Net Losses of Participants (to establish the pool of claimants entitled to a distribution) and Net Winnings of Participants (to identify those Participants subject to estate claims for recovery of amounts received in excess of amounts paid).   The resolution of claims of asserted Net Losers is substantially complete.

In computing Net Equity, the Trustee considered the various types of transactions in which a Participant could engage.  Participants could:

- purchase membership plans and pay membership fees directly to TelexFree

- purchase credits directly from TelexFree

- redeem credits directly with TelexFree.

These are collectively referred to as "direct" transactions. *See Affidavit of Stephen B. Darr,* "Darr Affidavit", at ¶10, filed separately.

In many instances, Participants purchased membership plans and opened User Accounts through a three-way transaction involving: (a) TelexFree, (b) the Participant purchasing the User Account (the Recruited Participant), and (c) the Participant who facilitated the transaction (the Recruiting Participant).[1]  This transaction, which has been referred to throughout the case as a "Triangular Transaction", operated as follows: (i) a new, or Recruited, Participant purchased a TelexFree membership plan from TelexFree; (ii) TelexFree issued the membership fee invoice to the Recruited Participant; (iii) the Recruited Participant paid the membership fee directly to the Recruiting Participant, and the Recruiting Participant then used accumulated credits in the TelexFree system to satisfy the invoice of the Recruited Participant. *See* Darr Affidavit, at ¶11.

Set forth below is a schematic of the Triangular Transaction:



---

[1] Occasionally, a Participant would open up additional User Accounts for himself/herself, in which case the Participant would, in effect, be both the Recruiting and Recruited Participant.

The Trustee concluded that it was reasonable to assume that a Recruiting Participant received cash from a Recruited Participant in a Triangular Transaction in an amount equal to the credits redeemed by the Recruiting Participant.  *See* Darr Affidavit, at ¶12.  This conclusion was based upon discussions with TelexFree employees, discussions with, and testimony from, Participants, representations made by the Office of Homeland Security who had investigated TelexFree, and an analysis of the economics of the TelexFree scheme and the Triangular Transactions.  *Id*.   Moreover, a Recruited Participant would not pay more than the membership invoice and, similarly, the Recruiting Participant would not access less than the redemption value of the credits.  Therefore, amounts received by a Recruiting Participant in a Triangular Transaction increased that Participant's Net Winnings, and amounts paid by a Recruited Participant in a Triangular Transaction decreased that Participant's Net Winnings.

As referenced above, Participants could also transfer credits between and among themselves (referred to as "Credit Transfers").  *See* Darr Affidavit, at ¶13.  The Credit Transfer was a two-party transaction between Participants.  Unlike the three-party Triangular Transaction which involved the purchase of a TelexFree membership plan and payment of a membership invoice, TelexFree was not a party to the Credit Transfers.   TelexFree merely recorded the transfer of credits in its records and charged an administrative fee of three (3) credits for the bookkeeping entry.   The Trustee excluded the Credit Transfers from the computation of Net Equity.  *See* Darr Affidavit, at ¶13.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Fed. R. Bank. P. 7056.  "The role of summary judgment is to pierce the boilerplate of the

pleadings and to provide a means for prompt disposition of cases where no trial-worthy issue exists." *Quinn v. City of Boston*, 325 F.3d 18, 28 (1st Cir. 2003) (citing *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has a potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986)).

"To be considered 'genuine' for Rule 56 purposes a material issue must be established by 'sufficient evidence supporting the claimed factual dispute…to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975) (quoting *First National Bank of Arizona v. Cities Service Co., Inc.*, 391 U.S. 253, 289 (1968)). "Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the non-moving party to present evidence showing the existence of a trial worthy issue." *Gulf Coast Bank & Trust Co. v. Reder*, 355 F.3d 35, 39 (1st Cir. 2004) (citing *Anderson*, 477 U.S. at 248); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990). To meet that burden, the non-moving party may not rely on "bare allegations" but must come forward with substantive evidence to rebut the evidence that has been offered by the moving party. *Gulf Coast*, 355 F.3d at 39 (citing *Rogan v. City of Boston*, 267 F.3d 24, 29 (1st Cir. 2001)).

The Trustee submits that all of the factual allegations are supported by the docket, the affidavits of the Trustee and Jean Louis Sorondo, and the deposition testimony of Participants. The facts are uncontroverted, and the Trustee is entitled to a judgment as a matter of law.

