# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>      Reorganized Debtors. | Chapter 11 Cases<br><br>14-40987-EDK<br>14-40988-EDK<br>14-40989-EDK<br><br>Substantively Consolidated |
| STEPHEN B. DARR, TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>      Plaintiff,<br>v.<br>FRANZ BALAN, A REPRESENTATIVE OF A<br>CLASS OF DEFENDANT NET WINNERS,<br>      Defendants. | Adversary Proceeding<br>No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>      Plaintiff,<br>v.<br>MARCO PUZZARINI AND SANDRO PAULO<br>FREITAS, REPRESENTATIVES OF A CLASS<br>OF DEFENDANT NET WINNERS,<br>      Defendants. | Adversary Proceeding<br>No. 16-4007 |

**OPPOSITION OF STEPHEN B. DARR, AS TRUSTEE OF THE ESTATES
OF TELEXFREE. LLC, TELEXFREE, INC. AND TELEX FINANCIAL, INC.,
TO CLASS REPRESENTATIVES' MOTION TO EXCLUDE TESTIMONY OF DR.
CAMERON FREER AS INADMISSIBLE UNDER *DAUBERT***

## **TABLE OF CONTENTS**

I. **BACKGROUND** ........................................................................................ 1

  **A.** The Freer Aggregation Methodology ................................................ 7

    1. Step 1: Selecting for Data Quality and Transforming the Fields ........................ 7
    2. Step 2: Cleaning the Fields ........................................................ 8
    3. Step 3: Deterministic Step ........................................................ 8
    4. Step 4: Blocking ................................................................. 9
    5. Step 5: Rubric Application to Calculate Gammas ............................ 10
    6. Step 6: Calculate Match Probabilities .................................... 10
    7. Step 7: Compute Clustering for Several Fixed Thresholds ............ 10
    8. Step 8: Dynamic Clustering .................................................. 11
    9. Step 9: Convert the Clustering of Account Groupings into a Clustering of User Accounts ..................................................... 12
    10. Step 10: Tabulate Total Net Equity for Each Cluster ................ 12
    11. Results .......................................................................... 13

II. **DR. FREER'S AGGREGATION METHODOLOGY MEETS ALL ADMISSIBILITY REQUIREMENTS UNDER FEDERAL RULE OF EVIDENCE 702** .................................................................................. 13

  **A.** Dr. Freer's Proposed Testimony is the Product of Reliable Principles and Methods 15

  **B.** Dr. Freer's Scientific, Technical, or Other Specialized Knowledge Will Help the Trier of Fact to Determine a Fact in Issue ......................................... 17

    1. Dr. Freer's statistical and computer science background make him more than qualified to opine on a probabilistic approach to linking User Account belonging to the same Participants. ................................ 17
    2. The output of Dr. Freer's aggregation methodology identifies each Net Winner. 18

  **C.** Dr. Freer's Aggregation Methodology is Based on Sufficient Facts and Data .... 19

    1. Dr. Freer specifically addresses the sufficiency of data quality in the TelexFree database. ............................................................................ 20
    2. Dr. Freer specifically addressed Mr. Dennis's unfounded critiques of his data quality assessment. ..................................................... 23
    3. Dr. Freer did not rely on an excluded Net Equity summation, and, even if the calculation changed it would have no impact on the reliability of the Freer Aggregation Methodology. ................................................ 24

  **D.** Dr. Freer's Opinions Reflect a Reliable Application of The Principles and Methods to The Facts of the Case ...................................................... 25

    1. Dr. Freer's estimated error rates are considered better than acceptable results in the data science community. .............................. 25
    2. Dr. Freer's methodology does not rely primarily on name. ........ 26

**III. MR. DENNIS'S OPINIONS ARE NOT ADEQUATELY SUPPORTED ......... 28**

   **A.**  Class Representative's Motions Lack a Scientific Foundation Because Mr. Dennis Lacks the Requisite Education, Training and Experience, and His Opinions are not the Product of Reliable Scientific Principles and Methods. .......................... 29

     1.  Dennis Lacks the Requisite Education, Training and Experience to Opine on Dr. Freer's Report, or Probabilistic Data Linkage Methodologies Generally. ........ 30

     2.  Mr. Dennis has Minimal Prior Experience with Probabilistic Modeling. ......... 31

     3.  Mr. Dennis Has No Experience Working with the Fellegi-Sunter Model that Lies at the Heart of the Freer Aggregation Methodology.................................. 33

     4.  Mr. Dennis's Critique of Dr. Freer's Aggregation Output Lacks any Statistical Support and Thus Fails the "More Probable than Not" Standard under FRE 702 34

  **IV. CONCLUSION ......................................................................................................... 39**

## EXHIBIT LIST

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | Developing Standard Tools for Data Linkage |
| 2 | April 29, 2022 Expert Report of Dr. Cameron E. Freer |
| 3 | Advisory Committee Note to 2000 Amendment to FRE 702 |
| 4 | Advisory Committee Note to 2023 Amendments to FRE 702 |
| 5 | July 31, 2020 Rebuttal Expert Report of Joshua W. Dennis |
| 6 | November 24, 2020 Transcript of Evidentiary Hearing |
| 7 | Using the EM Algorithim for Weight Computation in the Fellegi-Sunter Model of Record Linkage |
| 8 | An Application of the Fellegi-Sunter Model of Record Linkage to the 1990 U.S. Decennial Census |
| 9 | Using a Probabilistic Model to Assist Merging of Large-Scale Administrative Records |
| 10 | May 22, 2023 Reply Report of Dr. Cameron E. Freer |
| 11 | The Intuition Behind the Use of Expectation Maximisation to Train Record Linkage Models |
| 12 | May 9, 2023 Deposition of Joshua W. Dennis |
| 13 | Fuzzy Matching and Deduplicating Hundreds of Millions of Records with Splink |
| 14 | Modern Scientific Evidence, Vol. I |
| 15 | The Role of Expert Judgment in Statistical Inference and Evidence-Based Decision Making |
| 16 | April 14, 2023 Supplemental Rebuttal Expert Report of Joshua W. Dennis |

**OPPOSITION OF STEPHEN B. DARR, AS TRUSTEE OF THE ESTATES
OF TELEXFREE. LLC, TELEXFREE, INC. AND TELEX FINANCIAL, INC.,
TO CLASS REPRESENTATIVES' MOTION TO EXCLUDE TESTIMONY OF DR.
CAMERON FREER AS INADMISSIBLE UNDER *DAUBERT***

The *Domestic & International Class Representatives' Motion To Exclude Testimony Of
Dr. Cameron e. Freer as inadmissible Under Daubert* [A.P. No. 16-04006, Doc. 442] (the
"*Daubert* Motion") should fail for three reasons. First, the Trustee's expert, Dr. Cameron E.
Freer is a preeminent data scientist whose work in this case meets all of the requisites for
admissibility under Federal Rule of Evidence 702, including under the 2023 amendments to the
rule. Dr. Freer's use of the Fellegi-Sunter Model with Expectation Maximization (the "FS-EM
Model") for large set data linkage is appropriate, and his education, training and experience
permits him to apply the FS-EM Model to the TelexFree user database to arrive at a reliable
determination of linkage between individual net winner accounts. Second, the Class
Representatives' motion relies on the opinion testimony of Joshua W. Dennis. Mr. Dennis has
little to no experience in the science of complex data linkage, and he relies on limited *ad ho*c
examples of perceived inconsistencies to suggest set-wide data inconsistencies, rather than
adhering to rigorous a statistical review. His opinion testimony should be afforded little, if any,
weight by the Court. Third, any remaining account linkage questions should be resolved in a
follow-on Claims Portal process similar to that used in determining net losers. That process will
allow individual net winners to challenge Dr. Freer's net winner cluster results at the individual
user account level, where appropriately supported by other evidence.

## I.   BACKGROUND

TelexFree was a massive Ponzi and pyramid scheme that ensnared more than a million
individuals in multiple countries. While TelexFree was ostensibly in the business of selling voice

over internet protocol (VOIP) services, its real business was the sale of membership plans, where

membership fees from new members ("Participants") were used to pay the "profits" of existing

Participants.

Ympactus (an affiliate) operated a related Ponzi/pyramid scheme in Brazil, using the

same business model and maintaining its records on the TelexFree database. There were

approximately 17 million User Accounts in the TelexFree database. The Trustee has previously

determined that, of that 17 million individual accounts, approximately 11 million were

attributable to TelexFree, 4 million were attributable to Ympactus, and 2 million involved User

Accounts for which no membership fee was ever paid.

When the TelexFree scheme collapsed, some Participants received more money than they

had paid into the scheme (Net Winners), whereas the majority of Participants had contributed

more into the scheme than they were paid out (Net Losers). Many Participants maintained

multiple User Accounts. However, the TelexFree database treated each of the approximately 17

million User Accounts as a standalone record that was not internally linked to other User

Accounts, even when User Accounts were opened by the same Participant. Additionally, each

User Account could contain up to 44 different fields of data, including name, phone number,

email address, street address, etc. Some Participants at times entered information that was

inconsistent across these fields in their various User Accounts. For example, two User Accounts

opened by the same Participant may have entered a different street address, or variations of their

name.[1]

---

[1] Many Telex participants had multiple names. By way of example, individuals of Portuguese
extraction use both personal and family names, including up to two from the mother's side, two
from the father's side and two from the husband. See
https://en.wikipedia.org/wiki/Portuguese_name. The same user might enter some or all of their
given names in a given account.

