# EXHIBIT 12

**1**

```
                          VOLUME:  1
                          PAGES:  1 - 209
                          EXHIBITS: 1 - 11

         UNITED STATES BANKRUPTCY COURT
            DISTRICT OF MASSACHUSETTS

                    Chapter 11 Cases
                    14-40987-EDK
                    14-40988-EDK
                    14-40989-EDK

                    Jointly Administered
                    Adversary No. 16-4006
                    Adversary No. 16-4007

**************************************
In Re:                               *
TELEXFREE, LLC, TELEXFREE, INC.,     *
and TELEXFREE FINANCIAL, INC.,       *
            Debtors.                 *
                                     *
STEPHEN B. DARR, TRUSTEE OF THE      *
ESTATES OF TELEXFREE, LLC,           *
TELEXFREE, INC., and TELEXFREE       *
FINANCIAL, INC.,                     *
            Plaintiff,               *
                                     *
        vs.                          *
                                     *
FRANTZ BALAN, A REPRESENTATIVE OF    *
A CLASS OF DEFENDANT NET WINNERS,    *
            Defendants.              *
                                     *
STEPHEN B. DARR, TRUSTEE OF THE      *
ESTATES OF TELEXFREE, LLC,           *
TELEXFREE, INC., and TELEXFREE       *
FINANCIAL, INC.,                     *
            Plaintiff,               *
                                     *
        vs.                          *
                                     *
MARCO PUZZARINI AND SANDRO PAULO     *
FREITAS, REPRESENTATIVES OF A        *
CLASS OF DEFENDANT NET WINNERS,      *
            Defendants.              *
**************************************

            CURRAN COURT REPORTING
```

**2**

DEPOSITION OF JOSHUA W. DENNIS, a
witness called on behalf of the Plaintiff,
Stephen B. Darr, taken pursuant to the Federal
Rules of Bankruptcy Procedure and Federal
Rules of Civil Procedure, before Jacqueline M.
Curran, (CSR #134293), a Registered
Professional Reporter, Registered Merit
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the law
offices of MURPHY & KING, P.C., 28 State
Street, 31st Floor, Boston, Massachusetts on
Tuesday, May 9, 2023, commencing at 10:00 a.m.

CURRAN COURT REPORTING

21 Rowe Hill Road

Stoneham, Massachusetts 02180

(781) 279-8400 (telephone)

E-mail: currancourtrep@yahoo.com

CURRAN COURT REPORTING

**3**

A P P E A R A N C E S

Representing the Plaintiff, Stephen B. Darr,
Trustee of the Estates of TelexFree, LLC,
TelexFree, Inc., and TelexFree Financial,
Inc.:

    MURPHY & KING, P.C.
    By: Daniel J. Lyne, Esq.
        Alexandra M. Papas, Esq.
    28 State Street, Suite 3101
    Boston, MA 02109
    (617) 423-0400
    Dlyne@murphyking.com
    Apapas@murphyking.com


Representing the Defendants, Frantz Balan, the
Class Representative in the 16-4006 action,
and Sandro Paulo Freitas and Marco Puzzarini,
Class Representatives in the 16-4007 action:

    MILLIGAN RONA DURAN & KING, LLC
    By: Ilyas J. Rona, Esq.
    28 State Street, Suite 802
    Boston, MA 02109
    (617) 395-9570
    ijr@mrdklaw.com

CURRAN COURT REPORTING

**4**

I N D E X

WITNESS:  Joshua W. Dennis

Examination By:  DIRECT CROSS REDIRECT RECROSS
    Mr. Lyne        5

E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| No. 1, Notice of Deposition of Joshua W. Dennis | | 5 |
| No. 2, Supplemental Rebuttal Expert Report of Joshua W. Dennis | | 5 |
| No. 3, Borelian Aggregation Methodology Code Execution Instructions | | 15 |
| No. 4, Joshua Dennis Curriculum Vitae | | 33 |
| No. 5, Page 43 of Dr. Freer's Report Entitled Steps in the Aggregation Methodology | | 67 |
| No. 6, Expert Report of Dr. Cameron E. Freer | | 94 |
| No. 7, One-Page Document | | 131 |
| No. 8, Document Entitled Exhibit 2 | | 132 |
| No. 9, Document Entitled Exhibit 16 | | 158 |
| No. 10, Document Entitled Exhibit 13 | | 178 |
| No. 11, Document Entitled Exhibit 9.5 | | 189 |

(All original exhibits retained by court
reporter and scanned and e-mailed to all
counsel; hard copy mailed back to Attorney
Lyne)

CURRAN COURT REPORTING

5

1  (Deposition Exhibit No. 1, Notice of
2  Deposition of Joshua W. Dennis;
3  Exhibit No. 2, Supplemental Rebuttal
4  Expert Report of Joshua W. Dennis,
5  premarked for identification)
6
7  JOSHUA W. DENNIS, having been
8  satisfactorily identified by the production of
9  his driver's license, and duly sworn by the
10  Notary Public, was examined and testified as
11  follows:
12  DIRECT EXAMINATION
13  By Mr. Lyne:
14  Q.  Mr. Dennis, my name is Dan Lyne.  I
15  represent the trustee in bankruptcy in the
16  Telex proceedings -- multiple proceedings.  I
17  assume you've had your deposition taken
18  before?
19  A.  Not strictly a deposition.  As part
20  of the -- earlier we had the evidentiary
21  hearings --
22  Q.  Correct.
23  A.  -- that was not truly a deposition.
24  In addition, I've done trial testimony, but

CURRAN COURT REPORTING

7

1  MR. RONA:  Yes.
2  MR. LYNE:  Thirty days?
3  MR. RONA:  Do you think -- is
4  30 days enough time?
5  THE WITNESS:  For the errata?
6  MR. RONA:  Yes.
7  THE WITNESS:  Sure.
8  MR. RONA:  Okay.  And can we
9  waive notarization?
10  MR. LYNE:  Waive
11  notarization.  Do you want to waive
12  all objections, except as to form,
13  or do you want to waive objections
14  generally, or what do you want to
15  do?
16  MR. RONA:  We'll do, I think,
17  usual.  Reserve all objections,
18  except as to form, and motions to
19  strike until the time of trial or
20  evidentiary hearing.
21  MR. LYNE:  Whatever it may
22  be.
23  MR. RONA:  Whatever it may
24  be.

CURRAN COURT REPORTING

6

1  not a deposition like this.
2  Q.  Interesting.  So let me give you the
3  ground rules.  I'm going to ask you a series
4  of questions.  If at any time you don't
5  understand my question, please tell me, and
6  I'll try to rephrase it so you can understand
7  it.  To the extent you answer my question,
8  I'll assume that you understood it and that
9  you answered it fully, completely, and
10  truthfully.  Agreed?
11  A.  Agreed.
12  Q.  One of the things that's important
13  is to wait for me to answer or -- excuse me.
14  Let me try that again.
15  One of the things that's important
16  is to allow me to finish my question
17  completely before you start to answer.  This
18  is a courtesy to the stenographer, and when
19  you answer, please answer with words, not with
20  gestures or Uh-huhs or Uh-Uhs.  We're trying
21  to make sure that at the end of the exercise,
22  we have as clean a transcript as possible.
23  MR. LYNE:  Ilyas, do you want
24  to have your client read and sign?

CURRAN COURT REPORTING

8

1  Q.  Sir, directing your attention to
2  Exhibit 1, are you appearing this morning
3  pursuant to the notice of taking deposition
4  which I've just shown you?
5  A.  I am.
6  Q.  And am I correct in understanding
7  that you have been engaged by Mr. Rona's
8  office to provide some form of analytical work
9  in connection with this case?
10  A.  I think that's fair.
11  Q.  Okay.  And can you describe for me
12  what the scope of your engagement is in this
13  case?
14  A.  Sure.  So the scope of my
15  engagement, as I laid out in my expert
16  reports, was to review and assess the
17  methodology and the calculations that were put
18  forth by experts on behalf of the trustee in
19  terms of the determination of the net winners
20  and net losers.
21  Q.  And who assisted you in connection
22  with this exercise internally at StoneTurn?
23  A.  Sure.  So do you want me to kind of
24  go back in time here?  We were engaged quite

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

9

1  some time ago, and I've had two reports here,
2  so I just want to make sure I'm clear on --
3      Q.  All right.
4      A.  -- which report you're referring to.
5      Q.  So why don't you -- why don't you
6  tell me in connection with the 2020 report,
7  and then I'm going to ask you the same
8  question with respect to the current report.
9      A.  Understood.  And that's what will
10  test my memory here --
11          MR. RONA:  I'm sorry.  "2020
12  report."  Is that the Martin report?
13          MR. LYNE:  That's his
14  report --
15          MR. RONA:  Okay.
16          MR. LYNE:  -- commenting on
17  the Martin report.
18          MR. RONA:  Okay.
19      A.  2020 sounds about right for that.
20      Q.  Yes.
21      A.  So assisting me in that one would
22  have been Patrick Ryan and Gladys Leung,
23  L-E-U-N-G.  I believe those are the two
24  primary people.

10

1      Q.  And were you either of those people
2  trained in the area of data science?
3      A.  Yes.
4      Q.  All right.  Who of those two, or
5  were both of them data scientists?
6      A.  Patrick Ryan had his master's in
7  data science.
8      Q.  What about Gladys Leung, what's her
9  background?
10      A.  She helped more on the intellectual
11  property, the economic damages side of the
12  house, so she helped in preparing more of the
13  exhibits.  You know, reading the report for
14  typographical errors, things like that.
15      Q.  Okay.  And the current 2022 report
16  that you prepared, who worked with you on
17  that?
18      A.  So that would be Charles Soha,
19  S-O-H-A, as well as James Hubbs, H-U-B-B-S,
20  and Nicole Stedman, S-T-E-D-M-A-N.  I think I
21  got that right.
22      Q.  And are any of those individuals
23  data scientists?
24      A.  So just to be clear on this -- I can

11

1  give you their background in terms of -- so
2  I'm thinking to answer as data scientists.
3  Let me give you their education.
4      Q.  Okay.
5      A.  So Charles Soha, I believe, has his
6  undergrad degree in math -- mathematics, I
7  believe, and had continuing education, I
8  believe has his MBA.  James Hubbs, I believe
9  his undergrad degree was in math statistics
10  and has continuing graduate coursework in the
11  same.
12      Q.  And Ms. Stedman?
13      A.  She's similar to Gladys on the
14  economic damages side of the house, and,
15  again, assisted largely with, you know,
16  reading the report for confirming footnotes,
17  typographical errors, and things like that.
18      Q.  So am I correct in understanding --
19  well, let me back up a bit.
20          Do you have any formal training as a
21  data scientist?
22      A.  I do have formal training in the
23  areas of data, yes.
24      Q.  Okay.  And what is your formal

12

1  training?
2      A.  So as part of my undergraduate
3  degree -- well, my major was in management
4  business, my minor was in computer science,
5  and since that time, I've had continuing
6  coursework as well in the area of data
7  science.
8      Q.  Okay.  So I'll get to that.  Is it
9  fair to say then that you've had technical
10  support from data scientists or somebody with
11  statistical or mathematics background in both
12  -- in both of the reports that you have
13  signed?
14      A.  Yes.  That's true.
15      Q.  All right.  And did you rely upon,
16  for example, Mr. Ryan in doing analytical work
17  with respect to the 2020 report?
18      A.  What do you mean by "rely upon"?
19      Q.  Well, you tell me how you used
20  Mr. Ryan in two thousand -- in the 2020
21  report.
22      A.  So going back a ways now, my
23  recollection is what we received from
24  Mr. Martin in here on the time involved some

Deposition of Joshua W. Dennis
May 9, 2023

13

1  fairly large databases.  I think we received
2  the original large copy of the SIG, S-I-G,
3  database.  I recall at least he helped me load
4  that database onto our servers.  I think he
5  also helped me review some of the code I wrote
6  to help QC and confirm it.
7      Q.  You mean to QC and confirm whether
8  the SIG database was loaded correctly or
9  otherwise?
10      A.  No.  No.  I'm sorry.  I'm sorry.  He
11  helped me load the data, and then separately,
12  I performed an analysis based on that data,
13  and he reviewed the code I wrote that was in
14  support of my original report in response to
15  Mr. Martin's.
16      Q.  Okay.  And that was written in
17  Python?
18      A.  No.  That was in SQL.
19      Q.  SQL.
20      A.  S-Q-L.
21      Q.  Got it.  All right.  And then,
22  Mr. Soha, did he provide data science or --
23  well, you tell me.  What kind of support did
24  he provide you specifically with respect to

14

1  the 2022 report?
2      A.  So in the 2022 report, Mr. Soha
3  helped in the re-performance of certain of the
4  code that Dr. Freer provided.
5      Q.  "The re-performance of certain of
6  the code."  Can you be more specific?
7      A.  Sure.  So we received the underlying
8  code that Dr. Freer relied upon in forming his
9  opinion.  You know, as part of that, we
10  reviewed that code, and then we took small
11  portions of the data and reran and walked
12  through that code step-by-step to make sure we
13  understood how it worked.
14      Q.  Directing your attention to
15  Exhibit 2.
16      MR. LYNE:  (To Attorney
17  Papas)  Did you hand it to me?  Oh,
18  I have it.
19      Q.  Is this your two thousand -- your
20  current 2022 report, absent the tables?
21      A.  2023.  Sorry.
22      Q.  Sorry.  2023.
23      A.  You said '22 before.  My apologies.
24      Q.  Yup.  My mistake.

15

1      A.  It's my current report, yes.
2      MR. LYNE:  Okay.  (To
3  Attorney Papas)  And I need the code
4  instructions.
5      MS. PAPAS:  Here.
6  (Deposition Exhibit No. 3, Borelian
7  Aggregation Methodology Code Execution
8  Instructions, marked for
9  identification)
10      Q.  This is Exhibit 3.  Let me just make
11  sure I understand with respect to your report.
12  Together with the tables, which I have not yet
13  marked, but together with those tables, the
14  Exhibit 3 plus the tables would constitute
15  your entire report?
16      MR. RONA:  Objection.  You
17  said Exhibit 3.
18      MR. LYNE:  Oh, I'm sorry.
19  Let me ask the question again.
20      Q.  Let me make sure I understand.
21  Exhibit 2, together with the tables,
22  constitute your entire report; is that
23  correct?
24      A.  By "tables," you're referring to the

16

1  exhibits I attached?
2      Q.  Yes.
3      A.  That would be my expert report, yes.
4      Q.  Okay.  And was it your intention to
5  include in your report all of the opinions
6  that you formed that you deemed to be relevant
7  to your engagement?
8      A.  I certainly attempted to put in all
9  my opinions in some fashion I could.
10  Obviously, there was a lot of thoughts in my
11  head, and I did my best to get them down on
12  paper.
13      Q.  All right.  It was your intention to
14  include in your report all of the opinions
15  that you deemed to be relevant and important
16  to your engagement.  Is that a fair statement?
17      A.  I think that's generally fair, based
18  on the information I had available to me at
19  the time.
20      Q.  Okay.  Have you subsequently
21  obtained information which caused -- has
22  caused you to change any of the opinions
23  contained in your report?
24      A.  I think in going back and, you know,

17

1  preparing for the exhibit -- for this --
2  excuse me -- this deposition, you know, I
3  think there are things that I would -- maybe
4  additional critiques or things that I feel I
5  could have added, but nothing that
6  substantively changes the ultimate opinion and
7  conclusions.
8      Q.  Did you omit any opinions to your
9  report that you deemed to be relevant to your
10  inclusion -- or to your engagement?
11      A.  I don't believe so.
12      Q.  Okay.  Thus, to the extent that you
13  formed opinions that you deemed to be relevant
14  to your engagement, those opinions are
15  disclosed in the four corners of your report
16  and its exhibits; correct?
17      A.  I think necessarily a summary of my
18  opinions.
19      Q.  Okay.  But nothing substantively
20  different?
21      A.  Not that I can think of sitting here
22  today.
23      Q.  All right.  The exhibits that you
24  attached to your report include, for example,

18

1  cluster tables; right?
2      A.  Can you be more specific?
3      Q.  Do you remember attaching, for
4  example, a 430-line table from Maria Neves, a
5  cluster table?
6      A.  I don't remember the exact number of
7  records in that table, but I certainly
8  included the user accounts that Dr. Freer had
9  aggregated under the name Maria Neves --
10      Q.  Okay.
11      A.  -- and other names.
12      Q.  And the tables that were generated
13  by your office, did you include and attach all
14  of the tables that you generated in the course
15  of your investigation or just selective ones?
16      A.  Selected ones.
17      Q.  All right.  And can you give me an
18  order of magnitude how many tables StoneTurn
19  generated in the course of its investigation
20  associated with Dr. Freer's report?
21      A.  What do you mean by "generated"?
22      Q.  Well, "generated," you created,
23  either digitally or in hard copy tables, some
24  form of analytical tables.  Is that a fair

19

1  statement?
2      A.  It depends.  Certainly, there's data
3  exploration, so I can query a database and on
4  the screen will show me some subset of that
5  data.  I didn't necessarily take that data and
6  then paste into something else or create a
7  table add that is something that lives
8  momentarily until I query something else, so
9  that's why I'm trying to understand when you
10  say "generate," what you're referring to.
11      Q.  Well, let's go with queries.  Did
12  you generate a number of queries against the
13  Freer database?
14      A.  What do you mean by "Freer
15  database"?
16      Q.  The clusters that Mr. Freer
17  generated as a result of his work.
18      A.  So what I'm trying to think through
19  when you say clusters he generated, so
20  generated groups of user accounts.  There's a
21  lot of information that goes along with it
22  across many different tables, so I just want
23  to make sure what tables you're asking me in
24  terms of how many queries I did.

20

1      Q.  Well, let's then go to Exhibit 3.
2  Let me show you what's been marked as
3  Exhibit 3.  Directing your attention to
4  Exhibit 3, do you recognize this document?
5      A.  Certainly.  The answer is I
6  recognize -- I wouldn't say a singular
7  document.  What we received from Dr. Freer was
8  various different things, different files.
9      Q.  All right.  Well, this says
10  "Borelian Aggregation Methodology Code
11  Execution Instructions."  Do you remember ever
12  reviewing this?
13      A.  Trying to recall.  We certainly
14  received a lot of the code.  I'm trying to
15  remember reviewing this particular one or not.
16  This does look familiar.  I think this had to
17  do more with setting up the database itself.
18      Q.  Okay.  Did you or somebody under
19  your direction then set up the database
20  consistent with the code execution
21  instructions set forth in Exhibit 3?
22      A.  Not in full, no.
23      Q.  All right.  You said previously that
24  Mr. Soha --

Deposition of Joshua W. Dennis
May 9, 2023

21

1    A.  Uh-huh.
2    Q.  -- created and reviewed small
3  portions of the code, ran small portions of
4  the code; is that correct?
5    A.  Yes.
6    Q.  All right.  And how did he determine
7  which portions of Dr. Freer's code to run?
8    A.  We had discussions about certain
9  aspects of it, about how the blocking or what
10  kind of -- how the cleaning worked, and so we
11  would take samples of the data and run it
12  through portions of the code to see what the
13  out would look like.
14    Q.  With what intention?
15    A.  Simply making sure we had a full
16  understanding of how Dr. Freer's code worked,
17  reading it in connection with his expert
18  report to make sure we had a clear picture of
19  what the inputs and assumptions were.
20    Q.  And what portion of the code as a
21  percentage did you actually run?
22    A.  I guess I don't know how to -- how
23  to measure that.
24    Q.  Well, he has ten steps in his

22

1  analytical process.  Do you know that?  Do you
2  remember that?
3    A.  Yes, I do.
4    Q.  Okay.  Of the ten steps, did you run
5  code for any of those ten steps, blocking or
6  otherwise?
7    A.  Yes.  Certainly.
8    Q.  All right.
9    A.  Certainly.
10    Q.  How many of the steps did you run
11  code for?
12    A.  I don't recall.
13    Q.  Do you have any recollection of
14  whether it was more than half of the steps or
15  less than half of the steps?
16    A.  I don't recall.  We didn't look at
17  it in the concept of -- the context of steps.
18    Q.  How did you look at it?
19    A.  We received a number of files, and
20  the files that we received the code didn't
21  necessarily comport one to one with the steps.
22    Q.  Well, did you attempt to run
23  validating checks with respect to any blocks
24  of the code that were associated with a

23

1  discrete step in his process?
2    A.  Can you ask that question again?
3    Q.  Sure.  Did you attempt to run code
4  with respect to any of the discrete steps of
5  his process as an entire step so that you
6  could validate his output in that step?
7    A.  I don't recall.
8    Q.  Well, you mentioned blocking; right?
9  That was one of the things you ran code
10  against?
11    A.  For a portion of it, yes.
12    Q.  When you say "a portion of it," what
13  are you referring to?
14    A.  I'd have to -- so there's a lot of
15  code that goes into any one of those steps.  I
16  think we looked at certain pieces of that
17  code, to my recollection.
18    Q.  Okay.  But let's take blocking as an
19  example.  What portions of blocking code did
20  you run?
21    A.  I'd have to go back and look.
22    Q.  And where would you look?
23    A.  I'd probably go back and talk to
24  Mr. Soha and go back through and try to recall

24

1  what we specifically did, what we ran, and
2  what we discussed.
3    Q.  Is Mr. Soha the person who would
4  have the most knowledge with respect to
5  actually what portions of the code were run?
6    A.  Between him and I.  We both worked
7  on it together.
8    Q.  Okay.  But you're not recollecting
9  any specific sets other than looking at some
10  portions of the code -- blocking code, and I'm
11  trying to determine, as you sit here today,
12  are there any other portions of the Freer code
13  other than a portion of the blocking code
14  which you or Mr. Soha ran?
15    A.  Certain of the steps related to the
16  cleansing of the data.
17    Q.  Which steps?
18    A.  So the step itself is cleaning --
19  under Dr. Freer's ten steps, my recollection
20  is cleaning was one of the steps.  Not the
21  first step.  May have been the second step.
22    Q.  Okay.  And what portions of the
23  cleaning code did you run?
24    A.  I wanted to look at and see and

25

1 understand particularly that was related to
2 the name field. He had made certain
3 statements in his report about how he had
4 cleaned the actual string -- that wasn't the
5 name -- such as trimming off (inaudible).
6        THE STENOGRAPHER:  I didn't
7    hear you.
8    A.  Oh, I apologize.  Trimming.  So
9 removing leading and trailing spaces,
10 converting everything to lower case, as well
11 as setting anything that, I think he said, was
12 one character to null or blank.  I believe he
13 had also said and we had looked to confirm
14 that he had also eliminated certain names that
15 he considered to be entirely garbage, so
16 things that were only punctuation and in
17 numbers is my recollection.
18    Q.  And in running those portions of the
19 code that you ran, did it appear that
20 Dr. Freer's description of how his code
21 operated was accurate?
22    A.  I didn't see any inaccuracies.
23    Q.  All right.  Would the same be true
24 with respect to the blocking steps?

CURRAN COURT REPORTING

26

1    A.  I didn't see any errors in the
2 coding itself.
3    Q.  Okay.  Other than cleansing and
4 blocking, did you run any other portions of
5 Dr. Freer's code?
6    A.  I think those are the two primary
7 steps that we focused on that we wanted to
8 understand.
9    Q.  When you say, "those are the two
10 primary steps," were there any subsidiary
11 steps that you focused on after looking at
12 blocking and cleaning?
13    A.  So I also looked at the production
14 or how the final tables that were provided
15 were created or produced.  What we received
16 from Dr. Freer in terms of output were two
17 tables.  One that was kind of a more detailed
18 output table, and one that was titled summary.
19        Within the output table, the larger
20 of the two, we saw that there was significant
21 duplication of user accounts where the name
22 that was used across the duplicated records
23 sometimes differed, and we wanted -- and I
24 wanted to go and look and understand what may

CURRAN COURT REPORTING

27

1 be creating that duplication and those
2 differences.
3    Q.  And did you form an opinion as to
4 what was creating the duplication or
5 differences?
6    A.  Ultimately, I didn't.  I didn't see
7 in the code where that -- what step was
8 creating that potential duplication.
9    Q.  When you say "potential
10 duplication," I want to go from the abstract
11 to the concrete.
12        Was there duplication or potential
13 duplication?
14    A.  So there was definitely duplication
15 in that table.  In the summary table, which
16 was a summary of the output, it didn't appear
17 that the duplication existed, so that's why I
18 say "potential."  There was clearly
19 duplication in the detailed output table.
20    Q.  And the duplication was in what
21 table fields?
22    A.  At least within the name field.  It
23 may have been in others.
24    Q.  And are any of the specific

CURRAN COURT REPORTING

28

1 duplication detail included in your report?
2    A.  I'm trying to remember if I -- if I
3 inserted a footnote to that -- that effect.  I
4 may have.  I'd have to go back and look.
5    Q.  Do you have a recollection of what
6 percentage -- when you say the name field, are
7 you talking about rep_id?
8    A.  No.  No.  No.  The rep_nome,
9 N-O-M-E.
10    Q.  Okay.  And besides the rep_nome
11 field, were there any other fields which you
12 determined had duplication?
13    A.  Well, to be clear, it's not just --
14 the records -- the entire records were
15 duplicated; not just the field.
16    Q.  Okay.
17    A.  What was different was -- about the
18 name field was that they were duplicated
19 because the -- likely because there's
20 distinction or difference between the name
21 field and what would otherwise be the
22 duplicate record.
23    Q.  You mean in the clustering process,
24 it was -- they were -- there were clusters

CURRAN COURT REPORTING

29

1  with more than one cluster with rep_nome?
2    **A.**  No.
3    **Q.**  What do you mean?
4    **A.**  So, by way of example, within the
5  output, rep_id should be unique.  Rep_id
6  represents a unique user account, and there
7  should be one and only one.  Rep_id should
8  appear once and only once in that output set.
9  What we saw is that rep_id was appearing more
10  than once, and so when we looked across two
11  records that had the same rep_id, what we saw
12  was that there was a difference in at least
13  the name field, and maybe others, across those
14  two names.
15      What appeared to have been happening
16  is that at some point in time, the string or
17  phrase "NAN," N-A-N, had been excluded.  "NAN"
18  in Python is another word for null or blank.
19  And in doing so, it appears in certain ways to
20  be including -- causing certain duplication.
21  So, for example, Fernando would be Fer-Do.  I
22  think I got that right.
23    **Q.**  Is that the extent to which you
24  located duplication, when a name, for example,

30

1  included N-A-N?
2    **A.**  There seems to be what was causing
3  the duplication, yes.  It may have extended to
4  the address and other fields as well, but I
5  remember specifically seeing it in the name.
6    **Q.**  And as a percentage of output, what
7  percentage of the records implicated this
8  duplication?
9    **A.**  I don't recall doing that
10  calculation.
11    **Q.**  Was it a significant amount or a de
12  minimis amount?  I'm trying to look at order
13  of magnitude here.
14    **A.**  Again, I'd have to go back and do
15  the math.  I'm not sure I calculated that.
16    **Q.**  Was it in the thousands, the
17  hundreds?
18    **A.**  I would think it would be more than
19  a hundred, but I don't -- again, definitely
20  more than a hundred.  I don't remember the
21  exact magnitude though.
22    **Q.**  All right.  To the extent that you
23  determined that that was a -- that was a --
24  strike that.

31

1    Did any of the opinions in your
2  report rely upon this duplication based on the
3  NAN, N-A-N, field issue?
4    MR. RONA:  Objection.
5    **A.**  It was certainly something I had to
6  account for when utilizing Dr. Freer's output.
7    **Q.**  And how did you account for it?
8    **A.**  I accounted for it by, you know,
9  consolidating his output to make sure there
10  was only one rep_id within the output table to
11  avoid duplication within my analysis.
12    **Q.**  Okay.  We were talking about which
13  portions of the code you had run, and you had
14  run the portions of the code on the cleansing
15  step, on the -- on the out -- well, strike
16  that.  Did you run it on the output table?
17    **A.**  I'm sorry?
18    **Q.**  I'm sorry.  You received an output
19  table.  I want to focus just on what portions
20  of the code you actually ran.  So you ran it
21  on blocking, you ran it on trimming; right?
22    **A.**  Cleansing --
23    **Q.**  Cleansing.  Okay.
24    **A.**  -- was the name of the step.

32

1    **Q.**  Yup.  Anything else that you can
2  remember?
3    **A.**  I think those are the two we
4  primarily focused on.
5    **Q.**  Okay.  And, for that, you relied
6  upon Mr. Soha?
7    **A.**  In part.
8    **Q.**  All right.  Did you write the code
9  yourself for any of those analytical steps, or
10  did Mr. Soha?
11    **A.**  Well, we were relying on Dr. Freer's
12  code.
13    MR. LYNE:  Okay.  Before I
14  turn away here, the -- I need the
15  materials considered portion of his
16  report.
17    MS. PAPAS:  The list?
18    MR. LYNE:  The list.  Do you
19  have that?  It's Exhibit 2 to his
20  report.  Can you go get that?
21    MS. PAPAS:  Yup.
22    MR. LYNE:  And while we're
23  doing that, let's go with
24  Mr. Dennis's CV.

33

1  (Deposition Exhibit No. 4, Joshua
2  Dennis Curriculum Vitae, marked for
3  identification)
4  **Q.**  Sir, directing your attention to
5  what's been marked as Exhibit 4.  Is that a
6  copy of your current CV?
7  **A.**  Yes, it is.
8  MR. RONA:  It's current down
9  do the necktie.
10  THE WITNESS:  Wow.  Look at
11  that.  Very observant.
12  MR. LYNE:  And including the
13  shirt, it appears.
14  THE WITNESS:  Maybe.  I have
15  multiple blue shirts, but it's
16  certainly possible.
17  **Q.**  So you have a BS in management and
18  business from Skidmore; is that correct?
19  **A.**  It is.
20  **Q.**  And management and business is an
21  undergrad MBA-type study?  What is it exactly?
22  **A.**  If you're comparing it to MBA, it
23  was like an MBA to the extent it concentrated,
24  I think, on various areas of business, so

34

1  within that, it involved multiple accounting
2  courses, economics courses, finance courses,
3  marketing courses.  Things of that nature.
4  **Q.**  And you had a minor in computer
5  science; correct?
6  **A.**  Correct.
7  **Q.**  And the minor in computer science
8  required how many credits?
9  **A.**  I don't recall.
10  **Q.**  Do you remember approximately how
11  many computer science courses you took at
12  Skidmore?
13  **A.**  Between six and ten probably.  I'd
14  have to go back and look at my transcript.
15  It's been a while.
16  **Q.**  Did you take any data science
17  courses at Skidmore?
18  **A.**  As distinct from computer science?
19  **Q.**  Yes.
20  **A.**  I think it could be considered one
21  and the same.
22  **Q.**  Well, I would consider computer
23  science to be a broader area than data
24  science.  Data science being the manipulation

35

1  and aggregation or disassociation of data --
2  datasets.  So if I can use that term, did you
3  take any data science courses that
4  concentrated on manipulating or either
5  aggregating or disassociating datasets?
6  MR. RONA:  Objection.  You
7  can answer.
8  **A.**  Yes, I did.
9  **Q.**  Okay.  And, in that context, what
10  courses do you remember taking?
11  **A.**  I certainly at least had coursework
12  related to at that time it was Microsoft
13  Access.
14  **Q.**  Anything else?
15  **A.**  I think that there may very well
16  have been, but, again, this is quite some time
17  ago.  That's the one that comes to mind.
18  **Q.**  Okay.  And then subsequent or --
19  strike that.
20  In college, did you take any
21  statistics courses?
22  **A.**  I did.
23  **Q.**  Which -- how many courses do you
24  remember taking?

36

1  **A.**  At least one.
2  **Q.**  Sort of an intro to statistics type
3  course?
4  **A.**  Statistics is offered in various
5  programs.  There was a business statistics.
6  There was math statistics.  I recall certainly
7  taking the math statistics.  I don't recall if
8  I took separately a business statistics
9  course.
10  **Q.**  Okay.  Was the math statistics
11  course a half-year course, a semester course,
12  or a full year?
13  **A.**  I think it was a semester course.
14  **Q.**  Okay.  So let me move now.  After
15  you graduated, did you continue your education
16  after you graduated, either formally or
17  informally?
18  **A.**  Yes.
19  **Q.**  All right.  And can you tell me, to
20  the best of your recollection, what coursework
21  or study you engaged in relating to, I'll call
22  it again, data science?
23  **A.**  So certainly I took continuing
24  education as it related to SQL.  That would be

Deposition of Joshua W. Dennis
May 9, 2023

---

37

1 the primary focus of continuing education --
2 formal continuing education as opposed to
3 experiential.
4    Q.  Okay.  And the SQL coursework was
5 done through what entity?
6    A.  That was a number of years ago now.
7 I don't recall.
8    Q.  Was it a continuing education like a
9 night course, or was it --
10    A.  No.  It was -- it was a daytime
11 course.
12    Q.  Multiday course --
13    A.  Yes.
14    Q.  -- multiweek course?
15    A.  I think it spanned a couple weeks.
16 Yes.
17    Q.  Couple weeks.  Okay.  And do you
18 remember generally just it was sort of SQL
19 power user type stuff?
20    A.  What do you mean by "SQL power
21 user"?
22    Q.  Well, maybe I'll ask you to tell me.
23 What was the subject matter of the SQL course
24 that you took over several weeks?

CURRAN COURT REPORTING

---

38

1    A.  So -- sure.  It was learning about
2 programming in SQL.  It looked at complex ways
3 to join, manipulate, aggregate, filter data.
4    Q.  All in SQL?
5    A.  In SQL, yes.
6    Q.  Okay.  And besides the SQL course
7 that you took, was there any other formal
8 continuing education you took, leaving aside
9 experiential education?
10    A.  Related to data science?
11    Q.  Yes.
12    A.  Not that I can think of.
13    Q.  Okay.  And, now, you refer to
14 experiential education.  What do you mean when
15 you say "experiential education"?
16    A.  So having been in this business for,
17 it says more than 15, it's becoming a lot
18 closer to 20 years now, a large portion of the
19 work I do involves data analysis or assessing
20 data analysis generally in the area of
21 compliance litigation or investigation
22 matters.  So in doing that, I use a wide
23 variety of programs and approaches to perform
24 data analytics, and doing that on a daily

CURRAN COURT REPORTING

---

39

1 basis has led to a great degree of education.
2    Q.  All right.  First, let's start with
3 when you refer to compliance and
4 investigation, what are you referring to?
5    A.  Sure.  I'll take that in two parts,
6 if that's okay.
7    Q.  Of course.
8    A.  First, maybe it relates to
9 compliance.  A big portion of StoneTurn's work
10 is in the area of things like monitorships, so
11 that is where we might come in and assess the
12 compliance program of a company to make sure
13 it's reasonably designed and implemented to
14 detect and prevent fraud.  That may review--
15 that may include reviewing how they approach
16 things like transaction testing.
17       In the area of litigation, that's,
18 obviously, a very big area.  A lot of my work
19 relates to economic damages, whether it's
20 through things like contracts disputes or
21 intellectual property, patent infringement
22 trademark.  That frequently involves financial
23 modeling and data analytics.  I think those
24 are the two you asked me to describe.

CURRAN COURT REPORTING

---

40

1    Q.  And your compliance experiential
2 education, is it primarily directed towards
3 testing the sufficiency of a business's
4 internal compliance systems?
5    A.  I think the word I'm thinking about
6 there is "sufficiency."  That's only one
7 aspect we look at.  And efficacy would be
8 another.
9    Q.  Efficacy and sufficiency.  Would
10 that that be a fair --
11    A.  There are likely others, but those
12 are the two big ones.
13    Q.  Okay.  And then on the litigation
14 side, your experiential education includes
15 looking at and creating models for economic
16 damages analysis?
17    A.  That's certainly part of it.  I
18 mean, creating models is a wide, big area.  A
19 lot of that includes taking large or complex
20 datasets that need to be joined or integrated
21 or compared or distilled or visualized, and
22 using that to usually come up with an opinion
23 in the form of economic damages, although
24 there are certainly other opinions, I'm sure,

CURRAN COURT REPORTING

---

41

1  we've offered.
2      Q.  This case involves large-scale data
3  aggregation or very large dataset.  Is that
4  consistent with your understanding?
5      A.  That's certainly one aspect of this
6  case.
7      Q.  Okay.  Have you had previous
8  experience with data analysis and manipulation
9  on a dataset of equivalent size?
10     A.  Yes.
11     Q.  Okay.  And --
12     A.  I'm sorry.  When you say "dataset,"
13  you're referring to -- there's a lot of
14  different datasets that are in this case.  I
15  just want to make sure that I'm clear on what
16  you're referring to by the "dataset."
17     Q.  Well, the transactional dataset.
18  What's the term we use for that?  SIG?
19     A.  You mean the original source data
20  that Huron analyzed?
21     Q.  Yes.
22     A.  Yes.
23     Q.  Okay.  Do any of those -- those
24  engagements appear in your "Select

42

1  Professional Experience" description on the
2  second and third pages of your -- actually,
3  it's pages two, three, four, and five?
4      A.  So I imagine some of them would,
5  yes.
6      Q.  Which?
7      A.  So, certainly, one, two, three --
8  maybe the fourth one down certainly would.
9      Q.  The class action matter about
10  potential wages due?
11     A.  Yes.  And, again, I think it's
12  important to make the distinction that when
13  we're talking about data, it's not that
14  there's a single table that encompasses all
15  the records.  That's rarely the case, and
16  wasn't the case here.  Here, the primary
17  tables that there were, you know, four or
18  eight, depending how you look at it, each
19  contained a subset of data from a different
20  perspective in terms of what Dr. Freer relied
21  upon as well in conducting his analysis.
22     Q.  Okay.  Are there any other of your
23  stated select professional engagements on your
24  CV that you consider to be akin in size to the

43

1  size of the Telex dataset or sets, plural?
2      A.  I think focusing on the dataset in
3  terms of what was analyzed by Dr. Freer, I
4  think a lot of -- again, it's hard for me to
5  say 'cause I don't remember the total sum --
6  I'm talking about purely on size, and it
7  depends how you define "size."  Are we talking
8  about number of rows?  Are we talking about
9  the file size?  I guess I don't have all that
10  data in front of me to know one way or the
11  other.
12     Q.  Well, there were how many -- how
13  many user accounts in the SIG?
14     A.  I think my recollection was there
15  was, I think -- and I have it in my report,
16  but in the neighborhood of 17 million, of
17  which 15 million had at least one paid
18  invoice.
19     Q.  All right.  And if you take those
20  and you exclude the Brazilian accounts and
21  just focus on the domestic Telex accounts,
22  that would be about 11 million accounts?
23     A.  I don't recall if that's domestic or
24  domestic and international.

44

1      Q.  Okay.  But taking that number of
2  about 11 million accounts and using that as
3  the metric against which to look at your other
4  engagements, do any of the other engagements
5  on your CV involve datasets that large?
6      A.  They very well could.  I rarely --
7  sometimes I think it's interesting to put in
8  number of records, but it's rarely to me a
9  meaningful statistic, other than simply of
10  interest, so I don't know, sitting here today,
11  the number of records associated with each of
12  these engagements.
13     Q.  Well, regardless of whether you have
14  a specific number of records, are there any of
15  these that you considered to be akin in size
16  to the Telex SIG database?
17     A.  Again, I'd have to go back, to the
18  extent we even still have them.  We tend to
19  not retain data beyond what's necessary for
20  the engagement.  So I'd have to go back and
21  look at each of these cases to see what data
22  we received, what we analyzed, what we did.
23  It would really depend.  I would have to add
24  up all the data received across multiple

Deposition of Joshua W. Dennis
May 9, 2023

45

1 tables for different purposes.  It's really a
2 hard comparison to make.
3     Q.  Okay.  Do you have experience using
4 Python notebooks?
5     A.  Some.
6     Q.  When you say "some," what experience
7 do you have?
8     A.  We have certainly utilized Python
9 for certain analyses.  It really depends on
10 the use case.
11     Q.  When you say we use Python
12 notebooks, do you -- are you conversant in
13 Python?
14     A.  I have some base knowledge.
15     Q.  When you say "I have some base
16 knowledge," what do you mean by that?
17     A.  So we certainly use Python when
18 necessary.  As part of that, I'll go through
19 and walk through the notebooks.  I think I
20 generally have a stronger understanding of
21 literacy in it, reading it and understanding
22 how it works.  I do some basic analysis in
23 Python, but generally use SQL.
24     Q.  Okay.  How about Pandas?  Do you use
CURRAN COURT REPORTING

46

1 Pandas?
2     A.  Pandas data frames?
3     Q.  Yes.
4     A.  I have in the past.
5     Q.  And do you consider yourself to be
6 fully conversant in Pandas packages?
7     A.  I'd say partially.  It's not
8 something I use frequently.
9     Q.  Something you use -- you've used a
10 handful of times or --
11     A.  I think a handful is a good
12 estimate.
13     Q.  All right.  And would the same be
14 true with respect to Python?
15     A.  Probably more -- a little bit more
16 than a handful.
17     Q.  But not -- it's not your go-to?
18     A.  Generally not.  I tend to work more
19 in SQL.
20     Q.  How about Splinc?  Have you used
21 Splinc?
22     A.  No, I haven't.
23     Q.  How many of your -- how many -- I'll
24 call them data aggregation projects.  So how
CURRAN COURT REPORTING

47

1 many -- how many projects that you have been
2 involved in have been data aggregation
3 projects that require cluster analysis of the
4 type that we are dealing with in the Telex
5 case?
6     A.  When you say "cluster analysis," can
7 you be more specific?
8     Q.  Attempting to aggregate accounts
9 across a large database assigned to individual
10 clusters.
11     A.  I'm still not sure I understand your
12 question.
13     Q.  There are 11 million -- let's use
14 that number -- 11 million accounts of interest
15 in this case, whether domestic or domestic and
16 international.  Of those, there are a number
17 where every one of those accounts has to be
18 assigned to a cluster, right, to determine net
19 winners and net losers?
20         MR. RONA:  Objection.
21     A.  I don't necessarily know that's
22 true.
23     Q.  Well, it could be down to a cluster
24 of one.  That would still be a cluster, or it
CURRAN COURT REPORTING

48

1 could be a cluster of one plus N, whatever
2 that number is.
3         Taking that as your guide, of the 11
4 million accounts, to determine who's a net
5 winner and a net loser, you have to determine,
6 for individual participants, which one of
7 those accounts gets assigned to the
8 participant; correct?
9     A.  To a participant.
10     Q.  Yes.
11     A.  Yes.
12     Q.  Okay.
13     A.  My understanding, that was part of
14 the analysis that needed to be performed.
15     Q.  Okay.  And when I talk about a
16 cluster analysis, I'm talking about that
17 exercise, taking a series, an N number of
18 participants and an N number of accounts and
19 determining which accounts belong to which
20 participant, like we're doing in the Telex
21 case?
22         MR. RONA:  Objection.
23     Q.  Okay?
24     A.  I think, in my mind, there's a
CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

49

1  distinction between a cluster and a
2  participant.  Those things are not necessarily
3  -- often they're not the same, so I think
4  that's why I'm having a hard time answering
5  your question.
6       Q.  Well, you'll agree with me that the
7  exercise in this case for determining who is a
8  net winner and who is a net loser is looking
9  at the 11 million accounts, individual
10  accounts, and then determining whether or not
11  those accounts represent a single participant,
12  or whether a single participant may have
13  opened multiple accounts which should be
14  aggregated into a single cluster.  Is that a
15  fair statement?
16       MR. RONA:  Objection.
17       A.  No.  I don't think it is.
18       Q.  Why?
19       A.  I think they should be aggregated to
20  a single participant.
21       Q.  All right.  So using the term
22  "participant" as opposed to "cluster," let's
23  go there.  So the exercise is to take N number
24  of accounts, which in this case is 11 million,

50

1  and assign to all -- to all of those accounts
2  -- all of those accounts two individual
3  participants, such that no account is assigned
4  to more than one participant.
5       MR. RONA:  Objection.
6       Q.  Would you agree with me that's the
7  exercise here?
8       A.  I think it is, with the caveat that
9  I don't know factually or legally the basis
10  for exclusion of Ympactus.  Certainly, it's
11  what's been done, but notwithstanding that
12  fact, I think that's accurate.
13       Q.  Okay.  Now, that same concept, that
14  same process, have you had other engagements
15  which have required you to go through this
16  same process, whether you call it a cluster
17  analysis, whether you call it something else,
18  have you had other engagements that require
19  this same analytical process?
20       A.  Yes.
21       Q.  Okay.  And can you describe for me
22  what engagements those would be?
23       A.  Sure.  So one matter was -- it
24  originated as an anti-price fixing matter.

51

1  The bank needed to notify -- they went back a
2  few years now -- notify certain participants
3  of the issue.  The data we received related --
4  had the names of businesses and addresses, and
5  part of what we were asked to do is
6  essentially deduplicate, which is one aspect,
7  and essentially not similar to what was being
8  done here, but deduplicate those addresses to
9  minimize a number of mail-ins the company
10  ultimately had to do.
11       Q.  All right.  Well, that's a portion
12  of what happened here, deduplicating?
13       A.  Correct.
14       Q.  But it was a little more than that
15  at the end; right, in this -- in the Telex
16  case?  You weren't -- people weren't simply
17  deduplicating records?
18       A.  I guess --
19       MR. RONA:  Objection.
20       A.  -- it depends.  I don't know I agree
21  with that.
22       Q.  All right.  What analytical process
23  did you use to deduplicate records in the
24  anti-price fixing engagement?

52

1       A.  Your question is about process?
2       Q.  Yes.
3       A.  So we went through and looked at the
4  data.  We analyzed it in terms of looking at
5  the nature of the different fields we had at
6  our disposal.  In that case, we went through,
7  if I recall correctly, and used a combination
8  of fuzzy matching and parsing to try to split
9  out and find addresses that were likely in
10  common and should be brought together and
11  aggregated.
12       Q.  And what fuzzy matching tools did
13  you use?
14       A.  I'd have to go back and recall.  I
15  don't remember sitting here today.
16       Q.  How long ago was this engagement?
17       A.  Three, four years maybe.  Maybe
18  more.
19       Q.  I'm sorry.  Was it three or four or
20  more?
21       A.  I said three or four or maybe more.
22  I'd have to go back and look.
23       Q.  Okay.  But you can't remember what
24  fuzzy matching tools you used?

Deposition of Joshua W. Dennis
May 9, 2023

53

1    **A.** I think we used a combination, so
2    that's why I'm trying to remember which
3    specifically ones we used.  We may have used
4    some probably likely just right in Excel,
5    Excel fuzzy being one.  I think we may have
6    used other approaches as well.  Probably
7    Levenshtein-based approaches as well at that
8    time.
9    **Q.** So Levenshtein approaches?
10   Jaro-Winkler?  I mean, which approaches did
11   you use?
12   **A.** I'd have to go back and look.  It's
13   been a number of years.
14   **Q.** And what size dataset are we talking
15   about here?
16   **A.** I don't have a specific
17   recollection.
18   Okay.  Other than the anti-price
19   fixing case, were there any other cases or
20   engagements which you considered to be akin to
21   the process that was used here?
22   **A.** And by "process," again, you mean
23   general aggregation or deduplication?
24   **Q.** Sure.

CURRAN COURT REPORTING

54

1    **A.** I think, as a conceptual matter,
2    again, aggregation is something we do.
3    Grouping things is summing (inaudible).
4    THE STENOGRAPHER:  I'm sorry.
5    I didn't hear you.
6    **A.** I'm sorry.  Aggregation.  So
7    generally summing things up or grouping things
8    is something we do in a lot of our matters.
9    **Q.** All right.  Well, let's then focus
10   on deduplication.
11   **A.** Sure.  So for deduplication, again,
12   we got a lot of datasets that are very messy,
13   so I would have to say as a deduplication, a
14   lot of our matters contain data that we need
15   to present in a more summary fashion.  We have
16   multiple records that relate to a single
17   entity or company, and we need to aggregate
18   and bring that down to show something at a
19   more summary individualized level.
20   **Q.** Okay.  Well, that sounds more like a
21   data dashboard, but I'm really focusing on
22   deduplicating otherwise dirty datasets.
23   You referred to the auto price
24   fixing case where you used deduping tools.

CURRAN COURT REPORTING

55

1    Were there other engagements in which you used
2    deduping tools?
3    MR. RONA:  Objection.
4    **A.** I have no doubt that there are.
5    And, again, deduplication is part of the
6    process.  Generally understanding what you
7    have when you have, say, a dataset, and really
8    deduplication is a function of what it is
9    you're trying to summarize or aggregate or
10   show.  In this instance, if the goal was to
11   look at things on a rep_id level, then there
12   would be no deduplication needed.  It's,
13   certainly, a function of what you're trying to
14   get at.
15   **Q.** I'm really focusing on your
16   engagements.  And you said I'm sure there may
17   have been others, but really what I'm trying
18   to do is go from the abstract to the concrete.
19   Are there others that you can recollect as you
20   sit here today?
21   **A.** May I go through my list I have
22   here?
23   **Q.** Of course.
24   **A.** Yup.  So in the -- in the first one

CURRAN COURT REPORTING

56

1    here so --
2    **Q.** The 500 hardcopy bank statements?
3    **A.** Yes.
4    **Q.** Okay.  Is that listed first 'cause
5    it's been your most recent?
6    **A.** No.
7    **Q.** Okay.  Anything else?
8    **A.** The third bullet is the one we
9    discussed with respect to anti-price fixing --
10   antitrust and price fixing.  Yup.  So,
11   certainly, the fourth one as well, and I
12   believe the second to last bullet under the
13   complex data analysis, the one related to the
14   unbundling of products.  This is not to say
15   there aren't -- I have to keep going -- not to
16   say there aren't other examples within the
17   complex business disputes or intellectual
18   property or valuation subcategories.
19   **Q.** Well, that says, if I'm reading the
20   right one, retained by a national owner and
21   franchisor of travel centers?
22   **A.** Oh, no.  No.  I'm sorry.  I think
23   we're on different pages.
24   **Q.** Hence, my confusion.  Which page am

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

---

57

1  I supposed to be on?
2      A.  The third page.  The second one
3  before "Complex Business Disputes."
4      Q.  Reimbursement pursuant to federal
5  drug rebate program?
6      A.  Yes.
7      Q.  How about -- well, strike that.
8      Are you familiar with the modeling
9  -- strike that.
10      Are you familiar with the term
11  "Fellegi-Sunter"?
12      A.  I am.
13      Q.  All right.  And what is
14  Fellegi-Sunter?
15      A.  It is one approach to probabilistic
16  record linkage.
17      Q.  And it's F-E-L-L-E-G-I, hyphen,
18  S-U-N-T-E-R.
19      In any of your prior engagements,
20  did you use Fellegi-Sunter?
21      A.  I have not had cause to use that,
22  no.
23      Q.  All right.  Is it fair to say that
24  the Telex engagement is the first time that

---

58

1  you've been exposed to the Fellegi-Sunter
2  model?
3      A.  It is.
4      Q.  How about Charles Soha, do you have
5  an understanding as to whether he ever had any
6  prior experience with Fellegi-Sunter?
7      A.  I don't believe so.
8      Q.  What are the inputs, as you
9  understand it, to the Fellegi-Sunter method,
10  and what is the output sort of generally?
11      A.  That's a very big question.  I
12  mean --
13      Q.  Uh-huh.
14      A.  -- in that Dr. Freer relied on a lot
15  of inputs.  The entirety of what's in his
16  documents is considered solely.
17      Q.  No.  I'm talking sort of generally
18  speaking, in a Fellegi-Sunter model, what are
19  the inputs to the method, the Fellegi-Sunter
20  method?
21      A.  I think it would depend on the
22  purpose to which it was being performed.
23      Q.  Well, in what context is
24  Fellegi-Sunter used as you understand it?

---

59

1      A.  It's a part of probabilistic record
2  linkage.
3      Q.  Okay.  All right.  Let me try it a
4  little differently.
5      How many prior engagements have you
6  had in the field of probabilistic data
7  analysis or data aggregation?
8      A.  Can you ask that question again?
9      Q.  Sure.  How many engagements, prior
10  to the Telex engagement, involved
11  probabilistic computing?
12      MR. RONA:  Objection.
13      A.  Again, engagements usually have a
14  goal that is not -- the approach isn't
15  determined necessarily by the engagement.  The
16  engagement helps determine how you approach
17  it, so that's why I'm struggling with
18  answering your question specifically.
19      Q.  In any of the Select Professional
20  Experience descriptions, did you use
21  probabilistic computing in any of those?
22      MR. RONA:  Objection.
23      A.  I believe I did.
24      Q.  Which ones?

---

60

1      A.  Certainly, at a minimum, the price
2  fixing matter.
3      Q.  And when you say "probabilistic
4  computing," are you referring to your fuzzy
5  deduping?
6      A.  Fuzzy matching can be one aspect of
7  it, yes.
8      Q.  All right.  Well, I'm really
9  interested in what you actually did.  And you
10  said in that engagement, you used fuzzy
11  matching, which has a probabilistic component
12  to it.
13      So other than your fuzzy matching
14  experience, have you ever had any experience
15  using probabilistic computing tools beyond
16  simple fuzzy matching?
17      A.  I'd argue with the concept of fuzzy
18  matching is simple.
19      Q.  Okay.  The Levenshtein ratio,
20  whatever you want to call it.
21      A.  There's multiple different
22  techniques we use, but, yes.
23      Q.  Okay.  Whether it's using Excel
24  tools or the Levenshtein ratio or whatever you

---

Deposition of Joshua W. Dennis
May 9, 2023

---

61

1  want to call it, that's one aspect of
2  probabilistic computing that you have some
3  experience with; right?
4      A.  There are other methods of fuzzy
5  matching and things we use, but, yes.  That's
6  one aspect.
7      Q.  Okay.  What other tools have you
8  used in prior engagements for probabilistic
9  computing?
10     A.  When you say "tools" --
11         MR. RONA:  Objection.
12     A.  -- what are you referring to?
13  Sorry.
14     Q.  Whether it's a software package or
15  whether it's a native code.  Whatever it is
16  that you consider to rise to the level of a
17  probabilistic computing system as opposed to a
18  deterministic computing system.
19         MR. RONA:  Objection.
20     A.  Generally, when we look at
21  probabilistic record linkage, it's usually a
22  combination of things.  It can be -- some
23  aspects might be deterministic; some aspects
24  may be probabilistic.  We often do use fuzzy

CURRAN COURT REPORTING

---

62

1  matching as part of that.  Whether it's TF-IDF
2  or Jaccard distance or Levenshtein or some
3  combination thereof.
4      Q.  But that's all data cleaning?
5      A.  No.  I'm sorry.  I thought you
6  were --
7      Q.  Okay.  I'm really -- so you've
8  identified TF-IDF, Jaccard, and you said
9  Levenshtein?
10     A.  Yes.
11     Q.  Any other what you considered to be
12  probabilistic tools which you have used
13  previously, models, tools, however you want to
14  describe it?
15     A.  Again, those fuzzy matching are
16  inputs to an overall methodology and process.
17     Q.  Understood.  Any other tools or
18  models that you've used in that process?
19     A.  Each one is case and fact specific,
20  and we applied them in different ways, so I
21  guess that's why, you know, it's hard to put
22  an individual name on something when each
23  thing is so case and fact specific.
24     Q.  Well, for example, we can agree that

CURRAN COURT REPORTING

---

63

1  you've never used the Fellegi-Sunter data
2  aggregation method; correct?
3      A.  Correct.
4      Q.  All right.  And you've used
5  Levenshtein distance?
6      A.  I have.
7      Q.  Okay.  You've used Jaccard?
8      A.  Jaccard, J-A-C-C-A-R-D.
9      Q.  You've used TF-IDF?
10     A.  Correct.
11     Q.  "TF-IDF" stands for what?
12     A.  I'd have to go back and look.  I
13  don't recall.
14     Q.  Is it a -- is it a fuzzy matching
15  model?
16     A.  It is, yes.
17     Q.  Do you have any understanding as to
18  how the Fellegi-Sunter model with expectation
19  maximization improves upon the base
20  Fellegi-Sunter method?
21         MR. RONA:  Objection.
22     A.  I've certainly read that
23  characterization in Dr. Freer's report.
24     Q.  Well, I'm asking have you -- do you

CURRAN COURT REPORTING

---

64

1  have an understanding as to how FS-EM improves
2  upon or differs in any way from the FS model?
3         MR. RONA:  Objection.
4      A.  Again, I'd refer to what was in
5  Dr. Freer's report.
6      Q.  Well, other than referring to what's
7  in Dr. Freer's report, do you have any
8  understanding, as you sit here today, as to
9  how FS-EM differs from FS?
10     A.  That's not something I've
11  independently studied.
12     Q.  Okay.  Well, whether you've
13  independently studied it or not, can you
14  describe for me, as you sit here today, what
15  the difference is between Fellegi-Sunter and
16  Fellegi-Sunter with expectation maximization?
17         MR. RONA:  Objection.
18     A.  I certainly went back -- I want to
19  go back and look at the way it was described.
20  I have a general high-level understanding.
21     Q.  All right.  Tell me what your
22  general high-level understanding is.
23     A.  That the expectation -- expectation
24  maximization looks to go and help determine

CURRAN COURT REPORTING

65

1 the relative weights of the various fields of
2 agreement within the -- within the comparison.
3     Q.  And how are the relative weights of
4 the fields determined in FS-EM?
5         MR. RONA:  Objection.
6     A.  You'd have to go back and look at
7 the mathematics of it.  That's not something
8 I've studied.
9     Q.  Did you form any independent
10 opinions with respect to whether Dr. Freer's
11 weighting of fields using the FS-EM model was
12 done correctly or incorrectly?
13         MR. RONA:  Objection.
14     A.  I didn't find any issues with the
15 code itself, which is what performed the
16 process.
17     Q.  Well, beyond just looking at the
18 code, did you form any opinions with respect
19 to whether Dr. Freer applied the FS-EM method
20 appropriately against his dataset?
21         MR. RONA:  Objection.
22     A.  I did.
23     Q.  Okay.  And with respect to the
24 relative weights which the FS-EM model
                CURRAN COURT REPORTING

66

1 ascribed to each of the fields, did you form
2 an opinion as to whether those relevant
3 weights were appropriate or inappropriate?
4         MR. RONA:  Objection.
5     A.  It's hard for me to aggregate that
6 step from everything that came before and look
7 at that just in isolation.  I disagree with a
8 lot of the assumptions and the approach that
9 went into it, so it's hard for me to say that
10 this single step is right 'cause it's a
11 culmination of everything that's led up to it
12 in case-specific facts.
13     Q.  Okay.  Well, let's go a little
14 deeper.  With respect to the relative weights
15 of the fields, can you describe for me what
16 inputs you considered to be most important in
17 the FS-EM model?
18         MR. RONA:  Objection.
19     A.  What inputs that were most important
20 in the FS-EM model.  I don't think I looked at
21 it in that perspective in terms of most to
22 least important.
23     Q.  I'm just trying to determine, did
24 you form any opinions with respect to whether
                CURRAN COURT REPORTING

67

1 the relative weighting process used by
2 Dr. Freer in his FS-EM model used appropriate
3 inputs and, therefore, the weights were
4 correct or inappropriate inputs, and,
5 therefore, the weights were incorrect?
6         MR. RONA:  Objection.
7     A.  I didn't really look at his model
8 from that perspective.
9     Q.  As you sit here today -- let me try
10 to look at --
11         MR. LYNE:  (To Attorney
12     Papas)  Can I have the chart of the
13     ten steps?
14     (Deposition Exhibit No. 5, Page 43 of
15     Dr. Freer's Report Entitled Steps in
16     the Aggregation Methodology, marked
17     for identification)
18     Q.  Sir, directing your attention to
19 what's been marked as Exhibit 5, which I will
20 represent to you is page 43 of Dr. Freer's
21 report, have you seen this table before?
22     A.  I have.
23     Q.  Okay.  And it lays out ten steps in
24 his -- in his process.  Do you see that?
                CURRAN COURT REPORTING

68

1     A.  I do.
2     Q.  And which of these steps involve
3 data cleaning using fuzzy matching?
4     A.  I'm not sure I agree with the source
5 of the question.  Fuzzy matching isn't
6 inherently data cleaning.
7     Q.  Okay.  Well, which of these steps
8 includes fuzzy matching?
9     A.  So, at a minimum, certainly it's
10 described in at least the blocking and the
11 clustering processes.  They're elements of
12 fuzzy matching.
13     Q.  And field cleaning?
14     A.  I don't believe there was in the
15 field cleaning, at least I don't recall that
16 there was, sitting here today.
17     Q.  Okay.  Step one, filtering 17
18 million users down to 11 million users, do you
19 have any issue with Dr. Freer's decision to
20 filter the 17 million down to 11 million?
21     A.  I mean, that comes back to a legal
22 determination about whether or not the
23 Ympactus accounts should be included or not.
24 Ympactus, Y-M-P-A-C-T-U-S. I think I got that
                CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

69

1  right.
2      Q.  But leaving aside the legal
3  question, which we can all fight about later,
4  do you disagree with the process used to
5  reduce 17 million total accounts down to 11
6  million user accounts by disaggregating the
7  Ympactus?  The math is right; correct?
8          MR. RONA:  Objection.
9      A.  I -- I didn't see any issue with the
10  filtering process from my mathematical
11  perspective.
12      Q.  Okay.  And step one, the field
13  selection and transformation, did you see any
14  issues from a mathematical perspective in the
15  work that Dr. Freer did in step one?
16      A.  In terms of the code itself?  I
17  certainly disagree with a lot of the
18  assumptions and the process.
19      Q.  All right.  Let's start with code.
20      A.  I didn't see any issues with the
21  code, the mathematics of it.
22      Q.  Okay.  And you said you disagreed
23  with the assumptions and the process.  What
24  was the disagreement with respect to the

CURRAN COURT REPORTING

70

1  assumptions?
2      A.  So I think that would go back to --
3  looking at my report in a lot of the inputs
4  and the reliance on the data, the lack of
5  validation, the understandings he has that are
6  unsupported and unsubstantiated with regards
7  to how data was entered, the consistency with
8  which data was entered.
9      Q.  Okay.  So we'll get to those.  I
10  just want to go through all of these steps.
11  Then he engages in what he refers to as field
12  cleaning.  Did you have any issues with
13  respect to the process he used to clean
14  individual data fields?
15      A.  I think there are elements of it
16  that were unclear and not supported.
17      Q.  Which elements?
18      A.  So, for example, he elects to remove
19  and make null or blank any -- at a minimum,
20  names that were either -- I believe it was one
21  character in length, and I believe he also
22  eliminated any names that were comprised
23  entirely of numbers or -- well, he called it,
24  I believe, garbage characters.

CURRAN COURT REPORTING

71

1      Q.  All right.  Why do you -- do you
2  disagree with that decision, that assumption,
3  or however you want to characterize it?
4      A.  I think it's simply an unsupported
5  assumption.  I think it's just an unsupported
6  assumption.  There's no basis for removing
7  things in one character, but why not remove
8  things with two characters or three or four,
9  as Mr. Martin had done.
10      Q.  Did you attempt to run any code that
11  removed two characters or three characters or
12  four characters?
13      A.  For what purpose?
14      Q.  Exploration in connection with your
15  engagement.
16      A.  I guess I don't know what the output
17  of that would be.  Simply a column that had
18  fewer values.
19      Q.  Well, I'm asking did you determine
20  how many fewer values there might be, what the
21  size of the impact of that process would be
22  on --
23      A.  Yes.  Certainly.  Because Mr. Martin
24  had elected to remove -- I don't recall if

CURRAN COURT REPORTING

72

1  it's three or four -- I think there's actually
2  some ambiguity in Mr. Martin's report.  He had
3  a different determination of whether to
4  discount or remove the name field based on the
5  number of characters, so it's certainly
6  something we looked at differently when we
7  reviewed Mr. Martin's report.
8      Q.  Okay.  But I'm trying to determine
9  whether you, yourself, ran any code which
10  removed accounts that had more than one
11  character, say, two characters as opposed to
12  one character?
13      A.  We certainly quantified, and I
14  certainly looked at the number of names that
15  had certain lengths of characters as part of
16  the exploration of the data.
17      Q.  Well, when you say, I looked at an
18  exploration of the data, how many had two
19  characters versus three characters?
20      A.  Oh, I couldn't recall, sitting here
21  today, exactly.
22      Q.  All right.  And did you form any
23  independent opinions with respect to what the
24  appropriate field cleaning process was if not

CURRAN COURT REPORTING

73

1  removing null/one characters and numbers or
2  garbage?
3      A.  No.  That wasn't part of the scope
4  of my assignment.
5      Q.  Okay.  Step three, with respect to
6  the deterministic step, did you uncover any
7  errors, either in the code or otherwise, in
8  Dr. Freer's deterministic process?  And by
9  "deterministic," I mean his data matching
10 process.
11     A.  I think there's questions about the
12 validity of the data on which it's based.
13     Q.  Leaving aside the validity of the
14 data on which it's based, did you uncover any
15 issues from your perspective?
16     A.  From a code perspective?  No.
17     Q.  No.  And leaving aside code, but
18 talking about just the algorithm that was
19 used, did you have any issue with respect to
20 the algorithm that was used from a
21 deterministic phase?
22     A.  I wasn't distinguishing the
23 algorithm from the code.  I was using those
24 terms synonymously.

CURRAN COURT REPORTING

74

1      Q.  Okay.  There wasn't anything that
2  jumped out to you or was exposed in your data
3  analysis which suggested to you that the
4  deterministic step was performed incorrectly;
5  is that correct?
6      A.  From a purely mathematical
7  perspective.
8      Q.  All right.  And then the next step
9  is blocking.  I believe you did run blocking
10 code; right?
11     A.  We ran portions of it.
12     Q.  Okay.  And did the portions of your
13 blocking code that you did run, did they
14 confirm Dr. Freer's blocking process, or did
15 they expose some differences?
16     A.  Again, I disagree with the approach
17 to blocking and how he chose to -- what and
18 how he chose to do the blocking.
19     Q.  Have you ever had a prior engagement
20 which requires you to perform blocking against
21 very large datasets?
22     A.  I'd have to go back and think.  I'm
23 not sure I've thought about --
24     Q.  Well, take your time.  Think about

CURRAN COURT REPORTING

75

1  it.
2      A.  -- thought about that.  We've
3  certainly had matters that have involved large
4  data where we looked to distill it down to
5  that which in those facts we thought were most
6  relevant and pertinent.
7      Q.  Well, that's not blocking.  That's
8  sort of an ad hoc determination as to what
9  things you want to look at; right?
10     A.  I disagree that it's ad hoc
11 determination.  The purpose of blocking is to
12 go in and try to only look at and perform
13 subsequent analysis, at least initially, on
14 those pairs that Dr. Freer in his determine --
15 in his opinion thought had a chance of
16 potentially having linkage.
17     Q.  Right.  But I'm trying to determine
18 in a -- did you have any -- have you had any
19 prior engagements which required you to engage
20 in blocking large datasets to reduce the
21 computer run time to make it realistic?
22     A.  I don't know that I've done it for
23 purposes of minimizing computer run time.  I'd
24 have to go back and think on those.

CURRAN COURT REPORTING

76

1  Obviously, there's a lot of cases in the last
2  20 years.
3      Q.  Well, why do you understand
4  Dr. Freer was blocking in this engagement?
5      A.  Based on what he said, it was to
6  minimize (inaudible).
7          THE STENOGRAPHER:  I'm sorry.
8  I didn't hear you.  "Minimize"?
9      A.  Minimize the amount of comparisons
10 he had to make.
11         THE WITNESS:  I'm sorry.  I
12 think my mouth is getting a little
13 dry.  We've been going for maybe
14 close to an hour and a half here.
15         MR. LYNE:  Would you like to
16 take a break?
17         THE WITNESS:  If that's okay
18 with you.
19         MR. LYNE:  Sure.  Of course.
20         (Recess was taken)
21     Q.  Have any of your prior engagements
22 involved transitive closure?
23     A.  I'm trying to -- I apologize -- I'm
24 trying to think.  There have certainly been

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

77

1 engagements that have required things to be
2 bucketed and only input in one and only
3 one bucket.
4     Q.  Okay.  When you're describing
5 putting things in one bucket, did you use
6 transitive closure in those instances, or was
7 that just bucketizing individual bits of
8 information?
9     A.  My understanding is -- with
10 Dr. Freer is that transitive closure was
11 putting something in one cluster and only one
12 cluster.
13     Q.  Right.  But using a transitive
14 process to do so; correct?  If A equals B, B
15 equals C, then A equals C?  Well, broadly
16 speaking.
17     A.  I'd have to go back and think.  It's
18 possible.
19     Q.  Okay.  Well, can you think?
20     A.  It's certainly possible.  I can't
21 think of anything sitting here today.  I'll
22 continue to think on it and let you know.
23     Q.  Okay.  Please do.  And do you have
24 an understanding how to appropriately choose a

CURRAN COURT REPORTING

78

1 sample size to estimate how frequently some
2 property holds in a dataset?
3         MR. RONA:  Objection.
4     A.  Can you ask that question again?
5     Q.  Sure.  How do you appropriately
6 choose a sample size to estimate how
7 frequently a given property holds in a given
8 dataset?
9         MR. RONA:  Objection.
10     A.  When you say "property holds," what
11 do you mean?
12     Q.  I mean that a property -- a given
13 property that is true in a dataset, that is --
14 that is valid in the dataset.
15         MR. RONA:  Objection.
16     A.  I guess I'm not clear on what you
17 mean by "given property."
18     Q.  Are you familiar with the concept of
19 sample size?
20     A.  Yes.
21     Q.  In statistics?
22     A.  I am.
23     Q.  Okay.  How do you set sample size in
24 statistics -- in a statistical way?

CURRAN COURT REPORTING

79

1         MR. RONA:  Objection.
2     A.  Generally, you want to look at a
3 number of factors, such as how many standard
4 deviations you want to have, the size of the
5 dataset.  There are other factors that go into
6 it.  You have to look at how the -- how
7 disparate the dataset is, how diverse it is.
8 A number of things, depending on what you're
9 trying to look at.
10     Q.  In this engagement, did you do any
11 work to determine appropriate sample sizes for
12 any purposes?
13         MR. RONA:  Objection.
14     A.  I think I certainly compared certain
15 things that were viewed to aggregate size of
16 the dataset.  I didn't do an independent
17 determination of an appropriate sample size.
18     Q.  Why not?
19     A.  I wasn't asked to.
20     Q.  So you formed no opinion on that
21 subject as it relates to this engagement?
22     A.  What subject is that?
23     Q.  Calculating sample size.
24     A.  Can you be more specific 'cause,

CURRAN COURT REPORTING

80

1 again, I certainly looked at certain
2 transactions or amounts of transactions that
3 were reviewed by Dr. Freer and calculated
4 percentages.  I didn't come up with an
5 alternative correct answer, if that's what
6 you're asking.
7     Q.  That is what I was asking.
8     A.  Correct.
9     Q.  Are you familiar with Cochran's
10 Formula.  C-O-C-H-R-A-N apostrophe S.
11     A.  No.
12     Q.  Do you understand the difference
13 between false positives and false negatives?
14     A.  Yes.
15     Q.  And can you describe it for me?
16     A.  Sure.  So a false positive would be
17 two things that are determined to match that
18 are not true matches.  False negative would be
19 things -- two things that the outcome would
20 suggest are not matches but truly are.
21     Q.  I just realized -- let me go back
22 one step.  You said you compared some of
23 Dr. Freer's work against the aggregate data
24 size of the dataset; is that right?

CURRAN COURT REPORTING

81

1    A.  That was probably -- yes, but I
2  think I could probably be more specific in
3  terms of aggregate size of the dataset.  I'd
4  have to go back to my report and look
5  specifically what I compared.  It was looking,
6  I believe, at the number of user accounts and
7  specifically names that Dr. Freer reviewed in
8  the context of, I think, in the denominator it
9  was the total number of TelexFree user
10 accounts, but I'd have to go back and confirm.
11   Q.  All right.  You have your report.
12 Can you take a look?
13   A.  Yes.  Certainly.
14   Q.  I'll see if I can find it and we'll
15 race.
16   A.  Yes.  I can tell you the answer was
17 about .003 percent.  I don't remember if it
18 was in a footnote or in the body.
19   Q.  No.  I believe it was in the body.
20   A.  Thank you.  I'm on page 31, and I
21 have suspicion it's probably not far from
22 that.  Here we go.  It's footnote 105, which
23 is on page 34.
24        MR. RONA:  Of Exhibit 2.
            CURRAN COURT REPORTING

82

1    A.  Of Exhibit 2.  Correct.
2    Q.  Okay.  And this was reviewing the
3  300 name field values randomly selected?
4    A.  That was the context, yes.
5    Q.  Okay.  And did you form any opinion
6  as to whether or not that was an adequate
7  sample size?
8    A.  Not specifically.  I certainly would
9  and have reviewed far more.
10   Q.  Okay.  But I'm really just focusing
11 on this engagement, and what I think I heard
12 you say was no, you didn't form an opinion as
13 to whether that was an adequate sample size in
14 this instance; is that correct?
15   A.  I would have certainly wanted it to
16 be more than that.
17   Q.  Well, did you do any analysis to
18 determine how much more you thought it should
19 be?
20   A.  No, I didn't.
21   Q.  Okay.  Does minimum sample size grow
22 as the population size increases?
23        MR. RONA:  Objection.
24   A.  I think it would depend on the
            CURRAN COURT REPORTING

83

1  dataset.
2    Q.  In what sense would it depend on the
3  dataset?
4    A.  I think it would depend on the
5  nature of the dataset, what characteristics it
6  had, how similar or different it was across
7  that dataset.
8    Q.  Well, generally speaking, does the
9  required sample size grow in some linear
10 fashion as relates to the overall data size --
11 dataset?
12   A.  Not linearly, no.
13   Q.  Well, how does it grow?
14   A.  Well, I don't recall the math behind
15 it.
16   Q.  Is it logarithmic?  Is it sublinear?
17 Do you have any recollection?
18   A.  I don't recall them.
19   Q.  Besides the name sampling done by
20 Dr. Freer on page 37, I think you referred to
21 it in your report, did you do any other work
22 with respect to sample size and the adequacy
23 of sample size in your engagement?
24        MR. RONA:  Objection.
            CURRAN COURT REPORTING

84

1    A.  I think in certain contexts, yes.
2    Q.  What context?
3    A.  So Dr. Freer makes a comment that a
4  single aggregation, a single cluster is
5  representative -- not going to get his exact
6  words right -- of the general quality of the
7  data, and I saw no indication as to why this
8  particular aggregation selected by Dr. Freer
9  was, in fact, representative.
10   Q.  Did you do any analytical work to
11 determine if, in fact, the single cluster
12 chosen by Dr. Freer was, in fact, generally
13 representative of the quality of the data?
14        MR. RONA:  Objection.
15   A.  I think I did.
16   Q.  What did you do?
17   A.  I looked at lots of different
18 aggregations.
19   Q.  All right.  And is that referenced
20 in your report?
21   A.  The fact that I looked at lots of
22 different aggregations?
23   Q.  No.  I'm focusing really on the
24 single cluster that you referred to that
            CURRAN COURT REPORTING

85

1  Dr. Freer relied upon as representative of the
2  general quality of the data overall.  Did I
3  hear you correctly?
4      A.  I'd have to go back and see exactly
5  what I said, but that was the gist.
6      Q.  Okay.  Can you find it in your
7  report?
8      A.  Where I reference that particular
9  issue?
10     Q.  Yes.  Sure.
11     A.  Certainly.  I'll race you again if
12  you'd like to find Maria Neves.
13     Q.  Okay.
14     A.  It was towards the end of the
15  section with Dr. Freer.
16     Q.  Page 47?
17     A.  Yes.
18     Q.  Okay.  So can you point on page 47
19  or around this area what specifically you're
20  referring to?
21     A.  I'm sorry.  With what regard?
22     Q.  In regard to the single cluster
23  which Dr. Freer said you say referred to as
24  generally representative of the quality of the

CURRAN COURT REPORTING

86

1  data.
2      A.  Right.  Now that I have it in front
3  of me, the specific language which Dr. Freer
4  contends is, and I quote, "a visual
5  illustration of the general quality of the
6  dataset."
7      Q.  Sorry.  Where are you?
8      A.  Paragraph 141.
9      Q.  Okay.  And did you do any analytical
10  work to determine if, in fact, the Neves
11  dataset or cluster was, in fact,
12  representative of the general quality of the
13  data in the overall dataset?
14         MR. RONA:  Objection.
15     A.  I believe so.
16     Q.  Okay.  And what did you do?
17     A.  I certainly reviewed that particular
18  cluster, and then I certainly looked at many,
19  many other clusters, some of which are
20  summarized as exhibits in my report.
21     Q.  And did you calculate what you
22  deemed to be the error rate for the Neves
23  dataset?
24         MR. RONA:  Objection.

CURRAN COURT REPORTING

87

1      Q.  How do you define "error rate"?
2      A.  Something included in the Neves
3  cluster that should not have been included in
4  the Neves cluster.
5      A.  I certainly address user accounts
6  that are included in there that appear to be
7  overaggregations.
8      Q.  Okay.  And there's, I think, what,
9  430-ish accounts listed in the Neves cluster;
10  is that right?
11     A.  I'd have to go back and look.  It
12  may be in the report here.  466 user accounts.
13     Q.  And of the 466 user accounts, how
14  many did you determine were, in your opinion,
15  overaggregations?
16         MR. RONA:  Objection.
17     A.  I'd have to go look and look in
18  detail at the entire aggregation.
19     Q.  The aggregation is an exhibit to
20  your report; isn't it?
21     A.  It is.
22     Q.  Do you know which number it is?
23  What exhibit number?
24     A.  I have an index of exhibits in the

CURRAN COURT REPORTING

88

1  front of my report which should help guide us.
2      Q.  Very good.
3      A.  Let's go with Exhibit No. 16.
4      Q.  Exhibit No. 16.
5          MR. LYNE:  (To Attorney
6  Papas)  Do you have that?
7      Q.  And while that's happening, did you
8  do any work -- well, are you familiar with the
9  terms "precision" and "recall" in statistical
10  work -- in statistical analysis?
11     A.  To some degree.
12     Q.  When you say "to some degree," what
13  do you mean?
14     A.  I certainly read Dr. Freer's report
15  and how he described those terms.
16     Q.  Other than reading Dr. Freer's
17  report and how he described those terms, do
18  you have independent experience calculating
19  precision and recall?
20     A.  That's not something I've been asked
21  to do.
22     Q.  I mean generally speaking.
23     A.  There are specific definitions, and
24  they're, again, not something I typically

CURRAN COURT REPORTING

89

1 focus on or I've been asked to focus on.
2     Q.  I'm not asking whether you typically
3 focus on.  I'm asking if you have any
4 experience whatsoever calculating precision
5 and recall as it relates to error rate?
6     A.  Generally not.
7     Q.  When you say "generally not," as you
8 sit here today, is it fair to say you can't
9 think of any such experience?
10     A.  Agreed.  I certainly look at how
11 right or wrong things are and things that we
12 think are incorrect, but I'm not usually using
13 those terms or necessarily specific
14 definitions.
15     Q.  Well, how do you calculate the error
16 rate if you're not looking at precision and
17 recall?
18     A.  It depends on the case.
19     Q.  Well, let's take it from the
20 abstract to the concrete.  In this case, did
21 you calculate error rate, what would be an
22 appropriate error rate for the output of
23 Dr. Freer's cluster methodology?
24         MR. RONA:  Objection.
        CURRAN COURT REPORTING

90

1     A.  I didn't opine as to what an
2 appropriate error rate would be in this case,
3 no.
4     Q.  Whether you opined or not, did you
5 attempt to calculate what would be an
6 appropriate error rate?
7     A.  No, I did not.
8         MR. RONA:  Objection.
9     A.  It was not something I was asked to
10 do.
11     Q.  Okay.  Do you have an understanding
12 as to what an F-measure is or an F1 score is?
13     A.  Not beyond what I read in
14 Dr. Freer's report.
15     Q.  Do you understand what the connected
16 components of a network are in the sense of
17 graph theory?
18         MR. RONA:  Objection.
19     A.  I think I have some sense as
20 Dr. Freer described them.
21     Q.  Other than as Dr. Freer described
22 them in his report, do you have any
23 independent experience dealing with
24 calculating connected components?
        CURRAN COURT REPORTING

91

1     A.  No.  That's not something I've been
2 asked to do.
3     Q.  Generally?  No?
4     A.  That's fair.  It's not something
5 that I've been asked to do or studied before.
6     Q.  Okay.  Let's move on to transitive
7 closure.  Can you describe for me or define
8 what is transitive closure?
9     A.  So transitive closure, the purpose
10 was to look at things and make sure that
11 things end up in one bucket and only one
12 bucket.  So, for Dr. Freer's purpose, he was
13 looking to place user accounts in one cluster
14 and only one cluster and did so by connecting
15 components, you know, such as A is connected
16 to B and B is connected to C as he defines it,
17 and he applies it such that A and C would end
18 up in one and only one cluster.
19     Q.  Okay.  And do you have any opinion
20 as to whether transitive closure was something
21 that was a required step in this process that
22 Dr. Freer engaged in?
23         MR. RONA:  Objection.
24     Q.  I mean, in other words, if you don't
        CURRAN COURT REPORTING

92

1 do transitive closure, is there another way to
2 skin the cat?
3         MR. RONA:  Objection.
4     A.  I think it depends.
5     Q.  Depends on what?
6     A.  Depends on the approach taken.
7     Q.  Well, did you consider other
8 approaches beyond what Dr. Freer did?
9     A.  I wasn't asked to come up with an
10 affirmative determination.
11     Q.  Whether you were -- whether you were
12 asked to come up with an affirmative
13 determination, did you consider alternative
14 determinations?
15     A.  No.  That was not something I was
16 asked to do.
17     Q.  Okay.  How does transitive closure
18 fit into the Fellegi-Sunter model, if you
19 know?
20     A.  So how Dr. Freer applied it was
21 after -- and we have it in the steps in front
22 of us -- how he applied it was part of the
23 clustering to bring all of those user accounts
24 together, all his pairwise matches, to bring
        CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

93

1 that together and try to form individual
2 clusters, each of which are composed of user
3 accounts, and each user account appearing in
4 one and only one cluster.
5    Q.  You identified certain clusters from
6 Dr. Freer's report in your report; correct?
7 Like the Neves cluster and various other
8 clusters?
9    A.  I certainly included certain
10 clusters as exhibits.
11    Q.  Okay. And did you use certain
12 search techniques to isolate those clusters
13 and determine that you wanted to use them in
14 your report?
15    A.  What do you mean by "search
16 techniques"?
17    Q.  Well, could be query strings or --
18    A.  I certainly used queries to extract
19 that -- those clusters from the data.
20    Q.  Okay. And the query strings, how
21 did you determine what query strings you were
22 looking for? What were you searching for?
23    A.  I think it depends on the purpose of
24 the illustration.

CURRAN COURT REPORTING

94

1    Q.  Well, pick one of your
2 illustrations. Let's take Maria Neves. What
3 queries were you running for purposes of the
4 Maria Neves cluster?
5    A.  That was the cluster that Dr. Freer
6 stated was representative of the general
7 quality of the dataset -- I think I might have
8 forgotten that word sort of imperfectly -- so
9 that was one that I elected to look at.
10     (Deposition Exhibit No. 6, Expert
11     Report of Dr. Cameron E. Freer, marked
12     for identification.)
13    Q.  I believe if we go to -- let me
14 direct your attention to Exhibit 6. Can you
15 identify that document?
16    A.  I can. It's the Expert Report of
17 Dr. Cameron E. Freer.
18    Q.  All right. And if you turn to
19 Exhibit 3 of Dr. Freer's report, do you
20 recognize that as the Neves cluster?
21    A.  It is Cluster ID 132785.
22    Q.  Okay. And is that the Neves
23 cluster, Maria Neves cluster?
24    A.  It contains names, including -- some

CURRAN COURT REPORTING

95

1 of which are Maria Neves.
2    Q.  Okay. And did you attempt to
3 determine or identify any accounts which you
4 considered to be overclustered in this -- in
5 this exhibit?
6    A.  I certainly looked at certain of the
7 user accounts and questioned when they had
8 different names, different addresses and
9 things of that nature, different contact
10 information.
11    Q.  Okay. Well, when you went through
12 that process, did you attempt to determine how
13 many accounts out of the 471 listed in this
14 Cluster 132785 were, in your opinion,
15 overclustered?
16    A.  Not fulsome.
17    Q.  When you say "not fulsome," what
18 does that mean?
19    A.  So I think there are certain
20 accounts in here that more clearly appear to
21 differentiate themselves from other accounts,
22 and there are certain accounts in here that
23 have some different characteristics. I
24 focused on a discussion of those accounts

CURRAN COURT REPORTING

96

1 which more clearly differentiated themselves,
2 but that's not to say there aren't other
3 accounts in there that could potentially not
4 belong or not have been created by whoever
5 created the majority of these.
6    Q.  Okay. Well, did you do any
7 analytical work to actually come up with a
8 number that you say, in your opinion, are
9 overaggregations?
10     MR. RONA: Objection.
11    A.  Not specifically -- I'm sorry -- not
12 specifically. I provided examples of certain
13 accounts that appeared to be more greatly
14 differentiated.
15    Q.  Well, did you form any opinion as to
16 whether or not even those accounts were
17 overaggregations?
18     MR. RONA: Objection.
19    A.  I think that they differentiate
20 themselves and oftentimes don't comport with
21 the stated -- stated goal of Dr. Freer's
22 aggregation process.
23    Q.  Do you have an understanding as --
24 did you attempt to calculate any error rates

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

97

1  for any individual clusters including the
2  Neves cluster?
3          MR. RONA:  Objection.
4      A.  I attempted to -- I attempted to
5  demonstrate illustrations in the aggregation
6  process itself in the methodology.
7      Q.  That wasn't my question.  My
8  question is did you calculate the actual error
9  rate, what you considered to be an
10 overaggregation in any cluster?
11         MR. RONA:  Objection.
12     A.  No.  That would not have been
13 possible without determining affirmatively
14 first what I thought a right answer would be
15 -- was supposed to be, and that's not
16 something I was asked to do.
17     Q.  So with respect to all of
18 Dr. Freer's clusters, is it fair to say that
19 there are no clusters in which you can
20 actually say this cluster has an error rate of
21 X --
22         MR. RONA:  Objection.
23     Q.  -- in your opinion?
24     A.  Again, my goal was to demonstrate

CURRAN COURT REPORTING

98

1  issues with the process, and it would not have
2  been possible to determine an error rate
3  without first determining affirmative
4  analysis, which is not something I was asked
5  to do.
6      Q.  Did you ever perform an error rate
7  calculation for overclusters generally in
8  Dr. Freer's -- in Dr. Freer's model?
9          MR. RONA:  Objection.
10     A.  I don't even know what that
11 statistic would mean.  Again, you'd have to
12 have known what the right answer is, which
13 would require an affirmative analysis and
14 opinion and knowledge of what was right in the
15 first instance.
16     Q.  I'm really just asking you did you
17 perform any error rate calculation overall for
18 which you considered to be overclusters in
19 Dr. Freer's clustering?
20         MR. RONA:  Objection.
21     A.  I certainly provided plenty of
22 examples of instances that appear to be
23 overclustering or instances where his
24 clusterings don't comport with the stated

CURRAN COURT REPORTING

99

1  goals.
2      Q.  Did you perform any such calculation
3  for underclusters in your opinion?
4          MR. RONA:  Objection.
5      A.  Same comment.  There are plenty of
6  examples in instances where I show two
7  separate clusters that share a high degree of
8  similarity, which calls into question whether
9  or not that was -- those individual user
10 accounts were, in fact, created or the
11 ultimate participant wasn't the same economic
12 actor.
13     Q.  Well, but I'm really focusing on
14 actual error rate calculations, which -- and
15 I'm just trying to confirm that, as you sit
16 here today, you're not in a position to
17 identify what the error rate for
18 overclustering is or the error rate for
19 underclustering?
20         MR. RONA:  Objection.
21     Q.  Is that a fair statement?
22     A.  Again, I think I demonstrate and
23 show instances where the clustering process
24 lacks reliability, where the aggregation

CURRAN COURT REPORTING

100

1  methodology is inconsistent with Dr. Freer's
2  approach and stated goals, and I provided
3  indicia of that.
4      Q.  Those are examples.  They're ad hoc
5  examples.  I'm asking if you went from ad hoc
6  example to a statistical analysis of whether
7  the Dr. Freer's clusters overall are within an
8  acceptable error rate or not?
9          MR. RONA:  Objection.
10     A.  That would not have been possible
11 without first knowing and coming up with what
12 I believe the right answer to be, and in this
13 case, part of the biggest issue is that there
14 isn't a golden standard.  There isn't a known
15 set of data that says these are exactly the
16 right accounts that are owned by this person.
17 So without that information, it simply
18 wouldn't have been possible, nor was I asked,
19 to come up with a statistical error rate.
20     Q.  Is it your understanding that data
21 aggregation requires a golden set?
22         MR. RONA:  Objection.
23     A.  What do you mean by "requires"?
24     Q.  That it requires it or otherwise --

CURRAN COURT REPORTING

## Deposition of Joshua W. Dennis
### May 9, 2023

---

101

1  or the -- or the data aggregation process and
2  output are inherently unreliable.
3        MR. RONA:  Objection.
4     A.  I think it depends on the case
5  facts.
6     Q.  There's no hard-and-fast rule?
7        MR. RONA:  Objection.
8     A.  I think it depends on the case
9  facts.  I think within a given circumstance,
10  it certainly could be necessary.
11     Q.  Okay.  What about in this case?
12        MR. RONA:  Objection.
13     A.  Potentially.
14     Q.  When you say "potentially," what do
15  you mean?
16     A.  So I think one of the issues here,
17  and this is what I discussed in my report, is
18  that the data itself was not of high quality.
19  There was no testing done of the accuracy or
20  truly the real consistency of the data.  So
21  absent knowledge about what is a true match,
22  it's simply not possible from the data itself
23  to know how right or wrong you are.
24     Q.  Are you familiar with the fact that

CURRAN COURT REPORTING

---

102

1  all transitive closure processes have some
2  kind of error rate?  It's either over -- a
3  little bit overclustered, a little bit
4  underclustered.  You can be very, very
5  conservative, but you run the risk of being
6  underclustered, or you can be very, very
7  liberal, but run the risk of being
8  underclustered.  Are you familiar with that,
9  generally speaking?
10        MR. RONA:  Objection.
11     A.  The concept that Dr. Freer's
12  approach is inherently imperfect, sure.
13     Q.  No.  No.  I'm saying, generally
14  speaking, in transitive closure models, there
15  is always a trade-off between being
16  overinclusive in your transitive rules or
17  underinclusive in your transitive rules.  Is
18  that a fair statement?
19     A.  I think it depends on the dataset.
20     Q.  Well, that rule wouldn't apply to
21  certain datasets if you're transitively
22  closing the dataset?
23        MR. RONA:  Objection.
24     A.  Your suggestion is that inherently,

CURRAN COURT REPORTING

---

103

1  as I'm hearing your question, is the
2  transitive closure process necessarily going
3  to either over- or underaggregate, and,
4  therefore, be imperfect, and that's
5  potentially possible or not.
6     Q.  Well, do you have an understanding
7  from the literature as to whether transitive
8  closure always is a balance between
9  overclustering and underclustering and that
10  there is an acceptable error rate that is
11  accepted by data science generally?
12        MR. RONA:  Objection.
13     Q.  Do you have any understanding about
14  that?
15     A.  I think it would be case in fact
16  specific.
17     Q.  Well, did you attempt, in your
18  engagement, to determine whether Dr. Freer's
19  calculation of a .98 accuracy rate was correct
20  or incorrect?
21        MR. RONA:  Objection.
22     A.  What do you mean by "correct or
23  incorrect"?
24     Q.  That it fell within acceptable

CURRAN COURT REPORTING

---

104

1  statistical norms.
2     A.  I think it depends on the case.  In
3  this case, the reason he had to do that was
4  because he didn't find or didn't look or
5  didn't search for or didn't attempt to look to
6  real data, real real-world information, so in
7  the absence of having real-world information,
8  that's the approach he chose.  The issue with
9  that though is you don't have and didn't
10  account for the fact that the data quality,
11  the accuracy and the consistency were
12  unsupported and unquestioned, so it was a
13  self-fulfilling prophecy.
14     Q.  And when you say real-world data,
15  what are you referring to?
16     A.  True knowledge of what economic
17  actor opened and benefitted which user
18  accounts.
19     Q.  All right.  And what true knowledge
20  are you referring to?
21     A.  It would depend.
22     Q.  Well, in this case, what is it that
23  you say Dr. Freer should have done that would
24  qualify as true knowledge?

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

105

1    A.  I think there are things he
2  certainly could have attempted to do.  I'm not
3  aware of him talking to anyone.  I'm not aware
4  of him looking at the EPOC data.  I'm not
5  aware of him looking at E-wallet data, any
6  indicia, quite frankly.
7    Q.  Well, you've said three things.  He
8  didn't talk to people?
9    A.  Uh-huh.
10    Q.  He didn't look at EPOC, and he
11  didn't look at E-wallet data.  Anything else?
12    A.  I think there was bank data he could
13  have potentially looked at.
14    Q.  Anything else?
15    A.  Again, I haven't been asked to do
16  this affirmatively, but those are certain
17  things that come to mind, and the fact of the
18  matter is that simply looking at the data
19  itself or even looking at those things doesn't
20  necessarily mean it's complete or accurate.
21  Some datasets are simply not sufficient for a
22  different purpose.
23    Q.  I'm asking anything else?
24    A.  I don't know.  It's not a -- I
CURRAN COURT REPORTING

106

1  haven't been -- haven't given enough thought
2  to determine what the universe of options are
3  that he could have potentially looked at.
4    Q.  Did you talk to anyone?
5    A.  Not directly.
6    Q.  Well, when you say "not directly,"
7  what does that mean?
8    A.  No.  I've simply looked at
9  affidavits and other legal filings and
10  depositions.  I'm sorry.  When you say
11  "anyone," can you be more specific?  I think I
12  presumed that you meant.
13    Q.  Any participants.
14    A.  Thank you.  No.  Not live or
15  remotely.
16    Q.  You do refer to the Frantz Balan
17  affidavit a number of times in your report;
18  correct?
19    A.  Yes.  Is it Frantz Balan or Balan?
20  I've always wondered.
21    Q.  I don't know.  What is it?
22    MR. RONA:  The record is not
23  going to clarify that so.
24    Q.  I'm just going to say -- I'm just
CURRAN COURT REPORTING

107

1  going to say Frantz Balan.
2    A.  Very good.
3    Q.  All right.  Did you take any steps
4  to determine whether or not Frantz Balan was
5  available for you to talk to?
6    A.  No.
7    Q.  Did you look at any EPOC data?
8    A.  Yes.
9    Q.  What EPOC data did you look at?
10    A.  The EPOC data that was provided and
11  maintained by Huron.
12    Q.  Okay.  And what specifically did you
13  look at in the -- what were you looking for in
14  the EPOC data?
15    A.  So, originally, going back to
16  Mr. Martin, Mr. Martin contended that the EPOC
17  data was supportive of his aggregation, and in
18  that, we looked to determine whether we
19  believed that was the case, and we concluded
20  that was not.
21    Q.  Well, that was your work -- 2018,
22  '19, '20 work?
23    A.  That's why I originally received it
24  and why I originally analyzed it, yes.
CURRAN COURT REPORTING

108

1    Q.  Okay.  And you determined what in
2  connection with that?
3    A.  That Mr. Martin's contention that
4  the EPOC data supported his aggregation was an
5  incorrect assumption and conclusion.
6    Q.  All right.  And did you then compare
7  the EPOC data against Dr. Freer's aggregation?
8    A.  To some extent.  To some extent, I
9  did, yes.
10    Q.  To what extent?
11    A.  So certain of my exhibits include
12  columns that say -- I think the terminology
13  was claimed, and that relates to instances
14  where at least one user account within that
15  cluster was part of an accepted or agreed
16  claim within EPOC.
17    Q.  And what did you do with that data?
18    A.  I included it in my exhibits.
19    Q.  Okay.  But other than including it
20  in your exhibits, did you do any analytical
21  work with that?
22    A.  It certainly was something I
23  explored to look at instances where certain
24  aggregations, particularly things as large net
CURRAN COURT REPORTING

109

1  winners included data that was claimed by
2  somebody.
3      Q.  Well, when you say "I explored," did
4  you come to any conclusions?
5      A.  I'm not sure I came to an ultimate
6  opinion.  I certainly saw things that caused
7  me to look more carefully at certain things.
8      Q.  Well, in 2018, '19, '20, you went
9  through the EPOC data and formed an opinion
10  that it did not support the Huron aggregation;
11  is that right?
12      A.  Certainly, it wasn't -- Mr. Martin's
13  conclusion that it supported the Huron
14  aggregation, I thought, was faulty.
15      Q.  Okay.  And did you take any steps to
16  then compare the EPOC data against Dr. Freer's
17  clusters?
18      A.  I looked at some individual
19  examples, yes.
20      Q.  Which individual examples?  Who?
21      A.  Certainly, at least Benjamin
22  Argueta, A-R-G-U-E-T-A.
23      Q.  And with respect to Mr. Argueta, did
24  you form any opinions with respect to whether

110

1  the EPOC data supported Dr. Freer's Argueta
2  cluster?
3      A.  That particular cluster -- we'll
4  call it Argueta 'cause that was probably the
5  name that appeared most frequently -- it did
6  not entirely support it, no.
7      Q.  How did it not support it?
8      A.  So there were a number of accounts
9  that had been claimed as part of that cluster,
10  it may have been 55 or so, in that range, and
11  I was curious to understand why that might be,
12  so I went back and explored the EPOC data, and
13  what appeared to be the case is that as
14  potential or likely overclustering, Dr. Freer
15  had included user accounts with the name --
16  gosh -- was it maybe Benjamin Oleo [phonetic]
17  or something, something along those regards,
18  it was a different Ben, and someone had gone
19  in and claimed the EPOC, those 55 accounts,
20  which is, again, you know, strong indicia that
21  those 55 accounts represent overclustering.
22      Q.  Well, who claimed the 55 accounts?
23      A.  My recollection was someone by the
24  name of -- I want to say Ben Oleo, but I may

111

1  not have that right.  I would have to go back
2  and confirm.
3      Q.  All right.  Other than this one
4  example, did you do anything else with the
5  EPOC data?
6      A.  I did.
7      Q.  And what else did you do, other than
8  looking at Argueta?
9      A.  I certainly went in and looked at
10  certain commentary that people included.
11      Q.  Did you attempt to sample this in
12  any statistical way, or was this just sort of
13  a random look at varying accounts, or was it
14  targeted in some way?
15      A.  It was probably more targeted.
16  Again, it's for different purposes at
17  different times.
18      Q.  What about the E-wallet, did you
19  look at that data?
20      A.  No.  Not specifically.
21      Q.  How about bank data, did you look at
22  bank data?
23      A.  No, not specifically.
24      Q.  Okay.  Do you have any sense of how

112

1  many accounts had corresponding bank data
2  available to it?
3      A.  I don't -- I didn't look in detail
4  at the bank data, no.
5      Q.  Okay.  Do you have any sense of how
6  many E-wallet accounts were available to
7  examine against the Freer clusters?
8      A.  That's not something I examined.
9      Q.  Same question with respect to the
10  EPOC?
11      A.  Yes.
12      Q.  Okay.  How many clusters did you
13  examine?  I mean -- strike that.
14          How many EPOC accounts did you
15  examine?  You've identified Argueta?
16      A.  Oh, I analyzed the entire EPOC
17  dataset.
18      Q.  The entire EPOC dataset?
19      A.  Yes.
20      Q.  And when you say "I analyzed it,"
21  what did you do?
22      A.  So I went through a process of
23  loading that dataset, and in SQL, went and
24  sought to match those -- the terminology of

113

1 the EPOC data, the unique identifier was more
2 the login itself, so tie that login back to
3 the aggregation and the user account detail
4 originally in Mr. Martin's aggregation process
5 and subsequently as part of Dr. Freer's
6 aggregation process.
7     Q. All right. And what was -- what
8 were the match statistics?
9     A. I'm not sure I understand your
10 question.
11     Q. Well, you said you loaded the entire
12 EPOC dataset?
13     A. Correct.
14     Q. And then you matched the EPOC login
15 to the aggregation?
16     A. Correct.
17     Q. All right. And what did that
18 provide you?
19     A. There's at least one of my --
20 actually, multiple of my exhibits that I
21 described was claimed. I think one actually
22 aggregates and totals the number of logins by
23 tier that were claimed as part of EPOC.
24     Q. All right. And did you form any
CURRAN COURT REPORTING

114

1 opinion with respect to Dr. Freer's clustering
2 as a result of this EPOC analysis?
3     A. I think it was one piece of evidence
4 I considered.
5     Q. Okay. But what is it specifically
6 that you determined as a result of this
7 exercise as it relates to the Freer
8 aggregation process?
9     A. I think what it did is it helped
10 inform -- as an example of Argueta -- that
11 there were potential over- and
12 underaggregations.
13     Q. Okay. But did you attempt to then
14 quantify that or qualify it into some
15 statistical analysis that said there are this
16 many that don't match between EPOC and
17 Dr. Freer's cluster or some other analysis?
18     A. Not -- not what's beyond that was
19 presented in my exhibits.
20     Q. So whatever you did is limited to
21 what's in your exhibits?
22     A. Correct. Well, I guess beyond the
23 more exploratory review that we talked about
24 with Argueta, the quantification reside in the
CURRAN COURT REPORTING

115

1 exhibits.
2     Q. Okay. And as a result of the
3 quantification exercise, did you attempt to
4 calculate any overaggregation or
5 underaggregation error rates?
6     MR. RONA: Objection.
7     A. Not in this case. Again, beyond the
8 examples provided.
9     Q. Did you do it for the Huron
10 aggregation?
11     MR. RONA: Objection.
12     A. In part, I did -- I focused on the
13 analysis at least with respect to the way
14 Mr. Martin had stated it in his opinion.
15     Q. Did you review the most recent
16 deposition transcripts from participants in
17 the February and March time frame?
18     A. I received all of those, and some I
19 read more carefully than others, but I
20 reviewed them all.
21     Q. You read Argueta?
22     A. I did.
23     Q. Okay. Did you -- well, strike that.
24     What he said is what he said. I
CURRAN COURT REPORTING

116

1 just want to try to nail down, do you agree
2 that transitive closure is inherent in any
3 kind of aggregation methodology?
4     A. No. Not necessarily.
5     Q. You'll agree that Freer's
6 methodology performed a transitive closure
7 step; right?
8     A. He states it did.
9     Q. Well, do you agree that that's a
10 fact looking at his code and your --
11     A. Yes.
12     Q. -- review? Okay. And do you
13 believe that was a required step in his
14 process -- in the process using the
15 Fellegi-Sunter method, that you would have to
16 go through a closure step?
17     MR. RONA: Objection.
18     A. I don't know that I've analyzed the
19 alternatives.
20     Q. Are there any alternatives, as you
21 sit here today, that you can think of?
22     A. There's certainly different
23 approaches to how that's performed,
24 assumptions within. Categorically? Again,
CURRAN COURT REPORTING

---

**117**

1  it's not something I explored, whether
2  categorical options exist in the universe.
3      Q.  Well, I'm asking you, transitive
4  closure was performed here.  Can you think of
5  another alternative step besides transitive
6  closure which could have been used here using
7  the Freer methodology?  The Freer methodology
8  requires transitive closure; doesn't it?
9          MR. RONA:  Objection.
10     A.  Mr. Freer certainly used transitive
11 closure, so inherently, his methodology
12 required it.
13     Q.  All right.  So I'm trying to
14 determine, are you saying transitive closure
15 could have -- you could have used something
16 other than transitive closure in this
17 analysis, or would you agree that transitive
18 closure is a necessary component to a
19 clustering analysis in this dataset?
20         MR. RONA:  Objection.
21     A.  Again, I haven't sought to look for
22 alternatives or performed my own independent
23 affirmative analysis.
24     Q.  As you sit here today, is it fair to

CURRAN COURT REPORTING

---

**119**

1  closure for this clustering process?
2          MR. RONA:  Objection.
3      A.  So Mr. Martin performed an
4  aggregation, you can call it a clustering, if
5  you will.  He certainly -- I don't agree with
6  how he did it and the approach he used, but he
7  certainly never used the word "transitive
8  closure" as part of that process, so that
9  would be an alternative.  I'm not saying it's
10 a better or a worse one, but it's a different
11 approach.  It certainly didn't rely on the
12 terminology of transitive closure.
13     Q.  Well, I'm trying to determine if you
14 want an aggregation output for the Telex
15 dataset, as you sit here today, can you think
16 of anything that does not require transitive
17 closure to get to a full cluster, full set of
18 clusters?
19         MR. RONA:  Objection.
20     A.  I guess I don't know what you mean
21 by "a full set of clusters."
22     Q.  "A full set of clusters," by that I
23 mean assigning each account to a cluster and
24 only one cluster.

CURRAN COURT REPORTING

---

**118**

1  say you can't think of another analysis --
2      A.  I certainly have --
3      Q.  -- tool?
4      A.  Again, using the term "analysis
5  tool."  There's a difference between an
6  analysis tool and a conceptual process, so I'm
7  having a hard time maybe disaggregating that.
8      Q.  Let's go with conceptual process.
9  As you sit here today, can you think of
10 another conceptual process besides transitive
11 closure which could be used in clustering this
12 dataset?  And by "clustering," I mean taking
13 all of the individual accounts and assigning
14 them to a participant.
15     A.  Again, I haven't sought to think
16 about the universe of potential approaches to
17 bringing things together.
18     Q.  So, again, as you sit here today,
19 you can't think of one; is that a fair
20 statement?
21     A.  Can you ask your question in full
22 again, please?
23     Q.  Sure.  As you sit here today, you
24 can't think of an alternative to transitive

CURRAN COURT REPORTING

---

**120**

1      A.  So I go back to Mr. Martin, again, I
2  don't agree with his output and what he did
3  for the reasons I stated in my original
4  report, but, again, that was a process he
5  performed without ever using the word
6  "transitive closure" anywhere in his analysis.
7      Q.  No.  I understand, but you disagree
8  with his analysis, so I'm going to put that to
9  one side.
10         As you sit here today, can you think
11 of another analytical process which would --
12 which would aggregate every single Telex
13 account to an individual participant but only
14 one individual participant that would not
15 require transitive closure?
16         MR. RONA:  Objection.  I
17 think he's answered the question.
18     A.  Again, I haven't endeavored to go
19 and look at the universe of possible
20 approaches.  Certainly, the people that
21 Mr. Martin attempted to do it without, you
22 know, again, I don't agree with his output,
23 but he certainly used an approach without
24 using the terminology "transitive closure."

CURRAN COURT REPORTING

---

121

1    **Q.** I understand that you could argue
2  that he used some form of transitive closure
3  process. I'm taking the Huron analysis and
4  putting it to one side.
5    **A.** Okay.
6    **Q.** I have the Freer transitive closure
7  process right here in front of us, and I'm
8  asking, generally speaking, when you are
9  clustering data, when you're creating clusters
10  of individual -- it could be accounts or
11  individual medical results or individual
12  whatever, datapoints, doesn't it always
13  require some degree of transitive closure?
14    MR. RONA: Objection.
15    **A.** The goal of what Mr. Freer was asked
16  to do was to put individual user accounts
17  together and form a whole participant, an
18  individual economic actor. I don't think he
19  did that all the way. I think he stopped
20  short the clustering level, but his stated
21  goal was to take each user account and put it
22  in one participant or one cluster and only one
23  cluster.
24    **Q.** Right. And my question is doesn't

CURRAN COURT REPORTING

122

1  that necessarily require transitive closure?
2    MR. RONA: Objection.
3    **A.** Again, I don't know and haven't
4  attempted to research what other options may
5  exist in the universe. I don't know one way
6  or the other.
7    **Q.** So you have no opinion on that?
8    **A.** I don't have an opinion on whether
9  or not it was necessary to -- absolutely
10  necessary to use transitive closure in every
11  instance, other than the fact that Mr. Martin
12  attempted the same goal and never said the
13  words "transitive closure."
14    **Q.** Okay. And, remind me. Have you
15  ever done -- or strike that.
16    Have you ever been engaged to
17  perform analytical work that requires
18  transitive closure?
19    **A.** I don't think I've ever used that
20  specific terminology in a report.
21    **Q.** Okay. Regardless of whether you've
22  used the specific terminology, have you used
23  transitive closure in any of your prior
24  engagements?

CURRAN COURT REPORTING

123

1    **A.** I think you asked me this earlier,
2  and my recollection now, as it was then, is
3  likely, but I can't think of anything
4  specifically, sitting here today, over the
5  last 20 years.
6    **Q.** When you say "likely," why do you
7  say that? You have a general recollection of
8  having used it?
9    **A.** Yeah. Yes. That's right.
10    **Q.** Okay. And your general recollection
11  is in what context?
12    **A.** Certainly, I'm trying to think of
13  examples where we have sought to group or
14  aggregate or deduplicate things and have
15  looked to try to combine in a way that's
16  consistent with transitive closure to the
17  extent there's A is attached to B and B is
18  attached to C, such that A and C are now
19  grouped. I feel like that's something I have
20  done, but I'm just not thinking of -- I can't
21  think of a specific example sitting here
22  today. I'd have to go back and look.
23    **Q.** All right. And you wouldn't have
24  done it unless you considered it to be a valid

CURRAN COURT REPORTING

124

1  tool; correct?
2    **A.** Well, I'm not sure --
3    MR. LYNE: Objection.
4    **A.** -- I'd call it a tool. It's a --
5    **Q.** Concept?
6    **A.** -- concept. It depends on the case
7  in facts.
8    **Q.** Right. But you wouldn't have done
9  it in whatever that engagement might have been
10  unless you considered transitive closure to be
11  an appropriate concept to apply to that
12  engagement --
13    MR. RONA: Objection.
14    **Q.** -- fair statement?
15    MR. RONA: Objection.
16    **A.** Yes. I think that's fair. Again,
17  how you apply it is important, but
18  conceptually, that's true.
19    **Q.** Would it be fair to say that for the
20  stated goal, applying transitive closure to
21  assign every account to an individual cluster
22  but only one cluster, that transitive closure
23  will necessarily result in some degree of
24  overaggregation and some degree of

CURRAN COURT REPORTING

125

1 underaggregation?  It's inherent in the
2 process, in other words.  Is that a fair
3 statement?
4          MR. RONA:  Objection.
5     A.  I don't know.  It's a fair statement
6 in every situation.
7     Q.  How about in the context of
8 Dr. Freer's model?  Dr. Freer using transitive
9 closure under these circumstances, would it be
10 fair to say that it would be inherent in
11 Dr. Freer's transitive closure process that
12 there would be some level of overaggregation
13 and some level of underaggregation?
14          MR. RONA:  Objection.
15     A.  Absolutely.  I certainly agree with
16 the fact that Dr. Freer's analysis has a level
17 of overaggregation and a level of
18 underaggregation.  I think I've made that
19 pretty clear.
20     Q.  Okay.  But what you can't say is
21 what the acceptable level of an error rate
22 would be in overaggregation and
23 underaggregation in this instance --
24          MR. RONA:  Objection.
          CURRAN COURT REPORTING

126

1     Q.  -- 'cause you haven't done the work;
2 correct?
3          MR. RONA:  I think we've
4          covered this, but same objection.
5     A.  As I said, it would not be possible
6 to do that work without having come up with an
7 affirmative solution, and, frankly, without
8 knowing more about the data itself and
9 imparting real-world information because the
10 data itself lacks accuracy.  Certainly,
11 Dr. Freer hasn't demonstrated its accuracy nor
12 its consistency.
13     Q.  The accuracy is talking to people,
14 looking at EPOC, looking at E-wallet, and bank
15 data?
16     A.  Those are certain things he could
17 have -- could have done.  I'm not sure that
18 would have necessarily been sufficient, nor is
19 it necessarily, you know, extensive on what
20 else he could have done.
21     Q.  Well, what else could he have done?
22     A.  I don't know.  I haven't been asked
23 to look at that.
24     Q.  Well, as you sit here today, can you
          CURRAN COURT REPORTING

127

1 think of anything else that he could have
2 done?
3     A.  Again --
4          MR. RONA:  Objection.
5     A.  -- that was not something that I was
6 asked to think about or opine.
7     Q.  Okay.  Does Fellegi-Sunter with
8 equal -- strike that.
9          Does FS-EM require an external
10 ground-true dataset, as you understand it?
11     A.  Define "require."
12     Q.  Is it part of the FS-EM process?
13     A.  It can be.
14     Q.  In what circumstances -- when you
15 say "it can be," is it -- well, strike that.
16          I think I asked you previously can
17 you explain how FS-EM differs from the
18 Fellegi-Sunter model generally, and I thought
19 you said you weren't sure.
20          MR. RONA:  Objection.
21     A.  My answer was in the context of the
22 overall process, which would include testing
23 its reliability.
24     Q.  Well, did you attempt to determine
          CURRAN COURT REPORTING

128

1 how the FS-EM model deals with the lack of a
2 gold standard dataset or ground-truth dataset
3 or however you want to define it?
4     A.  Can you ask that question one more
5 time?
6     Q.  Sure.  Does FS-EM require a gold
7 standard --
8          MR. RONA:  Objection.
9     Q.  -- as you understand it?
10          MR. RONA:  Objection.
11     A.  I don't know if I've thought about
12 whether or not it's a requirement.  Certainly,
13 you can do an analysis.  It doesn't make the
14 analysis accurate or correct.
15     Q.  Okay.  Well, you've given me four
16 things that you say Dr. Freer could have done.
17 He could have talked to some number of people.
18 Is there a minimum number of people that he
19 would have had to have talked to for it to be
20 statistically significant in your opinion?
21     A.  That's not something I attempted to
22 compute.
23     Q.  Is there a minimum number of EPOC
24 accounts that he would have had to have
          CURRAN COURT REPORTING

129

1 reviewed for it to be statistically
2 significant in your opinion?
3    A.  Again, that's not something I've
4 attempted to calculate.
5    Q.  Is there a minimum number of
6 E-wallet transactions that he would have had
7 to have looked at for you to believe that it
8 was statistically significant?
9    A.  Again, that's not something I
10 attempted to look at.
11    Q.  All right.  How about bank data,
12 bank accounts, would there be a minimum number
13 of bank accounts that he would have had to
14 have sampled for it to be statistically
15 significant in your opinion?
16    A.  Again, that's not something I
17 attempted to look at.
18    Q.  Can we agree that it's a
19 standard technique in data science to perform
20 a pairwise match assessment followed by
21 transitive closure?
22        MR. RONA:  Objection.
23    A.  It's certainly a technique used.  I
24 think standard would require the case facts in

CURRAN COURT REPORTING

130

1 terms of whether it would be applied.
2    Q.  Okay.  But it's, in general, an
3 acknowledged process in the data science world
4 for data aggregation?
5        MR. RONA:  Objection.
6    A.  Generally, I think its application
7 would be case and fact specific or its
8 applicability would be case and fact specific.
9    Q.  But it's an acknowledged tool in
10 data science?  Yes?
11    A.  Generally.  Certainly.
12    Q.  Okay.  And that process does require
13 first a pairwise match and then transitive
14 closure; right?
15        MR. RONA:  Objection.
16    A.  Which process -- which process
17 generally are you referring to?
18    Q.  I'm talking about using transitive
19 closure.  First, you got to start with a
20 pairwise match, then you got to follow with
21 transitive closure?
22        MR. RONA:  Objection.
23    A.  That's certainly the analysis that
24 Dr. Freer performed, yes.

CURRAN COURT REPORTING

131

1    Q.  And that's a generally acknowledged
2 toolset in data aggregation science; right?
3        MR. RONA:  Objection.
4    A.  I think it would depend -- excuse me
5 -- it would depend on the field of science,
6 and Dr. Freer cites to various articles.
7    Q.  All right.  Can you cite to articles
8 that says that's not a valid data aggregation
9 methodology?
10        MR. RONA:  Objection.
11    A.  Not specifically, no.
12    Q.  When you say "not specifically," as
13 you sit here today, can you cite to any such?
14    A.  No.  No.
15        MR. LYNE:  Okay.  It's 12:30.
16    Do you want to have a 45-minute
17    break for lunch?
18        MR. RONA:  Sure.  Is that
19    good for you?
20        THE WITNESS:  Yeah.  Whatever
21    you think works best.
22        (Lunch recess was taken from 12:30
23    p.m. to 1:26 p.m.)
24    (Deposition Exhibit No. 7, One-Page

CURRAN COURT REPORTING

132

1    Document, marked for identification)
2        MR. LYNE:  Mark that as an
3    exhibit.
4    (Deposition Exhibit No. 8, Document
5    Entitled Exhibit 2, marked for
6    identification)
7        MR. LYNE:  Okay.  Back on.
8    Q.  Sir, during the break, you've had a
9 chance to reflect back on the answers you gave
10 me prior to lunch.  Is there any answer that
11 you believe you need to change to make it
12 either more accurate or more complete or to
13 correct an error?
14    A.  I think the only thing that was
15 coming to mind was the discussion of error
16 rates, and I tried to think about, you know,
17 where in my report I'd addressed error rates,
18 and I think the one thing that I was working
19 through was, you know, the error rates and the
20 things I looked at were on -- and I think this
21 is the appropriate way to look at it -- on a
22 specific cluster basis.  Right?  What is the
23 impact, what is the error -- potential error
24 rate on a given cluster?  And I think there

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

---

133

1  are a number of examples in the report where I
2  do specifically quantify more on the impact to
3  net equity side of things, what the impact on
4  specific, you know, clusters are of over- and
5  underclustering.
6      Q.  But that's only as to the specific
7  clusters that you have chosen to include in
8  your report; correct?
9      A.  The examples I provided where I
10  quantified, yes.
11     Q.  Which are the -- that isn't every
12  single cluster that you examined in the course
13  of your engagement, however; correct?
14     A.  No.  There are certainly other
15  clusters that I didn't -- that I saw potential
16  problems in that I didn't include as examples.
17  That's correct.
18     Q.  And there are other clusters that
19  had no problems; correct?
20     A.  I don't know that's true at all.
21     Q.  Well, did you look?
22     A.  Did I look at what?  I'm sorry.
23     Q.  Did you attempt to quantify how many
24  clusters in Dr. Freer's aggregate clusters had

---

134

1  no issues that you could discern?
2          MR. RONA:  Objection.
3      A.  I think that's part of inherently
4  the problem is that the data itself is
5  unreliable, so to look at clusters that are
6  based on unreliable data without bringing in
7  potential other information to help answer
8  that question, it's not possible to determine
9  with certainty that this is accurate or not.
10     Q.  Let me ask you the question again.
11  With respect to all of the clusters, did you
12  attempt to determine, irrespective of the
13  accuracy of the information, attempt to
14  determine whether or not the majority or the
15  significant majority or the minority of those
16  clusters were clusters that, on your visual
17  examination, showed no issues?
18         MR. RONA:  Objection.
19     A.  So in this -- in this hypothetical,
20  you're assuming that the data -- the
21  underlying data was accurate, that it had been
22  tested and demonstrated to be accurate.
23     Q.  I said irrespective of accuracy.
24  This is the clustering exercise.  Did you

---

135

1  attempt to determine how many of Dr. Freer's
2  clusters showed no apparent error, at least
3  with respect to the clustering itself?
4          MR. RONA:  Objection.
5      A.  Again, that would require me to have
6  had a fulsome analysis of my own opinion about
7  what the clustering should have been, which I
8  wasn't asked to do, and it's not clear to me
9  that -- whether or not it's even possible
10  'cause I wasn't asked to do it.
11     Q.  You identified and discussed a
12  relative handful of clusters where you point
13  out what you considered to be overclustering
14  issues or underclustering issues.  And my
15  question is did you attempt in any way to
16  determine with respect to all of the other
17  clusters that Dr. Freer created in his
18  clustering analysis how many of those showed
19  no apparent overclustering or
20  underclustering --
21         MR. RONA:  Objection.
22     Q.  -- just from the cluster itself?
23     A.  Again, that would require me to have
24  done an analysis on the affirmative to

---

136

1  determine what I believe the appropriate
2  clustering -- over- and underclustering would
3  have been.
4      Q.  No.  I'm saying independent of what
5  you consider to be accuracy questions.  Assume
6  that the data itself is accurate.  Did you
7  attempt to look at and quantify with respect
8  to all of Dr. Freer's other clusters how many
9  of those showed no apparent overclustering or
10  no apparent underclustering?
11         MR. RONA:  Objection.
12     A.  Again, I would go back to my
13  statement that in order to determine what has
14  no apparent under- or overclustering, that
15  would require me to have done an affirmative
16  analysis.
17     Q.  So the answer is you did not
18  undertake that exercise?  You didn't look for
19  ones that appeared to have no overclustering
20  or underclustering issues?
21         MR. RONA:  Objection.
22     A.  I looked and, I think, explored the
23  data.  If your question is did I manually
24  review all 15 million user accounts and

---

137

1  1.5 million clusters and then do a
2  quantification of which, on their face and
3  assuming the data was accurate, which I don't
4  think it is, which looked on its face to be
5  potentially okay, that's not an analysis I
6  performed.
7      Q.  Okay.  Did you perform that analysis
8  on any of the clusters looking for clusters
9  that appeared to be okay, to use your term?
10     MR. RONA:  Objection.
11     A.  I certainly looked at clusters, and
12  the goal was to look at how well or to what
13  extent or find indicia of the methodology,
14  right?  It's not just about whether this one
15  cluster or that one cluster appeared to have
16  problems, but does the methodology appear to
17  have reliable results, not just in the
18  aggregate, before a given participant, and
19  what we found was that there was significant
20  deviation for some participants more than
21  others and in both directions.
22     Q.  Okay.  And you were able to quantify
23  that for all of the clusters?
24     A.  Again --

138

1      MR. RONA:  Objection.
2      A.  -- I couldn't have done that for all
3  the clusters without either manually reviewing
4  all two million [inaudible].
5      THE STENOGRAPHER:  "Without
6  either"?
7      A.  Manually reviewing all 1.5 million
8  clusters -- excuse me -- 1.5 in Dr. Freer, or
9  doing my own affirmative analysis.
10     Q.  Okay.  Well, did you manual -- how
11  many clusters did you manually review?
12     A.  Oh, gosh.  I don't know.  Over the
13  course of four years, I guess in clusters, in
14  Freer's terminology over the last, however
15  long it's been, maybe eight months, nine
16  months, lots.
17     Q.  Give me sort of a ballpark.  "Lots."
18  How many?  Over a thousand?
19     A.  Probably less than a thousand, but
20  maybe -- maybe close.  Maybe close.
21     Q.  Okay.  So something close to a
22  thousand clusters you reviewed manually?
23     A.  You know, that's -- again, it's a
24  guesstimate.  It's hard to say "reviewed"

139

1  because there was certainly queries we
2  performed.  I didn't always review each
3  cluster for a singular purpose.
4      Q.  No.  No.  I understand, but I'm just
5  asking as to Cameron Freer's -- Dr. Freer's
6  cluster set, you think you reviewed something
7  close to or around a thousand clusters?  Is
8  that a fair estimation?
9      A.  Honestly, I don't -- I don't know
10  that it is.  It's hard to think about every
11  time I performed a query or looked at
12  something over the course of the last however
13  months.
14     Q.  Okay.  Well, you previously said you
15  thought a good guesstimate was around a
16  thousand?
17     A.  Potentially.  I'm thinking about it
18  now and thinking about if I feel that's an
19  accurate depiction, and the answer is -- I
20  think a better answer is I just don't know.
21     Q.  But it's more than the clusters that
22  you included in your report?
23     A.  Oh, certainly.
24     Q.  By a substantial number; right?

140

1      A.  Absolutely.
2      Q.  Okay.  And that's just with respect
3  to Dr. Freer's clusters, not the Huron
4  clusters; right?
5      A.  In terms of how many I reviewed?
6      Q.  Yes.
7      A.  Yes.  I mean, obviously, I reviewed
8  more if you look at it in a broader swath of
9  time.
10     Q.  Okay.  And can you guesstimate
11  roughly how many queries you made against the
12  dataset over time for Dr. Freer's clusters?
13     MR. RONA:  Objection.
14     A.  I guess I have a hard time -- what
15  do you mean by "queried"?
16     Q.  Running a query.  Running a search.
17     A.  How many times I hit execute in SQL?
18     Q.  Yeah.
19     A.  I couldn't begin to estimate that.
20     Q.  "Lots" would be a --
21     A.  Yes.
22     Q.  -- fair statement?
23     A.  I think "lots" is a fair statement.
24     Q.  Okay.  Just so I understand, what

141

1  you did is you wrote some SQL code, and you
2  put it on top of the Excel database and then
3  ran queries against that database or --
4      A.  No.  No.  That's not right.
5      Q.  Which database did you run it
6  against?
7      A.  So the database that I looked at was
8  the same source database that Dr. Freer used.
9      Q.  Okay.
10     A.  Over -- I'm sorry -- overlaid with
11  his conclusion as to what the clustering
12  should be.  So I wanted to look at the source
13  data, and there were multiple tables, but the
14  accounts table being one of the primary ones,
15  overlaid with Dr. Freer's determination to see
16  how those things meshed up and what his actual
17  aggregations were.
18     Q.  But your searches were against the
19  actual clusters themselves; right?  Find me
20  all the clusters that show these
21  characteristics?
22     A.  That's right.  But his clustering
23  output, the Excel files, didn't necessarily
24  have all of the underlying detail, so that

CURRAN COURT REPORTING

142

1  needed to be joined with back to the source
2  data in order to see a fulsome picture.
3      Q.  All right.  When you say it lacked
4  -- it required joining other source tables,
5  what source tables were you joining?
6      A.  So primarily I utilized the accounts
7  tables, which is the same table that Dr. Freer
8  -- and really the only table that Dr. Freer
9  utilized -- that's not entirely true -- that's
10  what he utilized for his aggregation.  He also
11  utilized Mr. Martin's conclusion as to net
12  equity for each of the user accounts, I
13  believe, within the rep_id summary table, and
14  that was a table, amongst others, that Huron
15  generated and Mr. Martin generated.
16     Q.  So the tables you joined were the
17  accounts and the net equity table?
18     A.  Those are two of the primary ones.
19  There are other tables in there that I may
20  have, at times, pulled information from.
21     Q.  Do you remember which ones?
22     A.  They're listed in my report.
23     Q.  But the ones you actually joined, is
24  it listed in your report?

CURRAN COURT REPORTING

143

1      A.  It is, yes.
2      Q.  Can you show me?
3      A.  Of course.  All right.  So we are
4  going to page seven.
5      Q.  Okay.
6      A.  So if we're looking at the second
7  solid bullet, there are four tables listed
8  there.  I've defined them as the "Huron Data
9  Tables."  Each of those are data tables that
10  were generated by Mr. Martin and included in
11  his initial expert report.  Those were
12  provided to us and ultimately Dr. Freer as
13  well.  Those all have information that are
14  based upon resulting analysis of the tables
15  that are listed below under the fourth solid
16  bullet defined "Freer Data Tables," so that
17  would include the "representante" which is the
18  account table I previously referenced, as well
19  as the (inaudible).
20         THE STENOGRAPHER:  Matura?
21         MR. LYNE:  Fatura,
22  F-A-T-U-R-A.
23     A.  Thank you.  And "transferencia," the
24  transfer table, and the bonus table -- that

CURRAN COURT REPORTING

144

1  one is an easy one -- the bonus table.  So
2  those all contain different components of the
3  TelexFree transactions and accounts and
4  invoices that all come together.  And so I
5  used different components of each of those to
6  understand the full scope and breadth of what
7  information we had about user accounts and how
8  they interacted with TelexFree with other
9  potential user accounts and participants.
10     Q.  Okay.  Thank you.  Now, let's go to
11  Exhibit 7.  And this is just a tree diagram
12  showing at the top the entire TelexFree
13  database of 17-plus million user accounts, and
14  it goes down to a list of 1,566,383
15  participants or separate clusters, and then
16  broken down between net winners and net
17  losers.  Do these numbers appear to be
18  correct?
19         MR. RONA:  Objection.
20     A.  Do you mind if I just --
21     Q.  Yeah.  Sure.  Go ahead.
22     A.  And by "correct," I'm not saying
23  that they are accurate or I agree with them,
24  simply that they are consistent with

CURRAN COURT REPORTING

145

1 Dr. Freer's calculations. This is right after
2 we go through the steps.
3    Q.  Yup.
4    A.  And here we are. Thank you. On
5 page 20. This won't have a complete picture,
6 but it will give me the right frame of
7 reference.
8    Q.  Yup.
9    A.  Six, one, seven -- I think there's a
10 missing comma, but fine. All right. And then
11 the net winner and net loser -- sorry -- I was
12 reading the numbers quietly to myself. Yes.
13 They're consistent with what I have in my
14 report.
15    Q.  And with respect to doing accuracy
16 checks, as you've defined it, talking to
17 people, looking at the EPOC, looking at bank
18 records, or the electronic wallet, the
19 E-wallet records, do you have any opinion with
20 respect to how many, for example, individuals
21 you would have to talk to to have a
22 statistically significant sampling that would
23 have some meaning for purposes of determining
24 accuracy of information?

CURRAN COURT REPORTING

147

1 uncertainty here. You know, based on just a
2 cursory look, without talking to someone, it
3 would seem reasonable based on Dr. Freer's own
4 approach that it should have been half of it,
5 that's an overstatement of 50 percent, so I
6 think that it's important to think about
7 things in that context.
8    Q.  So let's focus on what I was asking,
9 which is the accuracy check. Okay?
10    A.  Correct.
11    Q.  All right. And not the impact of
12 any errors. I'm just asking with respect to
13 sampling the data to determine its accuracy, I
14 just want to confirm that you have no opinion
15 with respect to how many people you would have
16 to talk to or how many records you would have
17 to look at to come to a statistically
18 appropriate sampling size that could be
19 validated under basic statistical principles?
20    MR. RONA: Objection.
21    A.  That's not something I've endeavored
22 to calculate, other than it would be a nonzero
23 number.
24    Q.  Okay. But a nonzero number is as

CURRAN COURT REPORTING

146

1    MR. RONA: Objection.
2    A.  Well, it would certainly be a
3 nonzero number, which is currently the number
4 of real-world datapoints he's brought in.
5    Q.  One? One person?
6    A.  I would probably think more than
7 one. One is more than zero. I don't think
8 one would be sufficient, if that's what you're
9 asking.
10    Q.  Well, what, in your opinion, would
11 have been sufficient?
12    MR. RONA: Objection.
13    A.  I didn't do that analysis, and it's
14 not clear to me that's even the right way to
15 look at it. Again, I think, you know, as I
16 said earlier, I think error rate is not just a
17 function of, you know, how many of his
18 clusters are right or wrong, but there's an
19 element of impact on individual people, right?
20 At the end of the day, we're asking an
21 individual person to be a net winner and net
22 loser, and if you tell me that their net
23 winnings are $800,000, but you look at the
24 data and you say, gee, there's a lot of

CURRAN COURT REPORTING

148

1 much as you can opine to at this point in
2 time?
3    A.  That's correct. I didn't endeavor
4 to calculate, again, 'cause I'm not sure it's
5 relevant as the impact of individuals, what
6 the overall error rate would be, how that
7 would -- how you'd calculate it truly in terms
8 of what that would even mean or whether it's
9 on a number of accounts or a dollar value.
10 There's a lot of ways you could potentially
11 look at it.
12    Q.  And you have no opinion as to which
13 way to do it; correct?
14    A.  I think I'd want to look at it
15 multiple different ways.
16    Q.  Well, name all the ways that you say
17 you would look at it.
18    A.  I think I'd want to -- all the ways
19 I'd look at it. So let's break that out a
20 little bit. So I think I'd want to look at
21 the dataset for accuracy with as much data as
22 I had available to me in the first instance,
23 and then determine whether or not I thought
24 that data was sufficiently representative and

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

---

149

1 informative as to come to a conclusion, in
2 this case, about how and to what degree I can
3 rely on the data overall.
4     Q.  Well, whether it's statistically
5 representative or not is really a function of
6 whether the data -- the sample size is large
7 enough; right?
8         MR. RONA:  Objection.
9     A.  Could be.  And that number may need
10 to be a large number or a small number.
11     Q.  Okay.  But you're not in a position
12 to say whether it's large or small; correct?
13     A.  I didn't do the analysis.
14     Q.  Okay.
15     A.  I wasn't asked to.
16     Q.  Okay.
17     A.  I'm not sure it's the appropriate
18 analysis.
19         MR. LYNE:  Well, I'll move to
20     strike the last part.
21     Q.  Do you have 8 in front of you?
22     A.  Exhibit 8?  Are we on 8 yet?
23         MR. LYNE:  Did you mark 8?
24         THE STENOGRAPHER:  I did.

---

150

1         MR. LYNE:  What did I do with
2     it?
3     A.  Thank you.
4     Q.  Mr. Freer, I'll represent to you
5 that this is Exhibit 2 to your -- excuse me --
6 report which is documents considered, and I
7 just want to ask a couple of questions here.
8         Is this a complete list of the
9 documents and other materials considered by
10 you in connection with forming your opinions
11 as contained in your report?
12     A.  I think you referred to me as
13 Dr. Freer --
14     Q.  Oh, geez --
15     A.  -- which I --
16     Q.  -- let me try it again.
17     A.  No.  I can answer your question
18 assuming that you meant me and not his
19 documents considered --
20     Q.  I did.
21     A.  -- to save you the time.  But, yes,
22 this looks consistent with my documents
23 considered list.
24     Q.  Okay.  And with respect to the

---

151

1 affidavits that you referred to in the last
2 portion of legal filing or in the middle of
3 the legal filings, the Affidavit of Lusette
4 Balan, Frantz Balan, and Sandro Paulo Freitas,
5 F-R-E-I-T-A-S, did you talk to any of those
6 three people?
7     A.  I did not.
8     Q.  Did you direct anyone under your
9 direction or control to talk to any of those
10 people?
11     A.  No, I did not.
12     Q.  Did you ask your counsel whether or
13 not those people were available for
14 interviews?
15         MR. RONA:  Objection.
16     A.  I don't believe so.
17     Q.  Did you take any steps to determine
18 the accuracy and truthfulness of the
19 information contained in any of those three
20 affidavits?
21     A.  I certainly -- at the very least for
22 the Balans, I certainly looked at the data
23 that was aggregated to them and data that was
24 not aggregated to them in and around their

---

152

1 accounts.
2     Q.  And did you form any opinion as to
3 whether or not the accounts attributed to them
4 were overaggregated, underaggregated, or
5 correct?
6         MR. RONA:  Objection.
7     A.  I'd have to go back and look
8 specifically.  I certainly recall that at
9 least with respect to the Frantz -- Frantz
10 Balan's affidavit, he had indicated in his
11 affidavit there were certain accounts with
12 certain e-mail addresses that he, in his sworn
13 testimony, said weren't his that were
14 aggregated to his account, which would imply
15 overaggregation.
16     Q.  Okay.  But did you take any steps to
17 determine if he was accurate in his
18 statements?
19         MR. RONA:  Objection.
20     A.  Other than confirming that the data,
21 as he described it, what was aggregated to him
22 or aggregated to his wife was consistent with
23 what is shown in the data and the description
24 of those was consistent with the data.

---

153

1    Q.  When you say the description was
2  consistent with the data, you mean you
3  referenced a particular account with a
4  particular e-mail address, and there was an
5  account with the e-mail address?
6    A.  That's certainly one thing.
7    Q.  Well, what are you referring to when
8  you said you confirmed?  What were you
9  confirming?
10   A.  He describes certain situations, and
11  by "situations," I mean user accounts, based
12  -- sometimes based on, I think, e-mail,
13  sometimes based on the names, and I went to
14  the data and confirmed his description of
15  those accounts was accurate.
16   Q.  When you say I went to the
17  documents, do you mean you went to the
18  individual e-mails?
19   A.  No.  If I said "documents," I meant
20  data.
21   Q.  Data.  And "data," you mean what was
22  contained in the various tables?
23   A.  Correct.  The tables we walked
24  through earlier.

CURRAN COURT REPORTING

154

1    Q.  Not that you went and looked at
2  secondary materials, like e-mails that he
3  discusses and the like?
4    A.  I don't think he discussed --
5        MR. RONA:  Objection.
6    A.  -- any -- I don't think he discussed
7  any e-mails.  I think he described an e-mail
8  address.
9    Q.  Okay.  Can you go back to Exhibit 5,
10  please, which is the ten-step Freer
11  methodology.
12   A.  Yes, sir.
13   Q.  Am I correct in understanding that
14  the net equity calculation, to the extent used
15  by Dr. Freer, was used only at step ten?
16   A.  I think that when -- as part of step
17  ten, I think that's -- the net equity portion
18  is true.  What I'm trying to recall is whether
19  he also used that table to isolate or drill
20  down to those users accounts that had one paid
21  invoice.  So going from the 17,000 -- excuse
22  me -- 17 million user accounts down to the 15
23  on the paid invoice, I don't remember if he
24  relied on the rep_id summary table for that

CURRAN COURT REPORTING

155

1  step as well or -- I'm sorry -- it's actually
2  right here in the -- in the diagram.  So he
3  utilized the rep_id summary table in both the
4  filtering to the TelexFree members as well as
5  to the -- it's in step ten, so he uses it at
6  the start of the analysis and at the end of
7  his analysis.
8    Q.  Okay.  The rep_id summary table, did
9  you review that Huron table?
10   A.  Yes, I did.
11   Q.  All right.  And did you determine
12  whether or not the rep_id summary table
13  appeared to be correct?
14   A.  I did.
15       MR. RONA:  Objection.
16   Q.  And what was your conclusion?
17   A.  That the rep_id summary table was
18  not correct, that the net equity contained
19  therein was inaccurate.
20   Q.  Okay.  And that's for the reasons
21  you set forth in the last part of your report;
22  correct?
23       MR. RONA:  Objection.
24   A.  Yes.  And all the reasons I stated

CURRAN COURT REPORTING

156

1  in my initial Martin report that I submitted.
2    Q.  The table marked as Exhibit 5 shows
3  that the entity information was exported from
4  rep_id summary.  Do you see that?
5    A.  (Witness nods head.)
6        THE STENOGRAPHER:  Is that
7  yes?
8    A.  I'm sorry.  I didn't know his
9  question was done.  I apologize.
10   Q.  Let me ask it again.  Do you see
11  that the rep_id summary table at step one, the
12  only information that was exported was entity
13  information?
14   A.  I do see that, yes.
15   Q.  And not net equity?
16   A.  That's what it indicates here.
17   Q.  All right.  And is that consistent
18  with your exploration of Dr. Freer's
19  methodology?
20   A.  I think that's right, yes.
21   Q.  Okay.  So with respect to steps one
22  through nine, none of those steps relied upon
23  Huron's net equity calculation; correct?
24       MR. RONA:  Objection.

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

157

1    A.  There are -- I don't believe so.  I
2  don't believe so.  I believe the net equity
3  calculation was brought on or attached at the
4  end.  They relied on Huron and Mr. Martin's
5  analysis in other respects, such as the entity
6  on this part, step one -- actually, before
7  step one.  Step zero.
8    Q.  Did you take any steps to determine
9  whether or not the entity information in the
10  rep_id summary table was correct or incorrect?
11    A.  My recollection is I reperformed the
12  analysis.  I didn't form an opinion one way or
13  another about whether that analysis was
14  accurate or reliable for purposes of
15  distinguishing the Ympactus accounts from the
16  hybrid accounts from the TelexFree accounts.
17    Q.  So you just formed no opinion?
18    A.  I was not asked to form an opinion
19  on that -- on that topic.
20    Q.  Okay.  I want to go back to the
21  Maria Neves cluster, which is attached, I
22  think, as Exhibit 3.
23    A.  3 to Dr. Freer's report?
24    Q.  3 to Dr. Freer's report.

158

1    A.  Yes.  Do I have that?
2    MR. RONA:  Exhibit 6.
3    Q.  You do have it.  It is Exhibit 6.
4    A.  Thank you so much.
5    MS. PAPAS:  We also printed
6  Freer's report.
7    MR. LYNE:  If this is easier,
8  use that one?  Okay.
9    A.  I'm more familiar with my own in
10  terms of the layout if that's available, but
11  if --
12    Q.  Okay.
13    A.  Yeah.  It's just a little bit easier
14  for me to read wide body like that.
15    (Deposition Exhibit No. 9, Document
16    Entitled Exhibit 16, marked for
17    identification)
18    Q.  Okay.  If you need a (gesturing).
19    A.  Thank you.  I very well may.
20    Q.  I usually need them.  So the
21  question here, I think, is of the 471, I
22  think, rows in Cluster 132785, did you attempt
23  to determine or can you tell me how many of
24  these accounts you believe are overaggregated

159

1  for this account?
2    MR. RONA:  Objection.
3    A.  My goal was not to determine how
4  many in totality were overaggregated but
5  demonstrate the process that Mr. Freer
6  utilized contains issues, instances where the
7  individual user accounts that he has placed in
8  here, on their face, don't appear to be the
9  same participant.  And in doing that, there's
10  at least two different groups, the first five
11  listed here on Exhibit 9, that while they
12  share -- in fact, it's more than that if you
13  look below -- the first five, at a minimum,
14  you know, may or may not have similar names,
15  some do; some don't, but don't share -- or
16  share very little, if nothing else, in terms
17  of other potential identifiers.
18    Q.  Okay.  But out of 471 or whatever
19  the number is, account entries, only five of
20  them showed evidence of overaggregation.
21  Would you consider that to be an
22  overclustering problem?
23    A.  Yes, I would.
24    Q.  So from your perspective, an

160

1  acceptable cluster has to have a zero
2  overclustering or underclustering error rate?
3    MR. RONA:  Objection.
4    A.  I haven't been asked, nor have I
5  defined "acceptable."
6    Q.  Well, can you define "acceptable" to
7  me now?
8    MR. RONA:  Objection.
9    A.  I don't think I can define it in the
10  context of how wrong someone can be
11  specifically in terms of number of accounts or
12  dollar value.  I can tell you that the
13  methodology, right, the methodology extends
14  not just in this individual example, which is
15  the one example Dr. Freer provided, contains
16  errors --
17    Q.  Yes.
18    A.  -- or apparent errors.
19    Q.  My question is am I correct in
20  understanding that you have no opinion, as you
21  sit here today, how much of an error rate
22  makes a clustering methodology unacceptable
23  versus acceptable?
24    MR. RONA:  Objection.

Deposition of Joshua W. Dennis
May 9, 2023

161

1    A.  I have not attempted to put a number
2  or value on the error rate across the board.
3  What we see is the methodology contains
4  zeroes.  Some people it impacts significantly;
5  other people less so.
6    Q.  Well, did you attempt to quantify
7  how many people had significant impacts and
8  how many people had less impact and how many
9  people had no impact?
10    MR. RONA:  Objection.
11    A.  No.  Because, as I said earlier, in
12  doing so, that would require me to come up
13  with an affirmative opinion about what I
14  believed the proper clustering and aggregation
15  would actually be.
16    Q.  And that opinion you do not have
17  currently?
18    A.  I was not asked to do an affirmative
19  analysis in this case.
20    Q.  Okay.  I'll ask you this question.
21  I think you may have already answered the
22  underlying questions, but let me ask it
23  anyway.
24    Suppose an aggregation methodology
CURRAN COURT REPORTING

162

1  has a precision of 0.980, a recall of 0.996,
2  and an F-measure of 0.988, how often would you
3  expect to see false positives in that
4  population?
5    MR. RONA:  Objection.
6    A.  I think it depends.  I think that
7  those measures are inherently estimates
8  because they lack real-world information such
9  that it's simply a self-fulfilling prophecy
10  inherent in the data itself.  If you utilize
11  unreliable and inaccurate data, then you can't
12  truly know how wrong or right your model is.
13    Q.  I wasn't asking about the underlying
14  data.  I was asking given the aggregation
15  methodology that's used that shows a precision
16  of 0.980, a recall of 0.996, and an F-measure
17  of 0.988, how often would you expect to see
18  false positives under that circumstance?
19    MR. RONA:  Objection.
20    A.  I think you can't answer that
21  without knowing truly what is accurate, and
22  those measures don't tell you, because you
23  never looked, about how accurate the data on
24  which it's based, so to calculate false
CURRAN COURT REPORTING

163

1  positive in those measures, I don't think,
2  yield reliable answers.
3    Q.  If I gave you a piece of paper and a
4  pencil and just asked you to calculate the
5  expected false positives under those
6  parameters, would you be able to do it?
7    MR. RONA:  Objection.
8    A.  I don't know.  That's never
9  something I had endeavored to do with a piece
10  of paper and a pencil.
11    Q.  Well, let me give you a piece of
12  paper and a pencil and give it your best shot.
13  Do you know how to do it?
14    MR. RONA:  Objection.
15    A.  Honestly -- honestly, I'd probably
16  go back and look at the definitions of how
17  Dr. Freer specifically calculated them, look
18  at the formula, and with that, I'm pretty
19  confident I could come up with that answer.
20    Q.  Do you know what the formulas are?
21    A.  I have not memorized them, no.
22    Q.  Have you ever calculated false
23  positives off of precision, recall, and
24  F-measure?
CURRAN COURT REPORTING

164

1    A.  No, I have not.
2    Q.  Okay.  Let me give you a
3  hypothetical.  In a given aggregation
4  methodology, in your opinion, would a single
5  missed link, either overaggregation or
6  underaggregation, would that invalidate the
7  methodology?
8    A.  Potentially.
9    Q.  Under what circumstances would a
10  single missed link invalidate the methodology?
11    A.  I think it would depend on the
12  methodology and what you're trying to show and
13  the size of the data and the case-specific
14  facts.
15    Q.  Okay.  Well, how would the size of
16  the data impact that?
17    A.  I think that it would be one factor,
18  among many, to think about.
19    Q.  Well, what would be the important
20  factors?
21    A.  It would depend on the case.
22    Q.  Well, generally speaking, what are
23  the important factors?
24    A.  I think those all could be
CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

---

165

1  potentially important factors, depending on
2  what you're trying to show.
3      Q.  What's the most important factor in
4  the Telex database for determining whether a
5  single missed link would invalidate the
6  aggregation methodology?
7      A.  I think I've lost track of how we
8  were defining "factor." I apologize.
9      Q.  Well, you said that a single missed
10 link in an aggregation methodology could
11 potentially invalidate the entire methodology.
12 So you said -- you said it depended on the
13 circumstance. So I said let's assume it's the
14 Telex database --
15     A.  Uh-huh.
16     Q.  -- what are the factors which you
17 consider to have primacy in determining that
18 question?
19     A.  I think I'd want to look at the
20 impact of the missed link. I think I'd want
21 to look at the purpose and cause of the missed
22 link. I think those would be -- and by
23 "purpose and cause," I mean what is the
24 underlying reason. I think I'd want to go

---

166

1  back and understand whether it's derived by
2  the source data itself, whether it was a
3  function of the way the program worked or the
4  methodology worked. I'd want to really seek
5  to understand, you know, whether it was a
6  reasonable and reliable methodology that was
7  applied in a way that was consistent with the
8  case facts and based upon reliable and
9  accurate data.
10     Q.  Generally speaking, would the number
11 of missed links be generally proportional to
12 the false negative rate?
13     A.  I'm not sure I could make that
14 generality.
15     Q.  What would you look to to determine
16 what the factors are to determine the linkage
17 between the number of missed links and the
18 false negative rate?
19         MR. RONA:  Objection.
20     A.  I'm sorry. I don't understand your
21 question.
22     Q.  Well, let's assume a given number N
23 of missed links in a dataset of some size. Is
24 that number of missed links proportional to

---

167

1  the false negative rate or to something else?
2          MR. RONA:  Objection.
3      A.  I guess I'm not totally clear on
4  what you're asking me. Is it proportional to
5  the false negative rate? I'm sorry. I don't
6  understand the question.
7      Q.  Let me try it differently. To
8  validate, in your opinion, any aggregation
9  methodology, would you be required to look for
10 every missed link and then determine its
11 impact, its cause, its source, and how it
12 relates to the methodology used?
13         MR. RONA:  Objection.
14     A.  I guess it would depend on the case.
15     Q.  Well, how about this case?
16         MR. RONA:  Objection.
17     A.  I don't know. I haven't endeavored
18 to think about the number of missed links one
19 would need.
20     Q.  Well, regardless of the number of
21 missed links, are you suggesting that every
22 missed link would then have to be subject to
23 an analysis of the impact of that missed link,
24 the cause of that missed link -- missed link,

---

168

1  the source of that missed link, and the
2  methodology and how it relates to the missed
3  link?
4          MR. RONA:  Objection.
5      A.  I don't know that it's a one-by-one
6  basis. I think I'd want to -- if I saw errors
7  in my analysis, clear errors, I'd certainly
8  want to go and understand why. I'm not sure
9  how many times that needs to occur.
10     Q.  Well, this goes back to the issue of
11 error rate. If you have a .99 or a quadruple
12 nine, nine, nine, nine, nine accuracy rate,
13 and a point zero, zero, zero, zero one error
14 rate, generally speaking, people tend to say
15 that's a pretty good number, quadruple nines,
16 I think up to six nines, six sigma. My
17 question, I guess, is am I correct that you
18 have no opinion as to what an acceptable error
19 rate is in this aggregation of data?
20         MR. RONA:  Objection.
21     A.  Again, I think it depends on how
22 you're determining the error rate. I
23 appreciate the math that Dr. Freer performed.
24 He did so on a methodology and using only data

Deposition of Joshua W. Dennis
May 9, 2023

169

1  that's contained within a database where he
2  didn't quantify or analyze the accuracy of it,
3  so any determination of error rate that
4  utilizes that inaccurate data is going to be
5  equally inaccurate.  So I think it depends on
6  what kind of math you're doing, understanding
7  the case facts and the data itself, and also
8  not just thinking about the totality across
9  all users, but thinking about the error rate
10  in the context of how it impacts individual
11  people.
12     Q.  So but individual people, of course,
13  can bring that to the attention of the trustee
14  in this case through the E-portal; right?
15        MR. RONA:  Objection.
16     Q.  The claims portal?
17     A.  I think it depends on what process
18  you're discussing.
19     Q.  Okay.  Well, let's assume that it's
20  a process that's similar to what was used in
21  the net loser process.  So there's an
22  E-portal, and a net winner can go in, and they
23  can either validate the cluster or they can
24  claim an overaggregation or an
        CURRAN COURT REPORTING

170

1  underaggregation.  Does that provide, in your
2  opinion, the necessary accuracy check?
3     A.  If you're --
4        MR. RONA:  Objection.
5     A.  If you're asking similar to the way
6  the claims process worked, if you put the onus
7  on the individual potential net winner to go
8  in and do Dr. Freer's work for him and confirm
9  whether it's right or wrong, they came in and
10  said, yes, I agree those are my accounts in
11  each and every case, then you're relying on
12  real-world data.  I agree with that.
13     Q.  Okay.  And that's the real-world
14  check that you're looking for; correct?
15        MR. RONA:  Objection.
16     A.  No.  It's not correct.
17     Q.  How is that incorrect?
18     A.  If you asked someone to go in and
19  demonstrate that those are their accounts,
20  that would certainly be helpful information.
21     Q.  Well, besides being helpful
22  information, what else do you say has to
23  happen before, in your opinion, the
24  information is sufficiently validated that it
        CURRAN COURT REPORTING

171

1  can be used?
2     A.  I think it would depend on the case.
3  I think I'd want to, in the first instance,
4  use all the data that was available to me.
5     Q.  Well, I'm giving you a hypothetical.
6  And the hypothetical is Dr. Freer creates a
7  whole series of clusters.  All the clusters
8  get posted in the E-portal.  Every cluster
9  owner has the opportunity to come in and say,
10  I validate this or you've missed something or
11  I want to add something.  And you said that's
12  one thing that would help validate it?
13     A.  That can mean if you went and asked
14  every net winner to come in and demonstrate
15  and show, as we've seen, where there are
16  under- and overaggregations in Dr. Freer's
17  analysis, if you got Oscar Sosa to come in and
18  say, yeah, gee, these two clusters are mine
19  and, in fact, that does lower my net equity by
20  80 percent, yeah, that would certainly be
21  something that would be helpful to consider.
22     Q.  Well, I want to go past helpful to
23  consider --
24     A.  No -- I'm sorry.
        CURRAN COURT REPORTING

172

1     Q.  -- and I want to know are you saying
2  that's insufficient, and if so, why is that
3  insufficient?
4        MR. RONA:  Objection.
5     A.  I think they're somewhat circular,
6  that if a net winner comes in and says these
7  are my accounts, I agree that that would be
8  sufficient for that particular participant.
9     Q.  Okay.  Now, suppose the net winner
10  comes in and says you underaggregated.  I have
11  some other accounts I want to put in?
12     A.  Yes.
13     Q.  Okay?  Is that sufficient?
14        MR. RONA:  Objection.
15     A.  Potentially, I think you'd want to
16  go and look at it, but I think that would
17  certainly be -- certainly something you want
18  to consider if that data was available.
19     Q.  Okay.  And when you say you'd want
20  to consider, who wants to consider?  The
21  trustee?  The court?  You?
22        MR. RONA:  Objection.
23     A.  I would say all of the above.
24  Whenever we do these types of analysis, you
        CURRAN COURT REPORTING

173

1  want to consider all the information that's
2  available to us, and if I have more
3  information that was available to me, I'd
4  certainly want to consider it.
5      Q.  That's what I want to try to track
6  down here.  When you say all of the
7  information available to us, what are you
8  talking about exactly?
9      A.  I think we've gone through some of
10  these examples.  We talked about information
11  that may have been available through potential
12  conversations, through EPOC, through the
13  discovery process.  Those were all things, I
14  think, would be helpful to have considered.
15  Now, whether they're sufficient, that's a
16  different question.
17      Q.  Well, in what way is that a
18  different question?
19      A.  Because you don't know if data is
20  sufficient until you've analyzed it.
21      Q.  Well, at what point in time do you,
22  Joshua Dennis, agree that the data is
23  sufficient?  What has to happen?
24          MR. RONA:  Objection.

174

1      A.  I haven't -- that's not an analysis
2  I've done.  My goal was to look at Dr. Freer's
3  analysis and determine whether it was a
4  process that was reasonably applied based on
5  the case facts and whether the data that was
6  used was reliable and accurate.  And looking
7  at his analysis, I found that the methodology
8  was not accurate, and that the accuracy of the
9  data was not tested.
10      Q.  So, as you sit here today, you do
11  not have an opinion as to what is a sufficient
12  quantum of proof?
13          MR. RONA:  Objection.
14      A.  That is not something I was asked to
15  analyze.
16      Q.  But, beyond that, you don't have an
17  opinion on that subject, as you sit here
18  today; correct?
19          MR. RONA:  Same objection.
20      A.  I do not have an opinion -- excuse
21  me -- a position or opinion on the quantum of
22  proof.  Again, I -- let me back up.  I'm a
23  little unclear about how you're defining
24  "quantum of proof."

175

1      Q.  It's whatever is sufficient for you
2  to sign off and say, yes, that is sufficiently
3  accurate.  I accept that cluster.
4          MR. RONA:  Objection.
5      A.  I haven't thought about all the
6  possibilities of the universe of what someone
7  could come out at to try to think about what
8  that would look like.  What I've done is look
9  at Dr. Freer's analysis and no clear issues in
10  aggregations, issues with methodology, and
11  issues with underlying data.
12      Q.  Okay.  Could you turn to page --
13  excuse me -- to page 51 of your report?
14      A.  Certainly.
15      Q.  Actually, let me start with you
16  turning to page 41.  I tried to open Cluster
17  119427, which you show here, and my question
18  is simple.  Is this the -- is this -- what you
19  show on page 41, is this the entire set of
20  entries for Cluster 119427?
21      A.  It's a summary of it.
22      Q.  And when you say "it's a summary of
23  it," what do you mean?
24      A.  It is a pivot table in --

176

1      Q.  Oh --
2      A.  -- Excel perspective, so it's taking
3  the data and aggregating it on certain common
4  factors and then in summing it up, if you
5  will, in terms of the net equity, and then on
6  the far right side, the number of rep_id's, so
7  user accounts that have that common, in this
8  case, name, e-mail, address, city, and
9  country, and phone number.
10      Q.  So is this Dr. Freer's cluster,
11  119427, or is this your pivot table based on
12  that cluster?
13          MR. RONA:  Objection.
14      A.  I'm not clear on the distinction.
15  It is a -- it is a summary of Dr. Clear's --
16  excuse me -- Dr. Freer's Cluster ID 119427.
17      Q.  Which would have 140 user accounts
18  associated with it?
19      A.  That's correct.
20      Q.  And then on that side, you see -- on
21  the far right-hand column, those numbers would
22  be the actual account numbers for that
23  individual showing under rep_nome?
24      A.  I'm sorry.  Can you ask that

177

1  question again?
2      Q.  Sure.  So if you look on the far
3  right-hand column, the count of rep_id?
4      A.  Yes.
5      Q.  Rep, underscore, ID.  The first one
6  for Alex Lopes -- Lopes, account one, that
7  means there's one account associated with that
8  name?
9          MR. RONA:  Objection.
10     A.  That's true, in that name, but also
11  in combination, that name, e-mail address,
12  rep_end, R-E-P, E-N-D, which is the address,
13  the city, the country, and that rep phone
14  number.  It's a combination of those factors.
15     Q.  Okay.  So if they match all of the
16  columns, then you get a number associated with
17  it?
18     A.  Correct.  It's a number of user
19  accounts and the sum of -- the net equity,
20  according to Mr. Martin, associated with those
21  user accounts that have that combination of
22  criteria.
23     Q.  Okay.  And then, for example, when
24  you go down to Elaine Carreiro,

CURRAN COURT REPORTING

178

1  C-A-R-R-E-I-R-O, you have 53 individual
2  accounts that match for the phone number, the
3  country, the city, and the address, Maplewood
4  Ave., plus Elaine at the e-mail address?
5      A.  The e-mail addressee
6  elainevit40@gmail.com.
7      Q.  Correct.  Okay.
8      A.  Yes.  It's that combination of --
9  the unique combination of each of those
10  different variables.
11     Q.  Okay.
12     A.  The underlying data is on a
13  line-by-line basis.  It's shown as a footnote
14  and demonstrates in Exhibit 13 to my report.
15         MR. LYNE:  Can I see
16     Exhibit 13?  Mark that as the next
17     exhibit.
18     (Deposition Exhibit No. 10, Document
19     Entitled Exhibit 13, marked for
20     identification)
21     Q.  Okay.  Showing you Exhibit 13.  Is
22  this the exploded table showing all of the
23  entries?
24     A.  I'll take your characterization of

CURRAN COURT REPORTING

179

1  "exploded."  That's accurate.
2      Q.  Yeah.  Okay.
3      A.  This is the underlying data.
4      Q.  Okay.  And if I go to the third
5  page, there is a ratio calculated for each of
6  the names and an aggregate ratio calculation.
7  Do you see that on the --
8      A.  Yes.  On the right side, that is a
9  -- that is the table that also appears in my
10  report.
11     Q.  Okay.  And that appears on page 43?
12     A.  Yes, sir.
13     Q.  Okay.  And that is the calculation
14  you performed or somebody at your instruction?
15     A.  I performed it, yes.
16     Q.  You performed it.  And where it
17  refers to ratio and W ratio, what are you
18  referring to?
19     A.  So those are similarity scores,
20  fuzzy matching scores using those two -- those
21  two functions.
22     Q.  Okay.  And you were using the same
23  methodology that Dr. Freer used for fuzzy
24  matching?

CURRAN COURT REPORTING

180

1      A.  Correct.
2      Q.  Okay.  Okay.  If you could turn to
3  page 51, paragraph 159.  You are comparing two
4  clusters, one for Shal, S-H-A-L, Group,
5  Cluster 12650741, with Dolarex, D-O-L-A-R-E-X,
6  Cluster 10992563; is that correct?
7      A.  Yes.
8      Q.  Okay.  And are you suggesting that
9  those two clusters should be aggregated?
10     A.  Potentially.
11     Q.  Well, did you form an opinion as to
12  whether they, in fact, should be aggregated?
13         MR. RONA:  Objection.
14     A.  No.  The purpose was to demonstrate
15  the commonality and similarities between them
16  to show that there is a great deal of
17  uncertainty about whether they should be or
18  not that no one has resolved.
19     Q.  Shal Group is a corporation; is that
20  right?
21         MR. RONA:  Objection.
22     A.  I don't know that to be a fact one
23  way or the other.
24     Q.  And the same is true for Dolarex?

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

181

1  You don't know whether that's a corporation
2  either?
3      MR. RONA:  Objection.
4      A.  I don't know if it's a corporation
5  one way or the other that exists out there or
6  is the same corporation that is listed here.
7      Q.  Okay.  Well, assume, for purposes of
8  my question, that those are two organized and
9  existing corporations.  Is it your position
10  that two corporations should be joined in a
11  single cluster under any circumstances?
12      MR. RONA:  Objection.
13      A.  I don't have a legal opinion one way
14  or another.  I don't know for a fact to what
15  extent someone types in a given name, just
16  like Mickey Mouse or anything else, if that
17  has legal import or reflects liability or
18  benefit of a corporation.
19      Q.  Well, I'm asking you a general
20  question, which is, in your opinion, in an
21  appropriate aggregation methodology, is there
22  any circumstance in which two corporations
23  with their own clusters should be joined
24  together as a single cluster?

CURRAN COURT REPORTING

182

1      MR. RONA:  Objection.
2      A.  I think that's a legal
3  determination.
4      Q.  I'm asking you as a data science
5  question.
6      A.  I don't think --
7      MR. RONA:  Objection.
8      A.  -- whether or not two corporations
9  should be joined as a data science question
10  is, in fact, a data science question.  I think
11  that's a legal question.  What it looks like
12  is that its potential likelihood is the same
13  economic actor, right, the same beneficiary
14  based on the commonalities in the data and the
15  way they're structured may have received the
16  benefits of both of those clusters.
17      Q.  Did you take any steps to determine
18  whether or not those are two separately
19  organized corporations?
20      A.  No, I did not.
21      Q.  I think you say on 159 -- yeah, you
22  say in the second sentence of paragraph 159,
23  "In fact, this linkage," that's Shal Group and
24  Dolarex, "was confirmed by the claims

CURRAN COURT REPORTING

183

1  submitted through the ePOC portal, as I can
2  see that a single user."  Can you tell me what
3  you're referring to there?
4      A.  Sure.  So this goes back to what we
5  were talking about a little bit earlier.
6  Another example where I looked at the EPOC
7  portal as potentially indicia of over- and
8  underaggregation.  In this particular
9  instance, we have one individual, Saryas Jaff,
10  submitted two claims, one for the Shal Group
11  and one for Dolarex listed -- with each claim
12  ID listed therein.
13      Q.  So when you say this linkage was
14  confirmed, it was confirmed in your mind
15  because one person submitted claims for each
16  of the two companies in the EPOC portal?
17      MR. RONA:  Objection.
18      A.  The purpose was simply to show, in
19  this case, that there is a linkage to the
20  extent that the same economic actor, in this
21  case, Saryas Jaff appeared to own the user
22  accounts for both clusters.
23      Q.  So Dolarex was a net winner,
24  according to you, in the amount of $189,701.

CURRAN COURT REPORTING

184

1  Do you see that?
2      A.  I do.
3      Q.  Is it your understanding that the
4  net winners were using the E-portal?
5      MR. RONA:  Objection.
6      A.  Again, I think the determination of
7  who was a net winner and a net loser is still
8  very much a determination that's not been
9  concluded.  Under Mr. Martin's aggregation, I
10  can tell you that both net winners and net
11  losers certainly did attempt to go into the
12  portal and identify accounts.
13      Q.  Did you go into the EPOC portal and
14  link other accounts besides this account --
15  these two accounts between these two
16  companies?
17      MR. RONA:  Objection.
18      A.  I'm sorry.  I don't -- I'm not sure
19  I understand the question.
20      Q.  Sure.  You went into the E-portal --
21  the EPOC portal, and you affirmatively, you
22  say, linked these two accounts in some fashion
23  because a single user, Saryas Jaff,
24  S-A-R-Y-A-S, J-A-F-F, submitted two claims;

CURRAN COURT REPORTING

185

1  correct?
2     A.  That is what I say here, yes.
3     Q.  Okay.  And you did that; right?
4     A.  One clarification.  Are we talking
5  about the EPOC portal?  There is a portal, I
6  understand, exists where people can go and
7  look at their claims and submit information.
8  I did not have direct access to the portal
9  itself.  What I received was a point-in-time
10 extract of the data -- underlying data that
11 was contained as a result of that portal at a
12 point in time.
13    Q.  All right.  But are you saying that
14 these two accounts between these two companies
15 should affirmatively be aggregated or not --
16       MR. RONA:  Objection.
17    Q.  -- as a result of the fact that
18 Saryas Jaff issued or submitted claims for
19 both companies through the EPOC?
20       MR. RONA:  Objection.
21    A.  I don't have an opinion one way or
22 the other --
23    Q.  Okay.  That's fine.
24    A.  -- that's an economic actor.
CURRAN COURT REPORTING

186

1     Q.  You don't know if it was a single
2  economic actor?
3     A.  Well, it was the same person that
4  submitted -- that claimed both clusters.
5     Q.  Well, that's not the same.  The
6  economic actors are Shal Group and Dolarex;
7  correct?
8       MR. RONA:  Objection.
9     A.  I don't know that's correct.
10    Q.  Well, what steps did you take to
11 determine who the actual economic actor was?
12    A.  It depends how you define "economic
13 actor."  Here, I'm saying that they're both
14 tied together by a single individual.
15    Q.  Well, a single individual submitted
16 claims for two companies.  I'm trying to
17 determine if you say that's an
18 underaggregation in Dr. Freer's methodology?
19    A.  I think that's a legal
20 determination.  My point is simply that there
21 is commonalities between the two, and at some
22 point in time, I'm not sure if there's legal
23 significance.  Someone will have to determine
24 whether what I typed into one of many fields
CURRAN COURT REPORTING

187

1  in a database when I signed up a user account
2  has legal significance.
3     Q.  Well, I'm trying to bring it back to
4  an aggregation methodology.  And Dr. Freer --
5  his aggregation methodology did not aggregate
6  those two companies' accounts.  He has
7  separate clusters for each of them identified
8  in paragraph 159.
9       Are you saying that Dr. Freer's
10 aggregation methodology was flawed because it
11 didn't aggregate the Shal Group account with
12 the Dolarex account, just as a matter of
13 methodology?
14       MR. RONA:  Objection.
15    A.  The underlie of your question is the
16 assumption that because someone put Dolarex in
17 the name field, that the extent that is a
18 valid corporation somewhere in the world, that
19 that -- somehow the liability or benefit goes
20 to them.  I don't know that that's the case or
21 there's legal import.
22    Q.  Well, you're speculating, aren't
23 you, that maybe it is and maybe it isn't?
24       MR. RONA:  Objection.
CURRAN COURT REPORTING

188

1     Q.  You have no basis to opine one way
2  or the other whether it should be aggregated?
3       MR. RONA:  Objection.
4     A.  That would be a legal determination.
5     Q.  Okay.  Was DL1 Inc. versus Linda
6  Hackett, where do you refer to DL1 Inc.?
7     A.  That should be right --
8     Q.  Paragraph 156.
9     A.  Yeah.  I was going to say it should
10 be in a similar -- similar area.
11    Q.  Okay.  Is that right?  No.  That's
12 not right.
13    A.  No.  I don't think it is.  I
14 certainly have an exhibit that speaks to DL1
15 and Linda Hackett.
16    Q.  Well, let's see if we can find it in
17 your report.
18    A.  I'm not sure I spoke to that one
19 specifically.
20    Q.  I thought you had.
21    A.  It's certainly one I reviewed in
22 detail.  I don't know if I used that
23 particular example.
24    Q.  Well, it's Exhibit 9.5.
CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

189

1    A.  Yes.
2    Q.  So if we pull that out.  Oh, you
3  found it?
4    A.  Oh, wonderful.
5    Q.  Okay.  Just turn to page 50.  Hold
6  on one second.  The last sentence of paragraph
7  156, "This evidence, which is summarized in
8  Exhibit 6 and detailed in Exhibits 9.1 to 9.5
9  includes instances where the same or similar
10  values for Potential Identifiers."  Do you see
11  that?
12    A.  I do.  And the sentence continues,
13  but, yes.
14    Q.  And it continues, but if we turn to
15  Exhibit 9.5.
16    MR. LYNE:  (To Attorney
17    Papas).  Do you have that?
18    (Deposition Exhibit No. 11, Document
19    Entitled Exhibit 9.5, marked for
20    identification)
21    Q.  Do you recognize Exhibit 11 as your
22  Exhibit 9.5 in your report?
23    A.  I do.
24    Q.  And it includes two clusters, 118449

CURRAN COURT REPORTING

190

1  and 707775, which --
2    A.  I think -- I apologize.  I think you
3  may have misread the cluster ID for the first
4  one.
5    Q.  My eyes are bad.  Let me try this
6  again.  I'm referring to Exhibit 9.5.  It
7  appears to contain two clusters, Cluster
8  11849449 and Cluster 70775.  The first cluster
9  is a rep_nome DL1 Inc., the company; correct?
10    MR. RONA:  Objection.
11    A.  That's what is shown here.
12    Q.  That's what's shown?
13    A.  Again, just to clarify, this
14  particular cluster contains 928 user accounts.
15  I'm showing a selection of them here.
16    Q.  Okay.  And you are suggesting that
17  it should be joined with Linda Hackett --
18    MR. RONA:  Objection.
19    Q.  -- is that right?
20    A.  I'm not suggesting one way or the
21  other.  My point is there are significant
22  overlap and commonality between the potential
23  identifiers.  I actually think the trustee is
24  the one who suggested and actually explicitly

CURRAN COURT REPORTING

191

1  stated that these two should be joined.  The
2  trustee stated as part of the settlement
3  agreement that -- and I can read it exactly if
4  we had the document -- that the Hacketts were
5  net winners of more than $580,000.  $580,000
6  is the aggregate total between the net
7  winnings of 1.2 million for the Linda Hackett
8  accounts listed here and less the 622,000 from
9  DL1.  That was the trustee's determination
10  that these two accounts should be aggregated
11  for purposes of settlement.
12    Q.  But I'm asking you questions with
13  respect to Dr. Freer's aggregation
14  methodology.
15    Are you suggesting that Dr. Freer's
16  aggregation methodology is invalid because, as
17  a methodology, it did not aggregate both of
18  these accounts, regardless of what the trustee
19  ultimately determined?
20    MR. RONA:  Objection.
21    A.  I think it speaks to one of the
22  issues with the entire methodology that
23  Dr. Freer employs.  His entire methodology is
24  based on an unfounded, unsupported

CURRAN COURT REPORTING

192

1  understanding given to him by the trustee that
2  people always used their own name and the
3  contact information of other people, right,
4  and that's something that is not in the
5  record.  That's something that's provided by
6  the trustee.  Dr. Freer pointed to my report,
7  the judge's court order eliminating
8  Mr. Martin, in Mr. Martin's report, as other
9  potential sources for that understanding, none
10  of which, other than Mr. Martin, who's now
11  been excluded, actually stand for that
12  proposition.  So, yes, I do think that a
13  methodology that relies on what someone
14  happened to type into the name field as a
15  basis for aggregating a single participant, a
16  simple beneficiary or loser or economic actor,
17  is not necessarily a reliable approach.
18    Q.  So what you're doing essentially is
19  collapsing Dr. Freer's aggregation methodology
20  with any subsequent validation or analysis and
21  that Dr. Freer's methodology is somehow
22  inaccurate or incomplete, and, therefore,
23  objectionable because it doesn't go through
24  the secondary step of aggregating based on

CURRAN COURT REPORTING

193

1 external data?
2　　　MR. RONA: Objection.
3　　　A. No. That's not. I think what I
4 just described was the very foundation of his
5 methodology was flawed. It's based entirely
6 on an assumption that name has a significance
7 or relevance or accuracy that is unproven.
8 His entire methodology requires two names to
9 be fairly similar or substantially similar,
10 and that core underlying assumption, the same
11 one that Mr. Martin made and the Court
12 excluded him for that very reason, here,
13 Dr. Freer has done the exact same thing.
14　　　Q. So it's your understanding that
15 Dr. Freer's report is primarily based on name?
16　　　A. His methodology very much relies
17 very heavily on the requirement that's baked
18 into the coding, that's baked into the
19 process. He states explicitly multiple times
20 in his report in order for two user accounts
21 to be aggregated, they had to have at least
22 fairly similar name or have substantial
23 agreement on name as well as other common
24 identifiers. He said that very explicitly.

CURRAN COURT REPORTING

194

1 Yes.
2　　　Q. Is it your understanding that
3 Dr. Freer's FESM [sic] methodology relies
4 primarily on name?
5　　　MR. RONA: Objection.
6　　　A. I think name is one of the core --
7 and when I say relies on name, his methodology
8 is implicit, the entire methodology, including
9 the FS-EM portion is the assumption that
10 participants consistently entered the name
11 accurately.
12　　　Q. Where in the FS-EM methodology do
13 you understand Dr. Freer gave primacy to name?
14　　　A. Sure. I'm happy to go through his
15 report and show you.
16　　　Q. Sure.
17　　　A. So I would point you to the section
18 marked "Special Role of the Name Field in the
19 TelexFree Dataset."
20　　　Q. Okay. But I'm asking you a specific
21 question, which is how in the FESM [sic]
22 methodology, where is name given primacy?
23　　　MR. RONA: Objection.
24　　　A. Sure. Of course. So I think the

CURRAN COURT REPORTING

195

1 first place it's given primacy is part of the
2 blocking. I'm happy to go to that and discuss
3 it.
4　　　Q. Yup. Okay. Do you want to look at
5 the ten steps? Would that help you?
6　　　A. Oh, no. I have his -- I have his
7 step four right here in his report. That's
8 helpful.
9　　　Q. Okay. Okay. So blocking?
10　　　A. That's correct. And I'd like to
11 just --
12　　　Q. Take your time.
13　　　A. Thank you. Here we are. Paragraph
14 148 on page 51.
15　　　Q. Okay.
16　　　A. Paragraph 148 on page 51 reads,
17 "Because of the special role that the name
18 field plays in the TelexFree dataset," and it
19 refers to the prior section, Section III.B.1,
20 "it is important that no pairs of" accounts --
21 excuse me -- "account groupings that
22 substantially disagree on the name end up
23 matched together. I use blocking as a
24 mechanism to accomplish this goal, by ensuring

CURRAN COURT REPORTING

196

1 that the blocking set contains only pairs of
2 account groupings with substantial agreement
3 on name. In this way, only such pairs, i.e.,
4 those with substantial agreement on name, are
5 even considered for potential linkage."
6　　　Q. Okay. That's step four, blocking.
7 Is there anywhere in steps five through nine
8 where name is given greater weight in
9 calculating match probabilities?
10　　　A. I believe -- I believe there is.
11 And, again, you know, this step four is not a
12 one in ten thing. This, by definition, the
13 goal of this singular step is to limit the
14 linkage to those which have names, so I think
15 this is --
16　　　Q. Which have names that are similar --
17　　　A. Thank you.
18　　　Q. -- or the same?
19　　　A. I misspoke. Thank you. Names that
20 are similar or the same. I agree.
21　　　Q. Okay.
22　　　A. I believe there's also relevance,
23 obviously, with every subsequent step which
24 relies on blocking, but I'll also note that

CURRAN COURT REPORTING

197

1 the step five calculates gamma values between
2 zero -- zero and five.
3    Q.  What's the gamma value for name?
4    A.  It looks like thresholds.  Where,
5 for example, if the nome ratio, which is his
6 fuzzy matching ratio is, for example, between
7 70, 80, it gives it a value of one.  If it's
8 100, it gives it a value of five.
9    Q.  Okay.
10    A.  In terms of subsequent steps, I'm
11 trying to -- so I guess I'd say that every
12 subsequent step is utilizing information in
13 the output of the blocking step, so to the
14 extent it's implicit in the blocking step,
15 it's going to be the same issue throughout.
16    Q.  Are you familiar with any blocking
17 methodology, would you say, that would be more
18 appropriate than using the same or similar
19 name that would give, in your opinion, more
20 valid results?
21    A.  Again --
22    MR. RONA:  Objection.
23    A.  -- I haven't determined what the
24 right or wrong blocking approaches are.  Well,

CURRAN COURT REPORTING

198

1 that's not entirely true.  I disagree with the
2 blocking approaches taken.  I have not been
3 asked, nor have I attempted to determine how
4 blocking should have been done or even if
5 doing this approach all together that includes
6 blocking is the best and most reliable
7 approach.
8    Q.  You have no opinion on that?
9    A.  That's correct.  I have not been
10 asked to do an affirmative model in this case.
11 Simply review the reliability of Dr. Freer's
12 model, which I do not find reliable.
13    Q.  So --
14    THE WITNESS:  And, I
15 apologize, my mouth is starting to
16 get dry.  Just give me even five
17 minutes to catch my breath.
18    MR. RONA:  We've been going
19 for over an hour.
20    MR. LYNE:  Sure.  Five
21 minutes?
22    (Recess was taken)
23    Q.  Sir, is it your understanding that
24 if accounts are not joined in the blocking

CURRAN COURT REPORTING

199

1 step, that those accounts can never be joined
2 in later steps?
3    A.  No.  It's not my understanding.
4    Q.  So what is your understanding on
5 that?
6    A.  So as part of that step, that's
7 where they create the pairwise functions, and
8 they only do that if the name, based on his
9 definition, is substantially -- in substantial
10 agreement or don't substantially disagree,
11 however you phrase it.  They have -- accounts
12 have the ability to come back together as part
13 of the chaining or clustering that happens
14 down the line.
15    Q.  Transitive closure?
16    A.  Whatever terminology you want.  I
17 think he describes the step as clustering, if
18 we can pull out his exhibit.  I think it's
19 called a dynamic clustering, but things do
20 come back together as part of that process,
21 which is where you lead to some of those
22 issues, quite frankly, with transitive closing
23 where you have chaining, where A may be
24 similar to B and B is similar to C and C is

CURRAN COURT REPORTING

200

1 similar to D, but you look at the outer edges,
2 and A and D have nothing in common, so there's
3 a potential for bringing things together.
4 There is also potential for that creating --
5 it does create additional error.
6    Q.  So let's take it in little steps.
7 So regardless of the similarity of name, later
8 steps can bring pairwise combinations that
9 were not joined in the blocking phase together
10 in the later phases, in the dynamic clustering
11 phase; correct?
12    MR. RONA:  Objection.
13    A.  There is still an element of name
14 that is considered as part of that process,
15 right, 'cause it looks at -- for every two
16 pairwise matches made through the blocking, it
17 goes to compare those -- the comparison
18 factors across each of those to other pairwise
19 matches and bring them together.  So there's
20 very much an element in similarity and
21 comparison of name that goes on in that, and
22 you can see that in some of the examples we
23 looked at before with the Carreiro example
24 where there's a similarity in name across

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

201

1  certain two pairs within there, but in the
2  aggregate, when you compare the beginning --
3  I'll call it the beginning of the chain to the
4  end of chain, however you want to order it,
5  there's substantial disagreement.
6      Q.  So have you -- strike that.
7      You're describing a chaining issue
8  that A and D may be radically different, but B
9  and C join them together in the dynamic
10  clustering process?
11      A.  That is one issue that we saw, and I
12  believe that's due to the chaining, yes.
13      Q.  All right.  And isn't
14  overaggregation and underaggregation -- you're
15  calling it a byproduct of the dynamic
16  clustering process, the chaining problem?
17      A.  I don't think that's the only source
18  of under- and overaggregation.  That is a
19  potential source of under- and
20  overaggregation.
21      Q.  Have you seen any published studies
22  that suggest, in your mind, that an
23  appropriate clustering process, dynamic or
24  otherwise, should result in zero

CURRAN COURT REPORTING

202

1  overaggregation or underaggregation?
2      MR. RONA:  Objection.
3      A.  Can you ask that question again?
4      Q.  Sure.  Are you aware of any studies
5  -- published studies or research papers that
6  suggest, in your mind, that a properly
7  designed aggregation methodology should result
8  in zero overaggregation and zero
9  underaggregation?
10      MR. RONA:  Objection.
11      A.  I didn't endeavor to answer that
12  question through looking at academic studies.
13      Q.  Well, in the studies you do cite in
14  your materials considered paragraph -- excuse
15  me -- Exhibit 8, you cite nine other -- "Other
16  Materials," some of which appear to be
17  published studies.  Do you see those?
18      A.  I do.  Those are studies that I
19  believe were cited by either Dr. Freer or, I
20  think, more likely in this case, Mr. Martin.
21      Q.  Okay.
22      A.  With the exception of the Peter
23  Christen book.  That was simply cited by
24  Dr. Freer.

CURRAN COURT REPORTING

203

1      Q.  Okay.  In any of these studies which
2  you considered, including the Christen
3  studies, do any of those studies, including
4  the Christen book or otherwise, suggest in
5  your mind that an over -- excuse me -- that a
6  properly designed aggregation methodology
7  should inevitably result in zero
8  overaggregation and zero underaggregation
9  errors?
10      MR. RONA:  Objection.
11      A.  I'm not aware that it addressed that
12  question either way in terms of what a
13  perfectly designed study should or should not
14  conclude.
15      Q.  Let's not limit it to a perfectly
16  designed study.  I'm saying an acceptable
17  aggregation methodology.
18      A.  I think what's acceptable --
19      MR. RONA:  Objection.
20      A.  -- is a fact-specific determination,
21  case-specific determination.
22      Q.  Well, in all of your review of
23  either Christen's book or any of the other
24  materials you cite in Exhibit 8, do any of

CURRAN COURT REPORTING

204

1  those materials state, in your mind, that an
2  acceptable aggregation methodology should
3  inevitably result in zero aggregation --
4  overaggregation errors and zero
5  underaggregation errors?
6      MR. RONA:  Objection.
7      A.  I don't think it says it one way or
8  another.  My recollection of things that were
9  said in those kinds of text or studies was
10  that's important to consider context in which
11  the analysis and methodology is being
12  performed, and that certain areas, such as
13  healthcare or litigation may have different
14  tolerances and different acceptances for false
15  positives and false negatives, and that should
16  be something that is considered when
17  performing an analysis.
18      Q.  Well, that consideration is done
19  after the analysis is complete and the output
20  is done; correct?
21      A.  No.
22      MR. RONA:  Objection.
23      A.  Not necessarily.
24      Q.  Well, do you have any support in any

CURRAN COURT REPORTING

---

**205**

1  materials which you have ever reviewed in the

2  field of data science that stand, in your

3  mind, for the proposition that an acceptable

4  data aggregation methodology must inevitably

5  result in zero errors in either

6  overaggregation or underaggregation?

7      MR. RONA:  Objection.

8      A.  I don't know that I've seen that

9  statement written in that way in any academic

10  studies.

11      Q.  Do any of those academic studies

12  talk about the tension between overaggregation

13  and underaggregation?

14      A.  I believe some of the studies

15  described what could cause over- and

16  underaggregation.

17      Q.  Well, what causes overaggregation

18  and underaggregation are by the joining rules;

19  right?  If they're liberal, you overaggregate.

20  If they're overly strict, you underaggregate?

21  That's a general principle; right?

22      MR. RONA:  Objection.

23      A.  I think it would depend on the data

24  and what you'd -- what your purpose is and

CURRAN COURT REPORTING

---

**206**

1  what your methodology is.

2      Q.  The purpose of data aggregation is

3  to aggregate data.  I mean, that's what --

4  regardless of, you know, end use, the

5  methodology is intended to create data

6  clusters out of a large dataset.  That's what

7  data aggregation does; right?

8      MR. RONA:  Objection.

9      A.  It depends.  It doesn't need to be

10  what data aggregation does.

11      MR. LYNE:  Okay.  All right.

12  I'm good.

13      THE WITNESS:  Thank you.

14      (Whereupon, the deposition concluded

15  at 3:06 p.m.)

16

17

18

19

20

21

22

23

24

CURRAN COURT REPORTING

---

**207**

1  COMMONWEALTH OF MASSACHUSETTS
   MIDDLESEX, SS.

2

3      I, Jacqueline Curran, Registered
   Merit Reporter and Notary Public in and for

4  the Commonwealth of Massachusetts, do hereby
   certify that pursuant to appropriate notice of

5  taking deposition, there came before me the
   following-named person, to wit: JOSHUA W.

6  DENNIS, who was by me duly sworn; that he was
   thereupon examined upon his oath and his

7  examination reduced to writing by me; and that
   the deposition is a true record of the

8  testimony given by the witness.

9      I further certify that I am not a
   relative or employee or counsel or attorney

10  for any of the parties, or a relative or
   employee of such counsel or attorney, nor am I

11  financially or otherwise interested in the
   outcome of the action.

12

13      IN WITNESS WHEREOF, I have hereunto set
   my hand and seal this 10th day of May, 2023.

14

15

16

17  My Commission Expires
   August 18, 2028

18                    *Jacqueline M. Curran*

19                    Notary Public

20

21  The foregoing certification of this transcript
   does not apply to any reproduction of the same

22  in any respect unless under the direct control
   and/or direction of the certifying reporter.

23

24

CURRAN COURT REPORTING

---

**208**

1  Excerpt from Rule 30(e):
   Submission to Witness: Changes; Signing.

2

3      When the testimony is fully
   transcribed, the deposition shall be submitted

4  to the witness for examination and shall be
   read to or by him/her, unless such examination

5  and reading are waived by the witness and by
   the parties.  Any changes in form or substance

6  which the witness desires to make shall be
   entered upon the deposition by the officer

7  with a statement of the reasons given by the
   witness for making them.

8

9      ********************************

10

11      I, JOSHUA W. DENNIS, have examined the
   above transcript of my testimony and it is

12  true and correct to the best of my knowledge,
   information and belief.  Any corrections are

13  noted on the attached errata sheet.

14

15      Signed under the pains and penalties of
   perjury this      day of,         2023.

16

17

18

19      _____
        Deponent's Signature

20

21

22

23

24

CURRAN COURT REPORTING

**Deposition of Joshua W. Dennis**
**May 9, 2023**

209

ERRATA SHEET

1

2

NAME:_____   DATE:_____

3

CASE NAME:_____

4

DATE OF DEPOSITION:_____

5

6

PAGE   LINE            CORRECTION

7

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

1

# #

**#134293** [1] - 2:7

# $

**$189,701** [1] - 183:24
**$580,000** [2] - 191:5
**$800,000** [1] - 146:23

# '

**'19** [2] - 107:22, 109:8
**'20** [2] - 107:22, 109:8
**'22** [1] - 14:23

# 0

**0.980** [2] - 162:1, 162:16
**0.988** [2] - 162:2, 162:17
**0.996** [2] - 162:1, 162:16
**003** [1] - 81:17
**02109** [2] - 3:7, 3:15
**02180** [1] - 2:22

# 1

**1** [6] - 1:1, 1:1, 1:2, 4:9, 5:1, 8:2
**1,566,383** [1] - 144:14
**1.2** [1] - 191:7
**1.5** [3] - 137:1, 138:7, 138:8
**10** [2] - 4:21, 178:18
**100** [1] - 197:8
**105** [1] - 81:22
**10992563** [1] - 180:6
**10:00** [1] - 2:13
**10th** [1] - 207:13
**11** [15] - 1:2, 1:4, 4:22, 43:22, 44:2, 47:13, 47:14, 48:3, 49:9, 49:24, 68:18, 68:20, 69:5, 189:18, 189:21
**118449** [1] - 189:24
**11849449** [1] - 190:8
**119427** [4] - 175:17, 175:20, 176:11, 176:16
**12650741** [1] - 180:5
**12:30** [2] - 131:15, 131:22
**13** [5] - 4:21, 178:14, 178:16, 178:19, 178:21
**131** [1] - 4:18
**132** [1] - 4:19

**132785** [3] - 94:21, 95:14, 158:22
**14-40987-EDK** [1] - 1:5
**14-40988-EDK** [1] - 1:5
**14-40989-EDK** [1] - 1:6
**140** [1] - 176:17
**141** [1] - 86:8
**148** [2] - 195:14, 195:16
**15** [5] - 4:12, 38:17, 43:17, 136:24, 154:22
**156** [2] - 188:8, 189:7
**158** [1] - 4:20
**159** [4] - 180:3, 182:21, 182:22, 187:8
**16** [4] - 4:20, 88:3, 88:4, 158:16
**16-4006** [2] - 1:7, 3:11
**16-4007** [2] - 1:8, 3:12
**17** [5] - 43:16, 68:17, 68:20, 69:5, 154:22
**17,000** [1] - 154:21
**17-plus** [1] - 144:13
**178** [1] - 4:21
**18** [1] - 207:17
**189** [1] - 4:22
**1:26** [1] - 131:23

# 2

**2** [10] - 4:10, 4:19, 5:3, 14:15, 15:21, 32:19, 81:24, 82:1, 132:5, 150:5
**20** [4] - 38:18, 76:2, 123:5, 145:5
**2018** [2] - 107:21, 109:8
**2020** [5] - 9:6, 9:11, 9:19, 12:17, 12:20
**2022** [4] - 10:15, 14:1, 14:2, 14:20
**2023** [5] - 2:13, 14:21, 14:22, 207:13, 208:15
**2028** [1] - 207:17
**209** [1] - 1:1
**21** [1] - 2:22
**279-8400** [1] - 2:23
**28** [3] - 2:11, 3:6, 3:14

# 3

**3** [13] - 4:12, 15:6, 15:10, 15:14, 15:17,

**20**:1, 20:3, 20:4, 20:21, 94:19, 157:22, 157:23, 157:24
**30** [1] - 7:4
**30(e** [1] - 208:1
**300** [1] - 82:3
**31** [1] - 81:20
**3101** [1] - 3:6
**31st** [1] - 2:12
**33** [1] - 4:13
**34** [1] - 81:23
**37** [1] - 83:20
**395-9570** [1] - 3:15
**3:06** [1] - 206:15

# 4

**4** [3] - 4:13, 33:1, 33:5
**41** [2] - 175:16, 175:19
**423-0400** [1] - 3:7
**43** [4] - 4:14, 67:14, 67:20, 179:11
**430-ish** [1] - 87:9
**430-line** [1] - 18:4
**45-minute** [1] - 131:16
**466** [2] - 87:12, 87:13
**47** [2] - 85:16, 85:18
**471** [3] - 95:13, 158:21, 159:18

# 5

**5** [8] - 4:6, 4:9, 4:10, 4:14, 67:14, 67:19, 154:9, 156:2
**50** [2] - 147:5, 189:5
**500** [1] - 56:2
**51** [4] - 175:13, 180:3, 195:14, 195:16
**53** [1] - 178:1
**55** [4] - 110:10, 110:19, 110:21, 110:22

# 6

**6** [6] - 4:16, 94:10, 94:14, 158:2, 158:3, 189:8
**617** [2] - 3:7, 3:15
**622,000** [1] - 191:8
**67** [1] - 4:14

# 7

**7** [3] - 4:18, 131:24, 144:11
**70** [1] - 197:7
**70775** [1] - 190:8

**707775** [1] - 190:1
**781** [1] - 2:23

# 8

**8** [8] - 4:19, 132:4, 149:21, 149:22, 149:23, 202:15, 203:24
**80** [2] - 171:20, 197:7
**802** [1] - 3:14

# 9

**9** [4] - 2:13, 4:20, 158:15, 159:11
**9.1** [1] - 189:8
**9.5** [7] - 4:22, 188:24, 189:8, 189:15, 189:19, 189:22, 190:6
**928** [1] - 190:14
**94** [1] - 4:16
**98** [1] - 103:19
**99** [1] - 168:11

# A

**A-R-G-U-E-T-A** [1] - 109:22
**a.m** [1] - 2:13
**ability** [1] - 199:12
**able** [2] - 137:22, 163:6
**absence** [1] - 104:7
**absent** [2] - 14:20, 101:21
**absolutely** [3] - 122:9, 125:15, 140:1
**abstract** [2] - 27:10, 55:18, 89:20
**academic** [2] - 202:12, 205:9, 205:11
**accept** [1] - 175:3
**acceptable** [13] - 100:8, 103:10, 103:24, 125:21, 160:1, 160:5, 160:6, 160:23, 168:18, 203:16, 203:18, 204:2, 205:3
**acceptances** [1] - 204:14
**accepted** [2] - 103:11, 108:15
**access** [1] - 185:8
**Access** [1] - 35:13
**accomplish** [1] - 195:24
**according** [2] -

177:20, 183:24
**account** [27] - 29:6, 31:6, 31:7, 50:3, 93:3, 104:10, 108:14, 113:3, 119:23, 120:13, 121:21, 124:21, 143:18, 152:14, 153:3, 153:5, 159:1, 159:19, 176:22, 177:6, 177:7, 184:14, 187:1, 187:11, 187:12, 195:21, 196:2
**accounted** [1] - 31:8
**accounting** [1] - 34:1
**accounts** [111] - 18:8, 19:20, 26:21, 43:13, 43:20, 43:21, 43:22, 44:2, 47:8, 47:14, 47:17, 48:4, 48:7, 48:18, 48:19, 49:9, 49:10, 49:11, 49:13, 49:24, 50:1, 50:2, 68:23, 69:5, 69:6, 72:10, 81:6, 81:10, 87:5, 87:9, 87:12, 87:13, 91:13, 92:23, 93:3, 95:3, 95:7, 95:13, 95:20, 95:21, 95:22, 95:24, 96:3, 96:13, 96:16, 96:19, 99:10, 100:16, 104:18, 110:8, 110:15, 110:19, 110:21, 110:22, 111:13, 112:1, 112:6, 112:14, 118:13, 121:10, 121:16, 128:24, 129:12, 129:13, 136:24, 141:14, 142:6, 142:12, 142:17, 144:3, 144:7, 144:9, 144:13, 148:9, 152:1, 152:3, 152:11, 153:11, 153:15, 154:20, 154:22, 157:15, 157:16, 158:24, 159:7, 160:11, 170:10, 170:19, 172:7, 172:11, 176:7, 176:17, 177:19, 177:21, 178:2, 183:22, 184:12, 184:14, 184:15, 184:22, 185:14, 187:6, 190:14, 191:8, 191:10, 191:18,

Case 16-04006   Doc 459-12   Filed 09/11/23   Entered 09/11/23 16:26:40   Desc
Exhibit 12   Page 56 of 76
Deposition of Joshua W. Dennis
May 9, 2023

2

193:20, 195:20, 198:24, 199:1, 199:11
**accuracy** [20] - 101:19, 103:19, 104:11, 126:10, 126:11, 126:13, 134:13, 134:23, 136:5, 145:15, 145:24, 147:9, 147:13, 148:21, 151:18, 168:12, 169:2, 170:2, 174:8, 193:7
**accurate** [22] - 25:21, 50:12, 105:20, 128:14, 132:12, 134:9, 134:21, 134:22, 136:6, 137:3, 139:19, 144:23, 152:17, 153:15, 157:14, 162:21, 162:23, 166:9, 174:6, 174:8, 175:3, 179:1
**accurately** [1] - 194:11
**acknowledged** [3] - 130:3, 130:9, 131:1
**action** [4] - 3:11, 3:12, 42:9, 207:11
**actor** [10] - 99:12, 104:17, 121:18, 182:13, 183:20, 185:24, 186:2, 186:11, 186:13, 192:16
**actors** [1] - 186:6
**actual** [7] - 25:4, 97:8, 99:14, 141:16, 141:19, 176:22, 186:11
**ad** [4] - 75:8, 75:10, 100:4, 100:5
**add** [3] - 19:7, 44:23, 171:11
**added** [1] - 17:5
**addition** [1] - 5:24
**additional** [2] - 17:4, 200:5
**address** [10] - 30:4, 87:5, 153:4, 153:5, 154:8, 176:8, 177:11, 177:12, 178:3, 178:4
**addressed** [2] - 132:17, 203:11
**addressee** [1] - 178:5
**addresses** [5] - 51:4, 51:8, 52:9, 95:8,

152:12
**adequacy** [1] - 83:22
**adequate** [2] - 82:6, 82:13
**Administered** [1] - 1:7
**Adversary** [2] - 1:7, 1:8
**Affidavit** [1] - 151:3
**affidavit** [3] - 106:17, 152:10, 152:11
**affidavits** [3] - 106:9, 151:1, 151:20
**affirmatively** [4] - 97:13, 105:16, 184:21, 185:15
**aggregate** [19] - 38:3, 47:8, 54:17, 55:9, 66:5, 79:15, 80:23, 81:3, 120:12, 123:14, 133:24, 137:18, 179:6, 187:5, 187:11, 191:6, 191:17, 201:2, 206:3
**aggregated** [15] - 18:9, 49:14, 49:19, 52:11, 151:23, 151:24, 152:14, 152:21, 152:22, 180:9, 180:12, 185:15, 188:2, 191:10, 193:21
**aggregates** [1] - 113:22
**aggregating** [4] - 35:5, 176:3, 192:15, 192:24
**Aggregation** [5] - 4:12, 4:15, 15:7, 20:10, 67:16
**aggregation** [61] - 35:1, 41:3, 46:24, 47:2, 53:23, 54:2, 54:6, 59:7, 63:2, 84:4, 84:8, 87:18, 87:19, 96:22, 97:5, 99:24, 100:21, 101:1, 107:17, 108:4, 108:7, 109:10, 109:14, 113:3, 113:4, 113:6, 113:15, 114:8, 115:10, 116:3, 119:4, 119:14, 130:4, 131:2, 131:8, 142:10, 161:14, 161:24, 162:14, 164:3, 165:6, 165:10, 167:8, 168:19, 181:21,

184:9, 187:4, 187:5, 187:10, 191:13, 191:16, 192:19, 202:7, 203:6, 203:17, 204:2, 204:3, 205:4, 206:2, 206:7, 206:10
**aggregations** [5] - 84:18, 84:22, 108:24, 141:17, 175:10
**ago** [4] - 9:1, 35:17, 37:6, 52:16
**agree** [20] - 49:6, 50:6, 51:20, 62:24, 68:4, 116:1, 116:5, 116:9, 117:17, 119:5, 120:2, 120:22, 125:15, 129:18, 144:23, 170:10, 170:12, 172:7, 173:22, 196:20
**agreed** [4] - 6:10, 6:11, 89:10, 108:15
**agreement** [6] - 65:2, 191:3, 193:23, 196:2, 196:4, 199:10
**ahead** [1] - 144:21
**akin** [3] - 42:24, 44:15, 53:20
**Alex** [1] - 177:6
**Alexandra** [1] - 3:6
**algorithm** [3] - 73:18, 73:20, 73:23
**allow** [1] - 6:16
**alternative** [5] - 80:5, 92:13, 117:5, 118:24, 119:9
**alternatives** [3] - 116:19, 116:20, 117:22
**ambiguity** [1] - 72:2
**amount** [4] - 30:11, 30:12, 76:9, 183:24
**amounts** [1] - 80:2
**analyses** [1] - 45:9
**analysis** [68] - 13:12, 31:11, 38:19, 38:20, 40:16, 41:8, 42:21, 45:22, 47:3, 47:6, 48:14, 48:16, 50:17, 56:13, 59:7, 74:3, 75:13, 82:17, 88:10, 98:4, 98:13, 100:6, 114:2, 114:15, 114:17, 115:13, 117:17, 117:19, 117:23, 118:1, 118:4, 118:6, 120:6, 120:8, 121:3,

125:16, 128:13, 128:14, 130:23, 135:6, 135:18, 135:24, 136:16, 137:5, 137:7, 138:9, 143:14, 146:13, 149:13, 149:18, 155:6, 155:7, 157:5, 157:12, 157:13, 161:19, 167:23, 168:7, 171:17, 172:24, 174:1, 174:3, 174:7, 175:9, 192:20, 204:11, 204:17, 204:19
**analytical** [13] - 8:8, 12:16, 18:24, 22:1, 32:9, 50:19, 51:22, 84:10, 86:9, 96:7, 108:20, 120:11, 122:17
**analytics** [2] - 38:24, 39:23
**analyze** [2] - 169:2, 174:15
**analyzed** [9] - 41:20, 43:3, 44:22, 52:4, 107:24, 112:16, 112:20, 116:18, 173:20
**AND** [1] - 1:22
**answer** [23] - 6:7, 6:13, 6:17, 6:19, 11:2, 20:5, 35:7, 80:5, 81:16, 97:14, 98:12, 100:12, 127:21, 132:10, 134:7, 136:17, 139:19, 139:20, 150:17, 162:20, 163:19, 202:11
**answered** [2] - 6:9, 120:17, 161:21
**answering** [2] - 49:4, 59:18
**answers** [2] - 132:9, 163:2
**anti** [4] - 50:24, 51:24, 53:18, 56:9
**anti-price** [4] - 50:24, 51:24, 53:18, 56:9
**antitrust** [1] - 56:10
**anyway** [1] - 161:23
**apapas @
murphyking.com** [1] - 3:8
**apologies** [1] - 14:23
**apologize** [6] - 25:8, 76:23, 156:9, 165:8, 190:2, 198:15

**apostrophe** [1] - 80:10
**apparent** [6] - 135:2, 135:19, 136:9, 136:10, 136:14, 160:18
**appear** [11] - 25:19, 27:16, 29:8, 41:24, 87:6, 95:20, 98:22, 137:16, 144:17, 159:8, 202:16
**appeared** [9] - 29:15, 96:13, 110:5, 110:13, 136:19, 137:9, 137:15, 155:13, 183:21
**appearing** [3] - 8:2, 29:9, 93:3
**applicability** [1] - 130:8
**application** [1] - 130:6
**applied** [7] - 62:20, 65:19, 92:20, 92:22, 130:1, 166:7, 174:4
**applies** [1] - 91:17
**apply** [4] - 102:20, 124:11, 124:17, 207:21
**applying** [1] - 124:20
**appreciate** [1] - 168:23
**approach** [17] - 39:15, 57:15, 59:14, 59:16, 66:8, 74:16, 92:6, 100:2, 102:12, 104:8, 119:6, 119:11, 120:23, 147:4, 192:17, 198:5, 198:7
**approaches** [11] - 38:23, 53:6, 53:7, 53:9, 53:10, 92:8, 116:23, 118:16, 120:20, 197:24, 198:2
**appropriate** [17] - 66:3, 67:2, 72:24, 79:11, 79:17, 89:22, 90:2, 90:6, 124:11, 132:21, 136:1, 147:18, 149:17, 181:21, 197:18, 201:23, 207:4
**appropriately** [3] - 65:20, 77:24, 78:5
**area** [10] - 10:2, 12:6, 34:23, 38:20, 39:10, 39:17, 39:18, 40:18, 85:19, 188:10
**areas** [3] - 11:23,

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

3

33:24, 204:12
**argue** [2] - 60:17, 121:1
**Argueta** [9] - 109:22, 109:23, 110:1, 110:4, 111:8, 112:15, 114:10, 114:24, 115:21
**articles** [2] - 131:6, 131:7
**ascribed** [1] - 66:1
**aside** [4] - 38:8, 69:2, 73:13, 73:17
**aspect** [6] - 40:7, 41:5, 51:6, 60:6, 61:1, 61:6
**aspects** [3] - 21:9, 61:23
**assess** [2] - 8:16, 39:11
**assessing** [1] - 38:19
**assessment** [1] - 129:20
**assign** [2] - 50:1, 124:21
**assigned** [4] - 47:9, 47:18, 48:7, 50:3
**assigning** [2] - 118:13, 119:23
**assignment** [1] - 73:4
**assisted** [2] - 8:21, 11:15
**assisting** [1] - 9:21
**associated** [7] - 18:20, 22:24, 44:11, 176:18, 177:7, 177:16, 177:20
**assume** [7] - 5:17, 6:8, 136:5, 165:13, 166:22, 169:19, 181:7
**assuming** [3] - 134:20, 137:3, 150:18
**assumption** [8] - 71:2, 71:5, 71:6, 108:5, 187:16, 193:6, 193:10, 194:9
**assumptions** [6] - 21:19, 66:8, 69:18, 69:23, 70:1, 116:24
**attach** [1] - 18:13
**attached** [7] - 16:1, 17:24, 123:17, 123:18, 157:3, 157:21, 208:12
**attaching** [1] - 18:3
**attempt** [22] - 22:22, 23:3, 71:10, 90:5, 95:2, 95:12, 96:24,

103:17, 104:5, 111:11, 114:13, 115:3, 127:24, 133:23, 134:12, 134:13, 135:1, 135:15, 136:7, 158:22, 161:6, 184:11
**attempted** [13] - 16:8, 97:4, 105:2, 120:21, 122:4, 122:12, 128:21, 129:4, 129:10, 129:17, 161:1, 198:3
**attempting** [1] - 47:8
**attention** [7] - 8:1, 14:14, 20:3, 33:4, 67:18, 94:14, 169:13
**attorney** [2] - 207:9, 207:10
**Attorney** [6] - 4:24, 14:16, 15:3, 67:11, 88:5, 189:16
**attributed** [1] - 152:3
**August** [1] - 207:17
**auto** [1] - 54:23
**available** [13] - 16:18, 107:5, 112:2, 112:6, 148:22, 151:13, 158:10, 171:4, 172:18, 173:2, 173:3, 173:7, 173:11
**Ave** [1] - 178:4
**avoid** [1] - 31:11
**aware** [5] - 105:3, 105:5, 202:4, 203:11

**B**

**background** [3] - 10:9, 11:1, 12:11
**bad** [1] - 190:5
**baked** [2] - 193:17, 193:18
**BALAN** [1] - 1:16
**Balan** [8] - 3:11, 106:16, 106:19, 107:1, 107:4, 151:4
**Balan's** [1] - 152:10
**balance** [1] - 103:8
**Balans** [1] - 151:22
**ballpark** [1] - 138:17
**bank** [12] - 51:1, 56:2, 105:12, 111:21, 111:22, 112:1, 112:4, 126:14, 129:11, 129:12, 129:13, 145:17
**bankruptcy** [1] - 5:15
**BANKRUPTCY** [1] -

1:3
**Bankruptcy** [1] - 2:5
**base** [3] - 45:14, 45:15, 63:19
**based** [25] - 13:12, 16:17, 31:2, 53:7, 72:4, 73:12, 73:14, 76:5, 134:6, 143:14, 147:1, 147:3, 153:11, 153:12, 153:13, 162:24, 166:8, 174:4, 176:11, 182:14, 191:24, 192:24, 193:5, 193:15, 199:8
**basic** [2] - 45:22, 147:19
**basis** [8] - 39:1, 50:9, 71:6, 132:22, 168:6, 178:13, 188:1, 192:15
**becoming** [1] - 38:17
**begin** [1] - 140:19
**beginning** [2] - 201:2, 201:3
**behalf** [2] - 2:3, 8:18
**behind** [1] - 83:14
**belief** [1] - 208:12
**belong** [2] - 48:19, 96:4
**below** [2] - 143:15, 159:13
**Ben** [2] - 110:18, 110:24
**beneficiary** [2] - 182:13, 192:16
**benefit** [2] - 181:18, 187:19
**benefits** [1] - 182:16
**benefitted** [1] - 104:17
**Benjamin** [2] - 109:21, 110:16
**best** [6] - 16:11, 36:20, 131:21, 163:12, 198:6, 208:11
**better** [2] - 119:10, 139:20
**between** [21] - 24:6, 28:20, 34:13, 49:1, 64:15, 80:13, 102:15, 103:8, 114:16, 118:5, 144:16, 166:17, 180:15, 184:15, 185:14, 186:21, 190:22, 191:6, 197:1, 197:6, 205:12
**beyond** [9] - 44:19, 60:15, 65:17, 90:13, 92:8, 114:18,

114:22, 115:7, 174:16
**big** [5] - 39:9, 39:18, 40:12, 40:18, 58:11
**biggest** [1] - 100:13
**bit** [7] - 11:19, 46:15, 102:3, 148:20, 158:13, 183:5
**bits** [1] - 77:7
**blank** [3] - 25:12, 29:18, 70:19
**blocking** [39] - 21:9, 22:5, 23:8, 23:18, 23:19, 24:10, 24:13, 25:24, 26:4, 26:12, 31:21, 68:10, 74:9, 74:13, 74:14, 74:17, 74:18, 74:20, 75:7, 75:11, 75:20, 76:4, 195:2, 195:9, 195:23, 196:1, 196:6, 196:24, 197:13, 197:14, 197:16, 197:24, 198:2, 198:4, 198:6, 198:24, 200:9, 200:16
**blocks** [1] - 22:23
**blue** [1] - 33:15
**board** [1] - 161:2
**body** [3] - 81:18, 81:19, 158:14
**bonus** [2] - 143:24, 144:1
**book** [3] - 202:23, 203:4, 203:23
**Borelian** [3] - 4:12, 15:6, 20:10
**Boston** [3] - 2:12, 3:7, 3:15
**Brazilian** [1] - 43:20
**breadth** [1] - 144:6
**break** [4] - 76:16, 131:17, 132:8, 148:19
**breath** [1] - 198:17
**bring** [7] - 54:18, 92:23, 92:24, 169:13, 187:3, 200:8, 200:19
**bringing** [3] - 118:17, 134:6, 200:3
**broader** [2] - 34:23, 140:8
**broadly** [1] - 77:15
**broken** [1] - 144:16
**brought** [3] - 52:10, 146:4, 157:3
**BS** [1] - 33:17
**bucket** [4] - 77:3,

77:5, 91:11, 91:12
**bucketed** [1] - 77:2
**bucketizing** [1] - 77:7
**bullet** [4] - 56:8, 56:12, 143:7, 143:16
**business** [8] - 12:4, 33:18, 33:20, 33:24, 36:5, 36:8, 38:16, 56:17
**Business** [1] - 57:3
**business's** [1] - 40:3
**businesses** [1] - 51:4
**byproduct** [1] - 201:15

**C**

**calculate** [13] - 86:21, 89:15, 89:21, 90:5, 96:24, 97:8, 115:4, 129:4, 147:22, 148:4, 148:7, 162:24, 163:4
**calculated** [5] - 30:15, 80:3, 163:17, 163:22, 179:5
**calculates** [1] - 197:1
**calculating** [5] - 79:23, 88:18, 89:4, 90:24, 196:9
**calculation** [10] - 30:10, 98:7, 98:17, 99:2, 103:19, 154:14, 156:23, 157:3, 179:6, 179:13
**calculations** [3] - 8:17, 99:14, 145:1
**Cameron** [4] - 4:16, 94:11, 94:17, 139:5
**carefully** [2] - 109:7, 115:19
**Carreiro** [2] - 177:24, 200:23
**CARREIRO** [1] - 178:1
**CASE** [1] - 209:3
**case** [58] - 8:9, 8:13, 25:10, 41:2, 41:6, 41:14, 42:15, 42:16, 45:10, 47:5, 47:15, 48:21, 49:7, 49:24, 51:16, 52:6, 53:19, 54:24, 62:19, 62:23, 66:12, 89:18, 89:20, 90:2, 100:13, 101:4, 101:8, 101:11, 103:15, 104:2, 104:3, 104:22, 107:19, 110:13, 115:7, 124:6, 129:24, 130:7, 130:8, 149:2,

161:19, 164:13,
164:21, 166:8,
167:14, 167:15,
169:7, 169:14,
170:11, 171:2,
174:5, 176:8,
183:19, 183:21,
187:20, 198:10,
202:20, 203:21
**case-specific** [3] -
66:12, 164:13,
203:21
**cases** [3] - 44:21,
53:19, 76:1
**Cases** [1] - 1:4
**cat** [1] - 92:2
**catch** [1] - 198:17
**categorical** [1] - 117:2
**categorically** [1] -
116:24
**caused** [3] - 16:21,
16:22, 109:6
**causes** [1] - 205:17
**causing** [2] - 29:20,
30:2
**caveat** [1] - 50:8
**centers** [1] - 56:21
**certain** [35] - 14:3,
14:5, 21:8, 23:16,
24:15, 25:2, 25:14,
29:19, 29:20, 45:9,
51:2, 72:15, 79:14,
80:1, 84:1, 93:5,
93:9, 93:11, 95:6,
95:19, 95:22, 96:12,
102:21, 105:16,
108:11, 108:23,
109:7, 111:10,
126:16, 152:11,
152:12, 153:10,
176:3, 201:1, 204:12
**certainly** [90] - 16:8,
18:7, 19:2, 20:5,
20:13, 22:7, 22:9,
31:5, 33:16, 35:11,
36:6, 36:23, 40:17,
40:24, 41:5, 42:7,
42:8, 45:8, 45:17,
50:10, 55:13, 56:11,
60:1, 63:22, 64:18,
68:9, 69:17, 71:23,
72:5, 72:13, 72:14,
75:3, 76:24, 77:20,
79:14, 80:1, 81:13,
82:8, 82:15, 85:11,
86:17, 86:18, 87:5,
88:14, 89:10, 93:9,
93:18, 95:6, 98:21,
101:10, 105:2,
108:22, 109:6,

109:12, 109:21,
111:9, 116:22,
117:10, 118:2,
119:5, 119:7,
119:11, 120:20,
120:23, 123:12,
125:15, 126:10,
128:12, 129:23,
130:11, 130:23,
133:14, 137:11,
139:1, 139:23,
146:2, 151:21,
151:22, 152:8,
153:6, 168:7,
170:20, 171:20,
172:17, 173:4,
175:14, 184:11,
188:14, 188:21
**certainty** [1] - 134:9
**certification** [1] -
207:21
**certify** [2] - 207:4,
207:9
**certifying** [1] - 207:22
**chain** [2] - 201:3,
201:4
**chaining** [5] - 199:13,
199:23, 201:7,
201:12, 201:16
**chance** [2] - 75:15,
132:9
**change** [2] - 16:22,
132:11
**Changes** [1] - 208:1
**changes** [2] - 17:6,
208:5
**Chapter** [1] - 1:4
**character** [5] - 25:12,
70:21, 71:7, 72:11,
72:12
**characteristics** [3] -
83:5, 95:23, 141:21
**characterization** [2] -
63:23, 178:24
**characterize** [1] - 71:3
**characters** [11] -
70:24, 71:8, 71:11,
71:12, 72:5, 72:11,
72:15, 72:19, 73:1
**Charles** [3] - 10:18,
11:5, 58:4
**chart** [1] - 67:12
**check** [3] - 147:9,
170:2, 170:14
**checks** [2] - 22:23,
145:16
**choose** [2] - 77:24,
78:6
**chose** [3] - 74:17,
74:18, 104:8

**chosen** [2] - 84:12,
133:7
**Christen** [3] - 202:23,
203:2, 203:4
**Christen's** [1] - 203:23
**circular** [1] - 172:5
**circumstance** [4] -
101:9, 162:18,
165:13, 181:22
**circumstances** [4] -
125:9, 127:14,
164:9, 181:11
**cite** [5] - 131:7,
131:13, 202:13,
202:15, 203:24
**cited** [2] - 202:19,
202:23
**cites** [1] - 131:6
**city** [3] - 176:8,
177:13, 178:3
**Civil** [1] - 2:6
**claim** [3] - 108:16,
169:24, 183:11
**claimed** [8] - 108:13,
109:1, 110:9,
110:19, 110:22,
113:21, 113:23,
186:4
**claims** [9] - 169:16,
170:6, 182:24,
183:10, 183:15,
184:24, 185:7,
185:18, 186:16
**clarification** [1] -
185:4
**clarify** [2] - 106:23,
190:13
**Class** [2] - 3:11, 3:12
**class** [1] - 42:9
**CLASS** [2] - 1:17, 1:23
**clean** [2] - 6:22, 70:13
**cleaned** [1] - 25:4
**cleaning** [12] - 21:10,
24:18, 24:20, 24:23,
26:12, 62:4, 68:3,
68:6, 68:13, 68:15,
70:12, 72:24
**cleansing** [5] - 24:16,
26:3, 31:14, 31:22,
31:23
**clear** [13] - 9:2, 10:24,
21:18, 28:13, 41:15,
78:16, 125:19,
135:8, 146:14,
167:3, 168:7, 175:9,
176:14
**clear's** [1] - 176:15
**clearly** [3] - 27:18,
95:20, 96:1
**client** [1] - 6:24

**close** [5] - 76:14,
138:20, 138:21,
139:7
**closer** [1] - 38:18
**closing** [2] - 102:22,
199:22
**closure** [50] - 76:22,
77:6, 77:10, 91:7,
91:8, 91:9, 91:20,
92:1, 92:17, 102:1,
102:14, 103:2,
103:8, 116:2, 116:6,
116:16, 117:4,
117:6, 117:8,
117:11, 117:14,
117:16, 117:18,
118:11, 119:1,
119:8, 119:12,
119:17, 120:6,
120:15, 120:24,
121:2, 121:6,
121:13, 122:1,
122:10, 122:13,
122:18, 122:23,
123:16, 124:10,
124:20, 124:22,
125:9, 125:11,
129:21, 130:14,
130:19, 130:21,
199:15
**Cluster** [10] - 94:21,
95:14, 158:22,
175:16, 175:20,
176:16, 180:5,
180:6, 190:7, 190:8
**cluster** [71] - 18:1,
18:5, 29:1, 47:3,
47:6, 47:18, 47:23,
47:24, 48:1, 48:16,
49:1, 49:14, 49:22,
50:16, 77:11, 77:12,
84:4, 84:11, 84:24,
85:22, 86:11, 86:18,
87:3, 87:4, 87:9,
89:23, 91:13, 91:14,
91:18, 93:4, 93:7,
94:4, 94:5, 94:20,
94:23, 97:2, 97:10,
97:20, 108:15,
110:2, 110:3, 110:9,
114:17, 119:17,
119:23, 119:24,
121:22, 121:23,
124:21, 124:22,
132:22, 132:24,
133:12, 135:22,
137:15, 139:3,
139:6, 157:21,
160:1, 169:23,
171:8, 175:3,

176:10, 176:12,
181:11, 181:24,
190:3, 190:8, 190:14
**clustering** [29] -
28:23, 68:11, 92:23,
98:19, 99:23, 114:1,
117:19, 118:11,
118:12, 119:1,
119:4, 121:9,
121:20, 134:24,
135:3, 135:7,
135:18, 136:2,
141:11, 141:22,
160:22, 161:14,
199:13, 199:17,
199:19, 200:10,
201:10, 201:16,
201:23
**clusterings** [1] - 98:24
**clusters** [69] - 19:16,
19:19, 28:24, 47:10,
86:19, 93:2, 93:5,
93:8, 93:10, 93:12,
93:19, 97:1, 97:18,
97:19, 99:7, 100:7,
109:17, 112:7,
112:12, 119:18,
119:21, 119:22,
121:9, 133:4, 133:7,
133:15, 133:18,
133:24, 134:5,
134:11, 134:16,
135:2, 135:12,
135:17, 136:8,
137:1, 137:8,
137:11, 137:23,
138:3, 138:8,
138:11, 138:13,
138:22, 139:7,
139:21, 140:3,
140:4, 140:12,
141:19, 141:20,
144:15, 146:18,
171:7, 171:18,
180:4, 180:9,
181:23, 182:16,
183:22, 186:4,
187:7, 189:24,
190:7, 206:6
**COCHRAN** [1] - 80:10
**Cochran's** [1] - 80:9
**code** [56] - 13:5,
13:13, 14:4, 14:6,
14:8, 14:10, 14:12,
15:3, 20:14, 20:20,
21:3, 21:4, 21:7,
21:12, 21:16, 21:20,
22:5, 22:11, 22:20,
22:24, 23:3, 23:9,
23:15, 23:17, 23:19,

24:5, 24:10, 24:12,
24:13, 24:23, 25:19,
25:20, 26:5, 27:7,
31:13, 31:14, 31:20,
32:8, 32:12, 61:15,
65:15, 65:18, 69:16,
69:19, 69:21, 71:10,
72:9, 73:7, 73:16,
73:17, 73:23, 74:10,
74:13, 116:10, 141:1
**Code** [3] - 4:12, 15:7,
20:10
**coding** [2] - 26:2,
193:18
**collapsing** [1] -
192:19
**college** [1] - 35:20
**column** [3] - 71:17,
176:21, 177:3
**columns** [2] - 108:12,
177:16
**combination** [9] -
52:7, 53:1, 61:22,
62:3, 177:11,
177:14, 177:21,
178:8, 178:9
**combinations** [1] -
200:8
**combine** [1] - 123:15
**coming** [2] - 100:11,
132:15
**comma** [1] - 145:10
**commencing** [1] -
2:13
**comment** [3] - 84:3,
99:5
**commentary** [1] -
111:10
**commenting** [1] - 9:16
**Commission** [1] -
207:17
**common** [5] - 52:10,
176:3, 176:7,
193:23, 200:2
**commonalities** [2] -
182:14, 186:21
**commonality** [2] -
180:15, 190:22
**Commonwealth** [2] -
2:10, 207:4
**COMMONWEALTH**
[1] - 207:1
**companies** [5] -
183:16, 184:16,
185:14, 185:19,
186:16
**companies'** [1] -
187:6
**company** [4] - 39:12,
51:9, 54:17, 190:9

**compare** [4] - 108:6,
109:16, 200:17,
201:2
**compared** [4] - 40:21,
79:14, 80:22, 81:5
**comparing** [2] - 33:22,
180:3
**comparison** [4] - 45:2,
65:2, 200:17, 200:21
**comparisons** [1] -
76:9
**complete** [5] - 105:20,
132:12, 145:5,
150:8, 204:19
**completely** [2] - 6:9,
6:17
**Complex** [1] - 57:3
**complex** [4] - 38:2,
40:19, 56:13, 56:17
**compliance** [6] -
38:21, 39:3, 39:9,
39:12, 40:1, 40:4
**component** [2] -
60:11, 117:18
**components** [5] -
90:16, 90:24, 91:15,
144:2, 144:5
**comport** [3] - 22:21,
96:20, 98:24
**composed** [1] - 93:2
**comprised** [1] - 70:22
**compute** [1] - 128:22
**computer** [8] - 12:4,
34:4, 34:7, 34:11,
34:18, 34:22, 75:21,
75:23
**computing** [8] - 59:11,
59:21, 60:4, 60:15,
61:2, 61:9, 61:17,
61:18
**concentrated** [2] -
33:23, 35:4
**concept** [8] - 22:17,
50:13, 60:17, 78:18,
102:11, 124:5,
124:6, 124:11
**conceptual** [4] - 54:1,
118:6, 118:8, 118:10
**conceptually** [1] -
124:18
**conclude** [1] - 203:14
**concluded** [3] -
107:19, 184:9,
206:14
**conclusion** [6] -
108:5, 109:13,
141:11, 142:11,
149:1, 155:16
**conclusions** [2] -
17:7, 109:4

**concrete** [3] - 27:11,
55:18, 89:20
**conducting** [1] - 42:21
**confident** [1] - 163:19
**confirm** [9] - 13:6,
13:7, 25:13, 74:14,
81:10, 99:15, 111:2,
147:14, 170:8
**confirmed** [3] - 153:8,
153:14, 182:24,
183:14
**confirming** [3] -
11:16, 152:20, 153:9
**confusion** [1] - 56:24
**connected** [4] - 90:15,
90:24, 91:15, 91:16
**connecting** [1] - 91:14
**connection** [7] - 8:9,
8:21, 9:6, 21:17,
71:14, 108:2, 150:10
**conservative** [1] -
102:5
**consider** [17] - 34:22,
42:24, 46:5, 61:16,
92:7, 92:13, 136:5,
159:21, 165:17,
171:21, 171:23,
172:18, 172:20,
173:1, 173:4, 204:10
**consideration** [1] -
204:18
**considered** [25] -
25:15, 32:15, 34:20,
44:15, 53:20, 58:16,
62:11, 66:16, 95:4,
97:9, 98:18, 114:4,
123:24, 124:10,
135:13, 150:6,
150:9, 150:19,
150:23, 173:14,
196:5, 200:14,
202:14, 203:2,
204:16
**consistency** [4] -
70:7, 101:20,
104:11, 126:12
**consistent** [11] -
20:20, 41:4, 123:16,
144:24, 145:13,
150:22, 152:22,
152:24, 153:2,
156:17, 166:7
**consistently** [1] -
194:10
**consolidating** [1] -
31:9
**constitute** [2] - 15:14,
15:22
**contact** [2] - 95:9,
192:3

**contain** [3] - 54:14,
144:2, 190:7
**contained** [8] - 16:23,
42:19, 150:11,
151:19, 153:22,
155:18, 169:1,
185:11
**contains** [6] - 94:24,
159:6, 160:15,
161:3, 190:14, 196:1
**contended** [1] -
107:16
**contends** [1] - 86:4
**contention** [1] - 108:3
**context** [13] - 22:17,
35:9, 58:23, 81:8,
82:4, 84:2, 123:11,
125:7, 127:21,
147:7, 160:10,
169:10, 204:10
**contexts** [1] - 84:1
**continue** [2] - 36:15,
77:22
**continues** [2] -
189:12, 189:14
**continuing** [8] - 11:7,
11:10, 12:5, 36:23,
37:1, 37:2, 37:8,
38:8
**contracts** [1] - 39:20
**control** [2] - 151:9,
207:22
**conversant** [2] -
45:12, 46:6
**conversations** [1] -
173:12
**converting** [1] - 25:10
**copy** [4] - 4:24, 13:2,
18:23, 33:6
**core** [2] - 193:10,
194:6
**corners** [1] - 17:15
**corporation** [6] -
180:19, 181:1,
181:4, 181:6,
181:18, 187:18
**corporations** [5] -
181:9, 181:10,
181:22, 182:8,
182:19
**correct** [70] - 5:22,
8:6, 11:18, 15:23,
17:16, 21:4, 33:18,
34:5, 34:6, 48:8,
51:13, 63:2, 63:3,
63:10, 67:4, 69:7,
74:5, 77:14, 80:5,
80:8, 82:1, 82:14,
93:6, 103:19,
103:22, 106:18,

113:13, 113:16,
114:22, 124:1,
126:2, 128:14,
132:13, 133:8,
133:13, 133:17,
133:19, 144:18,
144:22, 147:10,
148:3, 148:13,
149:12, 152:5,
153:23, 154:13,
155:13, 155:18,
155:22, 156:23,
157:10, 160:19,
168:17, 170:14,
170:16, 174:18,
176:19, 177:18,
178:7, 180:1, 180:6,
185:1, 186:7, 186:9,
190:9, 195:10,
198:9, 200:11,
204:20, 208:11
**CORRECTION** [1] -
209:6
**corrections** [1] -
208:12
**correctly** [4] - 13:8,
52:7, 65:12, 85:3
**corresponding** [1] -
112:1
**counsel** [4] - 4:24,
151:12, 207:9,
207:10
**count** [1] - 177:3
**country** [3] - 176:9,
177:13, 178:3
**couple** [3] - 37:15,
37:17, 150:7
**course** [23] - 18:14,
18:19, 36:3, 36:9,
36:11, 36:13, 37:9,
37:11, 37:12, 37:14,
37:23, 38:6, 39:7,
55:23, 76:19,
133:12, 138:13,
139:12, 143:3,
169:12, 194:24
**courses** [10] - 34:2,
34:3, 34:11, 34:17,
35:3, 35:10, 35:21,
35:23
**coursework** [5] -
11:10, 12:6, 35:11,
36:20, 37:4
**Court** [1] - 193:11
**court** [3] - 4:23,
172:21, 192:7
**COURT** [2] - 1:3, 2:21
**courtesy** [1] - 6:18
**covered** [1] - 126:4
**create** [4] - 19:6,

Case 16-04006   Doc 459-12   Filed 09/11/23   Entered 09/11/23 16:26:40   Desc
Exhibit 12   Page 60 of 76
Deposition of Joshua W. Dennis
May 9, 2023

6

199:7, 200:5, 206:5
**created** [7] - 18:22,
21:2, 26:15, 96:4,
96:5, 99:10, 135:17
**creates** [1] - 171:6
**creating** [7] - 27:1,
27:4, 27:8, 40:15,
40:18, 121:9, 200:4
**credits** [1] - 34:8
**criteria** [1] - 177:22
**critiques** [1] - 17:4
**CROSS** [1] - 4:5
**CSR** [1] - 2:7
**culmination** [1] -
66:11
**curious** [1] - 110:11
**Curran** [1] - 207:3
**curran** [1] - 2:7
**CURRAN** [2] - 2:21
**currancourtrep @**
**yahoo.com** [1] - 2:23
**current** [6] - 9:8,
10:15, 14:20, 15:1,
33:6, 33:8
**Curriculum** [2] - 4:13,
33:2
**cursory** [1] - 147:2
**CV** [4] - 32:24, 33:6,
42:24, 44:5

## D

**daily** [1] - 38:24
**damages** [5] - 10:11,
11:14, 39:19, 40:16,
40:23
**Dan** [1] - 5:14
**Daniel** [1] - 3:5
**DARR** [2] - 1:12, 1:18
**Darr** [2] - 2:4, 3:2
**dashboard** [1] - 54:21
**Data** [2] - 143:8,
143:16
**data** [182] - 10:2, 10:5,
10:7, 10:23, 11:2,
11:21, 11:23, 12:6,
12:10, 13:11, 13:12,
13:22, 14:11, 19:2,
19:5, 21:11, 24:16,
34:16, 34:23, 34:24,
35:1, 35:3, 36:22,
38:3, 38:10, 38:19,
38:20, 38:24, 39:23,
41:2, 41:8, 41:19,
42:13, 42:19, 43:10,
44:19, 44:21, 44:24,
46:2, 46:24, 47:2,
51:3, 52:4, 54:14,
54:21, 56:13, 59:6,
59:7, 62:4, 63:1,

68:3, 68:6, 70:4,
70:7, 70:8, 70:14,
72:16, 72:18, 73:9,
73:12, 73:14, 74:2,
75:4, 80:23, 83:10,
84:7, 84:13, 85:2,
86:1, 86:13, 93:19,
100:15, 100:20,
101:1, 101:18,
101:20, 101:22,
103:11, 104:6,
104:10, 104:14,
105:4, 105:5,
105:11, 105:12,
105:18, 107:7,
107:9, 107:10,
107:14, 107:17,
108:4, 108:7,
108:17, 109:1,
109:9, 109:16,
110:1, 110:12,
111:5, 111:19,
111:21, 111:22,
112:1, 112:4, 113:1,
121:9, 126:8,
126:10, 126:15,
129:11, 129:19,
130:3, 130:4,
130:10, 131:2,
131:8, 134:4, 134:6,
134:20, 134:21,
136:6, 136:23,
137:3, 141:13,
142:2, 143:9,
146:24, 147:13,
148:21, 148:24,
149:3, 149:6,
151:22, 151:23,
152:20, 152:23,
152:24, 153:2,
153:14, 153:20,
153:21, 162:10,
162:11, 162:14,
162:23, 164:13,
164:16, 166:2,
166:9, 168:19,
168:24, 169:4,
169:7, 170:12,
171:4, 172:18,
173:19, 173:22,
174:5, 174:9,
175:11, 176:3,
178:12, 179:3,
182:4, 182:9,
182:10, 182:14,
185:10, 193:1,
205:2, 205:4,
205:23, 206:2,
206:3, 206:5, 206:7,
206:10
**database** [20] - 13:3,

13:4, 13:8, 19:3,
19:13, 19:15, 20:17,
20:19, 44:16, 47:9,
141:2, 141:3, 141:5,
141:7, 141:8,
144:13, 165:4,
165:14, 169:1, 187:1
**databases** [1] - 13:1
**datapoints** [2] -
121:12, 146:4
**Dataset** [1] - 194:19
**dataset** [46] - 41:3,
41:9, 41:12, 41:16,
41:17, 43:1, 43:2,
53:14, 55:7, 65:20,
78:2, 78:8, 78:13,
78:14, 79:5, 79:7,
79:16, 80:24, 81:3,
83:1, 83:3, 83:5,
83:7, 83:11, 86:6,
86:11, 86:13, 86:23,
94:7, 102:19,
102:22, 112:17,
112:18, 112:23,
113:12, 117:19,
118:12, 119:15,
127:10, 128:2,
140:12, 148:21,
166:23, 195:18,
206:6
**datasets** [11] - 35:2,
35:5, 40:20, 41:14,
44:5, 54:12, 54:22,
74:21, 75:20,
102:21, 105:21
**DATE** [2] - 209:2,
209:4
**days** [2] - 7:2, 7:4
**daytime** [1] - 37:10
**de** [1] - 30:11
**deal** [1] - 180:16
**dealing** [2] - 47:4,
90:23
**deals** [1] - 128:1
**Debtors** [1] - 1:11
**decision** [2] - 68:19,
71:2
**deduping** [3] - 54:24,
55:2, 60:5
**deduplicate** [4] - 51:6,
51:8, 51:23, 123:14
**deduplicating** [3] -
51:12, 51:17, 54:22
**deduplication** [7] -
53:23, 54:10, 54:11,
54:13, 55:5, 55:8,
55:12
**deemed** [5] - 16:6,
16:15, 17:9, 17:13,
86:22

**deeper** [1] - 66:14
**DEFENDANT** [2] -
1:17, 1:23
**Defendants** [3] - 1:17,
1:24, 3:11
**define** [8] - 43:7, 87:1,
91:7, 127:11, 128:3,
160:6, 160:9, 186:12
**defined** [4] - 143:8,
143:16, 145:16,
160:5
**defines** [1] - 91:16
**defining** [2] - 165:8,
174:23
**definitely** [2] - 27:14,
30:19
**definition** [2] - 196:12,
199:9
**definitions** [3] - 88:23,
89:14, 163:16
**degree** [11] - 11:6,
11:9, 12:3, 39:1,
88:11, 88:12, 99:7,
121:13, 124:23,
124:24, 149:2
**demonstrate** [7] -
97:5, 97:24, 99:22,
159:5, 170:19,
171:14, 180:14
**demonstrated** [2] -
126:11, 134:22
**demonstrates** [1] -
178:14
**DENNIS** [4] - 2:2, 5:7,
207:6, 208:10
**Dennis** [9] - 4:3, 4:9,
4:11, 4:13, 5:2, 5:4,
5:14, 33:2, 173:22
**Dennis's** [1] - 32:24
**denominator** [1] -
81:8
**depended** [1] - 165:12
**depiction** [1] - 139:19
**Deponent's** [1] -
208:19
**DEPOSITION** [2] - 2:2,
209:4
**deposition** [12] - 5:17,
5:19, 5:23, 6:1, 8:3,
17:2, 115:16,
206:14, 207:5,
207:7, 208:3, 208:6
**Deposition** [12] - 4:9,
5:1, 5:2, 15:6, 33:1,
67:14, 94:10,
131:24, 132:4,
158:15, 178:18,
189:18
**depositions** [1] -
106:10

**derived** [1] - 166:1
**describe** [8] - 8:11,
39:24, 50:21, 62:14,
64:14, 66:15, 80:15,
91:7
**described** [11] - 64:19,
68:10, 88:15, 88:17,
90:20, 90:21,
113:21, 152:21,
154:7, 193:4, 205:15
**describes** [2] -
153:10, 199:17
**describing** [2] - 77:4,
201:7
**Description** [1] - 4:8
**description** [5] -
25:20, 42:1, 152:23,
153:1, 153:14
**descriptions** [1] -
59:20
**designed** [5] - 39:13,
202:7, 203:6,
203:13, 203:16
**desires** [1] - 208:6
**detail** [6] - 28:1, 87:18,
112:3, 113:3,
141:24, 188:22
**detailed** [3] - 26:17,
27:19, 189:8
**detect** [1] - 39:14
**determination** [18] -
8:19, 68:22, 72:3,
75:8, 75:11, 79:17,
92:10, 92:13,
141:15, 169:3,
182:3, 184:6, 184:8,
186:20, 188:4,
191:9, 203:20,
203:21
**determinations** [1] -
92:14
**determine** [53] - 21:6,
24:11, 47:18, 48:4,
48:5, 59:16, 64:24,
66:23, 71:19, 72:8,
75:14, 75:17, 79:11,
82:18, 84:11, 86:10,
87:14, 93:13, 93:21,
95:3, 95:12, 98:2,
103:18, 106:2,
107:4, 107:18,
117:14, 119:13,
127:24, 134:8,
134:12, 134:14,
135:1, 135:16,
136:1, 136:13,
147:13, 148:23,
151:17, 152:17,
155:11, 157:8,
158:23, 159:3,

Case 16-04006    Doc 459-12    Filed 09/11/23    Entered 09/11/23 16:26:40    Desc
Exhibit 12    Page 61 of 76
Deposition of Joshua W. Dennis
May 9, 2023

7

166:15, 166:16,
167:10, 174:3,
182:17, 186:11,
186:17, 186:23,
198:3
**determined** [9] -
28:12, 30:23, 59:15,
65:4, 80:17, 108:1,
114:6, 191:19,
197:23
**determining** [9] -
48:19, 49:7, 49:10,
97:13, 98:3, 145:23,
165:4, 165:17,
168:22
**deterministic** [7] -
61:18, 61:23, 73:6,
73:8, 73:9, 73:21,
74:4
**deviation** [1] - 137:20
**deviations** [1] - 79:4
**diagram** [2] - 144:11,
155:2
**differed** [1] - 26:23
**difference** [5] - 28:20,
29:12, 64:15, 80:12,
118:5
**differences** [3] - 27:2,
27:5, 74:15
**different** [36] - 17:20,
19:22, 20:8, 28:17,
41:14, 42:19, 45:1,
52:5, 56:23, 60:21,
62:20, 72:3, 83:6,
84:17, 84:22, 95:8,
95:9, 95:23, 105:22,
110:18, 111:16,
111:17, 116:22,
119:10, 144:2,
144:5, 148:15,
159:10, 173:16,
173:18, 178:10,
201:8, 204:13,
204:14
**differentiate** [2] -
95:21, 96:19
**differentiated** [2] -
96:1, 96:14
**differently** [3] - 59:4,
72:6, 167:7
**differs** [3] - 64:2, 64:9,
127:17
**digitally** [1] - 18:23
**direct** [4] - 94:14,
151:8, 185:8, 207:22
**DIRECT** [2] - 4:5, 5:12
**directed** [1] - 40:2
**directing** [5] - 8:1,
14:14, 20:3, 33:4,
67:18

**direction** [3] - 20:19,
151:9, 207:22
**directions** [1] - 137:21
**directly** [2] - 106:5,
106:6
**dirty** [1] - 54:22
**disaggregating** [2] -
69:6, 118:7
**disagree** [6] - 66:7,
69:4, 69:17, 71:2,
74:16, 75:10, 120:7,
195:22, 198:1,
199:10
**disagreed** [1] - 69:22
**disagreement** [2] -
69:24, 201:5
**disassociating** [1] -
35:5
**disassociation** [1] -
35:1
**discern** [1] - 134:1
**disclosed** [1] - 17:15
**discount** [1] - 72:4
**discovery** [1] - 173:13
**discrete** [2] - 23:1,
23:4
**discuss** [1] - 195:2
**discussed** [6] - 24:2,
56:9, 101:17,
135:11, 154:4, 154:6
**discusses** [1] - 154:3
**discussing** [1] -
169:18
**discussion** [2] -
95:24, 132:15
**discussions** [1] - 21:8
**disparate** [1] - 79:7
**disposal** [1] - 52:6
**disputes** [2] - 39:20,
56:17
**Disputes** [1] - 57:3
**distance** [2] - 62:2,
63:5
**distill** [1] - 75:4
**distilled** [1] - 40:21
**distinct** [1] - 34:18
**distinction** [4] - 28:20,
42:12, 49:1, 176:14
**distinguishing** [2] -
73:22, 157:15
**DISTRICT** [1] - 1:3
**diverse** [1] - 79:7
**DL1** [5] - 188:5, 188:6,
188:14, 190:9, 191:9
**dlyne@murphyking.
com** [1] - 3:8
**document** [4] - 20:4,
20:7, 94:15, 191:4
**Document** [10] - 4:18,
4:19, 4:20, 4:21,

4:22, 132:1, 132:4,
158:15, 178:18,
189:18
**documents** [7] -
58:16, 150:6, 150:9,
150:19, 150:22,
153:17, 153:19
**Dolarex** [8] - 180:5,
180:24, 182:24,
183:11, 183:23,
186:6, 187:12,
187:16
**DOLAREX** [1] - 180:5
**dollar** [2] - 148:9,
160:12
**domestic** [5] - 43:21,
43:23, 43:24, 47:15
**done** [30] - 5:24, 37:5,
50:11, 51:8, 65:12,
71:9, 75:22, 83:19,
101:19, 104:23,
122:15, 123:20,
123:24, 124:8,
126:1, 126:17,
126:20, 126:21,
127:2, 128:16,
135:24, 136:15,
138:2, 156:9, 174:2,
175:8, 193:13,
198:4, 204:18,
204:20
**doubt** [1] - 55:4
**down** [17] - 16:11,
33:8, 42:8, 47:23,
54:18, 68:18, 68:20,
69:5, 75:4, 116:1,
144:14, 144:16,
154:20, 154:22,
173:6, 177:24,
199:14
**Dr** [132] - 4:14, 4:16,
14:4, 14:8, 18:8,
18:20, 20:7, 21:7,
21:16, 24:19, 25:20,
26:5, 26:16, 31:6,
32:11, 42:20, 43:3,
58:14, 63:23, 64:5,
64:7, 65:10, 65:19,
67:2, 67:15, 67:20,
68:19, 69:15, 73:8,
74:14, 75:14, 76:4,
77:10, 80:3, 80:23,
81:7, 83:20, 84:3,
84:8, 84:12, 85:1,
85:15, 85:23, 86:3,
88:14, 88:16, 89:23,
90:14, 90:20, 90:21,
91:12, 91:22, 92:8,
92:20, 93:6, 94:5,
94:11, 94:17, 94:19,

96:21, 97:18, 98:8,
98:19, 100:1, 100:7,
102:11, 103:18,
104:23, 108:7,
109:16, 110:1,
110:14, 113:5,
114:1, 114:17,
125:8, 125:11,
125:16, 126:11,
128:16, 130:24,
131:6, 133:24,
135:1, 135:17,
136:8, 138:8, 139:5,
140:3, 140:12,
141:8, 141:15,
142:7, 142:8,
143:12, 145:1,
147:3, 150:13,
154:15, 156:18,
157:23, 157:24,
160:15, 163:17,
168:23, 170:8,
171:6, 171:16,
174:2, 175:9,
176:10, 176:15,
176:16, 179:23,
186:18, 187:4,
187:9, 191:13,
191:15, 191:23,
192:6, 192:19,
192:21, 193:13,
193:15, 194:3,
194:13, 198:11,
202:19, 202:24
**drill** [1] - 154:19
**driver's** [1] - 5:9
**drug** [1] - 57:5
**dry** [2] - 76:13, 198:16
**due** [2] - 42:10, 201:12
**duly** [2] - 5:9, 207:6
**duplicate** [1] - 28:22
**duplicated** [3] - 26:22,
28:15, 28:18
**duplication** [19] -
26:21, 27:1, 27:4,
27:8, 27:10, 27:12,
27:13, 27:14, 27:17,
27:19, 27:20, 28:1,
28:12, 29:20, 29:24,
30:3, 30:8, 31:2,
31:11
**DURAN** [1] - 3:13
**during** [1] - 132:8
**dynamic** [5] - 199:19,
200:10, 201:9,
201:15, 201:23

**E**

**e-mail** [10] - 2:23,

152:12, 153:4,
153:5, 153:12,
154:7, 176:8,
177:11, 178:4, 178:5
**e-mailed** [1] - 4:23
**e-mails** [3] - 153:18,
154:2, 154:7
**E-portal** [5] - 169:14,
169:22, 171:8,
184:4, 184:20
**E-wallet** [7] - 105:5,
105:11, 111:18,
112:6, 126:14,
129:6, 145:19
**easier** [2] - 158:7,
158:13
**easy** [1] - 144:1
**economic** [16] - 10:11,
11:14, 39:19, 40:15,
40:23, 99:11,
104:16, 121:18,
182:13, 183:20,
185:24, 186:2,
186:6, 186:11,
186:12, 192:16
**economics** [1] - 34:2
**edges** [1] - 200:1
**education** [14] - 11:3,
11:7, 36:15, 36:24,
37:1, 37:2, 37:8,
38:8, 38:9, 38:14,
38:15, 39:1, 40:2,
40:14
**effect** [1] - 28:3
**efficacy** [2] - 40:7,
40:9
**eight** [2] - 42:18,
138:15
**either** [18] - 10:1,
18:23, 35:4, 36:16,
70:20, 73:7, 102:2,
103:3, 132:12,
138:3, 138:6, 164:5,
169:23, 181:2,
202:19, 203:12,
203:23, 205:5
**Elaine** [2] - 177:24,
178:4
**elainevit40@gmail.
com** [1] - 178:6
**elected** [2] - 71:24,
94:9
**electronic** [1] - 145:18
**elects** [1] - 70:18
**element** [3] - 146:19,
200:13, 200:20
**elements** [3] - 68:11,
70:15, 70:17
**eliminated** [2] - 25:14,
70:22

Deposition of Joshua W. Dennis
May 9, 2023

8

eliminating [1] - 192:7
EM [16] - 64:1, 64:9, 65:4, 65:11, 65:19, 65:24, 66:17, 66:20, 67:2, 127:9, 127:12, 127:17, 128:1, 128:6, 194:9, 194:12
employee [2] - 207:9, 207:10
employs [1] - 191:23
encompasses [1] - 42:14
END [1] - 177:12
end [1] - 6:21, 51:15, 85:14, 91:11, 91:17, 146:20, 155:6, 157:4, 195:22, 201:4, 206:4
endeavor [2] - 148:3, 202:11
endeavored [4] - 120:18, 147:21, 163:9, 167:17
engage [1] - 75:19
engaged [5] - 8:7, 8:24, 36:21, 91:22, 122:16
engagement [25] - 8:12, 8:15, 16:7, 16:16, 17:10, 17:14, 44:20, 51:24, 52:16, 57:24, 59:10, 59:15, 59:16, 60:10, 71:15, 74:19, 76:4, 79:10, 79:21, 82:11, 83:23, 103:18, 124:9, 124:12, 133:13
engagements [20] - 41:24, 42:23, 44:4, 44:12, 50:14, 50:18, 50:22, 53:20, 55:1, 55:16, 57:19, 59:5, 59:9, 59:13, 61:8, 75:19, 76:21, 77:1, 122:24
engages [1] - 70:11
ensuring [1] - 195:24
entered [4] - 70:7, 70:8, 194:10, 208:6
entire [15] - 15:15, 15:22, 23:5, 28:14, 87:18, 112:16, 112:18, 113:11, 144:12, 165:11, 175:19, 191:22, 191:23, 193:8, 194:8
entirely [6] - 25:15, 70:23, 110:6, 142:9, 193:5, 198:1
entirety [1] - 58:15

Entitled [10] - 4:15, 4:19, 4:20, 4:21, 4:22, 67:15, 132:5, 158:16, 178:19, 189:19
entity [6] - 37:5, 54:17, 156:3, 156:12, 157:5, 157:9
entries [3] - 159:19, 175:20, 178:23
ePOC [1] - 183:1
EPOC [36] - 105:4, 105:10, 107:7, 107:9, 107:10, 107:14, 107:16, 108:4, 108:7, 108:16, 109:9, 109:16, 110:1, 110:12, 110:19, 111:5, 112:10, 112:14, 112:16, 112:18, 113:1, 113:12, 113:14, 113:23, 114:2, 114:16, 126:14, 128:23, 145:17, 173:12, 183:6, 183:16, 184:13, 184:21, 185:5, 185:19
equal [1] - 127:8
equally [1] - 169:5
equals [3] - 77:14, 77:15
equity [12] - 133:3, 142:12, 142:17, 154:14, 154:17, 155:18, 156:15, 156:23, 157:2, 171:19, 176:5, 177:19
equivalent [1] - 41:9
errata [2] - 7:5, 208:12
ERRATA [1] - 209:1
error [42] - 86:22, 87:1, 89:5, 89:15, 89:21, 89:22, 90:2, 90:6, 96:24, 97:8, 97:20, 98:2, 98:6, 98:17, 99:14, 99:17, 99:18, 100:8, 100:19, 102:2, 103:10, 115:5, 125:21, 132:13, 132:15, 132:17, 132:19, 132:23, 135:2, 146:16, 148:6, 160:2, 160:21, 161:2, 168:11, 168:13,

168:18, 168:22, 169:3, 169:9, 200:5
errors [13] - 10:14, 11:17, 26:1, 73:7, 147:12, 160:16, 160:18, 168:6, 168:7, 203:9, 204:4, 204:5, 205:5
Esq [3] - 3:5, 3:6, 3:14
essentially [3] - 51:6, 51:7, 192:18
Estates [1] - 3:3
ESTATES [2] - 1:13, 1:19
estimate [4] - 46:12, 78:1, 78:6, 140:19
estimates [1] - 162:7
estimation [1] - 139:8
evidence [3] - 114:3, 159:20, 189:7
evidentiary [2] - 5:20, 7:20
exact [4] - 18:6, 30:21, 84:5, 193:13
exactly [6] - 33:21, 72:21, 85:4, 100:15, 173:8, 191:3
Examination [1] - 4:5
examination [4] - 134:17, 207:7, 208:4, 208:4
EXAMINATION [1] - 5:12
examine [3] - 112:7, 112:13, 112:15
examined [5] - 5:10, 112:8, 133:12, 207:6, 208:10
example [22] - 12:16, 17:24, 18:4, 23:19, 29:4, 29:21, 29:24, 62:24, 70:18, 100:6, 111:4, 114:10, 123:21, 145:20, 160:14, 160:15, 177:23, 183:6, 188:23, 197:5, 197:6, 200:23
examples [15] - 56:16, 96:12, 98:22, 99:6, 100:4, 100:5, 109:19, 109:20, 115:8, 123:13, 133:1, 133:9, 133:16, 173:10, 200:22
Excel [6] - 53:4, 53:5, 60:23, 141:2, 141:23, 176:2
except [2] - 7:12, 7:18

exception [1] - 202:22
Excerpt [1] - 208:1
exclude [1] - 43:20
excluded [3] - 29:17, 192:11, 193:12
exclusion [1] - 50:10
excuse [12] - 6:13, 17:2, 131:4, 138:8, 150:5, 154:21, 174:20, 175:13, 176:16, 195:21, 202:14, 203:5
execute [1] - 140:17
execution [1] - 20:20
Execution [3] - 4:12, 15:7, 20:11
exercise [10] - 6:21, 8:22, 48:17, 49:7, 49:23, 50:7, 114:7, 115:3, 134:24, 136:18
Exhibit [58] - 4:19, 4:20, 4:21, 4:22, 5:1, 5:3, 8:2, 14:15, 15:6, 15:10, 15:14, 15:17, 15:21, 20:1, 20:3, 20:4, 20:21, 32:19, 33:1, 33:5, 67:14, 67:19, 81:24, 82:1, 88:3, 88:4, 94:10, 94:14, 94:19, 131:24, 132:4, 132:5, 144:11, 149:22, 150:5, 154:9, 156:2, 157:22, 158:2, 158:3, 158:15, 158:16, 159:11, 178:14, 178:16, 178:18, 178:19, 178:21, 188:24, 189:8, 189:15, 189:18, 189:19, 189:21, 189:22, 190:6, 202:15, 203:24
exhibit [8] - 17:1, 87:19, 87:23, 95:5, 132:3, 178:17, 188:14, 199:18
exhibits [16] - 1:2, 4:23, 10:13, 16:1, 17:16, 17:23, 86:20, 87:24, 93:10, 108:11, 108:18, 108:20, 113:20, 114:19, 114:21, 115:1
Exhibits [1] - 189:8
exist [2] - 117:2, 122:5

existed [1] - 27:17
existing [1] - 181:9
exists [2] - 181:5, 185:6
expect [2] - 162:3, 162:17
expectation [4] - 63:18, 64:16, 64:23
expected [1] - 163:5
experience [11] - 41:8, 45:3, 45:6, 58:6, 60:14, 61:3, 88:18, 89:4, 89:9, 90:23
Experience [2] - 42:1, 59:20
experiential [5] - 37:3, 38:9, 38:14, 38:15, 40:1, 40:14
Expert [5] - 4:10, 4:16, 5:4, 94:10, 94:16
expert [4] - 8:15, 16:3, 21:17, 143:11
experts [1] - 8:18
Expires [1] - 207:17
explain [1] - 127:17
explicitly [3] - 190:24, 193:19, 193:24
exploded [2] - 178:22, 179:1
exploration [5] - 19:3, 71:14, 72:16, 72:18, 156:18
exploratory [1] - 114:23
explored [5] - 108:23, 109:3, 110:12, 117:1, 136:22
exported [2] - 156:3, 156:12
expose [1] - 74:15
exposed [2] - 58:1, 74:2
extended [1] - 30:3
extends [1] - 160:13
extensive [1] - 126:19
extent [16] - 6:7, 17:12, 29:23, 30:22, 33:23, 44:18, 108:8, 108:10, 123:17, 137:13, 154:14, 181:15, 183:20, 187:17, 197:14
external [2] - 127:9, 193:1
extract [2] - 93:18, 185:10
eyes [1] - 190:5

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

9

# F

**F-A-T-U-R-A** [1] - 143:22
**F-measure** [4] - 90:12, 162:2, 162:16, 163:24
**F1** [1] - 90:12
**face** [3] - 137:2, 137:4, 159:8
**fact** [28] - 50:12, 62:19, 62:23, 84:9, 84:11, 84:12, 84:21, 86:10, 86:11, 99:10, 101:24, 103:15, 104:10, 105:17, 116:10, 122:11, 125:16, 130:7, 130:8, 159:12, 171:19, 180:12, 180:22, 181:14, 182:10, 182:23, 185:17, 203:20
**fact-specific** [1] - 203:20
**factor** [3] - 164:17, 165:3, 165:8
**factors** [10] - 79:3, 79:5, 164:20, 164:23, 165:1, 165:16, 166:16, 176:4, 177:14, 200:18
**facts** [10] - 66:12, 75:5, 101:5, 101:9, 124:7, 129:24, 164:14, 166:8, 169:7, 174:5
**factually** [1] - 50:9
**fair** [24] - 8:10, 12:9, 16:16, 16:17, 18:24, 40:10, 49:15, 57:23, 89:8, 91:4, 97:18, 99:21, 102:18, 117:24, 118:19, 124:14, 124:16, 124:19, 125:2, 125:5, 125:10, 139:8, 140:22, 140:23
**fairly** [3] - 13:1, 193:9, 193:22
**false** [15] - 80:13, 80:16, 80:18, 162:3, 162:18, 162:24, 163:5, 163:22, 166:12, 166:18, 167:1, 167:5, 204:14, 204:15
**familiar** [10] - 20:16,

57:8, 57:10, 78:18, 80:9, 88:8, 101:24, 102:8, 158:9, 197:16
**far** [5] - 81:21, 82:9, 176:6, 176:21, 177:2
**fashion** [4] - 16:9, 54:15, 83:10, 184:22
**fast** [1] - 101:6
**Fatura** [1] - 143:21
**faulty** [1] - 109:14
**February** [1] - 115:17
**Federal** [2] - 2:4, 2:5
**federal** [1] - 57:4
**fell** [1] - 103:24
**FELLEGI** [1] - 57:17
**Fellegi** [18] - 57:11, 57:14, 57:20, 58:1, 58:6, 58:9, 58:18, 58:19, 58:24, 63:1, 63:18, 63:20, 64:15, 64:16, 92:18, 116:15, 127:7, 127:18
**Fellegi-Sunter** [18] - 57:11, 57:14, 57:20, 58:1, 58:6, 58:9, 58:18, 58:19, 58:24, 63:1, 63:18, 63:20, 64:15, 64:16, 92:18, 116:15, 127:7, 127:18
**Fer** [1] - 29:21
**Fer-Do** [1] - 29:21
**Fernando** [1] - 29:21
**FESM** [2] - 194:3, 194:21
**few** [1] - 51:2
**fewer** [2] - 71:18, 71:20
**Field** [1] - 194:18
**field** [22] - 25:2, 27:22, 28:6, 28:11, 28:15, 28:18, 28:21, 29:13, 31:3, 59:6, 68:13, 68:15, 69:12, 70:11, 72:4, 72:24, 82:3, 131:5, 187:17, 192:14, 195:18, 205:2
**fields** [11] - 27:21, 28:11, 30:4, 52:5, 65:1, 65:4, 65:11, 66:1, 66:15, 70:14, 186:24
**fight** [1] - 69:3
**file** [1] - 43:9
**files** [4] - 20:8, 22:19, 22:20, 141:23
**filing** [1] - 151:2
**filings** [2] - 106:9,

151:3
**filter** [1] - 68:20
**filtering** [3] - 68:17, 69:10, 155:4
**final** [1] - 26:14
**finance** [1] - 34:2
**financial** [1] - 39:22
**Financial** [1] - 3:3
**FINANCIAL** [3] - 1:11, 1:14, 1:20
**financially** [1] - 207:11
**fine** [2] - 145:10, 185:23
**finish** [1] - 6:16
**first** [20] - 24:21, 39:2, 39:8, 55:24, 56:4, 57:24, 97:14, 98:3, 98:15, 100:11, 130:13, 130:19, 148:22, 159:10, 159:13, 171:3, 177:5, 190:3, 190:8, 195:1
**fit** [1] - 92:18
**five** [10] - 42:3, 159:10, 159:13, 159:19, 196:7, 197:1, 197:2, 197:8, 198:16, 198:20
**fixing** [7] - 50:24, 51:24, 53:19, 54:24, 56:9, 56:10, 60:2
**flawed** [2] - 187:10, 193:5
**Floor** [1] - 2:12
**focus** [8] - 31:19, 37:1, 43:21, 54:9, 89:1, 89:3, 147:8
**focused** [5] - 26:7, 26:11, 32:4, 95:24, 115:12
**focusing** [6] - 43:2, 54:21, 55:15, 82:10, 84:23, 99:13
**follow** [1] - 130:20
**followed** [1] - 129:20
**following** [1] - 207:5
**following-named** [1] - 207:5
**follows** [1] - 5:11
**footnote** [4] - 28:3, 81:18, 81:22, 178:13
**footnotes** [1] - 11:16
**foregoing** [1] - 207:21
**forgotten** [1] - 94:8
**form** [24] - 7:12, 7:18, 8:8, 18:24, 27:3, 40:23, 65:9, 65:18, 66:1, 66:24, 72:22, 82:5, 82:12, 93:1,

96:15, 109:24, 113:24, 121:2, 121:17, 152:2, 157:12, 157:18, 180:11, 208:5
**formal** [5] - 11:20, 11:22, 11:24, 37:2, 38:7
**formally** [1] - 36:16
**formed** [5] - 16:6, 17:13, 79:20, 109:9, 157:17
**forming** [2] - 14:8, 150:10
**Formula** [1] - 80:10
**formula** [1] - 163:18
**formulas** [1] - 163:20
**forth** [3] - 8:18, 20:21, 155:21
**foundation** [1] - 193:4
**four** [15] - 17:15, 42:3, 42:17, 52:17, 52:19, 52:21, 71:8, 71:12, 72:1, 128:15, 138:13, 143:7, 195:7, 196:6, 196:11
**fourth** [2] - 42:8, 56:11, 143:15
**frame** [2] - 115:17, 145:6
**frames** [1] - 46:2
**franchisor** [1] - 56:21
**frankly** [3] - 105:6, 126:7, 199:22
**Frantz** [8] - 3:11, 106:16, 106:19, 107:1, 107:4, 151:4, 152:9
**FRANTZ** [1] - 1:16
**fraud** [1] - 39:14
**Freer** [75] - 4:17, 14:4, 14:8, 18:8, 19:13, 19:14, 19:16, 20:7, 24:12, 26:16, 42:20, 43:3, 58:14, 65:19, 67:2, 69:15, 75:14, 76:4, 77:10, 80:3, 81:7, 83:20, 84:3, 84:8, 84:12, 85:1, 85:15, 85:23, 86:3, 90:20, 90:21, 91:22, 92:8, 92:20, 94:5, 94:11, 94:17, 104:23, 110:14, 112:7, 114:7, 117:7, 117:10, 121:6, 121:15, 125:8, 126:11, 128:16, 130:24, 131:6, 135:17, 138:8,

141:8, 142:7, 142:8, 143:12, 143:16, 150:4, 150:13, 154:10, 154:15, 159:5, 160:15, 163:17, 168:23, 171:6, 179:23, 187:4, 191:23, 192:6, 193:13, 194:13, 202:19, 202:24
**freer's** [1] - 175:9
**Freer's** [74] - 4:14, 18:20, 21:7, 21:16, 24:19, 25:20, 26:5, 31:6, 32:11, 63:23, 64:5, 64:7, 65:10, 67:15, 67:20, 68:19, 73:8, 74:14, 80:23, 88:14, 88:16, 89:23, 90:14, 91:12, 93:6, 94:19, 96:21, 97:18, 98:8, 98:19, 100:1, 100:7, 102:11, 103:18, 108:7, 109:16, 110:1, 113:5, 114:1, 114:17, 116:5, 125:8, 125:11, 125:16, 133:24, 135:1, 136:8, 138:14, 139:5, 140:3, 140:12, 141:15, 145:1, 147:3, 156:18, 157:23, 157:24, 158:6, 170:8, 171:16, 174:2, 176:10, 176:16, 186:18, 187:9, 191:13, 191:15, 192:19, 192:21, 193:15, 194:3, 198:11
**FREITAS** [2] - 1:23, 151:5
**Freitas** [2] - 3:12, 151:4
**frequently** [5] - 39:22, 46:8, 78:1, 78:7, 110:5
**front** [6] - 43:10, 86:2, 88:1, 92:21, 121:7, 149:21
**FS** [64] - 64:1, 64:2, 64:9, 65:4, 65:11, 65:19, 65:24, 66:17, 66:20, 67:2, 127:9, 127:12, 127:17, 128:1, 128:6, 194:9,

Deposition of Joshua W. Dennis
May 9, 2023

10

194:12
**FS-EM** [16] - 64:1, 64:9, 65:4, 65:11, 65:19, 65:24, 66:17, 66:20, 67:2, 127:9, 127:12, 127:17, 128:1, 128:6, 194:9, 194:12
**fulfilling** [2] - 104:13, 162:9
**full** [9] - 20:22, 21:15, 36:12, 118:21, 119:17, 119:21, 119:22, 144:6
**fully** [3] - 6:9, 46:6, 208:3
**fulsome** [4] - 95:16, 95:17, 135:6, 142:2
**function** [5] - 55:8, 55:13, 146:17, 149:5, 166:3
**functions** [2] - 179:21, 199:7
**fuzzy** [21] - 52:8, 52:12, 52:24, 53:5, 60:4, 60:6, 60:10, 60:13, 60:16, 60:17, 61:4, 61:24, 62:15, 63:14, 68:3, 68:5, 68:8, 68:12, 179:20, 179:23, 197:6

## G

**gamma** [2] - 197:1, 197:3
**garbage** [3] - 25:15, 70:24, 73:2
**gee** [2] - 146:24, 171:18
**geez** [1] - 150:14
**general** [13] - 53:23, 64:20, 64:22, 84:6, 85:2, 86:5, 86:12, 94:6, 123:7, 123:10, 130:2, 181:19, 205:21
**generality** [1] - 166:14
**generally** [34] - 7:14, 16:17, 37:18, 38:20, 45:20, 45:23, 46:18, 54:7, 55:6, 58:10, 58:17, 61:20, 79:2, 83:8, 84:12, 85:24, 88:22, 89:6, 89:7, 91:3, 98:7, 102:9, 102:13, 103:11, 121:8, 127:18, 130:6, 130:11, 130:17, 131:1,

164:22, 166:10, 166:11, 168:14
**generate** [2] - 19:10, 19:12
**generated** [11] - 18:12, 18:14, 18:19, 18:21, 18:22, 19:17, 19:19, 19:20, 142:15, 143:10
**gestures** [1] - 6:20
**gesturing** [1] - 158:18
**gist** [1] - 85:5
**given** [19] - 78:7, 78:12, 78:17, 101:9, 106:1, 128:15, 132:24, 137:18, 162:14, 164:3, 166:22, 181:15, 192:1, 194:22, 195:1, 196:8, 207:8, 208:7
**Gladys** [3] - 9:22, 10:8, 11:13
**go-to** [1] - 46:17
**goal** [13] - 55:10, 59:14, 96:21, 97:24, 121:15, 121:21, 122:12, 124:20, 137:12, 159:3, 174:2, 195:24, 196:13
**goals** [2] - 99:1, 100:2
**gold** [2] - 128:2, 128:6
**golden** [2] - 100:14, 100:21
**gosh** [2] - 110:16, 138:12
**graduate** [1] - 11:10
**graduated** [2] - 36:15, 36:16
**graph** [1] - 90:17
**great** [2] - 39:1, 180:16
**greater** [1] - 196:8
**greatly** [1] - 96:13
**ground** [3] - 6:3, 127:10, 128:2
**ground-true** [1] - 127:10
**ground-truth** [1] - 128:2
**Group** [6] - 180:4, 180:19, 182:23, 183:10, 186:6, 187:11
**group** [1] - 123:13
**grouped** [1] - 123:19
**grouping** [2] - 54:3, 54:7

**groupings** [2] - 195:21, 196:2
**groups** [2] - 19:20, 159:10
**grow** [3] - 82:21, 83:9, 83:13
**guess** [14] - 21:22, 43:9, 51:18, 62:21, 71:16, 78:16, 114:22, 119:20, 138:13, 140:14, 167:3, 167:14, 168:17, 197:11
**guesstimate** [3] - 138:24, 139:15, 140:10
**guide** [2] - 48:3, 88:1

## H

**Hackett** [4] - 188:6, 188:15, 190:17, 191:7
**Hacketts** [1] - 191:4
**half** [5] - 22:14, 22:15, 36:11, 76:14, 147:4
**half-year** [1] - 36:11
**hand** [4] - 14:17, 176:21, 177:3, 207:13
**handful** [4] - 46:10, 46:11, 46:16, 135:12
**happy** [2] - 194:14, 195:2
**hard** [13] - 4:24, 18:23, 43:4, 45:2, 49:4, 62:21, 66:5, 66:9, 101:6, 118:7, 138:24, 139:10, 140:14
**hard-and-fast** [1] - 101:6
**hardcopy** [1] - 56:2
**head** [1] - 16:11
**head)** [1] - 156:5
**healthcare** [1] - 204:13
**hear** [4] - 25:7, 54:5, 76:8, 85:3
**heard** [1] - 82:11
**hearing** [2] - 7:20, 103:1
**hearings** [1] - 5:21
**heavily** [1] - 193:17
**help** [6] - 13:6, 64:24, 88:1, 134:7, 171:12, 195:5
**helped** [7] - 10:10, 10:12, 13:3, 13:5, 13:11, 14:3, 114:9

**helpful** [6] - 170:20, 170:21, 171:21, 171:22, 173:14, 195:8
**helps** [1] - 59:16
**hence** [1] - 56:24
**hereby** [1] - 207:4
**hereunto** [1] - 207:12
**high** [4] - 64:20, 64:22, 99:7, 101:18
**high-level** [2] - 64:20, 64:22
**Hill** [1] - 2:22
**him/her** [1] - 208:4
**hit** [1] - 140:17
**hoc** [4] - 75:8, 75:10, 100:4, 100:5
**hold** [1] - 189:5
**holds** [3] - 78:2, 78:7, 78:10
**honestly** [3] - 139:9, 163:15
**hour** [2] - 76:14, 198:19
**house** [2] - 10:12, 11:14
**Hubbs** [2] - 10:19, 11:8
**HUBBS** [1] - 10:19
**huhs** [1] - 6:20
**hundred** [2] - 30:19, 30:20
**hundreds** [1] - 30:17
**Huron** [11] - 41:20, 107:11, 109:10, 109:13, 115:9, 121:3, 140:3, 142:14, 143:8, 155:9, 157:4
**Huron's** [1] - 156:23
**hybrid** [1] - 157:16
**hyphen** [1] - 57:17
**hypothetical** [4] - 134:19, 164:3, 171:5, 171:6

## I

**i.e** [1] - 196:3
**ID** [5] - 94:21, 176:16, 177:5, 183:12, 190:3
**identification** [10] - 5:5, 15:9, 33:3, 67:17, 94:12, 132:1, 132:6, 158:17, 178:20, 189:20
**identified** [6] - 5:8, 62:8, 93:5, 112:15, 135:11, 187:7
**identifier** [1] - 113:1

**identifiers** [3] - 159:17, 190:23, 193:24
**Identifiers** [1] - 189:10
**identify** [4] - 94:15, 95:3, 99:17, 184:12
**IDF** [4] - 62:1, 62:8, 63:9, 63:11
**III.B.1** [1] - 195:19
**ijr@mrdklaw.com** [1] - 3:16
**illustration** [2] - 86:5, 93:24
**illustrations** [2] - 94:2, 97:5
**Ilyas** [2] - 3:14, 6:23
**imagine** [1] - 42:4
**impact** [13] - 71:21, 132:23, 133:2, 133:3, 146:19, 147:11, 148:5, 161:8, 161:9, 164:16, 165:20, 167:11, 167:23
**impacts** [3] - 161:4, 161:7, 169:10
**imparting** [1] - 126:9
**imperfect** [2] - 102:12, 103:4
**imperfectly** [1] - 94:8
**implemented** [1] - 39:13
**implicated** [1] - 30:7
**implicit** [2] - 194:8, 197:14
**imply** [1] - 152:14
**import** [2] - 181:17, 187:21
**important** [15] - 6:12, 6:15, 16:15, 42:12, 66:16, 66:19, 66:22, 124:17, 147:6, 164:19, 164:23, 165:1, 165:3, 195:20, 204:10
**improves** [2] - 63:19, 64:1
**IN** [1] - 207:12
**inaccuracies** [1] - 25:22
**inaccurate** [5] - 155:19, 162:11, 169:4, 169:5, 192:22
**inappropriate** [2] - 66:3, 67:4
**inaudible)** [4] - 25:5, 54:3, 76:6, 143:19
**inaudible]** [1] - 138:4
**Inc** [5] - 3:3, 3:4, 188:5, 188:6, 190:9

CURRAN COURT REPORTING

Case 16-04006   Doc 459-12   Filed 09/11/23   Entered 09/11/23 16:26:40   Desc
Exhibit 12   Page 65 of 76
Deposition of Joshua W. Dennis
May 9, 2023

11

**INC** [6] - 1:10, 1:11, 1:13, 1:14, 1:19, 1:20
**include** [10] - 16:5, 16:14, 17:24, 18:13, 39:15, 108:11, 127:22, 133:7, 133:16, 143:17
**included** [14] - 18:8, 28:1, 30:1, 68:23, 87:2, 87:3, 87:6, 93:9, 108:18, 109:1, 110:15, 111:10, 139:22, 143:10
**includes** [6] - 40:14, 40:19, 68:8, 189:9, 189:24, 198:5
**including** [8] - 29:20, 33:12, 94:24, 97:1, 108:19, 194:8, 203:2, 203:3
**inclusion** [1] - 17:10
**incomplete** [1] - 192:22
**inconsistent** [1] - 100:1
**incorrect** [7] - 67:5, 89:12, 103:20, 103:23, 108:5, 157:10, 170:17
**incorrectly** [2] - 65:12, 74:4
**increases** [1] - 82:22
**independent** [7] - 65:9, 72:23, 79:16, 88:18, 90:23, 117:22, 136:4
**independently** [2] - 64:11, 64:13
**index** [1] - 87:24
**indicated** [1] - 152:10
**indicates** [1] - 156:16
**indication** [1] - 84:7
**indicia** [5] - 100:3, 105:6, 110:20, 137:13, 183:7
**individual** [34] - 47:9, 48:6, 49:9, 50:2, 62:22, 70:14, 77:7, 93:1, 97:1, 99:9, 109:18, 109:20, 118:13, 120:13, 120:14, 121:10, 121:11, 121:16, 121:18, 124:21, 146:19, 146:21, 153:18, 159:7, 160:14, 169:10, 169:12, 170:7, 176:23, 178:1,

183:9, 186:14, 186:15
**individualized** [1] - 54:19
**individuals** [3] - 10:22, 145:20, 148:5
**inevitably** [3] - 203:7, 204:3, 205:4
**inform** [1] - 114:10
**informally** [1] - 36:17
**information** [32] - 16:18, 16:21, 19:21, 77:8, 95:10, 100:17, 104:6, 104:7, 126:9, 134:7, 134:13, 142:20, 143:13, 144:7, 145:24, 151:19, 156:3, 156:12, 156:13, 157:9, 162:8, 170:20, 170:22, 170:24, 173:1, 173:3, 173:7, 173:10, 185:7, 192:3, 197:12, 208:12
**informative** [1] - 149:1
**infringement** [1] - 39:21
**inherent** [4] - 116:2, 125:1, 125:10, 162:10
**inherently** [7] - 68:6, 101:2, 102:12, 102:24, 117:11, 134:3, 162:7
**initial** [2] - 143:11, 156:1
**input** [1] - 77:2
**inputs** [10] - 21:19, 58:8, 58:15, 58:19, 62:16, 66:16, 66:19, 67:3, 67:4, 70:3
**inserted** [1] - 28:3
**instance** [8] - 55:10, 82:14, 98:15, 122:11, 125:23, 148:22, 171:3, 183:9
**instances** [9] - 77:6, 98:22, 98:23, 99:6, 99:23, 108:13, 108:23, 159:6, 189:9
**instruction** [1] - 179:14
**Instructions** [3] - 4:12, 15:8, 20:11
**instructions** [2] - 15:4, 20:21
**insufficient** [2] - 172:2, 172:3

**integrated** [1] - 40:20
**intellectual** [3] - 10:10, 39:21, 56:17
**intended** [1] - 206:5
**intention** [3] - 16:4, 16:13, 21:14
**interacted** [1] - 144:8
**interest** [2] - 44:10, 47:14
**interested** [2] - 60:9, 207:11
**interesting** [2] - 6:2, 44:7
**internal** [1] - 40:4
**internally** [1] - 8:22
**international** [2] - 43:24, 47:16
**interviews** [1] - 151:14
**intro** [1] - 36:2
**invalid** [1] - 191:16
**invalidate** [4] - 164:6, 164:10, 165:5, 165:11
**investigation** [4] - 18:15, 18:19, 38:21, 39:4
**invoice** [3] - 43:18, 154:21, 154:23
**invoices** [1] - 144:4
**involve** [2] - 44:5, 68:2
**involved** [6] - 12:24, 34:1, 47:2, 59:10, 75:3, 76:22
**involves** [3] - 38:19, 39:22, 41:2
**irrespective** [2] - 134:12, 134:23
**isolate** [2] - 93:12, 154:19
**isolation** [1] - 66:7
**issue** [12] - 31:3, 51:3, 68:19, 69:9, 73:19, 85:9, 100:13, 104:8, 168:10, 197:15, 201:7, 201:11
**issued** [1] - 185:18
**issues** [18] - 65:14, 69:14, 69:20, 70:12, 73:15, 98:1, 101:16, 134:1, 134:17, 135:14, 136:20, 159:6, 175:9, 175:10, 175:11, 191:22, 199:22
**itself** [20] - 20:17, 24:18, 26:2, 65:15, 69:16, 97:6, 101:18, 101:22, 105:19, 113:2, 126:8, 126:10, 134:4,

135:3, 135:22, 136:6, 162:10, 166:2, 169:7, 185:9

**J**

**J-A-C-C-A-R-D** [1] - 63:8
**Jaccard** [4] - 62:2, 62:8, 63:7, 63:8
**Jacqueline** [2] - 2:6, 207:3
**Jaff** [4] - 183:9, 183:21, 184:23, 185:18
**JAFF** [1] - 184:24
**James** [2] - 10:19, 11:8
**Jaro** [1] - 53:10
**Jaro-Winkler** [1] - 53:10
**join** [2] - 38:3, 201:9
**joined** [12] - 40:20, 142:1, 142:16, 142:23, 181:10, 181:23, 182:9, 190:17, 191:1, 198:24, 199:1, 200:9
**joining** [3] - 142:4, 142:5, 205:18
**Jointly** [1] - 1:7
**Joshua** [8] - 4:3, 4:9, 4:11, 4:13, 5:2, 5:4, 33:1, 173:22
**JOSHUA** [2] - 2:2, 5:7, 207:5, 208:10
**judge's** [1] - 192:7
**jumped** [1] - 74:2

**K**

**keep** [1] - 56:15
**kind** [7] - 8:23, 13:23, 21:10, 26:17, 102:2, 116:3, 169:6
**kinds** [1] - 204:9
**KING** [3] - 2:11, 3:5, 3:13
**knowing** [3] - 100:11, 126:8, 162:21
**knowledge** [9] - 24:4, 45:14, 45:16, 98:14, 101:21, 104:16, 104:19, 104:24, 208:11
**known** [2] - 98:12, 100:14

**L**

**L-E-U-N-G** [1] - 9:23
**lack** [3] - 70:4, 128:1, 162:8
**lacked** [1] - 142:3
**lacks** [2] - 99:24, 126:10
**laid** [1] - 8:15
**language** [1] - 86:3
**large** [16] - 13:1, 13:2, 38:18, 40:19, 41:2, 41:3, 44:5, 47:9, 74:21, 75:3, 75:20, 108:24, 149:6, 149:10, 149:12, 206:6
**large-scale** [1] - 41:2
**largely** [1] - 11:15
**larger** [1] - 26:19
**last** [9] - 56:12, 76:1, 123:5, 138:14, 139:12, 149:20, 151:1, 155:21, 189:6
**law** [1] - 2:10
**layout** [1] - 158:10
**lays** [1] - 67:23
**lead** [1] - 199:21
**leading** [1] - 25:9
**learning** [1] - 38:1
**least** [19] - 13:3, 27:22, 29:12, 35:11, 36:1, 43:17, 66:22, 68:10, 68:15, 75:13, 108:14, 109:21, 113:19, 115:13, 135:2, 151:21, 152:9, 159:10, 193:21
**leaving** [4] - 38:8, 69:2, 73:13, 73:17
**led** [2] - 39:1, 66:11
**legal** [14] - 68:21, 69:2, 106:9, 151:2, 151:3, 181:13, 181:17, 182:2, 182:11, 186:19, 186:22, 187:2, 187:21, 188:4
**legally** [1] - 50:9
**length** [1] - 70:21
**lengths** [1] - 72:15
**less** [5] - 22:15, 138:19, 161:5, 161:8, 191:8
**Leung** [2] - 9:22, 10:8
**level** [14] - 54:19, 55:11, 61:16, 64:20, 64:22, 121:20, 125:12, 125:13,

125:16, 125:17,
125:21
**Levenshtein** [7] -
53:7, 53:9, 60:19,
60:24, 62:2, 62:9,
63:5
**Levenshtein-based**
[1] - 53:7
**liability** [2] - 181:17,
187:19
**liberal** [2] - 102:7,
205:19
**license** [1] - 5:9
**likelihood** [1] - 182:12
**likely** [8] - 28:19,
40:11, 52:9, 53:4,
110:14, 123:3,
123:6, 202:20
**limit** [2] - 196:13,
203:15
**limited** [1] - 114:20
**Linda** [4] - 188:5,
188:15, 190:17,
191:7
**line** [3] - 178:13,
199:14
**LINE** [1] - 209:6
**line-by-line** [1] -
178:13
**linear** [1] - 83:9
**linearly** [1] - 83:12
**link** [14] - 164:5,
164:10, 165:5,
165:10, 165:20,
165:22, 167:10,
167:22, 167:23,
167:24, 168:1,
168:3, 184:14
**linkage** [10] - 57:16,
59:2, 61:21, 75:16,
166:16, 182:23,
183:13, 183:19,
196:5, 196:14
**linked** [1] - 184:22
**links** [6] - 166:11,
166:17, 166:23,
166:24, 167:18,
167:21
**list** [6] - 32:17, 32:18,
55:21, 144:14,
150:8, 150:23
**listed** [12] - 56:4, 87:9,
95:13, 142:22,
142:24, 143:7,
143:15, 159:11,
181:6, 183:11,
183:12, 191:8
**literacy** [1] - 45:21
**literature** [1] - 103:7
**litigation** [4] - 38:21,

39:17, 40:13, 204:13
**live** [1] - 106:14
**lives** [1] - 19:7
**LLC** [5] - 1:10, 1:13,
1:19, 3:3, 3:13
**load** [2] - 13:3, 13:11
**loaded** [2] - 13:8,
113:11
**loading** [1] - 112:23
**located** [1] - 29:24
**logarithmic** [1] - 83:16
**login** [3] - 113:2,
113:14
**logins** [1] - 113:22
**look** [92] - 20:16,
21:13, 22:16, 22:18,
23:21, 23:22, 24:24,
26:24, 28:4, 30:12,
33:10, 34:14, 40:7,
42:18, 44:3, 44:21,
52:22, 53:12, 55:11,
61:20, 63:12, 64:19,
65:6, 66:6, 67:7,
67:10, 75:9, 75:12,
79:2, 79:6, 79:9,
81:4, 81:12, 87:11,
87:17, 89:10, 91:10,
94:9, 104:4, 104:5,
105:10, 105:11,
107:7, 107:9,
107:13, 108:23,
109:7, 111:13,
111:19, 111:21,
112:3, 117:21,
120:19, 123:22,
126:23, 129:10,
129:17, 132:21,
133:21, 133:22,
134:5, 136:7,
136:18, 137:12,
140:8, 141:12,
146:15, 146:23,
147:2, 147:17,
148:11, 148:14,
148:17, 148:19,
148:20, 152:7,
159:13, 163:16,
163:17, 165:19,
165:21, 166:15,
167:9, 172:16,
174:2, 175:8, 177:2,
185:7, 195:4, 200:1
**looked** [35] - 23:16,
25:13, 26:13, 29:10,
38:2, 52:3, 66:20,
72:6, 72:14, 72:17,
75:4, 80:1, 84:17,
84:21, 86:18, 95:6,
105:13, 106:3,
106:8, 107:18,

109:18, 111:9,
123:15, 129:7,
132:20, 136:22,
137:4, 137:11,
139:11, 141:7,
151:22, 154:1,
162:23, 183:6,
200:23
**looking** [27] - 24:9,
26:11, 40:15, 49:8,
52:4, 65:17, 70:3,
81:5, 89:16, 91:13,
93:22, 105:4, 105:5,
105:18, 105:19,
107:13, 111:8,
116:10, 126:14,
137:8, 143:6,
145:17, 170:14,
174:6, 202:12
**looks** [5] - 64:24,
150:22, 182:11,
197:4, 200:15
**Lopes** [2] - 177:6
**loser** [7] - 48:5, 49:8,
145:11, 146:22,
169:21, 184:7,
192:16
**losers** [4] - 8:20,
47:19, 144:17,
184:11
**lost** [1] - 165:7
**lower** [2] - 25:10,
171:19
**lunch** [2] - 131:17,
132:10
**Lunch** [1] - 131:22
**Lusette** [1] - 151:3
**Lyne** [5] - 3:5, 4:6,
4:24, 5:13, 5:14
**LYNE** [30] - 6:23, 7:2,
7:10, 7:21, 9:13,
9:16, 14:16, 15:2,
15:18, 32:13, 32:18,
32:22, 33:12, 67:11,
76:15, 76:19, 88:5,
124:3, 131:15,
132:2, 132:7,
143:21, 149:19,
149:23, 150:1,
158:7, 178:15,
189:16, 198:20,
206:11

# M

**MA** [2] - 3:7, 3:15
**magnitude** [3] - 18:18,
30:13, 30:21
**mail** [11] - 2:23, 51:9,
152:12, 153:4,

153:5, 153:12,
154:7, 176:8,
177:11, 178:4, 178:5
**mail-ins** [1] - 51:9
**mailed** [2] - 4:23, 4:24
**mails** [3] - 153:18,
154:2, 154:7
**maintained** [1] -
107:11
**major** [1] - 12:3
**majority** [3] - 96:5,
134:14, 134:15
**management** [3] -
12:3, 33:17, 33:20
**manipulate** [1] - 38:3
**manipulating** [1] -
35:4
**manipulation** [2] -
34:24, 41:8
**manual** [1] - 138:10
**manually** [5] - 136:23,
138:3, 138:7,
138:11, 138:22
**Maplewood** [1] -
178:3
**March** [1] - 115:17
**Marco** [1] - 3:12
**MARCO** [1] - 1:22
**Maria** [8] - 18:4, 18:9,
85:12, 94:2, 94:4,
94:23, 95:1, 157:21
**mark** [3] - 132:2,
149:23, 178:16
**marked** [15] - 15:8,
15:13, 20:2, 33:2,
33:5, 67:16, 67:19,
94:11, 132:1, 132:5,
156:2, 158:16,
178:19, 189:19,
194:18
**marketing** [1] - 34:3
**Martin** [20] - 9:12,
9:17, 12:24, 71:9,
71:23, 107:16,
115:14, 119:3,
120:1, 120:21,
122:11, 142:15,
143:10, 156:1,
177:20, 192:8,
192:10, 193:11,
202:20
**Martin's** [10] - 13:15,
72:2, 72:7, 108:3,
109:12, 113:4,
142:11, 157:4,
184:9, 192:8
**MASSACHUSETTS**
[2] - 1:3, 207:1
**Massachusetts** [4] -
2:10, 2:12, 2:22,

207:4
**master's** [1] - 10:6
**match** [11] - 80:17,
101:21, 112:24,
113:8, 114:16,
129:20, 130:13,
130:20, 177:15,
178:2, 196:9
**matched** [2] - 113:14,
195:23
**matches** [5] - 80:18,
80:20, 92:24,
200:16, 200:19
**matching** [20] - 52:8,
52:12, 52:24, 60:6,
60:11, 60:13, 60:16,
60:18, 61:5, 62:1,
62:15, 63:14, 68:3,
68:5, 68:8, 68:12,
73:9, 179:20,
179:24, 197:6
**Materials** [1] - 202:16
**materials** [7] - 32:15,
150:9, 154:2,
202:14, 203:24,
204:1, 205:1
**math** [10] - 11:6, 11:9,
30:15, 36:6, 36:7,
36:10, 69:7, 83:14,
168:23, 169:6
**mathematical** [3] -
69:10, 69:14, 74:6
**mathematics** [4] -
11:6, 12:11, 65:7,
69:21
**matter** [8] - 37:23,
42:9, 50:23, 50:24,
54:1, 60:2, 105:18,
187:12
**matters** [4] - 38:22,
54:8, 54:14, 75:3
**Matura** [1] - 143:20
**maximization** [3] -
63:19, 64:16, 64:24
**MBA** [4] - 11:8, 33:21,
33:22, 33:23
**MBA-type** [1] - 33:21
**mean** [45] - 12:18,
13:7, 18:21, 19:14,
28:23, 29:3, 37:20,
38:14, 40:18, 41:19,
45:16, 53:10, 53:22,
58:12, 68:21, 73:9,
78:11, 78:12, 78:17,
88:13, 88:22, 91:24,
93:15, 95:18, 98:11,
100:23, 101:15,
103:22, 105:20,
106:7, 112:13,
118:12, 119:20,

Case 16-04006    Doc 459-12    Filed 09/11/23    Entered 09/11/23 16:26:40    Desc
Exhibit 12    Page 67 of 76
Deposition of Joshua W. Dennis
May 9, 2023

13

119:23, 140:7,
140:15, 148:8,
153:2, 153:11,
153:17, 153:21,
165:23, 171:13,
175:23, 206:3
**meaning** [1] - 145:23
**meaningful** [1] - 44:9
**means** [1] - 177:7
**meant** [3] - 106:12,
150:18, 153:19
**measure** [5] - 21:23,
90:12, 162:2,
162:16, 163:24
**measures** [3] - 162:7,
162:22, 163:1
**mechanism** [1] -
195:24
**medical** [1] - 121:11
**members** [1] - 155:4
**memorized** [1] -
163:21
**memory** [1] - 9:10
**mentioned** [1] - 23:8
**Merit** [2] - 2:8, 207:3
**meshed** [1] - 141:16
**messy** [1] - 54:12
**method** [7] - 58:9,
58:19, 58:20, 63:2,
63:20, 65:19, 116:15
**Methodology** [5] -
4:12, 4:15, 15:7,
20:10, 67:16
**methodology** [68] -
8:17, 62:16, 89:23,
97:6, 100:1, 116:3,
116:6, 117:7,
117:11, 131:9,
137:13, 137:16,
154:11, 156:19,
160:13, 160:22,
161:3, 161:24,
162:15, 164:4,
164:7, 164:10,
164:12, 165:6,
165:10, 165:11,
166:4, 166:6, 167:9,
167:12, 168:2,
168:24, 174:7,
175:10, 179:23,
181:21, 186:18,
187:4, 187:5,
187:10, 187:13,
191:14, 191:16,
191:17, 191:22,
191:23, 192:13,
192:19, 192:21,
193:5, 193:8,
193:16, 194:3,
194:7, 194:8,

194:12, 194:22,
197:17, 202:7,
203:6, 203:17,
204:2, 204:11,
205:4, 206:1, 206:5
**methods** [1] - 61:4
**metric** [1] - 44:3
**Mickey** [1] - 181:16
**Microsoft** [1] - 35:12
**middle** [1] - 151:2
**MIDDLESEX** [1] -
207:1
**might** [6] - 39:11,
61:23, 71:20, 94:7,
110:11, 124:9
**MILLIGAN** [1] - 3:13
**million** [22] - 43:16,
43:17, 43:22, 44:2,
47:13, 47:14, 48:4,
49:9, 49:24, 68:18,
68:20, 69:5, 69:6,
136:24, 137:1,
138:4, 138:7,
144:13, 154:22,
191:7
**mind** [11] - 35:17,
48:24, 105:17,
132:15, 144:20,
183:14, 201:22,
202:6, 203:5, 204:1,
205:3
**mine** [1] - 171:18
**minimis** [1] - 30:12
**minimize** [4] - 51:9,
76:6, 76:8, 76:9
**minimizing** [1] - 75:23
**minimum** [9] - 60:1,
68:9, 70:19, 82:21,
128:18, 128:23,
129:5, 129:12,
159:13
**minor** [3] - 12:4, 34:4,
34:7
**minority** [1] - 134:15
**minutes** [2] - 198:17,
198:21
**misread** [1] - 190:3
**missed** [20] - 164:5,
164:10, 165:5,
165:9, 165:20,
165:21, 166:11,
166:17, 166:23,
166:24, 167:10,
167:18, 167:21,
167:22, 167:23,
167:24, 168:1,
168:2, 171:10
**missing** [1] - 145:10
**misspoke** [1] - 196:19
**mistake** [1] - 14:24

**model** [19] - 58:2,
58:18, 63:15, 63:18,
64:2, 65:11, 65:24,
66:17, 66:20, 67:2,
67:7, 92:18, 98:8,
125:8, 127:18,
128:1, 162:12,
198:10, 198:12
**modeling** [2] - 39:23,
57:8
**models** [5] - 40:15,
40:18, 62:13, 62:18,
102:14
**momentarily** [1] - 19:8
**monitorships** [1] -
39:10
**months** [3] - 138:15,
138:16, 139:13
**morning** [1] - 8:2
**most** [10] - 24:4, 56:5,
66:16, 66:19, 66:21,
75:5, 110:5, 115:15,
165:3, 198:6
**motions** [1] - 7:18
**Mouse** [1] - 181:16
**mouth** [2] - 76:12,
198:15
**move** [3] - 36:14, 91:6,
149:19
**MR** [208] - 6:23, 7:1,
7:2, 7:3, 7:6, 7:8,
7:10, 7:16, 7:21,
7:23, 9:11, 9:13,
9:15, 9:16, 9:18,
14:16, 15:2, 15:16,
15:18, 31:4, 32:13,
32:18, 32:22, 33:8,
33:12, 35:6, 47:20,
48:22, 49:16, 50:5,
51:19, 55:3, 59:12,
59:22, 61:11, 61:19,
63:21, 64:3, 64:17,
65:5, 65:13, 65:21,
66:4, 66:18, 67:6,
67:11, 69:8, 76:15,
76:19, 78:3, 78:9,
78:15, 79:1, 79:13,
81:24, 82:23, 83:24,
84:14, 86:14, 86:24,
87:16, 88:5, 89:24,
90:8, 90:18, 91:23,
92:3, 96:10, 96:18,
97:3, 97:11, 97:22,
98:9, 98:20, 99:4,
99:20, 100:9,
100:22, 101:3,
101:7, 101:12,
102:10, 102:23,
103:12, 103:21,
106:22, 115:6,

115:11, 116:17,
117:9, 117:20,
119:2, 119:19,
120:16, 121:14,
122:2, 124:3,
124:13, 124:15,
125:4, 125:14,
125:24, 126:3,
127:4, 127:20,
128:8, 128:10,
129:22, 130:5,
130:15, 130:22,
131:3, 131:10,
131:15, 131:18,
132:2, 132:7, 134:2,
134:18, 135:4,
135:21, 136:11,
136:21, 137:10,
138:1, 140:13,
143:21, 144:19,
146:1, 146:12,
147:20, 149:8,
149:19, 149:23,
150:1, 151:15,
152:6, 152:19,
154:5, 155:15,
155:23, 156:24,
158:2, 158:7, 159:2,
160:3, 160:8,
160:24, 161:10,
162:5, 162:19,
163:7, 163:14,
166:19, 167:2,
167:13, 167:16,
168:4, 168:20,
169:15, 170:4,
170:15, 172:4,
172:14, 172:22,
173:24, 174:13,
174:19, 175:4,
176:13, 177:9,
178:15, 180:13,
180:21, 181:3,
181:12, 182:1,
182:7, 183:17,
184:5, 184:17,
185:16, 185:20,
186:8, 187:14,
187:24, 188:3,
189:16, 190:10,
190:18, 191:20,
193:2, 194:5,
194:23, 197:22,
198:18, 198:20,
200:12, 202:2,
202:10, 203:10,
203:19, 204:6,
204:22, 205:7,
205:22, 206:8,
206:11
**MS** [4] - 15:5, 32:17,

32:21, 158:5
**multiday** [1] - 37:12
**multiple** [11] - 5:16,
33:15, 34:1, 44:24,
49:13, 54:16, 60:21,
113:20, 141:13,
148:15, 193:19
**multiweek** [1] - 37:14
**MURPHY** [2] - 2:11,
3:5
**must** [1] - 205:4

## N

**N-O-M-E** [1] - 28:9
**nail** [1] - 116:1
**name** [51] - 5:14, 18:9,
25:2, 25:5, 26:21,
27:22, 28:6, 28:18,
28:20, 29:13, 29:24,
30:5, 31:24, 62:22,
72:4, 82:3, 83:19,
110:5, 110:15,
110:24, 148:16,
176:8, 177:8,
177:10, 177:11,
181:15, 187:17,
192:2, 192:14,
193:6, 193:15,
193:22, 193:23,
194:4, 194:6, 194:7,
194:10, 194:13,
194:22, 195:17,
195:22, 196:3,
196:4, 196:8, 197:3,
197:19, 199:8,
200:7, 200:13,
200:21, 200:24
**NAME** [2] - 209:2,
209:3
**Name** [1] - 194:18
**named** [1] - 207:5
**names** [17] - 18:11,
25:14, 29:14, 51:4,
70:20, 70:22, 72:14,
81:7, 94:24, 95:8,
153:13, 159:14,
179:6, 193:8,
196:14, 196:16,
196:19
**NAN** [6] - 29:17, 30:1,
31:3
**national** [1] - 56:20
**native** [1] - 61:15
**nature** [4] - 34:3, 52:5,
83:5, 95:9
**necessarily** [17] -
17:17, 19:5, 22:21,
47:21, 49:2, 59:15,
89:13, 103:2,

Deposition of Joshua W. Dennis
May 9, 2023

14

105:20, 116:4,
122:1, 124:23,
126:18, 126:19,
141:23, 192:17,
204:23
**necessary** [7] - 44:19,
45:18, 101:10,
117:18, 122:9,
122:10, 170:2
**necktie** [1] - 33:9
**need** [11] - 15:3,
32:14, 40:20, 54:14,
54:17, 132:11,
149:9, 158:18,
158:20, 167:19,
206:9
**needed** [4] - 48:14,
51:1, 55:12, 142:1
**needs** [1] - 168:9
**negative** [5] - 80:18,
166:12, 166:18,
167:1, 167:5
**negatives** [2] - 80:13,
204:15
**neighborhood** [1] -
43:16
**net** [42] - 8:19, 8:20,
47:18, 47:19, 48:4,
48:5, 49:8, 108:24,
133:3, 142:11,
142:17, 144:16,
145:11, 146:21,
146:22, 154:14,
154:17, 155:18,
156:15, 156:23,
157:2, 169:21,
169:22, 170:7,
171:14, 171:19,
172:6, 172:9, 176:5,
177:19, 183:23,
184:4, 184:7,
184:10, 191:5, 191:6
**NET** [2] - 1:17, 1:23
**network** [1] - 90:16
**never** [6] - 63:1, 119:7,
122:12, 162:23,
163:8, 199:1
**Neves** [17] - 18:4,
18:9, 85:12, 86:10,
86:22, 87:2, 87:4,
87:9, 93:7, 94:2,
94:4, 94:20, 94:22,
94:23, 95:1, 97:2,
157:21
**next** [2] - 74:8, 178:16
**Nicole** [1] - 10:20
**night** [1] - 37:9
**nine** [9] - 138:15,
156:22, 168:12,
196:7, 202:15

**nines** [2] - 168:15,
168:16
**nome** [1] - 197:5
**none** [2] - 156:22,
192:9
**nonzero** [3] - 146:3,
147:22, 147:24
**norms** [1] - 104:1
**notarization** [2] - 7:9,
7:11
**Notary** [4] - 2:9, 5:10,
207:3, 207:19
**note** [1] - 196:24
**notebooks** [3] - 45:4,
45:12, 45:19
**noted** [1] - 208:12
**nothing** [4] - 17:5,
17:19, 159:16, 200:2
**Notice** [2] - 4:9, 5:1
**notice** [2] - 8:3, 207:4
**notify** [2] - 51:1, 51:2
**notwithstanding** [1] -
50:11
**null** [3] - 25:12, 29:18,
70:19
**null/one** [1] - 73:1
**number** [60] - 18:6,
19:12, 22:19, 37:6,
43:8, 44:1, 44:8,
44:11, 44:14, 47:14,
47:16, 48:2, 48:17,
48:18, 49:23, 51:9,
53:13, 72:5, 72:14,
79:3, 79:8, 81:6,
81:9, 87:22, 87:23,
96:8, 106:17, 110:8,
113:22, 128:17,
128:18, 128:23,
129:5, 129:12,
133:1, 139:24,
146:3, 147:23,
147:24, 148:9,
149:9, 149:10,
159:19, 160:11,
161:1, 166:10,
166:17, 166:22,
166:24, 167:18,
167:20, 168:15,
176:6, 176:9,
177:14, 177:16,
177:18, 178:2
**numbers** [7] - 25:17,
70:23, 73:1, 144:17,
145:12, 176:21,
176:22

---

**O**

**oath** [1] - 207:6
**objection** [163] -

15:16, 31:4, 47:20,
48:22, 49:16, 50:5,
51:19, 55:3, 59:12,
59:22, 61:11, 61:19,
63:21, 64:3, 64:17,
65:5, 65:13, 65:21,
66:4, 66:18, 67:6,
69:8, 78:3, 78:9,
78:15, 79:1, 79:13,
82:23, 83:24, 84:14,
86:14, 86:24, 87:16,
89:24, 90:8, 90:18,
91:23, 92:3, 96:10,
96:18, 97:3, 97:11,
97:22, 98:9, 98:20,
99:4, 99:20, 100:9,
100:22, 101:3,
101:7, 101:12,
102:10, 102:23,
103:12, 103:21,
115:6, 115:11,
116:17, 117:9,
117:20, 119:2,
119:19, 120:16,
121:14, 122:2,
124:3, 124:13,
124:15, 125:4,
125:14, 125:24,
126:4, 127:4,
127:20, 128:8,
128:10, 129:22,
130:5, 130:15,
130:22, 131:3,
131:10, 134:2,
134:18, 135:4,
135:21, 136:11,
136:21, 137:10,
138:1, 140:13,
144:19, 146:1,
146:12, 147:20,
149:8, 151:15,
152:6, 152:19,
154:5, 155:15,
155:23, 156:24,
159:2, 160:3, 160:8,
160:24, 161:10,
162:5, 162:19,
163:7, 163:14,
166:19, 167:2,
167:13, 167:16,
168:4, 168:20,
169:15, 170:4,
170:15, 172:4,
172:14, 172:22,
173:24, 174:13,
174:19, 175:4,
176:13, 177:9,
180:13, 180:21,
181:3, 181:12,
182:1, 182:7,
183:17, 184:5,

184:17, 185:16,
185:20, 186:8,
187:14, 187:24,
188:3, 190:10,
190:18, 191:20,
193:2, 194:5,
194:23, 197:22,
200:12, 202:2,
202:10, 203:10,
203:19, 204:6,
204:22, 205:7,
205:22, 206:8
**Objection** [1] - 35:6
**objectionable** [1] -
192:23
**objections** [3] - 7:12,
7:13, 7:17
**observant** [1] - 33:11
**obtained** [1] - 16:21
**obviously** [5] - 16:10,
39:18, 76:1, 140:7,
196:23
**occur** [1] - 168:9
**OF** [12] - 1:3, 1:12,
1:13, 1:16, 1:17,
1:18, 1:19, 1:23,
1:23, 2:2, 207:1,
209:4
**offered** [2] - 36:4, 41:1
**office** [2] - 8:8, 18:13
**officer** [1] - 208:6
**offices** [1] - 2:11
**often** [4] - 49:3, 61:24,
162:2, 162:17
**oftentimes** [1] - 96:20
**Oleo** [2] - 110:16,
110:24
**omit** [1] - 17:8
**once** [3] - 29:8, 29:10
**one** [141] - 6:12, 6:15,
9:21, 20:15, 22:21,
23:9, 23:15, 24:20,
25:12, 26:17, 26:18,
29:1, 29:7, 31:10,
34:20, 35:17, 36:1,
40:6, 41:5, 42:7,
42:8, 43:10, 43:17,
47:17, 47:24, 48:1,
48:6, 50:4, 50:23,
51:6, 53:5, 55:24,
56:8, 56:11, 56:13,
56:20, 57:2, 57:15,
60:6, 61:1, 61:6,
62:19, 68:17, 69:12,
69:15, 70:20, 71:7,
72:10, 72:12, 77:2,
77:3, 77:5, 77:11,
80:22, 91:11, 91:13,
91:14, 91:18, 93:4,
94:1, 94:9, 101:16,

108:14, 111:3,
113:19, 113:21,
114:3, 118:19,
119:10, 119:24,
120:9, 120:14,
121:4, 121:22,
122:5, 124:22,
128:4, 132:18,
137:14, 137:15,
141:14, 144:1,
145:9, 146:5, 146:7,
146:8, 153:6,
154:20, 156:11,
156:21, 157:6,
157:7, 157:12,
158:8, 160:15,
164:17, 167:18,
168:5, 168:13,
171:12, 177:5,
177:6, 177:7, 180:4,
180:18, 180:22,
181:5, 181:13,
183:9, 183:10,
183:11, 183:15,
185:4, 185:21,
186:24, 188:1,
188:18, 188:21,
189:6, 190:4,
190:20, 190:24,
191:21, 193:11,
194:6, 196:12,
197:7, 201:11, 204:7
**One** [2] - 4:18, 131:24
**one-by-one** [1] - 168:5
**One-Page** [2] - 4:18,
131:24
**ones** [10] - 18:15,
18:16, 40:12, 53:3,
59:24, 136:19,
141:14, 142:18,
142:21, 142:23
**onus** [1] - 170:6
**open** [1] - 175:16
**opened** [2] - 49:13,
104:17
**operated** [1] - 25:21
**opine** [4] - 90:1,
127:6, 148:1, 188:1
**opined** [1] - 90:4
**opinion** [53] - 14:9,
17:6, 27:3, 40:22,
66:2, 75:15, 79:20,
82:5, 82:12, 87:14,
91:19, 95:14, 96:8,
96:15, 97:23, 98:14,
99:3, 100:9, 109:9,
114:1, 115:14,
122:7, 122:8,
128:20, 129:2,
129:15, 135:6,

CURRAN COURT REPORTING

Case 16-04006    Doc 459-12    Filed 09/11/23    Entered 09/11/23 16:26:40    Desc
Exhibit 12    Page 69 of 76
Deposition of Joshua W. Dennis
May 9, 2023

15

145:19, 146:10,
147:14, 148:12,
152:2, 157:12,
157:17, 157:18,
160:20, 161:13,
161:16, 164:4,
167:8, 168:18,
170:2, 170:23,
174:11, 174:17,
174:20, 174:21,
180:11, 181:13,
181:20, 185:21,
197:19, 198:8
**opinions** [16] - 16:5,
16:9, 16:14, 16:22,
17:8, 17:13, 17:14,
17:18, 31:1, 40:24,
65:10, 65:18, 66:24,
72:23, 109:24,
150:10
**opportunity** [1] -
171:9
**opposed** [4] - 37:2,
49:22, 61:17, 72:11
**options** [3] - 106:2,
117:2, 122:4
**order** [7] - 18:18,
30:12, 136:13,
142:2, 192:7,
193:20, 201:4
**organized** [2] - 181:8,
182:19
**original** [5] - 4:23,
13:2, 13:14, 41:19,
120:3
**originally** [4] - 107:15,
107:23, 107:24,
113:4
**originated** [1] - 50:24
**Oscar** [1] - 171:17
**otherwise** [9] - 13:9,
22:6, 28:21, 54:22,
73:7, 100:24,
201:24, 203:4,
207:11
**outcome** [2] - 80:19,
207:11
**outer** [1] - 200:1
**output** [24] - 23:6,
26:16, 26:18, 26:19,
27:16, 27:19, 29:5,
29:8, 30:6, 31:6,
31:9, 31:10, 31:16,
31:18, 58:10, 71:16,
89:22, 101:2,
119:14, 120:2,
120:22, 141:23,
197:13, 204:19
**overaggregate** [1] -
205:19

**overaggregated** [3] -
152:4, 158:24, 159:4
**overaggregation** [20]
- 97:10, 115:4,
124:24, 125:12,
125:17, 125:22,
152:15, 159:20,
164:5, 169:24,
201:14, 201:18,
201:20, 202:1,
202:8, 203:8, 204:4,
205:6, 205:12,
205:17
**overaggregations** [5]
- 87:7, 87:15, 96:9,
96:17, 171:16
**overall** [9] - 62:16,
83:10, 85:2, 86:13,
98:17, 100:7,
127:22, 148:6, 149:3
**overclustered** [3] -
95:4, 95:15, 102:3
**overclustering** [12] -
98:23, 99:18, 103:9,
110:14, 110:21,
135:13, 135:19,
136:9, 136:14,
136:19, 159:22,
160:2
**overclusters** [2] -
98:7, 98:18
**overinclusive** [1] -
102:16
**overlaid** [2] - 141:10,
141:15
**overlap** [1] - 190:22
**overly** [1] - 205:20
**overstatement** [1] -
147:5
**own** [2] - 117:22,
135:6, 138:9, 147:3,
158:9, 181:23,
183:21, 192:2
**owned** [1] - 100:16
**owner** [2] - 56:20,
171:9

**P**

**P.C** [2] - 2:11, 3:5
**p.m** [3] - 131:23,
206:15
**package** [1] - 61:14
**packages** [1] - 46:6
**page** [20] - 56:24,
57:2, 67:20, 81:20,
81:23, 83:20, 85:16,
85:18, 143:4, 145:5,
175:12, 175:13,
175:16, 175:19,

179:5, 179:11,
180:3, 189:5,
195:14, 195:16
**PAGE** [1] - 209:6
**Page** [5] - 4:8, 4:14,
4:18, 67:14, 131:24
**pages** [4] - 1:1, 42:2,
42:3, 56:23
**paid** [3] - 43:17,
154:20, 154:23
**pains** [1] - 208:15
**pairs** [5] - 75:14,
195:20, 196:1,
196:3, 201:1
**pairwise** [8] - 92:24,
129:20, 130:13,
130:20, 199:7,
200:8, 200:16,
200:18
**Pandas** [4] - 45:24,
46:1, 46:2, 46:6
**Papas** [3] - 3:6, 14:17,
15:3, 67:12, 88:6
**PAPAS** [4] - 15:5,
32:17, 32:21, 158:5
**Papas)** [1] - 189:17
**paper** [4] - 16:12,
163:3, 163:10,
163:12
**papers** [1] - 202:5
**paragraph** [9] - 86:8,
180:3, 182:22,
187:8, 188:8, 189:6,
195:13, 195:16,
202:14
**parameters** [1] - 163:6
**parsing** [1] - 52:8
**part** [33] - 5:19, 12:2,
14:9, 32:7, 40:17,
45:18, 48:13, 51:5,
55:5, 59:1, 62:1,
72:15, 73:3, 92:22,
100:13, 108:15,
110:9, 113:5,
113:23, 115:12,
119:8, 127:12,
134:3, 149:20,
154:16, 155:21,
157:6, 191:2, 195:1,
199:6, 199:12,
199:20, 200:14
**partially** [1] - 46:7
**participant** [19] - 48:8,
48:9, 48:20, 49:2,
49:11, 49:12, 49:20,
49:22, 50:4, 99:11,
118:14, 120:13,
120:14, 121:17,
121:22, 137:18,
159:9, 172:8, 192:15

**participants** [10] -
48:6, 48:18, 50:3,
51:2, 106:13,
115:16, 137:20,
144:9, 144:15,
194:10
**particular** [11] - 20:15,
84:8, 85:8, 86:17,
110:3, 153:3, 153:4,
172:8, 183:8,
188:23, 190:14
**particularly** [2] - 25:1,
108:24
**parties** [2] - 207:10,
208:5
**parts** [1] - 39:5
**past** [2] - 46:4, 171:22
**paste** [1] - 19:6
**patent** [1] - 39:21
**Patrick** [2] - 9:22, 10:6
**Paulo** [2] - 3:12, 151:4
**PAULO** [1] - 1:22
**penalties** [1] - 208:15
**pencil** [3] - 163:4,
163:10, 163:12
**people** [26] - 9:24,
10:1, 51:16, 105:8,
111:10, 120:20,
126:13, 128:17,
128:18, 145:17,
146:19, 147:15,
151:6, 151:10,
151:13, 161:4,
161:5, 161:7, 161:8,
161:9, 168:14,
169:11, 169:12,
185:6, 192:2, 192:3
**percent** [3] - 81:17,
147:5, 171:20
**percentage** [4] -
21:21, 28:6, 30:6,
30:7
**percentages** [1] - 80:4
**perfectly** [2] - 203:13,
203:15
**perform** [9] - 38:23,
74:20, 75:12, 98:6,
98:17, 99:2, 122:17,
129:19, 137:7
**performance** [2] -
14:3, 14:5
**performed** [20] -
13:12, 48:14, 58:22,
65:15, 74:4, 116:6,
116:23, 117:4,
117:22, 119:3,
120:5, 130:24,
137:6, 139:2,
139:11, 168:23,
179:14, 179:15,

179:16, 204:12
**performing** [1] -
204:17
**perjury** [1] - 208:15
**person** [7] - 24:3,
100:16, 146:5,
146:21, 183:15,
186:3, 207:5
**perspective** [10] -
42:20, 66:21, 67:8,
69:11, 69:14, 73:15,
73:16, 74:7, 159:24,
176:2
**pertinent** [1] - 75:6
**Peter** [1] - 202:22
**phase** [3] - 73:21,
200:9, 200:11
**phases** [1] - 200:10
**phone** [3] - 176:9,
177:13, 178:2
**phonetic** [1] - 110:16
**phrase** [2] - 29:17,
199:11
**pick** [1] - 94:1
**picture** [3] - 21:18,
142:2, 145:5
**piece** [4] - 114:3,
163:3, 163:9, 163:11
**pieces** [1] - 23:16
**pivot** [2] - 175:24,
176:11
**place** [2] - 91:13,
195:1
**placed** [1] - 159:7
**Plaintiff** [3] - 1:14, 2:3,
3:2
**plaintiff** [1] - 1:20
**plays** [1] - 195:18
**plenty** [2] - 98:21, 99:5
**plural** [1] - 43:1
**plus** [3] - 15:14, 48:1,
178:4
**point** [12] - 29:16,
85:18, 135:12,
148:1, 168:13,
173:21, 185:9,
185:12, 186:20,
186:22, 190:21,
194:17
**point-in-time** [1] -
185:9
**pointed** [1] - 192:6
**population** [2] - 82:22,
162:4
**portal** [16] - 169:14,
169:16, 169:22,
171:8, 183:1, 183:7,
183:16, 184:4,
184:12, 184:13,
184:20, 184:21,

**Deposition of Joshua W. Dennis**
**May 9, 2023**

16

185:5, 185:8, 185:11
**portion** [11] - 21:20,
23:11, 23:12, 24:13,
32:15, 38:18, 39:9,
51:11, 151:2,
154:17, 194:9
**portions** [17] - 14:11,
21:3, 21:7, 21:12,
23:19, 24:5, 24:10,
24:12, 24:22, 25:18,
26:4, 31:13, 31:14,
31:19, 74:11, 74:12
**position** [4] - 99:16,
149:11, 174:21,
181:9
**positive** [2] - 80:16,
163:1
**positives** [6] - 80:13,
162:3, 162:18,
163:5, 163:23,
204:15
**possibilities** [1] -
175:6
**possible** [14] - 6:22,
33:16, 77:18, 77:20,
97:13, 98:2, 100:10,
100:18, 101:22,
103:5, 120:19,
126:5, 134:8, 135:9
**posted** [1] - 171:8
**potential** [22] - 27:8,
27:9, 27:12, 27:18,
42:10, 110:14,
114:11, 118:16,
132:23, 133:15,
134:7, 144:9,
159:17, 170:7,
173:11, 182:12,
190:22, 192:9,
196:5, 200:3, 200:4,
201:19
**Potential** [1] - 189:10
**potentially** [16] -
75:16, 96:3, 101:13,
101:14, 103:5,
105:13, 106:3,
137:5, 139:17,
148:10, 164:8,
165:1, 165:11,
172:15, 180:10,
183:7
**power** [2] - 37:19,
37:20
**precision** [7] - 88:9,
88:19, 89:4, 89:16,
162:1, 162:15,
163:23
**premarked** [1] - 5:5
**prepared** [1] - 10:16
**preparing** [2] - 10:12,

17:1
**present** [1] - 54:15
**presented** [1] - 114:19
**presumed** [1] - 106:12
**pretty** [3] - 125:19,
163:18, 168:15
**prevent** [1] - 39:14
**previous** [1] - 41:7
**previously** [5] - 20:23,
62:13, 127:16,
139:14, 143:18
**price** [7] - 50:24,
51:24, 53:18, 54:23,
56:9, 56:10, 60:1
**primacy** [4] - 165:17,
194:13, 194:22,
195:1
**primarily** [5] - 32:4,
40:2, 142:6, 193:15,
194:4
**primary** [7] - 9:24,
26:6, 26:10, 37:1,
42:16, 141:14,
142:18
**principle** [1] - 205:21
**principles** [1] - 147:19
**printed** [1] - 158:5
**probabilistic** [14] -
57:15, 59:1, 59:6,
59:11, 59:21, 60:3,
60:11, 60:15, 61:2,
61:8, 61:17, 61:21,
61:24, 62:12
**probabilities** [1] -
196:9
**problem** [3] - 134:4,
159:22, 201:16
**problems** [3] - 133:16,
133:19, 137:16
**Procedure** [2] - 2:5,
2:6
**proceedings** [2] - 5:16
**process** [72] - 22:1,
23:1, 23:5, 28:23,
50:14, 50:16, 50:19,
51:22, 52:1, 53:21,
53:22, 55:6, 62:16,
62:18, 65:16, 67:1,
67:24, 69:4, 69:10,
69:18, 69:23, 70:13,
71:21, 72:24, 73:8,
73:10, 74:14, 77:14,
91:21, 95:12, 96:22,
97:6, 98:1, 99:23,
101:1, 103:2,
112:22, 113:4,
113:6, 114:8,
116:14, 118:6,
118:8, 118:10,
119:1, 119:8, 120:4,

120:11, 121:3,
121:7, 125:2,
125:11, 127:12,
127:22, 130:3,
130:12, 130:16,
159:5, 169:17,
169:20, 169:21,
170:6, 173:13,
174:4, 193:19,
199:20, 200:14,
201:10, 201:16,
201:23
**processes** [2] - 68:11,
102:1
**produced** [1] - 26:15
**production** [2] - 5:8,
26:13
**products** [1] - 56:14
**professional** [1] -
42:23
**Professional** [3] - 2:8,
42:1, 59:19
**program** [3] - 39:12,
57:5, 166:3
**programming** [1] -
38:2
**programs** [2] - 36:5,
38:23
**projects** [3] - 46:24,
47:1, 47:3
**proof** [3] - 174:12,
174:22, 174:24
**proper** [1] - 161:14
**properly** [2] - 202:6,
203:6
**property** [9] - 10:11,
39:21, 56:18, 78:2,
78:7, 78:10, 78:12,
78:13, 78:17
**prophecy** [2] - 104:13,
162:9
**proportional** [2] -
166:11, 166:24,
167:4
**proposition** [2] -
192:12, 205:3
**provide** [5] - 8:8,
13:22, 13:24,
113:18, 170:1
**provided** [11] - 14:4,
26:14, 96:12, 98:21,
100:2, 107:10,
115:8, 133:9,
143:12, 160:15,
192:5
**Public** [4] - 2:9, 5:10,
207:3, 207:19
**published** [3] -
201:21, 202:5,
202:17

**pull** [2] - 189:2, 199:18
**pulled** [1] - 142:20
**punctuation** [1] -
25:16
**purely** [2] - 43:6, 74:6
**purpose** [14] - 58:22,
71:13, 75:11, 91:9,
91:12, 93:23,
105:22, 139:3,
165:21, 165:23,
180:14, 183:18,
205:24, 206:2
**purposes** [9] - 45:1,
75:23, 79:12, 94:3,
111:16, 145:23,
157:14, 181:7,
191:11
**pursuant** [2] - 2:4, 8:3,
57:4, 207:4
**put** [12] - 8:17, 16:8,
44:7, 62:21, 120:8,
121:16, 121:21,
141:2, 161:1, 170:6,
172:11, 187:16
**putting** [3] - 77:5,
77:11, 121:4
**PUZZARINI** [1] - 1:22
**Puzzarini** [2] - 3:12
**Python** [9] - 13:17,
29:18, 45:4, 45:8,
45:11, 45:13, 45:17,
45:23, 46:14

### Q

**QC** [2] - 13:6, 13:7
**quadruple** [2] -
168:11, 168:15
**qualify** [2] - 104:24,
114:14
**quality** [9] - 84:6,
84:13, 85:2, 85:24,
86:5, 86:12, 94:7,
101:18, 104:10
**quantification** [3] -
114:24, 115:3, 137:2
**quantified** [2] - 72:13,
133:10
**quantify** [7] - 114:14,
133:2, 133:23,
136:7, 137:22,
161:6, 169:2
**quantum** [3] - 174:12,
174:21, 174:24
**queried** [1] - 140:15
**queries** [8] - 19:11,
19:12, 19:24, 93:18,
94:3, 139:1, 140:11,
141:3
**query** [7] - 19:3, 19:8,

93:17, 93:20, 93:21,
139:11, 140:16
**questioned** [1] - 95:7
**questions** [6] - 6:4,
73:11, 136:5, 150:7,
161:22, 191:12
**quietly** [1] - 145:12
**quite** [4] - 8:24, 35:16,
105:6, 199:22
**quote** [1] - 86:4

### R

**race** [2] - 81:15, 85:11
**radically** [1] - 201:8
**ran** [11] - 21:3, 23:9,
24:1, 24:14, 25:19,
31:20, 31:21, 72:9,
74:11, 141:3
**random** [1] - 111:13
**randomly** [1] - 82:3
**range** [1] - 110:10
**rarely** [3] - 42:15,
44:6, 44:8
**rate** [39] - 86:22, 87:1,
89:5, 89:16, 89:21,
89:22, 90:2, 90:6,
97:9, 97:20, 98:2,
98:6, 98:17, 99:14,
99:17, 99:18, 100:8,
100:19, 102:2,
103:10, 103:19,
125:21, 132:24,
146:16, 148:6,
160:2, 160:21,
161:2, 166:12,
166:18, 167:1,
167:5, 168:11,
168:12, 168:14,
168:19, 168:22,
169:3, 169:9
**rates** [5] - 96:24,
115:5, 132:16,
132:17, 132:19
**ratio** [8] - 60:19,
60:24, 179:5, 179:6,
179:17, 197:5, 197:6
**re** [2] - 14:3, 14:5
**Re** [1] - 1:9
**re-performance** [2] -
14:3, 14:5
**read** [9] - 6:24, 63:22,
88:14, 90:13,
115:19, 115:21,
158:14, 191:3, 208:4
**reading** [6] - 10:13,
11:16, 21:17, 45:21,
56:19, 88:16,
145:12, 208:5
**reads** [1] - 195:16

**CURRAN COURT REPORTING**

Deposition of Joshua W. Dennis
May 9, 2023

17

**real** [11] - 101:20, 104:6, 104:7, 104:14, 126:9, 146:4, 162:8, 170:12, 170:13
**real-world** [8] - 104:6, 104:7, 104:14, 126:9, 146:4, 162:8, 170:12, 170:13
**realistic** [1] - 75:21
**realized** [1] - 80:21
**really** [17] - 44:23, 45:1, 45:9, 54:21, 55:7, 55:15, 55:17, 60:8, 62:7, 67:7, 82:10, 84:23, 98:16, 99:13, 142:8, 149:5, 166:4
**reason** [3] - 104:3, 165:24, 193:12
**reasonable** [2] - 147:3, 166:6
**reasonably** [2] - 39:13, 174:4
**reasons** [4] - 120:3, 155:20, 155:24, 208:7
**rebate** [1] - 57:5
**Rebuttal** [2] - 4:10, 5:3
**received** [16] - 12:23, 13:1, 14:7, 20:7, 20:14, 22:19, 22:20, 26:15, 31:18, 44:22, 44:24, 51:3, 107:23, 115:18, 182:15, 185:9
**recent** [2] - 56:5, 115:15
**recess** [1] - 131:22
**Recess** [2] - 76:20, 198:22
**recognize** [4] - 20:4, 20:6, 94:20, 189:21
**recollect** [1] - 55:19
**recollecting** [1] - 24:8
**recollection** [16] - 12:23, 22:13, 23:17, 24:19, 25:17, 28:5, 36:20, 43:14, 53:17, 83:17, 110:23, 123:2, 123:7, 123:10, 157:11, 204:8
**record** [7] - 28:22, 57:16, 59:1, 61:21, 106:22, 192:5, 207:7
**records** [16] - 18:7, 26:22, 28:14, 29:11, 30:7, 42:15, 44:8, 44:11, 44:14, 51:17,

51:23, 54:16, 145:18, 145:19, 147:16
**RECROSS** [1] - 4:5
**REDIRECT** [1] - 4:5
**reduce** [2] - 69:5, 75:20
**reduced** [1] - 207:7
**refer** [5] - 38:13, 39:3, 64:4, 106:16, 188:6
**reference** [2] - 85:8, 145:7
**referenced** [3] - 84:19, 143:18, 153:3
**referred** [6] - 54:23, 83:20, 84:24, 85:23, 150:12, 151:1
**referring** [18] - 9:4, 15:24, 19:10, 23:13, 39:4, 41:13, 41:16, 60:4, 61:12, 64:6, 85:20, 104:15, 104:20, 130:17, 153:7, 179:18, 183:3, 190:6
**refers** [3] - 70:11, 179:17, 195:19
**reflect** [1] - 132:9
**reflects** [1] - 181:17
**regard** [2] - 85:21, 85:22
**regardless** [6] - 44:13, 122:21, 167:20, 191:18, 200:7, 206:4
**regards** [2] - 70:6, 110:17
**Registered** [3] - 2:7, 2:8, 207:3
**reimbursement** [1] - 57:4
**relate** [1] - 54:16
**related** [7] - 24:15, 25:1, 35:12, 36:24, 38:10, 51:3, 56:13
**relates** [9] - 39:8, 39:19, 79:21, 83:10, 89:5, 108:13, 114:7, 167:12, 168:2
**relating** [1] - 36:21
**relative** [8] - 65:1, 65:3, 65:24, 66:14, 67:1, 135:12, 207:9, 207:10
**relevance** [2] - 193:7, 196:22
**relevant** [7] - 16:6, 16:15, 17:9, 17:13, 66:2, 75:6, 148:5
**reliability** [3] - 99:24, 127:23, 198:11

**reliable** [9] - 137:17, 157:14, 163:2, 166:6, 166:8, 174:6, 192:17, 198:6, 198:12
**reliance** [1] - 70:4
**relied** [8] - 14:8, 32:5, 42:20, 58:14, 85:1, 154:24, 156:22, 157:4
**relies** [5] - 192:13, 193:16, 194:3, 194:7, 196:24
**rely** [5] - 12:15, 12:18, 31:2, 119:11, 149:3
**relying** [2] - 32:11, 170:11
**remember** [20] - 18:3, 18:6, 20:11, 20:15, 22:2, 28:2, 30:5, 30:20, 32:2, 34:10, 35:10, 35:24, 37:18, 43:5, 52:15, 52:23, 53:2, 81:17, 142:21, 154:23
**remind** [1] - 122:14
**remotely** [1] - 106:15
**remove** [4] - 70:18, 71:7, 71:24, 72:4
**removed** [2] - 71:11, 72:10
**removing** [3] - 25:9, 71:6, 73:1
**REP** [1] - 177:12
**rep** [2] - 177:5, 177:13
**rep_end** [1] - 177:12
**rep_id** [18] - 28:7, 29:5, 29:7, 29:9, 29:11, 31:10, 55:11, 142:13, 154:24, 155:3, 155:8, 155:12, 155:17, 156:4, 156:11, 157:10, 177:3
**rep_id's** [1] - 176:6
**rep_nome** [5] - 28:8, 28:10, 29:1, 176:23, 190:9
**reperformed** [1] - 157:11
**rephrase** [1] - 6:6
**Report** [7] - 4:11, 4:14, 4:16, 5:4, 67:15, 94:11, 94:16
**report** [89] - 9:4, 9:6, 9:8, 9:12, 9:14, 9:17, 10:13, 10:15, 11:16, 12:17, 12:21, 13:14, 14:1, 14:2, 14:20, 15:1, 15:11, 15:15,

15:22, 16:3, 16:5, 16:14, 16:23, 17:9, 17:15, 17:24, 18:20, 21:18, 25:3, 28:1, 31:2, 32:16, 32:20, 43:15, 63:23, 64:5, 64:7, 67:21, 70:3, 72:2, 72:7, 81:4, 81:11, 83:21, 84:20, 85:7, 86:20, 87:12, 87:20, 88:1, 88:14, 88:17, 90:14, 90:22, 93:6, 93:14, 94:19, 101:17, 106:17, 120:4, 122:20, 132:17, 133:1, 133:8, 139:22, 142:22, 142:24, 143:11, 145:14, 150:6, 150:11, 155:21, 156:1, 157:23, 157:24, 158:6, 175:13, 178:14, 179:10, 188:17, 189:22, 192:6, 192:8, 193:15, 193:20, 194:15, 195:7
**Reporter** [3] - 2:8, 2:9, 207:3
**reporter** [2] - 4:23, 207:22
**REPORTING** [1] - 2:21
**reports** [3] - 8:16, 9:1, 12:12
**represent** [5] - 5:15, 49:11, 67:20, 110:21, 150:4
**representante** [1] - 143:17
**representative** [9] - 84:5, 84:9, 84:13, 85:1, 85:24, 86:12, 94:6, 148:24, 149:5
**Representative** [1] - 3:11
**REPRESENTATIVE** [1] - 1:16
**Representatives** [1] - 3:12
**REPRESENTATIVES** [1] - 1:23
**representing** [1] - 3:2
**Representing** [1] - 3:11
**represents** [1] - 29:6
**reproduction** [1] - 207:21
**require** [16] - 47:3, 50:18, 98:13,

119:16, 120:15, 121:13, 122:1, 127:9, 127:11, 128:6, 129:24, 130:12, 135:5, 135:23, 136:15, 161:12
**required** [10] - 34:8, 50:15, 75:19, 77:1, 83:9, 91:21, 116:13, 117:12, 142:4, 167:9
**requirement** [2] - 128:12, 193:17
**requires** [7] - 74:20, 100:21, 100:23, 100:24, 117:8, 122:17, 193:8
**reran** [1] - 14:11
**research** [2] - 122:4, 202:5
**reserve** [1] - 7:17
**reside** [1] - 114:24
**resolved** [1] - 180:18
**respect** [41] - 9:8, 12:17, 13:24, 15:11, 22:23, 23:4, 24:4, 25:24, 46:14, 56:9, 65:10, 65:18, 65:23, 66:14, 66:24, 69:24, 70:13, 72:23, 73:5, 73:19, 83:22, 97:17, 109:23, 109:24, 112:9, 114:1, 115:13, 134:11, 135:3, 135:16, 136:7, 140:2, 145:15, 145:20, 147:12, 147:15, 150:24, 152:9, 156:21, 191:13, 207:22
**respects** [1] - 157:5
**response** [1] - 13:14
**result** [12] - 19:17, 114:2, 114:6, 115:2, 124:23, 185:11, 185:17, 201:24, 202:7, 203:7, 204:3, 205:5
**resulting** [1] - 143:14
**results** [3] - 121:11, 137:17, 197:20
**retain** [1] - 44:19
**retained** [2] - 4:23, 56:20
**review** [12] - 8:16, 13:5, 39:14, 114:23, 115:15, 116:12, 136:24, 138:11, 139:2, 155:9,

Case 16-04006   Doc 459-12   Filed 09/11/23   Entered 09/11/23 16:26:40   Desc
Exhibit 12   Page 72 of 76
Deposition of Joshua W. Dennis
May 9, 2023

18

198:11, 203:22
**reviewed** [17] - 13:13,
14:10, 21:2, 72:7,
80:3, 81:7, 82:9,
86:17, 115:20,
129:1, 138:22,
138:24, 139:6,
140:5, 140:7,
188:21, 205:1
**reviewing** [6] - 20:12,
20:15, 39:15, 82:2,
138:3, 138:7
**right-hand** [2] -
176:21, 177:3
**rise** [1] - 61:16
**risk** [2] - 102:5, 102:7
**Road** [1] - 2:22
**Role** [1] - 194:18
**role** [1] - 195:17
**RONA** [179] - 3:13, 7:1,
7:3, 7:6, 7:8, 7:16,
7:23, 9:11, 9:15,
9:18, 15:16, 31:4,
33:8, 35:6, 47:20,
48:22, 49:16, 50:5,
51:19, 55:3, 59:12,
59:22, 61:11, 61:19,
63:21, 64:3, 64:17,
65:5, 65:13, 65:21,
66:4, 66:18, 67:6,
69:8, 78:3, 78:9,
78:15, 79:1, 79:13,
81:24, 82:23, 83:24,
84:14, 86:14, 86:24,
87:16, 89:24, 90:8,
90:18, 91:23, 92:3,
96:10, 96:18, 97:3,
97:11, 97:22, 98:9,
98:20, 99:4, 99:20,
100:9, 100:22,
101:3, 101:7,
101:12, 102:10,
102:23, 103:12,
103:21, 106:22,
115:6, 115:11,
116:17, 117:9,
117:20, 119:2,
119:19, 120:16,
121:14, 122:2,
124:13, 124:15,
125:4, 125:14,
125:24, 126:3,
127:4, 127:20,
128:8, 128:10,
129:22, 130:5,
130:15, 130:22,
131:3, 131:10,
131:18, 134:2,
134:18, 135:4,
135:21, 136:11,

136:21, 137:10,
138:1, 140:13,
144:19, 146:1,
146:12, 147:20,
149:8, 151:15,
152:6, 152:19,
154:5, 155:15,
155:23, 156:24,
158:2, 159:2, 160:3,
160:8, 160:24,
161:10, 162:5,
162:19, 163:7,
163:14, 166:19,
167:2, 167:13,
167:16, 168:4,
168:20, 169:15,
170:4, 170:15,
172:4, 172:14,
172:22, 173:24,
174:13, 174:19,
175:4, 176:13,
177:9, 180:13,
180:21, 181:3,
181:12, 182:1,
182:7, 183:17,
184:5, 184:17,
185:16, 185:20,
186:8, 187:14,
187:24, 188:3,
190:10, 190:18,
191:20, 193:2,
194:5, 194:23,
197:22, 198:18,
200:12, 202:2,
202:10, 203:10,
203:19, 204:6,
204:22, 205:7,
205:22, 206:8
**Rona** [1] - 3:14
**Rona's** [1] - 8:7
**roughly** [1] - 140:11
**Rowe** [1] - 2:22
**rows** [2] - 43:8, 158:22
**Rule** [1] - 208:1
**rule** [2] - 101:6,
102:20
**Rules** [2] - 2:5, 2:6
**rules** [4] - 6:3, 102:16,
102:17, 205:18
**run** [22] - 21:7, 21:11,
21:21, 22:4, 22:10,
22:22, 23:3, 23:20,
24:5, 24:23, 26:4,
31:13, 31:14, 31:16,
71:10, 74:9, 74:13,
75:21, 75:23, 102:5,
102:7, 141:5
**running** [4] - 25:18,
94:3, 140:16
**Ryan** [4] - 9:22, 10:6,

12:16, 12:20

---

## S

**S-Q-L** [1] - 13:20
**S-T-E-D-M-A-N** [1] -
10:20
**S-U-N-T-E-R** [1] -
57:18
**sample** [15] - 78:1,
78:6, 78:19, 78:23,
79:11, 79:17, 79:23,
82:7, 82:13, 82:21,
83:9, 83:22, 83:23,
111:11, 149:6
**sampled** [1] - 129:14
**samples** [1] - 21:11
**sampling** [4] - 83:19,
145:22, 147:13,
147:18
**SANDRO** [1] - 1:22
**Sandro** [2] - 3:12,
151:4
**Saryas** [4] - 183:9,
183:21, 184:23,
185:18
**SARYAS** [1] - 184:24
**satisfactorily** [1] - 5:8
**save** [1] - 150:21
**saw** [8] - 26:20, 29:9,
29:11, 84:7, 109:6,
133:15, 168:6,
201:11
**scale** [1] - 41:2
**scanned** [1] - 4:23
**science** [26] - 10:2,
10:7, 12:4, 12:7,
13:22, 34:5, 34:7,
34:11, 34:16, 34:18,
34:23, 34:24, 35:3,
36:22, 38:10,
103:11, 129:19,
130:3, 130:10,
131:2, 131:5, 182:4,
182:9, 182:10, 205:2
**scientist** [1] - 11:21
**scientists** [4] - 10:5,
10:23, 11:2, 12:10
**scope** [4] - 8:12, 8:14,
73:3, 144:6
**score** [1] - 90:12
**scores** [2] - 179:19,
179:20
**screen** [1] - 19:4
**seal** [1] - 207:13
**search** [4] - 93:12,
93:15, 104:5, 140:16
**searches** [1] - 141:18
**searching** [1] - 93:22
**second** [7] - 24:21,

42:2, 56:12, 57:2,
143:6, 182:22, 189:6
**secondary** [2] - 154:2,
192:24
**section** [3] - 85:15,
194:17, 195:19
**Section** [1] - 195:19
**see** [29] - 21:12, 24:24,
25:22, 26:1, 27:6,
44:21, 67:24, 69:9,
69:13, 69:20, 81:14,
85:4, 141:15, 142:2,
156:4, 156:10,
156:14, 161:3,
162:3, 162:17,
176:20, 178:15,
179:7, 183:2, 184:1,
188:16, 189:10,
200:22, 202:17
**seeing** [1] - 30:5
**seek** [1] - 166:4
**seem** [1] - 147:3
**Select** [2] - 41:24,
59:19
**select** [1] - 42:23
**selected** [3] - 18:16,
82:3, 84:8
**selection** [2] - 69:13,
190:15
**selective** [1] - 18:15
**self** [2] - 104:13, 162:9
**self-fulfilling** [2] -
104:13, 162:9
**semester** [2] - 36:11,
36:13
**sense** [5] - 83:2,
90:16, 90:19,
111:24, 112:5
**sentence** [3] - 182:22,
189:6, 189:12
**separate** [3] - 99:7,
144:15, 187:7
**separately** [3] - 13:11,
36:8, 182:18
**series** [3] - 6:3, 48:17,
171:7
**servers** [1] - 13:4
**set** [14] - 20:19, 20:21,
29:8, 78:23, 100:15,
100:21, 119:17,
119:21, 119:22,
139:6, 155:21,
175:19, 196:1,
207:12
**sets** [2] - 24:9, 43:1
**setting** [2] - 20:17,
25:11
**settlement** [2] - 191:2,
191:11
**seven** [2] - 143:4,

145:9
**several** [1] - 37:24
**Shal** [6] - 180:4,
180:19, 182:23,
183:10, 186:6,
187:11
**SHAL** [1] - 180:4
**shall** [3] - 208:3,
208:4, 208:6
**share** [4] - 99:7,
159:12, 159:15,
159:16
**sheet** [1] - 208:12
**SHEET** [1] - 209:1
**shirt** [1] - 33:13
**shirts** [1] - 33:15
**short** [1] - 121:20
**shot** [1] - 163:12
**show** [16] - 19:4, 20:2,
54:18, 55:10, 99:6,
99:23, 141:20,
143:2, 164:12,
165:2, 171:15,
175:17, 175:19,
180:16, 183:18,
194:15
**showed** [5] - 134:17,
135:2, 135:18,
136:9, 159:20
**showing** [5] - 144:12,
176:23, 178:21,
178:22, 190:15
**shown** [5] - 8:4,
152:23, 178:13,
190:11, 190:12
**shows** [2] - 156:2,
162:15
**sic** [2] - 194:3, 194:21
**side** [9] - 10:11, 11:14,
40:14, 120:9, 121:4,
133:3, 176:6,
176:20, 179:8
**SIG** [6] - 13:2, 13:8,
41:18, 43:13, 44:16
**sigma** [1] - 168:16
**sign** [2] - 6:24, 175:2
**Signature** [1] - 208:19
**signed** [2] - 12:13,
187:1
**Signed** [1] - 208:15
**significance** [3] -
186:23, 187:2, 193:6
**significant** [11] -
26:20, 30:11,
128:20, 129:2,
129:8, 129:15,
134:15, 137:19,
145:22, 161:7,
190:21
**significantly** [1] -

Case 16-04006   Doc 459-12   Filed 09/11/23   Entered 09/11/23 16:26:40   Desc
Exhibit 12   Page 73 of 76
Deposition of Joshua W. Dennis
May 9, 2023

19

161:4
**Signing** [1] - 208:1
**similar** [18] - 11:13,
51:7, 83:6, 159:14,
169:20, 170:5,
188:10, 189:9,
193:9, 193:22,
196:16, 196:20,
197:18, 199:24,
200:1
**similarities** [1] -
180:15
**similarity** [5] - 99:8,
179:19, 200:7,
200:20, 200:24
**simple** [4] - 60:16,
60:18, 175:18,
192:16
**simply** [16] - 21:15,
44:9, 51:16, 71:4,
71:17, 100:17,
101:22, 105:18,
105:21, 106:8,
144:24, 162:9,
183:18, 186:20,
198:11, 202:23
**single** [26] - 42:14,
49:11, 49:12, 49:14,
49:20, 54:16, 66:10,
84:4, 84:11, 84:24,
85:22, 120:12,
133:12, 164:4,
164:10, 165:5,
165:9, 181:11,
181:24, 183:2,
184:23, 186:1,
186:14, 186:15,
192:15
**singular** [3] - 20:6,
139:3, 196:13
**sit** [19] - 24:11, 55:20,
64:8, 64:14, 67:9,
89:8, 99:15, 116:21,
117:24, 118:9,
118:18, 118:23,
119:15, 120:10,
126:24, 131:13,
160:21, 174:10,
174:17
**sitting** [8] - 17:21,
44:10, 52:15, 68:16,
72:20, 77:21, 123:4,
123:21
**situation** [1] - 125:6
**situations** [2] -
153:10, 153:11
**six** [4] - 34:13, 145:9,
168:16
**size** [32] - 41:9, 42:24,
43:1, 43:6, 43:7,

43:9, 44:15, 53:14,
71:21, 78:1, 78:6,
78:19, 78:23, 79:4,
79:15, 79:17, 79:23,
80:24, 81:3, 82:7,
82:13, 82:21, 82:22,
83:9, 83:10, 83:22,
83:23, 147:18,
149:6, 164:13,
164:15, 166:23
**sizes** [1] - 79:11
**Skidmore** [3] - 33:18,
34:12, 34:17
**skin** [1] - 92:2
**small** [5] - 14:10, 21:2,
21:3, 149:10, 149:12
**software** [1] - 61:14
**Soha** [11] - 10:18,
11:5, 13:22, 14:2,
20:24, 23:24, 24:3,
24:14, 32:6, 32:10,
58:4
**SOHA** [1] - 10:19
**solely** [1] - 58:16
**solid** [2] - 143:7,
143:15
**solution** [1] - 126:7
**someone** [10] -
110:18, 110:23,
147:2, 160:10,
170:18, 175:6,
181:15, 186:23,
187:16, 192:13
**sometimes** [4] -
26:23, 44:7, 153:12,
153:13
**somewhat** [1] - 172:5
**somewhere** [1] -
187:18
**sorry** [31] - 9:11,
13:10, 14:21, 14:22,
15:18, 31:17, 31:18,
41:12, 52:19, 54:4,
54:6, 56:22, 61:13,
62:5, 76:7, 76:11,
85:21, 86:7, 96:11,
106:10, 133:22,
141:10, 145:11,
155:1, 156:8,
166:20, 167:5,
171:24, 176:24,
184:18
**sort** [8] - 36:2, 37:18,
58:10, 58:17, 75:8,
94:8, 111:12, 138:17
**Sosa** [1] - 171:17
**sought** [4] - 112:24,
117:21, 118:15,
123:13
**sounds** [2] - 9:19,

54:20
**source** [12] - 41:19,
68:4, 141:8, 141:12,
142:1, 142:4, 142:5,
166:2, 167:11,
168:1, 201:17,
201:19
**sources** [1] - 192:9
**spaces** [1] - 25:9
**spanned** [1] - 37:15
**speaking** [10] - 58:18,
77:16, 83:8, 88:22,
102:9, 102:14,
121:8, 164:22,
166:10, 168:14
**speaks** [2] - 188:14,
191:21
**Special** [1] - 194:18
**special** [1] - 195:17
**specific** [29] - 14:6,
18:2, 24:9, 27:24,
44:14, 47:7, 53:16,
62:19, 62:23, 66:12,
79:24, 81:2, 86:3,
88:23, 89:13,
103:16, 106:11,
122:20, 122:22,
123:21, 130:7,
130:8, 132:22,
133:4, 133:6,
164:13, 194:20,
203:20, 203:21
**specifically** [23] -
13:24, 24:1, 30:5,
53:3, 59:18, 81:5,
81:7, 82:8, 85:19,
96:11, 96:12,
107:12, 111:20,
111:23, 114:5,
123:4, 131:11,
131:12, 133:2,
152:8, 160:11,
163:17, 188:19
**speculating** [1] -
187:22
**Splinc** [2] - 46:20,
46:21
**split** [1] - 52:8
**SQL** [16] - 13:18,
13:19, 36:24, 37:4,
37:18, 37:20, 37:23,
38:2, 38:4, 38:5,
38:6, 45:23, 46:19,
112:23, 140:17,
141:1
**SS** [1] - 207:1
**stand** [2] - 192:11,
205:2
**standard** [6] - 79:3,
100:14, 128:2,

128:7, 129:19,
129:24
**stands** [1] - 63:11
**start** [6] - 6:17, 39:2,
69:19, 130:19,
155:6, 175:15
**starting** [1] - 198:15
**state** [1] - 204:1
**State** [3] - 2:11, 3:6,
3:14
**statement** [14] - 16:16,
19:1, 49:15, 99:21,
102:18, 118:20,
124:14, 125:3,
125:5, 136:13,
140:22, 140:23,
205:9, 208:7
**statements** [3] - 25:3,
56:2, 152:18
**states** [2] - 116:8,
193:19
**STATES** [1] - 1:3
**statistic** [2] - 44:9,
98:11
**statistical** [10] - 12:11,
78:24, 88:9, 88:10,
100:6, 100:19,
104:1, 111:12,
114:15, 147:19
**statistically** [7] -
128:20, 129:1,
129:8, 129:14,
145:22, 147:17,
149:4
**statistics** [12] - 11:9,
35:21, 36:2, 36:4,
36:5, 36:6, 36:7,
36:8, 36:10, 78:21,
78:24, 113:8
**Stedman** [2] - 10:20,
11:12
**stenographer** [1] -
6:18
**STENOGRAPHER** [7]
- 25:6, 54:4, 76:7,
138:5, 143:20,
149:24, 156:6
**step** [48] - 14:12, 23:1,
23:5, 23:6, 24:18,
24:21, 27:7, 31:15,
31:24, 66:6, 66:10,
68:17, 69:12, 69:15,
73:5, 73:6, 74:4,
74:8, 80:22, 91:21,
116:7, 116:13,
116:16, 117:5,
154:10, 154:15,
154:16, 155:1,
155:5, 156:11,
157:6, 157:7,

192:24, 195:7,
196:6, 196:11,
196:13, 196:23,
197:1, 197:12,
197:13, 197:14,
199:1, 199:6, 199:17
**step-by-step** [1] -
14:12
**STEPHEN** [2] - 1:12,
1:18
**Stephen** [2] - 2:4, 3:2
**Steps** [2] - 4:15, 67:15
**steps** [41] - 21:24,
22:4, 22:5, 22:10,
22:14, 22:15, 22:17,
22:21, 23:4, 23:15,
24:15, 24:17, 24:19,
24:20, 25:24, 26:7,
26:10, 26:11, 32:9,
67:13, 67:23, 68:2,
68:7, 70:10, 92:21,
107:3, 109:15,
145:2, 151:17,
152:16, 156:21,
156:22, 157:8,
182:17, 186:10,
195:5, 196:7,
197:10, 199:2,
200:6, 200:8
**still** [5] - 44:18, 47:11,
47:24, 184:7, 200:13
**Stoneham** [1] - 2:22
**StoneTurn** [2] - 2:22,
18:18
**StoneTurn's** [1] - 39:9
**stopped** [1] - 121:19
**Street** [2] - 2:12, 3:6,
3:14
**strict** [1] - 205:20
**strictly** [1] - 5:19
**strike** [13] - 7:19,
30:24, 31:15, 35:19,
57:7, 57:9, 112:13,
115:23, 122:15,
127:8, 127:15,
149:20, 201:6
**string** [2] - 25:4, 29:16
**strings** [3] - 93:17,
93:20, 93:21
**strong** [1] - 110:20
**stronger** [1] - 45:20
**structured** [1] -
182:15
**struggling** [1] - 59:17
**studied** [4] - 64:11,
64:13, 65:8, 91:5
**studies** [11] - 201:21,
202:4, 202:5,
202:12, 202:13,
202:17, 202:18,

Deposition of Joshua W. Dennis
May 9, 2023

20

203:1, 203:3, 204:9, 205:10, 205:11, 205:14

**study** [4] - 33:21, 36:21, 203:13, 203:16

**stuff** [1] - 37:19

**subcategories** [1] - 56:18

**subject** [5] - 37:23, 79:21, 79:22, 167:22, 174:17

**sublinear** [1] - 83:16

**Submission** [1] - 208:1

**submit** [1] - 185:7

**submitted** [9] - 156:1, 183:1, 183:10, 183:15, 184:24, 185:18, 186:4, 186:15, 208:3

**subsequent** [6] - 35:18, 75:13, 192:20, 196:23, 197:10, 197:12

**subsequently** [2] - 16:20, 113:5

**subset** [2] - 19:4, 42:19

**subsidiary** [1] - 26:10

**substance** [1] - 208:5

**substantial** [6] - 139:24, 193:22, 196:2, 196:4, 199:9, 201:5

**substantially** [4] - 193:9, 195:22, 199:9, 199:10

**substantively** [2] - 17:6, 17:19

**sufficiency** [3] - 40:3, 40:6, 40:9

**sufficient** [11] - 105:21, 126:18, 146:8, 146:11, 172:8, 172:13, 173:15, 173:20, 173:23, 174:11, 175:1

**sufficiently** [3] - 148:24, 170:24, 175:2

**suggest** [4] - 80:20, 201:22, 202:6, 203:4

**suggested** [2] - 74:3, 190:24

**suggesting** [5] - 167:21, 180:8, 190:16, 190:20, 191:15

**suggestion** [1] - 102:24

**Suite** [2] - 3:6, 3:14

**sum** [2] - 43:5, 177:19

**summarize** [1] - 55:9

**summarized** [2] - 86:20, 189:7

**summary** [18] - 17:17, 26:18, 27:15, 27:16, 54:15, 54:19, 142:13, 154:24, 155:3, 155:8, 155:12, 155:17, 156:4, 156:11, 157:10, 175:21, 175:22, 176:15

**summing** [3] - 54:3, 54:7, 176:4

**Sunter** [18] - 57:11, 57:14, 57:20, 58:1, 58:6, 58:9, 58:18, 58:19, 58:24, 63:1, 63:18, 63:20, 64:15, 64:16, 92:18, 116:15, 127:7, 127:18

**Supplemental** [2] - 4:10, 5:3

**support** [7] - 12:10, 13:14, 13:23, 109:10, 110:6, 110:7, 204:24

**supported** [4] - 70:16, 108:4, 109:13, 110:1

**supportive** [1] - 107:17

**suppose** [2] - 161:24, 172:9

**supposed** [2] - 57:1, 97:15

**suspicion** [1] - 81:21

**swath** [1] - 140:8

**sworn** [5] - 5:9, 152:12, 207:6

**synonymously** [1] - 73:24

**system** [2] - 61:17, 61:18

**systems** [1] - 40:4

---

**T**

**table** [39] - 18:4, 18:5, 18:7, 19:7, 26:18, 26:19, 27:15, 27:19, 27:21, 31:10, 31:16, 31:19, 42:14, 67:21, 141:14, 142:7, 142:8, 142:13, 142:14, 142:17,

143:18, 143:24, 144:1, 154:19, 154:24, 155:3, 155:8, 155:9, 155:12, 155:17, 156:2, 156:11, 157:10, 175:24, 176:11, 178:22, 179:9

**Tables** [2] - 143:9, 143:16

**tables** [29] - 14:20, 15:12, 15:13, 15:14, 15:21, 15:24, 18:1, 18:12, 18:14, 18:18, 18:23, 18:24, 19:22, 19:23, 26:14, 26:17, 42:17, 45:1, 141:13, 142:4, 142:5, 142:7, 142:16, 142:19, 143:7, 143:9, 143:14, 153:22, 153:23

**targeted** [2] - 111:14, 111:15

**technical** [1] - 12:9

**technique** [2] - 129:19, 129:23

**techniques** [3] - 60:22, 93:12, 93:16

**telephone** [1] - 2:23

**Telex** [13] - 5:16, 43:1, 43:21, 44:16, 47:4, 48:20, 51:15, 57:24, 59:10, 119:14, 120:12, 165:4, 165:14

**TELEXFREE** [9] - 1:10, 1:11, 1:13, 1:13, 1:19, 1:19

**TelexFree** [11] - 3:3, 3:3, 81:9, 144:3, 144:8, 144:12, 155:4, 157:16, 194:19, 195:18

**ten** [13] - 21:24, 22:4, 22:5, 24:19, 34:13, 67:13, 67:23, 154:10, 154:15, 154:17, 155:5, 195:5, 196:12

**ten-step** [1] - 154:10

**tend** [3] - 44:18, 46:18, 168:14

**tension** [1] - 205:12

**term** [6] - 35:2, 41:18, 49:21, 57:10, 118:4, 137:9

**terminology** [8] - 108:12, 112:24,

119:12, 120:24, 122:20, 122:22, 138:14, 199:16

**terms** [24] - 8:19, 11:1, 19:24, 26:16, 42:20, 43:3, 52:4, 66:21, 69:16, 73:24, 81:3, 88:9, 88:15, 88:17, 89:13, 130:1, 140:5, 148:7, 158:10, 159:16, 160:11, 176:5, 197:10, 203:12

**test** [1] - 9:10

**tested** [2] - 134:22, 174:9

**testified** [1] - 5:10

**testimony** [5] - 5:24, 152:13, 207:8, 208:3, 208:11

**testing** [4] - 39:16, 40:3, 101:19, 127:22

**text** [1] - 204:9

**TF** [4] - 62:1, 62:8, 63:9, 63:11

**TF-IDF** [4] - 62:1, 62:8, 63:9, 63:11

**THE** [18] - 1:12, 1:18, 7:5, 7:7, 25:6, 33:10, 33:14, 54:4, 76:7, 76:11, 76:17, 131:20, 138:5, 143:20, 149:24, 156:6, 198:14, 206:13

**themselves** [4] - 95:21, 96:1, 96:20, 141:19

**theory** [1] - 90:17

**therefore** [4] - 67:3, 67:5, 103:4, 192:22

**therein** [2] - 155:19, 183:12

**thereof** [1] - 62:3

**thereupon** [1] - 207:6

**thinking** [7] - 11:2, 40:5, 123:20, 139:17, 139:18, 169:8, 169:9

**third** [4] - 42:2, 56:8, 57:2, 179:4

**thirty** [1] - 7:2

**thoughts** [1] - 16:10

**thousand** [7] - 12:20, 14:19, 138:18, 138:19, 138:22, 139:7, 139:16

**thousands** [1] - 30:16

**three** [13] - 42:3, 42:7, 52:17, 52:19, 52:21,

71:8, 71:11, 72:1, 72:19, 73:5, 105:7, 151:6, 151:19

**thresholds** [1] - 197:4

**throughout** [1] - 197:15

**tie** [1] - 113:2

**tied** [1] - 186:14

**tier** [1] - 113:23

**titled** [1] - 26:18

**today** [27] - 17:22, 24:11, 44:10, 52:15, 55:20, 64:8, 64:14, 67:9, 68:16, 72:21, 77:21, 89:8, 99:16, 116:21, 117:24, 118:9, 118:18, 118:23, 119:15, 120:10, 123:4, 123:22, 126:24, 131:13, 160:21, 174:10, 174:18

**together** [20] - 15:12, 15:13, 15:21, 24:7, 52:10, 92:24, 93:1, 118:17, 121:17, 144:4, 181:24, 186:14, 195:23, 198:5, 199:12, 199:20, 200:3, 200:9, 200:19, 201:9

**tolerances** [1] - 204:14

**took** [7] - 14:10, 34:11, 36:8, 36:23, 37:24, 38:7, 38:8

**tool** [6] - 118:3, 118:5, 118:6, 124:1, 124:4, 130:9

**tools** [1] - 52:12, 52:24, 54:24, 55:2, 60:15, 60:24, 61:7, 61:10, 62:12, 62:13, 62:17

**toolset** [1] - 131:2

**top** [2] - 141:2, 144:12

**topic** [1] - 157:19

**total** [4] - 43:5, 69:5, 81:9, 191:6

**totality** [2] - 159:4, 169:8

**totally** [1] - 167:3

**totals** [1] - 113:22

**towards** [2] - 40:2, 85:14

**track** [2] - 165:7, 173:5

**trade** [1] - 102:15

**trade-off** [1] - 102:15

**trademark** [1] - 39:22

**trailing** [1] - 25:9

CURRAN COURT REPORTING

Deposition of Joshua W. Dennis
May 9, 2023

21

trained [1] - 10:2
training [3] - 11:20, 11:22, 12:1
transaction [1] - 39:16
transactional [1] - 41:17
transactions [4] - 80:2, 129:6, 144:3
transcribed [1] - 208:3
transcript [4] - 6:22, 34:14, 207:21, 208:11
transcripts [1] - 115:16
transfer [1] - 143:24
transferencia [1] - 143:23
transformation [1] - 69:13
transitive [53] - 76:22, 77:6, 77:10, 77:13, 91:6, 91:8, 91:9, 91:20, 92:1, 92:17, 102:1, 102:14, 102:16, 102:17, 103:2, 103:7, 116:2, 116:6, 117:3, 117:5, 117:8, 117:10, 117:14, 117:16, 117:17, 118:10, 118:24, 119:7, 119:12, 119:16, 120:6, 120:15, 120:24, 121:2, 121:6, 121:13, 122:1, 122:10, 122:13, 122:18, 122:23, 123:16, 124:10, 124:20, 124:22, 125:8, 125:11, 129:21, 130:13, 130:18, 130:21, 199:15, 199:22
transitively [1] - 102:21
travel [1] - 56:21
tree [1] - 144:11
trial [2] - 5:24, 7:19
tried [2] - 132:16, 175:16
trimming [3] - 25:5, 25:8, 31:21
true [20] - 12:14, 25:23, 46:14, 47:22, 78:13, 80:18, 101:21, 104:16, 104:19, 104:24, 124:18, 127:10, 133:20, 142:9,

154:18, 177:10, 180:24, 198:1, 207:7, 208:11
truly [6] - 5:23, 80:20, 101:20, 148:7, 162:12, 162:21
Trustee [1] - 3:3
trustee [9] - 5:15, 8:18, 169:13, 172:21, 190:23, 191:2, 191:18, 192:1, 192:6
TRUSTEE [2] - 1:12, 1:18
trustee's [1] - 191:9
truth [1] - 128:2
truthfully [1] - 6:10
truthfulness [1] - 151:18
try [15] - 6:6, 6:14, 23:24, 52:8, 59:3, 67:9, 75:12, 93:1, 116:1, 123:15, 150:16, 167:7, 173:5, 175:7, 190:5
trying [28] - 6:20, 19:9, 19:18, 20:13, 20:14, 24:11, 28:2, 30:12, 53:2, 55:9, 55:13, 55:17, 66:23, 72:8, 75:17, 76:23, 76:24, 79:9, 99:15, 117:13, 119:13, 123:12, 154:18, 164:12, 165:2, 186:16, 187:3, 197:11
Tuesday [1] - 2:13
turn [6] - 32:14, 94:18, 175:12, 180:2, 189:5, 189:14
turning [1] - 175:16
two [57] - 9:1, 9:23, 10:4, 12:20, 14:19, 26:6, 26:9, 26:16, 26:20, 29:10, 29:14, 32:3, 39:5, 39:24, 40:12, 42:3, 42:7, 50:2, 71:8, 71:11, 72:11, 72:18, 80:17, 80:19, 99:6, 138:4, 142:18, 159:10, 171:18, 179:20, 179:21, 180:3, 180:9, 181:8, 181:10, 181:22, 182:8, 182:18, 183:10, 183:16, 184:15, 184:22, 184:24, 185:14, 186:16, 186:21,

187:6, 189:24, 190:7, 191:1, 191:10, 193:8, 193:20, 200:15, 201:1
type [5] - 33:21, 36:2, 37:19, 47:4, 192:14
typed [1] - 186:24
types [2] - 172:24, 181:15
typically [2] - 88:24, 89:2
typographical [2] - 10:14, 11:17

## U

Uh-huhs [1] - 6:20
Uh-Uhs [1] - 6:20
Uhs [1] - 6:20
ultimate [3] - 17:6, 99:11, 109:5
ultimately [4] - 27:6, 51:10, 143:12, 191:19
unacceptable [1] - 160:22
unbundling [1] - 56:14
uncertainty [2] - 147:1, 180:17
unclear [2] - 70:16, 174:23
uncover [2] - 73:6, 73:14
under [20] - 18:9, 20:18, 24:19, 56:12, 125:9, 136:14, 143:15, 147:19, 151:8, 162:18, 163:5, 164:9, 171:16, 176:23, 181:11, 184:9, 201:18, 201:19, 207:22, 208:15
underaggregate [2] - 103:3, 205:20
underaggregated [2] - 152:4, 172:10
underaggregation [18] - 115:5, 125:1, 125:13, 125:18, 125:23, 164:6, 170:1, 183:8, 186:18, 201:14, 202:1, 202:9, 203:8, 204:5, 205:6, 205:13, 205:16, 205:18
underaggregations

[1] - 114:12
underclustered [3] - 102:4, 102:6, 102:8
underclustering [9] - 99:19, 103:9, 133:5, 135:14, 135:20, 136:2, 136:10, 136:20, 160:2
underclusters [1] - 99:3
undergrad [3] - 11:6, 11:9, 33:21
undergraduate [1] - 12:2
underinclusive [1] - 102:17
underlie [1] - 187:15
underlying [11] - 14:7, 134:21, 141:24, 161:22, 162:13, 165:24, 175:11, 178:12, 179:3, 185:10, 193:10
underscore [1] - 177:5
understandings [1] - 70:5
understood [4] - 6:8, 9:9, 14:13, 62:17
undertake [1] - 136:18
unfounded [1] - 191:24
unique [4] - 29:5, 29:6, 113:1, 178:9
UNITED [1] - 1:3
universe [6] - 106:2, 117:2, 118:16, 120:19, 122:5, 175:6
unless [4] - 123:24, 124:10, 207:22, 208:4
unproven [1] - 193:7
unquestioned [1] - 104:12
unreliable [4] - 101:2, 134:5, 134:6, 162:11
unsubstantiated [1] - 70:6
unsupported [5] - 70:6, 71:4, 71:5, 104:12, 191:24
up [24] - 11:19, 20:17, 20:19, 40:22, 44:24, 54:7, 66:11, 80:4, 91:11, 91:18, 92:9, 92:12, 96:7, 100:11, 100:19, 126:6, 141:16, 161:12, 163:19, 168:16, 174:22, 176:4, 187:1, 195:22

user [43] - 18:8, 19:20, 26:21, 29:6, 37:19, 37:21, 43:13, 69:6, 81:6, 81:9, 87:5, 87:12, 87:13, 91:13, 92:23, 93:2, 93:3, 95:7, 99:9, 104:17, 108:14, 110:15, 113:3, 121:16, 121:21, 136:24, 142:12, 144:7, 144:9, 144:13, 153:11, 154:22, 159:7, 176:7, 176:17, 177:18, 177:21, 183:2, 183:21, 184:23, 187:1, 190:14, 193:20
users [4] - 68:18, 154:20, 169:9
uses [1] - 155:5
usual [1] - 7:17
utilize [1] - 162:10
utilized [7] - 45:8, 142:6, 142:9, 142:10, 142:11, 155:3, 159:6
utilizes [1] - 169:4
utilizing [2] - 31:6, 197:12

## V

valid [5] - 78:14, 123:24, 131:8, 187:18, 197:20
validate [5] - 23:6, 167:8, 169:23, 171:10, 171:12
validated [2] - 147:19, 170:24
validating [1] - 22:23
validation [5] - 70:5, 192:20
validity [2] - 73:12, 73:13
valuation [1] - 56:18
value [6] - 148:9, 160:12, 161:2, 197:3, 197:7, 197:8
values [5] - 71:18, 71:20, 82:3, 189:10, 197:1
variables [1] - 178:10
variety [1] - 38:23
various [7] - 20:8, 33:24, 36:4, 65:1, 93:7, 131:6, 153:22
varying [1] - 111:13

**Deposition of Joshua W. Dennis**
**May 9, 2023**

22

**versus** [3] - 72:19, 160:23, 188:5
**viewed** [1] - 79:15
**visual** [2] - 86:4, 134:16
**visualized** [1] - 40:21
**Vitae** [2] - 4:13, 33:2
**VOLUME** [1] - 1:1
**vs** [2] - 1:15, 1:21

## W

**wages** [1] - 42:10
**wait** [1] - 6:13
**waive** [4] - 7:9, 7:10, 7:11, 7:13
**waived** [1] - 208:5
**walk** [1] - 45:19
**walked** [2] - 14:11, 153:23
**wallet** [8] - 105:5, 105:11, 111:18, 112:6, 126:14, 129:6, 145:18, 145:19
**wants** [1] - 172:20
**ways** [8] - 12:22, 29:19, 38:2, 62:20, 148:10, 148:15, 148:16, 148:18
**weeks** [3] - 37:15, 37:17, 37:24
**weight** [1] - 196:8
**weighting** [2] - 65:11, 67:1
**weights** [7] - 65:1, 65:3, 65:24, 66:3, 66:14, 67:3, 67:5
**whatsoever** [1] - 89:4
**WHEREOF** [1] - 207:12
**whole** [2] - 121:17, 171:7
**wide** [3] - 38:22, 40:18, 158:14
**wife** [1] - 152:22
**Winkler** [1] - 53:10
**winner** [11] - 48:5, 49:8, 145:11, 146:21, 169:22, 170:7, 171:14, 172:6, 172:9, 183:23, 184:7
**winners** [7] - 8:19, 47:19, 109:1, 144:16, 184:4, 184:10, 191:5
**WINNERS** [2] - 1:17, 1:23
**winnings** [2] - 146:23,

191:7
**wit** [1] - 207:5
**Witness** [2] - 156:5, 208:1
**witness** [6] - 2:3, 207:8, 208:4, 208:5, 208:6, 208:7
**WITNESS** [11] - 4:3, 7:5, 7:7, 33:10, 33:14, 76:11, 76:17, 131:20, 198:14, 206:13, 207:12
**wondered** [1] - 106:20
**wonderful** [1] - 189:4
**word** [5] - 29:18, 40:5, 94:8, 119:7, 120:5
**words** [5] - 6:19, 84:6, 91:24, 122:13, 125:2
**works** [2] - 45:22, 131:21
**world** [10] - 104:6, 104:7, 104:14, 126:9, 130:3, 146:4, 162:8, 170:12, 170:13, 187:18
**worse** [1] - 119:10
**wow** [1] - 33:10
**write** [1] - 32:8
**writing** [1] - 207:7
**written** [2] - 13:16, 205:9
**wrote** [3] - 13:5, 13:13, 141:1

## Y

**Y-M-P-A-C-T-U-S** [1] - 68:24
**year** [2] - 36:11, 36:12
**years** [8] - 37:6, 38:18, 51:2, 52:17, 53:13, 76:2, 123:5, 138:13
**yield** [1] - 163:2
**Ympactus** [5] - 50:10, 68:23, 68:24, 69:7, 157:15
**yourself** [3] - 32:9, 46:5, 72:9
**yup** [8] - 14:24, 32:1, 32:21, 55:24, 56:10, 145:3, 145:8, 195:4

## Z

**zero** [17] - 146:7, 157:7, 160:1, 168:13, 197:2, 201:24, 202:8, 203:7, 203:8, 204:3, 204:4, 205:5

**zeroes** [1] - 161:4

**CURRAN COURT REPORTING**