# EXHIBIT 16

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC., and<br>TELEXFREE FINANCIAL, INC.,<br><br>Debtors | Chapter 11 Cases<br><br>14–40987–MSH<br>14–40988–MSH<br>14–40989–MSH<br><br>Jointly Administered |
| STEPHEN B. DARR, TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>            Plaintiff,<br>v.<br>BENJAMIN ARGUETA, A<br>REPRESENTATIVE OF A CLASS OF<br>DEFENDANT NET WINNERS,<br>            Defendants. | Adversary Proceeding No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>            Plaintiff,<br>v.<br>MARCO PUZZARINI, A REPRESENTATIVE<br>OF A CLASS OF DEFENDANT NET<br>WINNERS,<br>            Defendants. | Adversary Proceeding No. 16-4007 |

## SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS

Respectfully submitted this 14th day of April, 2023

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

# Table of Contents

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................1

       A.  TelexFree User Accounts and Participants ...................................................2

       B.  TelexFree Transactions .................................................................................4

III.   ASSIGNMENT .....................................................................................................6

IV.    INFORMATION CONSIDERED .........................................................................6

V.     UNDERSTANDING OF TRUSTEE'S METHODOLOGY FOR DETERMINING NET
       WINNERS AND NET LOSERS..........................................................................8

       A.  Freer Aggregation Process ..........................................................................12

           i.     Step 1: Selection and Transformation of Fields.............................12

           ii.    Step 2: Cleansing of Fields ...........................................................13

           iii.   Step 3: Deterministic Linkage .......................................................13

           iv.    Step 4: Blocking..............................................................................14

           v.     Step 5: Calculation of Gammas ......................................................15

           vi.    Step 6: Calculation of Match Probabilities ....................................16

           vii.   Steps 7-8: Fixed Threshold and Dynamic Clustering .....................16

           viii.  Step 9: Convert Clusters of Account Groupings into Clusters of User Accounts .18

           ix.    Step 10: Tabulate Total Net Equity for Each Cluster ......................18

       B.  Martin Net Equity Calculation....................................................................19

VI.    SUMMARY OF OPINIONS ...............................................................................20

VII.   ANALYSIS AND FINDINGS .............................................................................23

       A.  The Freer Aggregation Process is Unreliable .............................................23

           i.     Dr. Freer's Foundational Assumptions Regarding the Special Role of the Name
                  Field is Unsupported and Counter to Case Facts.................................23

           ii.    Dr. Freer Failed to Appropriately Consider the Quality of the Data Utilized in His
                  Aggregation Process..........................................................................29

           iii.   Dr. Freer's Results are Internally Inconsistent ....................................37

           iv.    The Results of the Freer Aggregation Process are Inconsistent with his Stated
                  Methodology and Requirements........................................................40

           v.     The Freer Aggregation Process Results in Inconsistent and Speculative Outcomes
                  ..............................................................................................................45

           vi.    The Only Example Cluster in the Freer Report Contains Questionable
                  Aggregations......................................................................................47

           vii.   Aggregation Errors Can Result in a Significant Overstatement of Participant Net
                  Equity..................................................................................................48

           viii.  Dr. Freer has Failed to Deliver the Full Scope of His Engagement ....................52

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

B. Mr. Martin's Calculation of Net Equity is Unreliable ...................................................... 53

    i.    The Net Equity Calculation Fails to Account for Participant Investments and Receipts Related to Transfers of Credit.................................................................53

    ii.   The Amount of Cash Invested/Received by Participants as Part of Triangular Transactions or Credits Transfers Can Differ from Amount of Credits Recorded in SIG.............................................................................................................................58

VIII. CONCLUSION ..........................................................................................................................62

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

## **List of Exhibits**

| Exhibit Number | Description |
|---|---|
| 1 | Curriculum Vitae of Joshua W. Dennis |
| 2 | Documents Considered |
| 3 | User Accounts and Participants by Entity and Type |
| 4 | Summary of TelexFree Net Equity by Tier and Transaction Type |
| 5 | Summary of TelexFree User Accounts and Participants by Tier |
| 6 | Summary of TelexFree Top Net Losers Matched to Net Winners |
| 7 | Top 100 TelexFree Net Losers |
| 8 | Top 100 TelexFree Net Winners |
| 9.1-9.5 | Top Net Loser and Matched Net Winner User Account Detail |
| 10 | Frantz Balan & Lusette Balan User Account Detail |
| 11 | Alphabet User Account Detail |
| 12 | Billybob Arbonne User Account Detail |
| 13 | Lopes & Carreiro User Account Detail |
| 14 | Zaglia & Ragolia User Account Detail |
| 15 | Rejane & Paulo Marinho User Account Detail |
| 16 | Maria Neves User Account Detail |
| 17 | Sann Devaconcelos User Account Detail |
| 18 | Oscar Sosa User Account Detail |
| 19 | Claimed Account Aggregations |
| 20.1-20.3 | Example Credit Transfer Detail |

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023


## I.      INTRODUCTION

1.      I, Joshua W. Dennis, am a Partner in the Boston office of StoneTurn Group LLP ("StoneTurn"). I provide financial and economic consulting services – including the analysis of complex data – to attorneys and companies. I have more than 15 years of experience working with clients and counsel on matters requiring complex data analysis, such as economic damages, forensic accounting, compliance monitoring, and valuation engagements.

2.      In addition to experience in data collection, mining, anomaly detection, and reporting of transactional and trading data, I have extensive expertise in financial modeling to quantify and assess lost profits, diminution of business value, and other areas of economic loss. My analyses also frequently include evaluations related to data sufficiency and integrity testing, integration of disparate datasets, data exploration, and visual modeling.

3.      In conjunction with my experience related to the quantification of economic damages, I have gained expertise through my certifications and trainings.

4.      A copy of my current curriculum vitae, which summarizes my qualifications and professional experience, is attached as **Exhibit 1**.

5.      StoneTurn charges $600 per hour for time I spend consulting and developing expert opinions, as well as time that may be spent testifying related to my opinions. Neither my, nor my staff's, nor StoneTurn's, compensation is affected in any way by either the conclusions I have reached or the outcome of this lawsuit.


## II.      BACKGROUND

6.      On June 6, 2014, the Plaintiff, Stephen Darr, was appointed Chapter 11 Trustee ("Trustee") of the bankruptcy estates of TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc., (collectively, the "Company," "TelexFree," or "Debtors").[1] The Trustee alleges that TelexFree

---

[1] Amended Complaint, Adversary Proceeding No. 16-04006, April 14, 2016 ("Amended Complaint") at 3.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

operated a massive Ponzi and pyramid scheme that defrauded hundreds of thousands of individuals in numerous countries out of billions of dollars.[2]

7.      The Trustee alleges that roughly 15,000 individuals or entities residing in the U.S. are "Net Winners"[3] who illegally profited from the fraud. These 15,000 Net Winners comprise a class of Defendants ("U.S. Net Winner Class").[4] Additionally, the Trustee alleges that roughly 80,000 individuals or entities residing outside the U.S. are "Net Winners" who illegally profited from the fraud.[5] These 80,000 Net Winners comprise a class of defendants ("Non-U.S. Net Winner Class," collectively with the U.S. Net Winner Class, hereinafter referred to as the "Net Winner Class").

### A.      TelexFree User Accounts and Participants

8.      I understand that an individual could join TelexFree (as a "Participant") by purchasing either a membership plan or individual Voice over Internet  Protocol ("VoIP") phone packages. However, VoIP phone packages, which cost $49.90 per package,[6] constituted only a minor portion of the Company's business, as TelexFree primarily generated returns from the membership fees associated with recruiting new Participants.[7]

9.      Each time a Participant purchased a membership plan or VoIP package, the Participant established a "User Account" with the Company and was directed to provide a name, address, email address, phone numbers, passcodes, and certain other information.[8]

10.     TelexFree used the User Accounts to track the activity of Participants, including "Credits" issued to Participants for becoming a "Promoter" of the business by placing advertisements on certain websites, as well as recruiting additional Participants. TelexFree also used the User Accounts to track certain other activities, such as bonuses, commissions, payments of invoices, use of Credits to satisfy invoices, transfers of Credits, and cash receipts. A Participant could

---

[2] Amended Complaint at 21.

[3] For the specific definition of Net Winner, see Section V of this report.

[4] Class Certification Order and Approval of Class Counsel, Adversary Proceeding No. 16-4006, October 6, 2016 ("Class Cert. 16-4006") at 3.

[5] Class Certification Order and Approval of Class Counsel, Adversary Proceeding No. 16-4007, August 3, 2017 ("Class Cert. 16-4007") at 2.

[6] Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief, October 7, 2015 ("Motion for Entry of Order that Debtors Engaged in Ponzi Scheme") at 6.

[7] Amended Complaint at 21.

[8] Amended Complaint at 22-23.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

establish more than one User Account, and in practice many Participants had multiple User Accounts, sometimes numbering in the thousands.[9]

11.     The User Accounts and related data were stored in TelexFree's Information Management System, SIG.[10] The SIG database contained data for approximately 17 million User Accounts, of which approximately 15 million were associated with at least one paid invoice.[11]

12.     An affiliated entity of TelexFree, Ympactus Commercial Ltda. ("Ympactus"), reportedly operated a similar scheme in Brazil, and also stored its data in SIG. Ympactus was seized by the Brazilian authorities in June 2013.[12] The currency field, which identified whether an invoice was denominated in Brazilian reais ("Reais" or "BRL") or United States dollars ("USD"), was utilized to separate out the Ympactus data from the TelexFree data within SIG. User Accounts with Brazilian contact information were denominated in Reais, and thus associated with Ympactus. Conversely, invoices associated with User Accounts with non-Brazilian contact information were denominated in USD and assumed to be associated with TelexFree. Approximately 11 million User Accounts with at least one paid invoice remained after excluding the User Accounts associated with Ympactus.[13]

13.     The Company provided Participants with two membership plan options, each of which allowed for the generation of Credits. A one-year membership plan could be purchased by Participants for $339 (for an "AdCentral Plan") or $1,425 (for an "AdCentral Family Plan"), as follows:[14]

- **AdCentral Plan –** $339 for a one-year contract ($50 membership fee plus $289 contract fee). This contract entitled the User Account holder to sell ten VoIP Packages, for which a Participant could receive a commission if the packages were sold. Participants were required to place one internet ad per day and, for each complete week in which the Participant placed the required ads, he or she was entitled to one additional VoIP Package, which could be sold or exchanged

---

[9] Amended Complaint at 22-23. Also, see e.g., **Exhibit 7** and **Exhibit 8**.

[10] Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 11. ("SIG stands for Sistemas de Informacoes Gerenciais, which is from the Portuguese language and translates roughly to 'Information Management System.'")

[11] Expert Report of Timothy J. Martin, April 13, 2018 ("Martin Report") at 11. Also, see **Exhibit 3**.

[12] Martin Report at 7; Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 14-16.

[13] Martin Report at 11. Also, see **Exhibit 3**.

[14] Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 7-8.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

> for $20 in credits with the Debtors. Thus, Participants who posted the required ads were eligible to receive $20 per week for 52 weeks, for a total annual return of $1,040.

- **AdCentral Family Plan** – $1,425 for a one-year contract ($50 membership fee plus $1,375 contract fee). This contract entitled the User Account holder to sell fifty VoIP Packages, for which a Participant could receive a commission if the packages were sold. Participants were required to place five internet ads per day and, for each week in which the Participant placed the required ads, he or she was entitled to five additional VoIP Packages, which could be sold or exchanged for $100 in credits with the Debtors. Thus, the Participants who posted the required ads were eligible to receive $100 per week for 52 weeks, for a total annual return of $5,200.

### B. TelexFree Transactions

14.    I understand that Invoices issued by the Company to Participants for the purchase of a membership plan could be satisfied in at least the following ways: (1) a Participant could satisfy the invoice by payment in cash directly to the Company (a "Direct Transaction"); or (2) a Participant could satisfy the TelexFree invoice in other ways, such as by having a Participant, usually the recruiting Participant, pay the invoice by redeeming his or her accumulated Credits, and TelexFree would mark the invoice as paid and reduced the recruiting Participant's Credits by a corresponding amount (a "Triangular Transaction"). The Trustee alleges that Participants frequently brought on new recruits through Triangular Transactions as one means to monetize their accumulated Credits, often instead of redeeming Credits directly with the Company for cash.[15]

15.    I understand that while invoices associated with the sale of membership plans or VoIP Packages had a face value of approximately $3.07 billion, only $360 million, or roughly twelve percent (12%) of that amount, was paid in cash to TelexFree; the balance of these invoices was satisfied using Participants' Credits.[16]

16.    In the case of a Direct Transaction where a Participant satisfies his or her own invoice by payment in cash to the Company, the process generally worked as follows:[17]

---

[15] Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 9-10; Memorandum in Support of Proposed Supplemental Order Respecting Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief, January 19, 2016 ("Support of Proposed Supplemental Order") at 3-4.

[16] Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 10.

[17] Amended Complaint at 23-24.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

- The new Participant established an online account.

- The Company's database recorded the data entered by the new Participant and identifies the recruiting Participant, and assigned an identification number to the newly created User Account.

- The Company recorded the purchase, issued a numbered invoice, and marked the invoice as 'pending.'

- The new Participant could pay the invoice by cash, check, cashier's check, money order, wire transfer, or through a third-party online payment processing account. When the invoice was paid, the Company would update the invoice.

- The new Participant could then start building a pyramid underneath the newly created User Account by recruiting other members (or by purchasing new User Accounts themself or through associates), which in turn generated bonuses and commissions for the new Participant.

17.     In the case of a Triangular Transaction where a new User Account is opened using accumulated Credits in another User Account, the process generally worked as follows:[18]

- A recruited Participant created a new online account, or used his or her existing account information, to establish a new User Account.

- The Company's database recorded the details entered by the recruited Participant and assigned an identification number to the new User Account.

- The Company recorded the purchase, issued an invoice to the new User Account, and marked the invoice as 'pending.'

- The new recruited Participant forwarded the invoice to the recruiting Participant or to a third-party Participant, who satisfied the invoice with accumulated Credits in an existing User Account.

- The Trustee alleges that the newly recruited Participant always paid the invoice amount in cash to the recruiting Participant (in those cases where there were two separate Participants involved). However, no evidence of such cash payments exists in SIG.

---

[18] Amended Complaint at 24.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

## III.   ASSIGNMENT

18.     Milligan Rona Duran & King LLC ("Counsel") retained StoneTurn[19] to assess the methodology developed and employed by the Trustee in calculating the supposed net funds received by members of the Net Winner Class as a result of their participation in TelexFree.

19.     My opinions are based on consideration of case-specific facts and circumstances, as well as on my education, training, and experience. I am not offering any legal opinions.

20.     While my work on this matter is ongoing, this report summarizes my current opinions given the information available to date. I may consider any additional materials if produced subsequent to the issuance of this report and modify or supplement my analysis or opinions as necessary. I also reserve the right to address any comments that may be received from an expert retained by the Trustee related to my work in this matter, as outlined in this report and associated exhibits.

21.     In connection with my anticipated trial testimony in this action, I may create, from various documents produced in this litigation, demonstrative exhibits which refer or relate to the matters discussed in this report, or in my deposition testimony (if I were to be deposed). I have not yet created any such exhibits as of the date of this report.

## IV.   INFORMATION CONSIDERED

22.     I considered information from a variety of sources, including (i) information produced or filed by the parties in this proceeding, (ii) information provided by relevant parties, and (iii) information from independent research.

23.     Specifically, I considered information produced in these proceedings, such as legal filings.

24.     Additionally, I considered information provided by relevant parties, such as reports submitted by experts retained on behalf of the Trustee in this matter, as well as any documents considered or cited therein.  This includes the Expert Report of Timothy J. Martin, dated April 13,

---

[19] As used herein, other than references to my education and experience, "I" ,"We" or "StoneTurn" shall mean either me personally or those StoneTurn professionals acting under my supervision. Also, "My", "Our", and "Us" shall refer to actions taken by me personally or by those StoneTurn professionals acting under my direct supervision. All of the conclusions and opinions expressed herein are my own.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

2018 (the "Martin Report")[20] and the Expert Report of Dr. Cameron E. Freer, dated April 29, 2022 (the "Freer Report"). I also considered the following data sources and documents:

- TelexFree Sistemas de Informacoes Gerenciais ("SIG") data tables, the management information systems used by TelexFree to track the activity for Participants by User Account.

- TelexFree data tables utilized and modified by Mr. Martin as part of his Net Equity computation[21] ("Huron Data Tables"), including:[22]

    o **rep_id_summary:** This table contains User Account and aggregation information developed by Mr. Martin for the Trustee.

    o **claim_statement:** This table contains the transactions extracted from the TelexFree database, which were then used to determine and calculate Net Equity.

    o **telexfree_accounts:** This table contains the same participant account and aggregation information, but excludes the Ympactus accounts.

    o **telexfree_transactions:** This table contains the transactions extracted from the TelexFree database to calculate Net Equity, but includes only transactions related to Participant Net Equity.

