UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC.,<br>TELEXFREE FINANCIAL, INC.,<br><br>Reorganized Debtors. | Chapter 11 Cases<br>14–40987–EDK<br>14–40988–EDK<br>14–40989–EDK<br><br>Jointly Administered |
| STEPHEN DARR, CHAPTER 11<br>TRUSTEE OF THE ESTATES OF EACH<br>OF THE DEBTORS,<br><br>Plaintiff,<br><br>v.<br><br>BENJAMIN ARGUETA, *et al.,* and a<br>CLASS OF DOMESTIC NET WINNERS,<br><br>Defendants. | Adv. Pro. No.: 16–04006–EDK |
| STEPHEN DARR, CHAPTER 11<br>TRUSTEE OF THE ESTATES OF EACH<br>OF THE DEBTORS,<br><br>Plaintiff,<br><br>v.<br><br>PAOLA ZOLLO ALECCI, *et al.,* and a<br>CLASS OF INTERNATIONAL NET<br>WINNERS,<br><br>Defendants. | Adv. Pro. No.: 16–04007–EDK |

**DOMESTIC & INTERNATIONAL CLASS REPRESENTATIVES'
OPPOSITION TO TRUSTEE'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Domestic Class Representative Frantz Balan and International Class

Representatives Marco Puzzarini and Sandro Paulo Freitas (the "Class Defendants") on

behalf of classes of alleged "net winner" Defendants in *Darr v. Argueta*, Adv. Pro.

16–4006 (the "Domestic Case") and *Darr v. Alecci*, Adv. Pro. 16–4007 (the "International

Case"), hereby oppose the Trustee Stephen B. Darr's Cross-Motion for Summary

Judgment (the "Motion") and request an evidentiary hearing.

## INTRODUCTION

In support of this Opposition, the Class Defendants rely on all materials previously

submitted and attached to the Class Defendants' Motion To Exclude Testimony of Dr.

Cameron E. Freer As Inadmissible Under *Daubert* (the "*Daubert* Motion")(ECF No. 442,

*Domestic Case* ) their Motion for Summary Judgment, including the Affidavit of Ilyas J.

Rona, and all of its exhibits[1] (ECF Nos. 443 & 444, *Domestic Case*), and Class Defendants'

Motion to Strike the Affidavits of Jean Louis Sorondo & Stephen B. Darr pursuant to

Fed. R. Civ. P. 37(c)(1), filed herewith.

In the Motion, the Trustee asks this Court to establish *prima facie* liability for all

Class Defendants, roughly 81,681 people, according to the Trustee. Motion, at 4. The

consequences of such a determination would be catastrophic for the Class Defendants.

Indeed, Judge Hoffman recognized this in his Order disqualifying the Trustee's last

expert, Timothy Martin. Domestic Case, ECF 385 at 33-34 ("alleged net winners would

have no ability to dispute their status and avoid liability other than by being forced to

put on a legal defense challenging their liability. Defendants who failed to do so would

risk a default judgment. Thus, in the context of these adversary proceedings,

---

[1] Unless stated otherwise, all exhibit references below are to the Affidavit of Ilyas J. Rona.

Mr. Martin's aggregation process would not merely be starting a conversation but also could be ending it.") While it has been two years since Judge Hoffman issued his decision, not much has changed. The Trustee still is trying to use a faulty process that all parties know is unreliable and fails to accurately identify net winners and calculate their net winnings. Indeed, the Trustee still uses the very same alleged net equity values for each user account calculated by Timothy Martin. These values are based on the same methodology of calculation and rely on the same assumptions. Freer imported these values into his aggregations. Now, Timothy Martin's colleagues at Huron Consulting Group attempt to palm off Mr. Martin's net equity calculations as their own.

The Trustee's Motion should be denied for all of the reasons already stated in the Class Defendants' Motion for Summary Judgment and identified by the Class Defendants' expert Joshua Dennis. (*Daubert* Motion, at 13-33.) The Motion is also untimely, coming well after **July 21, 2023,** the agreed-up deadline for filing dispositive motions. Even more, the Motion relies on the expert opinions of Jean Louis Sorondo and Stephen B. Darr, which were not timely disclosed, pursuant to Fed. R. Civ. P. 26(a), by the **May 22, 2023** deadline for expert disclosures. Therefore, the Trustee may not use these materials "to supply evidence on a motion, at a hearing, or at a trial" Fed. R. Civ. P. 37. Accordingly, they may not be considered by this Court.

