1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - EASTERN DIVISION
============================= .
IN THE MATTER OF:             . Case #14-40987
                             .
TELEXFREE, LLC                .
                             . Worcester, Massachusetts
                             . Thursday, October 12, 2023
     Debtor.                  . 10:14 a.m.
============================= .
DARR,                         . Adv. Proc. 16-04006
                             .
     Plaintiff,               .
                             .
v.                            .
                             .
ARGUETA ET AL,                .
                             .
     Defendants.              .
============================= .
DARR,                         . Adv. Proc. 16-04007
                             .
     Plaintiff,               .
                             .
v.                            .
                             .
ALECCI ET AL,                 .
                             .
     Defendants.              .
============================= .


TRANSCRIPT OF TRIAL ON:
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES TO
EXCLUDE TESTIMONY OF DR. CAMERON E. FREER AS INADMISSABLE
UNDER DAUBERT
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES FOR
SUMMARY JUDGMENT
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES TO
STRIKE THE AFFIDAVITS OF JEAN LOUIS SORONDO AND STEPHEN B.
DARR PURSUANT TO FRCP 37(C)(1) AND PRECLUDE THEIR TESTIMONY,
OR ALTERNATIVELY, TO RESCHEDULE THE DAUBERT HEARING, AMEND THE
DEADLINE FOR EXPERT DISCLOSURE, AND INCREASE THE BUDGET OF
CLASS DEFENDANTS' FOR LEGAL FEES AND EXPERT COSTS
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES FOR
SUMMARY JUDGMENT
MOTION OF PLAINTIFF TO PARTIALLY STRIKE PORTIONS OF THE
AFFIDAVIT OF FRANTZ BALAN UNDER FEDERAL RULES OF EVIDENCE 602
AND 702
MOTION OF PLAINTIFF TO EXCLUDE NEWLY DISCLOSED DENNIS EXHIBITS
AND RELATED TESTIMONY
BEFORE THE HONORABLE ELIZABETH D. KATZ

2

APPEARANCES:

For the Trustee:                ANDREW G. LIZCOTTE, ESQ.
                                 DANIEL J. LYNNE, ESQ.
                                 ALEXANDRA PAPAS, ESQ.
                                 Murphy & King, P.C.
                                 28 State Street
                                 Suite 3101
                                 Boston, MA 02109

For the Defendants:            MICHAEL J. DURAN, ESQ.
                                 ILYAS J. RONA, ESQ.
                                 Milligan Rona Duran & King LLC
                                 28 State Street
                                 Suite 802
                                 Boston, MA 02109


Electronic Sound Recording Operator:  ALBERTO BARRERA


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
800-257-0885

**eScribers, LLC**

3

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For The Defendants: | | | | | |
| JOSHUA DENNIS | | | | | |
| (By Mr. Rona) | 102 | | | | |
| (By Mr. Lynne) | | 151 | | | |
| | | | | | |
| For The Trustee: | | | | | |
| DR. CAMERON FREER | | | | | |
| (By Mr. Lynne) | | | 90 | | |
| (By Mr. Rona) | | 5 | | 97 | |

**eScribers, LLC**

4

1    (At 10:14 a.m.)

2              THE CLERK:  Please be seated.

3              Case Number 16-4006, Darr versus Argueta and Case

4    Number 16-4007, Darr versus Alecci.  This is a continuation of

5    the hearing that began on yesterday's calendar.

6              Judge, do you want me to read all these back in?  I

7    don't think we need to.

8              THE COURT:  No.  I think we're fine unless -- yeah,

9    unless Mr. Barrera needed it for the record, but I think we're

10   all set.

11             Okay.  Good morning, everyone.

12             Mr. Rona, are you ready to continue with

13   cross-examination?

14             MR. RONA:  Yes, Your Honor.

15             THE COURT:  Okay.  Dr. --

16             MR. LYNNE:  Your Honor, could I just --

17             THE COURT:  Yes.

18             MR. LYNNE:  It's Dan Lynne.  Could I just let you

19   know that for some reason they've scheduled a fire alarm drill

20   in my building?  I'm going to mute so that it doesn't bother

21   people.  But to the extent I have to make an objection, I will

22   try to stay live as short as possible so it doesn't bother the

23   proceedings.  But I apologize.  It is what it is.

24             THE COURT:  All right.  Thank you for letting us

25   know.

**DR. CAMERON FREER - Cross**

5

1        MR. RONA:  And Your, Honor, in light of yesterday, I

2   think I'm going to go back to what I prefer, which is the

3   podium.  And Mr. Duran will assist with the exhibits.

4        THE COURT:  That's fine.  Yes.

5        MR. RONA:  May I approach?

6        THE COURT:  Please.  Dr. Freer, if you would go ahead

7   to the stand.

8        THE CLERK:  Doctor, I just want to remind you you are

9   still under oath from yesterday.

10        THE WITNESS:  Okay.

11                    RESUMED CROSS-EXAMINATION

12   BY MR. RONA:

13        Q.   Good morning, Dr. Freer.

14   A.   Good morning.

15        Q.   I want to go back a little bit just because with the

16   break in the middle, I want to make sure we have a clean

17   record.  You understand that your assignment, the reason you

18   were retained by the Trustee, is to identify net winners and

19   compute their net winnings.  Isn't that right?

20   A.   Identify net winners and compute it insofar as I'm adding

21   up numbers that were given to me.  But yes.

22        Q.   So yes.  And you know the reason the Trustee wants

23   you to do that is because the Trustee is pursuing judgments

24   against those participants in those amounts?

25   A.   Correct.

**DR. CAMERON FREER - Cross**

6

1          MR. LYNNE:  Objection.

2          THE COURT:  What's the objection?

3          MR. LYNNE:  Calls for speculation.  There's no basis

4   for Dr. Freer to be engaging in speculation with respect to

5   what the legal end process is.

6          THE COURT:  Okay.  Overruled.  Thank you.

7   BY MR. RONA:

8      Q.   Well, let's look at that.  Could I pull up Exhibit

9   D007?

10  A.   Is this something I should have, sir.

11     Q.   If you would like a hard copy in front of you, I can

12  provide you with our exhibit book.  But it's also going to be

13  on screen.

14         MR. DURAN:  If you can see it on the screen, it's

15  right on the screen.

16     Q.   And Mr. Duran will try to enlarge it as much as

17  possible.  So let's start --

18         MR. LYNNE:  I'm sorry.  Could I just -- I'm sorry to

19  interrupt, but if it's a trial exhibit, can I -- and this --

20  can I just get your designation so I can try to pull it up

21  myself here?  Because it's difficult to read.

22         MR. RONA:  Sure.  D007.

23         MR. LYNNE:  Sorry, I was trying -- is it a -- is a

24  defendants' trial exhibit?  That's all I'm going to ask.

25         MR. RONA:  Yes, Mr. Lynne, a defendant exhibit.

**DR. CAMERON FREER - Cross**

1      MR. LYNNE:  I just want to know what the Exhibit

2  Number is so I can try to pull it up.

3      THE COURT:  7.

4      MR. RONA:  Okay.  D007.

5      MS. PAPAS:  Do you mind if I give our hard copy to

6  the witness?  I just feel like it'd be better if he --

7      MR. RONA:  I have no problem with that.  This as an

8  example.

9      THE COURT:  Hold on one second.  Attorney Lynne

10  Stepped away.  I can see him.  Hold on.  Okay.  He's back.

11  Go ahead, Attorney Rona.

12      MS. RONA:  Thank you, Your Honor.

13      Q.   This is an email, Dr. Freer, that you wrote to

14  counsel for the Trustee in November of 2021.  Isn't that

15  right?

16  A.   It looks correct, yes.

17      Q.   Okay.  And if Mr. Duran scrolls down, the email has

18  two paragraphs.  And I'm going to take them separately.  But

19  the first one you write, "What was the methodology for going

20  from a Huron generated cluster to the name of the defendant,

21  i.e., how would you pick who to sue given a cluster when the

22  cluster involves multiple names?"

23      Did I read that correctly?

24  A.   I believe so, yes.

25      Q.   Okay.

**DR. CAMERON FREER - Cross**

8

1          THE COURT:  Hold on.  I think attorney Lynne wants to

2     object to that question.  Is that right?  I saw your hand go

3     up.

4          MR. LYNNE:  I'm sorry.  No, I mean, if he's just

5     referring to this, I have no objection to just directing his

6     attention to something.

7          THE COURT:  Okay.  Go ahead.

8     Q.   Okay.  And the reason you asked that question was

9     because it's important to know who to sue.  Isn't that right?

10    A.   I believe we're talking about two different situations.

11    This is referring to the Huron clusters that I was looking at

12    to get an initial sense of where the case was.  This is not

13    with respect to my clusters.

14    Q.   Okay.  And your question was with respect to the

15    methodology that Huron used, how are they going to go from

16    clusters to names of defendants that they were going to sue?

17    A.   I believe it was how they did go.  I'd already seen court

18    documents that listed names.  And I was curious how they had

19    gone from the Huron clusters to that.  It was both sides in

20    the past.

21    Q.   And you were curious because you had the same

22    challenge.  Isn't that right?

23    A.   No.

24    Q.   You didn't have --

25    A.   I've never seen a court document with the names generated

**DR. CAMERON FREER - Cross**

9

1  for mine.  I was curious because I was trying to understand

2  what had happened in the case so far.

3       Q.   Well, if we go to -- scroll up to page 2, you get

4  a-- you received a response to this email.

5            MR. RONA:  Mr. Doran, If you could go up to the

6  Lizotte email right there.

7       Q.   you received a response from Mr. Lizotte; is that

8  right?

9  A.   Yes.  I see that.

10       Q.   And he numbered his response in line with yours?

11  His number 1 says that Huron never really had to migrate from

12  a cluster containing multiple names to a single name because

13  the cluster always had just one name.  Do you see that?

14  A.    I see that, yes.

15       Q.   Okay.  And do you agree with that statement?

16  A.   No.

17       Q.   Okay.  Well, do you agree that your clusters didn't

18  always have one, don't always have one name?

19  A.   Not always, but more frequently than Huron's, I believe.

20       Q.   Okay.  And so the reason you're asking is because

21  you were wondering how to resolve the issue; if there's more

22  than one name, how are we going to know who to sue?

23  A.   Once again, I was asking about Huron's situation, not

24  mine.  That's what this is about.

25       Q.   Well, at this point in November of 2021, had you

**DR. CAMERON FREER - Cross**

10

1   done your aggregation analysis?

2   A.   Not fully.  No.

3        Q.   Well, had you done it at all?

4   A.   I'd begun to think about the process for it.  Yes.  I'd

5   started but not completed it at that point.

6        Q.   But you hadn't run your ten steps?

7   A.   And not run all of the ten steps yet, no.

8        Q.   If we could go to the top email, you write,

9   "Regarding the first, I don't think that's actually the case."

10       Do you see that?

11  A.   Yes.

12       Q.   And that reflects that you think that on occasion,

13  Martin did include more than one name in a cluster?

14  A.   Yes.

15       Q.   And if we could scroll up to the top.  Mr. Lizotte

16  writes that, "According to Jean Louis, they generally did not

17  have more than one name in an aggregation as that would defeat

18  the purpose of relying upon name."

19       Do you see that?

20  A.   I do.

21       Q.   Okay.  Was there ever any further discussions

22  between you and the trustee about the issue of how to decide

23  if there's multiple names, who's going to be sued?

24  A.   In Huron's case?

25       Q.   In your case.

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document    Page 11 of 206
DR. CAMERON FREER - Cross

11

1   A.   In my case?  I don't know what you mean by further.  This

2   is all about Huron's.  I don't think I had discussions in

3   either case.

4          MR. RONA:  Okay.  Before we leave this email, if I

5   could ask Mr. Duran to go back to the email that we started

6   with on the bottom of page 2 and 3.

7          Q.   There was a second point that you had.  And the

8   second point you write, "I think you've said this before, but

9   we want to confirm that the net equity calculation by Huron is

10  not under review here.  It is our understanding that the court

11  has approved the net equity formula and that Huron has

12  implemented this formula to create the net equity field for

13  each account in the database.  We are hoping that we can

14  continue to use this field without further investigation, even

15  as we examine which accounts should be aggregated."

16         Do you see what I just read?

17  A.   I do.

18         Q.   Okay.  What was the basis -- well, actually, let

19  me -- let me scroll up.  If you go up.  Mr. Lizotte writes,

20  "Your assumption is correct."

21         Do you see where I read that?

22  A.   Yes.

23         Q.   Okay.  What was the basis for your understanding

24  that the Court has approved that the net equity formula as

25  implemented by Huron?

**DR. CAMERON FREER - Cross**

12

1  A.   My understanding is twofold:  1, what I have been told by

2  trustees and counsel, and 2, what I had seen in the Court

3  documents indicating what the formula was, something that I

4  believe Darr had sent to the court which the court said, yes,

5  I approve this, this is the formula we'll use.  I haven't

6  looked in all that much detail, but I believe I've seen both

7  the court documents approving it and the assertion from the

8  trustee and counsel that that was the case.

9       Q.   Okay.  And one of the Court documents was Judge

10  Hoffman's decision with respect to the Timothy Martin

11  opinions?

12  A.   That's not what I'm talking about.  This is from maybe a

13  year or two earlier.

14       Q.   Okay.  Well, have you read the Judge Hoffman

15  decision?

16  A.   Yes.

17       Q.   Okay.

18  A.   That's not what I had in mind here.

19       Q.   If we could pull up Exhibit D026.

20       MR. LYNNE:  Your Honor, I'm going to object to

21  examination on the meaning of Judge Hoffman's opinion.  That

22  is strictly a legal issue, not for this witness.

23       THE COURT:  So can you provide an offer of proof?

24  Where are you going with this?

25       MR. RONA:  Where I'm going, Your Honor, is that Dr.

**DR. CAMERON FREER - Cross**

1  Freer has testified that he has reviewed this document and

2  that he's trying to understand what assumptions he's to use

3  and what he's investigating or not.  And this is part of that

4  basis.

5       THE COURT:  Yes, Attorney Lynne.

6       MR. LYNNE:  The issue here is not -- where I assume

7  he's going is he's going to counsel is going to attempt to

8  argue that Judge Hoffman threw out the net equity calculation

9  which we do not believe to be the case which would be for the

10  Court to determine what it is that Judge Hoffman actually

11  ruled upon or did not rule upon.  It has nothing to do with

12  this witness.  And in fact, this witness would be incompetent

13  to testify as to what Judge Hoffman intended to say or did not

14  intend to say.

15       THE COURT:  So I understood Dr. Freer's testimony

16  yesterday to be that he didn't make any calculations with

17  regards to net winnings and the net losings.  He relied on

18  Huron's calculations.

19       MR. RONA:  That's correct, Your Honor.  And this

20  email that we looked at states and understanding that that's

21  not before him.  And I'm probing the basis for that, given he

22  says he's read Judge Hoffman's decision --

23       THE COURT:  Right.

24       MR. RONA:  -- and Judge Hoffman's decision touches on

25  that.

**DR. CAMERON FREER - Cross**

14

1        THE COURT:  Yeah, but even if he's wrong about Judge

2    Hoffman's decision, where does that get me?  I mean, at the

3    end of the day, he didn't do the net calculation.  Somebody

4    else did.  And that's that needs to be an evidentiary hearing

5    for another day, doesn't it?

6        MR. RONA:  Well, I think it has to do with his --

7    whether he delivered on his assignment.

8        THE COURT:  I see.

9        MR. LYNNE:  May I be heard, Your Honor?

10        THE COURT:  Well, let me just think through something

11    for a second.

12        Mr. Lynne, what's your comment?

13        MR. LYNNE:  Dr. Freer testified that he created a

14    nine-step process to go through the entire cluster process.

15    Step ten was he simply applied the net equity table which was

16    provided to him by counsel.

17        THE COURT:  Right.

18        MR. LYNNE:  And calculation was an arithmetic

19    calculation thereafter.  It's nothing to do with Dr. Freer's

20    substantive data science approach or the implementation of

21    that approach.

22        THE COURT:  Right.  I think I'm going to let Atty

23    Rona put on the record what you believe to be the case which

24    is that he was supposed to do X and he didn't do X.  And if

25    that somehow persuades me one way or the other, I think you're

**DR. CAMERON FREER - Cross**

15

1   entitled to have that line of questioning.  So go ahead.

2           MR. LYNNE:  Thank you, Your Honor.

3   BY MR. RONA:

4       Q.   Dr. Freer, this is the first page of Judge Hoffman's

5   decision, is it not?

6   A.   I believe this binder is missing Exhibits 24 through 46.

7       Q.   Okay.  Well, would you like the hard copy in front

8   of you or can you --

9   A.   If you're going to question me on it.  Yes, please.

10          MR. RONA:  Okay.  Your Honor, can I just have one

11  quick moment?

12          THE COURT:  Yeah, of course.

13          MR. RONA:  Thank you.

14      Q.   Dr. Freer, is that the decision of Judge Hoffman?

15  A.   I believe so, yes.

16      Q.   Okay.  And this is something you reviewed?

17  A.   Yes.

18      Q.   Okay.  And you read the whole opinion; is that

19  right?

20  A.   Yes.

21      Q.   Okay.  All the way to the last page?

22  A.   No, not particularly recently, but a while ago, yes.

23      Q.   Okay.  So let's go to the last -- let's go to the

24  second-to-last page, page 39 of the PDF, where it says

25  conclusion.  Okay.  And the conclusion was that the trustee

**DR. CAMERON FREER - Cross**

16

1   has not shown by a preponderance of the evidence the

2   reliability of his expert's opinion as to the selection and

3   application of his method for aggregating user accounts to

4   determine in these adversary proceedings, the identities and

5   gains of the net winners in the Telexfree scheme.  Do you see

6   that?

7   A.    I do.

8       Q.    Okay.  Do you recall reading that conclusion?

9   A.    Yes.  I do, yes.

10      Q.    Okay.  And then if you could go down to the last

11  page.  There's a footnote at the bottom.  Do you see that

12  footnote?

13  A.    I do, yes.

14      Q.    Okay.  And the -- Judge Hoffman writes, "The

15  defendants also raise arguments beyond simply addressing the

16  reliability of Mr. Martin's selection and application of an

17  aggregation methodology, including arguments that relate to

18  Mr. Martin's assumptions and decisions after the aggregation

19  process was complete when he set out to calculate the gains

20  and losses (net equity of each alleged participant).  Having

21  determined the reliability of Mr. Martin's aggregation

22  methodology has not been established and thus his expert

23  opinion cannot be admitted, it is unnecessary to address the

24  defendants additional arguments which they may choose to raise

25  in the future, if appropriate."

**DR. CAMERON FREER - Cross**

17

1    Do you see that?

2    A.    I do, yes.

3    Q.    Okay.  So does this -- is this consistent with your

4    understanding that Judge Hoffman approved the net equity

5    calculations as implemented by Huron?

6    A.    Yes.  My understanding is that this is saying there was

7    whatever earlier approval or not, in fact, earlier court

8    approval of the formula, and that there's simply no comment on

9    that in this opinion because it was not necessary to comment

10   on that, having made a determination about the rest of the

11   case.

12   Q.    Okay.  That's your interpretation of that footnote?

13   A.    Yes.  I believe that's what he's saying.  But having

14   determined the reliability, it is unnecessary to address.  I

15   believe it is not addressed here.

16   Q.    Okay.  Now, Mr. Lynne mentioned your -- your

17   ten-step process.  If I could go to -- we have it separately

18   marked.  I'll go with our marking, D005.  It's your expert

19   report, Dr. Freer.  Do you want a hard copy of that in front

20   of you?

21   A.    Yes, or I can get it from the other binder.

22   Q.    Okay.  Oh, actually, if you have it in a

23   different --

24   A.    I have it in the --

25   Q.    Okay.

**DR. CAMERON FREER - Cross**

18

1   A.   Yes, I have it here.

2           MR. RONA:  Okay.   If I could have Mr. Duran go to

3   PDF page 48 of Dr. Freer's expert report.

4       Q.   And I'll tell you what page number of the document

5   it is.  It's paragraph 120.  It's your -- it's the chart of

6   your ten steps.

7   A.   Okay.

8       Q.   Do you have that in front of you?

9   A.   I do, yes.

10      Q.   If we could scroll down to step nine.  Step nine was

11  when you when your analysis resulted in clusters of user

12  accounts.  Is that correct?

13  A.   Correct.

14      Q.   Okay.  You could have stopped at step nine.  Isn't

15  that right?

16  A.   I'm not sure you mean could have.  I was asked to do a

17  step ten, and so I did.  If I had been asked to stop at that

18  point, it would have been possible.  Yes.

19      Q.   Okay.  Who asked you to do step ten?

20  A.   Trustee's counsel.

21      Q.   Okay.  And did you indicate that if you stopped at

22  step nine, somebody else could do step ten at a later date?

23  A.   Did I indicate that in the report?

24      Q.   Or anywhere in your discussions with the trustee.

25  A.   I don't recall specifically whether we discussed it or

**DR. CAMERON FREER - Cross**

19

1    not.  It certainly is the case, as I testified yesterday, that

2    anybody could take the output from the methodology at step

3    nine and tabulate the numbers.  That doesn't require a

4    particular expertise.

5         Q.   Okay.  Well, that's my point.  You could have

6    stopped at step nine and somebody else could have done step

7    ten.  Is that right?

8    A.   It would have been possible.  But your earlier question

9    was whether I testified to such in here, and I don't recall

10   having done so.

11        Q.   Well, the reason -- is the reason that you pulled in

12   net equity is because you needed to identify net winners?

13   A.   Yes.  I believe that's why the trustee asked me to do

14   that.

15        Q.   Okay.  And so without reliance on Huron's net equity

16   calculations, you're not able to identify net winners.  Isn't

17   that right?

18   A.   I wouldn't say reliance on the calculation per se.  It's

19   only the number that I need, the final output.

20        Q.   Well, you agree that you adopted the calculations

21   without any real investigation.  Is that right?

22   A.   I'm not sure what you mean by adopted.  I took numbers

23   and I added them.  I was in no way commenting on the process

24   by which they were created.

25        Q.   Right.  The chart that you made shows there's an

**DR. CAMERON FREER - Cross**

20

1   orange balloon and then it says net equity.  That's -- that

2   symbolizes net equity that you did not calculate being brought

3   into your tabulation, correct?

4   A.   Correct.  That's a column of numbers is not the process

5   by which they were created.

6        Q.   And you did not do any review or investigation of

7   those calculations.  Isn't that right?

8   A.   No.  I mean, I believe that at some point I was aware of

9   what went into it.  And it seemed generally consistent with

10  what I had seen in the data, but I didn't investigate in any

11  detail.

12       Q.   Okay.  Staying on your report --

13            MR. RONA:  If I could have Mr. Duran go to page 7 of

14  the PDF.  And I'll tell you the paragraph number in a second.

15  If you could scroll down.  Actually, Mr. Duran, if you could

16  go to paragraph 22.  I thought that was page 7 of the PDF, but

17  maybe I'm wrong.

18            THE WITNESS:  It's page 7 as numbered.

19       Q.   Okay.  So page 7 as numbered, paragraph 22.  You

20  write the dimensions relevant to data quality include

21  completeness, how often the field values are present versus

22  missing, consistency, how consistent the values used for

23  matching are, accessibility, inclusion of different kinds of

24  nonoverlapping fields such as name, address, phone, email, et

25  cetera, and believability, how credible or plausible the

**DR. CAMERON FREER - Cross**

21

1    actual values are.  Do you see that?

2    A.    I do, yes.

3        Q.   Okay.  And if Mr. Duran could scroll down, there's

4    footnote 8.  And you got those from section 3.1 of the

5    Christen book on data matching?

6    A.   Got those -- I mean, they -- these concepts appear

7    elsewhere.  But yes, I'm citing that particular reference and

8    they use those terms there.

9        Q.   Okay.  You're citing to this book.  Is that right?

10   A.   Yes, that's correct.

11       Q.   Okay.  And if you go to section 3.1 --

12   A.   Was there a copy here?

13           MR. RONA:  Well, Your Honor, may I approach with my

14   copy?

15           THE COURT:  Of course.

16           MR. RONA:  And I will be offering this even though I

17   bought on Amazon to as Exhibit 54.

18           THE WITNESS:  Actually, there is a copy here.

19       Q.   So if you could go to page -- chapter 3, page 39.

20           THE COURT:  Dr. Freer, do you know what exhibit

21   number you're looking at?  Just to make a record of it.

22           THE WITNESS:  This is 17, I believe.  Oh, no, sorry.

23   This is 17 for Plaintiff.

24           THE COURT:  Okay.  Yes, I see that.

25       Q.   Okay.  Christen has references to the factors that

**DR. CAMERON FREER - Cross**

22

1   you mentioned, correct, from Section 3.1?

2   A.   References?

3       Q.   Well, he --

4   A.   I don't see any citations in those.

5       Q.   Okay.  But you mentioned completeness,

6   accessibility, consistency, and believability.  And those are

7   referenced in 3.1, correct?

8   A.   Correct.

9       Q.   But there's also other factors, right?

10  A.   Correct.

11      Q.   And the first factor is accuracy.  Is that right?

12  A.   That's the first one he listed.  Yes.

13      Q.   Okay.  And you don't list accuracy in your report,

14  correct?

15  A.   Not in the section that you quoted, no.

16      Q.   Well, in anywhere in your report, do you cite to

17  Christen referring to the first factor being accuracy?

18  A.   I don't believe that paragraph, but I thought your

19  earlier question was whether I refer to accuracy throughout

20  the report which I believe I do somewhere, but I would have to

21  search.

22      Q.   Well, when you discussed the factors or the

23  dimensions relevant to data quality in your report, do you

24  ever list accuracy?

25  A.   I can track it if you'd like.

**DR. CAMERON FREER - Cross**

23

1      Q.   Sure.  And may I suggest that you go to paragraph 88

2   of your report?  That's page 24 of the PDF.

3   A.   Paragraph 88.  Oh, sorry.  This is the reply which is

4   actually talking about a similar thing but --

5      Q.   Okay.  Well, I'm talking about your original report.

6   Paragraph 88.

7   A.   Okay.

8      Q.   Okay.  And you mentioned those facts -- those

9   dimensions again.  Isn't that right?

10  A.   That's right.

11     Q.   Okay.  And again, no mention of accuracy?

12  A.   Yes.  That doesn't allow me to determine where else in

13  the reporter referred accuracy as you previously asked.

14     Q.   Okay.

15  A.   I'd imagine it's not worth the time for me to look

16  through the entire report now to see where I refer to it.

17  A.   Well, isn't accuracy the first dimension because it's

18  arguably the most important dimension?

19  A.   No.  And I believe if you refer to the part of the

20  Christen book that I referred to in my reply, you see that

21  Christen was quite clear that he's referring at this point not

22  just to input qualities that are relevant as I am in the part

23  that you quoted to determining which columns are using -- what

24  is using but also about the overall process.  And in fact,

25  he's quite clear, you can quote from a few paragraphs later,

**DR. CAMERON FREER - Cross**

24

1  where he talks about how methods often work well in the

2  presence of more limited accuracy on input and nevertheless

3  achieve high accuracy on output, as I've repeatedly

4  demonstrated.  That's how he understands the concept.

5  It's specifically because data is not perfectly accurate, as

6  he says, that one needs to use these various methods.  So he's

7  not talking about what one initially looks at in the dataset

8  to determine quality but rather the output.

9      Q.   Okay.  Well, in a case where record linkage is being

10  done to assign liability to individuals, isn't accuracy of

11  vital dimension to consider?

12  A.   In the output.

13      Q.   Well, in the -- throughout the whole process?

14  A.   Not necessarily.  As I've just explained it and as

15  Christen explains, I could quote from that page if you would

16  like, I believe it's one page later --

17      Q.   Well, my question was, is accuracy  -- isn't

18  accuracy a vital factor?

19  A.   No, not in the input.

20          MR. RONA:  Okay.

21          MR. LYNNE:  All right.  Excuse me, Your Honor.  Would

22  the witness be permitted to read into the record the section

23  of the book that he is referring to?  He was attempting to do

24  so.

25          THE COURT:  You can save that for redirect, Attorney

25

1  Lynne.

2          MR. LYNNE:  Thank you.

3          MR. RONA:  Thank you, Your Honor.

4     Q.   Another factor that was not mentioned in your

5  original report was timeliness.  What is timeliness?

6     Q.   According to Christen?

7  A.   According to -- well, according to Christen or according

8  to you.

9     Q.   It's generally about the time period in which the

10 data was created.

11         S2:  Okay.  And when was Telexfree data created?

12 A.   My understanding is roughly between 2012 and 2014.

13    Q.   Okay.  So that was roughly give or take nine years

14 ago?

15 A.   From now, not from when I was doing the work.

16    Q.   Okay.  But from now, roughly nine years ago?

17 A.   Yes.

18    Q.   Okay.   And so a dimension that Kristin recommends

19 is considering how old the data might be because people move,

20 people change, email addresses, people change phone numbers.

21 Isn't that right?

22 A.   No, I don't think so.  He talks about whether the data

23 has been recorded at the same time or not, which in this case

24 is a two-year window or actually less than that I believe, not

25 about how old it is per se.

**DR. CAMERON FREER - Cross**

26

1        Q.    Well, isn't age of data an issue?

2   A.    Not that I believe he's talking about here.

3        Q.    Okay.   But how about in the field of data linkage?

4   Isn't age of data an issue?

5   A.    It of course entirely depends on the circumstance.   Here

6   the relevant thing is where the People were at the time which

7   is what the data represents.   Obviously, the data is not going

8   to say where they're living now, but that's a different issue.

9        Q.    All right.   One of the dimensions you did consider

10  was believability.   Is that right?

11  A.    Yes.

12       Q.    Okay.   And you found the data of Telexfree on the

13  whole believable.   Isn't that right?

14  A.    Yes.

15       Q.    Okay.   And that that wasn't in any way changed by

16  the entries of non-names, numbers in place of names, or things

17  that appeared fictitious like Mickey Mouse?   That didn't

18  affect your assessment of believability?

19  A.    No.   Of course it did.   That's the point.   Assessing the

20  believability involves taking into account how often those

21  things that you described occur and determining to what extent

22  that occurs.   It's precisely because of the small amount of

23  not believable data that one can say that it's ninety-eight

24  percent believable, ninety-seven, ninety-nine, right?   It's

25  because there is that one or two percent of nonbelievable in

27

1  there.

2      Q.   And your assessment of the percentage of

3  believability is based on the fact that if a name is not

4  Mickey Mouse or not Shakira, that you're going to take it at

5  face value.  Isn't that right?

6  A.   I'm not sure what you mean specifically, but not Mickey

7  Mouse.  The more typical situation was not something like

8  Mickey Mouse but rather what I described as keyboard mashing

9  of the sort that you see in the examples that I considered and

10  estimated accurately with a statistically valid sample, how

11  often it occurred.  There's an extraordinarily tiny portion of

12  things like Mickey Mouse.

13      Q.   Well, you were aware in Telexfree that people could

14  enter information, including names that weren't their own.

15  Isn't that right?

16  A.   In the same sense that --

17          MR. LYNNE:  I'm sorry.  I just had to unmute.  Calls

18  for speculation, foundation.

19          THE COURT:  Overruled.  Do you know if people could

20  enter whatever name they wanted?

21          THE WITNESS:  My understanding is that people type

22  their name into the field requesting name.  and as generally

23  on internet forms, that sort of thing is not especially

24  checked at the time of entry.  No.  My understanding is that

25  there were some automated checks perhaps to make things

**DR. CAMERON FREER - Cross**

28

1    like -- well, certain fields, I believe, were required to be

2    entered and the form would not be accepted if nothing was

3    entered for those fields.  I don't recall specifically if name

4    was such one.  But you can get a sense of that from how often

5    it's empty, which is vanishingly small.  So it's plausible

6    that name was required to be nonempty.

7            For email addresses and things like that, pretty

8    clearly they're not always validly formatted, but there may

9    have been some automated validation for format on that and

10   similarly for other fields.  But you can generally get a sense

11   of which were required based on how often they're empty, I

12   believe.

13       Q.   Based on your investigation, you're aware that there

14   was no system of validation for name.  Isn't that right?

15   A.   I'm not aware of specifically a system, but I don't have

16   full knowledge of the entire process by which the server was

17   set up enough to definitively say that there was no process.

18   For example, I believe there may have been a process on the

19   server for some fields like email.  I don't know if there was

20   no process or a more minimal or substantial one on the name

21   side.

22       Q.   Well, wouldn't that have been something important to

23   know to get to the bottom of?

24   A.   No.  Having determined that the name was of more than

25   adequate quality in its own right, that's sufficient for data

**DR. CAMERON FREER - Cross**

29

1  scientists to continue with the aggregation task.

2      Q.    If we can go to paragraph 5 of your report, which is

3  page 2 of the PDF.  You wrote that -- oh, I'll wait till you

4  have it.

5  A.    Okay.  Yep.

6      Q.    Okay.  You wrote that it was common practice for

7  recruits to use their own name while using the contact

8  information, email address, phone number, street address, and

9  other fields of other recruits or for family members to share

10  the same contact information or for a business and an

11  individual to share the same contact information.  Do you see

12  that?

13  A.    I do.

14      Q.    Okay.  What was the basis for that understanding?

15  A.    Generally, when I was told by the trustee about the case

16  and also a few other sources.  I believe in my reply I provide

17  extensive evidence for this because you would raise it in the

18  rebuttal.

19      Q.    Okay.  Well, did your sources indicate that in

20  addition to maybe the scenario that you describe a, user

21  entering in their name but someone else is contact

22  information, that the reverse could be true?  Someone could

23  use someone else's name, but use their contact information.

24  A.    Anything is possible, but I don't believe I found

25  evidence for that specifically.

**DR. CAMERON FREER - Cross**

30

1      Q.   Okay.  Well, did you look for evidence of that?

2   A.    Yes, in the same way that I looked for and found

3   evidence for these claims.  This is the general scenario that

4   I was told.  And there does seem to be evidence backing these

5   up.  All manner of things can and do occur in eleven million

6   records.  I'm sure that what you described occurred at least

7   once, but -- or, you know, not sure, but seems highly likely.

8   But this is the scenario that I was aware of being most

9   common.

10      Q.   Okay.  And you didn't talk to any participants, is

11   that right?

12   A.    No.  I was not instructed to.  And it didn't seem

13   appropriate nor was it necessary for this kind of work.

14      Q.   Okay.  Did you watch any videos, Telexfree training

15   videos?

16   A.   Yes.  I believe there's one that I referred to at some

17   point on YouTube that Jean Louis Sorondo had put to me.

18          MR. RONA:  Okay.  I'd like to, with the Court

19   permission, play a vide.  And I'm not going to play the whole

20   thing.  It would be two clips, a minute-fifty and a minute

21   twenty-five seconds.

22          THE COURT:  Okay.

23          MR. RONA:  And I want to play the first clip up until

24   the one minute, fifty-second mark and then just ask --

25   actually, why don't we play the first thirty seconds and ask

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 31 of 206
**DR. CAMERON FREER - Cross**

31

1  the witness if he's seen this video?

2      (Video played at 10:49 a.m., ending at 10:50 a.m.)

3          MR. RONA:  Okay.  Can we pause there?  Okay.

4      Q.  First, Dr. Freer, do you recall if this is one of

5  the videos you saw?

6  A.  I'm honestly not sure.  The beginning is definitely

7  different from anything that I've seen, but this is plausibly

8  the same or similar to the one that I did see in this part.  I

9  provided the YouTube URL.  It's been a while since I looked at

10  it, but it definitely didn't begin like that one.

11      Q.  And there's a reference to the promoter having a

12  page.  Do you know what that's referring to?

13  A.  Not in any detail.  I've heard of the term, but I don't

14  know the details.

15      Q.  And are you aware that on occasion promoters

16  actually sat with customers in order to fill in information,

17  or do you have any awareness of that?

18  A.  In general terms I've heard of something like that, but

19  again, I don't know any details.

20          MR. RONA:  Okay.  If we could just keep playing until

21  again, the one minute, fifty-second mark.

22      (Video played at 10:51 a.m., ending at 10:52 a.m.)

23          MR. RONA:  Okay.  You can pause there.  Okay.

24      Q.  Okay.  Have you seen a page like that, the form for

25  data entry?

**DR. CAMERON FREER - Cross**

32

1  A.   There was some form in the video that I saw.  Again, I'm

2  not totally sure if it's identical or different to this.

3       Q.   Okay.  If I could have Mr. Duran advance to two

4  minute fifty seconds and just play until 4:15.

5       (Video played at 10:52 a.m., ending at 10:54 a.m.)

6       Q.

7           So the first question is, did you notice, Dr. Freer,

8  that there was the potential for autocomplete in this on this

9  form?

10 A.   Not specifically, but that's common in many web browsers.

11      Q.   Okay.  And did you take into consideration that data

12 could be entered -- inaccurate data could be entered via

13 autocomplete in this case?

14 A.   I took into consideration all manner of possible errors

15 in data.  That's part of the point of cleaning and the other

16 methods.

17      Q.   Okay.  And do you recall seeing training videos that

18 that suggested that only consideration for name is in the

19 event that you wanted to pay by credit card?

20 A.   I don't believe I've seen that.  Certainly this one is

21 saying otherwise.  It says enter your name here.

22      Q.   Okay.  Well, did you hear the video also say

23 whatever name you enter?

24 A.   I believe it said whatever name you enter, this will be

25 the default on the credit card screen, presumably something

**DR. CAMERON FREER - Cross**

33

1    that could be changed.  But it sounded like they were saying

2    several times enter your name here.

3         Q.   Okay.  And do you know what percentage of accounts

4    paid by credit card?

5    A.   Not off the top of my head, no.

6         Q.   Okay.  Do you know if it's an exceedingly small

7    number?

8    A.   No, I don't know.

9         Q.   Okay.  Did you look at -- in trying to validate

10   Telexfree data, did you go look at the credit card transaction

11   data to see whether the names on that data matched the names

12   on the accounts?

13   A.   No.  As I described yesterday, I looked at the bonus

14   transparency and invoice table to the extent to determine that

15   they were not helpful for determining identity.  My

16   understanding is that it's entirely possible for somebody to

17   create an account of their own for any number of services,

18   Telexfree or otherwise, and to pay with a credit card with

19   someone else's name.  And that's generally acceptable as long

20   as the contact information on the credit card is correct,

21   possibly different from their own.  And so therefore, knowing

22   that there were a different name or the same name on the

23   credit card wouldn't tell me one way or the other the identity

24   of the account itself.

25        Q.   Did you review in this case the affidavit of Lizette

**DR. CAMERON FREER - Cross**

34

1  Bulan?

2  A.   I believe so.

3       Q.   So.  And are you aware that Lizette Bulan said that

4  she didn't -- she was not a Telexfree participant?

5  A.   I believe she said that, yes.

6       Q.   Okay.  And does that suggest that somebody else

7  entered her name?

8            MR. LYNNE:  I'm sorry.  Calls for speculation.

9            THE COURT:  Sustained.

10      Q.   Well, is -- based on what you know about the

11  Telexfree data entry system, would it be possible for someone

12  other than Lizette Bulan to enter Lizette Bulan?

13           MR. LYNNE:  Calls for speculation.

14           THE COURT:  Sustained.  That's an argument you can

15  make to me.

16      Q.   Okay.  Incidentally, you indicated yesterday that

17  you checked email addresses for formatting.  Isn't that right?

18  A.   Yes.

19      Q.   To make sure they were validly formatted?

20  A.   Correct.

21      Q.   Okay.  But you did not check any of the emails to

22  make sure that they were either ever valid or currently valid.

23  Correct?

24  A.   Not entirely.  But as I described, there were other

25  things that I did beyond the formatting; for example, seeing

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 35 of 206
**DR. CAMERON FREER - Cross**

35

1   what percentage are Gmail and Hotmail and so on.  My

2   understanding is that once you know that you have a string

3   followed by @gmail, there's essentially nothing you can do

4   other than email them and hope to get a response.  It's not

5   generally possible to check that sort of thing.  However, at

6   the domain level it is, and I did check that.

7       Q.   kay.  Well, do you know that the trustee has on

8   occasion sent Telexfree participants emails?

9   A.   Not specifically, though that would make sense.

10      Q.   And that because of the volume, the Trustee uses

11  some sort of service that does this on a mass basis?

12  A.   I haven't heard of that, but that seems plausible.  Sure.

13      Q.   Okay.  Did you ever ask to see the reports from any

14  email service as to which emails came back as either

15  undeliverable or --

16  A.   No, it did not.  No, it didn't seem relevant to the

17  aggregation process.  The data was sufficiently high quality

18  to do the aggregation whether or not what you said happened.

19      Q.   Okay.  Incidentally, you said you've reviewed the

20  tables.  And the tables you're referring to are the -- I'll

21  call it the Telexfree data, right, the SIG data system?

22  A.   Which are you calling that?

23      Q.   Well, you referred to various tables:  the bonus

24  table, the transfer table, the rep table, and the account

25  summary table.  Those are the Telexfree data tables, correct?

**DR. CAMERON FREER - Cross**

36

1    A.    No.   The rep ID summary was not from Telexfree.   Sorry.

2    That was what was provided to me for step 10.

3         Q.   Okay.   By Huron?

4    A.   Sorry?

5         Q.   Sorry.   That was provided to you by Huron?

6    A.   Yes.

7         Q.   Okay.   So -- but that's the -- that's the data that

8    you reviewed, correct?

9    A.   Yes.

10        Q.   Okay.   You didn't pull in any external sources of

11   data, correct?

12   A.   No.   I determined after looking at the what you're

13   calling the Telexfree data that that was more than sufficient

14   to carry out the data aggregation task in the standard

15   appropriate way.

16        Q.   Okay.   And you didn't ask the trustee if the trustee

17   had obtained via subpoena any bank data related to Telexfree

18   transactions that might help identify participants?

19   A.   No, I did not ask.

20        Q.   Okay.   Are you familiar with E-wallet?

21   A.   I've heard the term before though I don't recall much.

22        Q.   Okay.   Are you aware that people could use --

23   Telexfree users could withdraw money from Telexfree through a

24   third-party service that was referred to as E-wallet that was

25   part of their web page?

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 37 of 206
DR. CAMERON FREER - Cross

37

1   A.    believe you told me that during my deposition, but I

2   don't think I've encountered it in any other context.

3        Q.   Okay.  So I take it then that you never asked to see

4   whether E-wallet transaction data could help identify

5   participants?

6   A.    No.  Again, I determined that the initial Telexfree

7   dataset was more than sufficient for the aggregation process

8   to be accurate.

9        Q.   Some number, ten to sixteen percent of transactions,

10  were directly with Telexfree.  Is that right?

11  A.    I don't know.  If you tell me, that seems plausible.

12       Q.   Well, are you aware that that within the data

13  there's transactions that are referred to as triangular

14  transactions, but there's also transactions between a

15  participant and Telexfree itself?

16  A.    Yes, I'm aware of the concept, but I don't know the

17  percentage.

18       Q.   Okay.  And but those transactions could involve

19  checks being sent to Telexfree?

20  A.    I don't know specifically, but that seems plausible.

21       Q.   Okay.  Did you ever ask to see check data or any

22  other financial transaction data involving Telexfree to help

23  pull in more data that could help identify participants?

24  A.    No, for two reasons.  As I said, 1, the data had was

25  sufficient.  2, that kind of information doesn't necessarily

**DR. CAMERON FREER - Cross**

38

1    identify the participant as opposed to talk about who paid

2    what.

3         Q.   Okay.  You're familiar with the EPOC system?

4    A.   Not in any detail, but I've heard the term.

5         Q.   Okay.  EPOC was a web-based portal through which

6    participants could file proofs of claim.  Is that your

7    understanding?

8    A.    Yes, I believe so.

9         Q.   Okay.  And do you have any awareness of the fact

10   that some claims were denied by the trustee, because,

11   according to the Huron analysis, that person was a net winner?

12   A.   I don't know the details of what was approved or denied,

13   but if you told me that's true, that seems plausible.

14        Q.   Okay.  And did you ask to see any user-entered data

15   with respect to any EPOC submission to see if it helped

16   identify participants?

17   A.   No.  And for an additional reason beyond what I earlier

18   said which is that that sample is extremely biased in various

19   ways based on all the different incentives.  And as part of

20   not putting my finger on the scale of the aggregation

21   methodology, it was important that I not use a dataset of that

22   sort.

23        Q.   Okay.  Standing on your report, if we could go to

24   paragraph 89 and 90.  And this is on page 24 of the PDF.  And

25   I apologize.  My numbers are wrong.  But okay.  You wrote in

**DR. CAMERON FREER - Cross**

39

1   typical -- do you have it in front of you, paragraph 88?

2   A.   Yes.

3        Q.   Okay.

4   A.   89.

5        Q.   You wrote in paragraph 89, "In a typical user

6   account dataset, email addresses and phone numbers are unique

7   to an individual.  However, this is often not the case in the

8   Telexfree dataset."  Do you see that?

9   A.   I do.

10       Q.   And then you wrote, "As described in paragraph 5, a

11   major source of complexity with the Telexfree dataset is the

12   prevalence of user accounts that contain different names but

13   the same email address, phone number, address, et cetera."  Do

14   you see that?

15   A.   I do.  Okay.

16       Q.   And then in paragraph 90 you wrote, "As a result,

17   the name field in the Telexfree dataset gains a special

18   meaning that it might not have in another dataset."  Do you

19   see that?

20   A.   I do.

21       Q.   Okay.  And what empirical work did you do to

22   determine that -- that the name gains a special meaning that

23   it might not have in a different dataset?

24   A.   I describe this extensively in my reply.  I can describe

25   about five things there, if you like.

**DR. CAMERON FREER - Cross**

40

1       Q.   Well, yes.  What empirical work did you do?

2   A.   So one instance is looking at the data matching

3   literature, including, for example, the Winkler quote from 95

4   that I discussed yesterday, how in in the data aggregation

5   literature, this is a survey of matching record linkage

6   referring to quite a few empirical datasets where they talk

7   about how it's important to distinguish nonmatches such as

8   husband-wife or brother-sister pairs that agree on address

9   information.  So this is on the basis of empirical datasets

10  that Winkler in a peer-reviewed study examined, seeing that

11  the circumstance that I describe here also occurs and is

12  important to deal with.

13      Q.   Okay.  Does that assume that the person entering the

14  name enters their own name?

15  A.   It doesn't assume it, no.

16      Q.   Well, is there any literature that you're aware of

17  that that talks about the problems of record linkage when you

18  don't know who entered in the data?

19  A.   Essentially all of it.  There's no assumptions in any of

20  this.  You're linking to data on the basis of what the data

21  says.

22      Q.   Well, when you were working for Remine, did you have

23  the problem of people saying that they owned houses when they

24  didn't?

25  A.   It depends on what you mean by people.  There were

**DR. CAMERON FREER - Cross**

41

1   certainly errors in deeds.  Yes.

2        Q.   Okay.  Well, we're there intentional errors in the

3   names of the owner, the record owner?

4   A.   It's difficult for me to say.  I don't know if somebody

5   working at the deed office did something maliciously.  I

6   assume most were honest mistakes as was presumably the case

7   for many of the typos in this dataset.  But it's impossible to

8   say in any particular case.

9        Q.   Well, I'm talking about aside from typos, are you --

10  do you have any ability to assess names to know who was the

11  person behind that data entry?

12  A.   Yes.  The aggregation methodology provides a huge amount

13  of indirect evidence for that by the way that it clusters the

14  accounts.

15       Q.   So when you cluster the accounts, you've concluded

16  that the person whose name appears in that cluster is the

17  person that entered that data?

18  A.   No.  Your earlier question was about is there any

19  evidence?  And certainly there is some evidence, in fact, a

20  great deal that's provided by the methodology.  That's

21  different from being one hundred percent confident about

22  anything.

23       Q.   Okay.  But before you run your aggregation, do you

24  have any ability to assess the name field to determine who

25  entered that data?

**DR. CAMERON FREER - Cross**

42

1  A.   There's all the techniques that I've described for

2  assessing when the data is more likely to be accurate than

3  not, for example, in assessing the ninety-five percent

4  accuracy and so on.  In any particular case, it's of course

5  impossible to be totally sure.  But that shed some light on

6  whether the data was likely entered accurately or not.

7       Q.   If we could go to paragraph 92.  You addressed the

8  Mickey Mouse issue here.  You wrote, "It is worth noting that

9  while it may turn out that a name is made up such as Mickey

10 Mouse, this itself is not a critical issue for data

11 aggregation."  Do you see that?

12 A.   I do.

13      Q.   Okay.  You wrote, "The relevant issue for

14 aggregation is whether the values in the field support the

15 matches, not whether or not the values in the field reflect

16 the true name."  Do you see that?

17 A.   Yes.

18      Q.   Okay.  That wasn't part of your assignment to figure

19 out the true name of the People that entered the data in

20 Telexfree.  Is that right?

21 A.   As I just explained, it's indirectly part insofar as the

22 clusters generally shed quite a lot of evidence in that.  But

23 I didn't do any private investigatory work, if that's what

24 you're asking.

25      Q.   You wrote in the last sentence, "In the best case

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document    Page 43 of 206
**DR. CAMERON FREER - Cross**

43

1   scenario, the true identity of the participant can at a later

2   time be ascertained from the other indicia.  In the worst case

3   scenario, the participant will never be identified, but their

4   records do not contaminate the rest of the aggregation."  Did

5   I read that correctly?

6   A.    I believe so.

7        Q.    Okay.  What later time were you referring to there?

8   A.    Any later time.  As one example, let's say the trustee

9   gets a cluster of accounts or me.  Let's say it has a

10  pseudonym systematically through the name field and it has a

11  consistent address, consistent phone number, email, and so on.

12  If any of those other bits of information are accurate, they

13  can potentially be contacted.  And it can be determined at

14  that later point that the name was a pseudonym.  The cluster

15  is still high quality.  If in fact all of the information is

16  unsuitable for contacting them still to the extent that it's a

17  coherent cluster, that's just -- you can't contact them, but

18  it doesn't necessarily mess up any of the rest of the

19  aggregation process.

20       Q.    Okay.  And that's -- what you describe, that's the

21  best case scenario.  Is that right?

22  A.    No.  This is already in a pretty minute portion where you

23  have a situation like Mickey Mouse to begin with.  The best

24  case scenario -- or in fact, the typical case scenario is

25  overwhelmingly like I showed yesterday in those ten accounts,

DR. CAMERON FREER - Cross

44

1   in each of those clusters, identical name, identical address,

2   and so on.  And I see no reason to believe that that's not

3   accurate.

4       Q.   Okay.  Let's turn to clustering.  You described

5   yesterday transitive closure.  Is that right?

6   A.   Yes.

7       Q.   And you would agree with me that Christen describes

8   transitive closure as a contradiction of --- in a sense --

9   A.   Not --

10      Q.   -- that --

11  A.   It's a concept in data science and throughout mathematics

12  and graph theory.  It's not a contradiction.

13      Q.   Well, doesn't Christen say that transitive closure

14  involves pairs that were not matched being conjoined?

15  A.   I don't think so.  I'm happy to look at a specific page,

16  if you'd like to, to explain it.

17      Q.   Well, do you -- do you disagree with that what I

18  said, that a pair not matched will be conjoined under

19  transitive closure?

20  A.   I don't even understand what you're talking about.  If

21  you've joined two records together via transitive closure,

22  they are a match.  That's what's being talked about.

23      Q.   Well, you yesterday described you had a slide that

24  had A, B, C and D.  Do you recall that?

25  A.   Yes.

**DR. CAMERON FREER - Cross**

45

1      Q.   Okay.  And you could have a situation where A is

2   paired to B and B is paired to C.  Is that right?

3   A.   Sure.

4      Q.   But A and C don't pair?

5   A.   No.  That's the whole point of the slide.  It is

6   impossible via any method to have a clustering in which A and

7   B occur in the same cluster as each other, B and C occur in

8   the same cluster of each other, and A and C do not.

9      Q.   Okay.  And so -- and that would be an example that I

10  just gave of a pair that was not matched being conjoined

11  because of transitive closure?

12  A.   No.  Once again, that pair is matched.  That's the whole

13  point.

14     Q.   So your view is that transitive closure provides the

15  match?

16  A.   No.  Or I think I don't understand your scenario in

17  enough to tell the comment.  Could you be more specific,

18  please.

19     Q.   Well, I thought I was specific.  A is matched to B?

20  A.   Uh-huh.

21     Q.   And B is matched to C.

22  A.   Okay.

23     Q.   Okay.  A is not matched to C.

24  A.   That's impossible in any clustering, period.

25     Q.   Well, how does -- how does A and C end up in the

**DR. CAMERON FREER - Cross**

46

1  same cluster if there's transitive closure?

2  A.   It can end up by any number of methods.  But if it ends

3  up there, it's there.  If it doesn't end up there, it's not

4  there.  But it's impossible to have that scenario at the same

5  time as A and B are in the same cluster each other and B and C

6  are -- that's just -- it's not transitive closure in any

7  complicated sense.  That's transitiveness of equality.  If the

8  cluster of this is the same as the cluster of that and the

9  cluster of that's the same as the cluster of the third thing,

10 then by transitivity of equality, the first cluster is the

11 same as the third cluster.  That's just a fact.

12      Q.   So your view is that by mere presence in a cluster,

13 everything is equal and therefore a match?

14 A.   I'm sorry.  I don't understand what you mean by

15 everything is equal.

16      Q.   Is your is it your view that the mere presence of

17 any item in a cluster suggests that it's matched to all the

18 other items in the cluster?

19 A.   That's definitional.  If that's what you mean by being in

20 a cluster, I don't see what you mean by my view.

21      Q.   Okay.  Okay.  Does transitive closure lead to

22 chaining?

23 A.   What do you mean by chaining?

24      Q.   Well, have you heard the term chaining?

25

**DR. CAMERON FREER - Cross**

47

1   A.   Yes, But the sense in which we were discussing transitive

2   closure a second ago doesn't seem particularly relevant.

3       Q.   All right.  Well, do you have Christen in front of

4   you, section 6.8?  And just let me know when you have it.

5   A.   Uh-huh.

6       Q.   I had to take my glasses off so I won't see.

7   A.   Okay, yep.  6.8.

8       Q.   So if you look at the second paragraph in section

9   6.8, it refers to transitive closure where two pair -- record

10  pairs -- and I don't want to do his notation, so I'm going to

11  skip it -- have been classified as matches, but one of the

12  pairs has been classified as a nonmatch -- do you see that?

13  A.   I see that, yes.

14      Q.   And it -- the next sentence says this contradicts

15  the intuition that if one of the records is considered to be a

16  match with the other record -- well, maybe I should have done

17  the notation.  But you agree that he says that that

18  contradicts intuition?

19  A.   Yes.  I also see now why we were at odds a moment ago

20  about match.  I was using match in the same way that I was in

21  the slides.  He's referring to before the match is formed, the

22  evidence in the form of match probability.  So what you're

23  saying makes more sense now.

24      Q.   Okay.  So when I say match, I mean something that

25  meets the threshold of -- in terms of weight.

DR. CAMERON FREER - Cross

48

1  A.   Yes, I see now.

2       Q.   Okay.  So that is a contradiction.  And that

3  contradiction can lead to chaining.  Isn't that right?

4  A.   By chaining, you're referring to the next paragraph?

5       Q.   Well, sure.  Let's get to that next paragraph he

6  writes, "The transitivity of matches can also lead to problems

7  in that 'chains or records' where individual pairs are

8  classified as matches are formed.  The records at the two ends

9  of a chain can, however, be quite different from each other,

10 and they would not be considered to correspond to a match."

11 Do you see that?

12 A.   Yes.

13      Q.   Okay.  Does that describe the problem of chaining?

14 A.   The problem in the sense of the challenge to be addressed

15 by choosing thresholds appropriately.  This is about the

16 tension I described yesterday between over-clustering and

17 under-clustering.  No one forces you to choose a particular

18 threshold.  Indeed, some thresholds will lead to chaining of

19 the sort, and that's why it's important to balance.

20      Q.   Okay.  If you go to the bottom of the page, there's

21 the last paragraph that starts, "within real world databases,

22 the problem of record chains being generated by a pairwise

23 classification technique seems to occur only rarely because

24 the space of all possible values in the different record

25 attributes is very large."  Do you see that?

**DR. CAMERON FREER - Cross**

49

1    A.    I do.

2         Q.    Okay.    What is space?

3    A.    I believe he's referring to -- for a given -- what he

4    calls attributes is what I was calling field or column.   And I

5    believe this is saying that if you pick a particular column

6    and you look at, for example, all eleven million values that

7    occur, there's a very wide range of values that occur among

8    those.

9         Q.    Okay.    And that was not the case uniformly in the

10   Telexfree dataset.   Isn't that right?

11   A.    What was not the case uniformly, that there was a large

12   number of values?

13        Q.    There was -- that there was a lot of space.

14   A.    The space is -- he's talking about the space on the

15   whole.   Among the eleven million values for any given field,

16   there was a very wide range for each of the fields, I believe.

17        Q.    But there was also a lot of repetition of field

18   values.   Isn't that right?

19   A.    It depends on the field.   For login name, there was none

20   because it was required to be unique.   Birthdays obviously

21   collide with the frequency that birthday -- or birth date.

22   Dates of birth collide with approximately the frequency that

23   one would expect as I investigated it.   It all depends on the

24   field.

25        Q.    I think you had said earlier that email addresses

**DR. CAMERON FREER - Cross**

50

1    and streets could be shared among different participants.

2    A.   Yes, but in terms of frequency, it's vanishingly low as

3    Christen is discussing.

4         Q.   All right.  If we go to paragraph 89 of your report,

5    you wrote , "In a typical user account dataset" --

6    A.   I'm sorry.  What paragraph?

7         Q.   Oh, sorry, 89.  It's under the heading special role

8    of the name field --

9    A.   Yes.

10        Q.   -- in the Telexfree dataset.  You wrote, "In a

11   typical user account dataset, email addresses and phone

12   numbers are unique to an individual.  However, this is often

13   not the case in the Telexfree dataset."  Is that right?

14   A.   That's right.

15        Q.   So would the -- did the Telexfree dataset present

16   issues that could result in chaining?

17   A.   As Christen described, it's always something that one has

18   to be aware of and manage appropriately.  Ideally, as is the

19   case with Telexfree, this is occurring to a minimal degree

20   after one's appropriately dealt with it.

21        Q.   Okay.  Let's go to Defense -- or D012 or D12.  And

22   this is a little hard to work with.  I apologize.

23             MR. RONA:  But first, if I could have Mr. Duran go to

24   the first page and just Zoom in so that we can see as best as

25   possible the names for the top half of that.  I think that's

51

1  good enough.  You can stop right there.

2       Q.   So this is -- I think I asked you yesterday if you'd

3  heard of Benjamin Argueta.

4  A.   Yes.

5       Q.   Okay.  And you had said that you recognize his name

6  from the litigation?

7  A.   Yes, I believe so.

8       Q.   Okay.

9  A.   And also one of the larger clusters.

10      Q.   Yeah.  He is the first, I believe, named defendant

11 in the 4006 action.  And you assigned him a cluster ID of

12 2522900.  Is that right?

13 A.   It's quite long.  I'm looking through to see the names,

14 but it does seem that the rep name is quite often exactly the

15 string measurement Argueta, yes.

16      Q.   Okay.  And then if you scroll down, Mr. Duran a

17 little bit, it looks like he uses different email addresses,

18 but one of them is TelexfreeBen@gmail.com.

19 A.   I wouldn't presume about what he uses, but that does

20 appear in this cluster.

21      Q.   Right.  You don't know that anyone used any email.

22 It's just that email address is there?  Is that right?

23 A.   The email address is in this cluster.  Yes.

24      MR. RONA:  Okay.  And if I could have Mr. Duran go to

25 page 13 of the PDF.

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 52 of 206
DR. CAMERON FREER - Cross

52

1      UNIDENTIFIED SPEAKER:  Excuse me, Mr. Freer.  It is

2  on the screen, if you would like.

3      THE WITNESS:  Oh, thank you.

4      MR. RONA:  Okay.

5      THE WITNESS:  Okay.

6      MR. LYNNE:  And if you could just scroll down.  Okay.

7  That's good right there.  The second to last row.  Oh, you

8  can't scroll anymore.  All right.  You have to stop right

9  there so I can identify the row.  Okay.

10      Q.   Four rows down from -- on the computer -- I guess

11  maybe five or six, there's Kenya Benjamin.  Do you see that?

12  A.   I do.

13      Q.   Okay.  And you've assigned that entry of Kenya

14  Benjamin to the Benjamin Argueta cluster, correct?

15  A.   I've assigned to this cluster that you're calling the

16  Benjamin Argueta Cluster.  It appears to be in this cluster,

17  yes.

18      Q.   Okay.  And it has a different -- it does not have

19  the TelexfreeBen email address, correct?

20  A.   That's correct.

21      MR. RONA:  Okay.  Mr. Duran, if you could go to page

22  20.  Okay.  Don't scroll -- you had it.  Okay.

23      Q.   There's a Kenya Benjamin three rows from the bottom.

24  Do you see that?

25  A.   I do.

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 53 of 206
DR. CAMERON FREER - Cross

53

1       Q.   Okay.  And that, again, has a different email
2  address?
3  A.   Different than what?
4       Q.   Than the Telexfree --
5  A.   Yes.
6       Q.   -- Ben@gmail.com?
7  A.   Yes, that's right.
8            MR. RONA:  Okay.  And I'm not going to do all of
9  them.  But if you could go to page 36, Mr. Duran.  And just
10  scroll down towards the bottom.  Actually, maybe there's
11  another -- you're on page 35.  Could you go to 36?
12            MR. DURAN:  Oh, I'm sorry.
13            MR. RONA:  Okay.  Stop right there.
14       Q.   There's two more Kenya Benjamins.  Do you see that?
15  A.   I see a Kenya Benjamin and a Kenya Venjamin.  Yes.
16       Q.   Oh, actually, you're right.  It's spelled
17  differently.  And then there's -- the last few entries on that
18  page are Benjamin Morales.  Do you see that?
19  A.   Yes.
20       Q.   Okay.  And that has a different email address that
21  ends in Hotmail?
22  A.   Yes.
23            MR. RONA:  Okay.  And Mr. Duran, if you could go to
24  the next page.  We have more Benjamin Moraleses.  And then
25  near the bottom, we also have Benjamin Olaiya (ph.).  Do you

**DR. CAMERON FREER - Cross**

54

1  see that?

2  A.    I do.

3      Q.    And that has yet a different email address?

4  A.    Different than we've been discussing today, yes.

5          MR. RONA:   Okay.  And then if you could go to just

6  the last page, Mr. Duran, in the middle.

7          MR. DURAN:   I apologize.

8          MR. RONA:   The last page.   Okay.

9      Q.    In addition to Kenya Venjamin, there's also a

10  Benjamin Haley.  Do you see that?

11  A.    I see that, yes.

12      Q.    Okay.  So this would be an example of chaining,

13  would it not?

14  A.    I couldn't say without seeing more about how the data

15  came about.  Chaining that that's being referred to in the

16  book is a very specific phenomenon.  I agree that these small

17  number of examples within what appears to be something like a

18  2000 record cluster may be examples of over clustering

19  consistent with the two percent error rate.  How specifically

20  they came about would require more investigation.

21      Q.    Well, the two percent error rate that was calculated

22  internally to your aggregation methodology, correct?

23  A.    Internally, using the match probabilities which are well

24  aware of the fact that the examples you've pointed out are

25  less good of a fit.  They're therefore accounted for in that

**DR. CAMERON FREER - Cross**

55

1    two percent.  That's what it means for the model to know --

2    like it's bouncing the over and under clustering.  If you

3    change the parameters for that, you might end up with more

4    under-clustering as opposed to over-clustering.  In the course

5    of balancing, it's well aware of the fact that these are less

6    good fit than the others.

7         Q.   Okay.  But it's an estimation of the error rate that

8    the system itself generates, correct?

9    A.   Correct.

10        Q.   Okay.  You didn't do any retrospective review or get

11   any peer review to calculate an actual error rate, correct?

12   A.   I did do retrospective review in the form of the

13   statistically validly sampled clusters that I showed

14   yesterday, for example.  And those seem eminently consistent

15   with the error rates that I estimated.

16        Q.   Okay.  Other than that, you didn't do any systematic

17   analysis to calculate your own error rate?

18   A.   Other than that systematic analysis, I did not do any

19   other, no.

20        Q.   Okay.  So how many errors would this be?  Is this --

21   are you going by on an account-by-account basis or is it

22   cluster by cluster?

23   A.   It's linkage by linkage, as I described on those four

24   slides with true positive, true negative, false positive,

25   false negative.  That's what goes into those formulas.  So

**DR. CAMERON FREER - Cross**

1   it's on the basis of the possible pairs being matched.

2        Q.   Okay.  So as we get larger in the spectrum of net

3   equity, it's more likely that someone's going to have more

4   accounts.  Would you agree with that?

5   A.   That is what the summary table suggests.  Yes.

6        Q.   Okay.  So as someone gets more accounts, the

7   likelihood of an error increases?

8   A.   No, not the likelihood as a percentage necessarily.

9   Whether or not it does is an empirical question that one would

10  have to assess because larger clusters are presumably

11  unrepresentative in several ways.  But even if they were

12  representative as a percentage, it would therefore be the

13  same.  I agree that a small percentage times a larger number

14  is larger than that same small percentage times a smaller

15  number, if that's what you're asking.

16       Q.   Okay.  And then just pointing out that when you did

17  your analysis, did you look at the net equity of the

18  accounts -- the impact that over or under-clustering had on

19  net equity for your clusters?

20  A.   Not systematically.  The numbers do appear in some of the

21  tables for illustrative purposes.  But my understanding was

22  that it was important that the aggregation methodology

23  specifically be agnostic to the net equity and that it would

24  be putting my thumb on the scale or using an appropriate data

25  to form the clustering on the basis of where the money was.

**DR. CAMERON FREER - Cross**

57

1          Q.   And I think you had earlier said -- I want to make

2     sure that I don't misquote you, but I think you had said that

3     that under a best case scenario, the people could be contacted

4     via the contact information in a cluster.  Is that roughly

5     what you testified to earlier?

6     A.   I don't recall specifically what you're saying.

7          Q.   Well, you had said in a best case scenario, there

8     could be a later determination of who the participant is.

9     A.   Oh, in the paragraph that you were talking about earlier

10    from the report.  Yeah, something like that.

11         Q.   Okay.  And then I asked you what you meant by that.

12    And you said that there was -- you imagine a process by

13    whereby they would be contacted?

14    A.   It's not so much that I imagine a process in detail.

15    It's just that I'm talking about the shape of the data.  If

16    you have an address that's valid and an email that's valid and

17    phone number that's valid, even if there's typos or otherwise

18    inaccurate information in the name, I can imagine how one

19    might contact such a person.

20         Q.   Okay.  And do you -- how do you imagine -- or who do

21    you imagine is going to be contacted with respect to the

22    Benjamin Argueta cluster?  Do you have any ideas?

23    A.   Yes.  I mean --

24              MR. LYNNE:  Objection, Your Honor.  Objection, Your

25    Honor.  This is not his charge.

**DR. CAMERON FREER - Cross**

58

1              THE COURT:  I'll hear what you have to say.

2      Overruled.

3      A.   Yeah.  I mean, obviously, I don't know in detail what the

4      Trustee will do, but if you look at this, you've provided

5      forty pages which go on for page after page after page after

6      page with Benjamin Argueta being overwhelmingly the rep.  It

7      seems entirely plausible to me that Benjamin what I would be

8      contacted.  If you're asking it what email address, there

9      might be two email addresses.  Perhaps Benjamin Guacho (ph.)

10     and TelexfreeBen are each present 1,000 times.  It's hard to

11     tell without running summary statistics.  It might be that

12     those are the same address generally of 14 Illinois Avenue or

13     104 Broadway.

14          So it's entirely possible that there might be two

15     addresses, perhaps both residences or one past, one former

16     that might be contacted for Benjamin Argueta.  I think it's

17     pretty clear that it wouldn't make sense to contact Kenya

18     Venjamin in light of there being, what, three out of 2,000.

19          Q.   Okay.  And to the extent that you have an account

20     where -- accounts with different names but positive net equity

21     are associated under the system that you're imagining where

22     the trustee contacts the one with the preponderance of data,

23     the other -- what happens to the other name with positive net

24     equity?  Is that person just ignored?

25     A.    'm not sure what you mean about what happens to it.  I

**DR. CAMERON FREER - Cross**

59

1   mean, it's in -- it's in this list and they're not contacted

2   if the other person is contacted in their stead.

3       Q.   Let's go to Exhibit D039, just the first page.  And

4   if you could Zoom in to the upper quadrant.

5   A.   Sorry, 39?

6       Q.   39.

7       Q.   Do you have a copy of that, please?  This is, again,

8   the booklet that's missing between 24 and 46.

9           MR. RONA:  Your Honor, may I approach?

10          THE COURT:  Yes.

11          THE WITNESS:  Thank you.

12      Q.   I would say, Doctor Freer, I think your chances are

13  better with the computer screen, but we'll do our best to --

14  A.   How many pages is this?

15      Q.   it's only three pages.

16  A.   Okay.

17      Q.   I think it would be helpful for me to see the entire

18  context rather than just the snippet you're showing if I'm to

19  make any conclusions.

20  A.   Okay.  Well, if you want to take a moment, just let me

21  know when you're done looking at it.

22      Q.   Okay.  I only see two pages here.  There's a third?

23  Oh, I see a summary at the end.

24          THE COURT:  Attorney Rona, what are you calling this

25  exhibit?  Is there a title to it?

**DR. CAMERON FREER - Cross**

60

1        MR. RONA:   This is the -- this is actually Exhibit

2   13 from the Dennis report.

3        THE COURT:   Okay.

4        MR. RONA:   And it is a description of what he

5   called -- Mr. Dennis calls the Lopez and Carrero user account

6   detail.

7        THE COURT:   Thank you.

8    Q.   Okay.  Dr. Freer, have you looked at it

9   sufficiently?

10   A.   Yes.

11   Q.   Okay.  So this is cluster 119427 that you prepared?

12   A.   That appears correct.

13   Q.   Okay.  And it has a net equity that you tabulated

14   using Huron data of 327,000?

15   A.   That seems correct.

16   Q.   Okay.  And there are 140 user accounts that are

17   listed in that top box?

18   A.   Yes, that seems correct.

19        MR. RONA:   Okay.  And if I could have Mr. Duran

20   scroll now more to the right.  Saunter that way.  Can you go

21   to the right?

22   Q.   And we have net equity calculations on the right

23   hand column.  Do you see that?

24   A.   Calculations?  I see numbers.

25   Q.   Numbers.  Net equity numbers?

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 61 of 206
**DR. CAMERON FREER - Cross**

61

1   A.   Yes.

2          MR. RONA:   Okay.   And Mr. Duran, if you could just go

3   back to the middle.

4      Q.   And could you just read me the first three names

5   that you see?

6          MR. RONA:   Well, let me withdraw that question.   I

7      Q.   s the first name Alex de Carvallo Lopez?

8   A.   Yes, it appears so.

9      Q.   Okay.   And then is the next name that appears twice

10   Alex Lopez?

11   A.   Yes.

12      Q.   And then the name after that, not Niyal Lopez (ph.)?

13   A.   Yes.   And then the name after that John. A. Guerrero?

14   A.   Yes.

15      Q.   And then skipping down a few, is there an Elaine B.

16   Guerrero?

17   A.   Yes.

18          MR. RONA:   Okay.   Scroll down, Mr. Duran.

19      Q.   And then there's a number of Elaine Guerreros.   And

20   then that's good.   Then there's a Jacqueline Lopez (ph.).   Do

21   you see that?

22   A.   Yes.

23      Q.   And then Jacqueline Lopez Carrero?   It might be cut

24   off, but that's all I see.

25   A.   Yes.

Case 16-04006    Doc 493    Filed 10/19/23    Entered 10/19/23 13:11:55    Desc Main
Document        Page 62 of 206
DR. CAMERON FREER - Cross

62

1        Q.   Okay.  And then a Jean Guerrero (ph.)?

2   A.   Yes.

3        Q.   Okay.  And then there's some other permutations of

4   Jean Guerrero.  So who is the participant in this cluster?

5   A.   This cluster seems plausibly a very rare and highly

6   unrepresentative instance where there may be substantial

7   over-clustering in which case it's several participants in the

8   same cluster by the definition of over-clustering.  This is, I

9   expect, highly nonrepresentative.

10       I assume that you found this not via any statistically

11  valid sampling method but instead via some directed search.

12  And I would expect that there's a very small number of

13  clusters that appear like this in the total.

14       Q.   Okay.  And you were made aware of this cluster in

15  April of this year?

16  A.   That sounds about right.

17       Q.   Okay.  And have you taken any steps since then to

18  address the issue of having different names in this cluster?

19  A.   No.  My understanding is that it would be inappropriate

20  for me to put my thumb on the scale for any particular cluster

21  that you identified.  Furthermore, there's a cascading effect.

22  This is an instance of what I described as the balance between

23  over and under-clustering.  It's entirely possible that by

24  changing the parameters in a way that make this particular

25  cluster less likely to be over-clustered, that one creates

**DR. CAMERON FREER - Cross**

63

1  more under clustering elsewhere in the dataset.  So it's far

2  from a foregone conclusion that there's any systematic and

3  reliable way of changing the existing reliable methods so as

4  to achieve your goal here.

5      Q.   Okay.  Well, let me ask you about your error rate.

6  You have said before that it's an estimate, correct?

7  A.   Yes.

8      Q.   Okay.  And at no point have you consulted or brought

9  in external sources of data on either a sampling basis or a

10  systematic basis to try to verify whether your estimate of

11  error rate is, correct?  Is that right?

12  A.   Not external data, but as I said, the internal aspect is

13  well aware that the pairs in this cluster are a poor match.

14  If you look at what goes into those estimates, which first of

15  all they're not estimates in the sense that it's literally

16  using every single piece of pairwise data that the model has.

17  It's adding it up just like when I determined that

18  ninety-seven percent match the email format.  That's not

19  sampling.  That's the whole dataset.

20      So this is from the entire dataset.  It's an estimate in

21  the sense that it's using the match probabilities, which are

22  of course estimates in a different sense.  But the model is

23  well aware that the pairwise matches here are dramatically

24  worse than the typical one and therefore it counts for that

25  when it gives this match -- sorry, an overall over-clustering

**DR. CAMERON FREER - Cross**

64

1   measure.  I don't have it in front of me, but it surely way

2   higher than for the others.  And accordingly it's counted as a

3   demerit towards that two percent figure.

4       Q.   Okay.  Well, I asked this question before, but of

5   the 140 accounts that are here, how many errors does this

6   cluster represent according to your systems estimate?

7   A.   It's based on the number of pairwise linkages, like I

8   said.  So you would go through and determine how many pairs of

9   records here appear to be mismatched.  And it's that as a

10   fraction of the total linkages according to the formulas that

11   I described.

12       Q.   Okay.

13   A.   So for example, if you had one record that was

14   over-clustered out of place in a sea of a huge number of

15   records, that would count as a mismatch with every single one

16   of the other records.  But that would be a small portion of

17   the total number of pairs.

18      If you have two evenly balanced clusters that were over

19   clustered together, it's all of the pairwise matches between

20   them and not within those.  And that's how the calculation

21   would work.

22       Q.   Okay.  So this could, in your system, not be an

23   error.  Isn't that right?  This could be your --

24   A.   I don't think so.  As I just explained the --

25       Q.   -- your matching -- could I just finish my question?

**DR. CAMERON FREER - Cross**

1    A.    Sorry.

2         Q.    So this could be an example of your clustering

3    system working successfully?

4    A.    Could be.  Are you asking if I believe this to be of high

5    quality or if it's accounted for in the error rate to the

6    extent that it's not?

7    A.    Well, I'm asking you how you can tell whether this is --

8    are you able to tell which records are accounted for by the

9    error rate and which or not?

10        Q.    Not a hundred percent.  But as I described in the

11   slides assessing the match probability, you can get a pretty

12   good intuitive sense by looking at the extent to which the --

13   the names agree and so on.  And those examples that you've

14   pointed out where the names are really quite different, it's

15   obvious that the -- the fuzzy matching is going to assign a

16   low match probability between Nyal Lopez and John Carrero.

17   And accordingly, it seems to me highly plausible that the

18   methods assessment of its own error rate would count that

19   linkage also looking at the other fields being different as

20   something that accounts against itself in computing that

21   total.  That's why the error rate is two percent rather than

22   zero percent.

23        Q.    Okay.  On a percentage basis, have you estimated or

24   calculated how many net winners have errors in their clusters?

25   A.    No.  As I described, it seemed inappropriate to look at

**DR. CAMERON FREER - Cross**

66

1  the role of net winner versus net loser in assessing the

2  accuracy.  I simply computed the net winner and net loser at

3  the end after looking at the cluster quality.

4      Q.   Okay.  And I take it by the same reasoning that you

5  haven't determined on a dollar level how much net equity might

6  vary based on the -- what you say is the expected error rate

7  of your model?

8  A.   Not explicitly, no.

9      Q.   Okay.  And let's look at Exhibit D43.  This was

10  Exhibit 17 to the Dennis report.

11  A.   I'm sorry.  Which --

12      Q.   And if you could just -- I may need to help you find

13  that.

14  A.   Thank you.

15      Q.   This shows two clusters, does it not?

16  A.   How many pages?

17      Q.   Six pages.

18  A.   Yes, it appears to be two clusters.

19      Q.   Okay.  And the first one is 129528?

20  A.   Yes.

21      Q.   And it has five accounts?

22  A.   Yes.

23      Q.   And positive net equity, meaning this would be a net

24  winning cluster in your opinion?

25  A.   Correct.

**DR. CAMERON FREER - Cross**

67

1      Q.   Of 862,000 dollars and change?

2   A.   Yes.

3      Q.   Okay.  And then the second cluster is 128225.  Do

4   you see that?

5   A.   Yes.

6      Q.   And that one is negative, meaning this would be a

7   net loser of 363,000 dollars and change?

8   A.   Yes.

9      Q.   Okay.  And the second cluster has far more accounts

10   than the first.  Do you agree with that?

11   A.   Correct.

12         MR. RONA:  Okay.  And if I could have Mr. Duran just

13   scroll down a few arrows just to there.  That's good.  And

14   then scroll across so we can see more of the contact

15   information.  No, just to the middle.  Okay.

16      Q.   So the first cluster has the name Sann, S-A-N-N, or

17   Sann R.  Do you see that?

18   A.   I do.

19      Q.   Okay.  And then has an email sann@vicss.com?

20   A.   Yes.

21      Q.   And the only address that appears under rep end for

22   that cluster is 189 Squire?

23   A.   That's the only street name which happens to include the

24   number at this point.  But the address taken as a whole, it

25   appears that there's two different addresses.

**DR. CAMERON FREER - Cross**

68

1    Q.   Okay.  There's -- there's a forty number and then

2    there's a -- but the town in both top ones are Riveria or are

3    you referring to Davenport?

4    A.   Oh, I was referring to Davenport.  Yeah.

5    Q.   Okay.

6    A.   I guess there's three variations in total.

7    Q.   Yeah.  Okay.  But nevertheless, you would say that

8    that's pretty good clustering of Sann, whoever that may be?

9    A.   What do you mean by pretty good.

10   Q.   Meaning that that cluster, you would consider that

11   to be a successful cluster?

12   A.   I'm not sure what you mean by successful.  I haven't

13   evaluated each particular cluster on the basis of success.  If

14   I had a computer in front of me, I could ask the model what it

15   thought of this.  Obviously, like many examples that you're

16   pointing to, there's some intermediate degree of accuracy,

17   unlike the typical one which is overwhelmingly obviously

18   accurate.

19        MR. RONA:  Okay.  And then if Mr. Duran can scroll

20   down just a little more.

21   Q.   The other cluster, so that's below the dark line,

22   that has a name that is.  Sanderle vas Consellos (ph.)?

23   A.   For the first row.  Yes.

24   Q.   Okay.  And -- but the same email address is the as

25   the previous cluster?

**DR. CAMERON FREER - Cross**

69

1  A.   For that row.  Yes.

2      Q.   Okay.  And for that row, the same -- one of the same

3  addresses that we saw above?

4  A.   Yes.  Though I suspect that the way you've printed this

5  in Excel, it's missing some of the data.  I would assume that

6  wraps up is actually 02151.  And so I'm not sure how much I

7  can trust this.  But yeah, that seems generally plausible.

8      Q.   Okay.  And you would agree with me that it would be

9  possible that Sann, S-a-n-n, is the same person as Sanderle?

10  A.   Possible.  Anything is possible.  Are you asking is there

11  evidence in this cluster for it or --

12      Q.   Well, is there evidence --

13        MR. LYNNE:  Your Honor, I I'd just assert a

14  speculation objection.

15        THE COURT:  Sustained.

16      Q.   Okay.  Well, based on your common experience, you're

17  aware that some people shorten their names as nicknames for

18  example?

19  A.   Of course.

20      Q.   Okay.  And so Sann could be a nickname for Sanderle.

21  Is that right?

22        MR. LYNNE:  Same objection.

23        THE COURT:  Sustained.

24        MR. LYNNE:  Anything is possible.

25      Q.   You would agree with me that that having the same

**DR. CAMERON FREER - Cross**

70

1   email address is a factor, correct?

2   A.   It is a factor.

3        Q.   Okay.  And so you --

4   A.   I'm sorry.  A factor in what?

5        Q.   Well, it's a factor in determining whether

6   there's -- this whether either cluster or both have errors in

7   them?

8   A.   Yes.  The error rate calculation takes account of the

9   match probability which involves FSEM's use of all the

10  columns, all the eleven columns, including email.

11       Q.   Okay.  And does the fact that the email address for

12  the second cluster has Sann, S-A-N-N, and that that's the same

13  email address as the first cluster that has the name S-A-N-N,

14  is that counted within the error probability or is that

15  considered no error?

16  A.   It's a part of a complicated calculation that I've just

17  described.  First of all, there's more than one email in the

18  second cluster, but it is overwhelmingly the one that we're

19  talking about.  But as I described before, the error rate,

20  it's not per cluster, it's per linkage or a nonlinkage.  And

21  so the question is for each row in the bottom and each row in

22  the bottom and also each row in the bottom and each row on the

23  top and also each row in the top and each row on the top, the

24  degree to which it matches.  And for each of them, yes, the

25  error rate calculation involves looking at all of the values

**DR. CAMERON FREER - Cross**

71

1 of the eleven fields because that's what goes into match

2 probability, which is how the model assesses whether or not

3 it's an error.

4     Q.   Okay.  Could we go to Exhibit D13?

5 A.   Where is that here?  Is it back in the book?

6     Q.   I think it's back in the book.

7     MR. RONA:  And I'll just ask Mr. Duran to Zoom in on

8 the upper left for now.

9     Q.   And let me know when you're --

10 A.   Yeah, I see it.

11     Q.   Okay.  And there's a lot of data here, but some of

12 the data relates to your cluster 593987.  Do you see that?

13 A.   I see that in the first row and several other rows, but

14 there's twelve pages here.  What am I looking at with respect?

15     Q.   Well, I'm going to question you about specific rows.

16 So you agree with me the first row has the name Amilcar Lopez

17 (ph.).  Is that right?

18 A.   Yes.

19     Q.   And the cluster ID that I read?

20 A.   Yes.

21     Q.   And the next row has Ivan Lopez -- Ivan A. Lopez and

22 the same cluster ID?

23 A.   Yes, that's.

24     Q.   Correct.  And then the third row has Miri A. Lopez

25 and the same cluster ID?  Do you agree with that?

**DR. CAMERON FREER - Cross**

72

1   A.   Yes.

2        MR. RONA:   Okay.  And then if I could have Mr. Duran

3   go to page 12.  I think this is the last page.  And go to the

4   bottom.  Okay.  Not so far down.  Can you go up a little bit

5   to there?  Okay.  That's good.

6        Q.   So the last page where we pick it up has a bunch of

7   Amilcar F. Lopezes that are aggregated to 593987.  Correct?

8   A.   Among others.  Yes.

9        Q.   Okay.  And then it's easier, I guess, if you look at

10  your screen.  But if Mr. Duran goes down to the one that is --

11  please -- just near where Mr. Duran's cursor is, do you see,

12  there's an Amilcar Lopez aggregated to 19185233?

13  A.   Yes.

14       Q.   Okay.  And you wouldn't be able to tell by looking

15  at this whether -- that's a different cluster ID, correct?

16  A.   19185233 is different from 593987, yes.

17       Q.   Okay.  So there are -- Amilcar Lopez as a name

18  appears in two different clusters.  Is that right?

19  A.   Apparently, yes.

20       Q.   Okay.  And you don't know -- you have no way of

21  knowing whether there's two Amilcar Lopezes that are

22  appropriately clustered separately or whether this is a case

23  of under-aggregation?

24  A.   Those are two different questions.  I certainly couldn't

25  tell from those two columns.  It's not the case that I have no

**DR. CAMERON FREER - Cross**

73

1   way of knowing.  With the context of the full records I could

2   potentially tell you more.  And certainly with the context of

3   the clusters I could tell you more.  And then with a computer

4   in front of me looking at, for example, the assessed error

5   rate I could tell you still more.  There's quite a few ways of

6   knowing but not from these two columns, no.

7          MR. RONA:  Okay.  And if you could scroll to the

8   right, Mr. Duran, just where you are.  Don't go up or down.

9   Just scroll to the right.  That's good.

10         Q.   Do you agree with me that for all the Amilcar

11  Lopezes that we currently see, they all have the same email

12  address?

13  A.   Everything there is the same email address.  I've lost

14  track of which rows I'm supposed to look at, but they're all

15  the same in this case.  Yes.

16         Q.   Okay.  So my question is just if the email address

17  is the same and the name is the same, based on your

18  familiarity with your methodology, can you explain why the

19  same name would end up in two different clusters if the name

20  and the email are the same?

21  A.   My expectation is it has to do with the dynamic

22  clustering method where in portion of the dataset where

23  there's a lot of variation, for example, somebody who typed in

24  their name rather inconsistently or had multiple addresses,

25  the method infers a lower, more expansive threshold, which can

**DR. CAMERON FREER - Cross**

74

1    also lead to more variety of other fields being present.

2          On the other hand, when the data is more tightly

3    consistent, then it infers a higher threshold.  And so to the

4    degree that name -- so there's not a uniform respect

5    throughout the dataset to which agreeing to a certain amount

6    of name and a certain to -- and agreeing to a certain amount

7    on email determines whether or not it should be a match.  It

8    depends on the context of the rest of the nearby information

9    in the dataset.

10         Q.   Okay.  So does the manner that the data is entered

11   therefore play some sort of role in the dynamic clustering?

12   A.   Well, of course.  If you, for example, enter your name in

13   1,000 different ways, then that will affect this in the way

14   that I said.  If you use your initials -- I mean, the data

15   affects the process.

16         Q.   Okay.  Well, have you considered the circumstances

17   under which data was entered into Telexfree as part of your

18   assessment?

19   A.   Yes.  As I describe in the paragraph that you quoted from

20   twice, this is why it's especially important to do certain

21   aspects of the methodology that I chose to account for the

22   fact that the data is far from perfect yet still more than

23   adequate.

24         Q.   Okay.  But specifically, what I'm asking you is, are

25   you aware of the volume of data entry that Telexfree on

**DR. CAMERON FREER - Cross**

75

1   occasion required?

2   A.   The volume?

3        Q.   Well, we've seen some clusters --

4   A.   You mean the number of fields?

5        Q.   --  that have hundreds of user accounts, correct?

6   A.   U agree with that.  What is the volume you're referring

7   to?

8        Q.   Well, to create hundreds of user accounts, it

9   presents a data entry task, correct?

10  A.   Yes.  But over two years with many hundreds of days, that

11  seems like the kind of task that would be expected to create

12  accounts.

13       Q.   Are you aware that some people participated in

14  Telexfree for less than two years?

15  A.   Yes.

16       Q.   And so the volume of data entry could be an issue,

17  correct?

18  A.   I'm not sure what you mean by issue.

19       Q.   Well, would it be a concern to know that people were

20  either cut and pasting the same data over and over again, even

21  if it's not accurate?  Would that be a concern?

22       MR. LYNNE:  Well, objection.  Again, this is in the

23  realm of speculation.  Just try to get evidence.

24       THE COURT:  I think that's right.  What is -- is

25  there somebody that's going to testify that they cut and

**DR. CAMERON FREER - Cross**

76

1  pasted wrong information over and over?

2          MR. RONA:  Well, let me withdraw the question, Your

3  Honor.

4          THE COURT:  Okay.

5      Q.  How about with -- if people were using autocomplete

6  to save time to make lots of data entry, would that be a

7  concern in terms of assessing the data quality?

8      Q.  You're saying if somebody --

9          MR. LYNNE:  Same objection.

10         THE COURT:  I'll overrule that.  Go ahead.

11 A.  So you're saying if a participant in the course of

12 creating many accounts for themselves used autocomplete so as

13 to enter the same information consistently, would that be an

14 issue, that would seem to lead to even higher quality.

15     Q.  Well, if it wasn't -- if it wasn't accurate, if they

16 just autocomplete ID someone else's name for the sake of

17 expediency, would that be a concern in assessing data quality?

18         MR. LYNNE:  Well, unless there's going to be

19 predicate evidence that that in fact happens, this is entirely

20 speculative.

21         THE COURT:  Sustained.

22         MR. LYNNE:  And hypothetical.

23         THE COURT:  Yes.

24     Q.  Well, have you reviewed the affidavit of Frantz

25 Balan?

**DR. CAMERON FREER - Cross**

77

1  A.   Yes.

2      Q.   And do you recall Frantz Balan referring to the fact

3  that that data could be autocompleted?

4  A.   I believe he mentioned that as part of his

5  coconspirators' entry of data, that they use autocomplete and

6  sometimes use other people's information deliberately as part

7  of their conspiracy.  Yes.

8      Q.   And are you saying that Mr. Balan and others were

9  part of a conspiracy?

10 A.   My understanding is that he's describing how his team

11 deliberately entered incorrect information.  That is my

12 understanding of what he said.

13     Q.   Okay.  And would deliberately entering incorrect

14 information be a concern in terms of assessing data quality?

15 A.   Not a concern in the sense that I've assessed that it's

16 more than adequate for the task.  But certainly if somebody

17 tries to hide their tracks, they might be somewhat successful

18 in doing so.  To the extent they've done so that evidence may

19 not be in here.  And so if somebody has tried very hard to

20 escape responsibility, it's entirely possible that their

21 portion of the dataset may not be sufficient to identify them.

22 But I assess the data quality overall and deemed it more than

23 sufficient for performing the aggregation task.  That's not to

24 say that every last person will end up being responsible if

25 they tried very hard to cover their tracks.

**DR. CAMERON FREER - Cross**

78

1          MR. RONA:  Okay.  I'm going to move on.  Just one

2  moment, Your Honor.

3          THE WITNESS:  Excuse me, Your Honor.  Might I have a

4  quick bathroom break?

5          THE COURT:  Of course.  We'll take a recess.

6                (Off the record at 11:56 a.m.)

7                (On the record at 12:05 p.m.)

8          THE COURT:  Go right ahead.

9          MR. RONA:  Thank you.  I just want to approach one

10  more time to give Dr. Freer some additional exhibits.

11         THE WITNESS:  Thank you.

12         MR. RONA:  And if --

13         MR. LYNNE:  Can we have an identification?

14         MR. RONA:  Yes.  We're going to go to D055.  And if I

15  could have Mr. Duran go to PDF page 1.

16         MR. LYNNE:  Hold on one second.  For the record, Your

17  Honor, these are the additional exhibits which are the subject

18  of the motion to strike and exclude testimony.  For the reason

19  set forth in the motion papers, I would object to the use of

20  these documents at this point or this witness, we never having

21  had an opportunity to even look at these prior to the

22  examination going forward.

23         THE COURT:  And Attorney Rona, go ahead.  What's your

24  response to that?

25         MR. RONA:  Well, I disagree.  We furnished them

1    before 5:00 p.m. on Monday as the parties had discussed.  This

2    is like other compilations of voluminous data under 1006

3    prepared exclusively from the output of Dr. Freer and the

4    underlying telex free data.  So there's nothing -- there's

5    nothing here other than just showing you specific cluster IDs

6    as well as the related identifying information and the net

7    equity.  So this is all Dr. Freer's data.

8              THE COURT:  Atty Lynne?

9              MR. LYNNE:  May I actually respond to that.  This is

10   not a 106 compilation.  Compilations provide no internal

11   synthesis.  What it appears to be in this particular set of

12   headers is a whole series of information relating to, among

13   other things, a column for purchase of orders, triangular

14   transactions, credit transfers in, credit transfers out.

15             None of this is internal or a -- this is not a

16   compilation.  This is not a summary.  This is Mr. Dennis

17   engaging in some kind of calculation voodoo that we have no

18   knowledge as to how he did it and clearly is not something

19   which is limited to the (indiscernible) table used by Dr.

20   Freer.  It  contains far more information and apparently has

21   been drawn from other sources of which we have no knowledge.

22             MR. RONA:  That's not true, Your Honor.  It's from

23   the rep ID table.  And this is the same format that that Mr.

24   Dennis has summarized data in his report and appended to his

25   report.  It's simply taking Dr. Freer's cluster, the contact

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 80 of 206
DR. CAMERON FREER - Cross

80

1   information that's in the table that identifies the accounts.

2   And then there's also the rep ID summary table which has all

3   of those calculations.  Those are Huron's calculations.

4   That's what this case is about, those net equity calculations.

5         And so what I intend to do with this exhibit is to

6   only look at the one that's on the slide.  And so I don't

7   think Mr. Lynne is concerned about the other data.  But that's

8   the same type of data.  And I will cover the detail with some

9   other examples.  But this is how you present the data of a

10  cluster in this case.  This is the only way.

11         MR. LYNNE:  May I be heard?

12         I'm looking at a column for triangular transactions

13  which is what the Court considers to be an appropriate input.

14  But I'm also looking at several columns relating to credits.

15  And I assume those are credit transfers between two

16  participants which is not part of the net equity calculation

17  which has been added by apparently Mr. Dennis at some point in

18  time with the intention of creating some kind of challenge in

19  the net equity formula.  I don't get it, but I absolutely

20  don't have the ability to comment meaningfully on this because

21  it's all new data, that concept.

22         THE COURT:  So can I see it a little bit bigger,

23  Attorney Duran?  I can't even see what it is.

24         MR. RONA:  Well, I think Mr. Lynne is talking about

25  two different things.  So if Mr. Duran makes this screen

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 81 of 206
**DR. CAMERON FREER - Cross**

81

1    bigger, this is the -- this first page is the summary of the

2    summary.  So Mr. Dennis, as he has done in his report, has the

3    cluster ID, the name and email, street address, and then some

4    additional information, phone number.  And then the net equity

5    figure -- I don't know what happened to that.

6         UNIDENTIFIED SPEAKER:  I'm sorry.  That was me.

7         MR. RONA:  Okay.  Oh, thank you.  And so that's the

8    sum total of the -- that's Huron sum total of equity.  So

9    that's -- there's nothing there that Mr. Dennis has done other

10   than simply combine one, two, three, four, five -- twelve or I

11   guess eleven accounts.  My math is bad.  Eleven accounts into

12   a way that could be possibly looked at from one slide.

13        Now, if Mr. Duran goes to the next page, what Mr.

14   Lynne is complaining about is this is the rep ID table that

15   Huron provided.  Dr. Freer has testified that he got that

16   table from them and he didn't really do anything with it other

17   than pull in the net equity calculation.  Well, the net equity

18   calculation, if Mr. Duran scrolls to the right, is simply made

19   by adding -- this is the trustee's, this is the trustee's

20   data.  1, direct payment, two-year.  Why is two years

21   relevant?  Fraudulent transfer.  We left out that they also

22   have ninety-day payments.  2, direct receipt, two-year.

23   That's the -- Huron did that.  3, triangular payment, two-

24   year.  4, triangular receipt, two-year.  That's triangular

25   transactions.  Purchase of credits.  The Trustee actually

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 82 of 206
DR. CAMERON FREER - Cross

82

1    reduces net equity by the purchase of net -- purchase of

2    credit.  So 1 through 5 they simply add up.

3         Our criticism is that they also have columns 6 and 7,

4    credit transfers in, credit transfers out.  They leave that

5    out of their calculation simply by not adding it in.  We're

6    not doing anything with that.  We're just showing what the

7    trustee did.  This column approach, 1, 2, 3, 4, 5, 6, 7, that

8    is -- and 8, chargebacks, that's Huron's data.

9         So there's nothing that Mr. Dennis has done other

10   than he's showing the rows that correspond to the account ID,

11   the rep ID, and the net equity underlying figures so that we

12   can talk about the significance when you disaggregate a person

13   into two different groups of accounts, the effect that that

14   has.

15        MR. LYNNE:  Well, I think this is not for this

16   witness.  This is the issue that we're going to address

17   subsequently.  But I don't think as this witness's --

18        THE COURT:  Hold on one second.

19        Ms. Reynolds, somehow the Zoom is no longer on the

20   evidence presenter.  We just see the exhibit.  So I don't see

21   Attorney Lynne.

22        MR. LYNNE:  Am I not here?

23        THE COURT:  Hold on one second, Attorney Lynne.  You

24   are not a cat.  Don't worry.

25        I'm going to sustain the objection.  I at this point

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 83 of 206
DR. CAMERON FREER - Cross

83

1  think I have an understanding of what Dr. Freer did.  And the

2  Trustee is going to need to put on Mr. Sorondo and Mr. Darr.

3  And that's -- your criticism certainly can be brought up then.

4        MR. RONA:  Well, Your Honor, if I can just elaborate

5  one point.

6        THE COURT:  Sure.

7        MR. RONA:  I understand your concern.  I think the

8  issue that I want to ask Dr. Freer about is why there are two

9  cluster IDs here.  So if I don't ask about net equity but I

10 only ask about why these accounts end up in two clusters, I

11 think that's fair.

12       THE COURT:  Well, then do it off of his clusters, not

13 off of this newly created document.

14       MR. RONA:  Well, if I could just use the first page,

15 page 55.  There's no -- there's none of the columns that Mr.

16 Lynne mentioned.  It just has the cluster ID, the basic

17 contact information.  And I won't ask about the net equity

18 column on the right.  I just want to ask about what we see

19 right now.

20       THE COURT:  So I'll allow it.  But, Attorney Lynne, I

21 will permit you to object and move to strike if it turns out

22 that that's the appropriate thing to do.  But let's not --

23 don't ask another question just yet because I still can't see

24 Attorney Lynne.

25       Are we getting Mr. Zualik (ph.) in here?  Okay.  Hold

**DR. CAMERON FREER - Cross**

84

1   on.  We're getting our IT person to come in.

2            MR. LYNNE:  I am showing up on the Zoom screen as a

3   window.

4            THE CLERK:  While we're trying to correct this, Mr.

5   Rona, did you say this was Exhibit 055?

6            MR. RONA:  55, yes.  Do you not have that?

7            THE CLERK:  Does the Court have copy of that?  It

8   doesn't look to me like we do.

9            MR. RONA:  Okay.  I thought so, but I apologize.  Let

10  me grab it.

11           THE WITNESS:  It's in this.

12           MR. RONA:  I apologize for the oversight.  It's also

13  on the thumb drive.  So the Court has it on the thumb drive.

14  And it was supposed to be handed to you, but I forgot.

15                        (Pause)

16           THE COURT:  Thank you.  Go ahead.

17           MR. RONA:  Okay.  I'll try to be brief, Your Honor.

18                 RESUMED CROSS-EXAMINATION

19  BY MR. RONA:

20      Q.   DR. Freer, would you agree with me that cluster

21  12307763 reflects a rep no me of Aksana Prokopenka (ph.)?

22  A.   Yes.  But I'll note that your information on the first

23  page differs from the second page and the rep no me.  And

24  also, unlike with the ones that were provided to me before by

25  Mr. Dennis, I haven't had a chance to check this.  I mean,

**DR. CAMERON FREER - Cross**

85

1  already there's a discrepancy.  And as I noted also, there

2  have been systematically discrepancies with the actual data in

3  your Excel preparation, omitting zeros and other things.

4       So -- but taking the first page for what it is, which

5  seems inaccurate, yes.

6       Q.   Okay.  Well, in what way is the name inaccurate

7  in --

8  A.   Well, even according to your data, the name

9  capitalization is different in rep no me for the second one.

10  It differs across those, the two plus one versus seven.  But I

11  guess I'm also saying I've learned, unfortunately, that I

12  can't trust what's provided to me because this -- there are

13  errors in these and I haven't had a chance to check these,

14  but.  But I agree that's what's in what's written on the first

15  page.

16       Q.   Okay.  And then account cluster ID 12368437, that

17  has a name Prokopenka Aksana.  Do you agree with that?

18  A.   Other than my previous concern, yes.

19       Q.   Okay.  And so this suggests that the order of a name

20  or the order of the tokens in a name has some impact on the

21  ability of the system to aggregate the accounts, correct?

22  A.    Two things.  1, of course, the order of characters

23  matters.  That's how strings are compared.  Secondly, I'm not

24  sure one can conclude that from this because one needs to look

25  at the -- both the entire cluster contents to make a judgment

**DR. CAMERON FREER - Cross**

86

1    like that and also in the context of the entire dataset

2    because of how the over and under-clustering was balanced.

3    And so to make a judgment in this particular case when we need

4    to look at all of the eleven fields, though in clean form, not

5    the way that you presented it, and then furthermore in the

6    context of the whole dataset.  But certainly the order of

7    characters is on the basis of how strings are compared.

8        Q.   Okay.  And some strings in the blocking step prevent

9    those two accounts from being considered matches, correct?

10   A.   You're asking about these two accounts, whether they're

11   included in --

12       Q.   No, I'm just saying in general.  As a general

13   matter, the blocking step assumes that a certain level of

14   dissimilarity merits not having those two accounts considered

15   for pairwise matches, correct?

16   A.   I'm not sure I'd say it assumes it.  But it enforces that

17   judgment, yes.

18       Q.   Enforces it.  Okay.  And so if they're blocked, if

19   two accounts are blocked, they can't be clustered together?

20   A.   I would say the other way around.  The blocking set is

21   the set of things that can be clustered together before

22   transitive closure.

23       Q.   Okay.  Things that are blocked together.  Is that

24   what you mean?

25   A.   No.  As I explained, the blocking set is a collection of

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 87 of 206
DR. CAMERON FREER - Cross

87

1  pairs which are considered.

2        Q.    Okay.

3  A.    So if a pair makes it into the blocking set, that means

4  it will be considered.

5        Q.    Okay.  And if it doesn't make it into the blocking

6  set, it won't be considered?

7  A.    It won't be considered for match probability.  But there

8  is still a possibility that it will be joined due to

9  transitive closure.

10        Q.    Okay.  And the system does -- your system doesn't

11  include sets that didn't -- pairs that didn't make it into the

12  blocking set for purposes of calculating its error rate,

13  correct?

14  A.    It does.  So the error rate calculations are based on all

15  the match wise probabilities.  In the case when a pair did not

16  make it into blocking but nevertheless made it into the same

17  cluster, that's essentially a match probability of zero.  And

18  it will accordingly count it pretty substantially as potential

19  error in balancing the over and under-clustering.  So it's

20  absolutely part of a calculation in that sense.

21        Q.    Well, does your system identify accounts that,

22  notwithstanding blocking, should have been aggregated

23  together?

24  A.    To the extent that they're included in a cluster that's

25  included in the error rate calculation, like I just said.

**DR. CAMERON FREER - Cross**

88

1      Q.   Okay.  But if they're not included in the same

2   cluster, if two -- if the same name with the first and last

3   name reverse don't make it into the same cluster, does the

4   system generate any type of list to identify those clusters?

5   A.   'm not sure what you mean by generate any type of list.

6   That's not part of the methodology, but the answer to whether

7   or not it's assessed in the way that I believe you intend

8   depends on whether or not it made it into blocking, not just

9   whether or not the names are similar in the way that you're

10  describing.

11     Q.   And would you agree with me that under aggregation,

12  in the context Telexfree is a very real concern for

13  participants?

14          MR. LYNNE:  Hold on a second.  I would object.  That

15  that's a question that really --

16          THE COURT:  Sustained.

17          MR. LYNNE:  -- he's incapable of answering.

18          THE COURT:  Sustained.

19     Q.   Okay.  Let me ask it a better way.  You would agree

20  with me that that under-aggregation is an issue for -- in

21  terms of determining net winners and computing their net

22  winnings?

23  A.   Issue in the sense of a challenge to be resolved by the

24  method and to be both under and over-clustering should be

25  minimized, not an issue in the sense of a problem.

**DR. CAMERON FREER - Cross**

89

1      Q.   Well, it's an issue to be minimized because it could

2   have an impact on the determination of net equity, correct?

3   A.   Every change has an impact.  Yes.

4      Q.   And so if you disaggregate the positive accounts of

5   a participant from the negative accounts of a participant, you

6   could overstate their net equity, correct?

7   A.   I don't think I understand the premise of the question.

8   If, for example, Aksana Prokopenka is the same person as

9   Prokopenka Oksana here and they're served with whatever

10  information regarding two clusters, the sum of those is still

11  the same.

12     Q.   Right.  The sum could be negative, correct?

13  A.   The sum of -- you're saying that sum of two numbers, sum

14  of which are positive and negative, or in this particular

15  case?

16     Q.   Well, I wasn't going to talk about the particular

17  case because --

18        THE COURT:  I think I get the point.

19     Q.   Okay.  But you'd agree with me that if you have a

20  cluster 1 with positive net equity and cluster 2 with a

21  greater but negative net equity, that if that represents a

22  disaggregation, that could make a net loser look like a net

23  winner?

24  A.   Well, look like a net winner and net loser.

25     Q.   Okay.  But the trustee is, in this case, going after

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 90 of 206
DR. CAMERON FREER - Redirect

90
1  net winners, correct?

2  A.   My understanding is the trustee is also interested in net

3  losers.

4       Q.   Okay.  Well, are you -- do you have -- o you have

5  any knowledge of whether the Trustee is still accepting

6  claims?

7  A.   I don't know.

8            MR. RONA:  Nothing further, Your Honor.

9            THE COURT:  Atty Lynne, redirect?

10           MR. LYNNE:  Briefly.

11                       REDIRECT EXAMINATION

12 BY MR. LYNNE:

13      Q.   You were asked some questions about whether the net

14 equity table in the application of the net equity table was

15 required, in your opinion, to identify the participants in a

16 given cluster.  And I believe you said that was not required.

17 But I'd ask that you explain to the Court why you testified

18 that net equity table -- the net equity table is not required

19 to identify a given cluster owner.

20 A.   Yeah.  So the content of the cluster at the end of

21 step -- step 9, before I even look at net equity in the

22 methodology, that already contains the full and final list of

23 user accounts ascribed to a single participant.  And so

24 because the net equity was not used in any step prior to that,

25 the list of user accounts is already fixed.  And to the extent

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 91 of 206
**DR. CAMERON FREER - Redirect**

91

1  that the information contained to those accounts identifies

2  the participant that's already done, when one adds up numbers,

3  one gets a single number of total net equity, as I called it,

4  per participant.  But that doesn't change at all the set of

5  information that identifies them.

6      Q.   All right.  You were asked some questions with

7  respect to the Christen Treatise.  And if I could -- do you

8  have the Christen Treatise?  Can I direct you to page 14?

9      MR. LYNNE:  If you could put that on the screen, that

10  would be helpful.

11      MR. RONA:  One moment.  Okay.

12      Q.   Directing your attention to the first full paragraph

13  after the second bullet.  You were asked questions with

14  respect to this paragraph.  And Mr. Rona referred you to the

15  first half of the paragraph.  Arguably, the most important

16  data quality dimensions for data matching and deep duplication

17  are accuracy and consistency.  There's a large portion of

18  efforts in indexing comparisons and classification steps will

19  deal with inaccurate and inconsistent data.

20      Would you read into the record the remaining sentences of

21  that paragraph?

22  A.   "If the data would be of perfect quality, then data

23  matching could be accomplished through straightforward

24  database joint operations.  And no sophisticated indexing

25  techniques or approximate comparison functions would be

**DR. CAMERON FREER - Redirect**

92

1   needed.  As long as data are of imperfect quality, however,

2   techniques are needed that can deal with inaccurate and

3   inconsistent data while still achieving high matching

4   quality."

5       Q.   And did you use techniques to compensate for any

6   inaccurate and inconsistent data while still achieving high

7   matching quality?

8   A.   Yes.  At some level that's the purpose of all of steps 1

9   through 5 or certainly portions of them, cleaning and some of

10  the other matching steps.  Also, as Christen describes and the

11  part that you quoted, I'll note the second half of that

12  sentence that you quoted saying because it deals with

13  inaccurate data and referring to chapters 4.6, that was also

14  excluded in Mr. Dennis's misleading quote of the first half of

15  the sentence up to the comma.  Christen was clearly saying

16  that the point of this methodology of data matching described

17  in his book and specifically many of the chapters are to deal

18  with the fact that the input quality can be somewhat

19  inaccurate and still lead to highly accurate results.  And

20  it's for that reason that a large portion of my methodology

21  also deals with cleaning and improving the data so as to

22  achieve high quality results, not despite the inaccurate input

23  but using techniques that are designed specifically to deal

24  with that.

25      Q.   And when you turn to page 42, section 3.2, issues

**DR. CAMERON FREER - Redirect**

93

1 with names and other personal information, and if you could

2 read into the record the first paragraph of that section.

3 A.   "Names and other personal details play a crucial role in

4 daily life because people are using them to identify

5 individuals ranging from family and friends to work colleagues

6 all the way to politicians and celebrities.  For organizations

7 both in the private and public sectors, names are often a

8 primary source of identification of the individuals they're in

9 contact with."

10      Q.   And can you read the next sentence and following

11 paragraph?

12 A.   "Personal names are a major component of the information

13 used in many data matching or deduplication processes to

14 identify records that refer to the same individuals."

15      Q.   And is that consistent with the way you have treated

16 the issue of name in your methodology?

17 A.   Yes.  As I explained on the slides involving the role of

18 name and blocking and elsewhere, it's actually crucial that

19 one does recognize the role that name plays in identifying

20 persons, as is the task for this methodology.

21      Q.   And am I correct in understanding that in the

22 instant where a name has any primacy in your process,  that

23 was limited exclusively to the blocking process?

24 A.   Correct.  In in later steps, including crucially in the

25 application of FSCM, name is considered as a field just like

**DR. CAMERON FREER - Redirect**

94

1  any other.  And it's the automated unsupervised methods that

2  determine the relative weight of name in combination with all

3  the other fields.

4      Q.    You were asked some questions about clearly

5  fictitious names like Mickey Mouse or Superman, names like

6  that.  Did you determine or look to see whether how prevalent

7  the use of fictitious names were in the Telex database?

8  A.    Yes, in the sense that as I described on the slide with

9  the different colors of the forty-four -- forty-four different

10 fields, for name, I performed a number of validation steps.

11 And as part of determining that at least ninety-five percent

12 appeared to be a name.  That involved looking at specifically

13 those that did not pass the various validation criteria.

14      So looking at strings that are fewer than five characters

15 or include characters other than alphabetical across many

16 language sets, I could see that some decent portion of those

17 that failed the validation criteria indeed did not appear to

18 be names.  Nevertheless, such a vanishingly small portion must

19 have been fictitious things like Mickey Mouse that I didn't

20 ever or seldom encounter names of that sort.  It was

21 overwhelmingly like I described keyboard mashing or just

22 initials.

23      So to the extent that one can find clearly fictitious

24 names, I think that's only via directed search.  It must be a

25 very small percentage.

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 95 of 206
DR. CAMERON FREER - Redirect

95

1       Q.   You were provided with various tables, including

2   D12, D39, D43, D13, and D55.  You don't have to look at them.

3   I'm just sort of asking a general question.  Does the fact

4   that Mr. Rona is able to show you individual instances, maybe

5   five or six individual instances, where clusters appeared to

6   include information that appeared to be an over-clustering,

7   does that have any impact on -- from a statistical perspective

8   on the validity of your results?

9   A.   No.  I would say a few things.  First of all, those

10  examples were presumably not chosen at random in a

11  statistically valid way, and so one can't really conclude

12  anything about the dataset on the whole from them in any case.

13      But secondly, assuming that they were found -- found via

14  some sort of directed search looking for examples of a certain

15  sort, it's not at all surprising that he was able to find

16  them.  My stated error rate is not zero.  And indeed it would

17  be unrealistic and surprising if it were.  The fact that the

18  false positive and false negative rate are what I estimated

19  them to be of approximately two percent and less than one half

20  percent suggests that one should expect to find instances of

21  over-aggregation and under-aggregation.

22      And some of that comes in the form of small variations,

23  like in Maria Neves, as I was questioned about yesterday,

24  where a small number of -- I believe 471 records appear to be

25  potentially over-clustered.  Some of them require further

**DR. CAMERON FREER - Redirect**

96

1    investigation.  But there were a few, a small handful that did

2    appear to be out of place likely.  That's entirely consistent

3    with the two percent false positive rate.

4         Occasionally, that manifests in the form of an extremely

5    small number of clusters where there are more substantial

6    differences, like in some of them that I was presented with

7    today.  All of that is perfectly consistent.  This is not a

8    surprise to me.  In the course of examining the output, I

9    occasionally encountered such examples which seem to me well

10   within the stated error rate.

11        And indeed, even if one or more of them appears to be

12   clearly not ideal, as I said, in order to do a systematic

13   method, one can't put one thumb -- one's thumb on the scale

14   for any particular example.  And even if one were to change

15   parameters in light of that example, which might not be

16   appropriate statistically, still, because of this tension

17   between over and under-clustering, there's no guarantee that

18   changing to make one cluster better even in a somewhat

19   systematic way wouldn't actually cause more harm overall by,

20   say, making more under-clustering in the course of making less

21   over clustering.

22        And indeed, that's the point of the dynamic clustering

23   method to recognize that every single point on that chart

24   involves some things that are not ideal.  Nevertheless, any

25   number of them, including the one that I chose, provide a

**DR. CAMERON FREER - Recross**

97

1   reliable methodology suitable for this application.

2       Q.   And when you say the one that I chose, are you

3   referring to the .6?

4   A.   Exactly.

5       Q.   Okay.  Last question really is just, is there any

6   instance in which a directed search can have any statistical

7   significance on a set like basis?  If you're provided with a

8   handful or whatever number of results that are the result of a

9   directed search as opposed to random selection, can that ever

10  be considered to be statistically valid across the entire set?

11  A.   Not really when the dataset is large and the number of

12  examples found are very small like here.  If, of course, one

13  were to search for something and find, say, a million

14  instances out of eleven million, that lower bound of a million

15  instances would tell you something about the overall dataset

16  even without knowing exactly how prevalent.  But when you find

17  five or even fifty examples among 1.5 million clusters, that's

18  totally uninformative about the whole.

19          MR. LYNNE:  Your Honor, I had no further questions.

20          THE COURT:  Thank you.  Any recross?

21          MR. RONA:  Yes, Your Honor, very briefly.

22                    RECROSS-EXAMINATION

23  BY MR. RONA:

24      Q.   Dr. Freer, do you still have 3.1 open in front of

25  you?

**DR. CAMERON FREER - Recross**

98

1    A.   Yes.

2         Q.   Okay.

3              MR. LYNNE:  3.2?

4              MR. RONA:  3.1.

5              MR. LYNNE:  I'm sorry.

6              THE COURT:  And that's the Christen data matching

7    article?  Go ahead.

8              MR. RONA:  Yes, Your Honor.

9         Q.   You would agree with me -- well, Christen writes,

10   "For any type of data analysis, processing, and management,

11   the garbage in, garbage out principle holds."

12   A.   Which part of 3.1?

13        Q.   The first paragraph of 3.1.

14   A.   No.  The first paragraph 3.1 says most real world

15   databases.

16        Q.   Okay.  I'm sorry.  I was reading from the last

17   sentence.  "For any type of data analysis, processing and

18   management, the garbage in, garbage out principle holds."  Do

19   you see that?

20   A.   The second-to-last sentence, yes.

21        Q.   Okay.  And you agree -- do you agree with me that

22   there is a garbage in, garbage out principle?

23   A.   In general or at play here?

24        Q.   In your field.

25   A.   Generally, but keeping in mind that garbage in what he's

**DR. CAMERON FREER - Recross**

99

1   referring to, I believe, is not occasional or even systematic

2   small variation but rather actual total unsuitability of input

3   data, quite unlike what's at question here.

4       Q.   Okay.  And the next -- the last sentence is if the

5   quality of the input data is low, then the output generated is

6   normally not of high quality of accuracy either.  You see

7   that?

8   A.   I do.

9       Q.   Okay.  And you made a determination in this case

10  that Telexfree data quality was not low.  Correct?

11  A.   Correct.  Yeah.  The eight fields that I deemed to be of

12  high quality and three of intermediate quality together were

13  more than enough for high quality on the whole.

14          MR. RONA:  All right.  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Dr. Freer, you indicated -- and I may not say it in

17  the language you used, but basically the system you used

18  self-assessed an error rate.

19          THE WITNESS:  Yes.

20          THE COURT:  Would it tell you to the extent it found

21  an error what user ID you should look at for a potential

22  error, or is that something that you have available to you?

23          THE WITNESS:  It's something that could be computed

24  using the same methodology.  The primary calculation I did was

25  to assess the overall false positive and false negative rates,

but that information could be used to look at, for example,

clusters of the lowest quality by either of those metrics.

And indeed, I did look at instances of that in the course of

both determining that the method pass the smell test and also

as part of my confirmation that my balancing of over and

under-clustering was appropriate.  And so that involved

looking at some of the clusters that were most over-clustered

despite trying to balance it and those that were most

under-clustered despite trying to balance it using those

numbers.

THE COURT:  And you've said a couple of times now

that you don't want to put the thumb on the scale.  So I just

want to confirm what I believe to be the case, which is when

you did the final step and you took the trustee's numbers,

there wasn't a cluster that you went to where you saw one user

account that appeared that it probably didn't belong there and

take it out in any way.  You just plug the numbers in, even if

potentially you could see it was not, you know, consistent

with the rest of the user accounts, if that makes sense.

THE WITNESS:  Correct.  So for example, in that Maria

Neves cluster that's in the initial report, there do seem to

be the few questionable ones that were raised yesterday, Rita

Larez (ph.) and so on.  I think the typical pattern, as is the

case there, is often that it has really minimal impact on the

whole.  Maybe it's the $49.90 most common value or

101

1   occasionally higher mixed in to literally millions of dollars.

2   And so it has fairly minimal impact.  But I did nothing to

3   change it in that case.  That's the output of the methodology.

4           THE COURT:  Okay.  Any questions based off of what I

5   just asked?  Attorney Lynne?

6           MR. LYNNE:  None.  Thank you.

7           THE COURT:  Attorney Rona?

8           MR. RONA:  None, Your Honor.

9           THE COURT:  Okay.  Thank you, Dr. Freer.

10          THE WITNESS:  Thank you.

11          THE COURT:  You can step down.

12          And so I believe, Attorney Rona, you would be calling

13  your witness next.

14          MR. RONA:  I would be.  And, Your Honor, I don't know

15  if it makes sense to try to break a little early for lunch

16  just so I don't split up the direct --

17          THE COURT:  Sure.

18          MR. RONA:  -- of Mr. Dennis.

19          THE COURT:  Yes.  So let's still make it an hour

20  break and try to be back at about a quarter to two.  Thank

21  you.

22          MR. RONA:  Thank you, Your Honor.

23              (Off the record at 12:42 p.m.)

24              (On the record at 1:57 p.m.)

25          THE COURT:  Good afternoon.

**JOSHUA DENNIS - Direct**

1          Attorney Rona, go right ahead.

2          MR. RONA:  Thank you, Your Honor.  The class

3    defendants call Joshua Dennis.

4                     JOSHUA DENNIS SWORN

5          THE CLERK:  Have a seat.  Please, if you would for

6    the record, state your name and your business address.

7          THE WITNESS:  Joshua Dennis, 75 State Street, Boston,

8    Mass.

9          THE CLERK:  Thank you.

10         MR. RONA:  Your Honor, may I proceed?

11         THE COURT:  Please.

12                     DIRECT EXAMINATION

13   BY MR. RONA:

14    Q.   Good afternoon, Mr. Dennis.  Where are you employed?

15   A.   I'm employed at the StoneTurn Group.

16    Q.   Okay.  And what is the StoneTurn Group?

17   A.   So broadly, the Stone Turn Group is a global advisory

18   firm that handles a range of litigation, investigation, and

19   compliance matters for clients and counsel.

20    Q.   And how long have you worked at StoneTurn Group?

21   A.   About nineteen, coming on twenty years now.

22    Q.   Okay.  And what is your position currently?

23   A.   I'm a partner at the firm.

24    Q.   Okay.  And do you have a particular practice area or

25   a focus at StoneTurn?

**JOSHUA DENNIS - Direct**

1  A.   Yes.  And a partner.  I help lead our data analytics

2  group.

3       Q.   Okay.  And what does the data analytics group do?

4  A.   So the data analytics group, or sometimes we refer to it

5  as the forensic data analytics group, helps with a range of

6  typically large and messy datasets.  We work to connect them

7  and analyze them for the purpose of proving or disproving an

8  assertion or quantifying something, for example, economic

9  damages.

10      We also deal a lot with data integrity and data quality,

11 looking at how a dataset may have been constructed and how

12 it's being used to either inform or inform being formed by

13 case specific facts and circumstances.

14      Q.   And if I could just ask you to move the microphone

15 not too close but maybe --

16 A.   Yeah, of course.

17      Q.   -- a slight bit closer.

18 A.   Is that better?

19      Q.   Because I have trouble hearing you.  But --

20 A.   Of course.  Thank you.

21      Q.   Okay.  Can you give me some examples of the types of

22 assignments that that StoneTurn's data analytics group

23 receives?

24 A.   Sure.  So typically we work with a large -- as I said, a

25 lot of larger complex data.  So that's things like financial

**JOSHUA DENNIS - Direct**

104

1  services and healthcare to name two.  That can be things like

2  market manipulation or healthcare fraud.  In the neighborhood

3  of forensic accounting, we do a lot of asset misappropriation,

4  things like -- things like that.

5      Q.   Okay.  And to what extent does your group also deal

6  with Ponzi scheme cases?

7  A.   Yes.  We've dealt with Ponzi scheme cases in the past.

8          MR. LYNNE:  Your Honor, could I ask the witness to

9  limit his answers to questions -- or his answers to questions

10 of experience to that which he actually himself has

11 participated in?

12         THE COURT:  So Attorney Lynne, if you have an

13 objection, just say objection.

14         MR. LYNNE:  I do.  I do to the form of the question.

15 The question is what has StoneTurn done?  And the witness is

16 testifying to what he said StoneTurn is done as opposed to

17 what he has done.  And given the fact that I intend to

18 challenge his expertise once he's tendered, I do think it's

19 important to understand what it is that he has been doing as

20 opposed to what his group is doing.

21         THE COURT:  Okay.  Well, I'll keep that in mind as

22 the trier of fact.

23         Attorney Rona, go right ahead.

24         MR. RONA:  Okay.  I was going to get there.  And,

25 Your Honor, I disagree that I have to tender Mr. Dennis.  I

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 105 of 206
JOSHUA DENNIS - Direct

105

1  think he's going to testify about the things that -- the

2  subjects of this case that we all know.  And there's no jury.

3  I don't have to tender Mr. Dennis.

4      MR. LYNNE:  I actually would disagree.  I think

5  especially in the circumstance of Mr. Dennis who has no

6  experience with sophisticated data linkage algorithms or in

7  particular the (indiscernible) algorithm as well as his lack

8  of training and experience in statistical analysis, including

9  even statistics generally, that I think it's important for me

10  to be able to put on the record and understand exactly what it

11  is that Mr. Rona is tendering his witness as an expert on such

12  that I can preserve whatever objections I may have.  I would

13  prefer to do it through a voir dire.  But in any circumstance,

14  I want the record to be clear with respect to what it is that

15  Mr. Rona is professing his witness to be an expert.

16      THE COURT:  So a lot of what you just said, Attorney

17  Lynne, is really meant for your cross-examination.  To the

18  extent that attorney Rona asks a question that's

19  objectionable, please go ahead and object and I can make the

20  decision then as opposed to when the answer is proffered.  If

21  you have an issue with the answer, that's what cross-

22  examination is all about.

23      And if you -- I expect you're going to cross-examine

24  and bring out all the things you just mentioned, which is you

25  don't think Mr. Dennis is qualified to do what the defense is

**JOSHUA DENNIS - Direct**

106

1  asking him to do.  And I get that that's coming.  But Mr. Rona

2  can ask the questions and we'll go from there.

3        MR. LYNNE:  Understood.

4        MR. RONA:  Thank you, Your Honor.

5  BY MR. RONA:

6     Q.   And I apologize if you said this, but what is your

7  role in the data analytics group?

8  A.   So I help lead that group.  And when I was describing the

9  nature of the cases, I was speaking from my own personal

10 experience.

11    Q.   Okay.  So let me just ask the question again What

12 types of cases -- what types of assignments do you -- have you

13 personally worked on at StoneTurn?

14 A.   Sure.  So over the last almost two decades at StoneTurn,

15 I've worked on hundreds of cases and including the topics I

16 mentioned before.  A lot of it has been focused on analysis of

17 data and data sufficiency, such as in the application to

18 litigation, quantification of economic damages, health care

19 fraud, Ponzi schemes, market manipulation, trading -- trading

20 data, private equity cases, all sorts of really financial

21 analysis in healthcare analysis and related cases.

22    Q.   And to what extent does your -- in your practice do

23 you look at sufficiency of data as an issue?

24 A.   We look at the sufficiency of the data in every case.

25    Q.   And to what extent in your assignments do you

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 107 of 206
JOSHUA DENNIS - Direct

107

1    attempt to link disparate datasets?

2    A.    Yeah, it is very common, I'd say much more often than

3    not, that then the case involves more than one dataset and

4    those datasets needed to be used individually or more often

5    than not in combination to help answer the question.

6        Q.    Okay.  And incidentally, what types of matters do

7    your assignments arise in?

8    A.    So some of it is going to be kind of going back to the

9    topic I said, they arise in the context of litigation.  You

10   know, we are -- we are sometimes consulting experts, sometimes

11   testifying experts, certainly on -- on investigation matters.

12   We are brought in to help typically work with counsel to

13   uncover and quantify the nature of the issue and what

14   happened.  And then kind of leading from that is often

15   remediation, which is similar to compliance, about how do we

16   look at what happened to help make sure it doesn't happen

17   again or how do we prevent something from happening in the

18   first instance.

19       Q.    And if you could just briefly lay out your

20   educational background.

21   A.    Yep.  So I have my bachelor's degree from Skidmore

22   College in management in business with a minor computer

23   science.

24       Q.    And have you pursued any continuing education?

25   A.    Yes.

**JOSHUA DENNIS - Direct**

108

1          Q.    In what?

2     A.    Course work in in SQL programing.

3          Q.    What's SQL programing?

4     A.    So SQL programing is a programing language that's used to

5     connect and analyze and query large and complex datasets.

6          Q.    Okay.  And is the act -- whether it's SQL or

7     otherwise, but is the act of querying large datasets similar

8     to what you or Dr. Freer has done in Telexfree in terms of

9     pulling out case studies or examples?

10    A.    Yes, certainly.  So SQL is the is the language.  I used

11    to take eleven-plus million records and more than that across

12    multiple tables and connect it and analyze it and filter it to

13    bring out a lot of the examples that you've already seen that

14    we'll talk through today.

15         Q.    Okay.  Do you have any certifications?

16    A.    I do.

17         Q.    In what?

18    A.    Intellectual Property Law certificate from Suffolk

19    University.

20         Q.    Okay.  Let's talk about this case.  When were you

21    first retained in this case?

22    A.    So I was first retained back in 2017, I believe.

23         Q.    2017?

24    A.    Yes.

25         Q.    Okay.  And what was -- back then, what was your

**JOSHUA DENNIS - Direct**

109

1  assignment as you understood it?

2  A.   So the assignment I think categorically has been pretty

3  similar with time, although the nature of it has changed.  So

4  my assignment was to review the trustee's methodology for

5  aggregating user accounts as well as quantifying that equity.

6      Q.   Okay.  And when you were retained in 2017, who was

7  the -- did the trustee have an expert disclosed at that time?

8  A.   He did.

9      Q.   And who was that?

10 A.   That would be Mr. Martin.

11     Q.   Was that Timothy Martin?

12 A.   Yes, it was.

13     Q.   Okay.  And beginning in 2017 but just walking

14 forward in time, are you able to describe what information you

15 have reviewed in connection with Telexfree?

16 A.   Yes, certainly.  So it's been hosted information,

17 certainly independent research.  I've reviewed the many legal

18 pleadings and filings in this case, affidavits, depositions,

19 and of course extensive review of the data itself, the various

20 tables that we've talked about in this matter already, as well

21 as other tables that were produced by Huron.

22     Q.   Okay.  And in addition to the data tables provided

23 by Huron relating to Telexfree, are there other data tables

24 that you've received from Huron relating to Telexfree?

25 A.   Yes, there were.

**JOSHUA DENNIS - Direct**

110

1          Q.   What are they?

2     A.   So at least one would be the electronic proofs of claim

3     data.

4          Q.   Okay.  Is that called EPOC?

5     A.   That's what I referred to it as, yes.

6          Q.   Let's go through the chronology of expert reports in

7     this case.  What was the first expert report that you you're

8     aware of?

9     A.   So the first expert report I'm aware of would be, I

10    believe, Mr. Martin's affirmative report that came in, I want

11    to say early 2020, maybe February timeframe.

12         Q.   Okay.  And then what was the next report?

13    A.   So that came in or that was submitted generally?

14         Q.   Just generally submitted.

15    A.   So after that, I would have submitted a rebuttal report

16    to Mr. Martin's affirmative report.

17         Q.   Okay.  And when was that?

18    A.   That would have been mid 2020, I think, maybe the July

19    timeframe.

20         Q.   Okay.  And so that 2020 report, that's your first

21    report in this case?

22    A.   It was, yes.

23         Q.   Okay.  And then what -- were there any other reports

24    in 2020?

25    A.   Yes.  Mr. Martin also served a reply report at some point

**JOSHUA DENNIS - Direct**

111

1   later that year, maybe Septemberish, fall of 2020.

2       Q.   And so to give them names, there was the first

3   report, there was your rebuttal report, and there was a reply

4   report?

5   A.   Yes, that's my recollection.

6       Q.   Okay.  And then walking forward, have there been

7   additional reports in this case?

8   A.   Yes.

9       Q.   Okay.  What reports are those?

10  A.   So that would be Dr. Freer's report.

11      Q.   Okay.  When was that?

12  A.   I believe I received it maybe April of 2022 and around

13  that timeframe.

14      Q.   Okay.  And did you issue a report, a rebuttal report

15  in response to that?

16  A.   I did.

17      Q.   And were there any reports after your report?

18  A.   Yes, there were.

19      Q.   And what were they?

20  A.   That would be Dr. Freer's reply report.

21      Q.   Okay.  And so your April twenty 2023 report is your

22  second report in this case?

23  A.   It is.

24      Q.   Okay.  You have in front of you D002.  Is that your

25  report, the 2023 report?

**JOSHUA DENNIS - Direct**

112

1  A.   Yes, it is.

2          MR. RONA:  And, Your Honor, I would offer it just in

3  the interest of time.

4          MR. LYNNE:  I think we agreed there were no

5  objections to any of the reports coming in.

6          MR. RONA:  Okay.

7          THE COURT:  Okay.

8          MR. RONA:  Okay.  So --

9          THE COURT:  But let me make the same comment I made

10 yesterday.  I'm not going to just take my time and read

11 everything you need to point out whatever -- whether it be

12 through testimony or in your closing argument, both parties,

13 if there's something you specifically want me to look at, you

14 need to point me to it.  Okay?  Thank you.

15         MR. RONA:  Understood, Your Honor.

16     Q.   What happened after you issued your report in April

17 of 2023?

18 A.   So after I showed my report, there was an evidentiary

19 hearing much like this.

20     Q.   Oh, I'm sorry.  You're referring to your first

21 report?

22 A.   I'm sorry.  Yes.  Maybe I misunderstood your question.

23     Q.   Okay.  So, well, since you said it, did you testify

24 in a prior proceeding similar to this one?

25 A.   I did, yes.

**eScribers, LLC**

**JOSHUA DENNIS - Direct**

113

1      Q.   Okay.  And that related to Timothy Martin's

2  opinions?

3  A.   It did.

4      Q.   Okay.  After you issued your second report in 2023,

5  what happened?

6  A.   Certainly.  I received Dr. Freer's reply report.  And I

7  was just deposed in this matter.

8      Q.   Okay.  And did you conduct additional queries of the

9  Telexfree data in preparation for today's hearing?

10 A.   I did.

11     Q.   How much time -- if you could estimate by either

12 ours or what other metric, but how much time would you say

13 you've worked on Telexfree in one form or another?

14 A.   Hundreds, I believe north of 400 hours.

15     Q.   Okay.  And your report, does that contain a summary

16 of your analysis and opinions?

17 A.   It does.

18     Q.   Okay. And are all of your opinions summarized in

19 that report?

20 A.   I believe so, yes.

21     Q.   Okay.  So let's start at a very high level.  With

22 respect to your 2023 report, the second report, what was the

23 approach that you took in this case?

24 A.   So the approach I took in this case was really to look at

25 the aggregation process as well as net equity but focusing on

**JOSHUA DENNIS - Direct**

114

1   the aggregation process and really looking at what were the

2   underlying assumptions that were made and where were there

3   subjective judgments.  And then I looked to go and see how

4   those judgments and assumptions, were there tethered or not,

5   to the data itself as well as my understanding of the facts of

6   this case.

7       Q.   And did you do any type of sort of cross-sectional

8   analysis to gain a better understanding of this case?

9   A.   Yes.  Where I had concerns about certain of those

10  assumptions or judgments, I went to identify and understand

11  how that may be impacting the magnitude of the impact of those

12  assumptions on participants.

13      Q.   Okay.  And is that -- what you described, is that

14  the same thing as a case study or presenting a specific

15  example of a cluster?

16  A.   That's fair, yes.

17      Q.   Yes.  And what was the reason that you selected

18  specific clusters to examine in detail?

19  A.   I think the purpose, as mentioned in that, I was looking

20  for things that were illustrative of the issue.  You know,

21  it's one thing to say is an issue but another thing to

22  understand, you know what the potential degree of magnitude of

23  that -- that issue is, you know, both across the population

24  but equally importantly for individual participants.

25      Q.   And is this approach -- to what extent is this

**JOSHUA DENNIS - Direct**

115

1    similar to the approach that you use in the data analytics

2    group at StoneTurn?

3    A.    It's very common to look at specific examples.

4         Q.    Okay.  And is this -- was this the same approach you

5    used in connection with the Timothy Martin report?

6    A.    Yes, it was.

7         Q.    Okay.  Did you do a -- there's been some testimony.

8    You've been listening to Dr. Freer's testimony.  Is that

9    right?

10   A.    I have.

11        Q.    Okay.  There was some testimony about error rate.

12   Did you do a statistical analysis of Freer's opinions or try

13   to calculate an error rate?

14   A.    No, that wasn't my approach here.

15        Q.    Okay.  Why not?

16   A.    Well, I think in the first instance, it's important to

17   consider what we mean by error rare and understand what it is

18   conceptual measuring.  Here he purpose of the aggregation is

19   really to identify net winners and quantify their net

20   winnings.  And so in doing so I think it's important to think

21   about error rate in that context.  Do we have the right people

22   and what's the magnitude of the net winnings?  And that's not

23   a measure -- an error rate that Dr. Freer has calculated here.

24   And my role was to assess and critique Dr. Freer's analysis,

25   not conduct my own affirmative analysis in this case.

116

1      Q.   Would an affirmative -- what would an affirmative

2  analysis engagement have looked like?

3  A.   I guess it would depend.  I'd have to go back and figure

4  out what that would look like in full.

5      Q.   Okay.  But is it fair to say that that wasn't part

6  of your assignment?

7  A.   That was not -- that was not what I was asked to do, no.

8      Q.   Okay.  And your -- as summarized by your report, can

9  you break down your opinions into sort of the top-level

10  categories?

11  A.   Yeah.  Let me do my best here for memory and make sure I

12  capture them all.  So I think the first -- categorically, the

13  first issue --

14          MR. LYNNE:  Your Honor, could I just insert an

15  injunction understanding that you're taking this testimony.

16  But for purposes of the record, just note my objection.  This

17  witness hasn't been qualified yet.

18          THE COURT:  Well, he's -- okay.  Overruled.  Go

19  ahead.

20          MR. RONA:  Your Honor, just a moment.

21      Q.   So I forget where you were in your answer.  But let

22  me just for the sake of the record ask.  And so are your --

23  can you summarize at the top level the categories of your

24  opinion?

25  A.   Yes.  I'll do my best to go through and make sure I

**JOSHUA DENNIS - Direct**

117

1    capture them all.  So I think the first issue is really the

2    conceptual underpinnings of the aggregation process as Dr.

3    Freer applied it, which is really the same concept to what Mr.

4    Martin had done previously, really focusing on one of the key

5    pieces of ways of aggregating which is the assumption that the

6    name that a user entered in their -- in their user accounts as

7    part of the registration process was the same or similar

8    across all of their user accounts for that participant.

9         And what we see is that as part of that sign-up process

10   and subsequent, there was no data validation that was

11   performed by Telexfree or anyone that I'm aware of that would

12   prevent a user from entering whatever information they wanted,

13   whether that was, you know, as they said, mashing the keypad

14   or something that's fictitious or arbitrary or just

15   inconsistent for any number of reasons.  And the same would

16   hold true for any of the other fields for the most part in the

17   dataset as well.

18        Q.   And so do you have an opinion as to whether any

19   assumption that involves -- in this case involves people

20   entering their own name consistently, whether that assumption

21   is reliable?

22   A.   Yeah.  I think there's two pieces to that.  I think first

23   goes to the testing of that.  And here I think one of the main

24   concerns is, is whether or not someone entered their name in

25   particular consistently.  And so here we don't have the case

**JOSHUA DENNIS - Direct**

118

1  that Dr. Freer has either tested the accuracy of the data and

2  not meaningfully tested the significance -- I'm sorry, the

3  consistency of the data in terms of ensuring that not -- that

4  a participant didn't just enter things consistently sometimes,

5  but they consistently entered it through all of their user

6  accounts to ensure that they're all brought together in the

7  right way.

8       Q.   What types of things could be used to test accuracy

9  and consistency in data analytics?

10 A.   So as a few ways.  I mean, certainly looking at any kind

11 of real world or ground truth data to ensure that your

12 assumptions that you're making are consistent with the facts

13 of the case.

14      Q.   And was that, to your knowledge, done in this case

15 by Dr. Freer?

16 A.   No, it wasn't.

17      Q.   Okay.  Do you have any opinions as to how a

18 methodology of linking records relates to a population of the

19 subjects of those records?  Meaning to what extent do your

20 opinions concern whether linkages can be applied to an entire

21 population?

22 A.   I think it's important to understand, again, the context

23 of how the data was generated and how it's being used.  So I

24 think it's important to -- to truly study the -- both the

25 accuracy and consistency to the extent that it's something

**JOSHUA DENNIS - Direct**

119

1    that's going to be highly relevant to your aggregation

2    process.

3         Q.   Okay.  And we'll get to this in a little more

4    detail.  But at a high level, could you describe the universe

5    of Telexfree participants as you sort of can summarize them?

6    A.   Sure.  So as we know, there's a very high number and

7    frankly, an unknown number of individual participants.  As we

8    know, there's millions of user accounts.  And we also know

9    it's a global thing.  We have people, according to their

10   contact information, spread across the world.  And so it's a

11   great diversity of people and participants and how -- they how

12   they acted and how they behaved is -- I'm not sure I don't

13   think it's known that that's a consistent process.

14        Q.   And are the number of user accounts consistent

15   across all Telexfree participants?

16   A.   No, it's not.

17        Q.   In what way is it not consistent or uniform?

18   A.   Again, based upon the aggregations that have been done,

19   but it's -- this part I think is it's fair, what we see is

20   that certainly on average net winners tend to have a higher

21   number of user accounts than net losers do.  Sometimes we see

22   as many as one hundred or more than 1,000 user accounts

23   associated with a single -- potentially a single participant.

24        Q.   And what was the -- besides the aggregation method,

25   again, at a top level, did you -- was there another area that

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 120 of 206
**JOSHUA DENNIS - Direct**

120

1  you looked at in this case?

2  A.   Certainly we focused on the -- the methodology, the

3  testing, the real world data.  I'm trying to think another

4  concept they we have missed.

5       Q.   Well, aside from aggregation, was there another

6  component to the analysis?

7  A.   Yes.  I'm sorry.  I -- on that track.  I certainly looked

8  at the net equity as well.

9       Q.   Okay.  And why did you look at net equity?

10 A.   Because that was one of the things I was asked to look at

11 as part of my assignment.

12      Q.   Okay.  And sort of summarizing, what did you know

13 when you looked at Huron's net equity calculations?

14 A.   So I think I had two primary concerns with the net equity

15 calculation is here and I had applied it.  The first is the

16 inconsistent treatment of credit transfer specifically.

17 I think the easy way to think about it is an example.  So if I

18 were to initiate a -- if you were to transfer 10,000 credits

19 to Telexfree on behalf of me to satisfy an invoice from new

20 accounts, and because of that, I gave you 10,000 dollars,

21 that's considered a triangular transaction.  And that money

22 that exchanged hands would -- would go as part of net equity.

23      Another way to effectuate the same thing would be for you

24 to transfer me 10,000 credits, me to give you the same 10,000

25 dollars, and me simply to use those credits to go purchase the

**JOSHUA DENNIS - Direct**

121

1   plans and memberships myself.

2        In sum and substance is the same thing.  At best is a

3   small timing difference.  In both of those situations, I'm

4   still giving you 10,000 dollars.  You have 10,000 less

5   credits.  I have my membership plan.  And Telexfree has its

6   credits.

7        But again, that second example, those transfers, that

8   money that I gave you, and now they have my plan, that's not

9   considered as part of net equity.  And I think that's an

10  inconsistent.

11       Q.   Okay.  And then any other top level impressions that

12  you formed relating to net equity?

13  A.   Sure.  Another thing that I think is potentially

14  problematic is the assumption that every credit that was

15  transferred through a triangular transaction or and certainly

16  through a regular transfer of credits as well, assuming that

17  every one of those credits that changed hands meant that a

18  real dollar, a real world dollar changed hands, what we see is

19  a very high volume of both triangular transactions and credit

20  transfers such that there was actually a market for credits.

21  Credits were a currency and as such were subject to the basic

22  laws of supply and demand where if someone had -- had low --

23  low credits or deficient credits, they may be willing to pay

24  more than a dollar, or conversely, if they had excess credits,

25  which was more than likely the case in what we've seen, they

**JOSHUA DENNIS - Direct**

122

1  may have transacted at less than a dollar.

2  And the other issue is simply that do the magnitude is

3  collection.  There is a massive amount.  You've seen the

4  dollars, and we'll show them here, of triangular transfers and

5  credit transfers such that actually getting the money in the

6  first instance, given the minimum, the global nature of the --

7  of the Telexfree I think is a question.

8        MR. LYNNE:  Your Honor, I'm just going to move to

9  strike this because that testimony has no foundation unless

10  the witness is going to testify that he did an analysis to

11  quantify what may have changed hands without dollars changing

12  or that somehow a market existed that he has some personal

13  knowledge of.  Then under those circumstances, I would move to

14  strike all of them as unfounded supposition.

15        THE COURT:  I am going to grant the motion to strike

16  all of that testimony because, as we've established, Dr. Freer

17  didn't do any of that analysis.  So if you want to call Mr.

18  Dennis back after Mr. Sorondo or Mr. Darr testifies, so be it.

19  But all of that is stricken because it's not relevant to Dr.

20  Freer.

21        Q.   Okay.  Let's talk a little bit more about data

22  quality.  Is data quality important in this case?

23  A.   Very much so.

24        Q.   Why is that?

25  A.   Because the importance of the data on the on the input

**JOSHUA DENNIS - Direct**

123

1  side -- and I think the concept -- concept of data quality

2  here is both understanding what -- how high quality or not the

3  data is and the nature of where some of the deficiency

4  might -- might be.  Because if you don't understand or don't

5  appreciate and don't account for where some of the problems

6  are, you can't appropriately move to correct them.

7          Q.   Okay.  And to what extent does data have to be

8  sufficiently reliable to be used in any type of data linkage

9  process?

10 A.   I mean, it has to be sufficient for the purpose of using

11 it.

12         Q.   Okay.  And relative to the issues of data input,

13 what were some of the things that you looked at?

14 A.   So I looked at, again, going back to what the process was

15 for -- for inputting data, you know, how did the data get

16 there in the first place that form the table we're analyzing

17 today.  You know, and what we've seen through background of

18 research and things like YouTube videos and reading

19 depositions is that there are a number of challenges and

20 considerations.  You know, a lot of these folks may have not

21 have had computer or technical expertise and relied on other

22 people's computers or had other people enter their information

23 for them.

24         We've seen examples of fields that are subject to

25 autocomplete.  We know, again, this is a global -- a global

124

1    issue.  And the -- I believe I've seen the input in both at

2    least Portuguese and English in terms of what the screen

3    looked like to enter user accounts.  So that very well may

4    have been a language barrier across some of this.  So I think

5    there is a large degree of question or concern about the

6    actual input process that that generated, you know, these

7    records.

8        Q.   Okay.

9            MR. LYNNE:  Okay.  I'm going to move to a strike that

10   is unsupported speculation.  If the witness has examples that

11   he can identify where somebody had a language barrier or where

12   there was some issue for an individual that he's aware of,

13   that's fine.  But purporting the testify as to global issues

14   without any support strikes me as entirely inappropriate for

15   this individual.

16           THE COURT:  So I'm going to overrule the objection,

17   but I'm going to give it the weight that I think is

18   appropriate which is not very much at this point.

19       Q.   To what extent did the Telexfree input system have

20   any internal validation of the data that you're aware of?

21   A.   Very little.  And I think that's evident in the nature of

22   the data itself.  You know, each of the fields have a range of

23   values that are not are not consistent -- certainly not one

24   hundred percent by any stretch.  And certainly in the name

25   field, we see numerous instances of things that are not names

**JOSHUA DENNIS - Direct**

125

1    that couldn't have been validated as such.

2         Q.   Okay.  And were you aware of whether there were any

3    incentives for a user to enter information correctly?

4    A.   Very limited.  We kind of talked about it yesterday.  I

5    think certain fields need to be accurate to some degree in

6    order to perform certain types of transactions like credit

7    card payments.  But that didn't happen all that often based on

8    what was reflected in the data.

9         Q.   Okay.  And in your report, you have examples where

10   you look at data quality?

11   A.   Yes.

12        Q.   Okay.  Can we turn to page 33 of your report, which

13   is 37 of the PDF?  This is D002.

14             MR. LYNNE:  Sorry.  What page?

15             MR. RONA:  It's page 33 of the report.

16        Q.   And what is this table showing?

17   A.   So this is showing an example of some of the -- the

18   names, the full names that were entered into Telexfree

19   database with the associated number of user accounts with that

20   full name and then the aggregate losses associated with the

21   user accounts with those names.

22        Q.   And that aggregate loss, that's just the Huron

23   figures added up?

24   A.   Correct.  That -- the net equity associated -- looking at

25   the first line, for example, there were 40,687 user accounts

**JOSHUA DENNIS - Direct**

126

1  with the name one -- looks like space one.  And the aggregate

2  losses associated with those user accounts is 2,063,193

3  dollars.

4       Q.   Okay.  And --

5            THE COURT:  Let me just make one hundred percent sure

6  that I understand.  The 40,687 user accounts are not from Dr.

7  Freer's clusters but rather from Mr. Darr or Mr. Sorondo?

8            THE WITNESS:  So those are user accounts.  So those

9  are the individual records that that people entered.

10           THE COURT:  Right.

11           THE WITNESS:  So that is the from the source data

12 that Dr. Freer relied upon.  That's what he's aggregating

13 from.

14           THE COURT:  So as I understand the cluster, Dr.

15 Freer's report has a user number at the top.

16           THE WITNESS:  Yes.

17           THE COURT:  And now the cluster has all these other

18 user accounts that he attaches.

19           THE WITNESS:  Exactly.

20           THE COURT:  Is that this table?  No?

21           THE WITNESS:  No.  These are not reflecting clusters

22 at all.

23           THE COURT:  Okay.

24           THE WITNESS:  This is before and totally separate

25 from the clustering.  This could be could have been done

**JOSHUA DENNIS - Direct**

127

1  before all of that.  This is simply taking the source data --

2          THE COURT:  Yes.

3          THE WITNESS:  -- before any of the clustering

4  occurred, looking across all eleven-plus million records, and

5  saying please show me all of those records, in this case,

6  40,687 where the -- what a person entered in the in the full

7  name or rep no me field was one space one and then saying

8  that --

9          THE COURT:  And then you did the math and this is

10  your table.

11         THE WITNESS:  That's absolutely right.

12         THE COURT:  I just want to make sure what I was

13  looking at.

14         THE WITNESS:  Yep, of course.

15         THE COURT:  Thank you for clarifying that.

16     Q.   And a related question because I'm now curious, but

17  do you know if to what extent any of these full names -- let's

18  take the first one.  It's either one one or lowercase LL, I'm

19  not sure.  But whatever that is, to what extent did that --

20  did Dr. Freer put it in a single cluster versus having it be a

21  separate cluster?  Is that something you've looked at?

22  A.   It's certainly in the data.  I don't recall if of had

23  which -- one way or the other.

24     Q.   And what problems with Telexfree data quality does

25  this table highlight?

**JOSHUA DENNIS - Direct**

128

1  A.   So I think this shows a couple of things.  You know,

2  there are I think in the prior page, you know, more than

3  200,000 separate user counts where the name entered by the

4  user is less than four characters.  You know, and so what I'm

5  trying to show is the here examples of some of these names

6  that are, frankly, unbelievable but also, importantly, the

7  magnitude of the losses associated with these user accounts.

8  So these may be unbelievable for sure, but also they have

9  large dollars attached to them that may not be aggregated

10 correctly to the extent that they were something that were

11 entered inconsistently.

12        MR. LYNNE:  Well, again, I'm going to object.  When

13 counsel -- when -- excuse me, when the witness says things

14 like that may not be aggregated correctly, if the witness is

15 intending to offer an opinion, it cannot be it's possible.  It

16 has to be it is more likely so than not.

17        THE COURT:  I'll just consider that as I consider his

18 testimony, Attorney Lynne.

19        Q.   In any event, this table you prepared for purposes

20 of assessing data quality?

21 A.   Yes.  I wanted to look at the nature and type of -- of

22 data that would be unbelievable.  And also importantly, the --

23 the dollars that are currently being attached to them.

24        Q.   Okay.  And let's go to -- maybe a better way to

25 answer my question.  If we go to page 38 of your report, which

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 129 of 206
JOSHUA DENNIS - Direct

129

1  is 42 of the PDF, there's another table.  Okay.  So what is --

2  what does this table show?

3  A.   So this shows a single cluster.  So this is the result of

4  Dr. Freer's aggregation, specifically cluster -- the cluster

5  ID here -- the cluster ID here is 23118541.

6         MR. LYNNE:  I'm sorry.  Can I just reorient myself?

7  Where am I looking now?

8         MR. RONA:  You're looking page 38 --

9         MR. LYNNE:  Oh, I'm sorry.

10        MR. RONA:  -- of the Dennis report.

11        MR. RONA:  Okay.  Go it.

12        Q.   And I'm sorry.  I wasn't sure I got the full answer.

13  A.   Sorry.  I paused partway.  So again, this is -- just to

14  be clear, this is one of Dr. Freer's clusters.  I think I'd

15  read the cluster ID.  I was just noting that what this

16  reflects is a cluster comprised of 3,536 individual user

17  accounts with total net equity of $176,446.40.  The names that

18  were aggregated in this net equity were most of the -- most of

19  the alphabet in a few blanks.  And across all of it, you can

20  see a level of high level consistency with things like the

21  street number, the address, the city, the phone number.

22        Q.   And --

23        MR. LYNNE:  Can I just observe -- I believe this as a

24  net loss, not net equity, a net loss of 176.

25        THE COURT:  I noticed that too actually.

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document      Page 130 of 206
JOSHUA DENNIS - Direct

130

1           MR. RONA:  S2:  Oh, I heard loss.  But --

2           THE COURT:  He said equity.

3     Q.   For the record -- okay.  Could you just restate

4  your -- Mr. Dennis, what the resulting equity is of this

5  account.

6  A.   Of course.  I'm sorry.  I said loss to reflect there  was

7  simply a negative then the net equity is -$176,446.40, which

8  would be a net loss.

9     Q.   Okay.  And relative to Dr. Freer's assumptions, what

10  is this table illustrating?

11  A.   So I think it's interesting case study because here,

12  despite having different names, different values in the name

13  field, it's all been aggregated together.  And the reason why

14  is because one of the things that -- that Dr. Freer does as

15  part as cleaning or -- well, part of his process will say

16  generally is to -- is to ignore where there is -- the length

17  of the name field is only one character.  He wipes those out.

18  That's how these ended up together.  And I think what that

19  goes to show is that based on the other indications of

20  commonality in here, this likely was the same participant.

21  But despite that, there is a range of values in the name

22  field.

23  And that's not to say that this particular cluster is

24  necessarily accurate and that there could very well be other

25  user accounts with that same contact or other information but

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 131 of 206
JOSHUA DENNIS - Direct

131

1  with different rep names that aren't in here that could still

2  be very well under-aggregation.  I found it interesting and

3  useful to look at this though for what it was.

4      Q.   And did Dr. Freer his report indicate what he would

5  expect to happen in an aggregation process if people had

6  different names such as Alice Adams and Bob, some last name

7  that begins with B?

8  A.   What you expect to happen?  I mean, certainly that

9  functionally he would consider from what he stated to be

10 different names and different people.

11     Q.   Okay.  Let's go to page 39, the next page of your

12 report.  And what does this table show?

13 A.   Sure.  So kind of extending from the last example where

14 that was people who put a single character, right, albeit

15 unbelievable as a name into the name field, here what we have

16 is people entering a range of different names that are all

17 equally unbelievable, more than one -- more than one

18 character, and therefore have largely been split up into

19 different clusters.  Specifically, this is an example of

20 clusters, all of whom, for at least one of their user

21 accounts, had a rep email of Billybob.arbone@gmail.com.  So

22 you can kind of see down the left side each block with the

23 cluster ID at the top, that's the cluster.  So the first

24 cluster there.

25     10758965 contains a range of rep no -- rep names of

JOSHUA DENNIS - Direct

132

1    various types of team legendary.  Most of them have that same

2    email address I mentioned.  Most, but not all are at one to

3    three Main Street with a zip code of 7700.  And then below

4    that you obviously see other team legendries and a range of

5    other different, but I'll say equally unlikely names,

6    including Walt Disney, Barack Obama, Dark Shadow Agent,

7    Hydralisk, a lot of whom share that same I'm going to go ahead

8    and guess fictitious address 123 Main Street and similar phone

9    numbers as the ones above.

10       Q.    Okay.  And just to take a step back, this first of

11   all, how did you generate this table?

12   A.    Sure.  So again, this is user accounts and I think there

13   are others, but the certain user accounts that all contained

14   at least one individual record with BillyBob.Arebone@gmail.com

15   (ph.).

16       Q.    And did you manually type this in or do you have

17   a -- was there a process by which you created this table?

18   A.    No, there was a process.

19       Q.    Okay.  What is the -- so just can you explain how

20   many as produced by Dr. Freer is this referencing?

21   A.    So it's referencing -- I believe fifteen if I counted

22   right.

23       Q.    Okay.  And can you explain why some have only one

24   name next to them but others have multiple names?

25   A.    Yes.  That's simply reflecting the different names that

**JOSHUA DENNIS - Direct**

133

1  are -- that are within that particular cluster.

2       Q.   Okay.  And what did -- what does this table tell you

3  about Telexfree data quality issues?

4  A.   I think it speaks to a few things.  You know, it speaks

5  to obviously, the fact that there can and are names in here

6  that are certainly likely inaccurate.  Right?  I mean, some of

7  them are, I'll say, clearly fictitious on their -- on their

8  face.  There are some that are probably harder to tell.  You

9  know, Barack Obama is a name.  Was he an actual participant in

10  Telexfree?  I don't know.  But obviously, it's a range of what

11  one would define as believability.

12       Q.   And what is your understanding of believability?

13  A.   I think it depends on the context here.  It can be

14  challenging, you know, the extent one imparts their --

15  their -- their judgment on what's believable.  You know, I

16  think there's some that are clearly not believable, some that

17  I think, you know, are more believable names that -- doesn't

18  make believable -- doesn't make them accurate, but it makes

19  the name believable to your perspective.  And I think it

20  becomes increasingly hard.

21       And particularly, again, what we see as the range of

22  names and the range of geographies.  Again, there's a lot of

23  geographic-specific names that are hard to determine whether

24  that's believable without having knowledge of that particular

25  geography.

**JOSHUA DENNIS - Direct**

134

1    Q.   And does this table show anything with respect to

2  data consistency?

3        S3:  In some respects, yes.  Certainly there is

4  consistency to extent you see similar email addresses,

5  addresses, phone numbers, and zip codes.  But again, here you

6  have a range of names.  And the question becomes -- and you

7  know, is team legendary in cluster ID 10758965 the same team

8  legendary in the cluster below it?  And, you know, is that the

9  same participant as Agent Hydralisk or Walt Disney or any of

10 any of the other ones that you see in here?

11   Q.   Okay.  And that might be -- that could be an example

12 of under-aggregation if there's different team legendaries

13 that are that fall into different clusters?  Would that be an

14 example of under aggregation if they were the same entity?

15       MR. LYNNE:  Objection.  That calls for speculation

16 without the foundation.

17       THE COURT:  Sustained.

18   Q.   Well, could you explain what under-aggregation is?

19 A.   Sure.  So here the purpose is to identify participants

20 and focusing here specifically on net winners and thereby

21 quantify their associated net winnings.  So in that context,

22 under-aggregation would be if a user account associated with a

23 specific economic actor who benefited from or lost that

24 particular amount of dollars wasn't appropriately attributed

25 to that particular participant.

**JOSHUA DENNIS - Direct**

135

1      Q.    And in this case, have you observed any instances
2   where adding the two under-aggregated accounts or clusters
3   together reversed the net equity either from a negative to a
4   positive or positive to negative?
5   A.    Yes, I have.
6      Q.    And were -- did you observe some of those instances
7   in the slides that were prepared for this hearing?
8   A.    I did.
9         MR. RONA:  Your Honor, if I could maybe do one with
10  the witness just to explain the phenomenon.  And then I'll
11  move off.  Is that --
12        THE COURT:  I'm sorry.  Do one what?
13        MR. RONA:  Do one of those slides, 55 to 85.  I just
14  would do the one that I put in front of Dr. Freer just to ask
15  Mr. Dennis a couple of questions about it.
16        THE COURT:  Well, my concern is that it's not -- I
17  mean, I want to hear -- I mean, my understanding of this
18  witness is supposed to persuade me that Dr. Freer's
19  methodology and results should not be admitted.  That's what I
20  understand I'm supposed to be deciding.  The net winning, net
21  losing, he didn't do anything with that.  So I think it's for
22  another day.  But I -- what's your response to that?
23        MR. RONA:  Well, I would say that, again, our
24  position is that it's for today.
25        THE COURT:  Right.

**JOSHUA DENNIS - Direct**

136

1          MR. RONA:  But I would also say that it does have an

2     impact on how one assesses the data itself.

3          THE COURT:  Well, common sense tells me if people

4     weren't included, there's going to be a mistake in the math.

5     I don't need this witness to tell me that.  Right?  I mean,

6     it's not -- I get that on the commonsense level.

7          MR. RONA:  Okay.  Understood, Your Honor.

8          THE COURT:  And so let me let me repeat what I said

9     before which is -- and I remember the slide.  And it had all

10    these other columns that -- I think they may be relevant

11    later.  I just don't see how they're relevant now.

12         MR. RONA:  Okay.  Understood, Your Honor.

13         THE COURT:  So I'm going to sustain the objection

14    that attorney Lynne already made earlier about that chart.

15         MR. RONA:  And so without going there, then, Your

16    Honor --

17    BY MR. RONA:

18     Q.   Did you -- aside from those slides that you prepare

19    for this hearing, did you observe other instances of

20    under-aggregation in this case?

21    A.   I did.

22     Q.   Okay.  And did you attach some of those to your

23    report?

24    A.   I did.

25     Q.   Okay.  Let's look at Exhibit 44, D44.  This is

137

1   Exhibit 18 to the Dennis report.  And I'll do page 1 of the

2   PDF.

3           MR. LYNNE:  Exhibit 18 did you say?

4           MR. RONA:  It's Exhibit 18 to the Dennis report, but

5   it's D044 on the electronic version.

6           MR. LYNNE:  It's a big chart.

7           MR. RONA:  Yeah.  If you could just zoom into the --

8   and Mr. Dennis, when you're there, could you let me know?

9           THE WITNESS:  I'm there.  Thank you.

10      Q.   Okay.  In terms of data analysis, what does this

11  chart show?

12  A.   So what this is showing is comparing two of the clusters

13  that were aggregated by Dr. Freer.  The first cluster is

14  cluster ID, 10838191.  And the second cluster is 10811451.

15          MR. RONA:  And if you could, Mr. Duran, just go to

16  the right ever so slightly so that we can see the name and

17  email.  That's actually good.

18      Q.   What are your observations about these two clusters?

19  A.   That there is a very high degree of overlap and

20  similarity between the two of them.

21      Q.   Okay.  And did you look at the name field in trying

22  to figure out what happened here?

23  A.   Yes.

24      Q.   Okay.  And what did you -- what did you find in

25  looking at the name field?

**JOSHUA DENNIS - Direct**

138

1  A.   So here what we see is in the first cluster, the rep no

2  me, the rep name, ss Oscar Enrique Sosa Escuple (ph.).  And in

3  the second name field down below, below that dark line, in the

4  second cluster, the name field shows Oscar Sosa.

5       Q.   Okay.  And in terms of doing an analysis that

6  involves looking at names, does one have -- does an expert

7  have to be familiar with different naming conventions across

8  different cultures and nationalities?

9  A.   I think that would be necessary in this case.  Yes.

10      Q.   Okay.  And do you, based on your experience, have

11 familiarity with naming conventions for Spanish-speaking

12 people?

13 A.   That's something I've seen in this data and I've

14 encountered before.  Yes.

15      Q.   Okay.  And what have you seen with respect to last

16 names?

17           MR. LYNNE:  Well, objection.  This is Portuguese, not

18 Spanish.  So I don't understand his familiar already with

19 Spanish naming conventions.

20           THE COURT:  Sustained.

21           MR. RONA:  Okay.  Well, if you could scroll to the

22 right, Mr. Duran.

23      Q.   Okay.  I'm not sure we have any basis to know that

24 it's Portuguese.  But regardless of the nationality or

25 language, are you aware that there are variations of how a

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 139 of 206
JOSHUA DENNIS - Direct

139

1  number of last names people use or whether they use their

2  middle name or not?

3  A.   So certainly specific to this dataset, right, what we --

4  what we see in this dataset is a high prevalence.  And I've

5  seen lots of examples of multiple different names or strings

6  or tokens, whatever we like to call them, in that rep no me

7  field, right?  Not just Josh Dennis or Josh Whitney Dennis.

8  It tends to be often ranging from one to four or more

9  different names in that field.

10       Q.   Okay.  All right.  Let's move on.  Let's go to D033.

11  This was, I believe, Exhibit 7 to your report.  And when Mr.

12  Duran Zooms in and sort of at that point, I think, are you

13  able to recognize what this is?

14  A.   Yes, I do.

15       Q.   And what is this?  What does this show?

16  A.   So this is a summary of the top one hundred net losers in

17  Telexfree, so with negative net equity based upon Dr. Freer's

18  aggregations.

19       Q.   Okay.  So this is --

20            THE COURT:  An interrupt one more time again because

21  I just want to make sure.  This is your chart though because

22  you all know what you're looking at.  I'm looking at this for

23  the first time.  But Mr. Dennis, you created this chart,

24  correct?

25            THE WITNESS:  Yes.  This is my exhibit.

**JOSHUA DENNIS - Direct**

140

1          THE COURT:  Okay, right.

2          THE WITNESS:  I created it based upon the clustering

3     that Dr. Freer performed.

4          THE COURT:  Okay.  I just wanted to make sure I know

5     what I'm looking at.  Go ahead.

6      Q.   And why did you prepare a chart of the top one

7     hundred net losers as clustered by Dr. Freer?

8     A.   So I think there's a couple of reasons.  The first is I

9     think it's helpful to see what the sides look like, what those

10    outliers look like, because one of the things that I typically

11    do and typically done is look at things for a determination of

12    reasonableness.

13         In this case, you know, in my experience in Ponzi schemes

14    is that you don't typically see people with a high degree or a

15    large amount of net losses.  Usually that -- usually the

16    longer you stay in a Ponzi scheme, you eventually become

17    positive.  And to the extent that you're continuing with what

18    just shows to simply by account after account after account

19    and do nothing with it would be counter to intuition.  And I

20    wanted to see and look at specifically to what extent some of

21    this may in fact represent under-aggregation, right, in simple

22    instances where these net losses in reality should be attached

23    to potential net winners or simply other accounts but were not

24    for for whatever reason.

25     Q.   Okay.

## JOSHUA DENNIS - Direct

141

1          MR. LYNNE:  Well, I'm going to object to this -- to

2     the extent that the witness has not late explanation as to

3     whether he is going to tie any of these to an actual

4     under-aggregation.  If it's simply it could be an

5     under-aggregation, I don't see how that is admissible to the

6     Court's determination.

7          THE COURT:  Overruled at this point, subject to your

8     cross-examination, Attorney Lynne.

9     Q.    One and the top 100 net losers, that was also a

10    chart that you prepared in connection with Mr. Martin's

11    report.  Is that right?

12    A.    Yes.  I had done the same.  And certainly some of the

13    names that we see on here, for example, the -- the one we just

14    looked at before this Oscar Sosa Escuple, if you scroll down

15    slightly -- there we are, right there -- that was that was the

16    example that we just looked at a moment ago.

17    Q.    Okay.

18    A.    But I have other examples focusing on other of these top

19    net losers, including Sandra Ley de Vasconcelos.  Right there,

20    number 12.

21    Q.    Okay.  So did you also prepare a similar chart for

22    the top net winners?

23    A.    I did, yes.

24    Q.    Okay.  And so is this sort of a standard technique

25    that you use to try to assess data before going into the --

**JOSHUA DENNIS - Direct**

142

1   into the weeds?

2   A.   Absolutely.  I think it's important to understand what --

3   you know, where the big dollars are, understanding the output

4   of the analysis.

5       Q.   Okay.  Did you observe instances of over

6   aggregation?

7   A.   I did.

8       Q.   If we could go to page 41 of your report, it's 45 of

9   the PDF.  And this one, I think if you can just walk through

10  it.  What does this show?

11      Q.   So here --

12          MR. LYNNE:  Once again, I'm sorry.  I apologize.  I

13  just need to do all this from here.  I just need to open up

14  the report.

15          THE COURT:  Sure.

16          MR. LYNNE:  Page 45?

17          MR. RONA:  41.

18          MR. LYNNE:  I'm sorry.  I'm there.  Sorry.

19          MR. RONA:  And Mr. Lynne, are you ready for me to

20  proceed?

21          MR. RONA:  I'm sorry.  I thought -- yeah.

22          MR. LYNNE:  Okay.

23          MR. RONA:  I'm sorry.  I thought I said something.

24      Q.   So what does this show, Mr. Dennis?

25  A.   So I think we touched on this earlier, but this is an

**JOSHUA DENNIS - Direct**

143

1   example that I created that summarizes one of Dr. Freer's

2   clusters.  This is cluster ID 119427.

3        Q.   And so the rows -- it took me a while to understand

4   this, but I think I got it.  So the rows that appear under

5   name, what are those with respect to the cluster?

6   A.   Sure.  So each of those names under the rep no me the

7   unique name values that appear within that particular cluster.

8        Q.   Okay.  And then if you look at in the middle, Elaine

9   Carrera, there's sort of a big box, and then there's multiple

10  email addresses next to that in the third column, what is the

11  significance of one name box having multiple email boxes next

12  to it?

13  A.   Sure.  Of course.  This is -- what this is saying by

14  block is saying, you know, if this is all cluster ID 119427

15  and then within that block there's the rep no me, within that

16  in this example, the Eliani Cariero (ph.) block, kind of

17  biggest one in the middle, there is a range of different email

18  addresses that were associated with that rep name, Elaine

19  Cariero -- Eliani Cariero, within this particular cluster.  So

20  in this case, Eliani Cariero, there were one, two, three, six

21  different unique email addresses associated with that

22  particular name within this cluster.

23       Q.   And do you have an understanding -- we talked, I

24  think, this morning about chaining.

25  A.   Yes.

**JOSHUA DENNIS - Direct**

144

1      Q.   Okay.  What does this show, if anything, in terms of

2  chaining?

3  A.   I think this goes to what we spoke about before, which

4  the concept that as A is similar to B and B is similar to C

5  and C is similar to D and so on, you can end up in a place

6  where that whereby A is very different than D or E or F or so

7  far -- so far down.

8      And that's where we're seeing here, where you can find

9  two names within this -- within this cluster that are similar.

10 But as you kind of go farther down, you end up in a place

11 where you started is very different from where you ended both

12 in terms of the name as well as other contact information.

13     Q.   And do you -- do you have any opinions in a case

14 like Telexfree as to the significance of over-aggregation?

15 A.   Well, I -- there's two pieces to that.  You know, 1 is

16 obviously the amount of the equity.  You know, there are --

17 certainly if, as you see here, there are records associated

18 with John Carreiro that are -- have substantial net winnings

19 associated with that, that name in this cluster of 112,639

20 dollars.  I'm right there, right there down the bottom.  Thank

21 you.  And other net equity amounts associated with people with

22 different names towards the top.  For example, you'll see

23 Elian B. -- it looks like Elian B. Carreiro with a period.

24 About a third of the way down you can see that one has, you

25 know, net equity of $210,371.50.  So --

**JOSHUA DENNIS - Direct**

145

1        MR. LYNNE:  So I'm just going to object here.  We're

2   really staying into an area that is supposed to be reserved

3   for a later here as opposed to Dr. Freer's methodology.

4        THE COURT:  I'll let the testimony stand as it -- as

5   it is.  But you're right, Attorney Lynne.  Let's keep going.

6        MR. RONA:  We can move on, Your Honor.

7        THE COURT:  Although, let me let me just ask because

8   I think he may have said this really quickly.  How did you

9   decide to choose this cluster?  It was just one of the biggest

10  ones?

11       THE WITNESS:  No.  I chose this cluster because of

12  the variety of different -- different names.  My understanding

13  of one of the tasks that Dr. Freer set out to do was to

14  identify participants.

15       THE COURT:  Right.

16       THE WITNESS:  So what I wanted to do is, is find

17  examples of clusters where it wasn't clear to me what

18  participant was being identified.  And so that's how I -- one

19  of the reasons they landed on this particular cluster, the

20  variety of names and the variety of contact information

21  associated with those names.

22       THE COURT:  And in the previous chart you did a

23  similar analysis of -- this was a net winner of a net loser.

24  I'm sorry.  I should have probably asked it at the time.  But

25  when we were going through the previous chart, there were a

**JOSHUA DENNIS - Direct**

146

1    lot of different names.  And I thought the testimony was

2    something about I looked at the lowest number of net losers or

3    something along those lines.  Mr. Dennis, do you recall

4    something like that?

5            THE WITNESS:  This one here?

6            THE COURT:  Yes.  What were you telling me about how

7    you chose those people?  No, but the previous slide, Attorney

8    Duran, where you just were.

9            THE WITNESS:  It was the top one hundred.  Is that

10   you're referring to, Your Honor?

11           THE COURT:  Yes.

12           MR. RONA:  Okay.

13           THE COURT:  So that's something different than what

14   you did here?

15           THE WITNESS:  Very much so.

16           THE COURT:  Okay.

17           MR. DURAN:  This?  I'm sorry.

18           THE WITNESS:  Yeah.  So what we were looking at here

19   was each row, each record represents a cluster with a range of

20   user accounts, the first one having 62,000 user accounts.

21   That's kind of a unique one but obviously a range of user

22   accounts.  That was simply the top one hundred.  So that

23   wasn't going in and selecting one for particular reason other

24   than these are the largest net losers based on their net

25   equity that's been aggregated to them.

**JOSHUA DENNIS - Direct**

147

1          THE COURT:  Okay.  Thank you.

2    BY MR. RONA:

3          Q.   And have you seen other examples of chaining besides

4    the Carrero Lopez case?

5    A.   Yes, I believe so.

6          Q.   Okay.  Based on your review of Dr. Freer's report

7    and listening to his testimony, what did he do to test data

8    quality?

9          Q.   So he described it during his testimony.  But

10   largely, I'll break it up into two parts, he certainly looked

11   at each individual field, I'll say, in isolation, right, to

12   look at, for example, how many times was blank and, you know,

13   how many times it appeared to represent what are supposed to

14   represent and things like that.  He also did certainly some

15   work to look at it, you know, kind of record by record and

16   saying, you know, does this kind of hold together on an

17   individual record basis and then did in his reply report.

18          And in fact, some of that, I think just for this

19   particular hearing, he had additional examples where he looked

20   at just a handful of small groups of accounts, a record

21   accounts.  But I think that doesn't fully -- it doesn't speak

22   at all to the accuracy.  It doesn't do -- it doesn't

23   sufficiently speak to the consistency.

24          Q.   How did Dr. Freer test accuracy, if at all?

25   A.   Relative to the input into the data quality?

**JOSHUA DENNIS - Direct**

148

1        Q.    Yeah, relative to data quality.

2    A.    don't see -- I haven't seen any indication that he

3    tested the data accuracy.

4        Q.    And did you see any effort by Dr. Freer to identify

5    pseudonyms or nicknames?

6    A.    Not specifically.

7        Q.    Did you see any effort by Dr. Freer to

8    compartmentalize fictional names or do any analysis with

9    respect to whether the name related to a real person or not?

10   A.    Can you ask that question again?

11       Q.    Well, did Dr. Freer do any analysis as to the

12   validity of names?

13   A.    To the extent validity is the same as accuracy, my

14   understanding is he didn't.

15       Q.    Okay.  To your knowledge, did Dr. Freer look at any

16   real world data?

17   A.    The only thing I recall being -- he cited to in his

18   report that would be considered real world data would be the

19   Balan affidavit.

20       Q.    Did Dr. Freer, to your knowledge, look at the EPOC

21   data?

22   A.    My understanding is he did not.

23       Q.    Okay.  And to your knowledge, did Dr. Freer talk to

24   any participants?

25   A.    I don't believe so.

**JOSHUA DENNIS - Direct**

149

1      Q.   Okay.  You may have said this before, but in your --

2   in your profession, how important is real world data?

3   A.   I think obviously it depends on -- on the nature of the

4   task.

5      Q.   Okay.  Well, in a case where you have to link

6   disparate datasets or assess data quality, how important is

7   having data that is grounded in truth?

8   A.   I think it's quite important.  You know, I think

9   particularly when there is no data validation being performed

10  on the input side, I think understanding the background of,

11  you know, how the data by whom the data was entered, the --

12  particularly -- and the fact that people, individuals are

13  entering hundreds or thousands of user accounts, I think those

14  are all reasons that making sure that your analysis is

15  grounded and has some basis to case-specific facts is

16  important.

17     Q.   And in total, what is your opinion about the

18  sufficiency of Dr. Freer's data quality assessment?

19          MR. LYNNE:  I'm just going to object for the record.

20  This witness is not qualified.

21          THE COURT:  I'll overrule the objection.  Go ahead.

22  You can answer.

23  A.   I don't think it's sufficient.  I think, again, the two

24  key areas are accuracy and consistency which are two of the

25  most important dimensions of data quality going for when

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document   Page 150 of 206
JOSHUA DENNIS - Direct

150

1   you're looking at data deduplication and linkage.  You know, I

2   don't think it's sufficient just to look at a very small

3   handful of different clusters that already have the same name

4   and saying, look, this is consistent across other identifiers.

5   The important question is, are there other records, other

6   clustered, other user accounts that may not share that same

7   exact name.  And when I say exact, I don't mean off by a

8   period, but for example, where first name and last name are

9   juxtaposed or people only using their first and middle name

10  instead of their -- instead of the last name, things of that

11  nature which are inherently believable but nonetheless may not

12  meet the criteria of similarity that Dr. Freer is applying.

13        MR. LYNNE:  Well, objection.  Dr. Freer's testimony

14  did not say he was looking for consistency other than through

15  his algorithm.  And this witness has not testified that he

16  looked at any meaningful statistical sample which would be

17  sufficient to say that this is the problem across this set

18  database.

19        THE COURT:  Overruled.  And you'll have your chance

20  very soon, Attorney Lynne, to cross-examine.

21        Q.   You had mentioned, I think, sampling or looking at

22  samples.  To what extent was Dr. Freer's review of -- I think

23  in his report it was 300 accounts.  And then in his --

24  yesterday's testimony, there was a discussion of 400 accounts

25  that were reviewed.  To what extent is a sampling of 3- or 400

**JOSHUA DENNIS - Cross**

151

1   accounts in a case the size of Telexfree helpful for assessing

2   data consistency?

3   A.   Again, that sampling was focused on believability.  I

4   don't think it really spoke to the consistency.  Again,

5   consistency is how often did a single participant enter the

6   same information and specifically and importantly name across

7   all of their user accounts.  You know, sampling individual

8   records isn't going to tell you that answer.

9        MR. RONA:  Your Honor, could I just have one moment?

10        THE COURT:  Sure.

11        MR. RONA:  That's all I have for my witness.

12        THE COURT:  Okay.  Thank you.

13        Attorney Lynne?

14        MR. LYNNE:  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. LYNNE:

17        Q.   Mr. Dennis, let me go back to your background and

18   experience.  You graduated from Skidmore College in 2004,

19   correct?

20   A.   That's correct.

21        Q.   With a degree in management and business which

22   included courses in accounting, economics, finance, and

23   marketing.  Correct?

24   A.   That's correct.

25        Q.   You took one semester long statistics course as part

**JOSHUA DENNIS - Cross**

152

1  of your undergraduate studies, correct?

2  A.    That's accurate.

3      Q.    And while you minored in computer science, you could

4  at your deposition remember only one data science course, and

5  that was just studying how to create relational databases

6  using Microsoft Access, right?

7  A.    For -- under my computer science, right, a number of

8  programing courses and the Access course you mentioned.  Yes.

9      Q.    Okay.  And after college attended one SQL programing

10  course of a couple of weeks' duration, right?

11  A.    Yeah.  Fairly -- excuse me.  Yes.  Fairly early on, I

12  took that that course and then continued to use SQL pretty

13  much daily thereafter.

14      Q.    I'm just asking you for a yes or no, sir.  You took

15  one couple of weeks SQL course after you graduated in 2004.

16  Correct?

17  A.    Yes, that's accurate.

18      Q.    All right.  And well, you -- some knowledge of

19  Python, the open source data science tool, and only used it a

20  bit more than a handful of times, right?

21  A.    On a handful of cases, Yes.

22      Q.    Well, let me direct you to --

23          MR. LYNNE:  Can I pull up the deposition, please?

24          MS. PAPAS:  Yes.  Let me -- may I approach to give

25  you a copy?

1        THE COURT:  Sure.

2        THE WITNESS:  Thank you.

3    Q.   And if you would turn to page 45.  Directing your

4  attention starting at line 11, I will -- I'll read it to you.

5  And you can confirm that I read it correctly.

6    Question, "When you say we use Python notebooks, do

7  you -- are you versed in Python?"

8    Answer, "I have some base knowledge."

9    Did I read that correctly?

10 A.   You did.

11   Q.   All right.  And then Panda, if you're aware that

12 that's a set of libraries built using for Python and for

13 sophisticated data analysis.  You're familiar with that fact,

14 right?

15 A.   I am.

16   Q.   All right.  And you only use Pandas a handful of

17 times in your career, correct?

18 A.   Again, if I had been more --

19   Q.   Yes or no.

20 A.   -- specific on times, it was a handful of matters,

21 different cases.  Yes.

22   Q.   Sir, your experience in probabilistic computing,

23 let's confirm first that you have no direct experience using

24 the Foligi (ph.) center algorithm in any of your prior

25 engagements, correct?

**JOSHUA DENNIS - Cross**

154

1    A.    That's accurate.

2         Q.    All right.  And to the extent that you have any

3    understanding about how Foligi center with or without

4    expectation maximization, the only knowledge you have with

5    respect to that or understanding is what you have read in Dr.

6    Freer's report, correct?

7    A.    Or the other documents and studies he relied upon.

8         Q.    I'm sorry?

9    A.    That in addition to the documents and the literature he

10   cited as well in its report.

11        Q.    I'm going to direct your attention to page 64.

12   A.    I'm sorry.  my report or my deposition?

13        Q.    I'm sorry.  You deposition.  Starting a page -- or

14   excuse me, page 64, line 6.  I'll read for you.

15        Question, "Well, then -- well, other than referring to

16   what's in Dr. Freer's report, do you have any understanding as

17   you sit here today as to how FASM differs from FS?"

18        Answer, "That's not something of independently studied."

19        Did I read that correctly?

20   A.    You did.

21        Q.    Thank you.  You also have no understanding of how

22   the FESM model calculates relevant field weights other than

23   what you have read in Dr. Freer's description of that in his

24   report, correct?

25   A.    That is correct, yes.

**JOSHUA DENNIS - Cross**

155

1      Q.   And to the extent -- or strike that.

2          With respect to your probabilistic modeling experience,

3   when asked to describe your computing -- your probabilistic

4   computing experience, the only thing you could identify was

5   using fuzzy matching, quote, "Whether it's TFIDF or Jaccard

6   distance or Levenshtein or some combination thereof."  Do you

7   remember testifying to that?

8   A.   I did.  I believe I mentioned one other matter I use

9   probabilistic linkage on, but I do remember saying those words

10  as well.  Yes.

11     Q.   Let me direct your attention to page 61.

12         Question.  Page 61, line 14, "Whether it's a software

13  package or whether it's a native code, whatever it is that you

14  consider to rise to the level of a probabilistic computing

15  system as a deterministic computing system?"

16         Answer, "Generally, if we look at probabilistic record

17  linkage, it's usually a combination of things.  It can be.

18  Some aspects might be deterministic.  Some aspects may be

19  probabilistic.  We often do use fuzzy matching as part of

20  that, whether it's TF idea or Jaccard distance or Levenshtein

21  or some combination thereof."

22         And that's what you were referring to, sir, when you were

23  referring to your probabilistic experience, correct?

24  A.   Those were certainly fuzzy matching pieces or algorithms

25  that were used as part of other probabilistic analyzes I

## JOSHUA DENNIS - Cross

156

1  performed.

2          Q.   All right.  What is TF idea?

3  A.   Term frequent inverse document frequency I believe is

4  what it stands for.

5          Q.   And when I asked you that question during your

6  deposition, you were unable to tell me, correct?

7  A.   That's right.  I hadn't recalled at the time what that

8  acronym stood for.

9          Q.   And actually, TF-IDF is not a fuzzy matching tool.

10 It is, in fact, an algorithm for determining how important a

11 particular word is relative to the document itself.  Isn't

12 that right?

13 A.   That's one application for it.  It could also be used for

14 fuzzy matching.

15         Q.   Well, how did one use fuzzy matching -- TF-IDF in a

16 fuzzy matching capacity if its function is to find the

17 importance of a term to a relatively sized document?  Strike

18 that.  That is a terribly phrased question.  Let me try that

19 again.

20         TF-IDF is used in web search is regularly to determine

21 whether the returned result should be ranked in one way or

22 another, correct?

23              MR. RONA:  Your Honor, I --

24         Q.

25              THE WITNESS:  A Google search?

**JOSHUA DENNIS - Cross**

157

1          MR. RONA:  Your Honor, I'm not clear what the

2     relevance of this discussion is.

3          MR. LYNNE:  Well, I think the witness doesn't even

4     understand what TF-IDF is.

5          MR. RONA:  I'm not sure anyone in the courtroom does

6     either.  But I don't think that that's relevant to what

7     we're -- there's no testimony that Dr. Freer used it.  There

8     is no testimony in the direct that Mr. Dennis used it.  So

9     like the price of tea in China, I don't think this is relevant

10    to anything.

11         MR. LYNNE:  Well, the point is that when the witness

12    was asked what his probabilistic computing experience was, he

13    identified fuzzy matching and included in that TF-IDF, a

14    nonfuzzy matching tool.  And I think it's important for the

15    Court to understand that this particular witness, his

16    experience in probabilistic computing, is limited to fuzzy

17    matching of which he has an incomplete understanding if he

18    otherwise is intending to include TF-IDF in the definition of

19    fuzzy  matching.  That's why I'm examining the witness on this

20    point.

21         MR. RONA:  I'll just rest on my objection and also

22    object to testimony of counsel as to what TF-IDF is.

23         THE COURT:  Certainly, counsel's questions, comments

24    are never evidence for me.  But you can -- it's overruled.

25    Attorney Lynne, go ahead.

1          MR. LYNNE:  All right.  And could I pull up -- if you

2    actually pull up the Freer aggregation methodology.  I would

3    like to turn to the Freer flowchart which shows the

4    methodology itself, which can be found on page -- sorry.  All

5    right.  Here we go.  D9, slide 9.

6          THE WITNESS:  I'm sorry.  Which binder is this?

7          MR. RONA:  Your Honor, they're using the PowerPoint

8    that they sent us on Monday before 5 p.m., that Mr. Dennis, I

9    guess, has had the same amount of time as Dr. Freer to review

10   what we sent to them.  So I would just invoke the same

11   objection that they did, that he hasn't had time to prepare

12   for this, doesn't have it in front of him.

13         MR. LYNNE:  This flowchart was contained in the

14   Freer's -- Dr. Freer's original report.  And it was also

15   included in Dr. Freer's reply report.  So I believe this

16   witness has had extensive time to look at this particular

17   flowchart.  And in fact, he refers to and comments on it in

18   his reply.  I'm not sure how the timing of this particular

19   document affects his understanding of the Freer methodology

20   flowchart that he has had access to for many months.

21         MR. RONA:  Your Honor, no objection to use of this

22   slide, but I reserve on the other slides because there's

23   content that he hadn't seen and didn't --

24         THE COURT:  I see.

25         MR. RONA:  -- wasn't involve in the creation of it.

**JOSHUA DENNIS - Cross**

159

1          THE COURT:  Okay.  And if you are able to make it a

2    little bit bigger.  If you can't, that's okay.  Go ahead,

3    Attorney Lynne.

4    BY MR. LYNNE:

5          Q.   Sir, you've seen this, this Freer methodology

6    flowchart before, haven't you?

7    A.   I have.  It would help to have a hard copy to extent

8    we're going to talk about in detail.

9          Q.   Well, I'm just going to ask you some general

10   questions first.  You see there are steps 1 through -- 1

11   through 5.  And you were present when Dr. Freer talked about

12   his cleaning process, right, steps 1 through 5 which included

13   fuzzy matching and cleaning, removing the errant spaces and

14   the like.  You were here in the courtroom when he testified to

15   that?

16          MR. RONA:  Your Honor, may --

17          THE COURT:  Hold on one second.  So --

18          MS. PAPAS:  Can I interrupt?  You have the binder.

19   It's --

20          THE WITNESS:  Which binder is that?

21          MS. PAPAS:  it's the trustee's --

22          THE WITNESS:  I see my --

23          MS. PAPAS:  -- exhibits.  It's the bigger one.  I

24   think counsel had put it on the floor behind you.

25          THE WITNESS:  Oh, it's on the floor behind me?  Thank

160

1   you.  Trustee exhibit.  Thank you.

2          MS. PAPAS:  So D-33 is the presentation.

3          THE WITNESS:  One more time.

4          MS. PAPAS:  D -- P-33.

5          THE WITNESS:  P-33.  Thank you.

6          MS. PAPAS:  It's at the back, slide 9.

7          THE COURT:  Hold on one second, Attorney Lynne.  And

8   I'll have you repeat that once the witness can see the hard

9   copy.  It'll be much easier.

10         MR. LYNNE:  No problem.

11     Q.   Actually, if you turn to DM-003.  And if you could

12  just scroll through.  And I'm going to show the steps on the

13  right-hand column.  Thank you.  Sir, you'll see that steps 1

14  through 5 is preparation of the data for the FSM analysis,

15  correct?

16  A.   That's what it stays on -- states on the right, yes.

17     Q.   Okay.  And your understanding is that, Dr. Freer, to

18  the extent he used fuzzy matching principles, all that

19  occurred somewhere within steps 1 through 5, right?

20  A.   That where is employed.  Obviously it gets utilized --

21  the results of that gets utilized throughout the model.  But

22  that's where he employed the fuzzy matching.  Yes.

23     Q.   All right.  And it's really.  And it's really step 6

24  with the Foligi center expectation-maximization algorithm

25  where the cleaned (indiscernible) is actually (indiscernible)

1 are created based on gamma --

2   THE COURT:  Hold on.  Hold on one second.

3   Mr. Barrera, are you getting any of that?

4   You're cutting out, Attorney Lynne.

5   MR. LYNNE:  I apologize.  Let me try it again.

6   THE COURT:  No, of course.

7   Q.   And step 6 would be where Dr. Freer actually takes

8 the data that has been cleaned and then uses the Foligi center

9 algorithm to then analyze pairwise matches to determine their

10 closeness to each other based on assigned match weights and

11 gamma values, right?

12 A.   I think you referred to steps 1 to 5 as cleaned.  I think

13 it's more than just cleaned.  It's cleaned and blocked.  So

14 there's obviously more going on in those first steps, 1

15 through 5.

16   Q.   Am I right in understanding -- I believe that you've

17 never actually used blocking yourself, have you?  a cell.

18 Have you?

19 A.   I've never -- I've certainly done fuzzy matching which is

20 the what they employed in blocking.  I've never used blocking

21 in the context of a Foligi center model as this, no.

22   Q.   No, no.  I'm not limiting to the Foligi center

23 model.  During your deposition, you were unable to identify a

24 single prior engagement involving blocking a dataset, right?

25 A.   Certainly block -- to the extent blocking relates to

**JOSHUA DENNIS - Cross**

162

1  restricting what data is being looked at, certainly.  I've not

2  done blocking to the extent that it is being used in a Foligi

3  Center dataset.

4       Q.   I'm not limiting to a Foligi Center dataset, sir.

5  In your deposition, do you remember testifying that you were

6  unable to identify a single prior engagement involving

7  blocking a dataset?

8  A.   Again, I think it -- if I -- to the extent that I haven't

9  used blocking in a Foligi Center, yes.  But the process of

10  blocking, right, the process of limiting what you look at and

11  restricting it based on criteria including fuzzy matching,

12  yes.  So if I misunderstood what you meant by blocking my

13  apologies.

14       Q.   Well, let's turn to page 74.  And I'm directing your

15  attention to line 19.

16       Question, "Have you ever had a prior engagement which

17  requires you to perform blocking against a very large

18  dataset?"

19       Answer, "I'd have to go back and think.  I'm not sure

20  I've thought about it."

21       Question, "Well, take your time.  Think about it."

22       Answer, "Thought about that.  We certainly have had

23  matters that have involved large data that would look to

24  distill down to that which in those facts we thought were most

25  relevant and pertinent."

**JOSHUA DENNIS - Cross**

163

1      Question, "Well, that's not blocking.  That's sort of an

2  ad hoc determination as to what things you want to look at,

3  right?"

4      Answer, "I disagree that it's an ad hoc determination.

5  The purpose of blocking is to go in and try to look at only

6  and perform subsequent analysis at least initially on those

7  papers that Dr. Freer in his -- determined in his opinion

8  thought had a chance of potentially having linkage."

9      Question, "Right.  I'm trying to determine in a -- do you

10  have any -- have you had any prior engagements which requires

11  you to engage in blocking large datasets to reduce computer

12  time to make it realistic?"

13      Answer, "I don't know if I've done it for purposes of

14  minimizing computer runtime.  I'd have to go back and think on

15  those.  Obviously, that's a lot of cases in the last twenty

16  years."

17      And I asked you subsequently whether you had thought of

18  any blocking engagements or instances in which you had blocked

19  large datasets.  And I believe you said you hadn't -- you

20  weren't able to think of any during your deposition.  Is that

21  right?

22  A.   I think you asked me specifically if I'd done blocking

23  for large datasets for purposes of minimizing runtime.  And

24  that I couldn't answer specifically.  I didn't remember then

25  and I can't think of any specifically now.

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 164 of 206
**JOSHUA DENNIS - Cross**

164

1      Q.   Have you ever had an engagement in which you were

2   required to undertake blocking to reduce the amount of

3   computer runtime because the dataset was so large that the

4   pairwise comparisons would be simply unrealistic without

5   blocking?

6   A.   I can't think of using blocking for that purpose.

7      Q.   Okay.  Then what purpose have you been using

8   blocking for?

9   A.   I think generally, as I've used blocking, it would simply

10   be looking to reduce -- rather than saving computer runtime,

11   human runtime, right, the amount of -- amount of things I need

12   to review manually.  So taking what is a large dataset,

13   comparing the two, and then winnowing it down to a subset of

14   using fuzzy matching and other techniques to a subset that is

15   more likely to be potential matches, then we would then

16   manually review those.  So the blocking step was --

17      Q.   Well, I want you to --

18   A.   -- to bring it down to that.

19      Q.   -- exclude your fuzzy matching techniques.  I'm

20   really just -- I'm really focusing on just the tool, the

21   blocking tool.  Do you understand how blocking works?

22   A.   Yes.  The blocking step that Dr. Freer used did involve

23   fuzzy techniques.

24      Q.   Well, have you ever -- I'm going to try to press

25   this to a conclusion.  Have you ever had a dataset large

**JOSHUA DENNIS - Cross**

165

1  enough that you were required to use blocking to reduce the to

2  the calculation runtime to something which would be realistic?

3  A.   Not that specific scenario, no.

4      Q.   Okay.  You also had no prior engagements that

5  required transitive closure, correct?

6  A.   Not that I can think of here.

7      Q.   So this is all new for you, Foligi Center,

8  transitive closure, using Blocking to reduce runtime.  This is

9  the first time you've been exposed to those concepts, correct?

10 A.   That specific model, yes.

11     Q.   Well, not just that specific model.  Let me expand a

12 little bit.  What models -- what the algorithms have you use,

13 peer-reviewed algorithms other than Foligi Center or Foligi

14 Center with expectation management -- sorry,

15 expectation-maximization, which are used to do pairwise

16 comparisons in a dataset which in which you are attempting to

17 link data or accounts?

18 A.   I'm sorry.  That was a long question.  Can you ask that

19 one more time.?

20 A.   Let me let me do it again for you.  That is probably my

21 fault.

22 Let's take aside for like Foligi Center which is an algorithm

23 that is used to calculate pairwise linkages.  And that aside,

24 what other algorithms have you used that have been designed

25 and peer reviewed and used in the data science community for

**JOSHUA DENNIS - Cross**

166

1   the specific purpose of engaging in pairwise calculations?

2   A.   I don't think I have.

3        Q.   kay.  So that's only (indiscernible), correct?

4   A.   That's -- yes, that's fair.

5        Q.   Okay.  Now, let's talk a little bit about

6   statistical analysis.  And actually, I would like to go back

7   to Dr. Freer's presentation starting on slide 14.

8        MR. RONA:  Your Honor, that's -- I'm just renewing

9   that same objection about the other things in the

10  presentation.

11       THE COURT:  All right.

12       MR. LYNNE:  It's a pretty basic diagram.

13       THE COURT:  Let me --

14       MR. LYNNE:  It's (indiscernible) concepts.

15       THE COURT:  I'm going to ask -- I'm going to allow

16  Attorney Lynne to ask the question and see how the witness

17  answers.  And at that time, I would -- I'll entertain a move

18  to strike if that is necessary.  But it may be that it's not

19  necessary.  Go ahead, Attorney Lynne.

20       Q.   All right.  Given your undergraduate seminar --

21  excuse me, semester course in statistics, do you remember the

22  issue of statistical sampling ever coming up in the context of

23  your coursework?

24  A.   I do.

25       Q.   Okay.  And statistical sampling -- it would be fair

1  to say that it's a very standard statistical technique that's

2  used in a variety of applications in the field of statistics?

3  A.    Statistical sampling is common in statistics.  Yes.

4      Q.    All right.  And it's a subdiscipline of statistics.

5  Predictive statistical sampling is intended to use a

6  statistical sample to make predictions about what the

7  characteristics of the larger set are.  Fair to say?

8  A.    I think that's fair.

9      Q.    Okay.  And that would be to provide you with these

10  set wide characteristic predictions within a certain level of

11  competence by looking at that statistical sample, right?

12  A.    I think that can frequently be the purpose.  I think

13  that's fair.

14      Q.    Okay.  And if I could go to the next slide, please.

15  In your semester-long course in your undergraduate studies, do

16  you remember the issue of selection bias coming up in your

17  coursework?

18  A.    Yes, I do.

19      Q.    Okay.  And selection bias is when one selects a

20  sample which is either selected by hand or by -- in some other

21  way, there's some other directed way, to support a particular

22  conclusion or result.  Fair statement?

23  A.    It's certainly selected.  Whether the selection bias is

24  intentional or not I think is -- I think you have a selection

25  bias without being intentional selection bias, but you

**JOSHUA DENNIS - Cross**

168

1   certainly can select something for the purpose of proving a

2   point.

3       Q.   Okay.  And so the way statistics actually overcomes

4   the issue of selection bias is to ensure that the sample that

5   is drawn from a larger set is random, right?

6   A.   That's certainly one way.  Yeah.

7       Q.   Well, can you think of another way?

8   A.   I haven't thought about that specifically, but that makes

9   sense.

10      Q.   Well, think about it right now.

11  A.   No, I think --

12      Q.   Fair to say that to avoid selection bias, one must

13  engage in a random sampling process before one can say

14  anything about the larger set characteristics, correct?

15  A.   I believe that's correct, yes.

16      Q.   Okay.  And to do that, one uses generally some basic

17  tools like a random number generator to start the sequence,

18  right?

19  A.   You certainly can, yes.

20      Q.   All right.  Well, besides "can," how else does one

21  create a statistically appropriate random sample without

22  starting with a random number generator, whether it's a random

23  seed or otherwise?

24  A.   Yeah, no, I certainly agree with that.

25      Q.   Okay.  And once you have gone through that process

**JOSHUA DENNIS - Cross**

169

1   and you have created a random number that you can use to

2   generate random selections within the larger dataset, you can

3   create the sample, right?

4   A.   Once you -- so ask that one more time, please.

5        Q.   Sure.  Once you -- once you start with your random

6   number generator, you can then use that number to create a

7   whole random sequence of numbers which you can use to then

8   pull a truly random sample from the larger dataset, right?

9   A.   Yes, that's one way -- certainly a way to create a random

10  sample.  Yep.

11       Q.   Well, how else would one create it again?

12  A.   I haven't thought about all the universe.  I'm simply

13  suggesting that --

14       Q.   Well, think about it right now.

15  A.   Again, what you're saying makes sense.  I agree with you.

16       Q.   Okay.  And then once you have that random sample,

17  you can then look at the sample and infer something about the

18  larger set characteristics, right?

19  A.   Generally, I think that's fair.

20       Q.   All right.  And besides using a random number

21  generator, you would have to determine how large the sample

22  would be to determine that, in fact, the sample is large

23  enough to provide you with an appropriate random sampling

24  relative to the size of the larger dataset, right?

25  A.   Agreed.

**JOSHUA DENNIS - Cross**

170

1      Q.   Okay.  And there are sample size calculators that

2    can be used to generate exactly how many samples you have to

3    pull relative to the size of the dataset, right?

4    A.   Certainly.

5      Q.   Okay.  So there's two things that you need to do to

6    actually come up with a set of data that provides you with any

7    statistically valid information about the larger dataset.  You

8    have to use a random number generator to generate truly random

9    samples.  And you have to use a sample size calculator to

10   determine how many of those samples you have to pull.  Fair

11   statement?

12   A.   I agree.

13     Q.   Okay.  And you know that Dr. Freer used a random

14   number generator when he was pulling samples for review,

15   right?

16   A.   Most of the samples.

17     Q.   I'm sorry?

18   A.   Most of -- most of the samples.  I believe that's the way

19   he did it.

20     Q.   I apologize for breaking up again.

21   A.   Oh, I said most of the samples.  Yes.

22     Q.   Okay.  And he used a sample size calculator to

23   determine that a sample size of 400 samples would be

24   sufficient to say something statistically valid about a larger

25   dataset of the size of approximately ten million.  Remember

**JOSHUA DENNIS - Cross**

171

1  that?

2  A.   I do.

3      Q.   Okay.  You didn't do any of that in connection with

4  your engagement, did you?

5  A.   No, I didn't perform a random sample or statistical

6  analysis.  Correct.

7      Q.   Okay.  You did, however, have a statistician on your

8  team, right?

9  A.   I did.

10     Q.   Okay.  James Hubbs?

11 A.   Correct.

12     Q.   Okay.  And James Hubbs was part of your team and he

13 was -- he was available to do any kinds of statistical

14 analyzes which you would have asked him to do, right?

15 A.   Certainly.

16     Q.   All right.  And you also had Charles Soha on your

17 team, right?

18 A.   I did.

19     Q.   And if I suggested to you that Mr. Soha's LinkedIn

20 profile purports reports that he has expertise on data

21 profiling, statistical sampling, and combining data from both

22 structured and unstructured data sources to detect anomalies,

23 does that sound about right for his expertise?

24 A.   Yes, that sounds about right.

25     Q.   Okay.  So you had both a statistician in the form of

1    James Hobbs and you've had Mr. Soha who -- how would we

2    characterize his expertise?  Just data science in general?

3    A.    That's certainly one of the areas of expertise.  Yes.

4         Q.    Okay.  And yet despite having both a statistician

5    and Mr. Soha on your team, so a statistician and a data

6    scientist, you didn't perform a single statistically valid

7    sampling of the overall Telex database to determine what the

8    true characteristics of the database were across the entire

9    field, right?

10   A.    No, that's correct.  That's not the purpose of my

11   analysis.

12        Q.    Okay.  So what you did, however, is you loaded the

13   database or the representant table into SQL and you loaded

14   the aggregation table generated by Dr. Freer into SQL, right?

15   A.    Amongst other tables.  Yes.

16        Q.    Okay.  I want to focus on the representant table

17   and Dr. Freer's aggregation table.  And then what you did was

18   you started doing queries against the -- against the database

19   in SQL, right?

20   A.    That was something that certainly was part of my

21   analysis.  Yes.

22        Q.    Okay.  And you did that almost 1,000 times, right?

23   A.    How many -- you're asking me how many queries I performed

24   on the database?  I would say it was more than 1,000 over the

25   course of the last, gosh, six years.

**JOSHUA DENNIS - Cross**

173

1      Q.   Okay.  And not only were you doing all those

2  queries, but you only printed out and included certain of

3  those in your report, right?

4  A.   Yes.  Certainly not every query resulted in a cluster or

5  a single user account.  But yes, certainly not every query of

6  the thousands I ran ended up on paper in a report.

7      Q.   And really what you were looking for with all these

8  queries was looking to find some anomaly in a -- in Dr.

9  Freer's clusters that you could point out to the Court as a

10 possible under-aggregation or a possible over-aggregation,

11 right?

12 A.   Identifying potential errors and demonstrating them is

13 certainly one -- one of the reasons I perform queries.  Yes.

14     Q.   Well, you were -- you were cherry-picking off of all

15 the queries that you made, the thousand-plus queries, many

16 more than 1,000, and you were picking those that supported

17 your notion that there were potential aggregations,

18 over-aggregations, and potential under aggregations in Dr.

19 Freer's 91,000 clusters or whatever the number is?

20 A.   Well, first of all, not every query is for the purpose of

21 generating a cluster or a comparison I guess in my first

22 comment.

23     The second one is to the extent that I ran queries that

24 resulted in clusters, I certainly looked at many different

25 clusters and many different queries that resulted in potential

1   under and over-aggregation.  And then yes, some of those ended

2   up in my report.

3        Q.   And so let's -- how many times did you find an

4   over-aggregation or an under-aggregation in a given cluster?

5   A.   How many --

6        Q.   If you know.  If you know.  I don't want you to

7   guess.

8   A.   Lots.  It's hard to say how many individual user accounts

9   across all of the clusters I reviewed looked on their face to

10  be clearly over or under-aggregations.  And then there's a

11  scenario which I think is equally problematic where it ends up

12  being a subjective review, right, that it looks like it's

13  probably not, but again, you need to go back to real world

14  data to determine whether it is or isn't.

15       Q.   Well, let me get to this whole concept you're

16  talking about of real world data.  I'm just really trying to

17  determine at this point in time and confirm that you took a

18  selected number of examples and you put those into your report

19  and you chose those because you wanted to make a point to the

20  Court that there was a possible over-aggregation or a possible

21  under=aggregation in one or more of Dr. Freer's clusters.

22  Right?

23  A.   Certainly, I put in examples that I think are very clear

24  evidence of over and under-aggregation.  Yes.

25       Q.   All right.  And you had it within your power to do a

1   statistical sampling where you pulled a random sample across

2   the entire cluster -- cluster report, and you could have done

3   that with a statistically appropriate number of accounts.  And

4   then you could have looked to determine whether that

5   statistically valid sample said something which either

6   supported your arguments or did not support your arguments.

7   So you didn't do that, right?

8        Q.   So I guess two points there.  The first is that

9   pulling a statistically valid sample -- if I pulled 400

10  clusters out of -- out of all the clusters and looked at them,

11  that would be one approach to potentially identifying

12  over-aggregation.

13       Q.   I'm asking you a simple question.  You had it within

14  your power --

15       MR. RONA:  Your Honor, he was not done with his

16  answer I don't think.

17       MR. LYNNE:  Well, he wasn't answering the question.

18       THE COURT:  That's Okay.

19       MR. RONA:  Well --

20       THE COURT:  Attorney Lynne, I'm going to let him

21  finish.

22       Go ahead, Mr. Dennis.

23  A.   Sure.  So had I pulled 400 samples and analyzed them and

24  said, gee, does anything look like it's improperly added here,

25  that would potentially identify over-aggregation?  The issue

**JOSHUA DENNIS - Cross**

176

1   though is what isn't.  So for each of those 400 clusters, you

2   would have to go back and try to identify other clusters or

3   other user accounts within clusters that were -- that shared

4   sufficient similarities such that it was indicative of

5   under-clustering which is a bigger issue here.

6        Second of all, I was optimistic that that was something

7   that Dr. Freer would have done to as part of his QC process.

8   And what I saw yesterday was simply four clusters, I guess

9   maybe seven in total between Neves and the seven we saw

10  yesterday where he actually looked at and disclosed that he

11  looked at the output of his clusters, which in seven it was

12  not -- also not a statistically significant sample size.

13       Q.   So let me bring you back to the question.  You had

14  it within your power to pull a statistically valid number of

15  samples generated from a random number generator and to look

16  at that output so that you could provide the Court with some

17  statistically valid commentary with respect to whether Dr.

18  Freer's clusters were generally accurate or generally

19  inaccurate, included over-clusters or didn't include -- you

20  could have done that, right?

21  A.   Relative to over-clustering or --

22       Q.   Yes.  Let's start there.

23  A.   -- over-aggregation?  Yes, I think that that would be one

24  way to approach the over-aggregation issue.

25       Q.   Okay.  And you had a statistician on your staff and

**JOSHUA DENNIS - Cross**

177

1   you had Mr. Soha, data scientist.  And yet none of you

2   actually went through that process, correct?

3   A.    That's correct.  It's not a process we went through.

4        Q.    Okay.  And then I want to go back because I think

5   you said something about ground truth datasets and that one of

6   the things you would want to do is to marry and look at and

7   compare Dr. Freer's output with some kind of ground truth.

8   Remember your testimony on that?

9   A.    Either the outputs or the inputs.  Yes.

10       Q.    All right.  Well, let's start with the inputs or the

11   outputs.  I don't care.  With respect to the output.  Are you

12   suggesting that a linkage model can only be valid if it has a

13   ground truth set to compare it against, sometimes referred to

14   as a golden set?

15   A.    I think it depends on the purpose you're trying to use it

16   for.

17       Q.    Well, in this case, Dr. Freer was looking -- taking

18   a large dataset.  And he was using the Foligi Center to create

19   pairwise combinations or pairwise matches.  And then he went

20   through a dynamic clustering process and came up with a

21   aggregation table which took all eleven million accounts and

22   assigned them to clusters such that only one participant was

23   in each cluster.  All right.  Generally speaking, correct?

24   A.    Yes.

25       Q.    Okay.  And are you suggesting to the Court that the

**JOSHUA DENNIS - Cross**

178

1   only way to do that is to have a golden set or a ground truth

2   set to compare Dr. Freer's aggregation clusters against to

3   ensure that it was one hundred percent accurate?

4   A.   I'm sorry.  Can you ask that one more time?

5        Q.   Sure.  Are you suggesting to the Court that for Dr.

6   Freer's aggregation methodology to be valid, it would require

7   Dr. Freer to have a ground truth set or golden set, however

8   you want to call it, compare his output against to ensure that

9   it was effectively one hundred percent accurate?

10  A.   I guess I'm getting tripped up on the word one hundred

11  percent accurate in that.

12       Q.   Accurate.  I'll take one hundred percent off.

13  A.   That is accurate.  Again, to the extent the purpose here

14  is identify people and participants, and I want to be accurate

15  about that.  And I have clusters that contain user accounts,

16  that contain different names and different contact information

17  and I needed to choose and decide who the person is then, then

18  yes, I think in that instance you would need to understand how

19  accurate your data is relative to deciding the participant.

20       Q.   And are you suggesting that that would require

21  either a ground truth set or a golden set, however you want to

22  characterize it, before Dr. Freer's output can be deemed to be

23  reliable?

24  A.   For its purpose, yes.  I think generally there is a

25  there's a uncertainty in a large number of clusters that needs

179

1   to be solved.

2        Q.   So --

3           THE COURT:  Hold on one second, Attorney Lynne.

4   Would you say you still have maybe fifteen, twenty minutes,

5   half an hour to go?  Because we're at 4 o'clock.

6           MR. LYNNE:  Sure, I do.

7           THE COURT:  Okay.  So we'll break here.

8           Mr. Mr. Reynolds, that next hearing date was fine,

9   October 30th?

10          THE CLERK:  October 30, 10 a.m. in this courtroom.

11  Yes, Judge.  That's good for everybody.

12          THE COURT:  So we'll have to suspend here.  And I

13  think everything else will just have to wait until we finish

14  this hearing.  All the other matters will just continue on the

15  calendar.  So we'll suspend here.  Okay?  Thank you.

16          MR. LYNNE:  Thank you, Your Honor.

17          MR. RONA:  Thank you, Your Honor.

18  (End at 3:59 PM)

19                    * * * * * * * * * *

20

21

22

23

24

25

1          I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

4

5

6

7    /s/ Michael Drake                          October 19, 2023

_____

8    AAERT Certified Electronic Transcriber        Date
     (CER-513, CET-513)

9    ESCRIBERS LLC
                              eScribers
10                 7227 N. 16th Street, Suite #207
                         Phoenix, AZ 85020
11                       973-406-2250
                  e-mail operations@escribers.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$176,446.40 (2)**
129:17;130:7
**$210,371.50 (1)**
144:25
**$49.90 (1)**
100:25

**@**

**@gmail (1)**
35:3

**A**

**a- (1)**
9:4
**ability (4)**
41:10,24;80:20;
85:21
**able (10)**
19:16;65:8;72:14;
95:4,15;105:10;
109:14;139:13;159:1;
163:20
**above (2)**
69:3;132:9
**absolutely (4)**
80:19;87:20;
127:11;142:2
**acceptable (1)**
33:19
**accepted (1)**
28:2
**accepting (1)**
90:5
**Access (3)**
152:6,8;158:20
**accessibility (2)**
20:23;22:6
**accomplished (1)**
91:23
**According (10)**
10:16;25:6,7,7,7;
38:11;64:6,10;85:8;
119:9
**accordingly (3)**
64:2;65:17;87:18
**account (22)**
11:13;26:20;33:17,
24;35:24;39:6;50:5,
11;58:19;60:5;70:8;
74:21;82:10;85:16;
100:16;123:5;130:5;
134:22;140:18,18,18;
173:5
**account-by-account (1)**
55:21
**accounted (3)**
54:25;65:5,8
**accounting (2)**

104:3;151:22
**accounts (82)**
11:15;16:3;18:12;
33:3,12;39:12;41:14,
15;43:9,25;56:4,6,18;
58:20;60:16;64:5;
65:20;66:21;67:9;
75:5,8,12;76:12;80:1;
81:11,11;82:13;
83:10;85:21;86:9,10,
14,19;87:21;89:4,5;
90:23,25;91:1;
100:19;109:5;117:6,
8;118:6;119:8,14,21,
22;120:20;124:3;
125:19,21,25;126:2,6,
8,18;128:7;129:17;
130:25;131:21;
132:12,13;135:2;
140:23;146:20,20,22;
147:20,21;149:13;
150:6,23,24;151:1,7;
165:17;174:8;175:3;
176:3;177:21;178:15
**accuracy (26)**
22:11,13,17,19,24;
23:11,13,17;24:2,3,
10,17,18;42:4;66:2;
68:16;91:17;99:6;
118:1,8,25;147:22,24;
148:3,13;149:24
**accurate (23)**
24:5;37:8;42:2;
43:12;44:3;68:18;
75:21;76:15;92:19;
125:5;130:24;133:18;
152:2,17;154:1;
176:18;178:3,9,11,12,
13,14,19
**accurately (2)**
27:10;42:6
**achieve (3)**
24:3;63:4;92:22
**achieving (2)**
92:3,6
**acronym (1)**
156:8
**across (19)**
67:14;85:10;94:15;
97:10;108:11;114:23;
117:8;119:10,15;
124:4;127:4;129:19;
138:7;150:4,17;
151:6;172:8;174:9;
175:1
**act (2)**
108:6,7
**acted (1)**
119:12
**action (1)**
51:11
**actor (1)**
134:23

104:3;151:22
**actual (7)**
21:1;55:11;85:2;
99:2;124:6;133:9;
141:3
**actually (35)**
10:9;11:18;13:10;
17:22;20:15;21:18;
23:4;25:24;30:25;
31:16;53:10,16;60:1;
69:6;79:9;81:25;
93:18;96:19;104:10;
105:4;121:20;122:5;
129:25;137:17;156:9;
158:2;160:11,25;
161:7,17;166:6;
168:3;170:6;176:10;
177:2
**ad (2)**
163:2,4
**Adams (1)**
131:6
**add (1)**
82:2
**added (4)**
19:23;80:17;
125:23;175:24
**adding (5)**
5:20;63:17;81:19;
82:5;135:2
**addition (4)**
29:20;54:9;109:22;
154:9
**additional (8)**
16:24;38:17;78:10,
17;81:4;111:7;113:8;
147:19
**address (35)**
16:23;17:14;20:24;
29:8,8;39:13,13;40:8;
43:11;44:1;51:22,23;
52:19;53:2,20;54:3;
57:16;58:8,12;62:18;
67:21,24;68:24;70:1,
11,13;73:12,13,16;
81:3;82:16;102:6;
129:21;132:2,8
**addressed (3)**
17:15;42:7;48:14
**addresses (17)**
25:20;28:7;34:17;
39:6;49:25;50:11;
51:17;58:9,15;67:25;
69:3;73:24;134:4,5;
143:10,18,21
**addressing (1)**
16:15
**adds (1)**
91:2
**adequate (3)**
28:25;74:23;77:16
**admissible (1)**
141:5
**admitted (2)**

16:23;135:19
**adopted (2)**
19:20,22
**advance (1)**
32:3
**adversary (1)**
16:4
**advisory (1)**
102:17
**affect (2)**
26:18;74:13
**affects (2)**
74:15;158:19
**affidavit (3)**
33:25;76:24;148:19
**affidavits (1)**
109:18
**affirmative (5)**
110:10,16;115:25;
116:1,1
**afternoon (2)**
101:25;102:14
**again (43)**
9:23;23:9,11;31:19,
21;32:1;37:6;45:12;
53:1;59:7;75:20,22;
106:11;107:17;
118:22;119:18,25;
121:7;123:14,25;
128:12;129:13;
132:12;133:21,22;
134:5;135:23;139:20;
142:12;148:10;
149:23;151:3,4;
153:18;156:19;161:5;
162:8;165:20;169:11,
15;170:20;174:13;
178:13
**against (8)**
5:24;65:20;162:17;
172:18,18;177:13;
178:2,8
**age (2)**
26:1,4
**Agent (2)**
132:6;134:9
**aggregate (4)**
85:21;125:20,22;
126:1
**aggregated (10)**
11:15;72:7,12;
87:22;128:9,14;
129:18;130:13;
137:13;146:25
**aggregating (4)**
16:3;109:5;117:5;
126:12
**aggregation (39)**
10:1,17;16:17,18,
21;29:1;35:17,18;
36:14;37:7;38:20;
40:4;41:12,23;42:11,
14;43:4,19;54:22;

56:22;77:23;88:11;
113:25;114:1;115:18;
117:2;119:1;124;
120:5;129:4;131:5;
134:14;142:6;158:2;
172:14,17;177:21;
178:2,6
**aggregations (4)**
119:18;139:18;
173:17,18
**agnostic (1)**
56:23
**ago (6)**
15:22;25:14,16;
47:2,19;141:16
**agree (29)**
9:15,17;19:20;40:8;
44:7;47:17;54:16;
56:4,13;65:13;67:10;
69:8,25;71:16,25;
73:10;75:6;84:20;
85:14,17;88:11,19;
89:19;98:9,21,21;
168:24;169:15;
170:12
**agreed (2)**
112:4;169:25
**agreeing (2)**
74:5,6
**ahead (20)**
5:6;7:11;8:7;15:1;
76:10;78:8,23;84:16;
98:7;102:1;104:23;
105:19;116:19;132:7;
140:5;149:21;157:25;
159:2;166:19;175:22
**Aksana (3)**
84:21;85:17;89:8
**alarm (1)**
4:19
**albeit (1)**
131:14
**Alecci (1)**
4:4
**Alex (2)**
61:7,10
**algorithm (7)**
105:7;150:15;
153:24;156:10;
160:24;161:9;165:22
**algorithms (5)**
105:6;155:24;
165:12,13,24
**Alice (1)**
131:6
**alleged (1)**
16:20
**allow (3)**
23:12;83:20;166:15
**almost (2)**
106:14;172:22
**along (1)**
146:3

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
In the Matter of: TELEXFREE, LLC                    Document      Page 182 of 206

October 12, 2023

**alphabet (1)**
129:19
**alphabetical (1)**
94:15
**although (2)**
109:3;145:7
**always (6)**
9:13,18,18,19;28:8;
50:17
**Amazon (1)**
21:17
**Amilcar (6)**
71:16;72:7,12,17,
21;73:10
**among (6)**
49:7,15;50:1;72:8;
79:12;97:17
**Amongst (1)**
172:15
**amount (12)**
26:22;41:12;74:5,6;
122:3;134:24;140:15;
144:16;158:9;164:2,
11,11
**amounts (2)**
5:24;144:21
**analysis (35)**
10:1;18:11;38:11;
55:17,18;56:17;
98:10,17;105:8;
106:16,21,21;113:16;
114:8;115:12,24,25;
116:2;120:6;122:10,
17;137:10;138:5;
142:4;145:23;148:8,
11;149:14;153:13;
160:14;163:6;166:6;
171:6;172:11,21
**analytics (8)**
103:1,3,4,5,22;
106:7;115:1;118:9
**analyze (4)**
103:7;108:5,12;
161:9
**analyzed (1)**
175:23
**analyzes (2)**
155:25;171:14
**analyzing (1)**
123:16
**anomalies (1)**
171:22
**anomaly (1)**
173:8
**anymore (1)**
52:8
**apologies (1)**
162:13
**apologize (10)**
4:23;38:25;50:22;
54:7;84:9,12;106:6;
142:12;161:5;170:20
**Apparently (3)**

72:19;79:20;80:17
**appear (10)**
21:6;51:20;56:20;
62:13;64:9;94:17;
95:24;96:2;143:4,7
**appeared (6)**
26:17;94:12;95:5,6;
100:16;147:13
**appears (12)**
41:16;52:16;54:17;
60:12;61:8,9;66:18;
67:21,25;72:18;
79:11;96:11
**appended (1)**
79:24
**application (7)**
16:3,16;90:14;
93:25;97:1;106:17;
156:13
**applications (1)**
167:2
**applied (4)**
14:15;117:3;
118:20;120:15
**applying (1)**
150:12
**appreciate (1)**
123:5
**approach (16)**
5:5;14:20,21;21:13;
59:9;78:9;82:7;
113:23,24;114:25;
115:1,4,14;152:24;
175:11;176:24
**appropriate (12)**
16:25;30:13;36:15;
56:24;80:13;83:22;
96:16;100:6;124:18;
168:21;169:23;175:3
**appropriately (6)**
48:15;50:18,20;
72:22;123:6;134:24
**approval (2)**
17:7,8
**approve (1)**
12:5
**approved (4)**
11:11,24;17:4;
38:12
**approving (1)**
12:7
**approximate (1)**
91:25
**approximately (3)**
49:22;95:19;170:25
**April (4)**
62:15;111:12,21;
112:16
**arbitrary (1)**
117:14
**area (3)**
102:24;119:25;
145:2

**areas (2)**
149:24;172:3
**arguably (2)**
23:18;91:15
**argue (1)**
13:8
**Argueta (8)**
4:3;51:3,15;52:14,
16;57:22;58:6,16
**argument (2)**
34:14;112:12
**arguments (5)**
16:15,17,24;175:6,
6
**arise (2)**
107:7,9
**arithmetic (1)**
14:18
**around (2)**
86:20;111:12
**arrows (1)**
67:13
**article (1)**
98:7
**ascertained (1)**
43:2
**ascribed (1)**
90:23
**aside (5)**
41:9;120:5;136:18;
165:22,23
**aspect (1)**
63:12
**aspects (3)**
74:21;155:18,18
**assert (1)**
69:13
**assertion (2)**
12:7;103:8
**assess (8)**
41:10,24;56:10;
77:22;99:25;115:24;
141:25;149:6
**assessed (3)**
73:4;77:15;88:7
**assesses (2)**
71:2;136:2
**Assessing (10)**
26:19;42:3,3;65:11;
66:1;76:7,17;77:14;
128:20;151:1
**assessment (5)**
26:18;27:2;65:18;
74:18;149:18
**asset (1)**
104:3
**assign (2)**
24:10;65:15
**assigned (5)**
51:11;52:13,15;
161:10;177:22
**assignment (8)**
5:17;14:7;42:18;

109:1,2,4;116:6;
120:11
**assignments (4)**
103:22;106:12,25;
107:7
**assist (1)**
5:3
**associated (15)**
58:21;119:23;
125:19,20,24;126:2;
128:7;134:21,22;
143:18,21;144:17,19,
21;145:21
**assume (7)**
13:6;40:13,15;41:6;
62:10;69:5;80:15
**assumes (2)**
86:13,16
**assuming (2)**
95:13;121:16
**assumption (5)**
11:20;117:5,19,20;
121:14
**assumptions (9)**
13:2;16:18;40:19;
114:2,4,10,12;118:12;
130:9
**attach (1)**
136:22
**attached (3)**
128:9,23;140:22
**attaches (1)**
126:18
**attempt (2)**
13:7;107:1
**attempting (2)**
24:23;165:16
**attended (1)**
152:9
**attention (6)**
8:6;91:12;153:4;
154:11;155:11;
162:15
**Attorney (35)**
7:9,11;8:1;13:5;
24:25;59:24;78:23;
80:23;82:21,23;
83:20,24;101:5,7,12;
102:1;104:12,23;
105:16,18;128:18;
136:14;141:8;145:5;
146:7;150:20;151:13;
157:25;159:3;160:7;
161:4;166:16,19;
175:20;179:3
**attributed (1)**
134:24
**attributes (2)**
48:25;49:4
**Atty (3)**
14:22;79:8;90:9
**autocomplete (7)**
32:8,13;76:5,12,16;

77:5;123:25
**autocompleted (1)**
77:3
**automated (3)**
27:25;28:9;94:1
**available (2)**
99:22;171:13
**Avenue (1)**
58:12
**average (1)**
119:20
**avoid (1)**
168:12
**aware (28)**
20:8;27:13;28:13,
15;30:8;31:15;34:3;
36:22;37:12,16;
40:16;50:18;54:24;
55:5;62:14;63:13,23;
69:17;74:25;75:13;
110:8,9;117:11;
124:12,20;125:2;
138:25;153:11
**awareness (2)**
31:17;38:9
**away (1)**
7:10

## B

**bachelor's (1)**
107:21
**back (26)**
4:6;5:2,15;7:10;
11:5;35:14;61:3;71:5,
6;101:20;107:8;
108:22,25;116:3;
122:18;123:14;
132:10;151:17;160:6;
162:19;163:14;166:6;
174:13;176:2,13;
177:4
**background (4)**
107:20;123:17;
149:10;151:17
**backing (1)**
30:4
**bad (1)**
81:11
**Balan (4)**
76:25;77:2,8;
148:19
**balance (4)**
48:19;62:22;100:8,
9
**balanced (2)**
64:18;86:2
**balancing (3)**
55:5;87:19;100:5
**balloon (1)**
20:1
**bank (1)**
36:17

Case 16-04006 Doc 493 Filed 10/19/23 Entered 10/19/23 13:11:55 Desc Main
In the Matter of: TELEXFREE, LLC Document Page 183 of 206

October 12, 2023

**Barack (2)**
132:6;133:9

**Barrera (2)**
4:9;161:3

**barrier (2)**
124:4,11

**base (1)**
153:8

**based (22)**
27:3;28:11,13;
34:10;38:19;64:7;
66:6;69:16;73:17;
87:14;101:4;119:18;
125:7;130:19;138:10;
139:17;140:2;146:24;
147:6;161:1,10;
162:11

**basic (4)**
83:16;121:21;
166:12;168:16

**basically (1)**
99:17

**basis (21)**
6:3;11:18,23;13:4,
21;29:14;35:11;40:9,
20;55:21;56:1,25;
63:9,10;65:23;68:13;
86:7;97:7;138:23;
147:17;149:15

**bathroom (1)**
78:4

**become (1)**
140:16

**becomes (2)**
133:20;134:6

**began (1)**
4:5

**begin (2)**
31:10;43:23

**beginning (2)**
31:6;109:13

**begins (1)**
131:7

**begun (1)**
10:4

**behalf (1)**
120:19

**behaved (1)**
119:12

**behind (3)**
41:11;159:24,25

**believability (9)**
20:25;22:6;26:10,
18,20;27:3;133:11,
12;151:3

**believable (10)**
26:13,23,24;
133:15,16,17,18,19,
24;150:11

**belong (1)**
100:16

**below (5)**
68:21;132:3;134:8;

138:3,3

**Ben@gmailcom (1)**
53:6

**benefited (1)**
134:23

**Benjamin (16)**
51:3;52:11,14,14,
16,23;53:15,18,24,25;
54:10;57:22;58:6,7,9,
16

**Benjamins (1)**
53:14

**besides (4)**
119:24;147:3;
168:20;169:20

**best (10)**
42:25;43:21,23;
50:24;57:3,7;59:13;
116:11,25;121:2

**better (7)**
7:6;59:13;88:19;
96:18;103:18;114:8;
128:24

**beyond (3)**
16:15;34:25;38:17

**bias (7)**
167:16,19,23,25,25;
168:4,12

**biased (1)**
38:18

**big (3)**
137:6;142:3;143:9

**bigger (5)**
80:22;81:1;159:2,
23;176:5

**biggest (2)**
143:17;145:9

**Billybobarbone@gmailcom (1)**
131:21

**BillyBobArebone@gmailcom (1)**
132:14

**binder (5)**
15:6;17:21;158:6;
159:18,20

**birth (2)**
49:21,22

**birthday (1)**
49:21

**Birthdays (1)**
49:20

**bit (10)**
5:15;51:17;72:4;
80:22;103:17;122:21;
152:20;159:2;165:12;
166:5

**bits (1)**
43:12

**blank (1)**
147:12

**blanks (1)**
129:19

**block (5)**
131:22;143:14,15,

16;161:25

**blocked (5)**
86:18,19,23;
161:13;163:18

**blocking (39)**
86:8,13,20,25;87:3,
5,12,16,22;88:8;
93:18,23;161:17,20,
20,24,25;162:2,7,9,
10,12,17;163:1,5,11,
18,22;164:2,5,6,8,9,
16,21,21,22;165:1,8

**Bob (1)**
131:6

**bonus (2)**
33:13;35:23

**book (9)**
6:12;21:5,9;23:20;
24:23;54:16;71:5,6;
92:17

**booklet (1)**
59:8

**Boston (1)**
102:7

**both (20)**
8:19;12:6;58:15;
68:2;70:6;85:25;
88:24;93:7;100:4;
112:12;114:23;
118:24;121:3,19;
123:2;124:1;144:11;
171:21,25;172:4

**bother (2)**
4:20,22

**bottom (12)**
11:6;16:11;28:23;
48:20;52:23;53:10,
25;70:21,22,22;72:4;
144:20

**bought (1)**
21:17

**bouncing (1)**
55:2

**bound (1)**
97:14

**box (3)**
60:17;143:9,11

**boxes (1)**
143:11

**break (7)**
5:16;78:4;101:15,
20;116:9;147:10;
179:7

**breaking (1)**
170:20

**brief (1)**
84:17

**Briefly (3)**
90:10;97:21;107:19

**bring (4)**
105:24;108:13;
164:18;176:13

**broadly (1)**

16:161:25

102:17

**Broadway (1)**
58:13

**brother-sister (1)**
40:8

**brought (5)**
20:2;63:8;83:3;
107:12;118:6

**browsers (1)**
32:10

**building (1)**
4:20

**built (1)**
153:12

**Bulan (4)**
34:1,3,12,12

**bullet (1)**
91:13

**bunch (1)**
72:6

**business (4)**
29:10;102:6;
107:22;151:21

## C

**calculate (6)**
16:19;20:2;55:11,
17;115:13;165:23

**calculated (3)**
54:21;65:24;115:23

**calculates (1)**
154:22

**calculating (1)**
87:12

**calculation (20)**
11:9;13:8;14:3,18,
19;19:18;64:20;70:8,
16,25;79:17;80:16;
81:17,18;82:5;87:20,
25;99:24;120:15;
165:2

**calculations (14)**
13:16,18;17:5;
19:16,20;20:7;60:22,
24;80:3,3,4;87:14;
120:13;166:1

**calculator (2)**
170:9,22

**calculators (1)**
170:1

**calendar (2)**
4:5;179:15

**call (5)**
35:21;102:3;
122:17;139:6;178:8

**called (3)**
60:5;91:3;110:4

**calling (6)**
35:22;36:13;49:4;
52:15;59:24;101:12

**Calls (7)**
6:3;27:17;34:8,13;

49:4;60:5;134:15

**came (6)**
35:14;54:15,20;
110:10,13;177:20

**can (111)**
6:11,14,19,20,20;
7:2,10;11:13;12:23;
15:8,10;17:21;22:25;
23:25;24:25;26:23;
28:4,10;29:2;30:5;
31:3,23;34:14;35:3;
39:24;43:1,13,13;
46:2;48:3,6,9;50:24;
51:1;52:9;57:18;
60:20;65:7,11;67:14;
68:19;69:7;72:4;
73:18,25;78:13;
80:22;82:12;83:3,4;
85:24;86:21;91:8;
92:2,18;93:10;94:23;
97:6,9;101:11;
103:21;104:1;105:12,
19;106:2;116:8,23;
118:20;119:5;124:11;
125:12;129:6,19,23;
131:22;132:19,23;
133:5,13;137:16;
142:9;144:5,8,24;
145:6;148:10;149:22;
152:23;153:5;155:17;
157:24;158:4;159:18;
160:8;165:6,18;
167:12;168:1,7,13,19,
20;169:1,2,6,7,17;
170:2;177:12;178:4,
22

**capacity (1)**
156:16

**capitalization (1)**
85:9

**capture (2)**
116:12;117:1

**card (8)**
32:19,25;33:4,10,
18,20,23;125:7

**care (2)**
106:18;177:11

**career (1)**
153:17

**Cariero (4)**
143:16,19,19,20

**Carreiro (2)**
144:18,23

**Carrera (1)**
143:9

**Carrero (4)**
60:5;61:23;65:16;
147:4

**carry (1)**
36:14

**Carvallo (1)**
61:7

**cascading (1)**

Case 16-04006    Doc 493    Filed 10/19/23    Entered 10/19/23 13:11:55    Desc Main
In the Matter of: TELEXFREE, LLC    Document    Page 184 of 206

October 12, 2023

62:21
**Case (87)**
4:3,3;8:12;9:2;10:9,
24,25;11:1,3;12:8;
13:9;14:23;17:11;
19:1;24:9;25:23;
29:15;32:13;33:25;
39:7;41:6,8;42:4,25;
43:2,21,24,24;49:9,
11;50:13,19;57:3,7;
62:7;72:22,25;73:15;
80:4,10;86:3;87:15;
89:15,17,25;95:12;
99:9;100:13,24;
101:3;103:13;105:2;
106:24;107:3;108:9,
20,21;109:18;110:7,
21;111:7,22;113:23,
24;114:6,8,14;
115:25;117:19,25;
118:13,14;120:1;
121:25;122:22;127:5;
130:11;135:1;136:20;
138:9;140:13;143:20;
144:13;147:4;149:5;
151:1;177:17
**cases (10)**
104:6,7;106:9,12,
15,20,21;152:21;
153:21;163:15
**case-specific (1)**
149:15
**cat (1)**
82:24
**categorically (2)**
109:2;116:12
**categories (2)**
116:10,23
**cause (1)**
96:19
**celebrities (1)**
93:6
**cell (1)**
161:17
**center (14)**
153:24;154:3;
160:24;161:8,21,22;
162:3,4,9;165:7,13,
14,22;177:18
**certain (13)**
28:1;74:5,6,6,20;
86:13;95:14;114:9;
125:5,6;132:13;
167:10;173:2
**certainly (52)**
19:1;32:20;41:1,19;
72:24;73:2;77:16;
83:3;86:6;92:9;
107:11;108:10;
109:16,17;113:6;
118:10;119:20;120:2,
7;121:15;124:23,24;
127:22;131:8;133:6;

134:3;139:3;141:12;
144:17;147:10,14;
155:24;157:23;
161:19,25;162:1,22;
167:23;168:1,6,19,24;
169:9;170:4;171:15;
172:3,20;173:4,5,13,
24;174:23
**certificate (1)**
108:18
**certifications (1)**
108:15
**cetera (2)**
20:25;39:13
**chain (1)**
48:9
**chaining (13)**
46:22,23,24;48:3,4,
13,18;50:16;54:12,
15;143:24;144:2;
147:3
**chains (2)**
48:7,22
**challenge (5)**
8:22;48:14;80:18;
88:23;104:18
**challenges (1)**
123:19
**challenging (1)**
133:14
**chance (4)**
84:25;85:13;
150:19;163:8
**chances (1)**
59:12
**change (9)**
25:20,20;55:3;67:1,
7;89:3;91:4;96:14;
101:3
**changed (6)**
26:15;33:1;109:3;
121:17,18;122:11
**changing (4)**
62:24;63:3;96:18;
122:11
**chapter (1)**
21:19
**chapters (2)**
92:13,17
**character (3)**
130:17;131:14,18
**characteristic (1)**
167:10
**characteristics (4)**
167:7;168:14;
169:18;172:8
**characterize (2)**
172:2;178:22
**characters (5)**
85:22;86:7;94:14,
15;128:4
**charge (1)**
57:25

**chargebacks (1)**
82:8
**Charles (1)**
171:16
**chart (13)**
18:5;19:25;96:23;
136:14;137:6,11;
139:21,23;140:6;
141:10,21;145:22,25
**check (6)**
34:21;35:5,6;37:21;
84:25;85:13
**checked (2)**
27:24;34:17
**checks (2)**
27:25;37:19
**cherry-picking (1)**
173:14
**China (1)**
157:9
**choose (4)**
16:24;48:17;145:9;
178:17
**choosing (1)**
48:15
**chose (6)**
74:21;96:25;97:2;
145:11;146:7;174:19
**chosen (1)**
95:10
**Christen (19)**
21:5,25;22:17;
23:20,21;24:15;25:6,
7;44:7,13;47:3;50:3,
17;91:7,8;92:10,15;
98:6,9
**chronology (1)**
110:6
**circumstance (4)**
26:5;40:11;105:5,
13
**circumstances (3)**
74:16;103:13;
122:13
**citations (1)**
22:4
**cite (1)**
22:16
**cited (2)**
148:17;154:10
**citing (2)**
21:7,9
**city (1)**
129:21
**claim (2)**
38:6;110:2
**claims (3)**
30:3;38:10;90:6
**clarifying (1)**
127:15
**class (1)**
102:2
**classification (2)**

48:23;91:18
**classified (3)**
47:11,12;48:8
**clean (2)**
5:16;86:4
**cleaned (5)**
160:25;161:8,12,
13,13
**cleaning (6)**
32:15;92:9,21;
130:15;159:12,13
**clear (8)**
23:21,25;58:17;
105:14;129:14;
145:17;157:1;174:23
**clearly (9)**
28:8;79:18;92:15;
94:4,23;96:12;133:7,
16;174:10
**CLERK (7)**
4:2;5:8;84:4,7;
102:5,9;179:10
**clients (1)**
102:19
**clip (1)**
30:23
**clips (1)**
30:20
**close (1)**
103:15
**closeness (1)**
161:10
**closer (1)**
103:17
**closing (1)**
112:12
**closure (16)**
44:5,8,13,19,21;
45:11,14;46:1,6,21;
47:2,9;86:22;87:9;
165:5,8
**cluster (132)**
7:20,21,22;9:12,13;
10:13;14:14;41:15,
16;43:9,14,17;45:7,8;
46:1,5,8,8,9,9,10,11,
12,17,18,20;51:11,20,
23;52:14,15,16,16;
54:18;55:22,22;57:4,
22;60:11;62:4,5,8,14,
18,20,25;63:13;64:6;
66:3,24;67:3,9,16,22;
68:10,11,13,21,25;
69:11;70:6,12,13,18,
20;71:12,19,22,25;
72:15;79:5,25;80:10;
81:3;83:9,16;84:20;
85:16,25;87:17,24;
88:2,3;89:20,20;
90:16,19,20;96:18;
100:15,21;114:15;
126:14,17;127:20,21;
129:3,4,4,5,15,16;

130:23;131:23,23,24;
133:1;134:7,8;
137:13,14,14;138:1,4;
143:2,5,7,14,19,22;
144:9,19;145:9,11,19;
146:19;173:4,21;
174:4;175:2,2;177:23
**clustered (1)**
10:13
**clustering (17)**
44:4;45:6,24;54:18;
55:2;56:25;63:1;65:2;
68:8;73:22;74:11;
96:21,22;126:25;
127:3;140:2;177:20
**clusters (62)**
8:11,13,16,19;9:17;
18:11;41:13;42:22;
44:1;51:9;55:13;
56:10,19;62:13;
64:18;65:24;66:15,
18;72:18;73:3,19;
75:3;83:10,12;88:4;
89:10;95:5;96:5;
97:17;100:2,7;
114:18;126:7,21;
129:14;131:19,20;
134:13;135:2;137:12,
18;143:2;145:17;
150:3;173:9,19,24,25;
174:9,21;175:10,10;
176:1,2,3,8,11,18;
177:22;178:2,15,25
**coconspirators' (1)**
77:5
**code (2)**
132:3;155:13
**codes (1)**
134:5
**coherent (1)**
43:17
**colleagues (1)**
93:5
**collection (2)**
86:25;122:3
**College (3)**
107:22;151:18;
152:9
**collide (2)**
49:21,22
**colors (1)**
94:9
**column (10)**
20:4;49:4,5;60:23;
79:13;80:12;82:7;
83:18;143:10;160:13
**columns (9)**
23:23;70:10,10;
72:25;73:6;80:14;
82:3;83:15;136:10
**combination (5)**
94:2;107:5;155:6,

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
Document     Page 185 of 206
In the Matter of: TELEXFREE, LLC,

October 12, 2023

17,21
**combinations (1)**
177:19
**combine (1)**
81:10
**combining (1)**
171:21
**coming (5)**
102:21;106:1;
112:5;166:22;167:16
**comma (1)**
92:15
**comment (7)**
14:12;17:8,9;45:17;
80:20;112:9;173:22
**commentary (1)**
176:17
**commenting (1)**
19:23
**comments (2)**
157:23;158:17
**common (9)**
29:6;30:9;32:10;
69:16;100:25;107:2;
115:3;136:3;167:3
**commonality (1)**
130:20
**commonsense (1)**
136:6
**community (1)**
165:25
**compare (4)**
177:7,13;178:2,8
**compared (2)**
85:23;86:7
**comparing (2)**
137:12;164:13
**comparison (2)**
91:25;173:21
**comparisons (3)**
91:18;164:4;165:16
**compartmentalize (1)**
148:8
**compensate (1)**
92:5
**competence (1)**
167:11
**compilation (2)**
79:10,16
**compilations (2)**
79:2,10
**complaining (1)**
81:14
**complete (1)**
16:19
**completed (1)**
10:5
**completeness (2)**
20:21;22:5
**complex (2)**
103:25;108:5
**complexity (1)**
39:11

**compliance (2)**
102:19;107:15
**complicated (2)**
46:7;70:16
**component (2)**
93:12;120:6
**comprised (1)**
129:16
**compute (2)**
5:19,20
**computed (2)**
66:2;99:23
**computer (12)**
52:10;59:13;68:14;
73:3;107:22;123:21;
152:3,7;163:11,14;
164:3,10
**computers (1)**
123:22
**computing (9)**
65:20;88:21;
153:22;155:3,4,14,15;
157:12,16
**concept (10)**
24:4;37:16;44:11;
80:21;117:3;120:4;
123:1,1;144:4;174:15
**concepts (3)**
21:6;165:9;166:14
**conceptual (2)**
115:18;117:2
**concern (12)**
75:19,21;76:7,17;
77:14,15;83:7;85:18;
88:12;118:20;124:5;
135:16
**concerned (1)**
80:7
**concerns (3)**
114:9;117:24;
120:14
**conclude (2)**
85:24;95:11
**concluded (1)**
41:15
**conclusion (6)**
15:25,25;16:8;63:2;
164:25;167:22
**conclusions (1)**
59:19
**conduct (2)**
113:8;115:25
**confident (1)**
41:21
**confirm (5)**
11:9;100:13;153:5,
23;174:17
**confirmation (1)**
100:5
**conjoined (3)**
44:14,18;45:10
**connect (3)**
103:6;108:5,12

**connection (4)**
109:15;115:5;
141:10;171:3
**Consellos (1)**
68:22
**consider (8)**
24:11;26:9;68:10;
115:17;128:17,17;
131:9;155:14
**consideration (3)**
32:11,14,18
**considerations (1)**
123:20
**considered (16)**
27:9;47:15;48:10;
70:15;74:16;86:9,14;
87:1,4,6,7;93:25;
97:10;120:21;121:9;
148:18
**considering (1)**
25:19
**considers (1)**
80:13
**consistency (15)**
20:22;22:6;91:17;
118:3,9,25;129:20;
134:2,4;147:23;
149:24;150:14;151:2,
4,5
**consistent (18)**
17:3;20:9,22;43:11,
11;54:19;55:14;74:3;
93:15;96:2,7;100:18;
118:12;119:13,14,17;
124:23;150:4
**consistently (5)**
76:13;117:20,25;
118:4,5
**conspiracy (2)**
77:7,9
**constructed (1)**
103:11
**consulted (1)**
63:8
**consulting (1)**
107:10
**contact (19)**
29:7,10,11,21,23;
33:20;43:17;57:4,19;
58:17;67:14;79:25;
83:17;93:9;119:10;
130:25;144:12;
145:20;178:16
**contacted (8)**
43:13;57:3,13,21;
58:8,16;59:1,2
**contacting (1)**
43:16
**contacts (1)**
58:22
**contain (4)**
39:12;113:15;
178:15,16

**contained (3)**
91:1;132:13;158:13
**containing (1)**
9:12
**contains (3)**
79:20;90:22;131:25
**contaminate (1)**
43:4
**content (2)**
90:20;158:23
**contents (1)**
85:25
**context (15)**
37:2;59:18;73:1,2;
74:8;86:1,6;88:12;
107:9;115:21;118:22;
133:13;134:21;
161:21;166:22
**continuation (1)**
4:4
**continue (4)**
4:12;11:14;29:1;
179:14
**continued (1)**
152:12
**continuing (2)**
107:24;140:17
**contradiction (4)**
44:8,12;48:2,3
**contradicts (2)**
47:14,18
**conventions (3)**
138:7,11,19
**conversely (1)**
121:24
**copy (12)**
6:11;7:5;15:7;
17:19;21:12,14,18;
59:7;84:7;152:25;
159:7;160:9
**correctly (8)**
7:23;43:5;125:3;
128:10,14;153:5,9;
154:19
**correspond (2)**
48:10;82:10
**counsel (11)**
7:14;12:2,8;13:7;
14:16;18:20;102:19;
107:12;128:13;
157:22;159:24
**counsel's (1)**
157:23
**count (3)**
64:15;65:18;87:18
**counted (3)**
64:2;70:14;132:21
**counter (1)**
140:19
**counts (2)**
63:24;128:3
**couple (6)**
100:11;128:1;

135:15;140:8;152:10,
15
**course (33)**
15:12;21:15;26:5,
19;42:4;55:4;63:22;
69:19;74:12;76:11;
78:5;85:22;96:8,20;
97:12;100:3;103:16,
20;108:2;109:19;
127:14;130:6;143:13;
151:25;152:4,8,10,12,
15;161:6;166:21;
167:15;172:25
**courses (2)**
151:22;152:8
**coursework (2)**
166:23;167:17
**COURT (155)**
4:8,15,17,24;5:4,6;
6:2,6;7:3,9;8:1,7,17,
25;11:10,24;12:2,4,4,
7,9,23;13:5,10,15,23;
14:1,8,10,17,22;
15:12;17:7;21:15,20,
24;24:25;27:19;
30:18,22;34:9,14;
58:1;59:10,24;60:3,7;
69:15,23;75:24;76:4,
10,21,23;78:5,8,23;
79:8;80:13,22;82:18,
23;83:6,12,20;84:7,
13,16;88:16,18;
89:18;90:9,17;97:20;
98:6;99:15,20;
100:11;101:4,7,9,11,
17,19,25;102:11;
104:12,21;105:16;
112:7,9;116:18;
122:15;124:16;126:5,
10,14,17,20,23;127:2,
9,12,15;128:17;
129:25;130:2;134:17;
135:12,16,25;136:3,8,
13;138:20;139:20;
140:1,4;141:7;
142:15;145:4,7,15,22;
146:6,11,13,16;147:1;
149:21;150:19;
151:10,12;153:1;
157:15,23;158:24;
159:1,17;160:7;
161:2,6;166:11,13,15;
173:9;174:20;175:18,
20;176:16;177:25;
178:5;179:3,7,12
**courtroom (3)**
157:5;159:14;
179:10
**Court's (1)**
141:6
**cover (2)**
77:25;80:8
**create (11)**

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
In the Matter of: TELEXFREE, LLC         Document      Page 186 of 206

October 12, 2023

11:12;33:17;75:8,
11;152:5;168:21;
169:3,6,9,11;177:18
**created (12)**
14:13;19:24;20:5;
25:10,11;83:13;
132:17;139:23;140:2;
143:1;161:1;169:1
**creates (1)**
62:25
**creating (2)**
76:12;80:18
**creation (1)**
158:25
**credible (1)**
20:25
**credit (18)**
32:19,25;33:4,10,
18,20,23;79:14,14;
80:15;82:2,4,4;
120:16;121:14,19;
122:5;125:6
**credits (14)**
80:14;81:25;
120:18,24,25;121:5,6,
16,17,20,21,23,23,24
**criteria (4)**
94:13,17;150:12;
162:11
**critical (1)**
42:10
**criticism (2)**
82:3;83:3
**critique (1)**
115:24
**cross- (1)**
105:21
**cross-examination (6)**
4:13;5:11;84:18;
105:17;141:8;151:15
**cross-examine (2)**
105:23;150:20
**cross-sectional (1)**
114:7
**crucial (2)**
93:3,18
**crucially (1)**
93:24
**cultures (1)**
138:8
**curious (4)**
8:18,21;9:1;127:16
**currency (1)**
121:21
**currently (4)**
34:22;73:11;
102:22;128:23
**cursor (1)**
72:11
**customers (1)**
31:16
**cut (3)**
61:23;75:20,25

**cutting (1)**
161:4

# D

**D002 (2)**
111:24;125:13
**D005 (1)**
17:18
**D007 (3)**
6:9,22;7:4
**D012 (1)**
50:21
**D026 (1)**
12:19
**D033 (1)**
139:10
**D039 (1)**
59:3
**D044 (1)**
137:5
**D055 (1)**
78:14
**D12 (2)**
50:21;95:2
**D13 (2)**
71:4;95:2
**D-33 (1)**
160:2
**D39 (1)**
95:2
**D43 (2)**
66:9;95:2
**D44 (1)**
136:25
**D55 (1)**
95:2
**D9 (1)**
158:5
**daily (2)**
93:4;152:13
**damages (2)**
103:9;106:18
**Dan (1)**
4:18
**dark (3)**
68:21;132:6;138:3
**Darr (6)**
4:3,4;12:4;83:2;
122:18;126:7
**data (203)**
14:20;20:10,20;
21:5;22:23;24:5;
25:10,11,19,22;26:1,
3,4,7,7,12,23;28:25;
31:25;32:11,12,15;
33:10,11,11;34:11;
35:17,21,21,25;36:7,
11,13,14,17;37:4,12,
21,22,23,24;38:14;
40:2,4,18,20,20;
41:11,17,25;42:2,6,
10,19;44:11;54:14;

56:24;57:15;58:22;
60:14;63:9,12,16;
69:5;71:11,12;74:2,
10,14,17,22,25;75:9,
16,20;76:6,7,17;77:3,
5,14,22;79:2,4,7,24;
80:7,8,9,21;81:20;
82:8;85:2,8;91:16,16,
19,22,22;92:1,3,6,13,
16,21;93:13;98:6,10,
17;99:3,5,10;103:1,3,
4,5,10,10,22,25;
105:6;106:7,17,17,20,
23,24;109:19,22,23;
110:3;113:9;114:5;
115:1;117:10;118:1,
3,9,11,23;120:3;
122:21,22,25;123:1,3,
7,8,12,15,15;124:20,
22;125:8,10;126:11;
127:1,22,24;128:20,
22;133:3;134:2;
136:2;137:10;138:13;
141:25;147:7,25;
148:1,3,16,18,21;
149:2,6,7,9,11,11,18,
25;150:1;151:2;
152:4,19;153:13;
160:14;161:8;162:1,
23;165:17,25;170:6;
171:20,21,22;172:2,5;
174:14,16;177:1;
178:19
**database (10)**
11:13;91:24;94:7;
125:19;150:18;172:7,
8,13,18,24
**databases (3)**
48:21;98:15;152:5
**dataset (49)**
24:7;37:7;38:21;
39:6,8,11,17,18,23;
41:7;49:10;50:5,10,
11,13,15;63:1,19,20;
73:22;74:5,9;77:21;
86:1,6;95:12;97:11,
15;103:11;107:3;
117:17;139:3,4;
161:24;162:3,4,7,18;
164:3,12,25;165:16;
169:2,8,24;170:3,7,
25;177:18
**datasets (12)**
40:6,9;103:6;107:1,
4;108:5,7;149:6;
163:11,19,23;177:5
**date (3)**
18:22;49:21;179:8
**Dates (1)**
49:22
**Davenport (2)**
68:3,4
**day (3)**

14:3,5;135:22
**days (1)**
75:10
**de (2)**
61:7;141:19
**deal (8)**
40:12;41:20;91:19;
92:2,17,23;103:10;
104:5
**deals (2)**
92:12,21
**dealt (2)**
50:20;104:7
**decades (1)**
106:14
**decent (1)**
94:16
**decide (3)**
10:22;145:9;178:17
**deciding (2)**
135:20;178:19
**decision (8)**
12:10,15;13:22,24;
14:2;15:5,14;105:20
**decisions (1)**
16:18
**deduplication (2)**
93:13;150:1
**deed (1)**
41:5
**deeds (1)**
41:1
**deemed (3)**
77:22;99:11;178:22
**deep (1)**
91:16
**default (1)**
32:25
**defeat (1)**
10:17
**defendant (3)**
6:25;7:20;51:10
**defendants (4)**
8:16;16:15,24;
102:3
**defendants' (1)**
6:24
**Defense (2)**
50:21;105:25
**deficiency (1)**
123:3
**deficient (1)**
121:23
**define (1)**
133:11
**definitely (2)**
31:6,10
**definition (2)**
62:8;157:18
**definitional (1)**
46:19
**definitively (1)**
28:17

**degree (11)**
50:19;68:16;70:24;
74:4;107:21;114:22;
124:5;125:5;137:19;
140:14;151:21
**deliberately (1)**
77:6,11,13
**delivered (1)**
14:7
**demand (1)**
121:22
**demerit (1)**
64:3
**demonstrated (1)**
24:4
**demonstrating (1)**
173:12
**denied (2)**
38:10,12
**Dennis (35)**
60:2,5;66:10;79:16,
24;80:17;81:2,9;82:9;
84:25;101:18;102:3,
4,7,14;104:25;105:3,
5,25;122:18;129:10;
130:4;135:15;137:1,
4,8;139:7,7,23;
142:24;146:3;151:17;
157:8;158:8;175:22
**Dennis's (1)**
92:14
**depend (1)**
116:3
**depends (9)**
26:5;40:25;49:19,
23;74:8;88:8;133:13;
149:3;177:15
**deposed (1)**
113:7
**deposition (9)**
37:1;152:4,23;
154:12,13;156:6;
161:23;162:5;163:20
**depositions (2)**
109:18;123:19
**describe (10)**
29:20;39:24,24;
40:11;43:20;48:13;
74:19;109:14;119:4;
155:3
**described (23)**
26:21;27:8;30:6;
33:13;34:24;39:10;
42:1;44:4,23;48:16;
50:17;55:23;62:22;
64:11;65:10,25;
70:17,19;92:16;94:8,
21;114:13;147:9
**describes (2)**
44:7;92:10
**describing (1)**
77:10;88:10;106:8
**description (2)**

Case 16-04006    Doc 493    Filed 10/19/23    Entered 10/19/23 13:11:55    Desc Main
In the Matter of: TELEXFREE, LLC          Document       Page 187 of 206

October 12, 2023

60:4;154:23
**designation (1)**
6:20
**designed (2)**
92:23;165:24
**despite (6)**
92:22;100:8,9;
130:12,21;172:4
**detail (11)**
12:6;20:11;31:13;
38:4;57:14;58:3;60:6;
80:8;114:18;119:4;
159:8
**details (4)**
31:14,19;38:12;
93:3
**detect (1)**
171:22
**determination (8)**
17:10;57:8;89:2;
99:9;140:11;141:6;
163:2,4
**determine (22)**
13:10;16:4;23:12;
24:8;33:14;39:22;
41:24;64:8;94:2,6;
133:23;156:20;161:9;
163:9;169:21,22;
170:10,23;172:7;
174:14,17;175:4
**determined (9)**
16:21;17:14;28:24;
36:12;37:6;43:13;
63:17;66:5;163:7
**determines (1)**
74:7
**determining (8)**
23:23;26:21;33:15;
70:5;88:21;94:11;
100:4;156:10
**deterministic (2)**
155:15,18
**diagram (1)**
166:12
**difference (1)**
121:3
**differences (1)**
96:6
**different (70)**
8:10;17:23;20:23;
26:8;31:7;32:2;33:21,
22;38:19;39:12,23;
41:21;48:9,24;50:1;
51:17;52:18;53:1,3,
20;54:3,4;58:20;
62:18;63:22;65:14,
19;67:25;72:15,16,18,
24;73:19;74:13;
80:25;82:13;85:9;
94:9,9;130:12,12;
131:1,6,10,10,16,19;
132:5,25;134:12,13;
138:7,8;139:5,9;

143:17,21;144:6,11,
22;145:12,12;146:1,
13;150:3;153:21;
173:24,25;178:16,16
**differently (1)**
53:17
**differs (3)**
84:23;85:10;154:17
**difficult (2)**
6:21;41:4
**dimension (4)**
23:17,18;24:11;
25:18
**dimensions (6)**
20:20;22:23;23:9;
26:9;91:16;149:25
**dire (1)**
105:13
**direct (10)**
81:20,22;91:8;
101:16;102:12;
152:22;153:23;
154:11;155:11;157:8
**directed (6)**
62:11;94:24;95:14;
97:6,9;167:21
**directing (4)**
8:5;91:12;153:3;
162:14
**directly (1)**
37:10
**disaggregate (2)**
82:12;89:4
**disaggregation (1)**
89:22
**disagree (5)**
44:17;78:25;
104:25;105:4;163:4
**disclosed (2)**
109:7;176:10
**discrepancies (1)**
85:2
**discrepancy (1)**
85:1
**discussed (4)**
18:25;22:22;40:4;
79:1
**discussing (3)**
47:1;50:3;54:4
**discussion (2)**
150:24;157:2
**discussions (3)**
10:21;11:2;18:24
**Disney (2)**
132:6;134:9
**disparate (2)**
107:1;149:6
**disproving (1)**
103:7
**dissimilarity (1)**
86:14
**distance (2)**
155:6,20

distill (1)
162:24
**distinguish (1)**
40:7
**diversity (1)**
119:11
**DM-003 (1)**
160:11
**Doctor (2)**
5:8;59:12
**document (8)**
8:25;13:1;18:4;
83:13;156:3,11,17;
158:19
**documents (7)**
8:18;12:3,7,9;
78:20;154:7,9
**dollar (5)**
66:5;121:18,18,24;
122:1
**dollars (14)**
67:1,7;101:1;
120:20,25;121:4;
122:4,11;126:3;
128:9,23;134:24;
142:3;144:20
**domain (1)**
35:6
**done (30)**
10:1,3;19:6,10;
24:10;47:16;59:21;
77:18;81:2,9;82:9;
91:2;104:15,16,17;
108:8;117:4;118:14;
119:18;126:25;
140:11;141:12;
161:19;162:2;163:13,
22;175:2,15;176:7,20
**Doran (1)**
9:5
**down (28)**
7:17;16:10;18:10;
20:15;21:3;51:16;
52:6,10;53:10;61:15,
18;67:13;68:20;72:4,
10;73:8;101:11;
116:9;131:22;138:3;
141:14;144:7,10,20,
24;162:24;164:13,18
**Dr (99)**
4:15;5:6,13;6:4;
7:13;12:25;13:15;
14:13,19;15:4,14;
17:19;18:3;21:20;
31:4;32:7;60:8;78:10;
79:3,7,19,25;81:15;
83:1,8;84:20;97:24;
99:16;101:9;108:8;
111:10,20;113:6;
115:8,23,24;117:2;
118:1,15;122:16,19;
126:6,12,14;127:20;
129:4,14;130:9,14;

131:4;132:20;135:14,
18;137:13;139:17;
140:3,7;143:1;145:3,
13;147:6,24;148:4,7,
11,15,20,23;149:18;
150:12,13,22;154:5,
16,23;157:7;158:9,14,
15;159:11;160:17;
161:7;163:7;164:22;
166:7;170:13;172:14,
17;173:8,18;174:21;
176:7,17;177:7,17;
178:2,5,7,22
**dramatically (1)**
63:23
**drawn (2)**
79:21;168:5
**drill (1)**
4:19
**drive (2)**
84:13,13
**due (1)**
87:8
**duplication (1)**
91:16
**Duran (38)**
5:3;6:14,16;7:17;
11:5;18:2;20:13,15;
21:3;32:3;50:23;
51:16,24;52:21;53:9,
12,23;54:6,7;60:19;
61:2,18;67:12;68:19;
71:7;72:2,10;73:8;
78:15;80:23,25;
81:13,18;137:15;
138:22;139:12;146:8,
17
**Duran's (1)**
72:11
**duration (1)**
152:10
**during (5)**
37:1;147:9;156:5;
161:23;163:20
**dynamic (4)**
73:21;74:11;96:22;
177:20

## E

**earlier (13)**
12:13;17:7,7;19:8;
22:19;38:17;41:18;
49:25;57:1,5,9;
136:14;142:25
**early (3)**
101:15;110:11;
152:11
**easier (2)**
72:9;160:9
**easy (1)**
120:17
**economic (3)**

131:4;132:20;135:14,
18;137:13;139:17;
103:8;106:18;
134:23
**economics (1)**
151:22
**education (1)**
107:24
**educational (1)**
107:20
**effect (2)**
62:21;82:13
**effectively (1)**
178:9
**effectuate (1)**
120:23
**effort (2)**
148:4,7
**efforts (1)**
91:18
**eight (1)**
99:11
**either (18)**
11:3;34:22;35:14;
63:9;70:6;75:20;99:6;
100:2;103:12;113:11;
118:1;127:18;135:3;
157:6;167:20;175:5;
177:9;178:21
**elaborate (1)**
83:4
**Elaine (4)**
61:15,19;143:8,18
**electronic (2)**
110:2;137:5
**eleven (10)**
30:5;49:6,15;70:10;
71:1;81:11,11;86:4;
97:14;177:21
**eleven-plus (2)**
108:11;127:4
**Elian (2)**
144:23,23
**Eliani (3)**
143:16,19,20
**else (9)**
14:4;18:22;19:6;
23:12;29:21;34:6;
168:20;169:11;
179:13
**else's (3)**
29:23;33:19;76:16
**elsewhere (3)**
21:7;63:1;93:18
**email (54)**
7:13,17;9:4,6;10:8;
11:4,5;13:20;20:24;
25:20;28:7,19;29:8;
34:17;35:4,14;39:6,
13;43:11;49:25;
50:11;51:17,21,22,23;
52:19;53:1,20;54:3;
57:16;58:8,9;63:18;
67:19;68:24;70:1,10,
11,13,17;73:11,13,16,

20;74:7;81:3;131:21;
132:2;134:4;137:17;
143:10,11,17,21
**emails (3)**
34:21;35:8,14
**eminently (1)**
55:14
**empirical (5)**
39:21;40:1,6,9;56:9
**employed (5)**
102:14,15;160:20,
22;161:20
**empty (2)**
28:5,11
**encounter (1)**
94:20
**encountered (3)**
37:2;96:9;138:14
**end (16)**
6:5;14:3;45:25;
46:2,3;55:3;59:23;
66:3;67:21;73:19;
77:24;83:10;90:20;
144:5,10;179:18
**ended (4)**
130:18;144:11;
173:6;174:1
**ending (3)**
31:2,22;32:5
**ends (4)**
46:2;48:8;53:21;
174:11
**enforces (2)**
86:16,18
**engage (2)**
163:11;168:13
**engagement (6)**
116:2;161:24;
162:6,16;164:1;171:4
**engagements (4)**
153:25;163:10,18;
165:4
**engaging (3)**
6:4;79:17;166:1
**English (1)**
124:2
**enlarge (1)**
6:16
**enough (6)**
28:17;45:17;51:1;
99:13;165:1;169:23
**Enrique (1)**
138:2
**ensure (5)**
118:6,11;168:4;
178:3,8
**ensuring (1)**
118:3
**enter (14)**
27:14,20;32:21,23,
24;33:2;34:12;74:12;
76:13;118:4;123:22;
124:3;125:3;151:5

**entered (22)**
28:2,3;32:12,12;
34:7;40:18;41:17,25;
42:6,19;74:10,17;
77:11;117:6,24;
118:5;125:18;126:9;
127:6;128:3,11;
149:11
**entering (7)**
29:21;40:13;77:13;
117:12,20;131:16;
149:13
**enters (1)**
40:14
**entertain (1)**
166:17
**entire (11)**
14:14;23:16;28:16;
59:17;63:20;85:25;
86:1;97:10;118:20;
172:8;175:2
**entirely (10)**
26:5;33:16;34:24;
58:7,14;62:23;76:19;
77:20;96:2;124:14
**entitled (1)**
15:1
**entity (1)**
134:14
**entries (2)**
26:16;53:17
**entry (10)**
27:24;31:25;34:11;
41:11;52:13;74:25;
75:9,16;76:6;77:5
**EPOC (5)**
38:3,5,15;110:4;
148:20
**equal (2)**
46:13,15
**equality (2)**
46:7,10
**equally (4)**
114:24;131:17;
132:5;174:11
**equity (69)**
11:9,11,12,24;13:8;
14:15;16:20;17:4;
19:12,15;20:1,2;56:3,
17,19,23;58:20,24;
60:13,22,25;66:5,23;
79:7;80:4,16,19;81:4,
8,17,17;82:1,11;83:9,
17;89:2,6,20,21;
90:14,14,18,18,21,24;
91:3;106:20;109:5;
113:25;120:8,9,13,14,
22;121:9,12;125:24;
129:17,18,24;130:2,4,
7;135:3;139:17;
144:16,21,25;146:25
**errant (1)**
159:13

**error (36)**
54:19,21;55:7,11,
15,17;56:7;63:5,11;
64:23;65:5,9,18,21;
66:6;70:8,14,15,19,
25;71:3;73:4;87:12,
14,19,25;95:16;
96:10;99:18,21,22;
115:11,13,17,21,23
**errors (9)**
32:14;41:1,2;55:20;
64:5;65:24;70:6;
85:13;173:12
**escape (1)**
77:20
**Escuple (2)**
138:2;141:14
**especially (3)**
27:23;74:20;105:5
**essentially (3)**
35:3;40:19;87:17
**established (2)**
16:22;122:16
**estimate (5)**
63:6,10,20;64:6;
113:11
**estimated (4)**
27:10;55:15;65:23;
95:18
**estimates (3)**
63:14,15,22
**estimation (1)**
55:7
**et (2)**
20:24;39:13
**evaluated (1)**
68:13
**even (21)**
11:14;14:1;21:16;
44:20;56:11;57:17;
75:20;76:14;78:21;
80:23;85:8;90:21;
96:11,14,18;97:16,17;
99:1;100:17;105:9;
157:3
**evenly (1)**
64:18
**event (2)**
32:19;128:19
**eventually (1)**
140:16
**everybody (1)**
179:11
**everyone (1)**
4:11
**evidence (19)**
16:1;29:17,25;30:1,
3,4;41:13,19,19;
42:22;47:22;69:11,
12;75:23;76:19;
77:18;82:20;157:24;
174:24
**evident (1)**

124:21
**evidentiary (2)**
14:4;112:18
**E-wallet (3)**
36:20,24;37:4
**exact (2)**
150:7,7
**exactly (6)**
51:14;97:4,16;
105:10;126:19;170:2
**examination (5)**
12:21;78:22;90:11;
102:12;105:22
**examine (2)**
11:15;114:18
**examined (1)**
40:10
**examining (2)**
96:8;157:19
**example (38)**
7:8;28:18;34:25;
40:3;42:3;43:8;45:9;
49:6;54:12;55:14;
64:13;65:2;69:18;
73:4,23;74:12;89:8;
96:14,15;100:1,20;
103:8;114:15;120:17;
121:7;125:17,25;
131:13,19;134:11,14;
141:13,16;143:1,16;
144:22;147:12;150:8
**examples (27)**
27:9;54:17,18,24;
65:13;68:15;80:9;
95:10,14;96:9;97:12,
17;103:21;108:9,13;
115:3;123:24;124:10;
125:9;128:5;139:5;
141:18;145:17;147:3,
19;174:18,23
**exceedingly (1)**
33:6
**Excel (2)**
69:5;85:3
**excess (1)**
121:24
**exchanged (1)**
120:22
**exclude (2)**
78:18;164:19
**excluded (1)**
92:14
**exclusively (2)**
79:3;93:23
**Excuse (7)**
24:21;52:1;78:3;
128:13;152:11;
154:14;166:21
**Exhibit (25)**
6:8,12,19,24,25;
7:1;12:19;21:17,20;
59:3,25;60:1;66:9,10;
71:4;80:5;82:20;84:5;

136:25;137:1,3,4;
139:11,25;160:1
**exhibits (3)**
5:3;15:6;78:10,17;
159:23
**existed (1)**
122:12
**existing (1)**
63:3
**expand (1)**
165:11
**expansive (1)**
73:25
**expect (7)**
49:23;62:9,12;
95:20;105:23;131:5,8
**expectation (3)**
73:21;154:4;165:14
**expectation-maximization (2)**
160:24;165:15
**expected (2)**
66:6;75:11
**expediency (1)**
76:17
**experience (15)**
69:16;104:10;
105:6,8;106:10;
138:10;140:13;
151:18;153:22,23;
155:2,4,23;157:12,16
**expert (10)**
16:22;17:18;18:3;
105:11,15;109:7;
110:6,7,9;138:6
**expertise (7)**
19:4;104:18;
123:21;171:20,23;
172:2,3
**experts (2)**
107:10,11
**expert's (1)**
16:2
**explain (7)**
44:16;73:18;90:17;
132:19,23;134:18;
135:10
**explained (5)**
24:14;42:21;64:24;
86:25;93:17
**explains (1)**
24:15
**explanation (1)**
141:2
**explicitly (1)**
66:8
**exposed (1)**
165:9
**extending (1)**
131:13
**extensive (3)**
29:17;109:19;
158:16
**extensively (1)**

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
In the Matter of: TELEXFREE, LLC                Document        Page 189 of 206

October 12, 2023

39:24
**extent (41)**
4:21;26:21;33:14;
43:16;58:19;65:6,12;
77:18;87:24;90:25;
94:23;99:20;104:5;
105:18;106:22,25;
114:25;118:19,25;
123:7;124:19;127:17,
19;128:10;133:14;
134:4;140:17,20;
141:2;148:13;150:22,
25;154:2;155:1;
159:7;160:18;161:25;
162:2,8;173:23;
178:13
**external (3)**
36:10;63:9,12
**extraordinarily (1)**
27:11
**extremely (2)**
38:18;96:4

## F

**face (3)**
27:5;133:8;174:9
**fact (28)**
13:12;17:7;23:24;
27:3;38:9;41:19;
43:15,24;46:11;
54:24;55:5;70:11;
74:22;76:19;77:2;
92:18;95:3,17;
104:17,22;133:5;
140:21;147:18;
149:12;153:13;
156:10;158:17;
169:22
**factor (8)**
22:11;17;24:18;
25:4;70:1,2,4,5
**factors (3)**
21:25;22:9,22
**facts (6)**
23:8;103:13;114:5;
118:12;149:15;
162:24
**failed (1)**
94:17
**fair (13)**
83:11;114:16;
116:5;119:19;166:4,
25;167:7,8,13,22;
168:12;169:19;
170:10
**fairly (3)**
101:2;152:11,11
**fall (2)**
111:1;134:13
**false (7)**
55:24,25;95:18,18;
96:3;99:25,25

**familiar (5)**
36:20;38:3;138:7,
18;153:13
**familiarity (2)**
73:18;138:11
**family (2)**
29:9;93:5
**far (8)**
9:2;63:1;67:9;72:4;
74:22;79:20;144:7,7
**farther (1)**
144:10
**FASM (1)**
154:17
**fault (1)**
165:21
**February (1)**
110:11
**feel (1)**
7:6
**FESM (1)**
154:22
**few (13)**
23:25;29:16;40:6;
53:17;61:15;67:13;
73:5;95:9;96:1;
100:22;118:10;
129:19;133:4
**fewer (1)**
94:14
**fictional (1)**
148:8
**fictitious (8)**
26:17;94:5,7,19,23;
117:14;132:8;133:7
**field (34)**
11:12,14;20:21;
26:3;27:22;39:17;
41:24;42:14,15;
43:10;49:4,15,17,19,
24;50:8;93:25;98:24;
124:25;127:7;130:13,
17,22;131:15;137:21,
25;138:3,4;139:7,9;
147:11;154:22;167:2;
172:9
**fields (19)**
20:24;28:1,3,10,19;
29:9;49:16;65:19;
71:1;74:1;75:4;86:4;
94:3,10;99:11;
117:16;123:24;
124:22;125:5
**fifteen (2)**
132:21;179:4
**fifty (2)**
32:4;97:17
**fifty-second (2)**
30:24;31:21
**figure (5)**
42:18;64:3;81:5;
116:3;137:22
**figures (2)**

82:11;125:23
**file (1)**
38:6
**filings (1)**
109:18
**fill (1)**
31:16
**filter (1)**
108:12
**final (3)**
19:19;90:22;100:14
**finance (1)**
151:22
**financial (3)**
37:22;103:25;
106:20
**find (12)**
66:12;94:23;95:15,
20;97:13,16;137:24;
144:8;145:16;156:16;
173:8;174:3
**fine (4)**
4:8;5:4;124:13;
179:8
**finger (1)**
38:20
**finish (3)**
64:25;175:21;
179:13
**fire (1)**
4:19
**firm (2)**
102:18,23
**first (74)**
7:19;10:9;15:4;
22:11,12,17;23:17;
30:23,25;31:4;32:7;
46:10;50:23,24;
51:10;59:3;61:4,7;
63:14;66:19;67:10,
16;68:23;70:13,17;
71:13,16;81:1;83:14;
84:22;85:4,14;88:2;
91:12,15;92:14;93:2;
95:9;98:13,14;
107:18;108:21,22;
110:7,9,20;111:2;
112:20;115:16;
116:12,13;117:1,22;
120:15;122:6;123:16;
125:25;127:18;
131:23;132:10;
137:13;138:1;139:23;
140:8;146:20;150:8,
9;153:23;159:10;
161:14;165:9;173:20,
21;175:8
**fit (2)**
54:25;55:6
**five (7)**
39:25;52:11;66:21;
81:10;94:14;95:5;
97:17

**fixed (1)**
90:25
**floor (2)**
159:24,25
**flowchart (5)**
158:3,13,17,20;
159:6
**focus (2)**
102:25;172:16
**focused (3)**
106:16;120:2;151:3
**focusing (5)**
113:25;117:4;
134:20;141:18;
164:20
**Foligi (14)**
153:24;154:3;
160:24;161:8,21,22;
162:2,4,9;165:7,13,
13,22;177:18
**folks (1)**
123:20
**followed (1)**
35:3
**following (1)**
93:10
**footnote (4)**
16:11,12;17:12;
21:4
**forces (1)**
48:17
**foregone (1)**
63:2
**forensic (2)**
103:5;104:3
**forget (1)**
116:21
**forgot (1)**
84:14
**form (14)**
28:2;31:24;32:1,9;
47:22;55:12;56:25;
86:4;95:22;96:4;
104:14;113:13;
123:16;171:25
**format (3)**
28:9;63:18;79:23
**formatted (2)**
28:8;34:19
**formatting (2)**
34:17,25
**formed (4)**
47:21;48:8;103:12;
121:12
**former (1)**
58:15
**forms (1)**
27:23
**formula (7)**
11:11,12,24;12:3,5;
17:8;80:19
**formulas (2)**
55:25;64:10

**forth (1)**
78:19
**forty (2)**
58:5;68:1
**forty-four (2)**
94:9,9
**forward (3)**
78:22;109:14;111:6
**found (10)**
26:12;29:24;30:2;
62:10;95:13,13;
97:12;99:20;131:2;
158:4
**foundation (3)**
27:18;122:9;134:16
**Four (6)**
52:10;55:23;81:10;
128:4;139:8;176:8
**fraction (1)**
64:10
**frankly (2)**
119:7;128:6
**Frantz (2)**
76:24;77:2
**fraud (2)**
104:2;106:19
**Fraudulent (1)**
81:21
**free (1)**
79:4
**Freer (66)**
5:6,13;6:4;7:13;
13:1;14:13;15:4,14;
17:19;21:20;31:4;
32:7;52:1;59:12;60:8;
78:10;79:3,20;81:15;
83:1,8;84:20;97:24;
99:16;101:9;108:8;
115:23;117:3;118:1,
15;122:16,20;126:12;
127:20;130:14;131:4;
132:20;135:14;
137:13;140:3,7;
145:13;147:24;148:4,
7,11,15,20,23;150:12;
157:7;158:2,3,9,19;
159:5,11;160:17;
161:7;163:7;164:22;
170:13;172:14;176:7;
177:17;178:7
**Freer's (40)**
13:15;14:19;18:3;
79:7,25;111:10,20;
113:6;115:8,12,24;
126:7,15;129:4,14;
130:9;135:18;139:17;
143:1;145:3;147:6;
149:18;150:13,22;
154:6,16,23;158:14,
14,15;166:7;172:17;
173:9,19;174:21;
176:18;177:7;178:2,
6,22

Case 16-04006    Doc 493    Filed 10/19/23    Entered 10/19/23 13:11:55    Desc Main
In the Matter of: TELEXFREE, LLC    Document    Page 190 of 206

October 12, 2023

**frequency (4)**
49:21,22;50:2;
156:3

**frequent (1)**
156:3

**frequently (2)**
9:19;167:12

**friends (1)**
93:5

**front (13)**
6:11;15:7;17:19;
18:8;39:1;47:3;64:1;
68:14;73:4;97:24;
111:24;135:14;
158:12

**FS (1)**
154:17

**FSCM (1)**
93:25

**FSEM's (1)**
70:9

**FSM (1)**
160:14

**full (10)**
28:16;73:1;90:22;
91:12;116:4;125:18,
20;127:6,17;129:12

**fully (2)**
10:2;147:21

**function (1)**
156:16

**functionally (1)**
131:9

**functions (1)**
91:25

**furnished (1)**
78:25

**further (6)**
10:21;11:1,14;90:8;
95:25;97:19

**Furthermore (2)**
62:21;86:5

**future (1)**
16:25

**fuzzy (19)**
65:15;155:5,19,24;
156:9,14,15,16;
157:13,16,19;159:13;
160:18,22;161:19;
162:11;164:14,19,23

## G

**gain (1)**
114:8

**gains (4)**
16:5,19;39:17,22

**gamma (2)**
161:1,11

**garbage (7)**
98:11,11,18,18,22,
22,25

**gave (3)**

45:10;120:20;121:8

**gee (1)**
175:24

**general (8)**
30:3;31:18;86:12,
12;95:3;98:23;159:9;
172:2

**generally (24)**
10:16;20:9;25:9;
27:22;28:10;29:15;
33:19;35:5;42:22;
58:12;69:7;98:25;
105:9;110:13,14;
130:16;155:16;164:9;
168:16;169:19;
176:18,18;177:23;
178:24

**generate (6)**
88:4,5;132:11;
169:2;170:2,8

**generated (8)**
7:20;8:25;48:22;
99:5;118:23;124:6;
172:14;176:15

**generates (1)**
55:8

**generating (1)**
173:21

**generator (7)**
168:17,22;169:6,
21;170:8,14;176:15

**geographic-specific (1)**
133:23

**geographies (1)**
133:22

**geography (1)**
133:25

**gets (5)**
43:9;56:6;91:3;
160:20,21

**given (11)**
5:21;7:21;13:21;
49:3,15;90:16,19;
104:17;122:6;166:20;
174:4

**gives (1)**
63:25

**giving (1)**
121:4

**glasses (1)**
47:6

**global (6)**
102:17;119:9;
122:6;123:25,25;
124:13

**Gmail (1)**
35:1

**goal (1)**
63:4

**goes (8)**
55:25;63:14;71:1;
72:10;81:13;117:23;
130:19;144:3

**golden (4)**
177:14;178:1,7,21

**Good (18)**
4:11;5:13,14;51:1;
52:7;54:25;55:6;
61:20;65:12;67:13;
68:8,9;72:5;73:9;
101:25;102:14;
137:17;179:11

**Google (1)**
156:25

**gosh (1)**
172:25

**grab (1)**
84:10

**graduated (2)**
151:18;152:15

**grant (1)**
122:15

**graph (1)**
44:12

**great (2)**
41:20;119:11

**greater (1)**
89:21

**ground (7)**
118:11;177:5,7,13;
178:1,7,21

**grounded (2)**
149:7,15

**Group (14)**
102:15,16,17,20;
103:2,3,4,5,22;104:5,
20;106:7,8;115:2

**groups (2)**
82:13;147:20

**Guacho (1)**
58:9

**guarantee (1)**
96:17

**Guerrero (4)**
61:13,16;62:1,4

**Guerreros (1)**
61:19

**guess (13)**
52:10;68:6;72:9;
81:11;85:11;116:3;
132:8;158:9;173:21;
174:7;175:8;176:8;
178:10

## H

**Haley (1)**
54:10

**half (6)**
50:25;91:15;92:11,
14;95:19;179:5

**hand (4)**
8:2;60:23;74:2;
167:20

**handed (1)**
84:14

**handful (8)**
96:1;97:8;147:20;
150:3;152:20,21;
153:16,20

**handles (1)**
102:18

**hands (4)**
120:22;121:17,18;
122:11

**happen (4)**
107:16;125:7;
131:5,8

**happened (9)**
9:2;35:18;81:5;
107:14,16;112:16;
113:5;137:22

**happening (1)**
107:17

**happens (4)**
58:23,25;67:23;
76:19

**happy (1)**
44:15

**hard (13)**
6:11;7:5;15:7;
17:19;50:22;58:10;
77:19,25;133:20,23;
159:7;160:8;174:8

**harder (1)**
133:8

**harm (1)**
96:19

**head (1)**
33:5

**headers (1)**
79:12

**heading (1)**
50:7

**health (1)**
106:18

**healthcare (3)**
104:1,2;106:21

**hear (3)**
32:22;58:1;135:17

**heard (10)**
14:9;31:13,18;
35:12;36:21;38:4;
46:24;51:3;80:11;
130:1

**hearing (10)**
4:5;14:4;103:19;
112:19;113:9;135:7;
136:19;147:19;179:8,
14

**help (11)**
36:18;37:4,22,23;
66:12;103:1;106:8;
107:5,12,16;159:7

**helped (1)**
38:15

**helpful (5)**
33:15;59:17;91:10;
140:9;151:1

**helps (1)**
103:5

**hide (1)**
77:17

**high (19)**
24:3;35:17;43:15;
65:4;92:3,6,22;99:6,
12,13;113:21;119:4,
6;121:19;123:2;
129:20;137:19;139:4;
140:14

**higher (5)**
64:2;74:3;76:14;
101:1;119:20

**highlight (1)**
127:25

**highly (6)**
30:7;62:5,9;65:17;
92:19;119:1

**himself (1)**
104:10

**Hobbs (1)**
172:1

**hoc (2)**
163:2,4

**Hoffman (7)**
12:14;13:8,10,13;
15:14;16:14;17:4

**Hoffman's (6)**
12:10,21;13:22,24;
14:2;15:4

**Hold (15)**
7:9,10;8:1;78:16;
82:18,23;83:25;
88:14;117:16;147:16;
159:17;160:7;161:2,
2;179:3

**holds (2)**
98:11,18

**honest (1)**
41:6

**honestly (1)**
31:6

**Honor (58)**
4:14,16;5:1;7:12;
12:20,25;13:19;14:9;
15:2,10;21:13;24:21;
25:3;57:24,25;59:9;
69:13;76:3;78:2,3,17;
79:22;83:4;84:17;
89:7;90:7;19,21;98:8;
99:14;101:8,14,22;
102:2,10;104:8,25;
106:4;112:2,15;
116:14,20;122:8;
135:9;136:7,12,16;
145:6;146:10;151:9;
156:23;157:1;158:7,
21;159:16;166:8;
175:15;179:16,17

**hope (1)**
35:4

**hoping (1)**

Case 16-04006 Doc 493 Filed 10/19/23 Entered 10/19/23 13:11:55 Desc Main
In the Matter of: TELEXFREE, LLC Document Page 191 of 206

October 12, 2023

11:13

**hosted (1)**
109:16

**Hotmail (2)**
35:1;53:21

**hour (2)**
101:19;179:5

**hours (1)**
113:14

**houses (1)**
40:23

**Hubbs (2)**
171:10,12

**huge (2)**
41:12;64:14

**human (1)**
164:11

**hundred (13)**
41:21;65:10;
119:22;124:24;126:5;
139:16;140:7;146:9,
22;178:3,9,10,12

**hundreds (6)**
75:5,8,10;106:15;
113:14;149:13

**Huron (20)**
7:20;8:11,15,19;
9:11;11:9,11,25;17:5;
36:3,5;38:11;60:14;
81:8,15,23;109:21,23,
24;125:22

**Huron's (9)**
9:19,23;10:24;11:2;
13:18;19:15;80:3;
82:8;120:13

**husband-wife (1)**
40:8

**Hydralisk (2)**
132:7;134:9

**hypothetical (1)**
76:22

# I

**ID (24)**
36:1;51:11;71:19,
22,25;72:15;76:16;
79:23;80:2;81:3,14;
82:10,11;83:16;
85:16;99:21;129:5,5,
15;131:23;134:7;
137:14;143:2,14

**idea (2)**
155:20;156:2

**ideal (2)**
96:12,24

**Ideally (1)**
50:18

**ideas (1)**
57:22

**identical (3)**
32:2;44:1,1

**identification (2)**

78:13;93:8

**identified (4)**
43:3;62:21;145:18;
157:13

**identifiers (1)**
150:4

**identifies (3)**
80:1;91:1,5

**identify (29)**
5:18,20;19:12,16;
36:18;37:4,23;38:1,
16;52:9;77:21;87:21;
88:4;90:15,19;93:4,
14;114:10;115:19;
124:11;134:19;
145:14;148:4;155:4;
161:23;162:6;175:25;
176:2;178:14

**identifying (4)**
79:6;93:19;173:12;
175:11

**identities (1)**
16:4

**identity (3)**
33:15,23;43:1

**IDs (2)**
79:5;83:9

**ie (1)**
7:21

**ignore (1)**
130:16

**ignored (1)**
58:24

**Illinois (1)**
58:12

**illustrating (1)**
130:10

**illustrative (1)**
56:21;114:20

**imagine (6)**
23:15;57:12,14,18,
20,21

**imagining (1)**
58:21

**impact (9)**
56:18;85:20;89:2,3;
95:7;100:24;101:2;
114:11;136:2

**impacting (1)**
114:11

**imparts (1)**
133:14

**imperfect (1)**
92:1

**implementation (1)**
14:20

**implemented (3)**
11:12,25;17:5

**importance (2)**
122:25;156:17

**important (26)**
8:9;23:18;28:22;
38:21;40:7,12;48:19;

56:22;74:20;91:15;
104:19;105:9;115:16,
20;118:22,24;122:22;
142:2;149:2,6,8,16,
25;150:5;156:10;
157:14

**importantly (4)**
114:24;128:6,22;
151:6

**impossible (5)**
41:7;42:5;45:6,24;
46:4

**impressions (1)**
121:11

**improperly (1)**
175:24

**improving (1)**
92:21

**inaccurate (12)**
32:12;57:18;85:5,6;
91:19;92:2,6,13,19,
22;133:6;176:19

**inappropriate (3)**
62:19;65:25;124:14

**incapable (1)**
88:17

**incentives (2)**
38:19;125:3

**Incidentally (1)**
34:16;35:19;107:6

**include (8)**
10:13;20:20;67:23;
87:11;94:15;95:6;
157:18;176:19

**included (11)**
86:11;87:24,25;
88:1;136:4;151:22;
157:13;158:15;
159:12;173:2;176:19

**including (12)**
16:17;27:14;40:3;
70:10;93:24;95:1;
96:25;105:8;106:15;
132:6;141:19;162:11

**inclusion (1)**
20:23

**incompetent (1)**
13:12

**incomplete (1)**
157:17

**inconsistent (6)**
91:19;92:3,6;
117:15;120:16;
121:10

**inconsistently (2)**
73:24;128:11

**incorrect (2)**
77:11,13

**increases (1)**
56:7

**increasingly (1)**
133:20

**Indeed (6)**

48:18;94:17;95:16;
96:11,22;100:3

**independent (1)**
109:17

**independently (1)**
154:18

**indexing (2)**
91:18,24

**indicate (4)**
18:21,23;29:19;
131:4

**indicated (2)**
34:16;99:16

**indicating (1)**
12:3

**indication (1)**
148:2

**indications (1)**
130:19

**indicative (1)**
176:4

**indicia (1)**
43:2

**indirect (1)**
41:13

**indirectly (1)**
42:21

**indiscernible (6)**
79:19;105:7;
160:25,25;166:3,14

**individual (17)**
29:11;39:7;48:7;
50:12;95:4,5;114:24;
119:7;124:12,15;
126:9;129:16;132:14;
147:11,17;151:7;
174:8

**individually (1)**
107:4

**individuals (5)**
24:10;93:5,8,14;
149:12

**infer (1)**
169:17

**infers (2)**
73:25;74:3

**inform (2)**
103:12,12

**information (47)**
27:14;29:8,10,11,
22,23;31:16;33:20;
37:25;40:9;43:12,15;
57:4,18;67:15;74:8;
76:1,13;77:6,11,14;
79:6,12,20;80:1;81:4;
83:17;84:22;89:10;
91:1,5;93:1,12;95:6;
100:1;109:14,16;
117:12;119:10;
123:22;125:3;130:25;
144:12;145:20;151:6;
170:7;178:16

**inherently (1)**

150:11

**initial (3)**
8:12;37:6;100:21

**initially (2)**
24:7;163:6

**initials (2)**
74:14;94:22

**initiate (1)**
120:18

**injunction (1)**
116:15

**input (15)**
23:22;24:2,19;
80:13;92:18,22;99:2,
5;122:25;123:12;
124:1,6,19;147:25;
149:10

**inputs (2)**
177:9,10

**inputting (1)**
123:15

**insert (1)**
116:14

**insofar (1)**
5:20;42:21

**instance (8)**
40:2;62:6,22;97:6;
107:18;115:16;122:6;
178:18

**instances (13)**
95:4,5,20;97:14,15;
100:3;124:25;135:1,
6;136:19;140:22;
142:5;163:18

**instant (1)**
93:22

**instead (3)**
62:11;150:10,10

**instructed (1)**
30:12

**integrity (1)**
103:10

**Intellectual (1)**
108:18

**intend (4)**
13:14;80:5;88:7;
104:17

**intended (2)**
13:13;167:5

**intending (2)**
128:15;157:18

**intention (1)**
80:18

**intentional (3)**
41:2;167:24,25

**interest (1)**
112:3

**interested (1)**
90:2

**interesting (2)**
130:11;131:2

**intermediate (1)**
68:16;99:12

Case 16-04006 Doc 493 Filed 10/19/23 Entered 10/19/23 13:11:55 Desc Main
In the Matter of: TELEXFREE, LLC.
Document Page 192 of 206

October 12, 2023

**internal (4)**
63:12;79:10,15;
124:20
**internally (2)**
54:22,23
**internet (1)**
27:23
**interpretation (1)**
17:12
**interrupt (3)**
6:19;139:20;159:18
**into (36)**
20:3;9:24:22;26:20;
27:22;32:11,14;
55:25;63:14;71:1;
74:17;81:11;82:13;
87:3,5,11,16,16;88:3,
8;91:20;93:2;116:9;
125:18;131:15,18;
134:13;137:7;141:25;
142:1;145:2;147:10,
25;172:13,14;174:18
**intuition (3)**
47:15,18;140:19
**intuitive (1)**
65:12
**inverse (1)**
156:3
**investigate (1)**
20:10
**investigated (1)**
49:23
**investigating (1)**
13:3
**investigation (8)**
11:14;19:21;20:6;
28:13;54:20;96:1;
102:18;107:11
**investigatory (1)**
42:23
**invoice (2)**
33:14;120:19
**invoke (1)**
158:10
**involve (3)**
37:18;158:25;
164:22
**involved (3)**
94:12;100:6;162:23
**involves (10)**
7:22;26:20;44:14;
70:9,25;96:24;107:3;
117:19,19;138:6
**involving (4)**
37:22;93:17;
161:24;162:6
**isolation (1)**
147:11
**issue (39)**
9:21;10:22;12:22;
13:6;26:1,4,8;42:8,10,
13;62:18;75:16,18;
76:14;82:16;83:8;

88:20,23,25;89:1;
93:16;105:21;106:23;
107:13;111:14;
114:20,21,23;116:13;
117:1;122:2;124:1,
12;166:22;167:16;
168:4;175:25;176:5,
24
**issued (2)**
112:16;113:4
**issues (5)**
50:16;92:25;
123:12;124:13;133:3
**item (1)**
46:17
**items (1)**
46:18
**Ivan (2)**
71:21,21

**J**

**Jaccard (2)**
155:5,20
**Jacqueline (2)**
61:20,23
**James (3)**
171:10,12;172:1
**Jean (4)**
10:16;30:17;62:1,4
**John (3)**
61:13;65:16;144:18
**joined (2)**
44:21;87:8
**joint (1)**
91:24
**Josh (2)**
139:7,7
**Joshua (3)**
102:3,4,7
**Judge (15)**
4:6;12:9,14,21;
13:8,10,13,22,24;
14:1;15:4,14;16:14;
17:4;179:11
**judgment (4)**
85:25;86:3,17;
133:15
**judgments (4)**
5:23;114:3,4,10
**July (1)**
110:18
**jury (1)**
105:2
**juxtaposed (1)**
150:9

**K**

**kay (2)**
35:7;166:3
**keep (3)**
31:20;104:21;145:5

**keeping (1)**
98:25
**Kenya (8)**
52:11,13,23;53:14,
15,15;54:9;58:17
**key (2)**
117:4;149:24
**keyboard (2)**
27:8;94:21
**keypad (1)**
117:13
**kind (17)**
30:13;37:25;75:11;
79:17;80:18;107:8,
14;118:10;125:4;
131:13,22;143:16;
144:10;146:21;
147:15,16;177:7
**kinds (2)**
20:23;171:13
**knowing (5)**
33:21;72:21;73:1,6;
97:16
**knowledge (13)**
28:16;79:18,21;
90:5;118:14;122:13;
133:24;148:15,20,23;
152:18;153:8;154:4
**known (1)**
119:13
**Kristin (1)**
25:18

**L**

**lack (1)**
105:7
**landed (1)**
145:19
**language (7)**
94:16;99:17;108:4,
10;124:4,11;138:25
**Larez (1)**
100:23
**large (24)**
48:25;49:11;91:17;
92:20;97:11;103:6,
24;108:5,7;124:5;
128:9;140:15;162:17,
23;163:11,19,23;
164:3,12,25;169:21,
22;177:18;178:25
**largely (2)**
131:18;147:10
**larger (15)**
51:9;56:2,10,13,14;
103:25;167:7;168:5,
14;169:2,8,18,24;
170:7,24
**largest (1)**
146:24
**last (25)**
15:21,23;16:10;

42:25;48:21;52:7;
53:17;54:6,8;72:3,6;
77:24;88:2;97:5;
98:16;99:4;106:14;
131:6,13;138:15;
139:1;150:8,10;
163:15;172:25
**late (1)**
141:2
**later (12)**
18:22;23:25;24:16;
43:1,7,8,14;57:8;
93:24;111:1;136:11;
145:3
**Law (1)**
108:18
**laws (1)**
121:22
**lay (1)**
107:19
**lead (9)**
46:21;48:3,6,18;
74:1;76:14;92:19;
103:1;106:8
**leading (1)**
107:14
**learned (1)**
85:11
**least (7)**
30:6;94:11;110:2;
124:2;131:20;132:14;
163:6
**leave (2)**
11:4;82:4
**left (3)**
71:8;81:21;131:22
**legal (3)**
6:5;12:22;109:17
**legendaries (1)**
134:12
**legendary (3)**
132:1;134:7,8
**legendries (1)**
132:4
**length (1)**
130:16
**less (10)**
25:24;54:25;55:5;
62:25;75:14;95:19;
96:20;121:4;122:1;
128:4
**letting (1)**
4:24
**level (14)**
35:6;66:5;86:13;
92:8;113:21;116:23;
119:4,25;121:11;
129:20,20;136:6;
155:14;167:10
**Levenshtein (2)**
155:6,20
**Ley (1)**
141:19

**liability (1)**
24:10
**libraries (1)**
153:12
**life (1)**
93:4
**light (4)**
5:1;42:5;58:18;
96:15
**likelihood (2)**
56:7,8
**likely (11)**
30:7;42:2,6;56:3;
62:25;96:2;121:25;
128:16;130:20;133:6;
164:15
**limit (1)**
104:9
**limited (5)**
24:2;79:19;93:23;
125:4;157:16
**limiting (3)**
161:22;162:4,10
**line (9)**
9:10;15:1;68:21;
125:25;138:3;153:4;
154:14;155:12;
162:15
**lines (1)**
146:3
**link (3)**
107:1;149:5;165:17
**linkage (15)**
24:9;26:3;40:5,17;
55:23,23;65:19;
70:20;105:6;123:8;
150:1;155:9,17;
163:8;177:12
**linkages (4)**
64:7,10;118:20;
165:23
**LinkedIn (1)**
171:19
**linking (2)**
40:20;118:18
**list (7)**
22:13,24;59:1;88:4,
5;90:22,25
**listed (3)**
8:18;22:12;60:17
**listening (2)**
115:8;147:7
**literally (2)**
63:15;101:1
**literature (4)**
40:3,5,16;154:9
**litigation (4)**
51:6;102:18;
106:18;107:9
**little (13)**
5:15;50:22;51:17;
68:20;72:4;80:22;
101:15;119:3;122:21;

124:21;159:2;165:12;
166:5
**live (1)**
4:22
**living (1)**
26:8
**Lizette (4)**
33:25;34:3,12,12
**Lizotte (4)**
9:6;7;10:15;11:19
**LL (1)**
127:18
**loaded (2)**
172:12,13
**login (1)**
49:19
**long (6)**
33:19;51:13;92:1;
102:20;151:25;
165:18
**longer (2)**
82:19;140:16
**look (63)**
6:8;23:15;30:1;
33:9,10;44:15;47:8;
49:6;56:17;58:4;
63:14;65:25;66:9;
72:9;73:14;78:21;
80:6;84:8;85:24;86:4;
89:22,24;90:21;94:6;
95:2;99:21;100:1,3;
106:23,24;107:16;
112:13;113:24;115:3;
116:4;120:9,10;
125:10;128:21;131:3;
136:25;137:21;140:9,
10,11,20;143:8;
147:12,15;148:15,20;
150:2,4;155:16;
158:16;162:10,23;
163:2,5;169:17;
175:24;176:15;177:6
**looked (29)**
12:6;13:20;30:2;
31:9;33:13;60:8;
81:12;114:3;116:2;
120:1,7,13;123:13,14;
124:3;127:21;141:14,
16;146:2;147:10,19;
150:16;162:1;173:24;
174:9;175:4,10;
176:10,11
**looking (42)**
8:11;21:21;36:12;
40:2;51:13;59:21;
65:12,19;66:3;70:25;
71:14;72:14;73:4;
80:12,14;94:12,14;
95:14;100:7;103:11;
114:1,19;118:10;
125:24;127:4,13;
129:7,8;137:25;
138:6;139:22,22;

140:5;146:18;150:1,
14,21;164:10;167:11;
173:7,8;177:17
**looks (6)**
7:16;24:7;51:17;
126:1;144:23;174:12
**Lopez (14)**
60:5;61:7,10,12,20,
23;65:16;71:16,21,21,
24;72:12,17;147:4
**Lopezes (3)**
72:7,21;73:11
**loser (6)**
66:1,2;67:7;89:22,
24;145:23
**losers (8)**
90:3;119:21;
139:16;140:7;141:9,
19;146:2,24
**losing (1)**
135:21
**losings (1)**
13:17
**loss (6)**
125:22;129:24,24;
130:1,6,8
**losses (6)**
16:20;125:20;
126:2;128:7;140:15,
22
**lost (2)**
73:13;134:23
**lot (16)**
42:22;49:13,17;
71:11;73:23;103:10,
25;104:3;105:16;
106:16;108:13;
123:20;132:7;133:22;
146:1;163:15
**lots (3)**
76:6;139:5;174:8
**Louis (2)**
10:16;30:17
**low (6)**
50:2;65:16;99:5,10;
121:22,23
**lower (2)**
73:25;97:14
**lowercase (1)**
127:18
**lowest (2)**
100:2;146:2
**lunch (1)**
101:15
**LYNNE (120)**
4:16,18,18;6:1,3,18,
23,25;7:1,9;8:1,4;
12:20;13:5,6;14:9,12,
13,18;15:2;17:16;
24:21;25:1,2;27:17;
34:8,13;52:6;57:24;
69:13,22,24;75:22;
76:9,18,22;78:13,16;

79:8,9;80:7,11,24;
81:14;82:15,21,22,23;
83:16,20,24;84:2;
88:14,17;90:9,10,12;
91:9;97:19;98:3,5;
101:5,6;104:8,12,14;
105:4,17;106:3;
112:4;116:14;122:8;
124:9;125:14;128:12,
18;129:6,9,23;
134:15;136:14;137:3,
6;138:17;141:1,8;
142:12,16,18,19,22;
145:1,5;149:19;
150:13,20;151:13,14,
16;152:23;157:3,11,
25;158:1,13;159:3,4;
160:7,10;161:4,5;
166:12,14,16,19;
175:17,20;179:3,6,16

## M

**magnitude (5)**
114:11,22;115:22;
122:2;128:7
**main (3)**
117:23;132:3,8
**major (2)**
39:11;93:12
**makes (8)**
47:23;80:25;87:3;
100:19;101:15;
133:18;168:8;169:15
**making (4)**
96:20,20;118:12;
149:14
**maliciously (1)**
41:5
**manage (1)**
50:18
**management (5)**
98:10,18;107:22;
151:21;165:14
**manifests (1)**
96:4
**manipulation (2)**
104:2;106:19
**manner (3)**
30:5;32:14;74:10
**manually (3)**
132:16;164:12,16
**many (30)**
32:10;41:7;55:20;
59:14;64:5,8;65:24;
66:16;68:15;75:10;
76:12;92:17;93:13;
94:15;109:17;119:22;
132:20;147:12,13;
158:20;170:2,10;
172:23,23;173:15,24,
25;174:3,5,8
**Maria (2)**

95:23;100:20
**mark (2)**
30:24;31:21
**marked (1)**
17:18
**market (4)**
104:2;106:19;
121:20;122:12
**marketing (1)**
151:23
**marking (1)**
17:18
**marry (1)**
177:6
**Martin (7)**
10:13;12:10;
109:10,11;110:25;
115:5;117:4
**Martin's (7)**
16:16,18,21;
110:10,16;113:1;
141:10
**mashing (3)**
27:8;94:21;117:13
**mass (2)**
35:11;102:8
**massive (1)**
122:3
**match (24)**
44:22;45:15;46:13;
47:16,20,20,21,22,24;
48:10;54:23;63:13,
18,21,25;65:11,16;
70:9;71:1;74:7;87:7,
15,17;161:10
**matched (10)**
33:11;44:14,18;
45:10,12,19,21,23;
46:17;56:1
**matches (12)**
42:15;47:11;48:6,8;
63:23;64:19;70:24;
86:9,15;161:9;
164:15;177:19
**matching (32)**
20:23;21:5;40:2,5;
64:25;65:15;91:16,
23;92:3,7,10,16;
93:13;98:6;155:5,19,
24;156:9,14,15,16;
157:13,14,17,19;
159:13;160:18,22;
161:19;162:11;
164:14,19
**math (3)**
81:11;127:9;136:4
**mathematics (1)**
44:11
**matter (4)**
86:13;109:20;
113:7;155:8
**matters (7)**
85:23;102:19;

107:6,11;153:20;
162:23;179:14
**maximization (1)**
154:4
**May (40)**
5:5;14:9;16:24;
21:13;23:1;28:8,18;
42:9;54:18;59:9;62:6;
66:12;68:8;77:18,21;
79:9;80:11;99:16;
102:10;103:11;
105:12;114:11;
121:23;122:1,11;
123:20;124:3;128:8,
9,14;136:10;140:21;
145:8;149:1;150:6,
11;152:24;155:18;
159:16;166:18
**maybe (18)**
12:12;20:17;29:20;
47:16;52:11;53:10;
95:4;100:25;103:15;
110:11,18;111:1,12;
112:22;128:24;135:9;
176:9;179:4
**mean (35)**
8:4;11:1;14:2;
18:16;19:22;20:8;
21:6;27:6;40:25;
46:14,19,20,23;47:24;
57:23;58:3,25;59:1;
68:9,12;74:14;75:4,
18;84:25;86:24;88:5;
115:17;118:10;
123:10;131:8;133:6;
135:17,17;136:5;
150:7
**meaning (7)**
12:21;39:18,22;
66:23;67:6;68:10;
118:19
**meaningful (1)**
150:16
**meaningfully (2)**
80:20;118:2
**means (2)**
55:1;87:3
**meant (4)**
57:11;105:17;
121:17;162:12
**measure (2)**
64:1;115:23
**measurement (1)**
51:15
**measuring (1)**
115:18
**meet (1)**
150:12
**meets (1)**
47:25
**members (1)**
29:9
**membership (1)**

121:5
**memberships (1)**
121:1
**memory (1)**
116:11
**mention (1)**
23:11
**mentioned (14)**
17:16;22:1,5;23:8;
25:4;77:4;83:16;
105:24;106:16;
114:19;132:2;150:21;
152:8;155:8
**mere (2)**
46:12,16
**merits (1)**
86:14
**mess (1)**
43:18
**messy (1)**
103:6
**method (10)**
16:3;45:6;62:11;
73:22,25;88:24;
96:13,23;100:4;
119:24
**methodology (31)**
7:19;8:15;16:17,22;
19:2;38:21;41:12,20;
54:22;56:22;73:18;
74:21;88:6;90:22;
92:16,20;93:16,20;
97:1;99:24;101:3;
109:4;118:18;120:2;
135:19;145:3;158:2,
4,19;159:5;178:6
**methods (7)**
24:1,6;32:16;46:2;
63:3;65:18;94:1
**metric (1)**
113:12
**metrics (1)**
100:2
**Mickey (10)**
26:17;27:4,6,8,12;
42:8,9;43:23;94:5,19
**microphone (1)**
103:14
**Microsoft (1)**
152:6
**mid (1)**
110:18
**middle (8)**
5:16;54:6;61:3;
67:15;139:2;143:8,
17;150:9
**might (19)**
25:19;36:18;39:18,
23;55:3;57:19;58:9,
11,14,16;61:23;66:5;
77:17;78:3;96:15;
123:4,4;134:11;
155:18

**migrate (1)**
9:11
**million (11)**
30:5;49:6,15;97:13,
14,14,17;108:11;
127:4;170:25;177:21
**millions (2)**
101:1;119:8
**mind (4)**
7:5;12:18;98:25;
104:21
**mine (2)**
9:1,24
**minimal (4)**
28:20;50:19;
100:24;101:2
**minimized (2)**
88:25;89:1
**minimizing (2)**
163:14,23
**minimum (1)**
122:6
**minor (1)**
107:22
**minored (1)**
152:3
**minute (5)**
30:20,24;31:21;
32:4;43:22
**minute-fifty (1)**
30:20
**minutes (1)**
179:4
**Miri (1)**
71:24
**misappropriation (1)**
104:3
**misleading (1)**
92:14
**mismatch (1)**
64:15
**mismatched (1)**
64:9
**misquote (1)**
57:2
**missed (1)**
120:4
**missing (4)**
15:6;20:22;59:8;
69:5
**mistake (1)**
136:4
**mistakes (1)**
41:6
**misunderstood (2)**
112:22;162:12
**mixed (1)**
101:1
**model (13)**
55:1;63:16,22;66:7;
68:14;71:2;154:22;
160:21;161:21,23;
165:10,11;177:12

**modeling (1)**
155:2
**models (1)**
165:12
**moment (8)**
15:11;47:19;59:20;
78:2;91:11;116:20;
141:16;151:9
**Monday (2)**
79:1;158:8
**money (5)**
36:23;56:25;
120:21;121:8;122:5
**months (1)**
158:20
**Morales (1)**
53:18
**Moraleses (1)**
53:24
**more (72)**
9:19,21;10:13,17;
24:2;27:7;28:20,24;
36:13;37:7,23;42:2;
45:17;47:23;53:14,
24;54:14,20;55:3;
56:3,3,6;60:20;63:1;
67:9,14;68:20;70:17;
73:2,3,5,25;74:1,2,22;
77:16,22;78:10;
79:20;96:5,11,19,20;
99:13;107:2,3,4;
108:11;119:3,22;
121:24,25;122:21;
128:2,16;131:17,17;
133:17;139:8,20;
152:20;153:18;160:3;
161:13,14;164:15;
165:19;169:4;172:24;
173:16;174:21;178:4
**morning (4)**
4:11;5:13,14;
143:24
**most (19)**
23:18;30:8;41:6;
91:15;98:14;100:7,8,
25;117:16;129:18,18;
132:1,2;149:25;
162:24;170:16,18,18,
21
**motion (3)**
78:18,19;122:15
**Mouse (10)**
26:17;27:4,7,8,12;
42:8,10;43:23;94:5,
19
**move (12)**
25:19;78:1;83:21;
103:14;122:8,13;
123:6;124:9;135:11;
139:10;145:6;166:17
**much (15)**
6:16;12:6;36:21;
57:14;66:5;69:6;

107:2;112:19;113:11,
12;122:23;124:18;
146:15;152:13;160:9
**multiple (9)**
7:22;9:12;10:23;
73:24;108:12;132:24;
139:5;143:9,11
**must (3)**
94:18,24;168:12
**mute (1)**
4:20
**myself (3)**
6:21;121:1;129:6

# N

**name (123)**
7:20;9:12,13,18,22;
10:13,17,18;20:24;
27:3,20,22,22;28:3,6,
14,20,24;29:7,21,23;
32:18,21,23,24;33:2,
19,22,22;34:7;39:17,
22;40:14,14;41:16,
24;42:9,16,19;43:10,
14;44:1;49:19;50:8;
51:5,14;57:18;58:23;
61:7,9,12,13;67:16,
23;68:22;70:13;
71:16;72:17;73:17,
19,19,24;74:4,4,12;
76:16;81:3;85:6,8,17,
19,20;88:2,3;93:16,
18,19,22,25;94:2,10,
12;102:6;104:1;
117:6,20,24;124:24;
125:20;126:1;127:7;
128:3;130:12,17,21;
131:6,15,15;132:24;
133:9,19;137:16,21,
25;138:2,3,4;139:2;
143:5,7,11,18,22;
144:12,19;148:9;
150:3,7,8,8,9,10;
151:6
**named (1)**
51:10
**names (70)**
7:22;8:16,18,25;
9:12;10:23;26:16;
27:14;33:11,11;
39:12;41:3,10;50:25;
51:13;58:20;61:4;
62:18;65:13,14;
69:17;88:9;93:1,3,7,
12;94:5,5,7,18,20,24;
111:2;124:25;125:18,
18,21;127:17;128:5;
129:17;130:12;131:1,
6,10,16,25;132:5,24,
25;133:5,17,22,25;
134:6;138:6,16;
139:1,5,9;141:13;

143:6;144:9,22;
145:12,20,21;146:1;
148:8,12;178:16
**naming (3)**
138:7,11,19
**nationalities (1)**
138:8
**nationality (1)**
138:24
**native (1)**
155:13
**nature (9)**
106:9;107:13;
109:3;122:6;123:3;
124:21;128:21;149:3;
150:11
**near (2)**
53:25;72:11
**nearby (1)**
74:8
**necessarily (5)**
24:14;37:25;43:18;
56:8;130:24
**necessary (5)**
17:9;30:13;138:9;
166:18,19
**need (15)**
4:7;19:19;66:12;
83:2;86:3;112:11,14;
125:5;136:5;142:13,
13;164:11;170:5;
174:13;178:18
**needed (6)**
4:9;19:12;92:1,2;
107:4;178:17
**needs (4)**
14:4;24:6;85:24;
178:25
**negative (13)**
55:24,25;67:6;89:5,
12,14,21;95:18;
99:25;130:7;135:3,4;
139:17
**neighborhood (1)**
104:2
**net (174)**
5:18,19,20;11:9,11,
12,24;13:8,17,17;
14:3,15;16:5,20;17:4;
19:12,12,15,16;20:1,
2;38:11;56:2,17,19,
23;58:20,23;60:13,22,
25;65:24;66:1,1,2,2,5,
23;67:7;79:6;80:4,
16,19;81:4,17,17;
82:1,1,11;83:9,17;
88:21,21;89:2,6,20,
21,22,22,24,24;90:1,
2,13,14,18,18,21,24;
91:3;113:25;115:19,
19,22;119:20,21;
120:8,9,13,14,22;
121:9,12;125:24;

129:17,18,24,24,24;
130:7,8;134:20,21;
135:3,20,20;139:16,
17;140:7,15,22,23;
141:9,19,22;144:18,
21,25;145:23,23;
146:2,24,24
**nevertheless (5)**
24:2;68:7;87:16;
94:18;96:24
**Neves (3)**
95:23;100:21;176:9
**new (3)**
80:21;120:19;165:7
**newly (1)**
83:13
**next (17)**
47:14;48:4,5;53:24;
61:9;71:21;81:13;
93:10;99:4;101:13;
110:12;131:11;
132:24;143:10,11;
167:14;179:8
**nickname (1)**
69:20
**nicknames (2)**
69:17;148:5
**nine (8)**
18:10,10,14,22;
19:3,6;25:13,16
**nine-step (1)**
14:14
**nineteen (1)**
102:21
**ninety-day (1)**
81:22
**ninety-eight (1)**
26:23
**ninety-five (2)**
42:3;94:11
**ninety-nine (1)**
26:24
**ninety-seven (2)**
26:24;63:18
**Niyal (1)**
61:12
**nonbelievable (1)**
26:25
**none (6)**
49:19;79:15;83:15;
101:6,8;177:1
**nonempty (1)**
28:6
**nonetheless (1)**
150:11
**nonfuzzy (1)**
157:14
**nonlinkage (1)**
70:20
**nonmatch (1)**
47:12
**nonmatches (1)**
40:7

**non-names (1)**
26:16
**nonoverlapping (1)**
20:24
**nonrepresentative (1)**
62:9
**nor (1)**
30:13
**normally (1)**
99:6
**north (1)**
113:14
**notation (2)**
47:10,17
**note (3)**
84:22;92:11;116:16
**notebooks (1)**
153:6
**noted (1)**
85:1
**notice (1)**
32:7
**noticed (1)**
129:25
**noting (2)**
42:8;129:15
**notion (1)**
173:17
**notwithstanding (1)**
87:22
**November (2)**
7:14;9:25
**Number (64)**
4:3,4;7:2;9:11;
18:4;19:19;20:14;
21:21;29:8;33:7,17;
37:9;39:13;43:11;
46:2;49:12;54:17;
56:13,15;57:17;
61:19;62:12;64:7,14,
17;67:24;68:1;75:4;
81:4;91:3;94:10;
95:24;96:5,25;97:8,
11;117:15;119:6,7,14,
21;123:19;125:19;
126:15;129:21,21;
139:1;141:20;146:2;
152:7;168:17,22;
169:1,6,6,20;170:8,
14;173:19;174:18;
175:3;176:14,15;
178:25
**numbered (3)**
9:10;20:18,19
**numbers (21)**
5:21;19:3,22;20:4;
25:20;26:16;38:25;
39:6;50:12;56:20;
60:24,25,25;89:15;
91:2;100:10,14,17;
132:9;134:5;169:7
**numerous (1)**
124:25

**Nyal (1)**
65:16

## O

**oath (1)**
5:9
**Obama (2)**
132:6;133:9
**object (11)**
8:2;12:20;78:19;
83:21;88:14;105:19;
128:12;141:1;145:1;
149:19;157:22
**objection (24)**
4:21;6:1,2;8:5;
57:24,24;69:14,22;
75:22;76:9;82:25;
104:13,13;116:16;
124:16;134:15;
136:13;138:17;
149:21;150:13;
157:21;158:11,21;
166:9
**objectionable (1)**
105:19
**objections (2)**
105:12;112:5
**observations (1)**
137:18
**observe (4)**
129:23;135:6;
136:19;142:5
**observed (1)**
135:1
**obtained (1)**
36:17
**obvious (1)**
65:15
**Obviously (14)**
26:7;49:20;58:3;
68:15,17;132:4;
133:5,10;144:16;
146:21;149:3;160:20;
161:14;163:15
**occasion (4)**
10:12;31:15;35:8;
75:1
**occasional (1)**
99:1
**Occasionally (3)**
96:4,9;101:1
**occur (7)**
26:21;30:5;45:7,7;
48:23;49:7,7
**occurred (4)**
27:11;30:6;127:4;
160:19
**occurring (1)**
50:19
**occurs (2)**
26:22;40:11
**o'clock (1)**

179:5
**October (2)**
179:9,10
**odds (1)**
47:19
**off (12)**
33:5;47:6;61:24;
78:6;83:12,13;101:4,
23;135:11;150:7;
173:14;178:12
**offer (3)**
12:23;112:2;128:15
**offering (1)**
21:16
**office (1)**
41:5
**often (18)**
20:21;24:1;26:20;
27:11;28:4,11;39:7;
50:12;51:14;93:7;
100:24;107:2,4,14;
125:7;139:8;151:5;
155:19
**Oksana (1)**
89:9
**Olaiya (1)**
53:25
**old (2)**
25:19,25
**omitting (1)**
85:3
**Once (12)**
9:23;30:7;35:2;
45:12;104:18;142:12;
160:8;168:25;169:4,
5,5,16
**one (182)**
7:9,19;9:13,18,18,
22;10:13,17;12:9;
14:25;15:10;22:12;
24:6,7,16;26:9,23,25;
28:4,20;30:16,24;
33:23;40:2;41:21;
43:8;47:11,15;48:17;
49:23;50:17;51:9,18;
56:9;57:18;58:15,15,
22;62:25;63:24;
64:13,15;66:19;67:6;
68:17;69:2;70:17,18;
72:10;78:1,9,16;80:6;
81:10,12;82:18,23;
83:5;85:9,10,24,24;
91:2,3,11;93:19;
94:23;95:11,19,20;
96:11,13,13,14,18,25;
97:2,12;100:15;
107:3;110:2;112:24;
113:13;114:21;117:4,
23;119:22;120:10;
121:17;124:23;126:1,
1,5;127:7,7,18,18,18,
23;129:14;130:14,17;

131:17,17,20;132:2,
14,23;133:11,14;
135:9,12,13,14;136:2;
138:6;139:8,16,20;
140:6,10;141:9,13;
142:9;143:1,11,17,20;
144:24;145:9,13,18;
146:5,9,20,21,22,23;
151:9,25;152:4,9,15;
155:8;156:13,15,21;
159:17,23;160:3,7;
161:2;165:19;167:19;
168:6,12,13,16,20;
169:4,9,11;172:3;
173:13,13,23;174:21;
175:11;176:23;177:5,
22;178:3,4,9,10,12;
179:3
**ones (6)**
68:2;84:24;100:22;
132:9;134:10;145:10
**one's (2)**
50:20;96:13
**only (27)**
19:19;32:18;48:23;
59:15,22;67:21,23;
80:6,10;83:10;94:24;
130:17;132:23;
148:17;150:9;152:4,
19;153:16;154:4;
155:4;163:5;166:3;
173:1,2;177:12,22;
178:1
**open (3)**
97:24;142:13;
152:19
**operations (1)**
91:24
**opinion (12)**
12:21;15:18;16:2,
23;17:9;66:24;90:15;
116:24;117:18;
128:15;149:17;163:7
**opinions (9)**
12:11;113:2,16,18;
115:12;116:9;118:17,
20;144:13
**opportunity (1)**
78:21
**opposed (7)**
38:1;55:4;97:9;
104:16,20;105:20;
145:3
**optimistic (1)**
176:6
**orange (1)**
20:1
**order (7)**
31:16;85:19,20,22;
86:6;96:12;125:6
**orders (1)**
79:13
**organizations (1)**

93:6

**original (3)**
23:5;25:5;158:14

**Oscar (3)**
138:2,4;141:14

**others (6)**
55:6;64:2;72:8;
77:8;132:13,24

**otherwise (6)**
32:21;33:18;57:17;
108:7;157:18;168:23

**ours (1)**
113:12

**out (35)**
13:8;16:19;36:14;
42:9,19;54:24;56:16;
58:18;64:14;65:14;
79:14;81:21;82:4,5;
83:21;96:2;97:14;
98:11,18,22;100:17;
105:24;107:19;108:9,
13;112:11;116:4;
130:17;137:22;
145:13;161:4;173:2,
9;175:10,10

**outliers (1)**
140:10

**output (16)**
19:2,19;24:3,8,12;
79:3;96:8;99:5;101:3;
142:3;176:11,16;
177:7,11;178:8,22

**outputs (2)**
177:9,11

**over (20)**
54:18;55:2;56:18;
62:23;64:18;75:10,
20,20;76:1,1;86:2;
87:19;96:17,21;
100:5;106:14;142:5;
172:24;174:10,24

**over-aggregation (10)**
95:21;144:14;
173:10;174:1,4,20;
175:12,25;176:23,24

**over-aggregations (1)**
173:18

**overall (7)**
23:24;63:25;77:22;
96:19;97:15;99:25;
172:7

**over-clustered (4)**
62:25;64:14;95:25;
100:7

**over-clustering (8)**
48:16;55:4;62:7,8;
63:25;88:24;95:6;
176:21

**over-clusters (1)**
176:19

**overcomes (1)**
168:3

**overlap (1)**

137:19

**overrule (3)**
76:10;124:16;
149:21

**Overruled (7)**
6:6;27:19;58:2;
116:18;141:7;150:19;
157:24

**oversight (1)**
84:12

**overstate (1)**
89:6

**overwhelmingly (5)**
43:25;58:6;68:17;
70:18;94:21

**own (11)**
27:14;28:25;29:7;
33:17,21;40:14;
55:17;65:18;106:9;
115:25;117:20

**owned (1)**
40:23

**owner (3)**
41:3,3;90:19

**P**

**P-33 (2)**
160:4,5

**package (1)**
155:13

**page (72)**
9:3;11:6;15:4,21,
24,24;16:11;18:3,4;
20:13,16,18,19;21:19,
19;23:2;24:15,16;
29:3;31:12,24;36:25;
38:24;44:15;48:20;
50:24;51:25;52:21;
53:9,11,18,24;54:6,8;
58:5,5,5,6;59:3;72:3,
3,6;78:15;81:1,13;
83:14,15;84:23,23;
85:4,15;91:8;92:25;
125:12,14,15;128:2,
25;129:8;131:11,11;
137:1;142:8,16;
153:3;154:11,13,14;
155:11,12;158:4;
162:14

**pages (7)**
58:5;59:14,15,22;
66:16,17;71:14

**paid (2)**
33:4;38:1

**pair (7)**
44:18;45:4,10,12;
47:9;87:3,15

**paired (2)**
45:2,2

**pairs (11)**
40:8;44:14;47:10,
12;48:7;56:1;63:13;

64:8,17;87:1,11

**pairwise (13)**
48:22;63:16,23;
64:7,19;86:15;161:9;
164:4;165:15,23;
166:1;177:19,19

**Panda (1)**
153:11

**Pandas (1)**
153:16

**PAPAS (8)**
7:5;152:24;159:18,
21,23;160:2,4,6

**paper (1)**
173:6

**papers (2)**
78:19;163:7

**paragraph (31)**
18:5;20:14,16,19;
22:18;23:1,3,6;29:2;
38:24;39:1,5,10,16;
42:7;47:8;48:4,5,21;
50:4,6;57:9;74:19;
91:12,14,15,21;93:2,
11;98:13,14

**paragraphs (2)**
7:18;23:25

**parameters (3)**
55:3;62:24;96:15

**part (37)**
13:3;23:19,22;31:8;
32:15;36:25;38:19;
42:18,21;70:16;
74:17;77:4,6,9;80:16;
87:20;88:6;92:11;
94:11;98:12;100:5;
116:5;117:7,9,16;
119:19;120:11,22;
121:9;130:15,15;
151:25;155:19,25;
171:12;172:20;176:7

**participant (25)**
16:20;34:4;37:15;
38:1;43:1,3;57:8;
62:4;76:11;89:5,5;
90:23;91:2,4;117:8;
118:4;119:23;130:20;
133:9;134:9,25;
145:18;151:5;177:22;
178:19

**participants (23)**
5:24;30:10;35:8;
36:18;37:5,23;38:6,
16;50:1;62:7;80:16;
88:13;90:15;114:12,
24;119:5,7,11,15;
134:19;145:14;
148:24;178:14

**participated (2)**
75:13;104:11

**particular (33)**
19:4;21:7;41:8;
42:4;48:17;49:5;

62:20,24;68:13;
79:11;86:3;89:14,16;
96:14;102:24;105:7;
117:25;130:23;133:1,
24;134:24,25;143:7,
19,22;145:19;146:23;
147:19;156:11;
157:15;158:16,18;
167:21

**particularly (5)**
15:22;47:2;133:21;
149:9,12

**parties (2)**
79:1;112:12

**partner (2)**
102:23;103:1

**parts (1)**
147:10

**partway (1)**
129:13

**pass (2)**
94:13;100:4

**past (3)**
8:20;58:15;104:7

**pasted (1)**
76:1

**pasting (1)**
75:20

**pattern (1)**
100:23

**pause (3)**
31:3,23;84:15

**paused (1)**
129:13

**pay (3)**
32:19;33:18;121:23

**payment (2)**
81:20,23

**payments (2)**
81:22;125:7

**PDF (13)**
15:24;18:3;20:14,
16;23:2;29:3;38:24;
51:25;78:15;125:13;
129:1;137:2;142:9

**peer (2)**
55:11;165:25

**peer-reviewed (2)**
40:10;165:13

**people (37)**
4:21;25:19,20,20;
26:6;27:13,19,21;
36:22;40:23,25;
42:19;57:3;69:17;
75:13,19;76:5;93:4;
115:21;117:19;119:9,
11;123:22;126:9;
131:5,10,14,16;136:3;
138:12;139:1;140:14;
144:21;146:7;149:12;
150:9;178:14

**people's (2)**
77:6;123:22

**per (5)**
19:18;25:25;70:20,
20;91:4

**percent (23)**
26:24,25;37:9;
41:21;42:3;54:19,21;
55:1;63:18;64:3;
65:10,21,22;94:11;
95:19,20;96:3;
124:24;126:5;178:3,
9,11,12

**percentage (10)**
27:2;33:3;35:1;
37:17;56:8,12,13,14;
65:23;94:25

**perfect (2)**
74:22;91:22

**perfectly (2)**
24:5;96:7

**perform (6)**
125:6;162:17;
163:6;171:5;172:6;
173:13

**performed (6)**
94:10;117:11;
140:3;149:9;156:1;
172:23

**performing (1)**
77:23

**perhaps (3)**
27:25;58:9,15

**period (4)**
25:9;45:24;144:23;
150:8

**permission (1)**
30:19

**permit (1)**
83:21

**permitted (1)**
24:22

**permutations (1)**
62:3

**person (16)**
38:11;40:13;41:11,
16,17;57:19;58:24;
59:2;69:9;77:24;
82:12;84:1;89:8;
127:6;148:9;178:17

**personal (5)**
93:1,3,12;106:9;
122:12

**personally (1)**
106:13

**persons (1)**
93:20

**perspective (2)**
95:7;133:19

**persuade (1)**
135:18

**persuades (1)**
14:25

**pertinent (1)**
162:25

Case 16-04006 Doc 493 Filed 10/19/23 Entered 10/19/23 13:11:55 Desc Main
In the Matter of: TELEXFREE, LLC Document Page 197 of 206

October 12, 2023

**ph (14)**
53:25;58:9;61:12,
20;62:1;68:22;71:17;
83:25;84:21;100:23;
132:15;138:2;143:16;
153:24
**phenomenon (2)**
54:16;135:10
**phone (12)**
20:24;25:20;29:8;
39:6,13;43:11;50:11;
57:17;81:4;129:21;
132:8;134:5
**phrased (1)**
156:18
**pick (3)**
7:21;49:5;72:6
**picking (1)**
173:16
**piece (1)**
63:16
**pieces (4)**
117:5,22;144:15;
155:24
**place (6)**
26:16;64:14;96:2;
123:16;144:5,10
**Plaintiff (1)**
21:23
**plan (2)**
121:5,8
**plans (1)**
121:1
**plausible (9)**
20:25;28:5;35:12;
37:11,20;38:13;58:7;
65:17;69:7
**plausibly (2)**
31:7;62:5
**play (8)**
30:19,19,23,25;
32:4;74:11;93:3;
98:23
**played (3)**
31:2,22;32:5
**playing (1)**
31:20
**plays (1)**
93:19
**pleadings (1)**
109:18
**Please (13)**
4:2;5:6;15:9;45:18;
59:7;72:11;102:5,11;
105:19;127:5;152:23;
167:14;169:4
**plug (1)**
100:17
**plus (1)**
85:10
**pm (6)**
78:7;79:1;101:23,
24;158:8;179:18

**podium (1)**
5:3
**point (36)**
9:25;10:5;11:7,8;
18:18;19:5;20:8;
23:21;26:19;30:17;
32:15;43:14;45:5,13;
63:8;67:24;78:20;
80:17;82:25;83:5;
89:18;92:16;96:22,
23;110:25;112:11,14;
124:18;139:12;141:7;
157:11,20;168:2;
173:9;174:17,19
**pointed (2)**
54:24;65:14
**pointing (2)**
56:16;68:16
**points (1)**
175:8
**politicians (1)**
93:6
**Ponzi (5)**
104:6,7;106:19;
140:13,16
**poor (1)**
63:13
**population (3)**
114:23;118:18,21
**portal (1)**
38:5
**portion (9)**
27:11;43:22;64:16;
73:22;77:21;91:17;
92:20;94:16,18
**portions (1)**
92:9
**Portuguese (3)**
124:2;138:17,24
**position (2)**
102:22;135:24
**positive (14)**
55:24,24;58:20,23;
66:23;89:4,14,20;
95:18;96:3;99:25;
135:4,4;140:17
**possibility (1)**
87:8
**possible (24)**
4:22;6:17;18:18;
19:8;29:24;32:14;
33:16;34:11;35:5;
48:24;50:25;56:1;
58:14;62:23;69:9,10,
10,24;77:20;128:15;
173:10,10;174:20,20
**possibly (2)**
33:21;81:12
**potential (10)**
32:8;87:18;99:21;
114:22;140:23;
164:15;173:12,17,18,
25

**potentially (9)**
43:13;73:2;95:25;
100:18;119:23;
121:13;163:8;175:11,
25
**power (3)**
174:25;175:14;
176:14
**PowerPoint (1)**
158:7
**practice (3)**
29:6;102:24;106:22
**precisely (1)**
26:22
**predicate (1)**
76:19
**predictions (2)**
167:6,10
**Predictive (1)**
167:5
**prefer (2)**
5:2;105:13
**premise (1)**
89:7
**preparation (3)**
85:3;113:9;160:14
**prepare (4)**
136:18;140:6;
141:21;158:11
**prepared (5)**
60:11;79:3;128:19;
135:7;141:10
**preponderance (2)**
16:1;58:22
**presence (3)**
24:2;46:12,16
**present (6)**
20:21;50:15;58:10;
74:1;80:9;159:11
**presentation (3)**
160:2;166:7,10
**presented (2)**
86:5;96:6
**presenter (1)**
82:20
**presenting (1)**
114:14
**presents (1)**
75:9
**preserve (1)**
105:12
**press (1)**
164:24
**presumably (4)**
32:25;41:6;56:10;
95:10
**presume (1)**
51:19
**pretty (10)**
28:7;43:22;58:17;
65:11;68:8,9;87:18;
109:2;152:12;166:12
**prevalence (2)**

39:12;139:4
**prevalent (2)**
94:6;97:16
**prevent (3)**
86:8;107:17;117:12
**previous (5)**
68:25;85:18;
145:22,25;146:7
**previously (2)**
23:13;117:4
**price (1)**
157:9
**primacy (1)**
93:22
**primary (3)**
93:8;99:24;120:14
**principle (3)**
98:11,18,22
**principles (1)**
160:18
**printed (2)**
69:4;173:2
**prior (10)**
78:21;90:24;
112:24;128:2;153:24;
161:24;162:6,16;
163:10;165:4
**private (3)**
42:23;93:7;106:20
**probabilistic (11)**
153:22;155:2,3,9,
14,16,19,23,25;
157:12,16
**probabilities (3)**
54:23;63:21;87:15
**probability (8)**
47:22;65:11,16;
70:9,14;71:2;87:7,17
**probably (5)**
100:16;133:8;
145:24;165:20;
174:13
**probing (1)**
13:21
**problem (8)**
7:7;40:23;48:13,14,
22;88:25;150:17;
160:10
**problematic (2)**
121:14;174:11
**problems (4)**
40:17;48:6;123:5;
127:24
**proceed (2)**
102:10;142:20
**proceeding (1)**
112:24
**proceedings (2)**
4:23;16:4
**process (45)**
6:5;10:4;14:14,14,
16:19;17:17;19:23;
20:4;23:24;24:13;

28:16,17,18,20;35:17;
37:7;43:19;57:12,14;
74:15;93:22,23;
113:25;114:1;117:2,
7,9;119:2,13;123:9,
14;124:6;130:15;
131:5;132:17,18;
159:12;162:9,10;
168:13,25;176:7;
177:2,3,20
**processes (1)**
93:13
**processing (2)**
98:10,17
**produced (2)**
109:21;132:20
**professing (1)**
105:15
**profession (1)**
149:2
**proffered (1)**
105:20
**profile (1)**
171:20
**profiling (1)**
171:21
**programing (6)**
108:2,3,4,4;152:8,9
**Prokopenka (1)**
84:21;85:17;89:8,9
**promoter (1)**
31:11
**promoters (1)**
31:15
**proof (1)**
12:23
**proofs (2)**
38:6;110:2
**Property (1)**
108:18
**provide (8)**
6:12;12:23;29:16;
79:10;96:25;167:9;
169:23;176:16
**provided (12)**
14:16;31:9;36:2,5;
41:20;58:4;81:15;
84:24;85:12;95:1;
97:7;109:22
**provides (3)**
41:12;45:14;170:6
**proving (1)**
103:7;168:1
**pseudonym (2)**
43:10,14
**pseudonyms (1)**
148:5
**public (1)**
93:7
**pull (14)**
6:8,20;7:2;12:19;
36:10;37:23;81:17;
152:23;158:1,2;

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
In the Matter of: TELEXFREE, LLC                Document        Page 198 of 206

October 12, 2023

169:8;170:3,10;
176:14
**pulled (4)**
19:11;175:1,9,23
**pulling (3)**
108:9;170:14;175:9
**purchase (5)**
79:13;81:25;82:1,1;
120:25
**purporting (1)**
124:13
**purports (1)**
171:20
**purpose (18)**
10:18;92:8;103:7;
114:19;115:18;
123:10;134:19;163:5;
164:6,7;166:1;
167:12;168:1;172:10;
173:20;177:15;
178:13,24
**purposes (6)**
56:21;87:12;
116:16;128:19;
163:13,23
**pursued (1)**
107:24
**pursuing (1)**
5:23
**put (14)**
14:23;30:17;62:20;
83:2;91:9;96:13;
100:12;105:10;
127:20;131:14;
135:14;159:24;
174:18,23
**putting (2)**
38:20;56:24
**Python (4)**
152:19;153:6,7,12

## Q

**QC (1)**
176:7
**quadrant (1)**
59:4
**qualified (3)**
105:25;116:17;
149:20
**qualities (1)**
23:22
**quality (42)**
20:20;22:23;24:8;
28:25;35:17;43:15;
65:5;66:3;76:7,14,17;
77:14,22;91:16,22;
92:1,4,7,18,22;99:5,6,
10,12,13,13;100:2;
103:10;122:22,22;
123:1,2;125:10;
127:24;128:20;133:3;
147:8,25;148:1;

149:6,18,25
**quantification (1)**
106:18
**quantify (4)**
107:13;115:19;
122:11;134:21
**quantifying (2)**
103:8;109:5
**quarter (1)**
101:20
**queries (10)**
113:8;172:18,23;
173:2,8,13,15,15,23,
25
**query (4)**
108:5;173:4,5,20
**querying (1)**
108:7
**questionable (1)**
100:22
**quick (2)**
15:11;78:4
**quickly (1)**
145:8
**quite (11)**
23:21,25;40:6;
42:22;48:9;51:13,14;
65:14;73:5;99:3;
149:8
**quote (5)**
23:25;24:15;40:3;
92:14;155:5
**quoted (5)**
22:15;23:23;74:19;
92:11,12

## R

**raise (3)**
16:15,24;29:17
**raised (1)**
100:22
**ran (2)**
173:6,23
**random (23)**
95:10;97:9;168:5,
13,17,21,22,22;169:1,
2,5,7,8,9,16,20,23;
170:8,8,13;171:5;
175:1;176:15
**range (16)**
49:7,16;102:18;
103:5;124:22;130:21;
131:16,25;132:4;
133:10,21,22;134:6;
143:17;146:19,21
**ranging (2)**
93:5;139:8
**ranked (1)**
156:21
**rare (2)**
62:5;115:17
**rarely (1)**

48:23
**rate (28)**
54:19,21;55:7,11,
17;63:5,11;65:5,9,18,
21;66:6;70:8,19,25;
73:5;87:12,14,25;
95:16,18;96:3,10;
99:18;115:11,13,21,
23
**rates (2)**
55:15;99:25
**rather (8)**
24:8;27:8;59:18;
65:21;73:24;99:2;
126:7;164:10
**read (24)**
4:6;6:21;7:23;
11:16,21;12:14;
13:22;15:18;24:22;
43:5;61:4;71:19;
91:20;93:2,10;
112:10;129:15;153:4,
5,9;154:5,14,19,23
**reading (3)**
16:8;98:16;123:18
**ready (2)**
4:12;142:19
**real (14)**
19:21;48:21;88:12;
98:14;118:11;120:3;
121:18,18;148:9,16,
18;149:2;174:13,16
**realistic (2)**
163:12;165:2
**reality (1)**
140:22
**really (25)**
9:11;65:14;81:16;
88:15;95:11;97:5,11;
100:24;105:17;
106:20;113:24;114:1;
115:19;117:1,3,4;
145:2,8;151:4;
160:23,23;164:20,20;
173:7;174:16
**realm (1)**
75:23
**reason (15)**
4:19;5:17,22;8:8;
9:20;19:11,11;38:17;
44:2;78:18;92:20;
114:17;130:13;
140:24;146:23
**reasonableness (1)**
140:12
**reasoning (1)**
66:4
**reasons (6)**
37:24;117:15;
140:8;145:19;149:14;
173:13
**rebuttal (4)**
29:18;110:15;

111:3,14
**recall (13)**
16:8;18:25;19:9;
28:3;31:4;32:17;
36:21;44:24;57:6;
77:2;127:22;146:3;
148:17
**recalled (1)**
156:7
**receipt (2)**
81:22,24
**received (5)**
9:4,7;109:24;
111:12;113:6
**receives (1)**
103:23
**recently (1)**
15:22
**recess (1)**
78:5
**recognize (4)**
51:5;93:19;96:23;
139:13
**recollection (1)**
111:5
**recommends (1)**
25:18
**record (36)**
4:9;5:17;14:23;
21:21;24:9,22;40:5,
17;41:3;47:9,16;
48:22,24;54:18;
64:13;78:6,7,16;
91:20;93:2;101:23,
24;102:6;105:10,14;
116:16,22;130:3;
132:14;146:19;
147:15,15,17,20;
149:19;155:16
**recorded (1)**
25:23
**records (22)**
30:6;43:4;44:21;
47:15;48:8;64:9,15,
16;65:8;73:1;93:14;
95:24;108:11;118:18,
19;124:7;126:9;
127:4,5;144:17;
150:5;151:8
**records' (1)**
48:7
**recross (1)**
97:20
**RECROSS-EXAMINATION (1)**
97:22
**recruits (2)**
29:7,9
**redirect (3)**
24:25;90:9,11
**reduce (5)**
163:11;164:2,10;
165:1,8
**reduces (1)**

82:1
**refer (5)**
22:19;23:16,19;
93:14;103:4
**reference (2)**
21:7;31:11
**referenced (1)**
22:7
**references (2)**
21:25;22:2
**referencing (2)**
132:20,21
**referred (11)**
23:13,20;30:16;
35:23;36:24;37:13;
54:15;91:14;110:5;
161:12;177:13
**referring (24)**
8:5,11;22:17;23:21;
24:23;31:12;35:20;
40:6;43:7;47:21;48:4;
49:3;68:3,4;75:6;
77:2;92:13;97:3;99:1;
112:20;146:10;
154:15;155:22,23
**refers (2)**
47:9;158:17
**reflect (2)**
42:15;130:6
**reflected (1)**
125:8
**reflecting (2)**
126:21;132:25
**reflects (3)**
10:12;84:21;129:16
**Regarding (2)**
10:9;89:10
**regardless (1)**
138:24
**regards (1)**
13:17
**registration (1)**
117:7
**regular (1)**
121:16
**regularly (1)**
156:20
**relate (1)**
16:17
**related (6)**
36:17;79:6;106:21;
113:1;127:16;148:9
**relates (3)**
71:12;118:18;
161:25
**relating (5)**
79:12;80:14;
109:23,24;121:12
**relational (1)**
152:5
**relative (10)**
94:2;123:12;130:9;
147:25;148:1;156:11;

Case 16-04006    Doc 493    Filed 10/19/23    Entered 10/19/23 13:11:55    Desc Main
In the Matter of: TELEXFREE, LLC                      Document         Page 199 of 206

October 12, 2023

169:24;170:3;176:21;
178:19
**relatively (1)**
156:17
**relevance (1)**
157:2
**relevant (16)**
20:20;22:23;23:22;
26:6;35:16;42:13;
47:2;81:21;119:1;
122:19;136:10,11;
154:22;157:6,9;
162:25
**reliability (4)**
16:2,16,21;17:14
**reliable (6)**
63:3,3;97:1;117:21;
123:8;178:23
**reliance (2)**
19:15,18
**relied (4)**
13:17;123:21;
126:12;154:7
**relying (1)**
10:18
**remaining (1)**
91:20
**remediation (1)**
107:15
**remember (10)**
136:9;152:4;155:7,
9;162:5;163:24;
166:21;167:16;
170:25;177:8
**remind (1)**
5:8
**Remine (1)**
40:22
**removing (1)**
159:13
**renewing (1)**
166:8
**reorient (1)**
129:6
**rep (23)**
35:24;36:1;51:14;
58:6;67:21;79:23;
80:2;81:14;82:11;
84:21,23;85:9;127:7;
131:1,21,25,25;138:1,
2;139:6;143:6,15,18
**repeat (2)**
136:8;160:8
**repeatedly (1)**
24:3
**repetition (1)**
49:17
**reply (11)**
23:3,20;29:16;
39:24;110:25;111:3,
20;113:6;147:17;
158:15,18
**report (85)**

17:19;18:3,23;
20:12;22:13,16,20,23;
23:2,5,16;25:5;29:2;
38:23;50:4;57:10;
60:2;66:10;79:24,25;
81:2;100:21;110:7,9,
10,12,15,16,20,21,25;
111:3,3,4,10,14,14,17,
20,21,22,25,25;
112:16,18,21;113:4,6,
15,19,22,22;115:5;
116:8;125:9,12,15;
126:15;128:25;
129:10;131:4,12;
136:23;137:1,4;
139:11;141:11;142:8,
14;147:6,17;148:18;
150:23;154:6,10,12,
16,24;158:14,15;
173:3,6;174:2,18;
175:2
**reporter (1)**
23:13
**reports (8)**
35:13;110:6,23;
111:7,9,17;112:5;
171:20
**represent (4)**
64:6;140:21;
147:13,14
**representative (2)**
172:13,16
**representative (1)**
56:12
**represents (3)**
26:7;89:21;146:19
**requesting (1)**
27:22
**require (5)**
19:3;54:20;95:25;
178:6,20
**required (11)**
28:1,6,11;49:20;
75:1;90:15,16,18;
164:2;165:1,5
**requires (2)**
162:17;163:10
**research (2)**
109:17;123:18
**reserve (1)**
158:22
**reserved (1)**
145:2
**residences (1)**
58:15
**resolve (1)**
9:21
**resolved (1)**
88:23
**respect (20)**
6:4;8:13,14;12:10;
38:15;57:21;71:14;
74:4;91:7,14;105:14;

113:22;134:1;138:15;
143:5;148:9;154:5;
155:2;176:17;177:11
**respects (1)**
134:3
**respond (1)**
79:9
**response (7)**
9:4,7,10;35:4;
78:24;111:15;135:22
**responsibility (1)**
77:20
**responsible (1)**
77:24
**rest (6)**
17:10;43:4,18;74:8;
100:19;157:21
**restate (1)**
130:3
**restricting (2)**
162:1,11
**result (6)**
39:16;50:16;97:8;
129:3;156:21;167:22
**resulted (4)**
18:11;173:4,24,25
**resulting (1)**
130:4
**results (6)**
92:19,22;95:8;97:8;
135:19;160:21
**RESUMED (2)**
5:11;84:18
**retained (4)**
5:18;108:21,22;
109:6
**retrospective (2)**
55:10,12
**returned (1)**
156:21
**reverse (2)**
29:22;88:3
**reversed (1)**
135:3
**review (15)**
11:10;20:6;33:25;
55:10,11,12;109:4,19;
147:6;150:22;158:9;
164:12,16;170:14;
174:12
**reviewed (10)**
13:1;15:16;35:19;
36:8;76:24;109:15,
17;150:25;165:25;
174:9
**Reynolds (2)**
82:19;179:8
**right (166)**
4:24;5:19;6:15;
7:15;8:2,9,22;9:6,8;
13:23;14:17,22;
15:19;18:15;19:7,17,
21,25;20:7;21:9;22:9,

11;23:9,10;24:21;
25:21;26:9,10,13,24;
27:5,15;28:14,25;
30:11;34:17;35:21;
37:10;42:20;43:21;
44:5;45:2;47:3;48:3;
49:10,18;50:4,13,14;
51:1,12,21,22;52:7,8,
8;53:7,13,16;60:20,
21,22;62:16;63:11;
64:23;69:21;71:17;
72:18;73:8,9;75:24;
78:8;81:18;83:18,19;
89:12;91:6;99:14;
102:1;104:23;115:9,
21;118:7;126:10;
127:11;131:14;
132:22;133:6;135:25;
136:5;137:16;138:22;
139:3,7,10;140:1,21;
141:11,15,19;144:20,
20;145:5,15;147:11;
152:6,7,10,18,20;
153:11,14,16;154:2;
156:2,7,12;158:1,5;
159:12;160:16,19,23;
161:11,16,24;162:10;
163:3,9,21;164:11;
166:11,20;167:4,11;
168:5,10,18,20;169:3,
8,14,18,20,24;170:3,
15;171:8,14,16,17,23,
24;172:9,14,19,22;
173:3,11;174:12,22,
25;175:7;176:20;
177:10,23
**right-hand (1)**
160:13
**rise (1)**
155:14
**Rita (1)**
100:22
**Riveria (1)**
68:2
**role (8)**
50:7;66:1;74:11;
93:3,17,19;106:7;
115:24
**Rona (144)**
4:12,14;5:1,5,12;
6:7,22,25;7:4,7,11,12;
9:5;11:4;12:25;13:19,
24;14:6,23;15:3,10,
13;18:2;20:13;21:13,
16;24:20;25:3;30:18,
23;31:3,20,23;50:23;
51:24;52:4,21;53:8,
13,23;54:5,8;59:9,24;
60:1,4,19;61:2,6,18;
67:12;68:19;71:7;
72:2;73:7;76:2;78:1,
9,12,14,23,25;79:22;
80:24;81:7;83:4,7,14;

84:5,6,9,12,17,19;
90:8;91:11,14;95:4;
97:21,23;98:4,8;
99:14;101:7,8,12,14,
18,22;102:1,2,10,13;
104:23,24;105:11,15,
18;106:1,4,5;112:2,6,
8,15;116:20;125:15;
129:8,10,11;130:1;
135:9,13,23;136:1,7,
12,15,17;137:4,7,15;
138:21;142:17,19,21,
23;145:6;146:12;
147:2;151:9,11;
156:23;157:1,5,21;
158:7,21,25;159:16;
166:8;175:15,19;
179:17
**roughly (4)**
25:12,13,16;57:4
**row (16)**
52:7,9;68:23;69:1,
2;70:21,21,22,22,23,
23;71:13,16,21,24;
146:19
**rows (8)**
52:10,23;71:13,15;
73:14;82:10;143:3,4
**rule (1)**
13:11
**ruled (1)**
13:11
**run (3)**
10:6,7;41:23
**running (1)**
58:11
**runtime (7)**
163:14,23;164:3,
10,11;165:2,8

---

## S

**S2 (2)**
25:11;130:1
**S3 (1)**
134:3
**sake (2)**
76:16;116:22
**same (76)**
8:21;25:23;27:16;
29:10,11;30:2;31:8;
33:22;39:13;45:7,8;
46:1,4,5,8,9,11;47:20;
56:13,14;58:12;62:8;
66:4;68:24;69:2,2,9,
22,25;70:12;71:12,
25;73:11,13,15,17,17,
19,20;75:20;76:9,13;
79:23;80:8;87:16;
88:1,2,3;89:8,11;
93:14;99:24;112:9;
114:14;115:4;117:3,
7,15;120:23,24;

In the Matter of: TELEXFREE, LLC

October 12, 2023

121:2;130:20,25;
132:1,7;134:7,9,14;
141:12;148:13;150:3,
6;151:6;158:9,10;
166:9
**sample (24)**
27:10;38:18;
150:16;167:6,11,20;
168:4,21;169:3,8,10,
16,17,21,22;170:1,9,
22,23;171:5;175:1,5,
9;176:12
**sampled (1)**
55:13
**samples (11)**
150:22;170:2,9,10,
14,16,18,21,23;
175:23;176:15
**sampling (16)**
62:11;63:9,19;
150:21,25;151:3,7;
166:22,25;167:3,5;
168:13;169:23;
171:21;172:7;175:1
**Sanderle (3)**
68:22;69:9,20
**Sandra (1)**
141:19
**Sann (6)**
67:16,17;68:8;69:9,
20;70:12
**S-A-N-N (4)**
67:16;69:9;70:12,
13
**sann@vicsscom (1)**
67:19
**sat (1)**
31:16
**satisfy (1)**
120:19
**Saunter (1)**
60:20
**save (2)**
24:25;76:6
**saving (1)**
164:10
**saw (7)**
8:2;31:5;32:1;69:3;
100:15;176:8,9
**saying (24)**
17:6,13;32:21;33:1;
40:23;47:23;49:5;
57:6;76:8,11;77:8;
85:11;86:12;89:13;
92:12,15;127:5,7;
143:13,14;147:16;
150:4;155:9;169:15
**scale (5)**
38:20;56:24;62:20;
96:13;100:12
**scenario (14)**
29:20;30:3,8;43:1,
3,21,24,24;45:16;

46:4;57:3,7;165:3;
174:11
**scheduled (1)**
4:19
**scheme (4)**
16:5;104:6,7;
140:16
**schemes (2)**
106:19;140:13
**science (9)**
14:20;44:11;
107:23;152:3,4,7,19;
165:25;172:2
**scientist (2)**
172:6;177:1
**scientists (1)**
29:1
**screen (11)**
6:13,14,15;32:25;
52:2;59:13;72:10;
80:25;84:2;91:9;
124:2
**scroll (21)**
9:3;10:15;11:19;
18:10;20:15;21:3;
51:16;52:6,8,22;
53:10;60:20;61:18;
67:13,14;68:19;73:7,
9;138:21;141:14;
160:12
**scrolls (2)**
7:17;81:18
**se (2)**
19:18;25:25
**sea (1)**
64:14
**search (9)**
22:21;62:11;94:24;
95:14;97:6,9,13;
156:20,25
**seat (1)**
102:5
**seated (1)**
4:2
**second (33)**
7:9;11:7,8;14:11;
20:14;47:2,8;52:7;
67:3,9;70:12,18;
78:16;82:18,23;
84:23;85:9;88:14;
91:13;92:11;111:22;
113:4,22;121:7;
137:14;138:3,4;
159:17;160:7;161:2;
173:23;176:6;179:3
**Secondly (2)**
85:23;95:13
**seconds (3)**
30:21,25;32:4
**second-to-last (2)**
15:24;98:20
**section (9)**
21:4,11;22:1,15;

24:22;47:4,8;92:25;
93:2
**sectors (1)**
93:7
**seed (1)**
168:23
**seeing (5)**
32:17;34:25;40:10;
54:14;144:8
**seem (9)**
30:4,12;35:16;47:2;
51:14;55:14;76:14;
96:9;100:21
**seemed (2)**
20:9;65:25
**seems (14)**
30:7;35:12;37:11,
20;38:13;48:23;58:7;
60:15,18;62:5;65:17;
69:7;75:11;85:5
**seldom (1)**
94:20
**select (1)**
168:1
**selected (4)**
114:17;167:20,23;
174:18
**selecting (1)**
146:23
**selection (10)**
16:2,16;97:9;
167:16,19,23,24,25;
168:4,12
**selections (1)**
169:2
**selects (1)**
167:19
**self-assessed (1)**
99:18
**semester (2)**
151:25;166:21
**semester-long (1)**
167:15
**seminar (1)**
166:20
**sense (25)**
8:12;27:16;28:4,10;
35:9;44:8;46:7;47:1,
23;48:14;58:17;
63:15,21,22;65:12;
77:15;87:20;88:23,
25;94:8;100:19;
101:15;136:3;168:9;
169:15
**sent (5)**
12:4;35:8;37:19;
158:8,10
**sentence (8)**
42:25;47:14;92:12,
15;93:10;98:17,20;
99:4
**sentences (1)**
91:20

**separate (3)**
126:24;127:21;
128:3
**separately (3)**
7:18;17:17;72:22
**Septemberish (1)**
111:1
**sequence (2)**
168:17;169:7
**series (1)**
79:12
**served (2)**
89:9;110:25
**server (2)**
28:16,19
**service (3)**
35:11,14;36:24
**services (2)**
33:17;104:1
**set (31)**
4:10;16:19;28:17;
78:19;79:11;86:20,
21,25;87:3,6,12;91:4;
97:7,10;145:13;
150:17;153:12;167:7,
10;168:5,14;169:18;
170:6;177:13,14;
178:1,2,7,7,21,21
**sets (2)**
87:11;94:16
**seven (4)**
85:10;176:9,9,11
**several (5)**
33:2;56:11;62:7;
71:13;80:14
**Shadow (1)**
132:6
**Shakira (1)**
27:4
**shape (1)**
57:15
**share (4)**
29:9,11;132:7;
150:6
**shared (2)**
50:1;176:3
**shed (2)**
42:5,22
**short (1)**
4:22
**shorten (1)**
69:17
**show (14)**
95:4;122:4;127:5;
128:5;129:2;130:19;
131:12;134:1;137:11;
139:15;142:10,24;
144:1;160:12
**showed (3)**
43:25;55:13;112:18
**showing (8)**
59:18;79:5;82:6,10;
84:2;125:16,17;

137:12
**shown (1)**
16:1
**shows (7)**
19:25;66:15;128:1;
129:3;138:4;140:18;
158:3
**side (4)**
28:21;123:1;
131:22;149:10
**sides (2)**
8:19;140:9
**SIG (1)**
35:21
**significance (5)**
82:12;97:7;118:2;
143:11;144:14
**significant (1)**
176:12
**sign-up (1)**
117:9
**similar (17)**
23:4;31:8;88:9;
107:15;108:7;109:3;
112:24;115:1;117:7;
132:8;134:4;141:21;
144:4,4,5,9;145:23
**similarities (1)**
176:4
**similarity (2)**
137:20;150:12
**similarly (1)**
28:10
**simple (2)**
140:21;175:13
**simply (22)**
14:15;16:15;17:8;
66:2;79:25;81:10,18;
82:2,5;120:25;122:2;
127:1;130:7;132:25;
140:18,23;141:4;
146:22;164:4,9;
169:12;176:8
**single (16)**
9:12;63:16;64:15;
90:23;91:3;96:23;
119:23,23;127:20;
129:3;131:14;151:5;
161:24;162:6;172:6;
173:5
**sit (1)**
154:17
**situation (4)**
9:23;27:7;43:23;
45:1
**situations (2)**
8:10;121:3
**six (5)**
52:11;66:17;95:5;
143:20;172:25
**sixteen (1)**
37:9
**size (9)**

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
In the Matter of: TELEXFREE, LLC                Document      Page 201 of 206

October 12, 2023

151:1;169:24;
170:1,3,9,22,23,25;
176:12
**sized (1)**
156:17
**Skidmore (2)**
107:21;151:18
**skip (1)**
47:11
**skipping (1)**
61:15
**slide (12)**
44:23;45:5;80:6;
81:12;94:8;136:9;
146:7;158:5,22;
160:6;166:7;167:14
**slides (8)**
47:21;55:24;65:11;
93:17;135:7,13;
136:18;158:22
**slight (1)**
103:17
**slightly (2)**
137:16;141:15
**small (19)**
26:22;28:5;33:6;
54:16;56:13,14;
62:12;64:16;94:18,
25;95:22,24;96:1,5;
97:12;99:2;121:3;
147:20;150:2
**smaller (1)**
56:14
**smell (1)**
100:4
**snippet (1)**
59:18
**software (1)**
155:12
**Soha (4)**
171:16;172:1,5;
177:1
**Soha's (1)**
171:19
**solved (1)**
179:1
**Somebody (12)**
14:3;18:22;19:6;
33:16;34:6;41:4;
73:23;75:25;76:8;
77:16,19;124:11
**somehow (3)**
14:25;82:19;122:12
**someone (9)**
29:21,22,23;33:19;
34:11;56:6;76:16;
117:24;121:22
**someone's (1)**
56:3
**sometimes (7)**
77:6;103:4;107:10,
10;118:4;119:21;
177:13

**somewhat (3)**
77:17;92:18;96:18
**somewhere (2)**
22:20;160:19
**soon (1)**
150:20
**sophisticated (3)**
91:24;105:6;153:13
**Sorondo (4)**
30:17;83:2;122:18;
126:7
**sorry (50)**
6:18,18,23;8:4;
21:22;23:3;27:17;
34:8;36:1,4,5;46:14;
50:6,7;53:12;59:5;
63:25;65:1;66:11;
70:4;81:6;98:5,16;
112:20,22;118:2;
120:7;125:14;129:6,
9,12,13;130:6;
135:12;142:12,18,18,
21,23;145:24;146:17;
154:8,12,13;158:4,6;
165:14,18;170:17;
178:4
**sort (19)**
27:9,23;35:5,11;
38:22;48:19;74:11;
94:20;95:3,14,15;
114:7;116:9;119:5;
120:12;139:12;
141:24;143:9;163:1
**sorts (1)**
106:20
**Sosa (3)**
138:2,4;141:14
**sound (1)**
171:23
**sounded (1)**
33:1
**sounds (2)**
62:16;171:24
**source (5)**
39:11;93:8;126:11;
127:1;152:19
**sources (6)**
29:16,19;36:10;
63:9;79:21;171:22
**space (7)**
48:24;49:2,13,14,
14;126:1;127:7
**spaces (1)**
159:13
**Spanish (2)**
138:18,19
**Spanish-speaking (1)**
138:11
**speak (2)**
147:21,23
**SPEAKER (2)**
52:1;81:6
**speaking (2)**

106:9;177:23
**speaks (2)**
133:4,4
**special (3)**
39:17,22;50:7
**specific (17)**
44:15;45:17,19;
54:16;71:15;79:5;
103:13;114:14,18;
115:3;134:23;139:3;
153:20;165:3,10,11;
166:1
**specifically (28)**
18:25;24:5;27:6;
28:3,15;29:25;32:10;
35:9;37:20;54:19;
56:23;57:6;74:24;
92:17,23;94:12;
112:13;120:16;129:4;
131:19;134:20;
140:20;148:6;151:6;
163:22,24,25;168:8
**spectrum (1)**
56:2
**speculation (9)**
6:3,4;27:18;34:8,
13;69:14;75:23;
124:10;134:15
**speculative (1)**
76:20
**spelled (1)**
53:16
**split (2)**
101:16;131:18
**spoke (2)**
144:3;151:4
**spread (1)**
119:10
**SQL (11)**
108:2,3,4,6,10;
152:9,12,15;172:13,
14,19
**Squire (1)**
67:22
**ss (1)**
138:2
**staff (1)**
176:25
**stand (2)**
5:7;145:4
**standard (3)**
36:14;141:24;167:1
**Standing (1)**
38:23
**stands (1)**
156:4
**start (6)**
6:17;113:21;
168:17;169:5;176:22;
177:10
**started (4)**
10:5;11:5;144:11;
172:18

**starting (4)**
153:4;154:13;
166:7;168:22
**starts (1)**
48:21
**state (2)**
102:6,7
**stated (3)**
95:16;96:10;131:9
**statement (3)**
9:15;167:22;170:11
**states (2)**
13:20;160:16
**statistical (17)**
95:7;97:6;105:8;
115:12;150:16;166:6,
22,25;167:1,3,5,6,11;
171:5,13,21;175:1
**statistically (16)**
27:10;55:13;62:10;
95:11;96:16;97:10;
168:21;170:7,24;
172:6;175:3,5,9;
176:12,14,17
**statistician (5)**
171:7,25;172:4,5;
176:25
**statistics (8)**
58:11;105:9;
151:25;166:21;167:2,
3,4;168:3
**stay (2)**
4:22;140:16
**Staying (1)**
20:12;145:2
**stays (1)**
160:16
**stead (1)**
59:2
**Step (24)**
14:15;18:10,10,14,
17,19,22,22;19:2,6,6;
36:2;86:8,13;90:21,
21,24;100:14;101:11;
132:10;160:23;161:7;
164:16,22
**Stepped (1)**
7:10
**steps (16)**
10:6,7;18:6;62:17;
91:18;92:8,10;93:24;
94:10;159:10,12;
160:12,13,19;161:12,
14
**still (18)**
5:9;43:15,16;73:5;
74:22;83:23;87:8;
89:10;90:5;92:3,6,19;
96:16;97:24;101:19;
121:4;131:1;179:4
**Stone (1)**
102:17
**StoneTurn (9)**

102:15,16,20,25;
104:15,16;106:13,14;
115:2
**StoneTurn's (1)**
103:22
**stood (1)**
156:8
**stop (4)**
18:17;51:1;52:8;
53:13
**stopped (3)**
18:14,21;19:6
**straightforward (1)**
91:23
**street (7)**
29:8;67:23;81:3;
102:7;129:21;132:3,8
**streets (1)**
50:1
**stretch (1)**
124:24
**stricken (1)**
122:19
**strictly (1)**
12:22
**strike (9)**
78:18;83:21;122:9,
14,15;124:9;155:1;
156:17;166:18
**strikes (1)**
124:14
**string (2)**
35:2;51:15
**strings (5)**
85:23;86:7,8;94:14;
139:5
**structured (1)**
171:22
**studied (1)**
154:18
**studies (4)**
108:9;152:1;154:7;
167:15
**study (4)**
40:10;114:14;
118:24;130:11
**studying (1)**
152:5
**subdiscipline (1)**
167:4
**subject (4)**
78:17;121:21;
123:24;141:7
**subjective (2)**
114:3;174:12
**subjects (2)**
105:2;118:19
**submission (1)**
38:15
**submitted (3)**
110:13,14,15
**subpoena (1)**
36:17

Case 16-04006    Doc 493    Filed 10/19/23    Entered 10/19/23 13:11:55    Desc Main
In the Matter of: TELEXFREE, LLC    Document    Page 202 of 206

October 12, 2023

**subsequent (2)**
117:10;163:6
**subsequently (2)**
82:17;163:17
**subset (2)**
164:13,14
**substance (1)**
121:2
**substantial (4)**
28:20;62:6;96:5;
144:18
**substantially (1)**
87:18
**substantive (1)**
14:20
**success (1)**
68:13
**successful (3)**
68:11,12;77:17
**successfully (1)**
65:3
**sue (4)**
7:21;8:9,16;9:22
**sued (1)**
10:23
**sufficiency (4)**
106:17,23,24;
149:18
**sufficient (12)**
28:25;36:13;37:7,
25;77:21,23;123:10;
149:23;150:2,17;
170:24;176:4
**sufficiently (4)**
35:17;60:9;123:8;
147:23
**Suffolk (1)**
108:18
**suggest (2)**
23:1;34:6
**suggested (2)**
32:18;171:19
**suggesting (5)**
169:13;177:12,25;
178:5,20
**suggests (4)**
46:17;56:5;85:19;
95:20
**suitable (1)**
97:1
**sum (8)**
81:8,8;89:10,12,13,
13,13;121:2
**summarize (2)**
116:23;119:5
**summarized (3)**
79:24;113:18;116:8
**summarizes (1)**
143:1
**summarizing (1)**
120:12
**summary (11)**
35:25;36:1;56:5;

58:11;59:23;79:16;
80:2;81:1,2;113:15;
139:16
**Superman (1)**
94:5
**supply (1)**
121:22
**support (4)**
42:14;124:14;
167:21;175:6
**supported (2)**
173:16;175:6
**supposed (7)**
14:24;73:14;84:14;
135:18,20;145:2;
147:13
**supposition (1)**
122:14
**sure (58)**
5:16;6:22;18:16;
19:22;23:1;27:6;30:6,
7;31:6;32:2;34:19,22;
35:12;42:5;45:3;48:5;
57:2;58:25;68:12;
69:6;75:18;83:6;
85:24;86:16;88:5;
101:17;103:24;
106:14;107:16;
116:11,25;119:6,12;
121:13;126:5;127:12,
19;128:8;129:12;
131:13;132:12;
134:19;138:23;
139:21;140:4;142:15;
143:6,13;149:14;
151:10;153:1;157:5;
158:18;162:19;169:5;
175:23;178:5;179:6
**surely (1)**
64:1
**surprise (1)**
96:8
**surprising (2)**
95:15,17
**survey (1)**
40:5
**suspect (1)**
69:4
**suspend (2)**
179:12,15
**sustain (2)**
82:25;136:13
**Sustained (9)**
34:9,14;69:15,23;
76:21;88:16,18;
134:17;138:20
**SWORN (1)**
102:4
**symbolizes (1)**
20:2
**synthesis (1)**
79:11
**system (18)**

28:14,15;34:11;
35:21;38:3;55:8;
58:21;64:22;65:3;
85:21;87:10,10,21;
88:4;99:17;124:19;
155:15,15
**systematic (7)**
55:16,18;63:2,10;
96:12,19;99:1
**systematically (3)**
43:10;56:20;85:2
**systems (1)**
64:6

**T**

**table (36)**
14:15;33:14;35:24,
24,24,25;56:5;79:19,
23;80:1,2;81:14,16;
90:14,14,18,18;
123:16;125:16;
126:20;127:10,25;
128:19;129:1,2;
130:10;131:12;
132:11,17;133:2;
134:1;172:13,14,16,
17;177:21
**tables (12)**
35:20,20,23,25;
56:21;95:1;108:12;
109:20,21,22,23;
172:15
**tabulate (1)**
19:3
**tabulated (1)**
60:13
**tabulation (1)**
20:3
**talk (11)**
30:10;38:1;40:6;
82:12;89:16;108:14,
20;122:21;148:23;
159:8;166:5
**talked (5)**
44:22;109:20;
125:4;143:23;159:11
**talking (14)**
8:10;12:12;23:4,5;
24:7;26:2;41:9;44:20;
49:14;57:9,15;70:19;
80:24;174:16
**talks (3)**
24:1;25:22;40:17
**task (8)**
29:1;36:14;75:9,11;
77:16,23;93:20;149:4
**tasks (1)**
145:13
**tea (1)**
157:9
**team (10)**
77:10;132:1,4;

134:7,7,12;171:8,12,
17;172:5
**technical (1)**
123:21
**technique (3)**
48:23;141:24;167:1
**techniques (8)**
42:1;91:25;92:2,5,
23;164:14,19,23
**telex (3)**
79:4;94:7;172:7
**Telexfree (57)**
16:5;25:11;26:12;
27:13;30:14;33:10,
18;34:4,11;35:8,21,
25;36:1,13,17,23,23;
37:6,10,15,19,22;
39:8,11,17;42:20;
49:10;50:10,13,15,19;
53:4;74:17,25;75:14;
88:12;99:10;108:8;
109:15,23,24;113:9,
13;117:11;119:5,15;
120:19;121:5;122:7;
124:19;125:18;
127:24;133:3,10;
139:17;144:14;151:1
**TelexfreeBen (2)**
52:19;58:10
TelexfreeBen@gmailcom (1)
51:18
**telling (1)**
146:6
**tells (1)**
136:3
**ten (7)**
10:6,7;14:15;18:6,
17,19,22;19:7;37:9;
43:25;170:25
**tend (1)**
119:20
**tender (2)**
104:25;105:3
**tendered (1)**
104:18
**tendering (1)**
105:11
**tends (1)**
139:8
**tension (2)**
48:16;96:16
**ten-step (1)**
17:17
**term (6)**
31:13;36:21;38:4;
46:24;156:3,17
**terms (14)**
21:8;31:18;47:25;
50:2;76:7;77:14;
88:21;108:8;118:3;
124:2;137:10;138:5;
144:1,12
**terribly (1)**

156:18
**test (4)**
100:4;118:8;147:7,
24
**tested (3)**
118:1,2;148:3
**testified (9)**
13:1;14:13;19:1,9;
57:5;81:15;90:17;
150:15;159:14
**testifies (1)**
122:18
**testify (5)**
13:13;75:25;105:1;
112:23;122:10;
124:13
**testifying (4)**
104:16;107:11;
155:7;162:5
**testimony (20)**
13:15;78:18;
112:12;115:7,8,11;
116:15;122:9,16;
128:18;145:4;146:1;
147:7,9;150:13,24;
157:7,8,22;177:8
**testing (2)**
117:23;120:3
**tethered (1)**
114:4
**TF (2)**
155:20;156:2
**TFIDF (1)**
155:5
**TF-IDF (7)**
156:9,15,20;157:4,
13,18,22
**theory (1)**
44:12
**thereafter (2)**
14:19;152:13
**thereby (1)**
134:20
**therefore (7)**
33:21;46:13;54:25;
56:12;63:24;74:11;
131:18
**thereof (2)**
155:6,21
**third (6)**
46:9,11;59:22;
71:24;143:10;144:24
**third-party (1)**
36:24
**thirty (1)**
30:25
**though (8)**
21:16;35:9;36:21;
69:4;86:4;131:3;
139:21;176:1
**thought (5)**
20:16;22:18;45:19;
68:15;84:9;142:21,

Case 16-04006 Doc 493 Filed 10/19/23 Entered 10/19/23 13:11:55 Desc Main
In the Matter of: TELEXFREE, LLC, Document Page 203 of 206

October 12, 2023

23;146:1;162:20,22,
24;163:8,17;168:8;
169:12
**thousand-plus (1)**
173:15
**thousands (2)**
149:13;173:6
**three (9)**
52:23;58:18;59:15;
61:4;68:6;81:10;
99:12;132:3;143:20
**threshold (4)**
47:25;48:18;73:25;
74:3
**thresholds (2)**
48:15,18
**threw (1)**
13:8
**throughout (5)**
22:19;24:13;44:11;
74:5;160:21
**thumb (7)**
56:24;62:20;84:13,
13;96:13,13;100:12
**thus (1)**
16:22
**tie (1)**
141:3
**tightly (1)**
74:2
**till (1)**
29:3
**timeframe (3)**
110:11,19;111:13
**timeliness (2)**
25:5,5
**times (12)**
33:2;56:13,14;
58:10;100:11;147:12,
13;152:20;153:17,20;
172:22;174:3
**timing (2)**
121:3;158:18
**Timothy (4)**
12:10;109:11;
113:1;115:5
**tiny (1)**
27:11
**title (1)**
59:25
**today (6)**
54:4;96:7;108:14;
123:17;135:24;
154:17
**today's (1)**
113:9
**together (12)**
44:21;64:19;86:19,
21,23;87:23;99:12;
118:6;130:13,18;
135:3;147:16
**tokens (2)**
85:20;139:6

**told (5)**
12:1;29:15;30:4;
37:1;38:13
**took (11)**
19:22;32:14;
100:14;113:23,24;
143:3;151:25;152:12,
14;174:17;177:21
**tool (5)**
152:19;156:9;
157:14;164:20,21
**tools (1)**
168:17
**top (22)**
10:8,15;33:5;50:25;
60:17;68:2;70:23,23,
23;116:23;119:25;
121:11;126:15;
131:23;139:16;140:6;
141:9,18,22;144:22;
146:9,22
**topic (1)**
107:9
**topics (1)**
106:15
**top-level (1)**
116:9
**total (12)**
62:13;64:10,17;
65:21;68:6;81:8,8;
91:3;99:2;129:17;
149:17;176:9
**totally (4)**
32:2;42:5;97:18;
126:24
**touched (1)**
142:25
**touches (1)**
13:24
**towards (3)**
53:10;64:3;144:22
**town (1)**
68:2
**track (3)**
22:25;73:14;120:7
**tracks (2)**
77:17,25
**trading (2)**
106:19,19
**training (3)**
30:14;32:17;105:8
**transacted (1)**
122:1
**transaction (5)**
33:10;37:4,22;
120:21;121:15
**transactions (11)**
36:18;37:9,13,14,
14,18;79:14;80:12;
81:25;121:19;125:6
**transfer (6)**
35:24;81:21;
120:16,18,24;121:16

**transferred (1)**
121:15
**transfers (9)**
79:14,14;80:15;
82:4,4;121:7,20;
122:4,5
**transitive (16)**
44:5,8,13,19,21;
45:11,14;46:1,6,21;
47:1,9;86:22;87:9;
165:5,8
**transitiveness (1)**
46:7
**transitivity (2)**
46:10;48:6
**transparency (1)**
33:14
**treated (1)**
93:15
**Treatise (2)**
91:7,8
**treatment (1)**
120:16
**trial (2)**
6:19,24
**triangular (10)**
37:13;79:13;80:12;
81:23,24,24;120:21;
121:15,19;122:4
**tried (2)**
77:19,25
**trier (1)**
104:22
**tries (1)**
77:17
**tripped (1)**
178:10
**trouble (1)**
103:19
**true (10)**
29:22;38:13;42:16,
19;43:1;55:24,24;
79:22;117:16;172:8
**truly (3)**
118:24;169:8;170:8
**trust (2)**
69:7;85:12
**Trustee (26)**
5:18,22,23;7:14;
10:22;12:8;15:25;
18:24;19:13;29:15;
35:7,10;36:16,16;
38:10;43:8;58:4,22;
81:25;82:7;83:2;
89:25;90:2,5;109:7;
160:1
**trustees (1)**
12:2
**Trustee's (6)**
18:20;81:19,19;
100:14;109:4;159:21
**truth (8)**
118:11;149:7;

177:5,7,13;178:1,7,21
**try (16)**
4:22;6:16,20;7:2;
63:10;75:23;84:17;
101:15,20;115:12;
141:25;156:18;161:5;
163:5;164:24;176:2
**trying (13)**
6:23;9:1;13:2;33:9;
84:4;100:8,9;120:3;
128:5;137:21;163:9;
174:16;177:15
**turn (9)**
42:9;44:4;92:25;
102:17;125:12;153:3;
158:3;160:11;162:14
**turns (1)**
83:21
**twelve (2)**
71:14;81:10
**twenty (4)**
102:21;111:21;
163:15;179:4
**twenty-five (1)**
30:21
**twice (2)**
61:9;74:20
**two (67)**
7:18;8:10;12:13;
26:25;30:20;32:3;
37:24;44:21;47:9;
48:8;53:14;54:19,21;
55:1;58:9,14;59:22;
64:3,18;65:21;66:15,
18;67:25;72:18,21,24,
25;73:6,19;75:10,14;
80:15,25;81:10,20;
82:13;83:8,10;85:10,
22;86:9,10,14,19;
88:2;89:10,13;95:19;
96:3;101:20;104:1;
106:14;117:22;
120:14;135:2;137:12,
18,20;143:20;144:9,
15;147:10;149:23,24;
164:13;170:5;175:8
**two- (1)**
81:23
**twofold (1)**
12:1
**two-year (4)**
25:24;81:20,22,24
**type (10)**
27:21;80:8;88:4,5;
98:10,17;114:7;
123:8;128:21;132:16
**typed (1)**
73:23
**types (7)**
103:21;106:12,12;
107:6;118:8;125:6;
132:1
**typical (9)**

27:7;39:1,5;43:24;
50:5,11;63:24;68:17;
100:23
**typically (6)**
103:6,24;107:12;
140:10,11,14
**typos (3)**
41:7,9;57:17

**U**

**unable (3)**
156:6;161:23;162:6
**unbelievable (5)**
128:6,8,22;131:15,
17
**uncertainty (1)**
178:25
**uncover (1)**
107:13
**undeliverable (1)**
35:15
**under (20)**
5:9;11:10;44:18;
50:7;55:2;57:3;58:21;
63:1;67:21;74:17;
79:2;88:11,24;
122:13;134:14;143:4,
6;152:7;173:18;174:1
**under=aggregation (1)**
174:21
**under-aggregated (1)**
135:2
**under-aggregation (14)**
72:23;88:20;95:21;
131:2;134:12,18,22;
136:20;140:21;141:4,
5;173:10;174:4,24
**under-aggregations (1)**
174:10
**under-clustered (1)**
100:9
**under-clustering (10)**
48:17;55:4;56:18;
62:23;86:2;87:19;
96:17,20;100:6;176:5
**undergraduate (3)**
152:1;166:20;
167:15
**underlying (3)**
79:4;82:11;114:2
**underpinnings (1)**
117:2
**understands (1)**
24:4
**understood (6)**
13:15;106:3;109:1;
112:15;136:7,12
**undertake (1)**
164:2
**unfortunately (1)**
85:11
**unfounded (1)**

Case 16-04006   Doc 493   Filed 10/19/23   Entered 10/19/23 13:11:55   Desc Main
In the Matter of: TELEXFREE, LLC   Document   Page 204 of 206

October 12, 2023

122:14
**UNIDENTIFIED (2)**
52:1;81:6
**uniform (2)**
74:4;119:17
**uniformly (2)**
49:9,11
**uninformative (1)**
97:18
**unique (6)**
39:6;49:20;50:12;
143:7,21;146:21
**universe (2)**
119:4;169:12
**University (1)**
108:19
**unknown (1)**
119:7
**unless (4)**
4:8,9;76:18;122:9
**unlike (3)**
68:17;84:24;99:3
**unlikely (1)**
132:5
**unmute (1)**
27:17
**unnecessary (2)**
16:23;17:14
**unrealistic (2)**
95:17;164:4
**unrepresentative (2)**
56:11;62:6
**unstructured (1)**
171:22
**unsuitability (1)**
99:2
**unsuitable (1)**
43:16
**unsupervised (1)**
94:1
**unsupported (1)**
124:10
**up (54)**
5:21;6:8,20;7:2;
8:3;9:3,5;10:15;
11:19,19;12:19;
28:17;30:5,23;42:9;
43:18;45:25;46:2,3,3;
55:3;63:17;69:6;72:4,
6;73:8,19;77:24;82:2;
83:3,10;84:2;91:2;
92:15;101:16;125:23;
130:18;131:18;
142:13;144:5,10;
147:10;152:23;158:1,
2;166:22;167:16;
170:6,20;173:6;
174:2,11;177:20;
178:10
**upon (8)**
10:18;13:11,11;
119:18;126:12;
139:17;140:2;154:7

**upper (2)**
59:4;71:8
**URL (1)**
31:9
**use (39)**
11:14;12:5;13:2;
21:8;24:6;29:7,23,23;
36:22;38:21;70:9;
74:14;77:5,6;78:19;
83:14;92:5;94:7;
115:1;120:25;139:1,
1;141:25;152:12;
153:6,16;155:8,19;
156:15;158:21;165:1,
12;167:5;169:1,6,7;
170:8,9;177:15
**used (39)**
8:15;20:22;51:21;
76:12;79:19;90:24;
93:13;99:17,17;
100:1;103:12;107:4;
108:4,10;115:5;
118:8,23;123:8;
152:19;155:25;
156:13,20;157:7,8;
160:18;161:17,20;
162:2,9;164:9,22;
165:15,23,24,25;
167:2;170:2,13,22
**useful (1)**
131:3
**user (55)**
16:3;18:11;29:20;
39:5,12;50:5,11;60:5,
16;75:5,8;90:23,25;
99:21;100:15,19;
109:5;117:6,6,8,12;
118:5;119:8,14,21,22;
124:3;125:3,19,21,25;
126:2,6,8,15,18;
128:3,4,7;129:16;
130:25;131:20;
132:12,13;134:22;
146:20,20,21;149:13;
150:6;151:7;173:5;
174:8;176:3;178:15
**user-entered (1)**
38:14
**users (1)**
36:23
**uses (5)**
35:10;51:17,19;
161:8;168:16
**using (27)**
23:23,24;29:7;
47:20;54:23;56:24;
60:14;63:16,21;76:5;
92:23;93:4;99:24;
100:9;123:10;150:9;
152:6;153:12,23;
155:5;158:7;164:6,7,
14;165:8;169:20;
177:18

usually (3)
140:15,15;155:17
utilized (2)
160:20,21

## V

**valid (18)**
27:10;34:22,22;
57:16,16,17;62:11;
95:11;97:10;170:7,
24;172:6;175:5,9;
176:14,17;177:12;
178:6
**validate (1)**
33:9
**validated (1)**
125:1
**validation (8)**
28:9,14;94:10,13,
17;117:10;124:20;
149:9
**validity (2)**
95:8;148:12,13
**validly (3)**
28:8;34:19;55:13
**value (2)**
27:5;100:25
**values (17)**
20:21,22;21:1;
42:14,15;48:24;49:6,
7,12,15,18;70:25;
124:23;130:12,21;
143:7;161:11
**vanishingly (3)**
28:5;50:2;94:18
**variation (2)**
73:23;99:2
**variations (3)**
68:6;95:22;138:25
**variety (5)**
74:1;145:12,20,20;
167:2
**various (7)**
24:6;35:23;38:18;
94:13;95:1;109:19;
132:1
**vary (1)**
66:6
**vas (1)**
68:22
**Vasconcelos (1)**
141:19
**Venjamin (3)**
53:15;54:9;58:18
**verify (1)**
63:10
**versed (1)**
153:7
**version (1)**
137:5
**versus (6)**
4:3,4;20:21;66:1;

85:10;127:20
**via (9)**
32:12;36:17;44:21;
45:6;57:4;62:10,11;
94:24;95:13
**vide (1)**
30:19
**video (6)**
31:1,2,22;32:1,5,22
**videos (5)**
30:14,15;31:5;
32:17;123:18
**view (4)**
45:14;46:12,16,20
**vital (2)**
24:11,18
**voir (1)**
105:13
**volume (6)**
35:10;74:25;75:2,6,
16;121:19
**voluminous (1)**
79:2
**voodoo (1)**
79:17

## W

**wait (2)**
29:3;179:13
**walk (1)**
142:9
**walking (2)**
109:13;111:6
**Walt (2)**
132:6;134:9
**wants (2)**
5:22;8:1
**watch (1)**
30:14
**way (48)**
14:25;15:21;19:23;
26:15;30:2;33:23;
36:15;41:13;47:20;
60:20;62:24;63:3;
64:1;69:4;72:20;73:1;
74:13;80:10;81:12;
85:6;86:5,20;88:7,9,
19;93:6,15;95:11;
96:19;100:17;118:7;
119:17;120:17,23;
127:23;128:24;
144:24;156:21;
167:21,21;168:3,6,7;
169:9,9;170:18;
176:24;178:1
**ways (6)**
38:19;56:11;73:5;
74:13;117:5;118:10
**web (3)**
32:10;36:25;156:20
**web-based (1)**
38:5

**weeds (1)**
142:1
**weeks (1)**
152:15
**weeks' (1)**
152:10
**weight (3)**
47:25;94:2;124:17
**weights (2)**
154:22;161:10
**weren't (3)**
27:14;136:4;163:20
**What's (13)**
6:2;14:12;44:22;
78:23;85:12,14,14;
99:3;108:3;115:22;
133:15;135:22;
154:16
**whereby (2)**
57:13;144:6
**Whitney (1)**
139:7
**whole (3)**
15:18;24:13;26:13;
30:19;45:5,12;49:15;
63:19;67:24;79:12;
86:6;95:12;97:18;
99:13;100:25;169:7;
174:15
**who's (1)**
10:23
**whose (1)**
41:16
**wide (3)**
49:7,16;167:10
**willing (1)**
121:23
**window (2)**
25:24;84:3
**Winkler (2)**
40:3,10
**winner (6)**
38:11;66:1,2;89:23,
24;145:23
**winners (13)**
5:18,20;16:5;19:12,
16;65:24;88:21;90:1;
115:19;119:20;
134:20;140:23;
141:22
**winning (2)**
66:24;135:20
**winnings (7)**
5:19;13:17;88:22;
115:20,22;134:21;
144:18
**winnowing (1)**
164:13
**wipes (1)**
130:17
**wise (1)**
87:15
**withdraw (3)**

36:23;61:6;76:2
**within (21)**
37:12;48:21;54:17;
64:20;70:14;96:10;
133:1;143:7,15,15,19,
22;144:9,9;160:19;
167:10;169:2;174:25;
175:13;176:3,14
**without (15)**
11:14;19:15,21;
54:14;58:11;97:16;
122:11;124:14;
133:24;134:16;
136:15;154:3;164:4;
167:25;168:21
**WITNESS (74)**
5:10;7:6;12:22;
13:12,12;20:18;
21:18,22;24:22;
27:21;31:1;52:3,5;
59:11;78:3,11,20;
82:16;84:11;99:19,
23;100:20;101:10,13;
102:7;104:8,15;
105:11,15;116:17;
122:10;124:10;126:8,
11,16,19,21,24;127:3,
11,14;128:13,14;
135:10,18;136:5;
137:9;139:25;140:2;
141:2;145:11,16;
146:5,9,15,18;149:20;
150:15;151:11;153:2;
156:25;157:3,11,15,
19;158:6,16;159:20,
22,25;160:3,5,8;
166:16
**witness's (1)**
82:17
**wondering (1)**
9:21
**word (2)**
156:11;178:10
**words (1)**
155:9
**work (14)**
24:1;25:15;30:13;
39:21;40:1;42:23;
50:22;64:21;93:5;
103:6,24;107:12;
108:2;147:15
**worked (4)**
102:20;106:13,15;
113:13
**working (3)**
40:22;41:5;65:3
**works (1)**
164:21
**world (11)**
48:21;98:14;
118:11;119:10;120:3;
121:18;148:16,18;
149:2;174:13,16

**worry (1)**
82:24
**worse (1)**
63:24
**worst (1)**
43:2
**worth (2)**
23:15;42:8
**wraps (1)**
69:6
**write (4)**
7:19;10:8;11:8;
20:20
**writes (5)**
10:16;11:19;16:14;
48:6;98:9
**written (1)**
85:14
**wrong (4)**
14:1;20:17;38:25;
76:1
**wrote (12)**
7:13;29:3,6;38:25;
39:5,10,16;42:8,13,
25;50:5,10

**Y**

**year (4)**
12:13;62:15;81:24;
111:1
**years (8)**
25:13,16;75:10,14;
81:20;102:21;163:16;
172:25
**Yep (5)**
29:5;47:7;107:21;
127:14;169:10
**yesterday (19)**
5:1,9;13:16;19:1;
33:13;34:16;40:4;
43:25;44:5,23;48:16;
51:2;55:14;95:23;
100:22;112:10;125:4;
176:8,10
**yesterday's (2)**
4:5;150:24
**YouTube (3)**
30:17;31:9;123:18

**Z**

**zero (3)**
65:22;87:17;95:16
**zeros (1)**
85:3
**zip (2)**
132:3;134:5
**Zoom (6)**
50:24;59:4;71:7;
82:19;84:2;137:7
**Zooms (1)**
139:12

**Zualik (1)**
83:25

**0**

**02151 (1)**
69:6
**055 (1)**
84:5

**1**

**1 (19)**
9:11;12:1;37:24;
78:15;81:20;82:2,7;
85:22;89:20;92:8;
137:1;144:15;159:10,
10,12;160:13,19;
161:12,14
**1,000 (6)**
58:10;74:13;
119:22;172:22,24;
173:16
**1.5 (1)**
97:17
**1:57 (1)**
101:24
**10 (2)**
36:2;179:10
**10,000 (6)**
120:18,20,24,24;
121:4,4
**10:14 (1)**
4:1
**10:49 (1)**
31:2
**10:50 (1)**
31:2
**10:51 (1)**
31:22
**10:52 (2)**
31:22;32:5
**10:54 (1)**
32:5
**100 (1)**
141:9
**1006 (1)**
79:2
**104 (1)**
58:13
**106 (1)**
79:10
**10758965 (2)**
131:25;134:7
**10811451 (1)**
137:14
**10838191 (1)**
137:14
**11 (1)**
153:4
**11:56 (1)**
78:6
**112,639 (1)**

144:19
**119427 (3)**
60:11;143:2,14
**12 (2)**
72:3;141:20
**12:05 (1)**
78:7
**12:42 (1)**
101:23
**120 (1)**
18:5
**123 (1)**
132:8
**12307763 (1)**
84:21
**12368437 (1)**
85:16
**128225 (1)**
67:3
**129528 (1)**
66:19
**13 (2)**
51:25;60:2
**14 (4)**
58:12;91:8;155:12;
166:7
**140 (2)**
60:16;64:5
**16-4006 (1)**
4:3
**16-4007 (1)**
4:4
**17 (3)**
21:22,23;66:10
**176 (1)**
129:24
**18 (3)**
137:1,3,4
**189 (1)**
67:22
**19 (1)**
162:15
**19185233 (2)**
72:12,16

**2**

**2 (8)**
9:3;11:6;12:2;29:3;
37:25;81:22;82:7;
89:20
**2,000 (1)**
58:18
**2,063,193 (1)**
126:2
**20 (1)**
52:22
**200,000 (1)**
128:3
**2000 (1)**
54:18
**2004 (2)**
151:18;152:15

**2012 (1)**
25:12
**2014 (1)**
25:12
**2017 (4)**
108:22,23;109:6,13
**2020 (5)**
110:11,18,20,24;
111:1
**2021 (2)**
7:14;9:25
**2022 (1)**
111:12
**2023 (5)**
111:21,25;112:17;
113:4,22
**22 (2)**
20:16,19
**23118541 (1)**
129:5
**24 (4)**
15:6;23:2;38:24;
59:8
**2522900 (1)**
51:12

**3**

**3 (4)**
11:6;21:19;81:23;
82:7
**3- (1)**
150:25
**3,536 (1)**
129:16
**3.1 (9)**
21:4,11;22:1,7;
97:24;98:4,12,13,14
**3.2 (2)**
92:25;98:3
**3:59 (1)**
179:18
**30 (1)**
179:10
**300 (1)**
150:23
**30th (1)**
179:9
**327,000 (1)**
60:14
**33 (2)**
125:12,15
**35 (1)**
53:11
**36 (2)**
53:9,11
**363,000 (1)**
67:7
**37 (1)**
125:13
**38 (2)**
128:25;129:8
**39 (5)**

In the Matter of: **TELEXFREE, LLC**

October 12, 2023

15:24;21:19;59:5,6;
131:11

## 4

**4 (3)**
81:24;82:7;179:5
**4.6 (1)**
92:13
**4:15 (1)**
32:4
**40,687 (3)**
125:25;126:6;127:6
**400 (7)**
113:14;150:24,25;
170:23;175:9,23;
176:1
**4006 (1)**
51:11
**41 (2)**
142:8,17
**42 (2)**
92:25;129:1
**44 (1)**
136:25
**45 (3)**
142:8,16;153:3
**46 (2)**
15:6;59:8
**471 (1)**
95:24
**48 (1)**
18:3

## 5

**5 (12)**
29:2;39:10;82:2,7;
92:9;158:8;159:11,
12;160:14,19;161:12,
15
**5:00 (1)**
79:1
**54 (1)**
21:17
**55 (3)**
83:15;84:6;135:13
**593987 (3)**
71:12;72:7,16

## 6

**6 (6)**
82:3,7;97:3;154:14;
160:23;161:7
**6.8 (3)**
47:4,7,9
**61 (2)**
155:11,12
**62,000 (1)**
146:20
**64 (2)**
154:11,14

## 7

**7 (8)**
7:3;20:13,16,18,19;
82:3,7;139:11
**74 (1)**
162:14
**75 (1)**
102:7
**7700 (1)**
132:3

## 8

**8 (2)**
21:4;82:8
**85 (1)**
135:13
**862,000 (1)**
67:1
**88 (4)**
23:1,3,6;39:1
**89 (5)**
38:24;39:4,5;50:4,7

## 9

**9 (3)**
90:21;158:5;160:6
**90 (2)**
38:24;39:16
**91,000 (1)**
173:19
**92 (1)**
42:7
**95 (1)**
40:3