1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

```
============================ .
IN THE MATTER OF:            . Case #14-40987
                            .
TELEXFREE, LLC              .
                            . Worcester, Massachusetts
                            . Monday, October 30, 2023
      Debtor.               . 10:18 a.m.
============================ .
DARR,                       . Adv. Proc. 16-04006
                            .
      Plaintiff,            .
                            .
v.                          .
                            .
ARGUETA ET AL,             .
                            .
      Defendants.           .
============================ .
DARR,                       . Adv. Proc. 16-04007
                            .
      Plaintiff,            .
                            .
v.                          .
                            .
ALECCI ET AL,              .
                            .
      Defendants.           .
============================ .
```

TRANSCRIPT OF TRIAL ON:
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES TO
EXCLUDE TESTIMONY OF DR. CAMERON E. FREER AS INADMISSABLE
UNDER DAUBERT
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES FOR
SUMMARY JUDGMENT
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES TO
STRIKE THE AFFIDAVITS OF JEAN LOUIS SORONDO AND STEPHEN B.
DARR PURSUANT TO FRCP 37(C)(1) AND PRECLUDE THEIR TESTIMONY,
OR ALTERNATIVELY, TO RESCHEDULE THE DAUBERT HEARING, AMEND THE
DEADLINE FOR EXPERT DISCLOSURE, AND INCREASE THE BUDGET OF
CLASS DEFENDANTS' FOR LEGAL FEES AND EXPERT COSTS
MOTION OF DOMESTIC AND INTERNATIONAL CLASS REPRESENTATIVES FOR
SUMMARY JUDGMENT
MOTION OF PLAINTIFF TO PARTIALLY STRIKE PORTIONS OF THE
AFFIDAVIT OF FRANTZ BALAN UNDER FEDERAL RULES OF EVIDENCE 602
AND 702
BEFORE THE HONORABLE ELIZABETH D. KATZ

2

APPEARANCES (All present by video or telephone):

For the Trustee:              ANDREW G. LIZOTTE, ESQ.
                              DANIEL J. LYNE, ESQ.
                              ALEXANDRA PAPAS, ESQ.
                              Murphy & King, P.C.
                              28 State Street
                              Suite 3101
                              Boston, MA 02109

For the Defendants:           MICHAEL J. DURAN, ESQ.
                              ILYAS J. RONA, ESQ.
                              Milligan Rona Duran & King LLC
                              28 State Street
                              Suite 802
                              Boston, MA 02109


        Electronic Sound Recording Operator:   ALBERTO BARRERA


        Proceedings Recorded by Electronic Sound Recording
     Transcript Produced by Certified Transcription Service
                          eScribers, LLC
                7227 N. 16th Street, Suite #207
                      Phoenix, AZ 85020
                       800-257-0885

3

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For The Defendants: | | | | | |
| JOSHUA DENNIS | | | | | |
| (By Mr. Lyne) | | 5 | | 47,55 | |
| (By Mr. Rona) | | | 36,53 | | |


| RULINGS | PAGE |
|---|---|
| Motion to exclude Dr. Freer's testimony is denied. | 95 |
| Motions for summary judgment are denied without prejudice. | 97 |
| Motion to strike affidavits is denied without prejudice. | 105 |

4

1    (At 10:18 a.m.)

2         THE CLERK:  Case Number 16-4006, Darr versus Argueta

3    and Case Number 16-4007, Darr versus Alecci.  This is day 3

4    continuation of the hearings that we started previously.

5         I'm sorry, Judge, I don't have the date in front of

6    me.

7         THE COURT:  That's okay.

8         THE CLERK:  For the record, beginning with Attorney

9    Lizotte on my right, could I ask counsel to please identify

10   themselves as well as who they represent?

11        MR. LIZOTTE:  Andrew Lizotte for the trustee, Your

12   Honor.

13        MS. PAPAS:  Alexandra Papas for the trustee.

14        MR. LYNE:  Daniel Lynne also for the trustee.

15        MR. RONA:  Good morning, Your Honor.  Ilyas Rona on

16   behalf of the class defendants in both cases.

17        THE COURT:  Good morning.

18        MR. DURAN:  Good morning, Your Honor.  Michael J.

19   Duran, also on behalf of the class defendants in both cases.

20        THE COURT:  Good morning.  Is everyone ready to

21   proceed?  I think we were in the middle of cross-examination.

22        Attorney Lynne, come on forward.

23        THE CLERK:  Thank you.  Mr. Dennis.  I'm going to

24   remind you that you're still under oath.

25        THE WITNESS:  Of course.  Thank you.

5

1        THE CLERK:  Be seated, please.

2        MR. LYNE:  All set?

3        THE COURT:  Go right ahead.

4                JOSHUA DENNIS PREVIOUSLY SWORN

5                      CROSS-EXAMINATION

6   BY MR. LYNE:

7        Q.   Good morning, sir.  How are you?

8   A.   Good morning.  How are you?

9        Q.   Good, thank you.  I want to go back to 2020.  Do you

10  remember in 2020 attending a previous hearing and testifying

11  with respect to the Huron Report?

12  A.   I do.

13       Q.   Okay.  And do you remember testifying about the

14  differences between a deterministic methodology and a

15  probabilistic methodology?

16  A.   I recall that's certainly one of the opinions I had.

17  Yes.

18       Q.   All right.  And do you remember testifying that

19  using a probabilistic model would allow you to do precisely

20  what is required here, which is to address dirty data?

21  A.   I remember citing to literature that Mr. Martin had cited

22  to suggesting that was the better approach.

23       Q.   But you also testified to that as being a better

24  approach, correct?

25  A.   I think I cited to the -- my recollection was, again,

**JOSHUA DENNIS - Cross**

6

1   this was some years ago, that that was something that Mr.

2   Martin hadn't considered.

3         MR. LYNE:  Could we have a page 260, please?

4         Q.   Sir, I'll read it to you and you just make sure I'm

5   reading it correctly.  Line 15.  This is during your direct

6   examination.  "What is -- could you describe what a--  what a

7   probabilistic record linkage is?"

8         Answer, "Sure.  So -- so a probabilistic record linkage

9   uses math and statistics to compare instances where there

10  aren't high quality unique identifiers and does that by

11  creating weights that suggest whether a single variable is --

12  is -- is indicative or not, indicative of the population

13  match -- population of a match.

14        "So what it allows you to do is precisely what we have

15  here where there is - are -- there can be small details in the

16  data like misspellings or other things like that.  It can" --

17        Next page.

18        " -- account for those kinds of discrepancies and also

19  account for issues where there -- some combination of things

20  isn't inherently distinct where there -- which is where

21  deterministic is -- is most helpful."

22        Did I read that correctly?

23  A.   You did.

24        Q.   All right.  And so what you were referring to when

25  you said where you have precisely what we have here, you're

**JOSHUA DENNIS - Cross**

7

1  referring to where there aren't high quality unique

2  identifiers, right?

3  A.   I believe so, generally.

4      Q.   Okay.  Isn't it a fact, sir, that nowhere in your

5  2020 testimony did you testify that the dataset that you had

6  access to for some number of years was in fact so dirty that

7  it could not be used for any purpose, including a

8  probabilistic modeling purpose?

9  A.   Did I determine that it was so dirty that probabilistic

10  record linkage couldn't work?  No.

11      Q.   Correct.

12  A.   Because I didn't do an affirmative opinion.  I was asked

13  to review the opinion of Mr. Martin and Dr. Freer.

14      Q.   So the answer is no, you never testified that the

15  dataset which you had had access to for a number of years was

16  so dirty that it couldn't be used in a probabilistic system

17  correctly?

18  A.   Correct.  I didn't have that specific opinion.

19      Q.   Okay.  How long have you had the dataset before you

20  testified in -- oh, hold on one second -- November 24th, 2020?

21  And when I say the data et, I mean the Telex data set.

22  A.   Of course.  I think I was retained in 2017, so

23  approximately three years.

24      Q.   4:  Okay.  You had had plenty of opportunity to

25  review that dataset prior to your 2020 testimony, correct?

**JOSHUA DENNIS - Cross**

8

1  A.    I had certainly reviewed it, yes.

2        Q.   You had you reviewed it quite carefully, didn't you?

3  A.    I certainly reviewed it at that time in the context of

4  Mr. Martin's report.

5        Q.   You had plenty of time to review it carefully,

6  didn't you?

7  A.    Again, carefully, in the --

8        Q.   Yes or no?

9  A.    I'm trying to define it carefully to make sure we're

10  clear on answering your question.

11        Q.   I'll give you a definition of carefully.

12  A.    Okay.

13        Q.   You had the dataset, correct?

14  A.    I did.

15        Q.   You had had it since 2017, correct?

16  A.    Yes.

17        Q.   You reviewed it, understanding that you were about

18  to provide some kind of report and testimony in the federal

19  Bankruptcy Court, correct?

20  A.    That's accurate.

21        Q.   And you had had the opportunity to do various, say,

22  ad hoc searches of the -- of the dataset to determine what was

23  contained within the dataset?  Yes, no?

24  A.    I -- part of the question -- I certainly did searches as

25  a result of Mr. Martin's analysis at the time.  Yes.

**JOSHUA DENNIS - Cross**

9

1      Q.    Okay.  And you weren't -- or you weren't bounded by

2   any opportunity to look at any portion of the dataset, were

3   you?

4   A.    Bounded -- again, my focus was on reviewing Mr. Martin

5   had done at that time.  So I guess I'm not clear what you mean

6   by bounded.

7      Q.    Well, was there any part of the dataset that you

8   felt you were unable to or unauthorized to access?

9   A.    Any part of the dataset -- it was what it was.  I

10  certainly had access to it.

11     Q.    The entire dataset?

12  A.    The --

13        MR. RONA:  Objection.  It's unclear what spent my

14  entire dataset in this line of questioning.

15     Q.    Well, did you --

16        THE COURT:  Sustained.

17     Q.    -- have access to the entire representante table?

18  A.    I did.

19     Q.    All right.  And you had the opportunity to review

20  that representante table in any way, size, shape, or form that

21  you so chose, correct?

22  A.    Under the-- under the focus of what was -- my assignment

23  I was asked to do, certainly.

24     Q.    And during your testimony in 2020, after going

25  through your analysis, you testified that Huron's

1 deterministic system was inappropriate, correct?

2 A.   Again, I think I stated it more along the lines of the

3 literature suggested that Mr. Martin hadn't considered a

4 probabilistic fully.

5      Q.   Well, you also testified that you felt, in your

6 opinion, that a probabilistic system was the appropriate way

7 to address this dataset, correct?

8 A.   I think it was more likely.  Again, I wasn't asked to do

9 it an affirmative basis.

10      Q.   Well, that wasn't my question.  You determined that

11 in your opinion, you believed that a probabilistic approach

12 was the appropriate approach for this type of dataset?

13 A.   It certainly appeared more appropriate.  Again, I didn't

14 go forward and do my own affirmative analysis.

15      Q.   All right.  And you testified that it was the

16 appropriate approach because -- and I'll go back to the exact

17 language; hold on one second -- it allows you to do precisely

18 what we have here, where there is, are, and can be small

19 details in the data like misspellings and other things like

20 that, right?

21 A.    That's certainly an advantage it has, yes.

22      Q.   Okay.  And in fact, during that testimony, you

23 referred to something called the Statistical Data Warehouse

24 Design Manual.  Do you remember that?

25 A.   Vaguely.  I believe that was one of the sources that Mr.

1  Martin had relied upon.

2      Q.   And you relied on it, too, right?

3  A.   I certainly considered it, yes.

4          MR. LYNE:   Okay.   Could I see page 266, please?

5      Q.   And I'm going to read starting at question on line

6  5.  "Okay.  And this is referring to," and I'm referring here

7  to the Statistical Data Warehouse Design Manual. Is this the

8  basis for the statement that "when the data is poor quality,

9  probabilistic methods consistently outperform deterministic

10 methods?"  Question.

11     Answer, "It is -- that is -- that's one of them, although

12 that concept appears in multiple of different pieces of

13 literature that Mr. Martin cited."

14     Question, "Okay.  And I just want to point your attention

15 to the -- I guess the rest of the sentence.  It says meri,

16 extra time and resources required to implement them.  What is

17 that referring to?"

18     Answer, "So as part of doing our probabilistic linkage,

19 it -- it can -- it can be, depending on how you do it and what

20 your -- plan to do -- you know, in the alternative, it can be

21 more time-intensive and resource-intensive.  It is --

22 certainly takes more math to -- to build out that kind of

23 approach because you're trying to account for the fact that

24 you do have poor data quality."

25     Did I read that correctly?

**JOSHUA DENNIS - Cross**

12

1  A.  You did.

2      Q.  Okay.  Now, I think when we finished last -- two

3  weeks ago I guess now, I had asked you whether in your

4  opinion, there was a requirement for a so-called golden set to

5  confirm the accuracy of Dr. Freer's linked data.  Do you

6  remember?  Do you remember that testimony?

7  A.  I think you just started that question.  I remember if I

8  if I -- if we had gotten into that subject matter

9  sufficiently.

10     Q.  All right.  Well, let's go back.

11         MR. LYNE:  Can I have page 178?  And if you could

12  just blow that up a little bit.  Thank you.

13     Q.  Line 20, page 178, "And are you suggesting that --

14  that that would require either a ground truth set or golden

15  set, however you want to characterize it, before Dr. Freer's

16  output can be deemed to be reliable?"

17     Answer, "For its purposes, yes."

18     Do you see that?

19  A.  I do.

20     Q.  Okay.  And so is it your opinion that the literature

21  requires a golden set to validate FSAM (phonetic) output?

22  A.  Again, I think it depends on the facts and circumstances.

23  And certainly, Christen suggests that a gold standard is

24  required.  I appreciate that math can create outputs and

25  probabilities.  I think, given this case, the uncertainty

**JOSHUA DENNIS - Cross**

13

1  about the data itself, that simply letting the data speak for

2  itself is not inherently going to result in reliable output.

3      Q.   Well, let's unpack that.  First of all, when you say

4  doesn't necessarily guarantee that it will result in reliable

5  output, what steps did you take statistically, for example, in

6  terms of statistical testing to determine whether or not Dr.

7  Freer's output was, to use your words, reliable?

8  A.   I looked at the methodology and the testing that was done

9  around the quality of the data, the input, and provided

10 examples of where that fell down or was inconsistent with the

11 assumptions.

12     Q.   Well, that's single examples.  My question was, what

13 statistical testing did you do to determine whether Dr.

14 Freer's output was, to use your term, reliable?

15 A.   Well, I guess I would disagree with the term single

16 there.  There were numerous examples.

17     Q.   No, no.  I didn't limit it to single.  What

18 statistical steps, What statistical testing did you do to

19 determine whether Dr. Freer's output was, to use your term,

20 reliable?

21 A.   Again, my approach wasn't one of statistics.  It was

22 looking at the data quality on the frontend and whether or not

23 that data quality was sufficient and tested, specifically

24 focused on the accuracy and consistency of that data.

25     Q.   Something which you never testified to in the 2020

**JOSHUA DENNIS - Cross**

14

1  testimony, correct?

2  A.   No, I don't think that's accurate.  I certainly spoke to

3  the assumptions and the data quality, particularly relative to

4  name.

5       Q.   All right.  Where in your 2020 testimony did you say

6  this dataset, the representante table, is so dirty that it

7  cannot be used even for a probabilistic system?

8  A.   That was not my opinion.

9       Q.   All right.  So let me go back to the issue of a

10  golden set.  Which peer-reviewed studies do you refer to when

11  you take the position that a golden set is required to

12  validate probabilistic output?

13  A.   Again, when you say validate, I think it's important to

14  understand that in the context that we're trying to do here.

15  Right?  So I'm referring to both what was said in Christen

16  from one hand and the other, understanding that everything is

17  case and fact-specific.  And important to understand and apply

18  the case fact with the model.

19       Q.   What peer-reviewed studies or other publications did

20  you rely upon in coming to your conclusion that a golden set

21  is required as a matter of rule to validate probabilistic

22  output?

23  A.   Again, I'd go back to what was written in Christen as

24  well as understanding the data itself.

25       Q.   What peer-reviewed studies did you rely upon to

1  opine that a golden set is required as a rule to validate

2  probabilistic linkage output?

3  A.   Again, I'm not sure if the peer-reviewed study is

4  certainly within the Christen text.

5      Q.   Well, the Christen text said we address it by using

6  other methods.  Do you remember the tail end of that quote?

7  A.   I do, but that's not the quote when referring to -- and

8  the tail end of that didn't say that the accuracy and

9  consistency didn't matter.  It said it was important to look

10 at it so your model could appropriately address it.

11     Q.   So let me go back.  You have one quote from

12 Christen.  And I just wanted to determine whether or not you

13 have any other source data, a peer-reviewed study, another

14 treatise, any other publication on which you rely in taking

15 your position that a golden set is a required element of

16 validating any probabilistic linkage output.

17 A.   Again, the basis is my understanding of the data and I

18 think supported by what's in Christen.

19     Q.   You've got to listen to my question.  What

20 peer-reviewed studies or other, excluding Christen, we'll deal

21 with him later -- other than Christen, what other treatises or

22 other publications do you rely upon in taking your position

23 that a golden set or ground truth set is a required element to

24 validate the output of a probabilistic data linkage model?

25 A.   That name -- the two main things I relied upon there.

**JOSHUA DENNIS - Cross**

16

1   There's not another -- there's not a peer-reviewed beyond what

2   I've described.

3        Q.   Well, you haven't described any peer-reviewed

4   studies, so maybe I'm missing something.

5   A.   Again, I've described the basis.  If that -- the basis of

6   Christen was not peer-reviewed study, then so be it.

7        Q.   So that's it, just what Christen said in his book?

8   A.   That I think is supportive of my understanding of the

9   data.  Yes.

10       Q.   Well, I'm really -- I'm not interested in your

11   understanding of the data right now.

12   A.   Okay.

13       Q.   I'm asking what publications other than Christen do

14   you rely upon in taking the position that you've taken.  And I

15   think your answer is I don't have any other.  Is that right?

16   A.    That's right.  I've named the basis.

17       Q.   Okay. And did you read the Innamorato (phonetic)

18   paper, which would be Exhibit 12 to the trustee's exhibits?

19   A.   TO the extent it was something that Dr. Freer had cited

20   to, then I certainly reviewed it in part.

21       Q.   Well, this is the Innamorato study 2019.  Did you

22   review this?

23   A.   I may have.

24       Q.   Well, not may have.

25   A.   I believe so.

**JOSHUA DENNIS - Cross**

17

1     Q.   Did you or did you not?

2  A.   I'm trying to recall.  There are a number of different

3  documents that are attached to Dr. Freer's report.  I

4  certainly read in whole or in part all the things he cited to.

5     Q.   Well, I'm really focusing on --

6  A.   I'm trying to remember if is one of them.

7     Q.   -- the Innamorato paper which is a peer-reviewed

8  study of the FSEM model output compared against golden sets.

9  Did you read that?  Yes or no?

10  A.   I'm trying to do my best to recall.  There's a lot of

11  things I reviewed.  It looks familiar.

12     Q.   Well, do you remember Dr. Freer testifying during

13  his direct examination that the Innamorato study looked at

14  FSEM output, so Fellegi-Sunter with Expectation Maximization

15  output, and then compared it against a known golden set to

16  determine the accuracy of the FSEM output?  Do you remember

17  that testimony?

18  A.   I do.  I think he said it in the context of using census

19  and other -- other data sources.

20     Q.   Yeah.  And do you remember what he testified to with

21  respect to what the Innamorato study found?

22  A.   That there's a high degree of similarity between that.

23  Again, census data may or may not be at all similar to Ponzi

24  scheme data.  And whether or not the census data contains

25  thousands of things need to be linked together.  Maybe a

**JOSHUA DENNIS - Cross**

18

1  significant difference.

2       Q.   Okay.  And so let me turn to the FSEM model, the

3  Freer methodology.  Do you remember --

4            MR. LYNE:  If you could get up Plaintiff's Exhibit 7,

5  Trustee's 7.

6       Q.   Do you remember being given a --

7            MR. LYNE:  If you actually go up to the -- I'm sorry.

8  Yeah, let's start here.

9       Q.   Do you remember that you were provided with a copy

10  of Dr. Freer's Code and the opportunity to actually -- to give

11  you the opportunity to run Dr. Freer's code independently to

12  determine whether or not the Code and all of its assumptions

13  and builds were done correctly?  Do you remember getting this?

14  A.   Yes.  At some point in time after his report, we received

15  it.

16       Q.   If I suggested to you that you had it in January of

17  2023, does that sound about right?

18  A.   It could -- it could be about right, yes.

19            THE COURT:  Can I just interrupt for one second?

20  Every time you put up an exhibit, Attorney Lyne, go ahead and

21  repeat what exhibit number it is.  So on this one, I'm just

22  not one hundred percent sure which exhibit this is.

23            MR. LYNE:  This exhibit is P.  I said -- sorry,

24  Plaintiff Trustee's Exhibit 7.

25            THE COURT:  Thank you.

**JOSHUA DENNIS - Cross**

19

1    Q.   And so this was about a thirty-page document that

2  gave you a step-by-step set of instructions on how to set up

3  the servers and how to run the code so that you could actually

4  have Dr. Freer's entire linkage engine at your disposal.  Do

5  you remember that?

6  A.   I know we received -- this is something we received, yes.

7    Q.   Did you reveal it when you got it?

8  A.   I may have reviewed it quickly.  It's not something I

9  focused on.

10    Q.   All right.  So you had the opportunity had you so

11  chosen to actually build Dr. Freer's methodological engine and

12  to test data by running data through it, right?

13  A.   Yes.  So they could have rebuilt it, yep.

14    Q.   Okay.  And you could have looked at all of the code

15  sequences to determine that the engine was doing all the

16  things that it was supposed to be doing?

17  A.   I'm sure I could have, yes.

18    Q.   Okay.  I mean, do you have the skill to do that

19  yourself?

20  A.   Between me and my team, yes, I'm confident we do.

21    Q.   I didn't ask about your team.  I asked if you had

22  the expertise to do it.

23  A.   I'd probably have to rely on my technical team members to

24  help me.

25    Q.   Okay.  But you did have team members available that

**JOSHUA DENNIS - Cross**

20

1  would have allowed you to do that, right?

2  A.   Yes.

3       Q.   Okay.  But you didn't, right?

4  A.   No.

5       Q.   Okay.  So you're not in a position as you sit here

6  today to critique in any way, size, shape, or form the actual

7  mechanics of Dr. Freer's engine that he created to run his

8  data linkage process, correct?

9  A.   That's correct.  That was never part of my report.

10      Q.   Okay.  I just wanted to confirm whether you had, in

11 fact, done it.

12      So now let's go to statistical concepts.  You admit

13 you're not a statistician, right?

14 A.   That's correct.

15      Q.   Okay.  You've only taken one undergraduate -- one

16 semester undergraduate course in statistics, correct?

17 A.   That's right.

18      Q.   All right.  But you did have a statistician by the

19 name of James Hobbs on your team, correct?

20 A.   We did, yeah.

21      Q.   All right.  Trained statistician, right?

22 A.   Yes.

23      Q.   And you had a data scientist, Charles Soja, on your

24 team, correct?

25 A.   We did.

**JOSHUA DENNIS - Cross**

21

1     Q.   All right.  And those individuals, had you asked,

2  would have been able to create random samples, right?

3  A.   Certainly.

4     Q.   Okay.  And they would have been able to calculate

5  the appropriate sample size had they -- had you instructed

6  them to do so, right?

7  A.   Yes.  It's relatively straightforward.

8     Q.   Okay.  And they could have calculated the error rate

9  associated with their sample, the random sample size, correct?

10  A.   Certainly.  It gets -- testing for error, yep.

11     Q.   Yeah.

12  A.   That makes sense.

13     Q.   And none of that was done, correct?

14  A.   That was not the approach we took, no.

15     Q.   No.  The approach that you took actually was to go

16  through and put queries into the cluster table and look for

17  examples where there might possibly be an error in the

18  clustering either by over-clustering or under-clustering,

19  correct?

20  A.   That was certainly one portion of the analysis, yes.

21     Q.   All right.  And you understand that that process

22  that you engaged in, that has no statistical validity, does

23  it?

24  A.   Again, the goal is not to put together a statistical

25  analysis.  It was to demonstrate issues.

**JOSHUA DENNIS - Cross**

22

1      Q.   No, no, no.  Listen to my question.  You understand

2   as you sit here today that those ad hoc examples that you

3   pulled after 1,000-plus queries, that the ones you pulled out

4   and put into your report, those don't have any statistical

5   significance with respect to the entire dataset.  You'll agree

6   with me, won't you?

7   A.   With respect to the dataset in its entirety, yes, I agree

8   that.

9      Q.   Okay.  And for you to actually infer anything,

10  statistically speaking, from your ad hoc sampling, you would

11  have had to have gone through this process of creating a true

12  random sample for you to look at before you could do any type

13  of inference with respect to set like properties, correct?

14  A.   I think it depends.  I need to think -- can you ask that

15  question one more time?

16     Q.   Sure.  And to do that, you would have had to have

17  created a random sample of appropriate size, then examined the

18  random sample and determined whether or not there were errors

19  in the random sample from which you can infer something more

20  general as to the entire set wide characteristics, right?

21  A.   I think it depends what you're trying to demonstrate.

22     Q.   Well, you're trying to demonstrate what the error

23  rate is, for example, in Dr. Freer's cluster analysis, right?

24  So if you wanted to look at his cluster analysis, which is the

25  output of his aggregation methodology, you would have had to

**JOSHUA DENNIS - Cross**

23

1  have pulled on a random basis a number -- sufficient number of

2  clusters and then reviewed those clusters to determine whether

3  or not the clusters appeared to include over-aggregations or

4  under-aggregations or whether it appeared to be accurate?

5  A.   Well, if I want to calculate an area as you described,

6  that would certainly ben an approach.  Again, that wasn't the

7  methodology I employed.

8       Q.   NO.  The methodology you employed was to look for

9  things that you thought looked like an error and then raise

10  them to the Court.  That was your methodology, right?

11  A.   Part of our methodology was to demonstrate errors to the

12  Court.  That's correct.

13      Q.   No.  But you picked the samples that you gave to the

14  Court specifically to support your thesis that the data was

15  faulty, right?  That was your purpose?

16  A.   That was certainly part of it.  Absolutely.

17      Q.   Okay.  And that's referred to as selection bias in

18  statistics, isn't it?

19  A.   I guess it depends on the concept and what you're trying

20  to apply it.  If you're trying to do a statistical sampling,

21  it would be.  If you're trying to demonstrate that the data

22  itself has flaws and how that manifests in the output, then

23  that's a different purpose.

24      Q.   Well, but you can only demonstrate to the Court that

25  there's flaws in the samples that you gave to the Court,

1   right, because you haven't done any statistical sampling?

2   A.   I don't disagree -- I don't agree with that.  I think

3   what I was trying to demonstrate was that there are things

4   that were untested in the source data that no one has tested,

5   I hadn't fully tested and Dr. Freer hasn't fully tested.  And

6   as a result of that, it can create errors.  And those areas

7   can be significant.

8        Q.   I want to go from the can to the probable, okay?  So

9   instead of the possible, I want to go to the probable.  And

10  what you've done here, if I understand you correctly, is

11  you've done 1,000 or more searches in Dr. Freer's clusters and

12  you've looked for something that might be a problem.  And with

13  respect to those instances in which you have found a potential

14  problem, you have brought those to the attention of the Court

15  and none of the other results that may not have supported your

16  position.  That's a fair statement, isn't it?

17  A.   I think I rose things to the Court that were

18  demonstrative of the issues.  There are things that I found

19  are problematic that, other examples, I didn't raise the

20  Court.  Again, I was trying to be illustrative, given the

21  quantity of information.

22       Q.   How is that not selection bias?

23  A.   I think it's demonstrating the -- the results of an

24  output based on flawed inputs.

25       Q.   No.  It is just providing the Court with selecting

**JOSHUA DENNIS - Cross**

25

1  examples, right?

2  A.    Examples of why -- why --

3       Q.    Why you think there is an issue.   Fair?

4  A.    Correct.

5       Q.    Okay.   And so it is an example of selection bias.

6  You carefully selected those things, those outputs that you

7  consider to be supportive of your position, and that's what

8  you gave to the Court, right?

9  A.    I gave the Court things that were supportive and

10  demonstrative of the issues inherent in the data and the

11  output.

12      Q.    Now, you say that Dr. Freer should have validated

13  his output by, among other things, speaking to participants,

14  right?

15  A.    I think that's something that would be worth pursuing.

16  Yes.

17      Q.    But you have no opinion as to how many participants

18  Dr. Freer should have spoken to.   Correct?

19  A.    Not in terms of specific number of people.

20      Q.    You say he should have reviewed or could have

21  reviewed EPOC account data, right?

22  A.    Yes.

23      Q.    But you have no opinion as to how much EPOC account

24  data would have been sufficient, correct?

25  A.    I would -- my expectation would be you want look as much

**JOSHUA DENNIS - Cross**

26

1   data as you could.

2        Q.   Well --

3   A.   So I would have looked at all the data.

4        Q.   You have no opinion as to how much epoch data Dr.

5   Freer would have had to have looked at to validate his output,

6   right?

7   A.   Again, I would say you'd want to look as much data as

8   possible in confirming your opinion.

9        Q.   o you remember testifying in 2020 that the epoch

10  data was unreliable?

11  A.   Not specifically In terms -- no.  What I testified to was

12  the way Mr. Martin had employed it was unreliable.

13       Q.   Epoch accounts, if I understand correctly, somebody

14  could go in.  They could pull up their account and they could

15  say, yes, this is mine, or No, that's not mine.  Is that

16  roughly the way it worked?

17  A.   No, I don't think -- I don't think it's quite how the way

18  it worked.  I think it's more complex than that.

19       Q.   Well, let me keep going.  You said he should have

20  looked at e-wallet transactions.  Is that something you think

21  that he should have looked at?

22  A.   Again, if that is available, I think you -- any and all

23  information with respect to the accuracy of the data and what

24  people actually did I think is something that would be

25  probative.

**JOSHUA DENNIS - Cross**

27

1        Q.    Well, did you look at the epoch -- or excuse me, the

2    e-wallet data?

3    A.    I don't believe I looked at the e-wallet data.

4        Q.    Okay.  And you said that he should have been

5    potentially looking at available bank account data.  Do you

6    remember testifying to that?

7    A.    I believe so, yes.

8        Q.    All right.  And did you look at the available bank

9    account data?

10   A.    That was not something I focused on, no.

11       Q.    All right.  So what you're testifying to really is

12   you're surmising that that that might be helpful because you

13   haven't looked at it yourself, right?

14   A.    I'm suggesting that it's worth looking at as much data,

15   real-world data as you can, to tie the facts of the case.

16       Q.    You're not in a position to say whether or not bank

17   account data or e-wallet data or conversations with

18   participants or epoch accounts would have materially changed

19   Dr. Freer's aggregation output, right, because you haven't

20   done any of those things?

