## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br>TELEXFREE, INC. and<br>TELEXFREE FINANCIAL, INC.,<br><br>      Reorganized Debtors. | Chapter 11 Cases<br><br>14-40987-EDK<br>14-40988-EDK<br>14-40989-EDK<br><br>Substantively Consolidated |
| STEPHEN B. DARR, TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>      Plaintiff,<br>v.<br>FRANZ BALAN, A REPRESENTATIVE OF A<br>CLASS OF DEFENDANT NET WINNERS,<br>      Defendants. | Adversary Proceeding<br>No. 16-4006 |
| STEPHEN B. DARR AS TRUSTEE<br>OF THE ESTATES OF TELEXFREE, LLC,<br>TELEXFREE, INC. and TELEXFREE<br>FINANCIAL, INC.,<br>      Plaintiff,<br>v.<br>MARCO PUZZARINI AND SANDRO PAULO<br>FREITAS, REPRESENTATIVES OF A CLASS<br>OF DEFENDANT NET WINNERS,<br>      Defendants. | Adversary Proceeding<br>No. 16-4007 |

## JOINT PRETRIAL MEMORANDUM

Stephen B. Darr, the Liquidating Trustee ("Trustee") under the confirmed plan of

reorganization of TelexFree LLC, TelexFree Inc., and TelexFree Financial Inc. (collectively,

"TelexFree" or the "Debtor"), and Franz Balan, Marco Puzzarini, and Sandro Paulo, as

representatives ("Class Representatives") of the Defendants Classes, respectfully submit their

joint pretrial statement.

### Attempts to Resolve the Dispute by Mediation

The parties have been engaging in good faith settlement negotiations and are continuing

to do so.

### Stipulated Facts

1. TelexFree purported to be a multi-level marketing company selling voice over

internet protocol ("VOIP") subscriptions, which could be used to make international telephone

calls over the internet.  In reality, TelexFree perpetrated a Ponzi and pyramid scheme.

2. On October 7, 2015, the Trustee filed a *Motion by Chapter 11 Trustee for Entry

of Order Finding that Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief* (the

"Ponzi Motion") [docket entry 623].

3. On November 22, 2015, the Court, after notice and hearing, entered an Order, as

amended on December 21, 2015, approving the Ponzi Motion and finding that:

> Each of the Debtors in these jointly administered cases operated a Ponzi and pyramid
> scheme.  This ruling is the law of the case in each of these jointly administered cases.
> [Docket entries no. 654, 668].

4. The Ponzi Motion also sought a determination that claims of participants in the

TelexFree operation ("Participants") be calculated and allowed based upon a Net Equity

determination, that is, the difference between amounts that a Participant invested into the scheme

and amounts that the Participant received.  On January 26, 2016, the Bankruptcy Court entered a

supplemental order respecting the Ponzi Motion [docket entry no. 687].  The supplemental order

provided that:

The claims amounts of Participants shall be determined on a Net Equity basis, which shall be defined as follows: the amount invested by the Participant into the Debtors' scheme, including amounts paid pursuant to Triangular Transactions, less amounts received by the Participants from the Debtors' scheme, including amounts received pursuant to Triangular Transactions ("<u>Net Equity</u>").

5.      Members, or Participants, earned credits by several methods, including selling VOIP plans, publishing internet advertisements for TelexFree, and recruiting other Participants into the plan.

6.      Credits could be redeemed for cash, used to purchase additional memberships for that Participant or another Participant, or transferred to other Participants.

7.      Each time that a Participant purchased a VOIP plan or a membership plan, a user account was created ("<u>User Account</u>").   It was common for an individual Participant to have numerous User Accounts ("<u>User Account Cluster</u>").

8.      The TelexFree database did not have a mechanism to link User Accounts attributable to a single Participant into a User Account Cluster.

9.      In order to establish each Participant's Net Equity, the Trustee established a process for aggregating User Accounts for each Participant.

10.     Each time that a User Account was opened, a unique representative identification number or "<u>Rep ID</u>" was assigned.   The Rep IDs were issued in ascending numerical order. Consequently, the lowest Rep ID number within a User Account Cluster ("<u>Lowest Rep ID</u>") would represent the first User Account opened in such cluster.

11.     A Participant could open a User Account in one of two ways.   The first method involved the Participant making a payment directly to TelexFree to purchase a User Account.   A Participant could also redeem credits for cash directly from TelexFree. The foregoing transactions are referred to collectively as "<u>Direct Transactions.</u>"

12.    Alternatively, a Participant could acquire a membership plan through what is referred to as a "Triangular Transaction."

13.    In a Triangular Transaction, a recruiting Participant would redeem their accumulated credits in satisfaction of the purchase price of a membership plan for the recruited Participant.  TelexFree would then issue the membership plan to the recruited Participant.  The recruited Participant did not pay cash to TelexFree in a Triangular Transaction.

14.    Participants engaged in a third type of transaction, referred to as "Credit Transfers," which did not involve the purchase or sale of a TelexFree membership plan.

15.    In a Credit Transfer, one Participant would transfer some of their accumulated credits to another Participant.  TelexFree charged a Participant three (3) credits in order to implement the Credit Transfer on the TelexFree books and records.

16.    The Trustee used the transactional data for the User Account Clusters to compute the alleged Net Winnings or Net Losses for a Participant.

17.    TelexFree utilized a database referred to as SIG to track Participant activity.  The Participants' activity recorded by SIG included the acquisition and use of credits, Credit Transfers, the acquisition of membership plans through Direct Transactions and Triangular Transactions, and the identification of counterparties to each Triangular Transaction and Credit Transfer.

18.    Dr. Cameron Freer and Borelian Corporation ("Borelian"), on behalf of the Trustee, prepared a Report opining as to the appropriate methodology for the aggregation of User Account Clusters.