## III. ARGUMENT

As set forth above, in the Opposition to the Daubert Motion, the Trustee seeks a
determination that the TelexFree database provides sufficiently reliable information to perform
the Net Winner aggregation of User Accounts, and that Freer made appropriate usage of the data
fields in the TelexFree database.  Having established in the Opposition to the Daubert Motion
that the aggregation of User Accounts was performed in a reliable manner, the Trustee now seeks
a determination through this cross-motion that (a) the method of identifying the Participant in
each aggregation of User Accounts is reasonable and appropriate; and (b) the methodology for
calculating the Net Winnings of each Participant is reasonable and, therefore, the Trustee is
entitled to a presumption that the damages assessed against each Net Winner Participant is
accurate.

### A.  The use of the "Lowest Rep ID" is appropriate to determine the identity of each Participant in an aggregation of User Accounts.

After the aggregation of User Accounts had been completed, the Trustee needed to select
a method to identify the Participants who were the owners of the aggregated accounts.  As set
forth in his attached affidavit, Jean Louis Sorondo performed a series of mechanical steps to
confirm the Trustee's selection of the "Lowest Rep ID" as the basis for identifying the
Participant who owned the aggregated accounts.

Sorondo downloaded data files included in the expert report of Freer, which included
10,987,618 unique rows of data (reflecting the 10,987,618 User Accounts) and 1,566,383 unique
clusters, or User Account aggregations.  Sorondo then segregated the aggregations to account for
the 81,681 Net Winner aggregations.  *See* Sorondo Affidavit, at ¶3.

10

The first-created User Account in an aggregation is referred to as the "Lowest Rep ID". The rep ID field is a unique record identifier for each User Account. The rep ID is increased to a higher number as new User Accounts are created. Therefore, by definition, the Lowest Rep ID is the first account in an aggregation, and the highest rep ID is the last account in an aggregation. After conducting certain basic data formatting techniques, Sorondo then performed a series of steps to aid in assessing whether the Lowest Rep ID would be an accurate indicator of Participant identity of the User Account aggregation. As a result, Sorondo found as follows:

(i)     Using Freer's standards for a "clean" name (i.e., a string containing five or more characters that only included alphabetical characters, periods, commas, hyphens, spaces, or apostrophes), 98.09% of Net Winner names met Freer's standards, indicating a high likelihood that the name field in the Lowest Rep ID contained the name of an actual person;

(ii)    The name field in the Lowest Rep ID matched, identically, the most frequent name used in the User Account aggregation approximately eighty percent (80%) of the time;

(iii)   After making minor "cleaning" changes in the name field, the name field in the Lowest Rep ID matched the most frequent name used in the User Account aggregation approximately eighty-nine percent (89%) of the time;

(iv)    For the remaining eleven percent (11%) of User Account aggregations, Sorondo sorted the list of Lowest Rep ID name field and most frequent name field in the aggregation and assigned a numerical value, calculated in Excel, that indicates how close or far apart the two names are in value. A visual inspection of this list

reveals no significant differences between the name field in the Lowest Rep ID

and the most frequent name field used in the aggregation;

(v)      Out of the forty-seven (47) alleged celebrity and fictitious names cited by counsel

to the Class Representatives in challenging the value of the name field, only one

such name appeared in the Lowest Rep ID.  That name was Princess Rosario, who

was confirmed to be an individual whose address matched that contained in the

TelexFree records.

*See* Sorondo Affidavit, at ¶3; Affidavit of Ilyas Rona, Adv. Proc. No. 16-4006,
Doc. 443, at ¶25.

Based upon the calculations included in the Affidavit of Jean Louis Sorondo, the Trustee

concluded that the Lowest Rep ID provided an appropriate basis for determining the identity of

the Participant in each User Account aggregation.

## B.      Credit Transfers are properly excluded in the computation of Net Equity.

The Net Equity formula does not contemplate the inclusion of monies paid or received in

Credit Transfers.  Such inclusion would be legally unsupportable, would be inconsistent with the

computation of the claims of Net Losers and would impair the rights of individual Participants to

pursue their direct claims against other Participants.

The Credit Transfers are different in substance from the Triangular Transactions.  In a

Credit Transfer, no invoice was issued by TelexFree.  No membership plan was provided by

TelexFree, and no membership fee was due to TelexFree.  The transaction was strictly a

purchase, sale, and transfer or credits between two private participants, in which TelexFree had

no economic stake. TelexFree had no right to receive, and no obligation to pay, funds in a Credit

Transfer.  TelexFree's only role in connection with a Credit Transfer was merely as a

bookkeeper – to record the reduction in credits for one Participant and increase in credits for

another.  TelexFree charged three (3) credits to the transferring Participant for the bookkeeping

services, which was *de minimus* in that most transfers involved hundreds, or thousands, of

credits.