2

As set forth in more detail below, Dr. Freer relied on the FS-EM algorithm, a peer-reviewed data linkage methodology for linking data without the need for a separate control set of verified data. The Freer data linkage output resulted in one "cluster" of User Accounts for each Participant, so each User Account appears in only one cluster.

Data linkage is the science of joining disparate records based on matched identifiers. It can involve merging and linking data from two or more separate databases, or as in this case, linking separate user accounts contained in a single database. In each instance, the goal is to link data based on matching variables.

```
                              COMPLETE AGREEMENT
                                                          LINKED
                              AGREES ON MOST
                                  FIELDS

   POTENTIALLY
LINKABLE WITH
   FURETHER
   ANALYSIS                   PARTIAL FIELD
                               AGREEMENT


                              DISAGREES ON MOST
                                  FIELDS
                                                        NOT LINKED
                               COMPLETE
                              DISAGREEMENT
```

By way of example, consider the following abbreviated table drawn from Durham

County, North Carolina voter records containing seven fields of data:

|  | NAME | ADDRESS | AGE | SEX | RACE | BIRT. | PARTY |
|---|---|---|---|---|---|---|---|
| 1 | Domineck Q. AAshard Jr. | 914 Monmouth Ave #3 | 26 | M | B | _ | LIB |
| 2 | Domineck Q. AAshard Sr. | 1408 Auburndale Dr. | 55 | M | B | NY | DEM |
| 3 | Xiomira A. Martinez | 1715 Cole Mill Rd. | 31 | F | O | HL | REP |
| 4 | Xiomira A. Martinez | 2923 Forrestal Dr. | 31 | F | O | HL | _ |
| 5 | Jacqueline D. Fuller | 141 Bagby Ln. | 54 | _ | _ | _ | DEM |
| 6 | Jacqueline D. Fuller | 905 Cook Rd. | 56 | F | B | NC | DEM |

Accounts 1 and 2 share similar names, but the ages, addresses and party affiliations suggest a father/son relationship. Accounts 3 and 4 are likely the same individual, even though the party affiliation for one account is missing (null). Accounts 5 and 6 could be the same person with an age error in one account, but it is not clear, and requires further analysis.

Data linkage can be performed as a *deterministic* exercise or as a *probabilistic* exercise. The deterministic approach involves the exact matching of data field values to determine if a pair of records *are or are not* a match, while the probabilistic approach involves calculating a weight for each field that indicates for any pair of records how *likely* it is that they refer to the same person if there is a match in that field, or aggregation of fields. Deterministic matching is generally used where there is a high-quality identifier (e.g., a unique ID number for each user) available, or where multiple fields can be matched and concatenated to reach a high confidence match. Matching determinations are typically done after the data has been cleaned. Cleaning involves conforming individual field data to a more uniform state with losing important

5

information, e.g., removing multiple spaces within a name, or converting fields to all upper or lower case.

Once cleaned, matching is done on a one-to-one basis in deterministic matching. The result is one of two outcomes: the field data compared across two records is either a match or a non-match. Probabilistic linkage, on the other hand, assigns a match probability to each field compared; the higher the probability, the more likely the match. Additionally, weights may be assigned to each field considered, with higher weights assigned where the probability that a match across that field indicates a true overall record match (the *m*-variable) outweighs the probability of match across that field for an overall record non-match (the *u*-variable). For example, referring to the table above, a likely match across two records in party (affiliation) should be giving less weight that a likely match in street address when determining if two records should be linked.

The FS-EM Model used by Dr. Freer has been developed specifically to address large scale record linkage where there is no "gold standard" database[2] separately available to test *m*- and *u*-variable output. FS-EM is a peer-reviewed, unsupervised, iterative machine learning algorithm used to create data linkage even where data fields are incomplete or incorrect. There are multiple advantages of using the EM algorithm to calculate *m* and *u* probabilities for probabilistic matching, including no requirement of an external "gold standard" to teach the algorithm before it can be used. A useful description of the FS-EM Model can be found at:

---

[2] A gold standard database is an existing previously verified database against which probabilities can be calculated that two records in the database at issue will agree on a matching variable in truly matched pairs (the m-probability), compared to the probability that the same matching variable will agree in non-matched pairs (the u-probability). FESM was specifically designed to allow for estimating m- and u-probabilities in the absence of a gold standard database.

https://www.ons.gov.uk/methodology/methodologicalpublications/generalmethodology/onsworkingpaperseries/developingstandardtoolsfordatalinkagefebruary2021, also attached as Exhibit 1.

### A.  The Freer Aggregation Methodology

Data linkage is typically done in stages. First, the data is prepared for linking. This includes evaluating data quality to select which fields to use for comparison, along with data cleaning, parsing, and standardizing. Next, linkage is the bringing together of pairs of records for comparison and identifying matches, i.e., belonging to the same person. Finally, the results are checked to determine their accuracy. This includes evaluating the error rate of record linkage created by the model.

The Ten-Step Aggregation Methodology developed by Dr. Freer (the "Freer Aggregation Methodology") for clustering accounts in the TelexFree database includes these stages, including a data quality review to confirm that the Telex data was suitable for linkage. A brief overview of each step is provided below. A detailed description of each step is included paragraphs 121 through 208 of his April 29, 2022, opening Report (the "Freer Report"), attached as Exhibit 2.

### 1.  Step 1: Selecting for Data Quality and Transforming the Fields

The TelexFree database includes 44 fields in each User Account Record. Dr. Freer assessed each field across all records to identify which data fields were of sufficiently high quality to use for reliably assessing matches. The dimensions he assessed include completeness (how often the field values are present vs. missing), consistency (how consistent the values used for matching are), accessibility (inclusion of different kinds of non-overlapping fields such as name, address, phone, email, etc.), and believability (how credible or plausible the actual values are).

Dr. Freer found 11 TelexFree user account fields to be of sufficiently high quality to warrant inclusion in his Aggregation Methodology: *rep_nome* (name), *rep_email* (email), *rep_cel* (cell phone), *rep_fone* (phone), *rep_end* (street name), *rep_numero* (house number), *rep_cep* (ZIP code analogue), *rep_pwd_secondary* (hashed password), *rep_cpf* (SSN analogue), *rep_datanasc* (date of birth), and a truncated version of *rep_login* (login name). In addition, the field *rep_id*, a unique identifier assigned in increasing order to each record by Telex, was used to define each unique User Account record. Dr. Freer's extensive data quality testing is described generally at paragraphs 22 – 27 of the Freer Report, Ex. 2, and in more detail in paragraphs 85 – 110.

### 2. Step 2: Cleaning the Fields

Next, Dr. Freer applied standard cleaning techniques to the values of each field to ensure that the data in each selected field across all records is more consistent and uniform. The data cleaning techniques used for each field varied, but were generally designed to apply industry-accepted transformations, such as transforming all characters to lowercase and eliminating spaces and "garbage" (meaningless) characters, while retaining the informational content of the field to the maximum extent possible. See Ex. 2, Freer Report, ¶¶ 126-135.

### 3. Step 3: Deterministic Step

To make it computationally reasonable to perform probabilistic linkage methods on a dataset as large as the TelexFree dataset, Dr. Freer next performed a deterministic matching step; User Accounts that matched exactly across eight cleaned fields were placed into the same account groupings[3]. 7,563,961 User Accounts had at least one "exact" match to another User Account across all eight cleaned fields. This step reduced the number of records for subsequent

---

[3] The data in the remaining 3 fields were combined into sets of values in the account grouping to preserve the data.

probabilistic analysis by more than half: 10,987,617 User Account records were aggregated

down to 4,367,728 account groupings[4] that were treated as equivalent to a separate record in the

blocking and probabilistic linkage steps described below (account groupings were expanded

back into their constituent User Accounts in Step 9). Importantly, this step also reduces the

number of record pairs that were required to be analyzed in subsequent steps by more than 4-

fold. See Ex. 2, Freer Report, ¶¶ 136-143.

### 4. Step 4: Blocking

Because probabilistic matching algorithms consider the potential matches across each

pair of records being analyzed, the approximately 4 million account groupings (from the step

above) would result in approximately 10 *trillion* pairs of possible account groupings for

consideration. Because the computation run time for comparting 10 trillion separate pair

combinations is prohibitive, Dr. Freer used a "blocking" scheme to reduce the number of pairs

for consideration. Blocking relies on a set of rules that each pair must pass in order to be

considered in the probabilistic matching phase, in this case requiring a high level of agreement

between the two pairs across the name field and at least one cleaned other field other than the

cleaned version of *rep_numero* (house number).[5]   The final result of this step was a blocking set

consisting of 117,563,883 pairs of account groupings for later probabilistic analysis[6]. See Ex. 2,

Freer Report, ¶¶ 144-160.

---

[4] Some account groupings were a "grouping" of just one record while the largest account
grouping contained 3,536 records.

[5] The full rule is set forth in ¶¶ 150-153 of the Freer Report, Ex. 2.