- A summary description prepared by Mr. Martin of the components used to calculate Net Equity, the mechanism for computing Net Equity using the TelexFree database, and the method used to aggregate User Accounts;[23]

- TelexFree data tables considered by Dr. Freer ("Freer Data Tables"), as provided to him by Huron, including:[24]

    o **representante:** This table contains a unique record for each User Account, as well as related information entered by Participants such as a name, address, email address and phone number ("Account Table").

---

[20] Mr. Martin also issued a Reply Report on September 11, 2020 ("Martin Reply Report").

[21] For the specific definition of Aggregation Process and Net Equity, see Section V of this report, below.

[22] Transmittal letter from Andrew Lizotte to Ilyas Rona, January 5, 2017.

[23] Transmittal letter from Andrew Lizotte to Ilyas Rona, January 5, 2017; and Telexfree Net Equity Calculation and Aggregation.pdf.

[24] See e.g., Martin Report at 9.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

- o **fatura:** This table contains a unique record for each invoice generated by TelexFree/Ympactus, as well as related details such as the type of plan purchased, the amount, and how the invoice was satisfied ("Invoice Table").

- o **transferencia:** This table contains information about each transfer of Credits within TelexFree's system, as well as requests to redeem and withdraw funds ("Transfers Table")

- o **bonus:** This table primarily contains information about each accretion of TelexFree Credits into a Participant's User Account ("Bonus Table").

- Data tables containing Dr. Freer's concluded aggregation of User Accounts to a Participant.[25]

- Programming code and other related documentation underlying Dr. Freer's aggregation analysis.

- Electronic Proof of Claim ("ePOC") data tables containing claims and other related information provided by Participants through a portal developed by the Trustee and his advisors.

25. Lastly, I also considered information obtained through independent research, including trade press articles and other publicly available sources.

26. The information I considered is listed in **Exhibit 2**, as well as the footnotes and other citations in this report. I reserve the ability to consider further discovery in this case, including additional expert reports, transcripts of depositions, and documents produced or made available.

## V.   UNDERSTANDING OF TRUSTEE'S METHODOLOGY FOR DETERMINING NET WINNERS AND NET LOSERS

27. The Trustee initially retained Huron Consulting Services LLC ("Huron"), including Timothy Martin, a Managing Director in the Business Advisory Practice of Huron, to act as a financial and accounting advisor to the Trustee.[26] As part of this retention, Huron and Mr. Martin assisted in the development of a methodology that attempts to identify and quantify TelexFree "Net Winners" and "Net Losers," as defined therein.

---

[25] aggregation_output.csv; and aggregation_summary.csv. I note that Dr. Freer's aggregation_output.csv file appears to include numerous duplicate records (i.e., where a given User Account appears more than once).

[26] Martin Report at 3-4.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

28.   Mr. Martin considered a Participant to be a "Net Winner" when the net amount of funds received by the Participant exceeds the amounts expended. Conversely, Mr. Martin considers a Participant to be a "Net Loser" when the net amount of funds expended exceeds the amounts received. The nominal dollar value, whether a net gain or net loss, associated with a given Participant represents their "Net Equity," which I understand the Court in this matter has defined as follows:[27]

> The amount invested by the Participant into the Debtors' scheme, including amounts paid [by the Participant] pursuant to Triangular Transactions, less amounts received by the Participant from the Debtors' scheme, including amounts received [by the Participant] pursuant to Triangular Transactions.

29.   I understand that the Court's definition of Net Equity does not include the value of labor for the time spent by Participants or any expense incurred by Participants (e.g., rent, conferences, travel, etc.) from their involvement in TelexFree.

30.   In order to analyze the data and determine who is a Net Winner or Net Loser (as defined above), Mr. Martin used a data-matching process to identify owners of TelexFree accounts ("User Accounts") and aggregate multiple User Accounts by Participant ("Aggregation Process"). Specifically, Mr. Martin developed a 13-step Aggregation Process that primarily, if not entirely, utilized deterministic record linkage methods.

31.   In response to Mr. Martin's Net Equity Calculation and his related Aggregation Process, I submitted a Rebuttal Export Report on July 31, 2020 ("Initial Dennis Report") that assessed the methodologies and assumptions employed by Mr. Martin. In connection with the Initial Dennis Report and my subsequent testimony as part of an evidentiary hearing,[28] the Court on June 22, 2021 filed a Memorandum of Decision on Class Defendants' Motion to Exclude Expert Witness Testimony of Timothy Martin ("Martin Decision").

32.   The Martin Decision laid out the certain legal and factual bases that underpinned Mr. Martin's analysis and opinions, particularly as it related to Mr. Martin's Aggregation Process, and

---

[27] Supplemental Order Respecting Motion by Chapter 11 Trustee for Entry of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief, January 26, 2016 ("Supplemental Order"), at 2-3.

[28] Transcript of Video Evidentiary Hearings: Determining the Admissibility and Presumptive Effect of the Aggregation Methodology in Determining Net Winners before the Honorable Melvin S. Hoffman, J.U.S.B.C. November 23-24, 2020.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

concluded that "[t]he trustee has not shown by a preponderance of the evidence the reliability of [Mr. Martin's] opinion as to the selection and application of his method for aggregating user accounts to determine in these adversary proceedings the identities and gains of the net winners in the TelexFree scheme. Thus, the expert's opinion is inadmissible."[29]

33.     With respect to other issues raised by Defendants related more directly to Mr. Martin's determination of Net Equity, the Martin Decision stated:[30]

> The defendants also raise arguments beyond simply addressing the reliability of Mr. Martin's selection and application of an aggregation methodology, including arguments that relate to Mr. Martin's assumptions and decisions after the aggregation process was complete, when he set out to calculate the gains and losses (net equity) of each alleged participant. Having determined that the reliability of Mr. Martin's aggregation methodology has not been established and thus his expert opinion cannot be admitted, it is unnecessary to address the defendants' additional arguments, which they may choose to raise in the future, if appropriate.

34.     As a result of Mr. Martin's exclusion, in or around September 2021 the Trustee retained a second expert, Dr. Freer.[31] Specifically, the Trustee retained Borelian Corporation, of which Dr. Freer is a Principal, to:[32]

> [D]evelop and implement an aggregation methodology for grouping the User Accounts associated with each Participant. Specifically, Borelian was engaged to: (1) develop an aggregation methodology that creates one "cluster" of User Accounts for each Participant such that each User Account appears in precisely one cluster; and (2) provide the set of clusters that results from implementing this methodology on the 10,987,617 User Accounts attributable to TelexFree.

35.     Absent from Dr. Freer's assignment is any discussion related to an independent calculation or conclusion as to Net Equity. Instead, it appears Dr. Freer was only tasked with aggregating User Accounts ("Freer Aggregation Process"), and was instructed by counsel for the Trustee to adopt Mr. Martin's concluded Net Equity amounts associated with each User Account.[33] Given that the

---

[29] Martin Decision at 39-40.

[30] Martin Decision at 40.

[31] Motion by Liquidating Trustee to Schedule Case Management Conference Respecting Supplementation of Expert Reports, September 7, 2021 at 3; and Freer Report at 2.

[32] Freer Report at 2.

[33] BC002505-510 at 505-506 ("I think you've said this before, but we wanted to confirm that the Net Equity calculation by Huron is not under review here. It is our understanding that the Court has approved the Net Equity formula, and

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

Court appears to have excluded Mr. Martin's opinion in its entirety, it is unclear if, or to what extent, Dr. Freer is able to rely on Mr. Martin's work product, opinions or conclusions, in whole or in part, in forming his own opinions. If it is concluded that Mr. Martin's opinions and related work product should, in fact, be excluded in relevant part, then Dr. Freer's conclusions as to Net Winners and Net Losers, which necessarily utilizes Mr. Martin's concluded Net Equity figures, would likewise have no independent basis. I am not aware of any experts retained by the Trustee at this time other than Mr. Martin who have independently performed a Net Equity calculation as part of this Adversary Proceeding. In any event, Dr. Freer did not perform his own net equity calculations as he admitted they were supplied by Huron.[34] Dr. Freer also confirmed that he did not form any opinions "in detail" regarding whether Martin's calculations were correct or appropriate because he "didn't investigate enough to tell."[35]

36.     Notwithstanding this uncertainty, my report addresses: (i) fundamental flaws that existed within Mr. Martin's Aggregation Process and still persist within the Freer Aggregation Process; (ii) new issues Dr. Freer introduced into the Aggregation Process; and (iii) the unreliability of the Net Equity amounts calculated in the now-excluded Martin Report, which were still adopted by Dr. Freer.

---

that Huron has implemented this formula to create the net_equity field for each account in the database. We are hoping that we can continue to use this field without further investigation, even as we examine which accounts should be aggregated…Your assumption is correct. The principal inquiry here is reaching a resolution on the user accounts to be aggregated. As the defendants have pointed out, they may raise issues with respect to the calculation of the net equity, but that is an issue for another day (and is in any event presently outside of your scope."); and Freer Report at 22-23 ("Based on information provided to Borelian from Huron in the form of a rep_id_summary table (the 'Summary Table'), I filtered (via the entity field) the User Account records considered for aggregation down to the 10,987,617 User Accounts attributable to TelexFree and associated with at least one paid invoice. The Summary Table also contains (in the net_equity field) the Net Equity for each User Account as calculated by Huron, which I used in Step 10 to tabulate net equity after clustering.").

[34] Freer Deposition at 45.

[35] Freer Deposition at 48.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

### A.   Freer Aggregation Process

37.   The Freer Aggregation Process utilizes information supplied by Participants when registering User Accounts, such as name, email address, street address, cell phone number, and other information ("Potential Identifiers"), which was stored in the *representante* table (i.e., Account Table).[36] Specifically, I understand that Dr. Freer developed a 10-step Aggregation Process, which attempts to confirm which User Accounts belong to the same Participant primarily through the application of a probabilistic record linkage approach known as the Fellegi-Sunter model with Expectation Maximization.[37]

38.   Dr. Freer describes the Fellegi-Sunter model as a way to track agreement on multiple fields simultaneously and turn that information into an overall match probability for each pair of records under consideration. The output of the Fellegi-Sunter model is the agreement score for each pair of records under consideration, typically formulated as a "match probability."[38]

### i.   Step 1: Selection and Transformation of Fields

39.   The first step in the Freer Aggregation Process was the selection and transformation of relevant fields from the list of Potential Identifiers. Specifically, he selects 11 of the 44 data fields in the Account Table ("Aggregation Fields"):[39]

- Rep_nome – Full Name

- Rep_email – Email

- Rep_cel – Mobile Phone

- Rep_fone – Telephone

- Rep_end – Address

- Rep_numero – Address Number

- Rep_cep – Address Postal Code

- Rep_login – Username

---

[36] Freer Report at 5, 23-37 and 44-45.

[37] Freer Report at 5, 13, and 62.

[38] Freer Report at 13-15.

[39] Freer Report at 5 and 40; and 10ksample.xlsx.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

- Rep_pwd_secondary – User Created Secondary Password

- Rep_cpf – Social Security or Other Personal Identifier (Other Countries)

- Rep_datanasc – Birthday

40.    Other Potential Identifiers available in the Account Table that do not appear to have been utilized in the Freer Aggregation Process include but are not limited to: first name (rep_primeiro_nome); last name (rep_sobrenome); gender (rep_Sexo); company (rep_comp);[40] address neighborhood (rep_barrio); city (rep_cidade); address state (rep_uf); and country code (rep_pais).

41.    Additionally, with respect to the rep_login field, Dr. Freer makes a further transformation and truncates it to just the first four characters.[41]

ii.    Step 2: Cleansing of Fields

42.    The second step of the Freer Aggregation Process was to clean-up and format certain fields. Depending on the specific field, this typically included converting letters to lower case and eliminating certain spaces (e.g., leading spaces, trailing spaces, double spaces).[42]

43.    Other cleansing steps were performed on specific fields. For example, the rep_nome field ("Name Field") was replaced with an empty string where it had a length of one, where it was comprised of entirely non-alphanumeric characters, or where it had a length of three and the first and third characters were standard Latin alphabet while the second character was a space (e.g., "a a" or "1 1").[43] For phone numbers (i.e., rep_cel and rep_fone), any non-digit (i.e., 0-9) characters were removed and only the last 7 digits were used.[44]

iii.    Step 3: Deterministic Linkage

44.    The third step in the Freer Aggregation Process was the application of an initial deterministic record linkage, whereby it combined any User Accounts that were in exact agreement

---

[40] Consistent with Dr. Freer's observation, this field actually appears to contain various components of the address. (Freer Report at 35.)

[41] Freer Report at 44-45.

[42] Freer Report at 45-46.

[43] Freer Report at 46.

[44] Freer Report at 46.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

on cleansed non-null versions of eight the fields: rep_nome; rep_email; rep_cel; rep_fone; rep_end; rep_numero; rep_cep; and rep_login.

45.     This deterministic step resulted in 4,367,728 account groupings.[45]

iv.     Step 4: Blocking

46.     Dr. Freer states that when the dataset is large, it may be computationally unreasonable to run the Fellegi-Sunter algorithm on the set of all pairs directly. For example, in the TelexFree dataset after the application of Step 3, there were approximately 4 million account groupings, resulting in approximately 10 trillion pairs of account groupings to consider. As such, Dr. Freer's fourth step utilized a technique known as "blocking" to reduce the number of pairs under consideration to a much smaller number. Dr. Freer notes that the restriction to a smaller subset of pairs is justified only if every pair that is excluded from the blocking set would have been very unlikely to match, had it been considered. Dr. Freer further states that, importantly, the presence of a pair of records in the blocking set does not signal that the pair is necessarily likely to be a match; rather, it simply means that the pair meets the minimum requirement to be further considered.[46]

47.     In this case, for purposes of consideration for potential linkage, Dr. Freer required that User Accounts have "substantial agreement on name." And any account grouping pairs that did not meet this threshold, as determined by Dr. Freer, were deemed to not be part of the blocking set and were thus assigned a match probability of 0.[47]

48.     Specifically, Dr. Freer concludes that there is "substantial agreement" with a name if it meets the following criteria:[48]

---

[45] Freer Report at 49.

[46] Freer Report at 17-18 and 50

[47] Freer Report at 25 and 51.

[48] Freer Report at 53-54.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

$$WRatio(\text{accountGrouping1}.clean\_rep\_nome,$$
$$\text{accountGrouping2}.clean\_rep\_nome) >= 85.5$$

AND

$$(ratio(\text{accountGrouping1}.clean\_rep\_nome,$$
$$\text{accountGrouping2}.clean\_rep\_nome) >= 70$$

OR

$$ratio(firstLast(\text{accountGrouping1}.clean\_rep\_nome),$$
$$firstLast(\text{accountGrouping2}.clean\_rep\_nome)) >= 80)$$

49.    As part of this step, Dr. Freer also manually aggregates 62,725 User Accounts with a rep_nome of "John Williams" that also shared other commonalities, such as email domain ("mailinator.com") and street name ("Warry Lane").[49]

50.    After the exclusion of John Williams pairs, the output was a blocking set consisting of 117,563,883 pairs of account groupings.[50]

v.    Step 5: Calculation of Gammas

51.    The fifth step of the Freer Aggregation Process was to consider every pair of account groupings in the blocking set and assign each pair a comparison vector containing the gamma values for the cleaned fields. The gamma values, which depending on the field ranged from 0-1, 0-2, 0-3 or 0-5, were typically determined by applying cutoffs to the results of the string nearness measures (i.e., fuzzy matching) applied.[51] As an example, the criteria for the email address gamma is shown below:[52]

---

[49] Freer Report at 55.

[50] Freer Report at 55.

[51] Freer Report at 56 to 60. I note that both user birthday and secondary password were compared directly with no fuzzy matching resulting in a binary match (1) or non-match (0).

[52] Freer Report at 57.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

*gamma_clean_rep_email*:
- 3 **if** *email_ratio* == 100
- 2 **if** (*email_ratio* >= 92)
- 1 **if** (*email_beforeAt_ratio* >= 90)
- 0 otherwise

where

- *beforeAt* returns the portion of the string before the first @ character

- *email_ratio* = *ratio*(accountGrouping1.*clean_rep_email*,

    accountGrouping2.*clean_rep_email*)

- *email_beforeAt_ratio* = *ratio*(*beforeAt*(accountGrouping1.*clean_rep_email*),

    *beforeAt*(accountGrouping2.*clean_rep_email*))

### vi.  Step 6: Calculation of Match Probabilities

52.    The sixth step of the Freer Aggregation Process was to utilize the Splink Python Library to automatically convert the comparison vectors for each pair of account groupings to match probabilities. [53]

53.    The output of this step was an assignment of the match probability to each of the 117,563,883 pairs of account groupings in the blocking set.