Without admissible expert testimony, the Trustee will be unable to meet his burden of proof to identify the roughly 81,681 alleged Net Winners and quantify their share of the alleged $1.5 billion liability with the required level of exactitude. Summary judgment in favor of the Trustee is therefore inappropriate.

## ARGUMENT

### A. The Trustee's Cross-Motion Is Untimely and Should Be Denied.

The Trustee's cross-motion for summary judgment is untimely as it comes fifty-two days after the deadline for dispositive motions that this Court set for **July 21, 2023**. Failure to file a cross-motion for summary judgment by the dispositive-motion deadline of a court's scheduling order is a sufficient basis to strike or deny the motion. *Fin. Res. Network, Inc. v. Brown & Brown, Inc.*, 867 F. Supp. 2d 153, 174–76 (D. Mass. 2012); *see also, e.g., Kam-O'Donoghue v. Tully*, No. CV 16-11054-MLW, 2019 WL 4273686, at *5 (D. Mass. Sept. 10, 2019) ("As indicated earlier, the City moves to strike Castro's Cross-Motion for Summary Judgment, which he filed more than three weeks after the deadline for dispositive motions.... The court agrees that it is appropriate to strike the untimely Cross-Motion for Summary Judgment ...."); *Nickerson-Reti v. Bank of Am., N.A.*, No. CV 13-12316-FDS, 2018 WL 2271013, at *8 (D. Mass. May 17, 2018), *aff'd*, No. 19-1912, 2021 WL 4128222 (1st Cir. Mar. 31, 2021) ("According to the Court's scheduling order, dispositive motions were due August 30, 2017. Plaintiff never asked for an extension of time, either before or after the deadline passed. And she was represented by counsel, who was certainly aware of the deadline. Therefore the Court will not consider whether plaintiff is entitled to summary judgment on her cross-motion, and will deny that motion as untimely."); *Spencer v. Roche*, 755 F. Supp. 2d 250, 259 (D. Mass. 2010), *aff'd*, 659 F.3d 142 (1st Cir. 2011) ("The cross-motion was therefore filed late and will only be considered as an opposition to defendants' motions."); *Tashjian v. Countrywide Home Loans, Inc.*, No. 08CV11203-NG, 2009 WL 10694076, at *1 (D. Mass. Nov. 9, 2009)

(denying motion for leave to file a cross-motion for summary judgment); *Diana v. Wallace*, No. CIV.A.03-CV-40109-GA, 2004 WL 225055, at *1–2 (D. Mass. Jan. 30, 2004) (striking cross-motion); *Atl. Research Mktg. Sys., Inc. v. Saco Def., Inc.*, 997 F. Supp. 159, 165 (D. Mass. 1998) (striking cross-motion).

In *Financial Resources Network, Inc.*, the District Court allowed a motion to strike a cross-motion for summary judgment that had been filed after the dispositive-motion deadline. *Fin. Res. Network, Inc.*, 867 F. Supp. 2d at 176. There, the court had set a dispositive-motion deadline of July 15, 2011, which it later extended to July 29 upon a joint motion. *Id.* at 174. The defendants filed a timely motion on the deadline date. *Id.* On September 8, 2011, the plaintiffs filed an opposition and cross-motion for summary judgment, and on September 19, 2011, the plaintiffs filed an amended cross-motion for summary judgment. *Id.* at 175. The court noted this amended cross-motion was "more than seven weeks after the July 29, 2011 deadline." *Id.* The court rejected an argument that the cross-motion was timely because it was filed within the time permitted for filing an opposition and struck the pleading. *Id.* at 176.