21   A.    That's correct.  I've not redone his analysis using those

22   data sources.

23       Q.    Okay.  And you're really not clear as to how big a

24   sample would be informative, right?

25   A.    Again, I'd want to look as much information as I could.

**JOSHUA DENNIS - Cross**

28

1     Q.   You're not in a position to say how much would be

2  necessary to be informative?  Fifty percent of the e-wallet

3  transactions, thirty percent of the wallet transactions, fifty

4  percent of the e-wallet transactions.  How much?

5  A.   I guess it would depend on when I looked at it, how

6  informative it proved to be.  If it showed -- if it

7  demonstrated that there were issues, I'd want to look at more

8  and find other sources.

9     Q.   Well, you haven't looked at the e-wallet data

10  yourself.  So on what basis do you say this would have been

11  helpful?

12  A.   I'm not saying --

13     Q.   It's just possibly helpful?

14  A.   I'm saying I would have looked at it and made that

15  determination.  The fact it wasn't considered at all, I think,

16  is problematic.

17     Q.   Well, but you didn't just look at it yourself

18  either, right?

19  A.   That was not my -- my task.  No.

20     Q.   Okay.  You're postulating that it is possible that

21  if Dr. Freer had talked to participants, some number of

22  participants, if he had reviewed some amount of epoch data, or

23  if you have reviewed some amount of e-wallet transactions or

24  some amount of bank account data, that that would have somehow

25  changed the output of his aggregation methodology and moved it

**JOSHUA DENNIS - Cross**

29

1  towards a more correct result?  Is that your -- is that your

2  thesis?

3  A.   I think there are important data sources to consider to

4  confirm whether or not your output is accurate.

5       Q.   Do you remember testifying when I asked you how many

6  errors are to too many errors and you said, I have no idea

7  other than it's a nonzero number so one or more?

8  A.   How many errors?

9       Q.   How many errors -- in a cluster, for example, how

10 many errors in a cluster is too much?

11 A.   I don't recall that exact wording, no.

12      Q.   Okay.  Well, let me ask you the question now.  Let's

13 take -- let's take Maria Nevis, Maria Nevis, 471 separate

14 accounts, right?

15 A.   Uh-huh.

16      Q.   And just for the record, you have to say yes, not

17 uh-huh.

18 A.   Oh, I apologize.  Yes.  Sorry.  I was swallowing my

19 water.

20      Q.   No, no, it's fine.  And how many potential

21 over-clusters or under-clusters in the Maria Nevis  471

22 cluster?  Did you determine how many were, in your opinion, an

23 over-cluster or an under-clusters?

24 A.   I certainly had thoughts about things that looked clearly

25 not to be Maria Neves in there.  I don't remember the total

30

1   quantum of those.

2         Q.   Well, give me a rough estimate.  Do you have any

3   recollection?  There's 471 accounts in that cluster.  How many

4   did you come to the conclusion was an error?

5   A.   To answer it accurately, I'd have to go back and look at

6   my exhibit.

7         Q.   Which exhibit?

8   A.   It's an exhibit to my expert report.

9         MR. LYNE:  Let's pull up the Maria Nevis report,

10  Exhibit 16.

11        Q.   All right.  Here's Maria Neves, which is cluster

12  132785.  And what's on the screen is Exhibit 16 to your

13  report.  Okay?  Do you recognize that?

14  A.   I do.  Thank you.  Yes.

15        Q.   Okay.  And there's 471 accounts in this cluster.

16  Which ones are inaccurate or shouldn't be here?

17  A.   gain, looking at it, I'd have to study it more detail.

18  Scrolling down to -- it's going to be at least down to where

19  it says Mara Vase (phonetic).

20        Q.   Where's that?

21  A.   Maybe a third to half the way down this page.  Yeah.

22  Right around -- your mouse is -- can see your mouse.

23        Q.   Maria Neves?

24  A.   Just above that where it says Mara Vase for example.

25        Q.   Okay.  And did you take -- did you take any steps to

**JOSHUA DENNIS - Cross**

31

1  determine whether Mara Vase was, in fact, an incorrect

2  addition to this cluster or not?  Did you do anything to test

3  it?

4  A.   I looked at the consistency across the other identifying

5  fields.

6      Q.   Okay.  And did you do some kind of qualitative

7  analysis that you put into a table that said this number is

8  inappropriate for this cluster?  Did we ever come to a resting

9  place, for example?

10  A.   I don't recall that I quantified in that way.  I think I

11  identified there's a lack of consistency across name, address,

12  email, and seemed to be a mixture of people living in various

13  locations.

14      Q.   My question is very simple.  Did you come to a

15  resting place where you said out of 471 Maria Neves accounts

16  in this particular cluster, I opine that X number are

17  inaccurate and shouldn't be included?

18  A.   I don't think I put a specific number on it, no.

19      Q.   Okay.  And with respect to those which you have a

20  question about, you really didn't take any steps to determine

21  if, in fact, these were separate people and should not have

22  been included.  Fair?

23  A.   No, I don't -- I don't think that's fair.  I think I

24  identified that these were individual user accounts that were

25  inconsistent with what Dr. Freer stated he was going to do in

**JOSHUA DENNIS - Cross**

32

1  that they had different names, different contact information,

2  different addresses, different emails, different structure.

3  And that was inconsistent with what he was set out to do.

4        MR. LYNE:  Well, can I get can the -- can I get that

5  back up again?

6        Q.   There's 471 accounts here.

7  A.   There are.

8        Q.   At what point, in your opinion, is the output

9  unacceptable?  At what percentage level is it unacceptable?

10 Is it on any nonzero number which would mean anything more

11 than one renders the output entirely unaccepted, unacceptable?

12 A.   For a single cluster?  I think if the purpose of this is

13 to determine what the net winnings are for net winners, then I

14 think the appropriate -- appropriate answer of how reliable it

15 is, is how accurate is the equity.  Right?  Do I have the

16 appropriate user accounts tied to the person who is economic

17 actor who received the benefit or loss?

18       Q.   Let me ask again.  How many errors -- and I'll take

19 the Maria Neves account with 471 separate accounts.  How many

20 errors in this cluster, in your opinion, would render this

21 entire cluster unusable?

22 A.   Again, it depends.  Not all user accounts are created

23 equal.  Some user accounts are 49.99 losers, some are

24 500,000-dollar net winners.

25       Q.   Well, how many in this cluster -- first of all, did

**JOSHUA DENNIS - Cross**

33

1  you form any opinion as to whether or not this cluster is

2  unusable as a result of errors in the clustering?  Did you

3  form that opinion?

4  A.   With respect to this specific cluster?

5      Q.   That specific cluster.

6  A.   Not specifically.  Again, I think you're still left with

7  the problem of deciding --

8      Q.   No, no.  I asked you a question, which is did you

9  form an opinion?

10          MR. RONA:  Your Honor --

11          MR. LYNE:  And the --

12          THE COURT:  Hold on.  Hold on.

13          MR. RONA:  Your Honor, I object.  Mr. Lyne keeps

14  interrupting --

15          MR. LYNE:  Yes, I do.

16          MR. RONA:  -- Mr. Dennis.  And I don't think that's

17  appropriate.

18          MR. LYNE:  I asked him if he formed an opinion, and

19  the answer is no, he didn't.  That's all I want.

20          THE COURT:  So, Attorney Lyne, let the witness

21  finish.  Whatever it is he's going to say before you ask your

22  next question.  And you can repeat your question.

23          MR. LYNE:  Okay.

24          THE COURT:  But let him answer, please.

25      Q.   Did you form an opinion with respect to this

**JOSHUA DENNIS - Cross**

34

1   particular cluster -- and this is a yes or no question.  Did

2   you form an opinion with respect to this particular cluster as

3   to whether any perceived errors or over-aggregations or

4   under-aggregations rendered this cluster, in your opinion,

5   unusable?  Yes or no?

6   A.   I hadn't thought about my opinion specific to a given

7   cluster in this particular way.

8      Q.   And is it fair to say that the same is true with

9   respect to every single cluster in Dr. Freer's aggregation?

10   And in other words, in none of those clusters have you formed

11   an opinion as to whether any potential errors in the

12   aggregations renders any of those clusters unusable?

13   A.   I don't think that's the case.  I think there are some

14   clusters that are clearly unreliable, some that I think do

15   look absolutely fine, and some are in the middle that would

16   require someone to manually go through and make a judgmental

17   determination.

18      Q.   Okay.  And how many clusters as a percentage were

19   acceptable in your opinion?

20   A.   Again, that's not -- looked at the math that way.

21      Q.   Okay.  How many were as a percentage deemed to be

22   unacceptable?  Same answer?

23   A.   Again, that's not how I looked at things.  No.

24      Q.   In the end, isn't it fair to say that your opinion

25   is that there -- it is possible that there is some kind of

**JOSHUA DENNIS - Cross**

35

1  statistically meaningful level of over-aggregations or

2  under-aggregations in the Freer output, but that's as far as

3  you go, right?

4  A.   Again, I didn't word it that way.

5       Q.   Well, I'm going to ask you the question.  Isn't it a

6  fact that you don't have an opinion with respect to any

7  particular cluster as to whether there are over-aggregations

8  or under-aggregations sufficient to render that cluster

9  unusable?  You don't have any opinion on any particular

10 account?

11 A.   I'm sorry.  I'm not clear on your question.

12      Q.   t's entirely my fault I'm sure.  As we sit here

13 today, isn't it correct that you don't have in your report or

14 in any of your exhibits any kind of table that identifies for

15 the Court of the 89,000 clusters created by Dr. Freer's

16 methodology which ones you say are unacceptably inaccurate,

17 which ones you say are accurate, and which ones you say are

18 potentially a problem?

19 A.   I didn't do my own affirmative analysis.  My answer is

20 there are absolutely examples in my report of inaccurate

21 clusters that I don't think are reliable.

22      Q.   Those are the ones you handpicked, right?

23 A.   Those are the ones that are exemplary of the issues, yes.

24      Q.   But you handpicked?

25 A.   If they're in my report, then certainly I selected them.

Case 16-04006   Doc 501   Filed 11/06/23   Entered 11/06/23 14:09:43   Desc Main
Document     Page 36 of 124
**JOSHUA DENNIS - Redirect**

36

1   Yes.

2          MR. LYNE:  Yeah.  Okay.  Can I have just a moment,

3   Your Honor?  I think I may be finished.

4          THE COURT:  Sure.

5          MR. LYNE:  A correction.  It was 86,000 net winner

6   clusters, not 89,000.

7          THE COURT:  Okay.

8          MR. LYNE:  With that, I'm all set.  Thank you very

9   much, sir.

10          THE WITNESS:  Thank you.

11          THE COURT:  Okay.  Thank you.

12          Attorney Rona?

13          THE WITNESS:  Do you mind if I just refill my water?

14          MR. RONA:  Your Honor, can we give him the pitcher?

15          THE COURT:  Of course.

16                         REDIRECT EXAMINATION

17   BY MR. RONA:

18      Q.   Mr. Dennis, I just want to follow up on some of

19   those questions that you were asked today.  The 80,000

20   clusters, do you know which clusters Mr. Lyne was referring

21   to?

22   A.   My assumption was, and it should have clarified, he was

23   referring to the net winner clusters.

24      Q.   Okay.  Dr. Freer found far more clusters; isn't that

25   right?

**JOSHUA DENNIS - Redirect**

37

1    A.    Yes.   His aggregation was on the entirety of the dataset.

2         Q.    Okay.   And.   Is it your opinion that on numerous

3    occasions Dr. Freer under=aggregated, meaning with respect to

4    one aggregation, that may be a net winner cluster, there may

5    be net loss accounts that were not combined?   Is that your

6    opinion?

7         MR. LYNE:   I'm just going to object on forum grounds.

8    This is a leading question on redirect, so I think it's

9    inappropriate.

10        THE COURT:   I'm going to let it go because it's kind

11   of hard to ask that question unless you ask it in a leading

12   fashion.

13        So did you get the question?

14        THE WITNESS:   Yes.

15        THE COURT:   Go ahead.

16   A.    Yeah.   There are two forms of potential error, right?

17   One is over-aggregation.   That's when two accounts, we saw

18   examples of this, end up together that have clearly different

19   information.

20        But I think the more problematic one, quite frankly, is

21   under-aggregation.   It's harder to test for.   And that's where

22   the concept of consistency is important to ensure that names

23   are being used because name is really most important things

24   and critical to his -- Dr. Freer's analysis where, if names

25   were different, people get split up.   And that's what we saw a

Case 16-04006   Doc 501   Filed 11/06/23   Entered 11/06/23 14:09:43   Desc Main
Document     Page 38 of 124
**JOSHUA DENNIS - Redirect**

38

1  lot of significant examples of that where someone might be

2  Sand on one hand, nickname, and Sanderli, Sanderli De

3  Oscanchelos (phonetic) on the other.  Or you could be Oscar

4  Sosa and then Oscar Enrique Escuple Sosa (phonetic) on the

5  other.  I have may have had that -- those names in the wrong

6  order.  But where names are different for any number of reason

7  or Team Legendary versus Barack Obama.  So there's a lot of

8  different ways that we can see people using different names

9  that because of that distinction can lead to

10  under-aggregation.

11      Q.   Okay.  So would it -- how many clusters would you

12  have to review in order to know whether the 80,000 alleged net

13  winner clusters are accurate?

14  A.   Again, I think you'd have to go back and

15  under-aggregation to be the hard thing to test for, really

16  take a look at where other indicia suggest of

17  under-aggregation, right?  Because we also see instances where

18  people are using punctuation instead of names and where

19  those -- and those over ten million dollars' worth of accounts

20  that are using only punctuation, to what extent any of those

21  accounts should be reasonably aggregated with someone who used

22  maybe their full name in different setting.

23      Q.   Okay.  So would it be fair to say that a greater

24  number of clusters would have to be reviewed in order to

25  inspect the 80,000 alleged net winner?

**JOSHUA DENNIS - Redirect**

39

1   A.   Absolutely.

2        Q.   Okay.  And incidentally, it's been a while.  Could

3   you remind everybody, how is it that you looked at whether a

4   cluster was an alleged net winner or net loser account?

5   A.   Can you be more specific?

6        Q.   What data did you -- informed you as to whether

7   someone was an alleged net winner or cluster or not?

8   A.   It was Dr. Freer's data, Dr. Freer's output.

9        Q.   Okay.  And did you hear Dr. Freer use the word

10  agnostic in relation to net equity?

11  A.   I believe so, yes.

12       Q.   Okay.  In terms of assessing believability of the

13  data, to what extent did you find net equity useful?

14       MR. LYNE:  Objection.  Beyond the scope of direct.  I

15  did not ask any questions with respect to net equity.

16       THE COURT:  Sustained because I think you're going to

17  have to recall him later.  I don't think that really has much

18  to do with Dr. Freer today.

19       MR. RONA:  Okay.  Well, I'll move on.

20       Q.   But you would -- would you agree with me that in

21  order to determine whether someone is an alleged net winner

22  like Mr. Lyne said, that would require looking at the net

23  equity calculation?

24  A.   Certainly.

25       Q.   Okay.  You were asked questions about whether there

Case 16-04006   Doc 501   Filed 11/06/23   Entered 11/06/23 14:09:43   Desc Main
Document      Page 40 of 124
**JOSHUA DENNIS - Redirect**

40

1  was a golden set in this case.  Do you recall those questions?

2  A.   I do.

3      Q.   Okay.  And you were asked questions about error

4  rates in general.  Is it -- in your opinion, is it possible to

5  determine the accuracy of data or an error rate based on that

6  data without having an answer key?

7           MR. LYNE:  Objection.

8           THE COURT:  Overruled.

9  A.   Again, I think there are -- some is math one can do.

10  It's been -- it's been done here.  I think the question is,

11  you know, the math, the output, as Dr. Freer described it, was

12  letting the data speak for itself.  And to the extent that the

13  data is not accurate or consistent as it is assumed to be and

14  the nature of the analysis and the fuzzy matching and the

15  assumptions used impact the probability and those

16  probabilities are one formed with the error rate, then I think

17  it's all part and parcel to the same issue.

18      Q.   Well, let's take the example of Maria Neves because

19  Mr. Lyon used that.  Would it be possible to determine the

20  accuracy of any of the data without knowing -- without having

21  an answer key?

22  A.   Again, data rarely tells you anything with absolute

23  certainty, right?  It's largely a function of the quality of

24  the data on the -- on the input side.  So here I think looking

25  at that particular cluster, there are things people can

**JOSHUA DENNIS - Redirect**

41

1  reasonably conclude, that when two user accounts share nothing

2  in common, it is unlikely that they are similar or the same,

3  the same economic actor.

4  But there's a -- as I described, it's a lot of

5  heterogeneity in the data such that certain email addresses

6  and addresses and phone numbers and passwords are shared

7  across a large number of clusters. And I think it's that

8  issue that leads to the uncertainty of where two user accounts

9  are identical on everything but name, whether or not those are

10  the same people versus, you know, did they get the name wrong

11  or do they get the email address wrong, because some of these

12  email addresses are coming in hundreds of different clusters.

13  Q. Well, I think I'm asking on a more basic level. If,

14  for example, two people have the same name, would it be

15  possible just from looking at the output to know whether

16  that's a correct clustering or not without having an answer

17  key?

18  A. No. If you -- if you had two Josh Denis's living in

19  different -- which I know exists -- in different parts of the

20  United States, without knowing and doing additional research,

21  you wouldn't know if it's the same Josh Dennis or two

22  different Josh Dennises.

23  Q. Okay. And without an answer key, would it be

24  possible to know whether Marvez and Maria Neves are different

25  people or the same people with typos introduced?

**JOSHUA DENNIS - Redirect**

42

1  A.   You would -- you would presumably need to have

2  third-party corroborating source.

3       Q.   Okay.  And in the peer reviewed literature that that

4  you've reviewed, is there discussion about having an answer

5  key in order to validate the results?

6  A.   Certainly the Christen text discusses that.

7       Q.   Okay.  And does the -- I'm not going to say it

8  right -- Innamorato article, do you recall what data was used

9  in the Inamorato article?

10 A.   I believe it was census data.

11      Q.   Census data.  Okay.  Are you aware of any

12 peer-reviewed study where unvalidated data entered with no

13 system of control was found to be sufficiently accurate

14 without an answer key?

15 A.   Again, I'm not sure I have an opinion one way or the

16 other of that.

17      Q.   Well, are you aware of one?  Mr. Lyne asked you if

18 there were -- if you were aware of peer review studies that

19 said one thing.  I'm asking you now in the other direction.

20 Can you think of or have you heard Mr. Freer testify about a

21 peer-reviewed study that took unvalidated data entered with no

22 system of control that was found sufficiently reliable without

23 an answer key to check against?

24 A.   Not that I can think of right here.  I've not also

25 thought about that particular question.

Case 16-04006   Doc 501   Filed 11/06/23   Entered 11/06/23 14:09:43   Desc Main
Document     Page 43 of 124
**JOSHUA DENNIS - Redirect**

43

1      Q.   Let's talk about statistically significant samples.

2   Do you recall -- this might have been in your first day of

3   testimony -- being asked whether 400 was a sufficiently large

4   enough sample?

5   A.   I believe so, yes.

6      Q.   Okay.  And for the purpose of these next questions,

7   I'm just going to use that Number 400.  Would that apply if

8   you were going to do a sample of Dr. Freer's output against

9   Epoch?  Would you only need to look at 400 accounts?

10         MR. LYNE:  Objection.  There's nothing in his report

11   that goes through this exercise whatsoever.  So I'm a little

12   puzzled as to --

13         MR. RONA:  Well, he was questioned at length, Your

14   Honor, about the --

15         MR. LYNE:  But he testified that there was -- he had

16   no opinion as to how much was enough.  That was his -- that

17   was his testimony.

18         THE COURT:  I'm going to let Attorney Rona have this

19   question.

20         Can you reask the question, please?

21         MR. RONA:  Yeah.  And it was not a good question, so

22   I may -- can I modify it, Your Honor?

23         THE COURT:  Reask the question.

24         MR. RONA:  Okay.

25      Q.   If 400 were sufficient for -- were sufficiently

**JOSHUA DENNIS - Redirect**

44

1   large enough to be statistically significant, would that apply

2   if you were going to check Dr. Freer's output against epoch

3   data, for example?

4   A.   Again, I'd want to go and think about what the right --

5   whether I look at all, do I look at all, do I look at adjusted

6   net winner population.  I think I'd want to think about how I

7   would approach that study.  And again, I think you could do it

8   somewhat programmatically.  So in a general sense, I'd want,

9   again, to look at as much data and consider as much data as I

10  could in any instance.

11       Q.   Okay.  Well, do you recall the number of epoch

12  submissions roughly?

13  A.   It was a very large database.  I don't remember the

14  number of total number of records.

15       Q.   Okay.  Well, do you recall if it was more than

16  100,000 submissions?

17  A.   I believe so, but I would need to go double check.

18       Q.   But do you recall that it was a number far in excess

19  of 400?

20  A.   Yes.  Oh, for sure.

21       Q.   Okay.  I think you were asked at some length about

22  your first report and your testimony in the first Daubert

23  hearing.  Do you recall offering any opinions one way or the

24  other about whether TelexFree data had accuracy issues such as

25  fictitious names or inaccurate names?

**JOSHUA DENNIS - Redirect**

45

1   A.   Absolutely.

2      Q.   Okay.  What in your first report did you offer

3 opinions about Mickey Mouse?

4   A.   Yes.

5      Q.   Okay.

6   A.   Certainly as part of the testimony.

7      Q.   Okay.  So if there was some -- if there were some

8 suggestion that your data quality concerns are newly found,

9 would you agree with that or disagree with that?

10   A.   I would very much disagree with that.

11      Q.   Okay.

12   A.   A lot of the -- my opinion in relative to the reliance on

13 name was -- been consistent throughout.  That was one of my

14 primary criticisms of Mr. Martin, and that's one of my primary

15 criticisms here.

16      Q.   Okay.  And Mr. Lyne read, I think, testimony about

17 your recommendation to Huron at the time, that they should

18 have used -- considered using probabilistic rather than

19 deterministic.  Do you recall giving that?

20   A.   I do, yes.

21      Q.   Okay.  And I think I heard Mr. Lyne read the phrase

22 small details.  You recall him saying small details, that

23 where --

24   A.   I believe part of the quote -- I'd have to go back and

25 look.  Yeah.

**JOSHUA DENNIS - Redirect**

46

1    Q.   Okay.  Well, to what extent does probabilistic

2  analysis address things like typographical errors?

3  A.   I think depending on certainly what -- what fuzzy

4  matching you can use, I think that that -- that's just where

5  it does really well, things with typos, you know, maybe

6  letters mixed up back and forth.  I mean, that's -- that's

7  absolutely where it could do very well.

8    Q.   Okay.  And is there discussion in the literature

9  about that probabilistic record linkage can solve all data

10  problems?

11  A.   No.  I don't think that it's using probabilistic as

12  inherently a panacea.  Right?  It really depends on the

13  quality of the data and then how you understand that quality

14  of the data to make sure you're properly accounting for it to

15  the extent that you can account for it in the -- in the

16  analysis itself.

17    Q.   Right.  And do you recall reading in the Christen

18  book that, regardless of the methodology used, the principle

19  of garbage in, garbage out holds?

20  A.   Absolutely.

21        MR. RONA:  Okay.  Thank you, Your Honor.

22        THE COURT:  Attorney Lyne?

23        MR. LYNE:  Thank you.  Could you pull up Christen,

24  page 14?  Oh, I'm sorry.  Christen is Trustee's Exhibit 17.

25  We're pulling it up.

**JOSHUA DENNIS - Recross**

47

1                          RECROSS-EXAMINATION

2    BY MR. LYNE:

3         Q.   And we are looking at Exhibit 17, page 40, under

4    believability.  And there's a paragraph that starts, "Arguably

5    the most important data quality dimensions for data matching

6    and deduplication are accuracy and consistency because a large

7    portion of efforts in the indexing, comparisons, and

8    classification steps deal with inaccurate and inconsistent

9    data.

10        "If data would be of a perfect quality, then data

11   matching could be accomplished through straightforward

12   database joint operations, and no sophisticated indexing

13   techniques or approximate comparison functions would be

14   needed.  As long as the data is of imperfect quality however,

15   techniques are needed that can deal with inaccurate and

16   inconsistent data while still achieving high matching

17   quality."

18        Did I read that correctly?

19   A.   I believe so, yes.

20        Q.   And so you understand Dr. Christen to be saying if

21   there is imperfect data quality, then you need to use

22   additional techniques to deal with that inaccurate and

23   inconsistent data while still achieving high matching quality,

24   right?

25   A.   It says as long as the data is of -- as long as data are

**JOSHUA DENNIS - Recross**

48

1    of imperfect quality, then you need to deal with that data to

2    high match quality.  It doesn't say it's always possible.  But

3    that's exactly why it's important to understand why or how

4    it's potentially inaccurate or inconsistent such you can

5    inappropriately attempt to solve for it.

6        Q.   "As long as data are of imperfect quality however,

7    techniques are needed that can deal with inaccurate and

8    inconsistent data while still achieving high matching

9    quality."

10        I read that correctly, right?

11   A.   Yeah.

12        Q.   Yes or no?

13   A.   Yes, sir.

14        Q.   Okay.  And Dr. Freer used a number of recognized

15   data science techniques to address the issue of inaccurate and

16   inconsistent data in his methodology, didn't he?

17   A.   Again, I don't -- I do not -- I do not think he actually

18   used the appropriate way to appropriately consider the

19   accuracy and consistency in the first instance.

20        Q.   Let me --

21   A.   And without knowing the accuracy and inconsistency, I

22   don't think he appropriately applied the necessary techniques

23   that result in high quality matching.

24        Q.   So you're back to the issue that data science

25   requires in every instance a golden set to validate

**JOSHUA DENNIS - Recross**

49

1  probabilistic output, right?

2  A.   That's not what I said.

3      Q.   Well, so there are probabilistic systems and

4  datasets that don't require a golden set, right?

5  A.   Again, I think it depends on the purpose in the data

6  itself.

7      Q.   Well, the purpose is to link data, link accounts,

8  okay?  That's the purpose.

9  A.   Understood.

10     Q.   So okay.  So on that basis, you'll agree that there

11 are at least some probabilistic systems in datasets that can

12 be -- probabilistic systems that can be used to join datasets

13 without the existence of a golden set to compare the output

14 against, right?

15 A.   'm sure there are situations where that's reasonable.

16 Yes.

17     Q.   Okay.  And you're saying that this dataset is so

18 inconsistent across its entire boundaries that it cannot be

19 used at all, regardless of data science technique, to join

20 accounts in the Telex database?  That's your position, right?

21 A.   That's not my position.  No.

22     Q.   Okay.  So?  So let me just -- if you could give me

23 just a very succinct one or two sentence description of what

24 your position is on that.

25 A.   My position is that what Dr. Freer has is report is a

**JOSHUA DENNIS - Recross**

50

1  discussion of believability and availability.  And every one

2  of the other factors that Dr. Christen says here, absent in

3  his report, is any discussion of the accuracy.  And the

4  discussion of the consistency was limited, I think, entirely

5  to over-aggregation, not under-aggregation.  So the -- he did

6  not actually look at two of the most important data quality

7  dimensions.  And the fact that he didn't look at those two,

8  that he couldn't have built or it is less likely or much

9  harder for him to employ the proper techniques needed to deal

10  with the inaccuracy and inconsistency.

11       Q.   So we're back to the golden set?

12  A.   No, I don't think it's what I just said.

13       Q.   Okay.  I think you said that there could be

14  instances of under-aggregation if the names were different or

15  if the addresses were different or if the emails were

16  different, things like that?

17  A.   There can certainly be under-aggregation when things are

18  different.

19       Q.   Okay.  And I think you referred to the possibility

20  that emails and addresses across a large number of the

21  clusters appeared across large numbers of clusters.  I think

22  you said that, right?

23  A.   Yes.

24       Q.   And so do you have a table that shows how many

25  clusters have exactly the same email addresses and physical

**JOSHUA DENNIS - Recross**

51

1  addresses?

2  A.   No.   That would be interesting.   Certainly the ones I've

3  looked at include -- I think I looked at TT Bloggers, which is

4  one we looked at for Maria Neves I believe.   I think that was

5  well over one hundred -- I looked at a handful of examples,

6  and they were large net winners.   Particularly they're using

7  hundreds of clusters.

8       Q.   Okay.   And where in your report does it try to

9  distill that down to something that we can all look at?

10  A.   I don't think I have a table.   That would -- that would

11  be a good one though.

12       Q.   Okay.   Would it be fair to say that -- well, have

13  you lived at different addresses yourself?

14  A.   Yes.

15       Q.   Do you have a home line, a hard line to your house?

16  A.   Not for a long time.

17       Q.   Not for a long time.   You used to though at one

18  point?   We all did at one point.

19  A.   At one point in time.

20       Q.   Okay.   And you have a cell phone, right?

21  A.    I do.

22       Q.   Okay.   And other people in your house, they had cell

23  phones?

24  A.   They do.

25       Q.   What if there was two Josh Dennis accounts with

**JOSHUA DENNIS - Recross**

52

1    different addresses but they agree on phone number, email,

2    everything else?  Would you need to call Josh Dennis to ask

3    him if those two accounts were the same?

4    A.   Where the only distinction is address and everything else

5    is the same?

6         Q.   Sure.  Let's start there.

7    A.   No.  I think that's -- I think it's a reasonable -- the

8    reasonableness test would pass on that one.

9         Q.   What if there's a Josh Dennis and a Joshua Dennis?

10   Do you have to call Josh?

11   A.   If everything else is identical and the only thing was

12   Josh and Joshua Dennis, I think that would pass a

13   reasonableness test, yes.

14        Q.   Okay.  What if it was Jay Dennis?  Would that be --

15   everything else the same.  That sounds reasonable?

16   A.   Yes, it would.  And that would be something I would hope

17   be picked up in the aggregation, but we've seen since then it

18   may not be.

19        Q.   How about Joshua D. Dennis?  Don't need to call Josh

20   then either, do you?

21   A.   If everything else is the same, again, that's the place

22   where I think this methodology does work well with minor,

23   minor typos and distinctions.  Yes.

24        Q.   Okay.  Let's say -- and we'll take the Maria Neves

25   example again.  Let's say you determine that three user

Case 16-04006   Doc 501   Filed 11/06/23   Entered 11/06/23 14:09:43   Desc Main
Document      Page 53 of 124
JOSHUA DENNIS - Further Redirect

53

1  accounts out of 471 in that cluster were incorrectly clustered

2  and they were each forty-nine-dollar telephone plan accounts.

3  Would that invalidate the whole cluster of four million

4  dollars?

5  A.   I think you still need to figure out who the right person

6  is, but I don't think that inherently invalidates that

7  singular cluster.  No.

8         MR. LYNE:  Okay.  All right.  I'm all set.  Thank

9  you.