19.   On July 21, 2023, the Class Defendants filed a *Motion to Exclude Testimony of Dr. Cameron E. Freer as Inadmissible under Daubert* ("Daubert Motion") [docket no. 442 in A.P. 16-4006].

20.   The Court held an evidentiary hearing on the Daubert Motion on October 10, 2023, October 11, 2023, and October 30, 2023.

21.   On October 30, 2023, the Court entered an order denying the Daubert Motion, finding that "Dr. Freer's testimony meets the standard of Fed. R. Evid. 702" [docket no. 497 in A.P. 16-4006].

22.   Dr. Freer's testimony concerns a methodology for aggregating User Account Clusters from which Net Winners can be calculated.

### Facts to be Litigated

Whether the Lowest Rep ID is an appropriate mechanism to establish the identity of a Participant who is the owner of a User Account Cluster.

Whether the SIG data used by Borelian has sufficient integrity and reliability.[1]

Whether the assumptions made by the Trustee in computing the alleged amount of the Net Winnings, including any assumptions concerning the inclusion or exclusion of transfers of credits between Participants in the computation of Net Winnings and any assumptions made with

---

[1] The Trustee objects to Defendants' attempt to re-litigate the issue of SIG reliability as follows. Both experts testified extensively on SIG reliability issues (Freer Methodology – Step 1). The Court accepted Dr. Freer's report into evidence over the Defendants' FRE 702 objection. Because the Court has already determined that Dr. Freer's opinion testimony is based on "sufficient facts or data" (FRE 702(b)), SIG data reliability has necessarily been resolved in the Trustee's favor, and is now law of the case.

respect to the treatment of Triangular Transactions in the computation of alleged Net Winnings, are reasonable.

Whether Net Winner Defendants may be presumed to have received payment from a recruited Participant, while serving as a recruiting Participant in a Triangular Transaction, in an amount equal to the price of the membership plan purchased by the recruited Participant.

If the Credit Transfers are determined to constitute a component of Net Winnings, whether the Participant transferring credits may be presumed to have received payment from the transferee Participant in an amount equal to the credits purchased, on the basis of $1 being equal to 1 credit.

### Issues of Law to be Determined

Whether Credit Transfers are properly considered to be a component of Net Winnings for each Net Winner Defendant.

### Brief Summary of the Plaintiff's Case

#### I.     Use of Lowest Rep ID

The use of the Lowest Rep ID by the Trustee to determine the ownership of a User Account Cluster is reasonable and supported by the data.   Jean Sorondo of Huron compiled the information from the User Account Clusters established by Borelian into an Excel spreadsheet, demonstrating that the name associated with the Lowest Rep ID in a User Account Cluster had a high correlations with the most frequently appearing name in that cluster.  When each User Account Cluster was sorted from Lowest Rep ID to the highest Rep ID, in approximately eighty percent (80%) of cases, the name in a User Account Cluster associated with the Lowest Rep ID was an identical match to the most frequently appearing name in that User Account Cluster. The percentage match between the name for the Lowest Rep ID and the most frequently

appearing name in a cluster increased to approximately eighty-nine percent (89%), when the names were compared by taking all characters in the first name before a blank space appeared at the end, and all characters in the last name before a space appeared at the beginning.

The majority of the remaining eleven percent (11%) of User Account Clusters, while not identical, in most instances reflected a close match between the Lowest Rep ID name and the most frequently appearing name.

The Trustee concluded based upon this information that the use of the Lowest Rep ID to identify the owner of a User Account Cluster was reasonable.

## II.    Treatment of Triangular Transactions

The Trustee's presumption that cash was paid by a recruited Participant to a recruiting Participant in a Triangular Transaction in determining Net Winnings was reasonable.

As earlier discussed, the credits were a form of currency in the TelexFree Ponzi scheme. The credits could be, and were often, redeemed with TelexFree for par (one dollar for one credit). It would therefore logically follow that if a recruiting participant were to use 1,000 credits to open a User Account for a recruited participant, that the recruiting participant would expect to receive $1,000. As acknowledged in the *Supplemental Rebuttal Expert Report of Joshua W. Dennis*, the proposed expert for the Defendant Class Representatives:

> 174. It defies economic logic that one Participant would simply give Credits to another Participant without financial consideration in return (particularly in these large sums) given that Credits could be converted into cash through Direct Receipts or, much more frequently, Triangular Transactions.

The Trustee expects to introduce testimony of Participants of having made payments to recruiting Participants in a Triangular Transaction equal to the cost of the membership plan purchased. The Trustee further expects to introduce evidence from proofs of claim filed

whereby Participants attested under oath that they paid the membership invoices to a recruiting Participant when the claimant engaged in Triangular Transactions.

While there may have been circumstances where recruiting participants in a Triangular Transaction redeemed their credits for less than par, or as a gift, which the Trustee has accounted for, there is sufficient evidence to establish a pervasive course of conduct whereby the recruited Participant paid cash to the recruiting Participant in an amount equal to the membership plan purchased, and that the recruiting Participant redeemed credits in a like amount to satisfy the membership invoice.

Based upon the Trustee's submissions, it is reasonable to conclude that the Trustee has met his burden of establishing his *prime facie* case that cash was exchanged when membership plans were purchased through a Triangular Transaction in an amount equal to the credits redeemed in such transaction.

 To the extent that Net Winners failed to document their Triangular Transactions, the Class Representatives seek to hold the Trustee responsible for the lack of recordkeeping to establish their Net Losses or Net Winnings:

> Moreover, individual Participants likely do not have comprehensive receipts or records to prove just how much money they put into or received from the Telexfree system. Many transactions were done using cash, and Participants usually did not keep detailed records.
> Summary Judgment Motion, at p. 23

The class defendants should not be able to escape liability to the Trustee based upon a failure to maintain adequate books and records.  See *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Company*, 782 F.3d 353, 362 (7th Cir. 2015), and cases cited therein. This is particularly so in the present case, where the order certifying the Defendant Classes instructed class counsel

to provide notice to all Class Defendants of the need to preserve evidence with respect to their activity with TelexFree.