The Net Equity formula approved by the Court distinguishes between Triangular

Transactions and Credit Transfers because they are different in-kind.  The Net Equity formula

expressly references and includes monies paid or received pursuant to Triangular Transactions,

but no such reference is made to Credit Transfers.  The maxim *expressio unius est exclusio*

*alterius* mandates that when parties identify specific items in a document, any items not so listed

are appropriately excluded.  *Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 61 (1st Cir. 2001).

The exclusion of amounts paid or received in Credit Transfers was applied in computing

the Net Losses of individual Participants in the claims resolution process.  The continued

implementation of this formula in the computation of Net Winnings would be consistent with,

and complementary to, the process already employed in the claims resolution process.

Inclusion of the Credit Transfers in computing Net Winners and Net Losers would also

be inconsistent with established Ponzi scheme case law and the individual rights of Participants

to pursue their own direct, as opposed to derivative, claims against third parties.  Where a

transaction is between two non-debtors, and the non-debtors then separately transact with the

debtor, the solely participant-to-participant transaction does not involve a claim of, or against,

the bankruptcy estate.  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2nd Cir. 2014)("*Madoff*

*I*").

In the Bernie Madoff Ponzi scheme, the trustee occasionally found himself competing

with victims in the pursuit of recoveries against third parties who had benefited from the scheme.

In those instances, the Madoff trustee sought to enjoin the victim from interfering in the trustee's

collection efforts. The rulings on these injunction requests varied depending upon whether the victims had "direct" claims against the third party or whether such claims were, in actuality, derivative of the claims held by the Madoff estate and were properly asserted by the trustee.

In *Madoff I*, investors in feeder funds, which took investor money and in turn invested those funds into the Bernie Madoff Ponzi scheme, sued the feeder funds in connection with the scheme. The Madoff entities were not a party to the transaction between the investors and the feeder funds. The Madoff trustee brought a separate suit against the feeder funds to recover net winnings paid by the Madoff entities to the feeder funds. A schematic of the circumstances is set forth below:



The Madoff trustee commenced an action to enjoin the investors' litigation against the feeder funds, as the trustee was concerned that any recovery by the investors from the feeder funds could diminish the potential recovery by the trustee against the feeder funds. The Madoff trustee's injunction action was unsuccessful. The court concluded that the investors had "direct" or "particularized" claims against the feeder funds because the investors had contracted directly with the feeder funds in transactions to which the Madoff entities were not a party. The trustee

therefore had no basis to enjoin the pursuit of a direct claim by a third party (the investor) against

another third party (the feeder fund).

*Madoff I* is analogous to the circumstances arising under the Credit Transfers.  TelexFree

was not a party to the Credit Transfers, and the bankruptcy estate was neither augmented nor

diminished as a result of the transaction.  The transaction was strictly between non-debtors.  The

Trustee has no basis to recover monies paid as a result of the Credit Transfers, as these claims

are direct claims that may be brought by individual Participants against other Participants.   If the

trustee were to include amounts paid for Credit Transfers in the computation of Net Equity, the

recipient Participant could potentially be liable twice for the same Credit Transfer (once to the

Trustee as a Net Winner and then again to the counter-Participant who paid to receive the Credit

Transfer).

The results in *Madoff I* can be contrasted with the results of a second action commenced

by the Madoff trustee to enjoin claims asserted by third parties.  *See Marshall v. Picard*, 740

F.3d 81 (2nd Cir. 2014)("*Madoff II*").  In *Madoff II*, the Madoff trustee sued the Picower

defendants for excess withdrawals made by the Picower defendants from the Bernie Madoff

funds that allowed them to become net winners.  Certain creditors, including Marshall, also sued

the Picower defendants on account of their involvement in the Madoff scheme.  The creditor

claims were based upon civil conspiracy and conversion.   The Second Circuit Court of Appeals

concluded that the claims asserted by Marshall against the Picower defendants were actually

derivative of the claims held by the Madoff trustee – that is, the claims arose from harm done by

the Picower defendants to the bankruptcy estate and the Marshall creditors were simply

repackaging estate claims under another theory.  Because the Marshall creditors were in essence

seeking to recover estate property, the Court granted the Madoff trustee's injunction request.