[6] For computational reasons, 62,725 User Account pairs that included a name value of "John
Williams," email with a "mailinator.com" domain, and street name of the form "534 Warry
Lane" with differing numbers in the place of "534" were joined and assigned to the same cluster
at Step 9 after the final clustering of the remaining accounts was computed.

### 5. Step 5: Rubric Application to Calculate Gammas

The next step was to determine the similarity of values in each field (the gamma value) for each pair of accounts groupings in the blocking set. For some fields, the corresponding gamma value is binary (0 or 1), indicating complete agreement or total disagreement. For other fields, the corresponding gamma value indicates the degree of agreement, discretized (grouped) to a small number of values representing, for example, "different," similar," or "nearly identical."  In most cases, the gammas in the Freer Aggregation Methodology were determined by discretizing the result of an appropriate fuzzy matching function (e.g., a fuzzy match of less than 83% is "different," while a greater than 92% is "nearly identical"). The output of this step was the set of comparison vectors, one vector for each pair in the blocking set. See Freer Report, Ex. 2, Freer Report, ¶¶ 161-176.

### 6. Step 6: Calculate Match Probabilities

Next, gamma vectors for each account grouping pair were used to determine the match probability for each pair. Dr. Freer used Splink, a probabilistic record linkage software package, using the gamma vectors derived in Step 5 above to assign a match probability to each of the 117,563,883 pairs of account groupings created in the blocking process. See Ex. 2, Freer Report, ¶¶ 177-179.

### 7. Step 7: Compute Clustering for Several Fixed Thresholds

Next, 149 different clustering scenarios (aggregations) of account groupings were computed for various fixed thresholds of the match probability in the range of 0.006 to 100. For example, with a threshold of 0.95, only the pairs with 95 percent or higher match became part of a cluster. Because every account grouping must be in exactly one cluster, the cluster is "transitively closed" such that if Cluster A matched Cluster B at 95% or higher, and Cluster B

10

matched Cluster C at 95% or higher, Cluster A and Cluster C would be deemed in the same cluster regardless of individual match probability. See Ex. 2, Freer Report, ¶¶ 180-183.

### 8.   Step 8: Dynamic Clustering

Clustering necessarily balances two competing tensions: (1) records that do not belong in the same cluster are not joined (i.e., one should avoid "overclustering") and (2) records that do belong in the same cluster are joined in the same cluster (i.e., one should avoid "underclustering"). For the Telex dataset, Dr. Freer clustered thresholds dynamically across the dataset, rather than with a single fixed threshold (as described in step 7). This is because some participants entered their information very consistently across many accounts, while other participants, for a variety of reasons, entered information that differed more widely (e.g., name variants, typos, multiple email addresses or phone numbers, etc.). As a result, Dr. Freer devised a method whose implementation in code chose higher thresholds in that portion of the dataset where there was a "tightly bound" collection of account groupings having high match probability with each other and low match probability with every other account grouping, while choosing lower thresholds in that portion of the dataset where there was a more "loosely bound" collection of account groupings having moderately high match probability with each other but still much lower match probability with every other account grouping in the dataset.

Dynamic clustering was accomplished by: (1) defining measures of overclustering and underclustering for a given cluster, and calculating the overclustering measure for every cluster in each of the 149 fixed-threshold clusterings computed in Step 7; (2) using this data to compute a dynamic clustering for each of the 41 values of a "dynamic clustering  parameter", where the overclustering calculations and dynamic clustering parameter guide the  selection of a fixed threshold for each account grouping; and (3) choosing the dynamic clustering  from among these 41 dynamic clusterings that optimally balances the degree of overclustering and

11

underclustering[7]. The chosen dynamic clustering was the output of step 8. The cluster

assignments were tracked by assigning each account grouping in a given cluster an Account

Grouping Cluster ID that corresponded to the lowest *rep_id* in that cluster, i.e., the first account

created by any of the Participants assigned to the Cluster[8]. See Ex. 2, Freer Report, ¶¶ 184-204.[9]

### 9.  Step 9: Convert the Clustering of Account Groupings into a Clustering of User Accounts

The last step in determining the final clustering was to "ungroup" the account groupings

back into User Accounts. This was accomplished by joining the clustering output from the Step 8

with a table containing the mapping of each User Account to its Account Grouping (generated in

Step 3). As a result, each User Account was assigned a Cluster_ID that corresponded to lowest

*rep_id* in the cluster. The result of this step was 1,566,383 clusters corresponding to 1,566,383

different Participants.[10]  See Ex. 2, Freer Report, ¶¶ 205-207.

### 10. Step 10: Tabulate Total Net Equity for Each Cluster

Each User Account was assigned its Net Equity by Huron in accordance with the court-

approved net equity formula[11], and the total Net Equity of each cluster was defined to be the sum

of the Net Equity values of each of its User Accounts. Dr. Freer tabulated this quantity for each

cluster. See Ex. 2, Freer Report, ¶ 208.

---

[7] This process is described in great detail in ¶¶ 189-204 in the Freer Report, Ex. 2.

[8] See *Affidavit of Jean Louis Sorondo*, ("Sorondo Aff."), ¶ 3.d.

[9] The full rational for using low *rep_id* as the cluster owner is described in detail in the Trustee's Opposition to the Class Representatives' Motion for Summary Judgment and supporting affidavits.

[10] The "John Williams" cluster was added back in at this step.

[11] *Supplemental Order Respecting Motion by Chapter 11 Trustee for Entry of Order Finding That Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief* [A.P. No. 14-40987, Doc. 687], ¶ 5.ii.

**11. Results**

The Freer Aggregation Methodology determined that the 10,987,617 User Accounts attributable to TelexFree belonged to 1,566,383 different Participants, with an average size of 7.01 User Accounts per Participant. Of the 1,566,383 Participants, 1,484,702 are Net Losers and 81,681 are Net Winners. The Net Winners have a total net gain of $1,555,981,482.42, with an average net gain of $19,049.49 per Net Winner. The Net Losers have a total net loss of $1,782,171,730.09, with an average net loss of $1,200.36 per Net Loser. See Ex. 2, Freer Report, ¶ 209.

Finally, Dr. Freer checked his cluster output by calculating the error rates for the Aggregation Methodology. Taking into consideration two types of errors commonly considered in the field, "false discovery rate" and "false negative rate," he calculated the standard statistical measure known as accuracy (called F1 or the f-measure) to be 0.988 (98.8%). This was computed in accordance with a standard peer-reviewed statistical method based on information about pairwise match probabilities contained in his probabilistic record linkage model. See Ex. 2, Freer Report, ¶¶ 212-213.

## II.  DR. FREER'S AGGREGATION METHODOLOGY MEETS ALL ADMISSIBILITY REQUIREMENTS UNDER FEDERAL RULE OF EVIDENCE 702

Directly relevant to the Court's consideration of the Class Representatives' motions are the 2023 amendments to Federal Rule of Evidence ("FRE") 702.[12]

---

[12] While the FRE 702 Amendments do not formally go into effect until December 1, 2023, the Advisory Notes accompanying the Amendments confirm that the Amendment is not intended to change Rule 702, but rather is a clarification brought about by courts shirking their gatekeeper role. See https://www.uscourts.gov/sites/default/files/evidence_rules_report_-_may_2022_0.pdf, attached as Exhibit 3. Thus, commentators and courts are now citing to the Amendment prior to its official adoption date.

13

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if **the proponent demonstrates to the court that it is more likely than not that**:

>    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>    (b) the testimony is based on sufficient facts or data;
>
>    (c) the testimony is the product of reliable principles and methods; and
>
>    (d) the ~~expert has reliably applied~~ **expert's opinion reflects a reliable application of** the principles and methods to the facts of the case.

The 2023 Amendments, effective December 1, 2023, are intended to address two issues. First, the Amendments <u>clarify</u> the existing FRE 702 rule: first, a proponent of expert testimony bears the burden of demonstrating to the Court on a "*more likely than not*" standard that the proffered testimony meets the admissibility requirements set forth in the rule[13]; and second, each proffered opinion must stay within the bounds of what can be concluded from a reliable application of an accepted methodology. Dr. Freer meets each of FRE 702's elements of admissibility because:

>    (a)   The peer-reviewed FS-EM probabilistic data linkage approach employed by Dr. Freer is a reliable method for linking large set data;

---

[13] The 2023 Amendment Notes also make clear that while FRE 104(a) require the Court to decide "any preliminary question about whether the witness is qualified", FRE 702 ultimately controls. ("The amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard. But it remains the case that other admissibility requirements in the rule (such as that the expert must be qualified and the expert's testimony must help the trier of fact) are governed by the Rule 104(a) standard as well."). https://www.uscourts.gov/sites/default/files/2023_congressional_package_april_24_2023_0.pdf at p. 211, attached as Exhibit 4.

(b)     Dr. Freer has requisite education, training and experience to apply the FS-EM data

linkage methodology to the TelexFree database;

(c)     Dr. Freer's Aggregation Methodology determines a fact in issue in the case, and is

therefore helpful to the finder of fact;

(d)     Dr. Freer's Aggregation Methodology is based on sufficient facts and data because

he selected the appropriate fields in the TelexFree database by testing data quality,

and then selecting those fields that had the highest linkage power based on well-

accepted and statistically significant methods of evaluating data quality; and

(e)     As evidenced by statistical error rate analysis Dr. Freer has achieved a high-quality

aggregation of individual accounts into clusters that permit the Trustee to identify

net winners.