### vii.  Steps 7-8: Fixed Threshold and Dynamic Clustering

54.    The seventh and eighth steps of the Freer Aggregation Process involved aggregating pairs of the account groups into clusters. This was done by first creating 149 fixed threshold values, with the fixed thresholds occurring at given percentiles from 0.006 to 100. For any given fixed threshold value, Dr. Freer created a cluster such that each account grouping was placed into one cluster of the clustering by taking the transitive closure of the set of all account grouping pairs whose match probability was at least the given threshold. Higher fixed thresholds that required more closely related pairs would yield a larger number of clusters with smaller average cluster size, while smaller fixed thresholds that did not require the same closeness would yield fewer clusters with a larger average cluster size.[54]

---

[53] Freer Report at 62.

[54] Freer Report at 62-63.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

55.     However, due to the heterogeneity of the TelexFree dataset (i.e., some Participants entered information very consistently across may accounts, while other participants entered information that differed more widely), Dr. Freer ultimately elected to forgo a fixed threshold approach in favor of a dynamic clustering process.[55]

56.     Dr. Freer states that the dynamic clustering process seeks to select a different fixed threshold for each account grouping in such a way that (a) the choices are compatible across the entire dataset, and (b) the measures of "overclustering" and "underclustering" are balanced with each other.[56]

57.     Dr. Freer describes "overclustering" as:[57]

> Namely, define the overclustering measure of a given account grouping (with respect to a proposed clustering) to be the fraction of account groupings within its cluster with which it has a match probability above 0.5. In other words, it is the number of account groupings in its cluster with which it has a match probability over 0.5, divided by the total number of account groupings in its cluster. The average overclustering measure of a cluster (e.g., the fixed-threshold cluster of an account grouping for some particular fixed threshold) is then defined to be the average of the overclustering measures of each account grouping in the cluster. Finally, the overclustering measure of an entire proposed clustering (e.g., a candidate clustering for the dynamic clustering process) is defined to be the average overclustering measure of each account grouping's cluster, averaged across all account groupings. In this way, if the overclustering measure of a given clustering is close to 1, this indicates that the clusters do not contain many pairs of account groupings having low match probability, while if the overclustering measure is close to 0, this indicates that the clusters contain many pairs of account groupings having low match probability.

58.     Similarly, Dr. Freer describes "underclustering" as:[58]

> Namely, define the underclustering measure of a given account grouping (with respect to a given clustering) to be the fraction of all account groupings with which it has a match probability above 0.5 that are already within its cluster. In other words, it is the number of account groupings in its cluster with which it has a match probability over 0.5, divided by the total number of account groupings in the dataset with which it has a match probability over 0.5. The underclustering measure of an entire proposed clustering (e.g., a candidate clustering for the

---

[55] Freer Report at 64-65.

[56] Freer Report at 69.

[57] Freer Report at 67-68.

[58] Freer Report at 68.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

  dynamic clustering process) is then defined to be this quantity averaged across all account groupings. In this way, if the underclustering measure of a given clustering is close to 1, this indicates that its set of clusters already contains most of the pairs of account groupings having high match probability, while if the underclustering measure is close to 0, this indicates that there are many pairs of account groupings having high match probability which failed to both be included in any cluster.

59. This balance between overclustering and underclustering was done in the Freer Aggregation Process by choosing, for each account grouping, the fixed-threshold clustering with the smallest threshold that is still consistent with the resulting cluster having average overclustering measure above a determined dynamic clustering parameter. In this case, Dr. Freer determined the dynamic clustering parameter to be 0.60.[59]

60. This step resulted in dynamic clustering of 4,367,728 account groupings.[60]

  viii. <u>Step 9: Convert Clusters of Account Groupings into Clusters of User Accounts</u>

61. The ninth step in the Freer Aggregation Process was to determine the final clusters by ungrouping the account groupings created in the various steps and converting each back into User Accounts. This step resulted in 1,566,383 clusters of User Accounts ("Account Aggregations" or "Clusters"), with a mean size of 7.01 User Accounts per cluster.[61]

  ix. <u>Step 10: Tabulate Total Net Equity for Each Cluster</u>

62. The tenth and final step in the Freer Aggregation Process was to sum the Net Equity amount associated with each User Account (as determined by Mr. Martin) across all the User Accounts in a given cluster. In total, Dr. Freer aggregated 10,987,617 TelexFree User Accounts to 1,566,383 Clusters. Of those 1,566,383 Clusters, 1,484,702 Clusters are alleged to be Net Losers and 81,681 are alleged to be Net Winners. The Net Winners are claimed to have a total net gain of $1,555,981,482, with an average net gain of $19,049 per Net Winner, while the Net Losers are claimed to have a total net loss of $1,782,171,730, with an average net loss of $1,200 per Net Loser.[62]

---

[59] Freer Report at 71.

[60] Freer Report at 72.

[61] Freer Report at 72.

[62] Freer Report at 72-73.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

### B.   Martin Net Equity Calculation

63.   In the determination of Net, I understand the Trustee, and thus Mr. Martin Equity ("Net Equity Calculation" or "Martin Net Equity Calculation"), considered the following four primary transaction types:[63]

- **Direct Payment:** Transactions in which a Participant makes a payment (via cash, wire transfer, check, payment processor, etc.) to TelexFree in satisfaction of an invoice.

- **Direct Receipt:** Transactions in which a Participant receives a payment from TelexFree or payment processor.

- **Triangular Payment:** Transactions in which a recruiting Participant satisfies the membership fee for a newly recruited Participant using the recruiting Participant's accumulated Credits.

- **Triangular Receipt:** Transactions in which a recruiting Participant is assumed to have received cash from a newly recruited Participant in exchange for using his or her accumulated Credits to satisfy an invoice for the newly recruited Participant.

64.   In addition to these four primary transaction types noted in the now-excluded Martin Report, I understand the Net Equity Calculation also includes two other types of transactions: (i) chargebacks; and (ii) manual/purchased Credits. Chargebacks relate to bank or credit card refunds ("Chargebacks") while manual Credits, or purchased Credits as they are referred to in the Huron Data Tables, relate to instances where a participant paid TelexFree directly or through a bank or merchant to purchase system Credits ("Purchased Credits").[64]

65.   More specifically, Purchased Credits represent Credits issued to User Accounts unrelated to the purchase of a membership plan and not a result of the placement of advertisements or other components of the compensation scheme. Although I understand that the Trustee alleges that significant amounts of Purchased Credits were issued without consideration, I understand there were other instances in which Purchased Credits were issued to User Accounts in exchange for

---

[63] Martin Report at 11-12; and Huron TelexFree Analysis of Damages Presentation at 33-35.

[64] Telexfree Net Equity Calculation and Aggregation.pdf; Huron TelexFree Analysis of Damages Presentation at 33-35.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

cash payments to TelexFree.[65] As such, Purchased Credits were excluded from the Net Equity

Calculation by Mr. Martin unless SIG indicated that a payment was made to a banking institution

or via cashier's check, or the value was below $20,000.[66]

66.    There were also exchanges of Credits between User Accounts unassociated with the

issuance and satisfaction of TelexFree invoices ("Credit Transfers").[67] These Credit Transfers have

also been excluded from the Net Equity Calculation by Mr. Martin, and thus the Trustee.

67.    The results by Net Winner and Net Loser based upon Mr. Martin's Net Equity calculation

in conjunction with Dr. Freer's Aggregation Process are summarized below.[68]

| Participant Type | User Accounts | Participants | Total Net Equity |
|---|---|---|---|
| Net Loser | 9,150,955 | 1,484,702 | ($1,782,171,730) |
| Net Winner | 1,836,662 | 81,681 | $1,555,981,482 |
| TOTAL | 10,987,617 | 1,566,383 | ($226,190,248) |

68.    For comparison purposes, the table below the results by Net Winner and Net Loser based

upon Mr. Martin's Net Equity calculation in conjunction with Mr. Martin's Aggregation Process.[69]

| Participant Type | User Accounts | Participants | Total Net Equity |
|---|---|---|---|
| Net Loser | 9,196,914 | 2,042,027 | ($1,809,367,883) |
| Net Winner | 1,790,703 | 95,052 | $1,583,177,635 |
| TOTAL | 10,987,617 | 2,137,079 | ($226,190,248) |

## VI.    SUMMARY OF OPINIONS

69.    I have assessed the methodologies set forth in the Freer Report and Martin Report relative

to: (i) the Freer Aggregation Process; and (ii) the Martin Net Equity Calculation for Participants,

---

[65] Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 10-11; Huron TelexFree Analysis of Damages Presentation at 34; and Telexfree Net Equity Calculation and Aggregation.pdf at 2.

[66] Huron TelexFree Analysis of Damages Presentation at 34; and Telexfree Net Equity Calculation and Aggregation.pdf at 2. (I am not aware of any analysis performed by Mr. Martin relative why a $20,000 threshold was selected.)

[67] Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 10-11.

[68] Freer Report, Exhibit 5. Also, see **Exhibit 3**.

[69] Query of the Huron Data Tables. Also, see **Exhibit 3**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

and specifically Net Winners. While I address each of the methodologies separately below, both the Freer Aggregation Process and the Martin Net Equity Calculation contained flawed assumptions that render Dr. Freer's and Mr. Martin's, and ultimately the Trustee's, conclusion regarding the Net Equity amounts supposedly won or lost by a given TelexFree Participant to be unreliable.

70.     Relative to the Freer Aggregation Process, key considerations include:

- The Freer Aggregation Process is predicated on Dr. Freer's "understanding" that "it was common practice for recruits to use their own name while using the contact information…of their recruiters, or for family members to share the same contact information, or for a business and individual to share the same contact information,"[70] and as such he required "that any two User Accounts under consideration for possible linkage have at least fairly similar name."[71] However, this understanding is entirely unsupported and counter to real-world case facts. The Court in this matter has already excluded Mr. Martin for making the same assumption without adequate support. Specifically, the Court stated "I conclude that Mr. Martin has not shown that the name field data is sufficient to support his opinion that user accounts should be aggregated primarily by using that data for the purposes of determining who the net winners are and the extent of their liability…[h]e has not shown that his assumptions about the name field data's accuracy are reasonable and not speculative."[72] Further, Dr. Freer does not appear to have specifically considered, let alone tested, the <u>accuracy</u> of the Name Field on which he relies so heavily despite the Court's ruling, and the fact that accuracy is one of the most important dimensions of data quality according to his own citations.

- With respect to the accuracy and consistency of the Potential Identifiers based on the facts of this case, I have also not seen any meaningful evidence that TelexFree had internal controls in place during the registration of a User Account that would have prevented a Participant from entering different variations of their name or a name other than their own, such as spouse's name, family member name, business name, colleague/employer name, or some fictitious, erroneous, or arbitrary combination of numbers, letters, or punctuation. Moreover, Participants sometimes worked in teams, entering User Account information on behalf others, including on shared computers subject to autocomplete. And, importantly, the question of how accurately (or inaccurately) and consistently (or inconsistently) Participants entered the name or any other identifying information across their User Accounts simply cannot be answered by the TelexFree Account data alone, and would almost certainly vary from Participant to Participant. As a result, utilizing an Aggregation Process that requires Participants to have reasonably accurately or consistently entered the same or similar names in

---

[70] Freer Report at 2.
[71] Freer Report at 25.
[72] Martin Decision at 22.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

every instance across all their User Accounts (which could number in the thousands) is unreliable and counter to the facts of this case.

- The results of the Freer Aggregation Process are inconsistent with his stated methodology and requirements. For example, as one of his primary tenets, Dr. Freer states "[b]ecause of the special role that the Name Field plays in the TelexFree dataset…, it is important that no pairs of account groupings that substantially disagree on the name end up matched together."[73] However, there are numerous examples of User Accounts with completely different names that end up grouped under the same Participant according to Dr. Freer. (e.g., Alex Lopes and Jean Carreiro, and Flor M Florido and L & L Home Improvement). Similarly, Dr. Freer states "[o]nly when the names in the TelexFree dataset are near enough…and there are other markers of agreement (such as a matching email address, cell phone number, etc.), should these two User Accounts be treated as belonging to the same Participant and should be aggregated."[74] Once again, there are numerous examples of User Accounts that share no meaningful overlap in Aggregation Fields other than name that the Freer Aggregation Process grouped under the same Participant.

- Manual review of Account Aggregations and ePOC data suggests numerous instances of potential under- and over-aggregation. Even the singular example cluster included within the Freer Report appears to contain aggregation issues. This is highly problematic as a single missed link has the ability to (and often did) dramatically impact the Net Equity associated with Participants.

- As part of his scope of engagement, Dr. Freer was asked to "develop an aggregation methodology that creates one 'cluster' of User Accounts for each Participant." Instead, Dr. Freer performed a purely mathematical exercise that attempts to link together User Accounts that have similar characteristics, and specifically where there is substantial agreement on the values in the Name Field. However, such an approach fails to appropriately consider instances where the resulting Clusters may actually relate to more than one Participant, or where a Participant may relate to more than one Cluster. For example, in his deposition, Dr. Freer explicitly states, "[w]hen the name differs substantially, whether it's the same person or not that entered the accounts, that entered that information, when the name differs substantially, my understanding is those are to be considered as separate clusters." However, the Court in this case already specifically defined Participant as a "person" who purchased a membership plan or VoIP Package in TelexFree, not a "cluster" of User Accounts with similar values in the Name Field. As such, to the extent that the ultimate purpose of Dr. Freer's analysis is a quantification of the supposed net funds received by each TelexFree Participant that comprises the Net Winner Class, Dr. Freer's analysis fails to accomplish this goal absent additional expert analysis. This was also confirmed by Dr. Freer in his deposition where he acknowledged "I'm not aggregating accounts to persons period. I'm aggregating

---

[73] Freer Report at 51.

[74] Freer Report at 25.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

accounts to other accounts in clusters. The assignment to persons is a different thing
that might come later."

71.    Relative to Mr. Martin's calculation of Net Equity, key considerations include:

- There is no discussion in the Martin Report regarding why Triangular Transactions are
  included within the determination of Net Equity, but Credit Transfers are excluded
  when both appear to be substantively similar from a real-world (i.e., cash-based)
  perspective.

- To the extent any uncertainty exists regarding if, or how much, cash was exchanged as
  part of Credit Transfers, then such uncertainty necessarily extends to Triangular
  Transfers, given that the SIG database does not provide evidence of cash payments for
  either transaction type. This internal inconsistency within the Net Equity Calculation
  between the treatment of Credit Transfers and Triangular Transactions results in an
  unreliable Net Equity value.

- A foundational assumption of the Net Equity Calculation is that the Credit values
  recorded within SIG for Triangular Transactions (and/or Credit Transfers) are
  "typically" reflective of the amount of cash that was exchanged between Participants.
  However, the facts in this case suggest that in practice Participants transacted at
  amounts that could vary greatly, and sometimes at significant discounts, from the
  amount of Credits shown in SIG due to factors such as specific business arrangements,
  competition between Participants, or collection issues from new recruits. I understand
  that certain Participants also worked as part of larger teams with profit-sharing
  arrangements. Cash payment amounts could be waived, deferred, or borrowed and
  never repaid. None of this real-world activity is reflected in the SIG data on which Mr.
  Martin and the Trustee rely, and as a result the Net Equity Calculation can differ greatly
  from the net amount actually invested and received by Participants.

## VII.    ANALYSIS AND FINDINGS

### A.    The Freer Aggregation Process is Unreliable

#### i.    Dr. Freer's Foundational Assumptions Regarding the Special Role of the Name Field is Unsupported and Counter to Case Facts

72.    For the Trustee to determine whether a given Participant was a Net Winner or Net Loser,
it was first necessary for the Net Equity associated with the one or more underlying User Accounts
to be combined into a single Account Aggregation for the Participant that was the financial
beneficiary in a complete and accurate manner.

73.    In his attempt to accomplish this task, Dr. Freer primarily relied upon a Probabilistic
Record Linkage process, and applied it to the User Account information that was entered by

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

Participants, as reflected in the TelexFree *representante* table (i.e., Account Table).[75] And, according to Dr. Freer, of all the 44 fields in the Account Table, the Name Field (i.e., rep_nome) supposedly plays a "special role." Specifically, he states:[76]

> Because of the pyramid nature of TelexFree's scheme, Participants often recruited friends and relatives into the scheme. **My understanding** of the TelexFree scheme is that, in the course of User Account creation, it was common practice for recruits to use their own name while using the contact information (email address, phone number, street address, and other fields) of their recruiters, or for family members to share the same contact information, or for a business and an individual to share the same contact information. **(emphasis added)**

74.     This "understanding," which appears as Introductory Paragraph 5 to the Freer Report, is of paramount importance. It is foundational to the entirety of the Freer Aggregation Process, as described in the Freer Report:[77]

> Only when the names in the TelexFree dataset are near enough (in the sense of string nearness; see Section II.A.3), say "Alice Adams" and "Alice Addams", and there are other markers of agreement (such as a matching email address, cell phone number, etc.), should these two User Accounts be treated as belonging to the same Participant and should be aggregated. Accordingly, **in the aggregation methodology, we require that any two User Accounts under consideration for possible linkage have at least fairly similar name**. **(emphasis added)**

75.     Thus, if Dr. Freer's assumption regarding the Name Field is found to be inaccurate, it would render the entirety of his analysis unreliable. Despite the critical importance placed on the Name Field, Dr. Freer provides neither a source for this "understanding" nor any meaningful support elsewhere in his report. However, when asked in deposition about the basis for this "understanding," Dr. Freer stated:[78]

> Generally, the court documents, including primarily, I believe the court's memorandum from June 2021 and possibly from the Martin report or Dennis rebuttal or Martin reply.