Here, the Court should similarly deny the Trustee's cross-motion as an untimely dispositive motion. On February 28, 2023, this Court issued a scheduling order, in which it set a June 22, 2023 deadline for dispositive motions. Domestic Case, ECF No. 433. The class representatives subsequently requested an extension, which the Trustee **opposed**, but the Court granted. Domestic Case, ECF No. 441. In its order granting the extension, the Court set the deadline to file dispositive motions to be **July 21, 2023**. *Id.* The class representatives filed a motion for summary judgment on that date, but the

Trustee did not. Nor did the Trustee request additional time to file any dispositive motion after that date. The Trustee also knew about the deadline, having earlier opposed the class representatives' request to set the dispositive motion deadline to be July 21, 2023. Limited Objection, Domestic Case, ECF No. 440. Only long after the dispositive-motion deadline—fifty-two days after, to be precise—did the Trustee file this Motion. Domestic Case, ECF No. 458 (Sept. 11, 2023). This delay in filing is exactly as long as the delay in *Financial Resources Network*. *See Fin. Res. Network, Inc.*, 867 F. Supp. 2d at 174. Like in *Financial Resources Network*, the Trustee's conduct here violates the Court's scheduling order and renders the Motion untimely.

### B.  The Trustee's Motion Should be Denied Because Dr. Freer's Aggregation Process is Unreliable

The Motion should be denied for all of the reasons stated in the Class Defendants Motion for Summary Judgment. Namely, Dr. Freer's aggregation process is unreliable because:

- Dr. Freer's Foundational Assumptions Regarding the Special Role of the Name Field is Unsupported and Counter to Case Facts (*Daubert* Motion, at 13);

- Dr. Freer Failed to Appropriately Consider the Quality of the Data Utilized in His Aggregation Process (*id.* at 15);

- Dr. Freer's Results are Internally Inconsistent (*id.* at 19);

- The Results of the Freer Aggregation Process are Inconsistent with his Stated Methodology and Requirements (*id.* at 21);

- The Freer Aggregation Process Results in Inconsistent and Speculative Outcomes (*id.* at 24);

- The Only Example Cluster in the Freer Report Contains Questionable Aggregations (*id.* at 26);

- **Aggregation Errors Can Result in a Significant Overstatement of Participant Net Equity** (*id.*); and

- Dr. Freer has Failed to Deliver the Full Scope of His Engagement and **fails to actually identify participants** (*id.* at 29);

- Dr. Freer also relies on a previously disqualified expert's calculation of net equity, Which Was Unreliable (*id.* at 30);

- Dr. Freer Performed No Net Equity Calculations or Determinations, But Rather Uncritically Adopted the Flawed Opinions of a Disqualified Expert (*id.* at 30);

- The Net Equity Calculation Fails to Account for Participant Investments and Receipts Related to Transfers of Credit (*id.* at 31);

- The Amount of Cash Invested/Received by Participants as Part of Triangular Transactions or Credits Transfers Can Differ from Amount of Credits Recorded in SIG(*id.* at 33)

Dr. Freer's opinions are therefore inadmissible under Rule 702 and the principles set forth in *Daubert*.

### C. Depositions of Participants Show that the Trustee's Rigid and Uniform Assumptions Regarding Net Equity and Aggregation Are Incorrect

*Examples of Net Equity Problems*

#### 1. Ella Maria Reid

Telexfree Participant Ella Maria Reid never spent any of her own money on TelexFree. (Duran Affidavit, Ex. A, at 20:17–21.) Her accounts were all gifts from her mother. *Id.*, at 7:16–21.

Despite this testimony, the Trustee calculated that Ms. Reid lost money, and based on that erroneous calculation, Ms. Reid was able to file a proof of claim and receive money back. *Id.*, at 5:22–24.

**Q.  Okay. So in your view, you did not actually
suffer a cash loss. Is that correct? Apart from the
TelexFree system, you did not part ways with cash that
you never saw again. Is that correct?**

A.  Yes.

*Id.*, at 20:17–21.

## 2.  Maritza Elizabeth Garcia

Telexfree Participant Maritza Elizabeth Garcia transferred credits to somebody else

to pay off a personal loan which was unrelated to TelexFree. (Duran Affidavit, Ex. B, at

14:9–22):

**Q.  Well, why did you transfer him credits? Do you
remember?**

A.  I owed him money, and that's how I transfer the
money to him.

**Q.  Okay. Did you owe him money for setting up your
account?**

A.  No. That was something unrelated. Personal
loan.

**Q.  So you recall transferring him credits to pay
off a personal loan?**

A.  Correct.

**Q.  Do you recall how much that loan was?**

A.  No -- oh, the loan? It was, like, around $2,000
and something.

*Id.*, at 14:9–22.