10        THE COURT:  Okay.  Attorney Rona, anything else?

11        MR. RONA:  I'll try to be very brief, Your Honor.

12                FURTHER REDIRECT EXAMINATION

13  BY MR. RONA:

14     Q.   Mr. Dennis, to what extent would you consider any

15  mislinkage to be a potential concern in this case?  Talking

16  about TelexFree, not any other case.

17  A.   I think when I see a mislinkage, my first thought is

18  what's the cause of it, right, what's the source, because I

19  think I understanding the source can help derive where there

20  may be prevalence and where it may lead to other issues.

21        So inherently, having three out of 471 or whatever it was

22  over-aggregations, and I believe the number of

23  over-aggregations was more than that, is only part of the

24  issue.  It's how many under-aggregations are there and why are

25  there under-aggregations and where else could it be impacted

**JOSHUA DENNIS - Further Redirect**

54

1  and what the -- what the impact on the net equity.  So in

2  terms of are they net win or a net loser and by how much?  I

3  think that's the more important question to answer.

4      Q.   Okay.  And would you be -- to what extent would you

5  be concerned if it was represented to you that Dr. Freer's

6  analysis concludes that -- that one hundred percent of his

7  clusters have an error of one or two or three linkages?

8      MR. LYNE:  Well, a hypothetical.  Calls for

9  speculation.

10      THE COURT:  Well, I let you get away with it, so I'll

11  let Attorney Rona get away with it.

12  A.   Can you ask that question more time?

13      Q.   Yes.  To what extent would you be concerned if it

14  was -- it was represented to you that Dr. Freer's position is

15  that a hundred percent of clusters had an error of one or two

16  or three linkages?

17      MR. LYNE:  Well, I'll still object on the grounds

18  that it's not Dr. Freer's position, and the question assumes

19  that it was.

20      THE COURT:  Restate the question.

21      Q.   Okay.  Well, would you be -- to what extent would

22  you be concerned if you found that one hundred percent of Dr.

23  Freer's clusters had an error of one or two or three

24  mislinkages?

25  A.   Again, my -- my concern would be, as I said before, not

**JOSHUA DENNIS - Further Recross**

55

1  all accounts are created equal.  Just saying I missed one

2  doesn't tell you whether you missed a 49.99 or whether you

3  missed a 500,000-dollar account, which can be incredibly

4  impactful.  And that's what we've seen here.  The single

5  mislink is not just the one mislink.  It makes -- it can make

6  a very big difference.  And that's why I think the appropriate

7  way to look at it is -- is really not just say across the

8  entire population of ninety-nine percent correct or whatever

9  it is but how impactful is it on individuals.

10      Q.   Okay.  And does -- to what extent does the concern

11  grow as the number of accounts in a cluster increases?

12  A.   Well, to the extent everything was proportional, right?

13  Obviously, if I have, you know, a larger number of accounts

14  and I'm ninety-eight percent correct, that means a larger -- a

15  larger cluster with more accounts would inherently have

16  more -- more errors.

17          MR. RONA:  Thank you, Your Honor.

18          MR. LYNE:  Just briefly.

19                  FURTHER RECROSS EXAMINATION

20  BY MR. LYNE:

21      Q.   You were asked if one or two or three errors in an

22  account across the board would create in your mind and

23  unreliability.  Let me just ask, have you done an analysis

24  that determines that one, two, or three accounts in a cluster

25  across the board are in fact, in your opinion, over or

**JOSHUA DENNIS - Further Recross**

56

1  under-aggregations?  Have you done that analysis?

2  A.   I'm sorry.  I'm not sure I understand the question.

3      Q.   You were asked a hypothetical:  What if you were

4  told or you determined that there were three errors in each

5  account across the board?  Do you remember that question?

6  A.   I do.

7      Q.   Okay.  Have you actually done that analysis to

8  determine whether that's, in fact, the case?

9  A.   Whether or not -- you're asking me whether or not there

10  are, in fact, one to two errors in every cluster?

11  A.   Yeah, across the board.  Have you done that analysis?

12  A.   No, I didn't do an affirmative analysis.  No.

13      Q.   Okay.  And then you said the problem is that there

14  might be a big account that was missed in Dr. Freer's

15  aggregation.  Do you remember you said that?

16  A.   Yeah.  That's certainly one source of significant error.

17      Q.   Okay.  And have you done that analysis across the

18  board to determine that there is, in fact, a large material

19  account that was not included in a cluster that you are now

20  saying should have been included in the cluster?

21  A.   We've seen numerous examples of that.  Yes.

22      Q.   No.  No.  Have you done it -- well, first of all,

23  have you done that analysis across the board, across the

24  entire dataset?

25  A.   No, because to do that would require me to do my own

**JOSHUA DENNIS - Further Recross**

57

1    entire affirmative analysis --

2         Q.   Okay.

3    A.   -- (indiscernible) correct in the first instance.

4         Q.   And where in your report do you identify all of the

5    material accounts that you say are under-aggregated in a

6    particular cluster?

7    A.   Again, I provide examples because to say it in totality

8    would require me to do my own entire affirmative analysis.

9         Q.   Okay.  How many examples did you provide?

10   A.   I'd have to go back to my report and count and then the

11   additional ones prepared for this trial.

12             MR. LYNE:   Okay.  All right.  No further questions.

13             THE COURT:  Anything else?

14             MR. RONA:  No questions, Your Honor.

15             THE COURT:  So Mr. Dennis, Dr. Freer said his error

16   rate was two percent as I recall.

17             THE WITNESS:  Yes.

18             THE COURT:  Do you have an opinion as to what error

19   rate is scientifically acceptable?

20             THE WITNESS:  No, I didn't think of that context.  I

21   thought about the -- the error rate itself, how it's derived,

22   and what it meant, you know, to what extent it was focused on

23   the entire population versus net winners, to what extent that

24   allowed me to understand how impactful that was, meaning do I

25   have the right population that winners and do I have the net

1   winnings close to accurate.

2          And I appreciate that net equity is not something

3   we're talking about today.  But whatever those numbers are, I

4   think it's important to consider that there is a significant

5   variance and that all -- not all accounts are created equal or

6   will be equal at the end of the day.

7          THE COURT:  Do you know whether an error rate of two

8   percent is scientifically acceptable in the relevant

9   scientific community?

10         THE WITNESS:  I would think in isolation that would

11  be -- well, I guess it depends.  It depends on the on the

12  purpose.  Again, here we're trying to define a net winner

13  class.  And whether or not I think -- I don't think it's the

14  case that anyone has said that every one of my net winners are

15  within two percent of what their net equity should be or even

16  necessarily have two percent of the right accounts.  And I

17  think that's my concern, is that we don't know what we don't

18  know about how this will be used and how that will really

19  impact people end of the day.  Are we going to be actually

20  bring a potential lawsuit against people and for how much

21  money?

22         THE COURT:  Okay.  Any follow-up based on my

23  questions?  No?

24         MR. LYNE:  No, none, Your Honor.

25         THE COURT:  Okay, thank you.

1            MR. RONA:  No, Your Honor.

2            THE COURT:  Okay.  Thank you, Mr. Dennis.

3            THE WITNESS:  Thank you.

4            THE COURT:  So, Attorney Lyne, did you want to recall

5    Dr. Freer, I'm not inviting that, or do we just want to argue?

6            MR. LYNE:  I'm happy to argue.

7            THE COURT:  Okay.  So Attorney Rona, it's your motion

8    to exclude, so I'll hear you first.

9            MR. RONA:  Thank you, Your Honor.  I don't know if

10   the Court wants to take a --

11           THE COURT:  Do you want to take --

12           MR. RONA:  -- just a five-minute break.

13           THE COURT:  Yeah.  Let's take ten minutes.  Thank

14   you.

15                (Off the record at 11:33 a.m.)

16                (On the record at 12:01 p.m.)

17           THE CLERK:  Please be seated.

18           THE COURT:  Okay, Attorney Rona.

19           MR. RONA:  Thank you,  Your Honor.

20           Your Honor, I have a PowerPoint that I'm going to

21   have hopefully guide my remarks.  If I could have Mr.

22   Reynolds -- oh, thank you.

23           Your Honor, I want to begin with the trustee's burden

24   here.  This is their burden under Daubert to establish a

25   number of things.  And I've mentioned them before.

1        One is that the opinions have to be based on

2   sufficient facts or data, and so we're obviously going to

3   cover that.  But that is an important part of Daubert.  No

4   expert can save data that's unusable or that's so corrupted

5   that there's no fix.

6        Second thing is that the opinion has to reflect a

7   reliable application of the principles and methods to the

8   facts of the case.  So an expert methodology could be the best

9   methodology, could be the gold standard methodology, but it

10  has to be properly applied to the facts of the case.  And so

11  discussions about what's in the peer-reviewed literature take

12  us only so far because the peer-reviewed literature doesn't

13  deal with TelexFree.  There is no TelexFree in the

14  peer-reviewed literature.

15       What you have is census data, voter data.  Dr. Freer

16  has extensive expertise in his years with remine, dealing with

17  real estate data.  All of this is data that is fundamentally

18  different in nature than TelexFree data.  And so the question

19  is did Dr. Freer -- do his opinions -- even if we accepted his

20  methodology is the highest order, does it reflect a reliable

21  application in this case?

22       And then the final question, there's different ways

23  to phrase it, but at the end of the day, is it going to help

24  Your Honor?  And really embedded in that are a couple of

25  distinct notions.  One of them is, is it answering a relevant

1   question?  If Dr. Freer did a meteorological analysis that was

2   gold-plated, I'd say great, but we're not here to talk about

3   that.  So it has to help Your Honor.  It has to be material.

4   It has to give Your Honor confidence that we're answering

5   questions correctly.

6           And I would say that in this case, there's a very

7   different focus than in other cases, because at the end of

8   this tunnel are liability determinations that the trustee is

9   going to ask Your Honor to make for 80,000 people that this

10  data is sufficient.  And I think this is appropriate to be in

11  a Bankruptcy Court because Bankruptcy Courts have to answer

12  questions like this all the time, whether it's a foreclosure.

13  Do we allow robo-signing?  Do we allow foreclosures where the

14  documentation is ninety-eight percent accurate?  And there are

15  very real concerns about not using the gatekeeping function

16  here if any of those prior to questions are not answered

17  correctly or if overall there's a lack of fit.

18          So I'm going to start with the Christen factors.  And

19  it's important to point out that Dr. Freer did not include

20  accuracy as one of the factors he assessed.  He didn't --

21  he'll say, I didn't do it directly; I did it indirectly.

22  Well, it's -- according to Christen, with consistency, they're

23  arguably the two most important data quality dimensions,

24  accuracy.  And if you don't have any real world data, you

25  can't assess accuracy.  It seems so basic.  But at the end of

1  the day, whether Mickey Mouse is the same person or ten

2  different people entering that data, the question is how can

3  we know who those people were?  You need to have that.

4       And so I will suggest that the reason Dr. Freer, who

5  has a Ph.D., didn't put accuracy in his report is not because

6  he's not capable of reading, not because he doesn't have a

7  copy of Christen's book, not because he doesn't intuitively

8  understand what I just said, but because he knew he would be

9  stymied if he said I got to consider accuracy.  He would be

10 painted into a corner that he can't get out of.

11      The same problem attaches to consistency.  Dr. Freer

12 says he does consider consistency.  But he doesn't do anything

13 other than to say I looked at the data, it looks pretty

14 consistent.  And I'm going to get to some examples.

15      Consistency is actually the more challenging one to

16 understand because everybody understands it.  If I use a fake

17 name, that's a fake name.  But what gets confusing is if

18 sometimes I use a real name, sometimes I use a fake name,

19 sometimes my colleague uses the same fake name, and sometimes

20 my colleague uses my name, that consistency, or rather lack

21 thereof, is not simply the gross lack of consistency, but it's

22 the fact that even when I'm being inconsistent, I'm being

23 inconsistent.  And when you don't have accuracy, there's no

24 way for those two things to come together and tell you with

25 any confidence that this data is usable.  And Dr. Freer did

63

1  not assess consistency other than to sort of wave it off with

2  his hand.

3       Now, the other factor that is in Dr. Freer's report,

4  and he does discuss it, is believability.  And the reason --

5  and I think we heard it today.  Even though Your Honor has

6  made it clear we're not dealing with net equity, even Mr. Lyne

7  couldn't help but ask questions about net winners, about the

8  80,000, because you need to know who we're talking about, the

9  subset.  And that subset is impossible to determine without

10  knowing that equity.  And what Mr. Dennis discovered looking

11  at this data first with Mr. Martin's report and now Dr.

12  Freer's report, is if you look at net equity, you see

13  anomalies.  You see a large net winner and then you see

14  similar data for a large net loser.  If you put them together,

15  it could be a small net winner, it could be a small net loser,

16  it could cancel out.  And that has to do with believability.

17       Dr. Freer's data suggests that there are people who

18  lost millions of dollars.  That's just not believable.  Dr.

19  Freer's analysis also suggests that people made lots of money.

20  And ultimately, at the end of the day, that's a question of

21  believability.  Do we believe this data?  And so you have to

22  look at net equity.  And that's the reason Mr. Dennis did.

23  And I believe that's the reason why Mr. Lyne asked questions

24  about net winners, even though the Trustee is saying we're not

25  here to talk about net winners.

64

1          So looking at the data quality problems, I mentioned

2   that there's -- that Dr. Freer skipped over inaccuracy.  And

3   he doesn't meaningfully address inconsistency.

4          The question about validating -- Mr. Lyne keeps

5   talking about a golden set.  This isn't really a question

6   about is there a golden set.  There is not a golden set, so no

7   one's going to be able to make a golden set miraculously

8   appear.  However, there are Easter eggs of golden data, okay?

9   Maybe not the golden set, but there are little sets here and

10  there that one could use.

11         Epoch is 100,000-plus user count data -- or

12  submissions based on 100,000 people involving accounts that

13  are both net winning and losing accounts.  So there's a lot of

14  information there.  People validated email addresses.  People

15  validated their street addresses.  People validated or

16  invalidated names.  So there's information that could have

17  been used there.  Same thing if you go down the line with bank

18  data.  These are all things that Dr. Freer not only didn't

19  look at, but he didn't even ask for them.

20         So the question is not what Mr. Dennis thinks about

21  that data.  The question is why didn't Dr. Freer look for

22  external sources of validated data in order to help us out.

23         And we saw the video, Your Honor, where somebody is

24  telling the TelexFree world how to set up an account.  And we

25  see that the account allows for auto completion, for example.

65

1   And the person says put in your name or whatever name.  So

2   there was a data entry free-for-all.  And even one check from

3   one account that Dr. Freer has clustered could give you a

4   clue.  If Benjamin Argueta wrote a check that said Benjamin,

5   whatever his middle initial is, Argueta, that would be

6   information.  And I think Mr. Lyne covered extensively, and I

7   don't disagree with him, that there's a number -- and it's not

8   a big number; it's a surprisingly low number -- of samples

9   that you would need to look at to have a statistically

10   significant sample that you could do to give yourself a

11   confidence level.  And that was not done here.

12         And yes, Mr. Dennis didn't do it.  But Mr. Dennis

13   says I would have to -- I would have to do that on an

14   affirmative basis.  He would have had to have switched places

15   with Dr. Freer and done the entire analysis to start giving

16   you confidence intervals.  He'd be telling you who are the net

17   winners and the net losers.  That was never Mr. Dennis's

18   engagement.  His engagement was to offer a rebuttal report of

19   Dr. Freer's.  And so the trustee has been fairly consistent

20   trying to shift the burden onto us, onto Mr. Dennis, to try to

21   disprove something that we contend Dr. Freer did not

22   sufficiently prove.

23         Email Bounce-back reports -- I'm going to get into

24   some examples.  But when you send large salvos of email,

25   you'll get inevitably information that some of these emails

1  are not correct.  And Dr. Freer did not even consult with

2  those.  And emails will turn out to be important in this case.

3       So as I said before, the question is not was there a

4  golden set.  There obviously wasn't.  And it's not whether the

5  peer-reviewed literature requires a golden set or not.  The

6  question is, in this case, where we have such low confidence

7  in the data, did we need some dose of reality, some dose of

8  reality?  And the answer is yes.  And that didn't happen.

9       So at the end of the day, Dr. Freer never solved the

10  garbage in, garbage out problem.  His position is, well, if I

11  aggregate the accounts to Mickey Mouse, I've done my job.  So

12  we have a mickey Mouse cluster.  But what we'll get to is that

13  that's not what happened.  And I'll try to get into the

14  reasons.  But the main reason is because the data as of such

15  poor quality that it was inaccurate and it was consistently

16  inconsistent but inconsistent about how inconsistent it was.

17  And so you can't use this data.  You can't look at email

18  addresses, street addresses, names with any confidence.

19       Now, what Dr. Freer did not talk about is in typical

20  data linkages, you do look for and often find a canonical

21  piece of data.  You do find dates of birth.  You do find

22  Social Security numbers.  Here that was mostly blank.  And I

23  think that's important to understand.  It's not like the

24  birthdays were in there but we can't use them or they were

25  made up Social Security numbers.  It was just actually blank.

1    So there was nothing to really pivot this data on to give you

2    any greater sense that we've advance the football when all you

3    have is the same inherent problems with this data that you

4    started.

5         So let's turn to an example.  Dr. Freer said that the

6    order of strings matters.  Obviously.  So when you're linking

7    names -- I'm going to get to why names are important.  But

8    when you're doing record linkages based on names, the order of

9    the string matters, but also the mathematical computation.

10   And so what Mr. Dennis found is that the first row that we're

11   seeing, which, again, it could be a lowercase L or it could be

12   a 1, so 1-1 or LL or who knows, that there were 40,000

13   accounts with a total net loss of two million dollars.  And

14   what's important is not what Dr. Freer would say.  Dr. Freer

15   would say, well, whoever LL is or 1-1, that's fine if we just

16   either cluster them together or they're separate because

17   that's probably not a real person.

18        The problem is that some human entered that data and

19   there's two million dollars of net losses that are not

20   available to be linked to another account if Dr. Freer's

21   method doesn't pick them up.  And I will suggest that his

22   method doesn't pick them up.  And so this problem -- and this

23   is just one example.  And there are almost limitless numbers

24   of examples.

25        I mean, I think at the end of the day, Mr. Lyne's

main criticism in Mr. Dennis is he didn't go through all

twelve million accounts visually and try to see which ones go

together and which ones don't.  So there's many ways to try to

slice the data.  And this is one example.  Mr. Dennis looked

at things that are under four characters that seem to be not

names, although if Your Honor looks, there's JO, J-O.  That

might be a name.  That might be the beginning of a name.  That

might be a typo.  Or it might be something else.  We just

don't know.

And again, there was no effort by Dr. Freer to try to

figure out the nature of these problems to give you any

confidence that, well, maybe Jo is a person in this case, but

maybe AB is someone's initials or maybe I can tell you for a

fact it's not some of the initials.  We have simply no idea.

And the focus on individual error rates, meaning

error rates based on accounts, doesn't help you where net

equity is going to be involved at the backend.  Because even,

as Mr. Dennis said, one missed account could potentially swing

that equity in any direction.

Similarly, any clustering of people that don't belong

together can swing that equity but also can help -- can lose

actual participants.  And this is something I want to focus on

because I don't think Dr. Freer adequately addressed this

issue.  He said, and I'm going to jump ahead with respect to

Kenya Benjamin -- this was in the Benjamin Argueta -- if you

69

1   could go ahead to -- yeah, let's go to the next one.

2          So I don't have Kenya Benjamin on this one, but these

3   are other names that got mixed in with Benjamin Argueta's

4   aggregation.  And I asked Dr. Freer, what about Kenya

5   Benjamin, what are we going to make of that person, that name?

6   And he said, well, I assume that the trustee won't contact

7   that person.  So that assumption would apply to Benjamin

8   Morales, Benjamin Oleja, that I suppose they're not going to

9   be contacted either.

10          So to the extent that either of them -- any of them

11   are net winners here, there's a suggestion that they are --

12   well, we don't know.  Dr. Freer aggregated it to Benjamin

13   Argueta.  Mr. Martin said they were small net losers.  But the

14   point is we just don't know.  So we're not going to contact

15   actual people that are deemed visually to be insignificant to

16   a cluster.  So Rita Laures (phonetic) is not going to be

17   contacted because she's visually insignificant.

18          And so what Dr. Freer has done is use an elaborate

19   methodology to then leave us in need of resorting to the same

20   visual test, the eyeball test that Mr. Martin did that Judge

21   Hoffman found inadequate.

22          So if you go back to the -- where I was.

23          And, Your Honor, just a moment.

24          So why do we focus on name so much?  Because Dr.

25   Freer said that various points that the name is just one of

70

1    many factors, one of many datapoints.  But he admitted in his

2    testimony that the name has an important role to play in

3    blocking and indeed is crucial, is crucial for the method to

4    work.  And so because blocking is done based on the name -- so

5    in the case of what we're looking at on the screen, cluster

6    23118541, these are accounts where sometimes the name is just

7    a letter A, sometimes B, all the way down the alphabet.  And

8    the city is -- I'm not going to -- I'm not sure there's a

9    white right way to pronounce it, Yukarena (phonetic).  I tried

10   to find that on Google, couldn't find it.

11         So we might have obviously fake names, maybe a fake

12   city, maybe there's a street there, I don't know.  But for

13   mathematical reasons, Dr. Freer says this all belongs

14   together.  But when other names are sufficiently different,

15   like Alice Adams or Bob Baker, they will be -- those are to be

16   separately clustered.

17         So now you have a problem where the math is making a

18   decision, and it's not clear that that decision is correct in

19   a case like this.  It's not clear that A, B and C and D belong

20   together, but Alice Adams and Bob Baker don't belong together.

21   What is the mathematical basis for saying that those might --

22   those are definitely the same person?  We don't know.  And we

23   have no other information to help us because none of the other

24   information can be validated or in fact has been validated.

25   And again, this is -- this is a sum net loss account, which

71

1  means that to the extent that these accounts go with any

2  one -- anyone else's account, they're inflating net winnings.

3         So name is important for the blocking step.  And to

4  the extent that blocking gets tripped up over arbitrary

5  differences in names, which is the case here, then it's going

6  to separate.  It's going to separate accounts.  And I think

7  there was some equivocation by Dr. Freer on this point, but

8  it's very clear that the point of blocking is to not make --

9  not allow for every single pairwise combination.  So at some

10 point there are sets that are not going to be compared.  And

11 so that's the issue, is if the -- if you use blocking where

12 the names are essentially a free-for-all, you're going to get

13 unexpected results.

14         Looking now at Team Legendary, Dr. Freer said I don't

15 care -- at the end of the day, I don't care whether there is

16 a -- it's really Barack Obama or there is really a Mickey

17 Mouse; I'm content to just cluster things together.  But if

18 that's the case, then why do the Team Legendary accounts not

19 all clustered together?  Why are there different clusters for

20 Team Legendary?  And why does the email address not seem to

21 carry those things together?  And do we know anything about

22 BillyBob.Arbone@gmail.com (phonetic)?  Do we know anything?

23 Is that a person?  Is that somebody who could -- be who could

24 account for these different user accounts?  And the answer is

25 we just don't know.

72

1        And to go through and find these is a painstaking

2   process.  So again, the criticism of Mr. Dennis is he didn't

3   attempt to do a statistically significant-- or a sample based

4   on statistical significance of the errors.  But how would one

5   even go about this?  How would -- how would Mr. Dennis know

6   where to stop with -- is it just that Walt Disney?  Is it

7   Majestic Tia?  Is it anyone who uses

8   BillyBob.Arbonne@gmail.com?  at gmail.com?  Is it anyone who

9   puts down 123 Main Street?  Is there a 123 Main Street?  The

10  questions are limitless.  And so the trustee cannot evade his

11  burden of figuring this out, if he's going to retain an expert

12  to this.

13       Now let me talk about the other phenomenon, which is

14  over-clustering.  So over-clustering is easier to see when you

15  look at it.  Right?  Under clustering requires a lot of work

16  to dig it out.  But Mr. Dennis found very present examples of

17  over-clustering.  And the problem, as I said, is how do we

18  know which is the person that we're going to go after, and how

19  do we know what to do with the other people?  So there's going

20  to have to be some reckoning.

21       And I think -- I've looked for cases where an expert

22  is allowed to proceed with uncorrected errors.  And I couldn't

23  find one.  I'm not saying they aren't there, but I couldn't

24  find one.  I can't think of a case where an expert who

25  calculates the wrong GDP growth rate and when confronted with

73

1  using the wrong GDP growth rate, doesn't immediately correct

2  it and then proceed.  And Dr. Freer has had two bites at the

3  apple.  He had a report and he had a reply report.  And he

4  didn't -- he's aware of over-aggregation.  He wants us to rest

5  assured that he believes that it's one or two percent of the

6  time.  But we don't actually know that.  The only reason why

7  we can tell that this is over-aggregation is because in our

8  common experience, I can suppose that Elaine Carrero is not

9  the same person as Alex Lopez.

10        But there's a fundamental problem about things like

11  name prevalence, name usage.  There's cultural factors.

12  There's the use of middle initials.  There's the use -- the

13  common feature of certain nationalities of having two last

14  names that you either use together or sometimes you use one.

15  It becomes almost a hopeless exercise to try to say I can

16  identify just these and none other than these accounts of

17  over-aggregation because you'd have to still go through and

18  look at the others and try to make sure that you feel pretty

19  good about that.  And that's the visual inspection that I

20  think then becomes subjective.  So simply taking an objective

21  seeming methodology and deferring to a later day the

22  subjectivity does not comport with the requirements of

23  Daubert.

24        With respect to Maria Teresa Neves, and I'm not sure

25  if her account is on the slide, but there was a -- I believe a

1  Rita or a Maria Laures that ended up in that account.  That

2  was an account that -- or cluster that Dr. Freer selected.  He

3  included it in his report.

4       And when asked what are we going to do about Ms.

5  Laures, he said, well, it's either the same person or it's an

6  error.  And what I found fascinating about that is he doesn't

7  tell you which it is because he doesn't know.  So it's either

8  the same person or it's an error.  That's not the hallmark of

9  science to say I just -- I actually don't know.  That's simply

10  introducing tautology, That's saying everything is either

11  correct or it's an error.

12       So his error rate, which is a probability, it's a

13  calculation, is an estimation generated by the system, doesn't

14  actually tell you the true error rate.  And the true error

15  rate would require some form of real world data.  Not to say

16  that you have a complete answer key.  The answer key could be

17  a limited answer key.  It could be 400 accounts' worth of

18  answer.  It could be something, anything to help give you some

19  sense, some number of confidence, around the associations that

20  you're making.  And as this table by Mr. Dennis shows, we

21  can't have any confidence.  We can't have -- there's such a

22  difference in the names that are over-clustered that we can't

23  have confidence.  This is not what data linkage is meant to be

24  used for to say, well, I don't care if we enter judgments for

25  Juan Pablo or Eric Gutierrez; it's the same person to me.

75

1        Now, if we go to Benjamin Argueta quickly, this is

2    the issue about consistency that I wanted to come back to.  So

3    Benjamin Argueta, who has numerous user accounts according to

4    Dr. Freer, appears to use two different email addresses

5    principally.  One is Benjamin_gaochau@yahoo.com (phonetic) and

6    the other is TelexFreeBen@yahoo.com.  And if Your Honor looks,

7    in the first three accounts, which are the first three in the

8    cluster, the rep log-in is Mayaz Sol (phonetic) and Mayaz Sol

9    1, Mayaz Sol 2.

10       Well, there are other accounts which have the

11   TelexFreeBen@gmail.com email address that have the rep name

12   Mayaz (phonetic) and then a series of digits that follow.  And

13   it's unclear what happened here other than that doesn't appear

14   to be anyone's name.  But that could be just a data entry

15   issue.  That could be Benjamin Argueta mistyping user accounts

16   because those match the login.  So maybe he put in the place

17   of name the login.  But Dr. Freer would say that that that

18   email address, if it appears in Benjamin -- the rest of his

19   cluster is important because he looked at it.

20       But here we're ignoring the email address and saying

21   that's a separate person.  And in fact, those are all separate

22   clusters.  Those did not cluster together.  So it's not even

23   recognizing that this thing seems to be a species unto itself.

24   It's saying those are all one-offs, and we ignore them.  And

25   what we end up doing, because those are all negative accounts,

1    is we end up overstating Benjamin Argueta's net equity.

2            If you could go to the -- on the bottom row, there's

3    a BE entry that Dr. Freer did not aggregate to Benjamin

4    Argueta.  And I'm not going to fault him for that one.  I

5    would say that's hard to do.  But this proves the limit of

6    what Mr. Dennis was saying.  Mr. Dennis was saying

7    probabilistic record linkages are pretty good for when the

8    small details are wrong, when there are minor typographical

9    errors.  BE is not a minor typographical error.  For whatever

10   reason, it's almost none of the name.  And one can see that

11   Dr. Freer's methodology was not capable of aggregating BE to

12   Benjamin Argueta.

13           But on the flip side, we have the problem of

14   over-aggregation.  So Benjamin Argueta has both.  It has

15   over-aggregation.  It has under-aggregation.  And that

16   makes -- so to answer Mr. Lyne's question are there

17   aggregations that we can't use?  I would suggest Benjamin

18   Argueta's aggregation we can't use because we can't know is

19   this one person, is this a lot of people, are there missing

20   accounts.  There appear to be problems in both directions.

21   And so this affects the reliability and suggests that this is

22   not a reliable application in the facts of TelexFree.

23   Benjamin Argueta is not a random defendant.  He's the first

24   listed defendant in the complaint.  The case is named after

25   him.  And we can't even be sure that we've identified his and

1  only his accounts.

2         If we could go to one more example, Amilcar Lopez

3  (phonetic).  This one suggests that the problem of

4  under-aggregation could be profound because Amilcar Lopez, if

5  you assume that that's his email address, has also entered

6  names of Al Lopez, Alo, or A-L, all of those -- and Al Lope.

7  All of those could be Amilcar Lopez.  And I would agree that

8  it's speculative to say it is Amilcar Lopez.  It might be

9  speculative to say it's not.  But the bottom line is Dr.

10  Freer's method missed that.

11         And again, if that were the extent of the problem,

12  one could say, well, maybe we can address it.  But within the

13  Amilcar Lopez aggregation, there's also Yvonne Lopez and Miri

14  Lopez.  And so that introduces the problem, again, same thing

15  with Benjamin Argueta.  The problems go in both directions.

16  It's both under-aggregation and over-aggregation.  It suggests

17  that we don't actually know what is the real data and what

18  isn't the real data.

19         So in the end, the questions that I posed, did Dr.

20  Freer base his methodology on sufficient facts or data, I

21  think the answer to that is no.  And I don't think there's any

22  dispute that the data in this case was messy.  I think there's

23  no good answer for why there wasn't any effort to look at and

24  assess and quantify the magnitude of the unreliability of the

25  data.