Finally, because the monies paid through Triangular Transactions were included in the computation of the claims of Net Losers, fairness dictates that the estate should have a countervailing claim against Net Winners for amounts received through Triangular Transactions. Otherwise, the estate's pool of allowed claims would have been artificially inflated, and the Net Losers would be deprived of the right to participate in recoveries from the Net Winners. Because the First Circuit Court of Appeals has determined that monies paid pursuant to a Triangular Transaction constitutes property of the estate, if the Trustee is unable to pursue such claims, the victims will be left without recourse.

### III.    Exclusion of Credit Transfers

The Trustee's exclusion of payments by and between Participants in Credit Transfer in determining Net Winnings was reasonable.

The Net Equity formula does not contemplate the inclusion of monies paid or received in Credit Transfers.  Such inclusion would be legally unsupportable, inconsistent with the computation of the claims of Net Losers, and would impair the rights of individual Participants to pursue their direct claims against other Participants.

The Trustee has always distinguished Credit Transfers from Triangular Transactions, and with good reason.  As referenced above, the Trustee commenced the Dos Santos Litigation to resolve the competing rights of the bankruptcy estate and the PIEC to pursue claims arising from monies paid in Triangular Transactions.  The First Circuit Court of Appeals concluded that TelexFree had a property interest in the funds paid pursuant to Triangular Transactions, and that the Trustee was the proper party to pursue such claims.  *Darr v. Dos Santos (In re TelexFree,*

*LLC)*, 941 F.3d 576 (1st Cir. 2019).  The Credit Transfers are different in substance from the Triangular Transactions.  In a Credit Transfer, no invoice was issued by TelexFree.  No membership plan was provided by TelexFree and no membership fee was due to TelexFree.  The transaction was strictly a purchase, sale, and transfer or credits between two private participants, in which TelexFree had no economic stake, other than a nominal $3 administrative charge.  TelexFree had no right to receive, and no obligation to pay, funds in a Credit Transfer.

The Net Equity formula approved by the Court distinguishes between Triangular Transactions and Credit Transfers because they are different in-kind.  The Net Equity formula expressly references and includes monies paid or received pursuant to Triangular Transactions but no such reference is made to Credit Transfers.  The maxim *expressio unius est exclusio alterius* mandates that when parties identify specific items in a document, any items not so listed are appropriately excluded.  *Lohnes v. Level 3 Communs., Inc*., 272 F.3d 49, 61 (1st Cir. 2001).

The exclusion of amounts paid or received in Credit Transfers, was followed by the Trustee in computing the Net Losses of individual participants in the claims resolution process.  The continued implementation of this formula in the computation of Net Winnings would be consistent with, and complementary to, the process already employed in the claims resolution process.

Inclusion of the Credit Transfers in computing Net Winners and Net Losers would also be inconsistent with established Ponzi scheme case law and the individual rights of participants to pursue their own direct, as opposed to derivative, claims.

## IV.   Expert Testimony

The Trustee does not need the services of an expert witness to establish a basis for determining ownership of a User Account Cluster, nor to calculate Net Winnings.   Lay witness testimony is sufficient for these purposes.

The Trustee determined to use the Lowest Rep ID to identify ownership of a User Account Cluster based upon the summary of the User Account data prepared by Jean Sorondo of Huron.  Mr. Sorondo, by inputting data into Excel spreadsheets, was able to establish a high correlation between the name associated with the Lowest Rep ID and the most prevalent name in a User Account Cluster.  The Trustee used this information to form opinions based upon his perception to assist in determining a fact in issue, without recourse to scientific, technical or specialized knowledge.

The Trustee determined how to compute Net Equity in accordance with the order of the Court, based upon a review of the TelexFree data and his understanding of the TelexFree Ponzi scheme.  The efforts of Huron in this regard were limited to: (i) determining the fields of data in the TelexFree database that were needed to compute monies paid and received in Direct Transactions and monies presumed to be paid and received in Triangular Transactions; and (ii) performing the mathematical calculation of Net Equity based upon the amounts in the aforementioned data fields.  The Trustee consulted with counsel in concluding that, as a matter of law, Credit Transfers should be excluded from the computation of Net Equity.

The Class Representatives' assertion that an expert is required to testify as to the inclusion of Triangular Transactions in the computation of Net Equity and the exclusion of Credit Transfers in the computation of Net Equity is wrong.

The Trustee has administered the case, including the resolution of claims, distribution of funds, and computation of Net Winnings, based upon the presumption that a recruited participant paid cash to a recruiting participant, on a dollar for dollar basis, when purchasing a membership plan through a Triangular Transaction. This presumption was based upon the Trustee's initial interviews with employees of, and Participants in, TelexFree and upon discussions with the Department of Homeland Security.

In February and March 2023, the Trustee conducted depositions of numerous Participants to inquire further as to the mechanics of the Triangular Transactions. In numerous instances, the Participants confirmed that it was customary for a recruited Participant to pay cash to a recruiting participant when acquiring a membership plan through a Triangular Transaction in an amount equal to the cost of such membership plan.

## Brief Summary of the Defendants' Case

### A. Data Unreliability

The Trustee does not intend to call *any* fact witnesses who can testify as to the reliability of the SIG data used to compute alleged Net Winnings or authenticate the date. The only witness whose testimony the Trustee intends to use on this issue is John Soares, an agent in the Department of Homeland Security, who seized the data *after* TelexFree ceased operations. Mr. Soares has no personal knowledge as to the reliability of the SIG data, and thus he lacks competence to testify on this issue. To the extent he has any relevant knowledge about the inner workings of the SIG database, it is second-hand information gleaned through interviews and thus hearsay. The Trustee's other witnesses similarly lack personal knowledge as to the reliability or completeness of the SIG data. Accordingly, whether there were intrinsic flaws in the data or there was any after-the-fact tampering or alteration of the data prior to the involvement of the

federal government cannot be established by any fact witness whom the Trustee intends to call.