*Madoff II* is more analogous to the Triangular Transactions.  In fact, the First Circuit

Court of Appeals previously determined that payment made by a Recruited Participant to a

Recruiting Participant in a Triangular Transaction constituted property of the TelexFree estate.

*See Darr v. Dos Santos (In re TelexFree, LLC)*, 941 F.3d 576 (1st Cir. 2019).  The membership

fee was a payment otherwise due to TelexFree for the membership invoice, and such fee was

diverted to the Recruiting Participant in exchange for the redemption of the credits of the

Recruiting Participant.  As a result, recovery of the amounts paid was the sole province of the

Trustee, and claims by a Recruited Participant against the Recruiting Participant were derivative

of the claims of the TelexFree estate and therefore could not be pursued.  *Id.*

Because an individual Participant had no direct claim against another Participant in a

Triangular Transaction but only a claim derivative of that held by TelexFree, the Net Equity

formula includes amounts paid in a Triangular Transaction.  Amounts deemed received by a

Recruiting Participant in a Triangular Transaction results in an increase in Net Winnings, and

amounts deemed paid by a Recruited Participant in a Triangular Transaction results in a decrease

in Net Winnings.

**C.    There is ample basis for a presumption that cash payments were made in
        Triangular Transactions and that such payments should be included for purposes of
        computing Net Equity.**

The Trustee has administered the case, including the resolution of claims, distribution of

funds, and computation of Net Winnings, based upon the presumption that a Recruited

Participant paid cash to a Recruiting Participant, on the basis of $1 for each credit redeemed,

when purchasing a membership plan through a Triangular Transaction.  This presumption was

based upon the Trustee's initial interviews with employees of, and Participants in, TelexFree and

upon discussions with the Department of Homeland Security which had investigated TelexFree.

The Trustee also relied upon the simple economics of the Ponzi scheme – since credits could be

redeemed for cash, it would be logical to presume that Recruiting Participants would not redeem

their credits unless they received cash in the same amount from the Recruited Participants.

In February and March 2023, the Trustee conducted depositions of numerous Participants

to inquire further as to the mechanics of the Triangular Transactions.  In numerous instances, the

Participants confirmed that it was customary for a Recruited Participant to pay cash to a

Recruiting participant when acquiring a membership plan through a Triangular Transaction.

Excerpts from many of those depositions are provided below:

(i) Deposition of Ingrid Laplanche, February 15, 2023 (attached as Exhibit "A"):

> **Q.   So our records show that he opened the accounts**
> Page 9
> 1  **for you --**
> 2   A.   Mm-hmm.
> 3   **Q.   -- using his credits.  Is that accurate?**
> 4   A.   That's accurate.
> 5   **Q.   And he opened four accounts for you with his**
> 6  **credits?**
> 7   A.   Correct.
> 8   **Q.   And then you transferred money over Zelle in**
> 9  **exchange for that membership?**
> 10   A.   Yes.
> 11   **Q.   And you transferred that money over Zelle to**
> 12  **your brother?**
> 13   A.   Correct.
> 14   **Q.   And do you remember the amount that you**
> 15  **transferred him for each one of those four**
> 16  **transactions?**
> 17   A.   It was -- I don't remember exactly, but the
> 18  amount that I claimed was basically what I paid him.
> 19  I did not have the accounts for that long before it
> 20  was closed or whatever.
> 21   **Q.  I understand.  So the claim amount -- the claim**
> 22  **that you put in equals the money that you paid to your**
> 23  **brother?**
> 24   A.   Yes.

(ii) Deposition of Ivan Alvarenga, February 15, 2023 (attached as <u>Exhibit "B"</u>):

Page 14
**Q.   It was common practice to use credits to open up**
**10  accounts for others.  In those situations, was your**
**11  understanding that the original member of TelexFree**
**12  who would use their credits to set up an account for**
**13  someone else received payment for those credits?**
14            MR. RONA:  Objection.
15    A.    Sometimes.  Sometimes someone would exchange
16  their credits for cash to make it more efficient to
17  sign someone up.
**18    Q.    Okay.  When you say exchange for cash, you mean**
**19  exchange among two different people?**
20    A.    Correct.  Yeah.  I can explain it in more
21  detail.  So Person A, who is already signed up with
22  Telex, would have credits in their portal.  And rather
23  than having the Person B sign up with money, which
24  maybe they didn't have on a credit card, they just had
Page 15
 1  in cash, Person A would set up, transfer the credits
 2  to sign up Person B with their credits, and then
 3  Person B would pay Person A in cash for the credits in
 4  exchange, equal dollar for dollar.  No money was made
 5  in those exchanges, because it was already an obvious
 6  benefit to having someone sign up with a new account.