## A.  Dr. Freer's Proposed Testimony is the Product of Reliable Principles and Methods

There is no dispute that the primarily probabilistic data linkage approach employed by

Dr. Freer[14] is the most appropriate method for aggregating the User Accounts in the TelexFree

Dataset to Participants. Indeed, Class Representatives and their purported expert, Mr. Dennis,

have been calling for a probabilistic approach from the beginning.[15]

---

[14] While it is mainly probabilistic in its approach, the Freer Aggregation Methodology employs
many steps to prepare the data for the probabilistic analysis, including a deterministic step that
directly precedes the probabilistic step, and which matched over 7 million accounts across eight
fields.  Ex. 2, Freer Report, ¶ 111.

[15] "The source literature cited in the Martin Report suggests probabilistic record linkage may be
a more appropriate methodology when direct identifiers do not exist . . ." *Domestic &
International Class Representatives' Motion To Exclude Testimony Of Timothy Martin As
Inadmissible Under Daubert* (the "2021 Daubert Motion") [A.P. No. 16-04006, Doc. 377], pg. 6;
Ex. 5, July 31, 2020 Rebuttal Expert Report of Joshua W. Dennis, ¶ 52; see also November 24,
2020 Transcript of Evidentiary Hearing ("Daubert Hearing Tr."), Exhibit 6, 367:22-25 (Dennis
Cross).

So, so a probabilistic record linkage uses math and statistics to compare instances where there aren't high quality unique identifiers and does that by creating weights that suggest whether a single variable is, is, is indicative or not indicative in the population of a match. *So what it allows you to do is precisely what we have here where there is, are small, there can be small details in the data like misspellings and other things like that. It can account for those kind of discrepancies and also account for issues when there, some combination of things isn't inherently distinct*. . .

Ex. 6, Daubert Hearing Tr. 260:18-261:3 (Dennis Direct).

Additionally, the FS-EM (Fellegi-Sunter with Expectation Maximization) Model of probabilistic record linkage utilized by Dr. Freer is a peer-reviewed method for performing probabilistic record linkage in large datasets. Ex. 2, Freer Report, ¶ 50. The *Fellegi-Sunter* model describes a way to track agreement on multiple fields (e.g., name, email, phone number, address) simultaneously, to turn that information into an overall match probability for each pair of records under consideration, and *Expectation Maximization* is a ubiquitous, unsupervised learning algorithm for iteratively estimating parameters (e.g., $m$-variable, $u$-variable) for the statistical model. Ex. 2, Freer Report, ¶¶ 49-50. In 1988, William Winkler of the US Census Bureau described how to combine Expectation Maximization with the Fellegi-Sunter model to more accurately fix the scoring rubric tracking agreement on multiple fields directly from the dataset.[16] Ex. 2, Freer Report, ¶ 50. This combined approach (FS-EM) has been used to perform record linkage on the 1990 US Census[17], and continues to be a standard approach used by the U. S. Census Bureau today. Ex. 2., Freer Report, ¶ 50.

---

[16] Winkler, W. E. Using the EM Algorithm for Weight Computation in the Fellegi-Sunter Model of Record Linkage, American Statistical Association, *Proceedings of the Section on Survey Research Methods,* 667-671 (1988), attached as Exhibit 7.

[17] William E. Winkler and Yves Thibaudeau. *An application of the Fellegi-Sunter model of record linkage to the 1990 US decennial census.* US Bureau of the Census, 1991, attached as Exhibit 8.

Dr. Freer also used the Splink Python software libraries, which incorporate the FS-EM Model. This Python library set is maintained and published by the UK Ministry of Justice, and the science behind Splink has been extensively tested and peer reviewed. Ex. 2, Freer Report, ¶ 116.  Splink's statistical model has been reviewed and validated in a paper authored by researchers from Harvard and Princeton and published in a peer-reviewed journal[18]; that paper has been cited over 100 times in just the past 3 years. Ex. 2, Freer Report, ¶ 116. Additionally, the technique behind the Splink output has been extensively tested against "gold standard" data, and has been found to be quite accurate and with well-calibrated error rates.[19]  May 22, 2023 Reply Report of Dr. Cameron E. Freer ("Freer Reply"), Exhibit 10, ¶ 87. As a result, Splink is a reliable probabilistic software record linkage package for use with the TelexFree dataset. Ex. 10, Freer Reply, ¶ 87.

**B.  Dr. Freer's Scientific, Technical, or Other Specialized Knowledge Will Help the Trier of Fact to Determine a Fact in Issue**

**1.  Dr. Freer's statistical and computer science background make him more than qualified to opine on a probabilistic approach to linking User Account belonging to the same Participants.**

With a doctorate in Mathematics, and an extensive research background in statistical and computer science, Dr. Freer undisputedly[20] possesses the scientific and technical knowledge necessary to create and opine on a probabilistic record linkage model for large and unlabeled[21] datasets. Dr. Freer holds a Ph.D. in Mathematics from Harvard, is a Research Scientist at MIT's

---

[18] Enamorado, T., Fifield, B., and Imai, K. (2019). Using a probabilistic model to assist merging of large-scale administrative records. *American Political Science Review*, 113(2), 353-371, attached as Exhibit 9.

[19] Ex. 9, Using a probabilistic model to assist merging of large-scale administrative records.

[20] Defendants do not challenge Dr. Freer's qualification in their Daubert Motion.

[21] An unlabeled dataset is one for which no tested and verified "ground truth" data exists.

Probabilistic Computing Project, and has authored 28 research papers in mathematics, statistics, and computer science, including probabilistic inference, statistical testing, and clustering. Ex. 2, Freer Report, ¶¶ 9-10. He is the Founder and Chief Scientist at Borelian Corporation, and was previously Chief Scientist at Remine, Inc., performing statistical modeling on large consumer and property record datasets. Ex. 2, Freer Report, ¶¶ 9, 11. Thus, Dr. Freer possesses a reliable basis in the knowledge and experience in probabilistic record linkage.

### 2. The output of Dr. Freer's aggregation methodology identifies each Net Winner.

Dr. Freer's aggregation methodology determines a fact in issue, namely identifying the TelexFree Participants who are Net Winners based on the account clusters generated by the Freer Methodology. His approach reveals that the 10,987,617 User Accounts analyzed belong to 1,566,383 Participants, of which 81,681 are Net Winners. Ex. 2, Freer Report, ¶ 209.

Dr. Freer's approach determined the Participants by clustering (i.e. grouping) User Accounts based on patterns in the information in the TelexFree database. Each resulting cluster corresponds to a different Participant, and each cluster with a Net Equity greater than zero corresponds to a different Net Winner. Thus, each Net Winner is identified by the information (e.g., name, email, phone number, address) contained in the User Accounts in a given cluster. Ex. 10, Freer Reply, ¶ 118.

Nonetheless, the Class Representatives now claim that, because determining whom to sue is not within Dr. Freer's scope, his method somehow does not actually identify Participants. See *Daubert* Motion, pgs. 43-44. However, this simply is not true. Dr. Freer provided all of the necessary information to identify Participants in order for *the Trustee* to determine whom to sue. With his report, Dr. Freer produced an output file. The file includes 10,987,617 rows of data, each row corresponding to a User Account record, along with a Cluster ID (*Cluster_ID*) in each

row. Ex. 2, Freer Report, output.csv[22]. This Cluster ID was assigned as a result of the

Aggregation Methodology and it identifies the cluster to which the User Account in each row

was ultimately determined to belong. Ex. 2, Freer Report, output.csv. Importantly, the assigned

Cluster ID also identifies the first account opened in each cluster.[23]  This is important because

the Trustee has logically concluded that the most complete personal identifying information for

each Participant would in the first account opened in a given cluster, and is thus the best

information to identify the Participant to which the cluster belongs.[24]

For these reasons, the output of Dr. Freer's Aggregation Methodology provides a reliable

clustering of Participant accounts from which Net Winner can be determined.

### C.  Dr. Freer's Aggregation Methodology is Based on Sufficient Facts and Data

Dr. Freer's Aggregation Methodology, which analyzes and aggregates data from the

TelexFree database, is based on sufficient facts and data because he carefully selected only the

highest quality fields for the TelexFree database for consideration. Moreover, Dr. Freer

effectively addressed Mr. Dennis' inaccurate critique of the underlying data quality for these

fields in his reply report, a reply that Class Representatives have completely ignored in their

motion papers.

---

[22] This exhibit to the Freer Report was provided natively.  It has not been provided with this file due to size constraints but can be provided to the Court upon request.

[23] The Cluster ID for each cluster correspond to the lowest rep_id in that cluster, where rep_id is the TelexFree internal unique account tracking numbers created in increasing order by the TelexFree system each time an account was opened. As such, the lowest rep_id in a cluster corresponds to the first account opened in that cluster. Sorondo Aff., ¶ 3.d.

[24] The Trustee's Summary Judgment Opposition details the support for assigning the low rep_id account as the owner of a given cluster. See also Affidavit of Stephen B. Darr, ¶ 6.