---

[75] Freer Report at 22 and 37 ("The aggregation methodology developed by Borelian, under my direction, is mainly probabilistic in its approach because it is necessary to have a probabilistic step in the aggregation methodology to account for near-misses in data field matching, to assign partial credit for various fields based on these near-misses, and to account for all of this information when forming clusters.").

[76] Freer Report at 2.

[77] Freer Report at 24-25.

[78] Freer Deposition at 130-131.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

76.     As an initial observation, I do agree that Dr. Freer's assumptions regarding the Name Field are consistent with (and as equally flawed as) the assumption made previously by Mr. Martin, who very similarly stated:[79]

> **After a thorough review of the data, the Team selected the full name of the Participant as a starting point**. Because Participants could receive Direct Receipts from TelexFree, it is reasonable to assume that a Participant would include an accurate name when registering a User Account. Additional fields were selected based on the likelihood that their inclusion, combined with other fields, would accurately aggregate User Accounts by Participants. **(emphasis added**)

77.     To the extent that Dr. Freer's understanding regarding the Name Field is wholly or partially based upon Mr. Martin, such reliance is unfounded. Whereas Mr. Martin at least tried to provide a rationale – albeit fatally flawed as evidenced by his exclusion by the Court – Dr. Freer makes no such attempt. In fact, Dr. Freer appears to concede this point stating "[w]hile many Participants created multiple User Accounts, some Participants at times entered information that was inconsistent across their various User Accounts."[80] In his subsequent example, Dr. Freer describes two User Accounts opened by the same Participant that may have entered different email addresses but provides no evidence or support addressing why potential inconsistency would not extend to the Name Field as well.

78.     By way of comparison, while the value in Name Field appears to have played no meaningful role in the actual operation of a User Account, the email address was how TelexFree contacted Participants, and thus could potentially be more representative of the Participant. For example, the Martin Report on this topic states:[81]

> Email address was selected because TelexFree records, such as invoices, were sent to the email addresses associated with the User Accounts. Therefore, Participants were presumed to more likely provide accurate email addresses than most other data.

---

[79] Marin Report at 16.

[80] Freer Report at 1.

[81] Martin Report at 16-17.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

79.     Furthermore, with respect to the Court's memorandum from June 2021 (i.e., the Martin

Decision), the Court carefully explained over the course of ten pages why such an assumption

regarding the Name Field is at best unreliable absent clear evidentiary support, stating:[82]

> Having concluded that fields would need to be used in some combination, Mr.
> Martin asserted that he "considered name...to be the most important variable."
> Martin Tr. 67:23-68:1, 222:19-20. Yet, **he has offered only unsupported
> assumptions and untestable bases for why he selected the name field, despite
> its acknowledged flaws, above all other fields to be the primary focus in his
> aggregation process.** See also Martin Tr. 222:21-24 (agreeing that "if name didn't
> mean as much to...a particular user, that could skew the results of an aggregation").

> As noted, for an expert witness's opinion testimony to be admissible, it must be
> "based on sufficient facts or data." Fed. R. Evid. 702(b). Given actual and potential
> data quality and reliability issues discussed above, the defendants assert that,
> having selected the name field as his starting point and constant, Mr. Martin relied
> upon insufficient facts or data to support his expert opinion that user accounts
> should be aggregated primarily by using data from that field to determine the
> identity of individual net winners and the extent of their net winnings. See Defs.'
> Mot. 13-15. As also noted, an expert witness's opinion testimony must be based
> upon reliable principles and methods and the reliable application of such principles
> and methods. Fed. R.Evid. 702(c)-(d). Defendants suggest that Mr. Martin's
> process of selecting the name field as his starting point and constant does not meet
> either of these requirements for admissibility of his expert opinion. See Defs.' Mot.
> 15-16.

> Given the issues identified above, **I conclude that Mr. Martin has not shown
> that the name field data is sufficient to support his opinion that user accounts
> should be aggregated primarily by using that data for the purposes of
> determining who the net winners are and the extent of their liability. He has
> not shown that his assumptions about the name field data's accuracy are
> reasonable and not speculative**. He effectively conceded that his initial
> assumption about participant behavior lacked support. He failed to support his
> additional assumptions with any reference to the actual data. His own statements
> and concessions about the name field data's quality issues, along with his failures
> to show that his efforts to address those issues were well-reasoned, all undermine
> his position that such data is sufficient to support his opinion. Further, Mr. Martin
> has offered almost no concrete information about the principles and methods that
> he used and how he used them to select the name field as his starting point and
> constant. With no documentation or detailed explanation of his efforts, there is no
> practical ability to objectively review the reliability of Mr. Martin's analytical
> techniques. For admissibility, it is not enough for an expert simply to provide his
> conclusions, he must also show his work so that its reliability, including its

---

[82] Martin Decision at 13-22.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

adherence to accepted practices in the relevant field, can be meaningfully
reviewed. While I need not for purposes of the current dispute conclude that Mr.
Martin's selection and use of the name field as a starting point and constant were
correct or incorrect, **I must and do conclude that Mr. Martin has not shown the
requisite reliability of his selection and use of the name field, which formed
the basis of his opinion. (emphasis added)**

80.     Given that the Court already rejected Mr. Martin's explanation on this issue, it is unclear

why Dr. Freer now believes the Court's decision somehow supports his "understanding" when in

fact it does precisely the opposite.

81.     As for the Initial Dennis Report, Dr. Freer appears to ignore its express purpose, which

was described in the Initial Dennis Report as:[83]

> [O]ne of the factors likely driving what appears to be under-aggregation in certain
> instances, is the disconnect between the Aggregation Algorithm's requirement that
> the names be the same or similar across every Participant User Account and the
> reality that Participants could create User Accounts using a variety of names, such
> as business name, personal name, or even fictional names. This reliance on
> consistent naming fails to appropriately account for instances where other
> Potential Identifiers provide strong indicia that the User Accounts potentially
> belong to a single Participant.

82.     As such, the Initial Dennis Report, as well as the various examples contained therein, are

counter to, not in support of, the notion that distinct Participants consistently entered the same or

substantially similar names.

83.     With respect to the limited additional discussion by Dr. Freer on why he believes the Name

Field to be the same or substantially similar across all of a Participant's User Accounts, he states:[84]

> In a typical user-account dataset, email addresses and phone numbers are unique
> to an individual. However, this is often not the case in the TelexFree dataset. As
> described in Paragraph 5, a major source of complexity with the TelexFree dataset
> is the prevalence of User Accounts that contain different names, but the same email
> address, phone number, address, etc.
>
> As a result, the Name Field (rep_nome) in the TelexFree dataset gains a special
> meaning that it might not have in another dataset. In particular, it is the *only true
> differentiator* of Participants – if User Accounts A and B match in all other fields
> (email address, cell phone number, etc.) but A's Name Field is quite different from

---

[83] Initial Dennis Report at 27.
[84] Freer Report at 24-25.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

> B's Name Field (say, "Alice Adams" and "Bob Baker"), then these User Accounts
> should be treated as belonging to different Participants and should not be
> aggregated.

84.   As purported support for this assertion, Dr. Freer's cites the Initial Dennis Report (already discussed above) and the affidavits for Frantz Balan and Lusette Balan.

85.   Once again, these Affidavits refute rather than support Dr. Freer's understanding. The Affidavit of Lusette Balan confirmed that she had "no involvement in Telexfree" despite her name appearing in multiple User Accounts, and which was further discussed in the Affidavit of Frantz Balan:[85]

> There are numerous other accounts that were set up by me or team members
> working with me that were not in my name but that use my personal email address
> and are aggregated to someone else. **For example, the Trustee has aggregated
> several accounts to my wife, Lusette. This is incorrect because my wife Lusette
> had no personal involvement with TelexFree.**
>
> Similarly, there are accounts that I did not set up or in any way operate that are
> aggregated to me, even though they use a different email, street address, or
> username. Some of those accounts use email address that do not belong to me,
> such as vjmanigat@gmail.com.
>
> Based on my understanding of the Trustee's aggregation model, I believe the
> Trustee does not understand that many participants worked in teams, which had
> shared goals of member recruitment in order to earn money. The Trustee assumes
> everyone worked alone…
>
> There are a number of reasons why the information used to make the aggregations
> is unreliable.
>
> First, within my team, everyone's basic personal information like name, address,
> and phone number was known, so anyone could put an account in someone else's
> name.
>
> Second, shared computers allowed users to "autocomplete" fields, so even if
> someone used the computer in our office to setup TelexFree accounts, they could
> use the autocomplete to enter my information without me necessarily knowing
> about it or using the account…
>
> Third, there were financial incentives for people to set up accounts that appeared
> to be someone different, even if you were using the account. This included the

---

[85] Affidavit of Frantz Balan, July 30, 2020 ("F. Balan Affidavit") at 3-5; and Affidavit of Lusette Balan, July 29, 2020 at 2.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

> basic rule that you could not "recruit yourself," meaning that your downlines need
> to be different people. **(emphasis added)**

86.      These affidavits represent real-world examples and directly contradict, rather than support, Dr. Freer's fundamental assumption that the Name Field "is the *only true differentiator*."[86] I also note that Dr. Freer continued to aggregate User Accounts to Mr. Balan that have the email address "vjmanigat@gmail.com" despite Mr. Balan's confirmation that these accounts did not belong to him. Further, Mr. Balan offers an explanation for Dr. Freer's observation regarding the prevalence of User Account that "contain different names, but the same email address, phone number, address, etc."[87] (e.g., people working in teams and/or with shared computers).

87.      Dr. Freer has not provided any alternative real-world explanation as to why Participants, when creating User Accounts, supposedly always entered the same or substantially similar names in the Name Field, but frequently elected to utilize inconsistent or inaccurate information when entering every other field - opting instead to use the contact information of friends, relatives, or even fictious, erroneous or arbitrary combinations of numbers, letters, or punctuation.

88.      The Court already made it clear that an Aggregation Process founded simply on the unsupported "understanding" that Participants consistently entered the same or substantially similar names across all of their User Accounts is insufficient. Yet, Dr. Freer failed to provide any meaningful support demonstrating why such an understanding is grounded in fact, which renders his Aggregation Process, similar to Mr. Martin's, unreliable for determining Net Equity.

ii.      <u>Dr. Freer Failed to Appropriately Consider the Quality of the Data Utilized in His Aggregation Process</u>

89.      Regardless of the approach to record linkage selected (e.g., deterministic, probabilistic, hybrid), Dr. Freer states "it is crucial to assess the quality of the data in each field" and "select fields to be used for linkage based on data quality."[88]

90.      Further to this point, Dr. Freer describes four dimensions of data quality:[89]

---

[86] Freer Report at 24-25.

[87] Freer Report at 24.

[88] Freer Report at 5-6.

[89] Freer Report at 7.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

> The goal of data quality assessment is to identify fields that are of sufficiently high quality for reliably assessing pairwise matches. The dimensions relevant to data quality include **completeness** (how often the field values are present vs. missing), **consistency** (how consistent the values used for matching are), **accessibility** (inclusion of different kinds of nonoverlapping fields such as name, address, phone, email, etc.), and **believability** (how credible or plausible the actual values are). **(emphasis added)**

91.     As support for this statement, Dr. Freer cites Section 3.1 of "Data Matching, Data-Centric Systems and Applications" by Peter Christen (the "Christen Text"). However, Section 3.1, entitled Data Quality Issues Relevant to Data Matching lists six dimensions to data quality, not four. Notably absent from Dr. Freer's consideration are:[90]

- *Timeliness*: How old are the data available. For the matching of two databases, have the data been recorded at the same time or not? This can be a crucial factor to a successful matching because personal information, such as people's addresses, telephone numbers, and even names, change over time. If the data to be matched have been recorded at different points in time then this needs to be taken into account during the matching process.

- *Accuracy*: How accurate are the attribute values in the database(s) used for matching or deduplication? Is it known how the data have been entered or recorded? Have data entry checks been performed, and have the data been verified for correctness using external reference data (such as references of known and valid addresses)?

92.     It is unclear whether Dr. Freer's omission of these two data quality dimensions from his report was intentional, but both dimensions are relevant in this case.

93.     With respect to *timeliness*, User Accounts were created over the period of approximately February 2012 through April 2014.[91] As such, during this more than two-year period, it is possible that identifying information for certain Participants could have changed, including name.

94.     With respect to *accuracy*, the Christen Text states that it, along with consistency, are arguably the most important data quality dimensions for data matching and deduplication.[92] Further, the text suggests one should consider how the data was recorded, whether data entry checks were performed, and whether the data was verified using external references.

---

[90] Section 3.1 of P. Christen, Data Matching, Data-Centric Systems and Applications, Springer-Verlag, 2012.

[91] This time range reflects the minimum and maximum dates shown in the rep_data_cad field (i.e., User Account creation date) per the *representante* table. Also, see Freer Report at 31.

[92] Section 3.1 of P. Christen, Data Matching, Data-Centric Systems and Applications, Springer-Verlag, 2012.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

95.      In this case, with respect to how the data was recorded, it was generally inputted manually by millions of individuals worldwide through a website-based registration form. I have not seen any evidence regarding whether this webform was (i) consistently in English or Portuguese; (ii) to if and when the language may have changed over time; or (iii) if the Participant had the ability to manually select the language.[93] As such, there was the potential for language barriers as part of the input process for certain Participants. Also, as discussed above, Participants sometimes worked in teams, entering User Account information on behalf others, including on shared computers subject to autocomplete.[94]

96.      With respect to data entry checks, I am not aware of any internal controls that took place during the registration of a User Account that would have validated or confirmed a name, or prevented a Participant from entering a fictious, erroneous or arbitrary combination of numbers, letters, or punctuation in place of a name.[95]

97.      This does not support the notion that either the Participant's name or the remainder of the TelexFree Account table on which Dr. Freer relies had a high degree of accuracy, an important dimension of data quality according to Dr. Freer's own citations.

98.      The Court also explicitly emphasized the need for an independent assessment of data accuracy, and particularly the Name Field, stating:[96]

> I conclude that Mr. Martin has not shown that the name field data is sufficient to support his opinion that user accounts should be aggregated primarily by using that data for the purposes of determining who the net winners are and the extent of their liability. **He has not shown that his assumptions about the name field data's accuracy are reasonable and not speculative**. (emphasis added)

99.      I also note that in his deposition Dr. Freer explicitly states that he "didn't make as, formal, a separate assessment" of *accuracy* and instead "completeness, consistency, and believability have to do with accuracy and those I assessed in detail."[97] However, using these other three dimensions of data quality as a proxy for or indicia of *accuracy* is unfounded, as Dr. Freer subsequently

---

[93] See e.g., Martin Decision at 12.
[94] See e.g., F. Balan Affidavit at 3-4.
[95] See e.g., F. Balan Affidavit at 4-5.
[96] Martin Decision at 22.
[97] Freer Deposition at 106.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

admitted stating "it's certainly possible to have complete data that is not accurate, or consistent data this is not accurate, or believable data that is not accurate."[98]

100.    Further, with respect to the *believability* dimension of data quality, Dr. Freer states that the "dataset is also generally rather believable, despite a small portion of exceptions (due to garbage like '11111' or value like 'Mickey Mouse')."[99] He then points to a list of 471 names associated with just a single Cluster, which he states reflects "a visual illustration of the general quality of the dataset."[100] Dr. Freer provides no discussion regarding if or how this single Cluster, presumably selected at his own discretion, is representative of the entire dataset.

101.    In fact, there are approximately 2,400 unique names associated with more than 200,000 separate User Accounts where the name entered by the user is less than 4 characters.[101] Of these, the vast majority (i.e., over 2,300 names) are Net Losers, the losses of which total more than $11.4 million.[102] Examples include the following:

---

[98] Freer Deposition at 128.

[99] Freer Report at 24.

[100] Freer Report at 24 and Exhibit 3.

[101] Queries of the Freer and Huron Data Tables.

[102] Queries of the Freer and Huron Data Tables.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

| Full_Name | # of User Accounts | Aggregate Net Loss |
|---|---|---|
| l l | 40,687 | ($2,063,193) |
| . . | 36,498 | ($1,986,986) |
| a a | 30,363 | ($1,551,269) |
| . | 8,329 | ($535,314) |
| q q | 5,339 | ($278,741) |
| W W | 3,191 | ($161,427) |
| c c | 3,009 | ($151,197) |
| m m | 2,077 | ($108,882) |
| x x | 2,166 | ($108,732) |
| d d | 2,021 | ($102,095) |
| l l | 1,966 | ($98,403) |
| Jo | 1,849 | ($92,354) |
| A B | 1,770 | ($89,421) |
| 0 0 | 1,667 | ($84,082) |
| k k | 1,512 | ($76,497) |
| s s | 1,455 | ($72,954) |
| j | 1,328 | ($68,650) |
| j j | 1,298 | ($65,619) |
| p p | 1,242 | ($62,076) |
| f f | 1,171 | ($59,481) |
| , , | 1002 | ($59,243) |
| l | 830 | ($44,638) |

102.    Additionally, based on my review of the Account Table, I also observed usernames with more than four more characters that are as equally inaccurate. For example, there are over 125,000 TelexFree User Accounts that consist entirely of numerical values, punctuation, or spaces (i.e., no letters), such as "........." or "398985 9849348".[103]

103.    Dr. Freer performs a similar analysis stating:[104]

> [N]early all of the name values contain strings consisting entirely of alphabetical characters or the symbols commonly found in names (period, comma, hyphen, space, or apostrophe) – as opposed to numbers or other symbols – which is an indication that the value is a legitimate name. Specifically, 97% of the name field values are both five characters or longer and contain only the characters described above.