### 3. Benjamin Argueta

Telexfree Participant Benjamin Argueta testified that he lost $210,000 even though the Trustee claims that he is a $4 million net winner. (Duran Affidavit, Ex. C, at 33:10–23.) To surpass $4 million, the Trustee calculates improbably large net winnings between Mr. Argueta and other individual participants. For example, the Trustee calculates that Mr. Argueta received in excess of $300,000 in cash from a single person—his brother-in-law—in connection with TelexFree. Mr. Arguata testified that the Trustee's calculations were simply false:

> **Q. Did you ever receive, you, yourself, some amount of cash in excess of $300,000 from your brother-in-law?**
>
> A. Never.
>
> **Q. If the trustees believe that your brother-in-law paid you $317,000, in cash, that would be an incorrect belief. Is that right?**
>
> A. It's not correct.

*Id.,* at 29:15–22.

> **Q. Where I am highlighting, it says total net equity, and then it's a number greater than $4 million. Did you profit a number in excess of $4 million in connection with TelexFree?**
>
> A. I made zero. I lost.

*Id.,* at 33:10–14.

> **Q. And do you recall how much in money you put directly in TelexFree?**
>
> A. My own money, me, myself, it was between

200- and $210,000. I don't know about the other
people.

*Id.*, at 33:19–23.

Mr. Argueta also explained how he and other users often had to buy credits:

A.  So in order to wrap this up and explain to you
how the whole thing worked, so let's say, for example,
Delmy Argueta would give me the money. I would take
the money and deposit it into TelexFree account so
that then they could give us credit to open accounts.

**Q.  So was all the money you received deposited into
or paid into TelexFree?**

A.  So like I said before, sometimes you did it that
way. Or sometimes you give it to the people that had
available credits. But most of the times, it went
directly into TelexFree account.

**Q.  So either the money went to the company, to
TelexFree, or it went to somebody to buy credits. Is
that right?**

A.  That is correct.

*Id.*, at 44:16–45:6. The purchase of credits, which the Trustee ignores, explains why Mr.

Argueta's net winnings are grossly overstated.

### *Examples of Aggregation Problems*

#### 1.  **Selvi Vanessa Lewis Reynaga**

TelexFree participant Selvi Vanessa Lewis Reynaga normally goes by Vanessa, her

middle name. (Duran Affidavit, Ex. D, at 16:22–23.) She has two last names—Lewis is

her father's last name and Reynaga is her mother's last name. *Id.*, at 17:4–8. However,

she sometimes will go by just Vanessa Lewis to save time. *Id.*, at  18:6–8. Her testimony

directly contradicts Mr. Freer's assumption that the name field has a special meaning in the TelexFree dataset. Ms Lewis stated that she always makes sure to use all four of her names for important purposes, such as in legal documents. *Id.*, at 29:9–21. However, she did not do so for TelexFree. *Id.*  Indeed, she sometimes did not use any name at all, instead using two dots::

| rep_login | rep_nome | rep_email | rep_end | rep_num | rep_bairro | rep_cidad |
|---|---|---|---|---|---|---|
| vanessalewis | Selvi Lewis Reynaga | sparkledewdrop@gmail.com | C. 4to Center | 1050 | Villa Nuevo Potosi | La Paz |
| vanessalewisc1 | .. | sparkledewdrop@gmail.com | | | | |
| vanessalewis1 | Selvi Lewis Reynaga | sparkledewdrop@gmail.com | C. 4to Center | 1050 | Villa Nuevo Potosi | La Paz |
| vanessalewis2 | Selvi Lewis Reynaga | sparkledewdrop@gmail.com | C. 4to Center | 1050 | Villa Nuevo Potosi | La Paz |
| vanessalewis3 | Selvi Lewis Reynaga | sparkledewdrop@gmail.com | C. 4to Center | 1050 | Villa Nuevo Potosi | La Paz |
| vanessalewis4 | Selvi Lewis Reynaga | sparkledewdrop@gmail.com | C. 4to Center | 1050 | Villa Nuevo Potosi | La Paz |
| vanessalewis5 | Selvi Lewis Reynaga | sparkledewdrop@gmail.com | C. 4to Center | 1050 | Villa Nueva Potosi | La Paz |
| vanessalewis5c1 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c2 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c3 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c4 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c5 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c6 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c7 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c8 | .. | .sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c9 | .. | sparkledewdrop@gmail.com | . | . | . | . |
| vanessalewis5c0 | .. | sparkledewdrop@gmail.com | . | . | . | . |

(Duran Aff., ¶ 6.)