1        Second question is, did Dr. Freer's opinion reflect a

2    reliable application of the methodology that he used to the

3    facts of this case?  And I think the answer is no.  Dr. Freer

4    may have done an excellent probabilistic record linkage,

5    probably would have met or exceeded any of the standards used

6    in, for example, the commercial industry, whether it's remine,

7    people using U.S. census data, voter data, but it wasn't in

8    this case.  And in this case there was a need to find real

9    world footing to try to make comparisons that tell us whether

10    we're being led in the right direction or the wrong direction.

11    And that didn't happen.

12        And at the end of the day, those problems and the new

13    problem that Dr. Freer is not even attempting to identify net

14    winners and he's not even attempting to calculate their net

15    equity means that there's no fit here.  There's no

16    materiality.  The goal, the explicit goal of the trustee is to

17    ask Your Honor to enter judgments against actual human beings

18    that they estimate are 80,000 in number for real dollars that

19    could go as high as the millions.  And the error rate that Dr.

20    Freer estimates is unsupervised, meaning there's no

21    supervision.  There's no, like, actual assessment to tell us

22    whether it's too high or too low.  It's an unknown error rate.

23        And it's very rare, if at all possible, to satisfy

24    the strictures of Daubert where your error rate is unknown or

25    the error rate is unknown.  You can estimate the error rate.

But to estimate it, to rely on an error rate requires an

answer key of any kind so that we know if one percent is

wrong, is it too low?  Is two percent wrong?  Is it too low?

We don't know.  And the burden to answer that question is

always been on the trustee, and the trustee has not met that

burden.  Thank you.

THE COURT:  Thank you.

MR. LYNE:  Can you switch over to our side?  Thank

you.

Your Honor, I was going to start with a description

and discussion of Dr. Freer's qualifications, and I don't

think it's necessary to be honest.  His CV and his experience

speak for themselves.

I really want to skip to what the heart of the

defendants' collective defense is, and it is to attack the

foundation on which Dr. Freer's methodology is based.  And

that is the data quality issue.

And I want to start by going back to what it is that

Mr. Dennis testified to in his 2020 testimony.  And he

specifically said, don't use a deterministic model, use a

probabilistic model because it's capable of addressing data

quality issues.  Now, today he says, oh, no, no, I have a

probabilistic model, but you can't use it because the data

quality is too poor.  He never said in any way, size, shape,

or form that this dataset is entirely unusable for any purpose

80

in his 2020 testimony.  Instead, he said, you didn't use the

right model, you use a deterministic model, Mr. Huron, it

should have been a probabilistic model.

And then today, we keep hearing that Dr. Freer didn't

attend to or consider data quality.  And the answer is he very

much did so.

So if we go back up to where we were.

And this is a slide 10 of the of the presentation

that Dr. Freer gave.  And he -- that was the very first thing

he did.  He wanted to know is the data of sufficient quality,

which means which fields are relevant, what is the quality of

each field, and do the fields in the aggregate provide enough

information for him to do the things that he has to do?  And

for each field, he looked very specifically at what

information was contained in the field, how often those field

values were either present or absent, how consistent those

field values were across records, and how credible or

plausible the actual field values were based on a statistical

sample.

And so when you go to the next slide, there is a

matrix in which he identified very carefully what the results

of his analysis were.  And it was not an analysis that was

limited to a statistical sample, although I'll get to that

point.  In every single one of the accounts, he looked across

forty fields.  And he made a determination as to how many of

these fields are high quality, how many of these are

intermediate quality, and how many of these are of

insufficient quality.

And if you look at the rep nom, which is the name, it

was empty only 0.0002 percent of the time.  And ninety-seven

percent passed a character check.  And ninety-five percent of

the values appeared to be an actual name.  And he did that not

just with name, but he did it with every single one of the

other values that he ultimately determined to be of high

quality.

And in each and every instance, Dr. Freer determined

that they were populated, that the information contained in it

is consistent with what one would expect in the field value,

and then he went at the end of that exercise and said is my

analysis visually -- since I'm now using Mr. Rona's term, does

it pass a visual test?

And if you go to the next slide, he started looking.

He took 400 sampled values which is a number which was based

on -- the correct statistical number, 387, would have been

sufficient, but he used 400 for all chosen data fields.  And

he did his visual inspection.  And he determined from that

visual inspection that while not perfect -- because his error

rate ultimately confirmed that, while not perfect, the values

that were contained in the data fields from the 400 randomly

sampled values was consistently believable, subject to a few

82

1  here and there.

2         And if you go to the next field.  Excuse me.  Next

3  slide.

4         Dr. Freer's Exhibits 2.3 and 2.4 allow you to look at

5  these and to make a determination whether the name field

6  appears to contain actual names and whether the email field

7  contains actual email information.  And in each and every

8  instance, with some very small exceptions, consistent with a

9  two percent error rate, they all check out.

10        So the suggestion that Dr. Freer somehow ignored the

11 issue of data quality is entirely incorrect.  And the

12 suggestion that he didn't go through a smell test is also

13 entirely incorrect.  Dr. Freer was very, very specific and

14 very, very precise during his direct testimony as to what he

15 did to validate the data and determined that that data was

16 sufficient for the purpose which he intended, which was to

17 develop and implement a data linkage methodology that would be

18 both of a peer-reviewed type and then run that through.  He

19 then went through his entire process very carefully as to what

20 he did.

21        He started -- and if you could go to the flowchart.

22 Yeah.  Stop.  Go back one.

23        He started by preparing the data.  He prepared the

24 data in a way that is entirely consistent with how data

25 scientists clean data.  And he used fuzzy matching tools

1   against all of that data.  And if the Court wishes to look at

2   the actual specific steps, I encourage you to look at pages 38

3   through 40 of his report.

4           He then identified the specific cleaning rules that

5   he was going to use to clean the data in a way that prepared

6   it for analysis.  That is on pages 44 through 47 of his

7   report.

8           He then went through a deterministic matching process

9   where he looked at any entries that matched exactly across

10  eight data fields, exactly.  And that deterministic matching

11  reduced the number of accounts from nine million to four

12  million, rough numbers.  But that five million or so accounts

13  that were matched in a deterministic fashion matched exactly

14  across eight data fields.  That's not poor quality data.

15          Then with respect to the blocking rules, which

16  counsel has been suggesting somehow created a mismatch, the

17  blocking rules, which are set forth in pages 50 through 55 of

18  his report, are first of all used regularly by data

19  scientists.  The whole concept of blocking is that in large

20  datasets, there is a inability to do a pairwise comparison

21  across, in this particular instance if you were to calculate

22  it out, almost eleven trillion pairwise matches -- or four

23  million, I'm sorry.  I think it was four billion, excuse me,

24  pairwise matches.

25          And name was used appropriately at that step to do

84

the initial blocking phase.  But to suggest that name had

primacy is absolutely incorrect because in the following step,

the Fellegi-Sunter with Expectation Maximization, name was

just one of a number of fields that were weighted.  Each and

every field received weighting based on an internal

calculation.

And this is an unsupervised learning process, the

expectation maximization process, which counsel now suggests

is somehow should be subject to criticism because really it's

only math.  But that is a validated, peer-reviewed process

which has been used across multiple datasets, including the

census datasets.  And I haven't heard anyone provide any

explanation as to how a census dataset is any cleaner than the

Telex data set, why it doesn't have multiple addresses for

people, why it doesn't have multiple telephone numbers, why

father and son living in the same house don't exist as

individuals.  And yet the FSEM process has been used to

determine and has been validated to determine accurately

exactly how that data shakes down.  And that is the entire --

that entire dataset and the use of unsupervised learning on an

iterative process to distill down pairwise combinations to a

probabilistic set that matches the necessary calculations and

the necessary thresholds, that has been validated separately

in multiple peer-reviewed studies, including most recently,

the 2019 Innamorato study.

1          So to suggest that all of this is somehow just math

2     is to ignore what data science is.  Data science is that data

3     science does rely upon rules.  Data science does take complex

4     datasets, and it does engage in linkage algorithms that

5     provide reliable data.  And they use it based on cleaning,

6     blocking, FSEM.  And that data has been deemed to be reliable.

7          The other I'll call it sort of generalized criticism

8     that we hear is that there might have been -- and this is a

9     recurring theme in the defendant's defense.  There might have

10    been instances or I have found instances where there has been

11    over-clustering and especially under-clustering.  And they say

12    clustering is the is the difficult piece.

13         But I want to remind the Court that clustering here

14    was done specifically to address both over-clustering and

15    under-clustering.  It is a dynamic process in which there were

16    a 149 separate fixed thresholds used to set match

17    probabilities for each of the pairwise combinations, starting

18    with 0.006 likelihood all the way up through 99.999 percent,

19    and up to one, which would be 100 percent.

20         And Dr. Freer was very specific with respect to how

21    he addressed the over clustering and under clustering process.

22    He went through and he adjusted his algorithm and determined

23    that the optimal resolution, the optimal balancing of

24    over-clustering and under-clustering, is 0.6.  And that gave

25    him an optimal output, again, using, among other things, a

1  visual cue.

2         And so Dr. Freer has addressed this issue.  And the

3  dynamic clustering doesn't just address over-clustering.  It

4  specifically addresses under-clustering.

5         And so at the end of the day, he looked, again, at

6  the output and he did an error rate analysis.  And the error

7  rate analysis is not something which is just science or, as

8  counsel suggested, is not a real number or not capable of

9  validation because you don't have a golden set.  The whole

10  purpose of the ESEM (sic) process is to do away with the

11  concept of the necessity of a golden set by going through an

12  iterative, unsupervised learning process that has been proven

13  to be accurate.  And the error rate of .98 is an

14  extraordinarily high and precise number, because if you look

15  at Exhibit 8, the Ferrante and Boyd --

16         If you could just pull up Ferrante and Boyd for a

17  moment.

18         Ferrante and Boyd go through and they test a whole

19  series of packages, linkage packages.  And they determine that

20  on the basis of all of those tests, the F measure, which is

21  the F1 measure, which is the statistical harmonic mean of the

22  over-cluster and under-cluster results, that .9 is considered

23  very good.  And what we have here is .98 approaching one.

24  That is not to say that Dr. Freer's output is one hundred

25  percent accurate, nor can any methodology be one hundred

87

1  percent accurate, but it is staggeringly good according to the

2  literature.  It is better by a margin of -- by a full standard

3  deviation than those that are even considered very good.  So

4  this would be exceptional.

5          That is not to say, however, that you can't find

6  issues and problems.  and that is exactly what Mr. Dennis has

7  done.  He's not a statistician.  He's done no statistical

8  analysis, although he had statisticians on staff who could

9  have done this.  He is not a data scientist, although he had a

10  data scientist who could actually have made meaningful

11  critiques with respect to Dr. Freer's methodology but have

12  done none.

13          But to pull out a series of ad hoc examples that then

14  are intended to pollute the entire dataset is both

15  statistically irrelevant because it has nothing to do with

16  statistical sampling, and it is the exact definition of

17  statistical bias.  And so what he has done is simply found

18  within the dataset those pieces of the data which Dr. Freer

19  himself predicts would be an error in his .98 error rate and

20  has thrown them up on the stage to say, aha, the entire

21  dataset must somehow be wrong.

22          But that's not how science works.  And the notion

23  that somehow one can pick up projected data rates, find them,

24  throw them up on the screen, and then say I have the right to

25  in some ad hoc way suggest that in an inductive slip of -- say

88

1   that again -- an inductive just guess that somehow the rest of

2   the data is similarly incorrect when there is nothing in his

3   analysis that suggests that and Dr. Freer's analysis says

4   exactly the opposite.  We have eleven million accounts here.

5   There is going to be something somewhere which is incorrect.

6          And I want to get to this issue of what is correct or

7   why something is incorrect.  There are two different ways

8   there can be errors in this data.  One is simply negligence, I

9   mistyped it or I did something else.

10          But the other really is just get these is really --

11   let me just get these -- is really an attempt on the part of a

12   Ponzi scheme user to hide their identity.  And the courts have

13   dealt with this issue in all kinds of instances.  In our brief

14   in the opposition to the motion for summary judgment on page

15   23 and 24, we provide you with a number of cases that stand

16   for the proposition that the -- if the error rates are due to

17   the defendants' actions or inactions, then it is unfair to say

18   to the plaintiff, You haven't proven your case with sufficient

19   precision.  The Court doesn't have that rule for very obvious

20   reasons.

21          And so for example, in Bigelow v. RKO Radio Pictures,

22   a Supreme Court case, 1946, the most elementary conceptions of

23   justice in public policy require that the wrongdoer shall bear

24   the risk of uncertainty to which his own wrong has created.

25          And the First Circuit has signed on to specifically

1  this very same statement in Home Placement Service v.

2  Providence Journal.  The trier of fact can calculate damages

3  based upon reasonable inferences drawn from the evidence and

4  the defendant whose wrongful conduct caused or contributed to

5  uncertainty of damages sustained cannot protest that such

6  measure of damages is too imprecise.

7       And the District Court in Massachusetts has signed on

8  to this.  In Solodyn Minocycline Hydrochloride Antitrust

9  Litigation, uncertainties regarding damages should be resolved

10  against the wrongdoer and not those who are injured.

11       And there's another case which we had incited which I

12  found recently, which is the Seventh Circuit case.  And it's

13  actually a very, very good summary of the issue that's

14  presented exactly here.  And that is Kawasaki Kisen,

15  K-I-S-E-N, Kaisha, K-A-I-S-H-A, Ltd. V. Plano Molding Company,

16  782 F.3d 353, Seventh Circuit 2015.  And that court --

17       THE COURT:  Attorney Lyne, can you just say the cite

18  one more time?

19       MR. LYNE:  I can.  782 F.3d 353, Seventh Circuit

20  2015.

21       THE COURT:  Thank you.

22       MR. LYNE:  And I'd direct the Court to pages 362

23  through 364, because it starts with a recitation of the rule

24  of equity that we have right here.  And it reads, "Appellant's

25  argument is based on John Henry Wigmore's rule that 'the

1  burden of proving a fact is said to be put on the party who

2  presumably has the particular means of knowledge enabling him

3  to prove its falsity if it is false,'" citing to Wigmore.

4          The Supreme Court then cites in Campbell v. United

5  States.  "The ordinary rule based on considerations of

6  fairness does not place the burden upon a litigant of

7  establishing facts, particularly within the knowledge of his

8  adversary.  Wigmore's rule is not mandatory; rather, it is a

9  policy consideration to be applied in certain cases as a rule

10  of fairness."

11          And this -- and then he cites -- this case cites to a

12  number of other cases, trade secret cases, product liability

13  cases.  You can see all of those cases.

14          But I want to -- I want to apply what we -- what the

15  what the rule is to this particular case.  And the rule really

16  is perfectly suited to what we have here.  Participants in a

17  Ponzi/pyramid scheme created their own accounts which the

18  defendant class now claims are subject to criticism because

19  the information that they put into their own accounts is

20  somehow incorrect or misleading.  And under those

21  circumstances, a rule fairness says and should say that the

22  burden falls upon the person who created this problem in the

23  first instance.

24          And that is precisely what we have here.  It may have

25  been negligence or -- and we saw examples that that counsel

1  put up on the screen where it looked like people were actively

2  trying to hide their identities.  And to suggest a rule

3  that -- and this is really what counsel is suggesting, a rule

4  that places the entire burden on the trustee to do away with

5  every single uncertainty in this dataset before the dataset

6  can be deemed to be in any way usable, regardless of the

7  qualifications of the data scientist doing the data linkage,

8  that rule would allow Ponzi and pyramid scheme participants to

9  have their day every single time because the only thing that

10  the participants would need to do is to put false information

11  or misleading information into their account and then say, You

12  can never prove my net equity because I was smart enough to do

13  it in a way that prevents you from having one hundred percent

14  certainty.  And that is unfair.  That is grossly unfair.

15         And this leads to the exact argument that counsel has

16  been making, whether you call it a golden set or you call it

17  something else.  At one point in time -- let me just see if I

18  can find his language.  He said, well -- yes.  Well, I'm

19  not --  Mr. Dennis may not be sure if the epoch data would

20  change anything.  Mr. Dennis is not sure whether or not a

21  bounce to email would do anything to change the linkage.  But

22  he said these are Easter eggs of golden data.

23         But nobody has attempted to actually demonstrate that

24  these Easter eggs are of any value because Mr. Dennis didn't

25  do any analysis to determine whether or not that ancillary

1   data would have changed anything anyway.  And the real answer

2   to the problem is science requires rigor.  And it would be

3   entirely inappropriate for Dr. Freer to start sticking his

4   finger onto the scales based on -- I'm not even sure what --

5   telephone calls of an uncertain number to an uncertain number

6   of participants to ask them what or looking at bank account

7   data for an uncertain number of participants that may or may

8   not suggest anything.

9         It is a whole series of possibilities heaped upon

10  possibilities, but it never arrives at a more likely so than

11  not.  Dr. Freer has a more likely so than not standard that he

12  has absolutely satisfied.  He has gone through a rigorous

13  process of looking at the quality of data.  He has gone

14  through the process of cleaning that data.  He has clustered

15  that data.  He has applied the FESM (sic) algorithm to it.

16  And he has gone through a dynamic clustering process that

17  addresses both over-clustering and under-clustering.  And he

18  has found the error rate to be .98.  So it would be two

19  percent.

20        That is science.  Whether you call it just

21  mathematics or not, it is rigor.  And that is also the result

22  at the end of the day of a prima facie case.  You can't defend

23  against a prima facie case by saying, well, my guy put in a

24  bunch of misleading data and therefore you really can't

25  demonstrate to a one hundred percent certainty that the

1   clusters had been made exactly correctly and perfectly in each

2   and every instance.  First of all, science won't allow that.

3   It's never going to happen.  But it also runs afoul of the

4   rule of law that I have been talking about.

5          So I just want to end by saying Mr. Dennis has done

6   nothing but talk about possibilities:  It may be, it's

7   possible that, it could be.  None of that is a -- is legally

8   sufficient in any way, size, shape, or form.  And all of the

9   instances in which he has found something and said, aha, Your

10  Honor, look at this, all of that is expected under the Freer

11  model.  You can find problems if you want to find them.  But

12  you can't make any set-wise inferences based on individual ad

13  hoc results that that get thrown up against the wall.  That's

14  not how the law addresses these issues, and it's not how

15  science addresses these issues.  And it certainly is not a

16  statistically valid way of doing anything because it's built

17  ultimately on nothing but statistical bias.

18         So Mr. Dennis had statisticians on his team.  He had

19  data scientists on his team.  He had every right to go in and

20  start looking at this in some way that was even vaguely

21  scientific, and he did not.  So  don't know what else the

22  trustee can do.  The Trustee has provided the Court with

23  clusters which identify the owners of those clusters by

24  anybody's admission, if you look at them.  And he has done so

25  in an instance which has scientific rigor, which has a

94

1   validated error rate.  And to the extent that there is even a

2   two percent error, that I suggest is the result of the

3   defendants', participants' actions and has nothing to do with

4   the validity of the methodology used by the trustee himself.

5           So I'll just conclude by saying the trustee has met

6   his burden.  This is a validated dataset in ways that are

7   very, very specific and demonstrated in his report and in his

8   presentation.  It is a dataset that's been applied to peer

9   reviewed methodological processes in ways that are really

10  unimpeachable.  And it arrives at an error rate which it more

11  than satisfies Rule 207, Rule 202 -- let me try that again.

12  Rule 702's more-likely-so-than-not standard.

13          So I think we have to look at this in terms of what

14  the trustee's burden is and what the defendants have done to

15  frustrate that process and balance those two in ways that puts

16  the burden now back onto the defendants rightfully to address

17  the issues that they themselves have created by their data

18  quality entries.

19          So with that, unless the Court has any questions, I'm

20  finished.

21          THE COURT:  Thank you, Attorney Lyne.  I don't have

22  any questions right now.

23          We're going to come back at 2 o'clock.

24                  (Off the record at 1:04 p.m.)

25                  (On the record at 2:03 p.m.)

95

1          THE COURT:  Okay.  Attorney Rona, did you want to be

2   heard any further in rebuttal?  I saw you feverishly taking

3   notes, so I didn't know if you wanted to say something.

4          MR. RONA:  Oh, I -- maybe I do that as a matter of

5   habit, Your Honor.  I was not intending to say anything in

6   rebuttal.

7          THE COURT:  That's fine.

8          MR. RONA:  For the clarity of the record, I guess I

9   would make sure that I've offered all referenced exhibits.

10  And that's the only thing I wanted to add, Your Honor.

11         THE COURT:  Okay.  So this hearing was all about the

12  motion to exclude Dr. Freer's testimony.  And I'm going to

13  deny the motion.  He did meet the standard necessary for me to

14  use his testimony.  And I will give a more fulsome explanation

15  in writing at a later time.  But his testimony is not

16  excluded.  It's included.

17         And I asked -- Mr. Reynolds, can you bring up the

18  scheduling order on our evidence presenter?  Maybe not.  It's

19  on the bottom of the screen, isn't it, Mr. Reynolds?

20         THE CLERK:  Oh, sorry.  I didn't see that.

21         THE COURT:  Can't figure it out?  Okay.

22         Well, what I asked him to bring up was the scheduling

23  order that you all had filed and I agreed to way back in March

24  of 2022, because one of the things that happened here was --

25  what appeared to me was that the defendants were anticipating

96

1  Dr. Freer testifying about everything included in phase 1,

2  which included identifying net winners, as I understood it, in

3  a way that at least put the trustee's case in a prima facie --

4  put on the trustee's prima facie case.  But that's not what

5  Dr. Freer did.  In his step 10, he took information from

6  somewhere else and brought it here.

7          So as I mentioned to the parties, there needs to be

8  more evidence brought to me by the trustee as to how they came

9  up with that 81,000 dollars of net winners.  And if the

10  defense -- and the defense feels that that's an expert

11  witness.  The plaintiff trustee doesn't think it's an expert

12  witness.  All I really know is if the defense feels that they

13  want to propound discovery that they didn't have the

14  opportunity to do before.  And we'll have an evidentiary

15  hearing in the future, sooner if you don't need discovery,

16  later if you do need discovery.  So that's sort of where I'm

17  at right now.

18          Still no luck, Mr. Reynolds?  Because I like the

19  language of it.  Let me see if I -- I have it.  Okay.

20          And I had said this I think on the first day of our

21  hearings.

22          MR. LYNE:  Your Honor, we could try to pull it up.

23          THE COURT:  Oh, thank you.

24          THE CLERK:  It looks like it's docket entry number

25  687 which is a supplemental order respecting the motion by

1   Chapter 11 Trustee for entry of an order dated January 26th.

2          THE COURT:  No, not that one.

3          THE CLERK:  No?

4          THE COURT:  Not that one.  No.

5          MR. RONA:  Your Honor, we have it on our laptop.  So

6   maybe we could share it.

7          THE COURT:  Okay.

8          MR. RONA:  So I just want to make sure it's --

9          THE COURT:  Scroll down to where it says phase 1 in

10  sort of an inset type.

11         MR. RONA:  And to be clear, this is the stipulation

12  that was entered in January.

13         THE COURT:  No, that's not what I was thinking of

14  either.

15         MR. RONA:  Okay.

16         THE COURT:  Hold on one second.

17         THE CLERK:  Phase 1, Judge?

18         THE COURT:  Right.  It talks about what the parties

19  agreed phase 1 was going to be.  We'll get there.

20         So what I started to say, and I'll just finish my

21  thought, this phase 1 does not lend itself to motions for

22  summary judgment.  So the motions for summary judgment are

23  denied without prejudice.

24         The fact that both parties filed motions to strike

25  affidavits just highlights how this is not appropriate for

98

1   summary judgment argument, because there are issues, genuine

2   issues of material fact just on the basis of those motions to

3   strike, if nothing else.

4        The trustee also filed the motion for summary

5   judgment well past the deadline, the self-imposed deadline.

6   So for that reason alone, the trustee's motion for summary

7   judgment should have been denied.  But I'm also denying that

8   defendants' because I need to take evidence and I need to have

9   an evidentiary record.

10        Mr. Reynolds, it's the one -- it was the one March of

11   2022.  That's February 2023.  So it's a different document

12   than that.

13        THE CLERK:  I have March 24, '22.

14        THE COURT:  Yeah, probably that's the one.  Oh, it's

15   just a matter of dragging it.  Okay.  Go ahead and scroll

16   down.  Let's see if that's the one I'm thinking of.  I think

17   it probably is.  Yes.  Okay.  So scroll down just a little

18   bit.  Okay.

19        So the parties had agreed to this, what we're looking

20   at right now.  And essentially phase 1, then double II says

21   the reasonableness of the assumptions made by Barellian

22   (phonetic) in computing the amount of net winnings, including

23   but not limited to the inclusion or exclusion of transfers of

24   credits between participants and the computation of net

25   winnings and the assumptions made with respect to the

1  treatment of triangular transactions in the computation of net

2  winnings.

3        So Dr. Freer didn't do any of that.  So that's why I

4  need to take evidence.  And I need whoever -- I don't know if

5  it's Mr. Darr or the other person who's been referenced --

6        MR. LYNE:  Sorrondo.

7        THE COURT:  Yeah.  So whoever it is needs to take the

8  stand and testify as to what they did, how they did it.  And

9  then I can make a decision as to whether the trustee has

10 sustained its burden that they have a prima facie case.

11       And then just the other reflection that I have right

12 now is on behalf of the defendants, the arguments that you

13 made today continue to -- you can raise those arguments, are

14 still live arguments to be made as to -- and the trustee is

15 going to need to explain to me how are you identifying these

16 people and what is the process going to be if I find there's

17 prima facie evidence that they are defendants, what is the

18 process that they -- how are you contacting them, how are they

19 going to be able to say, no, no, no, no, no, I'm actually a

20 net loser because I was -- all these other user accounts

21 should be ascribed to me.  So I need to know all of that nitty

22 gritty, practical, how are we getting to where we need to get,

23 can we get to where we need to get.  So some of the arguments

24 I heard today can and should be repeated after the next

25 evidentiary hearing.

1           So having heard my -- how this case needs to go, do

2    you need discovery?

3           MR. RONA:  I would say yes, Your Honor.  But if I

4    could just back up and offer -- maybe pose two questions.  I

5    wish I had the answers to these questions.

6           But one is based on -- I think Your Honor accurately

7    conveyed our impression of what was happening.  We think an

8    expert is needed to do all of phase 1.  So to the extent that

9    there was no timely disclosure of anyone other than Dr. Freer,

10   we say that that sort of ends the inquiry.

11          I understand Your Honor wants an evidentiary hearing,

12   but my question would be what import would such a hearing have

13   if it's not going to yield additional expert testimony that

14   was needed.  Our position is that is subject matter for an

15   expert.  Dr. Freer chose to pull up short and not cross the

16   finish line.  And so we think that that an evidentiary

17   hearing, while it may be interesting, wouldn't meet the

18   trustee's burden and wouldn't fall within what we had agreed

19   to.

20          The second question is more practical, which is,

21   again, using the finish line metaphor, we, with trustee's

22   counsel throughout this case have been negotiating, as Your

23   Honor is aware, budgets, funding.  This is a reverse class

24   action.  It's very unusual.  There's sort of an economic

25   reality that cannot be ignored.  And both sides have worked

1   together to address that problem by having this arrangement.

2   And the arrangement was contemplated that we would essentially

3   finish with today, and that would be the end of it.  And we've

4   allocated our budgets accordingly to the best of our abilities

5   and what would -- if we do additional discovery and have an

6   evidentiary hearing, the concern I have is that was work that

7   was never contemplated.  So it wasn't part of the budget.  So

8   there's a there's a practical problem there.

9        That could be solved by us having some time to talk

10   to trustee's counsel, because we have worked through problems

11   like this in the past.  We can do it again, but it just hasn't

12   happened.  And we weren't sure we would need to be in this

13   position but understand Your Honor's rulings now sort of

14   require that conversation.

15        So I would say we would want discovery, but first

16   we'd have to talk to trustee's counsel, see what they'd be

17   willing to agree to, what we could work out consensually.

18   That might answer the question conclusively one way or the

19   other.  And then we could report back to the Court with some

20   form of a joint filing, as we've done in the past.

21        THE COURT:  Sure.

22        MR. RONA:  But I think that would have to happen

23   first.

24        THE COURT:  Okay.

25        MR. LIZOTTE:  Well, Your Honor, first off, we think

1    that this whole exercise of the motion for summary judgment

2    was unnecessary for the reasons the Court has already raised.

3    I don't think that the defendants can engage in a great bit of

4    activity in the case that is unnecessary and then expect the

5    estate to be compensating for it.

6          We had the same issue with the expert reports.  We've

7    taken the position that no expert reports are needed.  This is

8    information that has been provided to them seven years ago.

9    This is information that was summarized for them in a memo

10   four years ago that their expert relied upon in the report

11   that he filed in 2020.  So they're complaining about

12   inadequate funding at the same time that they're asking for

13   additional burdens that we think are wholly unnecessary.  We

14   think the Daubert motion was wholly unnecessary.  If they had

15   asked us, we would have suggested let's go straight to an

16   evidentiary hearing, put the three witnesses on at the same

17   time, and we could dispense with much of this.

18         So obviously we'll take whatever proposals are made

19   back to the trustee.  But it's our view that no experts are

20   required.  If they want to conduct one deposition of Mr.

21   Sorrondo and Mr. Darr, I cannot imagine with all the data

22   that's already in the hands for years what else they would

23   need.  We'd be ready to just get the evidentiary hearing

24   passed on the next ruling, address Your Honor's concerns about

25   the portal and how the defendants would have an opportunity to

1   rebut the prima facie case, Your Honor.

2         THE COURT:  Okay.  So to your point, Attorney Rona,

3   that you believe that the information in this phase 1, sub 2

4   requires an expert, just object at the evidentiary hearing.

5   The Trustee says they don't believe it requires an expert.

6   And you either -- I'm the trier of fact.  Either I agree with

7   you or I don't agree with you.  But if they're telling me that

8   a lay witness can show me what the winnings are, so be it.

9   So -- or a lay witness with some -- probably some level of

10  knowledge.  But so with regards to that argument, I think I

11  can hear the evidence.

12        With regards to the arrangements about financing,

13  I've never been privy to it before.  So if you need to bring

14  something to me, bring something to me.

15        What I think I should do is go ahead and set a status

16  conference and see where the parties are.  I just don't know

17  how much time I should.  I mean, I can already permit

18  discovery today and the parties can get going on that if they

19  need to.

20        So do the parties want to just have a telephonic

21  hearing and in a couple of weeks just to see where we're at?

22        MR. LIZOTTE:  No objection, Your Honor.

23        THE COURT:  So Attorney Rona?

24        MR. RONA:  I think that makes sense, Your Honor.

25        THE COURT:  Okay.  So let's do it on a Thursday when

1    I'm here, but it can be by phone, Mr. Reynolds.

2         THE CLERK:  Okay.  I'm going to Suggest November 16,

3    November 1-6, at 1:15 by telephone.

4         MR. RONA:  That's fine for us, Your Honor.

5         MR. LIZOTTE:  Fine, Your Honor.

6         THE COURT:  Okay.  So the phone number will be on the

7    docket.  And the orders will enter on the pleadings that I

8    have in front of me, which included a motion to strike, which

9    is going to be denied.