For these reasons, the Trustee fails in his predicate of using the SIG data for the truth of the

matter.

### B.  The Flawed Net Equity Calculations

In calculating "Net Equity," the Trustee is required to consider: (a) "the amount invested"

by a Participant in TelexFree (b) "less amounts received" by a Participant (c) "from the

TelexFree scheme." It is clear in this case, as in all other Ponzi scheme cases in general, that the

sole barometer of "amounts" invested or received is actual cash. Any reliance on the fictional

and fraudulent credits to establish Net Equity "would be carrying the fiction to a fantastic

conclusion." *S.E.C. v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *40

(S.D.N.Y. Nov. 29, 2000), *aff'd,* 290 F.3d 80 (2d Cir. 2002), quoting *Cunningham v. Brown*, 265

U.S. 1, 13 (1924); *Teletronics, Ltd. v. Kemp,* 649 F.2d 1237, 1241 (7th Cir.1981). Additionally,

the Trustee must consider all cash that changed hands as part of the scheme, not some of the

transactions, while ignoring others.

The Trustee fails to meet his burden. First, the Trustee presents no evidence or testimony

reflecting how much cash each Participant invested nor how much cash each Participant

received. The Trustee's two primary witnesses (Jean-Louis Sorondo and Stephen Darr) ***both lack***

***personal knowledge*** to testify as lay witnesses to the net amounts of cash that any Participant

received. Neither of them ever observed a single cash transaction, nor has any personal

knowledge of the practices or cash collections of even one of the 80,000, alleged Net Winners.

Given that the Trustee has no experts to offer who can analyze the SIG data, any second-hand

analysis of non-experts conducted for the purposes of litigation is inadmissible. The testimony of

Mr. Sorondo and Mr. Darr in particular are based on "understandings" that they obtained via

unattributed hearsay as part of this litigation or in anticipation of it. Mr. Sorondo's entire

testimony arises not from some ground level knowledge of TelexFree but rather from his

enlistment as an expert in this litigation to fill a gap in Dr. Freer's analysis related to Net Equity

and Participant identity. S*ee MSP Recovery Claims, Series LLC v. Plymouth Rock Assurance

Corp., Inc.*, No. 18-CV-11702-ADB, 2023 WL 2633907, at *2 (D. Mass. Mar. 24, 2023), citing

*Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011). All of Mr.

Sorondo's knowledge in this case derives from tests, analysis, and conclusions all "at the request

of Counsel." Sorondo Aff. ¶ 3. All of Mr. Sorondo's knowledge was acquired from the Trustee's

involvement in litigation, not apart from it.  Sorondo Aff. ¶ 2. Mr. Darr similarly relies on

hearsay, referring to undocumented "discussions" with Homeland Security and an affidavit from

a federal agent as key sources of his knowledge of the TelexFree scheme.

The best the Trustee can do is show that some Participants exchanged cash directly with

TelexFree, but the Trustee concedes that these transactions account for only 12% of the overall

Net Equity alleged.[2] In reality, the Trustee avoids relying on cash transactions because total

liability based on direct transactions is minimal. Thus, the Trustee is forced to speculate as to

what amounts of cash changed hands in unrecorded fashion to provide the eye-popping liability

numbers in this case. While the SIG data may inferentially suggest that a Participant may have

used a specific amount of credits to pay invoices in so-called Triangular Transactions, there is

unrebutted testimony that often the amount of credits translated into less cash or even no cash.

Franz Balan, for example, will testify about collection problems and the reality that promotors

were increasingly competing for a relatively smaller pool of new recruits who lacked the funds to

pay the face amount of membership plans. These realities caused promotors in practice to receive

---

[2] Motion for Entry of Order that Debtors Engaged in Ponzi Scheme at 10.

much smaller amounts than suggested by the SIG data. Indeed, Benjamin Argueta, who allegedly received more than $4 million, will testify without rebuttal that he derived no appreciable profits participating in TelexFree.

Second, the Trustee fails to account for all cash transactions relating to the TelexFree scheme. Specifically, the Trustee is seeking approval of the Court to ignore instances where a Participant gave cash to another Participant not as a Triangular Transaction but to purchase credits for purposes such as setting up additional User Accounts or performing subsequent Triangular Transactions. In both instances, a Participant is investing actual cash into the TelexFree scheme. Yet, the Trustee treats these situations inconsistently by including one type of inter-participant transfer (Triangular Transactions) in Net Equity but ignoring the other (Credit Transfers). It makes no economic or logical sense that Participants would demand precise amounts of cash in one form of transaction but give away credits for free in another. The exclusion of Credit Transfers is hugely impactful, artificially inflating the alleged Net Equity of Class Defendants by approximately $600 million. Once again, the unrebutted testimony of Participants is that they did not obtain credits for free. Franz Balan, in particular, will testify that Participants could not earn credits fast enough to have sufficient reserves to pay invoices to engage in Triangular Transactions. Thus, to "monetize" credits to recruit a large number of Participants, promoters had to "buy" credits. These cash purchases had the overall effect of dramatically lowering Net Equity. The Trustee's effort to ignore credit purchases is thus an example of overreach intended to grossly inflate liability.

In sum, neither Mr. Sorondo nor Mr. Darr possess any "personal knowledge acquired before any litigation had begun." *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 112–13 (1st Cir. 2003) (citing Fed. R. Civ. P. 26(a)(2)(B)). Rather, they base their "understandings" solely on

hearsay, speculation, and the instructions provided by counsel as to which types of transactions

to include and which transactions to ignore.