(iii) Deposition of Rudeidamia A. Calcano, February 15, 2023 (attached as <u>Exhibit "C"</u>):

**24    Q.    So just to make sure that I understand, you gave**
Page 11
 **1  Jose Lopez, Framin Alvarado Paulino, and someone named**
 **2  Juan that you don't remember the last name about**
 **3  $5,000 to open the accounts for you?**
 4    A.    Yes.
 **5    Q.    Is that correct?  Okay.  And how did you**
 **6  transfer the money to them?**
 7    A.    I gave them cash.
 **8    Q.    Do you remember which one of them you handed**
 **9  cash to or did you disperse?**
10    A.    I know the three of them were in charge and, you
11  know, they were there, you know, selling that, selling
12  the whole TelexFree thing to us.  So, you know, it
13  seemed legitimate.  It seemed right.  We saw a
14  contract.  And I just gave them -- we gave them the

15  money.  And, you know, they did say that they were,
16  you know, going to open an account and they were going
17  to give us the username and things, which they did
18  after.  But it never worked.


(iv) Deposition of Arismendy Alexandry Disla, February 21, 2023 (attached as <u>Exhibit</u>
<u>"D"</u>):

Page 10
**Q.   Do you recall any situations where someone would**
**7  have been opening an account for you where they used**
**8  their credits to open the account for you?**
 9    A.   Like -- yeah.  Like, okay, they say, "Let me
10  open an account for you.  Here is a credit, and then
11  you pay me."  Kind of like that?
**12   Q.   Yeah.**
13    A.   Yeah, yeah.  There were a couple guys that would
14  use it, and they even doing it in front of the
15  community meetings.  In the meetings.  Like, "I got --
16  I have a credit.  I have a balance, so who wants to
17  open a credit?  Give me 1300 or 1400."  And they used
18  to do it right in front of the people in those little
19  meetings, 20, 40, 50, even 100.  Even in the big
20  meetings.  So uh-huh.  They get like, "Give me cash,
21  and I open it for you," and then, like, they do the
22  rest for you.


(v)  Deposition of Martiza Elizabeth Garcia, February 21, 2023 (attached as <u>Exhibit "E"</u>):

Page 7
**11   Q.   Okay.  And so you had to pay to get in?**
12    A.   Correct.  You had to invest some type of -- I
13  honestly don't recall if it was, like, $500 or, like,
14  $1,000 or something like that.
**15   Q.   Do you remember who you paid?**
16    A.   I gave the money to Jose and I believe -- you
17  know, it seems like the money went from one hand to
18  another hand to another hand.  I don't know where it
19  ended up.
**20   Q.   Do you remember how you paid him?  Did you pay**
**21  him by cash or by, like, a credit card, or how did**
**22  that work?**
23    A.   No, I believe it was cash.

(vi)   Deposition of Selvi Vanessa Lewis Reynaga, February 22, 2023 (attached as
Exhibit "F"):

**Q.   And when you opened that account, I think we**
Page 12
**1  went over that it cost the $1,425.  I think I might**
**2  have said 420 before; sorry.  Do you remember how you**
**3  paid to open that account?**
4    A.   So what I remember is while I was in Bolivia --
5  in La Paz, Bolivia.  So I don't think I could have --
6  I knew I wasn't able to make the transfer through
7  Bolivia, so we actually -- this is why it's fuzzy.  I
8  sent the money to my brother-in-law, who has no
9  recollection of TelexFree or anything.  Just sent him
10  the money, I think, through Western Union.  And I
11  think he was able to give it to Francisco to do the
12  transaction part for TelexFree.  That part was kind of
13  fuzzy for me even back then.
**14   Q.   Okay.  So I understand that you sent money**
**15  through Western Union to your brother, who gave it to**
**16  Francisco in order to have the account set up.  Is**
**17  that correct?**
18  A.   Yes.
**19   Q.   Do you remember how much money you would have**
**20  sent?**
21  A.   Well, I remember it was around -- like, it was
22  over $7,000, because I also sent money for 10 -- I
23  think it was 10 of the cards, those calling cards that
24  were $50 each or $49.99, I think you mentioned.  So I
Page 13
1  think it was for five accounts that were $1,425.
2  Right.