**1. Dr. Freer specifically addresses the sufficiency of data quality in the TelexFree database.**

Based on a comprehensive analysis of all 44 data fields included in the User Account records, Dr. Freer selected 11 high-quality fields for use in his aggregation methodology. Ex. 2, Freer Report, ¶¶ 85-110. Specifically, he assessed completeness (how often the field values are present vs. missing), consistency (how consistent the values used for matching are), accessibility (inclusion of different kinds of non-overlapping fields such as name, address, phone, email, etc.), and believability (how credible or plausible the actual values are). Ex. 2, Freer Report, ¶¶ 85-110, ¶¶ 22-27.

By way of example, Dr. Freer validated that the name field (rep_nome) is of high quality *at least* 95% of the time via the following steps. First, he determined that the rep_nome field is only empty 0.002% of the time in the TelexFree database. Ex. 2, Freer Report, ¶¶ 93-94. Second, he determined that 97% of the field values met his criteria for a clean name: i.e., 5 or more characters and which included only alphabetical characters, periods, commas, hyphens, spaces, or apostrophes. Third, he randomly selected 300 populated accounts for manual review; and found that only 7 name values (from the 300 sampled accounts) appeared likely to be something other than actual names, while the remaining 293, approximately 98%, were plausible names (albeit with occasional typos, abbreviations or unusual capitalization). Ex. 2, Freer Report, ¶¶ 93-94; Ex. 10, Freer Reply, n. 135. From this, Dr. Freer estimated that at least 95% of the rep-nome values appear to be names (subtracting 3% for the values that did *not* meet his clean name criteria, and another 2% for the values that did meet his criteria, but did not appear to contain a plausible name). Ex. 2, Freer Report, ¶¶ 93-94.

Moreover, Dr. Freer explained why Mr. Dennis's criticism of his data quality sample size is unsupported. Ex. 10, Freer Reply, ¶ 110. As he explained, and as any trained statistician would

know, to obtain a 5% Margin of Error with 90% Confidence Level on a population size of

11,000,000, the Ideal Sample Size is just 271, less than the 300 sample set Dr. Freer used. Ex.

10, Freer Reply, ¶ 110. Nonetheless, to further demonstrate that 300 was sufficient for a

statistically significant conclusion, Dr. Freer used the same methodology to review a sample size

of 1067, which yields 3% Margin of Error with 95% Confidence Level on a population size of

11,000,000, and arrived at the same result: 98% of the values manually reviewed were plausible

names. Ex. 10, Freer Reply, ¶ 111.

Dr. Freer also separately validated the email address field (*rep_email*), phone number

fields (*rep_cel* and *rep_fone*), address fields (*rep_end*, *rep_numero*, and *rep_cep*), and login field

(*rep_login*) as high quality, thus suitable for inclusion as linkage fields in his Aggregation

Methodology. As with the name field (*rep_nom*), those fields were almost always complete,

contain the expected components, and were sufficiently diverse. Ex. 10, Freer Reply, ¶¶ 95-98.

Furthermore, these fields were found to be the same for multiple pairs of User Accounts with

similar or identical name values, supporting a high linkage value. Ex. 10, Freer Reply, ¶¶95-98.

Dr. Freer also included three additional fields: secondary password

(*rep_pwd_secondary*), SSN (*rep_cpf*), and DOB (*rep_datanasc*) that were found to of

intermediate quality. While password and DOB values were often null, each had a high linkage

value when present because it is not common for different parties to select the same password,

and there are many instances where multiple User Accounts include identical or similar names

and the same date of birth, respectively. Ex. 10, Freer Reply, ¶¶ 99-100, 103. The SSN

equivalent field, on the other hand, was only null or empty for just 0.001% of User Accounts and

accounts that appeared to belong to the same Participants (based on manual review) often have

21

the same value entered for this field giving it sufficient linking power. Ex. 10, Freer Reply, ¶¶ 101-102.

Dr. Freer further tested the data quality for these ten fields by manually reviewing a set of 400 randomly chosen accounts, and then manually reviewing each field separately in the manner described with respect to the name field. See Ex. 10, Freer Reply, ¶¶ 68-82, Report Exhibits 2.1-2.13. His review confirmed that the values in the various fields were in fact of high quality and that they generally cohered with one another. Ex. 10, Freer Reply, ¶¶ 68. For example, portions of the name in the name field often appeared as part of the email address, the two phone numbers usually had a similar format to each other (e.g., are of similar length and shared initial digits), and the three address components typically appeared believable in combination. Ex. 10, Freer Reply, ¶ 68.

Dr. Freer also explained that the quality of the dataset is of sufficient high quality as is evidenced by the exact matches obtained in his preliminary deterministic matching step (Step 3). Ex. 2, Freer Report, ¶ 111. Specifically, in Step 3, User Accounts were placed into the same account grouping if there was an exact match across eight cleaned fields. As a result, over 7.5 million User Accounts out just of under 11 million had at least one "exact" match to another User Account, supporting Dr. Freer's finding of sufficient consistency in data entry by the TelexFree Participants to permit him to proceed with probabilistic matching.

Finally, Dr. Freer separately confirmed that unselected fields were assessed and determined to have low quality, and thus were not suitable for inclusion in his linkage model. See Ex. 2, Freer Report, ¶¶ 104-110.

**2. Dr. Freer specifically addressed Mr. Dennis's unfounded critiques of his data quality assessment.**

Dr. Freer specifically addressed Dennis' misrepresentation of data science literature, and in particular, Mr. Dennis's suggestion that valid data linkage requires a "golden set." Dr. Freer's use of the FS-EM Model is an unsupervised learning technique that was expressly developed not to require a labeled or "golden set" dataset to use the algorithm. [25]. Ex. 10, Freer Reply, ¶ 86. Indeed that very point was previously argued by the Class Representatives in the last Daubert hearing: "[t]he lack of an answer key is the very reason why Mr. Martin should have performed a probabilistic linkage analysis." 2021 Daubert Motion, pg. 19. Moreover, unsupervised learning techniques are crucial in record linkage because "[m]anual labelling of comparisons is error prone and costly so isn't a great option." Ex. 10, Freer Reply, ¶ 85, quoting R. Linacre, *The Intuition Behind the Use of Expectation Maximization to Train Record Linkage Models,* October 14, 2022 (attached as Exhibit 11).

Dennis offered a quote from Peter Christen's treatise, *Concepts and Techniques for Record Linkage, Entity Resolution, and Duplicate Detection*, Springer (2012): "Arguably the most important data quality dimensions for data matching and deduplication are accuracy and consistency" in support of his argument. But the complete Christensen quote reads:

> Arguably, the most important data quality dimensions for data matching and deduplication are accuracy and consistency, **because a large portion of efforts in the indexing, comparisons and classification steps (that will be covered in Chaps. 4–6) deal with inaccurate and inconsistent data. If data would be of perfect quality, then data matching could be accomplished through**

---

[25] Some machine learning algorithms fall under the category of "supervised learning", and require a dataset that is labeled with "ground truth" for both training the model and for evaluating the accuracy of the trained model. Other machine learning algorithms perform "unsupervised learning", and do not rely on labeled data for either training or assessment. Unsupervised learning algorithms identify patterns and structure within the input data itself during training. Ex. 10, Freer Reply, ¶ 84.

**straightforward database join operations and no sophisticated indexing techniques or approximate comparison functions would be needed. As long as data are of imperfect quality, however, techniques are needed that can deal with inaccurate and inconsistent data while still achieving high matching quality.**

Christen's full quote emphasizes that *because* data is often not perfectly accurate, researchers have developed methods for dealing with imperfect data. Ex. 10, Freer Reply, ¶ 96. Far from demanding perfect accuracy and consistency, Christen's full quote underscores the necessity of employing sophisticated techniques to successfully resolve the very types of data entry issues found in the TelexFree database. Ex. 10, Freer Reply, ¶ 96. In essence, the complexities of data matching arise precisely due to the inherent imperfections in data. Ex. 2, Freer Report, ¶ 96. The Freer Aggregation Methodology using the FS-EM algorithm aligns completely with Christen's recommendations.

> **3. Dr. Freer did not rely on an excluded Net Equity summation, and, even if the calculation changed it would have no impact on the reliability of the Freer Aggregation Methodology.**

The Trustee's Summary Judgment Opposition details why (1) the Net Equity amount was determined through a simple mathematical calculation that is not expert testimony and (2) this calculation was not excluded by Judge Hoffman.

Moreover, the Freer Aggregation is agnostic to the choice of net equity formula. Ex. 10, Freer Reply, ¶¶ 133-137. Steps one through nine of the Freer Aggregation Methodology do not use Net Equity as an input, and these steps are the entire portion of the Freer Aggregation Methodology that determine clusters of User Accounts. Ex. 10, Freer Reply, ¶134. Net Equity is determined in step 10 after the clusters are formed. Total Net Equity is simply the sum of Net Equity for each User Account in that cluster. Ex. 10, Freer Reply, ¶134.

Even if the Court chooses to approve a different Net Equity formula than the one previously approved by Judge Hoffman (which it should not), that choice would have no impact on the reliability of the Freer Aggregation Methodology. The only change required would be to arithmetically total the Net Equity for each cluster using the new Net Equity formula. Ex. 10, Freer Reply, ¶¶ 136-137.