---

[103] Based on query of the Account table. Also, see e.g., rep_id 11655333 and 26451460.

[104] Freer Report at 26.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

104.　Additionally, Dr. Freer performed a manual review of just 300 Name Field values from this remaining population, or 0.0028% of remaining User Accounts with Name Field values that are both five characters or longer and contain only the characters commonly found in names.[105] Based on this review, he concludes that 98% "look[ed] like a name."[106] While the Freer Report provides no explanation as to what precisely it means to "look like a name," Dr. Freer in his deposition elaborated on this point confirming that "Mickey Mouse" would not have looked like a name to him but "Barack Obama" would have,[107] despite the fact that it's likely both are inaccurate.

105.　Taken together, Dr. Freer estimates that in 95% of the User Accounts, the value of the rep_nome field appears to be a name.[108] Assuming the denominator in his percentage is the 10,987,617 User Accounts attributable to TelexFree and associated with at least one paid invoice, this means, by Dr. Freer's own admission, there are over 500,000 User Accounts that <u>do not</u> appear to contain a name in the Name Field.

106.　Considering just the approximately 170,000 User Accounts that had at least one number in the Name Field and didn't appear to reflect a business,[109] this accounts for approximately $2.3 million in winnings from User Accounts with positive net equity and $11.0 million in net losses from User Accounts with negative net equity.[110]

107.　As such, this does not support the notion that either the Name Field or the remainder of the TelexFree Account Table is "generally rather believable." This is particularly important when considered in the appropriate context, which is the potential impact on a single Participant, not the entire population of Participants.

---

[105] Calculated as 300 / (97% x 10,987,617). 10,987,617 is the number of User Accounts attributable to TelexFree and associate with at least one paid invoice. Also, see Freer Report at 26.

[106] Freer Report at 26.

[107] Freer Deposition at 111-112.

[108] Freer Report at 25-26.

[109] Business were assumed to be any names that included the following: inc, corp, llc, trust, ltd, consult, service, enterprise or .com

[110] Queries of the Freer and Huron Data Tables.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

108.    In terms of *consistency*, Dr. Freer contends that this dimension is "generally high" for eight of the Aggregation Fields (including name), albeit with "occasional variation."[111] Yet, he provides little in the way of support for this contention. This is particularly true as it relates to Dr. Freer's most critical Aggregation Field, the Name Field associated with the User Account. On this issue, Dr. Freer simply states:[112]

> It is worth noting that while it may turn out that a name is made up (such as "Mickey Mouse"), this itself is not a critical issue for data aggregation. The relevant issue for aggregation is whether the values in the field support the matches, not whether or not the values in the field reflect the true name. Even when a Participant uses a pseudonym that is totally unrelated to their real name, **it is possible to successfully aggregate their User Accounts if (a) they use the pseudonym consistently,** and (b) not too many other Participants use that same pseudonym without including different information in other fields. In the best case scenario, the true identity of the Participant can, at a later time, be ascertained from the other indicia; in the worst case scenario, the Participant will never be identified, but their records do not contaminate the rest of the aggregation. **(emphasis added)**

109.    This statement appears to imply is that *accuracy* and *believability* of the Name Field are of lesser importance to the Freer Aggregation Process, as long as there is *consistency* in the name used by a given Participant across all of their User Accounts, and the remaining Aggregation Fields provide sufficient differentiation from other Participants. However, Dr. Freer poses this as an unsupported conditional "if then" statement, not a statement of fact confirmed through documentation or analysis. Dr. Freer even admits that the data lacked consistency, stating: "The TelexFree dataset presents an additional challenge due to the presence of heterogeneity: some Participants entered their information very consistently across many accounts, while other Participants, for a variety of reasons, entered information that differed more widely (e.g., name variants, typos, multiple email addresses or phone numbers, etc.)."[113]

110.    Stated in the converse, if Participants did not enter names consistently or did not provide sufficient differentiation in other Aggregation Fields, which the case facts suggest was likely for certain Participants (especially large Net Winners), then it would <u>not</u> be possible for Dr. Freer to successfully aggregate their User Accounts. And, importantly, the question of how consistently

---

[111] Freer Report at 24.
[112] Freer Report at 25.
[113] Freer Report at 64.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

(or inconsistently) and accurately (or inaccurately) Participants entered the name or any other identifying information across their User Accounts simply cannot be answered by the TelexFree Account data alone, and would almost certainly vary from Participant to Participant. To this point, the Freer Deposition reads:[114]

> Q. Did you make any determinations about the likelihood of data entry scenarios where information like name or any portion of contact information could be flipped between different users?
>
> A. No, and at some level, it's impossible to tell certain things from the dataset itself. If you take a record and you write down all the fields and you tell me, "Person A did it versus Person B did it," of course, information is not in the dataset. I don't know from the dataset, period.
>
> Q. You agree with me that you have at least some understanding that on certain occasions when a user entered data, they entered information that pertained to somebody else?
>
> A. That is, yeah, I mean, as I describe in that paragraph, there's, in fact, several specific scenarios where my understanding was that kind of thing was likely to have happened.

111.    To this point, Section 2.6 of the Christen Text is entitled Evaluation of Matching Quality and Complexing, and states:[115]

> To evaluate the completeness and accuracy of a data matching project, some form of ground-truth data, also known as *gold standard*, are required. Such ground-truth data must contain the true match status of all known matches (the true non-matches can be inferred from them). However, obtaining such ground-truth data is difficult in many application areas. For example, when matching a large tax payers database with a social security database it is usually not known which record pair classified as a match refers to a real, existing individual who has a record in both databases. Only further investigation, such as checking extra data about the individual under consideration, or even contacting them, can help determine the truth about such a classified match.
>
> A related problematic issue is the manual classification of potential matches through clerical review. It is often difficult to make a manual match or non-match decision with high confidence if the two records in a potential match pair contain several attribute values that differ from each other. Without further external information, a decision that was made manually might be wrong.

112.    As discussed above, and even setting aside the potential issues with the *believability* and *accuracy* of the data, simply assuming without basis or support that a Participant *consistently* entered data, and critically the Name Field, into a webform sometimes thousands of times over is not a reliable basis for an Aggregation Process in this case. This is especially true when (i)

---

[114] Freer Deposition at 132-133.
[115] Section 2.6 of P. Christen, Data Matching, Data-Centric Systems and Applications, Springer-Verlag, 2012.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

TelexFree did not appear to have any substantive verification or internal controls process as part registering a new User Account, and (ii) Participants had little, if any, incentive to enter names (or any Potential Identifiers) accurately. Thus, without quality data as an input, as is the case here, Dr. Freer's output is equally unreliable. The Christen Text concisely explains this issue:[116]

> For any type of data analysis, processing and management, the *garbage-in garbage-out* principle holds. If the quality of the input data is low, then the output generated is normally not a high quality or accuracy either.

### iii.   Dr. Freer's Results are Internally Inconsistent

113.   As one of his primary tenets, Dr. Freer states "[b]ecause of the special role that the name field plays in the TelexFree dataset (see Section III.B.1 above), it is important that no pairs of account groupings that substantially disagree on the name end up matched together."[117]

114.   Specifically, Section III.B.1 of the Freer Report states:[118]

> [I]f User Accounts A and B match in all other fields (email address, cell phone number, etc.) but A's Name Field is quite different from B's Name Field (say, "Alice Adams" and "Bob Baker"), then these User Accounts should be treated as belonging to different Participants and should not be aggregated.

> Only when the names in the TelexFree dataset are near enough (in the sense of string nearness; see Section II.A.3), say "Alice Adams" and "Alice Addams", and there are other markers of agreement (such as a matching email address, cell phone number, etc.), should these two User Accounts be treated as belonging to the same Participant and should be aggregated. Accordingly, in the aggregation methodology, we require that any two User Accounts under consideration for possible linkage have at least fairly similar name.

115.   However, as discussed below, the results of the Freer Aggregation Process are internally inconsistent. As a first example, take his simple statement that "if User Accounts A and B match in all other fields (email address, cell phone number, etc.) but A's Name Field is quite different from B's Name Field…then these User Accounts should be treated as belonging to different Participants and should not be aggregated."[119] In fact, the Freer Aggregation Process does precisely

---

[116] Section 3.1 of P. Christen, Data Matching, Data-Centric Systems and Applications, Springer-Verlag, 2012.

[117] Freer Report at 51.

[118] Free Report at 24-25.

[119] Freer Report at 24-25.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

the opposite, as reflected in the User Accounts aggregated as Cluster 23118541 shown in the table below:[120]

| cluster_id | rep_nome | rep_email | rep_numero | rep_end | rep_cidade | rep_pais | rep_fone | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|---|---|
| ⊟ 23118541 | ⊟ A | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (1,047.90) | 21 |
| | ⊟ B | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (12,125.70) | 243 |
| | ⊟ C | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (13,572.80) | 272 |
| | ⊟ D | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (7,634.70) | 153 |
| | ⊟ F | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (5,189.60) | 104 |
| | ⊟ H | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (948.10) | 19 |
| | ⊟ J | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (54,590.60) | 1,094 |
| | ⊟ K | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (1,097.80) | 22 |
| | ⊟ L | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (12,075.80) | 242 |
| | ⊟ M | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (11,676.60) | 234 |
| | ⊟ N | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (10,429.10) | 209 |
| | ⊟ P | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (6,586.80) | 132 |
| | ⊟ R | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (3,293.40) | 66 |
| | ⊟ S | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (7,684.60) | 154 |
| | ⊟ T | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (8,932.10) | 179 |
| | ⊟ V | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (6,736.50) | 135 |
| | ⊟ Z | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (748.50) | 15 |
| | ⊟ (blank) | ⊟ (blank) | ⊟ 1485 | ⊟ Rua Jo | ⊟ Xucarana | ⊟ AF | 689958478 | $ (12,075.80) | 242 |
| **Grand Total** | | | | | | | | $ (176,446.40) | 3,536 |

116.    As part of his Cluster 23118541, Dr. Freer has, in fact, aggregated User Accounts with name "A" and User Accounts with name "B" (along with other letters of the alphabet and even no name at all). This likely occurred because Dr. Freer removed the Name Field from consideration where it only contained a single character.[121] And, while Dr. Freer may have intended his "A" and "B" example in a purely hypothetical rather than literal sense, it still demonstrates an important point. In this example, Dr. Freer aggregates 3,536 User Accounts to a single Participant even though that supposed Participant inconsistently entered his or her name. This outcome is in direct contradiction to his own example and critically his assumption that name is the "only true identifier."[122]

117.    This example is also highly relevant when compared to other instances where a Participant may likely have entered a variety of "garbage" names, albeit with more than one character. In the

---

[120] See **Exhibit 11**.

[121] Freer Report at 46 ("For rep_nome (name), the additional cleaning steps consist of: (a) replacing, by the empty string, any values of length 1.").

[122] Freer Report at 24.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

table below, these supposedly different Participants all share substantial commonalities, in whole or in part, other than a clearly fictitious name:[123]

| cluster_id | rep_nome | rep_email | rep_end | rep_cep | rep_fone | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|
| ⊟10758965 | ⊟Team Legendary | ⊟billybob.arbonne@gmail.com | ⊟1 | ⊟1 | ? | $ (1,425.00) | 1 |
| | | | ⊟? | ⊟? | 3477667668 | $ (1,425.00) | 1 |
| | | | | | ? | $ (2,101.50) | 2 |
| | | | ⊟123 main st | ⊟77007 | 3477667668 | $ (19,900.10) | 14 |
| | | | ⊟123 main st. | ⊟77007 | 3477667668 | $ (21,125.50) | 15 |
| | | ⊟tommylin19@yahoo.com | ⊟? | ⊟? | ? | $ (14,832.40) | 13 |
| | | | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 10heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 11heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 12heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 13heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (2,850.00) | 2 |
| | ⊟Team Legendary 15heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 16heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 17heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Team Legendary 18heimer | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟10778683 | ⊟Team Legendary | ⊟billybob.arbonne@gmail.com | ⊟? | ⊟? | ? | $ (1,025.80) | 1 |
| ⊟10787619 | ⊟Team Legendary | ⊟peterkwongusa@yahoo.com | ⊟1 | ⊟1 | 1 | $ (1,425.00) | 1 |
| | | | ⊟? | ⊟? | ? | $ (4,203.00) | 4 |
| | ⊟Team Legenday | ⊟billybob.arbonne@gmail.com | ⊟1 | ⊟1 | ? | $ 7,174.90 | 1 |
| ⊟11089827 | ⊟chin hao chang | ⊟billybob.arbonne@gmail.com | ⊟9080 telstar ave #302 | ⊟91731 | 3477667668 | $ 18,824.40 | 1 |
| ⊟12982273 | ⊟X Legend X | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77017 | 3477667668 | $ (1,425.00) | 1 |
| ⊟13328313 | ⊟27legendary WC | ⊟billybob.arbonne@gmail.com | ⊟1337 legend ave | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟14207003 | ⊟Majestic Tia | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟77077 | 3477667668 | $ (1,425.00) | 1 |
| ⊟14394871 | ⊟Walt Disney | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟551166 | 11111111111 | $ (14,250.00) | 10 |
| | | | ⊟123 main st. | ⊟77007 | 3477667668 | $ 1,474.90 | 1 |
| ⊟15341909 | ⊟Agent hydralisk | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (11,350.10) | 8 |
| | ⊟Agent Hydralisk2 | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| | ⊟Agent Hydralisk3 | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟15744519 | ⊟WI-FI Cindy | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟77007 | 3477667668 | $ (1,425.00) | 1 |
| ⊟22032025 | ⊟King Blizzard | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟0 | 1111111111 | $ (339.60) | 1 |
| ⊟23079231 | ⊟Barack Obama | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟0 | 1111111111 | $ (339.60) | 1 |
| ⊟23088735 | ⊟why why not | ⊟billybob.arbonne@gmail.com | ⊟123 main st. | ⊟0 | 1111111111 | $ (339.60) | 1 |
| ⊟23092685 | ⊟glee 810 | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟0 | 1111111111 | $ (339.60) | 1 |
| ⊟23104679 | ⊟dark shadow | ⊟billybob.arbonne@gmail.com | ⊟123 main st | ⊟0 | 1111111111 | $ (339.60) | 1 |
| **Grand Total** | | | | | | $ (90,087.20) | 94 |

118.    Unlike the previous example where Dr. Freer was willing to aggregate different names, in this case, Dr. Freer treats these as 15 separate Participants. Such a distinction is arbitrary, however, and based on the number of characters in a string, not case facts or sound methodology. If a single Participant is willing and able to create multiple User Accounts with "A", "B," or "C" as the name, why is it any less likely that a single Participant created multiple User Accounts with "Barack Obama," "Walt Disney," or "Team Legendary" as the name?

119.    And, extending this logic one step further, if a Participant is willing and able to use a range of fictitious names only limited by their creativity, why is it any less likely that a Participant (or someone on the Participant's behalf) either intentionally or unintentionally entered other

---

[123] See **Exhibit 12**. I also note that these accounts share substantial similarity on Secondary Password.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

inaccurate or inconsistent names across their various User Accounts, such as the name of friends, relatives, or businesses? This internal inconsistency provides further indicia of the flawed nature of the Freer Aggregation Process.

> iv.   The Results of the Freer Aggregation Process are Inconsistent with his Stated Methodology and Requirements

120.   Dr. Freer explicitly states that "in the aggregation methodology, [he] require[d] that any two User Accounts under consideration for possible linkage have at least fairly similar name"[124] and that the Name Field was the "only true differentiator."[125]

121.   Dr. Freer further describes this requirement as follows:[126]

> Because of the special role that the name field plays in the TelexFree dataset..., it is important that no pairs of account groupings that substantially disagree on the name end up matched together. I use blocking as a mechanism to accomplish this goal, by ensuring that the blocking set contains only pairs of account groupings with substantial agreement on name. In this way, only such pairs (i.e. those with substantial agreement on name) are even considered for potential linkage.

122.    However, if this was indeed the intent of his Aggregation Process, then Dr. Freer's results are inaccurate and inconsistent with his desired outcome.