Selvi Vanessa Lewis Reynaga testified that she would have used all four of her names in connection with TelexFree if someone had told her that the name field was important:

> **Q.  Did anyone ever tell you that the name had some significance or importance in TelexFree? Was the name field in any way explained how that would be used?**
>
> A.  Possibly, yes, and I could have just forgotten.
>
> **Q.  Okay. Well, were you told you always had to use your legal name?**
>
> A.  I don't know. Because if they had, I would have made sure to put all my names as I always am with any legal papers that I have to. I put my four -- my first two names and my first last name. So if I didn't, I assume that someone probably told me that it's not so important as to put my full information in

there.

(Duran Affidavit, Ex. D, at 29:9–21.)

## 2. Arismendy Disla

Testimony from Telexfree participant Arismendy Disla's statements below contradict Mr. Freer's assumption about the special meaning of the name field in the TelexFree data. Disla testified that he created accounts named after his late mother "Daisi Jimenez" to "remember" her. He also on occasion shortened her name to "DJ," her initials.

**Q.  Do you know someone named Daisi Jimenez?**

A.  She is my mother. She died.

(Duran Affidavit, Ex. E, at 17:12–13.)

**Q.  And some of your accounts have "Daisi" in the login name.**

A.  Mm-hmm.

**Q.  Are those accounts that you created for her or were some of those also your accounts or do you remember?**

A.  Those are mine. All of them are mine. Because she has passed away, I put that as a remember.

**Q.  Okay. What about did you have accounts that said "DJ" in the name, in the login name?**

A.  DJ?

**Q.  That would be back to your mom's initials?**

A.  Yeah. The initial, yeah. Those are mine.

**Q.  But those are still your accounts?**

A.  Yeah, yeah, yeah.

*Id.*, at 18:13–19:3.

### D.  The Trustee May Not Recycle Disqualified Opinions of Timothy Martin through His Co-Worker Sorondo or Through Himself

It goes without saying that an expert must provide *his or her own* opinions, not simply parrot the opinions of an absent person. This is especially true where the other person is absent *because of* disqualification under *Daubert*. It is well-settled that an "expert witness must in the end be giving his own opinion. An expert cannot simply be a conduit for the opinion of an unproduced expert."*In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 20-MD-2924, 2022 WL 17480906, at *39 (S.D. Fla. Dec. 6, 2022), appeal dismissed, No. 23-10090-J, 2023 WL 2849068 (11th Cir. Mar. 22, 2023), *citing Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007); *see also Hi-Tech Pharms.*, 2021 WL 2185699, at *7 (explaining that an expert "may not simply parrot the work actually done by another expert").

Experts are not permitted to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 932 (D. Minn. 2020), *citing In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000); *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 713 (N.D. Ill. 2001), *aff'd and adopted sub nom. Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717 (N.D. Ill. 2001) ("In light of our ruling on 'Defendant's Motion To Bar Testimony Of Greg Kaplan, ' Dr. Morse may not reference

any of Mr. Kaplan's proposed opinions and testimony or Mr. Kaplan's proposed supplemental restraint device.") Otherwise, parties could freely circumvent *Daubert* rulings by simply palming off the opinions of disqualified experts as new opinions. Thus, for example, where the expert opinions of an economist are based on a calculator developed and run by a former colleague, the former colleague is "really the expert" on the calculator, and consequently the economist "should not be allowed to act as a mouthpiece for another expert." *Fowler v. United States*, No. 08-216, 2009 WL 2827958, at *8-9 (W.D. La. Sept. 1, 2009) ("The methods and calculations used by [the former colleague] are not accessible to the court for purposes of verification and, thus, [the former colleague] is not merely a 'gopher' or 'assistant,' but an independent expert."); *see also Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL 779283, at *4 (S.D. Ala. Mar. 2, 2010) (holding that "bootstrapping "of an undisclosed expert witness's opinions into the reports and testimony of another expert, who merely acts as a "conduit," is plainly improper).