10        I don't think there's any loose ends, but anything

11   else the parties -- any questions for me?

12        MR. LIZOTTE:  I don't believe so.

13        MR. DURAN:  So, Your Honor, are you ruling on your

14   motion with regard to -- that dealt with the issue of lay

15   witnesses being used as expert witnesses?  Are you ruling on

16   that motion right now or are you going to reserve that motion

17   until the hearing -- which you told us, I guess, argue it

18   there.  But we had a motion with regard to that issue

19   particularly with Mr. Sorrondo and Mr. Darr.  I suppose it was

20   our motion to strike.

21        THE COURT:  Right.  So I'm not hearing a summary

22   judgment motion anymore.  So those are moot, aren't they?

23        MR. DURAN:  The motion to strike?

24        THE COURT:  Yeah, Because you weren't moving to

25   strike the affidavits?  Am I not remembering that correctly?

1        MR. RONA:  Well, Your Honor, it was brought in the

2   context of a hearing on Daubert and we thought also that a

3   summary judgment hearing.  So to the extent that that

4   determination is part of phase 1, which I think it is, then

5   our motion was to strike Sorrondo -- Mr. Sorrondo and Mr. Darr

6   from filling in the missing gap left over after Dr. Freer.  So

7   we would say our motion applies.  It was not just to the

8   affidavits.  It was to any testimony by those witnesses as

9   part of phase 1 proceedings.

10        THE COURT:  Right.  I'm looking at one of them right

11   now.  Motion to strike the affidavits of Jean-Louis Sorrondo

12   and Stephen Darr pursuant to 37(c)(1) And preclude their

13   testimony or alternatively to reschedule the Daubert hearing

14   and amend he deadlines.

15        Hold on one second.

16        Right.  So I'm going to deny without prejudice,

17   because it's procedurally not -- it was connected to the

18   summary judgment motion.  So it's denied without prejudice.

19   And reargue it at the time when we have our evidentiary

20   hearing.

21        MR. RONA:  Okay.  Thank you, Your Honor.

22        THE COURT:  Okay.  Thank you.

23   (End at 2:24 PM)

24                    * * * * * * * * * *

25

106

1          I certify that the foregoing is a true and accurate

2   transcript from the digitally sound recorded record of the

3   proceedings.

4

5

6

7   /s/ Michael Drake                        November 6, 2023

8   _____
    AAERT Certified Electronic Transcriber       Date
    (CER-513, CET-513)

9   ESCRIBERS LLC

                              eScribers
10              7227 N. 16th Street, Suite #207
                       Phoenix, AZ 85020
11                       973-406-2250
                  e-mail operations@escribers.net
12

13

14

15

16

17

18

19

20

21

22

23

24

25

## A

**a- (1)**
6:6
**AB (1)**
68:13
**abilities (1)**
101:4
**able (4)**
21:2,4;64:7;99:19
**above (1)**
30:24
**absent (2)**
50:2;80:16
**absolute (1)**
40:22
**Absolutely (9)**
23:16;34:15;35:20;
39:1;45:1;46:7,20;
84:2;92:12
**acceptable (3)**
34:19;57:19;58:8
**accepted (1)**
60:19
**access (5)**
7:6,15;9:8,10,17
**accomplished (1)**
47:11
**according (3)**
61:22;75:3;87:1
**accordingly (1)**
101:4
**account (32)**
6:18,19;11:23;
25:21,23;26:14;27:5,
9,17;28:24;32:19;
35:10;39:4;46:15;
55:3,22;56:5,14,19;
64:24,25;65:3;67:20;
68:18;70:25;71:2,24;
73:25;74:1,2;91:11;
92:6
**accounting (1)**
46:14
**accounts (59)**
26:13;27:18;29:14;
30:3,15;31:15,24;
32:6,16,19,22,23;
37:5,17;38:19,21;
41:1,8;43:9;49:7,20;
51:25;52:3;53:1,2;
55:1,11,13,15,24;
57:5;58:5,16;64:12,
13;66:11;67:13;68:2,
16;70:6;71:1,6,18,24;
73:16;75:3,7,10,15,
25;76:20;77:1;80:24;
83:11,12;88:4;90:17,
19;99:20
**accounts' (1)**
74:17
**accuracy (18)**

12:5;13:24;15:8;
17:16;26:23;40:5,20;
44:24;47:6;48:19,21;
50:3;61:20,24,25;
62:5,9,23
**accurate (14)**
8:20;14:2;23:4;
29:4;32:15;35:17;
38:13;40:13;42:13;
58:1;61:14;86:13,25;
87:1
**accurately (3)**
30:5;84:18;100:6
**achieving (1)**
47:16,23;48:8
**across (20)**
31:4,11;41:7;49:18;
50:20,21;55:7,22,25;
56:5,11,17,23,23;
80:17,24;83:9,14,21;
84:11
**action (1)**
100:24
**actions (2)**
88:17;94:3
**actively (1)**
91:1
**activity (1)**
102:4
**actor (2)**
32:17;41:3
**actual (10)**
20:6;68:22;69:15;
78:17,21;80:18;81:7;
82:6,7;83:2
**actually (21)**
18:7;10;19:3,11;
21:15;22:9;26:24;
48:17;50:6;56:7;
58:19;62:15;66:25;
73:6;74:9,14;77:17;
87:10;89:13;91:23;
99:19
**ad (6)**
8:22;22:2,10;87:13,
25;93:12
**Adams (2)**
70:15,20
**add (1)**
95:10
**addition (1)**
31:2
**additional (6)**
41:20;47:22;57:11;
100:13;101:5;102:13
**address (21)**
5:20;10:7;15:5,10;
31:11;41:11;46:2;
48:15;52:4;64:3;
71:20;75:11,18,20;
77:5,12;85:14;86:3;
94:16;101:1;102:24
**addressed (3)**

68:23;85:21;86:2
**addresses (20)**
32:2;41:5,6,12;
50:15,20,25;51:1,13;
52:1;64:14,15;66:18,
18;75:4;84:14;86:4;
92:17;93:14,15
**addressing (1)**
79:21
**adequately (1)**
68:23
**adjusted (2)**
44:5;85:22
**admission (1)**
93:24
**admit (1)**
20:12
**admitted (1)**
70:1
**advance (1)**
67:2
**advantage (1)**
10:21
**adversary (1)**
90:8
**affects (1)**
76:21
**affidavits (4)**
97:25;104:25;
105:8,11
**affirmative (8)**
7:12;10:9,14;35:19;
56:12;57:1,8;65:14
**afoul (1)**
93:3
**again (53)**
5:25;8:7;9:4;10:2,8,
13;12:22;13:21;
14:13,23;15:3,17;
16:5;17:23;21:24;
23:6;24:20;26:7,22;
27:25;32:5,18,22;
33:6;34:20,23;35:4;
38:14;40:9,22;42:15;
44:4,7,9;48:17;49:5;
52:21,25;54:25;57:7;
58:12;67:11;68:10;
70:25;72:2;77:11,14;
85:25;86:5;88:1;
94:11;100:21;101:11
**against (12)**
17:8,15;42:23;43:8;
44:2;49:14;58:20;
78:17;83:1;89:10;
92:23;93:13
**aggregate (3)**
66:11;76:3;80:12
**aggregated (2)**
38:21;69:12
**aggregating (1)**
76:11
**aggregation (11)**
22:25;27:19;28:25;

34:9;37:1,4;52:17;
56:15;69:4;76:18;
77:13
**aggregations (2)**
34:12;76:17
**agnostic (1)**
39:10
**ago (4)**
6:1;12:3;102:8,10
**agree (11)**
22:5,7;24:2;39:20;
45:9;49:10;52:1;77:7;
101:17;103:6,7
**agreed (4)**
95:23;97:19;98:19;
100:18
**aha (2)**
87:20;93:9
**ahead (7)**
5:3;18:20;37:15;
68:24;69:1;98:15;
103:15
**AI (2)**
77:6,6
**A-L (1)**
77:6
**Alecci (1)**
4:3
**Alex (1)**
73:9
**Alexandra (1)**
4:13
**algorithm (2)**
85:22;92:15
**algorithms (1)**
85:4
**Alice (2)**
70:15,20
**alleged (5)**
38:12,25;39:4,7,21
**allocated (1)**
101:4
**allow (7)**
5:19;61:13,13;71:9;
82:4;91:8;93:2
**allowed (3)**
20:1;57:24;72:22
**allows (3)**
6:14;10:17;64:25
**almost (4)**
67:23;73:15;76:10;
83:22
**Alo (1)**
77:6
**alone (1)**
98:6
**along (1)**
10:2
**alphabet (1)**
70:7
**alternative (1)**
11:20
**alternatively (1)**

105:13
**although (5)**
11:11;68:6;80:23;
87:8,9
**always (2)**
48:2;79:5
**amend (1)**
105:14
**Amilcar (5)**
77:2,4,7,8,13
**among (2)**
25:13;85:25
**amount (4)**
28:22,23,24;98:22
**analysis (37)**
8:25;9:25;10:14;
21:20,25;22:23,24;
27:21;31:7;35:19;
37:24;40:14;46:2,16;
54:6;55:23;56:1,7,11,
12,17,23;57:1,8;61:1;
63:19;65:15;80:22,
22;81:15;83:6;86:6,7;
87:8;88:3,3;91:25
**ancillary (1)**
91:25
**Andrew (1)**
4:11
**anomalies (1)**
63:13
**answered (1)**
61:16
**anticipating (1)**
95:25
**Antitrust (1)**
89:8
**anymore (1)**
104:22
**apologize (1)**
29:18
**appear (3)**
64:8;75:13;76:20
**appeared (6)**
10:13;23:3,4;50:21;
81:7;95:25
**appears (4)**
11:12;75:4,18;82:6
**Appellant's (1)**
89:24
**apple (1)**
73:3
**application (4)**
60:7,21;76:22;78:2
**applied (5)**
48:22;60:10;90:9;
92:15;94:8
**applies (1)**
105:7
**apply (6)**
14:17;23:20;43:7;
44:1;69:7;90:14
**appreciate (2)**
12:24;58:2

**approach (11)**
5:22,24;10:11,12,
16;11:23;13:21;
21:14,15;23:6;44:7
**approaching (1)**
86:23
**appropriate (14)**
10:6,12,13,16;21:5;
22:17;32:14,14,16;
33:17;48:18;55:6;
61:10;97:25
**appropriately (4)**
15:10;48:18,22;
83:25
**approximate (1)**
47:13
**approximately (1)**
7:23
**arbitrary (1)**
71:4
**area (1)**
23:5
**areas (1)**
24:6
**Arguably (2)**
47:4;61:23
**argue (3)**
59:5,6;104:17
**Argueta (13)**
4:2;65:4,5;68:25;
69:13;75:1,3,15;76:4,
12,14,23;77:15
**Argueta's (3)**
69:3;76:1,18
**argument (4)**
89:25;91:15;98:1;
103:10
**arguments (4)**
99:12,13,14,23
**around (3)**
13:9;30:22;74:19
**arrangement (2)**
101:1,2
**arrangements (1)**
103:12
**arrives (2)**
92:10;94:10
**article (2)**
42:8,9
**ascribed (1)**
99:21
**assess (3)**
61:25;63:1;77:24
**assessed (1)**
61:20
**assessing (1)**
39:12
**assessment (1)**
78:21
**assignment (1)**
9:22
**associated (1)**
21:9

**associations (1)**
74:19
**assume (2)**
69:6;77:5
**assumed (1)**
40:13
**assumes (1)**
54:18
**assumption (2)**
36:22;69:7
**assumptions (4)**
13:11;14:3;18:12;
40:15;98:21,25
**assured (1)**
73:5
**attached (1)**
17:3
**attaches (1)**
62:11
**attack (1)**
79:15
**attempt (3)**
48:5;72:3;88:11
**attempted (1)**
91:23
**attempting (2)**
78:13,14
**attend (1)**
80:5
**attending (1)**
5:10
**attention (2)**
11:14;24:14
**Attorney (17)**
4:8,22;18:20;33:20;
36:12;43:18;46:22;
53:10;54:11;59:4,7,
18;89:17;94:21;95:1;
103:2,23
**auto (1)**
64:25
**availability (1)**
50:1
**available (5)**
19:25;26:22;27:5,8;
67:20
**aware (5)**
42:11,17,18;73:4;
100:23
**away (4)**
54:10,11;86:10;
91:4

**B**

**back (25)**
5:9;10:16;12:10;
14:9,23;15:11;30:5;
32:5;38:14;45:24;
46:6;48:24;50:11;
57:10;69:22;75:2;
79:18;80:7;82:22;
94:16,23;95:23;

100:4;101:19;102:19
**backend (1)**
68:17
**Baker (2)**
70:15,20
**balance (1)**
94:15
**balancing (1)**
85:23
**bank (6)**
27:5,8,16;28:24;
64:17;92:6
**Bankruptcy (3)**
8:19;61:11,11
**Barack (2)**
38:7;71:16
**Barellian (1)**
98:21
**base (2)**
77:20
**based (20)**
24:24;40:5;58:22;
60:1;64:12;67:8;
68:16;70:4;72:3;
79:16;80:18;81:18;
84:5;85:5;89:3,25;
90:5;92:4;93:12;
100:6
**basic (2)**
41:13;61:25
**basis (13)**
10:9;11:8;15:17;
16:5,5,16;23:1;28:10;
49:10;65:14;70:21;
86:20;98:2
**bear (1)**
88:23
**becomes (2)**
73:15,20
**begin (1)**
59:23
**beginning (2)**
4:8;68:7
**behalf (3)**
4:16,19;99:12
**beings (1)**
78:17
**believability (6)**
39:12;47:4;50:1;
63:4,16,21
**believable (2)**
63:18;81:25
**believes (1)**
73:5
**belong (3)**
68:20;70:19,20
**belongs (1)**
70:13
**ben (1)**
23:6
**benefit (1)**
32:17
**Benjamin (21)**

65:4,4;68:25,25;
69:2,3,5,7,8,12;75:1,
3,15,18;76:1,3,12,14,
17,23;77:15
Benjamin_gaochau@yahoocom (1)
75:5
**best (3)**
17:10;60:8;101:4
**better (3)**
5:22,23;87:2
**beyond (2)**
16:1;39:14
**bias (5)**
23:17;24:22;25:5;
87:17;93:17
**big (4)**
27:23;55:6;56:14;
65:8
**Bigelow (1)**
88:21
**billion (1)**
83:23
BillyBobArbone@gmailcom (1)
71:22
BillyBobArbone@gmailcom (1)
72:8
**birth (1)**
66:21
**birthdays (1)**
66:24
**bit (3)**
12:12;98:18;102:3
**bites (1)**
73:2
**blank (2)**
66:22,25
**blocking (11)**
70:3,4;71:3,4,8,11;
83:15,17,19;84:1;
85:6
**Bloggers (1)**
51:3
**blow (1)**
12:12
**board (6)**
55:22,25;56:5,11,
18,23
**Bob (2)**
70:15,20
**book (3)**
16:7;46:18;62:7
**both (14)**
4:16,19;14:15;
64:13;76:14,20;
77:15,16;82:18;
85:14;87:14;92:17;
97:24;100:25
**bottom (3)**
76:2;77:9;95:19
**bounce (1)**
91:21
**Bounce-back (1)**
65:23

**boundaries (1)**
49:18
**bounded (3)**
9:1,4,6
**Boyd (3)**
86:15,16,18
**break (1)**
59:12
**brief (2)**
53:11;88:13
**briefly (1)**
55:18
**bring (5)**
58:20;95:17,22;
103:13,14
**brought (4)**
24:14;96:6,8;105:1
**budget (1)**
101:7
**budgets (2)**
100:23;101:4
**build (2)**
11:22;19:11
**builds (1)**
18:13
**built (2)**
50:8;93:16
**bunch (1)**
92:24
**burden (15)**
59:23,24;65:20;
72:11;79:4,6;90:1,6,
22;91:4;94:6,14,16;
99:10;100:18
**burdens (1)**
102:13

**C**

**calculate (5)**
21:4;23:5;78:14;
83:21;89:2
**calculated (1)**
21:8
**calculates (1)**
72:25
**calculation (3)**
39:23;74:13;84:6
**calculations (1)**
84:22
**call (7)**
52:2,10,19;85:7;
91:16,16;92:20
**called (1)**
10:23
**Calls (2)**
54:8;92:5
**came (1)**
96:8
**Campbell (1)**
90:4
**can (85)**
6:15,16;10:18;

11:19,19,20;12:11,16,
24;18:19;22:14,19;
23:24;24:6,7,8;27:15;
30:22;32:4,4,4;33:22;
36:2,14;38:8,9;39:5;
40:9,25;42:20,24;
43:20,22;46:4,9,15;
47:15;48:4,7;49:11,
12;50:17;51:9;53:19;
54:12;55:3,5;60:4;
62:2;68:13,21,21,21;
70:24;73:7,8,15;
76:10;77:12;78:25;
79:8;86:25;87:23;
88:8;89:2,17,19;
90:13;91:6,12,18;
93:11,22;95:17;99:9,
13,23,24;101:11;
102:3;103:8,11,17,18;
104:1

**cancel (1)**
63:16
**canonical (1)**
66:20
**capable (4)**
62:6;76:11;79:21;
86:8
**care (3)**
71:15,15;74:24
**carefully (8)**
8:2,5,7,9,11;25:6;
80:21;82:19
**Carrero (1)**
73:8
**carry (1)**
71:21
**Case (44)**
4:2,3;12:25;14:17,
18;27:15;34:13;40:1;
53:15,16;56:8;58:14;
60:8,10,21;61:6;66:2,
6;68:12;70:5,19;71:5,
18;72:24;76:24;
77:22;78:3,8,8;88:18,
22;89:11,12;90:11,
15;92:22,23;96:3,4;
99:10;100:1,22;
102:4;103:1
**cases (10)**
4:16,19;61:7;72:21;
88:15;90:9,12,12,13,
13
**cause (1)**
53:18
**caused (1)**
89:4
**cell (2)**
51:20,22
**census (9)**
17:18,23,24;42:10,
11;60:15;78:7;84:12,
13
**certain (3)**

41:5;73:13;90:9
**certainly (30)**
5:16;8:1,3,24;9:10,
23;10:13,21;11:3,22;
12:23;14:2;15:4;
16:20;17:4;21:3,10,
20;23:6,16;29:24;
35:25;39:24;42:6;
45:6;46:3;50:17;51:2;
56:16;93:15
**certainty (3)**
40:23;91:14;92:25
**challenging (1)**
62:15
**change (2)**
91:20,21
**changed (3)**
27:18;28:25;92:1
**Chapter (1)**
97:1
**character (1)**
81:6
**characteristics (1)**
22:20
**characterize (1)**
12:15
**characters (1)**
68:5
**Charles (1)**
20:23
**check (7)**
42:23;44:2,17;65:2,
4;81:6;82:9
**chose (2)**
9:21;100:15
**chosen (2)**
19:11;81:20
**Christen (20)**
12:23;14:15,23;
15:4,5,12,18,20,21;
16:6,7,13;42:6;46:17,
23,24;47:20;50:2;
61:18,22
**Christen's (1)**
62:7
**Circuit (4)**
88:25;89:12,16,19
**circumstances (2)**
12:22;90:21
**cite (1)**
89:17
**cited (5)**
5:21,25;11:13;
16:19;17:4
**cites (3)**
90:4,11,11
**citing (2)**
5:21;90:3
**city (2)**
70:8,12
**claims (1)**
90:18
**clarified (1)**

36:22
**clarity (1)**
95:8
**class (5)**
4:16,19;58:13;
90:18;100:23
**classification (1)**
47:8
**clean (2)**
82:25;83:5
**cleaner (1)**
84:13
**cleaning (3)**
83:4;85:5;92:14
**clear (9)**
8:10;9:5;27:23;
35:11;63:6;70:18,19;
71:8;97:11
**clearly (3)**
29:24;34:14;37:18
**CLERK (11)**
4:2,8,23;5:1;59:17;
95:20;96:24;97:3,17;
98:13;104:2
**close (1)**
58:1
**clue (1)**
65:4
**cluster (49)**
21:16;22:23,24;
29:9,10,22;30:3,11,
15;31:2,8,16;32:12,
20,21,25;33:1,4,5;
34:1,2,4,7,9;35:7,8;
37:4;39:4,7;40:25;
53:1,3,7;55:11,15,24;
56:10,19,20;57:6;
66:12;67:16;69:16;
70:5;71:17;74:2;75:8,
19,22
**clustered (5)**
53:1;65:3;70:16;
71:19;92:14
**clustering (11)**
21:18;33:2;41:16;
68:20;72:15;85:12,
13,21,21;86:3;92:16
**clusters (32)**
23:2,2,3;24:11;
34:10,12,14,18;35:15,
21;36:6,20,20,23,24;
38:11,13,24;41:7,12;
50:21,21,25;51:7;
54:7,15,23;71:19;
75:22;93:1,23,23
**Code (5)**
18:10,11,12;19:3,
14
**colleague (2)**
62:19,20
**collective (1)**
79:15
**combination (2)**

6:19;71:9
**combinations (2)**
84:21;85:17
**combined (1)**
37:5
**coming (2)**
14:20;41:12
**commercial (1)**
78:6
**common (3)**
41:2;73:8,13
**community (1)**
58:9
**Company (1)**
89:15
**compare (2)**
6:9;49:13
**compared (3)**
17:8,15;71:10
**comparison (2)**
47:13;83:20
**comparisons (2)**
47:7;78:9
**compensating (1)**
102:5
**complaining (1)**
102:11
**complaint (1)**
76:24
**complete (1)**
74:16
**completion (1)**
64:25
**complex (2)**
26:18;85:3
**comport (1)**
73:22
**computation (3)**
67:9;98:24;99:1
**computing (1)**
98:22
**concept (5)**
11:12;23:19;37:22;
83:19;86:11
**conceptions (1)**
88:22
**concepts (1)**
20:12
**concern (5)**
53:15;54:25;55:10;
58:17;101:6
**concerned (3)**
54:5,13,22
**concerns (3)**
45:8;61:15;102:24
**conclude (2)**
41:1;94:5
**concludes (1)**
54:6
**conclusion (2)**
14:20;30:4
**conclusively (1)**
101:18

**conduct (2)**
89:4;102:20
**conference (1)**
103:16
**confidence (10)**
61:4;62:25;65:11,
16;66:6,18;68:12;
74:19,21,23
**confident (1)**
19:20
**confirm (3)**
12:5;20:10;29:4
**confirmed (1)**
81:23
**confirming (1)**
26:8
**confronted (1)**
72:25
**confusing (1)**
62:17
**connected (1)**
105:17
**consensually (1)**
101:17
**consider (9)**
25:7;29:3;44:9;
48:18;53:14;58:4;
62:9,12;80:5
**consideration (1)**
90:9
**considerations (1)**
90:5
**considered (7)**
6:2;10:3;11:3;
28:15;45:18;86:22;
87:3
**consistency (16)**
13:24;15:9;31:4,11;
37:22;47:6;48:19;
50:4;61:22;62:11,12,
15,20,21;63:1;75:2
**consistent (8)**
40:13;45:13;62:14;
65:19;80:16;81:13;
82:8,24
**consistently (3)**
11:9;66:15;81:25
**consult (1)**
66:1
**contact (3)**
32:1;69:6,14
**contacted (2)**
69:9,17
**contacting (1)**
99:18
**contain (1)**
82:6
**contained (4)**
8:23;80:15;81:12,
24
**contains (2)**
17:24;82:7
**contemplated (2)**

101:2,7
**contend (1)**
65:21
**content (1)**
71:17
**context (5)**
8:3;14:14;17:18;
57:20;105:2
**continuation (1)**
4:4
**continue (1)**
99:13
**contributed (1)**
89:4
**control (2)**
42:13,22
**conversation (1)**
101:14
**conversations (1)**
27:17
**conveyed (1)**
100:7
**copy (2)**
18:9;62:7
**corner (1)**
62:10
**correction (1)**
36:5
**correctly (13)**
6:5,22;7:17;11:25;
18:13;24:10;26:13;
47:18;48:10;61:5,17;
93:1;104:25
**corroborating (1)**
42:2
**corrupted (1)**
60:4
**counsel (10)**
4:9;83:16;84:8;
86:8;90:25;91:3,15;
100:22;101:10,16
**count (2)**
57:10;64:11
**couple (2)**
60:24;103:21
**course (4)**
4:25;7:22;20:16;
36:15
**COURT (91)**
4:7,17,20;5:3;8:19;
9:16;18:19,25;23:10,
12,14,24,25;24:14,17,
20,24;35:15;36:4,7,
11,15;37:10,15;
39:16;40:8;43:18,23;
46:22;53:10;54:10,
20;57:13,15,18;58:7,
22,25;59:2,4,7,10,11,
13,18;61:11;79:7;
83:1;85:13;88:19,22;
89:7,16,17,21,22;
90:4;93:22;94:19,21;

95:1,7,11,21;96:23;
97:2,4,7,9,13,16,18;
98:14;99:7;101:19,
21,24;102:2;103:2,23,
25;104:6,21,24;
105:10,22
**Courts (2)**
61:11;88:12
**cover (1)**
60:3
**covered (1)**
65:6
**create (4)**
12:24;21:2;24:6;
55:22
**created (11)**
20:7;22:17;32:22;
35:15;55:1;58:5;
83:16;88:24;90:17,
22;94:17
**creating (2)**
6:11;22:11
**credible (1)**
80:17
**credits (1)**
98:24
**critical (1)**
37:24
**criticism (5)**
68:1;72:2;84:9;
85:7;90:18
**criticisms (2)**
45:14,15
**critique (1)**
20:6
**critiques (1)**
87:11
**cross (1)**
100:15
**cross-examination (2)**
4:21;5:5
**crucial (2)**
70:3,3
**cue (1)**
86:1
**cultural (1)**
73:11
**CV (1)**
79:12

**D**

**damages (4)**
89:2,5,6,9
**Daniel (1)**
4:14
**Darr (7)**
4:2,3;99:5;102:21;
104:19;105:5,12
**data (192)**
5:20;6:16;7:21,21;
10:19,23;11:7,8,24;
12:5;13:1,1,9,22,23,

24;14:3,24;15:13,17,
24;16:9,11;17:19,23,
24,24;19:12,12;20:8,
23;23:14,21;24:4;
25:10,21,24;26:1,3,4,
7,10,23;27:2,3,5,9,14,
15,17,17,22;28:9,22,
24;29:3;39:6,8,13;
40:5,6,12,13,20,22,
24;41:5;42:8,10,11,
12,21;44:3,9,9,24;
45:8;46:9,13,14;47:5,
5,9,10,10,14,16,21,23,
25,25;48:1,6,8,15,16,
24;49:5,7,19;50:6;
60:2,4,15,15,17,17,
18;61:10,23,24;62:2,
13,25;63:11,14,17,21;
64:1,8,11,18,21,22;
65:2;66:7,14,17,20,
21;67:1,3,18;68:4;
74:15,23;75:14;
77:17,18,20,22,25;
78:7,7;79:17,21,23;
80:5,10;81:20,24;
82:11,15,15,17,23,24,
24,25;83:1,5,10,14,
14,18;84:14,19;85:2,
2,2,3,5,6;87:9,10,18,
23;88:2,8;91:7,7,19,
22;92:1,7,13,14,15,
24;93:19;94:17;
102:21
**database (3)**
44:13;47:12;49:20
**datapoints (1)**
70:1
**dataset (30)**
7:5,15,19,25;8:13,
22,23;9:2,7,9,11,14;
10:7,12;14:6;22:5,7;
37:1;49:17;56:24;
79:25;84:13,20;
87:14,18,21;91:5,5;
94:6,8
**datasets (7)**
49:4,11,12;83:20;
84:11,12;85:4
**date (1)**
4:5
**dated (1)**
97:1
**dates (1)**
66:21
**Daubert (8)**
44:22;59:24;60:3;
73:23;78:24;102:14;
105:2,13
**day (16)**
4:3;43:2;58:6,19;
60:23;62:1;63:20;
66:9;67:25;71:15;
73:21;78:12;86:5;

91:9;92:22;96:20
**De (1)**
38:2
**deadline (2)**
98:5,5
**deadlines (1)**
105:14
**deal (8)**
15:20;47:8,15,22;
48:1,7;50:9;60:13
**dealing (2)**
60:16;63:6
**dealt (2)**
88:13;104:14
**deciding (1)**
33:7
**decision (3)**
70:18,18;99:9
**deduplication (1)**
47:6
**deemed (5)**
12:16;34:21;69:15;
85:6;91:6
**defend (1)**
92:22
**defendant (4)**
76:23,24;89:4;
90:18
**defendants (9)**
4:16,19;94:14,16;
95:25;99:12,17;
102:3,25
**defendants' (4)**
79:15;88:17;94:3;
98:8
**defendant's (1)**
85:9
**defense (5)**
79:15;85:9;96:10,
10,12
**deferring (1)**
73:21
**define (2)**
8:9;58:12
**definitely (1)**
70:22
**definition (2)**
8:11;87:16
**degree (1)**
17:22
**demonstrate (9)**
21:25;22:21,22;
23:11,21,24;24:3;
91:23;92:25
**demonstrated (2)**
28:7;94:7
**demonstrating (1)**
24:23
**demonstrative (2)**
24:18;25:10
**denied (4)**
97:23;98:7;104:9;
105:18

**Denis's (1)**
41:18
**Dennis (38)**
4:23;5:4;33:16;
36:18;41:21;51:25;
52:2,9,9,12,14,19;
53:14;57:15;59:2;
63:10,22;64:20;
65:12,12,20;67:10;
68:1,4,18;72:2,5,16;
74:20;76:6,6;79:19;
87:6;91:19,20,24;
93:5,18
**Dennises (1)**
41:22
**Dennis's (1)**
65:17
**deny (2)**
95:13;105:16
**denying (1)**
98:7
**depend (1)**
28:5
**depending (2)**
11:19;46:3
**depends (9)**
12:22;22:14,21;
23:19;32:22;46:12;
49:5;58:11,11
**deposition (1)**
102:20
**derive (1)**
53:19
**derived (1)**
57:21
**describe (1)**
6:6
**described (6)**
16:2,3,5;23:5;
40:11;41:4
**description (2)**
49:23;79:10
**Design (2)**
10:24;11:7
**detail (1)**
30:17
**details (5)**
6:15;10:19;45:22,
22;76:8
**determination (5)**
28:15;34:17;80:25;
82:5;105:4
**determinations (1)**
61:8
**determine (25)**
7:9;8:22;13:6,13,
19;15:12;17:16;
18:12;19:15;23:2;
29:22;31:1,20;32:13;
39:21;40:5,19;52:25;
56:8,18;63:9;84:18,
18;86:19;91:25
**determined (8)**