## Name, Address, and Number of Each Witness

**Plaintiff:**

| Witness | Contact Information |
|---|---|
| **John S. Soares** | Senior Special Agent \| National Program Manager<br>Homeland Security Investigations<br>c/o Lincoln S. Jalelian<br>Assistant Chief Counsel / Embedded Attorney<br>Homeland Security Investigations, New England<br>U.S. Department of Homeland Security<br>Thomas P. O'Neill, Jr. Federal Building<br>10 Causeway Street<br>Boston, MA 02222 |
| **Manuel Fernando Lemus** | President<br>UFCW LOCAL 1445<br>30 Stergis Way<br>Dedham, MA 02026<br>617-201-9033 |
| **Jean-Louis Sorondo** | Financial Advisory Sr. Director<br>Huron Consulting Group Inc.<br>c/o Murphy & King PC<br>28 State Street, Suite 3101<br>Boston, MA  02109<br>617-423-0400 |
| **Stephen Darr** | Trustee of the Estates of Telexfree<br>c/o Murphy & King PC<br>28 State Street, Suite 3101<br>Boston, MA  02109<br>617-423-0400 |
| **Benjamin Argueta** | c/o Wendy Mead, Esq.<br>Wendy M. Mead, PC<br>11 Pleasant Street, Ste 130<br>Worcester, MA 01609<br>508-751-0200 |

| Witness | Contact Information |
|---|---|
| **Ana Rosario Ramos Cordon** | c/o Wendy Mead, Esq.<br>Wendy M. Mead, PC<br>11 Pleasant Street, Ste 130<br>Worcester, MA 01609<br>508-751-0200 |
| **Amilcar Lopez Garcia** | 94 Broadway St.<br>Somerville, MA 02145<br>617-777-6781 |
| **Bruno Graziani** | 80 Lilac Circle<br>Marlborough, MA 01915<br>978-235-2365 |

**Defendant:**

| Witness | Contact Information |
|---|---|
| **Frantz Balan** | Class Representative<br>c/o Ilyas J. Rona, Esq.<br>Milligan Rona Duran & King LLC<br>28 State Street, Suite 802<br>Boston, Massachusetts 02109<br>(617) 395-9570 |
| **Joshua Dennis** | Expert Witness<br>c/o Ilyas J. Rona, Esq.<br>Milligan Rona Duran & King LLC<br>28 State Street, Suite 802<br>Boston, Massachusetts 02109<br>(617) 395-9570 |
| **Rosmery Torrico** | 30 Nobscot Road, Unit 20<br>Sudbury, MA 01776 |
| **Benjamin Argueta** | c/o Wendy Mead, Esq.<br>Wendy M. Mead, PC<br>11 Pleasant Street, Ste 130<br>Worcester, MA 01609<br>508-751-0200 |
| **Sandro Paul Freitas** | Class Representative<br>c/o Ilyas J. Rona, Esq.<br>Milligan Rona Duran & King LLC<br>28 State Street, Suite 802<br>Boston, Massachusetts 02109<br>(617) 395-9570 |

| Witness | Contact Information |
|---|---|
| **Marco Puzzarini** | Class Representative<br>c/o Ilyas J. Rona, Esq.<br>Milligan Rona Duran & King LLC<br>28 State Street, Suite 802<br>Boston, Massachusetts 02109<br>(617) 395-9570 |
| **Flavio Boffetti** | *Address unknown* |

### Witnesses to be Presented by Deposition

**Plaintiff:**

i.    Ingrid Laplanche: February 15, 2023
ii.   Ivan Alvarenga: February 15, 2023
iii.  Rudeidamia Calcano: February 15, 2023
iv.   Arismendy Alexandry Disla: February 21, 2023
v.    Martiza Elizabeth Garcia: February 21, 2023
vi.   Selvi Vanessa Lewis Reynaga: February 22, 2023
vii.  Andre Trajano De Costa Silveira: February 23, 2023
viii. Suellen Schmidt: February 24, 2023
ix.   Bruno Graziani: March 16, 2023 (if unavailable to testify)

**Defendant:**

i.    Rosmery Torrico, January 19, 2023
ii.   Benjamin Argueta, March 16, 2023
iii.  Ella Maria Reid, February 22, 2023
iv.   Arismendy Alexandry Disla, February 21, 2023
v.    Selvi Vanessa Lewis Reynaga, February 23, 2023
vi.   Amilcar Frederico Lopez Garcia, March 16, 2023
vii.  Jean Louis Sorondo, December 7, 2023
viii. Stephen Darr, December 20, 2023

## List of Exhibits

**Plaintiff:**

*Previously admitted exhibits which will be offered if the need arises:*

| Ex. No. | Description |
|---------|-------------|
| P-001 | April 29, 2022 Expert Report of Dr. Cameron E. Freer, including exhibits |
| P-001.1 | USB drive containing Freer Report Exhibit 6, aggregation_output.csv, and Freer Report Exhibit 7, aggregation_summary.csv |
| P-001.2 | Excerpts from Freer Exhibit 6, aggregation_output.csv |
| P-002 | May 22, 2023 Reply Report of Dr. Cameron E. Freer, including exhibits |
| P-003 | CV of Dr. Cameron Freer |
| P-004 | USB drive containing Account Table (*representante*) |
| P-005 | Field Description Table (*10ksample.xlsx*), the "reference" tab |
| P-006 | USB drive containing Summary Table (*rep_id_summary*) |
| P-007 | Borelian Aggregation Methodology code execution instructions |
| P-008 | A. Ferrante and J. Boyd. A transparent and transportable methodology for evaluating Data Linkage software. *Journal of Biomedical Informatics* 45, no. 1: 165-172, 2012. |
| P-009 | Charpentier, Bertrand. Multi-scale clustering in graphs using modularity. Master's thesis, KTH, 2019 |
| P-010 | Christen, P. (2011). A survey of indexing techniques for scalable record linkage and deduplication. IEEE Transactions on Knowledge and Data Engineering, 24(9), 1537-1555 |
| P-011 | D. Cai, N. Ackerman, and C. Freer. Priors on exchangeable directed graphs, Electronic Journal of Statistics, 10, no. 2, 3490–3515, 2016. |
| P-012 | Enamorado, T., Fifield, B., and Imai, K. (2019). Using a probabilistic model to assist merging of large-scale administrative records. *American Political Science Review*, 113(2), 353-371 |
| P-013 | F. Saad, N. Ackerman, C. Freer, and V. Mansinghka. A family of exact goodness-of-fit tests for high-dimensional discrete distributions, Proceedings of the 22nd International Conference on Artificial Intelligence and Statistics, PMLR 89, 1640–1649, 2019. |
| P-014 | Fellegi, I. P. and Sunter, A. B. (1969). A theory for record linkage. Journal of the American Statistical Association, 64(328), 1183-1210. |
| P-015 | N. Ackerman, C. Freer, and D. Roy. On the computability of conditional probability, Journal of the ACM 66, no. 3, 23:1–23:40, 2019. |
| P-016 | Olivier Binette and Rebecca C. Steorts, (Almost) All of Entity Resolution, arXiv:2008.04443,2022 |