(vii)   Deposition of Andrew Tranjano De Costa Silveira, February 23, 2023 (attached as
Exhibit "G"):

**Q.   So every time you opened an account, you paid**
**24  Michael for the account?**
Page 14
1    A.   It was two times.  First, he came.  I opened up
2  with him.  And then, like, after the week after or two
3  weeks after, he came down again to my friend's house
4  and he opened up for a lot of people.  I was one of
5  the people.  He opened for my friend and some other

6 people around the room, and he explained it and he
7 answered questions, and this and that.
8       He drove from Connecticut.  I think he lived in
9 Bridgeport.
**10   Q.   And he opened up accounts for some of your**
**11 friends, you said.  Is that correct?**
12   A.   I think so.  Some people that were in the room,
13 yeah.
**14   Q.   When he opened up accounts for them, did they**
**15 also pay him money for those accounts?**
16   A.   I think it was all cash.

(viii)   Deposition of Suellen Schmidt, February 24, 2023 (attached as <u>Exhibit "H"</u>):

Page 9
**Q.   When you opened your first account, did you**
**3 personally go on and fill out all the information on**
**4 the Telex website to open it, or did someone help you?**
5   A.   I believe I had somebody help me.
**6   Q.   Do you know who helped you open it?**
7   A.   Her name is Isabella.  She is a friend of a
8 friend who convinced me to join.
**9   Q.   When Isabella helped you open the account, do**
**10 you remember how you paid for the account?**
11   A.   So, honestly, my friend -- because I told my
12 friend I didn't want to join.  I didn't have any money
13 to join at the time.  And she convinced me to accept
14 an offer from another friend, so I had to borrow money
15 from this other friend.  She borrowed the money and
16 invested the money, and then I ended up having to pay,
17 of course.

(ix)   Deposition of Bruno Graziani, March 16, 2023 (attached as <u>Exhibit "I"</u>):

Page 7
**Q.   Okay.  Thank you.  And when he brought you into**
**18 Telex, do you remember if he opened an account for**
**19 you?**
20   A.   I believe he did.  Yeah, he did at the time.
**21   Q.   When he opened that account for you, did you pay**
**22 him back for opening that account?**
23   A.   Yes.  So I wasn't able to go to the bank to get
24 my statements yet for that period of time, but I
Page 8
1 remember that, going to the bank, I took out -- I made

2  a withdrawal of money in order to make that payment.
**3  Q.   So did you withdraw cash?**
4   A.   Yes, because -- I don't know -- at the time,
5  like, you had to buy, like, credits.  I don't know if
6  it was -- if you bought credits from him or something
7  like that.

As earlier discussed, the credits were a form of currency in the TelexFree Ponzi scheme.

The credits could be, and were often, redeemed with TelexFree for par (one dollar in exchange

for one credit).  *See* Sorondo Affidavit, at ¶5, 7.   It would therefore logically follow that if a

Recruiting participant were to use 1,000 credits to open a User Account for a Recruited

Participant, that the Recruiting Participant would expect to receive $1,000.  As set forth in the

*Supplemental Rebuttal Expert Report of Joshua W. Dennis*, the proposed expert for the

Defendant Class Representatives:

> 174. It defies economic logic that one Participant would simply give
> Credits to another Participant without financial consideration in return
> (particularly in these large sums) given that Credits could be converted
> into cash through Direct Receipts or, much more frequently, Triangular
> Transactions.

In fact, TelexFree Participants saw, upon logging into the TelexFree portal, that their

credits were denominated as U.S. dollars (USD) on the basis of $1 per 1 credit).  *See* Sorondo

Affidavit, at ¶9.

While there may have been circumstances where Recruiting Participants in a Triangular

Transaction redeemed their credits for less than par, or as a gift, there is sufficient evidence to

establish a pervasive course of conduct whereby the Recruited Participant paid cash to the

Recruiting Participant in an amount equal to the membership plan purchased, and that the

Recruiting Participant redeemed credits in a like amount to satisfy the membership invoice.

Thus, the Court should establish a *prime facie* presumption of the use of cash to purchase

membership plans through a Triangular Transaction on a dollar-for-credit basis, which individual

Participants can seek to rebut in the context of assessment of damages against such Participants.