As set forth above, Dr. Freer clarified and corrected Mr. Dennis's erroneous claim that verification against real-world data is necessary for reliable account linkage, and there is nothing "speculative and unreliable" in Freer's extensive data quality analysis or his choice of fields. *Cf. Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation— i.e., 'good grounds,' based on what is known."); see also *Rothe Dev., Inc. v. DOD*, 107 F. Supp. 3d 183, 198-99 (D.D.C. 2015) (holding that the expert's decision to exclude certain data from his statistical model was valid since it was fully explained and scientifically sound, citing *Daubert*.).

### D.  Dr. Freer's Opinions Reflect a Reliable Application of The Principles and Methods to The Facts of the Case

#### 1.  Dr. Freer's estimated error rates are considered better than acceptable results in the data science community.

Based on Dr. Freer's statistical analysis detailed above, the Freer Aggregation Methodology has error rates that substantially exceed the standard considered "very good" in the data science community. Dr. Freer's statistical analysis took into account two types of errors: false positives and false negatives. Ex. 2, Freer Report, ¶ 212. False positives occur when User Accounts are grouped together even if they don't belong to the same Participant, while false negatives occur when User Accounts that do belong to the same Participant are placed in different clusters by the aggregation method. Ex. 2, Freer Report, ¶ 212. To evaluate these errors, the false discovery rate (FDR) and false negative rate (FNR) are calculated by statisticians to

determine the statistical measures of precision and recall. Ex. 2, Freer Report, ¶ 212. The f-measure referred to as accuracy, which is the harmonic mean of precision and recall, ranges from 0.0 to 1.0, with higher values indicating better results. According to a review of record linkage software quality, an accuracy of at least 0.90 is considered "very good."  Ex. 2, Freer Report, ¶ 212.

Dr. Freer utilized equations similar to the peer-reviewed equations provided by the authors of the fastLink package -analogous to the Splink package utilized by Dr. Freer, but in a different computer language- to estimate FDR and FNR based on pairwise match probabilities. Ex. 2, Freer Report, ¶ 213. Based on the fastLink equations, Dr. Freer estimated FDR as 0.0198 and FNR as 0.00377, which implies a precision of 0.980, a recall of 0.996, and an accuracy of 0.988. Ex. 2, Freer Report, ¶ 213. These results validate Dr. Freer's finding that his Aggregation Methodology provided results substantially superior to the "very good" criterion.

## 2. Dr. Freer's methodology does not rely primarily on name.

Contrary to the claims made by Mr. Dennis, Dr. Freer's methodology does not primarily rely on names. All 11 fields selected by Dr. Freer play a crucial role in the overall aggregations process. Ex. 10, Freer Reply, ¶¶ 48-49. For example, the deterministic step that precedes blocking requires exact matches across eight fields. The FS-EM algorithm, which is at the core of Dr. Freer's probabilistic model, evaluated the contents of *all* fields to determine their relative weights in determining match probabilities. Ex. 10, Freer Reply, ¶ 48. The clustering of User Accounts was *not* based on the name field, as records were partitioned into clusters based on their match probabilities by transitive closure, which was not reliant on name alone [26]  Ex. 10,

_____

[26] The dynamic clustering performed in step 8 of the aggregation methodology is employs the recommended approach for overcoming issues of "chaining" in which the opposite is true and

Freer Reply, ¶ 114. While there is necessarily tension between over-clustering and under-clustering, the transitive closure approach mostly ensures that records belonging in the same cluster should end up together, even if their names were not considered a match during the blocking step. This mathematical result is well-known in entity resolution literature, and is based on the fact that each record appears in only one cluster of a partition. Ex. 10, Freer Reply, ¶ 114.

In the context of aggregating accounts to individuals, however, names do play an important role. Ex. 10, Freer Reply, ¶ 40. This importance of names is supported by the record linkage literature, which emphasizes personal identifiers as crucial for identifying individuals. Among these identifiers, names stand out:

> Names and other personal details play a crucial role in daily life because people are using them to identify individuals, ranging from family and friends, to work colleagues, and all the way to politicians and celebrities. For organizations both in the private and public sectors, names are often a primary source of identification of the individuals they are in contact with. **Personal names are a major component of the information used in many data matching or deduplication processes to identify records that refer to the same individuals.** [Christen, 2012, p. 42] (Emphasis added).

Because different individuals can share other personal identifiers besides names (such as addresses or phone numbers), the standard solution involves using names to distinguish between records that share identifiers like addresses but not names. Ex. 10, Freer Reply, ¶ 46. Dr. Freer accomplishes this in the blocking step (step 3) of his methodology. Ex. 10, Freer Reply, ¶ 47. In this step, only accounts with similar names are put through for matching consideration. However, accounts with dissimilar names may still end up grouped together for the reasons described above.

---

Records A and C should not but joined, the result being the B is only joined with only one of A or C, if any. Ex. 10, Freer Reply, ¶¶ 91-93.

Because Dr. Freer is eminently qualified in the field of probabilistic computing by virtue of his education, training and experience, because he chose a peer reviewed data linkage algorithm that was appropriate for linking accounts in the TelexFree database, because he extensively tested data quality in the TelexFree database, and because he correctly implemented the appropriate algorithmic process to arrive at results that fall within a statistically acceptable margin of error, the Freer Clusters should be deemed sufficiently reliable to be admitted into evidence. *United States v. Gissantaner*, 990 F. 3d, 457 (6th Cir. 2021) (district court erred in excluding results of a probabilistic genotyping software program under FRE 702 and *Daubert* because the software was testable, had been peer-reviewed, had gained general acceptance in the scientific community, and the principals and methods had been reliably applied by the expert in the case.); *Powell v. Tosh*, 942 F. Supp. 2d 678 (W.D. Ky. 2013) (AERMOD model was reliable where model was the preferred air quality and dispersion model, making expert's use in this case to satisfy the reliability requirement under *Daubert.*); *Daubert v. Merrill Dow Pharms., Inc*. 509 U.S.579 (1993) ("scientific" implies grounded in methods and procedures of science, and not subjective belief and unsupported speculation).

## III. MR. DENNIS'S OPINIONS ARE NOT ADEQUATELY SUPPORTED

The Class Representatives have attacked the Freer Methodology, relying on the opinion testimony of Joshua W. Dennis. There is no requirement than a party file a *Daubert* challenge, especially where, as here, the Class Representatives' challenge to the Trustee's case is not being heard in anticipation of a later jury trial. Rather, the Court has an independent duty under FRE 702 to determine whether proffered opinion testimony, including Mr. Dennis's, meets the reliability standard under FRE 702. "First, the rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it

is *more likely so than* not that the proffered testimony meets the admissibility requirements set forth in the rule." Ex. 4, Advisory Committee Note to 2023 Amendments to FRE 702, ¶ 1 (Emphasis added).[27] Stated differently, "[t]he trial judge in *all* cases of proffered expert testimony *must find* that it is properly grounded, well-reasoned, and not speculative *before* it can be admitted." Ex. 3, Advisory Committee Note to 2000 Amendment to FRE 702 (Emphasis added); *Newell Rubbermaid, Inc v. Raymond Corp.*, 676 F.3d 521 (6th Cir. 2012) (District court identified at least four red flags – anecdotal evidence, improper extrapolation, failure to consider other causes, and lack of testing, sufficient to warrant exclusion); *King v. Enter. Rent-A-Car Co.*, 231 F.R.D 255 (E.D. Mich. 2004) (Expert failed to meet *Daubert* standard where he had no educational or professional background or experience in employment statistics).

### A. Class Representative's Motions Lack a Scientific Foundation Because Mr. Dennis Lacks the Requisite Education, Training and Experience, and His Opinions are not the Product of Reliable Scientific Principles and Methods.

As set forth in more detail below, Mr. Joshua Dennis fails on each of FRE 702's elements of admissibility: (a) Mr. Dennis lacks the requisite education, training and experience to opine on an unsupervised data linkage methodology generally, and the Freer Aggregation Methodology specifically. (b) Mr. Dennis's testimony is not based on sufficient facts or data because Mr. Dennis performed only a limited number of non-random *ad hoc* table queries relative to the size of the TelexFree database; (c) Mr. Dennis's testimony is not the product of reliable principles and methods because Mr. Dennis never performed any statistical  analysis to allow him to opine that the handful of account issues he identifies in his Report were: (1) more likely than not to be actual account over or under aggregations; or (2) were statistically indicative of aggregation

---

[27] Class Representatives' *Daubert* Motion (pg. 36, FN 32) correctly state that the pending "clarifying" amendments to FRE 702 can be relied upon in anticipation of the Amendment's official adoption date of December 1, 2023.

issues across Dr. Freer's entire aggregation output table; and (d) Mr. Dennis offers no peer-reviewed support for the notion that limited non-random *ad hoc* searching against a 10 million account database is an accepted method of determining the efficacy of the FS-EM data linkage output of the Freer Aggregation Methodology.

> **1. Dennis Lacks the Requisite Education, Training and Experience to Opine on Dr. Freer's Report, or Probabilistic Data Linkage Methodologies Generally.**

Mr. Dennis is not a data scientist by education, nor does he have the necessary training and experience to opine on the scientific foundations of Dr. Freer's Report. The following was confirmed during Mr. Dennis's deposition on May 9, 2023.