123.   For those names that Dr. Freer aggregated under a single Participant, see for example Cluster 119427, which includes the following unique names:[127]

---

[124] Freer Report at 25.
[125] Freer Report at 24.
[126] Freer Report at 51.
[127] See **Exhibit 13**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

| cluster_id | rep_nome | rep_email | rep_end | rep_cidade | rep_pais | rep_fone | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|---|
| 119427 | Alex de carvalho Lopes | carvalopes@gmail.com | Rua Prof° Renato Ribeir | Vitória | UY | 552730262158 | $ (1,375.10) | 1 |
| | Alex Lopes | carvalopes@gmail.com | R Prof Renato Ribeiro d | Vitoria | UY | 5527997852189 | $ (1,474.90) | 2 |
| | Edjane Carreiro | nay_justin@hotmail.com | SW 10Ch Place | derffildbeach | US | 15613057841 | $ (49.90) | 1 |
| | | may_justin@hotmail.com | Sw 10Th place | Deerfield Beach | US | 5613057841 | $ (289.10) | 1 |
| | Eliaavne Carreiro | elianevit40@gmail.com | Maplewood Av | Everett | US | 17818445344 | $ (49.90) | 1 |
| | Eliane B Carreiro | elianevit40@gmail.com | | Boston | US | 17818445344 | $ (975.00) | 1 |
| | | | Maplewood av | Boston | US | 17818445344 | $ 515.40 | 1 |
| | | | | Everett | US | 16175071974 | $ (2,990.00) | 2 |
| | | | maplewood ave | Boston | US | 17818445344 | $ 710.00 | 1 |
| | | | Rua Sao Jorge | Itaciba | US | 27328689367 | $ (906.50) | 1 |
| | | elianevit31@hotmail.com | Maplewood av | Boston | US | 17818445344 | $ (149.70) | 1 |
| | Eliane B. Carreiro | elianevit40@gmail.com | 43 maplewood ave | Boston | US | 17818445344 | $ 16,875.74 | 1 |
| | | | | | | 7818445344 | $ (199.60) | 1 |
| | | | 43 maplewood ave, | Everett | US | 17818445344 | $ 210,371.50 | 1 |
| | | | Maplewood av | Boston | US | 17818445344 | $ (1,351.00) | 2 |
| | | | maplewood av | Boston | US | 17818445344 | $ (1,975.00) | 4 |
| | Eliane Carreiro | elianevit40@gmail.com | maplewood av | Everett | US | 17818445344 | $ (49.90) | 1 |
| | | | 43 maplewood | Boston | US | 17818445344 | $ 11,257.16 | 1 |
| | | | 43 maplewood ave | Everett | US | 16179083340 | $ (49.90) | 1 |
| | | | | | | 7818445344 | $ (49.90) | 1 |
| | | | Maplewood Av | Boston | US | 16175071979 | $ (49.90) | 1 |
| | | | Maplewood av | 2149 | US | 17818445344 | $ (249.50) | 1 |
| | | | | Everett | US | 17818445344 | $ (6,745.90) | 8 |
| | | | | | | 27328689367 | $ (149.70) | 2 |
| | | | | | | 16179083340 | $ (249.50) | 1 |
| | | | | | | 7817384710 | $ (1,445.10) | 1 |
| | | | | | | 16175071974 | $ (28,045.90) | 53 |
| | | | | | | 18578889783 | $ (99.80) | 1 |
| | | | maplewood ave | Boston | US | 17818445344 | $ (49.90) | 1 |
| | | | Rua Sao Jorge | cariacica | BS | (27) 3286-8987 | $ (49.90) | 1 |
| | | | | | | (27) 3286-8987 | $ (49.90) | 1 |
| | | | | Itaciba | | (27) 3286-8987 | $ 38,350.90 | 2 |
| | | elianevit31@hotmail.com | maplewood av | Everett | US | 17818445344 | $ (199.60) | 1 |
| | | | 43 maplewood ave | Everett | US | 2792290673 | $ (49.90) | 1 |
| | | | 43 maplewood ave | Everett | US | 16178422930 | $ (49.90) | 1 |
| | | | | | | 18573184245 | $ (49.90) | 1 |
| | | | Maplewood av | 2149 | US | 17818445344 | $ (149.70) | 2 |
| | | | | Everett | US | 17818445344 | $ (848.30) | 11 |
| | | elianevit40@gmail.com | Maplewood av | Boston | US | 7818445344 | $ (49.90) | 1 |
| | | Cleidesantos2273@hotma | Maplewood av | Everett | US | 16175071974 | $ (99.80) | 1 |
| | | may_justin@hotmail.com | 4379 sw 10th place | Deerfield Beach | US | 5613057841 | $ (49.90) | 1 |
| | | felishapaz@gmail.com | Maplewood av | Everett | US | 16175071974 | $ (149.70) | 1 |
| | jaqueline lopes | josehelber@gmail.com | .............. | .............. | | 18578882783 | $ (49.90) | 1 |
| | Jaqueline Lopes Carreir | josehilber@gmail.com | 121 main st | Everett | US | 8578882783 | $ (5,700.00) | 4 |
| | Jean Carreiro | jelite2014@gmail.com | maplewood ave | Everett | US | 8572461459 | $ (49.90) | 1 |
| | | | Maplewood ave. | Everett | US | 8572461459 | $ (49.90) | 1 |
| | | | Mapplewood Ave | Everett | US | 8572461459 | $ (49.90) | 1 |
| | Jean de Paula Carreiro | carreirojean@hotmail.com | maplewood av | Boston | US | 18572461459 | $ (49.90) | 1 |
| | Jean P Carreiro | elianevit40@gmail.com | maplewood ave | Boston | US | 18572461459 | $ (3,925.00) | 7 |
| | | | Maplewood Ave | Boston | US | 18572461459 | $ (1,375.00) | 1 |
| | Jean P. Carreiro | elianevit40@gmail.com | 43 maplewood av | Boston | US | 18572461459 | $ (1,375.00) | 1 |
| | | | Maplewood av | Boston | US | 18572461459 | $ 112,639.20 | 1 |
| | nael lopes | saminha_nunes@yahoo.c | . | | US | | $ (49.90) | 1 |
| **Grand Total** | | | | | | | **$ 327,228.50** | **140** |

124.    Manual review of the Name Field for this Cluster, which Dr. Freer contends is the "*only true differentiator*,"[128] suggests that he is potentially over aggregating at least five separate Participants: (i) Alex Lopes; (ii) Eliane Carreiro; (iii) Jacqueline Carreiro; (iv) Jean Carreiro; and (v) Nael Lopes. Even if comparing selected pairs of these names (or variations thereof) yields a high "similarity score" using Dr. Freer's selected fuzzy matching approach, common sense suggests that these are likely not the same person. While each of the three Carreiros and two

[128] Freer Report at 24.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

Lopeses may or may not be family members given they share the same last name, the first name clearly differs. And, taking the far ends of the Cluster, Alex Lopes and Eliane B. Carreiro share almost nothing in common with respect to name, let alone substantial agreement. In fact, review of the underlying data suggests Alex Lopes and Eliane Carreiro have no contact information in common whatsoever, with the former living Vitoria, Brazil and the latter in Everett, Massachusetts. This demonstrates a clear failure in the Freer Aggregation Process, as it is it stands in direct contradiction to his stated goal "that no pairs of account groupings that substantially disagree on the name end up matched together."[129]

125.     This issue with the Freer Aggregation Process likely lies, at least in part, with his clustering methodology. As a hypothetical, Group 1 may share some commonalities with Group 2, and Group 2 may share some commonalties with Group 3, and Group 3 may share some commonalities with Group 4, the result of which is the aggregation of Groups 1, 2, 3 and 4 together as a single Participant. The potential issue is that taken as a whole, Groups 1 and 4 may share nothing in common, including name.

126.     On this point, Section 6.8 of the Christen Text addresses issues managing transitive closure of clusters stating:[130]

> The transitivity of matches can also lead to problems in that 'chains' of records, where individual pairs are classified as matches, are formed. The records at the two ends of the chain can, however, be quite different from each other, and they would not be considered to correspond to a match.

127.     Dr. Freer in his deposition further discusses the topic as follows:[131]

> Whereas, in fact, there's heterogeneity in this dataset, where some parts of the dataset do look something like that, I wouldn't say "ideal situation" but easier-to-deal-with situation.
>
> In other parts, there is a greater risk of chaining, as you were describing it. And, of course, if A is joined to B is joined to C is joined to D and so on, by reasonably high numbers, but A is not joined to Z at the end by reasonably high number, it would be bad to include A and Z at the same time.

128.     These "bad" scenarios are clearly seen in the example discussed above relative to the User Accounts with last name Carreiro and Lopes, where any two specific names may have a relatively high nearness measure (e.g., Eliane Carreiro vs. Edjane Carreiro), but taken at the outer edges the

---

[129] Freer Report at 51.

[130] Section 6.8 of P. Christen, Data Matching, Data-Centric Systems and Applications, Springer-Verlag, 2012.

[131] Freer Deposition at 202.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

names can have a very low nearness measure (e.g., Jean de Paula Carreiro vs. Alex de Carvalho

Lopes), as reflected in the chart below:



129.    Other examples of names which appear in a single of Dr. Freer's Clusters, but do not appear

to substantially agree, are shown below:[132]

| cluster_id | Name 1 | Name 2 |
|---|---|---|
| 140155 | Irene Ramos Fernandes Silva | Nidya Leal |
| 140155 | Irene Ramos Fernandes Silva | Ruben Sousa |
| 335971 | Flor M Florido | L & L Home Improvement |
| 100223 | Heloisa Santamaria | Marialva Sousa de Matos |
| 2522900 | Benjamin Argueta | Kenia Venjamin |
| 3194458 | Dorali Escobar | Zuly Caicedo |
| 4047480 | fatima elena bettencourt de andrade | maria beatriz de andrade martins |
| 4253920 | George Saad | El Hachem Georges |
| 3931290 | Giovanni Rigatti | go Brignoni |
| 2825686 | Luis Miguel Joaquim Rodrigues | Sao Rodrigues |
| 11199437 | Regina Celia Cintra Castro | Karina c |
| 9021130 | Juan Pablo | Erick Gutierrez |
| 10729205 | Maria Do Scorro Prazeres Rodrigues | Ricardo Trancoso |
| 5326578 | Patrícia Moutinho | Maria Angela Magalhães Coutinho |
| 12071881 | Jose Demoura | Paulo Roberto Ferreira Moura |
| 471741 | Kelly Silva | Arcelina Benedita Mota |

---

[132] Review of the Freer Data Tables.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

| cluster_id | Name 1 | Name 2 |
|---|---|---|
| 471741 | arcelina | zeike s |
| 5014900 | Camel R Quispe Calderon | ayme sias calderon |
| 11096037 | Helio Paz | eliton gonçalves paz |
| 10756933 | WenXiong Lee | Sui Ning Lee |
| 10630997 | fadelly robayo | Ricardo Ranulfo Yaranga Valencia |
| 12266593 | w dalman general services | BBC Financial Services LLLC |

130.     With respect to issues managing transitive closure Section 6.8 of the Christen Text states:[133]

> In real-world databases, the problem of record chains being generated by a pair-wise classification technique seems to occur only rarely because the space of all possible values in the different record attributes is very large. The likelihood that records that are not matching have a high similarity with each other is therefore very small.

131.     However, in this case, the Aggregation Fields on which Dr. Freer relies differ from those found in typical "real-world" datasets, such as healthcare data, making transitive closure more prone to potential record chains. Dr. Freer admits as such stating:[134]

> In a typical user-account dataset, email addresses and phone numbers are unique to an individual. However, this is often not the case in the TelexFree dataset. As described in Paragraph 5, a major source of complexity with the TelexFree dataset is the prevalence of User Accounts that contain different names, but the same email address, phone number, address, etc.

132.     Dr. Freer contends that another requirement of his Aggregation Process is the following:[135]

> Only when the names in the TelexFree dataset are near enough…**and there are other markers of agreement (such as a matching email address, cell phone number, etc.),** should these two User Accounts be treated as belonging to the same Participant and should be aggregated. **(emphasis added)**

133.     However, closer inspection of his resulting clusters shows that Dr. Freer has in fact aggregated User Accounts that may share a similar name and rough geographic location but <u>do not</u> meaningfully share other markers of agreement, such as matching email addresses, cell phone numbers, birthdays, etc. For example, Cluster 5463980 includes 12 User Account and two distinct names, Loredana Zaglia and Loredana Ragolia and no other Aggregation Fields in common.[136]

---

[133] Section 6.8 of P. Christen, Data Matching, Data-Centric Systems and Applications, Springer-Verlag, 2012.

[134] Freer Report at 24.

[135] Freer Report at 25.

[136] See **Exhibit 14**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

| rep_nome | rep_cpf | rep_numero | rep_end | rep_cep | rep_cel | rep_datanasc | rep_email | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|---|---|
| loredana zaglia | 180859 | 26 | via costantino nigra | 10080 | 393332449962 | NULL | raumy@me.com | (499.00) | 5 |
| | | | | | | | lunadicristallo59@yahoo.it | (249.50) | 5 |
| | | | | | | 8/18/1959 | raumy@me.com | 1,038.80 | 1 |
| loredana ragolia | 20981 | 31 | via romita | 93100 | 3498520663 | 9/2/1981 | geometravilla@tiscali.it | 8,999.10 | 1 |
| **Grand Total** | | | | | | | | **9,289.40** | **12** |

134.    As another example, Cluster 119427 (discussed above) includes three User Accounts with the name Alex Lopes. These three Alex Lopes User Accounts share no Aggregation Fields with any other User Accounts within that Cluster, including name.

135.    This apparent disconnect between Dr. Freer's results and his explicitly stated methodology that requires at least fairly similar names and the existence of other markers of agreement further demonstrates the unreliability of his Aggregation Process.

v.    The Freer Aggregation Process Results in Inconsistent and Speculative Outcomes

136.    In order to determine the relative similarity of any two names, Dr. Freer relies on certain fuzzy matching algorithms that measure "string nearness."[137] With respect to the Name Field, Dr. Freer primarily relies on two different algorithms, *WRatio* and *ratio*, which he describes as follows:[138]

- *WRatio* is an "attempt to weight (the name stands for 'Weighted Ratio') results from different algorithms to calculate the 'best' score". It uses *ratio* as well as variants of *ratio* that are good at finding whole tokens in any order. (Again, a token is a sequence of non-space characters separated by a space; in "Quick brown fox", the tokens are "Quick", "brown", and "fox".) As a result, I use it for nearness matching on the cleaned version of the *rep_nome* field, which has multiple names in various orders, sometimes with typos (e.g., "maria teresa milagres neves", "maria teresa neves", "marai teresa neves", maria milagres", and "maria t m neves" may all refer to the same name).

- *ratio* is a standard string nearness measure that is part of the difflib Python package; difflib itself is a built-in Python library, which speaks to its ubiquity. ratio is used by both RapidFuzz and FuzzyWuzzy. The ratio nearness measure involves "find[ing] the longest contiguous matching subsequence that contains no "junk" elements; these "junk" elements are ones that are uninteresting in some sense, such as blank lines or whitespace … This does not yield minimal edit sequences, but does tend to yield matches that "look right" to people." ratio is good at avoiding typos, treats various parts of the string the same (unlike *jwsim*), and is good at grouping together edits that occur in a similar part of the string. As a result, I use it for nearness matching in the cleaned

---

[137] Freer Report at 10 and 38.

[138] Freer Report at 39-40.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

> versions of *rep_nome, rep_email, rep_cel, rep_fone, rep_cep, rep_numero, rep_login,* and *rep_cpf* fields, as well as the derived quantities of "first and last token of name" and "the part of the email address before the @ sign" that are defined using *firstLast* and *beforeAt* functions in Step 5 of the aggregation methodology.

137.    However, fuzzy matching can also yield inconsistent and speculative results, especially in this case given that TelexFree, in part, spread organically through family members or communities that may share last names or even first names.[139]

138.    For example, Dr. Freer treats User Accounts with the name Paulo Marinho and User Accounts with the name Rejane Marinho as separate Clusters,[140] despite there being little or no difference across most other Aggregation Fields other than first name.[141] However, based on Dr. Freer's selected fuzzy matching algorithms, these names have a *WRatio* and *ratio* of 67, which would mean that the pair would not have made it into the blocking group as part of Step 4.[142] Thus, it is likely that Rejane Marinho and Paulo Marinho were not aggregated together as a result of their first names not sharing the same letters in the same order, and in conjunction with the fact that their last names (while matching) were relatively shorter. Frantz Balan and Lusette Balan were likely not aggregated for the same reason.[143]

139.    By comparison, and as discussed above, Dr. Freer treats User Accounts with the name Jean P. Carreiro and Eliane P. Carreiro as the same Participant, and similar to Rejane and Paulo Marinho, there is little or no difference across most of their other Aggregation Fields. However, based on Dr. Freer's selected fuzzy matching algorithms, the names Jean P. Carreiro and Eliane B. Carreiro have a *WRatio* and *ratio* of 82, which would mean that the pair would have made it into the blocking set as part of Step 4 and receive a rep_nome gamma value of 2 as part of his Step 5 .[144] Thus, it is likely that Jean and Eliane Carreiro were aggregated together as a result of their first names sharing more common letters in the same order, and in conjunction with the fact that their last names matched and were relatively longer.