Here, the Trustee will not be able to identify net winners or determine net winnings because the Trustee has failed to timely designate an expert to calculate each alleged Net Winner's respective net equity for the finder of fact. The Trustee also failed to timely identify an expert that can connect user accounts to actual people. Given that Freer was only retained because one Huron-employed expert (Martin) was disqualified under *Daubert*, the Trustee is now attempting to plug the holes in the replacement expert's opinions (Freer) by resurrecting the Martin opinions through two different Huron colleagues (Sorondo and Darr). This is simply a ploy to circumvent Judge

14

Hoffman's *Daubert* ruling. The Trustee has had over two years to complete a *new* expert analysis that meets the requirements of FRE 702. He failed to do so.

### E.  Even if the Trustee Had Designated an Expert to Opine on Net Equity, the Trustee's Net Equity Assumptions Are Flawed as a Matter of Law

The well-settled law on "net equity" requires that **_all_** cash transactions be included in the calculation, while the fictitious and fraudulent accounting of the Ponzi scheme be disregarded.  For this reason, net equity models expressly require a collapsing of all transactions down to "cash in and cash out," rejecting any other calculations that reflect the fraud or artifice of the Ponzi scheme.

In the *Madoff* cases, the trustee concluded that each customer's "net equity" should be calculated by the "Net Investment Method," which credited "the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011).

In the TelexFree cases, the original definition of net equity was:

> the amount invested by the Participant into the Debtors' scheme, including amounts paid pursuant to Triangular Transactions, less amounts received by the Participant from the Debtors' scheme, including amounts received pursuant to Triangular Transactions.

Ponzi Scheme Order dated January 26, 2016, ECF No. 0687. This is similar to the Madoff Net Investment Method, other than that it implicitly recognizes that many transactions were with other participants and did not occur directly to or from TelexFree. Thus, the proper interpretation of this definition turns on what it means to invest "into" or receive money "from" the "scheme."

According to this Court's Ponzi Scheme Order, "scheme" is one of several terms
ascribed the meaning in the Trustee's motion. *Id.* at 2 n.1. In that motion, the Trustee
describes the "Mechanics of Scheme and Methods of Compensation." Ponzi Motion, at
6, ECF No. 623. In that section, the Trustee describes how credits could be monetized:
"The credits issued to Participants for placing advertisements and selling membership
plans and VoIP Packages could be redeemed for cash, ***transferred to another User
Account***, or applied in satisfaction of an invoice for another User Account." *Id.* ¶ 21
(emphasis added). It is thus clear that part of the TelexFree scheme included "exchanges
of credits between User Accounts unassociated with the issuance and satisfaction of
Debtor invoices." Ponzi Motion ¶ 59, ECF No. 623.

Parsing the net equity formula became important when alleged victims of the
scheme attempted to argue in this case that the Estate had no interest in cash
transactions ***between*** participants. In rejecting that argument, Court indicated that it
understood the Trustee's request for a net equity formula encompassed all such
transactions:

> Mr. Darr requested that the participant's claim be calculated as the ***total
> amount of money paid by a participant to*** either TelexFree ***or another
> participant*** less ***all amounts received by the participant from*** TelexFree ***or
> another participant***….Using the net Equity formula, the total amount a
> participant paid, whether to TelexFree or to a recruiting participant, minus
> the amount of money that the participant received, whether from
> TelexFree or a recruited participant, results in the amount of the
> participant's claim.

Proposed Findings of Fact and Rulings of Law, *Darr v. Dos Santos* (Adv. Pr. 15-4055), at
10.  There were no limitations on how a participant could pay or receive money from
another participant, and there was certainly no express finding limiting such amounts

to triangular transactions. The District Court adopted this Court's proposed findings of fact and conclusions of law, and the First Circuit affirmed. *In re TelexFree, LLC*, 941 F.3d 576, 581 (1st Cir. 2019). *Darr v. Dos Santos* ends any debate about whether net equity calculations are limited solely to "triangular transactions." They are not. All transactions between participants, including credit sales, are included in net equity.