10:10;22:18;56:4;
81:9,11,21;82:15;
85:22
**determines (1)**
55:24
**deterministic (10)**
5:14;6:21;10:1;
11:9;45:19;79:20;
80:2;83:8,10,13
**develop (1)**
82:17
**deviation (1)**
87:3
**difference (3)**
18:1;55:6;74:22
**differences (2)**
5:14;71:5
**different (35)**
11:12;17:2;23:23;
32:1,1,2,2,2;37:18,25;
38:6,8,8,22;41:12,19,
19,22,24;50:14,15,16,
18;51:13;52:1;60:18,
22;61:7;62:2;70:14;
71:19,24;75:4;88:7;
98:11
**difficult (1)**
85:12
**dig (1)**
72:16
**digits (1)**
75:12
**dimensions (3)**
47:5;50:7;61:23
**direct (5)**
6:5;17:13;39:14;
82:14;89:22
**direction (4)**
42:19;68:19;78:10,
10
**directions (2)**
76:20;77:15
**directly (1)**
61:21
**dirty (5)**
5:20;7:6,9,16;14:6
**disagree (5)**
13:15;24:2;45:9,10;
65:7
**disclosure (1)**
100:9
**discovered (1)**
63:10
**discovery (7)**
96:13,15,16;100:2;
101:5,15;103:18
**discrepancies (1)**
6:18
**discuss (1)**
63:4
**discusses (1)**
42:6
**discussion (6)**

42:4;46:8;50:1,3,4;
79:11
**discussions (1)**
60:11
**Disney (1)**
72:6
**dispense (1)**
102:17
**disposal (1)**
19:4
**disprove (1)**
65:21
**dispute (1)**
77:22
**distill (2)**
51:9;84:21
**distinct (2)**
6:20;60:25
**distinction (2)**
38:9;52:4
**distinctions (1)**
52:23
**District (1)**
89:7
**docket (2)**
96:24;104:7
**document (2)**
19:1;98:11
**documentation (1)**
61:14
**documents (1)**
17:3
**dollars (6)**
53:4;63:18;67:13,
19;78:18;96:9
**dollars' (1)**
38:19
**done (33)**
9:5;13:8;18:13;
20:11;21:13;24:1,10,
11;27:20;40:10;
55:23;56:1,7,11,17,
22,23;65:11,15;
66:11;69:18;70:4;
78:4;85:14;87:7,7,9,
12,17;93:5,24;94:14;
101:20
**dose (2)**
66:7,7
**double (2)**
44:17;98:20
**down (13)**
13:10;30:18,18,21;
51:9;64:17;70:7;72:9;
84:19,21;97:9;98:16,
17
**Dr (115)**
7:13;12:5,15;13:6,
13,19;16:19;17:3,12;
18:10,11;19:4,11;
20:7;22:23;24:5,11;
25:12,18;26:4;27:19;
28:21;31:25;34:9;

35:15;36:24;37:3,24;
39:8,8,9,18;40:11;
43:8;44:2;47:20;
48:14;49:25;50:2;
54:5,14,18,22;56:14;
57:15;59:5;60:15,19;
61:1,19;62:4,11,25;
63:3,11,17,18;64:2,
18,21;65:3,15,19,21;
66:1,9,19;67:5,14,14,
20;68:10,23;69:4,12,
18,24;70:13;71:7,14;
73:2;74:2;75:4,17;
76:3,11;77:9,19;78:1,
3,13,19;79:11,16;
80:4,9;81:11;82:4,10,
13;85:20;86:2,24;
87:11,18;88:3;92:3,
11;95:12;96:1,5;99:3;
100:9,15;105:6
**dragging (1)**
98:15
**drawn (1)**
89:3
**due (1)**
88:16
**DURAN (4)**
4:18,19;104:13,23
**during (3)**
6:5;9:24;10:22;
17:12;82:14
**dynamic (3)**
85:15;86:3;92:16

# E

**easier (1)**
72:14
**Easter (3)**
64:8;91:22,24
**economic (3)**
32:16;41:3;100:24
**effort (2)**
68:10;77:23
**efforts (1)**
47:7
**eggs (3)**
64:8;91:22,24
**eight (2)**
83:10,14
**either (15)**
12:14;21:18;28:18;
52:20;67:16;69:9,10;
73:14;74:5,7,10;
80:16;97:14;103:6,6
**elaborate (1)**
69:18
**Elaine (1)**
73:8
**element (2)**
15:15,23
**elementary (1)**
88:22

**eleven (2)**
83:22;88:4
**else (16)**
52:2,4,11,15,21;
53:10,25;57:13;68:8;
88:9;91:17;93:21;
96:6;98:3;102:22;
104:11
**else's (1)**
71:2
**email (19)**
31:12;41:5,11,12;
50:25;52:1;64:14;
65:23,24;66:17;
71:20;75:4,11,18,20;
77:5;82:6,7;91:21
**emails (5)**
32:2;50:15,20;
65:25;66:2
**embedded (1)**
60:24
**employ (1)**
50:9
**employed (3)**
23:7,8;26:12
**empty (1)**
81:5
**enabling (1)**
90:2
**encourage (1)**
83:2
**end (23)**
15:6,8;34:24;37:18;
58:6,19;60:23;61:7,
25;63:20;66:9;67:25;
71:15;75:25;76:1;
77:19;78:12;81:14;
86:5;92:22;93:5;
101:3;105:23
**ended (1)**
74:1
**ends (2)**
100:10;104:10
**engage (2)**
85:4;102:3
**engaged (1)**
21:22
**engagement (2)**
65:18,18
**engine (4)**
19:4,11,15;20:7
**enough (5)**
43:4,16;44:1;80:12;
91:12
**Enrique (1)**
38:4
**ensure (1)**
37:22
**enter (3)**
74:24;78:17;104:7
**entered (5)**
42:12,21;67:18;
77:5;97:12

**entering (1)**
62:2
**entire (20)**
9:11,14,17;19:4;
22:5,20;32:21;49:18;
55:8;56:24;57:1,8,23;
65:15;82:19;84:19,
20;87:14,20;91:4
**entirely (8)**
32:11;35:12;50:4;
79:25;82:11,13,24;
92:3
**entirety (2)**
22:7;37:1
**entries (2)**
83:9;94:18
**entry (5)**
65:2;75:14;76:3;
96:24;97:1
**EPOC (2)**
25:21,23
**epoch (11)**
26:4,9,13;27:1,18;
28:22;43:9;44:2,11;
64:11;91:19
**equal (4)**
32:23;55:1;58:5,6
**equity (19)**
32:15;39:10,13,15,
23;54:1;58:2,15;63:6,
10,12,22;68:17,19,21;
76:1;78:15;89:24;
91:12
**equivocation (1)**
71:7
**Eric (1)**
74:25
**error (45)**
21:8,10,17;22:22;
23:9;30:4;37:16;40:3,
5,16;54:7,15,23;
56:16;57:15,18,21;
58:7;68:15,16;74:6,8,
11,12,14,14;76:9;
78:19,22,24,25,25;
79:1;81:22;82:9;86:6,
6,13;87:19,19;88:16;
92:18;94:1,2,10
**errors (22)**
22:18;23:11;24:6;
29:6,6,8,9,10;32:18,
20;33:2;34:3,11;46:2;
55:16,21;56:4,10;
72:4,22;76:9;88:8
**Escuple (1)**
38:4
**ESEM (1)**
86:10
**especially (1)**
85:11
**essentially (3)**
71:12;98:20;101:2
**establish (1)**

59:24
**establishing (1)**
90:7
**estate (2)**
60:17;102:5
**estimate (4)**
30:2;78:18,25;79:1
**estimates (1)**
78:20
**estimation (1)**
74:13
**et (1)**
7:21
**evade (1)**
72:10
**even (20)**
14:7;58:15;60:19;
62:22;63:5,6,24;
64:19;65:2;66:1;
68:17;72:5;75:22;
76:25;78:13,14;87:3;
92:4;93:20;94:1
**everybody (2)**
39:3;62:16
**everyone (1)**
4:20
**evidence (7)**
89:3;95:18;96:8;
98:8;99:4,17;103:11
**evidentiary (10)**
96:14;98:9;99:25;
100:11,16;101:6;
102:16,23;103:4;
105:19
**e-wallet (8)**
26:20;27:2,3,17;
28:2,4,9,23
**exact (4)**
10:16;29:11;87:16;
91:15
**exactly (10)**
48:3;50:25;83:9,10,
13;84:19;87:6;88:4;
89:14;93:1
**examination (5)**
6:6;17:13;36:16;
53:12;55:19
**examined (1)**
22:17
**example (17)**
13:5;22:23;25:5;
29:9;30:24;31:9;
40:18;41:14;44:3;
52:25;64:25;67:5,23;
68:4;77:2;78:6;88:21
**examples (21)**
13:10,12,16;21:17;
22:2;24:19;25:1,2;
35:20;37:18;38:1;
51:5;56:21;57:7,9;
62:14;65:24;67:24;
72:16;87:13;90:25
**exceeded (1)**

78:5
**excellent (1)**
78:4
**exceptional (1)**
87:4
**exceptions (1)**
82:8
**excess (1)**
44:18
**exclude (2)**
59:8;95:12
**excluded (1)**
95:16
**excluding (1)**
15:20
**exclusion (1)**
98:23
**excuse (3)**
27:1;82:2;83:23
**exemplary (1)**
35:23
**exercise (4)**
43:11;73:15;81:14;
102:1
**Exhibit (15)**
16:18;18:4,20,21,
22,23,24;30:6,7,8,10,
12;46:24;47:3;86:15
**exhibits (4)**
16:18;35:14;82:4;
95:9
**exist (1)**
84:16
**existence (1)**
49:13
**exists (1)**
41:19
**expect (2)**
81:13;102:4
**Expectation (4)**
17:14;25:25;84:3,8
**expected (1)**
93:10
**experience (2)**
73:8;79:12
**expert (17)**
30:8;60:4,8;72:11,
21,24;96:10,11;100:8,
13,15;102:6,7,10;
103:4,5;104:15
**expertise (2)**
19:22;60:16
**experts (1)**
102:19
**explain (1)**
99:15
**explanation (2)**
84:13;95:14
**explicit (1)**
78:16
**extensive (1)**
60:16
**extensively (1)**

65:6
**extent (21)**
16:19;38:20;39:13;
40:12;46:1,15;53:14;
54:4,13,21;55:10,12;
57:22,23;69:10;71:1,
4;77:11;94:1;100:8;
105:3
**external (1)**
64:22
**extra (1)**
11:16
**extraordinarily (1)**
86:14
**eyeball (1)**
69:20

**F**

**F1 (1)**
86:21
**F3d (2)**
89:16,19
**facie (7)**
92:22,23;96:3,4;
99:10,17;103:1
**fact (24)**
7:4,6;10:22;11:23;
14:18;20:11;28:15;
31:1,21;35:6;50:7;
55:25;56:8,10,18;
62:22;68:14;70:24;
75:21;89:2;90:1;
97:24;98:2;103:6
**factor (1)**
63:3
**factors (5)**
50:2;61:18,20;70:1;
73:11
**facts (9)**
12:22;27:15;60:2,8,
10;76:22;77:20;78:3;
90:7
**fact-specific (1)**
14:17
**fair (8)**
24:16;25:3;31:22,
23;34:8,24;38:23;
51:12
**fairly (1)**
65:19
**fairness (3)**
90:6,10,21
**fake (5)**
62:16,17,18,19;
70:11,11
**fall (1)**
100:18
**falls (1)**
90:22
**false (1)**
91:10
**false' (1)**

90:3
**falsity (1)**
90:3
**familiar (1)**
17:11
**far (4)**
35:2;36:24;44:18;
60:12
**fascinating (1)**
74:6
**fashion (2)**
37:12;83:13
**father (1)**
84:16
**fault (2)**
35:12;76:4
**faulty (1)**
23:15
**feature (1)**
73:13
**February (1)**
98:11
**federal (1)**
8:18
**feel (1)**
73:18
**feels (2)**
96:10,12
**fell (1)**
13:10
**Fellegi-Sunter (2)**
17:14;84:3
**felt (2)**
9:8;10:5
**Ferrante (3)**
86:15,16,18
**FESM (1)**
92:15
**feverishly (1)**
95:2
**few (1)**
81:25
**fictitious (1)**
44:25
**field (11)**
80:12,14,15,17,
18;81:13;82:2,5,6;
84:5
**fields (10)**
31:5;80:11,12,25;
81:1,20,24;83:10,14;
84:4
**Fifty (2)**
28:2,3
**figure (3)**
53:5;68:11;95:21
**figuring (1)**
72:11
**filed (4)**
95:23;97:24;98:4;
102:11
**filing (1)**
101:20

**filling (1)**
105:6
**final (1)**
60:22
**financing (1)**
103:12
**find (17)**
28:8;39:13;66:20,
21,21;70:10,10;72:1,
23,24;78:8;87:5,23;
91:18;93:11,11;99:16
**fine (6)**
29:20;34:15;67:15;
95:7;104:4,5
**finger (1)**
92:4
**finish (5)**
33:21;97:20;
100:16,21;101:3
**finished (3)**
12:2;36:3;94:20
**First (25)**
13:3;32:25;43:2;
44:22,22;45:2;48:19;
53:17;56:22;57:3;
59:8;63:11;67:10;
75:7,7;76:23;80:9;
83:18;88:25;90:23;
93:2;96:20;101:15,
23,25
**fit (2)**
61:17;78:15
**five (1)**
83:12
**five-minute (1)**
59:12
**fix (1)**
60:5
**fixed (1)**
85:16
**flawed (1)**
24:24
**flaws (2)**
23:22,25
**flip (1)**
76:13
**flowchart (1)**
82:21
**focus (6)**
9:4,22;61:7;68:15,
22;69:24
**focused (4)**
13:24;19:9;27:10;
57:22
**focusing (1)**
17:5
**follow (2)**
36:18;75:12
**following (1)**
84:2
**follow-up (1)**
58:22
**football (1)**
101:20

67:2
**footing (1)**
  78:9
**foreclosure (1)**
  61:12
**foreclosures (1)**
  61:13
**form (11)**
  9:20;20:6;33:1,3,9,
  25;34:2;74:15;79:25;
  93:8;101:20
**formed (3)**
  33:18;34:10;40:16
**forms (1)**
  37:16
**forth (2)**
  46:6;83:17
**forty (1)**
  80:25
**forty-nine-dollar (1)**
  53:2
**forum (1)**
  37:7
**forward (2)**
  4:22;10:14
**found (17)**
  17:21;24:13,18;
  36:24;42:13,22;45:8;
  54:22;67:10;69:21;
  72:16;74:6;85:10;
  87:17;89:12;92:18;
  93:9
**foundation (1)**
  79:16
**four (6)**
  53:3;68:5;83:11,22,
  23;102:10
**frankly (1)**
  37:20
**free-for-all (2)**
  65:2;71:12
**Freer (75)**
  7:13;16:19;17:12;
  18:3;24:5;25:12,18;
  26:5;28:21;31:25;
  35:2;36:24;37:3;39:9,
  18;40:11;42:20;
  48:14;49:25;57:15;
  59:5;60:15,19;61:1,
  19;62:4,11,25;64:2,
  18,21;65:3,15,21;
  66:1,9,19;67:5,14,14;
  68:10,23;69:4,12,18,
  25;70:13;71:7,14;
  73:2;74:2;75:4,17;
  76:3;77:20;78:3,13,
  20;80:4,9;81:11;
  82:10,13;85:20;86:2;
  87:18;92:3,11;93:10;
  96:1,5;99:3;100:9,15;
  105:6
**Freer's (42)**
  12:5,15;13:7,14,19;

17:3;18:10,11;19:4,
11;20:7;22:23;24:11;
27:19;34:9;35:15;
37:24;39:8,8;43:8;
44:2;54:5,14,18,23;
56:14;63:3,12,17,19;
65:19;67:20;76:11;
77:10;78:1;79:11,16;
82:4;86:24;87:11;
88:3;95:12
**front (2)**
  4:5;104:8
**frontend (1)**
  13:22
**frustrate (1)**
  94:15
**FSAM (1)**
  12:21
**FSEM (6)**
  17:8,14,16;18:2;
  84:17;85:6
**full (2)**
  38:22;87:2
**fully (3)**
  10:4;24:5,5
**fulsome (1)**
  95:14
**function (2)**
  40:23;61:15
**functions (1)**
  47:13
**fundamental (1)**
  73:10
**fundamentally (1)**
  60:17
**funding (2)**
  100:23;102:12
**FURTHER (4)**
  53:12;55:19;57:12;
  95:2
**future (1)**
  96:15
**fuzzy (3)**
  40:14;46:3;82:25

## G

**gain (1)**
  30:17
**gap (1)**
  105:6
**garbage (4)**
  46:19,19;66:10,10
**gatekeeping (1)**
  61:15
**gave (7)**
  19:2;23:13,25;25:8,
  9;80:9;85:24
**GDP (2)**
  72:25;73:1
**general (3)**
  22:20;40:4;44:8
**generalized (1)**

85:7
**generally (1)**
  7:3
**generated (1)**
  74:13
**genuine (1)**
  98:1
**gets (3)**
  21:10;62:17;71:4
**given (4)**
  12:25;18:6;24:20;
  34:6
**giving (2)**
  45:19;65:15
**gmailcom (1)**
  72:8
**goal (3)**
  21:24;78:16,16
**goes (1)**
  43:11
**gold (2)**
  12:23;60:9
**golden (28)**
  12:4,14,21;14:10,
  11,20;15:1,15,23;
  17:8,15;40:1;48:25;
  49:4,13;50:11;64:5,6,
  6,7,8,9;66:4,5;86:9,
  11;91:16,22
**gold-plated (1)**
  61:2
**Good (16)**
  4:15,17,18,20;5:7,8,
  9;43:21;51:11;73:19;
  76:7;77:23;86:23;
  87:1,3;89:13
**Google (1)**
  70:10
**great (2)**
  61:2;102:3
**greater (2)**
  38:23;67:2
**gritty (1)**
  99:22
**gross (1)**
  62:21
**grossly (1)**
  91:14
**ground (2)**
  12:14;15:23
**grounds (2)**
  37:7;54:17
**grow (1)**
  55:11
**growth (2)**
  72:25;73:1
**guarantee (1)**
  13:4
**guess (10)**
  9:5;11:15;12:3;
  13:15;23:19;28:5;
  58:11;88:1;95:8;
  104:17

**guide (1)**
  59:21
**Gutierrez (1)**
  74:25
**guy (1)**
  92:23

## H

**habit (1)**
  95:5
**half (1)**
  30:21
**hallmark (1)**
  74:8
**hand (1)**
  14:16;38:2;63:2
**handful (1)**
  51:5
**handpicked (2)**
  35:22,24
**hands (1)**
  102:22
**happen (4)**
  66:8;78:11;93:3;
  101:22
**happened (4)**
  66:13;75:13;95:24;
  101:12
**happening (1)**
  100:7
**happy (1)**
  59:6
**hard (4)**
  37:11;38:15;51:15;
  76:5
**harder (2)**
  37:21;50:9
**harmonic (1)**
  86:21
**heaped (1)**
  92:9
**hear (4)**
  39:9;59:8;85:8;
  103:11
**heard (7)**
  42:20;45:21;63:5;
  84:12;95:2;99:24;
  100:1
**hearing (20)**
  5:10;44:23;80:4;
  95:11;96:15;99:25;
  100:11,12,17;101:6;
  102:16,23;103:4,21;
  104:17,21;105:2,3,13,
  20
**hearings (2)**
  4:4;96:21
**heart (1)**
  79:14
**help (10)**
  19:24;53:19;60:23;
  61:3;63:7;64:22;

68:16,21;70:23;74:18
**helpful (4)**
  6:21;27:12;28:11,
  13
**Henry (1)**
  89:25
**Here's (1)**
  30:11
**heterogeneity (1)**
  41:5
**hide (2)**
  88:12;91:2
**high (13)**
  6:10;7:1;17:22;
  47:16,23;48:2,8,23;
  78:19,22;81:1,9;
  86:14
**highest (1)**
  60:20
**highlights (1)**
  97:25
**himself (2)**
  87:19;94:4
**Hobbs (1)**
  20:19
**hoc (6)**
  8:22;22:2,10;87:13,
  25;93:13
**Hoffman (1)**
  69:21
**hold (6)**
  7:20;10:17;33:12,
  12;97:16;105:15
**holds (1)**
  46:19
**home (2)**
  51:15;89:1
**honest (1)**
  79:12
**Honor (48)**
  4:12,15,18;33:10,
  13;36:3,14;43:14,22;
  46:21;53:11;55:17;
  57:14;58:24;59:1,9,
  19,20,23;60:24;61:3,
  4,9;63:5;64:23;68:6;
  69:23;75:6;78:17;
  79:10;93:10;95:5,10;
  96:22;97:5;100:3,6,
  11,23;101:25;103:1,
  22,24;104:4,5,13;
  105:1,21
**Honor's (2)**
  101:13;102:24
**hope (1)**
  52:16
**hopefully (1)**
  59:21
**hopeless (1)**
  73:15
**house (3)**
  51:15,22;84:16
**human (2)**

67:18;78:17
**hundred (9)**
18:22;51:5;54:6,15,
22;86:24,25;91:13;
92:25
**hundreds (2)**
41:12;51:7
**Huron (3)**
5:11;45:17;80:2
**Huron's (1)**
9:25
**Hydrochloride (1)**
89:8
**hypothetical (2)**
54:8;56:3

**I**

**idea (2)**
29:6;68:14
**identical (2)**
41:9;52:11
**identified (5)**
31:11,24;76:25;
80:21;83:4
**identifiers (2)**
6:10;7:2
**identifies (1)**
35:14
**identify (5)**
4:9;57:4;73:16;
78:13;93:23
**identifying (3)**
31:4;96:2;99:15
**identities (1)**
91:2
**identity (1)**
88:12
**ignore (2)**
75:24;85:2
**ignored (2)**
82:10;100:25
**ignoring (1)**
75:20
**II (1)**
98:20
**illustrative (1)**
24:20
**Ilyas (1)**
4:15
**imagine (1)**
102:21
**immediately (1)**
73:1
**impact (3)**
40:15;54:1;58:19
**impacted (1)**
53:25
**impactful (3)**
55:4,9;57:24
**imperfect (4)**
47:14,21;48:1,6
**implement (2)**

11:16;82:17
**import (1)**
100:12
**important (21)**
14:13,17;15:9;29:3;
37:22,23;47:5;48:3;
50:6;54:3;58:4;60:3;
61:19,23;66:2,23;
67:7,14;70:2;71:3;
75:19
**impossible (1)**
63:9
**imprecise (1)**
89:6
**impression (1)**
100:7
**inability (1)**
83:20
**inaccuracy (2)**
50:10;64:2
**inaccurate (12)**
30:16;31:17;35:16,
20;44:25;47:8,15,22;
48:4,7,15;66:15
**inactions (1)**
88:17
**inadequate (2)**
69:21;102:12
**Inamorato (1)**
42:9
**inappropriate (4)**
10:1;31:8;37:9;
92:3
**inappropriately (1)**
48:5
**incidentally (1)**
39:2
**incited (1)**
89:11
**include (3)**
23:3;51:3;61:19
**included (9)**
31:17,22;56:19,20;
74:3;95:16;96:1,2;
104:8
**including (4)**
7:7;84:11,24;98:22
**inclusion (1)**
98:23
**inconsistency (3)**
48:21;50:10;64:3
**inconsistent (15)**
13:10;31:25;32:3;
47:8,16,23;48:4,8,16;
49:18;62:22,23;
66:16,16,16
**incorrect (8)**
31:1;82:11,13;84:2;
88:2,5,7;90:20
**incorrectly (1)**
53:1
**increases (1)**
55:11

incredibly (1)
55:3
**indeed (1)**
70:3
**independently (1)**
18:11
**indexing (2)**
47:7,12
**indicative (2)**
6:12,12
**indicia (1)**
38:16
**indirectly (1)**
61:21
**indiscernible (1)**
57:3
**individual (3)**
31:24;68:15;93:12
**individuals (3)**
21:1;55:9;84:17
**inductive (2)**
87:25;88:1
**industry (1)**
78:6
**inevitably (1)**
65:25
**infer (2)**
22:9,19
**inference (1)**
22:13
**inferences (2)**
89:3;93:12
**inflating (1)**
71:2
**information (22)**
24:21;26:23;27:25;
32:1;37:19;64:14,16;
65:6,25;70:23,24;
80:13,15;81:12;82:7;
90:19;91:10,11;96:5;
102:8,9;103:3
**informative (3)**
27:24;28:2,6
**informed (1)**
39:6
**inherent (2)**
25:10;67:3
**inherently (6)**
6:20;13:2;46:12;
53:6,21;55:15
**initial (2)**
65:5;84:1
**initials (3)**
68:13,14;73:12
**injured (1)**
89:10
**Innamorato (7)**
16:17,21;17:7,13,
21;42:8;84:25
**input (2)**
13:9;40:24
**inputs (1)**
24:24

inquiry (1)
100:10
**inset (1)**
97:10
**insignificant (2)**
69:15,17
**inspect (1)**
38:25
**inspection (3)**
73:19;81:21,22
**instance (10)**
44:10;48:19,25;
57:3;81:11;82:8;
83:21;90:23;93:2,25
**instances (8)**
6:9;24:13;38:17;
50:14;85:10,10;
88:13;93:9
**instead (3)**
24:9;38:18;80:1
**instructed (1)**
21:5
**instructions (1)**
19:2
**insufficient (1)**
81:3
**intended (2)**
82:16;87:14
**intending (1)**
95:5
**interested (1)**
16:10
**interesting (2)**
51:2;100:17
**intermediate (1)**
81:2
**internal (1)**
84:5
**interrupt (1)**
18:19
**interrupting (1)**
33:14
**intervals (1)**
65:16
**into (9)**
12:8;21:16;22:4;
31:7;62:10;65:23;
66:13;90:19;91:11
**introduced (1)**
41:25
**introduces (1)**
77:14
**introducing (1)**
74:10
**intuitively (1)**
62:7
**invalidate (1)**
53:3
**invalidated (1)**
64:16
**invalidates (1)**
53:6
**inviting (1)**

59:5
**involved (1)**
68:17
**involving (1)**
64:12
**irrelevant (1)**
87:15
**isolation (1)**
58:10
**issue (20)**
14:9;25:3;40:17;
41:8;48:15,24;53:24;
68:24;71:11;75:2,15;
79:17;82:11;86:2;
88:6,13;89:13;102:6;
104:14,18
**issues (15)**
6:19;21:25;24:18;
25:10;28:7;35:23;
44:24;53:20;79:22;
87:6;93:14,15;94:17;
98:1,2
**iterative (2)**
84:21;86:12

**J**

**James (1)**
20:19
**January (3)**
18:16;97:1,12
**Jay (1)**
52:14
**Jean-Louis (1)**
105:11
**JO (2)**
68:6,12
**J-O (1)**
68:6
**job (1)**
66:11
**John (1)**
89:25
**join (2)**
49:12,19
**joint (2)**
47:12;101:20
**Josh (9)**
41:18,21,22;51:25;
52:2,9,10,12,19
**JOSHUA (4)**
5:4;52:9,12,19
**Journal (1)**
89:2
**Juan (1)**
74:25
**Judge (3)**
4:5;69:20;97:17
**judgment (10)**
88:14;97:22,22;
98:1,5,7;102:1;
104:22;105:3,18
**judgmental (1)**

34:16
**judgments (2)**
74:24;78:17
**jump (1)**
68:24
**justice (1)**
88:23

## K

**Kaisha (1)**
89:15
**K-A-I-S-H-A (1)**
89:15
**Kawasaki (1)**
89:14
**keep (2)**
26:19;80:4
**keeps (2)**
33:13;64:4
**Kenya (3)**
68:25;69:2,4
**key (11)**
40:6,21;41:17,23;
42:5,14,23;74:16,16,
17;79:2
**kind (7)**
8:18;11:22;31:6;
34:25;35:14;37:10;
79:2
**kinds (2)**
6:18;88:13
**Kisen (1)**
89:14
**K-I-S-E-N (1)**
89:15
**knew (1)**
62:8
**knowing (4)**
40:20;41:20;48:21;
63:10
**knowledge (3)**
90:2,7;103:10
**known (1)**
17:15
**knows (1)**
67:12

## L

**lack (4)**
31:11;61:17;62:20,
21
**language (3)**
10:17;91:18;96:19
**laptop (1)**
97:5
**large (13)**
41:7;43:3;44:1,13;
47:6;50:20,21;51:6;
56:18;63:13,14;
65:24;83:19
**largely (1)**

40:23
**larger (3)**
55:13,14,15
**last (2)**
12:2;73:13
**later (5)**
15:21;39:17;73:21;
95:15;96:16
**Laures (3)**
69:16;74:1,5
**law (2)**
93:4,14
**lawsuit (1)**
58:20
**lay (3)**
103:8,9;104:14
**lead (2)**
38:9;53:20
**leading (2)**
37:8,11
**leads (2)**
41:8;91:15
**learning (3)**
84:7,20;86:12
**least (3)**
30:18;49:11;96:3
**leave (1)**
69:19
**led (1)**
78:10
**left (2)**
33:6;105:6
**legally (1)**
93:7
**Legendary (4)**
38:7;71:14,18,20
**lend (1)**
97:21
**length (2)**
43:13;44:21
**less (1)**
50:8
**letter (1)**
70:7
**letters (1)**
46:6
**letting (2)**
13:1;40:12
**level (5)**
32:9;35:1;41:13;
65:11;103:9
**liability (2)**
61:8;90:12
**likelihood (1)**
85:18
**likely (4)**
10:8;50:8;92:10,11
**limit (2)**
13:17;76:5
**limited (4)**
50:4;74:17;80:23;
98:23
**limitless (2)**

67:23;72:10
**Line (10)**
6:5;9:14;11:5;
12:13;51:15,15;
64:17;77:9;100:16,21
**lines (1)**
10:2
**link (2)**
49:7,7
**linkage (17)**
6:7,8;7:10;11:18;
15:2,16,24;19:4;20:8;
46:9;74:23;78:4;
82:17;85:4;86:19;
91:7,21
**linkages (5)**
54:7,16;66:20;67:8;
76:7
**linked (3)**
12:5;17:25;67:20
**linking (1)**
67:6
**listed (1)**
76:24
**listen (2)**
15:19;22:1
**literature (11)**
5:21;10:3;11:13;
12:20;42:3;46:8;
60:11,12,14;66:5;
87:2
**litigant (1)**
90:6
**Litigation (1)**
89:9
**little (4)**
12:12;43:11;64:9;
98:17
**live (1)**
99:14
**lived (1)**
51:13
**living (3)**
31:12;41:18;84:16
**Lizotte (7)**
4:9,11,11;101:25;
103:22;104:5,12
**LL (2)**
67:12,15
**locations (1)**
31:13
**login (2)**
75:16,17
**log-in (1)**
75:8
**long (7)**
7:19;47:14,25,25;
48:6;51:16,17
**look (44)**
9:2;15:9;21:16;
22:12,24;23:8;25:25;
26:7;27:1,8,25;28:7,
17;30:5;34:15;38:16;