19

| Ex. No. | Description |
|---------|-------------|
| P-017 | P. Christen, *Data Matching*, Data-Centric Systems and Applications, Springer-Verlag, 2012. |
| P-018 | P. Christen. Data linkage: The big picture. *Harvard Data Science Review*, 1(2), 2019. |
| P-019 | R. Linacre, *Splink and the Open Source Dividend*, March 9, 2023. Retrieved from https://www.robinlinacre.com/open_source_dividend/ |
| P-020 | R. Linacre, *The Intuition Behind the Use of Expectation Maximisation to Train Record Linkage Models,* October 14, 2022. Retrieved from https://www.robinlinacre.com/em_intuition/ |
| P-021 | Tom Jackson, Caris Greyson, Ian Rickard and Andromachi Tseloni. Data First: Criminal Courts Linked Data. An exploratory analysis of returning defendants and the potential of linked criminal courts data from 2011 to 2019 in England and Wales. Ministry of Justice Analytical Series, UK Ministry of Justice, 2022. |
| P-022 | William E. Winkler and Yves Thibaudeau. *An application of the Fellegi-Sunter model of record linkage to the 1990 US decennial census.* US Bureau of the Census, 1991 |
| P-023 | Winkler, W. E. Using the EM Algorithm for Weight Computation in the Fellegi-Sunter Model of Record Linkage, American Statistical Association, *Proceedings of the Section on Survey Research Methods,* 667-671 (1988) |
| P-024 | Y. Zhu, Y. Matsuyama, Y. Ohashi, and S. Setoguchi. When to conduct probabilistic linkage vs. deterministic linkage? A simulation study. Journal of Biomedical Informatics 56 (2015): (80-86). |
| P-025 | "Portuguese name" (https://en.wikipedia.org/wiki/Portuguese_name) |
| P-026 | "RFC 2822" (https://datatracker.ietf.org/doc/html/rfc2822) |
| P-027 | DL1 INC. (001098948) on https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?sysvalue=WhUPoood4i5N_.888WGoiFsKd7tj6NldVysifMSuXQA- |
| P-028 | DLX FINANCIAL LLC (201036310329) on https://bizfileonline.sos.ca.gov/search/business |
| P-029 | Qualtrics, Sample size calculator, April 12, 2023. Retrieved from https://www.qualtrics.com/blog/calculating-sample-size/ |
| P-030 | SHAL GROUP LLC (201134810007) on https://bizfileonline.sos.ca.gov/search/business |
| P-031 | Supplemental Order Respecting Motion by Chapter 11 Trustee for Entry of Order Finding That Debtors Engaged in Ponzi and Pyramid Scheme and Related Relief [A.P. No. 14-40987, Doc. 687], January 26, 2016. |
| P-032 | An Interactive Introduction to the Fellegi-Sunter Model for Data Linkage/Deduplication. Retrieved from https://www.robinlinacre.com/intro_to_probabilistic_linkage/ |

| Ex. No. | Description |
|---------|-------------|
| P-033 | Freer Presentation, DM-001 - DM-064 |
| P-034 | O. Benjelloun, H. Garcia-Molina, D. Menestrina, Q. Su, S. E. Whang, J. Widom, *Swoosh, a Generic Approach To Entity Resolution,* The VLDB Journal, 2009. |

*Exhibits the Plaintiff expects to offer:*

| Ex. No. | Description |
|---------|-------------|
| P-035 | Affidavit of John S. Soares |
| P-036 | Table joining of Freer customer ID field in the aggregation-summary table to the matching rep ID field in the source data table containing a list of 81,681 net winners, the non-public version of Exhibit A to the Sorondo Affidavit |
| P-037 | A list comparing the most frequent names in each cluster to the lowest rep ID, Exhibit B to the Sorondo Affidavit |
| P-038 | Summary of queries to the "back office" to reflect changes in credits as U.S. currency on a one-to-one basis, Exhibit C to the Sorondo Affidavit |
| P-039 | TelexFree Demo Video |
| P-040 | Borelian Clustered Account Details and Net Equity for Benjamin Argueta |
| P-041 | Transaction Net Equity Summary for Benjamin Argueta |
| P-042 | Third Party Transaction Partners for Benjamin Argueta |
| P-043 | Net Equity Transaction Details for Benjamin Argueta |
| P-044 | Credit Transaction Summary for Benjamin Argueta |
| P-045 | Credit Transfer Partners for Benjamin Argueta |
| P-046 | Credit Transfer Transaction Details for Benjamin Argueta |
| P-047 | Argueta Exemplar Triangle Invoices, Exhibit 1 marked at the deposition of Benjamin Argueta on March 16, 2023 |
| P-048 | Argueta Tax Returns, Exhibit 2 marked at the deposition of Benjamin Argueta on March 16, 2023 |
| P-049 | Benjamin Argueta Banking Records: BARGUETA00001-0175, BARGUETA00180-0372 |
| P-050 | Borelian Clustered Account Details and Net Equity for Ana R Ramos |
| P-051 | Transaction Net Equity Summary for Ana R Ramos |
| P-052 | Third Party Transaction Partners for Ana R Ramos |
| P-053 | Net Equity Transaction Details for Ana R Ramos |
| P-054 | Credit Transaction Summary for Ana R Ramos |
| P-055 | Credit Transfer Partners for Ana R Ramos |
| P-056 | Credit Transfer Transaction Details for Ana R Ramos |
| P-057 | Ramos Bank Statements, Exhibit 1 marked at the deposition of Ana Rosario Ramos Cordon on March 16, 2023 |