**D.      Participants should bear the responsibility for failure to maintain records.**

To the extent that Net Winners failed to document their Triangular Transactions, the

Class Representatives seek to hold the Trustee responsible for the lack of recordkeeping by

Participants to establish their Net Losses or Net Winnings:

> Moreover, individual Participants likely do not have comprehensive receipts or
> records to prove just how much money they put into or received from the Telexfree
> system. Many transactions were done using cash, and Participants usually did not keep
> detailed records.
> *Defendants' motion for summary judgment, at p. 23*

The class defendants should not be able to escape liability to the Trustee based upon a

failure to maintain adequate books and records.  As set forth by the United States Supreme Court

in permitting proof by inference in an antitrust case:

> In such a case, even where the defendant by his own wrong has prevented a more precise
> computation, the jury may not render a verdict based on speculation or guesswork. But
> the jury may make a just and reasonable estimate of the damage based on relevant data,
> and render its verdict accordingly. In such circumstances "juries are allowed to act upon
> probable and inferential, as well as direct and positive proof." *Story Parchment Co*. v.
> *Paterson Co., supra,* 561-4; *Eastman Kodak Co*. v. *Southern Phot Co., supra,* 377-9.
> Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of
> his victim. It would be an inducement to make wrongdoing so effective and complete in
> every case as to preclude any recovery, by rendering the measure of damages
> uncertain.  Failure to apply it would mean that the more grievous the wrong done, the less
> likelihood there would be of a recovery.
> The most elementary conceptions of justice and public policy require that the wrongdoer
> shall bear the risk of the uncertainty which his own wrong has created.
> *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946)

> *See also Home Placement Service, Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206

(1st Cir. 1987)(trier of fact can calculate damages based upon reasonable inferences drawn from

the evidence and the defendant, whose wrongful conduct caused or contributed to the uncertainty

of damages sustained, cannot protest that such measurement of damages is too imprecise); *In re*

*Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 U.S. Dist. LEXIS 170676 (D. Mass.

2017)(uncertainties regarding damages should be resolved against the wrongdoer and not those

injured); *Gesualdi v. RRZ Trucking Co.*, 2011 U.S. Dist. LEXIS 54751 (E.D.N.Y. 2011)(failure

by employer to maintain records required under ERISA shifted burden to employer to either

come forward with evidence or to negate the reasonableness of the inferences to be drawn from

the plaintiff's evidence).

Individual defendants can seek to rebut the amount of damages assessed against them

after the class action component of the litigation has concluded.  Defendants, however, have

been on notice of the litigation since it was commenced and should not be able to use the failure

to keep records as a sword to evade liability.

**E.     The computation of Net Winnings is a mathematical exercise and does not require
        expert testimony.**

Freer performed the aggregation of the User Accounts attributable to each Participant.

After completing the aggregations, Freer relied upon the Net Equity calculations performed by

Huron as to each User Account to establish the Net Winnings of the respective Participants.  As

set forth below, Huron's computation of Net Equity was a mathematical exercise not requiring

expert testimony, and the suggestions by the Class Representatives that Huron's computation of

Net Equity was previously excluded are inaccurate and misleading.  The Court never reached the

issue of the Net Equity computation in the first *Daubert* hearing, as earlier discussed.[2]

---

[2] As set forth in the Decision:
The defendants also raise arguments beyond simply addressing the reliability of Mr. Martin's
selection and application of an aggregation methodology, including arguments that relate to Mr.
Martin's assumptions and decisions after the aggregation process was complete, when he set out

In calculating the Net Winnings of each Participant, Huron merely assembled the relevant

data fields and implemented the instructions of the Trustee.  As set forth above, the exclusion of

Credit Transfers was a matter of law, and the assumptions made with respect to monies paid by

Recruited Participants to Recruiting Participants pursuant to Triangular Transactions was based

upon factual evidence and conclusions made by the Trustee.  Huron's computations of Net

Equity were merely a mathematical exercise, for which an expert witness is not required.

*Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 U.S. Dist. LEXIS 134924 (D. Del. 2022)

at *55; *Foraker v. Schauer*, 2005 U.S. Dist. LEXIS 46071 (D. Col. 2005) at *24; *New York v.

UPS*, 942 F.3d 554, 596 (2nd Cir. 2019), *cert den*., 141 S. Ct. 242 (2020)(arithmetic calculations

performed using Excel, even as to spreadsheets that are large and unwieldy, does not require

expert testimony); *Qwest Corp. v. Elephant Butte Irrigation Dist.*, 616 F. Supp. 2d 1110 (D.N.M.