- o Mr. Dennis graduated from Skidmore College in 2004 with an undergraduate degree in Management and Business, which included courses in accounting, economics, finance and marketing. May 9, 2023 Deposition of Joshua W. Dennis ("Dennis Dep."), Exhibit 12, 33:17-34:34.

- o Mr. Dennis remembered taking only one semester-long statistics course as part of his undergraduate studies. *Id.*, 35:20-36:13.

- o Mr. Dennis minored in computer science but could remember only one data science course studying how to create relational databases using Microsoft Access. *Id.*, 34:16–35:17.

- o After college, Mr. Dennis attended a single "couple of week" SQL programming course, but remembers no other data science study after college. *Id.*, 36:19–38:12.

- o Mr. Dennis uses SQL in the majority of his work. *Id.*, 45:15-46:19. SQL is a basic programming language used to perform table queries against a dataset. SQL has a limited number of libraries available to users.

30

o  Python is an open source data science tool used extensively by data scientists to visualize and analyze data using a broad range of available open source libraries. Mr. Dennis has only "some base knowledge" of Python, having used it only "a little bit more than a handful of times." *Id.*, 45:11–45:16.

o  Pandas (Python Data Analysis Libraries) is a set of libraries built using Python, which are used for sophisticated data manipulation and analysis. Mr. Dennis has used Pandas only "a handful of times in his career. *Id.*, 45:24–25:12.

o  Splink is a probabilistic Python library used by data scientists for record linkage in extremely large datasets that lack unique identifiers (exactly the situation with the Telex data set). Splink incorporates the Fellegi-Sunter Expectation Maximization model of probabilistic record linkage. See generally, https://www.robinlinacre.com/introducing_splink/, attached as Exhibit 13. Spink is used extensively by the US Census Bureau and the UK Office for National Statistics. Splink has been rigorously tested as a canonical model of probabilistic record linkage. See Ex. 9, *Using a Probabilistic Model to Assist Merging of Large-Scale Administrative Records*. Splink was used extensively by Dr. Freer in his probabilistic linkage model. Ex. 2, Freer Report, ¶¶ 6, 16. Mr. Dennis has no experience using Splink. Ex. 12, Dennis Dep., 46:20–22.

2.  **Mr. Dennis has Minimal Prior Experience with Probabilistic Modeling.**

Mr. Dennis's deposition confirms that he has minimal experience in probabilistic modeling, and what experience he has is unrelated to probabilistic account linkage. When asked to describe his probabilistic computing experience, Mr. Dennis identified only fuzzy matching, "whether it's TF-IDF, or Jaccard Distance or Levenschtein or some combination thereof." Ex. 12, Dennis Dep., 61:24–65:3.

31

o Fuzzy matching is not probabilistic record linkage. It is a simple method for calculating similarity/distance between two strings. It is used regularly in spell check software. By way of example, below is a Levenschtein matrix calculating the distance between the words Levenschtein and Meilenstein:

|   | m | e | i | l | e | n | s | t | e | i | n |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| l | 1 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| e | 2 | 2 | 1 | 2 | 3 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| v | 3 | 3 | 2 | 2 | 3 | 4 | 4 | 5 | 6 | 7 | 8 | 9 |
| e | 4 | 4 | 3 | 3 | 3 | 3 | 4 | 5 | 6 | 6 | 7 | 8 |
| n | 5 | 5 | 4 | 4 | 4 | 4 | 3 | 4 | 5 | 6 | 7 | 7 |
| s | 6 | 6 | 5 | 5 | 5 | 5 | 4 | 3 | 4 | 5 | 6 | 7 |
| h | 7 | 7 | 6 | 6 | 6 | 6 | 5 | 4 | 4 | 5 | 6 | 7 |
| t | 8 | 8 | 7 | 7 | 7 | 6 | 5 | 5 | 4 | 5 | 6 | 7 |
| e | 9 | 9 | 8 | 8 | 8 | 7 | 7 | 6 | 5 | 4 | 5 | 6 |
| i | 10 | 10 | 9 | 8 | 9 | 8 | 8 | 7 | 6 | 5 | 4 | 5 |
| n | 11 | 11 | 10 | 9 | 9 | 9 | 8 | 8 | 7 | 6 | 5 | 4 |

A simple matrix calculates Levenschtein distance, in this sample, 4 transformations are required to reach equivalence between the words Levenschtein and Meilenstein.

o Probabilistic record linkage, on the other hand, is a far more complex exercise, looking across *multiple* data fields to compute the probability that pairs of records refer to the same entity, often based on a weighted scoring system for each individual field. Ex. 10, Freer Reply, ¶ 6.

o TF-IDF, identified by Mr. Dennis as a fuzzy matching tool, is a statistical measure of how important a given single word is to a document, not a fuzzy matching tool. Ex. 10, Freer Reply, ¶ 8. Mr. Dennis clearly had limited familiarity with TF-IDF (Term Frequency-Inverse Document Frequency) or its actual function.

Q: You've used TF-IDF?

A: Correct.

Q: TF-IDF stands for what?

A: I'd have to go back and look. I don't recall.

Q: Is it a – is it a fuzzy matching model?

A: It is, yes.

Ex. 12, Dennis Dep., 63:9-16.

Transitive closure is a key aspect of any data linking exercise, including the Freer

Aggregation Methodology. Mr. Dennis was unable to identify a prior engagement that required

transitive closure. *Id.*, 122:14–23:22. Blocking is a critical element in reducing computation run

time when working with large data sets. Absent a blocking scheme, a data set of this size would

require trillions of computation. Ex. 2, Freer Report, ¶ 64 ("… in the Telex dataset, which has

approximately 11 million user accounts, there would be approximately *60 trillion* pairs to

consider.") (Emphasis in original). During his deposition, Mr. Dennis was unable to identify a

single prior engagement involving blocking a data set. Ex. 12, Dennis Dep., 74:19 –75:24; 76:21

– 77:23.

3. **Mr. Dennis Has No Experience Working with the Fellegi-Sunter Model that Lies at the Heart of the Freer Aggregation Methodology**

Mr. Dennis has no previous experience working with the Fellegi-Sunter Model at issue in

this case, and no understanding of how FS-EM works other that what he has read in the Freer

Report. Neither Mr. Dennis nor his team has had any prior experience with the Fellegi-Sunter

model, with or without Expectation Maximization. Ex. 12, Dennis Dep., 5:19 – 58:3, 62:24 –

63:3. Mr. Dennis has no understanding as to how FS-EM works other than what Mr. Dennis has

read in Dr. Freer's reports. *Id.*, 64:6-11. Mr. Dennis has no understanding of how the FS-EM

Model calculates relative field weights other than reading Dr. Freer's description. *Id.*, 63:17 –

65:8. Mr. Dennis only reviewed minor portions of Dr. Freer's code and offers no admissible opinions on Dr. Freer's relative field weighting choices. Mr. Dennis was provided with detailed instructions on how to load the Freer Aggregation code. Despite having the ability to load and operate the code for all ten steps of the Freer Aggregation Model, Mr. Dennis only loaded code for two of ten steps in the Freer Aggregation Model; blocking and cleaning. *Id.*, 26:3 – 8; 31:18 – 32:12. Mr. Dennis's code review amounts to less than ten percent of the Freer code base. Ex. 10, Freer Reply, ¶ 24. Mr. Dennis can't remember how many steps he actually ran code for. Ex. 12, Dennis Dep., 21:24 – 22:12. Mr. Dennis's choice to limit his code review means that he could not possibly have recreated the Freer Aggregation Methodology steps or output for testing purposes. Of the portions Mr. Dennis did load, Dennis admits that he found no errors in the operation of the code. *Id.*, 72:22 – 73:16.

4. **Mr. Dennis's Critique of Dr. Freer's Aggregation Output Lacks any Statistical Support and Thus Fails the "More Probable than Not" Standard under FRE 702**

Statistical analysis allows a user to infer set-wide characteristics from a test subset of data. Probability sampling allows users to draw inferences about the characteristics of the entire set population based on the characteristics of the test subset. Dennis's clear bias in selecting a handful of *ad hoc* search results to support his opinion testimony makes Dennis's conclusions inherently unreliable.  Modern Scientific Evidence, Vol. I, §4:13, pp. 340-344, attached as Exhibit 14.[28] The TelexFree database contains 10,987,617 accounts exclusive of Ympactus accounts. To understand the magnitude of this database, consider the height of the ten tallest buildings in the

---

[28] Stated differently, "[E]licitation of expert judgments to produce probability distributions that represent uncertainty about model parameters can be conducted informally, but such judgments are easily affected by unconscious [or conscious] cognitive biases…" The Role of Expert Judgment in Statistical Inference and Evidence-Based Decision Making, The American Statistician, Vol. 73, No. 51, p. 67 (2019) (Text added in bracket), attached as Exhibit 15.

world.



A ream of paper is 500 Sheets. See https://en.wikipedia.org/wiki/Units_of_paper_quantity.

Assuming one account per page, a printout of the TelexFree database would require

10,987,617/500 pages equal to 21,975.234 reams of papers. A standard ream of paper is

approximately 2.5 inches tall. See https://www.hammermill.com/products/premium-inkjet-laser-

printer-paper. So, 21,975 reams times 2.5" equals 54,937.5", 4,578 feet or 1,395 meters, far taller

than the tallest building on earth.