---

[139] See e.g., Freer Report at 2.

[140] See Cluster 14635041 (Paulo Marinho) and Cluster 22681651 (Rejane Marinho).

[141] See **Exhibit 15**.

[142] Freer Report at 53.

[143] See **Exhibit 10**.

[144] Freer Report at 53 and 56.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

140.    This comparison demonstrates how the Freer Aggregation Process can lead to certain User Accounts being aggregated while others are kept apart not based on having "at least fairly similar names" in any meaningful or real-world sense, but arbitrarily based on, for example, whether two people's first names happen to share letters in a similar order.

vi.    The Only Example Cluster in the Freer Report Contains Questionable Aggregations

141.    The Freer Report contains a single example cluster, which Dr. Freer contends is a "visual illustration of the general quality of the dataset."[145] Specifically, Dr. Freer selected Cluster 132785, which includes User Accounts with the name Maria Neves or variations thereof.

142.    However, even inspection of Dr. Freer's one selected example reveals potential issues with his Aggregation Process. For example, User Accounts with Rep_IDs 196685, 1902924 and 16337571 have Maria Neves as the name, but the contact information is for an individual with the email address of mmariashousecleaning@gmail.com, living at 155 Pleasant St., Marlboro, MA 01752 or 998 Pleasant St., Framingham, MA 01701, with the phone number 857-236-7654. None of these or the other Aggregation Fields for these User Accounts match Aggregation Fields found elsewhere in cluster 132785.[146]

143.    For comparison, most of the other Maria Neves User Accounts in this cluster have an email address of ttmilagres@gmail.com, living at 2B Brackett Rd, Framingham, MA 01702 with the phone number 508-904-3810.[147] Dr. Freer appears to have failed to consider that two different Participants with the same name may have lived in the same city or state. I have not seen any evidence that Dr. Freer has attempted to perform any additional research or analysis to determine whether these Maria Neveses living at different addresses and with different contact information are, in fact, the same Participant.

144.    Similarly, User Accounts 11501403 and 15376207 in this Cluster have the names Maria Lares and Rita Lares, with the contact information shown below:

---

[145] Freer Report at 24.

[146] See **Exhibit 16**. While City (for the Framingham address) and State match other User Accounts in the Cluster, City and State are not Aggregation Fields and the zip code (which is an Aggregation Field) still differs. I also note that these two User Accounts appear to have been generated around the same time as other User Accounts in this Cluster, making it less likely that it is a single Participant that changed address and phone number.

[147] See **Exhibit 16**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

| cluster_id | rep_nome | rep_email | rep_numero | rep_end | rep_cidade | rep_cep | rep_fone | Sum of net_equity | Count of rep_id |
|---|---|---|---|---|---|---|---|---|---|
| ⊟132785 | ⊟rita lares | ⊟calderonr27@yahoo.com | ⊟4409 | ⊟4409 merida st | ⊟fort worth | ⊟76133 | 8176924229 | $ (49.90) | 1 |
| | ⊟maria lares | ⊟m.adame43@yahoo.com | ⊟2101 | ⊟2101 w fuller ave | ⊟fort worth | ⊟76133 | 9132599771 | $ (49.90) | 1 |
| Grand Total | | | | | | | | $ (99.80) | 2 |

145.    None of these Aggregation Fields appear elsewhere in the Cluster. In fact, the only potential overlap is the rep_cpf field (i.e., social security number), which has a value of 999999999, and was similar to just five of the remaining 466 User Accounts in the Cluster (and appears over 3,400 times in the data overall).[148] So, in this case, Dr. Freer is aggregating accounts with different names, different contact information, and the only commonality is a clearly fictional social security number used just a handful of times elsewhere in the Cluster.

146.    These potential issues identified in the one example Cluster that was specifically selected by Dr. Freer, and supposedly represents a "visual illustration of the general quality of the dataset,"[149] provides further evidence of the flaws in his Aggregation Process.

      vii.    <u>Aggregation Errors Can Result in a Significant Overstatement of Participant Net Equity</u>

147.    With respect to the impact of potential linkage errors, the Statistical Data Warehouse Design Manual states:[150]

> Poor quality (eg if variables are missing, indecipherable, inaccurate, incomplete, inconstant, inconsistent) could lead to records not being linked – missed links – or being linked to wrong records – false links. The impact of these two types of errors may not be equal (eg a missed link may be more harmful than a false link), so this needs to be taken into account when designing a data linkage strategy, especially if the linking has legal or healthcare implications.

148.    The numerous flaws in the Freer Aggregation Process, as described herein, also have the ability to significantly impact the Net Equity of supposed Net Winners.

149.    For example, Cluster 129528 is comprised of five User Accounts with the name "sann" or "sann r" and is supposedly a Net Winner with Net Equity of $862,565. The largest User Account in this Cluster has an email address of sann@vicss.com and an address at 189 Squire Rd #40, Revere, MA.[151]

---

[148] Queries of the Freer and Huron Data Tables.

[149] Freer Report at 24.

[150] Kroeze, Harold. "Methodology: Data Linkage." European Commission, February 2017.

[151] See **Exhibit 17**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

150.    Comparatively, Cluster 128225, is comprised of 839 User Accounts, many of which include names such as "Sanderley Devaconcelos", "Sanderley Vaconcelos", and "Sann Vasconcelos", an email address of sann@vicss.com and an address at 189 Squire Rd #40, Revere, MA, but this Account Aggregation is supposedly a Net Loser with Net Losses of ($363,822).[152]

151.    Given that every Aggregation Field in Cluster 129528 is either the same as, or in substantial agreement with, an Aggregation Field in Cluster 128225, including name (e.g., "sann" vs. "sann vasconcelos"), I see no logical or factual basis for treating these as separate Participants. By appropriately combining these Account Aggregations together, this Participant's Net Equity would decrease substantially from $862,565 to $498,743, a reduction of over 40%.

152.    As a second example, Cluster 10838191, a supposed Net Winner with Net Equity of $295,498, is comprised of three User Accounts, all with the name Oscar Enrique Sosa Esculpi, an email address of oscarsosa[####]@live.com or ososa_esculpi1@hotmail.com and an address at 1315 nw 98 ct suite 7, Miami, FL.[153]

153.    Comparatively, Cluster 10811451, is comprised of 1,030 User Accounts the majority of which have the name Oscar Sosa, an email address of oscarsosa[####]@live.com or ososa_esculpi1@hotmail.com, and an address at 1315 nw 98 ct suite 7 in Miami, FL. But this Account Aggregation is supposedly a Net Loser with Net Losses of ($242,162).[154]

154.    Given that every Aggregation Field in Cluster 10838191 is either the same as, or in substantial agreement with, an Aggregation Field in Cluster 10811451, including name, I see no logical or factual basis for treating these as separate Participants. By appropriately combining these Account Aggregations together, this Participant's Net Equity would decrease substantially from $295,498 to $53,336, a reduction of over 80%.

155.    The significant impact of a single missed link on a Participant's concluded Net Equity is also apparent when comparing the Trustee's largest Net Loser and Net Winner Account Aggregations. For example, the top 100 Net Losers in TelexFree comprise a total loss of approximately $25.8 million, and have individual losses ranging between approximately $132,000

---

[152] See **Exhibit 17**.
[153] See **Exhibit 18**.
[154] See **Exhibit 18**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

and $3.1 million.[155] Comparably, the top 100 Net Winners in TelexFree comprise a total gain of approximately $148.1 million, and have individual winners ranging between approximately $937,000 and $4.1 million.[156]

156.    Given the structure of TelexFree, there is a lower likelihood that a Participant would incur significant net losses on the scale reflected by the top Net Losers (i.e., repeatedly buy into TelexFree either directly or through Triangular Transactions but yet receive minimal or no gains).[157] One alternative rationale for the existence of some of these large Net Losers is the Trustee's failure to appropriately consolidate certain Net Loser Account Aggregations with corresponding Net Winners. To test this hypothesis, I manually reviewed the Potential Identifiers for the top five Net Losers (excluding the Cluster 25130588 for John Williams that Dr. Freer treats separately), and attempted to find matching Potential Identifiers among Net Winners. In all five cases, I found one or more Potential Identifiers that matched a Net Winner Account Aggregation. This evidence, which is summarized in **Exhibit 6** and detailed **Exhibits 9.1** to **9.5**,[158] includes instances where the same or similar values for Potential Identifiers, such as address, phone number, login, or email, appeared across both Net Loser and Net Winner Account Aggregations.

157.    For each of the potential matches I found, I also queried the Huron Data Tables to determine whether certain transactions, such as Credit Transfers or Triangular Purchases/Receipts, occurred between the matched Account Aggregations. Based on my review of the SIG data in this matter, I found that there was often a high degree of activity between User Accounts held by the same Participant, a factor not considered by Dr. Freer as part of the Aggregation Process. As such, confirming that transactions occurred between the matched Account Aggregations, which it did in most instances, further strengthens the potential connections.

158.    By way of example, and as reflected in **Exhibit 9.1**, the second largest Net Loser in TelexFree based on the Trustee's calculation of Net Equity is Du Painting DBA ("Du Painting"), which lost $1,018,291 and comprised 1,248 User Accounts. Across these User Accounts, Potential Identifiers for Du Painting included logins structured as "visionusa[##]," email addresses such as

---

[155] See **Exhibit 7**.

[156] See **Exhibit 8**.

[157] See e.g., **Exhibit 5**.

[158] Also, see **Exhibits 17-18**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

davidsonteixeira@hotmail.com, physical addresses such as 33 Vernal St., Everett MA, and phone numbers such as 781-484-7474 and 617-501-6788. A separate Participant under the Trustee's Aggregation Process, Parent ID 4032900, Davidson R. Teixeira, is shown to be a Net Winner of $1,544,804 comprised of 81 different User Accounts. Across Mr. Teixeira's User Accounts, every one of the noted Potential Identifiers for Du Painting can be found, which would provide strong indicia that both Account Aggregations represent the same Participant. As a result of what appears to be a missed link by the Freer Aggregation Process, Mr. Teixeira's Net Equity is overstated by more than $1 million, or approximately 193%, a very significant difference.[159]

159.    As a second example, and reflected in **Exhibit 9.4**, I found that Shal Group (Cluster 12650741 and Net Loser of $712,458) shared many of the same or similar Potential Identifiers with Dolarex (Cluster 10992563 and Net Winner of $189,701). In fact, this linkage was confirmed by the claims submitted through the ePOC portal, as I can see that a single user (i.e., Saryas Jaff, UserId 26627) submitted two claims, one for Shal Group (ClaimId 42877) and one for Dolarex (ClaimId 42906).[160] Once this under-aggregation is appropriately considered and accounted for, of Dolarex changes from a $190,000 Net Winner to a $523,000 Net Loser under the Net Equity Calculation, a difference of over 275%.[161] This further demonstrates the significant impact a single aggregation error can have on a Participant's Net Equity.

160.    In total, and simply based off the manual review of this sample population, I identified approximately $3.9 million in Net Loser aggregations that could potentially reduce the $4.4 million allegedly owed by the matched Net Winners, resulting in a reduction of almost 90%.[162]

161.    As discussed above, one of the factors likely driving what appears to be under-aggregation in certain instances, is the disconnect between the Freer Aggregation Process's requirement that the names be the same or similar across every Participant User Account and the reality that Participants could create User Accounts using a variety of names, such as business name, personal name, nicknames, or even fictitious names. This reliance on consistent naming fails to

---

[159] Calculated as 1,018,291 / (1,544,804 – 1,018,291) = 193%.
[160] Queries of the ePOC Data Tables.
[161] See **Exhibit 9.4**.
[162] See **Exhibit 6**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

appropriately account for instances where other Potential Identifiers provide strong indicia that the User Accounts potentially belong to a single Participant.

162.    It is also important to consider the impact of linkage errors in the appropriate context. While a given missed or false linkage may not represent a significant portion of TelexFree Net Equity in total, it can dramatically change the results for a single Participant.

viii.    <u>Dr. Freer has Failed to Deliver the Full Scope of His Engagement</u>

163.    As part of his scope of engagement, Dr. Freer was asked to "develop an aggregation methodology that creates one 'cluster' of User Accounts for each Participant."[163] Instead, Dr. Freer performed a purely mathematical exercise that attempts to link together User Accounts that have similar characteristics, and specifically where there is substantial agreement on the values in the Name Field.

164.    However, such an approach fails to appropriately consider instances where the resulting Clusters may actually relate to more than one Participant, or where a Participant may relate to more than one Cluster. For example, in his deposition, Dr. Freer explicitly states, "[w]hen the name differs substantially, whether it's the same person or not that entered the accounts, that entered that information, when the name differs substantially, my understanding is those are to be considered as separate clusters."[164] However, the Court in this case already specifically defined Participant as a "person" who purchased a membership plan or VoIP Package in TelexFree,[165] not a "cluster" of User Accounts with similar values in the Name Field. The issue with conflating a person and cluster can be seen through the examples such as Sanderley Devaconcelos, Oscar Sosa and Frantz Balan, among others.

165.    As such, to the extent that the ultimate purpose of Dr. Freer's analysis is a quantification of the supposed net funds received by each TelexFree Participant that comprises the Net Winner Class, Dr. Freer's analysis fails to accomplish this goal absent additional expert analysis. This was also confirmed by Dr. Freer in his deposition where he acknowledged "I'm not aggregating

---

[163] Freer Report at 2.

[164] Deposition of Cameron E. Freer, April 4, 2023 ("Freer Deposition") at 137.

[165] Support of Proposed Supplemental Order at 3

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

accounts to persons period. I'm aggregating accounts to other accounts in clusters. The assignment to persons is a different thing that might come later."[166]

### B.    Mr. Martin's Calculation of Net Equity is Unreliable

##### i.    The Net Equity Calculation Fails to Account for Participant Investments and Receipts Related to Transfers of Credit

166.    Relative to what constitutes Net Equity, I understand the Court in this matter stated the following:[167]

> (i) In determining the amount of claims of Participants, any claim or portion of claim based upon accumulated credits in a Participants' User Accounts as of the Petition Date shall be disallowed;

> (ii) The claims amounts of Participants shall be determined on a Net Equity basis, which shall be defined as follows: the amount invested by the Participant into the Debtors' scheme, including amounts paid [by the Participant] pursuant to Triangular Transactions, less amounts received by the Participant from the Debtors' scheme, including amounts received [by the Participant] pursuant to Triangular Transactions[;]

> (iii) In determining the amount of a claim of a Participant who has more than one User Account, the activity in all of the Participants' User Accounts shall be aggregated and netted against one another[.]

167.    Importantly, while this order notes that claims based on accumulated Credits are disallowed, Net Equity should consider the amount *invested*[168] by a Participant in TelexFree less amounts *received* by a Participant from the TelexFree scheme. Based on how the Trustee and Mr. Martin described their determination of Net Equity, the distinction between accumulated Credits and amounts invested/received appears to be the exchange of actual monetary consideration, such as cash. For example, simply earning Credits through the placement of advertisements on classified websites would not entitle the Participant to claim the value of those Credits, but if that same Participant gave cash to another Participant as part of a Triangular Transfer, then the cash paid would indeed be considered as part of the Net Equity Calculation.

---

[166] Freer Deposition at 137.

[167] Supplemental Order at 2-3.

[168] For purposes of this report, I am using the term "invest" or "invested" to mean the payment of cash into the TelexFree scheme, such as through Direct Payments, Triangular Payments, Credit Transfers In, or Purchased Credits. No other definition or legal meaning is intended or implied.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

168.     However, the determination of Net Equity as executed by the Trustee and Mr. Martin does not account for instances where a Participant uses cash to purchase Credits from another Participant for purposes such as setting up additional User Accounts or performing subsequent Triangular Transactions. In both instances, a Participant is investing actual cash into the TelexFree scheme, yet the Net Equity Calculation treats these situations inconsistently by including Triangular Transactions and excluding Credit Transfers.

169.     This dynamic between Triangular Transactions and Credit Transfers is also evident within the SIG data. For example, Mr. Balan, together with the accounts that I understand were incorrectly aggregated to his wife,[169] is alleged to be a $1.2 million Net Winner based upon the Net Equity Calculation performed by Mr. Martin, as shown in **Exhibit 10**. Most of those supposed winnings came in the form of Triangular Receipts, which totaled almost $1.5 million. However, in order to help generate the Credits necessary for this volume of Triangular Receipts, Mr. Balan also was a substantial net importer of approximately $836,000 in Credits, which I understand were not provided to Mr. Balan free of cost, as Mr. Martin and the Trustee presumes.[170] By including Triangular Transactions and excluding Credit Transfers, Mr. Martin is artificially increasing the supposed net amounts received by Participants and not properly considering the investments that were necessary in order to generate those supposed receipts.