The Trustee's wish to exclude credit transfers is troubling, especially because credit transfers clearly involved and relied on Telexfree. Yet, on more than one occasion in its cross-motion, Trustee falsely claims that a credit transfer "transaction was strictly between non-debtors." Motion, at 15.  For example, the Trustee states: "The [credit transfer] transaction was strictly a purchase, sale, and transfer or credits between two private participants, in which TelexFree had no economic stake." Motion, at 15. These repeated assertions are false, as even the Trustee is at some point forced to admit: "TelexFree charged three (3) credits to the transferring Participant for the bookkeeping services" for each transfer. Motion, at 13. What the Trustee neglects to mention is that credit transfers directly involved TelexFree, who performed more than bookkeeping services. Transfers could only be initiated using the TelexFree website. TelexFree charged and collected $3 (the Trustee refers to this as "three (3) credits," but this is the only time that the Trustee contends that credits are not worth 100 cents on the dollar). When participants engaged in credit transfers, they "engaged in a system designed and implemented by TelexFree" no different than triangular transactions.  *See In re TelexFree, LLC*, 941 F.3d 576, 584 (1st Cir. 2019)

It is telling that the Trustee's rationale for why credit transfers are excluded has been consistently changing. The Trustee's prior expert Timothy Martin stated in his original report, served before the First Circuit decision, that credit transfers could be excluded because "TelexFree was not a party to these transactions and the transfer of credits did not impact the net winnings or net losses of a participant for purposes of computing Net Equity." Martin Report, at 12 n.6. Mr. Martin was forced to retreat from this claim given his own acknowledgment that TelexFree was a party to these transactions and that he was aware that credits were sold for money. Hearing Tr. 176:22-177:5.

Recognizing that precarious nature of the net equity opinions, the Trustee pivoted. At the first *Daubert* hearing, the Trustee explained that the sole basis for excluding credit sales was an "instruction" from Trustee's counsel that Mr. Martin did not seek to overrule. Hearing Tr. 54:3-10, 179:5-7. This was the case, even though Martin believed that the credit transfer table was one of the four SIG data tables that he found "relevant" and "most useful." Hearing Tr. 43:19-45:16.

Now, the Trustee now retreats to its original position that TelexFree is not a party to credit transfers under some undefined "*de minimis*" standard. *See* Motion, at 13. This position was never disclosed in either the original Martin report, the *Daubert* hearing, or the Freer report. Nor has the Trustee attempted to articulate let alone justify his new *de minimis* standard.  Regardless of justification, in excluding credit transactions, the Trustee loses sight of the *Madoff* proviso to look solely at cash and ignore the fictions of the Ponzi scheme. By excluding credit sales because they lacked an invoice from

TelexFree, the Trustee is no longer solely collapsing cash transactions. Instead, the Trustee himself makes judgments based on the fictions of the Ponzi scheme.

Under the net equity formula in this case, once a person paid money to receive TelexFree credits, they became a customer and thus an investor in the scheme. Similarly, once a participant parted with credits for cash, that participant received amounts from the scheme. Pursuant to prior Court Orders in this case, credit sales should have been included. Mr. Martin's failure to adhere to the Net Equity formula would allow one participant to "elevate her claim over the claims of others," which "thwarts the policy of ratable distribution at the heart of the bankruptcy system." Proposed Findings of Fact and Rulings of Law, *Darr v. Dos Santos* (Adv. Pr. 15-4055), at 23. As is discussed below, this makes Mr. Martin's opinions unreliable and irrelevant.

The Trustee's prior expert, Timothy Martin, admitted in the first *Daubert* hearing that credits were sold for cash. Hearing Tr. 176:22-25. And he further admitted that they were sometimes sold for a dollar and sometimes more than a dollar. Hearing Tr. 177:13-16. Mr. Martin provided no data-driven explanation, however, for why credit sales could be ignored or why such exclusion had no effect on his overall opinions. The reason was purely legal, an instruction from Trustee's counsel that Mr. Martin did not seek to overrule. Hearing Tr. 54:3-10, 179:5-7. This was the case, even though Martin believed that the credit transfer table was one of the four SIG data tables that he found "relevant" and "most useful." Hearing Tr. 43:19-45:16.