43:9;44:5,5,5,9;
45:25;50:6,7;51:9;
55:7;63:12,22;64:19,
21;65:9;66:17,20;
72:15;73:18;77:23;
81:4;82:4;83:1,2;
86:14;93:10,24;94:13
**looked (32)**
13:8;17:13;19:14;
23:9;24:12;26:3,5,20,
21;27:3,13;28:5,9,14;
29:24;31:4;34:20,23;
39:3;51:3,3,4,5;
62:13;68:4;72:21;
75:19;80:14,24;83:9;
86:5;91:1
**looking (18)**
13:22;27:5,14;
30:17;39:22;40:24;
41:15;47:3;63:10;
64:1;70:5;71:14;
81:17;92:6,13;93:20;
98:19;105:10
**looks (5)**
17:11;62:13;68:6;
75:6;96:24
**loose (1)**
104:10
**Lope (1)**
77:6
**Lopez (9)**
73:9;77:2,4,6,7,8,
13,13,14
**lose (1)**
68:21
**loser (5)**
39:4;54:2;63:14,15;
99:20
**losers (3)**
32:23;65:17;69:13
**losing (1)**
64:13
**loss (4)**
32:17;37:5;67:13;
70:25
**losses (1)**
67:19
**lost (1)**
63:18
**lot (8)**
17:10;38:1,7;41:4;
45:12;64:13;72:15;
76:19
**lots (1)**
63:19
**low (5)**
65:8;66:6;78:22;
79:3,3
**lowercase (1)**
67:11
**Ltd (1)**
89:15
**luck (1)**

96:18
**LYNE (54)**
4:14;5:2,6;6:3;
11:4;12:11;18:4,7,20,
23;30:9;32:4;33:11,
13,15,18,20,23;36:2,
5,8,20;37:7;39:14,22;
40:7;42:17;43:10,15;
45:16,21;46:22,23;
47:2;53:8;54:8,17;
55:18,20;57:12;
58:24;59:4,6;63:6,23;
64:4;65:6;79:8;89:17,
19,22;94:21;96:22;
99:6
**Lyne's (2)**
67:25;76:16
**Lynne (2)**
4:14,22
**Lyon (1)**
40:19

## M

**magnitude (1)**
77:24
**main (5)**
15:25;66:14;68:1;
72:9,9
**Majestic (1)**
72:7
**makes (4)**
21:12;55:5;76:16;
103:24
**making (3)**
70:17;74:20;91:16
**mandatory (1)**
90:8
**manifests (1)**
23:22
**Manual (2)**
10:24;11:7
**manually (1)**
34:16
**many (24)**
25:17;29:5,6,8,9,10,
20,22;30:3;32:18,19,
25;34:18,21;38:11;
50:24;53:24;57:9;
68:3;70:1,1;80:25;
81:1,2
**Mara (3)**
30:19,24;31:1
**March (3)**
95:23;98:10,13
**margin (1)**
87:2
**Maria (15)**
29:13,13,21,25;
30:9,11,23;31:15;
32:19;40:18;41:24;
51:4;52:24;73:24;
74:1

**Martin (11)**
5:21;6:2;7:13;9:4;
10:3;11:1,13;26:12;
45:14;69:13,20
**Martin's (3)**
8:4,25;63:11
**Marvez (1)**
41:24
**Massachusetts (1)**
89:7
**match (5)**
6:13,13;48:2;75:16;
85:16
**matched (3)**
83:9,13,13
**matches (3)**
83:22,24;84:22
**matching (11)**
40:14;46:4;47:5,11,
16,23;48:8,23;82:25;
83:8,10
**material (4)**
56:18;57:5;61:3;
98:2
**materiality (1)**
78:16
**materially (1)**
27:18
**math (9)**
6:9;11:22;12:24;
34:20;40:9,11;70:17;
84:10;85:1
**mathematical (3)**
67:9;70:13,21
**mathematics (1)**
92:21
**matrix (1)**
80:21
**matter (6)**
12:8;14:21;15:9;
95:4;98:15;100:14
**matters (2)**
67:6,9
**Maximization (3)**
17:14;84:3,8
**may (21)**
16:23,24;17:23,23;
19:8;24:15;36:3;37:4,
4;38:5;43:22;52:18;
53:20,20;78:4;90:24;
91:19;92:7,7;93:6;
100:17
**Mayaz (4)**
75:8,8,9,12
**maybe (17)**
16:4;17:25;30:21;
38:22;46:5;64:9;
68:12,13,13;70:11,12;
75:16;77:12;95:4,18;
97:6;100:4
**mean (8)**
7:21;9:5;19:18;
32:10;46:6;67:25;

86:21;103:17
**meaning (4)**
37:3;57:24;68:15;
78:20
**meaningful (2)**
35:1;87:10
**meaningfully (1)**
64:3
**means (5)**
55:14;71:1;78:15;
80:11;90:2
**meant (2)**
57:22;74:23
**measure (3)**
86:20,21;89:6
**mechanics (1)**
20:7
**meet (2)**
95:13;100:17
**members (2)**
19:23,25
**memo (1)**
102:9
**mentioned (3)**
59:25;64:1;96:7
**meri (1)**
11:15
**messy (1)**
77:22
**met (3)**
78:5;79:5;94:5
**metaphor (1)**
100:21
**meteorological (1)**
61:1
**method (4)**
67:21,22;70:3;
77:10
**methodological (2)**
19:11;94:9
**methodology (28)**
5:14,15;13:8;18:3;
22:25;23:7,8,10,11;
28:25;35:16;46:18;
48:16;52:22;60:8,9,9,
20;69:19;73:21;
76:11;77:20;78:2;
79:16;82:17;86:25;
87:11;94:4
**methods (4)**
11:9,10;15:6;60:7
**Michael (1)**
4:18
**Mickey (5)**
45:3;62:1;66:11,12;
71:16
**middle (4)**
4:21;34:15;65:5;
73:12
**might (16)**
21:17;24:12;27:12;
38:1;43:2;56:14;68:7,
7,8,8;70:11,21;77:8;

85:8,9;101:18
**million (10)**
38:19;53:3;67:13,
19;68:2;83:11,12,12,
23;88:4
**millions (2)**
63:18;78:19
**mind (2)**
36:13;55:22
**mine (2)**
26:15,15
**Minocycline (1)**
89:8
**minor (4)**
52:22,23;76:8,9
**minutes (1)**
59:13
**miraculously (1)**
64:7
**Miri (1)**
77:13
**misleading (3)**
90:20;91:11;92:24
**mislink (2)**
55:5,5
**mislinkage (2)**
53:15,17
**mislinkages (1)**
54:24
**mismatch (1)**
83:16
**missed (6)**
55:1,2,3;56:14;
68:18;77:10
**missing (3)**
16:4;76:19;105:6
**misspellings (2)**
6:16;10:19
**mistyped (1)**
88:9
**mistyping (1)**
75:15
**mixed (2)**
46:6;69:3
**mixture (1)**
31:12
**model (13)**
5:19;14:18;15:10,
24;17:8;18:2;79:20,
21,23;80:2,2,3;93:11
**modeling (1)**
7:8
**modify (1)**
43:22
**Molding (1)**
89:15
**moment (3)**
36:2;69:23;86:17
**money (2)**
58:21;63:19
**moot (1)**
104:22
**Morales (1)**

69:8
**more (34)**
10:2,8,13;11:21,22;
22:15,19;24:11;
26:18;28:7;29:1,7;
30:17;32:10;36:24;
37:20;39:5;41:13;
44:15;53:23;54:3,12;
55:15,16,16;62:15;
77:2;89:18;92:10,11;
94:10;95:14;96:8;
100:20
**more-likely-so-than-not (1)**
94:12
**morning (6)**
4:15,17,18,20;5:7,8
**most (7)**
6:21;37:23;47:5;
50:6;61:23;84:24;
88:22
**mostly (1)**
66:22
**motion (21)**
59:7;88:14;95:12,
13;96:25;98:4,6;
102:1,14;104:8,14,16,
16,18,20,22,23;105:5,
7,11,18
**motions (4)**
97:21,22,24;98:2
**mouse (7)**
30:22,22;45:3;62:1;
66:11,12;71:17
**move (1)**
39:19
**moved (1)**
28:25
**moving (1)**
104:24
**much (22)**
25:23,25;26:4,7;
27:14,25;28:1,4;
29:10;36:9;39:17;
43:16;44:9,9;45:10;
50:8;54:2;58:20;
69:24;80:6;102:17;
103:17
**multiple (5)**
11:12;84:11,14,15,
24
**must (1)**
87:21

# N

**name (40)**
14:4;15:25;20:19;
31:11;37:23;38:22;
41:9,10,14;45:13;
62:17,17,18,18,19,20;
65:1,1;68:7,7;69:5,24,
25;70:2,4,6;71:3;
73:11,11;75:11,14,17;

76:10;81:4,7,8;82:5;
83:25;84:1,3
**named (2)**
16:16;76:24
**names (25)**
32:1;37:22,24;38:5,
6,8,18;44:25,25;
50:14;64:16;66:18;
67:7,7,8;68:6;69:3;
70:11,14;71:5,12;
73:14;74:22;77:6;
82:6
**nationalities (1)**
73:13
**nature (3)**
40:14;60:18;68:11
**necessarily (2)**
13:4;58:16
**necessary (6)**
28:2;48:22;79:12;
84:22,23;95:13
**necessity (1)**
86:11
**need (32)**
17:25;22:14;42:1;
43:9;44:17;47:21;
48:1;52:2,19;53:5;
62:3;63:8;65:9;66:7;
69:19;78:8;91:10;
96:15,16;98:8,8;99:4,
4,15,21,22,23;100:2;
101:12;102:23;
103:13,19
**needed (7)**
47:14,15;48:7;50:9;
100:8,14;102:7
**needs (3)**
96:7;99:7;100:1
**negative (1)**
75:25
**negligence (2)**
88:8;90:25
**negotiating (1)**
100:22
**net (58)**
32:13,13,24;36:5,
23;37:4,5;38:12,25;
39:4,4,7,10,13,15,21,
22;44:6;51:6;54:1,2,
2;57:23,25;58:2,12,
14,15;63:6,7,12,13,
14,15,15,22,24,25;
64:13;65:16,17;
67:13,19;68:16;
69:11,13;70:25;71:2;
76:1;78:13,14;91:12;
96:2,9;98:22,24;99:1,
20
**Neves (10)**
29:25;30:11,23;
31:15;32:19;40:18;
41:24;51:4;52:24;
73:24

**Nevis (4)**
29:13,13,21;30:9
**new (1)**
78:12
**newly (1)**
45:8
**Next (10)**
6:17;33:22;43:6;
69:1;80:20;81:17;
82:2,2;99:24;102:24
**nickname (1)**
38:2
**nine (1)**
83:11
**ninety-eight (2)**
55:14;61:14
**ninety-five (1)**
81:6
**ninety-nine (1)**
55:8
**ninety-seven (1)**
81:5
**nitty (1)**
99:21
**nobody (1)**
91:23
**nom (1)**
81:4
**none (9)**
21:13;24:15;34:10;
58:24;70:23;73:16;
76:10;87:12;93:7
**nonzero (2)**
29:7;32:10
**nor (1)**
86:25
**notes (1)**
95:3
**notion (1)**
87:22
**notions (1)**
60:25
**November (3)**
7:20;104:2,3
**nowhere (1)**
7:4
**Number (48)**
4:2,3;7:6,15;17:2;
18:21;23:1,1;25:19;
28:21;29:7;31:7,16,
18;32:10;38:6,24;
41:7;43:7;44:11,14,
14,18;48:14;50:20;
52:1;53:22;55:11,13;
59:25;65:7,8,8;74:19;
78:18;81:18,19;
83:11;84:4;86:8,14;
88:15;90:12;92:5,5,7;
96:24;104:6
**numbers (8)**
41:6;50:21;58:3;
66:22,25;67:23;
83:12;84:15

**numerous (4)**
13:16;37:2;56:21;
75:3

# O

**oath (1)**
4:24
**Obama (2)**
38:7;71:16
**object (4)**
33:13;37:7;54:17;
103:4
**Objection (5)**
9:13;39:14;40:7;
43:10;103:22
**objective (1)**
73:20
**obvious (1)**
88:19
**Obviously (6)**
55:13;60:2;66:4;
67:6;70:11;102:18
**occasions (1)**
37:3
**o'clock (1)**
94:23
**Off (4)**
59:15;63:1;94:24;
101:25
**offer (3)**
45:2;65:18;100:4
**offered (1)**
95:9
**offering (1)**
44:23
**often (2)**
66:20;80:15
**Oleja (1)**
69:8
**one (108)**
5:16;7:20;10:17,25;
11:11;13:21;14:16;
15:11;17:6;18:19,21,
22;20:15,15;21:20;
22:15;24:4;29:7;
32:11;37:4,17,20;
38:2;40:9,16;42:15,
17,19;44:23;45:13,
14;49:23;50:1;51:4,5,
11,17,18,19;52:8;
54:6,7,15,22,23;55:1,
5,21,24;56:10,16;
58:14;60:1,25;61:20;
62:15;64:10;65:2,3;
67:23;68:4,18;69:1,2,
25;70:1;71:2;72:4,23,
24;73:5,14;75:5;76:4,
10,19;77:2,3,12;79:2;
80:24;81:8,13;82:22;
84:4;85:19;86:23,24,
25;87:23;88:8;89:18;
91:13,17;92:25;

95:24;97:2,4,16;
98:10,10,14,16;100:6;
101:18;102:20;
105:10,15
**one-offs (1)**
75:24
**ones (11)**
22:3;30:16;35:16,
17,17,22,23;51:2;
57:11;68:2,3
**one's (1)**
64:7
**only (15)**
20:15;23:24;38:20;
43:9;52:4,11;53:23;
60:12;64:18;73:6;
77:1;81:5;84:10;91:9;
95:10
**onto (4)**
65:20,20;92:4;
94:16
**operations (1)**
47:12
**opine (2)**
15:1;31:16
**opinion (38)**
7:12,13,18;10:6,11;
12:4,20;14:8;25:17,
23;26:4,8;29:22;32:8,
20;33:1,3,9,18,25;
34:2,4,6,11,19,24;
35:6,9;37:2,6;40:4;
42:15;43:16;45:12;
55:25;57:18;60:6;
78:1
**opinions (5)**
5:16;44:23;45:3;
60:1,19
**opportunity (9)**
7:24;8:21;9:2,19;
18:10,11;19:10;
96:14;102:25
**opposite (1)**
88:4
**opposition (1)**
88:14
**optimal (3)**
85:23,23,25
**order (13)**
38:6,12,24;39:21;
42:5;60:20;64:22;
67:6,8;95:18,23;
96:25;97:1
**orders (1)**
104:7
**ordinary (1)**
90:5
**Oscanchelos (1)**
38:3
**Oscar (2)**
38:3,4
**others (1)**
73:18

**out (22)**
11:22;22:3;31:15;
32:3;46:19;53:1,5,21;
61:19;62:10;63:16;
64:22;66:2,10;68:11;
72:11,16;82:9;83:22;
87:13;95:21;101:17
**outperform (1)**
11:9
**output (38)**
12:16,21;13:2,5,7,
14,19;14:12,22;15:2,
16,24;17:8,14,15,16;
22:25;23:22;24:24;
25:11,13;26:5;27:19;
28:25;29:4;32:8,11;
35:2;39:8;40:11;
41:15;43:8;44:2;49:1,
13;85:25;86:6,24
**outputs (2)**
12:24;25:6
**over (8)**
38:19;51:5;55:25;
64:2;71:4;79:8;85:21;
105:6
**over-aggregation (8)**
37:17;50:5;73:4,7,
17;76:14,15;77:16
**over-aggregations (6)**
23:3;34:3;35:1,7;
53:22,23
**overall (1)**
61:17
**over-cluster (2)**
29:23;86:22
**over-clustered (1)**
74:22
**over-clustering (9)**
21:18;72:14,14,17;
85:11,14,24;86:3;
92:17
**over-clusters (1)**
29:21
**Overruled (1)**
40:8
**overstating (1)**
76:1
**own (7)**
10:14;35:19;56:25;
57:8;88:24;90:17,19
**owners (1)**
93:23

# P

**Pablo (1)**
74:25
**packages (2)**
86:19,19
**page (9)**
6:3,17;11:4;12:11,
13;30:21;46:24;47:3;
88:14

**pages (4)**
83:2,6,17;89:22
**painstaking (1)**
72:1
**painted (1)**
62:10
**pairwise (6)**
71:9;83:20,22,24;
84:21;85:17
**panacea (1)**
46:12
**Papas (2)**
4:13,13
**paper (2)**
16:18;17:7
**paragraph (1)**
47:4
**parcel (1)**
40:17
**part (18)**
8:24;9:7,9;11:18;
16:20;17:4;20:9;
23:11,16;40:17;45:6,
24;53:23;60:3;88:11;
101:7;105:4,9
**participants (12)**
25:13,17;27:18;
28:21,22;68:22;
30:16;91:8,10;92:6,7;
98:24
**participants' (1)**
94:3
**particular (12)**
31:16;34:1,2,7;
35:7,9;40:25;42:25;
57:6;83:21;90:2,15
**particularly (4)**
14:3;51:6;90:7;
104:19
**parties (8)**
96:7;97:18,24;
98:19;103:16,18,20;
104:11
**parts (1)**
41:19
**party (1)**
90:1
**pass (3)**
52:8,12;81:16
**passed (2)**
81:6;102:24
**passwords (1)**
41:6
**past (3)**
98:5;101:11,20
**peer (3)**
42:3,18;94:8
**peer-reviewed (19)**
14:10,19,25;15:3,
13,20;16:1,3,6;17:7;
42:12,21;60:11,12,14;
66:5;82:18;84:10,24

**people (32)**

25:19;26:24;31:12,
21;37:25;38:8,18;
40:25;41:10,14,25,25;
51:22;58:19,20;61:9;
62:2,3;63:17,19;
64:12,14,15;68:20;
69:15;72:19;76:19;
78:7;84:15;91:1;
99:16
**perceived (1)**
34:3
**percent (29)**
18:22;28:2,3,4;
54:6,15,22;55:8,14;
57:16;58:8,15,16;
61:14;73:5;79:2,3;
81:5,6,6;82:9;85:18,
19;86:25;87:1;91:13;
92:19,25;94:2
**percentage (3)**
32:9;34:18,21
**perfect (3)**
47:10;81:22,23
**perfectly (2)**
90:16;93:1
**permit (1)**
103:17
**person (19)**
32:16;53:5;62:1;
65:1;67:17;68:12;
69:5,7;70:22;71:23;
72:18;73:9;74:5,8,25;
75:21;76:19;90:22;
99:5
**phase (11)**
84:1;96:1;97:9,17,
19,21;98:20;100:8;
103:3;105:4,9
**PhD (1)**
62:5
**phenomenon (1)**
72:13
**phone (5)**
41:6;51:20;52:1;
104:1,6
**phones (1)**
51:23
**phonetic (13)**
12:21;16:17;30:19;
38:3,4;69:16;70:9;
71:22;75:5,8,12;77:3;
98:22
**phrase (2)**
45:21;60:23
**physical (1)**
50:25
**pick (3)**
67:21,22;87:23
**picked (2)**
23:13;52:17
**Pictures (1)**
88:21
**piece (2)**

66:21;85:12
**pieces (2)**
11:12;87:18
**pitcher (1)**
36:14
**pivot (1)**
67:1
**place (5)**
31:9,15;52:21;
75:16;90:6
**Placement (1)**
89:1
**places (2)**
65:14;91:4
**Plaintiff (3)**
18:24;88:18;96:11
**Plaintiff's (1)**
18:4
**plan (2)**
11:20;53:2
**Plano (1)**
89:15
**plausible (1)**
80:18
**play (1)**
70:2
**pleadings (1)**
104:7
**please (7)**
4:9;5:1;6:3;11:4;
33:24;43:20;59:17
**plenty (2)**
7:24;8:5
**pm (4)**
59:16;94:24,25;
105:23
**point (14)**
11:14;18:14;32:8;
51:18,18,19;61:19;
69:14;71:7,8,10;
80:24;91:17;103:2
**points (1)**
69:25
**policy (2)**
88:23;90:9
**pollute (1)**
87:14
**Ponzi (3)**
17:23;88:12;91:8
**Ponzi/pyramid (1)**
90:17
**poor (5)**
11:8,24;66:15;
79:24;83:14
**populated (1)**
81:12
**population (6)**
6:12,13;44:6;55:8;
57:23,25
**portal (1)**
102:25
**portion (3)**
9:2;21:20;47:7

pose (1)
100:4
**posed (1)**
77:19
**position (19)**
14:11;15:15,22;
16:14;20:5;24:16;
25:7;27:16;28:1;
49:20,21,24,25;54:14,
18;66:10;100:14;
101:13;102:7
**possibilities (3)**
92:9,10;93:6
**possibility (1)**
50:19
**possible (11)**
24:9;26:8;28:20;
34:25;40:4,19;41:15,
24;48:2;78:23;93:7
**possibly (2)**
21:17;28:13
**postulating (1)**
28:20
**potential (6)**
24:13;29:20;34:11;
37:16;53:15;58:20
**potentially (4)**
27:5;35:18;48:4;
68:18
**PowerPoint (1)**
59:20
**practical (3)**
99:22;100:20;101:8
**precise (2)**
82:14;86:14
**precisely (5)**
5:19;6:14,25;10:17;
90:24
**precision (1)**
88:19
**preclude (1)**
105:12
**predicts (1)**
87:19
**prejudice (3)**
97:23;105:16,18
**prepared (3)**
57:11;82:23;83:5
**preparing (1)**
82:23
**present (2)**
72:16;80:16
**presentation (2)**
80:8;94:8
**presented (1)**
89:14
**presenter (1)**
95:18
**presumably (2)**
42:1;90:2
**pretty (3)**
62:13;73:18;76:7
**prevalence (2)**

53:20;73:11
**prevents (1)**
91:13
**previous (1)**
5:10
**previously (2)**
4:4;5:4
**prima (7)**
92:22,23;96:3,4;
99:10,17;103:1
**primacy (1)**
84:2
**primary (2)**
45:14,14
**principally (1)**
75:5
**principle (1)**
46:18
**principles (1)**
60:7
**prior (2)**
7:25;61:16
**privy (1)**
103:13
**probabilistic (32)**
5:15,19;6:7,8;7:8,9,
16;10:4,6,11;11:9,18;
14:7,12,21;15:2,16,
24;45:18;46:1,9,11;
49:1,3,11,12;76:7;
78:4;79:21,23;80:3;
84:22
**probabilities (3)**
12:25;40:16;85:17
**probability (2)**
40:15;74:12
**probable (2)**
24:8,9
**probably (6)**
19:23;67:17;78:5;
98:14,17;103:9
**probative (1)**
26:25
**problem (21)**
24:12,14;33:7;
35:18;56:13;62:11;
66:10;67:18,22;
70:17;72:17;73:10;
76:13;77:3,11,14;
78:13;90:22;92:2;
101:1,8
**problematic (3)**
24:19;28:16;37:20
**problems (10)**
46:10;64:1;67:3;
68:11;76:20;77:15;
78:12;87:6;93:11;
101:10
**procedurally (1)**
105:17
**proceed (3)**
4:21;72:22;73:2
**proceedings (1)**

105:9
**process (21)**
20:8;21:21;22:11;
72:2;82:19;83:8;84:7,
8,10,17,21;85:15,21;
86:10,12;92:13,14,16;
94:15;99:16,18
**processes (1)**
94:9
**product (1)**
90:12
**profound (1)**
77:4
**programmatically (1)**
44:8
**projected (1)**
87:23
**pronounce (1)**
70:9
**proper (1)**
50:9
**properly (2)**
46:14;60:10
**properties (1)**
22:13
**proportional (1)**
55:12
**proposals (1)**
102:18
**proposition (1)**
88:16
**propound (1)**
96:13
**protest (1)**
89:5
**prove (3)**
65:22;90:3;91:12
**proved (1)**
28:6
**proven (2)**
86:12;88:18
**proves (1)**
76:5
**provide (7)**
8:18;57:7,9;80:12;
84:12;85:5;88:15
**provided (4)**
13:9;18:9;93:22;
102:8
**Providence (1)**
89:2
**providing (1)**
24:25
**proving (1)**
90:1
**public (1)**
88:23
**publication (1)**
15:14
**publications (3)**
14:19;15:22;16:13
**pull (7)**
26:14;30:9;46:23;

86:16;87:13;96:22;
100:15
**pulled (3)**
22:3,3;23:1
**pulling (1)**
46:25
**punctuation (2)**
38:18,20
**purpose (13)**
7:7,8;23:15,23;
32:12;43:6;49:5,7,8;
58:12;79:25;82:16;
86:10
**purposes (1)**
12:17
**pursuant (1)**
105:12
**pursuing (1)**
25:15
**put (18)**
18:20;21:16,24;
22:4;31:7,18;62:5;
63:14;65:1;75:16;
90:1,19;91:1,10;
92:23;96:3,4;102:16
**puts (2)**
72:9;94:15
**puzzled (1)**
43:12
**pyramid (1)**
91:8

**Q**

**qualifications (2)**
79:11;91:7
**qualitative (1)**
31:6
**quality (41)**
6:10;7:1;11:8,24;
13:9,22,23;14:3;
40:23;45:8;46:13,13;
47:5,10,14,17,21,23;
48:1,2,6,9,23;50:6;
61:23;64:1;66:15;
79:17,22,24;80:5,10,
11;81:1,2,3,10;82:11;
83:14;92:13;94:18
**quantified (1)**
31:10
**quantify (1)**
77:24
**quantity (1)**
24:21
**quantum (1)**
30:1
**queries (2)**
21:16;22:3
**quickly (2)**
19:8;75:1
**quite (3)**
8:2;26:17;37:20
**quote (4)**

15:6,7,11;45:24

**R**

**Radio (1)**
88:21
**raise (3)**
23:9;24:19;99:13
**raised (1)**
102:2
**random (8)**
21:2,9;22:12,17,18,
19;23:1;76:23
**randomly (1)**
81:24
**rare (1)**
78:23
**rarely (1)**
40:22
**rate (28)**
21:8;22:23;40:5,16;
57:16,19,21;58:7;
72:25;73:1;74:12,14,
15;78:19,22,24,25,25;
79:1;81:23;82:9;86:6,
7,13;87:19;92:18;
94:1,10
**rates (5)**
40:4;68:15,16;
87:23;88:16
**rather (3)**
45:18;62:20;90:8
**read (11)**
6:4,22;11:5,25;
16:17;17:4,9;45:16,
21;47:18;48:10
**reading (3)**
6:5;46:17;62:6
**reads (1)**
89:24
**ready (2)**
4:20;102:23
**real (12)**
60:17;61:15,24;
62:18;67:17;74:15;
77:17,18;78:8,18;
86:8;92:1
**reality (3)**
66:7,8;100:25
**really (27)**
16:10;17:5;27:11,
23;31:20;37:23;
38:15;39:17;46:5,12;
55:7;58:18;60:24;
64:5;67:1;71:16,16;
79:14;84:9;88:10,10,
11;90:15;91:3;92:24;
94:9;96:12
**real-world (1)**
27:15
**reargue (1)**
105:19
**reask (2)**

43:20,23
**reason (9)**
38:6;62:4;63:4,22,
23;66:14;73:6;76:10;
98:6
**reasonable (4)**
49:15;52:7,15;89:3
**reasonableness (3)**
52:8,13;98:21
**reasonably (2)**
38:21;41:1
**reasons (4)**
66:14;70:13;88:20;
102:2
**rebuilt (1)**
19:13
**rebut (1)**
103:1
**rebuttal (3)**
65:18;95:2,6
**recall (18)**
5:16;17:2,10;29:11;
31:10;39:17;40:1;
42:8;43:2;44:11,15,
18,23;45:19,22;
46:17;57:16;59:4
**received (5)**
18:14;19:6,6;32:17;
84:5
**recently (2)**
84:24;89:12
**recitation (1)**
89:23
**reckoning (1)**
72:20
**recognize (1)**
30:13
**recognized (1)**
48:14
**recognizing (1)**
75:23
**recollection (2)**
5:25;30:3
**recommendation (1)**
45:17
**record (15)**
4:8;6:7,8;7:10;
29:16;46:9;59:15,16;
67:8;76:7;78:4;94:24,
25;95:8;98:9
**records (2)**
44:14;80:17
**RECROSS (1)**
55:19
**RECROSS-EXAMINATION (1)**
47:1
**recurring (1)**
85:9
**REDIRECT (3)**
36:16;37:8;53:12
**redone (1)**
27:21
**reduced (1)**

83:11
**refer (1)**
14:10
**referenced (2)**
95:9;99:5
**referred (3)**
10:23;23:17;50:19
**referring (9)**
6:24;7:1;11:6,6,17;
14:15;15:7;36:20,23
**refill (1)**
36:13
**reflect (3)**
60:6,20;78:1
**reflection (1)**
99:11
**regard (2)**
104:14,18
**regarding (1)**
89:9
**regardless (3)**
46:18;49:19;91:6
**regards (2)**
103:10,12
**regularly (1)**
83:18
**relation (1)**
39:10
**relative (2)**
14:3;45:12
**relatively (1)**
21:7
**relevant (3)**
58:8;60:25;80:11
**reliability (1)**
76:21
**reliable (15)**
12:16;13:2,4,7,14,
20;32:14;35:21;
42:22;60:7,20;76:22;
78:2;85:5,6
**reliance (1)**
45:12
**relied (4)**
11:1,2;15:25;
102:10
**rely (8)**
14:20,25;15:14,22;
16:14;19:23;79:1;
85:3
**remarks (1)**
59:21
**remember (25)**
5:10,13,18,21;
10:24;12:6,6,7;15:6;
17:6,12,16,20;18:3,6,
9,13;19:5;26:9;27:6;
29:5,25;44:13;56:5,
15
**remembering (1)**
104:25
**remind (3)**
4:24;39:3;85:13

**remine (2)**
60:16;78:6
**render (2)**
32:20;35:8
**rendered (1)**
34:4
**renders (2)**
32:11;34:12
**rep (3)**
75:8,11;81:4
**repeat (2)**
18:21;33:22
**repeated (1)**
99:24
**reply (1)**
73:3
**Report (35)**
5:11;8:4,18;17:3;
18:14;20:9;22:4;30:8,
9,13;35:13,20,25;
43:10;44:22;45:2;
49:25;50:3;51:8;57:4,
10;62:5;63:3,11,12;
65:18;73:3,3;74:3;
83:3,7,18;94:7;
101:19;102:10
**reports (3)**
65:23;102:6,7
**represent (1)**
4:10
**representante (3)**
9:17,20;14:6
**represented (2)**
54:5,14
**require (9)**
12:14;34:16;39:22;
49:4;56:25;57:8;
74:15;88:23;101:14
**required (9)**
5:20;11:16;12:24;
14:11,21;15:1,15,23;
102:20
**requirement (1)**
12:4
**requirements (1)**
73:22
**requires (8)**
12:21;48:25;66:5;
72:15;79:1;92:2;
103:4,5
**reschedule (1)**
105:13
**research (1)**
41:20
**reserve (2)**
104:16
**resolution (1)**
85:23
**resolved (1)**
89:9
**resorting (1)**
69:19
**resource-intensive (1)**