| Ex. No. | Description |
|---|---|
| P-058 | Credit Card Authorization Forms, Exhibit 2 marked at the deposition of Ana Rosario Ramos Cordon on March 16, 2023 |
| P-059 | Ana R Ramos 2012-2015 Tax Returns: ARAMOS00004-0029 |
| P-060 | Borelian Clustered Account Details and Net Equity for Amilcar Lopez |
| P-061 | Transaction Net Equity Summary for Amilcar Lopez |
| P-062 | Third Party Transaction Partners for Amilcar Lopez |
| P-063 | Net Equity Transaction Details for Amilcar Lopez |
| P-064 | Credit Transaction Summary for Amilcar Lopez |
| P-065 | Credit Transfer Partners for Amilcar Lopez |
| P-066 | Credit Transfer Transaction Details for Amilcar Lopez |
| P-067 | Deposits, Exhibit 1 marked at the deposition of Amilcar Lopez Garcia on March 16, 2023 |
| P-068 | Triangle Transaction Graphic, Exhibit 2 marked at the deposition of Amilcar Lopez Garcia on March 16, 2023 |
| P-069 | Amilcar Lopez 2012-2015 Tax Returns: ALOPEZ00002-0021 |
| P-070 | Telex Information: ALOPEZ00022-0038 |
| P-071 | Borelian Clustered Account Details and Net Equity for Bruno Graziani |
| P-072 | Transaction Net Equity Summary for Bruno Graziani |
| P-073 | Third Party Transaction Partners for Bruno Graziani |
| P-074 | Net Equity Transaction Details for Bruno Graziani |
| P-075 | Credit Transaction Summary for Bruno Graziani |
| P-076 | Credit Transfer Partners for Bruno Graziani |
| P-077 | Credit Transfer Transaction Details for Bruno Graziani |
| P-078 | Graziani Exemplar Invoices, Exhibit 1 marked at the deposition of Bruno Graziani on March 16, 2023 |
| P-079 | Bruno Graziani 2011-2015 Tax Returns: BGRAZIANI00004-0093 |
| P-080 | Profit and Loss Telexfree LLC (January-December 2012) |
| P-081 | Profit and Loss Telexfree LLC (January-December 2013) |
| P-082 | Triangle Transaction Graphics, Exhibit 1 marked at the deposition of Ivan Alvarenga on February 15, 2023 |
| P-083 | Selected Portions of the Supplemental Rebuttal Expert Report of Joshua W. Dennis |
| P-084 | 2013-10-15 Check - Helio Barbosa (exhibit provided to Defendants on May 15, 2024; Plaintiff presumes exhibit is subject to objection) |

**Defendant:**

| Ex. No. | Exhibit Description |
|---------|--------------------|
| D-001 | Rebuttal Expert Report Joshua W. Dennis, and all exhibits to the report (July 31, 2020) |
| D-002 | Supplemental Rebuttal Expert Report Joshua W. Dennis, and all exhibits to the report (April 14, 2023) |
| D-003 | Affidavit of Frantz Balan dated July 30, 2020 |
| D-004 | Affidavit of Lusette Balan dated July 29, 2020 |
| D-005 | Affidavit of Ilyas J. Rona dated (ECF No. 443) |
| D-006 | Stipulation Respecting the Amended Fee Arrangement for Defendants dated January 4, 2022 |
| D-007 | Email string Cameron Freer and Andrew Lizotte dated November 2-3, 2021 - BC002512-18 |
| D-008 | SIG account data for Rosmery Torrico |
| D-009 | EPOC data for Rosmery Torrico |
| D-010 | SIG account data for Ella Maria Reid |
| D-011 | EPOC data for Ella Maria Reid |
| D-012 | SIG account data for Benjamin Argueta |
| D-013 | SIG account data Amilcar Lopez |
| D-014 | Lopesa Services Advertisement appearing in La Planeta (4/12/2012) |
| D-015 | "claim_statement" Table |
| D-016 | Exhibit 1 to Freer Deposition - Curriculum Vitae of Cameron Freer |
| D-017 | Exhibit 3 to Freer Deposition - E-mail Chain, Sorondo to Freer, 7/10/21 |
| D-018 | Exhibit 4 to Freer Deposition - E-mail Chain, Sorondo to·Freer, 7/18/21 |
| D-019 | Exhibit 5 to Freer Deposition - E-mail Chain, Sorondo to·Freer, 7/13/21 |
| D-020 | Exhibit 6 to Freer Deposition - E-mail Chain, Freer to·Sorondo, 7/13/21 |
| D-021 | Exhibit 7· to Freer Deposition - E-mail Chain, Sorondo to Freer, 7/14/21 |
| D-022 | Exhibit 8 to Freer Deposition - E-Mail Chain, Lizotte to Freer, 11/3/21 |
| D-023 | Exhibit 9 to Freer Deposition - E-mail Chain, Lizotte to Freer, 11/3/21 |
| D-024 | Transcript of Video Evidentiary Hearings: Determining the Admissibility and Presumptive Effect of the Aggregation Methodology in Determining Net Winners before The Honorable Melvin S. Hoffman, J.U.S.B.C. (Volume 1 - 11/23/2020) |
| D-025 | Transcript of Video Evidentiary Hearings: Determining the Admissibility and Presumptive Effect of the Aggregation Methodology in Determining Net Winners before The Honorable Melvin S. Hoffman, J.U.S.B.C. (Volume 2- 11/24/2020) |
| D-026 | Memorandum of Decision on Class Defendants'Motion to Exclude Expert Witness Testimony of Timothy Martin |
| D-027 | Curriculum Vitae of Joshua W. Dennis |
| D-028 | List of Documents Considered by Joshua W. Dennis |
| D-029 | User Accounts and Participants by Entity and Type |