2008)(witness estimate was a mathematical exercise based upon information known and

reasonably available; the case was tried to the bench and the Court understood the calculation;

accordingly, declarant was not an expert witness).  Therefore, there is no need for a second

expert with respect to the computation of Net Winnings, and the Class Representatives'

assertions in this regard are without merit.

**F.      The Trustee requests rulings that will establish a rebuttable presumption as to the
         Net Winnings of each class defendant.**

Based upon the facts and law provided, the Trustee has offered sufficient evidence for a

finding that the Freer aggregation of User Accounts, and the computation of Net Winnings by

---

to calculate the gains and losses (net equity) of each alleged participant.  Having determined that
the reliability of Mr. Martin's aggregation methodology has not been established and thus his
expert opinion cannot be admitted, it is unnecessary to address the defendants' additional
arguments, which they may choose to raise in the future, if appropriate.
(Decision, at p. 40, n.32)

Huron as instructed by the Trustee, satisfies the Trustee's *prima facie* case and gives rise to a presumption in favor of the Trustee.   In accordance with Federal Rule of Evidence 301, the establishment of the *prima facie* case by the Trustee imposes upon each defendant the burden of going forward with, or producing, evidence to rebut or meet this presumption.  *See* FRE 301; *Zohbe v. Ameriquest Mortg. Co. (In re Zohbe)*, 2012 Bankr. LEXIS 1730 (Bankr. N.D. Ga. 2012) at *7 (articulating the "bursting bubble" theory whereby a party must introduce rebutting evidence sufficient to support a finding contrary to the presumed fact and, if the presumption is rebutted, the court may make its decision as any ordinary issue of fact); *see also Giza v. Amcap Mortg., Inc. (In re Giza)*, 458 B.R. 16 (Bankr. D. Mass. 2011)(*id.*); *Keydata Corp. v. Boston Edison Co.*, 37 B.R. 324 (Bankr. D. Mass. 1983)(*id.*).

The Court may then weigh all of the evidence to determine if: a) the defendant has produced sufficient evidence to rebut any presumption; and b) if so, whether the Trustee has satisfied his ultimate burden to establish the amount of the damages to be entered in favor of the Trustee.  While an individual defendant may submit evidence to rebut the *prima facie* case establishing the amount of their Net Winnings, such evidence should be limited to rebutting factual presumptions.   In this regard, the Trustee will provide defendants with the details of the User Account activity attributable to them to facilitate any rebuttal. The defendant should not, however, be permitted to challenge the methodology of aggregating User Accounts, nor the methodology for computing Net Winnings.

## IV. CONCLUSION

There is no genuine issue of material fact, and the Trustee is entitled to summary judgment as a matter of law.  The Trustee accordingly requests that the Court find that:

(i)      That the Trustee's usage of the Lowest Rep ID in each Participant aggregation of User Accounts was an appropriate methodology to establish the identity of the Participant whose User Accounts were aggregated;

(ii)     That monies paid in connection with the transfer of credits between Participants was properly excluded in computing Net Winnings;

(iii)    That in computing the Net Winnings arising in a Triangular Transaction, it is presumed that a Recruited Participant paid cash to a Recruiting Participant to obtain a TelexFree membership plan;

(iv)     that the aggregation of Net Winners as performed by Freer, coupled with the other factual and legal evidence, establishes *prima facie* evidence of the Participant identity of the Net Winners and the amount of the Net Winnings of such Net Winners, subject to the resolution of any issues in Phase II of the litigation and subject to the right of individual Net Winners to seek to rebut the amount of Net Winnings asserted by the Trustee on the limited grounds provided herein; and

(v)      summary judgment should be granted to the Trustee and the Class Representatives' motion for summary judgment should be denied.

Respectfully submitted,

STEPHEN B. DARR, LIQUIDATING
TRUSTEE,
By his counsel:

Dated:  September 11, 2023

/s/ Andrew G. Lizotte
Charles R. Bennett, Jr. (BBO #037380)
Andrew G. Lizotte (BBO #559609)
MURPHY & KING,
Professional Corporation
28 State Street, 31st Floor
Boston, MA  02109
Telephone: (617) 423-0400
ALizotte@murphyking.com

823858

## CERTIFICATE OF SERVICE

I, Andrew G. Lizotte, hereby certify that on September 11, 2023, I caused a copy of the

foregoing document to be served electronically through the Court's ECF System upon the

registered participants as identified on the Notice of Electronic Filing.

/s/ Andrew G. Lizotte
Andrew G. Lizotte

Dated:  September 11, 2023