Each of those 10,987,617accounts involving 1,566,383 Participants, of which the Freer

Methodology has identified 81,681 net winner account clusters.

35

Against these extraordinary numbers, Mr. Dennis's critique relies on the largely

inadmissible affidavit testimony of Franz Balan, whom Mr. Dennis has never spoken to and who

purports to testify about what all Participants did based on his own singular experience, together

with a handful of tables culled from *ad hoc* queries performed against Freer output tables. Ex.

12, Dennis Dep., 138:10–20. The Balan Affidavit is inadmissible other than to describe his own

singular experience.

Offering opinion testimony based on a handful of selected tables to suggest that the Freer

Clusters are unreliable violates FRE 702 if Dennis cannot demonstrate that his hand-picked

tables are statistically representative of a larger data quality issue. Mr. Dennis, however, lacks

the training and experience to demonstrate the statistical significance of his handpicked data

tables: Mr. Dennis was unable to describe how to set a sample size relative to the size of a

dataset, including what size sampling would be adequate to test the Freer Model. Ex. 12, Dennis

Dep., 82:5 – 83:18. Mr. Dennis offers no opinion on whether Dr. Freer's sampling sizes were

adequate. *Id*., 83:19 – 84:20. Mr. Dennis was unfamiliar with Cochran's Formula, used by

statisticians to calculate sample size within a defined margin of error. *Id.*, 80:9-11. Mr. Dennis

could not recall any experience calculating basic statistical notions of precision (how many

retrieved items are relevant) and recall (how many relevant items are retrieved). *Id.*, 88:7 –

89:14.

Highlighting his statistical inexperience, Mr. Dennis does not know how to calculate an F

measure (a basic statistical measure of accuracy) other than what he has read in the Freer Report.

When asked to calculate the false positive rate assuming a precision of 0.980, a recall of 0.996

and an F-measure of 0.988, Mr Dennis was unable to, admitting that he had never calculated

false positive rates in an aggregation before. *Id.*, 161:24 – 164:1. The calculation is not difficult;

a precision of 0.980 straightforwardly implies a false discovery rate of 1 – 0.980 = 0.02, meaning

2% of the matches generated from the methodology are expected to be false positives. Ex. 10,

Freer Reply, ¶12. Mr. Dennis was also unable to even generally explain the correlation between

sample size and population size for purposes of defining the appropriate size of a statistically

adequate sample. Ex. 12, Dennis Dep., 82:21–83:18. Finally, Mr. Dennis's selection of which *ad*

*hoc* table queries results to offer in support of his report is classic selection bias, and cannot be

suggestive of valid statistical error rates across the Freer cluster output.

Unlike Mr. Dennis, Dr. Freer validated data quality in the TelexFree database via random

sampling of 11 fields. For the name field, Dr. Freer's data quality analysis was based on an initial

test set of 300 accounts to obtain a 5% Margin of Error with 90% Confidence Level, with a

second test set of 1067 accounts confirming the results (with a 3% Margin of Error with 95%

Confidence Level). Dr. Freer reviewed the remaining ten fields by manually reviewing a set of

400 randomly accounts chosen accounts. Each test used a fixed-random seed to pick truly

random accounts for statistically relevant sampling. Dr. Freer's analysis, detailed in his Reply

Report (Ex. 10, Section B., ¶¶ 60-82) is an example of a rigorous statistical analysis that permits

scientifically valid inferences to be drawn as to TelexFree data quality.

Mr. Dennis ultimately offers no admissible conclusions about the overall accuracy of the

Freer Net Winner Clusters, and instead offers only the *"possibility"* that selected individual

clusters *may* include individual over or under account aggregations. Mr. Dennis offers no

opinion as to whether Freer's analysis in the *rep_id_summary* table was accurate or reliable for

purposes of distinguishing the TelexFree accounts from the Ympactus accounts and hybrid

accounts. Ex. 12, Dennis Dep., 157:8–19. Mr. Dennis offers no opinion on Dr. Freer's field

cleaning process would have been appropriate. *Id.*, 72:22–73:4. Mr. Dennis offers no opinion

about how Freer's blocking step should have been performed. *Id.*, 197:16-198:12. Mr. Dennis

offers no opinion whether Dr. Freer's field weightings were correctly determined. *Id.*, 66:23–

67:8. Mr. Dennis offers no opinion on whether transitive closure was a "required step" in Dr.

Freer's aggregation process. *Id.*, 134:23–135:10. Mr. Dennis offers no opinion to determine what

percentage of the clusters in the aggregation output of the Freer Aggregation Methodology he

thinks are erroneous. *Id.*, 94:18–96:2. Mr. Dennis offers no opinion on adequacy of Dr. Freer's

expected rates of error. Mr. Dennis formed no opinion on whether a zero overclustering or

underclustering error rate is required for a cluster to be acceptable. *Id.*, 159:24–160:5. Mr. Dennis

formed no opinion on what error rate would make Freer's clustering methodology acceptable.

*Id.*, 160:19–161:19. Mr. Dennis formed no opinion on the number of missed links one would

have to examine to validate or invalidate the Freer Aggregation Methodology. *Id.*, 167:7–1. Mr.

Dennis performed no analysis of the actual over or underclustering rates in any output cluster

generated by the Freer Aggregation Methodology. *Id.*, 96:23–97:16; 114:20–115:8; *see also* Ex.

10, Freer Reply, ¶ 32.

In the end, Mr. Dennis's analysis raises only the "possibility" that the Freer Aggregation

Output includes over- or under-aggregations within a given cluster, even in those tables that Mr.

Dennis handpicked to include and discuss in his report. Opinions based on "possible" over/under

clusters in the Freer Aggregation output is clearly inadmissible under the express *"more likely so

than not"* standard required under FRE 702, as expressly called out in FRE 702's 2023

Amendment. By way of example: Mr. Dennis offers no opinion on whether accounts in cluster

132785 (the "Maria Neves" cluster) were in fact over-aggregations, despite referring to them in

his Rebuttal as "potential issues". Ex. 12, Dennis Dep., 94:18–96:22. He also did not do any

analytical work to specifically arrive at a number of over-aggregations that in his opinion appear

in this cluster, despite discussing this cluster at length in his Rebuttal. Mr. Dennis offers no opinion on whether the "Shal Group" cluster 12650741 and "Dolarex" cluster 10992563, compared in the April 14, 2023 Supplemental Rebuttal Expert Report of Joshua W. Dennis ("2022 Dennis Rebuttal"), Exhibit 16, in paragraph 159 and Exhibit 9.4, should have been aggregated into one cluster or not. Ex. 12, Dennis Dep., 180:2–18, 185:13–22. This is despite specifically referring to these examples as "under-aggregation" in his Rebuttal. Ex. 16, 2022 Dennis Rebuttal, ¶159. Mr. Dennis offers no opinion on whether the "DL1 INC" cluster 11849449, and "Linda Hackett" cluster 707775, compared in his Rebuttal in Exhibit 9.5, should be aggregated into one cluster or not,[48] despite again insinuating in his Rebuttal that it "appears to be under-aggregation". Ex. 16, 2022 Dennis Rebuttal, ¶161.

In the end, Mr. Dennis offers the Court nothing but "maybe" opinions about "possible" errors. His relies on statistically insignificant hand-picked examples that suffer from obvious selection bias, and then concludes nothing based on his sampling. FRE 702 requires both expertise and an accepted scientific process correctly implemented. Mr. Dennis offers the court none of that. His testimony should be afforded little, if any, weight.

## IV. CONCLUSION

Dr. Freer's Aggregation Methodology meets all admissibility requirements under FRE 702, and none of Mr. Dennis's unfounded critiques detract from the reliability of Dr. Freer's methods. The Trustee accordingly requests that this Court find that:

i) The 11 TelexFree data fields relied upon by Dr. Freer in his 10-step process have sufficient quality to allow Freer to reliably aggregate Participant accounts into Net Winner clusters;

ii) Dr. Freer made appropriate usage of the selected data fields for arriving at his net winner clusters by using a 10-step process that meets the reliability standard in FRE 702; and

iii) Mr. Dennis's Report provides no useful or reliable critique of the Freer Methodology.

For those reasons, the Court should deny Class Representative's *Daubert* Motion, and Dr. Freer's net winner cluster output opinion testimony should be allowed into evidence.


Respectfully submitted,

STEPHEN B. DARR, LIQUIDATING
TRUSTEE,
By his counsel:


Dated:  September 11, 2023          */s/ Daniel J. Lyne*_____
Daniel J Lyne (BBO #309290)
Alexandra Papas (BBO #707581)
MURPHY & KING,
Professional Corporation
28 State Street, 31st Floor
Boston, MA  02109
Telephone: (617) 423-0400
Dlyne@murphyking.com
Apapas@muprhyking.com


40

**<u>CERTIFICATE OF SERVICE</u>**

I, Daniel J. Lyne, hereby certify that on September 11, 2023, a copy of this document was served by operation of the Court's ECF System upon the registered participants as identified on the Notice of Electronic Filing.

Date:  September 11, 2023

/s/ Daniel J. Lyne_____
Daniel J. Lyne (BBO# 309290)
MURPHY & KING,
Professional Corporation
28 State Street, 31st Floor
Boston, MA  02109
Telephone:  617-423-0400
Dlyne@murphyking.com