170.     There is no discussion in the Martin Report regarding why Triangular Transactions are considered within the determination of Net Equity but Credit Transfers are excluded when both appear to be substantively similar from a real-world (i.e., cash based) perspective. Additionally, to the extent any uncertainty exists regarding if, or how much, cash was exchanged as part of Credit Transfers, then such uncertainly necessarily extends to Triangular Transfers given that the SIG database does not provide evidence of cash payments for either transaction type. This internal inconsistency within the Net Equity Calculation between the treatment of Credit Transfers and Triangular Transactions results in a concluded Net Equity value that can differ greatly from the net amount actually invested and received by Participants.

---

[169] L. Balan Affidavit; F. Balan Affidavit at 3.

[170] F. Balan Affidavit at 6-7.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

171.    Credit Transfers between User Accounts and Credit Transfers as part of Triangular Transactions are also stored together within SIG from a data perspective. I understand that the "Transfer Table" contains information about transfers of Credits between User Accounts and includes a "tipo" that delineates "ten different transfer types, including requests to withdraw funds, payments of invoices with credits, and transfers of credits between accounts. The remaining types relate to chargebacks and other adjustments."[171]

172.    Further, the transfer of Credits in exchange for cash is not just a hypothetical scenario that occurs infrequently; rather, the SIG data reflects vast transfers of Credits both between distinct Participants and internally within a Participant's User Accounts. This is especially true for many of the Participants that Mr. Martin determined to be large Net Winners and Net Losers, as shown in **Exhibit 8** and **Exhibit 7**, respectively. For example, the top 100 Net Winners made over $210 million in Credit Transfers Out and over $250 million in Credit Transfers In (i.e., significant net importers of Credits).[172] By comparison, the top Net Losers made $32 million in Credit Transfers Out and $19 million in Transfers In (i.e., significant net exporters of Credits).[173]

173.    The inclusion of Credit Transfers is highly impactful to the determination of a Participant's Net Equity as in many cases it can change a Participant's designation as a Net Winners or Net Losers, a sample of which is shown below:[174]

| Participant Type | Cluster | Net Equity Excluding Transfers In/Out | 6 - Credit Transfers In | 7 - Credit Transfers Out | Net Equity Including Transfers In/Out |
|---|---|---|---|---|---|
| NetLoser | 13022279 | **($1,018,291)** | *($578,327)* | *$845,237* | **($751,381)** |
| NetLoser | 11849449 | **($622,342)** | *($1,904,355)* | *$2,254,352* | **($272,344)** |
| NetLoser | 12242105 | **($481,228)** | *($621,865)* | *$1,008,813* | **($94,279)** |
| NetLoser | 10525055 | **($240,773)** | *($768,138)* | *$1,548,862* | **$539,950** |
| NetLoser | 1020407 | **($210,525)** | *($5,147,691)* | *$6,163,099* | **$804,884** |
| NetWinner | 132785 | **$4,087,745** | *($7,290,296)* | *$6,634,688* | **$3,432,137** |
| NetWinner | 2522900 | **$4,012,999** | *($7,135,275)* | *$3,926,183* | **$803,907** |
| NetWinner | 323967 | **$3,147,693** | *($5,155,263)* | *$3,265,763* | **$1,258,193** |
| NetWinner | 1385480 | **$1,494,466** | *($3,220,534)* | *$1,554,200* | **($171,868)** |
| NetWinner | 10853999 | **$1,308,377** | *($1,581,410)* | *$176,389* | **($96,644)** |

---

[171] Huron TelexFree Analysis of Damages Presentation at 29.

[172] See **Exhibit 8**.

[173] See **Exhibit 7**.

[174] See **Exhibit 7** and **Exhibit 8**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

174.   It defies economic logic that one Participant would simply give Credits to another Participant without financial consideration in return (particularly in these large sums) given that Credits could be converted into cash through Direct Receipts or, much more frequently, Triangular Transactions. It is also worth noting that TelexFree appears to have charged the recipient of Credit Transfers a $3 fee per transaction, demonstrating that such activities were not without a cost.

175.   There is also direct evidence of Credits transferred in exchange for cash based on descriptions of events noted by users through the ePOC portal, such as:

- Ana Patricia Salmeron de Pereira (ePOC ClaimId 68594)[175]

  - "Through the account of patriciaycarlos **I was buying the credit for other participants with real cash, so i could accumulate a large amount of credit in this account, to allow me to easily create new accounts for new members**. As this was the fastest method. Therefore when Telexfree got shutdown, all of this accumulated money ($90,038) had been distributed and ultimately given to Telexfree through accounts and Voips. So I never actually had this amount of money, therefore all I am owed for this account is the original $1425 that I paid."[176] **(emphasis added)**

  - The transactions reflected in SIG confirm that Ms. Salmeron de Pereira had $100,237 in total Credit Transfers In, of which $83,507 came from her login "patriciayalex" or "patriciaycarlos."[177]

  - If Credit Transfers In and Out were considered as part of Net Equity, Ms. Salmeron de Pereira's Net Winnings of $104,998 would be reduced to $31,856, a decrease of ($73,142), or 70%.

- Marcel McFarren (ePOC ClaimId4282)[178]

  - "**I gave money to a friend of mine Diego Alonso Lizama Zegarra on several opportunities who transfered telexfree credits to my accounts in order to purchase new accounts and VOIP plans**. I currently don't remember or have records of all the transfers I received or the dates nor individual amounts. But **in the time I participated in telexfree I paid in cash [$30,383.40] US dollars that where transferred to my account from other user accounts**. Wich

---

[175] See **Exhibit 20.1**.

[176] Queries of the ePOC Data Tables: UnmatchedAccount table, UnmatchedAccountId=6961, Description field.

[177] Queries of the Freer and Huron Data Tables: Cluster 12902527.

[178] See **Exhibit 20.2**.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

[$26,193.60] were used in opening user accounts and voip accounts, [$597.00] US dolars in user account maintenance and [$3,592.80] US dolars in voip renewals." [179] **(emphasis added)**

o The transactions reflected in SIG confirm that Mr. McFarren had $35,028 of Credit Transfers In from User accounts Mr. McFarren. [180]

o If Credit Transfers In and Out were considered as part of Net Equity, Mr. McFarren's Net Winnings of $2,736 would be reduced to a Net Loss of ($21,924), a decrease of ($24,660) or approximately 900%.

- Jose Norford (ePOC ClaimId 150603)[181]

o "This claim indicates that I owe approximately [$202,698.80] however I should be receiving a reimbursement of approximately [$32,775.00]."[182]

o The transactions reflected in SIG confirm the determined Net Equity to be $202,698.80 under Mr. Martin's Aggregation Process (i.e., the basis for ePOC). However, when Credit Transfers In and Out are considered, Mr. Norford's Net Equity under Mr. Martin's Aggregation Process is reduced to $39,118.12.[183]

o If Credit Transfers In and Out were considered as part of Net Equity under the Freer Aggregation Process, Mr. Norford's Net Winnings of $199,749 would be reduced to Net Winnings of $23,844, a decrease of ($175,905) or 88%.

176. This exclusion of Credit Transfers fails to appropriately consider the "amount invested" or "amounts received" by Participants within the determination of Net Equity, and, as a result, the Net Equity determined by Mr. Martin is not reliable for the over 435,000 Account Aggregations that took part in Credit Transfer transactions, of which approximately 73,000 are currently alleged Net Winners.[184]

---

[179] Queries of the ePOC Data Tables: UnmatchedAccount table, UnmatchedAccountId=23413, Description field.

[180] Queries of the Freer and Huron Data Tables: Cluster 13094257.

[181] See **Exhibit 20.3**.

[182] Queries of the ePOC Data Tables: UnmatchedAccount table, UnmatchedAccountId=13886, Description field.

[183] Queries of the Freer and Huron Data Tables: Cluster 10789133.

[184] Queries of the Freer and Huron Data Tables.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

<ol type="i" start="2">
<li>

**The Amount of Cash Invested/Received by Participants as Part of Triangular Transactions or Credits Transfers Can Differ from Amount of Credits Recorded in SIG**

</li>
</ol>

177.   With respect to Triangular Transactions, Mr. Martin describes the process as follows:[185]

> To redeem credits for a recruited Participant a new User Account was opened for the recruited Participant and the recruiting Participant satisfied the resulting membership fee with credits held by the recruiting Participant (a "Triangular Transaction").

> Based upon interviews with Participants and others, the recruited Participant **typically** paid the membership fee in cash to the recruiting Participant who, in turn, satisfied the recruited Participant's membership fee with their own credits. **(emphasis added)**

178.   This description is exemplary of why the Net Equity Calculation is not reliable. Mr. Martin and the Trustee assume that the amount of Credits transferred as part of a Triangular Transaction is equivalent to the amount of cash invested or received by Participants. However, the assumption that cash was exchanged is based on interviews with what could only be a very small percentage of the total 2.1 million TelexFree Participants according to Mr. Martin (or 1.6 million TelexFree Participants according to Dr. Freer), many of whom are outside of the U.S., and even then, cash exchanges only "typically" occurred.[186]

179.   Mr. Martin does not provide any specific guidance regarding what "typically" means in this context. For example, was cash exchanged between Participants as part of Triangular Transactions 90% of the time, or less than 75%? In those instances where cash was exchanged, was it always the exact amount of, and equivalent to, the amount of Credits recorded within SIG, the data source which forms the basis for the Trustee's determination of Net Equity? Given the massive size and volume of Triangular Transactions that occurred on a global scale (i.e., more than $2.7 billion dollars and 13.3 million transactions for Triangular Receipts alone),[187] much of which I understand was transacted in physical cash,[188] the assumption that Credits recorded in SIG are necessarily equivalent to investments or receipts by Participants is unsupported.[189]

---

[185] Martin Report at 7.

[186] See, **Exhibit 3**. I understand that Counsel requested the notes from these interviews, but was informed that notes were not compiled.

[187] See **Exhibit 4**.

[188] See e.g., F. Balan Affidavit at 5.

[189] F. Balan Affidavit at 5.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

180.    In direct contradiction to this assumption, I understand that Frantz Balan, a supposed Net

Winner according to the Trustee,[190] affirmed the following:[191]

> It is a mistake to assume that 100% of the face amount of invoices were collected 100% of the
> time. In practice, promoters like me rarely received the full amount in cash. I would estimate for
> me and the promoters I worked with or spoke to that at best this happened only 10% of the time.
>
> Most often, promoters were only able to ask for steeply discounted payments, as low as $250 for
> an AdCentral Family membership. Most commonly, the amount requested ranged from 50% to
> 75% of the invoiced amount.

181.    Additionally, I understand that Participants were often part of larger teams working

alongside or employing other Participants. In these instances, I understand each team, and each

pair of Participants within a team, had their own compensation arrangements and there was no

universal payment practice.[192]

182.    As one approach to teaming, I understand that it was the role of the lower-level recruiting

Participants of the team to identify and signup new members; however, the responsibility of

satisfying the resulting invoices with Credits generally fell to the higher-level team leads in the

TelexFree pyramid structure. The recruiting Participants would also collect the cash from the new

recruits (frequently at a discount relative to the amount of Credits, as noted above), and then

distribute a percentage of the cash collected to the lead Participant and keep the remainder as a

fee.[193] In this way, Participants were actually sharing compensation in a manner not reflected in

the SIG data.

183.    The information within SIG would not reflect this real-world dynamic, making it a

potentially unreliable source for purposes of determining Net Equity. As a result, the Trustee's

concluded Net Equity for the lead Participant would be overstated relative to cash, and the Net

Equity for the recruiting Participant would be understated.

184.    Also, as it relates to teaming, I'm not aware of anything that would have prevented two

people from potentially sharing User Accounts and splitting any cash investments and receipts

---

[190] Queries of the Freer and Huron Data Tables.

[191] F. Balan Affidavit at 5.

[192] F. Balan Affidavit at 4.

[193] F. Balan Affidavit at 6.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

associated therewith. There is evidence that this may have occurred based upon logins such as in the "patriciayalex" or "patriciaycarlos."[194]

185.    Further, as part of my manual review of top Net Winners and Net Losers (discussed above), I explored certain of the underlying transaction detail to help me better understand the potential connections between top Net Losers and Net Winners. For example, the largest supposed Net Loser, "John Williams," is alleged to have lost over $3.1 million (Cluster 25130588).[195] This Account Aggregation according to Dr. Freer is comprised of 62,725 underlying User Accounts, every one of which is a VoIP Phone Plan with a value of $49.90 purchased through a Triangular Payment.[196]  The chance that a single person bought in excess of 62,000 VoIP Phone Plans for over $3.1 million during the approximately two-week period of March 30, 2014 to April 13, 2014[197] (a process that would likely have taken one person months of full-time work to accomplish since each VoIP Phone Plan required the creation of a new User Account) does not stand up to common sense logic.[198]

186.    An alternative explanation lies in the timing of the first User Account in the "John Williams" Account Aggregation (i.e., March 30, 2014). I understand that on or around March 9, 2014, TelexFree changed its compensation plan such that Participants were required to sell at least one VoIP Phone Plan, which many did through Triangular Transactions.[199] It is appears that "John Williams" is the result of this modification to TelexFree's policy. Whether the creation of these 62,725 User Accounts were done by a service company, an automated software product, or by some other means is not clear from the data, but it does introduce significant uncertainty regarding whether "John Williams" truly made over 62,000 cash payments of $49.90 to what the SIG data shows to be over 1,800 unique counterparty Participants in the span of less than month.[200] To the extent that such amounts were not actually paid by "John Williams" to the counterparty

---

[194] Queries of the Freer and Huron Data Tables: Cluster 12902527.

[195] See **Exhibit 7**.

[196] Queries of the Freer and Huron Data Tables.

[197] Queries of the Freer and Huron Data Tables.

[198] This same fact pattern exists for other Account Aggregation as well, including at least "Ming Hua" (Cluster 21036267). See **Exhibit 7** and **Exhibit 9.2**.

[199]   www.sec.gov/litigation/complaints/2014/comp-pr2014-79.pdf;   www.justice.gov/usao-ma/pr/former-president-telexfree-sentenced-billion-dollar-pyramid-scheme; queries of the Huron Data Tables.

[200] Queries of the Freer and Huron Data Tables.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

Participants, then the Net Equity for those Participants is necessarily overstated. This is due to the fact that each supposed $49.90 Triangular Payment by "John Williams" would have a corresponding Triangular Receipt associated with the counterparty Participant in the SIG data, which is a component of the Net Equity Calculation.

187.    In fact, when all TelexFree Triangular Receipts of $49.90 are charted over time a demonstrable spike beginning in March 2014 becomes clearly apparent, as shown in the table below:



188.    During just the post-March 9, 2014 period, there are over 5.4 million Triangular Receipts for $49.90 between User Accounts supposedly belonging to different Participants, resulting in supposed net winnings of more than $270 million.[201] As noted above relative to "John Williams," there is significant uncertainty (and no support in the SIG data) regarding whether Participants actually received the associated cash despite the increase to their Net Equity.

189.    Additionally, it is not clear to what extent the Net Equity calculation considers the potential impact of foreign exchange rates. Mr. Martin identifies over 1.7 million Net Losers outside the

---

[201] Queries of the Freer and Huron Data Tables.

SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOSHUA W. DENNIS
April 14, 2023

United States across more than 200 different countries.[202] However, I understand that the Credit amounts within SIG are intended to reflect U.S. dollars (i.e., USD). As such, when non-US Participants presumably exchange cash in local currency, it is neither clear what exchange rate may have been used at the time, nor how changes in those exchange rates between the time of the transactions and today may disproportionately impact certain Participants.

190.     For example, Mr. Martin indicates that there were approximately 950,000 victims in Brazil.[203] The exchange rate today is approximately 5 Brazilian Reais (i.e., BRL) to 1 USD. By comparison, the exchange rate in 2014 was approximately 2.4 BRL to 1 USD.[204] Therefore, depending on whether you are a Net Winner or Net Loser, the amount of your claim or liability could differ from the original net transaction amount invested or received by as much as 100%.

191.     The potential inconsistency between the actual value of the cash exchanged and the amount of Credits recorded for Triangular Transactions within SIG is equally true with respect to Credit Transfers. Given this uncertainty regarding a foundational assumption of the Net Equity calculation, which is that the Credit amounts reflected in SIG are a reliable and accurate proxy for actual cash investments and receipts, the resulting Net Equity amounts concluded by the Trustee are equally unreliable in this instance.

## VIII.  CONCLUSION

I have assessed the methodologies set forth in the Freer Report and Martin Report relative to: (i) the Freer Aggregation Process; and (ii) Mr. Martin's Net Equity Calculation for Participants, and specifically Net Winners. As addressed in detail above, both the Aggregation Process and the Net Equity Calculation contained flawed assumptions that render Dr. Freer's and Mr. Martin's, and ultimately the Trustee's, conclusion regarding the Net Equity amounts supposedly won or lost by a given TelexFree Participant to be unreliable.

---

[202] Huron TelexFree Analysis of Damages Presentation at 8 and 18.

[203] Huron TelexFree Analysis of Damages Presentation at 18.

[204] https://www.ofx.com/en-us/forex-news/historical-exchange-rates/yearly-average-rates.