The Affidavit of Frantz Balan makes clear that there was in fact a market for credits, which were undeniably a part of the scheme as triangular transactions. Defendants'

Exhibit 19, ¶ 30. This is confirmed by Exhibit 10 to the Dennis Report, which shows that

Mr. Balan bought or otherwise transferred in $625,513.96 worth of credits (assuming

Mr. Martin's dollar per credit assumption is accurate), while selling or transferring out

$323,569.03. If Martin applied a consistent assumption of dollar parity to Mr. Balan's

credit transfers, the $302,000 imbalance in credit transfers would reduce Mr. Balan's

alleged $518,000 net equity by more than 50%. The Trustee's net equity calculations are

thus based on inconsistent assumptions and instructions which cannot be squared with

the net equity formula to be used in this case. The practical consequences of ignoring

credit sales is that the net equity calculations are incorrect and would change if credit

sales were included. Hearing Tr. 177:1-8. On occasion, a net winner could even become a

net loser, and *vice versa*. *Id.*

The Trustee seeks refuge in the *Madoff* line of cases, but these cases are

distinguishable because no investors who were sued for their positive net equity

transacted with feeder funds.  Therefore the analogy to *Madoff* is inapt. In *Madoff I*, none

of the investors in either the four Fairfield Greenwich Group funds for two of the

Merkin Funds were themselves direct participants in the Madoff scheme or Bernard L.

Madoff Investment Securities LLC ("BLMIS").  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d

199, 203–05 (2d Cir. 2014). Rather, their injuries were "caused directly by the non-debtor

defendants—not by Madoff or BLMIS." *Id.*, at 211. For this reason, the Second Circuit

found that these investors had "a claim for injury that is particularized as to them" and

thus "they are exclusively entitled to pursue that claim, and the bankruptcy trustee is

precluded from doing so." *Id.*, at 211.  Had any of these investors participated directly with Madoff's scheme, a different outcome would have been reached.

*Madoff II* offers no help to the Trustee either. There, various investors, including Madoff "net winners" tried to bring claims against the Picower Defendants, who were also net winners. *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 85-86 (2d Cir. 2014). The court enjoined the investors from proceeding, finding that the claims against the Picower Defendants were not sufficiently particularized. *Id.* at 93.  For example, there were no claims that the Picower Defendants made misrepresentations to the investors. *Id.* Rather, the claims were merely that they "reaped the benefits of Madoff's scheme." *Id.* This is precisely the same situation here. No TelexFree participant would be able to bring a claim for particularized injury against another participant for credit sales, since such claim would be based on the same Ponzi scheme allegations and would merely add that the selling participant "reaped the benefits" of the Ponzi scheme by selling worthless credits. Therefore, the Trustee's claims that credit sales do not concern the TelexFree Estate and, by inference, that participants are free to sue each other for credit sales is erroneous. The Trustee suggests that TelexFree net winners could sue other promoters to recover for their credit purchases, but the ruling in *Madoff II* does not support that conclusion.

In the end, the Trustee should have included cash exchanged in credit sales in his net equity formula. The Trustee has consistently chosen not to, thus making his calculations inaccurate.

## CONCLUSION

For the reasons set forth above, the Class Defendant hereby respectfully move that

the Court deny the Trustee's Cross-Motion for Summary Judgment.

## HEARING REQUESTED

Class Plaintiffs respectfully request a hearing at a time convenient to the Court.

Respectfully submitted,

FRANTZ BALAN,
FOR HIMSELF AND AS CLASS
REPRESENTATIVE ON BEHALF OF
ALL DOMESTIC NET WINNERS,

*-and-*

MARCO PUZZARINI AND
SANDRO PAULO FREITAS,
FOR THEMSELVES AND AS CLASS
REPRESENTATIVES ON BEHALF OF
ALL INTERNATIONAL NET
WINNERS,

By their counsel,

Dated: October 2, 2023

/s/ Ilyas J. Rona
Ilyas J. Rona, Esq. (BBO# 642964)
Michael J. Duran, Esq. (BBO #569234)
MILLIGAN RONA DURAN & KING LLC
28 State Street, Suite 802
Boston, Massachusetts 02109
(617) 395-9570
ijr@mrkdlaw.com
mjd@mrdklaw.com

## CERTIFICATE OF SERVICE

I, Ilyas J. Rona, hereby certify that I have caused a copy of the foregoing Domestic &

International Class Representatives' Motion For Summary Judgment be served on

counsel for the Trustee and all registered electronic filers appearing in this case using

the Court's CM/ECF system.

Dated: October 2, 2023                    /s/ Ilyas J. Rona
                                          Ilyas J. Rona, Esq.