11:21
**resources (1)**
  11:16
**respect (21)**
  5:11;17:21;22:5,7,
  13;24:13;26:23;
  31:19;33:4,25;34:2,9;
  35:6;37:3;39:15;
  68:24;73:24;83:15;
  85:20;87:11;98:25
**respecting (1)**
  96:25
**rest (4)**
  11:15;73:4;75:18;
  88:1
**Restate (1)**
  54:20
**resting (2)**
  31:8,15
**result (9)**
  8:25;13:2,4;24:6;
  29:1;33:2;48:23;
  92:21;94:2
**results (7)**
  24:15,23;42:5;
  71:13;80:21;86:22;
  93:13
**retain (1)**
  72:11
**retained (1)**
  7:22
**reveal (1)**
  19:7
**reverse (1)**
  100:23
**review (7)**
  7:13,25;8:5;9:19;
  16:22;38:12;42:18
**reviewed (16)**
  8:1,2,3,17;16:20;
  17:11;19:8;23:2;
  25:20,21;28:22,23;
  38:24;42:3,4;94:9
**reviewing (1)**
  9:4
**Reynolds (6)**
  59:22;95:17,19;
  96:18;98:10;104:1
**right (94)**
  4:9;5:3,18;6:24;
  7:2;9:19;10:15,20;
  11:2;12:10;14:5,9,15;
  16:11,15,16;18:17,18;
  19:10,12;20:1,3,13,
  17,18,21,21;21:1,2,6,
  21;22:20,23;23:10,
  15;24:1;25:1,8,14,21;
  26:6;27:8,11,13,19,
  24;28:18;29:14;
  30:11,22;32:15;35:3,
  22;36:25;37:16;
  38:17;40:23;42:8,24;
  44:4;46:12,17;47:24;

48:10;49:1,4,14,20;
  50:22;51:20;53:5,8,
  18;55:12;57:12,25;
  58:16;70:9;72:15;
  78:10;80:2;87:24;
  89:24;93:19;94:22;
  96:17;97:18;98:20;
  99:11;104:16,21;
  105:10,10,16
**rightfully (1)**
  94:16
**rigor (3)**
  92:2,21;93:25
**rigorous (1)**
  92:12
**risk (1)**
  88:24
**Rita (2)**
  69:16;74:1
**RKO (1)**
  88:21
**robo-signing (1)**
  61:13
**role (1)**
  70:2
**Rona (42)**
  4:15,15;9:13;33:10,
  13,16;36:12,14,17;
  39:19;43:13,18,21,24;
  46:21;53:10,11,13;
  54:11;55:17;57:14;
  59:1,7,9,12,18,19;
  95:1,4,8;97:5,8,11,15;
  100:3;101:22;103:2,
  23,24;104:4;105:1,21
**Rona's (1)**
  81:15
**rose (1)**
  24:17
**rough (1)**
  30:2;83:12
**roughly (2)**
  26:16;44:12
**row (2)**
  67:10;76:2
**rule (18)**
  14:21;15:1;88:19;
  89:23,25;90:5,8,9,15,
  15,21;91:2,3,8;93:4;
  94:11,11,12
**rules (4)**
  83:4,15,17;85:3
**ruling (3)**
  102:24;104:13,15
**rulings (1)**
  101:13
**run (4)**
  18:11;19:3;20:7;
  82:18
**running (1)**
  19:12
**runs (1)**
  93:3

**S**

**salvos (1)**
  65:24
**same (31)**
  34:8,22;40:17;41:2,
  3,10,14,21,25;50:25;
  52:3,5,15,21;62:1,11,
  19;64:17;67:3;69:19;
  70:22;73:9;74:5,8,25;
  77:14;84:16;89:1;
  102:6,12,16
**sample (14)**
  21:5,9,9;22:12,17,
  18,19;27:24;43:4,8;
  65:10;72:3;80:19,23
**sampled (2)**
  81:18,25
**samples (5)**
  21:2;23:13,25;43:1;
  65:8
**sampling (4)**
  22:10;23:20;24:1;
  87:16
**Sand (1)**
  38:2
**Sanderli (2)**
  38:2,2
**satisfied (1)**
  92:12
**satisfies (1)**
  94:11
**satisfy (1)**
  78:23
**save (1)**
  60:4
**saw (5)**
  37:17,25;64:23;
  90:25;95:2
**saying (18)**
  28:12,14;45:22;
  47:20;49:17;55:1;
  56:20;63:24;70:21;
  72:23;74:10;75:20,
  24;76:6,6;92:23;93:5;
  94:5
**scales (1)**
  92:4
**scheduling (2)**
  95:18,22
**scheme (4)**
  17:24;88:12;90:17;
  91:8
**science (14)**
  48:15,24;49:19;
  74:9;85:2,2,3,3;86:7;
  87:22;92:2,20;93:2,
  15
**scientific (3)**
  58:9;93:21,25
**scientifically (2)**
  57:19;58:8

**scientist (4)**
  20:23;87:9,10;91:7
**scientists (3)**
  82:25;83:19;93:19
**scope (1)**
  39:14
**screen (5)**
  30:12;70:5;87:24;
  91:1;95:19
**Scroll (3)**
  97:9;98:15,17
**Scrolling (1)**
  30:18
**searches (3)**
  8:22,24;24:11
**seated (2)**
  5:1;59:17
**second (8)**
  7:20;10:17;18:19;
  60:6;78:1;97:16;
  100:20;105:15
**secret (1)**
  90:12
**Security (2)**
  66:22,25
**seeing (1)**
  67:11
**seem (2)**
  68:5;71:20
**seemed (1)**
  31:12
**seeming (1)**
  73:21
**seems (2)**
  61:25;75:23
**selected (3)**
  25:6;35:25;74:2
**selecting (1)**
  24:25
**selection (3)**
  23:17;24:22;25:5
**self-imposed (1)**
  98:5
**semester (1)**
  20:16
**send (1)**
  65:24
**sense (5)**
  21:12;44:8;67:2;
  74:19;103:24
**sentence (2)**
  11:15;49:23
**separate (9)**
  29:13;31:21;32:19;
  67:16;71:6,6;75:21,
  21;85:16
**separately (2)**
  70:16;84:23
**sequences (1)**
  19:15
**series (4)**
  75:12;86:19;87:13;
  92:9

**servers (1)**
  19:3
**Service (1)**
  89:1
**set (42)**
  5:2;7:21;12:4,14,
  15,21;14:10,11,20;
  15:1,15,23,23;17:15;
  19:2,2;22:13,20;32:3;
  36:8;40:1;48:25;49:4,
  13;50:11;53:8;64:5,6,
  6,7,9,24;66:4,5;83:17;
  84:14,22;85:16;86:9,
  11;91:16;103:15
**sets (3)**
  17:8;64:9;71:10
**setting (1)**
  38:22
**set-wise (1)**
  93:12
**seven (1)**
  102:8
**Seventh (1)**
  89:12,16,19
**shakes (1)**
  84:19
**shall (1)**
  88:23
**shape (4)**
  9:20;20:6;79:24;
  93:8
**share (1)**
  41:1;97:6
**shared (1)**
  41:6
**shift (1)**
  65:20
**short (1)**
  100:15
**show (1)**
  103:8
**showed (1)**
  28:6
**shows (2)**
  50:24;74:20
**sic (2)**
  86:10;92:15
**side (3)**
  40:24;76:13;79:8
**sides (1)**
  100:25
**signed (2)**
  88:25;89:7
**significance (2)**
  22:5;72:4
**significant (8)**
  18:1;24:7;38:1;
  43:1;44:1;56:16;58:4;
  65:10
**significant- (1)**
  72:3
**similar (3)**
  17:23;41:2;63:14

**similarity (1)**
17:22
**Similarly (2)**
68:20;88:2
**simple (1)**
31:14
**simply (7)**
13:1;62:21;68:14;
73:20;74:9;87:17;
88:8
**single (12)**
6:11;13:12,15,17;
32:12;34:9;55:4;71:9;
80:24;81:8;91:5,9
**singular (1)**
53:7
**sit (3)**
20:5;22:2;35:12
**situations (1)**
49:15
**size (7)**
9:20;20:6;21:5,9;
22:17;79:24;93:8
**skill (1)**
19:18
**skip (1)**
79:14
**skipped (1)**
64:2
**slice (1)**
68:4
**slide (5)**
73:25;80:8,20;
81:17;82:3
**slip (1)**
87:25
**small (9)**
6:15;10:18;45:22,
22;63:15,15;69:13;
76:8;82:8
**smart (1)**
91:12
**smell (1)**
82:12
**so-called (1)**
12:4
**Social (2)**
66:22,25
**Soja (1)**
20:23
**Sol (3)**
75:8,8,9
**Solodyn (1)**
89:8
**solve (2)**
46:9;48:5
**solved (2)**
66:9;101:9
**somebody (3)**
26:13;64:23;71:23
**somehow (9)**
28:24;82:10;83:16;
84:9;85:1;87:21,23;

88:1;90:20
**someone (5)**
34:16;38:1,21;39:7,
21
**someone's (1)**
68:13
**sometimes (7)**
62:18,18,19,19;
70:6,7;73:14
**somewhat (1)**
44:8
**somewhere (2)**
88:5;96:6
**son (1)**
84:16
**sooner (1)**
96:15
**sophisticated (1)**
47:12
**Sorrondo (6)**
99:6;102:21;
104:19;105:5,5,11
**sorry (9)**
4:5;18:7,23;29:18;
35:11;46:24;56:2;
83:23;95:20
**sort (7)**
63:1;85:7;96:16;
97:10;100:10,24;
101:13
**Sosa (2)**
38:4,4
**sound (1)**
18:17
**sounds (1)**
52:15
**source (6)**
15:13;24:4;42:2;
53:18,19;56:16
**sources (6)**
10:25;17:19;27:22;
28:8;29:3;64:22
**speak (3)**
13:1;40:12;79:13
**speaking (2)**
22:10;25:13
**species (1)**
75:23
**specific (12)**
7:18;25:19;31:18;
33:4,5;34:6;39:5;
82:13;83:2,4;85:20;
94:7
**specifically (9)**
13:23;23:14;26:11;
33:6;79:20;80:14;
85:14;86:4;88:25
**speculation (1)**
54:9
**speculative (2)**
77:8,9
**spent (1)**
9:13

**split (1)**
37:25
**spoke (1)**
14:2
**spoken (1)**
25:18
**staff (1)**
87:8
**stage (1)**
87:20
**staggeringly (1)**
87:1
**stand (2)**
88:15;99:8
**standard (6)**
12:23;60:9;87:2;
92:11;94:12;95:13
**standards (1)**
78:5
**start (8)**
18:8;52:6;61:18;
65:15;79:10,18;92:3;
93:20
**started (7)**
4:4;12:7;67:4;
81:17;82:21,23;97:20
**starting (2)**
11:5;85:17
**starts (2)**
47:4;89:23
**stated (2)**
10:2;31:25
**statement (3)**
11:8;24:16;89:1
**States (2)**
41:20;90:5
**Statistical (21)**
10:23;11:7;13:6,13,
18,18;20:12;21:22,
24;22:4;23:20;24:1;
72:4;80:18,23;81:19;
86:21;87:7,16,17;
93:17
**statistically (9)**
13:5;22:10;35:1;
43:1;44:1;65:9;72:3;
87:15;93:16
**statistician (4)**
20:13,18,21;87:7
**statisticians (2)**
87:8;93:18
**statistics (4)**
6:9;13:21;20:16;
23:18
**status (1)**
103:15
**step (4)**
71:3;83:25;84:2;
96:5
**step-by-step (1)**
19:2
**Stephen (1)**
105:12

**steps (6)**
13:5,18;30:25;
31:20;47:8;83:2
**sticking (1)**
92:3
**still (10)**
4:24;33:6;47:16,23;
48:8;53:5;54:17;
73:17;96:18;99:14
**stipulation (1)**
97:11
**stop (2)**
72:6;82:22
**straight (1)**
102:15
**straightforward (2)**
21:7;47:11
**street (5)**
64:15;66:18;70:12;
72:9,9
**strictures (1)**
78:24
**strike (5)**
97:24;98:3;104:8,
20,23,25;105:5,11
**string (1)**
67:9
**strings (1)**
67:6
**structure (1)**
32:2
**studies (7)**
14:10,19,25;15:20;
16:4;42:18;84:24
**study (12)**
15:3,13;16:6,21;
17:8,13,21;30:17;
42:12,21;44:7;84:25
**stymied (1)**
62:9
**sub (1)**
103:3
**subject (5)**
12:8;81:25;84:9;
90:18;100:14
**subjective (1)**
73:20
**subjectivity (1)**
73:22
**submissions (3)**
44:12,16;64:12
**subset (2)**
63:9,9
**succinct (1)**
49:23
**sufficient (13)**
13:23;23:1;25:24;
35:8;43:25;60:2;
61:10;77:20;80:10;
81:20;82:16;88:18;
93:8
**sufficiently (7)**
12:9;42:13,22;43:3,

25;65;22;70:14
**suggest (12)**
6:11;38:16;62:4;
67:21;76:17;84:1;
85:1;87:25;91:2;92:8;
94:2;104:2
**suggested (4)**
10:3;18:16;86:8;
102:15
**suggesting (5)**
5:22;12:13;27:14;
83:16;91:3
**suggestion (4)**
45:8;69:11;82:10,
12
**suggests (8)**
12:23;63:17,19;
76:21;77:3,16;84:8;
88:3
**suited (1)**
90:16
**sum (1)**
70:25
**summarized (1)**
102:9
**summary (11)**
88:14;89:13;97:22,
22;98:1,4,6;102:1;
104:21;105:3,18
**supervision (1)**
78:21
**supplemental (1)**
96:25
**support (1)**
23:14
**supported (2)**
15:18;24:15
**supportive (3)**
16:8;25:7,9
**suppose (3)**
69:8;73:8;104:19
**supposed (1)**
19:16
**Supreme (2)**
88:22;90:4
**sure (26)**
6:4,8;8:9;15:3;
18:22;19:17;22:16;
35:12;36:4;42:15;
44:20;46:14;49:15;
52:6;56:2;70:8;73:18,
24;76:25;91:19,20;
92:4;95:9;97:8;
101:12,21
**surmising (1)**
27:12
**surprisingly (1)**
65:8
**Sustained (4)**
9:16;39:16;89:5;
99:10
**swallowing (1)**
29:18

**swing (2)**
68:18,21
**switch (1)**
79:8
**switched (1)**
65:14
**SWORN (1)**
5:4
**system (7)**
7:16;10:1,6;14:7;
42:13,22;74:13
**systems (3)**
49:3,11,12

## T

**table (9)**
9:17,20;14:6;21:16;
31:7;35:14;50:24;
51:10;74:20
**tail (2)**
15:6,8
**talk (8)**
43:1;61:2;63:25;
66:19;72:13;93:6;
101:9,16
**talked (1)**
28:21
**Talking (5)**
53:15;58:3;63:8;
64:5;93:4
**talks (1)**
97:18
**task (1)**
28:19
**tautology (1)**
74:10
**team (12)**
19:20,21,23,25;
20:19,24;38:7;71:14,
18,20;93:18,19
**technical (1)**
19:23
**technique (1)**
49:19
**techniques (7)**
47:13,15,22;48:7,
15,22;50:9
**telephone (4)**
53:2;84:15;92:5;
104:3
**telephonic (1)**
103:20
**Telex (3)**
7:21;49:20;84:14
**TelexFree (7)**
44:24;53:16;60:13,
13,18;64:24;76:22
**TelexFreeBen@gmailcom (1)**
75:11
**TelexFreeBen@yahoocom (1)**
75:6
**telling (3)**

64:24;65:16;103:7
**tells (1)**
40:22
**ten (3)**
38:19;59:13;62:1
**Teresa (1)**
73:24
**term (4)**
13:14,15,19;81:15
**terms (6)**
13:6;25:19;26:11;
39:12;54:2;94:13
**test (11)**
19:12;31:2;37:21;
38:15;52:8,13;69:20,
20;81:16;82:12;86:18
**tested (4)**
13:23;24:4,5,5
**testified (11)**
5:23;7:14,20;9:25;
10:5,15;13:25;17:20;
26:11;43:15;79:19
**testify (3)**
7:5;42:20;99:8
**testifying (9)**
5:10,13,18;17:12;
26:9;27:6,11;29:5;
96:1
**testimony (24)**
7:5,25;8:18;9:24;
10:22;12:6;14:1,5;
17:17;43:3,17;44:22;
45:6,16;70:2;79:19;
80:1;82:14;95:12,14,
15;100:13;105:8,13
**testing (5)**
13:6,8,13,18;21:10
**tests (1)**
86:20
**the- (1)**
9:22
**theme (1)**
85:9
**therefore (1)**
92:24
**thereof (1)**
62:21
**thesis (2)**
23:14;29:2
**thinking (2)**
97:13;98:16
**third (1)**
30:21
**third-party (1)**
42:2
**thirty (1)**
28:3
**thirty-page (1)**
19:1
**though (4)**
51:11,17;63:5,24
**thought (7)**
23:9;34:6;42:25;

53:17;57:21;97:21;
105:2
**thoughts (1)**
29:24
**thousands (1)**
17:25
**three (12)**
7:23;52:25;53:21;
54:7,16,23;55:21,24;
56:4;75:7,7;102:16
**thresholds (2)**
84:23;85:16
**throughout (2)**
45:13;100:22
**throw (1)**
87:24
**thrown (2)**
87:20;93:13
**Thursday (1)**
103:25
**Tia (1)**
72:7
**tie (1)**
27:15
**tied (1)**
32:16
**time-intensive (1)**
11:21
**timely (1)**
100:9
**today (13)**
20:6;22:2;35:13;
36:19;39:18;58:3;
63:5;79:22;80:4;
99:13,24;101:3;
103:18
**together (17)**
17:25;21:24;37:18;
62:24;63:14;67:16;
68:3,21;70:14,20,20;
71:17,19,21;73:14;
75:22;101:1
**told (2)**
56:4;104:17
**took (5)**
21:14,15;42:21;
81:18;96:5
**tools (1)**
82:25
**total (3)**
29:25;44:14;67:13
**totality (1)**
57:7
**towards (1)**
29:1
**trade (1)**
90:12
**Trained (1)**
20:21
**transactions (6)**
26:20;28:3,3,4,23;
99:1
**transfers (1)**

98:23
**treatise (1)**
15:14
**treatises (1)**
15:21
**treatment (1)**
99:1
**trial (1)**
57:11
**triangular (1)**
99:1
**tried (1)**
70:9
**trier (2)**
89:2;103:6
**trillion (1)**
83:22
**tripped (1)**
71:4
**true (4)**
22:11;34:8;74:14,
14
**trustee (24)**
4:11,13,14;61:8;
63:24;65:19;69:6;
72:10;78:16;79:5,5;
91:4;93:22,22;94:4,5;
96:8,11;97:1;98:4;
99:9,14;102:19;103:5
**trustee's (13)**
16:18;18:5,24;
46:24;59:23;94:14;
96:3,4;98:6;100:18,
21;101:10,16
**truth (2)**
12:14;15:23
**try (12)**
51:8;53:11;65:20;
66:13;68:2,3,10;
73:15,18;78:9;94:11;
96:22
**trying (16)**
8:9;11:23;14:14;
17:2,6,10;22:21,22;
23:19,20,21;24:3,20;
58:12;65:20;91:2
**t's (1)**
35:12
**TT (1)**
51:3
**tunnel (1)**
61:8
**turn (3)**
18:2;66:2;67:5
**twelve (1)**
68:2
**two (39)**
12:2;15:25;37:16,
17;41:1,8,14,18,21;
49:23;50:6,7;51:25;
52:3;54:7,15,23;
55:21,24;56:10;
57:16;58:7,15,16;

61:23;62:24;67:13,
19;73:2,5,13;75:4;
79:3;82:9;88:7;92:18;
94:2,15;100:4
**type (4)**
10:12;22:12;82:18;
97:10
**typical (1)**
66:19
**typo (1)**
68:8
**typographical (3)**
46:2;76:8,9
**typos (3)**
41:25;46:5;52:23

## U

**ultimately (4)**
63:20;81:9,23;
93:17
**unable (1)**
9:8
**unacceptable (4)**
32:9,9,11;34:22
**unacceptably (1)**
35:16
**unaccepted (1)**
32:11
**unauthorized (1)**
9:8
**uncertain (3)**
92:5,5,7
**uncertainties (1)**
89:9
**uncertainty (5)**
12:25;41:8;88:24;
89:5;91:5
**unclear (2)**
9:13;75:13
**uncorrected (1)**
72:22
**under (10)**
4:24;9:22,22;47:3;
59:24;68:5;72:15;
85:21;90:20;93:10
**under=aggregated (1)**
37:3
**under-aggregated (1)**
57:5
**under-aggregation (10)**
37:21;38:10,15,17;
50:5,14,17;76:15;
77:4,16
**under-aggregations (7)**
23:4;34:4;35:2,8;
53:24,25;56:1
**under-cluster (1)**
86:22
**under-clustering (6)**
21:18;85:11,15,24;
86:4;92:17
**under-clusters (2)**

29:21,23
**undergraduate (2)**
20:15,16
**understands (1)**
62:16
**Understood (2)**
49:9;96:2
**unexpected (1)**
71:13
**unfair (3)**
88:17;91:14,14
**unimpeachable (1)**
94:10
**unique (2)**
6:10;7:1
**United (2)**
41:20;90:4
**unknown (3)**
78:22,24,25
**unless (2)**
37:11;94:19
**unlikely (1)**
41:2
**unnecessary (4)**
102:2,4,13,14
**unpack (1)**
13:3
**unreliability (2)**
55:23;77:24
**unreliable (3)**
26:10,12;34:14
**unsupervised (4)**
78:20;84:7,20;
86:12
**untested (1)**
24:4
**unto (1)**
75:23
**unusable (7)**
32:21;33:2;34:5,12;
35:9;60:4;79:25
**unusual (1)**
100:24
**unvalidated (2)**
42:12,21
**up (38)**
12:12;18:4,7,20;
19:2;26:14;30:9;32:5;
36:18;37:18,25;46:6,
23,25;52:17;64:24;
66:25;67:21,22;71:4;
74:1;75:25;76:1;80:7;
85:18,19;86:16;
87:20,23,24;91:1;
93:13;95:17,22;96:9,
22;100:4,15
**upon (12)**
11:1;14:20,25;
15:22,25;16:14;85:3;
89:3;90:6,22;92:9;
102:10
**usable (2)**
62:25;91:6

**usage (1)**
73:11
**use (31)**
13:7,14,19;39:9;
43:7;46:4;47:21;
62:16,18,18;64:10;
66:17,24;69:18;
71:11;73:12,12,14,14;
75:4;76:17,18;79:20,
20,23;80:1,2;83:5;
84:20;85:5;95:14
**used (29)**
7:7,16;14:7;37:23;
38:21;40:15,19;42:8;
45:18;46:18;48:14,
18;49:12,19;51:17;
58:18;64:17;74:24;
78:2,5;81:20;82:25;
83:18,25;84:11,17;
85:16;94:4;104:15
**useful (1)**
39:13
**user (13)**
31:24;32:16,22,23;
41:1,8;52:25;64:11;
71:24;75:3,15;88:12;
99:20
**uses (5)**
6:9;62:19,20;72:7
**using (16)**
5:19;15:5;17:18;
27:21;38:8,18,20;
45:18;46:11;51:6;
61:15;73:1;78:7;
81:15;85:25;100:21

---

**V**

**Vaguely (2)**
10:25;93:20
**valid (1)**
93:16
**validate (10)**
12:21;14:12,13,21;
15:1,24;26:5;42:5;
48:25;82:15
**validated (12)**
25:12;64:14,15,15,
22;70:24,24;84:10,18,
23;94:1,6
**validating (2)**
15:16;64:4
**validation (1)**
86:9
**validity (2)**
21:22;94:4
**value (2)**
81:13;91:24
**values (8)**
80:16,17,18;81:7,9,
18,23,25
**variable (1)**
6:11

**variance (1)**
58:5
**various (3)**
8:21;31:12;69:25
**Vase (3)**
30:19,24;31:1
**versus (5)**
4:2,3;38:7;41:10;
57:23
**video (1)**
64:23
**view (1)**
102:19
**visual (6)**
69:20;73:19;81:16,
21,22;86:1
**visually (4)**
68:2;69:15,17;
81:15
**voter (2)**
60:15;78:7

---

**W**

**wall (1)**
93:13
**wallet (1)**
28:3
**Walt (1)**
72:6
**wants (3)**
59:10;73:4;100:11
**Warehouse (2)**
10:23;11:7
**water (2)**
29:19;36:13
**wave (1)**
63:1
**way (31)**
9:20;10:6;20:6;
26:12,16,17;30:21;
31:10;34:7,20;35:4;
42:15;44:23;48:18;
55:7;62:24;70:7,9;
79:24;82:24;83:5;
85:18;87:25;91:6,13;
93:8,16,20;95:23;
96:3;101:18
**ways (7)**
38:8;60:22;68:3;
88:7;94:6,9,15
**weeks (2)**
12:3;103:21
**weighted (1)**
84:4
**weighting (1)**
84:5
**weights (1)**
6:11
**weren't (4)**
9:1,1;101:12;
104:24
**what's (6)**

15:18;30:12;53:18,
18;60:11;67:14
**whatsoever (1)**
43:11
**Where's (1)**
30:20
**white (1)**
70:9
**whole (7)**
17:4;53:3;83:19;
86:9,18;92:9;102:1
**wholly (2)**
102:13,14
**who's (1)**
99:5
**whose (1)**
89:4
**wide (1)**
22:20
**Wigmore (1)**
90:3
**Wigmore's (2)**
89:25;90:8
**willing (1)**
101:17
**win (1)**
54:2
**winner (12)**
36:5,23;37:4;38:13,
25;39:4,7,21;44:6;
52:12;63:13,15
**winners (14)**
32:13,24;51:6;
57:23,25;58:14;63:7,
24,25;65:17;69:11;
78:14;96:2,9
**winning (1)**
64:13
**winnings (7)**
32:13;58:1;71:2;
98:22,25;99:2;103:8
**wish (1)**
100:5
**wishes (1)**
83:1
**within (7)**
8:23;15:4;58:15;
77:12;87:18;90:7;
100:18
**without (14)**
40:6,20,20;41:16,
20,23;42:14,22;
48:21;49:13;63:9;
97:23;105:16,18
**WITNESS (13)**
4:25;33:20;36:10,
13;37:14;57:17,20;
58:10;59:3;96:11,12;
103:8,9
**witnesses (4)**
102:16;104:15,15;
105:8
**word (2)**

35:4;39:9
**wording (1)**
29:11
**words (2)**
13:7;34:10
**work (6)**
7:10;52:22;70:4;
72:15;101:6,17
**worked (4)**
26:16,18;100:25;
101:10
**works (1)**
87:22
**world (4)**
61:24;64:24;74:15;
78:9
**worth (4)**
25:15;27:14;38:19;
74:17
**writing (1)**
95:15
**written (1)**
14:23
**wrong (11)**
38:5;41:10,11;
72:25;73:1;76:8;
78:10;79:3,3;87:21;
88:24
**wrongdoer (2)**
88:23;89:10
**wrongful (1)**
89:4
**wrote (1)**
65:4

---

**Y**

**years (8)**
6:1;7:6,15,23;
60:16;102:8,10,22
**yep (2)**
19:13;21:10
**yield (1)**
100:13
**Yukarena (1)**
70:9
**Yvonne (1)**
77:13

---

**0**

**0.0002 (1)**
81:5
**0.006 (1)**
85:18
**0.6 (1)**
85:24

---

**1**

**1 (12)**
67:12;75:9;96:1;
97:9,17,19,21;98:20;

100:8;103:3;105:4,9
**1,000 (1)**
24:11
**1,000-plus (1)**
22:3
**1:04 (1)**
94:24
**1:15 (1)**
104:3
**10 (2)**
80:8;96:5
**10:18 (1)**
4:1
**100 (1)**
85:19
**100,000 (2)**
44:16;64:12
**100,000-plus (1)**
64:11
**11 (1)**
97:1
**1-1 (2)**
67:12,15
**11:33 (1)**
59:15
**12 (1)**
16:18
**12:01 (1)**
59:16
**123 (2)**
72:9,9
**132785 (1)**
30:12
**14 (1)**
46:24
**149 (1)**
85:16
**15 (1)**
6:5
**16 (3)**
30:10,12;104:2
**1-6 (1)**
104:3
**16-4006 (1)**
4:2
**16-4007 (1)**
4:3
**17 (2)**
46:24;47:3
**178 (2)**
12:11,13
**1946 (1)**
88:22

**2**

**2 (3)**
75:9;94:23;103:3
**2.3 (1)**
82:4
**2.4 (1)**
82:4
**2:03 (1)**

94:25
**2:24 (1)**
105:23
**20 (1)**
12:13
**2015 (2)**
89:16,20
**2017 (2)**
7:22;8:15
**2019 (2)**
16:21;84:25
**202 (1)**
94:11
**2020 (12)**
5:9,10;7:5,20,25;
9:24;13:25;14:5;26:9;
79:19;80:1;102:11
**2022 (2)**
95:24;98:11
**2023 (2)**
18:17;98:11
**207 (1)**
94:11
**22 (1)**
98:13
**23 (1)**
88:15
**23118541 (1)**
70:6
**24 (2)**
88:15;98:13
**24th (1)**
7:20
**260 (1)**
6:3
**266 (1)**
11:4
**26th (1)**
97:1

**3**

**3 (1)**
4:3
**353 (2)**
89:16,19
**362 (1)**
89:22
**364 (1)**
89:23
**37c1 (1)**
105:12
**38 (1)**
83:2
**387 (1)**
81:19

**4**

**4 (1)**
7:24
**40 (2)**
47:3;83:3

**40,000 (1)**
67:12
**400 (9)**
43:3,7,9,25;44:19;
74:17;81:18,20,24
**44 (1)**
83:6
**47 (1)**
83:6
**471 (9)**
29:13,21;30:3,15;
31:15;32:6,19;53:1,
21
**49.99 (2)**
32:23;55:2

**5**

**5 (1)**
11:6
**50 (1)**
83:17
**500,000-dollar (2)**
32:24;55:3
**55 (1)**
83:17

**6**

**687 (1)**
96:25

**7**

**7 (3)**
18:4,5,24
**702's (1)**
94:12
**782 (2)**
89:16,19

**8**

**8 (1)**
86:15
**80,000 (6)**
36:19;38:12,25;
61:9;63:8;78:18
**81,000 (1)**
96:9
**86,000 (1)**
36:5
**89,000 (2)**
35:15;36:6

**9**

**9 (1)**
86:22
**98 (4)**
86:13,23;87:19;
92:18
**99.999 (1)**

85:18