| Ex. No. | Exhibit Description |
|---|---|
| D-030 | Summary of TelexFree Net Equity by Tier and Transaction Type |
| D-031 | Summary of TelexFree User Accounts and Participants by Tier |
| D-032 | Summary of TelexFree Top Net Losers Matched to Net Winners |
| D-033 | Top 100 TelexFree Net Losers |
| D-034 | Top 100 TelexFree Net Winners |
| D-035 | Top Net Loser and Matched Net Winner User Account Detail |
| D-036 | Frantz Balan & Lusette Balan User Account Detail |
| D-037 | Alphabet User Account Detail |
| D-038 | Billybob Arbonne User Account Detail |
| D-039 | Lopes & Carreiro User Account Detail |
| D-040 | Zaglia & Ragolia User Account Detail |
| D-041 | Rejane & Paulo Marinho User Account Detail |
| D-042 | Maria Neves User Account Detail |
| D-043 | Sann Devaconcelos User Account Detail |
| D-044 | Oscar Sosa User Account Detail |
| D-045 | Claimed Account Aggregations |
| D-046 | Example Credit Transfer Detail |
| D-047 | Brandon Zagarella affidavit dated 10/25/2020 |
| D-048 | TelexFree Bankruptcy Petition |
| D-049 | Exhibit A-1 to Notice of Proposed Resolution of Claim Amount of Claim Filed with Portal: Name of Creditor: Edivaldo Alves Reis Claim Number: 66876-000 |
| D-050 | SIG account data for Edivaldo Reis |
| D-051 | EPOC data for Edivaldo Reis |
| D-052 | Peter Christen, Data Matching (2012) |
| D-053 | SIG account data for Dani Goes |
| D-054 | American Greed TV Episode: "Billion Dollar Fraud Goes Viral" (excerpts) |
| D-055-D-085 | Additional Dennis Exhibits |
| D-086 | Dennis VOIP Chart.pdf |
| D-087 | 433_Balan New Scheduling Order 2.28.23.pdf |
| D-088 | PROPAY0001079-80.pdf |
| D-089 | Rosmery Torrico, 01-19-2023 full.pdf |
| D-090 | TelexFREE Training - How To Register [LOIXSSyExTk].mp4 |
| D-091 | How To Sign Up A Customer In Telex ENGLISH [sMX0Ju-Trxg].mp4 |
| D-092 | TelexFREE Training - How To Log Into Your Customer Back Office [Ftw3k2KpA_s].mp4 |
| D-093 | SIG account data for Cluster ID 521747 |
| D-094 | SIG account data for Cluster ID 104205 |
| D-095 | SIG account data for Cluster ID 178992 |

| Ex. No. | Exhibit Description |
|---------|---------------------|
| D-096 | SIG account data for Cluster ID 256429 |
| D-097 | SIG account data for Cluster ID 4005896 |
| D-098 | SIG account data for Graca Luisa |
| D-099 | SIG account data for Cluster ID 6270770 |
| D-100 | SIG account data for Cluster ID 4545010 |

**Confirmation that Parties Have Exchanged Exhibits**

The parties confirm that they have exchanged proposed exhibits.

**Intent to Present by Certification Records of Regularly Conducted Business Activity**

At the present time, the Trustee does not intend to present any such documents.

Respectfully submitted,

STEPHEN B. DARR, LIQUIDATING
TRUSTEE,
By his counsel:

Dated:  May 15, 2024                     /s/ Andrew G. Lizotte
                                         Charles R. Bennett, Jr. (BBO #037380)
                                         Andrew G. Lizotte (BBO #559609)
                                         Alexandra M. Papas
                                         MURPHY & KING,
                                         Professional Corporation
                                         28 State Street, 31st Floor
                                         Boston, MA  02109
                                         Telephone: (617) 423-0400
                                         ALizotte@murphyking.com

DEFENDANT CLASS REPRESENTATIVE
FRANTZ BALAN
By his counsel,


 /s/ Ilyas J. Rona
Ilyas J. Rona, Esq. (BBO #642964)
Michael J. Duran, Esq. (BBO #569234)
MILLIGAN RONA DURAN & KING LLC
28 State Street, Suite 802
Boston, Massachusetts 02109
(617) 395-9570
ijr@mrdklaw.com


DEFENDANT CLASS REPRESENTATIVES
MARCO PUZZARINI AND SANDRO PAULO
FREITAS,
By counsel,


  /s/ Ilyas J. Rona
Ilyas J. Rona, Esq. (BBO #642964)
Michael J. Duran, Esq. (BBO #569234)
MILLIGAN RONA DURAN & KING LLC
28 State Street, Suite 802
Boston, Massachusetts 02109
(617) 395-9570
ijr@mrdklaw.com


832277

## CERTIFICATE OF SERVICE

I, Andrew G. Lizotte, hereby certify that on May 15, 2024, I caused a copy of foregoing

*Joint Pretrial Memorandum* to be served electronically through the Court's ECF System upon

the registered participants as identified on the Notice of Electronic Filing.


Dated:  May 15, 2024                    /s/ Andrew G. Lizotte_____
                                        Andrew G. Lizotte